IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-141C
(Senior Judge Smith)

SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA,
ATLANTIC RICHFIELD COMPANY, and TEXACO, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7562
Facsimile: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

April 17, 2006

## TABLE OF CONTENTS


STATEMENT OF THE ISSUE .................................................................................... 1

STATEMENT OF THE CASE AND SUMMARY OF PLAINTIFFS' CLAIMS ........................ 1

ARGUMENT .......................................................................................................... 3

THE AVGAS CONTRACTS DID NOT - AND COULD NOT - INDEMNIFY THE OIL COMPANIES AGAINST UNKNOWN FUTURE COSTS ............................. 3

I. Legal Standards .................................................................................... 3

II. The Avgas Contracts Unambiguously Provided Only For Price Adjustments, Not For Indemnification By The Government ................................ 5

A. Contract Provisions ........................................................................ 5

B. The Avgas Contracts Do Not Entitle Plaintiffs To Recover ...................... 9

C. The ADA Bars Relief, In Any Event ..................................................... 13

CONCLUSION ..................................................................................................... 14

# TABLE OF AUTHORITIES

## CASES

ABC Plastics, Inc.,
323 F.3d 695 (8th Cir. 2003) .......... 4

Beazer E., Inc. v. Mead Corp.,
34 F.3d 206 (3d Cir. 1994) .......... 5

Briscoe v. LaHue,
663 F.2d 713 (7th Cir. 1981) .......... 2

California-Pac. Utils. Co. v. United States,
194 Ct. Cl. 703 (1971) .......... 5, 13

Castleberry v. Goldome Credit Corp.,
418 F.3d 1267 (11th Cir. 2005) .......... 4

Cherry Cotton Mills, Inc. v. United States,
327 U.S. 536 (1946) .......... 2

Commander Oil Corp. v. Advance Food Serv. Equip.,
991 F.2d 49 (2d Cir. 1993)) .......... 4, 11

Conley v. Gibson,
355 U.S. 41 (1957) .......... 3

Corbitt v. Diamond M. Drilling Co.,
654 F.2d 329 (5th Cir. 1981) .......... 10

Cortec Indus., Inc. v. Sum Holding, L.P.,
949 F.2d 42 (2d Cir. 1991) .......... 4

E.I. Du Pont de Nemours & Co. v. United States,
365 F.3d 1367 (Fed. Cir. 2004) .......... 5, 10, 14

Ford Motor Co. v. United States,
378 F.3d 1314 (Fed. Cir. 2004) .......... 10, 14

Franconia Assocs. v. United States,
61 Fed. Cl. 335 (2004) .......... 1

Hanson v. United States,
13 Cl. Ct. 519 (1987) .......... 2

Haskell v. Time, Inc.,
857 F. Supp. 1392 (E.D. Cal. 1994) ........ 4

Hercules Inc. v. United States,
516 U.S. 417 (1996) ........ 5, 14

Johns-Manville Corp. v. United States,
12 Cl. Ct. 1, 22-25 (1987) ........ 14

Lindsay v. United States,
295 F.3d 1252 (Fed. Cir. 2002) ........ 3

Mattes v. ABC Plastics, Inc.,
323 F.3d 695 (8th Cir. 2003) ........ 4

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) ........ 10

Rosenzweig v. GSA,
299 F.2d 22 (Emer. Ct. App. 1961) ........ 2

Rumsfeld v. Freedom NY, Inc.,
329 F.3d 1320 (Fed. Cir.) ........ 13

Schism v. United States,
316 F.3d 1259 (Fed. Cir. 2002) ........ 4

Teagardener v. Republic-Franklin Inc. Pension Plan,
909 F.2d 947 (6th Cir. 1990) ........ 4

United States v. Bestfoods,
524 U.S. 51 (1998) ........ 12

STATUTES

28 U.S.C. § 1631 ........ 2

31 U.S.C. § 1341 ........ 5

41 U.S.C. § 101 ........ 2

41 U.S.C. § 113 ........ 2

MISCELLANEOUS

GAO, Principles of Federal Appropriations Law, 1992 WL 700351 ........................................ 14

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941) ................................................ 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | No. 06-141 C (Senior Judge Smith) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

Pursuant to Rule 12(a) and (b)(6) of the Court's Rules ("RCFC"), defendant, the United States, respectfully requests the Court to dismiss the amended complaint for failure to state a claim upon which relief could be granted. The Government relies solely upon the allegations of the complaint, this brief, and the attached exemplar contract.

