CONFORMED COPY

67971

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

SHELL OIL COMPANY, INCORPORATED

(California Refineries - Second Contract)

100-OCTANE AVIATION GASOLINE

May 1, 1943

MAR 23 ENTD

Ex 83

DEFENDANT'S EXHIBIT 83

67971

DEFENSE SUPPLIES - SHELL CONTRACT

(California Refineries - Second Contract)

Revised January 19, 1944

CONTRACT made as of May 1, 1943, between SHELL OIL COMPANY, INCORPORATED, a Virginia corporation, having offices at 100 Bush Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5(d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of April 10, 1942, between the parties entitled "Contract between Defense Supplies Corporation and SHELL OIL COMPANY, INCORPORATED (California Refineries)" is hereby modified to the extent but only to the extent hereinafter expressed and shall otherwise remain in full force and effect. Said certain contract will be referred to hereinafter as "the prior California contract".

I. Expansion of Seller's Refining Facilities.

(a) Seller has existing facilities for the production at its Wilmington-Dominguez and Martinez, California, refineries of approximately four thousand (4,000) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 1 of Exhibit A attached hereto and made a part hereof, having previously expanded its existing facilities at a cost of approximately Two Million Dollars ($2,000,000.00) to increase its production from three thousand (3,000) barrels to four thousand (4,000) barrels per calendar day of said gasoline, and has under the prior california contract contracted to expand further the facilities at its Wilmington-Dominguez, refineries at an estimated cost of approximately Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00) to a degree which it is estimated will enable Seller to produce at its said refineries a total of approximately ten thousand (10,000) barrels per calendar day of said 100 octane aviation gasoline specified as Item 1 of Exhibit A hereof, or nine thousand five hundred (9,500) barrels per calendar day of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof.

(b) Seller is willing to make an additional expansion of its facilities at its Wilmington-Dominguez refineries at an estimated additional cost of

Ex 83
0544

NAW-0078-7497

approximately One Million Five Hundred Thousand Dollars ($1,500,000.00) to a degree which it is estimated will enable Seller to increase production at its Wilmington-Dominguez and Martinez refineries by two thousand one hundred (2,100) barrels per calendar day to a total of approximately eleven thousand six hundred (11,600) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof.

(c) Seller shall use its best efforts so to make the additional expansion of its facilities referred to in paragraph (b) of this Section I, to maintain work thereon day and night in so far as the requisite labor and materials are available, and to complete such additional expansion as soon as possible and not later than March 1, 1944.

(d) Seller represents that there has not been included in the estimated additional expenditures referred to in paragraph (b) of this Section I of approximately One Million Five Hundred Thousand Dollars ($1,500,000.00) any allowance for premium payments to secure earlier delivery of material, overtime, or bonus payments (all of which are herein called "bonus payments"). Seller will make or arrange for such bonus payments as will in its judgment substantially expedite the completion of the new facilities, and full and complete records of such payments shall be maintained and made available to Buyer. Buyer shall pay Seller the amount by which the actual cost of construction of the facilities for such additional expansions, including all such bonus payments, exceeds whichever is the greater of (a) the actual cost of construction of the additional facilities contemplated by this contract, excluding all bonus payments, and (b) One Million Five Hundred Thousand Dollars ($1,500,000.00).

(e) Such repayment of bonus payments shall be made by distributing the same as an addition to the unit price of the first seven hundred fifty thousand (750,000) barrels of 100 octane aviation gasoline purchased after the effective date of the notification referred to in Section II (a) hereof. If Buyer fails to purchase said quantity of seven hundred fifty thousand (750,000) barrels at such increased price on or before, February 28, 1945, Buyer, shall on or before March 20, 1945 pay to Seller the unpaid balance of such bonus payments, which shall be treated as an advance payment of a portion of the purchase price of the remainder of the seven hundred fifty thousand (750,000) barrels at the time the purchase of such remaining quantity is made at the increased price.

