**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 06-CV-141<br>(Senior Judge Smith) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)

June 30, 2006

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........................................ iii

INDEX TO APPENDIX ........................................ v

INTRODUCTION ........................................ 1

QUESTIONS PRESENTED ........................................ 8

STATEMENT OF THE CASE ........................................ 9

I. WORLD WAR II AVGAS PRODUCTION PROGRAM ........................................ 10

II. THE AVGAS CONTRACTS ........................................ 13

III. AVGAS PRODUCTION ........................................ 17

IV. THE CERCLA LITIGATION ........................................ 21

STANDARD OF REVIEW ........................................ 24

ARGUMENT ........................................ 24

I. THE AVGAS CONTRACTS UNAMBIGOUSLY REQUIRE THE GOVERNMENT TO REIMBURSE THE OIL COMPANIES FOR THE CERCLA CLEANUP COSTS ........................................ 24

A. The Reimbursement Clause Does Not Require that the New or Additional Costs Be Impose During Contract Performance ........................................ 26

B. The Oil Companies' CERCLA Cleanup Costs Were Incurred By Reason Of Their Production of Avgas in Performance of the Contracts ........................................ 27

C. The Contract Provision Requiring Limiting Damages To Those Arising Proximately From Breach of the Avgas Contracts Does Not Bar Recovery ........................................ 31

II. THE OIL COMPANIES' CLAIMS ARE NOT BARRED BY THE ANTI-DEFICIENCY ACT ........................................ 32

A. The First War Powers Act Authorized the Reimbursement Promises that the Government Made to the Oil Companies ........................................ 33

1. Executive Order 9024 ....................................................................33

2. Executive Order 9001 ....................................................................36

B. The National Defense Act of 1916 Authorized the Reimbursement Promises that the Government Made to the Oil Companies.......................................41

C. DSC's Charter and RFC's Enabling Legislation Authorized the Reimbursement Promises the Government Made to the Oil Companies...............43

CONCLUSION.........................................................................................................45

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) ....................24

*Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019 (9th Cir. 2002) .................... *passim*

*E.I. DuPont de Nemours v. United States*, 54 Fed. Cl. 361 (2002) ....................32, 38

*E.I. DuPont de Nemours & Co. v. United States*, 365 F.3d 1367 (Fed. Cir. 2004) ....................14, 5, 27, 28

*Federico v. United States*, 70 Fed. Cl. 378 (2006) ....................24

*Ford Motor Co. v. United States*, 378 F.3d 1314 (Fed. Cir. 2004).................... *passim*

*Huntington Cab Co. v. American Fidelity & Casualty Co.*, 155 F.2d 117 (4th Cir. 1946) ....................30

*International Paper Co. v. United States*, 282 U.S. 399 (1931) ....................7, 42, 43

*Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1 (1987) ....................38, 39

*Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144 (1991) ....................39

*Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584 (1st Cir. 2004) ....................29

*Rappold v. Indiana Lumbersmen's Mut. Ins. Co.*, 431 S.E.2d 302 (Va. 1993) ....................30

*Spirtas Co. v. Insurance. Co. of the State of Pa.*, No. 4:05CV100DDN, 2006 U.S. Dist. LEXIS 27498 (E.D. Mo. May 9, 2006) ....................29

*Udall v. Tallman*, 380 U.S. 1 (1965)....................39, 40

*United States v. Shell Oil Co.*, 841 F. Supp. 962 (C.D. Cal. 1993) ....................21

*United States v. Shell Oil Co.*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778 (C.D. Cal. Sept. 18, 1995) .................... *passim*

*United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018 (C.D. Cal. 1998) .................... *passim*

*United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002) .................... *passim*

**Statutes, Rules, and Regulations**

42 U.S.C. § 9607(a)(3) .......... 22

42 U.S.C. § 9613(f)(1) .......... 21

Act of Feb. 27, 1906, Pub. L. No. 59-28, 34 Stat. 27 (1906) .......... 32

National Defense Act of 1916, Pub. L. No. 64-85, 39 Stat. 166 (1916) .......... 11, 41

Reconstruction Finance Corporation Act, Pub. L. No. 72-2, 47 Stat. 5 (1932) .......... 14, 43

Reorganization Plan No. I of 1939, 53 Stat. 1423 (1939) .......... 37

Act of June 25, 1940, Pub. L. No. 76-664, 54 Stat. 572 (1940) .......... 14, 44

Act of June 10, 1941, Pub. L. No. 77-108, 55 Stat. 248 (1941) .......... 44

First War Powers Act of 1941, Pub. L. No. 77-354, 55 Stat. 838 (1941) .......... 33, 38, 39

Renegotiation Act of 1942, Pub. L. No. 77-528, 56 Stat. 226 (1942) .......... 15

Joint Resolution of June 20, 1945, Pub. L. No. 79-109, 59 Stat. 310 (1945) .......... 14

Act of Sept. 6, 1950, Pub. L. No. 81-759, 64 Stat. 595 (1950) .......... 32

Reorganization Plan No. 1 of 1957, 71 Stat. 647 (1957) .......... 14

RCFC 56(c) .......... 24

Exec. Order No. 9001, 6 Fed. Reg. 6787 (Dec. 27, 1941) .......... 36

Exec. Order No. 9024, 7 Fed. Reg. 329 (Jan. 16, 1942) .......... 11, 12, 34, 40

Exec. Order No. 9040, 7 Fed. Reg. 527 (Jan. 24, 1942) .......... 11, 12, 41, 42

Exec. Order No. 9071, 7 Fed. Reg. 1531 (Feb. 24, 1942) .......... 37

Exec. Order No. 9246, 7 Fed. Reg. 7379 (Sept. 17, 1942) .......... 35, 36

Exec. Order No. 9264, 7 Fed. Reg. 9105 (Nov. 5, 1942) .......... 37

Exec. Order No. 9276, 7 Fed. Reg. 10091 (Dec. 12, 1942) .......... 12

# INDEX TO APPENDIX

**Contracts**

Contract between Defense Supplies Corporation and
Shell Oil Company, Inc. (Apr. 10, 1942)....0001

Contract between Defense Supplies Corporation and
Shell Oil Company, Inc. (May 1, 1943)....0025

Contract between Defense Supplies Corporation and
Union Oil Company (Dec. 31, 1942)....0054

Contract between Defense Supplies Corporation and
Union Oil Company of California (May 1, 1943) ....0068

Contract between Defense Supplies Corporation and
Richfield Oil Corporation (Feb. 3, 1942)....0099

Contract between Defense Supplies Corporation and
Richfield Oil Corporation (Feb. 20, 1943)....0117

Contract between Defense Supplies Corporation and
The Texas Company (Jan. 17, 1942) ....0149

Contract between Defense Supplies Corporation and
The Texas Company (Feb. 8, 1943)....0164

Contract between Defense Supplies Corporation and
Tidewater Associated Oil Company (June 10, 1942) ....0192

Contract between Defense Supplies Corporation and
Tidewater Associated Oil Company (Feb. 18, 1943) ....0216

**Executive Orders**

Executive Order No. 9001, 6 Fed. Reg. 6787 (Dec. 27, 1941)....0244

Executive Order No. 9024, 7 Fed. Reg. 329 (Jan. 16, 1942)....0246

Executive Order No. 9040, 7 Fed. Reg. 527 (Jan. 24, 1942)....0248

Executive Order No. 9071, 7 Fed. Reg. 1531 (Feb. 24, 1942) ....0249

Executive Order No. 9246, 7 Fed. Reg. 7379 (Sept. 17, 1942) ....0250

Executive Order No. 9264, 7 Fed. Reg. 9105 (Nov. 5, 1942) ....................0251

Executive Order No. 9276, 7 Fed. Reg. 10091 (Dec. 12, 1942)....................0252

**Statutes**

Act of Feb. 27, 1906, Pub. L. No. 59-28, 34 Stat. 27 (1906) (excerpt) ....................0255

National Defense Act of 1916, Pub. L. No. 64-85, 39 Stat. 166 (1916) (excerpt) ....................0258

Reconstruction Finance Corporation Act, Pub. L. No. 72-2, 47 Stat. 5 (1932)....................0261

Reorganization Plan No. I of 1939, 39 Stat. 1423 (1939)....................0269

Act of June 25, 1940, Pub. L. No. 76-664, 54 Stat. 572 (1940) ....................0279

Act of June 10, 1941, Pub. L. No. 77-108, 55 Stat. 248 (1941) ....................0282

First War Powers Act of 1941, Pub. L. No. 77-354, 55 Stat. 838 (1941)....................0285

Renegotiation Act of 1942, Pub. L. No. 77-528, 56 Stat. 226 (1942) (excerpt)....................0289

Joint Resolution of June 20, 1945, Pub. L. No. 79-109, 59 Stat. 310 (1945)....................0294

Act of Sept. 6, 1950, Pub. L. No. 81-759, 64 Stat. 595 (1950) (excerpt) ....................0295

Reorganization Plan No. 1 of 1957, 71 Stat. 647 (1957)....................0300

**Other**

Amendment to the Charter of the Defense Supplies Corporation,
6 Fed. Reg. 3363 (1941) ....................0303

Letter from WPB Chairman Nelson to Harold I. Ickes,
Petroleum Coordinator for National Defense (Feb. 13, 1942)....................0305

40 Op. Atty. Gen. 225 (1942) ....................0307

Memorandum from Robert P. Patterson (Oct. 10, 1942)....................0317

Reference Manual of Government Corporations, GAO,
Senate Doc. No. 86 (June 30, 1945) (excerpt)....................0318

A History of the Petroleum Administration for War (1946) (excerpts)....................0335

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)

Partial Consent Decree (Filed Dec. 12, 1994) ....................0345

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)
Stipulated Facts (June 23, 1995) ....................0377

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)
Supplemental Stipulated Facts (July 31, 1995)....................0476

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)
Preliminary Draft Pretrial Conference Order and Supplemental
Stipulated Facts (Dec. 11, 1997)....................0479

*Shell Oil Co. v. United States*, No. 05-704 (Fed. Cl.)
Docket Sheet (as of Mar. 2, 2006) ....................0551

Letter from Michael W. Kirk to The Honorable David L. Bibb
re Claims on Contracts between the United States and Various
Oil Companies for the Production of High-Octane Aviation
Fuel During World War II (Nov. 23, 2005)....................0554

Letter from Ruth Kowarski to Michael Kirk re Claims on
Contracts between the United States and Various Oil
Companies for the Production of High-Octane Aviation
Fuel During World War II (Feb. 15, 2006)....................0560

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., Plaintiffs, | |
| v. | Case No. 06-CV-141 (Senior Judge Smith) |
| UNITED STATES OF AMERICA, Defendant. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Plaintiffs Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc. (collectively, the "Oil Companies") respectfully oppose the Government's motion to dismiss this suit, and ask instead that the Court enter partial summary judgment as to liability for breach of contract in their favor.

