**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 06-CV-141<br>(Senior Judge Smith) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' APPENDIX IN SUPPORT OF THEIR CROSS-**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)

June 30, 2006

# INDEX

## Contracts

Contract between Defense Supplies Corporation and Shell Oil Company, Inc. (Apr. 10, 1942) .......... 0001

Contract between Defense Supplies Corporation and Shell Oil Company, Inc. (May 1, 1943) .......... 0025

Contract between Defense Supplies Corporation and Union Oil Company (Dec. 31, 1942) .......... 0054

Contract between Defense Supplies Corporation and Union Oil Company of California (May 1, 1943) .......... 0068

Contract between Defense Supplies Corporation and Richfield Oil Corporation (Feb. 3, 1942) .......... 0099

Contract between Defense Supplies Corporation and Richfield Oil Corporation (Feb. 20, 1943) .......... 0117

Contract between Defense Supplies Corporation and The Texas Company (Jan. 17, 1942) .......... 0149

Contract between Defense Supplies Corporation and The Texas Company (Feb. 8, 1943) .......... 0164

Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (June 10, 1942) .......... 0192

Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (Feb. 18, 1943) .......... 0216

## Executive Orders

Executive Order No. 9001, 6 Fed. Reg. 6787 (Dec. 27, 1941) .......... 0244

Executive Order No. 9024, 7 Fed. Reg. 329 (Jan. 16, 1942) .......... 0246

Executive Order No. 9040, 7 Fed. Reg. 527 (Jan. 24, 1942) .......... 0248

Executive Order No. 9071, 7 Fed. Reg. 1531 (Feb. 24, 1942) .......... 0249

Executive Order No. 9246, 7 Fed. Reg. 7379 (Sept. 17, 1942) .......... 0250

Executive Order No. 9264, 7 Fed. Reg. 9105 (Nov. 5, 1942) ....................0251

Executive Order No. 9276, 7 Fed. Reg. 10091 (Dec. 12, 1942)....................0252

**Statutes**

Act of Feb. 27, 1906, Pub. L. No. 59-28, 34 Stat. 27 (1906) (excerpt) ....................0255

National Defense Act of 1916, Pub. L. No. 64-85, 39 Stat. 166 (1916) (excerpt) ....................0258

Reconstruction Finance Corporation Act, Pub. L. No. 72-2, 47 Stat. 5 (1932)....................0261

Reorganization Plan No. I of 1939, 39 Stat. 1423 (1939)....................0269

Act of June 25, 1940, Pub. L. No. 76-664, 54 Stat. 572 (1940) ....................0279

Act of June 10, 1941, Pub. L. No. 77-108, 55 Stat. 248 (1941) ....................0282

First War Powers Act of 1941, Pub. L. No. 77-354, 55 Stat. 838 (1941)....................0285

Renegotiation Act of 1942, Pub. L. No. 77-528, 56 Stat. 226 (1942) (excerpt)....................0289

Joint Resolution of June 20, 1945, Pub. L. No. 79-109, 59 Stat. 310 (1945)....................0294

Act of Sept. 6, 1950, Pub. L. No. 81-759, 64 Stat. 595 (1950) (excerpt)....................0295

Reorganization Plan No. 1 of 1957, 71 Stat. 647 (1957)....................0300

**Other**

Amendment to the Charter of the Defense Supplies Corporation,
6 Fed. Reg. 3363 (1941) ....................0303

Letter from WPB Chairman Nelson to Harold I. Ickes,
Petroleum Coordinator for National Defense (Feb. 13, 1942)....................0305

40 Op. Atty. Gen. 225 (1942) ....................0307

Memorandum from Robert P. Patterson (Oct. 10, 1942)....................0317

Reference Manual of Government Corporations, GAO,
Senate Doc. No. 86 (June 30, 1945) (excerpt)....................0318

A History of the Petroleum Administration for War (1946) (excerpts)....................0335

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)

Partial Consent Decree (Filed Dec. 12, 1994) ....................0345

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)
Stipulated Facts (June 23, 1995) ....................0377

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)
Supplemental Stipulated Facts (July 31, 1995)....................0476

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)
Preliminary Draft Pretrial Conference Order and Supplemental
Stipulated Facts (Dec. 11, 1997)....................0479

*Shell Oil Co. v. United States*, No. 05-704 (Fed. Cl.)
Docket Sheet (as of Mar. 2, 2006) ....................0551

Letter from Michael W. Kirk to The Honorable David L. Bibb
re Claims on Contracts between the United States and Various
Oil Companies for the Production of High-Octane Aviation
Fuel During World War II (Nov. 23, 2005)....................0554

Letter from Ruth Kowarski to Michael Kirk re Claims on
Contracts between the United States and Various Oil
Companies for the Production of High-Octane Aviation
Fuel During World War II (Feb. 15, 2006)....................0560

Conformed Copy

184407

April 8, 1942

# C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

SHELL OIL COMPANY, INCORPORATED

(California Refineries)

100-OCTANE AVIATION GASOLINE

April 10, 1942.

