57440

CONFORMED COPY

B. K. B. NOTED

MAR 1 1942

CONTRACT

between

DEFENSE SUPPLIES CORPORATION

and

UNION OIL COMPANY

(Wilmington Refinery)

100 OCTANE AVIATION GASOLINE

December 31, 1942.

230014

DEFENSE SUPPLIES - UNION CONTRACT
(Wilmington Refinery)

Revised January 14, 1943.

CONTRACT made as of December 31, 1942, between UNION OIL COMPANY OF CALIFORNIA, a California corporation, having its principal place of business at Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Seller's Refining Facilities.

Seller has existing facilities at its Wilmington, California refinery for producing approximately nine hundred (900) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 1 of Exhibit A attached hereto and made a part hereof, and is currently expanding its facilities at its own expense to an extent which it is estimated will increase its production to approximately fifty-five hundred (5500) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 1 of said Exhibit A. It is estimated that the new facilities will be completed about April 15, 1943.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer.

(b) Beginning January 1, 1943, Seller shall sell and deliver and Buyer shall buy and receive 100 octane aviation gasoline which shall be in accordance with the specification set forth in Exhibit A hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(c) The quantity of said gasoline shall be such quantity as Buyer may require for delivery from Seller's refinery at Wilmington, California and such quantity may be all or any part of the aviation gasoline which Seller may produce at its Wilmington refinery during the period between January 1, 1943 and the expiration of the original term of this contract or any extension thereof. However, Buyer shall not require delivery from Seller

of a quantity of such gasoline in excess of Seller's maximum production thereof which is estimated to be approximately nine hundred (900) barrels per calendar day until April 15, 1943 and approximately fifty-five hundred (5500) barrels per calendar day thereafter, and Seller agrees to operate said facilities during said period at full capacity or at a capacity sufficient al least to satisfy Buyer's requirements; provided, however, that Seller shall not be required to operate said facilities during any period in which Seller's inventory of 100 octane aviation gasoline, leaded or unleaded, exceeds three hundred thousand (300,000) barrels.

(d) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refinery facilities and the same raw materials as are used in producing 100 octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(e) Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet any other specifications required by Buyer.

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

III. Price and Payment.

(a) The base price of 100 octane aviation gasoline shall be as follows f.o.b. Seller's refinery at Wilmington, California:

(1) For deliveries made between January 1, 1943 and the earlier of the following dates: (a) the end of the original term of this contract or (b) the effective date of the notification referred to in Section II(a)

hereof, thirteen and sixty five one-hundredths cents ($0.1365) per gallon for 100 octane aviation gasoline in accordance with Item 1 of Exhibit A hereof.

(2) For deliveries from and after the effective date of said notification, if prior to the end of the original term of this contract, until the end of the original term of this contract, thirteen and fifty five one-hundredths cents ($0.1355) per gallon for 100 octane aviation gasoline in accordance with Item 1 of Exhibit A hereof.

(b) Seller represents that there has not been included in its computation of costs upon which the base prices were negotiated any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section V hereof shall accompany the aforesaid monthly statements.

IV. Duration of Contract.

The original term of this contract shall expire at midnight on June 30, 1943. Buyer shall have the option to extend this contract for one six month period beyond the original term by giving notice in writing to Seller of the exercise of such option at least thirty (30) days prior to the end of the original term. Upon such extension the obligations to purchase and receive shall be in accordance with Section II(b) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the thirty (30) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

V. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section III(c) hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set

of which shall be delivered forthwith to the hereinafter referred to authorized officer or employee of the War Department or Navy Department. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) ~~Should, any~~ such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section V and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer in appropriate limited quantities to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section V any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

VI. (Section Omitted)

VII. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

VIII. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either

party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

IX. Taxes.

(a) Buyer shall pay in addition to the prices as established in Section III hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States

or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section III hereof.

(b) Buyer shall also pay in addition to the prices as established in Section III hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section III hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized government tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

X. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail

confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XI. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XII. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XIII. Statutory Compliance.

(a) In carrying out this Contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller, or otherwise changed in a manner satisfactory to Seller.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

H. H. Turner
Secretary

(Seal)

UNION OIL COMPANY OF CALIFORNIA

By W. L. Stewart, Jr.
Executive Vice-President

ATTEST:

W. R. Edwards
Secretary

(Seal)

EXHIBIT A

Item 1: U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 - - - - - September 26, 1940

Amendment No. 4 - - - November 24, 1941

Knock Test Method - - AN-VV-F-746

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc./Gal.

