60351
62826

or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material, or in securing labor necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior ~~Judge of~~ the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs

and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes, fees or charges on crude petroleum, or the transportation thereof, to the extent such taxes, fees or charges result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is

obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify the extent of such waiver, and include a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable

federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin and will include a similar provision in all contracts entered into by it with others incidental to or in connection with this contract.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) Omitted.

(d) Seller shall comply with requirements of the Walsh-Healey Act (41 USCA Sections 35-45) insofar as such Act is applicable to this transaction.

(e) This contract shall be subject to the provisions of Exhibit C attached hereto and made a part hereof.

XVII. Right to Terminate.

(a) Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for performing this contract and for the prompt completion of the additional facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

(b) In the event of termination of this contract in accordance with the provisions of paragraph (a) of this Section XVII, the aforesaid certain contract made as of December 31, 1942 shall be reinstated as of the date of such termination and thereafter shall remain in effect according to its terms.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
President

(SEAL)

ATTEST:

(Sgd) Merle A. Crandall
Assistant Secretary

UNION OIL COMPANY OF CALIFORNIA

By (Sgd) W. L. Stewart, Jr.
Executive Vice-President

(SEAL)

ATTEST:

(Sgd) W. R. Edwards
Secretary

60351
62826

EXHIBIT A

Item 1: (Item Omitted)

Item 2: U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 - - - - - September 26, 1940

Amendment No. 4 - - - November 24, 1941

Knock Test Method - - AN-VV-F-746

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc./Gal.

Item 3:

AN-F-28 December 23, 1942

Amendment No. 1 March 23, 1943

100 Octane Number by Method AN-VV-F-746, as amended November 5, 1940, or

99 Octane Number by Method ASTM-D-357-43T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a-March 23, 1943

Tetraethyl Lead Limit - 4.0 cc. per gallon.

EXHIBIT B

I. (A). Seller represents that the base prices set forth in Section IV (a) (4) of the foregoing contract include certain "catalytic cracking royalty sums" representing patent royalties which Seller expects to pay to a third party or parties; that said "catalytic cracking royalty sums" are calculated at a running royalty rate of $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operation, and amounts to $0.00151 per gallon of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A of the foregoing contract.

I. (B). In the event that Seller's licensor at any time during the term of the foregoing contract, shall issue to any third party a patent license covering catalytic cracking operations of the type employed by Seller at a running royalty rate lower than $0.05 per barrel of fresh stock charged to said third party's catalytic cracking operation, which lower running royalty rate is applicable to Seller's license, then as between Buyer and Seller, the first receiving such information shall notify the other and the base price which includes said "catalytic cracking royalty sum" shall, for all aviation gasoline thereafter delivered under the foregoing contract, be adjusted by subtracting from such base price, an amount equal to said "catalytic cracking royalty sum" multiplied by a factor equal to $\frac{A}{B}$, where A equals the difference between $0.05 and said lower running royalty rate payable by said third party, and B equals $0.05; and Seller shall within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer, without interest, an amount equal to the total number of gallons of 100 octane aviation gasoline delivered under the foregoing contract at a base price including said "catalytic cracking royalty sum" between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the amount of said "catalytic cracking royalty sum" and (b) by said factor $\frac{A}{B}$.

I. (C). In the event that during the term of the foregoing contract Seller does not pay to any third party or parties the "catalytic cracking royalty sum" aforesaid, or any part thereof, then within sixty (60) days following the date of termination, cancellation or expiration of the foregoing contract, Seller shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking royalty sum".

I. (D). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "catalytic cracking royalty sum" then Seller shall promptly notify Buyer and the base price of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from said base price an amount equal to said "catalytic cracking royalty sum"; and Seller shall within sixty (60) days after the date of said notification refund to Buyer, without interest, an amount equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum," multiplied by said "catalytic cracking royalty sum".

II (A). Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract also include certain "alkylation royalty sums" representing patent royalties which Seller is obligated to pay to its licensor for a certain sulfuric acid alkylation process employed by Seller in the manufacture of said aviation gasoline; that said "alkylation royalty sums" are calculated in the cost computations for the period prior to July 1, 1943 at the rate of $0.21 per barrel of total alkylate included in said aviation gasoline and after July 1, 1943 at the rate of $0.15 per barrel of total alkylate and amount to the following sums per gallon of 100 octane aviation gasoline:

| | Item 2 (Exhibit A) | Item 3 (Exhibit A) |
|---|---|---|
| For the period from January 1, 1943 to Midnight June 30, 1943 | $0.00225 | None |
| From midnight June 30, 1943 to the effective date of the first notification referred to in Section II(a) of the foregoing contract: | $0.00161 | None |
| For the period from the effective date of the first notification referred to in Section II(a) of the foregoing contract until the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.00174 | None |
| For the period after the effective date of the second notification referred to in Section II(a) of the foregoing contract: | None | $0.00106 |

60351
62826

II. (B). In the event that during the term of the foregoing contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such alkylation process, shall be reduced below $0.15 per barrel with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices as set forth in Section IV of the foregoing contract for 100 octane aviation gasoline manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "alkylation royalty sum" applicable thereto as set forth in Section II (A) of this Exhibit B, and an amount equal to such "alkylation royalty sum" multiplied by the factor $\frac{C}{D}$ where C equals the reduced running royalty per barrel that Seller is obligated to pay, and D equals fifteen cents ($0.15). As to any of said gasoline delivered to and paid for by Buyer under the foregoing contract at a price including said "alkylation royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "alkylation royalty sum" has been reduced.

III. (A). Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract include certain "isomerization royalty sums" representing royalties which Seller is obligated to pay to its licensor for a certain isomerization process employed by Seller in the manufacture of said aviation gasoline; that said "isomerization royalty sums" are calculated at the rate of $0.05 per barrel of isobutane produced by said process and used in the manufacture of said aviation gasoline and are as follows per gallon of 100 octane aviation gasoline:

| | Item 2 (Exhibit A) | Item 3 (Exhibit A) |
|---|---|---|
| For the period from the effective date of the first notification referred to in Section II(a) of the foregoing contract until the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.00024 | None |
| For the period after the effective date of the second notification referred to in Section II(a) of the foregoing contract: | None | $0.00001 |

III. (B). In the event that during the term of said contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such isomerization process shall be reduced with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices of 100 octane aviation gasoline, as set forth in Section IV of said contract, manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "isomerization royalty sum" applicable thereto, as set forth in Section III (A) of this Exhibit B, and an amount equal to such "isomerization royalty sum" multiplied by the factor $\frac{E}{F}$ where E equals the reduced running royalty per barrel that Seller is obligated to pay, and F equals five cents ($0.05). As to any of said gasoline delivered to and paid for by Buyer under said contract at price including said "isomerization royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "isomerization royalty sum" has been reduced.

IV. (A). In the event that any base price of said aviation gasoline is reduced under the provisions of this Exhibit B, and in the event that at any time prior to six (6) years following the date of termination, cancellation or expiration of the foregoing contract, a suit or suits for infringement with respect to the aforesaid catalytic cracking process or the products thereof, or with respect to the aforesaid alkylation process or the products thereof, or with respect to the aforesaid isomerization process or the products thereof, ~~shall~~ be made or brought against Seller, and if such suit or suits so brought, shall result in final adjudication or settlement which shall establish an obligation to be paid by Seller in satisfaction thereof, Buyer shall make payment to Seller as follows: The amount so payable by Buyer to Seller in each case shall in no event exceed whatever amount is the lessor of (1) the amount whereby Buyer's price for the total quantity of gasoline purchased under this contract and involved in such suit

60351
62826

was reduced under this Exhibit B, or (2) the amount required to be paid in settlement or satisfaction of such suit, above any portion thereof for which Seller is reimbursed by its licensor; it being expressly understood that all payments by Buyer to Seller (under this paragraph) shall be solely for the purpose of paying damages or other moneys applicable to the case, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation; provided, however, that with respect to such settlement no payment shall be made by Buyer to Seller unless Buyer shall first have given in writing its approval to such settlement; Buyer hereby agreeing that it will give its approval to any such settlement which, under the circumstances, appears to be reasonable.

IV. (B). With respect to such suit or suits for infringement referred to in Section IV. (A) hereof, Seller agrees that it will defend, with all due diligence and at its own expense, such suit or suits at least until an adjudication shall have been made therein by a court of record having primary jurisdiction thereof, or until a settlement approved by Buyer, as above provided, has been effected. Seller further agrees to notify Buyer promptly of the institution of each such suit and shall permit Buyer at its own election, to be represented therein by counsel of its own choice and at its own expense.

IV. (C). If an adjudication adverse to Seller has been made in any such suit by said court of record having primary jurisdiction thereof, and if no settlement approved by Buyer has been effected previously, and Seller shall, in its best judgment, elect not to appeal from such adverse adjudication or to continue the defense of such suit, then, in that event, Seller agrees to give timely notice to Buyer and agrees that Buyer may, at its election and at its own expense, continue to defense of such suit, file and perfect appeals to courts of higher jurisdiction, and do such other things as Buyer believes necessary or desirable to obtain a final adjudication or settlement of such suit, and in such event, Seller agrees that Buyer may use its name for all proper purposes connected with the continuance of such suits, and that it will cooperate fully with Buyer in any proper and legal manner necessary to aid Buyer in the furtherance of the defense of such suits.

60351
62826

V. Seller also represents that there have not been included in its computation of the base prices set forth in Section IV of the foregoing contract any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder other than those set forth in Sections I, II and III of this Exhibit B; except that Seller in its computation of such base prices has included as a capital investment, and has amortized at the rate of ten percent (10%) per annum the sum of $200,000.00 which Seller expects to pay for fully paid-up licenses for certain thermal cracking employed by Seller in the manufacture of such aviation gasoline.

VI. Seller covenants that any "catalytic cracking royalty sum" and any "alkylation royalty sum" and any "isomerization royalty sum" paid by it and included within the base prices set forth in Section IV of the foregoing contract, shall be paid in good faith only to a third party or parties who, in Seller's judgment, are entitled to receive such royalties and to license the respective processes covered thereby.

60351
62826

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to UNION OIL COMPANY OF CALIFORNIA to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 1, 1943.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles S. Fisher, Jr.
Vice-Chairman

ATTEST:

(Sgd) A. T. Hobson
Secretary

(SEAL)

EXHIBIT C

Contractor: Union Oil Company of California

Renegotiation Pursuant to Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, hereinafter referred to as "the Act".

(a) Upon the written demand of Defense Supplies Corporation, at such period or periods when, in the judgment of Defense Supplies Corporation, the profits accruing to Contractor under this contract can be determined with reasonable certainty, the contract price will be renegotiated to eliminate therefrom any amount found as a result of such renegotiation to represent excessive profits. The demand of Defense Supplies Corporation shall fix a place for renegotiation and a time for commencement thereof not later than one year after the close of the fiscal year of Contractor within which completion or termination of the contract, as determined by Defense Supplies Corporation, occurs.

(b) Contractor will furnish to Defense Supplies Corporation such statements of actual costs of production and such other financial statements, at such times and in such form and detail, as Defense Supplies Corporation may prescribe, and will permit such audits and inspections of its books and records as Defense Supplies Corporation may request.

(c) Defense Supplies Corporation shall retain from amounts otherwise due to Contractor, or Contractor shall repay to the United States if paid to him, any amount of the contract price found as a result of such renegotiation to represent excessive profits and not eliminated through reductions in contract price or otherwise, as Defense Supplies Corporation may direct.

(d) In each subcontract made by Contractor under this contract, Contractor will include in each subcontract described in paragraph (f) (2) (ii) of this Exhibit C, and in each subcontract for an amount in excess of $100,000 described in paragraph (f) (2) (i) of this Exhibit C, the following provisions:

"ARTICLE ..........Renegotiation Pursuant to Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, hreinafter referred to as 'the Act'.

(1) Upon the written demand of Defense Supplies Corporation at such period or periods when, in the judgment of Defense Supplies Corporation the profits accruing to ............... (subcontractor) under this contract can be determined with reasonable certainty, Defense Supplies Corporation and ....................... will renegotiate the contract price to eliminate therefrom any amount found as a result of such renegotiation to represent excessive profits. The demand of Defense Supplies Corporation shall fix a place for renegotiation and a time for the commencement thereof not later than one year after the close of the fiscal year of the subcontractor within which completion or termination of the contract, as determined by Defense Supplies Corporation, occurs.

(2) ............... (subcontractor) will furnish to Defense Supplies Corporation such statements of actual costs of production and such other financial statements, at such times and in such form and detail, as Defense Supplies Corporation may prescribe, and will permit such audits and inspections of its books and records as Defense Supplies Corporation may request.

(3) Any amount of the contract price found as a result of such renegotiation to represent excessive profits shall, as directed by Defense Supplies Corporation,—

(A) Be deducted by . . . . . . . . . (contractor) from payments otherwise due to . . . . . . . . . . . (subcontractor) under this contract; or

(B) Be paid by . . . . . . . . . . (subcontractor) directly to the United States, if paid to him; or

(C) Be eliminated through reductions in the contract price, or otherwise.

62715
62826

(4) . . . . . . . . . . . .agrees that . . . . . . . . . shall not
(subcontractor) (contractor)
be liable to . . . . . . . . . . . . for or on account of any amount paid
(subcontractor)
to the United States by . . . . . . . . . . or deducted by . . . . . . .
(subcontractor) (contractor)
from payments otherwise due under this contract, pursuant to directions from Defense Supplies Corporation in accordance with the provisions of this Article. Under its contract with Defense Supplies Corporation, . . . . . . . . is obligated to pay or credit to Defense Supplies Corpora-
(contractor)
tion all amounts withheld by it from . . . . . . . . . . hereunder.
(subcontractor)

(5) . . . . . . . . . . . . . agrees (a) upon direction of Defense
(subcontractor)
Supplies Corporation, to include in any subcontract hereunder sections (1) to (6), inclusive, of this Article, and (b) to make no subdivisions of any contract for the purpose of evading the provisions of this Article, and (c) to repay to the United States the amount of any reduction in the contract price of any such subcontract which results from renegotiation thereof by Defense Supplies Corporation, and which Defense Supplies Corporation directs . . . . . . . . . . . . to withhold from payments which
(subcontractor)
are otherwise due under such subcontract and actually unpaid at the time . . . . . . . . . . . . receives such direction.
(subcontractor)

(6) As used in this Article - -

(a) The term 'Defense Supplies Corporation' shall be deemed to include any duly authorized representative or representatives.

(b) Except as exempted under or exempted pursuant to section 403 (1) of the Act, the term 'subcontract' means (i) any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of this contract, or (ii) any contract or arrangement (other than a contract or arrangement between two contracting parties, one of which is found by Defense Supplies Corporation to be a bona fide executive officer, partner, or full time employee of the other contracting party), (A) under which any amount payable is contingent upon the procurement of this contract with Defense Supplies Corporation or of a subcontract or subcontracts hereunder, or determined with reference to the amount of this contract or such subcontract or subcontracts, or (B) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring this contract with Defense Supplies Corporation, or any subcontract or subcontracts hereunder; Provided, that nothing in this sentence shall be construed (1) to affect in any way the validity or construction of provisions in any contract with Defense Supplies Corporation, or any subcontract thereunder, heretofore at any time or hereafter made, prohibiting the payment of contingent fees or commissions; or (2) to restrict in any way the authority of Defense Supplies Corporation to determine the nature or amount of selling expenses under subcontracts as defined in (ii) herein, as a proper element of the contract price or as a reimbursable item of cost, under a contract with Defense Supplies Corporation, or a subcontract thereunder. The term 'Article' as used in this subsection (b) includes any material, part, assembly, machinery, equipment, or other personal property.

(c) The term 'renegotiate' and 'renegotiation' have the same meaning as in section 403(b) of the Act.

(d) The term 'this contract' means this contract as modified from time to time.

(e) The term 'contract price' includes without limitation any amount paid or to be paid pursuant to this contract."

(e) (1) Contractor agrees to make no subdivisions of any contract or subcontract for the purpose of evading the provisions of this Exhibit C.

(2) If any renegotiation between Defense Supplies Corporation and any subcontractor pursuant to the provisions required by section (d) hereof results in a reduction of the contract price of the subcontract, Defense Supplies Corporation shall retain from payments otherwise due to Contractor, or Contractor shall repay to the United States, as Defense Supplies Corporation may direct, the amount of such reduction which Defense Supplies Corporation directs Contractor to withhold from payments which are otherwise due to the subcontractor under the subcontract and actually unpaid at the time Contractor receives such direction.

(f) As used in this Exhibit C--

(1) The term "Defense Supplies Corporation" shall be deemed to include any duly authorized representative or representatives.

(2) Except as exempted under or exempted pursuant to section 403 (i) of the Act, the term "subcontract" means (i) any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of this contract, or (ii) any contract or arrangement (other than a contract or arrangement between two contracting parties, one of which is found by Defense Supplies Corporation to be a bona fide executive officer, partner or full time employee of the other contracting party), (A) any amount payable under which is contingent upon the procurement of this contract with Defense Supplies Corporation or of a subcontract or such subcontracts hereunder, or determined with reference to the amount of this contract or subcontract or subcontracts, or (B) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring this contract with Defense Supplies Corporation, or any subcontract or subcontracts hereunder: Provided, That nothing in this sentence shall be construed (1) to affect in any way the validity or construction of provisions in any contract with Defense Supplies Corporation or any subcontract thereunder, heretofore at any time or hereafter made, prohibiting the payment of contingent fees or commissions; or (2) to restrict in any way the authority of Defense Supplies Corporation to determine the nature or amount of selling expenses under subcontracts as defined in (ii) herein, as a proper element of the contract price or as a reimbursable item of cost, under a contract with Defense Supplies Corporation or a subcontract thereunder. The term "Article" as used in this subsection (b) includes any material, part, assembly, machinery, equipment, or other personal property.

(3) The terms "renegotiate" and "renegotiation" have the same meaning as in section 403(b) of the Act.

(4) The term "this contract" means this contract as modified from time to time.

(5) The term "contract price" includes without limitation any amount paid or to be paid pursuant to this contract.

176608
177835

CONFORMED COPY

Revised February 3, 1942.

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

RICHFIELD OIL CORPORATION

100-OCTANE AVIATION GASOLINE

February 3, 1942.

230042

DEFENSE SUPPLIES - RICHFIELD CONTRACT

(Watson, California, Refinery)

Revised February 3, 1942.

CONTRACT made as of February 3, 1942, between RICHFIELD OIL CORPORATION, a Delaware Corporation, having its principal business office at 555 South Flower Street, Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Expansion of Seller's Refining Facilities.

Seller has facilities for the production at Watson, California, of approximately one thousand seven hundred (1,700) barrels per calendar day of 100-Octane aviation gasoline and is willing to expand its facilities, at an estimated cost of approximately Three Million Dollars ($3,000,000.00), to a degree which it is estimated will enable Seller to produce at Watson, California, approximately three thousand seven hundred fifty (3,750) barrels per calendar day of 100-Octane aviation gasoline. Seller shall use its best efforts to expand said facilities and shall endeavor to maintain work on said expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as soon as possible and not later than January 1, 1943. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, in accordance with provisions of this contract, seventy-five thousand (75,000) barrels per calendar month of 100-Octane aviation gasoline which shall be in accordance with

the specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline.

(b) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(c) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(d) Seller shall maintain storage facilities at, or in the vicinity of, Watson, California, to accommodate at least one hundred fifty thousand (150,000) barrels of 100-Octane aviation gasoline. Subject to Section VIII hereof, Buyer shall order and take deliveries in such quantities as it may determine; provided, however, that whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract,

then such additional aviation gasoline shall be treated as covered by Section III hereof. In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

III. Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of the 100-Octane aviation gasoline which Seller may produce between the execution of this contract and the date of receipt by Buyer of notification of the completion of the expansion of said facilities to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100-Octane aviation gasoline which Seller may produce between said receipt by Buyer of notification of completion and the expiration of this contract. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

The options granted in this Section III shall terminate on any termination of this contract.

IV. Price and Payment.

The base price of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, shall be thirteen and one-half cents ($0.135) per gallon f.o.b. Seller's refinery at Watson, California. The base price of 100-Octane aviation gasoline specified as Item 2 of Exhibit A hereof shall be thirteen and one-quarter cents ($0.1325) per gallon f.o.b. Seller's refinery at Watson, California. The base prices of other kinds of 100-Octane aviation gasoline shall be as specified by addenda to Exhibit A

hereof. Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

Buyer shall pay promptly, but not later than the twentieth (20th) day after the end of each calendar month, all money due for gasoline delivered to it by Seller during said month. On or before the tenth (10th) day of each calendar month, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of one dollar and eleven cents ($1.11) per barrel for Signal Hill crude, twenty-six degrees (26°) A.P.I., deliverable to Seller in the Los Angeles Basin Field. The price shall be increased or decreased six hundred eight ten-thousandths of one cent ($0.000608) per gallon for each one cent ($0.01) advance or decrease in the average price paid for said crude over or under one dollar and eleven cents ($1.11) per barrel by the three (3) largest purchasers of such crude in the Los Angeles Basin Field. The prices posted for such crude in the Los Angeles Basin Field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seven hundred twenty-two ten-thousandths of one cent ($0.000722) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5). The effective

date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number, regardless of what Seller's crude inventory may be at the time of such change. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to ~~Seller's refinery at Watson, California~~, and upon a normal operation of ~~that refinery~~, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to ~~said~~ refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price

within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on December 31, 1945. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. During such extension or extensions all of the provisions of this contract except those not then applicable shall be in full force and effect.

VII. Advance on Account of Purchase of Gasoline.

(a) Buyer shall make an advance payment to Seller on account of the purchase of 100-Octane aviation gasoline in the amount of Two Million One Hundred Thousand Dollars ($2,100,000.00) which shall be disbursed in monthly installments as the construction of the expanded facilities progresses. The first installment shall be disbursed in the amount of one-twelfth (1/12th) of said Two Million One Hundred Thousand Dollars ($2,100,000.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer from Seller of Seller's waiver of its right to

terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall deliver to Buyer statements, showing only principal items, to certify that it has expended, or firmly committed itself to expend, on account of the construction of the expanded facilities all of the funds theretofore advanced to it by Buyer and in addition has so expended, or firmly committed itself to expend, from its own funds not less than thirty-three and one-third percent (33-1/3%) of the aggregate of such installments advanced by Buyer. Buyer shall have the privilege of examining Seller's books to verify said statements, but such verification shall not be a condition of payments by Buyer. If such examination shall lead to any disagreement, it shall be settled by arbitration under Section XI hereof.

(b) From the amount due Seller for deliveries of 100-Octane aviation gasoline for each of the first thirty-six (36) full calendar months following receipt by Buyer of Seller's notification of completion of the expanded facilities referred to in Section I hereof, Buyer shall deduct and retain one thirty-sixth (1/36th) of the sum of:

(1) the above advance payment, and

(2) interest at the rate of two percent (2%) per annum on outstanding balances of such advance payment accruing subsequent to the date of receipt by Buyer of Seller's notification of completion of said expanded facilities;

provided that Buyer shall also deduct and retain, with respect to each of the first twelve (12) full calendar months after the date of receipt of such notification of completion the sum of:

(1) one-twelfth (1/12th) of the amount of interest at the rate of two percent (2%) per annum on the outstanding balances of such advance payment accrued prior to and including the date of receipt by Buyer of Seller's notification of completion of said expanded facilities; and

(2) one-twelfth (1/12th) of the amount of the credit, if any, referred to in paragraph (c) of this Section VII.

The above deductions shall be considered as payment for the first purchases by Buyer in each of the first thirty-six (36) full calendar months following receipt by Buyer of Seller's notification of completion of said expanded facilities.

(c) If, by reason of delay in the completion of the expanded facilities, the notification of completion referred to in Section II hereof shall not be received at least thirty-six (36) months prior to December 31, 1945, then Seller shall repay to Buyer one thirty-sixth (1/36th) of the principal amount of the advance payment for each month or fraction thereof by which receipt of said notification of completion is delayed after January 1, 1943, such repayment to be credited against any purchases by Buyer of 100-Octane aviation gasoline hereunder delivered during each of the twelve (12) full calendar months following receipt of said notification of completion; provided, however, that not more than one-twelfth (1/12th) of such credit shall be taken in each of said twelve (12) full calendar months; and provided further that any such repayment not made as provided above or in paragraph (d) of this Section VII shall be made by Seller to Buyer in cash on December 31, 1945.

(d) In the event of Seller's failure to deliver sufficient 100-Octane aviation gasoline hereunder following such notification of completion, due to reasons other than the force majeure reasons referred to in Section X hereof, to permit Buyer to recoup in any month the monthly repayment installment as provided in paragraph (b) of this Section VII, the unrecouped portion of the monthly repayment installment as aforesaid shall be repaid immediately by Seller to Buyer in cash; but if such failure was due to such force majeure reason then the repayment period provided in paragraphs (b) and (c) of this Section VII shall be extended one month for each month in which such failure due to such force majeure reason occurred.

176608

VIII. Liquidated Damages and Limitation of Liability.

The parties mutually agree that the Seller would be seriously damaged in the event that Buyer should breach its obligation to take that minimum quantity of 100-Octane aviation gasoline herein agreed upon and that the liquidated damages herein provided for are not in the nature of a penalty or forfeiture and that they reflect allowance for the possible cessation of war prior to the expiration of the original term of the contract. If Buyer shall fail to purchase sufficient 100-Octane aviation gasoline in any one full calendar month following receipt by Buyer of Seller's notification of completion of said expanded facilities to liquidate the monthly repayment installment (determined as provided in paragraphs (b) and (c) of Section VII hereof), Buyer shall have the privilege to deduct and retain from amounts owing to Seller for purchases of 100-Octane aviation gasoline during the next succeeding month, over and above amounts sufficient to liquidate the regular monthly repayment installment for such month, an amount up to the unrecouped portion of the monthly repayment installment for the preceding month. If Buyer so fails to make recoupment, as aforesaid, during such succeeding month, then Seller shall, upon the expiration of such month, be entitled to retain as liquidated damages such unrecouped amount plus interest at the rate of two percent (2%) per annum on such unrecouped amount computed from the first (1st) day of the preceding month.

It is understood that the foregoing liquidated damages relate solely to a default by Buyer in not purchasing the stipulated quantities. Damages for any other default by Buyer and for any default by Seller shall be determined by Arbitration.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the intake pipe of the means of transportation, f.o.b. Seller's refinery at Watson, California.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of Seller's capacity for loading tank trucks and tank car deliveries

not to be in excess of two thousand (2,000) barrels in any one day all to be supplied by Buyer at its own cost and expense.

(c) Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each tanker or barge and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board.

Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Seller shall furnish certificates of inspection, by a licensed inspector satisfactory to the parties which shall set forth the quantity and quality of each shipment of gasoline. Inspection shall be based on samples taken from Seller's storage tanks from which the product is delivered. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall forthwith be delivered to Buyer, and a third submitted to Buyer with the monthly statement required by Section IV hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, in which event Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(e) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery except in case of deliveries into tank trucks, in which case no adjustment shall be made.

(f) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society

for Testing Materials, wherever applicable, and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(g) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(h) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(i) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may nevertheless accept such product and claim an adjustment for such deficiency; provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(j) Upon request by Buyer, Seller shall make deliveries of 100-Octane aviation gasoline under this contract in appropriate limited quantities to points where Seller may be currently engaged in making deliveries of aviation gasoline in the ordinary course of its business. The delivery costs shall be paid by Buyer and are to be mutually agreed upon.

(k) Seller shall not be obligated to procure the 100-Octane gasoline to be delivered hereunder from any source other than its Watson, California, refinery.

X. Force Majeure.

Seller shall not be liable for delays or defaults in its performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts or requests of the Government, or of any Governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provisions of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days after receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the person who at the time is the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit, acting in his individual and not judicial capacity, upon application therefore by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expenses of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.