XII. Taxes.

Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

Any addition of taxes to the prices as established in Sections IV and V hereof shall not be considered in arriving at the value of the gasoline delivered hereunder in connection with those portions of the contract referring to liquidated damages, repayment of advance or recoupment of advance, and such taxes shall be shown separately and be in addition to the price.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or registered mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question. No modification shall be binding unless in writing and signed by officers of the parties. Authorization or ratification by the boards of directors of the parties shall not be required in respect of modifications.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other governmental Agency, department, instrumentality or wholly government-owned corporation in which event Buyer shall remain liable.

XVI. Statutory Compliance.

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations,

and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and assurances from the Treasury Department, in the form of closing agreements, that the advance payment provided for in Section VIII hereof, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder. Failure so to terminate shall not constitute a waiver of any other rights of Seller.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

Dudley H. Digges
Acting Secretary

(SEAL)

RICHFIELD OIL CORPORATION

By H. F. Sinclair
Chairman of the Board of Directors

ATTEST:

Cleve B. Bonner
Secretary
(SEAL)

EXHIBIT "A"

Item 1.................................price, 13.5 cents per gallon, F.O.B. Seller's refinery at Watson, California.

U. S. ARMY - NAVY SUPPLY

| | |
|---|---|
| AN-VV-F-781 | Sept. 26, 1940 |
| Amendment No. 3 | June 6, 1941 |
| Knock Test Method | AN-VV-F-746 |

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2.................................price, 13.25 cents per gallon, F.O.B. Seller's refinery at Watson, California.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Richfield Oil Corporation to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 3rd day of February, 1942.

RECONSTRUCTION FINANCE CORPORATION

By Charles B. Henderson
Chairman

Attest:

A. T. Hobson
Acting Secretary

(SEAL)

Mr. Bruce K. Brown
B.K.B

57158

CONFORMED COPY

Revised March 23, 1943.

# C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

RICHFIELD OIL CORPORATION

(Second Contract)

100-OCTANE AVIATION GASOLINE

February 20, 1943.

230030

DEFENSE SUPPLIES - RICHFIELD CONTRACT

(Watson Refinery - Second Contract)

Revised March 23, 1943.

CONTRACT made as of February 20, 1943, between RICHFIELD OIL CORPORATION, a Delaware Corporation, having its principal business office at 555 South Flower Street, Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of February 3, 1942, between the parties entitled "Contract between Defense Supplies Corporation and Richfield Oil Corporation" is hereby modified to the extent that it is inconsistent herewith and shall otherwise remain in full force and effect. Said certain contract will be referred to hereinafter as "the prior contract".

I. Expansion of Seller's Refining Facilities.

As of the date of the prior contract, Seller had existing facilities for the production at Watson, California, of approximately one thousand seven hundred (1,700) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 1 of Exhibit A hereof.

Seller has now recently completed an expansion of such facilities contemplated by the prior contract, to an extent which Seller originally estimated would enable it to produce approximately three thousand seven hundred fifty (3,750) barrels per calendar day of 100 octane aviation gasoline in accordance ~~with~~ Item 1 of Exhibit A hereof and which Seller currently estimates will enable it to produce approximately three thousand sixty-five (3,065) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof.

57158
58333

Seller is willing to make an additional expansion of its facilities at an estimated cost of approximately Fourteen Million Three Hundred Seventy-five Thousand Dollars ($14,375,000.00), which it is estimated will enable Seller to produce at Watson, California, a total of approximately ten thousand two hundred (10,200) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. Seller shall use its best efforts to expand said additional facilities and shall endeavor to maintain work on said expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as soon as possible and not later than March 1, 1944. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid additional expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, in accordance with provisions of this contract, two hundred twenty-five thousand (225,000) barrels per calendar month of 100 octane aviation gasoline which shall be in accordance with the specifications set forth in Exhibit A hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline such quantity shall be an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline.

(c) Buyer ~~on giving~~ reasonable notice to Seller may require the delivery hereunder of 100 octane aviation gasoline of specifications other than those originally set forth in Exhibit A hereof which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100 octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A

hereof. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A hereof.

(d) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(e) Seller shall maintain storage facilities at, or in the vicinity of, Watson, California, to accommodate at least three hundred thousand (300,000) barrels of 100 octane aviation gasoline. Subject to Section VIII hereof, Buyer shall order and take deliveries in such quantities as it may determine; provided, however, that whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100 octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof. In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

III. Optional Gasoline.

(a) Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100 Octane aviation gasoline which Seller may produce between the effective date of the notification referred to in Section II (a) hereof and the expiration of this contract. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

IV. Price and Payment.

(a) Prior to the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline, specified as Item 2 of Exhibit A hereof, shall be thirteen and one-quarter cents ($0.1325) per gallon f.o.b. Seller's refinery at Watson, California, but said base price shall not apply from and after the effective date of the notification referred to in Section II (a) hereof.

(b) From and after the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof purchased under the present contract and under the prior contract shall be thirteen and one-half cents ($0.135) per gallon f.o.b. Seller's refinery at Watson, California.

(c) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture, plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(d) Buyer shall pay promptly, but not later than the twentieth (20th) day after the end of each calendar month, all money due for gasoline delivered to it by Seller during said month. On or before the tenth (10th) day of each calendar month, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The base prices of 100 octane aviation gasoline purchased under the present contract and under the prior contract shall be subject to adjustment, first, as provided in Exhibit B hereof, and second, as follows:

(a) The said base prices are based on a price of One Dollar and Eleven Cents ($1.11) per barrel for twenty-six degree (26°) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field. The said prices shall be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Eleven Cents ($1.11) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field should constitute prima facie evidence of the prices paid by such purchasers.

(b) The base price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics. United States Department of Labor, over or under the index figure of ninety-three and five-tenths (93.5) (the final index number used in the prior contract). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may

most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The base price for 100 octane aviation gasoline set forth in Section IV (b) hereof shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease over or under a calculated index figure which is the weighted average of three thousand sixty-five (3,065) barrels per calendar day at ninety-three and five-tenths (93.5) and seven thousand one hundred thirty-five (7,135) barrels per calendar day at ninety-five and eight-tenths (95.8) (the present final index number). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number.

(d) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Watson, California, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a), (b), and (c), Seller may give notice to Buyer that the delivery of

100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the notification referred to in Section II (a) hereof, but not later, in any event, than June 30, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller ~~of the~~ exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of

the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect. Section VI of the prior contract is hereby superseded and cancelled, except for the first sentence thereof.

VII. Advance on Account of Purchase of Gasoline.

(a) In addition to the advance payment provided for in the prior contract, Buyer shall make an advance payment to Seller on account of the purchase of 100 octane aviation gasoline under this contract in the amount of Ten Million Seven Hundred Eighty-one Thousand Two Hundred Forty-four Dollars ($10,781,244.00) which shall be disbursed in monthly installments as the construction of the expanded facilities progresses. The first installment shall be disbursed in the amount of one-twelfth (1/12th) of said Ten Million Seven Hundred Eighty-one Thousand Two Hundred Forty-four Dollars ($10,781,244.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer from Seller of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall deliver to Buyer statements, showing only principal items, to certify that it has expended, or firmly committed itself to expend, on account of the construction of the additional expansion of facilities referred to in Section I hereof all of the funds theretofore advanced to it by Buyer and in addition has so expended, or firmly committed itself to expend, from its own funds not less than thirty-three and one-third percent (33-1/3%) of the aggregate of such installments advanced by Buyer. Buyer shall have the privilege of examining Seller's books to verify said statements, but such verification shall not be a condition of payments by Buyer. If such examination shall lead to any disagreement, it shall be settled by arbiration under Section XI hereof.

57158
58333

(b) From the amount due Seller for deliveries of 100 octane aviation gasoline for each of the first thirty-six (36) full calendar months following receipt by Buyer of Seller's notification of completion of the additional expansion of facilities referred to in Section I hereof, Buyer shall deduct and retain the sum of:

(1) one thirty-sixth (1/36th) of the above advance payment, and

(2) interest at the rate of two percent (2%) per annum on outstanding balances of such advance payment accruing subsequent to the date of receipt by Buyer of Seller's notification of completion of said additional expansion of facilities;

provided that Buyer shall also deduct and retain, with respect to each of the first twelve (12) full calendar months after the date of receipt of such notification of completion the sum of:

(1) one-twelfth (1/12th) of the amount of interest at the rate of two percent (2%) per annum on the outstanding balances of such advance payment accrued prior to and including the date of receipt by Buyer of Seller's notification of completion of said additional expansion of facilities; and

(2) one-twelfth (1/12th) of the amount of the credit, if any, referred to in paragraph (c) of this Section VII.

The above deductions, plus the deductions under the provisions of Section VII of the prior contract accruing subsequent to the effective date referred to in Section II (a) hereof, shall be considered as payment for the first purchases by Buyer in each of the first thirty-six (36) full calendar months following the effective date of the notification referred to in Section II (a) hereof.

(c) If, by reason of delay in the completion of the expanded facilities, the effective date of the notification referred to in Section II (a) hereof shall not be at least thirty-six (36) months prior

to June 30, 1947, then Seller shall repay to Buyer one thirty-sixth (1/36th) of the principal amount of the advance payment for each month or fraction thereof by which the effective date of said notification is subsequent to July 1, 1944, such repayment to be credited against any purchases by Buyer of 100 Octane aviation gasoline hereunder delivered during each of the twelve (12) full calendar months following the effective date of said notification; provided, however, that not more than one-twelfth (1/12th) of such credit shall be taken in each of said twelve (12) full calendar months; and provided further that any such repayment not made as provided above or in paragraph (d) of this Section VII shall be made by Seller to Buyer in cash on expiration of the original term of this contract.

(d) In the event of Seller's failure to deliver sufficient 100 octane aviation gasoline hereunder following the effective date of the notification referred to in Section II (a) hereof, due to reasons other than the force majeure reasons referred to in Section X hereof, to permit Buyer to recoup in any month the monthly repayment installment as provided in paragraph (b) of this Section VII, the unrecouped portion of the monthly repayment installment as aforesaid shall be repaid immediately by Seller to Buyer in cash; but if such failure was due to such force majeure reason then the repayment period provided in paragraphs (b) and (c) of this Section VII shall be extended one month for each month in which such failure due to such force majeure reason occurred.

VIII. <u>Liquidated Damages and Limitation of Liability</u>.

(a) The parties mutually agree that the Seller would be seriously damaged in the event that Buyer should breach its obligation to take that minimum quantity of 100 octane aviation gasoline herein agreed upon and that the liquidated damages herein provided for are not in the nature of a penalty or forfeiture and that they reflect allowance for the possible cessation of war prior to the expiration of the original term of the contract. If Buyer shall fail to purchase sufficient 100 octane aviation gasoline in any one full calendar month following the effective date of the notification referred to in Section II (a) hereof to liquidate the

total of the monthly repayment installments under this contract and the prior contract (determined as provided in paragraphs (b) and (c) of Section VII hereof and in paragraphs (b) and (c) of Section VII of the prior contract), Buyer shall have the privilege to deduct and retain from amounts owing to Seller for purchases of 100 octane aviation gasoline during the next succeeding month, over and above amounts sufficient to liquidate the regular monthly repayment installments for such month, an amount up to the unrecouped portion of the monthly repayment installments for the preceding month. If Buyer so fails to make recoupment, as aforesaid, during such succeeding month, then Seller shall, upon the expiration of such month, be entitled to retain as liquidated damages such unrecouped amount plus interest at the rate of two percent (2%) per annum on such unrecouped amount computed from the first (1st) day of the preceding month.

(b) The foregoing liquidated damages and the liquidated damages provided in Section VIII of the prior contract relate solely to a default by Buyer in not purchasing the stipulated quantities and there shall be no other damages for any failure by Buyer to take the quantities stipulated in Section II (a) of the prior contract and Section II (a) of the present contract. Damages for any other default by Buyer and for any default by Seller shall be determined by arbitration under Section XI hereof.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the intake pipe of the means of transportation, f.o.b. Seller's refinery at Watson, California.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank ~~trucks~~ (tank truck deliveries to be not in excess of Seller's capacity for loading tank trucks and tank car deliveries not to be in excess of two thousand (2,000) barrels in any one day) all to be supplied by Buyer at its own cost and expense.

(c) Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each tanker or barge and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Seller shall furnish certificates of inspection, by a licensed inspector satisfactory to the parties which shall set forth the quantity and quality of each shipment of gasoline. Inspection shall be based on samples taken from Seller's storage tanks from which the product is delivered. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (1) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(e) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the

correction tables of the United States Bureau of Standards prevailing at the time of delivery except in case of deliveries of quantities less than four thousand (4,000) gallons into tank wagons, in which case no adjustment shall be made.

(f) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials, wherever applicable, and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(g) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(h) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(i) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may neverthless accept such product and claim an adjustment for such deficiency; provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(j) Upon request by Buyer, Seller shall make deliveries of 100 octane aviation gasoline under this contract in appropriate limited quantities to points where Seller may be currently engaged in making deliveries of aviation gasoline in the ordinary course of its business. The delivery costs shall be paid by Buyer and are to be mutually agreed upon.

(k) Seller ~~shall~~ not be obligated to procure the 100 octane gasoline to be delivered hereunder from any source other than its Watson, California, refinery.

(l) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and

authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such aviation gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in its performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts or requests of the Government, or of any Governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provisions of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days after receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the person who at the time is the Senior Judge of the United States Circuit

Court of Appeals for the Ninth Circuit, acting in his individual and not judicial capacity, upon application therefore by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint is arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expenses of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Section IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

(d) Any addition of taxes to the prices as established in Sections IV and V hereof shall not be considered in arriving at the value of the gasoline delivered hereunder in connection with those portions of the contract referring to liquidated damages, repayment of advance or recoupment of advance, and such taxes shall be shown separately and be in addition to the price.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or registered mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been givon at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized

person and specify a duration sufficient in time to embrace the matter in question. No modification shall be binding unless in writing and signed by officers of the parties. Authorization or ratification by the boards of directors of the parties shall not be required in respect of modifications.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other governmental Agency, department, instrumentality or wholly government-owned corporation in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for the prompt completion of the expanded facilities which Seller

will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and assurances from the Treasury Department, in the form of closing agreements, that the advance payment provided for in Section VII hereof, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder. Failure so to terminate shall not constitute a waiver of any other rights of Seller.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
President

ATTEST:

(Sgd) H. H. Turner
Secretary

(SEAL)

RICHFIELD OIL CORPORATION

By (Sgd) Chas. S. Jones
President

ATTEST:

(Sgd) C. B. Bonner
Secretary

(SEAL)

57158

EXHIBIT "A"

Item 1.

U. S. ARMY - NAVY SUPPLY

| | |
|---|---|
| AN-VV-F-781 | Sept. 26, 1940 |
| Amendment No. 3 | June 6, 1941 |
| Knock Test Method | AN-VV-F-746 |

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY - NAVY SUPPLY

| | |
|---|---|
| AN-VV-F-781 | Sept. 26, 1940 |
| Amendment No. 4 | Nov. 24, 1941 |
| Knock Test Method | AN-VV-F-746 |

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc/Gal.

Item 3.

U. S. ARMY - NAVY SUPPLY

| | |
|---|---|
| AN-F-28 | Dec. 23, 1942 |

100 Octane Number by Method AN-VV-F-746, or

99 Octane Number by Method ASTM-D-357-41T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748

Tetraethyl Lead Limit 4.0 cc/Gal.

57158

EXHIBIT B

I. (A). Seller represents that the base price set forth in Section IV (b) of the foregoing contract for 100 octane aviation gasoline includes a certain "catalytic cracking royalty sum" representing patent royalties which Seller expects to pay to a third party or parties; that said "catalytic cracking royalty sum" is calculated at a running royalty rate of $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operation, and is as follows:

| | Item 3 |
|---|---|
| Period before date of Seller's notification referred to in Section II (a) of the foregoing contract. .................. | none |
| Period after date of Seller's notification referred to in Section II (a) of the foregoing contract. .................. | $0.00132 |

I. (B). In the event that at any time during the term of the foregoing contract, there shall issue to any third party a patent license covering catalytic cracking operations of the type employed by Refiner, at a running royalty rate lower than $0.05 per barrel of fresh stock charged to said third party's catalytic cracking operation, then as between Buyer and Seller, the first receiving such information shall notify the other, and the base prices of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from such base price, an amount equal to said "catalytic cracking royalty sum" multiplied by a factor equal to $\frac{A}{B}$, where A equals the difference between $0.05 and said lower running royalty rate payable by said third party, and B equals the sum of $0.05; and Seller shall within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline delivered under the foregoing contract, between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the amount of said "catalytic cracking royalty sum" and (b) by said factor $\frac{A}{B}$.

I. (C). In the event that during the term of the foregoing contract Seller does not pay to any third party or parties the "catalytic cracking royalty sum" aforesaid, or any part thereof, then within sixty (60) days following the date of termination, cancellation or expiration of the foregoing contract, Seller shall refund to Buyer an amount of money equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking royalty sum".

I. (D). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "catalytic cracking royalty sum" then Seller shall promptly notify Buyer and the base price of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from said base price an amount equal to said "catalytic cracking royalty sum"; and Seller shall within sixty (60) days after the date of said notification refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking royalty sum".

II. (A). Seller further represents:

(1) That the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract also include certain "contingent sums", as follows:

| | Item 2 | Item 3 |
|---|---|---|
| Period before the effective date of the notification referred to in Section II (a) of the foregoing contract. ....... | $0.00113 | $0.00155 |
| Period after the effective date of the notification referred to in Section II (a) of the foregoing contract. ....... | $0.00096 | $0.00096 |

(2) That said "contingent sums" represent patent royalties which Seller may or may not be obligated to pay to third parties with

respect to the manufacture of certain "alkylate" constituents of aviation gasoline covered by the foregoing contract, according to a certain process to be employed by Seller. Said "contingent sums" have been calculated at the rate of $0.15 per barrel of total alkylate included in said aviation gasoline.

(3) That said "contingent sums" include the following "prepaid sums" as follows:

| | Period before the effective date of the notification referred to in Section II (a) of the foregoing contract. | | Period after the effective date of the notification referred to in Section II (a) of the foregoing contract. | |
|---|---|---|---|---|
| | Item 2 | Item 3 | Item 2 | Item 3 |
| Prior to July 1, 1943 | $0.00047 | $0.00064 | $0.00019 | $0.00019 |
| From July 1, 1943 to November 16, 1944 | 0.00038 | 0.00052 | 0.00016 | 0.00016 |
| On and after November 16, 1944 | 0.00023 | 0.00031 | 0.00009 | 0.00009 |

(4) That said "prepaid sums" represent certain sums of money which have heretofore been paid on behalf of Seller for licenses under certain alkylation patent rights of Universal Oil Products Company and Stratford Engineering Corporation. Said "prepaid sums" have been calculated upon the basis of 1,330 barrels of total alkylate at the rate of $0.062 per barrel of total alkylate manufactured prior to July 1, 1943, $0.050 per barrel of total alkylate manufactured from July 1, 1943 to November 16, 1944, and $0.030 per barrel of total alkylate manufactured after November 16, 1944.

II. (B). If, at any time, prior to one year after the termination of the Present Emergency, Seller shall in good faith become obligated to pay patent royalties to third parties having an established sulfuric acid alkylation patent licensing position at rates lower than those set forth hereinabove, Seller shall so advise Buyer, and the base prices of all aviation gasoline, if any, delivered under the foregoing contract after the date Seller becomes so obligated shall be adjusted by subtracting from each of the base prices set forth in Section IV of the foregoing contract, an amount equal to the respective "contingent sum" applicable

thereto, minus the respective "prepaid sum" applicable thereto, multiplied by a factor equal to $\frac{C}{D}$, where C equals the difference between $0.15 and the rate which Seller becomes obligated to pay to said third parties, and D equals $0.15, and Seller shall, within sixty (60) days after becoming so obligated, refund to Buyer an amount equal to the total number of gallons of aviation gasoline delivered under the foregoing contract prior to the date Seller becomes so obligated under each base price, multiplied (a) by an amount equal to the respective "contingent sum" applicable to the said base price and (b) by said factor $\frac{C}{D}$.

II. (C). If any suit for infringement with respect to said "alkylate" constituents or the manufacture thereof is pending against Seller at the expiration of one year after the termination of the Present Emergency, no refund shall be made by Seller until final adjudication or settlement of such suit in good faith, but within sixty (60) days after such final adjudication or settlement, if the same establishes an obligation on the part of Seller to pay damages or other moneys at a rate lower than the royalty rate set forth hereinabove, Seller shall refund to Buyer an amount equal to the total number of gallons of aviation gasoline sold to Buyer under the foregoing contract under each base price multiplied (a) by the difference between the respective "contingent sum" and the respective "prepaid sum" and (b) by a factor equal to $\frac{E}{F}$, where E equals the difference between $0.15, and the rate which Seller becomes obligated to pay under such final adjudication or settlement, and F equals $0.15, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation.

II. (D). In the event that no suit for infringement is brought against Seller and Seller itself undertakes no obligation to pay any patent royalties to others with respect to said "alkylate" constituents or the manufacture thereof, prior to the expiration of one year after the termination of the Present Emergency, Seller shall, within sixty (60) days after