the expiration of said one-year period, refund to Buyer an amount equal to the total number of gallons of aviation gasoline sold to Buyer under this contract at each base price multiplied by a factor equal to G - H, where G equals the respective "contingent sum" applicable thereto, and H equals the respective "prepaid sum" applicable to said base price.

II. (E). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "contingent sums", then Seller shall promptly notify Buyer and within sixty (60) days after the date of such notification, Seller shall refund to Buyer an amount of money equal to the total number of gallons of 100 octane aviation gasoline so sold to Buyer under the foregoing contract at each base price multiplied by the factor G - H applicable to said base price.

II. (F). In no event shall the combined amounts of all the said "prepaid sums" which may be deducted from said "contingent sums" establishing the amounts of the refunds set forth in Sections II (B), II (C), II (D), and II (E) hereof exceed the total sum of Sixty Four Thousand Eight Hundred Dollars ($64,800) for the periods of the foregoing contract and the prior contract and any extensions thereof.

II. (G). In determining the effect of this Section II of this Exhibit B with respect to any obligation on the part of Seller to pay royalty on a paid-up or commuted basis, such royalty shall be considered as amortized at a rate not to exceed 10% per annum, or at such other rate as shall be determined by negotiations between the parties at the time the payment of such royalty on a paid-up or commuted basis is projected. In the event the parties fail to agree upon a mutually satisfactory rate of amortization, the question shall be determined by arbitration in accordance with Section XI of the foregoing contract.

II. (H). In determining the effect of this Section II of this Exhibit B with respect to any payment by Seller for past infringement, only that portion of such payment shall be considered which is ratably attributable to aviation gasoline sold under the foregoing contract.

III. (A). Seller represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract include certain "isomerization royalty sums" representing patent royalties which Seller expects to pay to a third party or parties; that said "isomerization royalty sums" are calculated at a running royalty rate of $0.05 per barrel of isomerized product from Seller's catalytic isomerization operation, and are as follows:

| | Item 2 | Item 3 |
|---|---|---|
| Period before the effective date of the notification referred to in Section II (a) of the foregoing contract. .................. | $0.00012 | $0.00017 |
| Period after the effective date of the notification referred to in Section II (a) of the foregoing contract. .................. | $0.00008 | $0.00008 |

III. (B). In the event that at any time during the term of the foregoing contract, there shall issue to any third party a patent license covering catalytic isomerization operations of the type employed by Seller, at a running royalty rate lower than $0.05 per barrel of isomerized product from third party's catalytic isomerization operation, then as between Buyer and Seller, the first receiving such information shall notify the other, and the base prices of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from each of the said base prices, an amount equal to the "catalytic isomerization royalty sum" applicable thereto multiplied by a factor equal to $\frac{J}{K}$, where J equals the difference between $0.05 and said lower running royalty rate payable by said third party, and K equals the sum of $0.05; and Seller shall within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline delivered under the foregoing contract, between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the amount of the "catalytic isomerization royalty sum" and (b) by said factor $\frac{J}{K}$.

III. (C). In the event that during the term of the foregoing contract Seller does not pay to any third party or parties the "catalytic isomerization royalty sum" aforesaid, or any part thereof, then within sixty (60) days following the date of termination, cancellation or expiration of the foregoing contract, Seller shall refund to Buyer an amount of money equal to the number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic isomerization royalty sum", multiplied by said "catalytic isomerization royalty sum".

III. (D). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "catalytic isomerization royalty sum" then Seller shall promptly notify Buyer and the base price of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from said base price an amount equal to said "catalytic isomerization royalty sum"; and Seller shall within sixty (60) days after the date of said notification refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic isomerization royalty sum", multiplied by said "catalytic isomerization royalty sum".

IV. (A). In the event that Seller shall make refunds to Buyer in accordance with the provisions of Sections I (C), II (D) and III (C) hereof, and in the event that at any time within six (6) years after the termination of the Present Emergency a suit or suits for infringement with respect to said "alkylate" constitutents or the manufacture thereof, or with respect to said catalytic isomerization operations, shall be brought against Seller and such suit or suits shall result in final ajudication or settlement which shall establish an obligation on the part of Seller to pay damages or other moneys in satisfaction thereof, Buyer shall repay to Seller from the particular refund applicable in each case a sum of money, which shall in no event exceed the total amount of that refund,

for the payment solely of said damages or other moneys applicable to that case, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation; provided, however, that with respect to such settlement, no repayment shall be made by Buyer unless Buyer shall first have given in writing its approval to such settlement.

IV. (B). With respect to such suit or suits for infringement referred to in Section IV. (A) hereof, Seller agrees that it will defend, with all due diligence and at its own expense, such suit or suits at least until an adjudication shall have been made therein by a court of record having primary jurisdiction thereof, or until a settlement approved by Buyer, as above provided, has been effected. Seller further agrees to notify Buyer promptly of the institution of each such suit and shall permit Buyer at its own election, to be represented therein by counsel of its own choice and at its own expense.

IV. (C). If an adjudication adverse to Seller has been made in any such suit by said court of record having primary jurisdiction thereof, and if no settlement approved by Buyer has been effected previously, and Seller shall, in its best judgment, elect not to appeal from such adverse adjudication or to continue the defense of such suit, then, in that event, Seller agrees to give timely notice to Buyer and agrees that Buyer may, at its election and at its own expense, continue the defense of such suit, file and perfect appeals to courts of higher jurisdiction, and do such other things as Buyer believes necessary or desirable to obtain a final adjudication or settlement of such suit, and in such event, Seller agrees that Buyer may use its name for all proper purposes connected with the continuance of such suits, and that it will cooperate fully with Buyer in any proper and legal manner necessary to aid Buyer in the furtherance of the defense of such suits.

IV. (D). As used in Sections II and IV of this Exhibit B, the term "Present Emergency" shall mean the period that the United States is at war or the period of the existing National Emergency as declared by the President to exist in his proclamation dated May 27, 1941, whichever period is the longer.

V. Seller further represents that no patent royalties other than those set forth in Sections I, II and III of this Exhibit B have knowingly been included in the base prices set forth in Section IV of the foregoing contract.

VI. Seller further covenants that any "catalytic cracking royalty sums", any "contingent sums" and any "catalytic isomerization sums" paid by it and included within said base prices shall be paid in good faith only to a third party or parties having a licensing position recognized by a substantial portion of the refining industry to license the catalytic cracking process, the sulfuric acid alkylation process, and the catalytic isomerization process, respectively, of the type employed by Seller.

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Richfield Oil Corporation to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of February 20, 1943.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles B. Henderson
Chairman

Attest:

(Sgd) A. T. Hobson
Secretary

(SEAL)

ADDENDUM #1

Richfield Oil Corporation

Los Angeles, Calif.

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, Richfield Oil Corporation, a Delaware corporation, (hereinafter designated as "Contractor") agrees to the provisions set forth below, provided, however, that to the extent that the obligations of manufacturers or dealers are limited, restricted or relaxed by amendments of the law or by authorized governmental regulations, then the obligations of the Contractor shall be automatically and correspondingly limited, restricted or relaxed.

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any

violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of February 20, 1943.

RICHFIELD OIL CORPORATION

By: (Sgd) Chas. S. Jones

173126

CONFORMED COPY

Revised January 17, 1942.

# CONTRACT

between

DEFENSE SUPPLIES CORPORATION

and

THE TEXAS COMPANY

(Los Angeles Refinery)

100-OCTANE AVIATION GASOLINE

January 17, 1942.

230081

DEFENSE SUPPLIES - TEXAS CONTRACT

(Los Angeles, Refinery)

CONTRACT made as of January 17, 1942, between The Texas Company, a Delaware corporation, having its principal place of business at 135 East 42nd St., New York, N. Y., hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of mutual agreements herein contained the parties agree as follows:

I. Sale and Storage of Products.

(a) Seller, having constructed emergency plant facilities at Los Angeles, California, which enables it to produce 100-Octane aviation gasoline, agrees to sell and deliver and Buyer agrees to purchase and receive in accordance with provisions of this contract, for the period January 1, 1943 to and including December 31, 1943, one thousand one hundred ten (1,110) barrels per calendar day of 100-Octane aviation gasoline which shall be in accordance with the specifications set forth in Exhibit A attached hereto and made a part hereof, or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) During the period beginning at the end of the one year period provided in paragraph (a) above and ending December 31, 1945, Buyer shall purchase and receive and Seller shall sell and deliver a quantity of 100-Octane aviation gasoline produced in the facilities referred to in Section I hereof, which together with any other sales of said gasoline by Seller to the United States Government shall equal the pro-rata share of the entire requirements of the United States Government during such period, as hereinafter defined.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to

deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(d) The term "United States Government" shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "pro-rata share of the entire requirements of the United States Government" shall mean a quantity equal to the proportion of the entire requirements of the United States Government for 100-Octane aviation gasoline which the refining capacity for 100-Octane aviation gasoline of the facilities referred to in Section I hereof less the quantity of Seller's sales of 100-Octane aviation gasoline from said facilities to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd. in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) The term "barrel" as used in this contract means a barrel of forty two (42) gallons and a gallon is a United States gallon of two hundred and thirty one (231) cubic inches.

(g) Seller shall maintain storage facilities at, or in the vicinity of, Los Angeles, California, to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline. Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section II hereof.

II. Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of the 100-Octane aviation gasoline which Seller may produce in the facilities hereinabove mentioned between the execution of this contract and December 31, 1942 to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100-Octane aviation gasoline which Seller may produce in said facilities between January 1, 1943 and December 31, 1945 to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section I hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

III. Price and Payment.

The base price of 100-Octane aviation gasoline, specified as Item 1 of Exhibit A hereof, shall be thirteen and one-quarter cents ($0.1325) per gallon f.o.b. Seller's Los Angeles, California refinery. The base price of 100-Octane aviation gasoline, specified as Item 2, Exhibit A, shall be thirteen cents ($0.13) per gallon f.o.b. Seller's Los Angeles, California, refinery. Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

Buyer shall pay promptly, but not later than the twentieth (20th) of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section VI hereof shall accompany the aforesaid monthly statements.

IV. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of one dollar and eleven cents ($1.11) per barrel for Signal Hill crude, 26° A.P.I., deliverable to Seller in the Los Angeles Basin Field. The price shall be increased or decreased sixty thousandths of one cent ($0.00060) per gallon for each one cent ($0.01) advance or decrease in the average price paid for said crude over or under one dollar and eleven cents ($1.11) per barrel by the three (3) largest purchasers of such crude in the Los Angeles Basin Field. The prices posted for such crude in the Los Angeles Basin Field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seventy-one thousandths of one cent ($0.00071) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number, regardless of what Seller's crude inventory may be at the time of such change. If said index shall cease to be issued, the parties shall use such other index as may closely approximate the discontinued one, and if they shall be unable to agree within

ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section VIII hereof.

(c) The prices herein above set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Los Angeles, California, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section VIII hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount

and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

In making adjustments under this Section, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

V. Duration of Contract.

The original term of this contract shall expire at midnight on December 31, 1945. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section I (b) hereof and the price to be paid shall be fixed by agreement of the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VI. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the point of manufacture.

(b) Buyer shall take delivery of said gasoline in tank cars, barges, tank vessels, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section) at its own cost and expense, at Seller's Los Angeles refinery, in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller

shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, and a third submitted to Buyer with the monthly statement required by Section III hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods ofthe American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specificationsset forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform, completely, to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, where such gasoline is to be used, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

VII. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of any governmental authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery,

of any product, service or material necessary in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

VIII. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Second Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other cost and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be divided. Pending such determination of every disagreement as to the price to be

paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

IX. Taxes.

Buyer shall pay in addition to the prices as established in Sections III and IV hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller or its Suppliers may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section IV hereof.

It is understood that Buyer's obligation under this Section shall include all presently existing taxes not now deemed applicable by Buyer, but which may later be held to apply to the commodities delivered hereunder. It is understood that Buyer does not deem sales taxes or excise taxes in the nature of sales taxes to be applicable.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

X. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or

telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XI. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XII. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental Agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

XIII. Statutory Compliance.

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

No Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or to any benefit

that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce the price payable to Seller as provided for in this contract, Seller shall have the option at any time thereafter to terminate this contract by thirty (30) days written notice to Buyer.

XIV. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date hereof, on written notice to Buyer, unless within said ninety (90) days it shall receive such certificates or other evidence as may be necessary to permit them to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

Dudley H. Digges
Acting Secretary

(Seal)

THE TEXAS COMPANY

By M. Halpern
Vice-President

ATTEST:

Meeker H. Smith
Assistant Secretary

(Seal)

173126

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to The Texas Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 17th day of January, 1942.

RECONSTRUCTION FINANCE CORPORATION

By Charles B. Henderson
Chairman

ATTEST:

Leo Nielson
Assistant Secretary

(Seal)

173126

EXHIBIT "A"

Item 1. ............................ price, thirteen and one-quarter cents ($0.1325) per gallon, F.O.B. Seller's refinery at Los Angeles, California.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2. ............................ price, thirteen cents ($0.13) per gallon, F.O.B. Seller's refinery at Los Angeles, California.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

CONFORMED COPY 57442

MAR 1 1942

B. K. B. NOTED

CONTRACT

between

DEFENSE SUPPLIES CORPORATION

and

THE TEXAS COMPANY

(Los Angeles Refinery - Second Contract)

100 OCTANE AVIATION GASOLINE

February 8, 1943.

230082

55429

DEFENSE SUPPLIES - TEXAS COMPANY

(Los Angeles Refinery - Second Contract)

Revised
February 8, 1943.

CONTRACT made as of February 8, 1943, between THE TEXAS COMPANY, a Delaware corporation, having its principal place of business at 135 E. 42nd St., New York, N. Y., hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D.C., hereinafter called Buyer.

In consideration of mutual agreements herein contained the parties agree as follows:

A certain contract made as of January 17, 1942, between the parties entitled "Contract between Defense Supplies Corporation and the Texas Company (Los Angeles Refinery)" is replaced by the present contract and is hereby terminated and cancelled.

I. Expansion of Seller's Refining Facilities.

Seller has existing facilities for the production at Los Angeles, California of approximately one thousand eight hundred (1,800) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 2 of Exhibit A attached hereto and made a part hereof, having heretofore expanded its production from approximately one thousand one hundred seventy (1,170) barrels per calendar day by the expenditure of approximately Two Hundred Thousand Dollars ($200,000.00) for this purpose, and is willing to expand its facilities further, at an estimated cost of approximately Sixteen Million Six Hundred Ninety-Five Thousand Dollars ($16,695,000.00), to a degree which it is estimated will enable Seller to produce at Los Angeles, California as much as eight thousand five hundred thirteen (8,513) barrels per calendar day of 100-octane aviation gasoline but not less than approximately seven thousand one hundred and sixty-three (7,163) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 4 of Exhibit A hereof. In addition Seller will expend approximately Six Hundred Thousand Dollars ($600,000.00) for facilities to enable it to store and deliver to its Los Angeles refinery for use in producing said 100 octane aviation gasoline, certain condensate products to be produced in the

Paloma Field, Kern County, California by means of a Cycling Plant to be installed in said Paloma Field at an estimated cost of approximately Four Million One Hundred Thousand Dollars($4,100,000.00) by Paloma Operators of 417 South Hill Street, Los Angeles, California. The present members of said Paloma Operators are Seller, Western Gulf Oil Company, and Ohio Oil Company. Said storage and delivery facilities and said Cycling Plant, if approved by the appropriate agencies of Government, are to be constructed substantially concurrently with the construction of said 100 octane aviation gasoline facilities at Seller's Los Angeles refinery. Seller shall use all reasonable efforts to expand said refining facilities at its Los Angeles refinery and said storage and delivery facilities and shall endeavor to maintain work on the expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as soon as possible and estimates that such expansion will be completed by about January 1, 1944. Seller shall also use its best efforts to assure completion of said Cycling Plant by Paloma Operators on or before the date of completion of said facilities at Seller's Los Angeles refinery. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of said facilities and said Cycling Plant as well as the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer.

(b) Under the terms of this contract and subject to the provisions of Section IV (h) hereof, Seller shall sell and deliver and Buyer shall buy and receive the following aggregate quantities of 100 octane aviation gasoline which shall be in accordance with Item 2 of Exhibit A hereof prior to the effective date of the notification referred to in Section II (a) hereof and thereafter shall be in accordance with Item 4 of Exhibit A hereof:

(1) From and after January 1, 1943 until, but not including the earlier of the following dates: January 1, 1944 or the effective date of the notification referred to in Section II (a) hereof, one thousand eight hundred (1,800) barrels per calendar day;

(2) If said effective date of notification is prior to January 1, 1944, then from and after said effective date until, but not including January 1, 1944, seven thousand one hundred sixty-three (7,163) barrels per calendar day; from and after January 1, 1944, until and including December 31, 1945, five thousand three hundred sixty-three (5,363) barrels per calendar day plus such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined.

(3) If said effective date of notification is after January 1, 1944, then from and after January 1, 1944, until said effective date of notification such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined; from and after said effective date of notification until and including December 31, 1945, five thousand three hundred sixty-three (5,363) barrels per calendar day plus such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined.

(4) If said effective date of notification is January 1, 1944, from and after January 1, 1944

55429
55819

until and including December 31, 1945, five thousand three hundred sixty-three (5,363) barrels per calendar day plus such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined;

(5) From and after January 1, 1946 until the expiration of this contract, five thousand three hundred sixty-three (5,363) barrels per calendar day, or such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from all of said facilities at Seller's Los Angeles refinery, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, whichever is greater; and

(6) During any extension of this contract, unless the parties shall otherwise agree, such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from all of said facilities at Seller's Los Angeles refinery, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100 octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same materials as are used in producing 100 octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation

between the parties. Deliveries of the products covered by this contract shall not be suspended during such negotiations. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(d) The term "United States Government" shall include the War Department, the Navy Department, any other department, agency, or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "pro-rata share of the entire requirements of the United States Government" shall mean a quantity equal to the proportion of the entire requirements of the United States Government for 100 octane aviation gasoline which the refining capacity for 100 octane aviation gasoline of the facilities referred to in Section I hereof less the quantity of Seller's sales of 100 octane aviation gasoline from said facilities to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd. in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(g) Seller shall maintain storage facilities at, or in the vicinity of, Los Angeles, California, to accommodate at least two hundred forty thousand (240,000) barrels of 100 octane aviation gasoline. Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller, in addition to all other remedies it may have, shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such