full storage condition, and shall not thereafter be required to make up deliveries of said amount, but this shall not be in derogation of Buyer's rights under Section III hereof. Such discontinuance of production shall not be construed as a waiver by Seller of any of its rights under this contract.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of the 100 octane aviation gasoline which Seller may produce in any of the facilities hereinabove mentioned between the execution of this contract and receipt of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will at least satisfy Buyer's indicated requirements.

(b) Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100 octane aviation gasoline which Seller may produce in any of the facilities hereinabove mentioned between receipt by Buyer of the notification referred to in Section II (a) hereof and the expiration of this contract to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will at least satisfy Buyer's indicated requirements.

(c) In addition to the quantities of 100 octane aviation gasoline referred to in Section I hereof, Seller will be able to produce, as a result of the installation of the new facilities and the Cycling Plant referred to in Section I hereof, approximately one thousand one hundred thirty three (1,133) barrels per calendar day of 91 octane aviation gasoline in accordance with Item 5 of Exhibit A hereof. Buyer shall also have the option from time to time and at any time to purchase all or any part of the 91 octane aviation gasoline which Seller may produce in any of the facilities hereinabove mentioned between receipt by Buyer of the

notification referred to in Section II (a) hereof and the expiration of this contract to the extent that such 91 octane aviation gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer; provided, however, Buyer shall exercise this option for half-calendar year option periods, except that the first of said option periods shall start with the effective date of the notification referred to in Section II (a) hereof and shall end on the next succeeding June 30 or December 31, by giving notice thereof to Seller for the first such option period within ten (10) days following receipt by Buyer of said notification, and not less than thirty (30) days prior to the beginning of each subsequent option period. Upon exercise of such option Buyer shall buy and receive and Seller shall sell and deliver the quantity of said 91 octane aviation gasoline covered by said exercised option.

IV. Price and Payment.

(a) Prior to the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline specified as Item 2 of Exhibit A hereof, shall be twelve and seventy-five one-hundredths cents ($0.1275) per gallon f.o.b. Seller's Los Angeles, California refinery.

(b) From and after the effective date of the notification referred to in Section II (a) hereof the base prices for 100 octane aviation gasoline specified as Item 4 of Exhibit A hereof, shall be thirteen and one-tenth cents ($0.131) per gallon f.o.b. Seller's Los Angeles, California refinery, except as hereinafter provided in Paragraphs (d) and (e) of this Section IV.

(c) The price of 91 octane aviation gasoline specified as Item 5, of Exhibit A hereof shall be eight and three quarter cents ($0.0875) per gallon f.o.b. Seller's Los Angeles, California refinery.

(d) In the event Buyer exercises its option set forth in Section III (c) hereof to purchase not less than one thousand one hundred thirty three (1,133) barrels per calendar day of 91 octane aviation gasoline, the base prices for 100 octane aviation gasoline specified as Item 4 of Exhibit A hereof delivered during the period covered by said option shall be twelve and nine-tenths cents ($0.129) per gallon f.o.b. Seller's Los Angeles, California refinery.

(e) In the event that during any of the option periods set forth in Section III (c) hereof, whether or not such option has been exercised, Seller shall, in addition to one hundred twenty-two (122) barrels per calendar day now being produced and sold, sell and deliver to any customer or customers not less than an average of one thousand one hundred and thirty-three (1,133) barrels per calendar day of 91 octane aviation gasoline produced in Seller's Los Angeles, California refinery during such option period at an average price netting Seller not less than eight and three-quarters cents ($0.0875) per gallon at Seller's Los Angeles, California refinery, the base prices for 100 octane aviation gasoline specified as Item 4 of Exhibit A hereof, during such option period shall be adjusted to twelve and nine-tenths cents ($0.129) per gallon f.o.b. Seller's Los Angeles, California refinery.

(f) Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 91 octane and 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes. Seller also represents that there has not been included in its computation of such prices any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder.

(g) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month all money due for gasoline delivered to it by Seller during the preceding calendar month; provided, however, that Buyer may deduct from amounts due Seller, amounts due Buyer from Seller under Section VII hereof. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer

55429
55819
56555

a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

(h) The base prices for 100 octane aviation gasoline set forth in paragraphs (b), (d) and (e) of this Section IV are based upon a presently estimated production of seven thousand one hundred sixty-three (7,163) barrels per calendar day of such 100 octane aviation gasoline from the existing and new facilities referred to in Section I hereof. If the actual average calendar day production of said 100 octane aviation gasoline from said existing and new facilities shall be found to exceed said estimated production, after said new facilities are in settled production, Seller shall promptly so notify Buyer and if Buyer so desires the parties shall promptly thereafter renegotiate said prices upon the basis of the increased production. The base prices determined by said renegotiation shall become effective either when Buyer agrees to purchase the excess quantity upon which the renegotiation was based or, if Buyer does not so agree, when Seller arranges the sale thereof to third parties at a price at least equal to the renegotiated price and shall be retroactive to the date which shall be proper under the circumstances.

In the event Buyer agrees to purchase said excess quantity, the provisions of Section II (b) (2), (3), (4) and (5) shall be deemed amended as of the date of such agreement to purchase, by substituting therein (1) for seven thousand one hundred sixty-three (7,163) barrels, wherever said quantity appears, the actual average calendar day production of said 100 octane aviation gasoline from said existing and new facilities and (2) for five thousand three hundred sixty-three (5,363) barrels, wherever said quantity appears, a quantity equivalent to five thousand three hundred sixty-three (5,363) barrels plus the number of barrels by which said actual average calendar day production exceeds seven thousand one hundred sixty-three (7,163) barrels.

In the event said excess quantity is purchased either by Buyer or by said third parties, Section V (d) shall be deemed amended as of the date when said renegotiated price becomes effective, by substituting therein for five thousand three hundred sixty-three (5,363) barrels, wherever such

55429
55819
56555
56936

quantity appears, a quantity equivalent to five thousand three hundred sixty-three (5,363) barrels plus the number of barrels by which said actual average calendar day production exceeds seven thousand one hundred sixty-three (7,163) barrels.

V. Price Escalation.

The base prices of 100 octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) From January 1, 1943 until the effective date of the notification referred to in Section II (a) hereof, the base price for 100 octane aviation gasoline set forth in Section IV (a) hereof is based on a price of One Dollar and Eleven Cents ($1.11) per barrel for Signal Hill crude, 26° A.P.I., deliverable to Seller in the Los Angeles Basin Field. Effective on the date of any change in the price of said Signal Hill crude, the base price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the average price over or under One Dollar and Eleven Cents ($1.11) per barrel paid by the three (3) largest purchasers of such crude in the Los Angeles Basin Field. The prices posted for such crude in the Los Angeles Basin Field shall constitute prima facié evidence of the prices paid by such purchasers.

(b) The base prices for 100 octane aviation gasoline set forth in Section IV (b), (d), and (e) hereof are based on a crude oil price of One Dollar Twelve and Ninety-three One-hundredths Cents ($1.1293) per barrel, hereinafter called "crude oil base price". The crude oil base price was computed by taking weighted average of the prices for five thousand five hundred seventy-three (5,573) barrels per calendar day of debutanized Paloma recycle condensate at One Dollar and Twenty-five Cents ($1.25) per barrel in the Paloma Field and for thirty four thousand nine hundred thirty-two (34,932) barrels per calendar day of 26° A.P.I. Signal Hill crude at One Dollar and Eleven Cents ($1.11) per barrel in the Los Angeles Basin.

Seller represents that the price of One Dollar and Twenty-five Cents ($1.25) per barrel for Paloma recycle condensate in the Paloma Field used in computing said weighted average is the price presently being paid by Seller for the product produced by Paloma Operators from a plant in the Paloma Field now producing approximately One thousand (1,000) barrels per calendar day of such product.

55429
55819
56555

In computing increases or decreases in the crude oil base price;

(1) the weighted average of the prices for Five thousand five hundred seventy-three (5,573) barrels per calendar day of said condensate at the lowest of the following prices:

(i) the maximum field price which has been or may be established for such condensate by the United States Government;

(ii) the field price for such condensate then payable by Seller;

(iii) the field price as covered by paragraph (ii) hereof which would be payable if the effect, if any, of postings by Seller or any company controlled by Seller were eliminated from the contract provision under which said condensate is purchased by Seller;

and for thirty four thousand nine hundred thirty-two (34,932) barrels per calendar day of 26° A.P.I. Signal Hill crude at the average of the field prices posted therefor by the three (3) purchasers of the largest quantities thereof shall be determined; and

(2) the difference between the weighted average so determined and the crude oil base price shall be ascertained. The difference so ascertained shall be the increase or decrease in the crude oil base price as the case may be. From and after the effective date of the notification referred to in Section II (a) hereof until the expiration of this contract, and effective on the date of any change in the crude oil base price, the base prices for 100 octane aviation gasoline set forth in Section IV (b), (d), and (e) hereof shall be increased or decreased by a percentage equal to one half the percentage increase or decrease in the crude oil base price.

(c) From and after January 1, 1943 until the effective date of the notification referred to in Section II (a) hereof the price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-three and five-tenths (93.5) (The final index number used in the aforesaid contract of January 17, 1942).

55429
55819
56555
56936
57442

The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(d) From and after the effective date of the notification referred to in Section II (a) hereof until the expiration of this contract, the said prices for 100 octane aviation gasoline shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease over or under the weighted average of eighteen hundred (1800) barrels per calendar day at the index number of ninety-three and five-tenths (93.5) and five thousand three hundred and sixty-three (5,363) barrels per calendar day at ninety-five and five-tenths (95.5) (the present final index number). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number.

(e) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Los Angeles, California, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of the refinery at which the aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in

55429
55819
56555

the opinion of Seller the cost of refining aviation gasoline is increased in respects other than those corrected by adjustment of the base prices under the above paragraphs (a), (b), (c), and (d) of this Section V, Seller may give notice to Buyer of this circumstance and thereupon Seller and Buyer shall endeavor to reach an agreement with respect to increasing said base prices by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer and Seller are unable to agree upon the amount of such increase in price, within ten (10) days thereafter, Buyer or Seller may give notice to the other party that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as speedily as possible as to the amount and effective date of such price increase.

(f) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later, in any event, than midnight on April 30, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) (6) hereof and the price to be paid shall be fixed by agreement of the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

55429
55819
56555

VII. Loan to Seller.

(a) Buyer shall loan to Seller Twelve Million Five Hundred Twenty-One Thousand Dollars ($12,521,000.00) which shall be disbursed by Buyer to Seller in approximately monthly installments as the construction of the 100 octane aviation gasoline facilities referred to in Section I hereof progresses. The first installment shall be disbursed immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. Each remaining installment shall be disbursed upon Seller's request and upon receipt by Buyer from Seller of satisfactory evidence that it has expended or firmly committed itself to expend within the succeeding ninety (90) days on account of the additional expansion of the 100 octane aviation gasoline facilities referred to in Section I hereof all of the funds theretofore advanced to it by Buyer plus the amount of the installment requested, and in addition has so expended or firmly committed itself to expend within the succeeding ninety (90) days from its own funds not less than thirty-three and one-third percent (33-1/3%) of the aggregate of such installments advanced by Buyer, including the installment for which the request is then being made.

(b) Such loan shall bear interest at the rate of two percent (2%) per annum on the outstanding balance thereof, until repaid.

(c) Seller shall repay the principal amount of the aforementioned loan to Buyer in equal monthly installments, as near as can be determined, plus interest accrued to the time of each such repayment, beginning the twentieth (20th) day of the month following the month in which Buyer receives the notification referred to in Section II (a) hereof and ending on the twentieth (20th) day of the month following the expiration of the original term of this contract; provided, however, that if Buyer shall breach its obligation to disburse the installments of said loan in accordance with this Section VII, or shall breach its obligation to buy the quantities of 100 octane aviation gasoline called for by paragraphs (2), (3), (4), and (5) of Section II (b) hereof, then Seller may withhold such part of or all the unrepaid portion of said loan including interest thereon (other than repayments, if any, falling due prior to

such breach), as shall not exceed the amount of damages claimed by Seller to result from such breach, pending determination by agreement, arbitration or otherwise, of Buyer's liability, if any, for such breach. Upon such determination Seller shall be obligated to repay to Buyer only the unrepaid portion of said loan, plus interest accrued to date of breach, plus interest from date of breach on the amount, if any, by which said unrepaid portion of said loan exceeds the amount of damages, if any, sustained by Seller, less the amount of said damages.

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasoline in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure, shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities referred to in Section II (g) hereof are full of 100 octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline only to the extent that the aggregate amount taken and paid for is less than (1) the aggregate amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) multiplied by the number of days in the period over which damages accrue, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (g) and V(e) hereof.

(b) The first proviso of paragraph (a) of this Section VIII shall not apply in the event of rescission, abrogation, or termination of this contract by Buyer, or anticipatory breach thereof by Buyer.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the point of manufacture.

(b) Buyer shall take delivery of said gasoline in tank cars, barges, tank vessels, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such points to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required

by Section IV hereof; a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the hereinafter referred to authorized officer or employee of the War Department or Navy Department. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform, completely, to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency; provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

55429
55819
56555

(l) Notwithstanding the preceding provisions of this Section and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, where such gasoline is to be used, such service to be at the expense of Buyer and at Buyer's risk. Such expense shall be Seller's cost for such service. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, picketing, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the construction of the facilities and Cycling Plant contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to

their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed; provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Second Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the price as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller or its Suppliers may be required by any municipal, state, or federal

law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities or any components thereof delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) It is understood that Buyer's obligation under this Section shall include all presently existing taxes not now assessed or deemed applicable but which may later be assessed or held to apply to the commodities delivered hereunder, or any raw or component material or ingredients thereof. It is understood that Buyer does not deem sales taxes or excise taxes in the nature of sales taxes to be applicable.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram, or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) No Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or

prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded, or changed so as not to reduce the price payable to Seller or otherwise changed in a manner satisfactory to Seller.

XVII. Right to Terminate.

(a) Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocation necessary for obtaining materials, equipment, supplies, crude petroleum and other raw or component materials, and (1) such certificates or other evidence as may be necessary to permit Seller to invoke the provisions of Section 124, Internal Revenue Code; (2) assurances from the Treasury Department, in the form of closing agreements, that the advance payment of Twelve Million Five Hundred Twenty-one Thousand Dollars ($12,521,000.00) herein provided for, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder.

(b) Seller shall also have the right to terminate this contract within ninety (90) days of the date thereof unless within said ninety (90) days Paloma Operators shall receive all Government assistance which is available or necessary for the prompt completion of the facilities included in the Cycling Plant referred to in Section I hereof, including, without limitation, priorities and allocation necessary for obtaining materials, equipment and supplies therefor, and such certificates or other evidence as may be necessary to permit Paloma Operators to invoke the provisions of Section 124, Internal Revenue Code.

(c) In the event of the termination of this contract as herein provided, that certain contract between the parties hereto made as of January 17, 1942 shall be reinstated and shall thereupon become effective and shall remain in full force and effect according to its terms, except that the base price for the 100 octane aviation gasoline sold and delivered thereunder will be twelve and seventy-five one-hundredths cents ($0.1275) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A thereof.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

H. H. Turner
Acting Secretary

(SEAL)

THE TEXAS COMPANY

By M. Halpern
Vice-President

ATTEST:

W. G. Elicker
Assistant Secretary

(SEAL)

55429
55819

EXHIBIT "A"

100 OCTANE AVIATION GASOLINE

Item 1. (Omitted)

Item 2.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 September 26, 1940

Amendment No. 4 November 24, 1941

Knock Test Method AN-VV-F-746 as amended November 5, 1940.

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc/Gal.

Item 3. (Omitted)

Item 4.

U. S. ARMY - NAVY SUPPLY

AN-F-28 December 23, 1942

100 Octane Number by Method AN-VV-F-746 as amended November 5, 1940, or

99 Octane Number by Method ASTM-D-357-41T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a - June 17, 1942

Tetraethyl Lead Limit 4.0 cc/Gal.

91 OCTANE AVIATION GASOLINE

Item 5.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-776 October 15, 1940

Amendment No. 4 August 13, 1942

Knock Test Method AN-VV-F-746 as amended November 5, 1940.

91 Octane Number by Method AN-VV-F-746 as amended November 5, 1940.

Tetraethyl Lead Limit 4.0 cc/Gal.

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to The Texas Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of February 8, 1943.

RECONSTRUCTION FINANCE CORPORATION

By Charles B. Henderson
Chairman

ATTEST:

A. T. Hobson
Acting Secretary

(SEAL)

ADDENDUM #1

The Texas Company

New York, N. Y.

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, The Texas Company, a Delaware corporation, (hereinafter designated as "Contractor") agrees to the provisions set forth below, provided, however, that to the extent that the obligations of manufacturers or dealers are limited, restricted or relaxed by amendments of the law or by authorized governmental regulations, then the obligations of the Contractor shall be automatically and correspondingly limited, restricted or relaxed.

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any

Addendum #1

violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of February 8, 1943.

THE TEXAS COMPANY

By: M. Halpern
Vice-President

# C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

TIDE WATER ASSOCIATED OIL COMPANY
(Associated Division)
(Second Contract)

100-OCTANE AVIATION GASOLINE

June 10, 1942.

189506

DEFENSE SUPPLIES - TIDE WATER ASSOCIATED CONTRACT
(Associated Division)
(Second Contract)

Revised June 3, 1942.

CONTRACT made as of June 10, 1942, between TIDE WATER ASSOCIATED OIL COMPANY (Associated Division), a Delaware corporation, having a principal place of business at 79 New Montgomery Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of March 26, 1942, between the parties, entitled "Contract between Defense Supplies Corporation and Tide Water Associated Oil Company (Associated Division)", is replaced by the present contract and is hereby terminated and cancelled.

I. Expansion of Seller's Refining Facilities.

(a) Seller has existing facilities for the production at its Avon, California, refinery of approximately one thousand four hundred thirty-five (1,435) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof, or approximately one thousand seven hundred twenty (1,720) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof; and is proceeding to expand its facilities, at an estimated cost of approximately One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00), to an extent which it is estimated will enable Seller to produce at its Avon Refinery a total of approximately two thousand two hundred eighty-five (2,285) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof, or approximately two thousand seven hundred forty (2,740) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof. Seller shall use its best efforts so to expand said facilities, to maintain work on the expansion day and night to the extent necessary to expedite substantially said

expansion, in so far as the requisite labor and materials are available, and to complete such expansion as soon as possible and not later than November 1, 1942.

(b) Seller is willing to construct additional facilities at an estimated cost of approximately One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) which will enable Seller to produce at Avon, California, a total of approximately three thousand nine hundred thirty-five (3,935) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof, or approximately four thousand seven hundred twenty-two (4,722) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof. Seller shall use its best efforts to construct said additional facilities, to maintain work on said construction day and night to the extent necessary to expedite substantially said construction and in so far as the requisite labor and materials are available, and to complete such construction as soon as possible and not later than June 1, 1943.

(c) The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. <u>Sale and Storage of Products</u>.

(a) When the aforesaid expansion of Seller's facilities referred to in Section I (a) hereof shall be completed and ready for operation, Seller shall promptly notify Buyer, and when the construction of the additional facilities referred to in Section I (b) hereof shall be completed and ready for operation, Seller shall again promptly notify Buyer. From and after the effective date of the first of the above-mentioned notifications, Seller shall sell and deliver and Buyer shall buy and receive 100-Octane aviation gasoline which shall be in accordance with the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) From and after the effective date of the first notification referred to in paragraph (a) of this Section II until the end of the original term of this contract and during any extension thereof, the quantity of said gasoline shall be such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced

at Seller's A 'efinery, shall equal Seller's rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than the following minimum quantities:

(1) From and after the effective date of said first notification until the effective date of the second notification referred to in paragraph (a) of this Section II, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of eight hundred fifty (850) barrels per day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof or one thousand twenty (1,020) barrels of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof, or a corresponding quantity of 100-Octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(2) From and after the effective date of said second notification until midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of said first notification, but not later, in any event, than December 31, 1945, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of two thousand five hundred (2,500) barrels per day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof or three thousand (3,000) barrels of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof or a corresponding quantity of 100-Octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(3) From midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of said first notification, but not later, in any event, than December 31, 1945, until the end of the original term of this contract, Seller shall sell and deliver and Buyer shall buy and receive her

quantity of one thousand six hundred fifty (1,650) barrels per day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof or one thousand nine hundred eighty (1,980) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof or a corresponding quantity of 100-Octane aviation gasoline of any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(c) The above quantities which Seller shall be required to sell and deliver hereunder may, at Seller's option, be temporarily reduced during the period from the effective date of said first notification to December 31, 1942, both dates inclusive, by part or all of the amount of such gasoline as Seller may have contracted, prior to the effective date of said first notification, to sell and deliver during said period to the United States Government other than Buyer.

(d) Buyer may apportion the above aggregate quantities among the various grades of gasoline specified in Exhibit A hereof, and the quantities shall be adjusted to correspond to the grades required by Buyer.

(e) The damages, if any, for a breach of the foregoing provisions of this Section II shall be in accordance with Section VIII hereof.

(f) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which is capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation between the parties, and neither party shall be relieved of any of its obligations hereunder and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(h) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100-Octane aviation gasoline as the total refining capacity for 100-Octane aviation gasoline at Seller's Avon Refinery, less the quantity of Seller's sales of 100-Octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(i) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(j) Seller shall maintain storage facilities at, or in the vicinity of, its Avon Refinery to accommodate at least two hundred forty thousand (240,000) barrels of 100-Octane aviation gasoline, or components thereof ready for blending, said storage facilities to be available by the effective date of the second notification referred to in Paragraph (a) of this Section II, and at least one hundred forty thousand (140,000) barrels of said storage facilities to be available by the effective date of the first notification referred to in paragraph (a) of this Section II.

(k) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered

to Buyer by a[illegible]unt equal to the amount of [illegible] the aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantity specified in paragraph (b) of this Section II, or any obligation undertaken under Section III hereof. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof, provided that Buyer shall arrange for the prompt removal from Seller's storage facilities of all such additional gasoline which Buyer may elect to purchase.

(l) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(m) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time (as such or as components thereof ready for blending) in the facilities referred to in Section II (j) hereof to the extent of not more than two hundred forty thousand (240,000) barrels.

III. <u>Optional Gasoline</u>.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Avon Refinery between the date of execution of this contract and the effective date of the first notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate