the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may procure at its Avon Refinery between the effective date of the first notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under the provisions of paragraphs (a), (b) and (c) of Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. <u>Price and Payment</u>.

(a) The base prices of 100-Octane aviation gasoline shall be as follows f.o.b. Seller's refinery at Avon, California:

(1) For deliveries prior to the effective date of the second notification referred to in Section II (a) hereof, fourteen cents ($0.14) per gallon for 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof and thirteen and three-fourth cents ($0.1375) per gallon for 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof;

(2) For deliveries from and after the effective date of the second notification referred to in Section II (a) until the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the first notification referred to in Section II (a) hereof, or until December 31, 1945 if said last day is subsequent to December 31, 1945, thirteen and nine-tenths cents ($0.139) per gallon for 100-Octane aviation

gasoline in accordance with Item 1 of Exhibit A hereof and thirteen and sixty-five one-hundredths cents ($0.1365) per gallon for 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof; and

(3) For deliveries from and after the aforementioned last day, or after December 31, 1945 if said last day is subsequent to December 31, 1945, thirteen and eight-tenths cents ($0.138) per gallon for 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof and thirteen and fifty-five one hundredths cents ($0.1355) per gallon for 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.

(b) Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The base prices of 100-Octane aviation gasoline set forth in Section IV (a) hereof shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven to twenty-seven and nine-tenths degree (27 to 27.9°) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field, California. Each of the base prices set forth in Section IV (a) hereof shall be increased or decreased by four hundred thirty-five thousandths of one percent (0.435%) of said base price for each one cent ($0.01) advance or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) Each of the base prices set forth in Section IV (a) hereof shall also be increased or decreased by five hundred twenty-seven thousandths of one percent (0.527%) of said base price for each one point increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index number is over or under ninety-four and nine-tenths (94.9), which is an average figure based on the latest available index numbers as of the date of the aforementioned contract made as of March 26, 1942 and as of the date of this contract. The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's Avon Refinery, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

agency of the Un[illegible]d States Government, some o[illegible] [illegible]mponents of 100-Octane aviation gasoline from other refiners and moves the same to its Avon Refinery for blending with other stocks for the production of 100-Octane aviation gasoline, thereby incurring increased costs of such components at said refinery, or if Seller acquires isobutane, base stock, or other components of 100-Octane aviation gasoline from sources other than those presently contemplated, thereby effecting reduced costs of such isobutane, base stock or other components at said refinery, the prices hereinabove provided shall be increased or decreased, as the case may be, to compensate for any such increase or decrease in costs. If Buyer and Seller are unable to agree on the existence or amount of such increase or decrease in costs, or on the resulting increase or decrease in the prices hereinabove provided, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the second notification referred to in Section II (a) hereof, but not later, in any event, than August 31, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Sections II (b) and II (c) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Omitted).

(a) the event that Seller shall f o sell and deliver or Buyer shall fail to take and pay for 100-Octane aviation gasoline in accordance with Sections II (b) and II (c) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline unless the storage facilities referred to in Section II (j) hereof, shall contain, prior to the effective date of the second notification referred to in Section II (a) hereof, an aggregate of at least one hundred forty thousand (140,000) barrels of 100-Octane aviation gasoline, leaded or unleaded, or components thereof ready for blending, and from and after the effective date of said second notification, an aggregate of at least two hundred forty thousand (240,000) barrels of 100-Octane aviation gasoline, leaded or unleaded, or components thereof ready for blending; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100-Octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (k) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production

[illegible] vessel delivery shall be [illegible] and title and risk of loss shall [illegible] the [illegible] of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48 [illegible] of the arrival of each vessel and of the quantity [illegible] gasoline to be loaded. Seller shall furnish [illegible] to Buyer [illegible] at which each vessel may safely lie afloat to- [illegible] all [illegible] and facilities for loading, and shall load the [illegible] on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform to usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into

tank cars and tank ....ks shall be made in accordance ...ch the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Associated Division of Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, explosions, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The

decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract

without the writt[en co]nsent of the other party, exc[ept t]hat Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable. With Buyer's consent, which consent shall not be unreasonably withheld, Seller may assign to any party to whom Seller may transfer substantially all of the assets of its Associated Division, including the Avon, California, Refinery.

XVI. <u>Statutory Compliance</u>.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin, except as directed by the United States Government.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum

price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller or otherwise changed in a manner satisfactory to Seller.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Signed) H. A. Mulligan
President

ATTEST:

(Signed) Dudley H. Digges
Acting Secretary

(SEAL)

TIDE WATER ASSOCIATED OIL COMPANY

By (Signed) L. F. Beyer
Vice-President

ATTEST:

(Signed) J. P. Edwards
Exec. Secretary

(SEAL)

EXHIBIT "A"

Item 1.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Tide Water Associated Oil Company to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of June 10, 1942.

RECONSTRUCTION FINANCE CORPORATION

By (Signed) Charles B. Henderson
Chairman

ATTEST:

(Signed) A. T. Hobson
Acting Secretary

(SEAL)

ADDENDUM #1

Tide ter Associated Oil Company

San Francisco, California

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract Tide Water Associated Oil Company, a Delaware corporation, (hereinafter designated as "Contractor") agrees:

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of

Addendum #1

189506
190384

any violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of June 10, 1942.

TIDE WATER ASSOCIATED OIL COMPANY

By: (Signed) L. F. Bayer.
Vice-President

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

TIDE WATER ASSOCIATED OIL COMPANY
(Associated Division)
(Third Contract)

100-OCTANE AVIATION GASOLINE

February 18, 1943

DEFENSE SUPPLIES - TIDE WATER ASSOCIATED CONTRACT
(Associated Division)
(Third Contract)

Revised April 12, 1943

CONTRACT made as of February 18, 1943, between TIDE WATER ASSOCIATED OIL COMPANY (Associated Division), a Delaware corporation, having a principal place of business at 79 New Montgomery Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of June 10, 1942, between the parties, entitled "Contract between Defense Supplies Corporation and Tide Water Associated Oil Company (Associated Division), (Second Contract)" is replaced by the present contract and is hereby terminated and canc[illegible] effective as of the effective date of this contract, all rights accrued under the contract of June 10, 1942 to such date to be reserved.

I. Expansion of Seller's Refining Facilities.

(a) Seller has existing facilities for the production at its Avon, California, refinery of approximately two thousand seven hundred forty (2,740) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof, said facilities having been completed on October 8, 1942, and has contracted to expand its facilities, at an estimated cost of approximately One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00), to an extent which it is estimated will enable Seller to produce at its Avon Refinery a total of approximately four thousand seven hundred twenty-two (4,722) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. Seller shall use its best efforts so to expand said facilities, to maintain work on the expansion day and night to the extent necessary to expedite substantially said expansion, in so far as the requisite labor and materials are available, and to complete such expansion as soon as possible. Seller estimates such expansion will be completed by May 1, 1943.

Entry 510
Box 3593
Folder - 360 - Tide Water
AVO [illegible]

(b) Seller is willing to construct additional facilities at an estimated cost of approximately One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) which will enable Seller to produce at Avon, California, a total of approximately six thousand three hundred fifty-three (6,353) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. Seller shall use its best efforts to construct said additional facilities, to maintain work on said construction day and night to the extent necessary to expedite substantially said construction and in so far as the requisite labor and materials are available, and to complete such construction as soon as possible and estimates such construction will be completed by February 1, 1944.

(c) The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) Seller agrees that for the purpose of this contract the aforesaid expansion of Seller's facilities referred to in Section I (a) hereof shall be deemed to be completed and ready for operation on May 1, 1943, and when the construction of the additional facilities referred to in Section I (b) hereof shall be completed and ready for operation, Seller shall promptly notify Buyer. Prior to midnight April 30, 1943, Seller shall sell and deliver and Buyer shall buy and receive 100 octane aviation gasoline which shall be in accordance with the specification set forth as Item 2 of Exhibit A attached hereto and made a part hereof and thereafter 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof, or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) From the date of this contract until the end of the original term of this contract and during any extension thereof, the qu tity of said gasoline shall be such quantity as, together with all oth sales by Seller to the United States Government of said gasoline produced at Seller's Avon Refinery, shall equal Seller's pro-rata share o the entire requirements of the United States Government, as hereinafte defined, but not less than the following minimum quantities:

Entry 510
Box 3593
Folder - 360 - Tide Water
AVO 32

58959

(1) From the date of this contract until midnight April 30, 1943 Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of one thousand twenty (1,020) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof;

(2) From and after midnight April 30, 1943 until the effective date of the notification referred to in paragraph (a) of this Section II, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of three thousand (3,000) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof, or a corresponding quantity of 100 octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(3) From and after the effective date of said notification until midnight on October 31, 1945, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of four thousand six hundred thirty (4,630) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof or a corresponding quantity of 100 octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(4) From and after midnight on October 31, 1945 until midnight on April 30, 1946, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of three thousand six hundred ten (3,610) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof or a corresponding quantity of 100 octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

Entry 510
Box 3593
Folder - 260 - Tide Water
AVO

(5) From midnight on April 30, 1946 until the end the original term of this contract, Seller shall se and deliver and Buyer shall buy and receive hereund a minimum quantity of one thousand six hundred thir (1,630) barrels per calendar day of 100 octane avia gasoline in accordance with Item 3 of Exhibit A her or a corresponding quantity of 100 octane aviation gasoline of any other specification which by mutual agreement shall be attached as an addendum to Exhib

(c) Buyer may apportion the above aggregate quantities among the various grades of gasoline specified in Exhibit A hereof, and the quantities shall be adjusted to correspond to the grades required b Buyer.

(d) The damages, if any, for a breach of the foregoing provisions of this Section II shall be in accordance with Section VIII hereof.

(e) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications ot than those originally set forth in Exhibit A which is capable of being produced with the same refining facilities and the same raw materials ard used in producing 100 octane aviation gasoline in accordance with specifications originally set forth in Exhibit A. The prices and spec cations of such products shall be determined by negotiation between th parties, and neither party shall be relieved of any of its obligations hereunder and Seller shall not be required to deliver such products un less and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(f) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Departme any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(g) The term "Seller's pro-rata share of the entire r quirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United S

Entry 510
Box 3593
Folder - 360 - Tide Water
AVO 32

Government of 100 octane aviation gasoline as the total refining cap for 100 octane aviation gasoline at Seller's Avon Refinery, less the quantity of Seller's sales of 100 octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(h) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United State gallon of two hundred and thirty-one (231) cubic inches.

(i) Seller shall maintain storage facilities at, or in the vicinity of, its Avon Refinery to accommodate at least two hundred forty thousand (240,000) barrels of 100 octane aviation gasoline, or components thereof ready for blending.

(j) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantities specified in paragraph (b) of this Section II, or any obligation undertaken under Section III hereof. If, however, Seller shall produce during any such period of full storage any additional 100 octane aviation gasolin of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof; provided that Buye shall arrange for the prompt removal from Seller's storage faciliti all such additional gasoline which Buyer may elect to purchase.

Entry 510
Box 3593
Folder - 360 - Tide Water
AUO [illegible]

(k) In accumulating said storage, Seller may store gaso line of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer request and if Seller can do so without extra cost, or if Seller can do at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications cover in Exhibit A hereof.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and a any time to purchase from Seller hereunder all or any part of the aviat gasoline which Seller may produce at its Avon Refinery between the date this contract and midnight April 30, 1943, to the extent that such gaso is in excess of quantities which Seller has, prior to receipt by Seller notification of the exercise of such option, contracted to sell to part other than Buyer. Upon the exercise of such option Seller shall operat the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of th aviation gasoline which Seller may produce at its Avon Refinery betwee midnight April 30, 1943 and the expiration of the original term of thi contract, to the extent that such gasoline is in excess of the sum of the quantity to be purchased by Buyer under the provisions of paragrap (a) and (b) of Section II hereof and (b) the quantities which Seller h prior to receipt of notification of exercise of such option, contracte to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such fication.

IV. Price and Payment.

(a) The base prices of 100 octane aviation gasoline s be as follows f.o.b. Seller's refinery at Avon, California:

(1) For deliveries prior to midnight April 30, 1 thirteen and eighty-two one-hundredths cents

Entry 510
Box 3593
Folder - 260 - Tide Water
AVO 32

($0.1382) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof;

(2) For deliveries from and after midnight April 30, 1943 until the date of the notification referred to in Section II (a) hereof, fourteen cents ($0.14) per gallon for 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof; and

(3) For deliveries from and after the effective date of the notification referred to in Section II (a) hereof until the end of the original term of this contract, fourteen and five one-hundredths cents ($0.1405) per gallon for 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof.

(b) Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the said monthly statements.

Entry 510
Box 3593
Folder 360 Tide Water
AUO 32

(d) The base price set forth in Section IV (a) (3) hereof for 100 octane aviation gasoline meeting the specifications set forth as Item 3 of Exhibit A hereof is based upon a presently estimated production of six thousand three hundred fifty-three (6,353) barrels per calendar day of such aviation gasoline from all of the facilities referred to in Section I hereof. If the actual average calendar day production of said 100 octane aviation gasoline from all of said facilities shall be found to substantially exceed said estimated production after said facilities are in settled production, Seller shall promptly so notify Buyer, but not oftener than once every six (6) months, and, if Buyer so desires, the parties shall promptly thereafter renegotiate said base price upon the basis of the increased production, but in a manner consistent with the costing principles upon which the original price negotiation was based. The base price determined by said renegotiation shall be effective only so long as Buyer purchases the increased quantity upon which the renegotiation was based or Seller sells said increased quantity to third parties at a price at least equal to the renegotiated price. Said renegotiated base price for said gasoline shall be retroactive to the date which shall be proper under the circumstances and payment shall be made thereunder promptly without interest. Appropriate amendments in respect of such renegotiated prices and quantities shall be made in such provisions of this contract as are affected thereby. Any questions arising from such renegotiation which cannot be settled by agreement between the parties, shall be determined by arbitration in accordance with the provisions of Section XI hereof. During any period for which a renegotiated base price and effective date therefor and quantity to which same are applicable have not been arrived at by renegotiation or arbitration, Buyer shall continue to pay the price provided in Sections IV and V hereof subject to retroactive adjustment as provided above.

V. Price Escalation.

The base prices of 100 octane aviation gasoline set forth in Section IV hereof shall be subject to adjustment, first, by revision of the base prices specified in Section IV (a) (2) and (3) under the provisions of Exhibit B hereof, and second, as follows:

(a) The said base prices are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven to twenty-seven and nine-tenths degrees (27 to 27.9) A.P.I. Signal Hill crude de- [illegible] Signal Hill, California. Each of the

Entry 510 Box 3593 Folder # 360 Tide Water AUO [illegible] 32

base prices set forth in Section IV (a) hereof shall be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) Each of the base prices set forth in Section IV (a) hereof shall also be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index number is presently ninety-five and nine-tenths (95.9). The effective date of a change price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's Avon Refinery, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functionin

Entry 510
Box 3593
Folder - 360 - Tide Water
AUO

of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane avia tion gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon th amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The ar bitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are no connected with either of the parties hereto. The arbitrators shall be di rected to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(d) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustments.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the notification referred to in Section II hereof, but not later, in any event, than midnight May 31, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior t

Entry 510
Box 3593
Folder - 360 Tide Water
AUO 32

the end of the original term for the first yearly extension and at ninety (90) days prior to the end of the first yearly extension for second yearly extension. Upon such extension the obligations to purch and receive shall be in accordance with Section II (b) hereof and the prices to be paid shall be fixed by agreement between the parties heret during the ninety (90) day period prior to each such extension. All the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Omitted).

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasol in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities refer to in Section II (i) hereof, shall contain, from and after the date of this contract, an aggregate of at least two hundred forty thousand (240, barrels of 100 octane aviation gasoline, leaded or unleaded, or componen thereof ready for blending; provided further that Seller shall be entitl to damages for failure by Buyer to take and pay for 100 octane gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (to current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (j) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

Entry 510
Box 3593
Folder - 260 Tide Water
AUO