FEDERAL REGISTER

Published daily, except Sundays, Mondays, and days following legal holidays by the Division of the Federal Register, The National Archives, pursuant to the authority contained in the Federal Register Act, approved July 26, 1935 (49 Stat. 500), under regulations prescribed by the Administrative Committee, approved by the President.

The Administrative Committee consists of the Archivist or Acting Archivist, an officer of the Department of Justice designated by the Attorney General, and the Public Printer or Acting Public Printer.

The daily issue of the FEDERAL REGISTER will be furnished by mail to subscribers, free of postage, for $1.25 per month or $12.50 per year; single copies 10 cents each; payable in advance. Remit money order payable to the Superintendent of Documents directly to the Government Printing Office, Washington, D. C.

CONTENTS—Continued

TITLE 36—PARKS AND FORESTS: Page
Forest Service:
George Washington and Jefferson National Forests, etc., trespass, amendment ... 3376
TITLE 47—TELECOMMUNICATION:
Federal Communications Commission:
Amateur radio stations and operators, regulations amended ... 3376
TITLE 49—TRANSPORTATION AND RAILROADS:
Interstate Commerce Commission:
Motor carriers, etc., regulations amended:
Surety bonds, policies of insurance, etc ... 3377
Transfers of rights to operate in interstate or foreign commerce ... 3376

NOTICES

Department of Commerce:
Civil Aeronautics Authority:
Aerovias Nacionales Puerto Rico, Inc., hearing postponed ... 3379
Department of Labor:
Wage and Hour Division:
Miscellaneous apparel industry, appointment of industry committee ... 3379
Securities and Exchange Commission:
Standard Gas and Electric Co., et al., sale of shares approved ... 3379
Treasury Department:
Bureau of the Public Debt:
Offering of Commodity Credit Corporation notes, etc ... 3377
War Department:
Contract summaries:
Benham Engineering Co ... 3378
Williams, W. Horace, Co ... 3378

personal property for taxation purposes) of the Corporation shall be subject to State, territorial, county, municipal or local taxation to the same extent according to its value as other real property is taxed.

[SEAL] CHARLES B. HENDERSON, *Chairman.*

Attest:

G. R. COOKSEY, *Secretary.*

[F. R. Doc. 41-4918; Filed, July 10, 1941; 10:56 a. m.]

## TITLE 16—COMMERCIAL PRACTICES

### CHAPTER I—FEDERAL TRADE COMMISSION

[Docket No. 4439]

### PART 3—DIGEST OF CEASE AND DESIST ORDERS

IN THE MATTER OF H. W. LAY & COMPANY, INC.

§ 3.99 (b) *Using or selling lottery devices—In merchandising.* In connection with offer, etc., in commerce, of nuts or nut products, or any other merchandise, (1) selling, etc., nuts or nut products, or any other merchandise, so packed and assembled that sales thereof to the general public are to be, or may be, made by means of a game of chance, gift enterprise or lottery scheme; (2) supplying, etc., dealers or others with assortments of packages of nuts or nut products, or other merchandise, which are to be, or may be, used to conduct a lottery, game of chance, or gift enterprise in the sale or distribution thereof to the public; (3) packing or assembling in the same assortment packages of nuts or nut products, or other merchandise, for ultimate sale to the public, which individual packages of nuts or nut products, or other merchandise, are of uniform appearance, but some of which contain coupons or slips notifying the purchaser that said packages are furnished without cost; and (4) selling, etc., any merchandise by means of a lottery, game of chance or gift enterprise; prohibited. (Sec. 5, 38 Stat. 719, as amended by sec. 3, 52 Stat. 112; 15 U.S.C., Supp. IV, sec 45b) [Cease and desist order, H. W. Lay & Company, Inc., Docket 4439, June 28, 1941]

At a regular session of the Federal Trade Commission held at its office in the City of Washington, D. C., on the 28th day of June, A. D. 1941.

This proceeding having been heard[1] by the Federal Trade Commission upon the complaint of the Commission and the answer of the respondent, in which answer respondent admits all the material allegations of fact set forth in said complaint and states that it waives all intervening procedure and further hearing as to said facts, and the Commission having made its findings as to the facts and conclusion that said respondent has violated the provisions of the Federal Trade Commission Act:

*It is ordered,* That the respondent H. W. Lay & Company, Inc., a corporation, its officers, representatives, agents and employees, directly or through any corporate or other device, in connection with the offering for sale, sale and distribution of nuts or nut products, or any other merchandise, in commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

(1) Selling or distributing nuts or nut products, or any other merchandise, so packed and assembled that sales of such nuts or nut products, or other merchandise, to the general public are to be made, or may be made, by means of a game of chance, gift enterprise or lottery scheme;

(2) Supplying to or placing in the hands of dealers, or others, assortments of packages of nuts or nut products, or other merchandise, which are to be used, or may be used, to conduct a lottery, game of chance, or gift enterprise in the sale or distribution of such nuts or nut products to the public;

(3) Packing or assembling in the same assortment packages of nuts or nut products, or other merchandise, for ultimate sale to the public, which individual packages of nuts or nut products, or other merchandise, are of uniform appearance, but some of which contain coupons or slips notifying the purchaser that said packages are furnished without cost;

(4) Selling or otherwise disposing of any merchandise by means of a lottery, game of chance or gift enterprise.

*It is further ordered,* That the respondent shall, within sixty (60) days after service upon it of this order, file with the Commission a report in writing setting forth in detail the manner and form in which it has complied with this order.

By the Commission.

[SEAL] OTIS B. JOHNSON, *Secretary.*

[F. R. Doc. 41-4893; Filed, July 9, 1941; 1:20 p. m.]

[Docket No. 4473]

### PART 3—DIGEST OF CEASE AND DESIST ORDERS

IN THE MATTER OF MEADORS MANUFACTURING COMPANY

§ 3.99 (b) *Using or selling lottery devices—In merchandising.* In connection with offer, etc., in commerce, of candy, nuts or nut products or any other merchandise, (1) selling, etc., any merchandise so packed or assembled that sales thereof to the public are to be, or may be, made by means of a game of chance, gift enterprise or lottery scheme; (2) supplying, etc., others with any de-

[1] 6 F.R. 846.

Case 1:06-cv-00141-LAS Document 10-16 Filed 08/30/2006 Page 2 of 11
REPRODUCED AT THE NATIONAL ARCHIVES

100

1759

February 13, 1942

Honorable Harold I. Ickes
Petroleum Coordinator for National Defense
Washington, D. C.

Dear Mr. Ickes:

In the interest of expediting the completion, at the earliest possible date, of the program for additional capacity for aviation gasoline, I should like to ask you, the Federal Loan Administrator, the Under-Secretary of War, and the Under-Secretary of the Navy to adopt the following procedure and definition of responsibility with respect to the contracts which remain to be entered into:

1. It shall be the responsibility of the Office of the Petroleum Coordinator to determine, in behalf of the Government, the price at which aviation gasoline is to be purchased, the capacity of the particular refiner to perform and the technical details of the particular contract. The Defense Supplies Corporation (and Defense Plant Corporation), the War Department and the Navy Department shall rely upon the Office of the Petroleum Coordinator for these determinations.

2. It shall be the responsibility of Defense Supplies Corporation and Defense Plant Corporation, as the case may be, to determine, in behalf of the Government, the other terms and the form of such contracts.

3. In negotiating each of the contracts which remain to be entered into, the Office of the Petroleum Coordinator shall put the price and the technical details, as determined by it, into one of the forms of contract for such gasoline heretofore entered into with the approval of all the participating agencies of the Government--the Office of the Petroleum Coordinator, Defense Supplies Corporation, War Department and Navy Department. If any minor variations appear to be appropriate, such variations shall be settled on behalf of the Government by Defense Supplies Corporation or Defense Plant Corporation, as the case may be.

REPRODUCED AT THE NATIONAL ARCHIVES



4. The War Department and the Navy Department shall adhere to their undertaking to purchase from Defense Supplies Corporation all of the aviation gasoline accumulated by Defense Supplies Corporation under the program, but shall not insist upon their approval of each individual contract which remains to be let as a condition of such undertaking. The War Department and the Navy Department would thus withdraw from the negotiation of the particular contracts hereinafter to be let.

I am writing parallel letters to the Federal Loan Administrator, the Under-Secretary of War and the Under-Secretary of the Navy.

I trust that this procedure will be satisfactory to you.

Sincerely yours,

Donald M. Nelson
Chairman
War Production Board

MK:gdc

LEXSEE 40 OP ATTY GEN 225

OPINION OF HON. FRANCIS BIDDLE, OF PENNSYLVANIA

APPOINTED SEPTEMBER 5, 1941

CONTRACTS FOR WAR MATERIEL

*40 Op. Atty Gen. 225; 1942 U.S. AG LEXIS 6*

August 29, 1942

**SYLLABUS:**

[*1]

The proposed redelegation of authority to make, modify, and amend contracts for war materiel purchased by the War Department and to authorize the waiver of certain statutes ordinarily applicable to procurement contracts, is in accordance with the provisions of the First War Powers Act, 1941, and Executive Order No. 9001 of December 27, 1941.

The action proposed to be taken with respect to the amendment or modification of contracts in the circumstances indicated in the opinion and the waiver of certain statutory requirements ordinarily applicable to procurement contracts, is authorized by the statute and Executive order above mentioned.

An administrative determination in good faith that the prosecution of the war will be facilitated by the modification or amendment of a contract may not be drawn into question as being an error of judgment.

**ADDRESSEE:**

The SECRETARY OF WAR

**OPINIONBY:** BIDDLE

**OPINION:**

MY DEAR MR. SECRETARY: Reference is made to your letter of July 13 concerning the delegation by the Under Secretary of War of certain powers to make, modify and amend contracts for war material. You have asked my opinion as to whether "(a) the proposed delegation is in accord with the provisions of the First [*2] War Powers Act of 1941 and Executive Order 9001, December 27, 1941, and (b) the action proposed in the three specific examples set forth in the attached memorandum to the Judge Advocate General may properly be taken."

I

The answers to both of these questions depend upon the interpretation to be given to Title II of the First War Powers Act (approved December 18, 1941, c. 593, 55 Stat. 838), and to Executive Order No. 9001 of December 27, 1941 *(6 F.R. 6787).*

Title II of the First War Powers Act provides:

"SEC. 201. The President may authorize any department or agency of the Government exercising functions in connection with the prosecution of the war effort, in accordance with regulations prescribed by the President for the protection of the interests of the Government, to enter into contracts and into amendments or modifications of contracts heretofore or hereafter made and to make advance, progress and other payments thereon, without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war: *Provided,* That nothing herein shall be construed [*3] to authorize the use of the cost-plus-a-percentage-of-cost system fo contracting: *Provided further,* That nothing herein shall be construed to authorize any contracts in violation of existing law relating to limitation of profits: *Provided further,* That all acts under the authority of this section shall be made a matter of public record under regulations prescribed by the President and when deemed by him not to be incompatible with the public interest."

The President's order of December 27, 1941 (Executive Order No. 9001), issued pursuant to Title II, authorized the War Department, the Navy Department, and the Maritime Commission to take the action described in the statute, and prescribed regulations for their guidance.

By order dated December 30, 1941, the Secretary of War has authorized and directed the Under Secretary of War to exercise the powers conferred upon the War Department by Executive Order No. 9001.

II

In answer to your first question, it is my opinion that the proposed delegation is in accord with the provisions of the First War Powers Act of 1941 and Executive Order No. 9001.

The act grants power to the President to "authorize any department or agency of [*4] the Government exercising functions in connection with the prosecution of the war effort" to take the action described in the statute. As a "department" or "agency" must act through its officials, delegation of authority is certainly contemplated.

Executive Order No. 9001 provides that the authority therein conferred upon the War Department may be exercised by the Secretary of War "or in [his] discretion and by [his] direction * * * may also be exercised through any other officer or officers or civilian officials" of the War Department. It further provides that the Secretary of War "may confer upon any officer or officers * * * [of the War Department], or civilian officials thereof, the power to make further delegations fo such powers" within the War Department. As pointed out above, the Secretary has authorized and directed the Under Secretary of War to exercise the powers conferred upon the War Department by Executive Order No. 9001, an action which was authorized not only by the Executive order but also by U.S.C., title 5, section 181 (a). Under the order now proposed, the powers therein described would be conferred upon the Commanding General, Services of Supply, [*5] who would be authorized to redelegate them within the War Department.

Without authority to delegate and redelegate, these powers would be dead powers. The immensity of the program of procurement of material necessary, effectively to prosecute the war, makes impossible its administration in all details by any one person. In the very nature of things the Under Secretary must delegate authority to act if the purpose of the statute is to be effective. For the same

reasons, the Commanding General, Services of Supply, must have authority to redelegate. The proposed order properly authorizes the delegation and redelegation of these powers.

III

I turn now to the substance of the proposed order, and to its practical operation, as evidenced in the examples set forth in the Judge Advocate General's memorandum. (See Appendix II of this opinion.)

Paragraph I of the proposed order authorizes the Commanding General, Services of Supply:

"1. To make contracts and purchases, to place orders, and to make payments thereon, without regard to any restrictions, whether of substance or procedure, contained in the following statutes (and any Executive orders, rules and regulations promulgated [*6] thereunder or applicable thereto):

"*a.* The act of March 3, 1933, title III (47 Stat. 1521, *41 U.S.C. 10a,* 10b, 10c); concerning foreign-made, foreignmined, or foreign-produced goods;

"*b.* The act of June 25, 1938 (52 Stat. 1196, *41 U.S.C. 48),* concerning purchases of blind-made goods;

"*c.* The act of May 27, 1930 (46 Stat. 392, *18 U.S.C. 744g),* concerning purchases of prison-made goods;

"*d.* The act of February 27, 1929 (45 Stat. 1342, 41 U.S.C. (7a, 7b, 7c, 7d), concerning Treasury Department procurement;

"*e.* The act of January 12, 1895, as amended (28 Stat. 622, *44 U.S.C. 111),* requiring that Government printing, etc., be done at the Government Printing Office;

"*f.* The act of June 26, 1906 (34 Stat. 476, as amended, *39 U.S.C. 355),* concerning the procurement of envelopes by the Postmaster General."

This paragraph is a valid exercise of the powers granted by Title II of the First War Powers Act, which authorizes the President to permit you --

"* * * to enter into contracts and into amendments or modifications of contracts * * * *without regard to the provisions of law* relating to the making, performance, amendment, or modification of contracts * * [*7] *." [Italics supplied.]

The grant is without any limitation whatever save that cost-plus contracts are prohibited, statutory limitations on profits must be observed, and action taken under the statute must be published when deemed by the President not incompatible with the public interest.

The first statute listed in the quoted paragraph of the order is generally referred to as the "Buy American Act." It limits, with certain exceptions, the source of governmental supply to articles produced or manufactured in the United States. The remaining five statutes mentioned in the order require certain articles or material, or general classes of articles or material, to be obtained from or through designated sources. All of these statutes were enacted in time of peace and without regard to the imperative need for the utmost speed in the process of procurement. The events of this war have proved that time is of the essence in procuring war material and sending it to the combat forces of the United Nations, which are engaged in fighting the enemy at great distances from the conti-

nental United States. Title II of the First War Powers Act has as one of its purposes the speeding [*8] up of this procurement process.

The legislative history of Title II underscores the breadth of its language. The committee reports (H. Rept. 1507, 77th Cong.; S. Rept. 911 *id.*) state that under Title II "the President may authorize agencies, among other things (*a*) to enter into contracts without competitive bidding in those cases where bidding is still required; (*b*) to enter into contracts without performance bonds; (*c*) to amend or modify contracts; (d) to make progress payments on contracts." The reports also state that a substantially complete list of statutes involved is appended to the reports. These appended lists include three general classes of statutes, viz, those requiring advertising for bids for Government contracts; those requiring bonds for Government contracts; and those containing provisions concerning advance and partial payments. (See H. Rept., 1507, *supra.*)

The above specifically enumerated activities, however, are only "*among other things*" which the President may authorize agencies to do. The reports state that Title II "is intended to speed up the procurement of war material"; that "it empowers the President, whenever he deems such [*9] action would facilitate the prosecution of the war, to authorize agencies to enter into contracts with a maximum of speed"; and that it "liberalizes existing statutes relating to procurement and permits elimination of restrictions so as to give the procurement agencies the flexibility they need in the procurement of war material." (See H. Rept. 1507, *supra.*)

The debate in the Congress reinforces the broad language of the committee reports. A member of the House Judiciary Committee characterized the measure as "a very long step" and said that it would "permit the President or any of his agents to enter into contracts without regard to the provisions of any other law" (Cong. Rec., v. 87, p. 9860-1). Another member of that committee said: "We now take the lid off entirely, with the exception that we still outlaw that sort of contract known as cost-plus." *Id.* 9862. There was a frank recognition that the bill was "far-reaching" and "extraordinary" (*id.* 9860, 9864), and no attempt was made to conceal the fact that peacetime safeguards were being discarded.

The debate in the Senate confirms this legislative purpose. It was stated that "nothing of the sort was even [*10] contemplated during the first World War" and that "the language is so clear that there can be, in my opinion, not the slightest doubt that this does change the contract laws as well as merely the procedure of making contracts." *Id.* 9843, 9839. Referring to the proviso forbidding cost-plus-a-percentage-of-cost contracts, a Senator said: "That is the only limitation left as I see it, and evidently it was thought that if that proviso were not put in, even cost-plus contracts would be permitted." *Id.* 9839. An amendment was proposed and adopted to preserve existing laws which limited profits. At a later point, another amendment was proposed and adopted to require that all action under this title be made a matter of public record, because the measure was "a complete, blanket authority to the President of the United States to authorize any department to do anything it pleases in respect to war contracts." *Id.* 9842. The publicity provision was stated to be "the very minimum of precaution which ought to be exercised by us if we must delegate this enormous power." *Id.* 9842. Like the House debate, the discussion in the Senate was a candid acknowledgment that vast powers [*11] were being conferred upon the President because of the grave emergency.

I turn to the statutes listed in paragraph 1 of your order. The Buy American Act, 47 Stat. 1521, no matter how justified at the time of its passage, now prevents the full utilization by us of the resources of the other United Nations and of the Latin American countries. It seems clear to me that

the Congress did not intend to leave intact this impediment to total war. I may point out, as I recently had occasion to do when considering another obstacle to the full use of all available resources, that, since our domestic economy is already fully utilized, there is little danger that domestic producers will be adversely affected by lifting the barrier. See *40 Op. A.G. 202.* The statutes listed in sections (b) and (c) of paragraph 1 are limitations of similar nature on the full use of our resources. Those listed in sections (d), (e), and (f) deal simply with the distribution of procurement functions within the Government. Title II of the First War Powers Act is, it seems to me, fully broad enough to include all these statutes in its scope.

Paragraph 3 of the proposed order grants authority to "waive [*12] bid, payment, performance, or other bonds, and to dispense with advertising for bids and competitive bidding." This clause is patterned after paragraph 4 of Title I of Executive Order No. 9001. The authority contained in paragraph 3 of your order is clearly within the intention of the Congress in enacting Title II of the First War Powers Act, and within the scope of the Executive order. No further discussion of paragraph 3 appears necessary.

I may add that this opinion should not be understood as being intended to include mention or discussion of all the statutes or provisions of law which may be waived under the First War Powers Act, Title II.

IV

The portions of your proposed order not so far considered authorize the amendment and modification of contracts.

Paragraph 2 of the proposed order reads in part:

"Whenever, in the judgment of the Commanding General, Services of Supply (or of an officer or civilian employee of the War Department to whom authority has been delegated as provided in subparagraph 4 to exercise such powers), the prosecution of the war is thereby facilitated, to amend or modify contracts heretofore or hereafter made for the purpose of (a) obtaining continued [*13] operations by contractors engaged in war production, (b) encouraging greater diligence on the part of contractors, (c) protecting contractors from the consequences of unforeseen or unexpected events, (d) adjusting contracts to new conditions and circumstances, including those created by the rules, orders, instructions, and determinations of Government departments, or (e) for any other purpose for facilitating the prosecution of the war.

"Such amendments and modifications of contracts may be without consideration, other than the determination that the prosecution of the war will thereby be facilitated, and may be utilized to accomplish the same things as any original contract could accomplish, irrespective of the time or circumstances of the making of or the form of the contract amended or modified, or of the amending or modifying contract, and irrespective of rights which may have accrued under the contract or the amendments or modifications thereof."

Amendment or modification of a contract is proper for any or all of the purposes set out above. Title II of the First War Powers Act permits the President to authorize you to amend or modify contracts, "without regard to [*14] the provisions of law relating to the * * * amendment or modification of contracts whenever he deems such action would facilitate the prosecution of the war." By Executive Order No. 9001, the President has authorized you, among other things, to make amendments or modifications whenever (in the words of the order) "in the judgment of the War Depart-

ment * * * the prosecution of the war is thereby facilitated." In my opinion, this requirement of the Executive order is satisfied by a judgment in good faith that the prosecution of the war will be facilitated by a modification or amendment. Action so taken may not later be drawn into questions as being an error of judgment. This office has consistently had, in accordance with *Wright v. Ynchausti & Co., 272 U.S. 640,* that in the absence of fraud or other irregularity administrative determinations and findings of fact made by executive officers of the Government, acting in the performance of duty, are conclusive. See *37 Op. A.G. 95, 100-101, 219;* 34 *id. 162;* 38 *id. 181.*

The statute and Executive Order No. 9001 clearly contemplate that the War Department may formulate general policies designed to facilitate the procurement [*15] of war materiel, and may effectuate those policies through the amendment or modification of contracts. With respect to the types of amendments or modifications which are to be permitted, the proposed order provides:

"The powers hereby delegated may be exercised by (a) supplemental agreements which modify or amend or settle claims by or against the United States arising under or with respect to any contracts heretofore or hereafter made; (b) agreements with contractors or obligors modifying or releasing accrued obligations of any sort, including accrued liquidated damages or liability under any surety or other bonds; or (c) supplemental agreements and change orders suspending or modifying the operation of existing contracts as yet uncompleted, and providing for the payment by the Government of the damages incurred by a contractor by reason of such suspension or modification; *provided* in each instance that full performance by the contractor under such contract, or under a series of contracts between the United States and the same contractor for substantially the same goods, shall not have been completed and final payment made thereunder."

The quoted provisions are amply [*16] sustained by the statute and the President's order. The directive submitted and the examples annexed plainly do not involve the award of any gratuity to the contractor, inasmuch as the proposed modifications or amendments are to be based on findings that the prosecution of the war will thereby be facilitated, thus contemplating a clear benefit to the United States.

In passing the First War Powers Act, the Congress desired to enable you, and the contractors who supply you with war material, to revise and modify existing arrangements so as to meet the countless dislocations and uncertainties caused by changes in weapons, in strategy, in the economy, in the availability of commodities, and other variables. The extreme scope of the power given by Title II to "modify" and "amend" contracts was explicitly recognized in the debate in the Senate. (See Cong. Rec., v. 87, p. 9839.) Title II must be given an interpretation which will carry out the obvious intention of its framers.

In particular, the language of the act respecting "amendments or modifications of contracts * * * without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts," [*17] would be largely meaningless if it did not include the power to settle claims and release obligations in favor of or against the United States arising either in connection with the original contract or as a result of a modification or amendment thereof. It is clear that these powers of settlement and release are not in any wise denied to you by the provisions of the act of June 10, 1921, 42 Stat. 24, or by the provisos of section 1 of Title I of the First War Powers Act.

I conclude that the provisions of the proposed order relating to the amendment and modification of contracts are in every respect valid.

V

You also request my opinion, whether, if the War Department desires to do so, the action proposed in three specific examples, which are set forth in detail in the second appendix to this opinion, properly may be taken.

Example A is illustrative of a situation in which it is deemed that the prosecution of the war will be facilitated by the making of purchases or contracts without regard to the restrictive provisions of the statutes enumerated in paragraph 1 of the proposed order.

Example B is a case in which it is deemed advisable to modify a certain contract in [*18] order to relieve the contractor from liquidated damages. It is stated in the papers submitted to me that "the contracting officer and the Chief of Ordnance are of the opinion that unless the contractor receives further advance payments or waiver of liquidated damages due to date, financial difficulties will compel the contractor to cease production. Production of the contractor is deemed essential for the prosecution of the war, and cannot be allowed to cease under any circumstances."

Example C relates to a contract for dredging which is deemed "absolutely essential in the war effort." It is proposed to enter into an agreement whereby the Government is to indemnify the dredge owner against loss of his dredge and plant by enemy action, and against liability as a self-insurer under various Workmen's Compensation laws. It is stated that the proposed action "is deemed expedient in the interest of facilitating the war effort, of insuring the continued operation of the dredge, and as a fair assumption of a risk caused solely by the war."

In all of these cases the Judge Advocate General has concluded that the proposed action may be taken if it is determined administratively that such [*19] action would facilitate the prosecution of the war. I agree with these conclusions. It is my understanding that in each case the action is to be taken in the exercise of a good faith judgment, and in an attempt to protect the interests of the United States, within the meaning of Title II of the First War Powers Act. On this basis, the examples given are clearly within your authority.

Respectfully,

FRANCIS BIDDLE.

APPENDIX I

PROPOSED ORDER OF DELEGATION TO COMMANDING GENERAL, SERVICES OF SUPPLY

Pursuant to Title II of the First War Powers Act and Executive Order No. 9001, there is hereby vested in the Commanding General, Services of Supply, authority to take the following action:

1. To make contracts and purchases, to place orders, and to make payments thereon, without regard to any restrictions, whether of substance or procedure, contained in the following statutes (and any Executive orders, rules, and regulations promulgated thereunder or applicable thereto):

*a.* The act of March 3, 1933, title III (47 Stat. 1521, *41 U.S.C., 10a,* 10b, 10c), concerning foreign-made, foreign-mined, or foreign-produced goods;

*b.* The act of June 25, 1938 (52 Stat. 1196, *41* [*20] *U.S.C. 48),* concerning purchases of blind-made goods;

*c.* The act of May 27, 1930 (46 Stat. 392, *18 U.S.C. 744g),* concerning purchases of prison-made goods;

*d.* The act of February 27, 1929 (45 Stat. 1342, *41 U.S.C. 7a,* 7b, 7c, 7d), concerning Treasury Department procurement;

*e.* The act of January 12, 1895, as amended (28 Stat. 622, *44 U.S.C. 111),* requiring that Government printing, etc., be done at the Government Printing Office;

*f.* The act of June 26, 1906 (34 Stat. 476, as amended, *39 U.S.C. 355),* concerning the procurement of envelopes by the Postmaster General.

2. The contracts hereby authorized to be made include agreements of all kinds (whether in the form of letters of intent, purchase orders, or otherwise) for all types and kinds of things and services necessary, appropriate or convenient for the prosecution of war, or for the invention, development, or production of, or research concerning any such things, including but not limited to, aircraft, buildings, vessels, arms, armament, equipment, or supplies of any kind, or any portion thereof, including plans, spare parts and equipment therefor, materials, supplies, facilities, utilities machinery, [*21] machine tools, and any other equipment, without any restriction of any kind, either as to type, character, location, or form.

Whenever, in the judgment of the Commanding General, Services of Supply (or of an officer or civilian employee of the War Department to whom authority has been delegated as provided in subparagraph 4 to exercise such powers), the prosecution of the war is thereby facilitated, to amend or modify contracts heretofore or hereafter made for the purpose of (a) obtaining continued operations by contractors engaged in war production, (b) encouraging greater diligence on the part of contractors, (c) protecting contractors from the consequences of unforeseen or unexpected events, (d) adjusting contracts to new conditions and circumstances, including those created by the rules, orders, instructions and determinations of Government departments, or (e) for any other purposes for facilitating the prosecution of the war.

Such amendments and modifications of contracts may be without consideration, other than the determination that the prosecution of the war will thereby be facilitated, and may be utilized to accomplish the same things as any original contract could accomplish, [*22] irrespective of the time or circumstances of the making of or the form of the contract amended or modified, or of the amending or modifying contract, and irrespective of rights which may have accrued under the contract or the amendments or modifications thereof. The powers hereby delegated may be exercised by (a) supplemental agreements which modify or amend or settle claims by or against the United States arising under or with respect to any contracts heretofore or hereafter made; (b) agreements with contractors or obligors modifying or releasing accrued obligations of any sort, including accrued liquidated damages or liability under any surety or other bond; or (c) supplemental agreements and change orders suspending or modifying the operation of existing contracts as yet uncompleted, and providing for the payment by the Government of the damages incurred by a contractor by reason of such suspension or modification; *provided* in each instance that full performance by the contractor under such contract, or under a series of contracts between the United States and the same contractor for substantially the same goods, shall not have been completed and final payment made [*23] thereunder. The supplemental contracts hereby authorized to be made include agreements of all kinds for all types and kinds of things and services necessary, appropriate or convenient for the prosecution of the war, or for the invention, development or production of, or research concerning any such things.