3. To waive bid, payment, performance, or other bonds, and to dispense with advertising for bids and competitive bidding.

4. The powers hereby conferred upon the Commanding General, Services of Supply, may be redelegated by him to the Chief, Purchases Branch, Procurement and Distribution Division, Services of Supply, with the power of redelegating such powers, in whole or a part, to any officer or officers or civilian officials of the War Department.

APPENDIX II

EXAMPLES OF ACTION PROPOSED TO BE TAKEN, AS SET FORTH IN MEMORANDUM OF THE JUDGE ADVOCATE GENERAL

*Example A.* A supply arm or service may find that compliance with the restrictions contained in various of the statutes listed in paragraph 1 above, either in general, or in particular cases, impose unreasonable restraints upon contracting officers in the making of purchases or contracts, or upon the obtaining of [*24] services. This may be either because the time consumed in complying with the restrictions and procedures prescribed in or pursuant to the statutes is so long as to hamper the war, or because purchases cannot be made on a satisfactory basis under these procedures in the matter of delivery dates, quality of articles, or for some other reason, or because necessary services cannot be obtained on a basis which complies with the statutory restrictions. The proposed delegation would permit the Commanding General, Services of Supply (pursuant to the First War Powers Act and Executive Order No. 9001) either in individual cases to make specific contracts, or to authorize the making of specific contracts without regard to the restrictions and procedures prescribed by these statutes, or to authorize the making of such contracts generally, whenever he finds that thereby the prosecution of the war will be facilitated.

*Example B.* A contract was made with the N Company for the delivery of 1,500,000 A.P. Shot. Deliveries under the terms of the contract were to begin March 1941, with 31,250 Shot. The contract contained the then Standard Liquidated-Damages clause (date of contract [*25] January 7, 1941), providing for such damages at the rate of 1/5 of 1 % for each day of delay, with a maximum of 20 % on the damages that could be collected. At the time the invitation to bid and subject contract were drawn, Procurement Circular No. 36, dated October 23, 1940, was in effect. This Circular provided that because of the emergency then existing due to the requirements of the National Defense program, liquidated damages should be required only in exceptional cases. No exceptional circumstances requiring the inclusion of liquidated damages in this contract then existed. On the contrary, the production of the shot in question was in an experimental stage, not only for this company, but for all other companies, and therefore, the inclusion of a rigid delivery schedule, with provisions for liquidated damages, in the original contract appears to have been inadvisable.

A supplemental agreement, dated April 23, 1941, revised and extended the original delivery schedule, but at the time of the execution of this supplemental agreement on April 23, 1941, 31,250 shot which should have been delivered in March 1941 had not been delivered. Consequently, by the terms of the original [*26] contract, liquidated damages had accrued in favor of the Government prior to the execution of Supplement No. 2. These liquidated damages, however, have never been assessed or vouchered against the contractor.

The contractor has been unable thus thus far to meet the new delivery schedule established by Supplemental Agreement No. 2, by the terms of which deliveries were to commence in September 1941 and end in August 1942. As a result, liquidated damages, totaling $29,356.17, have been as-

sessed and vouchered by the Hartford Ordnance District against the contractor for late deliveries from September 1941 through January 1942.

Additional liquidated damages in amounts that cannot yet be determined are due the Government for late deliveries for the months subsequent to January 1942 to date.

Although the contractor claims that the delays in deliveries have been due to unforeseeable causes beyond its control and without its fault or negligence, it failed to notify the contracting officer in writing of the causes of the delays within ten days from the beginning thereof, as required by the terms of the contract. The contractor has requested the contracting officer to grant an [*27] extension of this ten-day notification period, but the contracting officer has refused this request. Moreover, the contracting officer and this office are of the opinion, after a preliminary investigation, that the delays in deliveries have not been due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, and that, therefore, no waiver of liquidated damages can be granted under the terms of the present contract.

The contractor has received the full amount of advance payments possible under the present terms of the contract, amounting to $873,000, as stipulated in Supplemental Agreement No. 1, dated January 22, 1941.

The contracting officer and the Chief of Ordnance are of the opinion that unless the contractor receives further advance payments or waiver of liquidated damages due to date, financial difficulties will compel the contractor to cease production. Production of the contractor is deemed essential for the prosecution of the war, and cannot be allowed to cease under any circumstances. The Chief of Ordnance and the contracting officer believe that all liquidated damages due to date should be waived, in order to give the contractor [*28] the financial assistance now required. It is further the opinion of the Chief of Ordnance and of the contracting officer that a new delivery schedule should be adopted, setting up feasible requirements, and that the liquidated damages clause should be deleted from the contract and the Delays-Damages clause substituted therefor. It is desired to do this by supplemental agreement, pursuant to Executive Order No. 9001.

*Example C.* The Corps of Engineers has a firm contract on lump-sum basis to do certain dredging. The contract to do this dredging was entered into for a fixed sum, $3,000,000, prior to December 9, 1941. The equipment employed in this dredging is worth a very large sum, believed to be about $500,000. The dredging to be done is absolutely essential in the war effort. Although the Government is under no legal obligation to do so, it is desired to enter into an agreement by which the Government will agree to undertake to indemnify the dredge owner against loss of his dredge and plant by enemy action, and against liability as a self-insurer, under various Workmen's Compensation laws. There is some possibility that unless this is done, the owner of the dredge [*29] will prefer to run the risks of damages by breach of contract rather than to proceed, but no definite threat to this effect has been made. It is regarded as being to the Government's advantage to guard against any possible interference with this vital war work. Accordingly, the proposed action is deemed expedient in the interest of facilitating the war effort of insuring the continued operation of the dredge, and as a fair assumption of a risk caused solely by the war.

Entry 32 Box 40

COPY

October 10, 1942

RG 334, Records of Interservice Agencies

Memorandum for Mr. Eberstadt

100 Octane Gasoline Program.

If we have a program more urgent than the 100 octane gasoline program, I do not know what it is.

The carrying on of the air offensive against the axis powers is dependent upon the supply of 100 octane gasoline. The Army, the Navy and the British look to our supplies for the bulk of their needs, and more recently the Russians have asked us to supply them with 100 octane gasoline. The loss of two plants by the Russians as a result of enemy action will make the demands upon our production all the heavier.

At present the requirements are 140,000 barrels a day, practically all of it for military airplanes, against production of 115,000 barrels a day. The new construction program, on estimates of September, would have brought production up to requirements by January 1943. Within the last few weeks the construction program has been delayed, however, by inability to get the materials and the equipment for the new plants, with the result that present estimates indicate that production will not meet requirements until April. If the program is delayed to this extent, the effect on the operations of the Army and Navy Air Forces will be disastrous.

I have discussed the matter with Mr. Davies and with General Pyron, as well as with Colonel Lingle of the Army Air Forces. It is my view, and I believe that the others share this view, that the 100 octane gasoline program is suffering damage because of the synthetic rubber program. You will recall that the priorities on the synthetic rubber program were recently raised.

At the present time the plants scheduled for early completion carry AA-3 priority and the plants scheduled for later completion carry AA-4 priority. I believe that the entire construction program for 100 octane gasoline plants should be given AA-1 priority.

Robert P. Patterson,
Under Secretary of War.

rpp:lm

Copy to Mr. Ralph K. Davies,
Office of Petroleum
Coordinator.

NARA RG 334
Army - Navy Petroleum Board
Entry 32 : Subject - Numeric File
Box 40 File : 100 octane Program Reports

Ex 42

0353

DECLASSIFIED
NND 841022
By ______ NARS, Date

DEFENDANT'S EXHIBIT 42

79TH CONGRESS *1st Session* } SENATE { DOCUMENT No. 86

# REFERENCE MANUAL
OF
# GOVERNMENT CORPORATIONS

## GENERAL ACCOUNTING OFFICE

AS OF JUNE 30, 1945

U.S. General Accounting Office
MAY 13 1998

PRESENTED BY MR. BARKLEY

AUGUST 1, 1945.—Ordered to be printed

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1945

## FOREWORD

Section 5 of Public Law 4, approved February 24, 1945, provides that, beginning with the fiscal year 1945, the financial transactions of all Government corporations shall be audited by the General Accounting Office in accordance with the principles and procedures applicable to commercial corporate transactions and under such rules and regulations as may be prescribed by the Comptroller General of the United States, and that a report of each such audit for each fiscal year shall be made by the Comptroller General to the Congress not later than the following January 15. The importance of this audit duty is shown by the fact that on March 31, 1945, Government corporations had total assets of 29.6 billion dollars and total liabilities of 28.4 billion dollars, including intercorporate items.

Enactment of Public Law 4, Seventy-ninth Congress, and introduction of S. 469 and H. R. 3660, providing further financial control of Government corporations, the latter bill having been passed unanimously by the House of Representatives, accentuate the need for a central source of information as to the activities and finances of Government corporations, and their legal and factual status with reference to accounting for and auditing of public funds entrusted to such enterprises, as evidenced by Executive and administrative orders, decisions of the Comptroller General, and other pertinent source materials. The accompanying manual is designed to assist in filling that need. The manual grew out of a survey of the legal and accounting history of 58 corporations or groups of corporations. Divisions and offices of the General Accounting Office, as well as the Bureau of the Budget and the corporations themselves, have cooperated in the preparation of the work.

While not all the corporations represented here are Government corporations in the strictest sense of the term, all were deemed of sufficient importance, because of Government ownership, control, or financial or contractual interest, to warrant the inclusion thereof in this manual. It should be pointed out especially that the inclusion or exclusion of a particular corporation is not equivalent to a determination that it is or is not a "Government corporation" within the meaning of the act of February 24, 1945.

A separate chapter has been prepared covering each corporation or group of corporations, setting forth, generally under the detailed headings indicated on the outline appearing as table 5, below, information as to organic authority; ownership, organization, and management; purpose and scope of activities; finances; and status with respect to accounting and auditing. In addition, there are included in an appendix, classified under the respective corporations, such materials as charters and bylaws, certain decisions of the Comptroller General, and a limited number of other relevant documents not generally available. Also, tables will be found following this

foreword, showing the period of existence of the corporations; the supervising or interested Government agency; the manner of creation of each corporation and the authority relied upon for Federal creation, organization, or acquisition of interest; and an analysis of budgetary and congressional control of such corporations.

The extent of the topics covered in the manual has made it necessary to limit the material therein, but information is furnished as a guide to further research if necessary. While care has been exercised to see that the statements in the manual are historically accurate, it may be necessary in some instances to reexamine the particular subject matter in the light of more recent developments.

The information for the manual originally was compiled as of June 30, 1944. The rapid changes since that date in the field under discussion are illustrated not only by the audit provisions of Public Law 4, referred to at the beginning of this foreword, but by the reconstitution of the Federal Loan Agency as an independent establishment of the Government by other provisions of the same law; the inclusion of budgets for all subsidiaries of the Reconstruction Finance Corporation, many of them for the first time, in the Annual Budget Document for the fiscal year 1946; and the issuance on September 1, 1944, of Budget-Treasury Regulation No. 3, requiring quarterly financial statements from Government corporations.

In view of such numerous changes, every effort has been made to revise the manual to include developments to June 30, 1945, note being taken also of certain important subsequent changes.

It is planned to issue material supplementary to this manual, incorporating changes in applicable laws, creation or liquidation of corporations, Government reorganizations, and other conditions affecting the corporations and their relations with the General Accounting Office.

(Signed) Lindsay C. Warren,
*Comptroller General of the United States.*

# CONTENTS


| | Page | Appendix page |
|---|---|---|
| Tables: | | |
| 1. Period of existence of corporations, with supervising or interested Government department or agency | VII | ------ |
| 2. Manner of creation of corporations, and authority relied upon for Federal creation, organization, or acquisition of interest | VIII | ------ |
| 3. Corporations arranged according to supervising or interested Government department or agency | X | ------ |
| 4. Analysis of budgetary and congressional control of corporations as of June 30, 1945 | XI | ------ |
| 5. General outline of information included in manual | XIII | ------ |
| Note on accounting and auditing of Government corporations | XIV | ------ |
| Corporations: | | |
| American President Lines, Ltd | 1 | ------ |
| Banks for cooperatives | 3 | 297 |
| Cargoes, Inc | 9 | 300 |
| Colonial Mica Corporation | 14 | ------ |
| Commodity Credit Corporation | 15 | 307 |
| Copper Recovery Corporation | 27 | ------ |
| Defense Homes Corporation | 28 | 326 |
| Defense Plant Corporation | 32 | 333 |
| Defense Supplies Corporation | 38 | 338 |
| Disaster Loan Corporation | 44 | 343 |
| Electric Home and Farm Authority | 49 | 344 |
| Export-Import Bank of Washington | 55 | 349 |
| Farmers' Home Corporation | 62 | ------ |
| Federal Crop Insurance Corporation | 65 | 360 |
| Federal Deposit Insurance Corporation | 71 | 364 |
| Federal Farm Mortgage Corporation | 76 | 372 |
| Federal home loan banks | 82 | ------ |
| Federal intermediate credit banks | 88 | 377 |
| Federal land banks | 93 | 378 |
| Federal National Mortgage Association | 100 | 378 |
| Federal Prison Industries, Inc | 107 | 384 |
| Federal Public Housing Authority | 111 | ------ |
| Federal Savings and Loan Insurance Corporation | 120 | 387 |
| Federal Subsistence Homesteads Corporation | 126 | 389 |
| Federal Surplus Commodities Corporation | 131 | 395 |
| Home Owners' Loan Corporation | 138 | 402 |
| Inland Waterways Corporation | 144 | 405 |
| Institute of Inter-American Affairs | 150 | 408 |
| Institute of Inter-American Transportation | 155 | 415 |
| Inter-American Educational Foundation, Inc | 159 | 422 |
| Inter-American Navigation Corporation | 164 | 430 |
| Metals Reserve Company | 169 | 433 |
| Panama Railroad Company | 176 | 437 |
| Petroleum Reserves Corporation | 182 | 441 |
| Prencinradio, Inc | 187 | 443 |
| Production credit corporations | 191 | 450 |
| Puerto Rico Cement Corporation | 196 | 450 |

| | Page | Appendix page |
|---|---|---|
| Corporations—Continued | | |
| Reconstruction Finance Corporation | 200 | 462 |
| Regional agricultural credit corporations | 208 | 469 |
| RFC Mortgage Company | 213 | 471 |
| Rubber Development Corporation | 219 | 479 |
| Rubber Reserve Company | 225 | 484 |
| Smaller War Plants Corporation | 231 | 488 |
| Smithsonian Institution | 237 | 493 |
| Steel Recovery Corporation | 243 | ------ |
| Tennessee Valley Associated Cooperatives, Inc | 244 | 495 |
| Tennessee Valley Authority | 248 | 502 |
| Textile Foundation | 254 | 503 |
| U. S. Commercial Company | 258 | 504 |
| United States Housing Corporation | 264 | ------ |
| United States Spruce Production Corporation | 270 | ------ |
| Virgin Islands Company | 274 | 508 |
| War Damage Corporation | 279 | 519 |
| War Emergency Pipelines, Inc | 285 | ------ |
| War Hemp Industries, Inc | 286 | ------ |
| War Materials, Inc | 288 | ------ |
| Warrior River Terminal Company | 289 | ------ |
| Welfare and Recreational Association of Public Buildings and Grounds, Inc | 293 | 523 |

## Defense Supplies Corporation

(Dissolved)

### A. ORGANIC AUTHORITY

*1. Statutes*

The Corporation was created by the Reconstruction Finance Corporation on August 29, 1940, pursuant to authority of section 5d of the Reconstruction Finance Corporation Act, as amended by the act of June 25, 1940 (54 Stat. 573; 15 U. S. C. 606b).

By the act of February 24, 1945 (59 Stat. 5), the Federal Loan Agency was reconstituted as an independent Government agency to supervise administration of Reconstruction Finance Corporation and its subsidiary and affiliated corporations then under the Commerce Department. The Defense Supplies Corporation was dissolved, effective July 1, 1945 (Public Law 109), and its powers and duties transferred to the Reconstruction Finance Corporation.

*2. Executive orders and reorganization plans*

By Executive Order No. 9071, dated February 24, 1942 (50 U. S. C. appendix, Supp. IV, note to 601), all functions, powers, and duties of the Federal Loan Agency and of the Federal Loan Administrator which related to the Defense Supplies Corporation were transferred to the Department of Commerce to be exercised under the direction and supervision of the Secretary of Commerce. (But see the act of February 24, 1945, under "A 1. Statutes", above, reconstituting the Federal Loan Agency as an independent establishment.)

Foreign activities of this Corporation were affected by Executive Order No. 9361, dated July 15, 1943, which provides in section 3 (b) that the functions, powers, and duties, and outstanding contracts and obligations relating to activities and transactions in or pertaining to foreign countries vested in, or in the name of, any corporation created or organized under section 5d of the Reconstruction Finance Corporation Act, or any other corporation organized by the Reconstruction Finance Corporation, shall, unless the Director of War Mobilization otherwise determines, be transferred to the corporation or corporations designated by the Director of the Office of Economic Warfare, and that the charter and bylaws of the corporations affected by such transfers, so far as necessary, shall be amended accordingly. (See, also, Executive Order No. 9380, dated September 25, 1943, which further transferrred such foreign activities to the Foreign Economic Administration. Texts of Executive Orders 9361 and 9380 are likewise carried in the note to sec. 601, 50 U. S. C. appendix, Supp. IV.)

*3. Administrative action*

The necessary administrative action was taken to effect creation of the Corporation, as set forth under "A 4. Charter", below.

*4. Charter*

The Corporation was incorporated under a Federal charter pursuant to the above cited authority on August 29, 1940, by the Reconstruction

Case 1:06-cv-00141-LAS Document 10-17 Filed 06/30/2006 Page 10 of 15



Finance Corporation, upon request of the Federal Loan Administrator, with approval of the President of the United States, to function for the purposes and under conditions prescribed by the charter, appendix, p. 338. The charter was amended on February 15, 1941, and July 9, 1941, appendix, pp. 339 and 340.

Article Seventh of the charter provided that the Corporation should have existence until dissolved by the Reconstruction Finance Corporation or by act of Congress. Section 5d of the Reconstruction Finance Corporation Act, as amended by section 4 of the act of June 10, 1941 (55 Stat. 249; 15 U. S. C., Supp. IV, 606b), provided that no corporation theretofore or thereafter created or organized by the Reconstruction Finance Corporation pursuant to said section 5d should have succession beyond January 22, 1947, except for purposes of liquidation, unless the life of such corporation was extended beyond such date pursuant to an act of Congress. However, by the act of June 30, 1945 (Public Law 109), the Defense Supplies Corporation was dissolved, effective July 1, 1945, and its powers and duties transferred to the Reconstruction Finance Corporation.

### B. OWNERSHIP, ORGANIZATION, AND MANAGEMENT

The Corporation was owned by the United States.

Article Ninth of the charter, appendix, p. 339, provided that the affairs and business of the Corporation should be managed by a Board of Directors, appointed by Reconstruction Finance Corporation pursuant to the charter and provisions of the bylaws. The charter and bylaws were subject to amendment by the Reconstruction Finance Corporation. For organization of the Board of Directors, and titles and duties of officers of the Corporation, see articles 3 through 13 of the bylaws, appendix, pp. 341 to 342. Article 7 provided that the salaries and compensation of all officers, agents, and employees should be fixed by the Board of Directors and paid by Reconstruction Finance Corporation and reimbursed by the Corporation. Further explanation of the methods by which the Reconstruction Finance Corporation operates its subsidiaries is made in the House hearings on the Department of Commerce appropriation bill for 1945, commencing at page 210.

The Corporation was dissolved, effective July 1, 1945. (See "A 1. Statutes," above.)

### C. PURPOSE AND SCOPE OF ACTIVITIES

The purpose of the Corporation was to produce, acquire, carry, sell, or otherwise deal in strategic and critical materials and supplies; to purchase and lease land; to engage in the manufacture of arms, ammunition, and implements of war; to produce, lease, or otherwise acquire railroad equipment and commercial aircraft, and to lease, sell, or otherwise dispose of same; to acquire facilities for the training of aviators and to operate or lease, sell, or otherwise dispose of such facilities; and to take such further action as the President and the Secretary of Commerce deemed necessary to expedite the national defense program.

Defense Supplies Corporation paid most of the expenses incident to the travel, maintenance, and training, in various aviation schools

in this country, of several hundred nationals of South America countries in various branches of aviation. The total estimated cos of the program was set at $2,387,845, and with the exception of a advance of $399,245 from the Office for Emergency Management, al expenses were to be paid from funds of the Corporation. As o March 1, 1943, the sum of $1,160,671.16 had been disbursed for thi program. (See House hearings on 1944 appropriation bill for Department of Commerce, pp. 216 and 241.)

The Corporation engaged in programs involving payment o abnormal transportation costs of coal, petroleum, and sugar, an payment of subsidies on meat, butter, and flour. (See p. 225, Hous hearings on Commerce Department appropriation bill for 1944 p. 1894, Congressional Record for February 18, 1944; 8 F. R. 10825 10826.) Such programs were limited with respect to operations durin the fiscal year 1946 by the act of June 23, 1945 (Public Law 88).

The Defense Supplies Corporation was dissolved and its functions powers, duties, and authority were transferred to the Reconstructio Finance Corporation, effective July 1, 1945. (See "A 1. Statutes," above.)

D. FINANCES

*1. Source of funds*

(*a*) *Direct appropriations.*—The Corporation did not receive direc annual appropriations; however, Public Law 61, approved May 21 1945 (59 Stat. 200), included an authorization for administrativ expenses of the Corporation for the fiscal year 1946.

(*b*) *Allocations.*—The Corporation received allocations from th President's emergency funds for the development of transportatio facilities in other American republics, the establishment of a reserv supply of wool, the maintenance of the Latin-American aviator program, etc. (See House hearings on the Department of Commerc appropriation bill for 1944, pp. 241–244, and for 1945, p. 241.)

(*c*) *Capital stock.*—The charter provided that the total authorize capital stock of the Corporation should be $5,000,000, of whic $1,000,000 should be paid in immediately and the balance as called the stock to be of one class and issued for cash only. The Reconstruction Finance Corporation subscribed and paid for all of the stock of Defense Supplies Corporation and such stock is not transferable

(*d*) *Borrowings.*—Funds required, in addition to the amoun derived from the capital stock, were advanced to Defense Supplie Corporation by Reconstruction Finance Corporation. In this connection, section 5d of the Reconstruction Finance Corporation Act as amended (15 U. S. C. 606b), provides that the Reconstructio Finance Corporation may make loans to any corporation created o organized by it pursuant to said section for any purpose within th powers of such corporation, as set forth in that section, related t the national defense program, upon such terms and conditions a the Reconstruction Finance Corporation may determine. There i no record in the General Accounting Office of any other borrowings although the Corporation's charter as issued by the Reconstructio Finance Corporation included a borrowing provision.

(*e*) *Realization upon assets.*—As of February 6, 1945, the Corporation had made commitments aggregating $10,368,000,000 and disbursements of $5,188,000,000. Repayments, including sales o

Case 1:06-cv-00141-LAS Document 10-17 Filed 06/30/2006 Page 12 of 15



materials and other collections, totaled $3,428,000,000. The source of the above information does not show a further classification of the repayments; accordingly, it is impossible to indicate what is represented thereby. (See hearings before the subcommittee of the Committee on Appropriations, House of Representatives, on the Department of Commerce appropriation bill for 1946, p. 348.)

A financial statement of the Corporation as of December 31, 1943, appears on page 240 of the hearings before the above-named committee on the Department of Commerce appropriation bill for 1945.

(*f*) *Operating revenues.*—The only information available concerning this subject is set forth in the preceding paragraph. However, operating revenues appear to have been obtainable through the sale of various materials and from the leasing of land, manufacture of arms and ammunition, etc.

(*g*) *Other sources.*—None of record in the General Accounting Office.

*2. Custody and availability of funds*

(*a*) *How funds are kept.*—Article 12 of the bylaws, appendix, p. 342, provided that the treasurer should have custody of the corporate funds and securities, and should deposit with Reconstruction Finance Corporation all funds for the account of the Corporation or in such other depositories as might be designated or approved for the purpose by Reconstruction Finance Corporation.

Funds of the Reconstruction Finance Corporation, including funds of the Defense Supplies Corporation, are deposited with the Treasurer of the United States in official checking accounts under specified disbursing symbols or in Federal Reserve banks, pursuant to authority of section 7 of the act of January 22, 1932 (47 Stat. 8; 15 U. S. C. 607), and become available for disbursement as set forth in articles 12 and 16 of the bylaws.

(*b*) *How funds become available for use.*—The administrative expenses of the Corporation were paid from its corporate funds. By Executive Order No. 9159, dated May 11, 1942, amending Executive Order No. 7126 of August 5, 1935, the Defense Supplies Corporation was requested to submit to the Director of the Bureau of the Budget, from and after July 1, 1942, at such times and in such manner as he should prescribe, estimates of amounts to be expended for each fiscal year for administrative expenses, such estimates to be approved by the Director of the Bureau of the Budget. Statements showing the quarterly apportionment of administrative funds authorized for the fiscal year, and monthly statements showing the current status of the funds so authorized for obligation, were submitted to the Bureau of the Budget. For the fiscal year 1946, for the first time such expenses were included in the Federal Budget, and authorized by the Congress.

Funds deposited by the Corporation were immediately available for disbursement for the Corporation by the Federal Reserve banks and their branches upon presentation of proper evidence of obligation.

*3. Disposition of funds*

(*a*) *Expenditures, manner and authority for making.*—Article 12 of the bylaws provided that the treasurer should disburse the funds of the Corporation pursuant to the authority of the Board of Directors of the Corporation, or executive committee.

Article 16 of the bylaws provided that unless otherwise prescribed by the Board of Directors, all checks and drafts for authorized disbursements issued by the Corporation should be signed by the treasurer, and should be countersigned by the secretary. Reconstruction Finance Corporation at the request of the Board of Directors of the Corporation certified to the Treasurer of the United States the names of the incumbents of all offices, the holders whereof had such signatory powers.

Article 18 provided that all expenses incurred in connection with the operation of the Corporation should be supervised and paid in such manner as the Board of Directors or executive committee might from time to time prescribe.

In practice, disbursements, other than those for administrative expenses, usually were made by the Federal Reserve banks acting as fiscal agents of the Corporation.

(*b*) *Receipts*.—The funds of the Corporation, including profits, were treated generally as a revolving fund. Under the structure of the Reconstruction Finance Corporation, of which Defense Supplies Corporation was a subsidiary, there is no provision of law which requires a periodic transfer of profits into the Treasury of the United States as miscellaneous receipts, and until the final outcome of loans and investments is determined, the earnings serve as a reserve to take care of losses. The Federal Reserve banks acted as fiscal agents in collecting amounts due the Corporation.

### E. ACCOUNTING AND AUDITING ASIDE FROM THE ACT OF FEBRUARY 24, 1945, PUBLIC LAW 4

*1. Governing provisions*

(*a*) *Statutes*.—Since the Defense Supplies Corporation was created as a subsidiary corporation by the Reconstruction Finance Corporation on August 29, 1940, pursuant to authority of section 5d of the Reconstruction Finance Corporation Act, as amended (54 Stat. 573; 15 U. S. C. 606b), and in view of the method of operation of such subsidiaries, as explained in the House hearings on the Department of Commerce appropriation bill for 1945, commencing at page 210, the following provision of the Reconstruction Finance Corporation Act was applicable to transactions of Defense Supplies Corporation:

> * * * The board of directors of the Corporation shall determine and prescribe the manner in which its obligations shall be incurred and its expenses allowed and paid. * * * (sec. 4, 47 Stat. 6; 15 U. S. C. 604.)

(*b*) *Executive orders*.—Executive Order No. 6549, January 3, 1934, providing for audit of accounts of emergency agencies, is as follows:

> By virtue of the authority vested in me as President of the United States, it is hereby ordered and directed that accounts of all receipts and expenditures by governmental agencies, including corporations, created after March 3, 1933, the accounting procedure for which is not otherwise prescribed by law, shall be rendered to the General Accounting Office in such manner, to such extent, and at such times as the Comptroller General of the United States may prescribe, for settlement and adjustment pursuant to Title III of the Act of June 10, 1921, 42 Stat. 23.

(*c*) *Administrative orders*.—Article 12 of the bylaws provided that the treasurer should render to the Board of Directors or executive committee of the Corporation, whenever so required, an account of all his transactions as treasurer and of the financial condition of the Corporation.

A current internal audit of the records of all financial transactions of Defense Supplies Corporation as a subsidiary of the Reconstruction Finance Corporation was maintained by the Auditing Division of the parent corporation, which reported thereon from time to time to the Board of Directors. In addition, the Board of Directors annually employed an outside firm of public accountants to audit the records and to review procedures followed and work performed by the Auditing Division and comment on the adequacy thereof. For further information, see description of functions and procedures of the Auditing Division of the Reconstruction Finance Corporation in chapter 14 of "Internal Auditing: A New Management Technique", edited by John B. Thurston.

Budget-Treasury Regulation No. 2, issued under authority of Executive Order No. 8512, dated August 13, 1940, as amended by Executive Order No. 9084, dated March 3, 1942, required the Corporation to submit to the Bureau of Accounts, Treasury Department, an annual financial report for the fiscal year 1942, and for each fiscal year thereafter. Similarly, Budget-Treasury Regulation No. 3, issued September 1, 1944, required quarterly financial reports beginning with the fiscal year 1945.

*2. Submission of accounts to General Accounting Office*

(*a*) *Compliance with law.*—As a corporate subsidiary of the Reconstruction Finance Corporation, the Defense Supplies Corporation did not comply with the legal requirements applicable to regular Government establishments, providing for the rendition of accounts to the General Accounting Office.

(*b*) *Compliance with general or special accounting requirements.*—The Corporation did not comply with General Regulations No. 80, dated August 15, 1934, which provided in part that officers and employees of Government owned or controlled corporations created after March 3, 1933, who receive and disburse funds for the United States or for such corporations, should render on a monthly basis to the General Accounting Office an accounting of all such receipts, deposits, and disbursements.

(*c*) *Steps by General Accounting Office to enforce compliance.*—As the result of mutual agreement between the Secretary of Commerce and the Comptroller General of the United States, proposed legislation was drafted to provide for an audit of the transactions of the Reconstruction Finance Corporation and its subsidiary corporations under the direction of the Comptroller General of the United States, in accordance with generally accepted practices and procedures applicable to audits of commercial, industrial, and banking institutions. For further details see letter of the Comptroller General, dated May 31, 1943, B-34590, and draft of proposed legislation attached thereto, included in the appendix on the Reconstruction Finance Corporation.

(*d*) *Completeness of accounting for all funds.*—Paid checks of the Reconstruction Finance Corporation and its subsidiary corporations have, since January 1, 1943, been forwarded for temporary use in connection with settlement of the accounts of the Treasurer of the United States.

*3. Manner of auditing and settling accounts*

No audit was made by the General Accounting Office prior to the act of February 24, 1945.

OATH OF OFFICE

16. All directors and officers (and other agents or employees of the Corporation, when so required by the Board of Directors or Executive Committee) shall subscribe to the oath of office prescribed by Section 1757, Revised Statutes of the United States.

CHECKS

17. Unless otherwise prescribed by the Board of Directors, all checks and drafts for authorized disbursements issued by the Corporation shall be signed by the Treasurer or an Assistant Treasurer acting under his direction. Reconstruction Finance Corporation at the request of the Board of Directors of the Corporation shall certify to the Treasurer of the United States the names of the incumbents of all offices, the holders whereof have such signatory powers.

STOCK CERTIFICATES

18. The stock certificates or receipts for payments by Reconstruction Finance Corporation, for or on account of the stock subscribed, shall be signed by the president, the executive vice president, or a vice president and by the secretary of the Corporation.

EXPENSES

19. All expenses incurred in connection with the operation of the Corporation shall be supervised and paid in such manner as the Board of Directors or Executive Committee may from time to time prescribe.

NOTICES

20. Whenever under the provisions of these Bylaws any notice is required to be given, it shall not be construed to mean personal notice, but such notice may be given by mail, telephone, or telegraph. Any requirement as to notice may be waived in writing by the party entitled thereto.

AMENDMENTS

21. These Bylaws may be altered or amended or repealed by the Board of Directors of Reconstruction Finance Corporation at any meeting by such Board.

## DEFENSE SUPPLIES CORPORATION

### Charter of Defense Supplies Corporation

In order to aid the Government of the United States in its national-defense program, Reconstruction Finance Corporation hereby declares:

First. That pursuant to the authority contained in section 5d of the Reconstruction Finance Corporation Act, as amended by Act of Congress approved June 25, 1940, at the request of the Federal Loan Administrator with the approval of the President, there has been created a corporation under the name of Defense Supplies Corporation (hereinafter referred to as the "Corporation").

Second. That the location of the principal office of the Corporation shall be in the City of Washington, District of Columbia.

Third. That the objects and purposes of the Corporation shall be to buy, sell, carry, acquire, store, transport, produce, process, manufacture, market, and otherwise dispose of strategic or critical materials and supplies of all kinds, which may be necessary or appropriate in connection with the national-defense program of the Government, and the Corporation shall have the power and authority to do and perform all acts and things whatsoever in connection therewith or incidental thereto, including, but without limitation, the power to borrow money and issue its secured or unsecured obligations therefor; to adopt and use a corporate seal; to make contracts; to acquire, hold, and dispose of real and personal property necessary or appropriate in the conduct of its business; to sue and be sued; and to conduct its operations and business and to maintain branches or agencies in any or all states, territories, districts, and portions of the United States.

Fourth. That the Corporation, including its franchise, its capital, reserves, surplus, income, and assets shall be exempt from all taxation now or hereafter imposed by the United States, or any territory, dependency, or possession thereof,