FOR DEFENDANT ATLANTIC RICHFIELD COMPANY

Date: 16 Jun 94

Robert J. Trunek
Vice President, Environment Health & Safety

Agent Authorized to Accept Service on Behalf of Atlantic Richfield Company:

R. Walter Simmons
Manager of Operations
Corporate Environmental Remediation
Atlantic Richfield Company
AP41125
515 South Flower Street
Los Angeles, California 90071

FOR DEFENDANT TEXACO, INC.

Date: ________________

J. Donald Annett
President, Environment Health & Safety Division

Agent Authorized to Accept Service on behalf of Texaco, Inc.:

Lowell N. Elsen
Legal Department
Texaco, Inc.
10 Universal City Plaza
Suite 1300
Universal City, California 91608

FOR DEFENDANT ATLANTIC RICHFIELD COMPANY

Date: ________________

Robert J. Trunek
Vice President, Environment Health & Safety

Agent Authorized to Accept Service on Behalf of Atlantic Richfield Company:

R. Walter Simmons
Manager of Operations
Corporate Environmental Remediation
Atlantic Richfield Company
AP41125
515 South Flower Street
Los Angeles, California 90071

FOR DEFENDANT TEXACO, INC.

Date: 5/31/94

J. Donald Annett
President, Environment Health & Safety Division

Agent Authorized to Accept Service on behalf of Texaco, Inc.:

Lowell N. Elsen
Legal Department
Texaco, Inc.
10 Universal City Plaza
Suite 1300
Universal City, California 91608

CERTIFICATE OF SERVICE BY MAIL

I, MARILEN ILISCUPIDES, declare:

That I am a citizen of the United States and a resident or employed in Los Angeles County, California; that my business address is Office of the United States Attorney, Room 7516, Federal Building, 300 North Los Angeles Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action.

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on November 18, 1994, I deposited in the United States mails in the Federal Building at 300 North Los Angeles Street, Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of: PARTIAL CONSENT DECREE AMONG PLAINTIFFS AND OIL COMPANY DEFENDANTS REGARDING CERTAIN COST CLAIMS

addressed to: SEE ATTACHED SERVICE LIST

at their last known addresses, at which place there is a delivery service by United States mail.

This Certificate is executed on November 18, 1994, at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct.

Marilen Iliscupides

MARILEN ILISCUPIDES

SERVICE LIST

Peter R. Taft
Munger, Tolles & Olson
355 S. Grand Avenue
35th Floor
Los Angeles, CA 90071-1560

Cynthia L. Burch
Allen, Matkins, Leck, Gamble & Mallory
515 South Figueroa Street
Eighth Floor
Los Angeles, CA 90071-3398

Jeffrey Wolin
Demetriou, Del Guercio, Springer & Moyer
Chase Plaza, 10th Floor
801 South Grand Avenue
Los Angeles, CA 90017

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural
Resources Division

JOSHUA M. LEVIN
MICHAEL ZEVENBERGEN
H. MICHAEL SEMLER
Environment & Natural
Resources Division
Environmental Defense Section
United States Department of
Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: 202-514-4198

NORA M. MANELLA
United States Attorney

LEON W. WEIDMAN
Assistant United States
Attorney
Chief, Civil Division

KURT ZIMMERMAN
Assistant United States
Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: 213-894-0474

RONALD L. OLSON
PETER R. TAFT
CARY B. LERMAN
CYNTHIA L. BURCH
MUNGER, TOLLES & OLSON
355 South Grand Avenue
Los Angeles, California
90071-1560
(213) 683-9100

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., Plaintiffs, v. SHELL OIL COMPANY, et al., Defendants. | CASE NO. Civ. 91 0589 RJK(Ex) |
| AND RELATED ACTIONS. | **STIPULATED FACTS OF THE PARTIES RELATING TO PENDING MOTIONS FOR SUMMARY JUDGMENT AND RELATED MOTIONS**<br><br>Date: [No Hearing]<br>Time: [None]<br>Ctrm: Honorable Robert J. Kelleher |

# TABLE OF CONTENTS


| | Page(s) |
|---|---|
| Prologue | 1 |
| The McColl Site | 3 |
| 100 Octane Aviation Gasoline | 3 |
| Defendants' Refineries and Operations During the 1930s | 6 |
| World War II Agencies Relevant to Aviation Gasoline Production | 10 |
| Composition and Function of PAW Committees | 19 |
| OPC/PAW Recommendations | 24 |
| Wartime Expansion Program for 100-Octane Facilities | 32 |
| Oil Company Defendants Avgas Plants | 38 |
| Aviation Gasoline Reimbursement Plan | 40 |
| The Drive To Maximize Wartime Avgas Production | 43 |
| The Quick 100-Octane Program | 45 |
| The Planned Blending Program | 48 |
| United States Purchase And Sale of Intermediate Avgas Components | 56 |
| Fluid Catalytic Cracker Facilities | 57 |
| Oil Company Management | 61 |
| Inspection of Refinery Equipment | 63 |
| Refinery Operations | 64 |
| United States Seizure of Authority at War's End | 64 |
| Postwar Use of Facilities | 65 |
| Use of Sulfuric Acid | 69 |
| Sulfuric Acid Allocation | 72 |
| Acid Reprocessing Plants | 73 |
| Problems at Stauffer Dominguez Plant No. 2 | 75 |
| Wilshire Storage Tank | 78 |

Regeneration Plants Declined WPB . . . . . . . . . . . . . . 82
WPB Employee Richard Smith . . . . . . . . . . . . . . . . . 89
Acid Sludge Disposal . . . . . . . . . . . . . . . . . . . . 91
Tank Cars . . . . . . . . . . . . . . . . . . . . . . . . . 92
Shell Toluene Plant . . . . . . . . . . . . . . . . . . . . 94
Other Petroleum Products . . . . . . . . . . . . . . . . . . 95
Postwar Disposal . . . . . . . . . . . . . . . . . . . . . 94
The McColl Site and the Grants . . . . . . . . . . . . . . 96

It is hereby stipulated, by and between the Oil Company Defendants and the United States and its related agencies, through their undersigned counsel, that the following facts are true for purposes of the summary judgment and other motions currently pending before the Court:

Prologue

In the following stipulations, the Oil Company counterclaimants are referred to as "Defendants" and the counterdefendants are often referred to collectively as the United States or the government.

The Texas Company is a predecessor in interest of Defendant Texaco, Inc. For ease of identification, the Texas Company is occasionally referred to in the stipulations as Texaco.

To assist the parties in tracing the source of specific stipulations, those stipulations originally offered by the United States are followed with the notation "[us__]" where "__" is the original number. Similarly, those originating with the Oil Companies are identified as "[co__]."

The parties have attempted to provide the Court with a document that reads with comprehension and clarity, but recognize that in places, a reliance upon differing sources may have resulted in duplications, uneven transitions, or "gaps" in information. Thus, the parties are prepared to respond to any questions the Court may have arising from its review of these stipulated facts.

Due to the consideration of recently received discovery, the parties are continuing to consider stipulations relating to the treatment of benzol and may file supplemental stipulations relating thereto.

The McColl Site

1. As this Court has already found, the McColl Site is a facility containing hazardous substances from which there has been a release or threatened release for which the United States has incurred response costs. Defendants contracted with Eli McColl to transport their acid waste and dispose of it at the McColl Site. [co1]

2. Dumping at the McColl Site began in June 1942 and continued until approximately September 6, 1946, over a year after the end of World War II. Eli McColl's municipal permit was originally scheduled to expire on June 8, 1946, but McColl petitioned for and obtained an 90-day extension of that permit. [us349]

3. The waste at McColl contains benzene. [co184]

100 Octane Aviation Gasoline

4. During World War II, the most critically needed refinery product was 100 octane aviation gasoline, often referred to herein as "avgas." [co13]

5. 100 octane gasoline permitted aircraft to attain greater speeds, higher ceilings, faster rates of climb and the ability to carry a heavier payload, advantages unavailable to the Axis. [co14]

6. Throughout the war, the War Production Board (WPB) maintained a short list of critical war products that were essential for combat activity. 100 octane aviation gasoline was on the list for the entire war. [co15]

7. Avgas was a blend of various hydrocarbon components intended to meet the requirements of high compression aircraft engines. Two primary requirements had to be met: 1) octane rating and 2)

volatility. Octane is a measure of the smoothness of burn of gasoline in an engine cylinder. "100 octane" is the burn rating for a hydrocarbon known as iso-octane. With a lesser octane rating, a high compression engine would "knock" and lose power. A fixed volatility was required so that the avgas would evaporate in the carburetor of the engine, but would not evaporate in storage or in the aircraft fuel tanks at altitude. [co16]

8. To meet avgas requirements, the refineries would blend several different elements: the first element was aviation base stock -- generally 40% to 50% of avgas: at the start of the war, this was similar to a normal motor gasoline with an octane rating of 72 to 75. [co17]

9. A second avgas element was alkylate -- generally 25% to 40% of avgas: This was produced by a process called alkylation which involved combining molecules of lighter weight petroleum fractions to produce iso-octanes. The most efficient process was to mix iso- butane with butylene in the presence of 98% sulfuric acid. Butylene and iso-butane each had four carbon atoms and would combine to make iso-octane, which had eight carbon atoms. Because of the presence of other hydrocarbons, alkylate had an octane rating of 92 to 94. [co18]

10. A third avgas element was iso-pentane -- constituting 10% to 20% of avgas: this element was added to meet the volatility requirement of the military specifications, and had a blending octane rating of 104. [co19]

11. A fourth avgas element was cumene -- when used, constituted up to 15% of avgas: It was a heavy hydrocarbon molecule with a blending octane rating of 124. When available, it permitted the

use of substantially less alkylate, but required more iso-pentane to meet the volatility requirement. Late in the war, toluene and xylene were often used in the place of cumene. [co20]

12. A fifth avgas element was tetra-ethyl lead -- between 3cc and 4.6cc per gallon of avgas: This additive could boost the octane rating of base stock by as much as 20 points. [co21]

13. The avgas components were blended in batches of 12,000 to 70,000 barrels or more at the refineries. [co22]

14. Sulfuric acid was used as a catalyst to assist the production of several of the above components: 98% sulfuric acid was the catalyst for the alkylation process which employed approximately 90% of the acid acquired by the refineries. It produced a stream of around 89% spent alkylation acid which had other potential beneficial uses. [co23]

15. Spent alkylation acid was used to remove sulfur compounds from aviation base stocks because the presence of sulfur compounds would interfere with the effectiveness of tetra-ethyl lead. This acid treatment produced acid sludge. [co24]

16. Certain components going into the alkylation process were acid treated before being alkylated to remove impurities and unwanted hydrocarbons that would cause excessive acid use and poorer quality product in alkylation. This process produced acid sludge. [co25]

17. National goals for the production of high-octane gasoline were set by the PAW, in consultation with the military with reference to industries' production capacity. Although the WPB was authorized to screen military requirements with the PAW and

military, in the case of high-octane gasoline it rarely, if ever, did so. [us256]

Defendants' Refineries and Operations During the 1930s

18. In or about 1930, the octanes obtained from good crude oils through thermal cracking were only about 72 or 73. Dr. Wayne Kuhn, former head of the research department of The Texas Company (now Texaco) described his efforts to improve the no-knock properties of aviation gasoline:

> "I asked for and got approval for [an] exploratory research section in my operation in Port Arthur. We hired a couple chemists to do that exploratory work. Out of that exploratory work they came up one day and showed me a tube of isooctane that they'd obtained in that exploratory work, and we thought we had a gigantic breakthrough. . . . We clamped down on any visitations to the area where the work was being done and cautioned people not to talk about it. And a couple years later Anglo-Iranian publishes some of the same ideas and same work, and shortly Shell came out, and they had been doing the same type of work, and Standard of New Jersey, which was Esso and then Exxon, to get the records right, also had done the same work." [co222]

19. In 1934-35, Shell, Union and Richfield each held contracts to sell aviation gasoline to the U.S. Air Corps's Material Division. Documents available to counsel do not indicate the octane of the fuel acquired. [us2]

20. Specifically, one Shell entity, the Shell Oil Company of San Francisco, California, entered into contracts in October 1934 and March 1935, to sell the Air Corps nearly one million gallons of

aviation gasoline. Documents available to counsel do not indicate the octane of the fuel acquired. [us3]

21. A second Shell entity, the Shell Petroleum Corporation of St. Louis, Missouri, held one contract, dated January 1934, to sell the Air Corps over 2.7 million gallons of aviation gasoline. Documents available to counsel do not indicate the octane of the fuel acquired. [us4]

22. Union Oil Co. of California entered into two contracts, dated January 25, 1934 and December 19, 1934, to sell the Air Corps over 800,000 gallons of aviation gasoline. Documents available to counsel do not indicate the octane of the fuel acquired. [us5]

23. Richfield, under a contract dated May 25, 1934, agreed to sell the Air Corps 231,000 gallons of aviation gasoline. Documents available to counsel do not indicate the octane of the fuel acquired. [us6]

24. In May 1935, Shell offered to furnish the peace-time requirements of the Air Corps for 100 octane gasoline on several months notice. There is no indication of the amount involved. [us10]

25. In July 1935, while serving as Shell's aviation manager, J.H. ("Jimmy") Doolittle informed the Army Air Corps that "there need be no worry about the petroleum industry's ability to furnish any required amount of 100 octane fuel, regardless of the magnitude of the emergency that requires it." [us11]

26. In 1992, General Doolittle stated that in 1934, he "urged" Shell to construct three 100 octane plants and "urged" the Army Air Corps to purchase Shell's fuel. [us12]

27. In October 1936, Shell informed the Navy that "the Shell companies have been making a very careful study of high octane fuels for aviation usage" and that Shell was "producing large quantities of 100 octane fuel for the Army Air Corps' use at one Army Air Force facility. [us14]

28. Shell began producing limited quantities of commercially-available high-octane gasoline at its Wilmington refinery as early as June 1936, and produced high-octane gasoline at its Martinez, California refinery in 1935. The documents do not indicate the octane of the fuel involved. [us15]

29. Texaco's 1943 annual report noted that "[t]he ability of the industry to meet the needs of the armed services for the many important petroleum products, including toluene, 100 octane aviation gasoline, and butadiene, the principal ingredient of synthetic rubber, is due to the research work carried on for a decade or more preceding the war by a few of the important integrated units of the oil industry," including Texaco. [us16]

30. Texaco's 1943 annual report also stated that the company "has at all times been one of the leaders [in the field of 100 octane and synthetic rubber research and development], recognizing at an early date the necessity of research work not only to keep abreast of current technical and mechanical advancement but also to endeavor to anticipate the needs of the future." [us17]

31. Texaco's 1940 annual report informed stockholders that Texas Company's subsidiaries were among "the first to carry on extensive work on [the 100 octane manufacturing process] in the United States . . . ." [us18]

32. Texaco initiated and funded its own research to develop a commercial method for making high-octane gasoline in approximately 1932. [us19]

33. Texaco initiatec detailed plans to construct a commercial alkylation unit at Wilmington, California by October 1939 and Texaco's unit went on line at Wilmington in the spring of 1941. [us20]

34. In Richfield's 1943 annual report, Richfield stated that "[l]ong before Pearl Harbor [it] had acquired the 'know how' for the manufacture of 100-octane aviation gasoline and [] had built plants for the production of its principal components, so that when war was declared [Richfield was] one of the few producers" of 100 octane gasoline in the world and were producing approximately 5% of the total production then available to the United Nations. [us24]

35. Union's 1940 annual report asserted that "[m]any of the fundamentals upon which the alkylation plant process is based were discovered in the Company's research laboratories." [us21]

36. By May 1936, Doolittle, in his capacity as a Major with the United States Army, prepared a report for the Army Air Corps recommending:

> "It is recommended that in view of the advantages to be obtained through the use of 100 octane fuel and the necessity for developing this fuel and a market for it to the end of having it economically available for peace time operations and economically available in sufficient quantities in time of war, the Army plan to purchase 100

octane fuel for their entire tactical requirements starting on January 1, 1937" [us13]

37. Union operated a pilot alkylation unit at Wilmington in 1936 and its first commercial alkylation unit went on-line in approximately 1939. [us22]

38. The American commercial aircraft industry was familiar with the American oil industry's pre-war development of 100 octane gasoline prior to World War II. [us7]

39. Beginning in 1937, at least one Defendant, Texaco, held annual clinics with the aircraft and airline industries, at which the state of high octane technology was discussed. [us8]

40. Richfield's 1940 annual report noted the completion of "new refining facilities for the manufacture of 100 octane aviation gasoline," in California. [us23]

41. As of November 1941, the Office of Petroleum Coordinator (OPC) concluded that "the manufacture of 100 octane aviation gasoline is an extremely new technological development. In this country, during the past 3 years the commercial capacity for the production of the highly essential components used to make 100 octane aviation fuel has risen from virtually nothing to approximately 40,000 barrels a day." [us8.1]

World War II Agencies Relevant to Aviation Gasoline Production

42. Congress entrusted President Franklin D. Roosevelt with extraordinary authority to mobilize the national economy in the years immediately preceding and during World War II. [us214]

43. Prior to World War II, President Franklin Roosevelt proclaimed a limited and then an unlimited state of national emergency. Concurrently, Congress enacted legislation authorizing

mobilization of the U.S. economy, including authorizing the President to place obligatory product orders with companies, orders which were subject to both criminal sanctions and takeover for non-compliance. [co2]

44. During World War II, the United States issued government regulations, directives, orders, and recommendations concerning the production of petroleum products, including 100 octane aviation fuel, through several of its agencies. [co3]

45. The President, through Executive Order 9024, established the War Production Board ("WPB") in January 1942 and gave that Board broad regulatory power over military procurement and supply. [us215]

46. In May 1940, a National Defense Advisory Commission ("NDAC") was established to render non-binding advice on procurement policy. [us216]

47. The NDAC was succeeded in January 1941 by the Office of Production Management ("OPM"), which established an early priorities system to expedite delivery of essential materials to the Army and Navy. [us217]

48. In August 1941, the Supply Priorities and Allocation Board ("SPAB") was established to coordinate scarce material deliveries among competing agencies of the United States. [us218]

49. In January 1942, the OPM and SPAB were eliminated and their duties consolidated within the WPB. [us219]

50. The WPB was not a procurement agency, but was respc sible for procurement policy. [us220]

51. The WPB's power included the authority to

"increase, accelerate, and regulate the production and supply of materials, articles and equipment . . . required for national defense [and to] formulate plans for the mobilization for defense of the production facilities of the Nation, and to take all lawful action necessary to carry out such plans." [us221]

52. The WPB's task was principally accomplished through use of a nationwide priority rankings system, under which the WPB reviewed requirements for goods appearing to be scarce, determined how much of each such product or raw material was needed, and identified facilities to help meet this demand. [us222]

53. The WPB acted primarily through the allocation of scarce materials and equipment under an intricate system of priorities. [co9]

54. The WPB exercised authority (delegated from the President) under several wartime statutes. [us223]

55. The Priorities and Allocations Act of 1940 ["Priorities Act"], as amended, required facilities to give priority to military contracts and authorized the President to regulate the flow of scarce raw materials where the use of such materials for national defense resulted in a supply shortage. [us224]

56. The Second War Powers Act, passed in March 1942, authorized the WPB to allocate not just "materials" deemed to be in scarce supply, but "facilities" as well. [us225]

57. The Second War Powers Act enabled the WPB to require a company to produce a good needed for the war effort where it was within the company's physical and technical capacity to do so. [us226]

58. Presidential powers under the Second War Powers Act were delegated to the Chairman of the War Production Board in April 1942. [us227]

59. The Selective Training and Service Act of 1940, Pub. L. No. 76-783, 54 Stat. 885, 892 (1940), and the Second War Powers Act authorized the United States to required companies to produce goods needed for war where it was within a company's physical and technical capacity to do so, and such requirements were backed by civil and criminal penalties and the possibility of seizure. [co11]

60. The United States set up the Office of Petroleum Coordinator for National Defense ("OPC") in May, 1941 under the President's inherent powers as Commander in Chief. [co4]

61. The OPC was created by a Presidential letter. For this reason, among others, its early authority was limited to the issuance of "Recommendations." In practice, as far as allocation of materials were concerned, the OPC and the Office of Production Management (later, the War Production Board), instituted a procedure by July 1941 whereby the OPC made priority determinations as to supplies for the petroleum industry and as to requirements for petroleum. The OPM/WPB subsequently set national priorities, balancing petroleum-related needs with other requirements of the defense effort. Priorities recommendations of the OPC could be reissued as orders by the Priorities Division of the OPM. Regulations applicable to the operations of the Priorities System were specified in WPB Priorities Regulation No. 1, in August 1941, 6 Fed. Reg. 4489. Delegation to the OPC

of this authority, including ratification of past actions, was formalized in May 1942. [co5]

62. On December 2, 1942, pursuant to Executive Order 9276, issued under authority of the First and Second War Powers Acts, the President created the Petroleum Administration for War (PAW), the successor to OPC, to "coordinate and centralize the war policies and actions of the Government relating to petroleum." It was given the authority to "issue the necessary policy and operating directives to parties engaged in the petroleum industry." The PAW reported directly to the President. [co6]

63. The Petroleum Administration for War ("PAW") was established by Executive Order in December 1942 to address the military's pressing need for adequate petroleum supplies. [us229]

64. Like the WPB, the PAW was the successor to a previous agency, the Office of the Petroleum Coordinator for National Defense, later the Office of the Petroleum Coordinator for War ("OPC"). [us230]

65. Among other things, the Executive Order charged the PAW with:

> "a. establish[ing] basic policies and formulat[ing] plans and programs to assure for the prosecution of the war the conservation and most effective development and utilization of petroleum in the United States . . . [and] issu[ing] necessary policy and operating directives to parties engaged in the petroleum industry, and appoint[ing] such general, regional, local, or functional petroleum industry committees or councils as the Administrator finds necessary . . . .

b. [s]erv[ing], as far as practicable, as the liaison and channel of communication between the units of the petroleum industry and the several departments and agencies of the Federal Government on matters directly involving the functions and duties of the [PAW] Administrator . . . [and]

* * * * *

d. [s]ubject to the direction of the [WPB], exercis[ing] the powers, authority, and the discretion conferred upon the [WPB Chairman] by issuing, and taking appropriate action to enforce, such orders or directives to the petroleum industry as the [PAW] Administrator may deem necessary, in order to [] provide adequate supplies of petroleum for military, or other essential uses, or [] effect the proper distribution of such amounts of materials as the Chairman of the [WPB] may allot for the use of the petroleum industry." [us231]

66. WPB overlap with the PAW extended to some raw materials for the oil industry, such as sulfuric acid, and all construction materials for refinery facilities. [co10]

67. The Reconstruction Finance Corporation ("RFC") was established in January 1932, to assist financial institutions and private businesses disabled by the Depression. [us232]

68. In June 1940, the RFC's authority was expanded "to aid the Government of the United States in its national-defense program." [us233]

69. Under its enhanced authority, the RFC was empowered to make loans to facilitate the production, acquisition and transportation of "strategic and critical materials," and to

assist in arranging for additional plant capacity and equipment "necessary to the national defense." [us234]

70. The RFC was also authorized to

> "create or organize a corporation or corporations, with power (a) to produce, acquire, and carry strategic and critical materials, (b) to purchase . . . , lease, build and expand plants . . . for the manufacture of arms, ammunition, and implements of war, (c) to lease such plants to private corporations to engage in such manufacture, and (d) if the President finds that it is necessary for a Government agency to engage in such manufacture, to engage in such manufacture itself." [us235]

71. Aviation gasoline was designated a critical material in August 1941, a designation enabling the RFC to produce, buy and sell aviation gasoline and make loans for the construction of aviation gasoline facilities. [us236]

72. The RFC ultimately established seven subsidiary corporations in aid of national defense, among them the Defense Plant Corporation ("DPC") and the Defense Supplies Corporation ("DSC"). [us237]

73. The DPC frequently provided loans for or otherwise financed the construction of defense plants for corporations lacking sufficient capital to do so. In many cases, the plants and land on which a defense plant was built were DPC-owned; the plant was leased to a contractor who operated it under terms of a supply contract. [us238]

74. Although a number of 100 octane facilities throughout the country were owned by the DPC, none of the Defendants' oil

refineries in this litigation were owned by the United States. [us239]

75. The DSC had two principal missions: one, the procurement, stockpiling and disposition of nonmetallic commodities defined by the President to be strategic and critical; the other, payment of subsidies to producers and transporters of strategic and critical materials for purposes of price stabilization. [us240]

76. In late 1941, the PAW's predecessor, the OPC, recommended that the DSC be made the federal government's sole purchaser of 100 octane gasoline, a policy which was implemented on January 1, 1943. [us241]

77. Under DSC's agreement with the military, DSC resold gasoline to the Army, Navy and other authorized consumers at a national, uniform price, established by the OPC/PAW. [us242]

78. The WPB, PAW and other governmental agencies issued wide-ranging regulations, directives, and orders during World War II to implement their policies. [us243]

79. Chief among the WPB's regulations was Priorities Regulation No. 1, 6 Fed. Reg. 4489 (Aug. 30, 1941), described by the WPB itself as the "backbone of the priorities system." [us244]

80. Priorities Regulation No. 1 mandated that defense orders for any material must be accepted and fulfilled in preference to any other contracts or purchase orders for such material, but specified that such orders 'need not be accepted' if the persons placing such orders are 'unwilling or unable to meet regularly established prices and terms of sale.' [us245]

81. A system of alpha-numeric preference was prescribed by Priorities Regulation No. 1, with each contract assigned a rating that governed the place it took in the war economy. [us246]

82. The WPB also issued limitation orders ("L-orders") and material conservation orders ("M-orders"). [us247]

83. L-orders limited the production of nonessential items consuming scarce materials. [us248]

84. The production of some end products, such as civilian automobiles, was banned completely, while production of other items, such as air conditioning, was limited to a fraction of the pre-war level. [us249]

85. Companies wishing to produce more than their allocated amount were permitted to appeal to the WPB. These appeals were often granted. [us250]

86. "M-orders" controlled the flow and use of scarce materials. [us251]

87. The PAW acquired the authority to issue priority orders and orders regarding the distribution of petroleum products, subject to approval of the WPB, in February 1943. [us252]

88. This authority enabled the PAW to set national priorities directly affecting only the petroleum industry, including whether refiners should produce greater or lesser quantities of an aviation gasoline component, or aviation gasoline itself in order to maximize the production of avgas. [us253]

89. The WPB continued to make policy and program determinations affecting both the petroleum industry, primarily in the construction of new resources or allocation of non-petroleum products such as sulfuric acid, and other claimants for scarce

materials, e.g., deciding whether steel would be used for petroleum tank car construction or for other uses. [us254]

90. Throughout the war, policies and directives issued by the PAW remained technically subject to the review and approval of the WPB. In practical effect, the PAW's authority as an allocation agency was all but co-equal with that of the WPB. [us255]

91. The PAW provided industry with government requirements, to determine the quantity of production possible and the speed with which production could be expanded, and thereafter reviewed and approved proposals by industry for such expansion. [us257]

Composition and Function of PAW Committees

92. The publication, A History of the PAW, states the following with regard to the composition of the OPC/PAW:

> "The delicate and complex job of administering the oil program required men thoroughly experienced in all phases of oil operations, ranging from geophysical exploration to the design of catalytic cracking plants, from pipeline operation to distribution and marketing practices. There was only one source where such men were available in the required numbers, namely the oil industry. Consequently, [the OPC/PAW] followed the policy from the start of recruiting technical, operating, executive staff largely from men who had engaged extensively in petroleum operations, and thus had an intimate familiarity with the problems involved." [co61]

93. The degree to which the PAW was staffed by representatives of its regulated industry was greater than other wartime agencies. [us29]

94. The PAW was unique among governmental agencies in the extent to which it relied upon and cooperated with industry. It made the fullest use of the resources, experience, and ingenuity, of the petroleum industry. Other agencies made effective use of industry advisory committees, but not to an extent comparable to that furnished by the petroleum industry. [us30]

95. The Final Report of the Special Subcommittee on Petroleum Investigation of the Committee on Interstate and Foreign Commerce of the United States House of Representatives dated December 30, 1946, states with respect to the PAW's reliance on industry committees:

> "And the record clearly establishes that not only was a complex and highly technical task accomplished with great efficiency and competence, but the public interest was fully safeguarded." [co216]

96. A history of the Defense Supply Corporation stated that because the PAW staff was largely culled from the oil industry, the staff often had a viewpoint favorable to industry. [us31]

97. DSC retained a right to review the contracts negotiated by PAW for the DSC in part because of the PAW staffs' composition. [co217]

98. The knowledge of industry personnel was also obtained through the appointment of committees by the PAW. These committees were appointed on both a national and on a district level. [co62]

99. The publication, A History of the PAW, states as follows:

"The district committees and their numerous subcommittees operated, under the various recommendations, directives, and orders, and subject to the clearance procedure and supervision of the OPC/PAW, in a very real sense as extensions of the Government agency. This provided an organization arrangement admirably adapted to the war situation -- one that could be speedily mobilized, take full advantage of the qualified personnel who were available and permit the greatest degree of flexibility in adjusting to constantly shifting problems." [co63]

100. OPC Recommendation No. 7, dated August 18, 1941, provided for the procedures whereby OPC district committees were to relate to the District Director and the OPC. Industry committees were authorized to advise the Government either on request or upon their own motion, and to submit plans for any industry actions deemed necessary. They were to consult with appropriate OPC representatives, direct inquires and questionnaires to industry, and ask for and receive expert assistance from industry. The plan was to be reduced to writing and submitted to the OPC for inclusion in a formal Recommendation. [us35]

101. On October 16, 1942, the President of one of the Defendants, Union, urged the Government to assume greater regulatory authority over 100 octane production. [us33]

102. One principal PAW advisory committee created by the PAW was the Petroleum Industry War Council ("PIWC") (originally, the Petroleum Industry Council for National Defense). [us36]

103. The PIWC was an industry committee comprised of representatives of both "major" and "minor" petroleum operators and it maintained subcommittees to provide technical expertise to the PAW. [us37]

104. The Petroleum Industry War Council initiated or suggested many of the regulations (both "recommendations" and "directives") issued by the OPC and PAW. [us47]

105. In a letter, dated December 10, 1942, from PIWC Chairman William Boyd to R.E. Wilson, setting up the PIWC Technical Committee, he described the PIWC as follows:

> "The PIWC is a semi-Government agency and is a part of the organization of the Petroleum Administration of War and its functional activities are therefore limited only to fields where the Administrator approves."

[co192]

106. The Technical Advisory Committee, a subcommittee of the PIWC, influenced research and development in petroleum products. Its duties were:

1) to collect and correlate available basic technical information;

2) to obtain when needed further information through voluntary research and development work utilizing laboratory, pilot unit or full-scale plant equipment;

3) to transmit such information to the PAW and such other agencies and individuals as designated by the PAW.

All projects had to be approved by the PIWC and PAW. Reports were distributed to the members of the committee and, as directed by the PAW, to all units of the industry able to use the