information for the war effort. As of May 1945, approximately 220 reports on processes and 80 reports on analytical methods had been issued by the Committee. [co190]

107. Technical committees established on behalf of the OPC and PAW did not order or require refiners to engage in any specific research and development activities. [us132]

108. A second committee created by the PAW was the Aviation Gasoline Advisory Committee ("AGAC"), formally established in the fall of 1942, with the chairman appointed by the PAW. The purposes and objectives of the committee were delineated by the PAW. From February to October 1943, the Secretary of the Committee was an employee of the PAW. Starting in November 1943 through January 1945, the Secretary was a Major in the Corps of Engineers. [us38]

109. When the AGAC was formed in October 1942, one if its primary objectives was to secure maximum production of 100 octane gasoline from existing facilities. The PAW recognized that the accomplishment of this task would involve both maximum production of components from existing plants and most efficient utilization of these components in the manufacture of the finished product. [co65]

110. Members of the AGAC visited refineries, at refiners' request, to help them solve their operations problems. [us39]

111. The AGAC also had technical subcommittees to assist in the effort to maximize 100 octane gasoline production. [us41]

112. The AGAC's alkylation subcommittee was chaired by Victor Stapleton and later by J.S. Worden, both of Texaco. [us42]

113. Both Victor Stapleton and J.S. Worden of Texaco worked on AGAC duties out of their Texaco office in New York. [us43]

114. The Chairman and the members of the AGAC were from industry and were in charge of its proceedings. The meetings were attended by representatives of the PAW who participated substantively with the members in the proceedings. [us44]

115. In April 1943, the PAW instituted a decentralization plan to govern the relationship between the PAW and the industry committees of District 5. Under the plan, the Director in Charge of District Five was authorized to request its committees to develop information and review plans or recommendations of the PAW "for the more efficient and effective war-time operation of the petroleum industry," in District 5. The decentralization plan also authorized industry committees to initiate efforts to provide information or suggestions to the PAW. The plan stated that "the appropriate Industry Committee shall employ its best efforts to obtain compliance with any plan, recommendation, directive, order, rule or regulation approved or issued by the Petroleum Administration for War." [co64]

<u>OPC/PAW Recommendations</u>

116. Before the war commenced, on August 23, 1941, the OPC issued Recommendation No. 8, which stated that all refiners "cease to use" blending agents such as "iso-octanes including alkylates, hot acid octanes, and hydrocodimers, iso-pentanes, and neo-hexanes" except for the production of "100 octane aviation gasoline." [co26]

117. Two days after Pearl Harbor, on December 9, 1941, the OPC issued Recommendation No. 16 stating: "It is essential, in the

national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses be increased immediately to the maximum." It provided for a survey of facilities and development of plans "for the allocation, exchange, license, pooling, loan, sale or lease of crude oil, base stocks, blending agents, processes and patents, and production, transportation and refining facilities" related to avgas. It further recommended that "except in accordance with the provisions of an approved plan formulated [under the Recommendation]," no action could be taken by refiners and producers with respect to the production of aviation gasoline without prior notice to the OPC, "in order that [it] might have an opportunity to make specific recommendation with respect thereto." [co27]

118. The Government regulated refiners' access to crude oil through Material Conservation Order "M-68," which rationed companies' access to materials to construct new oil wells, to conserve both steel and oil, among other things. [us86]

119. Generally, the PAW did not allocate crude oil to refiners in instances where they could obtain their own, either from their own fields or from others. The PAW's decision on whether to allocate crude oil to specific refiners depended on the refiners' particular situation. [us84]

120. On December 11, 1941, Recommendation No. 19 specified that the Production Committee of District 5 of the OPC would prepare a plan "for the development and operation of [oil] fields, pools and wells in District 5 in accordance with the provisions" of the Recommendation to become effective on approval of the OPC. The

plan was to provide "the equitable allocation of petroleum production among the various fields, pools and wells in District 5." [co28]

121. On December 18, 1941, pursuant to Recommendation 23, the OPC, "[i]n order to augment immediately and substantially the supply of 'alkylate' for the production of 100 octane aviation gasoline" recommended that Texaco, Shell, Standard Oil Development Company and other companies developing the sulfuric acid alkylation process "shall unite in offering to petroleum refiners new licenses covering the use of the 'sulfuric acid alkylation process'" under the patent rights owned by such companies. Under the Recommendation, the terms and conditions of such licenses were to be approved by the OPC Chief Counsel. It further provided that these companies "shall immediately negotiate with each other and with competent engineering and contracting firms to standardize as far as is possible the design of and operating and technical data with respect to sulfuric acid alkylation plants" to be made available to the petroleum industry. The Recommendation also recognized the named companies' "willing[ness] to revise the terms of the existing licenses issued by them" covering alkylation, in order "to aid in obtaining a substantial expansion of the production of 'alkylate.'" [co30]

122. Recommendation No. 23 was issued, in part, to achieve the pooling of patents in the area of the sulfuric acid alkylation process. The OPC approved a license agreement in which the previous running royalty was reduced initially by 50 cents to 21 cents per barrel of product with the understanding that further

reduction would be effected as the total production of alkylate increased. By the end of hostilities, the rate was 10.5 cents per barrel, or 25% of the rate prior to Pearl Harbor. [co29]

123. Prior to Recommendation 23, in its 1940 annual report, Texaco announced that it was "substantially interested in licensing the use of the [sulfuric acid alkylation] process in the industry." [us68]

124. Representatives of Texaco Development discussed the development of the sulfuric acid alkylation process and its value to the petroleum industry with the PAW prior to issuance of Recommendation 23, on December 18, 1941. [us67]

125. In the early 1930s, prior to refiners' general knowledge about alkylation, Texaco, Shell, and others held discussions about alkylation under the guidance of legal counsel. In about 1933, Shell and Anglo-Iranian came to Port Arthur to observe Texaco's pilot alkylation facility. [us69]

126. As early as April 1939, Texaco voluntarily reached agreement on the sharing of alkylation technology with three other refiners to whom OPC Recommendation 23 was directed, including Shell. [us70]

127. In order to settle outstanding patent disputes and promote the commercial development of sulfuric acid alkylation, the "April 1939 Agreement" provided for the parties' to exchange all technical information in their possession relating to their sulfuric acid alkylation; gave the parties the opportunity to inspect one another's sulfuric acid plants at reasonable times; and granted each party a nontransferable, unlimited, irrevocable

and royalty-free license to use one another's sulfuric acid process patent rights, as defined in the Agreement. [us71]

128. On January 1, 1942, pursuant to Recommendation No. 28, the OPC recommended to State agencies "having jurisdiction with respect to the exploration, development, or conservation of petroleum," and to the Production Committee of District Five, to crude oil producers and others, that within the production rates certified to the OPC, production allowables shall be fixed in such a manner as will efficiently "provide aviation grade crude petroleum, to the full extent that such petroleum can be utilized for the production of aviation gasoline, to refineries that are actually utilizing their aviation gasoline refining facilities." [co31]

129. As the war began, the oil companies were also developing a new method of cracking petroleum, the process of breaking large molecular heavy hydrocarbons into lighter ones for use in gasoline type products. Whereas thermal cracking with heat was the standard, the new methods used catalysts in what was known as catalytic cracking. For purposes of avgas, it produced more components for alkylation and also a higher quality base stock which reduced the amount of alkylate necessary. [co32]

130. From the early to mid-1930s, representatives of Texaco Development Company, Shell Development Company and other companies holding patents in the field of catalytic cracking, consulted with one another and negotiated cross-licenses for the use of one another's catalytic cracking technology in order to avoid patent disputes and permit further use of the technology. [us58]

131. Dr. Wayne Kuhn, former head of Texaco's research department, recalled that in the 1930's, representatives from Standard of Indiana and Shell visited Texaco's refinery to learn about Texaco's cracking technology. [us59]

132. Texaco reported entering into cross-licensing agreements for catalytic cracking technology according to its 1938 Annual report. [us60]

133. Shell, Texaco and other companies holding patents in the field of catalytic cracking met in the 1930s. Under the guidance and advice of lawyers as to what could be revealed, the companies decided who would pursue which phase of research. Texaco agreed to continue work on fix-bed cat crackers, Standard Oil agreed to continue work on fluid bed cat crackers, and they agreed to share information on the results. [us61]

134. When, as a result of the information exchange, the fluid bed catalytic cracker was demonstrated to be the better process, Texaco switched its work to the fluid crackers. [us63]

135. Generally, in or about 1938, under an association known as the Catalytic Refining Association ("CRA"), Shell, Texaco, and other companies agreed to make their know-how available to certain construction companies so that they could license and build catalytic cracking units to promote the technology. [us64]

136. As of August 1939, Texaco and Shell were participants in the CRA. [us65]

137. On July 24, 1942, the OPC issued Recommendation 41. Recommendation 41 identified companies, including Shell and Texaco, which had represented that they previously had exchanged technical data and information, "and had cooperated in the

development of the "catalytic cracking process." OPC Recommendation 41 further stated that Shell, Texaco and the other identified companies held patent rights pertaining to the catalytic cracking process and the companies had represented that they were "in a position to license" the catalytic process to the petroleum industry. Accordingly, OPC Recommendation 41 recommended that these companies "shall negotiate a cross-license and licensing arrangement and carry forward their cooperative research and development work . . . shall standardize the design, construction, and operation of plants adapted to operate such processes, so far as possible and consistent with the present need for saving critical materials, . . . shall make available to the petroleum refining industry" the preliminary information and data to make bids on such plants. The Recommendation also specified that the companies shall make available to all licensees necessary information for the construction and operation of the plants. OPC Recommendation 41 specified that the terms and condition in any license for the catalytic cracking process were to be "negotiated in the usual manner between the licensor and licensee," subject to the approval of the Chief Counsel of the OPC. Royalties on sales to the United States could not be in excess of a rate approved by the OPC. [co33]

138. Recommendation 41 notes that Shell and Texaco along with 5 other companies had already "exchanged technical data and information and cooperated in the development of new and efficient catalytic cracking refining processes" prior to the Recommendation's issuance. [us66]

139. Recommendation 48, dated July 24, 1942, recommended that persons holding technical information useful "in producing aviation gasoline, alcohols, benzene, toluene and other materials necessary or useful in the war," "shall" provide technical information for each process to the OPC on request, and to other members of the industry having licenses for such processes, "if, as and at the time requested by the OPC." Terms and conditions of the licenses and royalty rates were subject to approval of the OPC. [co34]

140. The Department of Justice determined that compliance with the directions contained in Recommendations 8, 16, 23, and 28 would be subject to the law enforcement policy described in the letter of Attorney General Robert Jackson to John Lord O'Brian, General Counsel of the Office of Production Management, dated April 29, 1941. This letter specified that "in the present emergency acts performed by industry under the direction of public authority, and designed to promote public interest . . . do not constitute violations of the anti-trust laws." The April 29, 1941 letter further stated that requests for industry to perform specific acts could only be made after the general character of the action had been cleared by the Department of Justice. The April 29, 1941 letter further stated that thereafter, acts done in accordance with agency requests of the type cleared by the Department of Justice, would not be viewed as constituting violations of antitrust laws. Recommendation 41 was cleared by the Department of Justice on March 25, 1942. [co35]

141. There was a difference in how information was exchanged in the fields described by Recommendations 23, 41, and 48. Both

before and after the war, the exchanges were among select groups involving "technical matters that were covered by certain patent applications and overlapping patent rights." Pursuant to the OPC "directives" the number of companies with whom information was shared was greater during the war. The effect of the directives was that for smaller refiners who didn't have the background or expertise, the directives "would help him in removing bottlenecks and removing problems of quality, and when you remove bottlenecks and problems of quality you increase production of gasoline." "The increase in knowledge was at the basis of many of the directives, increase in sharing the knowledge in order to get increased production." [co36]

142. On one or more occasions, Dr. Kuhn, head of research at Texaco, was contacted by government officials and consulted with them regarding prospective recommendations. [us52]

143. On two occasions, in January and February 1942, R.J. Dearborn, the President of Texaco Development, wrote to J. Howard Marshall, Chief Counsel of the OPC, enclosing drafts of a proposed recommendation which concerned the subject matter of what was later issued as Recommendation 41. [us55]

<u>Wartime Expansion Program for 100-Octane Facilities</u>

144. Before, during and after World War II, each of the Defendants operated one or more refineries in the vicinity of Wilmington, California, for the production of, among other things, high-octane aviation gasoline. [us9]

145. In mid-1941, the OPC sent telegrams to existing 100 octane refiners seeking "complete aviation gasoline data" and a

"comprehensive description [of their] present production . . . and contemplated expansions." [us98]

146. Prior to Pearl Harbor, after "canvass[ing] the refining industry [the OPC] prepared a list of companies which had indicated their willingness to expand . . . ." [us99]

147. Prior to Pearl Harbor, Shell, Union, and Texaco sought and received priority approval to procure avgas construction materials for new 100 octane gasoline or blending agent facilities at Wilmington. [us100]

148. Due to the lack of commercial markets for alkylate, the United States had to create an atmosphere which made the financial investment in alkylation facilities viable. The American oil industry concluded that one year purchase contracts from the military were not sufficient to justify the investments. [co38]

149. To provide the industry assurance that its investment in new facilities would be economically justified, in November, 1941, the United States agreed that the Reconstruction Finance Corporation (RFC), or its subsidiaries would enter into long term contracts to purchase aviation gasoline from new facilities to be constructed by the oil companies. The Army and Navy in turn agreed with RFC that they would endeavor to reimburse RFC for its expense out of future Military appropriations when granted. This decision by the United States led to the subsequent contract negotiations with the industry. [co39]

150. The United States therefore employed the Defense Supplies Corporation (DSC), an RFC subsidiary created "to produce, acquire and carry critical and strategic materials" including

specifically the procurement of avgas and gave it the authority to finance alkylation facilities and to enter into 3 year supply contracts for the purchase of avgas on behalf of the military. [co40]

151. Three year contracts were used both as financial incentives for building new facilities and to establish a centralized purchasing program over the entire output of 100-octane gasoline. The DSC's three year contracts were only entered into following Pearl Harbor. [us76.1]

152. On February 13, 1942, WPB specified that contracts thereafter be consistent in form with types previously approved to finance alkylation and related facilities and to purchase avgas. The three forms outlined were: 1) Contracts for Government Plants, under the Defense Plant Corporation ("DPC") itself financed facilities which it owned, but which were operated by a private oil company. Companies were given the option to purchase these plants at war's end. 2) "Escrow Fund" contracts, under which the DSC agreed to lend a refiner funds to finance a plant owned and operated by the refiner. The refiner had the option of retaining the facility at war's end -- in which case, funds an escrow account established by the DSC reverted to the Government -- or forfeiting the facility and keeping the funds placed in escrow. During the war only two refiners chose this contract form. 3) Regular Supply contracts, in which the DSC agreed to purchase at a fixed price a minimum quantity of aviation gasoline, from plants owned at all times by the oil company. Regular supply contracts provided for construction

loans from the DSC to the company where necessary. Under regular supply contracts, the refiner retained ownership of the facilities during and after the war. The Defendants negotiated contracts consistent with this third form, although in Union's case, the company chose not to accept a loan. [co41]

153. Most of the large oil companies engaged in the aviation gasoline program, including Defendants, preferred not to use the option of operating DPC owned plants. Having long term purchase commitments from the Government and other incentives, these companies decided to erect new facilities as private rather than public ventures. [co41.1]

154. Between 1942 and 1944, each of the Defendants entered into one or more contracts with the United States, through the Defense Supplies Corporation, to sell to the DSC large volumes of 100 octane gasoline, for use in the war effort. [us96]

155. The PAW solicited proposals to expand the production of 100 octane facilities but did not impose a legal requirement on refineries to submit such proposals. [us88]

156. If the PAW rejected a company's proposal to produce additional 100 octane, the company was free to resubmit its proposal, but was under no legal requirement to do so. [us89]

157. Each Defendant sought and submitted proposals for the high-octane contracts they entered into during the war. [us97]

158. Between February 1942 and May 1943, each of the Oil Company defendants entered into output contracts to sell 100% of their 100 octane aviation gasoline to the DSC. [co42]

159. Defendants' 100 octane contracts with the DSC contained some variations in contract terms, which the Defendants requested and which the Government accepted. [us76]

160. The DSC was prepared to and did agree to modify some terms of its contracts with the Defendants to meet Defendants' requests. [us112]

161. As part of its negotiation with Texaco, the United States deleted a typical damage clause from its contract with that company; however, the contract was, for the most part, in the usual form for contracts on privately owned facilities. [us113]

162. Under Defendants' contracts involving their Los Angeles refineries, the Defendants invested a total of $76,559,843 in construction of new alkylation and related facilities with the three year avgas purchase term beginning upon completion of the construction. The contracts provided for loans or product payment advances from DSC in the total amount of $37,027,244 to pay for the facilities. Only Union Oil Company chose not to avail itself of a DSC loan at its Los Angeles refinery. [co43]

163. The Government's loans to finance high-octane plants were generally issued at 2 percent interest and were repayable through credits applied towards the United States' subsequent gasoline purchases or on monthly installment payments. This feature was open to negotiation and was not uniform. [us78] [us79]

164. The PAW negotiated prices on the contracts for 100-octane, which were generally accepted by DSC. [co44]

165. These prices were negotiated individually with each refiner after the submission of detailed production costs by the refiner. [co45]

166. Each of the Oil Companies' 100 octane contracts with the United States was negotiated separately, accepted by the companies and based on proposals initiated by the companies. [us102]

167. Every contract entered into between the Oil Company Defendants and the DSC included an estimated profit based on the company's production costs. Production costs were submitted by the companies on government forms and then negotiated by the parties. [us103]

168. The cost estimates used to arrive at a negotiated price for the avgas contracts with DSC permitted an estimated profit between 6 and 7 percent. [us104]

169. The PAW required each refiner to provide it with a breakdown of its costs. [co46]

170. The PAW adopted criteria in which estimated profits were not to exceed 6-7% per year on refiners' investments. [co47]

171. Each of the DSC contracts with the Defendants concerning the Wilmington refineries authorized the Defendants to deliver reduced amounts of 100 octane to the United States when, due to any "cause or condition . . . resulting directly or indirectly from a state of war," their refining costs rose in respects not governed by the cost escalation provision of their contracts. This reduction was permitted unless the DSC and the seller agreed to have the DSC increase the price paid for 100 octane by a sufficient amount. [co49]

172. The PAW selectively reviewed and approved refiners' applications for priority approval and approved proposals which were deemed most advantageous to the war effort. The PAW's

Facilities Review Committee rejected 64 out of 242 such proposals between February and May 1944. [us90]

173. After mid-1942, profits on sales of petroleum products to the United States for military use were subject to provisions of the so-called "Renegotiation Act." This law authorized both parties to war-related contracts to re-review these contracts, and company profits thereunder, when such profits could be determined with "reasonable certainty." Renegotiation of these profits from existing contracts, "realized or likely to be realized" "may be excessive." By contrast, profits from commercial contracts, i.e., those not entered into with the United States, were not subject to renegotiation. [us352]

<u>Oil Company Defendants' Avgas Plants</u>

174. Defendants' 100 octane facilities at Wilmington were owned by Defendants themselves and not by the United States. [us75]

175. The first wartime facilities built by Richfield for the manufacture of 100 octane gasoline at Wilmington were completed in February 1943. [us25]

176. Richfield's expanded facilities were financed through 75 % loans from the Defense Supplies Corporation, through advances repayable by deliveries of gasoline over a three year period. [us26]

177. Richfield entered into another contract with the DSC in March 1943, to further expand its refining facilities, including the construction of catalytic cracking units. [us27]

178. Union, on its own initiative, submitted a detailed proposal to the OPC in January 1942 to design and construct expanded

facilities to produce 100 octane gasoline "upon assignment of adequate priority ratings." [us93]

179. Union's January 1942 proposal stated that it constituted a firm offer to the United States "for acceptance at any on or before March 1, 1942," and that if the United States accepted the offer, "[a] formal contract [would be] entered into embracing" the proposal. [us94]

180. Tidewater (now Texaco) informed the OPC in April 1942 that any commitments from the company to expand its 100 octane facilities were subject to obtaining final approval from its Board of Directors. [us95]

181. Texaco and the DSC negotiated a contract under which the unit price to the DSC for 100 octane would drop if Texaco produced 100 octane in greater than anticipated quantities. [us114]

182. Tidewater's (now Texaco) contract allowed that company to reduce its 100 octane production whenever it determined that "the normal functioning of any refinery" supplying it with 100 octane components was unduly interfered with. [us116]

183. Union attempted to negotiate a contact with the United States for avgas which did not include the standard depreciation clause and was not based on costs submitted on OPC forms. Instead, it wished to continue short term contracts directly with the Army and the Navy. The OPC responded that only DSC would acquire avgas after January 1, 1943, and that without proper cost submissions and negotiations, no extraordinary costs could be recovered under the Aviation Gasoline Reimbursement Plan. Ultimately, at Union's insistence, the OPC agreed that the term

would be for only 6 months after the facilities came on line rather than the typical three years. Union agreed to the DSC contract with the depreciation clause and based on the proper cost submissions. [us117]

184. The Defendants' wartime contracts between the United States and the Oil Companies are silent with regard to the ownership, handling and discarding of wastes, and contain no provision transferring title of spent acid or acid sludge -- or any other waste -- to the United States. [us118]

185. The contracts passed title only for the gasoline itself and not for sulfuric acid used to make the gasoline, and the contracts contained no provisions assigning the United States with responsibility to dispose of spent acid. [us119]

<u>Aviation Gasoline Reimbursement Plan</u>

186. The Aviation Gasoline Reimbursement Plan ("AGRP") was a response to the Government's recognition that the rapid expansion of 100 octane production would require manufacturers to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of refiners' entry into their 100 octane contracts. [us200]

187. The AGRP was created pursuant to a "Memorandum of Understanding on Plan to Reimburse Manufacturers of 91 Octane and Higher Aviation Gasoline for Losses Incurred in Following Office of Petroleum Coordination Recommendations" executed by the PAW, DSC, the Army and the Navy. The Memorandum became effective as of July 24, 1942, and remained in effect until the end of World War II. [co74]

188. The AGRP placed no limits on the kind or amount of expenditures refiners could incur, but only limited the kinds and types of expenditures which the Government would reimburse. It required that the expenditures be authorized by the PAW. [us199]

189. Among the activities for which reimbursement could be sought under the AGRP were the quick 100-octane and the planned blending program -- the shifting of gasoline components from plants to others better able to utilize them -- the readjustment of plant facilities and equipment, production of goods whose specifications were frequently and uneconomically changed by the Services and the use of cumene to meet new specifications or to increase production from existing components. [us201]

190. The first formal proposal for an AGRP came from Ralph Davies, deputy head of the Office of Petroleum Coordinator (predecessor to the PAW) in June 1942. [us203]

191. The OPC, DSC and the Departments of War and Navy approved the AGRP in July 1942, through the entry of a "Memorandum of Understanding." [us204]

192. The AGRP described its purpose as follows:

> "The plan outlined below provides that losses incurred by manufacturers of 91 octane and higher grades of aviation gasoline at the request of, or with the approval of, the Office of Petroleum Coordinator be reimbursed by Government in order to permit maximum production and utilization of product during the current shortage." [co75]

193. The AGRP provided that the United States as a purchaser would compensate refiners directly, and fully, for extraordinary expenditures in connection with these activities. [us202]

194. Before doing so, the OPC informed and solicited comments from 100 octane manufacturers regarding the Plan. [us205]

195. The AGRP only reimbursed refiners for extraordinary losses incurred by high-octane refiners at the request of, or with the approval of, the OPC, and later the PAW. [us206]

196. The AGRP was a program implemented by the PAW, the Army and the Navy in July 1942. The AGRP's purpose was to reimburse manufacturers of high-octane aviation grade gasoline for extraordinary costs and expenses incurred at the request of, or with the approval of, the Government. [co50]

197. Upon the formation of the PAW on December 2, 1942, the avgas purchase program was changed to place all avgas purchasing under a single program. As described in a PAW memorandum entitled "Aviation Gasoline - Administration of Defense Supplies Corporation Contracts," dated December 9, 1942, DSC was to become the sole avgas purchaser as of January 1, 1943, and would resell to the end-users in accord with the allocation of the Allocations Committee made up of the PAW, the Army, Navy, and British Government. The DSC sale price would be based on the contract base price, escalation, reimbursement of losses and a charge to cover DSC expenses. [co76]

198. The "reimbursement of losses" aspect of DSC contract administration was described as follows in a PAW memorandum to all avgas manufacturers on December 14, 1992:

> "In the course of your 100 octane aviation gasoline blending operations, you may be requested by this Office to adopt manufacturing procedures differing from normal and to use raw materials or components purchased from other companies

as a part of the program to increase the production of 100 octane aviation gasoline.

"These requests in many instances will result in losses when selling 100 octane aviation gasoline at prices specified in the Defense Supplies Corporation contracts. The Aviation Gasoline Reimbursement Plan of July 24, 1942 is designed to take care of such situations." [co77]

199. On December 30, 1942, the DSC informed refiners that for purposes of DSC contracts with refiners, they "may rely upon instructions transmitted by the Petroleum Administration for War in matters relating to production and blending of gasoline or components thereof, as well as specifications," to which such gasoline is manufactured. With respect to PAW requests to shift components among refiners, the DSC stated that any contractual provisions with DSC were considered waived if and where compliance with the PAW's requests interfered with the company's performance of its contract with the DSC. [co78]

<u>The Drive To Maximize Wartime Avgas Production</u>

200. Once a refinery had the capacity to make 100 octane aviation gasoline, the government had the authority pursuant to the Second War Powers Act to compel the refinery to maximize its existing capacity to produce priority products, including aviation gasoline. [co53]

201. During the War, the government was prepared to exercise its authority under the Second War Powers Act to assure continued production of avgas from existing facilities, including seizure of a facility. [co54]

202. The first OPC recommendation following Pearl Harbor stated that "it was essential" that avgas production "be increased immediately to the maximum." The theme was incessant throughout the war, involving directives, orders, telegrams, and memoranda to refiners. [co55]

203. On June 21, 1944, the PAW issued a statement "strongly urging refiners" to operate "insofar as practicable" in the following manner: "(1) Those facilities contributing in any way to 100 octane gasoline production should be kept on stream maximum possible time. (2) Postpone shutdowns for routine inspection and maintenance as long as possible and minimize down time by every means at your disposal . . ." [co56]

204. Vice Admiral Morrell reported in December 1943 to the Secretary of War on the 100 octane gasoline program, stating that he has assigned eight civil engineer officers to the refineries who are "devoting their energies to removing bottlenecks." He goes on to state: "We have taken the position that whatever action is necessary to get production must be taken regardless of whose money is involved. My position is that whatever action is necessary to get production of 100 octane gasoline will have to be taken and if either the oil company or the contractor considers that it has a proper claim for additional compensation or damages they can file the claim and have it considered in the proper manner." [co58]

205. Vice Admiral Moreell, Chief of the Navy Bureau of Yards and Docks, was assigned by the PAW and a Special 100-Octane Interagency Committee in November 1943 to monitor and assist the

timely completion of 100 octane construction projects which had been jeopardized by work slowdowns and labor unrest. [us80]

206. Admiral Moreell posted engineers at locations throughout the country to expedite plant construction by "eliminating bottlenecks in the way of labor shortages, materials, transportation, etc." [us81]

207. Superintending engineers in turn assigned "resident officers" to perform a variety of expediting tasks at these construction projects, ranging from encouraging patriotism in construction workers to expediting the availability of construction workers' housing and equipment. [us82]

208. By mid- to late-1944, the construction monitoring work of the "resident officers" was complete. [us83]

209. On the completion of the construction phase, the Special 100 Octane Interagency Committee focussed "its attention to the problems being encountered in the operation of these 100 octane gasoline plants." It assigned at least one Naval officer to plant operations in District Two and was considering other means of assistance in plant operations elsewhere. It was active in assisting in manpower, transportation, and housing as it affected operations. [co205]

The Quick 100-Octane Program

210. Prior to the war, Defendants' Wilmington refineries commonly exchanged products with other companies' refineries to balance out their product requirements. [us73]

211. OPC Recommendation No. 8, reserved the use of high-octane blending agents exclusively for the production of 100 octane

fuel. Texaco was engaged in this practice prior to issuance of the Recommendation. [us74]

212. In the Fall of 1941, the OPC obtained regulatory authority over stocks of aviation gasoline and component parts thereof (Recommendation No. 8, August 23 1941 and Recommendation No. 16, December 9, 1941). Under this authority the OPC was authorized to cut across company lines to require shifting of individual components from one company to another to whatever extent necessary to secure maximum quantities of 100 octane gasoline from all components available throughout the United States. [co66]

213. Although the construction of new avgas facilities were under negotiation or under construction in late 1941 and early 1942, they would not come on line until late 1942 or early 1943. This required a program to increase production from existing facilities. This became known as the "quick 100 octane program." The program was based on a report of an OPC technical group which proposed that the various components of 100 octane be blended in the plants best able to utilize them. As a result, components were shipped across the country, shuffling components to get the most production "regardless of the economic considerations." This was done pursuant to Recommendations 8 and 16. Excess costs incurred under this program were reimbursed in accord with the terms of the Aviation Gasoline Reimbursement Plan. [us119.1]

214. In early to mid-1942, while it awaited the completion of new 100 octane facilities, the OPC instituted a program whereby the operations of existing equipment and the outputs of various refiners' were able to be coordinated, where necessary, to

produce the maximum 100 octane yield. As described in the Introduction to a new OPC plan in June 1942, it was envisioned that shifting individual components among refineries to maximize production would have "the effect of increasing the actual cost of manufacture and the actual transportation costs above those properly to be incurred by individual refiners should they operate independently of each other and on the basis of price competition." [co67]

215. Pursuant to OPC Recommendation 16, on February 18, 1942, the OPC sent a letter to all avgas refineries recommending that they provide certain forms monthly: one gave the results of the past month, a second provided for a three month forecast of the next three months. Each month, the next three months were forecast. [co68]

216. One of the purposes of the monthly reporting program was described in an OPC report to the WPB on February 16, 1942, as ". . . the procedure being to shift blending agents and base stocks between refineries in ways devised to eke out the last available gallon." [co69]

217. Organizing of the shifting of components was performed by, among others, OPC committees which included refinery and government representatives. As the objective was described in the Minutes of the District Five Refining Committee of September 30, 1942: "The responsibility of the Refining Committee to see that the most efficient use is made of refineries in this district without regard to the ownership of supplies of raw material." [co70]

218. Each of the DSC contracts with the Defendants introduced as evidence in this case contain specifications to which the avgas would be produced. [co187]

219. Early in World War II, the British developed a new "rich-mixture" specification for avgas that could produce up to 25% more power. The PAW determined that under existing methods for blending, production of this rich-mixture gasoline would reduce the total amount of barrels produced. Benzol and cumene, or isopropyl benzene, were ultimately found to be components which were capable of being used to partially offset this loss in output from rich-mixture. Consequently, the Army, Navy, OPC and British Air Commissions adopted a new rich mixture specification on July 1, 1942. [co71]

220. It was determined that existing polymer facilities could produce cumene by the alkylation of benzol with propylene. Benzol was required in this process as well as by the synthetic rubber program, thus contributing to a shortage of benzol supplies. The PAW, the WPB and other wartime agencies worked to conserve available benzol and so augment the primary sources as much as possible, including the import of benzol. [co72]

<u>The Planned Blending Program</u>

221. Starting at least as early as February 1943, the PAW sent each refinery involved in the high octane program a statement of the planned blending requirements for each refinery for a three month period, which statement was updated monthly. It identified the blending components the refinery would receive from other sources and where it was to ship its own excess components. A January 1, 1945, PAW Report on Production and Blending states

that: "Upon receipt, the [planned blending] data, in some cases revised by wire or telephone conversation, are transferred to the Planned Blending Sheets. In most cases, the blend indicated by the refiner is copied as received; in others, it is revised in accordance with standard operating procedure of transferring components so as to produce maximum aviation gasoline nation-wide." Under the planned blending program, letters were sent to each high octane refiner, which recommended the blending of components for each of the three months covered by the sheet, and authorized the purchase or sale of components indicated for the third or last month. [co82]

222. Planned Blending Reports were prepared by PAW summarizing the status of avgas production and attaching the Planned Blending Sheets for the current three month period for producers of aviation gasoline components. [co83]

223. Under the planned blending program, refiners filled out supply and demand forecast forms ("A-1 forms") to estimate the quantity of aviation gasoline components expected to be produced and blended over three months. [us124]

224. The PAW often informed refiners, including Defendants, that it "agree[d]" or "essentially agree[d]" with their A-1 form estimates. [us128]

225. The PAW gave each refiner an individual "Planned Blending Sheet." In most cases, the blend indicated by the refiner was copied as received; in others, it was revised in accordance with the standard operating procedure of transferring components so as to produce maximum aviation gasoline nation-wide. [us125]

226. Letters to refiners regarding planned blending constituted an authorization to proceed with the transactions indicated, and provided the basis for submitting a claim for reimbursement. [co84]

227. Beginning in December 1943, the Planned Blending letters to the defendant Oil Companies involving the purchase of blending agents from other refiners frequently included a statement to the effect: "This letter and attachment[s] is your authorization for the transactions indicated during the month of ---," or "This letter and attachment is your authority for the purchase of [cumene] [isopentane] as shown for the month of ---," or "This tabulation is your authority for the purchase of [cumene] [isopentane] as shown for the month of ---." [co194]

228. Authority for the blending program began with Recommendations 8 and 16, see <u>supra</u>, and later was placed under PAW Petroleum Directive 77, issued on July 24, 1944. PAW Directive 77 stated:

> "The Petroleum Administration for War controls all transfers within the petroleum industry of aviation-grade base stock, blending agents, and high-octane aviation fuel. The Petroleum Administration for War instructs industry with respect to specifications for the types and grades of high-octane aviation fuel which shall be manufactured or blended in regular commercial production." [co85]

229. One of the monthly planned blending letters to Union, dated February 10, 1943, stated that:

"[W]e feel it necessary to use cumene only to the extent required to meet a rich-mixture rating of S plus 1.25. We

therefore recommend that you reduce the amount of cumene used in your blending to just make S plus 1.25. We realize that this will mean a slight reduction in volume of the 100 octane number gasoline which you can blend, but it will make available additional cumene to some other blender, and thereby make possible for him to attain a rich-mixture rating of S plus 1.25 on increased quantities of 100 octane number gasoline. Thus the over-all effect will be increased production of 100 octane number gasoline to the new specification." [co87]

230. One of the monthly planned blending letters to Union, dated February 20, 1943, stated that:

> "We have used as a basis for this statement the data reflected on the latest A-1 statement submitted by you. You will note that there is practically no difference between the attached statement and the A-1 statement except as to the source of cumene. It is suggested that before you contact Globe and Ashland to obtain cumene in substitution for that which you are currently obtaining from the Atlantic Refining Company, you confirm to us the minimum amount of cumene required to meet specifications of Grade 130." [co88]

231. The monthly planned blending letter of February 18, 1994 to Union stated:

> "You will note that we are in essential agreement with the CS blending for the quantities indicated in your latest A-1 forecast. . . . There is a possibility that we shall discontinue the use of CS at such time as your new facilities provide substantial increase in blending. This