will be reviewed upon the receipt of your next forecast, and you shall be subsequently advised."

The letter further stated:

"We have shown no receipts of rich rating components for blending at Wilmington as it is our recommendation that you utilize toluene from Oleum in your current blending." [co206]

232. In its March 1944, letter to Union, the PAW informed Union that "At the present time we do not anticipate that you will blend Grade 98/100 beyond the month of March. Unless otherwise directed, your blending for April should revert to Grade 100/130 without C-S." The PAW's letter also stressed that it was "assuming that allocations of toluene will provide sufficient rich rating components in subsequent months . . . . We have not assigned your indicated excess of blending agent in April and May pending receipt of your next forecast . . . ." [co91]

233. Oleum was Union's northern California refinery that produced toluene under an Army contract. The monthly planned blending letters also concerned distribution of this product if released for aviation gasoline. The April 17, 1944, monthly planned blending letter to Union stated:

"The attached photostatic statement is in essential agreement with your latest forecast of blending of Grade 100/130 aviation gasoline at your Wilmington refinery for the quantity of blending shown therein. Our recommendation for the distribution of components during the month of May may be considered firm and this is your authority to proceed with the necessary transactions for their distribution.

> Providing Army Ordnance releases the volume of toluene shown, it is our intention to continue with the indicated supplies to Wilshire and Mohawk. It is necessary that these shipments continue in order that the above-mentioned blenders may meet specifications in their finished product. You will be notified of the exact quantity of toluene released by Ordnance in subsequent communication." [co207]

234. In the monthly planned blending letter of May 13, 1944, Union was informed:

> "You will note that the operations indicated herein are in essential agreement with your recent A-1 forecast. You will also note that during the month of June your requirement for rich component at Wilmington is covered by your own production of toluene at Oleum. The present indications received by this Office are that approximately 18,000 barrels of toluene will be released to aviation gasoline blending from Oleum during June. You will receive separate advise from WPB and this Office concerning the distribution of this material." [co208]

235. The monthly planned blending letter to Union of June 13, 1944 states:

> "The recommended blending of Grade 100/130 at Wilmington and disposition of aviation components at Oleum are shown on the attached photostat. You will receive separate advice from W.P.B. concerning the disposition of the toluene through July.
>
> We are pleased to note that the production of grade 130 at Wilmington is expected to increase materially in July,

and you are authorized to proceed with arrangements for cumene in the quantities shown through that month at the price negotiated between the supplier and this Office." [co209]

236. A PAW "night letter" to Union dated July 26, 1944 stated: "Authorize August purchase Grade 130 Wilmington cumene 17,000 Shell, Norco at price approved this Office. Toluene releases ex Oleum 15,000 Wilmington, 2,000 Mohawk, 10,000 Tidewater at Ordnance contract price." [co210]

237. A PAW "night letter" to Union dated August, 10, 1944, stated:

"Kindly decrease August cumene Shell Norco from 17,000 to 9,000 barrels. Authorize August purchase 8,800 barrels toluene from Shell Wilmington at price approved this Office. Wilshire require the immediate receipt of cumene and have suggested to them that you may be able to divert some of Norco's receipts to them for repayment at later date. Your cooperation is appreciated. Also advise us of any surplus isopentane that can be made available to others."

A PAW "night-letter" dated August 26, 1944, stated:

"Re September distribution aviation gasoline components authorize increase isopentane ex Wilmington from 8 to 13,000 barrels Standard California. Cancel cumene from Globe. Decrease cumene Shell, Norco from 10 to 8,000 barrels. Purchase 19,000 barrels ethylbenzene from Rubber Reserve ex Dow, Gardena in accordance with Rubber Reserve terms. Toluene distribution Oleum, 10,000 barrels Wilmington, 2,000

barrels Mohawk, [several thousand] barrels Shell, Martinez." [co93]

238. The PAW's monthly planned blending letter dated December 18, 1943, to Richfield stated: "The cumene from Standard of Louisiana should be purchased at the price negotiated between Standard and this office [PAW]. Your purchase of isopentane from Baytown should be at the price approved by this office." [co95]

239. On the occasions that the PAW recommended that identified components be purchased from other companies, the PAW frequently indicated the purchase was to be "at a price to be negotiated between the supplier and this Office" or "at a price approved by this Office" or "at prices approved by the PAW Economic Section." [co218]

240. The purpose of the PAW avgas program was to maximize the amount of avgas available to the United States for purchase in order to pursue the war effort. On the occasions that the PAW recommended that identified blending components be purchased from other companies under the planned blending program, the United States separately negotiated the price of the blending components transferred as well as the price of the final product. [co175]

241. In the summary report dated January 1, 1945, the PAW stated:

"the primary purpose of the Planned Blending Program is to coordinate the production, transfer and blending of aviation gasoline components in the interest of maximum production, nation-wide. It has been estimated that the increased production resulting therefrom is on the order of 15 to 20 per cent. The authority by which the program currently

operates is contained in Petroleum Directive 77 (originally Recommendations 8 and 16)." [co98]

United States Purchase And Sale of Intermediate Avgas Components

242. Refiners in Southern California, including the Defendants, relied on private sources of crude. During 1945, the Naval Reserves at Elk Hills were opened and reached production of 64,000 barrels a day; however, the parties have no records of its distribution or whether any of it reached the Defendants' Wilmington refineries. [us160]

243. For purposes of these motions, defendants do not contend that the United States supplied crude to their Los Angeles refineries. [co220]

244. The DSC sold xylidine, also known as cumene substitute ("C-S"), to certain refiners as a substitute for cumene between the fall of 1943 through October 1944. [us208]

245. Since the sources of benzol were limited for the production of cumene, substitutes were sought. One substitute was excess xylidines produced by the Ordnance Department of the Army. This came to be identified as "C-S" (cumene substitute). C-S was sold by the DSC to refiners as a substitute for benzol from the fall of 1943 through October 1944. The War Department, PAW and DSC agreed to authorize DSC to acquire xylidines and sell them to refiners. New specifications were prepared for avgas made with C-S, identified as Grade 98/130 with C-S and provision was made for DSC to sell C-S to avgas refiners at a price PAW approved. [co99]

246. Xylene was an aromatic with one less carbon atom than cumene and a high octane rating. [co99.1]

247. As part of this program, a contract was entered into between counterclaimant Union Oil Company and DSC in January 1944 for the purchase of C-S for use in the blending of avgas. Under Union's contract, Union retained the right to buy C-S "in the amounts [it] required" and at the time it required. Union's contract with the DSC also allowed the company to return C-S found to be deficient in quality and to cancel its agreement with the DSC unilaterally. [co100]

248. Under the DSC contract with Union, Union retained the right to buy C-S only "in the amounts [it] required" and at the time it required. [us209]

249. The DSC's contract with one C-S purchaser, Union, dated January 1944, allowed that company to return C-S found to be deficient in quality and to cancel its agreement with the DSC unilaterally, upon 10 days' notice. [us210]

250. In January 1944, DSC entered into a revision of its May 1, 1943, contract with Shell. The purpose of the revision was to expand the hydrogenation facilities at the Shell refinery for the hydrogenation of aromatic distillate acquired at a price of 6.55 cents per gallon from the Rubber Reserve Company, a government subsidiary of the RFC, to produce high quality aviation base stock. The contract provided that DSC, or its designee, would acquire the base stock at 9.5 cents a gallon from Shell. [co101]

Fluid Catalytic Cracker Facilities

251. Fluid catalytic crackers began to come on line in early 1944. Base stocks from these cat crackers had higher octane ratings and reduced the amount of alkylate and/or cumene

required, allowing a greater volume of avgas to be produced. [co195]

252. The Minutes of the Aviation Gasoline Subcommittee for District Five on April 11, 1945, refer to Fluid Catalytic Cracking at the Texas Company Wilmington refinery and state:

> Texas is charging [the fluid catalytic cracker] about 15,000 barrels per day composed of 70% gas oil with 725 end point and 30% kerosene 380 to 500 . The production is: . . . Crude naphtha 300 to 380 which is reformed and then acid treated and steam stilled giving a 50% yield of stock with about 90 octane 1C and 110 3C which goes directly into 100 Octane gasoline.

A similar report was made at the May 1945 meeting, noting that the naphtha was treated with "15 pounds per barrel of acid" to produce "an aviation cut." [co196]

253. The Texas Company Report to the Catalytic Cracking Subcommittee of the Aviation Gasoline Advisory Committee for May 1945, reflects that some aviation base stocks created by the fluid cat cracker were treated in the laboratory with 20 pounds per barrel of spent alkylation acid (87%) at 100 degrees Fahrenheit. [co197]

254. By January 7, 1942, the PAW was aware that the Texas Company intended to acid treat the aviation base stock from the catalytic cracker which the Texas Company proposed to build. [co198]

255. Starting on September 14, 1944, as its cracker was about to go on line, Texas Co. began providing a weekly report on the cracker by telegram to the PAW. References to acid treatment of base stock are found in eight telegrams through May 23, 1945.

The parties presume that the PAW requested the weekly telegrams. [co199]

256. Tidewater conducted sulfuric acid tests on its typical gas oil stock which was run through a pilot cat cracker of the same design as its proposed fluid cat cracker at Avon, California. It concluded in a report dated May 12, 1944:

> "The results demonstrate that aviation base stock of exceptional quality can be manufactured by sulfuric acid treatment of both light and heavy gasoline fractions produced by Fluid Catalytic Cracking . . . .

The report also reported the acid concentrations of the sludges created under different treatment conditions. [co200]

257. Standard Oil of New Jersey, at its Baltimore refinery, used spent alkylation acid for its treatment of aviation base stocks. [co201]

258. On August 3, 1944, a Fluid Catalytic Cracking Subcommittee of the Aviation Gasoline Subcommittee of the Refining Committee for District 5 of the PAW was formed and met, designating Monroe Spaght of Shell as its chairman. The subcommittee's membership consisted of two representatives each from Shell, Texas, Tidewater, Wilshire and the California Research Corporation. The first meeting was also attended by representatives of other oil companies and the PAW. Its purpose was to exchange information on the cat crackers. [co202]

259. When Tidewater's new facilities came on line in early 1945, including a fluid cat cracker, the PAW recommended acid treatment. Tidewater had consulted the PAW on the best methods of treatment of various fractions. At PAW's suggestion,

comparisons were made between acid treatment of aviation base stock and hydrogenation. Following these tests, Tidewater wrote the PAW that some, but not all, cracked fractions were being acid treated. The PAW recommended acid treatment of additional cracked fractions because the results were about the same and hydrogenation "would involve considerable rail movement," raising the tank car shortage issue. In response, Tidewater stated that it was storing these additional cracked fractions for future use rather than acid treating them. Tidewater wrote the PAW that acid treatment of these additional fractions created an acid sludge that turned solid in a short time and several tanks and tank cars would have to be "mined." [co203]

260. In accord with Recommendation 41, the companies who were covered by Recommendation 41, issued a 60 page report entitled "Production of Aviation Gasoline by the Fluid Catalytic Cracking Process, Effect of Operating Variables, Available under Agreement Pursuant to PAW Recommendation 41" dated February 15, 1945. This was made available to operators of fluid crackers. It recommends acid treatment of several of the avgas base stock cuts. [co204]

261. All cracking technologies, including new catalytic crackers and the older thermal crackers, produced gasoline fractions that were acid treated. [us252]

262. Thermal cracking required more acid than catalytic cracking. [us253]

263. Catalytic cracking, like thermal cracking, produced fractions that were used in products other than aviation gasoline. [us254]

Oil Company Management

264. During World War II, the United States Government placed no restrictions on research and development activities of Texaco's Office of Research and Technology. However, Texaco changed the emphasis from development of new products to increasing the quality and production of current products such as aviation gasoline. The same applied to the refining process. Texaco emphasized improvement of current refining processes rather than developing new processes. [us129]

265. Texaco's research and technology manager during the 1930's, Dr. Kuhn, retained full flexibility to spend his office's research and technology budget in the manner that he had before wartime. [us130]

266. The United States military received technical reports prepared by Shell, on subjects such as the effect of toluene on 100 octane output, but did not participate in the reports' preparation. [us131]

267. The United States did not require the Defendants to employ any specific refinery design, or process for making 100 octane gasoline, at their Wilmington refineries. However, a refiner's choice could affect whether the PAW accepted or rejected a project. [us133]

268. In 1943, Shell initiated a proposal to expand its Wilmington refinery's capacity to increase its 100 octane production, in response to a request from the PAW directed to all West Coast oil companies. The PAW subsequently recommended that DSC approve the Shell proposal. [us136]

269. As part of its proposal to expand its 100 octane facilities, Shell installed hydrogenation facilities to hydrogenate catalytic base stock and butylene polymers as a means of further increasing 100 octane production. [us137]

270. The hydrogenation facility built by Shell was "privately owned and financed entirely by Shell with its own funds." [us212]

271. In April 1943, Union initiated a proposal to expand its Wilmington refinery's capacity to increase its 100 octane production, in response to a request from the PAW directed to all West Coast oil companies. [us138]

272. As part of its 1943 expansion proposal, Union proposed to erect a "Thermofor" catalytic cracking unit. [us139]

273. This catalytic cracker utilized a catalyst developed by a private company, Socony-Vacuum. [us140]

274. In 1943, Richfield initiated a proposal to expand its Watson refinery's capacity to increase its 100 octane production, in response to a request from the PAW delivered to all West Coast oil companies. [us141]

275. During the course of Richfield's contract negotiations with the United States, Richfield engaged in experimental work on its proposal and, on its own initiative, changed the cat cracker to be employed. [us143]

276. As a result of Richfield's experimental work, that company substituted a revised proposal in March 1943, under which it offered to produce 56 barrels per day more than it anticipated in its January 1943 proposal. [us144]

277. Richfield's March 1943 proposal came as a result of the company's decision to substitute one type of catalytic cracking device for another type, previously proposed. [us145]

278. In early 1942, Texaco initiated a proposal to expand its 100 octane production facilities at Los Angeles (Wilmington) in response to a request of the PAW to all West Coast oil companies. [us146]

279. The United States did not perform or supervise the inspection of refinery equipment. [us147]

280. The United States did not hire, fire, or discipline personnel at Defendants' refineries. [us155]

281. The Government held no financial ownership interest in the land, buildings, tools, fixtures, or machinery on site used by Defendants. [us166]

282. The Government played no role in Defendants' selection of their Boards of Directors or their management personnel. [us167]

283. Apart from its financing through loans or purchase advances of certain 100 octane facilities, the Government played no role in Defendants' investment or corporate governance decisions. [us168]

<u>Inspection of Refinery Equipment</u>

284. During the war, the PAW published a booklet of "recommendations for refinery inspections," prepared by the PAW in conjunction with the oil industry, which was intended for use by company refinery personnel. [us148]

285. Contracts between the DSC and the Defendants provided that the Defendants, not the Government, would provide for product

inspections where licensed inspectors were regularly available. [us154]

286. Generally, the Defendants did the laboratory testing to insure that their aviation gasoline met the required specifications, and military representatives inspected the results to assure the product conformed to military specifications. [us149]

Refinery Operations

287. During the war, the only personnel operating, maintaining and repairing the physical equipment of the Defendant's refineries in Southern California were company personnel. [us156]

288. Refiners, rather than the Government, were responsible for the daily operations, maintenance and repair of the physical equipment of the Defendants' facility in Southern California. [us157]

United States Seizure of Authority at War's End

289. During and immediately after World War II, the United States performed a regulatory seizure of only a single refinery owned by the Defendants at Wilmington, that being the paper "seizure" of Union's Wilmington refinery between October 1945 and February 1946. [us191]

290. This "seizure" was one of several which were implemented at a oil refineries and pipelines at the end of the war to address the consequences of a series of labor strikes and was performed pursuant to the President's authority under the Selective Training and Service Act of 1940, ch. 720, 54 Stat. 885, and the War Labor Disputes Act ch. 144, 57 Stat. 163 (1943). [us192]

291. The purpose of these seizures was to assist the petroleum industry's efforts to keep a series of national labor strikes from interfering with production in the days immediately following victory. [us193]

292. During the period of "seizure," each affected company continued to operate its plants, using its own capital and retaining the profits. [us194]

293. During the Navy's time at the Union refinery, the Navy's representative assigned no men to work; did not instruct anyone on how to do his job; and did nothing to alter the duties of the refinery's manager, Kenneth Kingman. [us195]

294. Union's refinery manager also continued to be paid by the Union company during this period of unrest. [us196]

295. Union's refinery manager at Wilmington during the period of Navy seizure, Kenneth Kingman, recalled no problems during this time with regard to the storage of spent alkylation acid. [us197]

Postwar Use of Facilities

296. The Government cancelled aviation gasoline contracts immediately after the war ended, except for the Richfield contract. [us350]

297. It was universally expected that the military's demand for 100 octane would dramatically decrease at war's end, and it did. [us169]

298. Nonetheless, even before the war ended, the Defendants anticipated that the postwar automobile industry would change its engine designs to use higher octane fuels, and that equipment installed to make 100 octane aviation gasoline could also be used

to meet the anticipated higher octane numbers for the automobile fuel. [us170]

299. Union stated in its 1942 annual report that the impact of the war would "result[] in development of new processes and products which show great post-war possibilities . . . As an indirect result of wartime research, we shall be able to market greatly improved fuels . . . after the war." [us171]

300. Union's 1943 annual report stated that although the company's wartime investments were expensive, they would "improve the Company's postwar position." [us172]

301. In 1944, Union also established a new Aviation Department and entered negotiations to acquire an airplane manufacturing company ("Airplane Manufacturing and Supply Corporation") to create a market for petroleum products. [us175]

302. Union's Wilmington refinery produced alkylate for military and commercial aviation fuel and for automobile gasoline after the war. [us176]

303. Both Union's catalytic cracker and its alkylation unit made commercial gasoline well into the 1950s, at least. [us177]

304. During the war, Texaco's management anticipated that its alkylation and its catalytic cracking facilities would have postwar utility. [us178]

305. The 1945 Texaco annual report states:

> "Much of the equipment which was installed for making 100 octane gasoline and other products will be used in the post-war period. With these facilities the Company is in excellent condition to continue manufacturing products of the highest quality." [us179]

306. Texaco's catalytic crackers produced automobile gasoline, among other products, after the war and are still operating today. [us180]

307. Texaco's alkylation units produced commercial aviation gasoline and operated until the mid- to late-1980s, when Texaco replaced the still-functioning unit with a more current design. [us181]

308. During World War II, the post-war utility of wartime alkylation facilities was considered by Shell; if the company had alternative designs it could present to the government, the one the company favored and proposed to the United States Government was the one that would have the greater utility in peacetime. [us182]

309. During World War II, Shell anticipated that catalytic crackers built during the war would be useful after the war. [us183]

310. Shell reported in 1944 that "[a]s a result of its achievements in the production of aviation fuel" in California, Shell would be able to meet postwar demands for higher octane automotive gasolines on the West Coast. It further stated:

> "By constructing new plant facilities and by converting certain others to further the war-time aviation fuel program, Shell has assumed a serious postwar problem. Not only is there considerable risk involved in the original investment, but there also looms the trying and costly problem of research to determine the most advantageous use to which these plants can be put. After this use had been established, there will arise numerous engineering and

operating problems inherent in the conversion of plant facilities." [us184]

311. In fact, the physical plant of Shell's Wilmington refinery required no significant modifications to convert to post-war use. [us185]

312. The 1945 Shell Operating Report for its Wilmington refineries states:

"Cancellation of Government contracts at the end of the war necessitated broad changes in the refinery operating program to conform with post-war volume and quality requirements. These changes involved shutting down the Toluene and Catalyst Manufacturing Plants and Alkylation Plant No. 1, reduction in Thermal Cracking and Butane Isomerization throughputs, and revision of motor gasoline compositions to improve the quality of these products. In addition to alteration of the operating program, the refineries returned [to] the forty hour work week on October 1." [co210]

313. Shell's Dominguez plant produced 100 octane gasoline until September 1991, although not in the quantities produced during the war. [us186]

314. The Dominguez plant's catalytic cracker continues in use today. [us187]

315. Richfield's 1945 annual report stated:

"[T]he demands of the war led the Corporation into a construction program which has resulted in equipping it with refining facilities embodying the latest developments for the manufacture of the highest quality gasolines, and with a

capacity for production thereof fully adequate for the post-war era." [us188]

316. The Richfield 1945 annual report also states:

"While most of the Corporations new refining facilities are being operated in connection with the manufacture of motor gasolines for the civilian trade, refinery operations as a whole since the war have been at a reduced rate, as compared with the war period, because of diminished military demand for aviation and other gasolines." [co212]

317. Richfield noted in its 1946 annual report that its wartime additions "proved well adaptable to peacetime uses and no substantial capital expenditure was made [to convert] the refinery [to peacetime use]." [us189]

318. Capital expenditures for Watson became necessary in 1952 in response to California's extraordinary population growth. [us190]

Use of Sulfuric Acid

319. The impact of contracts between the government and oil companies nationwide which contemplated the construction of avgas facilities and the government purchase of avgas, plus allocation and blending programs of the OPC and PAW and government purchases and sale of intermediate products was to dramatically increase the production of avgas during the war. Production of aviation gasoline increased from 40,000 barrels a day in December 1941 to 514,000 barrels a day in 1945, a twelve-fold increase. [co103]

320. Each increase in production of avgas was matched by an increased requirement of 98% sulfuric acid in order to produce alkylate. [co104]

321. Because of other uses of acid in the refinery and less efficient use of acid in alkylation at the start of the war, the actual growth of acid use was not as dramatic as the increase in aviation gasoline production. According to the Shell operating reports for its Los Angeles refineries, annual acid use went from 24 million pounds in 1941 to 120 million pounds at the peak in 1944, a five fold increase. [co105]

322. Sulfuric acid is used by refineries primarily as a catalyst or for treatment of product. Generally, sulfuric acid is not incorporated into products leaving the refinery. For example, during the war years at Shell's Los Angeles refinery, roughly 10% of acid was consumed within the refinery. Thus, virtually all the acid coming into the refinery must leave the refinery after use. [co106]

323. The Oil Companies' Southern California refineries generated two general types of sulfuric acid by-products during the war: "spent alkylation acid" and "acid sludge." Spent alkylation acid was 87% to 90% sulfuric acid by weight and could be reused and recycled within the refineries up to the limit of other processes that could use spent alkylation acid. [us299]

324. Acid sludge was different. It contained only 45% to 65% unreacted and reacted sulfuric acid by weight, and generally could not be put to further use within the refineries. [us300]

325. In 1941, 85% of the fresh sulfuric acid going into the Shell Los Angeles refineries was used for alkylation, a figure that reached 91% in 1944. Depending on the year, some or all of the spent alkylation acid was reused within the refinery to treat

other products, including motor gasoline, kerosene, lubricating oil, and aviation gasoline components. [co107]

326. Just before Pearl Harbor, the OPC initiated a sulfuric acid survey for "the determination of prospective requirements of refineries for sulphuric acid in view of the large required expansion of alkylation precesses." One of the six questions was: "5. Procedure for disposing of acid sludge if no acid recovery system in operation:" [co108]

327. A compilation of District Five results dated early January 1942, shows that eight refineries dumped acid sludge (including Richfield and Shell); three hauled it away, destination unknown; Texas Co. burned it; and Union replied, "Given away." [co109]

328. On August 8, 1942, an OPC national acid survey showed that every District in the nation dumped waste sulfuric acid and that 12 refineries in District 5 dumped waste acid including Richfield, Texaco, and Shell. [co110]

329. Fresh sulfuric acid was in short supply in California from the end of 1943 through the end of the war. Refinery spent alkylation acid could be a valuable commodity since, for many industrial processes, spent alkylation acid could substitute for fresh acid, thereby freeing up fresh acid for use in alkylation. For example, spent sulfuric acid could be used to treat other refinery products, to manufacture ammonium sulfate and superphosphates and to pickle steel. Sulfuric acid sludge could be used in the manufacture of ammonium sulfate although the demands were small. Spent alkylation acid and acid sludge could also be regenerated into fresh acid. However, acid sludge was

much more difficult to regenerate than spent alkylation acid. [co111]

330. Spent alkylation acid was used primarily within the Shell Los Angeles refineries in 1941 through 1942. However, the excess rose [substantially] beyond refinery needs through 1945. [co113]

331. The Second War Powers Act provided that "the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense." [us284]

332. During World War II, the United States regulated sulfuric acid production and usage in California through three principal means: (i) orders allocating sulfuric acid pursuant to Material Conservation Order M-257; (ii) approval or denial of applications to build sulfuric acid production and reprocessing facilities pursuant to Limitation Order L-41, and (iii) efforts to expedite the efficient use of various grades of used sulfuric acid in order to free up scarce "fresh" sulfuric acid. [us259]

<u>Sulfuric Acid Allocation</u>

333. M-257 was issued on December 5, 1942; however, no sulfuric acid was actually allocated in California until December 1, 1943. [us268]

334. The WPB shifted allocation of sulfuric acid from M-257 to M-300 in November 1944. [us264]

335. Sulfuric acid allocation authority ended when Order M-300 was revoked on August 31, 1945. [us265]

336. Like other material conservation orders, M-257 itself did not allocate sulfuric acid. Rather, it established procedures

under which particular amounts of sulfuric acid could be allocated. [us272]

337. The actual allocation was done through sub-orders sent to individual acid producers. These sub-orders specified the amount of certain grades of sulfuric acid that an acid producer could sell to each customer. [us273]

Acid Reprocessing Plants

338. From 1941, the United States was aware that spent alkylation acid and acid sludge were produced in the manufacture of aviation gasoline and that increasing production of aviation gasoline would increase the amount of spent alkylation and acid sludge produced. [co181]

339. Limitation Order L-41 required WPB approval for all industrial construction projects above a minimal size, including the construction of facilities to produce and reprocess sulfuric acid. [us274]

340. Construction of new regeneration facilities required WPB approval. Without that approval, the materials needed for construction could not be obtained. [co120]

341. All WPB decisions relating to construction or modification of spent sulfuric acid reprocessing facilities subject to Limitation Order L-41 were made pursuant to the WPB's powers to allocate resources for the war effort. [us275]

342. Similarly, all WPB decisions regarding construction of storage tanks, or the use of tank cars for sulfuric acid transport, were made pursuant to the WPB's powers to allocate resources for the war effort. [us276]

343. The Defendants privately contracted with chemical companies to reprocess their excess spent alkylation acid. [us316]

344. In 1928, Shell and Stauffer formed a company to provide acid to Shell at Dominguez. Shell had a 50% interest in earnings until 1936 with an option to turn the earnings into a 50% share of the company. It chose not to exercise the option and Stauffer gained 100% control over the Dominguez acid facility. The plant continued to provide acid to the Shell refinery. [us317]

345. Stauffer's Dominguez plant and Shell's Wilmington/Dominguez refinery were across the street from each other and were connected by pipelines. [us318]

346. In September and October of 1942, Shell and Stauffer were negotiating a contract under which Stauffer agreed to sell approximately 150 tons a day of fresh acid to Shell and to pay Shell $3.00 per ton for approximately 100 tons a day of spent alkylation acid Stauffer received back from Shell. Stauffer had the further right to acquire up to 10 tons a day of acid sludge at no charge. Shell had considered building its own reprocessing facility, but ultimately "found the better procedure would be contracting with Stauffer." [us319]

347. It was cheaper for Stauffer to build a spent acid decomposition plant because Stauffer's existing plant already contained much of the needed equipment. [us320]

348. Richfield and Texaco arranged with Stauffer to reprocess spent alkylation acid. [us321]

349. Richfield's Wilmington refinery was connected to Stauffer's Dominguez plant by pipeline at some time during the war. [us322]

350. Union reprocessed spent alkylation acid at the General Chemical Company and at Stauffer. [us323]

351. Stauffer opened its first reprocessing plant at Dominguez, and in late 1943, began operating a second plant it acquired at Torrance. At the same time, the company began planning a second Dominguez plant ("Dominguez No. 2"), designed to reprocess both spent alkylation acid and acid sludge. [us324]

352. In December 1943, the WPB authorized priority ratings for Stauffer to build Dominguez No. 2. [us325]

353. General Chemical Company also constructed spent alkylation acid reprocessing plants in Southern California. [us326]

354. Stauffer entered into a contract with Shell in 1942 to construct an acid reclamation plant that would use spent alkylation acid. This plant had technical limitations on acid strength and organic content. The spent acid had to be between 85-90% acid and no more than 6-8% organic content. If these criteria were not met, the used acid would be rejected. These limitations were required in order to reprocess the acid to 98% strength that could be used in alkylation. [co130]

355. Union built an acid reprocessing plant at its Wilmington refinery in the early 1930s, but shut it down because of problems. [us306]

356. In the early 1950s, through a subsidiary, Union built an acid reprocessing plant at the refinery. [co219]

Problems at Stauffer Dominguez Plant No. 2

357. Between June and September 1943, Stauffer determined to build a second reclamation plant for new alkylation facilities which was approved by the WPB for priorities in December 1943.

It was supposed to process 100 tons of spent acid and 100 tons of PD acid sludge a day. In the fall of 1944 as it was brought on line, operational problems developed since "the attempts to use a higher percentage of the P.D. sludge was not satisfactory in that we could not make the 7 percent gas [sulfur dioxide] going to the acid plant for the 98 to 100 percent sulfuric acid." [co131]

358. As early as June 1944, prior to the Dominguez No. 2 plant's completion, Stauffer was aware that the plant might need to be modified to work as expected. As of September 1944, tests were inconclusive and it was decided to continue to build the original design before installing modifications. On February 1, 1945, the company decided to continue operation of the plant as completed for 90 additional days in order to continue testing the equipment. On February 27, 1945, on the advice of the president of another chemical company and a representative of the WPB, Stauffer decided to modify Dominguez No. 2 by adding additional equipment. [us331]

359. When Stauffer decided on February 27, 1945, to modify its plant, the WPB promptly granted a priority rating for this project. [us333]

360. As of March 2, 1945, a report of the Aviation and Technological Sections, WPB, noted: "The Chemical Bureau reported that the new acid sludge disposal plant of the Stauffer Chemical Company, Dominguez California, rated at 200 tons per day cannot handle more than 60 tons a day." By May 23, 1945, capacity was up to 120 tons per day. [co132]

361. AGAC Minutes from March 19, 1945, reflect: "There is a definite sludge disposal problem in District 5 occasioned

primarily by the fact that the Stauffer sludge plant had so far failed to operate at its expected capacity. Mr. Hyde pointed out that in District 5, spent acid was currently going into storage at the rate of 100-200 tons per day because of lack of means of disposal at the present time." [co133]

362. April 11, 1945, Minutes of the Aviation Gasoline Subcommittee show that the Stauffer plant was being overhauled and expected to be on line in July 1945. The Stauffer Board Minutes for August 7, 1945 indicate that the plant finally was operating at 185 tons a day by burning sulfur with alkylation acid. [co135]

363. Dr. Raymond Reuter prepared a PAW Memorandum addressing the acid situation on the West Coast as of May 5, 1945, attributing the lack of production from the Los Angeles area to "the failure of Stauffer Chemical Company's new acid sludge decomposition [regeneration] plant." [co136]

364. The Stauffer plant failure resulted in the dumping of both spent alkylation acid and acid sludge in late 1944 and 1945. According to AGAC minutes, Monroe Spaght of Shell Oil Co. reported to the PAW Aviation Gasoline Advisory Committee on December 11, 1944, that Southern California refineries were dumping spent acid. [co137]

365. As stated in the October 13, 1944 Summary of Meeting of the Inorganic Acids Committee regarding a proposed sulfuric acid reclamation plant in Texas:

> "One of the committee members said that when his company built a similar regeneration plant in California, it took a year to complete the project. Another said that type of

plant is highly complicated in comparison with a sulphuric acid plant.

The committee recommended that, since the proposed regeneration plant would be tying up strategic materials and equipment needed by the proposed sulphuric acid plants for direct war production, the case be deferred until the proposed sulphuric acid plant are completed."

The California committee member was Henry Stauffer and was presumably referring to the Dominguez No. #2 plant. [co142]

<u>Wilshire Storage Tank</u>

366. A March 24, 1945, interoffice communication reflects that the Chemical Bureau of the WPB was discussing the possible lease of a storage tank at Wilshire Oil to store this accumulation of spent acid. [co134]

367. A letter dated March 14, 1945, from Mr. Wizeman, Chief Inorganics Branch, WPB, to Mr. Byrne, of the PAW, states: "Removal of alkylation spent sulfuric acid from the oil ref[ineries] of Southern California has become a serious problem and threatens to result in curtailment of aviation gasoline production if immediate means for withdrawing spent acid cannot be provided." [co146]

368. Citing the "decomposition units" in Southern California as the cause of this build up and noting the availability of a storage tank at nearby Wilshire Oil Company, Mr. Wizeman, WPB recommended:

"That the Petroleum Administrator of War make arrangements with Defense Supplies Corporation to rent the storage tank from Wilshire Oil Company, purchase the excess spent

alkylation acid from the various oil refineries and after a period of about four months storage resell the acid so stored to the acid manufacturers for decomposition operations." [co147]

369. In a letter responding to WPB's request, Mr. Byrne, PAW Assistant Director of Refining, stated: "We believe that since the War Production Board has sole jurisdiction over spent acid under its allocation order that the War Production Board should be the one to make all the necessary arrangements between the oil companies and the acid companies." The letter also states:

"We understand that this acid disposal problem is local in southern California and believe that the local refiners together with the Stauffer Chemical Company could mutually work out some agreement to store this spent acid until it can be decomposed, possibly using the tank that you mention on the property of the Wilshire Oil Company." [co148][1]

370. On March 15, 1945, at the request of the PAW, the Chairman of the District Aviation Gasoline Subcommittee sought comments from the Southern California oil companies on Wilshire's offer to lease to the oil companies a 134,000 barrel tank for storing spent alkylation acid under certain conditions requested by Wilshire including Wilshire's desire that the tank not be tied up more than one year. The telegram to the oil companies also

---

[1] The parties agree that the documents referencing the WPB's "responsibility" over sulfuric acid in stipulations __ are quoted accurately but disagree about the interpretation of those documents. The United States' interpretation of these documents is set forth in its February 18, 1995, Opening Brief at pages 27-31, and its April 13, 1995 Reply Brief at page 20. The Defendants contend that the meaning of the word "responsibility" must be taken from the context of the documents and the regulatory authority of the WPB and PAW.

stated: "Only alternative appears to be diversion of excess spent acid to San Francisco area to extent that decomposition capacity is available[.] [A]t present less than half of excess could be accommodated this way." The telegram notes that if any were sent to San Francisco, it would be more expensive than storage at Wilshire. The agreements proposed by Wilshire mentioned only the oil and chemical companies as parties. [co149]

371. The Wilshire tank was in service as of April 11, 1945, which alleviated problems with storage of excess spent alkylation acid. [us336]

372. If faced with a choice between dumping acid waste or stopping avgas production, the government's own expert, Lincoln Gordon, testified: "A. No. I think the refinery might have been careful where it dumped it. It might have burned it, which apparently a lot of them did. But it should do something other than shut down the production of the 100 octane, I think was a good decision." [co150]

373. Paul Skinner, a WPB employee assigned to assisting the West Coast refineries, collected acid information for the PAW District Five Avgas Subcommittee and attached a chart to the December 27, 1944, minutes of the Subcommittee; the chart included each refineries' storage capacity for spent acid and current status. The storage capacity for all the Defendants as of December 27, 1944, was full. [co138]

374. A similar chart attached to the February 21, 1945 Avgas Subcommittee Minutes indicated, as of that date, the following as to spent acid storage capacity: the Richfield storage was full, Texas was "near full," Shell had 450 tons available out of 2650