tons capacity, and Union had temporarily used fresh acid storage tanks. It indicated that existing reprocessing capacity was insufficient. The shortage of reprocessing capacity was estimated at 100 to 200 tons per day in California at that time. The Southern California refiners were able to reprocess their excess spent alkylation acid in Northern California until some time in February, when new alkylation units came on line in Northern California. It was not until April 1945 that additional storage capacity at Wilshire Oil Company was obtained awaiting repairs to the new Stauffer plant. [co139]

375. In December 1944, the Texas Co. telegrams to PAW on acid treatment of its cat cracker base stock reported difficulties with acid sludge disposal. Since aviation base stock and other acid-treated products such as motor gasoline, kerosene, and lubricating oil continued in production, acid sludge too had to have been dumped. Acid sludge dumping was not halted by the Wilshire storage. [co140]

376. Acid sludge reclamation plants did not pose a problem of technical feasibility. The Texas Co. plant had operated for 8 years in the 1930s when P.D. sludge was the only waste acid. However, acid sludge was more difficult and expensive to reprocess than spent alkylation acid.

In addition, Stauffer's plants were designed to reprocess spent alkylation acid with a spray burning technology. By including a substantial percentage of P.D. sludge in the reprocessing, the resulting sulfur dioxide gas was not sufficiently concentrated to permit the production of 98 to 100 percent fresh acid for alkylation. [co141]

377. According to Shell's Wilmington/Dominguez operating reports, spent alkylation acid from Shell's refinery was not dumped between 1939 and 1941, except for 2,000 barrels dumped in 1941. [us328]

378. On December 7, 1942, R.B. Cragin of PAW, sent to D.W. Wilson an interoffice memorandum, attaching a separate memorandum from Mr. Apjohn, discussing an acid disposal problem in the Gulf Coast. In Mr. Cragin's memorandum he states: "I am assuming that you [an employee of PAW] are taking the responsibility for the acid disposal problem for all companies and would appreciate some advice from you as to the steps which are being taken." [co144][2]

Regeneration Plants Declined By WPB

379. The WPB declined to authorize priorities during the war for acid regeneration plants in California only on two occasions. The first occasion involved a Texaco proposal to build a 52-ton-per-day acid reprocessing plant to reprocess spent alkylation acid and acid sludge from Texaco's planned refinery expansion. Texaco anticipated reprocessing about 40 tons per day of spent alkylation acid and 12 to 14 tons per day of acid sludge. [us337]

380. Texas Co. had operated an acid reclamation plant from 1930 to 1938. As part of its application for new avgas facilities in early 1942, it sought to construct a new acid reclamation plant.

---

[2] The parties agree that the documents referencing the WPB's "responsibility" over sulfuric acid in stipulations ___ are quoted accurately but disagree about the interpretation of those documents. The United States' interpretation of these documents is set forth in its February 18, 1995, Opening Brief at pages 27-31, and its April 13, 1995 Reply Brief at page 20. The Defendants contend that the meaning of the word "responsibility" must be taken from the context of the documents and the regulatory authority of the WPB and PAW.

The plant would have treated approximately 40 tons of spent alkylation acid per day. The plant would have also treated between 12 and 14 tons of acid sludge a day. This request was denied by WPB in March, 1943, because of the Government's belief that existing facilities could take care of the acid supply and disposal problems. At that time, no other reclamation facilities were contemplated that would treat acid sludge. As of May 19, 1943, Texaco was not able to find such other facilities. However, Texas, at some point, did contract with Stauffer to reprocess Texas' spent alkylation acid. [co121]

381. The WPB denied Texaco's request for priorities in March 1943 on the basis that Stauffer could reprocess Texaco's spent alkylation acid. Dr. Wayne Kuhn testified: "And if they wanted a hundred octane gasoline, it should not be deleted, they should have put in the acid facilities, which they declined to do so." Dr. Kuhn further testified: "We were not in the business of building file cabinets . . . we also were in not in the acid recovery business, and that was a business of others." "As long as another company was going to handle it, we didn't give it much priority." Stauffer's March 9, 1943, Board Meeting minutes state: "It had been suggested by the management of Stauffer Chemical Company that arrangements be made to contract with the Texas Company for the purchase by the Stauffer Chemical Company of all of the alkylation sludge acid produced at the high octane gasoline plant to be constructed by The Texas Company in Southern California. It appeared likely that if the alkylation sludge acid so produced was not purchased by the Stauffer Chemical Company, the Texas Company might construct its own sulfuric acid

plant with a consequent loss to the Stauffer Chemical Company of one of its valued customers. No action was taken on the proposal of the management but the directors generally agreed that every effort would be made to make a contract with the Texas Company which would preserve the Texas Company as a customer of Stauffer Chemical Company." [us338]

382. Texaco ceased operating its acid sludge recovery plant in 1938. As of December 1941, Texaco had not restarted this plant and stated that doing so would require "considerable time and major expense." [us307]

383. The other WPB refusal to authorize priority ratings concerned an acid reclamation plant proposed by the Monsanto company. This plant was would have been built near San Francisco and would have been devoted exclusively to the Tidewater refinery in that area. [us341]

384. WPB approved priority ratings for the Monsanto plant in January 1944. [us342]

385. Monsanto delayed building this plant as a result of a disagreement with the Government over the amount of accelerated depreciation Monsanto should receive under its so-called "Certificate of Necessity." [us343]

386. Tidewater Associated Oil Company requested WPB approval of an acid regeneration plant proposed by Monsanto to handle anticipated additional spent alkylation acid and acid sludge from an alkylation plant and fluid cat cracker then being constructed. In a letter to the WPB, dated June 9, 1944, Tidewater explained:

> "Under our present and proposed operations, a number of different kinds of sulfuric acid sludges are produced

at the alkylation plant and also during acid treatment of light and heavy oils. Some of these acid sludges are extremely difficult to handle and have an acid content from 30 to 50%. Furthermore, such sludges continue to react upon standing and the disposal problems increase with the evolution of corrosive, obnoxious and poisonous gas."

Tidewater's refinery referenced above was near San Francisco, California. [co122]

387. Tidewater sent several telegrams to the PAW on the same subject. On June 21, 1944, the PAW wrote the WPB that it expected a sulfuric acid demand of 41,000 tons per month in Northern California by December 1944 which should remain constant thereafter. It mentioned the Tidewater acid disposal issue, but described it as involving only "alkylate sludge acid" which the WPB was evaluating for all of California. [co123]

388. The PAW responded to Tidewater that it considered Tidewater's disposal problems when making its acid estimates to WPB. On July 8, 1944, PAW said that the acid disposal problem was being left to WPB since "they have overall responsibility for industrial uses of acid." In response, Tidewater stated that PAW could raise the production forecast from the Tidewater facilities under construction "provided that WPB will take for responsibility for the disposal of all acid sludge resulting from our refining operations when utilizing a total of 407 tons of

acid per day, including the above mentioned 400 tons for alkylation." [co124][3]

389. Although a compromise on accelerated depreciation was reached in March 1944, Monsanto allowed its priority ranking to expire before commencement of construction. In July 1944, WPB refused to renew the priority ratings. [us344]

390. On July 28, 1944, WPB turned down the Monsanto acid reclamation facility stating:

> "The Avon project was recommended by us on January 1944 as a safety factor on the Pacific Coast sulfuric acid situation at a time when acid requirements for that area were very much in debate and we had just established an area allocation of sulfuric acid in California. Considerable factual information has been secured since that time as a result of the allocation and of the detailed studies of probable future requirements which have been made by our own people and the Petroleum Administration for War, both here and on the Pacific Coast. On the basis of this work, we cannot find at the present time that the construction of this plant is necessary to the effective prosecution of the war.
>
> The marked interest in progress of your construction plans to which you refer was the natural result of our deep

---

[3] The parties agree that the documents referencing the WPB's "responsibility" over sulfuric acid in stipulations __ are quoted accurately but disagree about the interpretation of those documents. The United States' interpretation of these documents is set forth in its February 18, 1995, Opening Brief at pages 27-31, and its April 13, 1995 Reply Brief at page 20. The Defendants contend that the meaning of the word "responsibility" must be taken from the context of the documents and the regulatory authority of the WPB and PAW.

concern this winter and spring over the sulfuric acid situation on the Pacific Coast, and early in the spring we were perturbed over the fact that your project, which had been originally expected to start operation in September of this year, was not taking shape. . . .

Realizing that a certification of necessity is involved, you will appreciate that we must certify to war necessity in requesting extension of a project on which actual construction has not yet started at the time that the original priority ratings expired. . . .

Further, I think it significant that both your company and Tidewater have informed us that this project does not have postwar appeal to the extent that private financing without certificate of necessity would be justified." [co223]

391. The July 28, 1944 WPB letter further stated:

"In connection with sludge disposal, our West Coast representative [Paul Skinner] went into this very thoroughly both with the producers of the sludge and the companies which were expected to dispose of it, and our best present information is that this problem can be satisfactorily handled with the present facilities."

In a letter dated August 23, 1944 from the PAW to Tidewater, the PAW again stated "the sludge disposal problem was being left with the WPB since they have the over-all responsibility for industrial uses of acid." PAW's letter also quoted the above paragraph from the WPB letter in answer to Tidewater's letter of July 25, 1944. [co125]

392. By letter dated September 9, 1944, Tidewater stated that it did not agree that there were adequate facilities, stating:

> "Our Company is still greatly concerned with the fact that there do not appear to be adequate sludge disposal facilities available here in California to handle the acid sludge resulting from the maximum operations of present and authorized alkylation facilities. As we understand the situation, the War Production Board has taken full responsibility to dispose of all our acid sludge when we operating these large facilities at Avon at well above AGAC maximum rating."

The PAW sent this correspondence to the Chairman of the PAW District V, Aviation Gasoline Subcommittee who responded to the PAW that Paul C Skinner, the WPB employee following the acid situation, had informed the Committee that the "alkylation spent acid is pretty much in balance in California at the present time" and that General Chemical could increase the amount of spent alkylation acid reprocessing capacity if required, provided reasonable notice were given. [co126]

393. On December 1, 1944, Tidewater stated that, in its view, the projected increase in alkylation acid sludge could not be handled, specifically mentioning tank car shortages and inconsistent demands of Shell Chemical as an example. [co127]

394. There is no evidence that any of the acid sludge dumped at the McColl Site was shipped from Tidewater's San Francisco-area refinery. [us346]

WPB Employee Richard Smith

395. In November of 1943, the WPB sent Richard Smith to the West Coast to assist in monitoring and expediting the use of the refineries' spent alkylation acid and acid sludge. Smith's job was to assist in finding outlets in the economy for spent alkylation acid and acid sludge so that fresh acid would be freed up for alkylation. [co115]

396. Part of Richard Smith's job was to help California refiners free up fresh acid for alkylation by identifying manufacturing processes elsewhere where spent acid could be used. [us278]

397. In this capacity, Smith, a former Shell employee, provided information on the industry's fresh acid requirements to the WPB officials in Washington who were allocating fresh sulfuric acid. [us279]

398. If companies had been unwilling to substitute spent acids for fresh acid, the WPB in Washington could have allocated the company less fresh acid. It then would have been up to the company to obtain spent alkylation acid or acid sludge to replace the fresh acid, or discontinue the acid using process. [us292]

399. Smith did not involved in arrangements for the dumping of acid waste. [us281]

400. The Government issued no orders specifically requiring or approving the dumping of refinery acid waste. [us283]

401. Smith wrote a series of reports to his chief in Washington at the WPB in November and December 1943. In Sulfuric Acid Report 3, concerning the Shell Chemical Ammonium Sulfate Plant which used acid sludge to make fertilizer, he noted that Union and Shell would send 400 and 1000 tons a month respectively to

the plant. Smith wrote that "these figures [were] dependant upon promised arrival of tank cars to handle the movement." [co116]

402. Report 8 concerning the Union and Shell Los Angeles refineries noted that their acid sludge in the month of December was being dumped. The Union report noted in particular that "will ship to Shell Chemical soon as cars available." Richard Smith testified that this report indicated that the immediate cause of Union's dumping was a shortage of tank cars. [co116.1]

403. The WPB's Smith occasionally worked with refiners to find available tank cars which the refiners could use to move spent alkylation acid or acid sludge. Final arrangements for tank car usage were made by the companies involved. [us296]

404. Richard Smith testified: "Now, in the case of local tank car shortages, obviously we could not move various kinds of spent acids and sludges as we might prefer to do. What happened in this case, I understand some of those sludges were dumped . . . ." Smith testified that this happened "rarely," but on "at least one occasion" [co118]

405. Although tank cars were sometimes in short supply during World War II, Richard Smith knew of only one or two instances in which a shortage contributed to dumping of acid sludge that might otherwise have been taken elsewhere. [us298]

406. Smith also identified refinery processes capable of using spent, rather than fresh, sulfuric acid, thus making scarce fresh acid available for processes that could only use fresh acid. [us280]

407. Richard Smith helped California refiners free up fresh acid for alkylation by helping identify manufacturing processes elsewhere where spent acids could be used. [us290]

408. One use for sulfuric acid by-products was regeneration into fresh acid. [co119]

Acid Sludge Disposal

409. Shell's Wilmington/Dominguez refinery operating reports specify the quantities of acid sludge burned or otherwise disposed of in the years immediately preceding the war:

1939: 47,000 barrels burned, 1,000 barrels "disposed of by Gray Trucking Company"

1940: 9,500 barrels burned, 34,000 barrels "disposed of by Gray Trucking Company"

1941: 0 barrels burned, 92,000 barrels "to disposal" [us309]

410. Shell continued to dump acid sludge from its Wilmington/Dominguez refinery during the war. Shell's operating reports specify the quantities of acid sludge burned or disposed of during the war:

1942: 0 barrels burned, 100,000 barrels "to disposal"

1943: 0 barrels burned, 112,000 barrels "to disposal"

1944: 0 barrels burned, 66,000 barrels "to disposal"

1945: 4,500 barrels burned, 1,000 barrels "to disposal"

This Court has previously found that the acid sludge sent "to disposal" was dumped at the McColl Site. [us310]

411. The primary reuse to which acid sludge could be put was making ammonium sulfate fertilizer at a Shell Chemical plant. [us312]

412. As this Court has found, throughout the war each Oil Company Defendant dumped some or all of its acid sludge at the McColl Site. [us311]

Tank Cars

413. A January 24, 1940, Shell Oil Company memorandum discusses options for disposal of spent alkylation acid. One option considered was sending spent alkylation acid to a Shell Chemical plant near San Francisco for fertilizer manufacture. The memorandum disfavored this option, in part because "local sludges [were] very cheap and very good" and because Shell Oil would have to pay $3.50 per ton in transportation costs to move its spent alkylation acid to San Francisco. From 1943 through 1946, Shell did send some acid sludge and spent alkylation acid from its Los Angeles refineries to Shell Chemical. [us355]

414. In October 1943, tank car shortages were causing delays in the shipment of spent ordnance acid from ordnance plants in the southeastern United States. A progress report dated October 9, 1943 from J.W. Wizemen of the Inorganics Section, Chemical Bureau, WPB, stated that delays in a program to distribute spent ordnance acid from ordnance plants in the Southeastern United States were partially caused by a lack of tank cars. [co117]

415. Another shortage of acid tank cars began in the summer of 1944 when WPB estimated that the sulfuric acid industry would need several hundred additional tank cars for August and September. [co152]

416. As of December 1, 1944, allocation of sulfuric acid was broadened to include the entire country. Anyone who "redeliver[ed] spent or recovered sulfuric acid" was required to

report these deliveries on a monthly basis to the WPB. This included all petroleum refiners. [co153]

417. A WPB publication dated December 9, 1944, stated that it was not just sulfuric acid that was in short supply, but that "tank cars are more critical than the product they carry." It reported that an additional 1,100 acid tank cars would be needed by April 1945. It stated that the WPB intended to convert petroleum tank cars, but there was already a shortage of 15,000 petroleum tank cars. Nonetheless, telegrams were sent to oil companies ordering them to deliver tank cars for conversion no matter what their objection. [co154]

418. In January 1945, the Office of Defense Transportation noted that shortage would be 1,200 tank cars as of July 1945, and stated that there was already a shortage of at least 290 acid tank cars with none idle. The WPB recommended a construction program for 600 new acid tank cars and the conversion of 600 additional cars. The DSC was requested to finance the conversion of 239 to be provided by private industry. [co155]

419. On the West Coast, in part due to the failure of the Stauffer reclamation plant, acid had to be obtained from Arizona. [co156]

420. When the government determined that the provision of tank cars was a war priority, it had the authority to order the cars where it wished. As part of the December 1944 conversion, it ordered the Carter Oil Company to deliver five specifically identified cars as follows:

"Please do not delay forwarding[;] do not telephone[;] do not telegraph seeking to retain these cars. . . . Wire Acquiescence." [co157]

Shell Toluene Plant

421. On January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two year period. The contract provided that Shell would construct a toluene plant at Shell' Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. The Shell Operating Reports indicate that Shell started production in or about December 1942 and produced toluene for the remainder of the war. The Shell Operating Reports indicate that Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war. [co167]

422. Although the toluene plant was constructed to provide toluene to manufacture TNT, in mid-1943, it became apparent that there was capacity in excess of Army Ordnance needs and a plan was developed to divert toluene on the West Coast to the avgas program as a blending agent since it had an octane rating of up to 112. WPB approval of the transfer was given in October 1943, and allocation to both the Shell avgas program and to Socal, Tidewater, and Union began in the Spring of 1944. [co168]

423. The Shell Operating Reports indicate that the production process for toluene included treatment with 98% sulfuric acid up until February 1944. This would have created an acid sludge waste stream that would include toluene, benzene and other

aromatic hydrocarbons that would have been removed from the refinery. [co169]

424. The acid usage for treating toluene in 1943 was eight hundred and seventy nine thousand pounds and in 1944, three hundred and eighty thousand pounds. [co170]

Other Petroleum Products

425. All of the refineries sold motor gasoline to the United States for use in the war. Examples are Richfield who sold the United States 95.5 million gallons in 1943, 43.3 million gallons in 1944 and 10.1 million gallons in 1945. [co172]

426. Altogether, in PAW District 5 during 1942, the United.States purchased 166,100 barrels per day of petroleum products, including 29,300 barrels of aviation gasoline and 19,800 barrels of motor gasoline. By 1945, it was acquiring 415,200 barrels per day of petroleum products, including 149,100 barrels of aviation gasoline and 57,300 barrels of motor gasoline. [co173]

427. Sulfuric acid was often used to treat gasoline fractions of distillation to remove sulfur compounds as part of the process of producing the final motor gasoline product. Kerosene and lubricating oils were also acid treated. All of these acid-treating operations produced acid sludge. [co174]

Postwar Disposal

428. After the McColl Site was closed to dumping, some Defendants continued dumping their acid sludge elsewhere. Between 1947 and 1949, Texaco, Union, and Richfield arranged to have their acid sludge dumped at sea. In December 1949, the Refiner's Committee on Waste Disposal (of which Defendants were members) obtained a

quotation on sea disposal of their acid sludge and spent caustic. [us351]

The McColl Site and the Grants

429. Elizabeth Grant does not recall ever hearing Helen Grant express reluctance to have her property used for waste dumping. [us289]

430. Under Helen Grant's agreement with Eli McColl, Helen Grant sold her land to McColl for $2,500 plus five cents for every barrel of sludge dumped at the site in excess of 50,000 barrels. Eli McColl was required to dump 98% or more of his sludges at the site until at least 200,000 barrels of sludge were disposed there. Helen Grant could cancel the agreement if McColl failed to pay her an average of $208.33 per month, which at 5 cents per barrel represents 50,000 barrels of sludge per year. [us287]

Respectfully submitted,

ENVIRONMENTAL DEFENSE SECTION
UNITED STATES DEPARTMENT OF JUSTICE
JOSHUA M. LEVIN
MICHAEL J. ZEVENBERGEN
H. MICHAEL SEMLER

Dated: June 23, 1995 By: Joshua M. Levin
Joshua M. Levin
Attorneys for Plaintiff and Counterdefendant UNITED STATES OF AMERICA

MUNGER, TOLLES & OLSON
RONALD L. OLSON
PETER R. TAFT
CARY B. LERMAN
CYNTHIA L. BURCH

Dated: June 23, 1995 By: Peter R. Taft
Peter R. Taft
Attorneys for Defendants and Counterclaim Plaintiff, SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC.

[identification of counsel is found at the end of this document]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., Plaintiffs, v. SHELL OIL COMPANY, et al., Defendants, AND RELATED ACTIONS. | CASE NO. Civ. 91 0589 RJK(Ex) **SUPPLEMENTAL STIPULATED FACTS OF THE PARTIES RELATING TO PENDING MOTIONS FOR SUMMARY JUDGMENT AND RELATED MOTIONS** Date: July 31, 1995 Time: 10:00 a.m. Ctrm: Honorable Robert J. Kelleher |

The Oil Company Defendants and the United States hereby submit this supplement to the joint statement of facts previously submitted on June 23, 1995. It is hereby stipulated, by and between the Oil Company Defendants and the United States and its related agencies, through their undersigned counsel, that the following facts are true for purposes of the summary judgment and other motions currently pending before the Court.

Supplement to Joint Stipulation 325

431. The oil companies disposed of acid sludge resulting from both (a) aviation gasoline production and (b) the production of other petroleum products distinct from aviation gasoline, including motor gasoline, kerosene, and lubricating oils. Some of this motor gasoline, kerosene, and lubricating oil was sold in civilian products, and some was sold to the military. The McColl Site therefore contains acid sludge resulting from the treatment of civilian and military petroleum products.

Dated: July 25, 1995

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural Resources Division

JOSHUA M. LEVIN
MICHAEL ZEVENBERGEN
H. MICHAEL SEMLER
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: 202-514-4198

NORA M. MANELLA
United States Attorney
KURT ZIMMERMAN
Assistant United States Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: 213-894-0474

Michael J. Zevenbergen
By
Attorneys for Federal Counterdefendants, United States of America et al.

RONALD L. OLSON
PETER R. TAFT
CARY B. LERMAN
CYNTHIA L. BURCH
MUNGER, TOLLES & OLSON
355 South Grand Avenue
Los Angeles, California 90071-1560
(213) 683-9100

Peter R. Taft by Michael J. Zevenbergen
Peter R. Taft
Attorneys for Defendants Shell Oil Company, Texaco, Inc., Atlantic Richfield Company, Union Oil Company

PROOF OF SERVICE

I am employed in the City of Washington, D.C. by the U.S. Department of Justice; am over the age of 18 years; not a party to this action herein; and my business address is P.O. 23986, Washington, D.C. 20026-3986.

On July 26, 1995, I served the document described as:

**SUPPLEMENTAL STIPULATED FACTS OF THE PARTIES RELATING TO PENDING MOTIONS FOR SUMMARY JUDGMENT AND RELATED MOTIONS**

on the interested parties to this action by placing the same in Federal Express overnight mail as follows:

Peter R. Taft
Cary B. Lerman
Cynthia L. Burch
Gregg W. Kettles
MUNGER, TOLLES & OLSON
355 S. Grand Street, 35th Floor
Los Angeles, CA 90071

Regina Liudzius Cobb
DEMETRIOU, DELGUERCIO, SPRINGER & MOYER
Chase Plaza, 10th Floor
801 South Grand Avenue
Los Angeles, CA 90017

Timothy R. Patterson
Deputy Attorney General
110 West "A" Street, Suite 1100
San Diego, CA 92186-5266

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on July 26, 1995, at Washington, D.C.

Michael J. Zevenbergen
Michael J. Zevenbergen

[identification of counsel is found at the end of this document]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., Plaintiffs, v. SHELL OIL COMPANY, et al., Defendants, | CASE NO. Civ. 91 0589 RJK(Ex) PRELIMINARY DRAFT PRETRIAL CONFERENCE ORDER Date: December 15, 1945 Time: 10:00 am Ctrm: Honorable Robert J. Kelleher |
| AND RELATED ACTIONS. | |

Following pretrial proceedings, pursuant to Rule 16, F.R.Civ.P. and Local Rule 9, IT IS ORDERED:

1. Parties:

A) As counterclaimants: Shell Oil Company, Texaco, Inc., Atlantic Richfield Company and Union Oil Company [hereinafter often referred to as the Oil Company Defendants].

B) As counter defendant: United States of America.

Each of these parties has been served and has appeared.

Since this phase of the case involves only apportionment

between the above two parties, the United States as plaintiff and the State of California are not involved. McAuley has been dismissed from the action.

2. Pleadings:

The pleadings which raise the issues are:

A) Counterclaim filed April 22, 1991;

B) Answer to Counterclaim filed August 15, 1991.

3. Jurisdiction and Venue:

Jurisdiction and venue are pursuant to Comprehensive Environmental Response, Compensation and Liability Act § 113(b), 42 U.S.C. § 9613(b). The McColl Site is within the District. Not withstanding the above, the United States notes that it has previously opposed the Oil Company Defendants' CERCLA claims on grounds that it has not waived sovereign immunity to suit. The United States specifically reserves this argument for purposes of appeal.

4. Trial Estimate:

This is a non-jury case. The United States has estimated a trial of five to eight court days. The Oil Companies estimate up to 15 court days depending on how much video taped testimony of previous depositions is offered and permitted by the Court.

5. Facts Admitted:

The following facts are admitted and require no proof:

A) The stipulations No. 1 to 431 which were agreed to by the parties as part of cross summary judgment motions re liability of the United States and filed on June 23, 1995, and July 25, 1995, are hereby incorporated by reference.

B) New stipulated facts to which there are no evidentiary

objections other than noted parenthetically following the stipulation are attached hereto as Exhibit A.

6. Facts Stipulated except as to admissibility.

Stipulated facts to which there is an evidentiary relevance objection are identified in Exhibit A.

7. Claims Presented:

Counterclaimants:

a) This portion of the case relates to apportionment of response costs between the Oil Companies and the United States. The parties have agreed that the apportionment shall be done by the Court by way of fixing a percentage allocable to each side and that the parties thereafter will negotiate the actual costs to which this percentage shall apply. The legal standard applicable to this finding is set forth in 42 U.S.C. § 9613(f)(1) which provides:

> "Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."

b) The ultimate facts to be proven are those facts necessary to establish the equitable factors which the Court determines to be appropriate to resolve the allocation. There are no statutory or judicially established equitable factors that are required to be considered in order to establish an allocation or claim for contribution. Rather, the Court is free to select those equitable factors as are deemed appropriate. The

counterclaimants contend that the following equitable factors (without prejudice to modification) should be taken into consideration by the Court in arriving at its final decision:

1) A benefit analysis argues that the United States should receive a 100% allocation;

2) rules of allocation that encourage contracting support using the benefit analysis described in #1, _supra_;

3) an allocation based on what the parties themselves would have negotiated in 1942 and 1943 had they known of the future CERCLA response costs also supports a 100% allocation to the United States and is a variation on the benefit analysis in #1, _supra_;

4) the United States was a substantial wartime purchaser of all the products of the refineries, including products that required acid treating, and was the reason for increased refinery throughput which necessarily increased sludge production. The United States had the legal authority to compel production from existing facilities;

5) the United States prevented the oil companies from developing and using alternative methods of disposal during the war and restricted access to materials to otherwise alleviate the disposal issue;

6) the United States changed the rules long after the fact and is now using CERCLA to impose a very expensive regulatory cleanup program on the waste from the aviation gasoline program after all claims relating to the program were closed out in the late 1940s,

including a renegotiation of profits;

7) the United States has failed to cooperate with the agencies overseeing the cleanup, even after it was held liable in September 1995;

8) the Oil Companies used due care in selecting the McColl Site in consultation with the relevant state agencies, and engaged in disposal which was considered appropriate under the standards applied at the time.

c) The evidence relied on by the counterclaimants to establish the above relevant equitable factors are 1) the stipulated facts and 2) the following additional facts attached hereto as Exhibit B.

Counterdefendant:

a) Incorporates by reference Counterclaimants' statement in part (a).

b) The ultimate facts to be proven are those facts necessary to establish the equitable factors which the Court determines to be appropriate to resolve the allocation. There are no statutory or judicially established equitable factors that are required to be considered in order to establish an allocation or claim for contribution. Rather, the Court is free to select those equitable factors as are deemed appropriate. The United States contends that the following equitable factors (without prejudice to modification) should be taken into consideration by the Court in arriving at its final decision:

1) At the outset, the United States believes the Court should apply the first of the so-called "Gore" factors, and determine whether the Government's contribution to

the release of hazardous wastes can be distinguished from the contribution of the Oil Companies. Evidence to be presented at trial demonstrates that 22% of the volume of acid wastes at the McColl Site is attributable to av gas and benzol, while 78% of the waste at the Site is attributable to acid sludge derived from other petroleum products. The parties' respective contributions to the release of hazardous substances should be distinguished on this threshold ground.

2) In allocating the 22% share attributable to av gas and benzol production, the United States believes the Court should consider several additional equitable factors, especially the "degree of involvement in waste generation, storage, or disposal." The historical evidence demonstrates that Oil Companies retained substantial freedom to make individual decisions bearing on the generation of waste. The evidence also shows that the United States did not participate in the Companies' decisions concerning the disposal of acid sludge.

3) Third, the United States believes the Court should consider, as an equitable factor, evidence of the parties' respective benefits, financial or otherwise, relating to the conduct that resulted in the contamination at the McColl Site. <u>Weyerhaeuser Co. v. Koppers Co.</u>, 771 F. Supp. 1420, 1424-27 (D. Md. 1991).

4) Fourth, there are considerable so-called "orphan

shares," i.e., "those shares attributable to PRPs who either are insolvent or cannot be located or identified." Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1303 (9th Cir. 1997). The two significant orphan shares in this case belong to Eli McColl, who operated the McColl Site, arranged for their transportation to the McColl Site, and owned or leased the Site at the time of disposal. The other orphan share belongs to Helen Grant and Charles Emery, who owned the Site at the time of disposal. "Orphan shares," like each responsible party's own share, should be divided equitably. Pinal Creek, 118 F.3d at 1303. The orphan shares in this case should be borne entirely by the Oil Companies, because the Oil Companies, not the Government, had significant, long-term relationships with these parties.

c) The evidence relied on by the United States to establish the above relevant equitable factors are 1) the stipulated facts and 2) the following additional facts as set forth in Exhibit C.

The parties agree that they will make their best efforts to disclose rebuttal evidence other than witness impeachment evidence in terms of both exhibits and witnesses contemporaneously with the filing of the Trial Brief identified in Local Rule 10.

8. Remaining Discovery

Discovery is complete except in the following respects. First, the parties have agreed that they shall obtain Rule 26 reports from, and may depose, rebuttal experts. Second, the Oil

Company Defendants have agreed to make available to the United States the pleadings from the insurance litigation between Texaco and its insurance carriers relating to costs incurred at the McColl Site. Counsel for the United States intends to review those records in the coming weeks. Third, the parties agree that they have a continuing obligation to supplement their responses to existing discovery.

9. Exhibit Objections

The Joint Exhibit List is not complete and objections not yet formulated.

10. Witness Lists

Witness lists will be filed in the near future.

11. Deposition Testimony

The marking of deposition testimony, which will be substantial, is not yet complete.

12. Motions

The list of in limine motions relevant to this portion of the case have not yet been completed. The parties will identify these motions in the near future.

13. Bifurcation: Issues For This Trial

At issue in this trial is the determination of an allocation percentage to be applied to CERCLA response costs which the parties contemplate will be negotiated subsequent to the Court's determination.

14. Conclusion

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this pretrial conference order

shall supercede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

Dated: December __, 1997.

Robert J. Kelleher, United States District Judge

Approved as to form and content.

Dated: December 11, 1997

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural Resources Division

JOSHUA M. LEVIN
MICHAEL J. ZEVENBERGEN
Environment & Natural Resources Division
Environmental Defense Section
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: 202-514-4198

NORA M. MANELLA
United States Attorney
JOHN RUBINER
Assistant United States Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: 213-894-2451

By Joshua M. Levin
Attorneys for Federal Counterdefendants,
United States of America et al.

PETER R. TAFT
RONALD L. OLSON
CARY B. LERMAN
CYNTHIA L. BURCH
MUNGER, TOLLES & OLSON
355 South Grand Avenue
Los Angeles, California 90071-1560
(213) 683-9100

______________________
Peter R. Taft
Attorneys for Defendants Shell Oil Company, Texaco, Inc., Atlantic Richfield Company, Union Oil Company