<u>Exhibit A To Preliminary Draft Pretrial Order</u>

<u>Dated December 11, 1997</u>

<u>United States et al. v. Shell Oil Co. et al.</u>

Case No. 91 0589 RJK(Ex)

**SUPPLEMENTAL STIPULATED FACTS OF THE PARTIES RELATING TO PENDING TRIAL TO ALLOCATE RESPONSE COSTS BETWEEN THE OIL COMPANIES AND THE UNITED STATES**

## TABLE OF CONTENTS


**Page(s)**

Prologue . . . . . . . . . . . . . . . . . . . . . . . . . 1

Amounts Of Waste Disposed Of At The McColl Site By Each Oil Company . . . . . . . . . . . . . . . . . . . . . . . . 2

The Oil Companies' Relationships With Eli McColl . . . . . . 3

Shell's Disposal Contracts With Gray Trucking . . . . . . . . 6

Shell's 1941 Oil And Gas Leases At The Emery Ranch, Including Part Of The McColl Site . . . . . . . . . . . 7

Charles Emery's 1942 Lease . . . . . . . . . . . . . . . . . 11

Eli McColl's Lease Of The Charles Emery Property . . . . . . 12

Eli McColl's Agreement With Helen Grant . . . . . . . . . . . 12

Shell's Disposal Contracts With Eli McColl . . . . . . . . . 14

Eli McColl's Unsuccessful Application For A Sludge Disposal Permit In Los Angeles County . . . . . . . . . . . . . . 16

McColl Site Disposal . . . . . . . . . . . . . . . . . . . 20

Production Of Waste Disposed At The McColl Site . . . . . . . 20

Acid Disposal Practices Of The Oil Companies . . . . . . . . 22

Trends in Acid Sludge Utilization and Disposal . . . . . . . . 25

Stauffer plant problems . . . . . . . . . . . . . . . . . . . 30

Wilshire storage tank . . . . . . . . . . . . . . . . . . . . 31

The Oil Companies' Dividends To Stockholders . . . . . . . . . 31

Accelerated Amortization Of Av Gas Facilities And The Renegotiation Acts . . . . . . . . . . . . . . . . . . . . 32

Aviation Gasoline Production Compared To Total Sales . . . . 40

Proposed Pre-War Legislation To Outlaw Acid Sludge Dumping . 40

The Oil Companies' Lawsuits Against Their Insurers . . . . . 42

Government-Owned And Privately-Owned Av Gas Facilities . . . 43

Av Gas Contracts Between Refiners And The Government . . . . 48

The Planned Blending Program . . . . . . . . . . . . . . . . 55

Claims Under The Aviation Gasoline Reimbursement Plan . . . . 56

Tank Cars . . . . . . . . . . . . . . . . . . . . . . . . . 57

Motor Gasoline Production . . . . . . . . . . . . . . . . . . 57

Prologue

The Oil Company Defendants and the United States hereby submit this supplement to the joint statements of facts previously submitted on June 23, 1995 and July 25, 1995. It is hereby stipulated, by and between the Oil Company Defendants and the United States and its related agencies, through their undersigned counsel, that the following facts are true for purposes of this litigation.

To assist the parties in tracing the source of specific stipulations, those stipulations originally offered by the United States are followed with the notation "[us__]" where "__" is the original number. Similarly, those originating with the Counterclaim plaintiff Oil Companies are identified as "[cc__]."

The parties do not agree that all of the stipulations below are relevant to the allocation trial. Where a party maintains a relevance objection, the stipulation in question is annotated with the comment "[relevance]."

The Texas Company referenced in the stipulations below is a predecessor in interest of Defendant Texaco, Inc.

Amounts Of Waste Disposed Of At The McColl Site By Each Oil Company

432. According to the July 11, 1957 minutes of the Refiners' Committee on Waste Disposal, the Oil Companies sent the following quantities of acid waste to the McColl Site during its years of operations:

| | Barrels |
|---|---|
| Shell: | 200,000 |
| Richfield: | 60,000 |
| Union: | 60,000 |
| Texas: | 5,000 |
| Tidewater: | 1,000 |

On a percentage basis, the relative contributions of the Oil Companies would be as follows:

| | % of total |
|---|---|
| Shell: | 61.3% |
| Richfield: | 18.4% |
| Union: | 18.4% |
| Texas: | 1.5% |

[us435.1]

433. According to the June 6, 1956 minutes of the Refiners Committee, the Oil Companies sent the following quantities of acid waste to the McColl Site during its years of operation:

| | Barrels | % of total |
|---|---|---|
| Shell: | 225,000 | 72% |
| Union: | 60,000 | 18% |
| several other companies | the balance | 10% |

[us435.2]

434. An internal Union Oil Company memorandum dated August 16, 1957, states that the original source of the waste "is reported to be divided roughly as follows: 75% Shell, 15% Union, 10% others." [us435.3]

The Oil Companies' Relationships With Eli McColl

435. In 1930 a committee was formed that became known as the Refiners' Committee on Waste Disposal. The Refiners' Committee's purpose was to determine the source of noxious odors emanating from the Defendants' operation and the operations of other local refiners. [us445]

436. In the late 1920s, a number of complaints were raised in Long Beach with respect to odors originating from large refineries in Watson, Hynes, and Wilmington, including the refineries of the Oil Company Defendants. By 1930, over $2.6 million had been spent by the refineries on odor control. At the request of the Long Beach city council, J.A. Campbell, a local natural gas engineer, formed a committee in 1930 to study the odor problem and make recommendations. The companies sending representatives to the committee included Richfield, Shell, Texas, Union, Associated, Macmillan, and U.S. Refining, a private company. Two other companies, Hancock and Edington-Witz, joined later. Eli McColl, a former Shell employee, was hired as an investigator for the committee and became its chairman when J.A. Campbell retired in 1933. A three month investigation undertaken by the committee in 1930 determined that the principal cause of

refinery odors was the handling of disposal of waste materials produced by the acid treating process. [us445.1]

437. From 1930 until 1933, Eli McColl served the Oil Company Defendants and the other Southern California refiners represented on the Refiners' Committee on Waste Disposal, as an investigator. In 1933, upon the retirement of J.A. Campbell, McColl served both as investigator and as chairman. Until he became chairman McColl was paid for his work by Mr. Campbell, rather than by the refinery members. However, as chairman, McColl was paid directly by the Oil Company Defendants and the other committee members. [us446]

438. The Campbell committee became known as the Refiner's Committee on Waste Disposal which met periodically and from which some records have been found. In early 1932, a memorandum describes a tour taken by the committee to a number of refineries and concludes that many of the odor problems are related to tar burners, acid sludge, acid treaters, and in one instance, an acid concentrator. Minutes of the Committee during late 1932 indicate that the committee was involved in responding to odor complaints and attempts by Mr. McColl to trace odors back to their sources. If involving a refiner member of the committee, attempts were made to solve the odor problem. [us446.1]

439. As an agent for the Refiners' Committee, McColl was "actively engaged" in tracing the Defendants' refinery odors. McColl also "represent[ed] the major oil companies" in discussions with the City of Long Beach over odors. [us447]

440. Eli McColl's work on behalf of the Refiners' Committee was not limited to odor control. McColl also spent time representing the Oil Companies in an investigation into local flooding. In 1937 and 1938, Eli McColl represented the Oil Company Defendants in dealing with flooding a slough then known as "Nigger Slough," now known as the Dominguez Channel, which is adjacent to some of the Oil Companies' refineries as well as many other businesses, and extends to Inglewood and El Segundo, covering an area of 51 square miles. McColl responded to complaints that effluent from the refineries was causing odors or damage adjacent to Dominguez Channel. One memorandum issued by Shell on this subject, dated March 2, 1937, noted that according to citizens attending a public meeting, effluent from Shell's refinery was carrying silt which was gradually filling up the channel. "The fact that the Union Oil Company was placing a concrete dam at the channel was mentioned" as well. [us447.1]

441. In 1944, McColl attended a meeting which examined water acidity at a local shipping dock. McColl attended this meeting with Union Oil, the Coast Guard and Western Pipe & Steel, a shipbuilding company. The meeting concerned corrosion of ship hulls, allegedly caused by an acid spill and acidic waste water from Union Oil. Minutes of the meeting note that McColl attended as a "Petroleum Industry Referee." [us448]

442. McColl was employed by the Refiners' Committee until at least 1957. [us448.1]

Shell's Disposal Contracts With Gray Trucking

443. On February 27, 1933, Shell contracted for one year with the Ralph Gray Trucking Company to remove surplus acid sludge from Shell's Wilmington Refinery. In 1934, the agreement was expanded to include removal of acid sludge from Shell's Dominguez refinery (which was connected to the Wilmington refinery), and to transport high-grade sludge between the Dominguez and Wilmington refineries. [us457]

444. Shell's contract with Gray Trucking specified that "[u]pon the loading of [acid sludge] into the Trucking Company's trucks, the Trucking Company shall thenceforth be wholly responsible for such substances . . . ." [us458]

445. Shell required that Gray Trucking remove Shell's acid sludge at Gray Trucking's "sole cost, risk, liability and expense." All the contracts between Shell and Gray Trucking that have been found contain this clause. [us459]

446. Shell also required that Gray Trucking maintain "[p]ublic liability and property damage insurance" that fully insured Shell against any liability on account of damage, injury, death or nuisance to persons and/or to property occurring in the course of or in anywise arising out of . . . the collection, removal, transportation and/or disposition of the aforesaid substances." [us460]

447. An internal Shell memorandum dated December 13, 1932, recommends a contract with Gray Trucking with the following explanation:

"Our investigation has shown that, while it would not be profitable for us to arrange for the disposal of our Dominguez sludge in this manner, it would be cheaper to get rid of our Wilmington sludge this way than by our present methods of operation, at any rate while the quantities so to be disposed of remain small. We have discussed with Mr. Gray his plans for the disposal of the material and see no reason why his methods should not be satisfactory."

[us461]

448. Shell's internal memoranda indicate that the Gray Trucking contract was renewed through 1936. The Shell Operating Reports for 1939 and 1940, indicate that Grey Trucking continued to dispose of Shell's acid waste in those years. No records are available indicating the relationship in 1937 and 1938.

[us460.1]

Shell's 1941 Oil And Gas Leases At The Emery Ranch, Including Part Of The McColl Site

449. The McColl Site is a site which totals approximately 47 acres in Fullerton, California. The parties stipulate that this site is divided into two parcels, one of which totals approximately 8.31 acres, known as the Ramparts area, and the other of which totals approximately 39.332 acres, known as Los Coyotes. Six of the 12 sumps found at the McColl Site were situated on the Ramparts area, and six were situated on the Los Coyotes area. The parties agree that for purposes of allocation, the Ramparts area may be identified as "Parcel I," and the Los Coyotes area may be identified as "Parcel II." [us444]

450. Prior to World War II, the land upon which the McColl Site now sits was part of a large tract of land known as the "Emery Ranch," which was historically used for farming and whose owner was one Katherine S. Emery. [us470]

451. The Emery Ranch is situated immediately south of, and in close proximity to, an oil field known as the West Coyote Oil Field. The Standard Oil Company of California first discovered the West Coyote Oil Field as a source for oil production in April 1909. Standard Oil Company of California drilled the West Coyote Oil Field productively for decades thereafter. [us483]

452. Katherine S. Emery owned the Emery Ranch (including Parcel I and II of the McColl Site) and had two children known to the parties in this case, Charles Goodwin Emery and Helen F. Grant. [us471]

453. Upon the death of Katherine S. Emery, the Emery Ranch was divided in probate, with Helen Grant obtaining an eastern tract totaling 231.069 acres and Charles Goodwin Emery obtaining an adjoining tract to the west, also 231.069 acres. The westernmost tract, totaling approximately 693.20 acres, was placed in trust, with Charles Goodwin Emery as Trustee. The eastern tract transferred to Helen Grant included Parcel I of the McColl Site. The adjoining tract to the west included Parcel II of the McColl Site. The westernmost tract (693.20 acres) is not part of the McColl Site. [us472]

454. On July 1, 1941, Shell entered into an oil and gas lease with Charles Goodwin Emery, covering 160 acres which included Parcel II, to enable Shell to drill for oil, gas and other

hydrocarbons. The parties agree that this parcel may be known as the "Charles Emery property." On the same date, Shell entered into an oil and gas lease with Charles Goodwin Emery, as trustee, covering 480 acres to enable Shell to drill for oil, gas, and other hydrocarbons. The parties agree that this parcel may be known as the "Charles Emery Trust property." [us473]

455. Under its leases for both the Charles Emery Trust property and the Charles Emery property, Shell was given the lease "for the purposes and with the exclusive right of prospecting for and of drilling for oil, other hydrocarbons, gas and all associated substances, and producing, taking and removing such substances . . . ." This included the right to use the land, including the "surface and subsurface of the leased land in any manner to aid in the survey, prospecting and exploration for, discovery therein, drilling for, production from, or storing, processing, removing, and/or transporting of any of said substances and/or products thereof; together with the right to drill thereon for water and the free use of water so obtained in operations on the leased land." [us474]

456. The 160 acres of the Shell oil and gas lease on the Charles Emery property includes the totality of Parcel II (Los Coyotes) and is adjacent to Parcel I which is covered by Eli McColl's agreement in July 1, 1943 with Helen Grant. [us476]

457. Under Shell's lease of the Charles Emery Trust property, Shell was able to maintain its right to the land for up to 20 years, even if Shell did not begin drilling operations within one year, as long as Shell paid $1.00 per acre per month to Charles

Goodwin Emery, as trustee, but subject to termination "ipso facto" if Shell did not "commence operations for the drilling of a well" on one of the two leases within two years. [us477]

458. Under Shell's lease of the Charles Emery property, Shell was also able to maintain its right to the land for up to 20 years, even if Shell did not begin drilling operations within one year, as long as Shell paid $1.00 per acre per month to Charles Goodwin Emery, as owner, but subject to termination "ipso facto" if Shell did not "commence operations for the drilling of a well" on one of the two leases within two years. [us478]

459. Under its lease for both the Charles Emery Trust property and the Charles Emery property, if Shell, within two years, began drilling operations on the land covered by either lease, Shell could "suspend or resume such operations at will, except operations for the drilling of an offset well on the leased land . . . ." [us479]

460. Under its lease for both the Charles Emery Trust property and the Charles Emery property, Shell could suspend or delay performance of its obligations at any time if Shell was "hindered in or prevented from performance by act of God, accident, strike, lockout, operation of law, or any cause, whether similar or dissimilar, beyond the reasonable control of Lessee." [us480]

461. Shell's leases at both the Charles Emery Trust property and the Charles Emery property specified that the lease would terminate at the end of two years, unless Shell began drilling operations for a well on either property. In the event of termination, Shell was required "within reasonable time

thereafter," to "fill all sump holes, ditches and other excavations . . . ." [us481]

462. In a document entitled "Surrender of Oil and Gas Lease," Shell surrendered its interests under its leases for both the Charles Emery Trust property and the Charles Emery property on January 29, 1943. Shell did not drill wells on either lease prior to surrender of the leases. [us482]

Charles Emery's 1942 Lease

463. On December 15, 1942, Charles Emery, as trustee, leased the land covered by the Emery Trust Lease to himself for a period of three years. The lease noted that this property, together with the adjacent property owned by Charles Emery, were operated as a single farm, that the trust property was being operated at a loss and was without funds to continue such operation. The lessee, Charles Emery, agreed to farm the land. The lease noted that the land was subject to oil and gas leases whose proceeds were reserved to the Trust. It noted that the land was subject to other farm leases that were assigned to Charles Emory. [us485]

464. The terms of Charles Goodwin Emery's lease on the Trust land gave him the right to use the property "for agricultural, horticultural and general ranching purposes with the right to excavate gravel, permit dumping, or disposal of sludge and make other uses similar to the uses to which said property is now put." This lease did not include either Parcel I or Parcel II. [us486]

Eli McColl's Lease Of The Charles Emery Property

465. A legal notice, signed by Charles Emery on July 7, 1942, indicates that Mr. Emery became aware of Eli McColl's commencement of work associated with acid sludge dumping in sludge pits on Parcel II as early as June 27, 1942. In the legal notice, identified as a "notice of non-responsibility," Charles Emery stated that he had become aware, within the prior 10 days, of "improvements" on his property, including "the construction of sump holes . . . ." Eli McColl is identified as the lessee of the property involved. The parties have not yet found McColl's lease. [us 484.1]

466. Prior to Eli McColl's agreement with Helen Grant on July 1, 1943, Eli McColl dumped acid sludge in sludge pits on the Charles Emery property and on which Shell had an oil and gas lease. These sludge pits constitute Parcel II (Los Coyotes) at the McColl Site. [us484]

Eli McColl's Agreement With Helen Grant

467. On July 1, 1943, Helen Grant and Eli McColl entered into an "Agreement for the Purchase of Real Estate," under which McColl agreed to buy 6.61 of the 231.06 acres of the former Emery Ranch owned outright by Helen Grant. Today, these 6.61 acres comprise part of Parcel I (Ramparts) of the McColl Site. [us463]

468. Under Helen Grant's agreement with Eli McColl, McColl agreed to hold Helen Grant harmless from any and all claims by others arising out of McColl's use of the McColl Site. McColl also agreed to purchase insurance to protect Helen Grant from claims

associated with McColl's acid sludge dumping at the McColl Site. [us462]

469. In his July 1, 1943 agreement with Helen Grant for the purchase of the McColl Site, Eli McColl and Helen Grant agreed that Helen Grant "expressly reserve[d] and except[ed]" from the agreement, "all oil, petroleum, gas, coal, and other hydrocarbon substances contained in" the property, "except those deposited by the BUYER," i.e., McColl. [us464]

470. In his July 1, 1943 agreement with Helen Grant for the purchase of the McColl Site, Eli McColl agreed to "construct without delay and in a workmanlike manner, a forty (40) foot oiled roadway connecting the roadway serving the sludge pits on the Charles Emery property with the easement (a) above reserved" and referred to in stipulation 471. [us465]

471. In his July 1, 1943 agreement with Helen Grant for the purchase of the McColl Site, Eli McColl and Helen Grant agreed that Helen Grant retained an easement for "road, travel and public utility purposes" over the roadway built by McColl, connecting "sludge pits" on the Charles Emery property with the easement. [us466]

472. On November 25, 1946, Helen Grant conveyed to Eli McColl, via grant deed, the 6.61 acres of the McColl Site which was covered by their July 1, 1943 agreement. [us467]

473. On September 19, 1949, Eli McColl and his wife, Edna McColl, conveyed back to Helen Grant the same 6.61 acres of the McColl Site which was covered by their July 1, 1943 agreement. [us468]

474. On October 10, 1949, Helen Grant reconveyed to Eli McColl the same 6.61 acres of the McColl Site covered by their July 1, 1943 agreement. At the same time, Helen Grant conveyed to Eli McColl two additional and adjoining parcels, totaling .31 acres and 1.39 acres, respectively. These acres comprise the remaining portion of the Parcel I (Ramparts) of the McColl Site. [us469]

Shell's Disposal Contracts With Eli McColl

475. As disclosed in a memorandum from Shell's Legal Department, on June 23, 1942, Shell entered into its first contract with Eli S. McColl to dispose of acid sludge from the Dominguez portion of its Wilmington refinery. Under their agreement, Mr. McColl committed to collect, remove and dispose of "surplus acid sludge, alkylate acid and P.D. acid sludge and other waste materials [from Dominguez] as [Shell] shall from time to time designate." Under this first contract, which covered the period from June 23, 1942 through June 30, 1943, Shell agreed to pay Mr. McColl 50 cents for each barrel of "waste material" collected and removed. [us449]

476. In Shell's 1942 contract with Mr. McColl, Shell "agree[d] that it [would] designate to [Mr. McColl] for collection and removal . . . not less than 50,000 barrels of waste material" by June 30, 1943. Shell further agreed to designate this amount for removal "in fairly equal quantities" during the contract term. [us450]

477. Shell's first agreement with Eli McColl guaranteed Eli McColl the same minimum quantity of waste materials (50,000

barrels) that were necessary to keep the McColl Site open under Mr. McColl's agreement with Helen Grant. [us451]

478. Shell renewed its contract with Eli McColl in 1943, 1944 and 1945. All of the Shell-McColl contracts contain identical provisions transferring title for Shell's wastes to Mr. McColl "[u]pon the loading of such materials" into trucks contracted by McColl. All of the contracts also contain identical clauses under which, upon transfer of title to Shell's waste materials, Eli McColl became "wholly responsible for [Shell's] waste materials and for their immediate removal from Shell's premises and disposition elsewhere." Eli McColl also agreed to remove Shell's wastes "at [his] sole risk, cost, liability and expense" in all of his contracts with Shell. [us452]

479. In all of its contracts with McColl, Shell required that McColl maintain public liability and property damage insurance against damage to property, injury, death, or nuisance "in anywise arising out of any acts and/or omissions of [Eli McColl, his] employees, agents or representatives in the collection, removal, transportation and/or disposition of the aforesaid waste materials." The contract required property damage insurance in the amount of $10,000 and damage to persons insurance in the amount of $50,000 and $100,000 aggregate. [us453]

480. None of the Shell-McColl contracts mention the United States Government and there is no evidence that the United States was aware of the contracts or their terms. [us454]

481. Eli McColl and Shell terminated their contract effective June 30, 1946. [us455]

482. No contracts have been found between Eli McColl and the other oil company defendants. [us456]

Eli McColl's Unsuccessful Application For A Sludge Disposal Permit In Los Angeles County

483. On April 24, 1942, Eli McColl applied for a permit to operate a dump for refinery acid sludge in Los Angeles County near La Brea Canyon Road. McColl's application was denied by the Los Angeles County Board of Supervisors on June 16, 1942. [us487]

484. At the public hearing on McColl's application to permit an acid sludge dump site in Los Angeles County, McColl stated that the acid sludge to be dumped "is not new in any sense of the word," and that the process of treating petroleum with sulfuric acid went back "as long as we have had this industry." [us488]

485. Eli McColl further stated at the hearing that sulfuric acid was used in the refineries first to make alkylate for aviation gasoline, after which the spent alkylation acid was then used to treat gasoline, kerosene, and petroleum. McColl indicated to the county Fire Prevention Engineer that the acid sludge to be dumped contained between 40% to 50% sulfuric acid. [us489]

486. Eli McColl stated at the public hearing on his dumping permit application in Los Angeles County that, to protect the surrounding property owners from any possible damage or claims, he had applied for a $50,000 insurance policy from Lloyd's of London to cover "everything without a single exception regardless of what it might be." [us492]

487. During his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl represented that "the government [would] not allow [him, or the companies he represented] to use tank cars" to ship acid to northern California for use as fertilizer. McColl provided no further details or illustrations to the Commission in support of this contention. [cc151]

488. In his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl described the refinery process resulting in acid sludge as follows:

> "The sulfuric acid, the product which we start with, serves a dual purpose. It is used in concentrated form in the production of a product called alkalate which is essential in the production of aviation gasoline. We have it in concentrated form, and use it for this first of all. After serving its purpose in that respect, we then use it as a treating agent in the manufacture of kerosene and petroleum. It has the ability to absorb the pitch, tar and gum out of the gasoline. After it has absorbed all of this, it is then known as acid sludge. It is then a waste product and there is a question of disposing of it."

[cc152]

489. In his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl stated that he represented "seven oil companies in the Wilmington area. As far back as 1930, we

endeavored to recover the acid content from the acid sludge. That resulted in difficulty with the surrounding communities as a nuisance." McColl further stated that acid reprocessing, involving the separation of tar from acid and the elimination of fumes and moisture was a "practical and economic method in which companies could justify their advancement and operate it at a profit." However, McColl stated that the process had been "abandoned" by the companies he represented. Instead, he stated, the companies had turned to alternatives such as burning, which "our company" had"partially abandoned" due to odors." "[A]s a last resort, more or less," his companies then contracted with private industries to haul this away at a price, and disposing of it by dumping."

[cc152]

490. In his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl described the companies' history of trying to handle acid sludge in the Los Angeles Basin:

> "I represent seven oil companies in the Wilmington area. As far back as 1930, we endeavored to recover the acid content from the acid sludge. That resulted in difficulty with the surrounding communities as a nuisance. We must heat it up to separate the tar from the acid, drive off the fumes, and exhaust the moisture. We can then build it up and use it all over again. That is a practical and economic method in which companies could justify their advancement and operate it at a profit. The entire recovery of sludge has been

abandoned. We have abandoned over one and a half million dollars in equipment. None of our companies are attempting to recover it. Then we turned to what looked like a more satisfactory manner, by burning it in a specially designed sludge disposal furnace. That also required special equipment. It required special equipment to maintain a temperature of approximately 2000 degrees in order to have combustion, and that was partially abandoned by our company because it produced an odor. We then as a last resort, more or less, contracted with private industries to haul this away at a price, and disposing of it by dumping. I believe there isn't a single rubbish dump in that southern part of our county that hasn't at some time or other had this product disposed of there. That also resulted in a nuisance." [cc153]

491. In his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl contended that he was cooperating with local agencies to find a safe site. Specifically McColl claimed that:

"At the suggestion of the County Health Department, the inspector of our district, and the Commissioner of Fish and Game, we were requested to seek a satisfactory place to dispose of this, to take it farther back from civilization, and under proper supervision by ourselves, we would handle it and handle it right. We must meet the requirements of the Health Department, the Fish and Game Warden and the Fire

Department. We are well isolated, it must be accessible and it must be available."

McColl added that "we [i.e., he and the refiners he represented] knew that something like this would have to be done. That is why my committee instructed me to make a study to find something satisfactory to all the parties concerned."
[cc154]

McColl Site Disposal

492. Eli McColl's permit from the City of Fullerton to dump acid sludge at the McColl Site was granted on June 8, 1942. [us493]

Production Of Waste Disposed At The McColl Site

493. Each of the Oil Company Crossclaimants entered into contracts to produce avgas and to sell it to the United States. The parties contemplated that the Oil Companies would expand their refining facilities. These expanded facilities included additional alkylation units which used substantial amounts of 98% sulfuric acid as a catalyst to produce alkylate, a major component of avgas. When sulfuric acid reached a concentration in the neighborhood of 87-90% in the alkylation unit, it no longer served its catalytic function and was replaced. Portions of this "spent alkylation acid" were used in acid treating units in the refinery. The result was the production of acid sludge, a byproduct that was, among other disposal methods, dumped at the McColl Site as found by this Court. Some spent alkylation acid was also dumped at the McColl Site between late 1944 and early 1945 when Stauffer's new acid reprocessing plant at Dominguez experienced problems. [ccl]

494. The alkylation process itself did not generate acid sludge. Rather, it generated spent alkylation acid of approximately 87-90% strength. [us437]

495. Acid sludge was generated in acid treating units. [us438]

496. Most of the acid waste at the McColl Site began as fresh sulfuric acid of approximately 98% strength that was used in the alkylation units to produce alkylate for aviation gasoline. The "spent alkylation acid" that resulted from the alkylation process was of approximately 87-90% strength. Much of the spent alkylation acid generated at the Oil Companies' facilities was reprocessed at plants built by Stauffer Chemical Company and General Chemical Company. Some of the spent alkylation acid was used within the defendants' refineries to treat other petroleum fractions, including motor gasoline (both civilian and military), kerosene and other products. Many of these other petroleum fractions were not used in aviation gasoline. The acid sludge that resulted from acid treating these other petroleum fractions was between 35% and 65% strength. [us432]

497. As described in Stipulation 496, most of the acid waste dumped at the McColl Site was used in the Oil Company Defendants' refineries for both aviation gasoline production and the production of other products. Thus, any given barrel of waste dumped at the McColl Site likely contained contamination from both aviation gasoline production and production of other products. [us433]

498. The best currently available evidence indicates that approximately 9% of Shell's acid waste at the McColl Site was generated in the acid treatment of benzol by Shell. [us435]

Acid Disposal Practices Of The Oil Companies

499. The Oil Companies' Wilmington refineries each used sulfuric acid treating units long before the war. There is no evidence that, during the war, the federal government required the Oil Companies to alter how their acid treating units were used. [us439]

500. In the 1930s and early 1940s, the Oil Companies' decisions to reprocess, burn, dump, or otherwise dispose of their acid sludge were based in part on economic considerations. [us513]

501. During the early part of World War II, some of Union's acid sludge from its Wilmington refinery was reprocessed by General Chemical Company. [us499]

502. In the early 1930s Shell often destroyed acid sludge in special sludge burners. [us500]

503. One Shell memorandum noted in 1939:

> "At Dominguez this [burning] is now being done at considerable expense, but what is perhaps more important -- it is creating a menace through the discharge of large amounts of sulfur dioxide."

[us500.1]

504. In late 1941 and early 1942, Shell considered using General Chemical's process for reprocessing alkylation acid and high acid sludges. Issues were raised as to whether or not Shell had

sufficient hydrogen sulfide to support the process. Shell did not go forward with the General Chemical process. [us503]

505. Shell bought fresh acid from Stauffer and returned spent alkylation acid to Stauffer. Shell's evaluation of its spent acid disposal options is set forth in a memo dated April 28, 1942. The memo begins: "With the beginning of catalytic cracking, usage of alkylation acid will increase and the volume of surplus spent alkylation acid will be so great that dumping will be extremely difficult. Some form of regeneration for alkylation acid is therefore indicated." The memo analyzes two different reprocessing options, and recommends that arrangements be made for Stauffer to reprocess Shell's spent alkylation acid using Stauffer's decomposition technology. The memo makes a comparison between the two different reprocessing options and buying fresh acid and dumping the spent alkylation acid. The two reprocessing options cost one third less. [us504]

506. Shell examined spent acid and acid sludge disposal options with various chemical companies throughout the war. [us505]

507. Unlike Shell, however, Richfield was still burning acid sludge at its Wilmington refinery in 1943. [us507]

508. At the start of the war, the Texas Company Los Angeles refinery burned all of its acid sludge. [cc74]

509. Texas Company (now Texaco) was burning acid sludge in 1943 at its Wilmington refinery. [us508]

510. As Texas Company brought its catalytic cracker on line, on December 30, 1944, Texas informed the PAW that "treating for [the] week [is] low due to difficulties with sludge acid

disposal" and the following week referred again to "continued sludge difficulties." [cc78]

511. When Texas put in the catalytic cracker, it increased the amount of acid sludge it had to handle. Until the expansion, all the acid sludge produced could be handled by burning. However, the expansion, besides increasing the amount of sludge also produced hydrogen sulfide from the catalytic cracker. Since this was lethal, it got priority in burning in the boiler. Although there was some boiler capacity increase, increased burning of sludge was limited by the amount of fumes the refinery could put out with its impact on the community and the Pacific Coast Highway that went through the middle of the refinery. [cc77]

512. Standard Oil Company's El Segundo refinery in Southern California re-used or reprocessed all of its spent alkylation acid and acid sludge, either within the refinery, or at General Chemical Company. [us514]

513. On April 24, 1944, R. G. Follis, Chairman of the District #5 Aviation Gasoline Subcommittee, wrote Cragin on the efficiency of the refineries in using and reusing sulfuric acid in the District. He stated that the District V refineries (including the Oil Company Defendants' refineries at issue herein) used 1213 tons of acid a day, of which 709 tons was new acid, 592 tons of which was used for alkylation and 117 tons for other uses. The letter notes that spent alkylation acid was used wherever possible for treating other products. Of the 1213 tons, an additional 342 tons is sold to other industries after use. The chart attached indicates that with respect to the defendants'

acid sludge (as opposed to spent alkylation acid), Shell buried 5 tons of acid sludge a day and delivered 33 tons per day to Shell Chemical. Richfield burned 39 tons per day, Texas burned 21 tons per day, and Union sent 37 tons per day to Shell Chemical and 2 tons per day to its acid company. [cc63]

Trends in Acid Sludge Utilization and Disposal

514. Decades before World War II, petroleum refiners in the United States, including the Oil Company Defendants, faced a problem regarding the utilization and/or disposal of acid sludge resulting from the treatment of petroleum with sulfuric acid. [us509]

515. Sulfuric acid was used in the 1850s to treat coal oil. By the 1930s, about 25% of the output of the sulfuric acid industry was used in the refining of petroleum products. [us510]

516. During World War II, whether disposal of acid byproducts to land was acceptable under the standards applicable at the time depended upon the conditions of the site used. Factors to be considered were odors, risk of fires, or threats to groundwater or water courses. [cc2]

517. With the passage of RCRA in 1976, the disposal method employed at McColl would have been illegal under federal law if used thereafter. Appropriate disposal to land would have resulted in a substantially increased cost of disposal. Disposal at the McColl Site was illegal under municipal law after expiration of the City of Fullerton permit on September 6, 1946. [cc3] [relevance]

518. On August 19, 1943, Albert Elder, Head Chemical Advisor of the WPB wrote Bruce Brown, Assistant Deputy Petroleum Administrator that he heard at a conference that the petroleum industry could recover 500,000 tons of sulfuric acid "from the petroleum industry, from alkalation [sic] processes, etc." Elder asked for information on acid recovery processes. Elder also noted reports that "Shell has a process [for reprocessing] that is not being used." On August 24, 1943, Brown responded that the issue would be passed down to the Refining division. Brown also confirmed that acid recovery was a process known for many years and that Standard of Indiana operated such a process at its Whiting refinery. Brown also noted that Atlantic Refining Company and Shell operated such a procedure. The process involved was sponsored by Cyanamid, involving the "controlled burning of heavy acid sludge and a recovery of the sulfur dioxide vapors thus produced by routing them through the existing sulfuric acid plant at Whiting." Brown expressed "doubt that any considerable volume of sulfuric acid can be recovered from the petroleum industry." Brown added that "our people will be very happy to work with you to whatever extent seems desirable." The parties agree that Shell did not operate this process at its Dominguez refinery at Wilmington. [cc60]

519. On September 4, 1943, Robert Cragin, Assistant Director of Refining for the PAW, responded to Elder. He states:

> "[W]e would like to point out that although a large proportion of the total sulfuric acid used in the refining industry will, in the ultimate program, be used in

connection with alkylation plants, the spent acid from these alkylation plants, in a great number of instances, will be reconcentrated and re-used in the operation. Certain refiners will have available the equipment required to accomplish this, while others will ship spent alkylation acid to acid producers for re-concentration. The spent alkylation acid not so re-concentrated is in practically every instance used in other refining operations, as discussed below, where it in effect replaces fresh acid otherwise required. With such a procedure it can be seen that the possibilities of recovering additional acid from spent alkylation acid itself are very small."

The letter goes on to explain about the reuse of spent acid within the refinery:

"In certain cases the spent alkylation acid may be used for treating other refinery products such as burning oils. Fresh acid is also used for treating by some refiners. The sludge produced from such a treating operation usually represents a disposal problem, and for this and other reasons a few refiners have installed processes to thermally decompose the acid sludge, recovering the sulfur dioxide for subsequent conversion into sulfuric acid. The great majority of refiners, however, do not have such equipment available and thus are forced to either burn, neutralize, or dump the sludge. It is estimated that in 1942 a total of approximately 350,000 tons (expressed as 100% acid) was either burned, neutralized or dumped by the refining