industry. This sulfuric acid could only be recovered through the installation of sludge decomposition and acid manufacturing plants, and of course such a process would have to be compared with alternate methods of obtaining fresh sulfuric acid, if new facilities for producing fresh sulfuric acid are indicated." [cc61]

520. On November 3, 1943, Cragin of the PAW wrote to Walter G. Whitman, Assistant Director of the Chemical Division of the PAW on ways to increase the availability of sulfuric acid. He noted that the PAW was working with the oil industry to substitute spent alkylation acid for fresh acid in as many refinery processes as possible. He then sought help from the WPB on finding ways to substitute spent acid or acid sludge for fresh acid in use in industries outside the oil industry, stating:

"We understand that at present a considerable amount of fresh acid is being used by industries other than oil companies. We have no detailed information on what uses are involved here, but we would like to point out that spent alkylation acid has been used in a number of cases where fresh acid was formerly required and we believe this possibility should be investigated. In addition to the spent alkylation acid, which may have an acidity of 85 to 90%, considerable quantities of acid sludge, having an acidity of 40 to 50% are also produced by the oil companies. We would be glad to cooperate with you in supplying you with any information which you may require on the properties of such spent alkylation acid and said sludges, or to arrange

for the shipment of samples for evaluation, to aid you in determining how these materials can be used to replace fresh acid in other industries on the West Coast."

[cc62]

521. Progress in the production of cracked distillates (beginning in the 1920s) required increased use of sulfuric acid and acids of greater strength. In turn, cracking created more acid sludge which in composition was more difficult to separate. In some cases, the sludges could not be separated at all. The need for stronger treating acid and greater quantities of acids meant that existing concentrating processes were inadequate to meet the demand. Although the concentration processes had greatly improved since the late 1920s, they sometimes failed to produce the higher strengths of acid required from the available acid sludge. This led to the testing of new separation and concentration methods, but also required rethinking of prevailing disposal options, depending on available technology, refinery location, and cost factors. By the late 1930s, the accepted best technology for reprocessing sludge involved separation into weak acid and hydrocarbons, with subsequent reconcentration of the weak acid to a strength suitable for reuse. At the onset of World War II, basic methods for dealing with acid sludge did not vary substantially from pre-war practices. However, industry was experimenting with a variety of techniques for sludge disposition. Common industry practices ranged from the use of fresh acid sludge for pretreating or even treating some petroleum products, to burning, to the discharge of acid sludge into sumps

or ponds. In all cases, efforts to deal with acid sludge were guided by a desire to utilize low-cost reuse or disposal methods. [cc79]

522. As the industry approached World War II, the technology for reprocessing waste acid were not consistently able to produce the necessary acid concentrations required by the new refinery processes. [cc80]

523. The reprocessing of sludge created more difficult problems than reprocessing spent alkylation acid because sludge reprocessing required separation into constituent parts and produced weak acid that was difficult to reprocess to a level of utility. [cc81]

Stauffer plant problems

524. The operational problems at Stauffer's new Dominguez plant, which occurred in late 1944 and early 1945, resulted from either technical problems or intra-company disagreements, but were not caused by government denials of any priorities or approvals. A March 8, 1945, Shell Development Company memorandum states:

> "Mr. Ross [of Stauffer] is entirely satisfied with the Dominguez unit taking into account the fact that it was designed before the Torrance pilot plant was erected, and there was little or no opportunity to incorporate pilot plant developments in the construction at Dominguez. He estimates the capacity of the present plant to be 170 tons per day, and following installation of alloy decomposer shells expects to exceed 200 tons of $H_2SO_4$ per day. They are also planning to try cast iron decomposer shells."

[us494]

525. Stauffer's repaired Dominguez No. 2 plant began operations on July 17, 1945. [us495]

Wilshire storage tank

526. On April 6, 1943, Shell and Wilshire Oil Company agreed that Shell would deliver at least 1,600 tons of spent alkylation acid to Wilshire beginning on April 4, 1945. Delivery was at Shell's Dominguez refinery in tank trucks or railroad cars supplied by Wilshire, and title to the spent acid passed to Wilshire upon delivery. [us516]

527. Shell's agreement with the Wilshire Oil Company was between Shell and Wilshire alone; the Government was not a party to this agreement. [us517]

The Oil Companies' Dividends To Stockholders

528. Between 1942 and 1946, Shell paid dividends to its shareholders as follows: $1.00 per share (1942); $1.25 per share (1943); $1.50 per share (1944); $1.50 per share (1945); and $1.50 per share (1946). [us519] [relevance]

529. Between 1942 and 1946, Union paid constant dividends to its shareholders in the amount of $1.00 per share. [us520] [relevance]

530. Between 1942 and 1946, the Texas Company paid constant dividends to its shareholders in the amount of $2.00 per share. [us521] [relevance]

531. Between 1942 and 1946, Richfield paid dividends to its shareholders as follows: $.50 per share (1942); $.50 per share

(1943) $.60 per share (1944); $.75 per share (1945); $.80 per share (1946). [us522] [relevance]

<u>Accelerated Amortization Of Av Gas Facilities And The Renegotiation Acts</u>

532. During World War II, so-called "certificates of necessity" were available to industries building or acquiring essential wartime facilities, to accelerate the period during which the costs of such facilities could be amortized for tax purposes. [us523]

533. Under section 124 of the Internal Revenue Code, companies constructing "emergency facilities" for war production could obtain certificates of necessity permitting them to amortize the cost of such facilities over a five year period. As originally defined, "emergency facilities" included any qualified facility, land, building, machinery, or equipment, the construction, reconstruction, erection or installation of which was completed after June 10, 1940 (later revised to January 1, 1940). [us524]

534. Issuance of a necessity certificate constituted a determination that the construction, reconstruction, erection, installation, or acquisition of a facility was necessary in the interest of national defense. [us525]

535. The effect of accelerated depreciation is to pass income into later years. [cc158]

536. Accelerating the amortization of wartime facility costs created an economic incentive to construct a facility. [us526]

537. On December 17, 1943, the WPB was charged with the responsibility for issuing necessity certificates for facilities,

applications for which were filed after October 5, 1943. The War Department and Navy Department held this responsibility previously. [us527]

538. The Certificates of Necessity allowed depreciation over five years or over the term of the war emergency, whichever was shorter, for that percentage of a facility which was covered by the certificate. When a Presidential Proclamation was issued on September 29, 1945, at the end of the war emergency, the companies had the option of taking whatever amortization was left on their books, even if less than five years had passed. This permitted the Oil Companies to write off at an accelerated pace, that percentage of their war facilities as was covered by a Certificate of Necessity and on which all accelerated depreciation had not yet been taken. Depending on applicable tax rates, this could constitute a substantial tax savings. Companies which operated, but did not own, aviation gasoline facilities were unable to take advantage of this instrument. [us549]

539. Companies which operated, but did not own, government facilities did not have to invest the capital to build facilities. [us549.1]

540. Certificates of necessity were officially to be used to reflect only that portion of a facility's usefulness having only wartime value. For example, a plant considered to have full post-war value would not receive a necessity certificate. By contrast, a plant deemed to have no post-war value would receive

a 100 percent certificate, i.e., the full value of the plant was eligible for accelerated amortization. [us528]

541. In a memorandum dated January 8, 1944, James Pew, the PAW's Director of the Natural Gas and Natural Gasoline Division, stated that the PAW's policy concerning recommending Certificates of Necessity "tightened" following the issuance of Executive Order 9406, effective December 17, 1943. Under the tighter policy, Pew stated, for "projects coming under the jurisdiction of this Division [i.e., the Natural Gas and Natural Gasoline Division], the PAW would not recommend Certificates of Necessity for plants which would be good business ventures under either peace or wartime conditions and which it felt would continue to operate economically after the end of the war. Pew stressed, however, that "favorable recommendation" would continue to be made "upon facilities directly related to the high octane program or to some other specific war product." [cc156]

542. In April 1945, the PAW recommended that Shell obtain a 100 percent necessity certificate for a preheating furnace at its catalytic cracking plant in Wilmington. The WPB approved the 100 percent recommendation on May 8, 1945. [us532]

543. After the entry of the United States into World War II, Congress enacted the Renegotiation Act of 1942, or "First Renegotiation Act," 56 Stat. 245. [us537]

544. The First Renegotiation Act was administered separately by War Adjustment Board for the following contracting agencies: War Department, Navy Department, Treasury Department, Maritime

Commission, War Shipping Administration, and the Reconstruction Finance Corporation and its subsidiaries. [us538]

545. The First Renegotiation Act required contractors or subcontractors of war contracts to renegotiate their contracts with the United States, and make repayments to the government, "[w]henever, in the opinion of the Secretary of a Department, the profits realized or likely to be realized . . . may be excessive. . . ." Exceptions were made for contracts for which final payment was made prior to the passage of the Act. [us540]

546. To improve uniform administration, the Congress rewrote the Renegotiation Act on February 25, 1944 ("Second Renegotiation Act"). The Second Renegotiation Act established a central War Contracts Price Adjustment Board, comprised of officials from contracting agencies. [us541]

547. The term "excessive profits" in the Renegotiation Act was distinguishable from "excess profits," the term used by the Treasury Department to describe that portion of a company's profits which were taxed at a higher than normal rate. [us542]

548. The PAW discussed the idea of renegotiating 100 octane contracts in April 1943. In a memorandum to other PAW officials, the PAW's Director of Refining, George Parkhurst, noted that renegotiation was appropriate to respond to refiners' production of "much larger volumes of 100 octane aviation gasoline than was contemplated in the cost data on which price negotiations were based." To the parties knowledge, no existing 100 octane gasoline contract with the Oil Company defendants were individually renegotiated. [us543]

549. The PAW's Director of Refining, George Parkhurst, stated in an April 20, 1943 memorandum that renegotiation of 100 octane contracts was necessary due to "increased volumes, improved processing techniques, changes in specifications and the constant addition of small but significant amounts of new facilities to the original projects." These factors led to a situation which "in most instances has gotten so far out of line with the factual basis on which the original prices were negotiated that those prices have become indefensible." [us544]

550. The actual practice of renegotiation was done before the RFC Price Adjustment Board which considered all renegotiable government business for a calendar year and renegotiated the profit across the board. Oil Companies set aside a portion of their incomes as a reserve for "post-war adjustments" and other contingencies. The companies then entered negotiations with the Price Adjustment Board, to determine what amount of profits were required to be repaid to the United States, if any. [us547]

551. Certificates of Necessity were also used as a basis for computing profits which would be subject to renegotiation under the Renegotiation Act. Specifically, the accelerated amortization by a certificate was included in the cost of sales for the purpose of calculating the renegotiable profits which were reported to the Renegotiation Board. [us548]

552. Data submitted to the United States Senate by the Price Adjustment Board after World War II reveals the quantity of profits by the Oil Company Defendants which were determined to be "excessive profits," and whether these "excessive profits" were

ultimately repaid to the United States Treasury. This data is as follows:

| RICHFIELD | Renegotiable Sales | Renegotiable Profits | Excessive Profits | Accelerated Amortization Offset |
|---|---|---|---|---|
| 1943 | $35,855,000 | $3,756,000 | $1,489,000 | 0 |
| 1944 | $41,826,000 | $6,129,000 | $3,778,000 | $3,778,000 |
| 1945 | $42,009,000 | $6,405,000 | $3,984,000 | $3,984000 |

| SHELL | Renegotiable Sales | Renegotiable Profits | Excessive Profits | Accelerated Amortization Offset |
|---|---|---|---|---|
| 1943 | $132,168,000 | $8,948,000 | $2,899,000 | $2,899,000 |
| 1944 | $180,894,000 | $13,898,000 | $5,855,000 | $5,855,000 |
| 1945 | $137,854,000 | $8,674,000 | $2,393,000 | $2,393,000 |

| TEXAS | Renegotiable Sales | Renegotiable Profits | Excessive Profits | Accelerated Amortization Offset |
|---|---|---|---|---|
| 1943 | $117,055,000 | $3,292,000 | $0 | None |
| 1944 | $174,327,000 | $6,572,000 | $0 | None |
| 1945 | $152,966,000 | $13,966,000 | $5,932,000 | $5,932,000 |

| UNION | Renegotiable Sales | Renegotiable Profits | Excessive Profits | Accelerated Amortization Offset |
|---|---|---|---|---|
| 1943 | $46,989,000 | $374,000 | $0 | None |

| | | | | |
|---|---|---|---|---|
| 1944 | $56,954,000 | ($2,312,000) | $0 | None |
| 1945 | $54,382,000 | $277,000 | $0 | None |

[us550]

553. In 1948, the Senate Special Committee Investigating the National Defense Program concluded that the 20 largest oil companies credited amortization in the amount of $59,000,000 against excessive profits determined to be $65,000,000, enabling them to keep all but $6,000,000 of the $65,000,000 in profits found to be excessive. [us555]

554. In the case of Richfield, renegotiable sales were based on the full range of its refinery products sold to the United States for the war, of which 100 octane aviation gasoline was only one. Richfield had three refineries in California, with the primary one at Watson having avgas facilities. Union had three refineries in California, with the primary one in Wilmington having avgas facilities. Texas had 22 refineries throughout the country, three of them with avgas facilities of which one was in Wilmington. Shell had seven refineries throughout the country, of which five had avgas facilities, one in Wilmington. These facilities included two catalytic crackers, of which one in Wilmington. [cc177]

555. In January 1940, none of the Oil Companies had catalytic cracking facilities operating on a commercial scale. By January 1945, however, Shell's catalytic cracker at Wilmington, alone, represented 3.67% of the nation's entire catalytic cracking capacity. The catalytic cracker at Richfield's Watson refinery, alone, represented 2.7% of the nation's total catalytic cracking capacity. The numbers for Union's and Texas' catalytic cracker

at Wilmington refinery were 2.7% and 1.69% of the nation's total, respectively. [us' supplemental stip 48]

556. The Oil Company Defendants were able to use the accelerated amortization permitted under their certificates of necessity to reduce their taxable income which could reduce any "excess profits tax" if applicable, a tax enacted through the Excess Profit Tax Act of 1940. This tax is distinct from the calculation and return of so-called "excessive profits" under the Renegotiation Acts. The interaction between excessive profits under the Renegotiation Acts which is repaid to the government and the excess profits tax or other income tax is as follows. If a company were to refund to the United States excessive profits, this would lower the company's taxable income by that amount. This would entitle the company to a tax refund at the tax rate applicable to that portion of the taxable income that is eliminated. As an example, if the marginal income in the amount of the excessive profits that were repaid to the United States under the Renegotiation act were subject to the excess profits tax at a rate of 95%, then the company would be entitled to a tax refund in the amount of 95% of the excessive profits repaid. This would be a net cost to the company of only 5% of the excessive profits repaid. A similar analysis would apply to what ever other income tax rate that was applicable. [us556]

557. The "excess profits" tax was levied at an effective rate of 81% for the years 1942 and 1943 (tax rate of 90% with a 10% post-war refund) and 85.5% for the years 1944 and 1945 (tax rate of 95% with a 10% post-war refund). [us557]

558. In 1944, Richfield sold 180,336,315 gallons of 100 octane aviation gasoline for a loss of $3,167,147 million or 1.8 cents per gallon. It recorded $5,123,848 of accelerated amortization to the cost of this gasoline, which if not applied would have resulted in a profit of 1.0 cents per gallon. [cc145]

Aviation Gasoline Production Compared To Total Sales

559. In 1945, Shell's Wilmington refinery had a crude oil capacity of 52,000 barrels per day (January 1945), and an aviation gasoline production capacity of 19,560 barrels per day (March 1945). [us571]

560. In 1945, Richfield's Watson refinery had a crude oil capacity of 70,000 barrels per day (January 1945), and an aviation gasoline production capacity of 16,750 barrels per day (March 1945). [us570]

561. In 1945, Texaco's Wilmington refinery had a crude oil capacity of 40,000 barrels per day (January 1945), and an aviation gasoline production capacity of 10,080 barrels per day (March 1945). [us572]

562. In 1945, Union's Wilmington refinery had a crude oil capacity of 60,000 barrels per day (January 1945), and an aviation gasoline production capacity of 11,030 barrels per day (March 1945). [us573]

Proposed Pre-War Legislation To Outlaw Acid Sludge Dumping

563. As of October 1921, the only federal laws regarding the dumping or disposal of acid sludge forbade the discarding of oil, oil sludge, or other oil refuge in New York Harbor, but did not forbid such discard elsewhere. [us580]

564. In 1921, Congress held hearings on a proposed law (H.R. 7369) which, if enacted, would have made it illegal to throw, discharge, or deposit "oil, fuel oil, oil sludge, or any other oil refuse . . . into any navigable waters of the United States, . . ." except as otherwise permitted. [us581]

565. In 1921, Congress held hearings on another proposed law (H.R. 8783) which, if enacted, would have amended the 1899 Rivers and Harbors Act by making it illegal to "throw, discharge, or deposit . . . any free acid or acid waste in any form . . . either directly or indirectly into any navigable water of the United States," except as otherwise permitted. [us582]

566. In 1924, Congress held hearings on another proposed law (H.R. 51) which, if enacted, would have prohibited any person from emptying, discharging, throwing, or depositing oil, or permitting the flowing of oil, including oil sludge, into the coastal navigable waters of the United States, except as otherwise permitted. [us583]

567. In 1924, Congress held hearings on another proposed law (H.R. 690) which, if enacted, would have amended the 1899 Rivers and Harbors Act by making it illegal to ". . . throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited from any source whatever, any free acid or acid waste in any form . . . either directly or indirectly into any navigable water of the United States , . . ." except as otherwise permitted. [us584]

568. In 1924, Congress held hearings on another proposed law (H.R. 6256) which, if enacted, would have made it illegal to

"discharge, flow, drain, or deposit oil," including "oil sludge," upon or into any coastal navigable water, either from or out of any "vessel, . . or any wharf, mill, mine, factory, or other establishment," except as otherwise permitted. [us585]

The Oil Companies' Lawsuits Against Their Insurers

569. Each of the Oil Company Defendants have sued their insurers, claiming that General Corporate Liability insurance policies held by each of the Oil Companies entitle each Oil Company to be reimbursed for response costs at the McColl Site and many other sites. [us586]

570. The 1973 pollution exclusion adopted for the standard form CGL policy provided:

> "This policy does not apply
>
> "(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of . . . toxic chemicals, liquids or gases, waste materials or other irritants or contaminants or pollutants into or upon the land, the atmosphere, or any water course or body of water, but this exclusion does not apply if such discharge dispersal, release or escape is sudden and accidental."

[cc137] [relevance]

571.The 1986 pollution exclusion to the standard form CGL policy provided:

> "This insurance does not apply to:
>
> "(f) (1) 'bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal or escape of pollutants:

"(a) At or from premises you own, rent or occupy;

"(b) At or from any site or location used by you or for you by others for the handling, storage, disposal, processing or treatment of waste;

* * *

"(2) Any loss, cost, or expense arising out of any governmental direction or request that you monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants."

[cc138] [relevance]

<u>Government-Owned And Privately-Owned Av Gas Facilities</u>

572. At a November 1945 hearing of the Special Senate Committee Investigating Petroleum Resources, it was stated by the president of an independent petroleum refining company, M. H. Robineau, that the government's wartime aviation gasoline program had left all catalytic cracking facilities, with the exception of those owned by the United States, "in the hands of larger companies," rather than in the hands of independents. [us574]

573. In the months immediately following World War II, a dispute emerged between independent refiners which had operated Government-owned aviation gasoline facilities during the war, and those which had not. The dispute generally concerned the price for which surplus Government-owned facilities (in particular, catalytic crackers) would be sold to the refiners. Operators of Government-owned facilities sought to have the government sell, or lease, surplus facilities at "fair value," as that term was defined by the Surplus Property Disposal Act. These operators

wished for the terms of sale to be negotiable, and based upon an independent's capacity to pay. By contrast, it was believed by at least one refiner which had not participated in the aviation gasoline program that such a price was unreasonably low, and detrimental to companies which had to invest private capital to build their facilities from scratch. [us575]

574. By one estimate, there were 100 independent refining companies which neither built their own aviation gasoline facilities nor operated Government-owned facilities during World War II. After the war, these companies expressed concern over the competitive disadvantage they found themselves in, compared both to the independents which operated Government-owned facilities and to major refiners which owned and operated their own. However, a large percentage of the small refiners, those processing 3,000 to 10,000 barrels a day, could not economically build a catalytic cracker for such small production. [us576]

575. By one estimate, approximately 75% of the aviation gasoline facilities owned by the United States during the war were operated by small, independent (non-major) companies. [us577]

576. The parties agree that exhibits I and II to the testimony of Mr. M. H. Robineau, at the November 1945 hearing of the Senate Special Committee Investigating Petroleum Resources, contains an accurate list of the aviation gasoline facilities built, owned and/or operated for the Allies. [us578]

577. According to a monograph prepared in 1948 by the Reconstruction Finance Corporation entitled "The Role of Defense Supplies Corporation in the Wartime Aviation Gasoline Program"

[hereinafter referred to as the "1948 RFC Report"], a large part of the oil refining industry's investment was recaptured during the war through profits on the sale of aviation gasoline and its constituent materials, as well as through other incentives allowed by Government. The 1948 RFC Report stated that much of government's investment in DPC-owned plants, operated by independent refiners, was valueless at war's end, and that the facilities built by the DPC were no longer fully useful. The 1948 RFC Report also stated that, in contrast to wartime demand, there was only a relatively small market for aviation fuel at that time. [cc23]

578. It was one of PAW's objectives to get the widest possible participation by industry in the program. The PAW did not wish to disturb any existing balances between companies in the industry. Furthermore, it was necessary to get every drop of the high octane material that was available to meet the vast requirements of the war. Therefore the smaller companies were asked to submit proposals for producing aviation gasoline. Some of these refiners were unwilling to invest in new facilities which might be worthless due to national over-capacity after the war. Some of them were financially unable to install the costly equipment. In both of these cases the DPC mechanism was used when the company indicated its willingness to take part in the program. [cc24]

579. Of the $235,000,000 of Government-owned facilities built by DPC, that Agency recouped $29,095,993 in rentals. Through postwar sale of the plants, War Assets Administration also

recovered approximately ten cents for each dollar invested. Total recovery on this investment was therefore approximately 22 percent and the loss about $180,000,000. PAW, the Army and Navy considered this investment necessary in order to meet the requirements for aviation gasoline. The government-owned plants produced about 70,000 barrels daily, when production from other plants amounted to approximately 400,000 barrels daily. [cc25]

580. Avgas plants built by the Defense Plant Corporation included 14 catalytic crackers, 19 alkylation units and 15 isomerization units at a cost of $237,000,000. These DPC facilities were operated by 19 different refining companies. The facilities had a total rated capacity of 66,063 barrels a day. The Oil Company Defendants did not operate DPC-owned plants. [cc30]

581. The construction and operation of the DPC-owned facilities was a more costly and less fruitful program than the program to obtain avgas from expanded privately-owned facilities. This had been expected by Government administrators when the program was initiated. However, the Government's purposes in entering the program -- to least disturb existing industry balances and to get the fullest possible production of aviation gasoline -- were fulfilled. [cc31]

582. According to the 1948 RFC Report, privately-owned facilities increased avgas production from 44,000 barrels a day at the time of Pearl Harbor to approximately 450,000 barrels prior to V-J Day. "After the war, however, much of this capacity was useless. By 1948 consumption of aviation gasoline produced in American-owned facilities had dropped to 70,000 barrels daily." [cc28]

583. According to the 1948 RFC Report:

> "The three major units constructed during the war to increase production were catalytic crackers, isomerization units and alkylation units. The "cat crackers," representing the major portion of the cost of war-built facilities, probably had the greatest post war usefulness. They could be and were in many cases converted for the production of higher grades of motor fuel and other products. The isomerization and alkylation units were less useful."

[cc29]

584. Either with the assistance of long-term, low-interest government loans or, in the case of Union, through its own assets, the Oil Companies paid for the avgas facilities installed at their Los Angeles refineries. [cc159]

585. In their report to Congress in November 1945, the independent producers were concerned with both new and old catalytic crackers. As the report stated:

> "The Defense Plant facility operators are thus caught between two competitive forces. New construction will approximate prewar costs for improved facilities. The war built privately owned facilities have investment costs scaled down to a competitive basis."

[cc161]

586. The independent producers' representative also noted that although privately-owned wartime facilities were built at a higher cost than pre-war facilities, they were able to compete

with such prewar facilities due to the companies' ability to write down their investments. [us' oil 161A]

587. Virtually all of Richfield's avgas investment for the war -- the full value of its alkylation additions, its catalytic cracker and its other 100 octane equipment at Watson -- was covered under a 100% certificate of necessity. [us' oil 161C]

588. In its submission to the RFC Price Adjustment Board concerning its 1943 profits, Richfield acknowledged that "[l]ong before Pearl Harbor, [it] had acquired the 'know-how' for the manufacture of 100 octane aviation gasoline. Richfield completed an early alkylation plant in 1940. [us' oil161E]

<u>Av Gas Contracts Between Refiners And The Government</u>

589. As stated in a letter from the PAW Assistant Deputy Petroleum Administrator to Senator W. Lee O'Daniel dated December 27, 1943:

> "Prior to the war and continuing for some months thereafter, the procurement officers of the Services purchased aviation gasoline on short term contracts at bid prices determined by competition. However, as rapidly as possible the purchasing of all 100 octane gasoline was vested in Defense Supplies Corporation, . . . . The prices paid for aviation gasoline have been those recommended by us [PAW] in each case. Our policy has not been one which involves a setting of any one price applicable to all refiners and all refining operations. On the contrary, it has been our effort to establish such prices as permit even a high cost producer a modest profit but which do not permit a low cost producer a

larger profit. We have arrived at these prices by taking into account the cost of raw materials, maintenance and repair, labor, amortization of investment, contingencies and profit. A separate cost docket has been prepared with respect to each contract."

[cc10]

590. Prior to the start of the war on December 7, 1941, competitive market prices for a gallon of 100 octane aviation gasoline as reported by the PAW included the following:

Texas Company, Port Arthur, Texas: (3cc lead)

Navy Reserve (8-25-41) 15.75¢ (3 cc lead)

British Lend Lease (11-24-41) 14.4¢

Texas Company, Los Angeles, CA: (3cc lead)

British Lend Lease (12-5-41) 14.4¢

Phillips sales FOB Oklahoma (3cc lead)

Army Air Corps (5-15-41) 13.5¢

Army Air Corps (5-15-41) 12.5¢

British Lend Lease (12-5-41) 13.4¢

British Lend Lease (12-5-41) 14.4¢

Phillips sale FOB Gulf Coast with 6 mos. free storage

Navy Reserve 19.15¢

Tidewater Associated Oil Company (3cc lead)

British Lend Lease (12-15-41) 15.5¢

Richfield Oil Corporation (3cc lead)

British Lend Lease (12-5-41) 14.4¢

[cc11]

591. Initial purchase contracts with Texas Company for aviation gasoline provided for the following negotiated prices for 100 octane aviation gasoline:

| | | |
|---|---|---|
| Lockport, Illinois | 15.25¢ (3cc lead) | 15¢ (4cc lead) |
| Port Arthur, Texas | 13.25¢ (3cc lead) | 13¢ (4cc lead) |
| Los Angeles, CA | 13.25¢ (3cc lead) | 13¢ (4cc lead) |

[cc12]

592. Initial purchase contracts with Richfield Oil Corporation for aviation gasoline provided for the following negotiated prices for 100 octane aviation gasoline:

| | | |
|---|---|---|
| Los Angeles, CA | 13.5¢ (3cc lead) | 13.25¢ (4cc lead) |

On negotiation of its second contract, Richfield agreed to a price of 13.25¢ from existing and expanded facilities for Grade 100 avgas and a price of 13.5¢ on Grade 130 from its new facilities at Watson. [cc13]

593. The contract with Phillips Petroleum Company for the production of aviation gasoline dated in early 1942 provided for the following negotiated prices for 100 octane aviation gasoline: 13.9¢ (3cc lead) and 13.75¢ (4cc lead). [cc14]

594. The contract with Union Oil Company for the production of aviation gasoline dated December 31, 1942 provided for the following negotiated prices for 100 octane aviation gasoline: 13.0¢ (4cc lead) [cc15]

595. The contract with Shell Oil Company in February 1942 for the production of aviation gasoline at its Wood River, Illinois, refinery provided for the following negotiated prices for 100 octane aviation gasoline: 14.1¢ (3cc lead) and 13.85¢ (4cc lead).

With further expansion, in May 1943, Shell negotiated a price of 13.8¢ for all aviation gasoline for 130 grade avgas for production up to 15,830 barrels per calendar day and a price of 10.80 cents for gallons in excess thereof. [cc16]

596. In early 1942, in arriving at a negotiated price, the PAW or its predecessor reviewed the raw material costs of the particular company and its operating costs, allowed a 10% facilities charge based on depreciation, amortization and obsolescence, and a profit of 7% per year on the investment diminished by normal depreciation, or 6.3% on the original investment. [cc17]

597. The contract with the Texas Company for production of aviation gasoline in Los Angeles dated January 17, 1942 provided for a profit of 0.39¢ per gallon. Under a second contract signed in association with its 1943 plant expansion the Texas profit was 1.33¢ per gallon. In each case, the profit was based on a 7% profit on investment. [cc18]

598. The contract with Richfield for production of aviation gasoline in Los Angeles dated February 3, 1942 provided for a profit of 0.6¢ per gallon based on an average 6.3% profit on investment. Under a second contract signed in association with its 1943 plant expansion the Richfield profit was 0.64¢ a gallon. [cc19]

599. The government's average price of aviation gasoline it purchased during WW II was approximately 16¢ a gallon. In contrast, pre-war prices averaged 15 cents to 15.5 cents a gallon. [cc21]

600. According to the 1948 RFC Report, prior to the war, PAW and industry representatives were exploring the possibility of expanding productive facilities. The report indicates that prior to the war, such expansion was perceived as a risky financial proposition with potentially poor post-war commercial possibilities. The report indicates that due to this uncertainty, private industry requested a guaranteed return of its investment within a set time. The government met this condition through the use of three-year purchase contracts. [cc22]

601. Generally, aviation gasoline from DPC plants cost the Government from 16 to 25 cents a gallon, while the average cost from private facilities ranged from thirteen to 15 cents a gallon. [cc32]

602. In determining the cost of avgas from DPC plants, capital charges were not included in the unit costs on the theory that the Government had already made the investment in the facilities. In determining the price per gallon of avgas the Los Angeles refineries of Union, Texas, and Richfield included a facilities charge for depreciation, amortization and obsolescence of 1.8 cents, 0.56 cents, and 1.09 cents respectively; no information is available on the Shell Wilmington refinery contracts. [cc33]

603. A PAW report dated June 1, 1945, analyzes the impact of the end of the war in Europe. Up until that time, the military requirements were always higher than the available productive capacity. The report indicates that with the European war over, there was the prospect of a surplus. The issue was whether to

keep up the maximum production and put it in a strategic reserve under existing policy or to review and change the policy. The conclusion of the report was that the policy to accumulate the surplus in a strategic reserve should be rescinded. The last 3,000 barrels of the estimated production of 512,000 a day in June 1945 used very expensive codimer and cost the military 42 cents a gallon. The next 6,500 barrels of codimer and expensive base stocks cost 22 cents a gallon. [cc34]

604. Most, but not all, of the contracts between the Oil Company defendants and the DSC provided that the price of avgas would increase or decrease in set amounts depending on the posted price of certain crude oils and on changes in the wholesale price index number for "All Commodities Other Than Farm Products And Foods," an index published by the federal Bureau of Labor Statistics. Union's contract dated December 31, 1942 did not contain this provision. [cc47]

605. Each of the contracts between the Oil Company defendants and the DSC provided that the DSC as buyer would pay

> "additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery [of 100 octane aviation gasoline]. Buyer shall also pay any such taxes on crude petroleum or the transportation thereof . . . ."

[cc48]

606. Many, but not all, of the contracts between the Oil Company defendants and the DSC provided that the prices of the agreements were set based on normal methods of transporting crude oil and normal operations of the refinery where "substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline." If costs of operations were increased or markets for other products were abnormally restricted or if "by reason of any cause or condition . . . resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery . . . shall be interfered with to such an extent that in the opinion of the Seller the cost of refining [] 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base prices . . . Seller may give notice to the Buyer." At that point, the Seller was authorized to reduce production of avgas to offset the additional cost, unless the DSC agreed to increase the price paid for avgas by an amount sufficient to offset such increased cost. Where the DSC notified the seller that it would not accept a lower output, and where the parties could not agree on a new increased price, any dispute was to be resolved by arbitration. The Texas contract dated February 8, 1943 did not contain the clause authorized reduced output. The Union contract dated December 31, 1942 did not contain the price escalation clause. [cc49]

607. In its May 1943 expansion of its avgas facilities, Unocal charged 100% of the sulfuric acid used in its alkylation units and 100% of the cost of catalyst for the catalytic cracker to the

cost of avgas. Unocal included 100% of the capital cost of the catalytic cracker in determining the facilities charge, which was then included in the price of avgas. [cc50]

608. Each of the oil companies' contracts stated: "substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline." [cc55]

609. The contracts for avgas entered into between the United States and the oil companies during World War II were terminated in 1945 or, in the case of Richfield, shortly thereafter. Matters relating to profits from these contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s. [cc58]

The Planned Blending Program

610. There is no direct evidence linking the Planned Blending Program to waste dumping at the McColl Site. [us442]

611. The "quickie" program was to increase the production of avgas in 1942 before new facilities were to come on line. This was done by converting existing facilities and combining components often from different refineries. The 1948 RFC Report stated that "[t]he transference of components from one plant to another and the diversion of refining facilities was sometimes cumbersome, often costly. However, cost was secondary factor to military requirements." [cc27]

612. The Government diverted butylenes from the manufacture of butydiene, the main ingredient of synthetic rubber, to the production of aviation gasoline. This shift required that the

Rubber Reserve Corporation expend an additional $30 million to utilize a more expensive substitute for butylenes, alcohol. [cc41]

Claims Under The Aviation Gasoline Reimbursement Plan

613. In July 1943, PAW Administrator Ickes noted: "I know that maximum production may often result in uneconomic operations, but the provisions of the Aviation Gasoline Reimbursement Plan have been designed to permit Government to assume the burden of any such losses." [cc36]

614. As an example of extraordinary costs, in May 1945, the PAW advised the DSC that "[u]pon the recommendation of the [PAW]" the DSC could pay the extra cost incurred by Los Angeles refineries for importing acid from outside the area of their normal sources out of the Aviation Gasoline Reimbursement Plan. In accord with this authority, Union submitted a claim for $6,955.29 on July 18, 1945. [cc37]

615. Through June 30, 1946, DSC paid 317 claims nationwide totaling approximately $126.6 million under the Aviation Gasoline Reimbursement Plan, of which 298 claims totaling approximately $125.97 million were for the 100 octane aviation gasoline program. [cc38]

616. The Government also paid a total of $7.27 million nationwide to cover extraordinary construction costs to expedite the completion of plant expansions, a measure which is estimated to have brought the facilities on line between one and three months earlier than would otherwise have been the case. [cc39]