617. The Aviation Gasoline Reimbursement Plan placed the final decision to reimburse extraordinary expenses with the PAW and, in some cases, the PAW determined that it was appropriate to adjust the reimbursement downward. One example of this practice is evident in Richfield's RFC Price Adjustment Board data for 1944. This submission shows that for 1944, Richfield claimed $445,450 in renegotiable income, due to money reimbursed under the AGRP. Richfield's data shows that one previously-approved claim, for the period of October 1, 1944 through December 31, 1944, had been adjusted downward and reduced Richfield's income by as much as $392,866. [us' oil 161D]

<u>Tank Cars</u>

618. The Government spent approximately $1.78 million to pressurize tank cars to carry additional butylene and isobutane, avgas components. [cc40]

619. Richfield's report to the RFC Price Adjustment Board, concerning its 1944 profits, reports that Richfield operated its own fleet of tank cars, of unspecified design, from which it derived revenue from rental income to outside sources. [us drafted oil151A]

<u>Motor Gasoline Production</u>

620. In 1942, the Army developed a specification for an all purpose gasoline to be used by the military. As described in the Richfield Renegotiation Report for the year 1944:

> "An 80-octane gasoline with a vapor pressure low enough for extremely hot weather, with a boiling range low enough for adequate volatility in extremely cold

> weather, with low sulfur content, and with such other exacting specifications as would make it suitable for use as well in a heavy tank or mobile gun as in a jeep or motorcycle, and as well in the heat of the African desert as in the sub-zero temperatures of the Aleutians."

[cc65] [relevance]

621. Purchases of 80-octane military gasoline were made on a bid basis until September 29, 1943, when a directive on the production of all gasolines was issued by the PAW because of the "urgent need for increasing the output of military aviation and 80 octane number all purpose gasolines." This advised all the refineries in District 5 as follows:

> "All fractions or potential fractions capable of producing 80 octane number all purpose gasoline Army specification 2-103A as revised, but not suitable for use in aviation gasolines or base stocks must be utilized in the manufacture of maximum quantities of the 2-103A grade."

The directive went further and directed distillation requirements on civilian gasoline as follows:

> "In connection with the above you are directed to control the ASTM distillation range of all civilian automotive gasolines blended or otherwise produced so that the temperature in decrees Fahrenheit at which 10% and 50% are evaporated shall not be lower than 150 and 260 respectively.

> "You are further directed to limit your production of civilian automotive gasoline having an octane number above 74 CFRMM to not more than 10% by volume of the total civilian automotive gasoline you produce."

The directive continued in effect prior directives to produce the maximum amounts of "100 and 91 octane number aviation gasoline and components thereof, toluene, butadiene, . . . .." The directive requested that the companies produce reports on their current production as of August 1943, and on the anticipated operations after putting the changes in effect. [cc66] [relevance]

622. Thereafter, from November 1943 until July 1945, the PAW gave exceptions to the September 29th directive on a monthly basis in order to meet the United States need for avgas, 80-octane and octanes of a lower grade. From Requests for Admission in a 1950s United States antitrust case, we have copies of these directives from October 1943 through the end of the war for District 5 companies. Each month the directive would give an exception to the requirements of the September 29th directive providing that the company produce a designated amount of 80 octane gasoline for the government, plus an additional fixed amount of motor gasoline of lower octane. The directive further indicated that the District V refineries of each company would produce a designated amount of 100 octane aviation gasoline. Attached to the directive would be a list of each company indicating the quantity of each type of gasoline. [cc67] [relevance]

623. Civilian motor gasoline was in short supply during World War II and was rationed until after the end of World War II.

624. As of April of 1944, Richfield, Shell, Texas and Union were using their acid treaters to treat motor gasoline. [cc73]

Dated: December 11, 1997

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural Resources Division

JOSHUA M. LEVIN
MICHAEL J. ZEVENBERGEN
Environment & Natural Resources Division
Environmental Defense Section
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: 202-514-4198

NORA M. MANELLA
United States Attorney
JOHN RUBINER
Assistant United States Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: 213-894-2451

Joshua M. Levin PRG
By Joshua M. Levin
Attorneys for Federal Counterdefendants, United States of America et al.

PETER R. TAFT
RONALD L. OLSON
CARY B. LERMAN
CYNTHIA L. BURCH
MUNGER, TOLLES & OLSON
355 South Grand Avenue
Los Angeles, California 90071-1560
(213) 683-9100

Peter R. Taft
Attorneys for Defendants Shell Oil Company, Texaco, Inc., Atlantic Richfield Company, Union Oil Company

CLOSED, ECF

**US Court of Federal Claims**
**United States Court of Federal Claims (COFC)**
**CIVIL DOCKET FOR CASE #: 1:05-cv-00704-LAS**

SHELL OIL COMPANY et al v. USA
Assigned to: Sr. Judge Loren A. Smith
Related Case: 1:06-cv-00141-LAS
Case in other court: U.S. District Court Central District of California, 2:91-cv-00589
Cause: 28:1491 Tucker Act

Date Filed: 06/30/2005
Jury Demand: None
Nature of Suit: 134 Contract - Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**SHELL OIL COMPANY**
*and*

represented by **Cary B. Lerman**
Munger, Tolles & Olsen
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1560
(213) 683-9100
*TERMINATED: 07/28/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael William Kirk**
Cooper & Kirk, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, DC 20004
(202) 220-9600
Email: mkirk@cooperkirk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**UNION OIL COMPANY OF CALIFORNIA**
*and*

represented by **Cary B. Lerman**
(See above for address)
*TERMINATED: 07/28/2005*
*LEAD ATTORNEY*

**Michael William Kirk**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ATLANTIC RICHFIELD COMPANY**
*and*

represented by **Cary B. Lerman**
(See above for address)

*TERMINATED: 07/28/2005*
*LEAD ATTORNEY*

**Michael William Kirk**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEXACO INC.**
*and*

represented by **Cary B. Lerman**
(See above for address)
*TERMINATED: 07/28/2005*
*LEAD ATTORNEY*

**Michael William Kirk**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**

represented by **Kyle Eric Chadwick**
U. S. Department of Justice
Civil Div. - Commercial litigation Br.
1100 L Street, NW
8th Floor
Washington, DC 20530
(202) 305-7562
Fax: (202) 305-7644
Email: kyle.chadwick@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/30/2005 | 1 | Case transferred in from District of California; Case Number 2:91-cv-00589. Original file with documents numbered 1-530, certified copy of transfer order and docket sheet received., filed by SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, TEXACO INC..Transfer Complaint due by 7/28/2005. (Attachments: # 1 docket sheet)(lg1, ) Additional attachment (s) added on 6/30/2005 (lg1, ). (Entered: 06/30/2005) |
| 06/30/2005 | 2 | NOTICE of Assignment to Judge Loren A. Smith. (lg1, ) (Entered: 06/30/2005) |
| 06/30/2005 | 3 | NOTICE of Designation of Electronic Case. (lg1, ) (Entered: 06/30/2005) |
| | | |

| | | |
|---|---|---|
| 07/13/2005 | 4 | NOTICE of Appearance by Kyle Eric Chadwick for USA. (Chadwick, Kyle) (Entered: 07/13/2005) |
| 07/28/2005 | 5 | Rule 7.1 Disclosure Statement by all plaintiffs. (Kirk, Michael) (Entered: 07/28/2005) |
| 07/28/2005 | 6 | [Transfer] COMPLAINT (captioned Amended Complaint), against USA, filed by SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, TEXACO INC.. Answer Due by 9/26/2005. (Attachments: 1) Exhibit A; (2) Exhibit B; (3) Exhibit C; (4) Cover Sheet)(dls ) (Entered: 07/29/2005) |
| 07/28/2005 | | *** Attorney Cary B. Lerman terminated. (dls ) (Entered: 07/29/2005) |
| 09/22/2005 | 7 | NOTICE of Voluntary Dismissal without prejudice by all plaintiffs (Kirk, Michael) (Entered: 09/22/2005) |
| 09/22/2005 | | Complaint dismissed pursuant to Rule 41(a)(1)(i) this day. (dls) (Entered: 11/16/2005) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/02/2006 17:32:36 | | | |
| **PACER Login:** | cc0358 | **Client Code:** | 7060 |
| **Description:** | Docket Report | **Search Criteria:** | 1:05-cv-00704-LAS |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

Cooper & Kirk
Lawyers
A Professional Limited Liability Company
Suite 200
1500 K Street, N.W.
Washington, D.C. 20005
(202) 220-9600
Fax (202) 220-9601

Michael W. Kirk
(202) 220-9671
mkirk@cooperkirk.com

November 23, 2005

**VIA FEDERAL EXPRESS**

The Honorable David L. Bibb
Acting Administrator
United States General Services Administration
1800 F Street, N.W.
Washington, DC 20405

Re: Claims on Contracts between the United States and Various Oil Companies for the Production of High-Octane Aviation Fuel During World War II

Dear Mr. Bibb:

Pursuant to § 13(a) of the Contract Settlement Act of 1944 (the "Act"), 41 U.S.C. § 113(a), Shell Oil Company ("Shell"), Union Oil Company of California ("Union"), Atlantic Richfield Company ("Atlantic Richfield"), and Texaco Inc. ("Texaco") (collectively referred to as the "Oil Companies"), by undersigned counsel, respectfully demand a decision and written findings addressing their termination claims on the contracts attached hereto as Exhibits 1-10 (collectively referred to as the "Avgas Contracts"), for approximately $66,283,698.40 of costs which the Oil Companies were required to pay, and approximately $16,651,508 of costs which they reasonably expect to be required to pay in the future, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §§ 9601 *et seq.*, because of the release of hazardous substances at the McColl Superfund site ("McColl Site"), located in Fullerton, California. The Oil Companies incurred these charges by reason of the production or manufacture of high-octane aviation fuel, known as Avgas, in performance of the Avgas Contracts.

We direct this letter to the United States General Services Administration ("GSA") as the successor-in-interest to the contracting agency, the Defense Supplies Corporation ("DSC").

## I. Background

A GSA predecessor-in-interest, the Reconstruction Finance Corporation, established the Defense Supplies Corporation ("DSC") as a subsidiary corporation to procure strategic commodities (among other activities) during World War II. Pursuant to this authority, the United States, through the DSC, entered into one or more contracts with various predecessors-in-

interest of the Oil Companies to produce and manufacture Avgas. Specifically, the DSC and Oil Companies entered into at least the following Avgas Contracts:

1. On April 10, 1942, Shell and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 1.

2. On May 1, 1943, Shell and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 2.

3. On December 31, 1942, Union and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 3.

4. On May 1, 1943, Union and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 4.

5. On February 3, 1942, Richfield Oil Corporation, a predecessor-in-interest to Atlantic Richfield, and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 5.

6. On February 20, 1943, Richfield Oil Corporation, a predecessor-in-interest to Atlantic Richfield, and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 6.

7. On January 17, 1942, The Texas Company, a predecessor-in-interest to Texaco Inc., and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 7.

8. On February 8, 1943, The Texas Company, a predecessor-in-interest to Texaco Inc., and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 8.

9. On June 10, 1942, Tidewater Associated Oil Company, a predecessor-in-interest to Texaco Inc., and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 9.

10. On February 18, 1943, Tidewater Associated Oil Company, a predecessor-in-interest to Texaco Inc., and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. This contract is attached hereto as Exhibit 10.

With the exception of certain provisions not pertinent to the Oil Companies' termination claims, the Avgas Contracts are substantially similar in all relevant respects. The United States terminated the Avgas Contracts at the end of World War II.

On February 1, 1991, the United States and the State of California filed a complaint in the United States District Court for the Central District of California against the Oil Companies (and other defendants) pursuant to CERCLA for the recovery of costs ("response costs") incurred in responding to the release of hazardous substances at the McColl Site. That complaint is attached hereto as Exhibit 11. The Oil Companies counterclaimed against the United States for the response costs, for breach of contract, and for related causes of action. The Oil Companies' Counterclaim, filed on April 22, 1991, is attached hereto as Exhibit 12.

On September 28, 1993, the Central District of California granted summary judgment to the United States and the State of California on liability against the Oil Companies for the response costs. The court bifurcated the issues relating to cost recovery from the Oil Companies' counterclaims, deferring the counterclaims. On December 12, 1994, the parties entered into a partial consent decree pursuant to which the Oil Companies paid $18,000,000 for response costs incurred by the United States and the State of California through 1990, and the Oil Companies retained the right to recover these funds pursuant to its counterclaims. The partial consent decree also clarified that the September 28, 1993 Order constituted a declaratory judgment pursuant to CERCLA in favor of the United States and the State of California for ongoing response costs.

On September 18, 1995, the Central District of California granted the Oil Companies summary judgment on liability against the United States for the response costs based on some of the Oil Companies' counterclaims, and after trial in 1998, allocated 100 percent of all response costs to the United States, including the $18,000,000 previously paid by the Oil Companies. The United States Court of Appeals for the Ninth Circuit reversed the Central District of California's judgment on liability for response costs relating to the majority of the hazardous substances at the McColl Site. The Ninth Circuit, however, affirmed the Central District's allocation of 100 percent of the costs to the United States as to approximately 5.5 percent of the hazardous

substances at the McColl Site, which related to the treatment of government-owned benzol. Thus, the Oil Companies were found liable for the response costs for the non-benzol related hazardous substances. On remand, the Oil Companies pursued their remaining counterclaims.

The Central District of California addressed all remaining counterclaims, except that it transferred, pursuant to 28 U.S.C. § 1631, the Oil Companies breach of contract counterclaim against the United States to the United States Court of Federal Claims. The Oil Companies dismissed, without prejudice, the transferred counterclaim in order to pursue their claims under the Act, and therefore it is now appropriate to commence proceedings under the Act.

II. The United States' Liability Under the Contract

The Avgas Contracts expressly require the United States to pay for any new charges that the Oil Companies are required to pay pursuant to federal law as a result of their production of the Avgas. Specifically, the Avgas Contracts expressly provide, in relevant part:

> [T]he [United States] shall pay . . . any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [Avgas].

There can be no question that this provision encompasses the charges that the Oil Companies were required to pay pursuant to CERCLA, because the release of the hazardous substances at the McColl Site was a direct result of the Oil Companies' performance of the Avgas Contracts.

More generally, the Avgas Contracts make clear that the parties' intent was for the United States to pay or reimburse the Oil Companies for all unanticipated, extraordinary costs or expenses incurred by the Oil Companies because of the production of Avgas pursuant to the Avgas Contracts, or in otherwise complying with the government mandate to maximize the manufacture of Avgas at all costs. For example, the Avgas Contracts, either originally or as amended, expressly provide in relevant part with minor variations:

> [I]f by reasons of any cause or condition . . . resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the [Avgas] supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of the Seller the cost of refining [that Avgas] is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of [Avgas] will be reduced in an amount sufficient in the

> judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for [Avgas] by an amount sufficient to offset such increased cost.

The fact that the Avgas Contracts were terminated at the end of World War II, long before the costs at issue were incurred, in no way undermines the United States' obligation to reimburse the Oil Companies for the response costs that they have paid, and to pay future response costs that the Oil Companies are required to pay, pursuant to CERCLA because of the Oil Companies production of Avgas. *See Ford Motor Co. v. United States*, 378 F.3d 1314 (Fed. Cir. 2004); *E.I. Du Pont De Nemours & Co. v. United States*, 365 F.3d 1367 (Fed. Cir. 2004).

Section 13(a) of the Act, 41 U.S.C. § 113(a), requires the contracting agency, upon written demand, to issue written findings determining the amount due on a "termination claim," which the Act defines as "any claim or demand by a war contractor for fair compensation for the termination of any war contract and any other claim under a terminated war contract . . . ." 41 U.S.C. § 103(g). In this case, the Oil Companies' termination claims for reimbursement of the response costs that they have paid (or will pay) in the future pursuant to CERCLA, as a result of their production or manufacture of the Avgas under the Avgas Contracts, falls squarely within the scope of the Act.

III. Summary of Charges

The charges that the Oil Companies were required to pay (or will be required to pay) pursuant to CERCLA arising out of their performance of the Avgas Contracts fall into three categories: (1) response costs that the Oil Companies have paid; (2) estimated future response costs that the Oil Companies reasonably expect they will be required to pay; and (3) response costs incurred by the United States and the State of California for which they are seeking reimbursement from the Oil Companies. We address each in turn.

A. Response Costs the Oil Companies Have Already Paid

In 1999, the Oil Companies and the United States stipulated that the total amount of the response costs that the Oil Companies have paid (excluding interest but including prior payments made by the Oil Companies) through October 31, 1998 consist of the sum of $64,219,514.46. Since October 31, 1998, the Oil Companies have paid approximately an additional $2,064,183.94 in response costs (excluding interest). Because the Oil Companies were required to pay these costs pursuant to CERCLA as a result of their performance of the Avgas Contracts, and the Avgas Contracts require that the United States pay these costs, the Oil Companies are entitled to reimbursement from the United States for these costs.

B. Estimated Response Costs that the Oil Companies Reasonably Expect they will be Required to Pay in the Future

The Oil Companies currently estimate that they will be required to pay future response costs of approximately $16,651,508.00. Pursuant to the Avgas Contracts, the United States is required to pay these costs. Accordingly, the Oil Companies are entitled to a determination that the United States will pay these new charges.

C. Responses Costs that the United States and the State of California Have Paid, and for which they Seek Reimbursement from the Oil Companies

The State of California, the Department of Justice, and the United States Environmental Protection Agency have requested that the Oil Companies reimburse them for responses costs that they have paid of approximately $40,085,168.77 (partially excluding interest). Pursuant to the Avgas Contracts, the United States is required to pay these costs. Accordingly, the Oil Companies are entitled to a determination that the United States will pay these new charges.

IV. Conclusion

For the foregoing reasons, the Oil Companies are now entitled to reimbursement of approximately $66,283,698.40 for the response costs that they have paid, plus interest under § 6(f) of the Act, 41 U.S.C. § 106(f). In addition, the Oil Companies are entitled to a determination that the United States will pay for any response costs that the Oil Companies are required to pay in the future. Thus, in accordance with § 13(a) of the Act, 41 U.S.C. § 113(a), the Oil Companies respectfully demand that the contracting agency issue written findings determining the amount due on the Oil Companies' termination claims for response costs they have already paid, and determining that the Oil Companies are entitled to have the United States pay for all responses that they are required to pay in the future.

Sincerely,

Michael W. Kirk

Michael W. Kirk

cc: Kyle Chadwick, Esq.
United States Department of Justice

GSA

GSA Office of General Counsel

February 15, 2006

Michael W. Kirk, Esquire
Coopers & Kirk, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004

Re: Claims on Contracts between the United States and Various Oil
Companies for the Production of High-Octane Aviation Fuel During World
War II

Dear Mr Kirk:

I have been asked to respond to your Claim letter dated November 23, 2005, and to your most recent letter of January 4, 2006 addressed to the Honorable David L. Bibb, Acting Administrator of the General Services Administration.

I have reviewed your claim and can find no basis for recovery and no basis for the appointment of a contracting officer. Specifically, your letters assert a termination claim under § 113(a) of the Contract Settlement Act of 1944 (the "Act"), 41 U.S.C. § 113(a) for terminated World War II contracts, yet no evidence has been provided demonstrating that these war contracts were actually terminated for the convenience of or at the option of the former Defense Supplies Corporation, rather than expiring of their own accord. War contracts that were not terminated in the manner prescribed by the Act are not eligible for compensation or consideration under the Act. See 41 U.S C. §§ 103(d) and 103(h).

Moreover, GSA neither receives nor currently has any authorized appropriations or other funds available for the purpose of liquidating or otherwise paying for any alleged liability of the RFC or those of RFC's predecessor agencies. Since there is no account available within GSA to fund liabilities of the RFC or that of the RFC's predecessor agencies, GSA cannot consider this matter at this time.

Should you wish to provide further information in support of your claim, you can provide this information directly to my attention.

Sincerely,

Ruth Kowarski

Ruth Kowarski J.D., LL.M.
Senior Assistant General Counsel
Real Property Division
U.S. General Services Administration
Room 5137
Office of the General Counsel (LR)
1800 F. Street, NW
Washington, D.C. 20405

cc: Kyle Chadwick, Esq.
United States Department of Justice

U.S. General Services Administration
1800 F Street, NW
Washington, DC 20405-0002
www gsa gov

**CERTIFICATE OF FILING**

I certify that on June 30, 2006, the attached document was filed electronically. I understand that service is complete upon filing and that parties may access this filing through the Court's ECF system.

s/ Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Vincent J. Colatriano
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)