### STATEMENT OF THE ISSUE

Whether the Court should dismiss the amended complaint upon the grounds that plaintiffs' World War II fuel supply contracts contain no promises of indemnity and do not impose upon the Government any reimbursement obligations that could survive by decades the end of plaintiffs' contracts in the 1940s.[1]

### STATEMENT OF THE CASE AND SUMMARY OF PLAINTIFFS' CLAIMS

Plaintiffs (collectively, the "Oil Companies") filed this lawsuit on February 24, 2006. The complaint contains two counts, seeking monetary relief for breach of contract and violation

---

[1] The four plaintiffs appear to be improperly joined. See Franconia Assocs. v. United States, 61 Fed. Cl. 335, 336-37 & n.1 (2004) (string-citing cases rejecting proposition that RCFC 19(a) "may be construed to allow joinder of parties having only 'similar' claims, for example, breach of contract claims based on the same form contract") (emphasis added). We have opted not to request the Court to sever plaintiffs at this time, however, because improper joinder does not bar a grant of relief upon the merits and can be cured at any time. See RCFC 21.

of the Contract Settlement Act of 1944 ("CSA"), 41 U.S.C. § 101 et seq., respectively. Compl. ¶¶ 22-29. The Oil Companies previously filed the breach claim in this Court in Shell Oil Co. v. United States, No. 05-704C, which was a case transferred from the United States District Court for the Central District of California, pursuant to 28 U.S.C. § 1631.

Any jurisdictional connection to the district court litigation was forever severed, however, when the Oil Companies voluntarily dismissed their complaint in No. 05-704C in September 2005, in order to pursue the "termination claim" procedures of the CSA. See 41 U.S.C. § 113; Compl. ¶¶ 20-21. The complaint before the Court is, therefore, a freestanding CSA lawsuit.

The Oil Companies allege, and we agree, that, between them, they entered into 10 individual contracts between January 1942 and May 1943 with the Defense Supplies Corporation ("DSC"), a component of the Reconstruction Finance Corporation ("RFC"), to supply aviation-grade, 100-octane gasoline ("avgas") for military use. Compl. ¶ 9.[2] Plaintiffs allege that, "[w]ith the exception of certain provisions not pertinent to this action, the Avgas Contracts are substantially identical in all relevant respects." Id. The latter allegation is a legal conclusion, however, and is entitled to no presumption of truth under RCFC 12. E.g., Hanson v. United States, 13 Cl. Ct. 519, 530 (1987) (citing Briscoe v. LaHue, 663 F.2d 713 (7th Cir. 1981)).

We have attached to this motion a copy of one of the avgas contracts, dated May 1, 1943, between the DSC and plaintiff Shell Oil Company. All parties possess, from the California

---

[2] Although created as "corporations," the RFC and its subsidiaries were funded by appropriations and functioned as Federal agencies. See Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539 (1946). The DSC's functions and obligations that are pertinent here were transferred to the RFC in July 1945 and, in turn, to the General Services Administration when the RFC was abolished in 1957. See Rosenzweig v. GSA, 299 F.2d 22, 24-25 nn.4 & 5 (Emer. Ct. App. 1961).

district court litigation, copies of the nine other avgas contracts cited in the complaint and can submit them for the record on request.

The Oil Companies claim they are entitled to reimbursement under their 1942 and 1943 avgas contracts for costs, including litigation costs and Comprehensive Environmental Response, Compensation and Liability Act of 1978 ("CERCLA") response costs, that they have incurred since 1991, or may incur, as the result of a release of hazardous substances from a sludge dump in Fullerton, California (the "McColl site"). Compl. ¶¶ 2, 16-19. The district court in Central California held the Oil Companies liable for CERCLA cleanup costs upon the grounds that, in the course of producing avgas during World War II, each of the companies generated acid sludge that was then deposited at the McColl site, among other places. See id. ¶¶ 17-19.

## ARGUMENT

## THE AVGAS CONTRACTS DID NOT – AND COULD NOT – INDEMNIFY THE OIL COMPANIES AGAINST UNKNOWN FUTURE COSTS

### I. Legal Standards

Dismissal for failure to state a claim is warranted "when the facts asserted by the claimant do not entitle [it] to a legal remedy . . . accept[ing] all well-pleaded factual allegations as true and draw[ing] all reasonable inferences in the claimant's favor." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002); see Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Because, pursuant to RCFC 10(c), contracts that form the basis of a claim for relief are considered part of the pleadings, and because contract interpretation is an issue of law, the Court is free to consider the attached, sample Shell contract (and any other avgas contract alleged in the complaint) without converting this motion into a summary judgment motion. E.g., Mattes

v. ABC Plastics, Inc., 323 F.3d 695, 698 & n.4 (8th Cir. 2003); Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42 (2d Cir. 1991). The Oil Companies cannot avoid responding to a motion to dismiss by resting upon bare allegations in their complaint that they entered into written contracts with the Government, while withholding those written contracts, upon which plaintiffs "relied . . . in framing the complaint . . . ." Id. at 47-48; accord Teagardener v. Republic-Franklin Inc. Pension Plan, 909 F.2d 947, 949-50 (6th Cir. 1990) ("[T]he language of the Plan, and the arguable meanings of its terms, were central to the plaintiffs' complaint, and were part of the pleadings before the district court."); Haskell v. Time, Inc., 857 F. Supp. 1392, 1397-98 (E.D. Cal. 1994).

The Court will construe unambiguous contract terms according to their ordinary meaning and without reference to extrinsic evidence. Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc). At the same time, outside the insurance context, an alleged promise of indemnification "is strictly construed, and a duty to indemnify should not be found 'absent manifestation of a clear and unmistakable intent to indemnify.'" Castleberry v. Goldome Credit Corp., 418 F.3d 1267, 1272 (11th Cir. 2005) (quoting Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51 (2d Cir. 1993)) (internal quotation marks omitted).

Although contracts of indemnity executed before the enactment of modern environmental laws may encompass CERCLA response costs, in order to do so, the indemnity must be "specific enough to include CERCLA liability or general enough to include any and all environmental liability . . . ." Beazer E., Inc. v. Mead Corp., 34 F.3d 206, 210 (3d Cir. 1994), quoted in E.I. Du Pont de Nemours & Co. v. United States, 365 F.3d 1367, 1373 (Fed. Cir. 2004).

Finally, in Federal Government contracts, an indeterminate or open-ended indemnity is void and unenforceable under the Anti-Deficiency Act ("ADA"), 31 U.S.C. § 1341, unless

specifically authorized by Congress. Hercules Inc. v. United States, 516 U.S. 417, 426-27 (1996); California-Pac. Utils. Co. v. United States, 194 Ct. Cl. 703, 715 (1971) (per curiam). The ADA, enacted in Public Law 59-28, 34 Stat. 27, 49 (1906), bars Federal officials, in pertinent part, from entering into "a contract or obligation for the payment of money before an appropriation is made [to satisfy the obligation] unless authorized by [another] law." 31 U.S.C. § 1341(a)(1)(B). By definition, no appropriation can exist to satisfy an open-ended obligation. See California-Pac., 194 Ct. Cl. at 715.

## II. The Avgas Contracts Unambiguously Provided Only For Price Adjustments, Not For Indemnification By The Government

The Oil Companies are attempting to convert straightforward (albeit unusually generous) pricing terms in their World War II fuel supply contracts into indemnification provisions promising them reimbursement by the Government 60 years after contract performance.

We demonstrate below that plaintiffs' reading of the contracts is unsustainable for multiple reasons. To summarize, (i) the contracts contain no language of indemnity; (ii) even if they are construed as promising indemnification, the contracts do not provide for recovery of the type of costs sought here, or for recovery at this late date, or in this manner; and (iii) even if construed in the manner plaintiffs propose, the contracts would contain an open-ended indemnity that would be void ab initio under the ADA, because the DSC lacked statutory authority to bind the Government to such an obligation and the Oil Companies do not allege that the Government ever ratified any such unauthorized commitment, pursuant to the CSA.

### A. Contract Provisions

The language of the avgas contracts differs from the standard clauses in Part 52 of the Federal Acquisition Regulation ("FAR") and thus merits discussion and quotation at some

length. The agreements were intended to ensure availability of 100-octane gasoline for military use during World War II. The contracts contain 17 numbered sections, not all of them used in every contract. We base the following discussion upon the attached Shell contract. (To the extent the Oil Companies are mistaken in alleging that every avgas contract is "identical in all relevant respects" to the every other contract, Compl. ¶ 9 – or wish to reconsider the argument – differences among contracts would militate toward severing plaintiffs. RCFC 19(a), 21.)

In section I of the contracts, the suppliers promised to promptly expand their refining capacities by specified volumes, subsidized in part by the Government. See Attach. 1-3 (sample Shell contract). Section II established the amounts of avgas to be delivered and the terms of delivery. Id. at 3-7. Section III gave the DSC an option to purchase additional quantities of fuel beyond its estimated requirements. Id. at 7.

Section IV, "Price and Payment," established the supplier's base price per gallon of fuel, which would typically decline by a few cents if deliveries exceeded a certain volume. Id. at 7-9. Subsection IV(d) is pertinent here, as it provided that the DSC would

> pay . . . not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month . . ., Seller shall render to Buyer a statement setting forth the total quantity of aviation gasoline delivered during the preceding month, the price per gallon of each individually priced quantity, and the total amount to be paid therefor. . . .

Id. at 9.

Section V, "Price Escalation," contains one of the key provisions upon which the Oil Companies rely. This section provides for adjustments of the base price per gallon – both before and after the beginning of fuel deliveries – corresponding to movements in (a) crude oil prices at particular locations and (b) wholesale price indexes (the particulars of which are not germane).

With apologies for an extended block quotation, subsection V(d) is at the heart of the case and deserves to be set forth in full. (Some of the words quoted below do not appear in some avgas contracts.) We underscore the words quoted selectively in paragraph 14 of the complaint.

> The base prices specified in Sections IV(a) and IV(b) hereof are based upon present normal methods of transporting petroleum raw materials to Seller's refineries at [specified locations] and upon a normal operation of said refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refineries by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or <u>if by reason of any cause or condition</u> (whether or not of the same class or kind) <u>resulting directly or indirectly from the from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining that 100 octane aviation gasoline sold at such base prices is increased in respects other than those corrected by the adjustment of the base prices under the above paragraphs (a), (b), and (c), of this Section V, Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase such prices paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost.</u> If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does no[t] elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) year[s'] experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the

> production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

Id. at 11-12 (emphasis added).

Section VI of the contracts established a three-year term, with an option for the DSC to renew "for two (2) successive yearly periods beyond the original term" upon 90 days' notice. Id. at 12. (Plaintiffs allege that their contracts were terminated "[a]t the end of World War II," i.e., in 1945 or later. Compl. ¶ 11.) Section VII is omitted from the Shell contract, but, in some contracts, provided for the DSC to extend loans to the seller in order to fund the construction of avgas production facilities.

Section VIII contains two subsections relating to damages. Subsection (a), not pertinent here, provides that disputes regarding the quantities that the seller is required to deliver, or the DSC is required to accept, "shall" be resolved by arbitration (see section XI). Pursuant to subsection VIII(b), "Damages under this contract shall be limited to those arising proximately from a breach of contract." Id. at 12-13.

Sections IX, X, and XI – "Deliveries and Inspections," "Force Majeure," and "Arbitration," respectively – are fairly routine commercial provisions that do not appear relevant to this case. Id. at 13-16. (The avgas contracts permit, but do not require, the Oil Companies to request arbitration of price disputes. Plaintiffs opted not to request arbitration.)

In addition to section V(d), quoted above, the Oil Companies rely in their complaint upon section XII, "Taxes," and specifically, subsection XII(a). See Compl. ¶ 13. That subsection provides:

> (a) Buyer shall pay in addition to the prices as established in Sections IV and V thereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or

> federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost . . . .

Attach. 16-17. Subsection XII(b) is a parallel provision concerning "now existing taxes, fees, or charges" and, therefore, does not apply here. Id. at 17 (emphasis added). Subsection (c), also inapplicable, places the burden upon the DSC to obtain rulings from tax authorities to secure any tax exemptions to which the Government believed the supplier was entitled. Id.

Four of the five remaining contract sections relate to matters of contract administration that are immaterial here (XIII, "Notices"; XV, "Assignability"; XVI, "Statutory Compliance"; and XVII, "Right to Terminate," which permitted only the seller to terminate within 90 days of contract execution, under limited circumstances). Id. at 17-19. Section XIV, finally, is an integration clause providing in pertinent part that "[t]his instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein." Id. at 18.

B. The Avgas Contracts Do Not Entitle Plaintiffs To Recover

The plain language discussed above does not obligate the Government to reimburse the Oil Companies for environmental liabilities or litigation costs incurred several decades after the avgas contracts were signed and performed.

To begin at the most general level, construed properly as a whole, see, e.g., McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996), the avgas contracts unambiguously provided for the contract price to be determined contemporaneously with contract performance. Thus, price escalation formulas were applied automatically (§ V); the supplier was obligated to present a bill for fuel delivered during a calendar month within 10 days

of the end of that month and the Government was required to pay for the fuel on or before the 20th day (§ IV); and any adjustments in price or in quantity under section V(d), as the result of interruption in "the normal functioning of [a] refinery," were intended to occur promptly – ordinarily in fewer than 10 days, but in no case in more than approximately one month, even in the event of arbitration.

Nothing in the contracts' pricing provisions supports the Oil Companies' view that the amount of payment owed to them for the avgas they delivered could remain open and unresolved for decades into the future. Indeed, although no "special words" are required to create a promise of indemnification, e.g., Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 334 (5th Cir. 1981), the total absence of any mention in the avgas contracts of future costs, claims, or liabilities – much less of any intent to "hold [the Oil Companies] harmless," see Du Pont, 365 F.3d at 1370, or to protect the contractor against "unknown" liabilities, see Ford Motor Co. v. United States, 378 F.3d 1314, 1319 (Fed. Cir. 2004) – should preclude a finding that the Government "clear[ly] and unmistakabl[y]" promised in the 1940s to reimburse the Oil Companies for costs incurred in the 1990s and beyond. Commander Oil, 991 F.2d at 51.

Neither of the two specific contract provisions relied upon in the Oil Companies' complaint – sections V(d) and XII(a) – contains a promise of indemnity (unmistakable or otherwise) which supports the Oil Companies' claims. Section V(d), quoted above, provides in relevant part only that (i) if the state of war results in (ii) "interfere[nce] with" the "normal functioning" of the supplier's refinery, such that (iii) the contract's price escalators are inadequate, (iv) the Government may at its option elect either to (a) accept reduced deliveries or (b) negotiate (or arbitrate) an appropriate price increase on an expedited basis. Attach. 11-12.

The complaint does not allege, however, either that the Oil Companies' refineries failed to function "normal[ly]," or that abnormal functioning caused plaintiffs to incur the CERCLA-related costs they seek to recover. Furthermore, even assuming – although we disagree – that the complaint might be liberally construed as raising both of those indispensable allegations (i.e., abnormal functioning and cost causation), section V(d) still fails to support the Oil Companies' claims, since section V(d) required plaintiffs to offer the Government a timely choice between accepting reduced deliveries and paying higher prices – a choice that plaintiffs, for obvious timing reasons, never offered. (For reasons noted below, the option for the DSC to reduce its purchases, rather than uncontrollably increasing its expenditures for fuel, was required in order to conform with antideficiency principles.)

Section XII(a), concerning taxes and fees, is equally inapplicable here. That section, by its terms, covers only new costs (with exceptions not pertinent here) imposed by authorities at any level of Government "by reason of the production, manufacture or sale of commodities delivered hereunder." Attach. 16-17. As an initial matter, it is clear that this refers, in this context, to costs imposed during contract performance. Equally important, the Oil Companies can point to nothing in CERCLA that imposed any liabilities or costs upon them upon the grounds, or "by reason of" the fact, that they "produc[ed], manufacture[d], or s[old]" avgas.

CERCLA is, instead, a "sweeping" remedial statute designed to apportion the costs of cleaning up environmental contamination among all potentially responsible parties. United States v. Bestfoods, 524 U.S. 51, 56 n.1 (1998). CERCLA is generally silent with respect to the production or sale of particular products. And, by their own description, the Oil Companies are liable under CERCLA not "by reason of" the fact that they made avgas – they are liable by reason of the fact that they generated hazardous substances that were released into the

environment at the McColl site. See Compl. ¶¶ 17, 19. Plaintiffs would not have been liable under CERCLA, other things being equal, if they had refined and sold avgas, but had not disposed of acid sludge. See id. Conversely, they would still be liable under CERCLA, if they had disposed of acid sludge in the same manner, without producing any avgas. It follows that production and sale of avgas were neither necessary nor sufficient conditions of plaintiffs' liability under CERCLA.

Even assuming, for purposes of argument, that either section V or section XII could be construed as ambiguous with respect to the scope or duration of the Government's payment obligations, any uncertainty disappears when the pricing provisions of the avgas contracts are properly read alongside, and in harmony with, the contracts' unambiguous integration clause (§ XIV, Attach. 18), and the express limitation of damages to those "arising proximately from a breach" (§ VIII(b), Attach. 12-13). The Oil Companies do not, and cannot, allege that the Government proximately caused them to incur CERCLA costs by breaching the avgas contracts. The CERCLA costs arose, instead, from plaintiffs' own conduct. Similarly, the Government has not "breached" the price escalation provision (section V), since the Oil Companies do not allege that they ever offered to deliver less fuel – instead of raising their prices to recover additional costs – as that section of the contracts expressly requires. Attach. 11-12.

The Oil Companies are actually arguing, instead, that the amounts that they billed, and that the DSC duly paid, during the 1940s did not reflect the final or true prices for the avgas delivered. As demonstrated above, however, nothing in the language of the avgas contracts either requires or allows such ad hoc price reconciliation, decades after the fact. The contracts' integration clause (§ XIV, Attach. 18) also precludes finding such a right in side agreements. Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1328 (Fed. Cir.). The text of the avgas contracts

compels the conclusion that plaintiffs forfeited any possible claims for additional compensation by accepting, without objection, the prices that the DSC paid them, month after month. There is simply no language in these fuel supply contracts reflecting any agreement by the DSC to provide these sellers with a never-ending right to reimbursement.

C. The ADA Bars Relief, In Any Event

Finally, assuming such a sweeping indemnity could be found in the avgas contracts, it would be void and unenforceable. "The United States Supreme Court, the Court of Claims, and the Comptroller General have consistently held that absent an express provision in an appropriation for reimbursement adequate to make such payment [or other statutory authority], [the Anti-Deficiency Act] proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated." California-Pac. Utils., 194 Ct. Cl. at 710 (citing cases). "In plain English, you cannot purport [without authority] to bind the government to unlimited liability. The rule is not some arcane [Government Accountability Office] concoction." 2 GAO, Principles of Federal Appropriations Law ch. 6.c.1 (Dec. 1992), 1992 WL 700351, *14.

The Supreme Court listed in Hercules certain statutes that supersede the ADA by authorizing indefinite indemnification under specified circumstances. 516 U.S. at 428-29. None applies here.[3] More recently, the Court of Appeals for the Federal Circuit construed the Contract Settlement Act as authorizing the War Department to enter into, or "ratify," open-ended indemnity provisions when terminating World War II contracts pursuant to the CSA. Ford, 378

[3] To the extent the First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941), could have loosened antideficiency restrictions upon World War II spending, President Franklin D. Roosevelt expressly reimposed those restrictions when redelegating his war powers to agency heads in Executive Order No. 9001 (Dec. 27, 1941). See Johns-Manville Corp. v. United States, 12 Cl. Ct. 1, 22-25 (1987).

F.3d at 1319; Du Pont, 365 F.3d at 1373-74. (The Ford and Du Pont cases represent exceptions to the ADA bar that prove the rule.) Although the Oil Companies allege that their contracts were "terminated," Compl. ¶ 11, they do not even allege the existence of any CSA Termination Settlement Agreements, such as those in Ford and Du Pont, that allegedly contained any language agreeing to an open-ended indemnity. Cf. Ford, 378 F.3d at 1318-20.

Thus, even assuming the avgas contracts could be construed as the Oil Companies urge (an argument we rebutted above), in view of the absence of statutory authority for the DSC to agree to the supposed indemnity, the complaint would still fail to state a claim that the contracts obligate the Government to reimburse plaintiffs for their CERCLA-related costs.

## CONCLUSION

For the reasons above, we respectfully request the Court to dismiss the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/
DAVID M. COHEN
Director

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

April 17, 2006

CERTIFICATE OF FILING

I certify that on April 17, 2006, the attached motion was filed electronically. I understand that service is complete upon filing and that parties may access this filing through the Court's system.

s/Kyle Chadwick