Ex 83

67971

(f) If Buyer shall notify Seller at any time that it does not desire that additional expenditures for bonus payments shall be incurred or that such additional expenditures should be limited in a specified way or to a specified amount, Seller shall endeavor to arrange for the termination of any contracts or commitments for such bonus payments to the extent indicated in such notice so as to reduce the liability of Buyer hereunder.

(g) As used above, the term "bonus payments" shall include any charges for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments.

(h) The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. <u>Sale and Storage of Products</u>.

(a) When the additional expansion of Seller's facilities referred to in paragraph (b) of Section I hereof shall be completed and ready for operation, Seller shall promptly notify Buyer.

(b) In lieu of the obligations under Section II (b) of the prior California contract, and subject to the provisions of Section IV (d) hereof, Seller shall sell and deliver and Buyer shall buy and receive the following aggregate quantities of 100 octane aviation gasoline which shall be in accordance with Item 2 of Exhibit A hereof prior to the effective date of the notification referred to in Section II (a) hereof and thereafter shall be in accordance with Item 3 of Exhibit A hereof:

(1) From and after the effective date of the notification referred to in Section II (a) of the prior California contract, until but not including the effective date of the notification referred to in Section II (a) hereof; such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez refineries from all the aforesaid facilities, excluding the aforesaid additional expansion, shall equal Seller's pro-rata share of the entire requirements

Ex 83



0546

NAW-0078-7499

of the United States Government, as hereinafter defined, but not less than six thousand (6000) barrels per calendar day;

(2) From and after the effective date of the notification referred to in Section II (a) hereof until the end of the original term of the prior California contract; such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez refineries from all the aforesaid facilities, including the aforesaid additional expansion, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than seven thousand eight hundred (7,800) barrels per calendar day;

(3) From and after the end of the original term of the prior California contract until midnight on February 28, 1947, such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez refineries from all the aforesaid facilities, including the aforesaid additional expansion, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than two thousand one hundred (2,100) barrels per calendar day;

(4) From and after midnight on February 28, 1947 until the end of the original term of this contract; two thousand one hundred (2,100) barrels per calendar day.

Ex 83

(c) Whenever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various grades of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various grades of gasoline. The damages, if any, for a breach of the foregoing provisions of paragraphs (a) and (b) of this Section II shall be in accordance with Section VIII hereof. Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with Seller's available refining facilities and Seller's available raw materials then capable of use in producing 100 octane aviation gasoline in accordance with said specifications other than those originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties or by arbitration in accordance with Section XI hereof. Deliveries of aviation gasoline of such other specifications shall not be suspended during such negotiations. Any agreement so reached shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(d) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100 octane aviation gasoline as the total refining capacity for 100 octane aviation gasoline at Seller's Wilmington-Dominguez and Martinez refineries, less the quantity of Seller's sales of 100 octane aviation gasoline from said refineries to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

Ex 83

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(g) From and after the effective date of notification referred to in Section II (a) hereof, Seller shall maintain storage facilities at, or in the vicinity of, its Wilmington-Dominguez refineries to accommodate an aggregate of at least six hundred thousand (600,000) barrels of 100 octane aviation gasoline produced under this contract and the prior California contract. Seller represents that it has, and agrees to maintain storage facilities at its Martinez refinery to accommodate at least sixty (60) days' full capacity production of 100 octane aviation gasoline at five hundred (500) barrels per day, which is the present production.

(h) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantity specified in paragraph (b) of this Section II. If, however, Seller shall produce during any such period of full storage any additional 100 octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof.

(i) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(j) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100 octane aviation gasoline stored at that time in the facilities referred to in

Ex 83

Section II (g) hereof to the extent of the difference between the quantity of aviation gasoline which Buyer is required to buy and receive and Seller to sell and deliver in accordance with Section II (b) hereof during the period of the contract, and the quantity actually purchased by Buyer and delivered by Seller during said period.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez refineries between the date of execution of this contract and the effective date of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez refineries in any of the facilities referred to in Section I hereof between the effective date of the notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (1) the quantity to be purchased by Buyer under the provisions of paragraph (b) of Section II hereof and (2) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) From January 1, 1943 until the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline specified as Item 2 of Exhibit A hereof purchased under the present contract and the prior California contract shall be thirteen and thirty-seven one-hundredths cents ($0.1337) per gallon, f. o. b. Seller's refineries at Wilmington-Dominguez and Martinez, California.

Ex 83, 7

(b) For deliveries from and after the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline specified as Item 3 of Exhibit A, hereof, purchased under the present contract and the prior California contract produced by Seller in Seller's facilities described in Section I hereof (together with components purchased from others) shall be:

(1) Thirteen and fifty hundredths cents ($0.1350) per gallon f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California, for such volume of said aviation gasoline delivered to Buyer, as does not exceed an average of eleven thousand six hundred (11,600) barrels per day from the date of first delivery hereunder in pursuance of notification referred to in Section II (a) hereof;

(2) Ten cents ($0.10) per gallon f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California, for such volume of said aviation gasoline delivered to Buyer as exceeds said average daily delivery of eleven thousand six hundred (11,600) barrels per day;

it being understood and agreed that at the end of each calendar month of the term hereof, the number of days elapsing in the period from and after commencement of delivery in pursuance of notification referred to in Section II (a) hereof (including the first day of delivery and the last day of such calendar month), shall be determined, and such total number of days shall be multiplied by eleven thousand six hundred (11,600) barrels, and settlement and payment for such calendar month shall be made by Buyer in such amount as will adjust and result in total payment for all deliveries during such period equalling thirteen and fifty hundredths cents ($0.1350) per gallon for the quantity so determined (if that quantity shall have been delivered), and ten cents ($0.10) per gallon for any excess thereof delivered; it being understood that in adjusting for delivery in any month below the base average of eleven thousand six hundred (11,600) barrels per calendar day by delivery during another month of a quantity in excess of said

Ex B 8

base average, escalation in accordance with Section V hereof of the base price of such excess quantity shall be at the rate applicable at the time of delivery of such excess; it being further understood that excesses which are applied to balance subsequent deficiencies below said base average shall be applied in the chronological order of the accumulation of such excesses;

(3) In no event shall Seller be entitled to a payment under this Section IV (b) to the extent that Seller has previously otherwise received reimbursement for losses incurred in selling 100 octane aviation gasoline at a base price of ten cents ($0.10) per gallon f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California.

(c) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture plus ten per cent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes. Seller also represents that there has not been included in its computation of such prices any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder.

(d) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the total quantity of aviation gasoline delivered during the preceding month, the price per gallon of each individually priced quantity, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

Ex 839

V. Price Escalation.

The base prices of 100 octane aviation gasoline purchased under the present contract and the prior California contract shall be subject to adjustment as follows and not in accordance with Section V of the prior California contract:

(a) The base prices specified in Sections IV (a) and IV (b) hereof are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven degree (27) A. P. I. Signal Hill crude deliverable to Seller in the Signal Hill Field. Such base prices shall be increased or decreased by a percentage thereof equal to one-half (½) the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) Prior to the effective date of the notification referred to in Section II (a) hereof, the base price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall also be increased or decreased by a percentage thereof equal to one-half (½) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-four and nine-tenths (94.9) (the final index number used in the prior California contract).

(c) From and after the effective date of the notification referred to in Section II (a) hereof until the expiration of this contract, the said base prices for 100 octane aviation gasoline set forth in Section IV (b) hereof shall also be increased or decreased by a percentage thereof equal to one-half (½) the percentage increase or decrease in such final monthly wholesale price Index Number over or under a calculated index figure which is the weighted average of nine thousand five hundred (9,500) barrels per calendar day at ninety-four and nine-tenths (94.9) and two thousand one hundred (2,100) barrels per calendar day at ninety-six and five-tenths (96.5) (the present final index number). The effective date of a change in price due to a change in the index numbers in paragraphs (b) and (c) of this Section V shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may

most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(d) The base prices specified in Sections IV (a) and IV (b) hereof are based upon present normal methods of transporting petroleum raw materials to Seller's refineries at Wilmington-Dominguez and Martinez, California, and upon a normal operation of said refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refineries by other than present normal methods thereby incurring additional cost of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining that 100 octane aviation gasoline sold at such base prices is increased in respects other than those corrected by adjustment of the base prices under the above paragraphs (a), (b), and (c), of this Section V, Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase such prices paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does no elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) year's experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the

Ex 8311

arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustments shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

(f) Section V (d) of the prior California contract is hereby cancelled and is of no force and effect.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later, in any event, than June 30, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect. Section VI of the prior California contract is hereby superseded and cancelled, except for the first sentence thereof.

VII. (Section Omitted).

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasoline in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities referred to in Section II (g) hereof are full of 100 octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to

take and pay for 100 octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (h) and V (d) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's said refineries in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on Board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments of 100 octane aviation gasoline purchased under the present contract and the prior California contract made from refineries and any other points where licensed inspectors are regularly available, Seller shall

furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (m) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of each delivery of a quantity of less than three thousand five hundred (3,500) gallons into a tank truck or motor transport in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States within which Seller customarily delivers gasoline from its Wilmington-Dominquez and Martinez Refineries, such service to be at the expense of Buyer and at Buyer's risk. Such expense shall be Seller's cost for such service. In the event of loss during the performance of such service, Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder and under the prior California contract, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such aviation gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

Ex 83

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefore by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrators as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other

than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery and cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram; except that the notice of completion of facilities referred to in Section II (a) hereof shall be deemed to be effective as of the date of completion of the facilities therein referred to. Each party shall immediately send to the other by regular mail confirming copies of any notice sent by

Ex 83₁₇

cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin, and will include a similar provision in all contracts entered into by it with others incidental to or in connection with this contract.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

67971

(c) Seller shall comply with requirements of the Walsh-Healy Act (41 USCA Sections 35-45) insofar as such Act is applicable to this transaction.

(d) Notwithstanding anything herein to the contrary this contract shall be subject to the provisions of Exhibit B attached hereto and made a part hereof.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days; (a) Seller shall have entered into satisfactory contracts, with responsible engineering contractors for the additional expansion of the facilities referred to in Section I (b) hereof at a cost not materially in excess of Seller's presently estimated additional cost as set forth in Section I (b) hereof; and (b) Seller shall have received (1) all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the additionally expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum; and (2) such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
President

ATTEST:

(Sgd) George H. Hubert
Assistant Secretary

(SEAL)

SHELL OIL COMPANY, INCORPORATED

By (Sgd) F. S. Clulow
Vice-President

ATTEST:

(Sgd) C. S. Gentry
Secretary

(SEAL)

Ex 83 19

67971

EXHIBIT A.

Item 1.

U. S. ARMY – NAVY SUPPLY

| | |
|---|---|
| AN-VV-F-781 | Sept. 26, 1940 |
| Amendment No. 3 | June 6, 1941 |
| Knock Test Method | AN-VV-F-746 |

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY – NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

Item 3.

U. S. ARMY – NAVY SUPPLY

| | |
|---|---|
| AN-F-28 | Dec. 23, 1942 |
| Amendment No. 1. | March 23, 1943 |

100 Octane Number by Method AN-VV-F-746, as amended Nov. 5, 1940, or 99 Octane Number by Method ASTM-D-357-41T, S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a March 23, 1943

Tetraethyl Lead Limit 4.0 cc/Gal.

Ex 83 20

67971

Contractor: Shell Oil Company, Incorporated

EXHIBIT B

RENEGOTIATION PURSUANT TO SECTION 403 OF THE SIXTH SUPPLEMENTAL NATIONAL DEFENSE APPROPRIATION ACT, 1942, AS AMENDED.

A. Upon the written request of Defense Supplies Corporation at such period or periods when in the judgment of Defense Supplies Corporation the profits accruing under the contract of which this Exhibit is a part can be determined with reasonable certainty, the contract price shall be renegotiated to eliminate therefrom such amount as is found as a result of such renegotiation to represent excessive profits.

B. Any profits found as a result of such renegotiation to be excessive and not eliminated through reductions in the contract price hereunder or otherwise shall, as Defense Supplies Corporation may direct, (1) be retained by the Government from amounts otherwise due the contractor, or (2) be repaid by the contractor to the Government, if such excessive profits have been paid to the contractor.

C. The contractor shall require the insertion of the following provisions in each subcontract described in subparagraph F(2)(ii) of this Exhibit and in each subcontract for an amount in excess of $100,000 described in subparagraph F(2)(i) of this Exhibit, directly entered into by the contractor under this contract:

(1) Upon the written request of Defense Supplies Corporation at such period or periods when in the judgment of Defense Supplies Corporation the profits accruing under this contract can be determined with reasonable certainty, the contract price shall be renegotiated by Defense Supplies Corporation and ______________ (Subcontractor) to eliminate therefrom such amount as is found as a result of such renegotiation to represent excessive profits.

(2) Any profits found as a result of such renegotiation to be excessive and not eliminated through reductions in the contract price hereunder or otherwise, shall, as Defense Supplies Corporation may direct, (i) be retained by ______________ (Contractor) for the Government, or (ii) be repaid by ______________ (Subcontractor) to the Government, if such excessive profits have been paid to ______________ (Subcontractor).

(3) ______________ (Contractor) is hereby relieved from any liability to ______________ (Subcontractor) on account of any amount retained or repaid pursuant to paragraph (2) above.

(4) ______________ (Subcontractor) shall, upon the direction of Defense Supplies Corporation, require the insertion in any subcontract made hereunder, of contract provisions conforming substantially to the provisions of this Exhibit.

(5) Any renegotiation under this Exhibit shall be conducted pursuant to the provisions of Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended.

The contractor shall also require the insertion of the definitions which are contained in subparagraph F of this Exhibit in each such subcontract.

Ex 83

D. Any profits under any subcontract hereunder which are found as the result of renegotiation to be excessive and which the contractor is directed by Defense Supplies Corporation to withhold from payments otherwise due the subcontractor and actually unpaid at the time of receipt of such direction, shall, as Defense Supplies Corporation may direct, (1) be retained by the Government from amounts otherwise due the contractor, or (2) be repaid by the contractor to the Government.

E. Any renegotiation under this Exhibit shall be conducted pursuant to the provisions of Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended.

F. For the purpose of this Exhibit,

(1) The term "Defense Supplies Corporation" shall be deemed to include any authorized representative of Defense Supplies Corporation, and

(2) The term "subcontract" means (i) any purchase order or agreement to perform all or any part of the work or to make or furnish any article, required for the performance of any other contract or subcontract, unless exempted from the provisions of Section 403, as amended, under subsection (i) thereof, or (ii) any contract or arrangement (other than a contract or arrangement between two contracting parties, one of which parties is found by Defense Supplies Corporation to be a bona fide executive officer, partner, or full-time employee of the other contracting party), (a) any amount payable under which is contingent upon the procurement of a contract or contracts with Defense Supplies Corporation or of a subcontract or subcontracts thereunder, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts, or (b) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with Defense Supplies Corporation or a subcontract or subcontracts thereunder. The term "article", as used in this definition, includes any material, part, assembly, machinery, equipment, or other personal property.

Ex 83 22

67971

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Shell Oil Company, Incorporated, to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 1, 1943.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles B. Henderson
Chairman

ATTEST:

(Sgd) A. T. Hobson
Acting Secretary

(SEAL)

Ex 8323

67971

GUARANTEE BY SHELL UNION OIL CORPORATION

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, Shell Union Oil Corporation, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Shell Oil Company, Incorporated, (a subsidiary of Shell Union Oil Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Shell Union Oil Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 1, 1943.

SHELL UNION OIL CORPORATION

By (Sgd) R. G. A. Van Der Woude
President

ATTEST:

(Sgd) F. W. Woods
Secretary

(SEAL)

Ex 83