## INTRODUCTION

During World War II, the United States required massive quantities of 100-octane aviation fuel, known as Avgas, for use in airplane engines. The production of sufficient quantities of Avgas was perhaps the single most critical requirement for the successful prosecution of the war. Indeed, less than a year after Pearl Harbor, Under Secretary of War Robert P. Patterson bluntly stated that, "[i]f we have a program more urgent than the 100 octane gasoline program, I do not know what it is." Memorandum from Robert P. Patterson (Oct. 10,

1942), Pl. App. 317.[1] The Government "had the authority to require production of goods at refineries owned by the Oil Companies, and even to seize refineries if necessary." *United States v. Shell Oil Co.*, 294 F.3d 1045, 1050 (9th Cir. 2002). However, recognizing that maximum production would more likely flow from cooperation with the petroleum industry, the Government "relied almost exclusively on contractual agreements to ensure avgas production." *Id.* Accordingly, the Government, acting through the Defense Supplies Corporation ("DSC"), entered supply contracts with each of the Oil Companies that "were of the 'cost plus' variety, meaning that the Government would reimburse the Oil Companies for all the costs of avgas production plus a small profit, typically between 6 and 7 percent of costs." *United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1023 (C.D. Cal. 1998), *aff'd in part and rev'd in part on other grounds*, 294 F.3d 1045 (9th Cir. 2002).

Under the contracts (collectively referred to as the "Avgas Contracts"), the Oil Companies recovered their costs primarily through the price paid for each gallon of Avgas sold to the Government, which was based upon the Oil Companies' estimated costs and then adjusted to reflect their actual costs. However, the parties recognized that the price adjustment mechanism was ill-suited to provide for reimbursement of new or additional governmental charges that could arise from the production of Avgas. Accordingly, it was expressly agreed in each of the contracts entered by the Oil Companies that such charges would be directly reimbursed by the Government. Specifically, the Avgas Contracts state that the Government "shall pay in addition to the prices as established [in the price provisions of the contract], any new or additional taxes, fees, or charges, other than income, excess profits, or corporate

[1] The materials supporting the Oil Companies' cross-motion for summary judgment have been compiled in Plaintiffs' Appendix in Support of Their Cross-Motion for Partial Summary Judgment as to Liability, which will be cited as "Pl. App."

franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder." *See, e.g.*, Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (May 1, 1943) ("1943 Shell Contract") 16-17, Pl. App. 41-42.[2]

The Oil Companies have now been required, by "federal law in the United States," to pay "new or additional … charges … by reason of the production, manufacture, sale or delivery of" Avgas under the contracts. Following enactment of the Comprehensive Environmental Response, Compensation and Liability Act of 1978 ("CERCLA"), as amended, 42 U.S.C. § 9601, *et seq.*, the United States and the State of California brought suit in 1991 in the United States District Court for the Central District of California seeking to require the Oil Companies to pay cleanup costs arising from acid waste generated by the Oil Companies in the course of producing Avgas pursuant to their World War II contracts with the Government. The acid waste had been deposited at the McColl Superfund site in Fullerton, California. After extensive litigation over the course of more than a decade, the Oil Companies were found liable under CERCLA and required to pay all of the non-benzol related cleanup costs associated with the McColl Site. *See Shell*, 294 F.3d at 1048-49 (summarizing holding). The Oil Companies have already incurred over $65 million in cleanup costs, and will likely be required to pay millions more over the next 15 to 30 years to complete, and to operate and maintain, the remedy they implemented to cleanup the site.

Simply stated, the Government promised to reimburse costs such as these, and its refusal to do so constitutes a breach of its contracts with the Oil Companies. In recent years, the Federal

[2] As demonstrated below, each of the other contracts entered between the Oil Companies and the Government at issue in this case contains identical language.

Circuit has twice entertained similar breach of contract claims, and it has twice held that promises made by the United States in World War II contracts to reimburse costs arising from the performance of the contract cover environmental cleanup costs incurred decades later. *See Ford Motor Co. v. United States*, 378 F.3d 1314, 1315 (Fed. Cir. 2004) (holding that Ford was entitled to recover "environmental cleanup costs arising from a World War II bomber contract"); *E.I. DuPont de Nemours & Co. v. United States*, 365 F.3d 1367, 1369 (Fed. Cir. 2004) (holding that DuPont was entitled "to recover costs it incurred pursuant to [CERCLA] for an ordnance plant it built and operated for the government during World War II"); *see also Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019, 1027-29 (9th Cir. 2002) (holding that the Government was contractually obligated to indemnify Dow Chemical for CERCLA costs arising from performance of a World War II contract to operate a rubber plant). In each of these cases, the Government sought to repudiate its promises with arguments similar to those advanced here, and in each of these cases, the Court of Appeals rejected the Government's arguments.

The Government admits that the above-quoted contractual provision "covers … new costs (with exceptions not pertinent here) imposed by authorities at any level of Government 'by reason of the production, manufacture or sale of commodities delivered hereunder,' " Defendant's Motion to Dismiss the Complaint, Doc. No. 7 ("Gov't Br.") 11 (quoting 1943 Shell Contract 17, Pl. App. 42),[3] but argues that the provision is limited "to costs imposed <u>during</u> contract performance." Gov't Br. 11. (emphasis in the original). The Federal Circuit has rejected the same argument in *Ford*, holding that "[t]he passage of time did not negate Ford's liability, and does not defeat the government's obligation of reimbursement." 378 F.3d at 1320; *see also id.* ("Ford's claim for reimbursement is not barred merely because the originating events

[3] The Government slightly misquotes the contractual language, *compare* Gov't Br. at 11 *with* 1943 Shell Contract 16-17, Pl. App. 41-42, but the misquotation is immaterial.

are long past, for the liability for cleanup did not arise until after enactment of CERCLA"). And in *DuPont*, the Court of Appeals rejected the closely related argument that the Government should not be required to reimburse DuPont because the parties could not have foreseen the enactment of CERCLA decades later. 365 F.3d at 1373-74.

The Government also argues that the costs the Oil Companies seek to have reimbursed were not incurred "by reason of" the production of the Avgas, but rather "by reason of the fact that they generated hazardous substances that were released into the environment at the McColl site." Gov't Br. 11-12. But it is undisputed that the relevant hazardous substances, "acid sludge and alkylation acid, *necessarily resulted from* the production of avgas." *United States v. Shell Oil Co.*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778, at *7 (C.D. Cal. Sept. 18, 1995) (emphasis added) (ruling on summary judgment on the basis of the parties' joint statement of undisputed facts), *aff'd in part and rev'd in part on other grounds*, 294 F.3d 1045 (9th Cir. 2002). Indeed, the Government has stipulated that the acid sludge and the spent alkylation acid dumped at the McColl site was generated during the production of Avgas pursuant to the contracts at issue in this case. Stipulations between the United States and the Oil Companies in *United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.) ("Stipulation"), ¶¶ 493-96, Pl. App. 510-11.

What is more, "the Government['s] acts or omissions" in exercising its power to allocate scarce resources during the war "foreclosed the reasonable alternative methods of disposal (transportation via tank cars for recycling or construction of regeneration plants) of the waste." *Shell*, 13 F. Supp. 2d at 1028. As the Ninth Circuit explained, by 1944, "the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries, and the facilities for reprocessing this acid were insufficient. When the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent

alkylation acid at the McColl site." *Shell*, 294 F.3d at 1050-51. Simply put, the Oil Companies' fulfillment of their contractual obligation to produce the massive quantities of Avgas required by the United States to win the war necessarily depended upon dumping the hazardous waste; put another way, the only available alternative to dumping was wholly unacceptable: "to halt avgas production." Accordingly, as both the trial court and the Ninth Circuit found, "the cleanup costs are properly seen as part of the war effort for which the American public as a whole should pay." *Shell*, 294 F.3d at 1060; *see also Shell*, 13 F. Supp. 2d at 1027 (same).

Finally, the Government seeks to avoid its contractual promise by claiming that it lacked authority to make it under the terms of the Anti-Deficiency Act. *See* Gov't Br. 13-14. This argument too has been uniformly rejected. Every Court of Appeals to consider the question has held that "the Anti-Deficiency Act does not bar recovery under the [Contract Settlement Act] of environmental cleanup costs arising from performance of a contract during World War II." *Ford*, 378 F.3d at 1320; *see also DuPont*, 365 F.3d at 1374 (same). The Ninth Circuit has likewise rejected a Government claim that a promise to reimburse a World War II contractor for CERCLA costs is *ultra vires* under the Anti-Deficiency Act because the promise "was authorized by law, namely the emergency powers Congress gave the President, and the regulations issued by the executive branch for the prosecution of the war." *Cadillac Fairview*, 299 F.3d at 1029.

As we demonstrate below, the general statutes, executive orders, and executive branch directives relied upon by the Ninth Circuit with respect to the production of rubber, as well as similar materials governing petroleum production, compel the same conclusion here. Most significantly, as the Ninth Circuit held, the First War Powers Act of 1941 empowered President Roosevelt "to authorize agencies to make contracts 'without regard to the provisions of law' such

as the Anti-Deficiency Act, 'whenever he deemed such action would facilitate the prosecution of the war.' " *Id*. (quoting First War Powers Act of 1941, Pub. L. No. 77-354, § 201, 55 Stat. 838, 839, Pl. App. 0286). As we demonstrate below, the President exercised and delegated this power in two Executive Orders that authorized the War Production Board ("WPB") to exercise absolute power with respect to the policies governing war procurement, production, and contracting, and the WPB in turn delegated to DSC the power to determine on behalf of the United States all relevant Avgas contractual terms.

Moreover, in one of the Executive Orders referenced above, President Roosevelt invoked and delegated the powers Congress granted to the President in the National Defense Act of 1916. Over 70 years ago, the Supreme Court considered an analogous Government argument that Congress had not authorized the Government to take the actions it took to obtain materials necessary to the prosecution of World War I, and therefore the Government need not reimburse the costs incurred by reason of the Government's procurement activities. Writing for the Court, Justice Holmes accorded "scant consideration to such a repudiation of responsibility," pointing out that "[t]he Secretary of War in the name of the President, with the power of the country behind him, in critical times of war, requisitioned what was needed and got it. Nobody doubts, we presume, that if any technical defect of authority had been pointed out, it would have been remedied at once." *International Paper Co. v. United States*, 282 U.S. 399, 406 (1931). Observing that the Government waited "until the time comes to pay for what it had" to raise its concerns about its authority, the Court found that its "doubt [was] rather late," and held that Section 120 of the statute provided ample authority for the action taken. *Id*. This reasoning applies with equal force to the Government's claim that it lacked authority to promise to

reimburse the Oil Companies for the costs at issue in this case, and compels the conclusion that the Anti-Deficiency Act does not bar the Oil Companies' claim for breach of contract.

* * *

Judge Kleinfeld, writing for the Ninth Circuit in *Cadillac Fairview*, well captured the state of affairs before this Court:

> This is a shocking case. The government is trying to take money from firms it conscripted for a critical part of a great war effort. The government's arguments are strikingly weak. The pollution occurred almost six decades ago. The polluting conduct was completely under the direction of the government, it was legal at the time, and the government promised to hold the polluters, who acted as government agents, harmless. The government decided at the time that polluting the land and water this way was preferable to diverting resources from the war effort to do anything about it. Now the government wants its servants to pay for what it told them to do and promised they could do with no fear of liability.

299 F.3d at 1029. The Ninth Circuit did not tolerate this stand by the Government in *Cadillac Fairview*, the Supreme Court refused to accept it in *International Paper*, and the Federal Circuit did not countenance it in *Ford* and *DuPont*. This Court should do likewise here.

**QUESTIONS PRESENTED**

1. Do the Avgas Contracts require the United States to reimburse the Oil Companies for the CERCLA cleanup costs they incurred by reason of their production of the Avgas during World War II?

2. Did the Anti-Deficiency Act deprive the Government of the authority to promise to reimburse the Oil Companies for the CERCLA cleanup costs they incurred by reason of their production of the Avgas during World War II?

**STATEMENT OF THE CASE**

During World War II, the United States, through DSC, entered the Avgas Contracts with the Oil Companies for the production of high-octane aviation fuel, colloquially known as Avgas.[4] The production of Avgas necessarily resulted in two related hazardous waste byproducts – spent alkylation acid and acid sludge – some of which was sent to the McColl Superfund site in Fullerton, California ("McColl Site"). Fifteen years ago, the Government (joined by the State of California) brought suit against the Oil Companies in the United States District Court for the Central District of California under CERCLA seeking to require the Oil Companies to pay the costs of cleaning up the acid waste at the McColl Site. Because of the extensive discovery and a comprehensive stipulation of facts entered into by the parties in the

[4] Specifically, DSC and the Oil Companies' various predecessors-in-interest entered into the following Avgas Contracts: (1) Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (April 10, 1942) ("1942 Shell Contract"), Pl. App. 1-24; (2) Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (May 1, 1943) ("1943 Shell Contract"), Pl. App. 25-53; (3) Contract between Defense Supplies Corporation and Union Oil Company (December 31, 1942) ("1942 Union Contract"), Pl. App. 54-67; (4) Contract between Defense Supplies Corporation and Union Oil Company of California (May 1, 1943) ("1943 Union Contract"), Pl. App. 68-98; (5) Contract between Defense Supplies Corporation and Richfield Oil Corporation (February 3, 1942) ("1942 Richfield Contract"), Pl. App. 99-116; (6) Contract between Defense Supplies Corporation and Richfield Oil Corporation (February 20, 1943) ("1943 Richfield Contract"), Pl. App. 117-48; (7) Contract between Defense Supplies Corporation and The Texas Company (January 17, 1942) ("1942 Texas Contract"), Pl. App. 149-63; (8) Contract between Defense Supplies Corporation and The Texas Company (February 8, 1943) ("1943 Texas Contract"), Pl. App. 164-91; (9) Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (January 17, 1942) ("1942 Tidewater Contract"), Pl. App. 192-215; and (10) Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (February 18, 1943) ("1943 Tidewater Contract"), Pl. App. 216-43.

underlying CERCLA litigation, no further factual development is required for resolution of liability on the Oil Companies' contract claims presented here.[5]

## I. WORLD WAR II AVGAS PRODUCTION PROGRAM

During World War II, the Government marshaled the largest mobilization in this Nation's history, requiring the unprecedented cooperation of industries in all facets of the economy. Because "World War II, from beginning to end, was a war of oil," perhaps the single most important industry to the successful prosecution of the war was the petroleum industry. A History of the Petroleum Administration for War 1, Pl. App. 336. And that industry's most important product was Avgas, which enabled "allied fighters to attain higher speeds, higher ceilings, faster rates of climb and the ability to carry a heavier load than our enemies could achieve." *Shell*, 1995 U.S. Dist. LEXIS 19778, at *5; *see also* Stipulation ¶¶ 4-5, Pl. App. 382. As the Government recognized just two days after Pearl Harbor, " '[i]t is essential, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses be increased immediately to the maximum.' " Stipulation ¶ 117, Pl App. 403-04 (quoting Recommendation No. 16 issued by the Office of the Petroleum Coordinator for National Defense); *see also* Stipulation ¶ 202, Pl. App. 423.

To maximize production of this vital material, the Government instituted a comprehensive regulatory regime whereby it controlled Avgas production. Under this regime, the Government mandated that maximum production took priority over economic costs, disposal of byproducts (including waste), and even routine inspection and maintenance of plants. *See, e.g., Shell*, 13 F. Supp. 2d at 1027-28; *Shell*, 1995 U.S. Dist. LEXIS 19778, at *4-*5; Stipulation

[5] The parties entered into Stipulation ¶¶ 1-430 on June 23, 1995, Pl. App. 377-475, Stipulation ¶ 431 on July 25, 1995, Pl. App. 476-78, and Stipulation ¶¶ 432-624 on December 11, 1997, Pl. App. 479-550.

¶¶ 44, 186, 189, 198, 203-09, 213-14, 365, 372, 395, Pl. App. 390, 419, 420, 421-22, 423-24, 425-26, 456-57, 459, 468. The Government exercised this control in part through two wartime agencies that are particularly relevant to this case: the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").

President Roosevelt established the WPB in January 1942 to "assur[e] the most effective prosecution of war procurement and production," and delegated to it the power to set mandatory policies and procedures for such production and procurement, including the power to issue mandatory directives concerning "contracting, specifications, and construction." Exec. Order No. 9024, ¶ 2, 7 Fed. Reg. 329, 329-30 (Jan. 16, 1942), Pl. App. 246-47. The President also delegated to the WPB the authority vested in him by Section 120 of the National Defense Act of 1916. Exec. Order No. 9040, ¶ 1, 7 Fed. Reg. 527 (Jan. 24, 1942), Pl. App. 248. Section 120 authorized the President, "in time of war or when war is imminent, … in addition to the present authorized methods of purchase or procurement, to place an order with any [supplier] for such product or material as may be required." National Defense Act of 1916, Pub. L. No. 64-85, § 120, 39 Stat. 166, 213 (1916), Pl. App. 259. This authority included the power to seize plants that did not comply with production orders, and to enforce production under threat of criminal penalties. *Id*. Section 120, however, required that the "compensation to be paid to any [supplier] for its products or material … be fair and just." *Id*. The WPB coordinated the allocation of scarce materials and resources under a priority ranking system. *See* Stipulation ¶¶ 52-53, Pl. App. 391.

In delegating this authority to the WPB regarding war procurement and production, the President provided that the WPB Chairman "may exercise the powers, authority, and discretion conferred upon him by this or any other Order through such officials or agencies and in such

manner as he may determine; and his decisions shall be final." Exec. Order No. 9024, ¶ 5, 7 Fed. Reg. 329 (Jan. 16, 1942), Pl. App. 247; Exec. Order No. 9040, ¶ 3, 7 Fed. Reg. 527 (Jan. 24, 1942), Pl. App. 248. By letter dated February 13, 1942, the WPB Chairman in turn delegated his contracting authority for determining the price and technical details of Avgas to the Office of Petroleum Coordinator for National Defense ("OPC"), and delegated all other contracting authority to the DSC (with an exception not pertinent here). Letter dated Feb. 13, 1942 from WPB Chairman Nelson to Harold I. Ickes, Petroleum Coordinator for National Defense, Pl. App. 305-06. Executive Order 9024 required DSC to comply with the WPB Chairman's delegation of contracting authority. Exec. Order No. 9024, ¶ 3, 7 Fed. Reg. 329 (Jan. 16, 1942), Pl. App. 247.

In December 1942, President Roosevelt established an agency subordinate to the WPB – the PAW – "to coordinate and centralize the war policies and actions of the Government relating to petroleum with a view toward providing adequate supplies of petroleum for the successful prosecution of the war and for other essential purposes." Exec. Order No. 9276, 7 Fed. Reg. 10091 (Dec. 12, 1942), Pl. App. 252. PAW was a successor to OPC (whose name had been changed to "Office of Petroleum Coordinator for War"), which had been established in May 1941. Exec. Order No. 9276, 7 Fed. Reg. 10091 (Dec. 12, 1942), Pl. App. 252; Letter from President Roosevelt to the Secretary of the Interior (May 28, 1941), Pl. App. 343-44. Executive Order 9276 provided for the appointment of a Petroleum Administrator to head PAW, whose duties included "establishing basic policies and formulating plans and programs to assure for the prosecution of the war the conservation and most effective development and utilization of petroleum in the United States and its territories and possessions," and "issuing necessary policy and operating directives to parties engaged in the petroleum industry." Exec. Order No. 9276, ¶¶ 2-3, 7 Fed. Reg. 10091, 10092-93 (Dec. 12, 1942), Pl. App. 253-54.

"The purpose of the PAW avgas program was to maximize the amount of avgas available to the United States for purchase in order to pursue the war effort." Stipulation ¶ 240, Pl. App. 434; *see also* Stipulation ¶¶ 202, 213-14, 216, Pl. App. 423, 425-26. Accordingly, PAW was intimately involved with the production of Avgas, and it directed the Oil Companies' operations to produce the maximum quantities of Avgas. *See, e.g.*, Stipulation ¶¶ 212-14, Pl. App. 425-26. For example, one method PAW used to maximize Avgas production was the "Planned Blending Program." Stipulation ¶¶ 211-241, Pl. App. 424-35. Under this program, the Government dictated the quality of Avgas and required quarterly inventory reports from refineries, authorized purchase of certain quantities of raw materials, and instructed refineries with respect to manufacturing specifications. Stipulation ¶¶ 211-241, Pl. App. 424-35. The Government also directed refiners to blend Avgas in a way that would allow increased overall production, even if doing so would reduce an individual refiner's yield. Stipulation ¶¶ 211-241, Pl. App. 424-35. DSC even notified refiners in December 1942 that, "[w]ith respect to PAW requests to shift components among refiners, … any contractual provisions with DSC were considered waived if and where compliance with the PAW's requests interfered with the company's performance of its contract with the DSC." Stipulation ¶ 199, Pl. App. 422.

## II. <u>THE AVGAS CONTRACTS</u>

Although the Government exercised significant regulatory control over the petroleum industry, and it had the power to seize the refineries needed to produce the required Avgas if necessary, it sought to achieve maximum production primarily through supply contracts with oil producers. *Shell*, 294 F.3d at 1050. Because of the lack of a significant commercial market for Avgas prior to the war (commercial aviation in this country was then in its infancy), however, the Government had to "create an atmosphere which made financial investments in alkylation

facilities viable." Stipulation ¶ 148, Pl. App. 412. At the time, the military could only enter into one-year purchase contracts, which led the petroleum industry to fear that such purchase contracts would not justify the necessary investments in new or upgraded facilities. Stipulation ¶148, Pl. App. 412. Therefore, to provide industry assurance that its investments would be economically feasible, the Government used its corporation, the Reconstruction Finance Corporation ("RFC"), and that corporation's wholly owned subsidiary, DSC, to enter into long term contracts (primarily three year contracts) to purchase Avgas. Stipulation ¶¶ 148-54, 158, Pl. App. 412-14. These long-term contracts enabled the Oil Companies to build new refining facilities, and they established a centralized purchasing program for the Nation's entire output of Avgas. Stipulation ¶ 151, Pl. App. 413. In December 1942, the DSC, Army, Navy, and PAW agreed that, as of January 1, 1943, DSC would act as the *sole* purchaser of Avgas from the petroleum industry for the United States, and would then resell it to the Armed Forces as needed. Stipulation ¶ 197, Pl. App. 421.[6]

The Oil Companies entered into the Avgas Contracts with DSC in 1942 and 1943, and the RFC contractually guaranteed DSC's performance. *See, e.g.*, 1943 Shell Contract 23, Pl. App. 48; Stipulation ¶ 158, Pl. App. 414. The contracts "were of the 'cost plus' variety, meaning

[6] Congress created the RFC in 1932 as a wholly owned corporation of the United States, Pub. L. No. 72-2, §§ 1-2, 47 Stat. 5 (1932), Pl. App. 261, and in 1940 authorized it to create subsidiary corporations "[i]n order to aid the Government of the United States in its national-defense program." Pub. L. No. 76-664, 54 Stat. 572, 573 (1940), Pl. App. 280. The RFC did so, incorporating several subsidiaries including the DSC in August 1940. GAO Report at 38, 338-39, Pl. App. 323, 329-30. In 1945, Congress dissolved the DSC, and the RFC assumed DSC's liabilities "whether arising out of contract or otherwise." Joint Resolution of June 20, 1945, Pub. L. No. 79-109, § 2, 59 Stat. 310 (1945), Pl. App. 294. In 1957, Congress dissolved the RFC and transferred its obligations relevant to this action to the General Services Administration ("GSA"). Reorganization Plan No. 1 of 1957, 71 Stat. 647 (1957), Pl. App. 300-02; *see also* Gov't Br. 2 n.2 (acknowledging that the GSA is the successor-in-interest to the RFC for purposes of this action).

that the Government would reimburse the Oil Companies for all the costs of avgas production plus a small profit, typically between 6 and 7 percent of costs." *Shell*, 13 F. Supp. 2d at 1023; Stipulation ¶¶ 164-70, 589, Pl. App. 415-16, 538-39. Specifically, the parties negotiated the contract price for the Avgas based on the Oil Companies' estimated production costs, with an estimated profit between 6 and 7 percent. Stipulation ¶¶ 164-70, 589, Pl. App. 415-16, 538-39. The estimated profits, however, were subject to the Renegotiation Act of 1942, Pub. L. No. 77-528, § 408, 56 Stat. 226, 245 (1942), Pl. App. 291, as amended, which required contractors to renegotiate their contracts with the United States and make repayments to the Government, " '[w]henever, in the opinion of the [Government], the profits realized or likely to be realized … may be excessive ….' " Stipulation ¶ 545, Pl. App. 525; *see also* Stipulation ¶¶ 173, 543-47, Pl. App. 417, 524-25. The Government, therefore, had at least two opportunities to ensure that the Oil Companies did not obtain undue benefits under the Avgas Contracts: once in the course of contracting in the first instance and again when the contracts were renegotiated after the war. *Shell*, 13 F. Supp. 2d at 1029; *see also* Stipulation ¶¶ 167-70, 543-58, Pl. App. 416, 524-30. And "[e]ach time, the Government determined that it was getting a fair deal, which is to say that the Oil Companies were not receiving undue benefits from the bargain at taxpayer expense." *Shell*, 13 F. Supp. 2d at 1029.

While the Government thus ensured that the Oil Companies did not excessively profit at the taxpayers' expense, its overriding purpose was to maximize the production of Avgas. This objective took precedence over economic costs, disposal of byproducts (including waste), and even routine inspection and maintenance of plants. *See, e.g., Shell*, 13 F. Supp. 2d at 1027-28; *Shell*, 1995 U.S. Dist. LEXIS 19778, at *4-*5; Stipulation ¶¶ 44, 186, 189, 198, 203-09, 213-14, 365, 372, 395, Pl. App. 390, 419, 420, 421-22, 423-24, 425-26, 456-57, 459, 468. To achieve

this goal, the Government expressly agreed in each of the Avgas Contracts that *it* – not the contractor who the Government limited to a modest profit – would bear the risk of future governmental acts imposing costs on the contractors "by reason of" their performance of the contracts. Specifically, the Government expressly agreed to pay:

> [A]ny new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [Avgas].

*See, e.g.*, 1943 Shell Contract 16-17, Pl. App. 41-42.[7]

The Government also expressly agreed to bear the risk of increased costs caused by the state of war. 1943 Shell Contract 11, Pl. App. 36. Each of the Avgas Contracts, either originally or as amended, provided that if the war interfered with production "to such an extent that in the opinion of Seller the cost of refining [the Avgas] is increased," the price paid by the Government must be raised "by an amount sufficient to offset such increased cost," unless the Government is willing to accept reduced production. *See, e.g.*, 1943 Shell Contract 11, Pl. App. 36.[8]

In addition to expressly assuming the risk in the Avgas Contracts of increased costs due to future governmental acts and due to conditions caused by the war, the Government also

---

[7] Each of the Avgas Contracts at issue in this case included this reimbursement clause verbatim. *See* 1942 Shell Contract 15, Pl. App. 16; 1942 Union Contract 7-8, Pl. App. 61-62; 1943 Union Contract 16, Pl. App. 84; 1942 Richfield Contract 13, Pl. App. 112; 1943 Richfield Contract 15, Pl. App. 132; 1942 Texas Contract 10, Pl. App. 159; 1943 Texas Contract 19-20, Pl. App. 183-84; 1942 Tidewater Contract 16, Pl. App. 208; 1943 Tidewater Contract 15-16, Pl. App. 231-32.

[8] The Government devotes the bulk of its motion to dismiss to refuting the proposition that this clause, standing alone, requires reimbursement of the CERCLA costs. However, the Oil Companies do not advance that proposition. Rather, we have drawn this clause to the Court's attention because it reflects the parties' general intent that the Government would bear all of the costs of producing the Avgas. As noted above, the parties recognized that the price adjustment provision was not well suited to address new or additional charges arising from new local, state, federal, or foreign law (such as CERCLA), and for that reason agreed to the separate reimbursement provision.

"recogni[zed] that the rapid expansion of 100 octane production would require manufacturers to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of refiners' entry into their 100 octane contracts," Stipulation ¶¶ 186-87, Pl. App. 419, and the Government agreed to bear those costs as well (albeit outside the Avgas Contracts), Stipulation ¶ 613, Pl. App. 546. Accordingly, in July 1942, the DSC, Army, Navy, and PAW adopted the Aviation Gasoline Reimbursement Plan ("AGRP"). Stipulation ¶¶ 186-87, Pl. App. 419. The AGRP remained in effect until the end of World War II, and provided that the Government would compensate refiners for extraordinary expenditures in connection with production of Avgas at the request of, or with the approval of, PAW, including expenditures incurred under the Planned Blending Program. Stipulation ¶¶ 186-99, 613-17, Pl. App. 419-22, 546-47.

In short, the Government established a regime whereby it ensured that the Oil Companies were limited to a modest profit, but, in turn, the Government assumed all the risks of increased costs due to the unusual times and its unqualified mandate that the Oil Companies maximize production of Avgas.

## III. <u>AVGAS PRODUCTION</u>

Avgas was a blend of several different chemical elements, the production of which necessarily produced sulfuric acid waste. *See, e.g.*, *Shell*, 1995 U.S. Dist. LEXIS 19778, at *7; Stipulation ¶¶ 338, 493-96, Pl. App. 452, 510-11. The Government has stipulated that "[f]rom 1941, the United States was aware that spent alkylation acid and acid sludge were produced in the manufacture of aviation gasoline and that increasing production of aviation gasoline would increase the amount of spent alkylation and acid sludge produced." Stipulation ¶ 338, Pl. App. 452. Similarly, the Government has stipulated, "[m]ost of the acid waste at the McColl Site

began as fresh sulfuric acid … that was used in the alkylation units to produce alkylate for [Avgas]." Stipulation ¶ 496, Pl. App. 511.[9]

As the parties expected, the production of Avgas in extraordinary quantities at the demand of the Government and in fulfillment of the requirements of the Avgas Contracts generated much larger quantities of acid waste than before the war. *See, e.g.*, *Shell*, 294 F.3d at 1050; *Shell*, 13 F. Supp. 2d at 1020; Stipulations ¶¶ 319-21, 338, 367, Pl. App. 448-49, 452, 457. The Oil Companies' performance of their requirements contracts with the Government helped increase the Nation's production of Avgas from 40,000 barrels a day in December 1941 to 514,000 barrels a day by 1945, Stipulation ¶ 319, Pl. App. 448, with a corresponding increase in the generation of acid waste. Because of the unavailability of reasonable alternatives, the Oil Companies had no choice but to send some of this acid waste to the McColl Site. *See Shell*, 13 F. Supp. 2d at 1028.

To be sure, the technology did exist to reprocess acid waste into fresh acid, Stipulation ¶¶ 329, 408, Pl. App. 450-51, 470, and the Oil Companies did reprocess much of the acid waste generated by the production of Avgas. *See, e.g.*, Stipulation ¶¶ 343-54, 496, Pl. App. 453-54, 511. However, the massive quantities of Avgas required by the Government produced correspondingly massive quantities of waste that overwhelmed existing facilities. *See Shell*, 294 F.3d at 1050-51; *Shell*, 13 F. Supp. 2d at 1023. Accordingly, the Oil Companies sought Government approval to build additional acid reprocessing capacity. The construction of acid reprocessing facilities, however, required WPB approval, Stipulation ¶¶ 339-41, Pl. App. 452,

---

[9] A small percentage of the acid waste at the McColl Site is attributable to the production of Government-owned benzol. *United States v. Shell Oil Co.*, 294 F.3d 1045, 1051 (9th Cir. 2002); *see also United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1023 (C.D. Cal. 1998). As discussed in more detail *infra*, the Ninth Circuit affirmed the Government's liability as arranger under CERCLA for all costs relating to the benzol-related waste. *Id.* at 1059-61. Accordingly, this action does not involve the costs of cleaning up the benzol acid waste at the McColl Site.

and despite the Oil Companies' requests, "the United States refused to allocate resources to build reprocessing plants." *Shell*, 294 F.3d at 1060; *see also* Stipulation ¶¶ 365, 379-92, Pl. App. 456-57, 461-67.

One reprocessing facility that was built near the Oil Companies' refineries during World War II, moreover, failed to operate at design capacity, and could not keep up with the amount of acid waste. Stipulation ¶¶ 351, 357-64, Pl. App. 454, 454-56. As the Government stipulated, this failure "resulted in the dumping" of acid waste. Stipulation ¶ 364, Pl. App. 456. Moreover, "[b]y late 1944 and 1945, the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries, and the facilities for reprocessing this acid were insufficient. When the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl Site." *Shell*, 294 F.3d at 1051.

Of course, in light of the Government's inelastic demand for Avgas, its power to seize and/or impose criminal penalties on plants that failed to meet production orders, and the shared objective of doing everything possible to meet the dire threat to the Nation and its allies posed by enemy forces, slowing the wartime production of Avgas to accommodate the reprocessing bottleneck was not an option for the Oil Companies. As Vice Admiral Moreell put it in a report to the Secretary of War on Governmental efforts to eliminate bottlenecks in Avgas production,

> We have taken the position that whatever action is necessary to get production must be taken regardless of whose money is involved. My position is that whatever action is necessary to get production of 100 octane gasoline will have to be taken and if either the oil company or the contractor considers that it has a proper claim for additional compensation or damages they can file the claim and have it considered in the proper manner.

Stipulation ¶ 204, Pl. App. 423.

The Government was fully aware of the acid waste disposal problem during World War II. *See, e.g.*, Stipulation ¶¶ 338, 360-64, 366-70, 373-75, 378, 388, 391-93, 395, Pl. App. 452, 455-46, 457-59, 459-60, 461, 464-65, 466-67, 468. For example, in 1945, the WPB observed that " '[r]emoval of alkylation spent sulfuric acid from the oil ref[ineries] of Southern California has become a serious problem and threatens to result in curtailment of aviation gasoline production if immediate means for withdrawing spent acid cannot be provided.' " Stipulation ¶ 367, Pl. App. 457 (quoting March 14, 1945 letter from Mr. Wizeman, Chief Inorganics Branch, WPB, to Mr. Byrne, PAW). The Government attempted to alleviate this problem by facilitating the lease of a large storage tank in Southern California. Stipulation ¶¶ 368-71, Pl. App. 457-59. However, "[a]cid sludge dumping was not halted by the [storage tank]." Stipulation ¶ 375, Pl. App. 460.

Furthermore, the demands of World War II caused chronic shortages of tank cars that otherwise might have been available to transport acid waste for reprocessing elsewhere. *See, e.g.*, *Shell*, 294 F.3d at 1051-51, 1060; *Shell*, 13 F. Supp. 2d at 1027-28; Stipulation ¶¶ 393, 401-02, 414-15, 417-18, 487, Pl. App. 467, 468-69, 471, 472, 507. The WPB alone had the power to allocate tank cars, but "the United States generally refused to make tank cars available to the Oil Companies to transport the waste to Northern California for reprocessing." *Shell*, 294 F.3d at 1060. Consequently, the shortage left the Oil Companies with no alternative but to dump the acid waste as a last resort. *See, e.g.*, *Shell*, 13 F. Supp. 2d at 1028; Stipulation ¶¶ 393, 401-02, Pl. App. 467, 468-69. In fact, Eli McColl, a representative of the Oil Companies and the namesake of the McColl Site, *see Shell*, 294 F.3d at 1051, stated before the Los Angeles Planning Commission that he needed a permit to dispose of acid waste because " 'the government [would] not allow [him, or the companies he represented] to use tank cars.' "

Stipulation ¶ 487, Pl. App. 507.

In short, "the war requirements created the waste and Government acts or omissions foreclosed the reasonable alternative methods of disposal (transportation via tank cars for recycling or construction of regeneration plants) of the waste." *Shell*, 13 F. Supp. 2d at 1028.

## IV. THE CERCLA LITIGATION

On February 1, 1991, the United States and the State of California brought suit against the Oil Companies in the Central District of California pursuant to CERCLA for recovery of costs incurred in cleaning up the acid waste at the McColl Site. The Oil Companies counterclaimed against the United States, asserting that the Government should be held responsible for the CERCLA costs. Under CERCLA, the United States Environmental Protection Agency ("EPA") has broad authority to provide for cleanup of sites contaminated by hazardous substances, and the United State may bring suit to hold the parties responsible for the hazardous substances financially liable for the cleanup. While all responsible parties are jointly and severally liable, the court has the authority to equitably apportion the cleanup costs among them. *See* 42 U.S.C. § 9613(f)(1).

On September 28, 1993, the district court granted partial summary judgment in favor of the United States and State of California, holding that the Oil Companies were responsible parties and thus liable under CERCLA. *United States v. Shell Oil Co.*, 841 F. Supp. 962, 968-74 (C.D. Cal. 1993); *see also* Partial Consent Decree ¶ 10, Pl. App. 357. On December 12, 1994, the parties entered into a partial consent decree pursuant to which the Oil Companies provisionally paid $18,000,000 for CERCLA costs incurred by the United States and State of California through 1990; however, the Oil Companies retained the right to recover these funds

should the Government ultimately be held responsible for the cleanup or liable under the Avgas Contracts to reimburse the Oil Companies. Partial Consent Decree, Pl. App. 345-76.

On September 18, 1995, the District Court granted the Oil Companies partial summary judgment as to the liability of the United States as an "arranger" under CERCLA for the CERCLA costs. *Shell*, 1995 U.S. Dist. LEXIS 19778, at *18-*25.[10] Because the court had found both the Oil Companies and United States liable under CERCLA, it conducted a trial in 1998 to determine the appropriate allocation of the cleanup costs. Based on the parties' stipulations and the evidence presented at trial, the district court allocated 100 percent of the costs of cleaning up the non-benzol related waste to the United States, including the $18,000,000 previously paid by the Oil Companies. 13 F. Supp. 2d at 1030. The court cited three reasons for its decision to allocate total responsibility to the Government: "(1) such a result simply places a cost of the war on the United States and thus on society as a whole, (2) the Oil Companies were unable to transport avgas waste to Richmond [a Northern California reprocessing facility] for recycling due to the unavailability of tank cars, and (3) the Oil Companies were unable to construct treatment plants due to the WPB's refusal to issue priorities." *Id*. at 1027. Simply put, the court found that "[h]aving created the problem and foreclosed the possible solutions, the Government will receive a 100 percent allocation of waste attributable to the avgas program." *Id.* at 1028; *see also Cadillac Fairview*, 299 F.3d at 1029 (same). In a later opinion, the district court extended its reasoning to the benzol-related waste and allocated 100 percent of the cleanup costs for that waste to the United States as well. *See* 294 F.3d at 1060.

---

[10] An arranger under CERCLA is "any person who by contract, agreement, or otherwise arranged for disposal or treatment … of hazardous substances owned or possessed by such person, by any other party or entity, at any facility … owned or operated by another party." 42 U.S.C. § 9607(a)(3). An "arranger" is responsible party that is liable for response costs under CERCLA.

On appeal, the Ninth Circuit affirmed the district court's judgment holding the Government 100 percent responsible for the cost of cleaning up the benzol waste at the McColl Site, but reversed the ruling that the United States was liable as an "arranger" for the non-benzol waste. *Shell*, 294 F.3d at 1048-49 (summarizing rulings). Because the Court of Appeals concluded that the United States was not an "arranger" under CERCLA for the non-benzol waste, it did not directly address the district court's allocation of liability for the cleanup of that waste. *Id.* at 1059. In affirming the trial court's allocation of 100 percent of the benzol-related waste cleanup costs to the United States, however, the Ninth Circuit held that although the "analysis in *Shell III* [i.e., the 1998 post-trial allocation opinion] was focused on the non-benzol [related] waste," the district court was "entirely justified" in "explicitly extend[ing] its *Shell III* analysis to the benzol waste." *Id.* at 1060. Moreover, "to the degree that the equitable factors support allocation of the cleanup costs to the United States with respect to the non-benzol waste, where the arranger status of the United States was disputed, such factors are even stronger with respect to the benzol waste, where the United States concedes that it was an arranger." *Id.* Accordingly, the Ninth Circuit expressly upheld the findings that led the district court to allocate 100 percent of the non-benzol related cleanup costs to the Government even though it had reversed the judgment as to those costs. *Id.*

Following remand, the district court resolved all remaining counterclaims, except that it transferred, pursuant to 28 U.S.C. § 1631, the Oil Companies' counterclaim for breaches of contract to this Court. *Shell Oil Co. v. United States*, No. 05-704 (Fed. Cl.), Doc. Entry No. 1, Pl. App. 552. In order to exhaust their administrative remedies in accordance with the Contract Settlement Act of 1944, 41 U.S.C. § 113, however, the Oil Companies voluntarily dismissed the

transfer complaint without prejudice. After exhausting those administrative remedies, the Oil Companies brought this action.

## STANDARD OF REVIEW

The Court may grant the Government's motion to dismiss only "if it appears beyond doubt that [the Oil Companies] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Federico v. United States*, 70 Fed. Cl. 378, 380 (2006) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654 (1999) (quotations marks omitted)). Furthermore, the Court must "assume that all well-pled factual allegations in the complaint are true and draw all reasonable inferences in favor of [the Oil Companies]." *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004). On the other hand, summary judgment is appropriate where, as here, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c) (summary judgment warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

## ARGUMENT

### I. THE AVGAS CONTRACTS UNAMBIGOUSLY REQUIRE THE GOVERNMENT TO REIMBURSE THE OIL COMPANIES FOR THE CERCLA CLEANUP COSTS.

The Avgas Contracts expressly require the Government to reimburse the Oil Companies for the CERCLA cleanup costs they have incurred at the McColl site. Specifically, each of the Avgas Contracts state:

> [The Government] shall pay in addition to the prices as established [in other parts of the contract], any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [Avgas].

*See, e.g.*, 1943 Shell Contract 16-17, Pl. App. 41-42. Thus, the McColl site CERCLA costs are reimbursable under the Avgas Contracts if they are (1) new or additional charges; (2) which the Oil Companies have been required to pay by federal law; and (3) they were incurred by reason of the production, manufacture, sale or delivery of the Avgas. None of these elements is subject to factual dispute.

The Government concedes, as it must, that the reimbursement clause "covers … new costs (with exceptions not pertinent here) imposed by authorities at any level of Government 'by reason of the production, manufacture[,] sale [or delivery] of [the Avgas].' " Gov't Br. 11 (quoting 1943 Shell Contract 16-17, Pl. App. 41-42). As discussed in more detail above, there is no dispute that the Oil Companies were required to pay, pursuant to CERCLA, all of the non-benzol related cleanup costs associated with the McColl Site. *See Shell*, 294 F.3d at 1048-49 (summarizing holding), and it is these costs for which the Oil Companies seek reimbursement in this action. There can be no factual dispute, therefore, that the Oil Companies' claimed costs are new costs they are "required to pay by … federal law," i.e., CERCLA, a law enacted after the parties entered the Avgas Contracts.

The Government mistakenly contends, however, that the Oil Companies cannot recover despite the reimbursement clause's plain meaning because (1) the new or additional costs must have been imposed during contract performance, and (2) the Oil Companies did not incur the costs "by reason of" their performance of the Avgas Contracts. Gov't Br. 11-12. The Government also erroneously contends that a separate contract provision, stating that "[d]amages under this contract shall be limited to those arising proximately from a breach of contract," bars the Oil Companies' claims. Gov't Br. at 8, 12 (internal quotation marks omitted). We address each argument in turn.

### A. **The Reimbursement Clause Does Not Require that the New or Additional Costs Be Imposed During Contract Performance.**

The Government summarily asserts that "it is clear" that the reimbursement clause covers only "costs imposed during contract performance." Gov't Br. 11 (emphasis in original). But the plain language of the reimbursement clause imposes no such requirement, nor does the Government cite any authority whatsoever to support its assertion. Indeed, the only connection between the costs and contract performance specified in the contractual language is that the Oil Companies must incur the costs "by reason of" the production of Avgas in performance of their contracts. This provision does not impose a temporal requirement, but rather a causal one. It does not matter *when* the Oil Companies incurred the costs or *when* they were imposed; instead, what matters is that the costs are causally related to (must be "by reason of") performance of the Avgas Contracts. The Government simply confuses a temporal with a causal requirement.

Moreover, the Government overlooks the plain language of the clause requiring the costs to be "new or additional," indicating that the costs must not be in existence at the time the parties entered the Avgas Contracts. The word "new" in no way distinguishes between new costs imposed during contract performance and new costs imposed after contract performance. The Government certainly could have sought a provision that distinguished between the two types of new costs, but it did not do so here, presumably because such a distinction would be contrary to the parties' shared understanding that the Government would bear *all* of the costs associated with the production of Avgas.

The Government's argument is also foreclosed by the Federal Circuit's decision in *Ford*. As in this case, Ford sought reimbursement under a World War II contract for CERCLA costs incurred in the 1990s that arose from its performance of the War contract, and the Government argued that the costs were not reimbursable because the costs were incurred long after

performance of the contract had been completed. The Federal Circuit squarely rejected this argument, holding that "[t]he passage of time did not negate Ford's liability, and does not defeat the government's obligation of reimbursement." 378 F.3d at 1320. Simply stated, "Ford's claim for reimbursement is not barred merely because the originating events are long past, for the liability for cleanup did not arise until after enactment of CERCLA." *Id.* Likewise, in *DuPont*, the Federal Circuit rejected the closely related argument that the Government should not be required to reimburse DuPont pursuant to its World War II contract because the parties could not have foreseen the enactment of CERCLA decades later. 365 F.3d at 1373-74. These holdings cannot be distinguished from this case, and they compel rejection of the Government's submission.

**B. The Oil Companies' CERCLA Cleanup Costs Were Incurred By Reason Of Their Production of Avgas in Performance of the Contracts.**

The Government also argues that the Oil Companies did not incur their claimed costs "by reason of" the production of the Avgas, but rather "by reason of the fact that they generated hazardous substances that were released into the environment at the McColl site." Gov't Br. 11-12. Specifically, the Government asserts that the Oil Companies "would not have been liable under CERCLA … if they had refined and sold avgas, but had not disposed of acid sludge." *Id.* at 12 (emphasis in original). But the undisputed factual record developed in the CERCLA litigation and the Government's own stipulations make clear that production of the Avgas in satisfaction of the Oil Companies' contractual obligations to the United States *necessarily entailed* disposal of the hazardous waste. Put another way, the Oil Companies could only have avoided disposing of the waste by reducing the production of Avgas in violation of their obligation to satisfy the Government's massive wartime requirements.

It is undisputed that the relevant hazardous substances, "acid sludge and alkylation acid, *necessarily resulted from* the production of avgas." *Shell*, 1995 U.S. Dist. LEXIS 19778, at *7 (emphasis added) (ruling on summary judgment on the basis of the parties' joint statement of undisputed facts). In fact, the Government has stipulated that "[f]rom 1941, the United States was aware that spent alkylation acid and acid sludge were produced in the manufacture of aviation gasoline and that increasing production of aviation gasoline would increase the amount of spent alkylation and acid sludge produced." Stipulation, ¶ 338, Pl. App. 452. The Government has also stipulated that the Oil Companies generated the acid sludge and spent alkylation acid sent to the McColl site during the production of Avgas pursuant to the contracts at issue in this case. Stipulation, ¶¶ 493-96, Pl. App. 510-11. Thus, it is undisputed that the Oil Companies' production of the acid waste resulting in their liability under CERCLA was the necessary and unavoidable result of their production of Avgas under their contracts with the Government.

It is likewise beyond dispute that, once it was produced, the Oil Companies had no alternative but to dump the hazardous waste. The huge volume of Avgas required by our Armed Forces resulted in a correspondingly huge volume of acid waste that overwhelmed existing treatment facilities. The Oil Companies sought Government permission to transport the waste, or alternatively to build additional treatment facilities, but the Government refused to authorize the diversion of resources necessary to implement these alternatives. *See* Stipulation, ¶¶ 379-94, 413-20, Pl. App. 461-67, 471-73; *Shell*, 294 F.3d at 1060; *Shell*, 13 F. Supp. 2d at 1027. As the district court found in the CERCLA action, "the Government['s] acts or omissions" in exercising its power to allocate scarce resources during the war "foreclosed the reasonable alternative

methods of disposal (transportation via tank cars for recycling or construction of regeneration plants) of the waste." *Shell*, 13 F. Supp. 2d at 1028.

In sum, "the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries, and the facilities for reprocessing this acid were insufficient. When the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl site." *Shell*, 294 F.3d at 1050-51. Thus, the Oil Companies' fulfillment of their contractual obligation to produce the massive quantities of Avgas required by the United States to win the war necessarily depended upon dumping the hazardous waste; put another way, the only available alternative to dumping was wholly unacceptable: "to halt avgas production." Any reduction or halt in production would have violated the Oil Companies' contractual obligation to fulfill the Government's avgas requirements. And most importantly, the fact that the only alternative to dumping the waste was the reduction or halt of avgas production necessarily means that the dumping occurred "by reason of" the production of Avgas.

This conclusion is confirmed by settled judicial understanding of the phrase "by reason of," as it is used in contracts promising to reimburse costs. For example, the First Circuit has held that "the language [is] unambiguous: 'by reason of' means 'because of,' BLACK'S LAW DICTIONARY 201 (6th ed. 1990), and thus necessitates an analysis at least approximating a 'but-for' causation test." *Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584, 589 (1st Cir. 2004) (citing *United States v. Rosa-Ortiz*, 348 F.3d 33, 38 (1st Cir. 2003) ("The statutory phrase 'by virtue of,' by its plain meaning, suggests a but-for causation test.") (citing WEBSTER'S THIRD NEW INT'L DICTIONARY 307) (defining "by virtue of" to mean "by reason of")); *see also Spirtas Co. v. Insurance Co. of the State of Pa.*, No. 4:05CV100DDN, 2006 U.S. Dist. LEXIS 27498, at

*17 (E.D. Mo. May 9, 2006) (" 'by reason of' … means … 'but for' "). Likewise, the Virginia Supreme Court has held that "the words 'by reason of,' found in the indemnity agreement … hav[e] the same effect as 'resulting from,' and establish[] causation as the test for determining whether a particular loss or expense is recoverable …." *Rappold v. Indiana Lumbersmen's Mut. Ins. Co.*, 431 S.E.2d 302, 304 (Va. 1993). The CERCLA costs before this Court unquestionably satisfy this test: they "result[ed] from" the production of Avgas under the Oil Companies' contracts, the Oil Companies have incurred the CERCLA costs "because of" the Avgas production, and the costs would not have been incurred "but for" the production of Avgas.

Cases from the time that the parties entered the Avgas Contracts are to the same effect; indeed, courts have found that language satisfied on the basis of far more tenuous causal connections than in this case. In *Huntington Cab Co. v. American Fidelity & Casualty Co.*, for example, the Fourth Circuit considered a contractual promise to insure against "injur[ies] … *by reason of* the ownership, maintenance or use of the [taxi]." 155 F.2d 117, 120 (4th Cir. 1946) (emphasis added) (quotation marks omitted). A passenger was injured when the cab driver turned around and punched him. The Court held that the injury was "by reason of" the use of the automobile, explaining that the phrase does not "require that the automobile itself produce the injury," but merely that the injury "is made possible and derives from the use of the [taxi]." *Id*. The Court emphasized that the terms are "equally satisfied if the injury is incidental to or grows out of the relationship of carrier and passenger which in this form of transportation necessitates personal dealings and contact between the driver and the passenger." *Id*. As demonstrated above, the costs at issue in this case were unquestionably more than just "incidental to or grow[ing] out of" the Oil Companies' Avgas production.

### C. The Contract Provision Requiring Limiting Damages To Those Arising Proximately From Breach of the Avgas Contracts Does Not Bar Recovery.

Finally, the Government argues that a separate contract provision stating that " '[d]amages under this contract shall be limited to those arising proximately from a breach of contract,' " bars the Oil Companies' claims. *See* Gov't Br. 8, 12 (quoting 1943 Shell Contract, Pl. App. 38).[11] This argument plainly fails, for the damages sought by the Oil Companies – reimbursement of their CERCLA costs – indisputably arose proximately from the alleged breach – the Government's failure to pay those costs as expressly required by the Avgas Contracts.

The Government does not dispute this, but instead argues that the Oil Companies "do not, and cannot, allege that the Government proximately caused them to incur CERCLA costs by breaching the avgas contracts." Gov't Br. 12 (emphases in original). This assertion misreads the damages clause. On its face, this provision merely requires that the damages sought be proximately caused by the breach, not that a breach of contract proximately cause the Oil Companies to incur costs in performance of the contract.

To be clear, the Oil Companies do not, and need not, assert that the Government's breach of its obligation to reimburse the CERCLA response costs under the reimbursement clause somehow actually caused the Oil Companies to incur the CERCLA response costs in the first instance. Rather, they assert that (i) they incurred the CERCLA response costs "by reason of" their production of Avgas in performance of their obligations under the Avgas Contracts; (ii) the reimbursement clause unambiguously obligates the Government to pay such costs; (iii) the

[11] This provision only appears in some of the Avgas Contracts. *See* 1942 Shell Contract 11, Pl. App. 12; 1943 Shell Contract 13, Pl. App. 38; 1942 Tidewater Contract 12, Pl. App. 204; 1943 Tidewater Contract 11, Pl. App. 227; and 1943 Union Contract 12, Pl. App. 80. As discussed in the text, however, this provision is not relevant to the Oil Companies' claims that the Government breached the contracts and, instead, relates solely to whether those breaches caused the Oil Companies' claimed damages. The fact that it is included in only some of the Avgas Contracts is thus immaterial.

Government's refusal to do so constitutes a breach of its contractual promise; and (iv) the Oil Companies are entitled to recover in damages the amounts the Government was contractually obliged to reimburse. The damages sought in step (iv) plainly arise proximately from the breach identified in step (iii). The damages clause cited by the Government requires no more.

## II. THE OIL COMPANIES' CLAIMS ARE NOT BARRED BY THE ANTI-DEFICIENCY ACT.

The Government incorrectly contends that the Anti-Deficiency Act bars the Oil Companies' claims. Gov't Br. 13-14. However, both the Federal Circuit (twice) and the Ninth Circuit have rejected similar arguments, and no Court of Appeals has held to the contrary. *See Ford*, 378 F.3d at 1320 ("the Anti-Deficiency Act does not bar recovery under the [Contract Settlement Act] of environmental cleanup costs arising from performance of a contract during World War II"); *DuPont*, 365 F.3d at 1375-80 (same); *Cadillac Fairview*, 299 F.3d at 1029 (relying upon Government's promise to reimburse in affirming district court's allocation of CERCLA costs to the Government, and holding that the Anti-Deficiency Act did not bar the reimbursement promise because it was authorized by law).

The version of the Anti-Deficiency Act in effect during World War II provided, in relevant part:

> No Executive Department or other Government establishment of the United States shall expend, in any one fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the Government in any contract or obligation for the future payment of money in excess of such appropriations *unless such contract or obligation is authorized by law*.

Act of Feb. 27, 1906, Pub. L. No. 59-28, 34 Stat. 27, 49 (1906), Pl. App. 257 (emphasis added).[12] This Act did not deprive DSC and RFC (in its capacity as guarantor to DSC) of the authority to

[12] This version remained in effect from 1906 until it was amended in 1950. *See* Act of Sept. 6, 1950, Pub. L. No. 81-759, § 1211, 64 Stat. 595, 765 (1950), Pl. App. 296.

promise to reimburse the Oil Companies for costs arising from new or additional federal statutes incurred by reason of their performance of the Avgas Contracts because such agreements were plainly authorized by law.

Specifically, as the Ninth Circuit held in *Cadillac Fairview*, the First War Powers Act authorized the reimbursement promises. In addition, Section 120 of the National Defense Act of 1916 independently authorized the promises. And DSC's charter, which had the force of law pursuant to an Act of Congress, and RFC's enabling legislation, as amended, authorized DSC and RFC to perform all acts necessary in furthering their purposes, including entering into contracts promising to reimburse costs incurred by reason of performance. Each of these statutes is independently sufficient to overcome the Government's Anti-Deficiency Act objection to honoring its contractual promise.

### A. The First War Powers Act Authorized the Reimbursement Promises that the Government Made to the Oil Companies.

Title II of the First War Powers Act expressly granted the President the power to

> authorize any department or agency [engaged in the war effort], in accordance with regulations prescribed by the President for the protection of the interests of the Government, to enter into contracts and into amendments or modifications of contracts heretofore or hereafter made . . . *without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts* whenever he deems such action would facilitate the prosecution of the war.

Pub. L. No. 77-354, § 201, 55 Stat. 838, 839 (1941), Pl. App. 286 (repealed 1966) (emphasis added). President Roosevelt exercised this broad grant of power on several occasions that are relevant here.

#### 1. Executive Order 9024

On January 16, 1942, he issued Executive Order 9024 establishing the War Production Board ("WPB"). In Executive Order 9024, President Roosevelt invoked the full range of

authority vested in him by both the Constitution and by the "statutes of the United States," which obviously included the First War Powers Act which had been enacted a month earlier. Exec. Order No. 9024, 7 Fed. Reg. 329 (Jan. 16, 1942), Pl. App. 246. Pursuant to this authority, he delegated extremely broad authority to the WPB and its chairman for the purpose of "assuring the most effective prosecution of war procurement and production." Exec. Order No. 9024, 7 Fed. Reg. 329 (Jan. 16, 1942), Pl. App. 246. The President authorized the WPB Chairman, with the advice of the other members of the Board, to "[e]xercise general direction over the war procurement and production program." Exec. Order No. 9024, ¶ 2(a), 7 Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247. More specifically, President Roosevelt granted the WPB Chairman the power to "[d]etermine *the policies, plans, procedures, and methods* of the several departments, establishments, and agencies in respect to war procurement and production, including purchasing, *contracting*, specifications, and construction." Exec. Order No. 9024, ¶ 2(b), Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247 (emphasis added). The WPB Chairman's authority was far-reaching and absolute: "The Chairman may exercise the powers, authority, and discretion conferred upon him by this Order through such officials or agencies and in such manner as he may determine; *and his decisions shall be final*." Exec. Order No. 9024, ¶ 5, Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247 (emphasis added).

Pursuant to this authority, WPB Chairman Donald Nelson delegated broad authority to establish contract terms governing Avgas Contracts to DSC and another RFC subsidiary, Defense Plant Corporation ("DPC"): "It shall be the responsibility of [DSC] and [DPC], as the case may be, to determine, in behalf of the Government, the other terms and the form of such contracts." Letter dated Feb. 13, 1942 from WPB Chairman Nelson to Harold I. Ickes, Petroleum Coordinator for National Defense, Pl. App. 305. In the same letter, Chairman Nelson

delegated the responsibility for setting the price and technical specifications for the Avgas to the Office of the Petroleum Coordinator. *Id*. Thus, the authority to "determine," on behalf of the United States, all "other" terms – including terms governing what costs would be reimbursed by the Government – was conferred upon DSC.

Accordingly, DSC entered into the Avgas Contracts with the Oil Companies pursuant to the authority granted to President Roosevelt by the First War Powers Act (and the National Defense Act of 1916, *see infra*), as exercised and delegated by him to WPB Chairman Nelson in Executive Orders 9024, and then delegated by Chairman Nelson to DSC. It is beyond dispute that the First War Powers Act authorized the President to delegate authority for entering into all contracts necessary to fight the war without regard to the Anti-Deficiency Act. *See, e.g., Cadillac Fairview*, 299 F.3d at 1029. By the plain terms of Executive Order 9024, the President granted the WPB Chairman full power, without limitation, to make "policy" for the Government with respect to "contracting" for "war procurement and production," emphasizing that his decisions in this regard "shall be final." And by the plain terms of Chairman Nelson's letter, Chairman Nelson in turn delegated to DSC all power, without limitation, to "determine" on behalf of the United States contract terms with respect to war procurement and production of Avgas.

In *Cadillac Fairview*, the Ninth Circuit relied on an analogous order, Executive Order 9246, in finding that the Anti-Deficiency Act did not defeat the validity of the agreement by the Rubber Reserve Company, another subsidiary of the RFC, to indemnify Dow Chemical Company. 299 F.3d at 1028-29. Executive Order 9246 authorized the WPB "to assume full responsibility for and control over the Nation's rubber program." Exec. Order No. 9246, ¶ 1, 7 Fed. Reg. 7379 (Sept. 17, 1942), Pl. App. 250. In carrying out the Order, the WPB "may direct

the Rubber Reserve Company and other subsidiaries of the [RFC] ... to execute such aspects of the rubber program in such manner and for such period of time as [the WPB] deem advisable." Exec. Order No. 9246, ¶ 3, Fed. Reg. 7379 (Sept. 17, 1942), Pl. App. 250. The Ninth Circuit held that the Rubber Reserve Company's agreement to indemnify against future CERCLA costs was not *ultra vires* based on the Anti-Deficiency Act because "[t]he [First] War Powers Act authorized the President to authorize agencies to make contracts 'without regard to the provisions of law' such as the Anti-Deficiency Act, 'whenever he deemed such action would facilitate the prosecution of the war.' The president exercised this authority in an executive order particularly directed to the Rubber Reserve." 299 F.3d at 1029 & nn. 25-27 (citing to Executive Order 9246).

The conclusion that WPB and DSC were authorized to make the reimbursement promises to the Oil Companies in this case follows *a fortiori* from the Ninth Circuit's ruling. The delegation of power in Executive Order 9024 is considerably broader than the Rubber Reserve order. For example, nothing in the Rubber Reserve order authorized WPB to make "policy" with respect to "contracting" on behalf of the Government as Executive Order 9024 provides, nor did it provide that WPB's decision to delegate the power to "determine" contracting "terms" on behalf of the United States must be deemed "final."

**2. <u>Executive Order 9001</u>**

President Roosevelt also exercised his authority under the First War Powers Act in Executive Order 9001, which delegated the contracting powers to various governmental entities. Exec. Order No. 9001, 6 Fed. Reg. 6787 (Dec. 27, 1941), Pl. App. 244.[13] In a contemporaneous

[13] Although Executive Order 9001 was initially limited to the War Department, Navy Department, and United States Maritime Commission, President Roosevelt formally extended its provisions to the Department of Commerce, which had the authority to "supervise the

formal opinion, the Attorney General of the United States confirmed that Executive Order 9001 authorizes open-ended indemnification agreements like those before the Court in this case. 40 Op. Att'y Gen. 225, 234-35 (1942), Pl. App. 312-13. In response to an inquiry concerning the authority of the Corps of Engineers to enter an indemnification agreement with a dredging company, Attorney General Biddle explained:

> It is proposed to enter into an agreement whereby the Government is to indemnify the dredge owner against loss of his dredge and plant by enemy action, and against liability as a self-insurer under various Workmen's Compensation laws.… It is my understanding that in each case the action is to be taken in the exercise of a good faith judgment, and in an attempt to protect the interests of the United States, within the meaning of Title II of the First War Powers Act. On this basis, the examples given are clearly within your authority.

*Id.*, Pl. App. 313.

Thus, the First War Powers Act clearly empowered the President to authorize DSC and RFC to enter into contracts to further the war effort notwithstanding any other provisions of law relating to the making of government contracts (including the Anti-Deficiency Act), and Attorney General Biddle's opinion definitively establishes that the President properly exercised that power by authorizing indemnification agreements with war contractors. The Ninth Circuit adopted this conclusion in *Cadillac Fairview*, holding that the Anti-Deficiency Act did not render the Government's promise to indemnify Dow Chemical for its CERCLA costs *ultra vires* because First War Powers Act authorized the President to make such promises "'without regard

---

administration [and] be responsible for the coordination of the functions and activities" of the RFC and its subsidiary corporations. Reorganization Plan No. I of 1939, § 402(c), 53 Stat. 1423, 1430 (1939), Pl. App. 276 (granting authority to Federal Loan Administrator). *See* Exec. Order No. 9264, 7 Fed. Reg. 9105 (Nov. 5, 1942), Pl. App. 251 (extending Executive Order 9001 to Commerce Department); Exec. Order No. 9071, 7 Fed. Reg. 1531 (Feb. 24, 1942), Pl. App. 249 (transferring duties of Federal Loan Administrator to Department of Commerce). Thus, Executive Order 9001 applies to DSC and RFC by operation of Executive Orders 9071 and 9264.

to the provisions of law' such as the Anti-Deficiency Act," and President Roosevelt had exercised that power in, *inter alia*, Executive Order 9001. 299 F.3d at 1029 & n.27.

In asserting that the First War Powers Act did not authorize the reimbursement promises here, the Government relies exclusively upon the vacated opinion of the trial court in *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1, 22-25 (1987), *vacated on jurisdictional grounds*, 855 F.2d 1571 (Fed. Cir. 1988). *See* Gov't Br. 13 n.3; *see also E.I. DuPont de Nemours v. United States*, 54 Fed. Cl. 361, 371 (2002), *rev'd on other grounds*, 365 F.3d 1367 (Fed. Cir. 2004).[14] But unlike in this case, the issue in *Johns Manville* was whether a promise to indemnify could be *implied* in the absence of an express written promise to reimburse as in this case.

To be sure, in her subsequently vacated opinion, Judge Miller did suggest that Attorney General Biddle's authoritative, contemporaneous interpretation of Executive Order 9001 could be disregarded on the theory that "the Attorney General and other government officials, in their honest effort to facilitate the war effort, may have misunderstood or ignored the limitations on powers to contract and genuinely believed unlimited indemnification agreements to have been valid and essential." *Johns-Manville*, 12 Cl. Ct. at 24. But the *Johns-Manville* opinion erroneously failed to recognize that the Attorney General's conclusion that "unlimited indemnification agreements [were] valid and essential" to the war effort, *id.*, constitutes the Executive's determination that such contracts are necessary to "facilitate the prosecution of the war," Pub. L. No. 77-354, § 201, 55 Stat. 838, 839 (1941), Pl. App. 286, and thus fully

[14] In the course of reversing the trial court's holding that DuPont's claim was barred by the Anti-Deficiency Act, the Federal Circuit noted that DuPont had not challenged the trial court's conclusion with respect to the First War Powers Act and Executive Order 9001, and so the Court of Appeals had no occasion to consider the issue. 365 F.3d at 1374 n.12. In any case, as the Court later observed, the First War Powers Act could not have authorized the indemnification agreement in *DuPont* because the contract was entered in 1940, before passage of the First War Powers Act. *Id.* at 1377 n.15.

authorized under the First War Powers Act without regard to whether Attorney General Biddle's interpretation of Executive Order 9001 was "correct" as an abstract legal matter.

Simply put, Congress authorized the Executive to enter whatever contracts he deemed necessary to win the war, "without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts," Pub. L. No. 77-354, § 201, 55 Stat. 838, 839 (1941), Pl. App. 286, and acting through the Attorney General of the United States, the Executive authoritatively concluded that indemnification agreements were "valid and essential," *Johns-Manville*, 12 Cl. Ct. at 24, and fully authorized under the First War Powers Act. In these circumstances, it does not matter whether a court, reviewing the Attorney General's interpretation of Executive Order 9001 *de novo*, would agree with his understanding.

Moreover, even if review of the Attorney General's interpretation of Executive Order 9001 was appropriate, the *Johns Manville* opinion erred by failing to defer to it. It is well-established that courts must accord substantial deference to interpretation of Executive Orders by the Executive Branch. *See Udall v. Tallman*, 380 U.S. 1, 4 (1965) (interpretation of Executive Order by Secretary of Interior entitled to respect). Indeed, deference to the Executive's interpretation of an Executive Order may be greater even than that accorded to an agency's construction of its own regulations. *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991). The Executive Branch is *wholly responsible* for establishing an Executive Order's operational goals, interpreting the Order's terms, and applying the Order in various factual contexts. The entire process is thus internalized to the Executive Branch and involves subjects of predominant executive authority and of traditional judicial abstention.

The level of deference due to the Attorney General's opinion only increases when one considers that the United States entered into thousands of World War II contracts with indemnification provisions on the understanding that such provisions were fully authorized. As the Supreme Court stated, "[p]articularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, or making the parts work efficiently and smoothly while they are yet untried and new.' " *Udall*, 380 U.S. at 16 (quotation marks omitted).

In sum, Attorney General Biddle's opinion constitutes a considered exercise of the power granted to the Executive in the First War Powers Act to authorize the making of contracts that the Anti-Deficiency Act may have otherwise prohibited. As such, it is definitive without regard to any claim that its reasoning is deficient. Alternatively, Attorney General Biddle's opinion stands as the authoritative interpretation of Executive Order 9001. Either way, it is clear that the First War Powers Act provided ample authority, notwithstanding the Anti-Deficiency Act, for the promises to reimburse the Oil Companies for new charges imposed upon them by reason of their performance of the Avgas Contracts. The only non-vacated federal court decision to consider the issue has so held, *see Cadillac Fairview*, 299 F.3d at 1029, and this Court should hold likewise.[15]

[15] Even if Executive Order 9001 could be read, contrary to Attorney General Biddle's opinion, to bar the reimbursement promises made to the Oil Companies, those promises were authorized by Executive Order 9024, in which the President specifically provided that Executive Order 9001 is "amended" to conform with Executive Order 9024, and any provision of Executive Order 9001 that "conflict[s] with [Executive 9024 is] hereby superseded." Exec. Order No. 9024, ¶ 7, Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247.

### B. **The National Defense Act of 1916 Authorized the Reimburse-ment Promises that the Government Made to the Oil Companies.**

Eight days after he issued Executive Order 9024, President Roosevelt significantly expanded the authority of the WPB Chairman, granting him the power to "[p]erform the functions and exercise the powers vested in the President by Section 120 of the National Defense Act of 1916." Exec. Order No. 9040, ¶ 1(a), 7 Fed. Reg. 527 (Jan. 24, 1942), Pl. App. 248. In Section 120 of the National Defense Act of 1916, Congress had granted the President even more sweeping powers to obtain materials necessary to wage war "in addition to the present authorized methods of purchase or procurement." National Defense Act of 1916, Pub. L. No. 64-85, § 120, 39 Stat. 166, 213 (1916), Pl. App. 259. The statute authorized the President "to place an order" with any supplier for any "product or material as may be required," and made compliance with the order "obligatory" on both the supplier and "the responsible head or heads thereof." *Id.* Should the supplier refuse to comply with such an order, the statute authorized the President "to take immediate possession of any such plant or plants" capable of manufacturing the needed supplies. *Id.* What is more, the statute subjected any supplier and "the responsible head or heads thereof" that fails to comply with this section (i.e., refuses to fill an "obligatory" order) to felony criminal liability punishable "by imprisonment for not more than three years and by fine not exceeding $50,000." *Id.* Finally, Section 120 provided that "[t]he compensation to be paid" to any supplier "for its products or material … shall be fair and just." *Id.*

In delegating his broad powers under Section 120 of the National Defense Act of 1916 to the WPB Chairman, President Roosevelt again emphasized the absolute nature of his authority: "The Chairman of the War Production Board may exercise the powers, authority, and discretion conferred upon him by this or any other Order through such officials or agencies and in such

manner as he may determine; *and his decisions shall be final*." Exec. Order No. 9040, ¶ 3, 7 Fed. Reg. 527 (Jan. 24, 1942) Pl. App. 248 (emphasis added).

The additional grant of the President's powers under Section 120 of the National Defense Act of 1916 confirms beyond all question that the Anti-Deficiency Act did not limit the authority of WPB and DSC to make the reimbursement promises. Section 120 expressly expanded the President's procurement authority beyond that provided by then-existing law (including the Anti-Deficiency Act), authorizing him, if necessary, to require production of needed supplies on pain of seizure of plant facilities and felony criminal liability. Thus, the Oil Companies were effectively *required* to enter the agreements at issue in this case, subject only to the Government's obligation to provide "fair and just" compensation.

The Supreme Court has squarely held that Section 120 fully authorized the reimbursement of costs incurred as a result of the Government's requisitioning of materials needed for prosecution of war, and thus forecloses the Government's Anti-Deficiency Act argument in this case. In *International Paper Co. v. United States*, 282 U.S. 399, 405 (1931), the Court considered a claim arising during World War I from a Government order to a power company "requisition[ing] the total quantity and output of electrical power which is capable of being produced" by the supplier. International Paper owned a portion of the water necessary to fulfill the Government power order, but the Government ordered the power company to utilize " 'all of the water capable of being diverted through your intake canal.... This is intended to cut off the water being taken by the International Paper Company and thereby increase your productive capacity.' " *Id*. at 405-06. The Government paid the power company "fair and just compensation" in accordance with Section 120 pursuant to an agreement, but refused to reimburse the International Paper Company.

In awarding International Paper reimbursement of the costs it incurred by virtue of the diversion of its water, the Supreme Court rejected the argument, analogous to that advanced here, that Congress had not authorized the Government's procurement actions:

> The Government has urged … that it does not appear that the action of the Secretary was authorized by Congress. We shall give scant consideration to such a repudiation of responsibility. The Secretary of War in the name of the President, with the power of the country behind him, in critical time of war, requisitioned what was needed and got it. Nobody doubts, we presume, that if any technical defect of authority had been pointed out it would have been remedied at once. The Government exercised its power in the interest of the country in an important matter, without difficulty, so far as appears, until the time comes to pay for what it has had. The doubt is rather late. We shall accept as sufficient answer the reference of the petitioner to the National Defense Act of June 3, 1916, c. 134, § 120, 39 Stat. 166, 213, U.S. Code, Title 50, § 80, giving the President in time of war power to place an obligatory order ….

*Id.* at 406.

Unlike in this case, the *International Paper* Court acknowledged that "the petitioner did not come within the scope of the Government's written promise to pay." *Id*. at 407. The Court nevertheless held that the Government must reimburse the costs incurred by International Paper as just compensation that "it was bound by the Constitution to pay." *Id*. *A fortiori*, because the Oil Companies contracted for the Government's written promise to reimburse the charges incurred "by reason of" their production of Avgas pursuant to contracts authorized, *inter alia*, by Section 120 of the National Defense Act of 1916, the Government must pay such expenses as "fair and just" compensation fully authorized by law notwithstanding the Anti-Deficiency Act.

### C. DSC's Charter and RFC's Enabling Legislation Authorized the Reimbursement Promises the Government Made to the Oil Companies.

The RFC was originally created by Congress in 1932 with the "power to … make contracts" and to "determine and prescribe the manner in which its obligations shall be incurred and its expenses allowed and paid." Reconstruction Finance Corporation Act ("RFCA"), Pub. L.

No. 72-2, § 4, 47 Stat. 5, 6 (1932), Pl. App. 262. Congress amended RFC's enabling legislation in 1940 to give RFC authority to take certain actions "[i]n order to aid the Government of the United States in its national-defense program." Act of June 25, 1940, Pub. L. No. 76-664, § 5, 54 Stat. 572, 573 (1940), Pl. App. 280 (amending § 5d of the RFCA). Specifically, Congress authorized RFC "[w]hen requested by the Federal Loan Administrator, with the approval of the President, to create or to organize a corporation or corporations[] with power … to produce, acquire, and carry strategic and critical materials." § 5, 54 Stat. at 573, Pl. App. 280. Congress subsequently amended this authorization in 1941, further expanding RFC's authority so that it could create or organize corporations "(a) to produce, acquire, carry, sell, or otherwise deal in strategic and critical materials . . . ." Act of June 10, 1941, Pub. L. No. 77-108, § 4, 55 Stat. 248, 249 (1941).[16] The Act of June 10, 1941 also provided:

> [P]owers of every corporation hereafter created or organized under this subsection shall be set out in a charter which shall be valid only when certified copies thereof are filed with the Secretary of the Senate and the Clerk of the House of Representatives and published in the Federal Register, and all amendments to such charters shall be valid only when similarly filed and published. The charters of corporations heretofore so created or organized shall be so filed and published before July 1, 1941, and amendments thereto shall be valid only when certified copies thereof are hereafter so filed and published.

§ 4, 55 Stat. at 250, Pl. App. 284. Accordingly, all charters of corporations created by RFC pursuant to § 5d of the RFCA, as amended, that were filed and published had the force of law.

Upon Congress' grant of authority to create corporations to aid in national defense, on August 29, 1940, the RFC created the DSC as a wholly-owned subsidiary. GAO Report at 38, 338-39, Pl. App. 323, 329-30. When the parties entered into the Avgas Contracts, DSC's charter provided, in relevant part:

---

[16] Avgas was designated a critical material in August 1941, thus enabling the RFC and its subsidiary corporations, including the DSC, to buy and sell Avgas in accordance with the powers granted by subsection (a) of the Act of June 10, 1941 and the corresponding subsection, *see infra*, of the DSC charter. *See* Stipulation, ¶¶ 6, 71, Pl. App. 382, 395.

> [T]he objects, purposes, and powers of the [DSC] shall be:
>
> (a) To produce, acquire, carry, sell, or otherwise deal in strategic and critical materials . . . .
>
> . . . .
>
> The [DSC] shall have power and authority to do and perform all acts and things *whatsoever* which are necessary, suitable convenient, or proper in connection with or incidental to the foregoing objects, purposes, and powers, including, but without limitation, the power . . . to make contracts . . . .

GAO Report at 340-41, Pl. App. 331 (emphasis added). Because the charter was filed on July 10, 1941, GAO Report at 341, Pl. App. 332, and published in the Federal Register, 6 Fed. Reg. 3363, Pl. App. 303, it had the force of law.

The DSC, therefore, was expressly authorized by law to perform all acts *whatsoever* in furthering its corporate purpose of acquiring strategic materials deemed critical to the war effort. To state the obvious, the ability to perform all acts *whatsoever*—i.e., the ability to perform all acts without limitation – in acquiring and selling Avgas necessarily included the power to promise to reimburse the Oil Companies for costs incurred "by reason of" the production of Avgas notwithstanding the Anti-Deficiency Act. Significantly, while subsection (g) of the DSC charter, and the corresponding subsection (g) of the Act of June 10, 1941 authorizing the creation of DSC, both restrict the residual power granted to the President and the Federal Loan Administrator to actions committing no more than $200 million in the aggregate, Congress imposed no such limitation in subsection (a), authorizing actions to produce and acquire "strategic and critical materials."

**CONCLUSION**

For the foregoing reasons, we respectfully submit that the Court should deny the Government's motion to dismiss and enter partial summary judgment as to liability for breach of contract in favor of the Oil Companies.

June 30, 2006

Respectfully Submitted,

s/ Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)

**CERTIFICATE OF FILING**

I certify that on June 30, 2006, the attached document was filed electronically. I understand that service is complete upon filing and that parties may access this filing through the Court's ECF system.

s/ Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Vincent J. Colatriano
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)