230050

DEFENSE SUPPLIES - SHELL CONTRACT

(California Refineries)

April 8, 1942.

CONTRACT made as of April 10, 1942, between SHELL OIL COMPANY, INCORPORATED, a Virginia corporation, having offices at 100 Bush Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Expansion of Seller's Refining Facilities.

Seller has existing facilities for the production at its Wilmington-Dominguez and Martinez, California, refineries of approximately three thousand (3,000) barrels per calendar day of the type of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, and is currently expanding the facilities at its Wilmington-Dominguez, Refineries at an estimated cost of approximately Two Million Dollars ($2,000,000.00), to a degree which it is estimated will enable Seller to produce at its said Refineries a total of approximately four thousand (4,000) barrels per calendar day of said gasoline. Seller is willing to expand its facilities at its Wilmington-Dominguez Refineries further at an estimated additional cost of approximately Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00), to a degree which it is estimated will enable Seller to produce at its Wilmington-Dominguez and Martinez Refineries a total of approximately ten thousand (10,000) barrels per calendar day of said aviation gasoline.

Seller shall use its best efforts so to expand said facilities to maintain work on the expansion day and night in so far as the requisite labor and materials are available, and to complete such expansion as soon as possible and not later than August 1, 1943.

Seller represents that there has not been included in the estimated expenditure of approximately Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00) any allowance for premium payments to secure

earlier delivery of material, overtime, or bonus payments (all of which are herein called "bonus payments"). Seller will make or arrange for such bonus payments as will in its judgment substantially expedite the completion of the new facilities, and full and complete records of such payments shall be maintained and made available to Buyer. Buyer shall pay Seller the amount by which the actual cost of construction of the facilities not now under construction, including all such bonus payments, exceeds whichever is the greater of (a) the actual cost of construction of the facilities not now under construction, excluding all bonus payments, and (b) Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00).

Such repayment of bonus payments shall be made by distributing the same as an addition to the unit price of the first three million five hundred thousand (3,500,000) barrels of 100-Octane aviation gasoline purchased after receipt of the notice of completion referred to in Section I (a) hereof. If Buyer fails to purchase said quantity of three million five hundred thousand (3,500,000) barrels at such increased price on or before July 31, 1944, Buyer shall on or before August 20, 1944 pay to Seller the unpaid balance of such bonus payments, which shall be treated as an advance payment of a portion of the purchase price of the remainder of the three million five hundred thousand (3,500,000) barrels at the time the purchase of such remaining quantity is made at the increased price.

If Buyer shall notify Seller at any time that it does not desire that additional expenditures for bonus payments shall be incurred or that such additional expenditures should be limited in a specified way or to a specified amount, Seller shall endeavor to arrange for the termination of any contracts or commitments for such bonus payments to the extent indicated in such notice so as to reduce the liability of Buyer hereunder.

As used above, the term "bonus payments" shall include any charges for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments.

The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive 100-Octane aviation gasoline which shall be in accordance with the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) The quantity of said gasoline shall be such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez Refineries, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, from and after Buyer's receipt of the notification referred to in paragraph (a) of this Section II until the end of the original term of this contract and during any extension thereof; provided, however, that from and after Buyer's receipt of said notification until the end of the original term of this contract but not during any extension thereof, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of six thousand (6,000) barrels per day. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various grades of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various grades of gasoline. The damages, if any, for a breach of the foregoing provisions of paragraphs (a) and (b) of this Section II shall be in accordance with Section VIII hereof.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation

between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(d) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100-Octane aviation gasoline as the total refining capacity for 100-Octane aviation gasoline at Seller's Wilmington-Dominguez and Martinez Refineries, less the quantity of Seller's sales of 100-Octane aviation gasoline from said refineries to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(g) Seller shall maintain storage facilities at, or in the vicinity of, its Wilmington-Dominguez Refineries to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline at six thousand (6,000) barrels per day. Seller represents that it has, and agrees to maintain storage facilities at its Martinez Refinery to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline at five hundred (500) barrels per day, which is the present production.

(h) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder

until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantity specified in paragraph (b) of this Section II. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof.

(i) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(j) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time in the facilities referred to in Section II (g) hereof to the extent of not more than Three hundred and ninety thousand (390,000) barrels.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez Refineries between the date of execution of this contract and the date of receipt of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such

option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez Refineries between the date of receipt by Buyer of the notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (1) the quantity to be purchased by Buyer under the provisions of paragraphs (a) and (b) of Section II hereof and (2) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) The base price of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, shall be Thirteen and sixty-five hundredths cents ($0.1365) per gallon, f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California. The base price of 100-Octane aviation gasoline specified as Item 2 of Exhibit A hereof shall be Thirteen and four-tenths cents ($0.134) per gallon, f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California.

(b) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven degree (27°) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field. The prices shall be increased or decreased five hundred ninety-three ten-thousandths of one cent ($0.000593) per gallon for each one cent ($0.01) advance or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seven hundred nineteen ten-thousandths of one cent ($0.000719) per gallon for each one point increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index number is now ninety-four and nine-tenths (94.9). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be

substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refineries at Wilmington-Dominguez and Martinez, California, and upon a normal operation of said refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refineries by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by

the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

(d) If at the request of Buyer or other agency of the United States Government, Seller acquires from other refiners some of the components of 100-Octane aviation gasoline and moves the same to its refineries for blending with other stocks for the production of 100-Octane aviation gasoline, it shall be entitled to compensation for any increase in costs thereby incurred by increasing the price of the 100-Octane aviation gasoline so produced by an amount which will equal the difference between the purchase price of such components and the cost of manufacturing the same or similar components at its own refineries, plus transportation and other costs of any kind or character involved in the delivery of the components to the refinery where the blending occurs. If Seller and Buyer are unable to agree upon the amount of such additional compensation, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later, in any event, than July 31, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. Loan to Seller.

(a) Buyer shall loan to Seller Eleven Million Six Hundred Twenty-Five Thousand Dollars ($11,625,000.00) which shall be disbursed by Buyer to Seller in installments of approximately One Million Dollars ($1,000,000.00) each as the expansion of the facilities referred to in Section I hereof progresses. The first installment shall be disbursed immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. Each remaining installment shall be disbursed upon Seller's request and upon receipt by Buyer from Seller of satisfactory evidence that it has expended or firmly committed itself to expend within the succeeding thirty (30) days on account of the expansion of the facilities referred to in Section I hereof all of the funds theretofore advanced to it by Buyer plus the amount of the installment requested, and in addition has so expended or firmly committed itself to expend within the succeeding thirty (30) days from its own funds not less than Thirty-Three and One-Third percent (33 1/3%) of the aggregate of such installments advanced by Buyer, including the installment for which the request is then being made.

(b) Such loan shall bear interest at the rate of two percent (2%) per annum on the outstanding balance thereof, until repaid.

(c) Seller shall repay the principal amount of the aforementioned loan to Buyer in equal monthly installments, as near as can be determined, plus interest accrued to the time of each such repayment, beginning the twentieth (20th) day of the month following the month in which Buyer receives the notification referred to in Section II (a) hereof and ending on the twentieth (20th) day of the month following the expiration of the original term of this contract; provided, however, that if Buyer shall breach its obligation to disburse the installments of said loan in accordance with this Section VII, or shall breach its obligation to buy the quantities of 100-Octane aviation gasoline called for by Section II (a) hereof, then Seller may withhold such part or all of the unrepaid portion of said loan including interest thereon (other than repayments, if any,

falling due prior to such breach), as shall not exceed the amount of damages claimed by Seller to result from such breach pending determination by agreement, arbitration or otherwise, of Buyer's liability, if any, for such breach. Upon such determination Seller shall only be obligated to repay to Buyer the unrepaid portion of said loan, plus interest accrued to date of breach, plus interest from date of breach on the amount, if any, by which said unrepaid portion of said loan exceeds the amount of the damages, if any, sustained by Seller, less the amount of said damages, if any.

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100-Octane aviation gasoline in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline unless the storage facilities referred to in Section II (g) hereof are full of 100-Octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100-Octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (h) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in

excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section IX) at its own cost and expense, at Seller's said refineries in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on Board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform to usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States within

which Seller customarily delivers gasoline from its Wilmington-Dominguez and Martinez Refineries, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss during the performance of such service, Seller shall make its records available to Buyer to prove the extent and value of such loss.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to

select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes

that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days; (a) Seller shall have entered into satisfactory contracts, with responsible engineering contractors for the expansion of the facilities referred to in Section I hereof at a cost not materially in excess of Seller's presently estimated cost as set forth in Section I hereof; and (b) Seller shall have received (1) all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations

necessary for obtaining materials, equipment, supplies and crude petroleum; and (2) such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

Dudley H. Digges
Acting Secretary

(Seal)

SHELL OIL COMPANY, INCORPORATED

By F. S. Clulow
Vice-President

ATTEST:

C. S. Gentry
Secretary

(Seal)

184407

EXHIBIT A.

Item 1.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

184407

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Shell Oil Company, Incorporated, to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of April 10, 1942.

RECONSTRUCTION FINANCE CORPORATION

By Charles B. Henderson
Chairman

ATTEST:

A. T. Hobson
Acting Secretary

(Seal)

184407

GUARANTEE BY SHELL UNION OIL CORPORATION

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, Shell Union Oil Corporation, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Shell Oil Company, Incorporated, (a subsidiary of Shell Union Oil Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Shell Union Oil Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of April 10, 1942.

SHELL UNION OIL CORPORATION

By R. G. A. Van Der Woude
President

ATTEST:

F. W. Woods
Secretary

(Seal)

21

184407

ADDENDUM #1

Shell Oil Company, Incorporated

San Francisco, California

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract Shell Oil Company, Incorporated, a Virginia corporation, (hereinafter designated as "Contractor") agrees:

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture of furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of

184407

Addendum #1

any violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of April 10, 1942.

SHELL OIL COMPANY, INCORPORATED

By: F. S. Clulow
Vice-President