ADDENDUM #1

Union Oil Company of California

Los Angeles, California

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, Union Oil Company of California, a California corporation, (hereinafter designated as "Contractor") agrees to the provisions set forth below, provided, however, that to the extent that the obligations of manufacturers or dealers are limited, restricted or relaxed by amendments of the law or by authorized governmental regulations, then the obligations of the Contractor shall be automatically and correspondingly limited, restricted or relaxed.

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be perfomred shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any

Addendum #1

violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of December 31, 1942.

UNION OIL COMPANY OF CALIFORNIA

By: W. L. Stewart, Jr.
Executive Vice-President

(Seal)

Conformed Copy

60351
62826

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

UNION OIL COMPANY OF CALIFORNIA

(Wilmington Refinery)

(Second Contract)

100 OCTANE AVIATION GASOLINE

May 1, 1943.

230015

60351
62826

DEFENSE SUPPLIES - UNION CONTRACT
(Wilmington Refinery)
(Second Contract)

Revised July 29, 1943.

CONTRACT made as of May 1, 1943, between UNION OIL COMPANY OF CALIFORNIA, a California corporation, having its principal place of business at Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of December 31, 1942, between the parties entitled "Contract between Defense Supplies Corporation and Union Oil Company (Wilmington Refinery)" is replaced by the present contract and is hereby terminated and cancelled.

I. Seller's Refining Facilities.

(a) Seller has existing facilities at its Wilmington, California refinery for producing approximately nine hundred (900) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 2 of Exhibit A attached hereto and made a part hereof, or approximately six hundred (600) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof, and is currently expanding its facilities at its own expense, at an estimated cost of approximately Fifteen Million One Hundred Fifty-nine Thousand Eight Hundred Forty-three Dollars ($15,159,843.00), to an extent which it is estimated will increase its production to approximately five thousand five hundred (5,500) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 2 of said Exhibit A, or approximately four thousand nine hundred (4,900) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 3 of said Exhibit A. It is estimated that the expanded facilities will be completed about August 1, 1943.

(b) Seller is willing to construct or cause to be constructed at its Wilmington refinery additional facilities at an estimated cost of approximately Nine Million Seven Hundred Thirty Thousand Dollars ($9,730,000.00), which it is estimated will enable Seller to increase production at its Wilmington refinery by approximately six thousand three hundred (6,300) barrels

per calendar day of 100 octane aviation gasoline to a total, from all of the aforesaid facilities, of approximately eleven thousand two hundred (11,200) barrels per calendar day of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof. Seller shall use its best efforts to complete said additional facilities as soon as posible and not later than July 1, 1944 and shall maintain work on the construction day and night insofar as the requisite labor and materials are available.

(c) Seller represents that there has not been included in the estimated expenditure of approximately Nine Million Seven Hundred Thirty Thousand Dollars ($9,730,000.00) set forth in paragraph (b) of this Section I, any allowance for premium payments to secure earlier delivery of material, overtime in excess of that required by law or executive order for six work days of eight hours each per week, or bonus payments (all of which are herein called "bonus payments"). Seller will make or arrange for such bonus payments as will in its judgment substantially expedite the completion of the new facilities, and full and complete records of such payments shall be maintained and made available to Buyer each month as such bonus payments accrue. Buyer shall pay Seller the amount by which the actual cost of construction of the additional facilities referred to in paragraph (b) of this Section I, including all such bonus payments, exceeds whichever is the greater of (a) the actual cost of construction excluding all bonus payments, and (b) Nine Million Seven Hundred Thirty Thousand Dollars ($9,730,000.00).

(d) Such repayment of bonus payments shall be made by distributing the same as an addition to the unit price of the first two million three hundred thousand (2,300,000) barrels of 100 octane aviation gasoline purchased after the effective date of the second notification referred to in Section II (a) hereof. If Buyer fails to purchase said quantity of two million three hundred thousand (2,300,000) barrels at such increased price on or before June 30, 1945, Buyer shall on or before July 31, 1945 pay to Seller the unpaid balance of such bonus payments, which shall be treated as an advance payment of a portion of the purchase price of the remainder of the two million three hundred thousand (2,300,000) barrels at the time the purchase of such remaining quantity is made at the increased price.

(e) If Buyer shall notify Seller at any time that it does not desire that additional expenditures for bonus payments shall be incurred or that

60351
62826

such additional expenditures should be limited in a specified way or to a specified amount, Seller shall endeavor to arrange for the termination of any contracts or commitments for such bonus payments to the extent indicated in such notice so as to reduce the liability of Buyer hereunder, but in the event Seller is unable to make such arrangements Buyer shall not be relieved of its obligation to pay Seller for such bonus payments as hereinabove provided.

(f) As used above, the term "bonus payments" shall include any charges for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments.

(g) The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the expansion of Seller's facilities referred to in Section I (a) hereof shall be completed and ready for operation, Seller shall promptly notify Buyer, and when the additional facilities referred to in Section I (b) hereof shall be completed and ready for operation, Seller shall again promptly notify Buyer.

(b) Under the terms of this contract, Seller shall sell and deliver and Buyer shall buy and receive the following quantities of 100 octane aviation gasoline which shall be in accordance with Item 2 of Exhibit A hereof prior to the effective date of the second notification referred to in paragraph (a) of this Section II, and thereafter shall be in accordance with Item 3 of Exhibit A hereof:

(1) During the period from January 1, 1943 until the effective date of the second notification referred to in paragraph (a) of this Section II, such quantity as Buyer may require for delivery from Seller's Wilmington refinery, which quantity may be all or any part of the aviation gasoline which Seller may produce at its Wilmington refinery during said period.

(2) From the effective date of the second notification referred to in paragraph (a) of this Section II until the expiration of this contract; such quantity as together

with all other sales by Seller to the United States government of said gasoline produced at Seller's Wilmington refinery from all the aforesaid facilities shall equal Seller's pro rata share of the entire requirements of the United States government, as hereinafter defined, but not less than six thousand three hundred (6,300) barrels per calendar day.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100 octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with Seller's available raw materials and with Seller's available refining facilities then capable of use in producing 100 octane aviation gasoline in accordance with said specifications other than those originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties or by arbitration under Section XI hereof. Deliveries of the products shall not be suspended during such negotiations. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(d) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(e) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100 octane aviation gasoline as the total refining capacity for 100 octane aviation gasoline at Seller's Wilmington Refinery, less the quantity of Seller's sales of 100 octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) Seller shall maintain storage facilites at, or in the vicinity of Wilmington, California, to accomodate an aggregate of at least three hundred thousand (300,000) barrels of 100 octane aviation gasoline or components thereof ready for blending produced under this contract prior to the effective date of the second notification referred to in paragraph (a) of this Section II, and

60351
62826

thereafter to accommodate an aggregate of at least four hundred fifty thousand (450,000) barrels of aviation gasoline or components thereof ready for blending produced under this contract.

(g) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller, in addition to all other remedies it may have, shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition, and shall not thereafter be required to make deliveries of said amount, but this shall not be in derogation of Buyer's rights under Section III hereof. Such discontinuance of production shall not be construed as a waiver by Seller of any of its rights under this contract.

(h) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(i) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100 octane aviation gasoline stored at that time in the facilities referred to in Section II (f) hereof to the extent of not more than four hundred and fifty thousand (450,000) barrels, but this paragraph (i) shall not be construed to enlarge Buyer's obligations under Section II (b) and Section VIII hereof.

III. Optional Gasoline.

(a) During the period prior to the effective date of the second notification referred to in Section II (a) hereof, Seller shall operate all its available facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements as they may be indicated from time to time in accordance with the provisions of Section II (b) (1) hereof.

(b) Buyer shall also have the option from time to time and at any time to purchase all or any part of the aviation gasoline which Seller may produce

at its Wilmington Refinery between the date of receipt by Buyer of the second notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II (b) hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) The base prices of 100 octane aviation gasoline shall be as follows f.o.b. Seller's refinery at Wilmington, California:

(1) For deliveries made between January 1, 1943 and midnight June 30, 1943, thirteen and sixty-five one-hundredths cents ($0.1365) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.

(2) For deliveries made between midnight June 30, 1943 until the effective date of the first notification referred to in Section II (a) hereof, thirteen and five hundred eighty-six one-thousandths cents ($0.13586) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.

(3) For deliveries from and after the effective date of the first notification referred to in Section II (a) hereof until the effective date of the second notification referred to in Section II (a) hereof, thirteen and fifty-five one-hundredths cents ($0.1355) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.

(4) For deliveries from and after the effective date of the second notification referred to in Section II (a) hereof until the end of the original term of this contract, the base price of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof shall be thirteen cents ($0.13) per gallon for that volume of said aviation gasoline delivered to Buyer in each calendar month which does not exceed eleven thousand two hundred (11,200) barrels multiplied by the number of days in that calendar month (hereinafter called "Base Volume"), and for all aviation gasoline delivered to Buyer in such calendar month in excess of the Base Volume (such excess being hereinafter called "Monthly Excess"), the base price shall be ten cents ($0.10) per gallon, except as hereinafter provided in accordance with the following subparagraph (ii) of this paragraph (a) (4):

(i) If prior to final termination of the sale and purchase of aviation gasoline hereunder the delivered volume for any month for which payment is made is less than the Base Volume for such month (such deficiency being hereinafter called "Deficiency Volume"), and the total volume delivered to Buyer up to the first day of such month exceeds the sum of all the Base Volumes up to the first day of such month (such excess hereinafter called "Accumulated Excess"), then such Deficiency Volume shall be applied to extinguish such Accumulated Excess or an amount thereof equal to such Deficiency Volume, whichever is the lesser, in the chronological order of accumulation of the Accumulated Excess, and Seller shall receive from Buyer a payment equal to the difference between the base price of thirteen cents ($0.13) per gallon and the base price of ten cents ($0.10) per gallon multiplied by the number

of gallons of Accumulated Excess so extinguished; provided that both base prices used in applying this subparagraph (i) shall be escalated in accordance with the provisions of Section V hereof as of the date of delivery of the so extinguished excess.

(ii) If in any month for which payment is made there is a Monthly Excess and the total volume delivered to Buyer up to the first day of such month is less than the sum of the Base Volumes up to the first day of such month (such difference hereinafter called "Accumulated Deficiency"), then the base price of so much of said Monthly Excess as does not exceed the Accumulated Deficiency shall be thirteen cents ($0.13) per gallon and the base price of the remainder of such Monthly Excess, if any, shall be ten cents ($0.10) per gallon.

(iii) In no event shall Seller be entitled to a payment under this Section IV (a) (4) to the extent that Seller has previously otherwise received reimbursement for losses incurred in selling 100 octane aviation gasoline at a base price of ten cents ($0.10) per gallon f.o.b. Seller's Wilmington refinery.

(b) Seller represents that there has not been included in its computation of costs upon which the base prices were negotiated any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said aviation gasoline which is properly allocable to

such manufacture, plus ten percent (10%) per annum of that portion of the original estimated cost of its additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The price of 100 octane aviation gasoline purchased hereunder shall be subject to adjustments as follows:

(a) As to deliveries on or after October 1, 1943, the base prices set forth in Section IV hereof shall be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the average price paid at the well for 25.0° - 25.9° A.P.I. Signal Hill crude over or under the present price of One Dollar Seven Cents ($1.07) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima-facie evidence of the prices paid by such purchasers.

(b) As to deliveries on or after October 1, 1943, the base prices set forth in Section IV hereof shall also be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the final monthly Wholesale Price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-six (96.0). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall

use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Wilmington, California, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced out-put and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, the amount of such increase shall be fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after

the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(d) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

(e) In the event of changes in royalties paid by Seller, price adjustment shall be made in accordance with Exhibit B attached hereto and made a part hereof.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the second notification referred to in Section II (a) hereof, but not later, in any event, than midnight on November 20, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive and the prices to be paid shall be fixed by agreement between the parties hereto, or failing agreement, by arbitration in accordance with Section XI hereof, during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Omitted)

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and ~~pay for~~ 100 octane aviation gasoline in accordance with Section II (b) and IV (c) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities referred to in Section II (f) hereof are full of 100 octane

aviation gasoline, leaded or unleaded or components thereof ready for blending (but if Buyer shall repudiate this contract and Seller shall accept such repudiation and terminate this contract then this proviso shall not apply); provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) (3) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) multiplied by the number of days in the period over which damages accrue, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (g) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank trucks deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on Board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (m) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of each delivery of a quantity of less than four thousand (4,000) gallons into a tank truck or motor transport in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

60351
62826

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer in appropriate limited quantities to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. Such expense shall be Seller's cost for such service. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault