IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 06-141C
(Senior Judge Smith)

---

SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA,
ATLANTIC RICHFIELD COMPANY, and TEXACO, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS, AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7562
Facsimile: (202) 305-7644

August 11, 2006

Attorneys for Defendant

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ..................................................................................................... 2

I. The Oil Companies Cannot Recover Under The Language Of The "Taxes" Clause ..................................................................... 2

II. The Anti-Deficiency Act Bars Relief, In Any Event ..................................... 9

III. Alternatively, The Oil Companies Are Not Entitled To Summary Judgment ..................................................................... 14

CONCLUSION ..................................................................................................... 16

TABLE OF AUTHORITIES

CASES

AINS, Inc. v. United States,
365 F.3d 1333 (Fed. Cir. 2004) .......... 9

Cadillac Fairview/California v. Dow Chemical Co..,
299 F.3d 1019 (9th Cir. 2002) .......... 11

California-Pacific Utils. Co. v. United States,
194 Ct. Cl. 703 (1971) .......... 8

Cherry Cotton Mills, Inc. v. United States,
327 U.S. 536 (1946) .......... 9

Commander Oil Corp. v. Advance Food Serv. Equip.,
991 F.2d 49 (2d Cir. 1993) .......... 4

Consumers Ice Co. v. United States,
201 Ct. Cl. 116, 475 F.2d 1161 (1973).......... 3

Currier v. McKee,
59 A. 442 (Me. 1904) .......... 5, 7

Dynamics Corp. of Am. v. United States,
182 Ct. Cl. 389 F.2d 424 (1968) .......... 8

E.I. Du Pont de Nemours & Co. v. United States,
365 F.3d 1367 (Fed. Cir. 2004) .......... 3, 4

Ford Motor Co. v. United States,
378 F.3d 1314 (Fed. Cir. 2004) .......... 3, 4

Green Bus Lines v. Ocean Acc. & Guaranty Corp.,
39 N.E.2d 251 (N.Y. 1942) .......... 7

Holmes v. Security Inv. Protec. Corp.,
503 U.S. 258 (1992) .......... 5

Huntington Cab Co. v. American Fidelity & Casualty Co.,
155 F.2d 117 (4th Cir. 1946) .......... 7

International Paper Co. v. United States,
282 U.S. 399 (1931) ........ 13

Johns-Manville Corp. v. United States,
12 Cl. Ct. 1, 24 (1987) ........ 10

Longo v. Shore & Reich, Ltd.,
25 F.3d 94 (2d Cir. 1994) ........ 14

McNeilab, Inc. v. North River Ins. Co.,
645 F. Supp. 525 (D.N.J. 1986) ........ 5

National Mut. Cas. Co. v. Clark,
7 So.2d 800 (Miss. 1942) ........ 7

Pacific Ins. Co. v. Eaton Vance Mgmt.,
369 F.3d 584 (1st Cir. 2004) ........ 5, 6

Rappold v. Indiana Lumbermen's Mutual Insurance,
431 S.E. 302 (Va. 1993) ........ 7

United States Rubber Co. v. United States,
142 Ct. Cl. 42, 160 F. Supp. 492 (1958) ........ 4

Wang Labs., Inc. v. Applied Comp. Sci., Inc.,
958 F.2d 355 (Fed. Cir. 1992) ........ 14

William B. Tanner Co. v. Sparta-Tomah Broadcasting Co.,
716 F.2d 1155 (7th Cir. 1983)........3

STATUTES

18 U.S.C. § 1964(c) ........ 5

31 U.S.C. § 1341 ........ 1, 13

41 U.S.C. § 106(c) ........ 14

41 U.S.C. § 120 ........ 2, 12

Anti-Deficiency Act, Pub. L. No. 59-28, 34 Stat. 27, 49 (1906)........1

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941)........9, 10

National Defense Act of 1916, Pub. L. No. 64-85, § 120, 39 Stat. 166, 213 (1916)........11

MISCELLANEOUS

Executive Order No. 9001 (Dec. 27, 1941) .......... 9

Executive Order No. 9040 (1942) .......... 11

Executive Order No. 9024 (1942) .......... 10

Executive Order No. 9246 (1942) .......... 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | No. 06-141 C (Senior Judge Smith) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS, AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to the Court's Rules ("RCFC"), defendant, the United States, respectfully opposes the motion for partial summary judgment as to liability filed by plaintiffs (collectively, "the Oil Companies") on June 30, 2006 and replies to plaintiffs' response to our April 17, 2006 motion to dismiss the complaint pursuant to RCFC 12(b)(6).

PRELIMINARY STATEMENT

Accompanying this brief is our response to plaintiffs' proposed findings of undisputed fact, which we respectfully incorporate, in order to avoid extending this brief unnecessarily. Because the factual allegations presented in the first 23 pages of plaintiffs' brief are largely, if not entirely, immaterial to either party's motion and, in any event, consist largely of legal argument, we need not respond here. The Oil Companies fail, in any event, to refute our demonstration that they cannot recover indemnification, as a matter of law, pursuant to the language of their "avgas" contracts or, alternatively, owing to the restrictions of the Anti-Deficiency Act, Pub. L. No. 59-28, 34 Stat. 27, 49 (1906), now codified at 31 U.S.C. § 1341.

Additionally, as pointed out in our response to the proposed findings, (i) the Oil Companies stipulated in the district court litigation in June 1995 that "[m]atters relating to

profits from these [avgas] contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s," Pl. App. 545 (¶ 609) (emphasis added), and (ii) the documents which the Oil Companies allege are their "avgas contracts" are not executed in pen and appear not to be otherwise authenticated in this record. The resulting genuine issues of material fact with respect to the Government's contractual liability preclude granting the Oil Companies' motion, even assuming the Court denies our motion to dismiss.

## ARGUMENT

### I. The Oil Companies Cannot Recover Under The Language Of The "Taxes" Clause

We demonstrated in our motion that (i) the avgas contracts contain no language of indemnity, Def. Mot 5-13, and that (ii) if construed in the manner plaintiffs propose, the contracts would contain an open-ended indemnity that would be void ab initio under the ADA, because the Defense Supply Corporation ("DSC") lacked statutory authority to bind the Government to such an obligation, and the Oil Companies do not allege that the Government ever ratified any such unauthorized commitment, pursuant to the Contract Settlement Act of 1944, 41 U.S.C. § 120, or other authority. Id. at 13-14. In their response and motion, the Oil Companies do not rely upon section V of the contracts, "Price Escalation," as we anticipated they might. See id. at 11. They seek to recover, instead, exclusively under section XII, "Taxes," which provides:

> (a) Buyer shall pay in addition to the prices as established in Sections IV and V . . ., any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the

extent such taxes result in increased cost . . . .

Def. Attach. 16-17 (emphasis added). Plaintiffs' focus upon the Taxes clause considerably narrows the scope of the parties' contractual arguments.

As we observed, the Taxes clause is, upon its face, a supplemental pricing term of the contracts which bears no resemblance to an indemnification clause. The Taxes clause allows for the possibility that taxes, fees, and charges incurred during performance could be included in the prices charged and paid during performance. It does not, for example, express an intent upon the part of the Government to "hold [the Oil Companies] harmless" from any or all new costs that might be imposed by municipal, State, Federal, or foreign Governments. Cf. E.I. Du Pont de Nemours & Co. v. United States, 365 F.3d 1367, 1370 (Fed. Cir. 2004). Furthermore, the Court should not construe the Taxes clause so as "to lock [the] parties into a given set of rights and obligations for long or indefinite periods without some clear indication that this was actually intended by the parties." Consumers Ice Co. v. United States, 201 Ct. Cl. 116, 475 F.2d 1161, 1166-67 (1973); accord William B. Tanner Co. v. Sparta-Tomah Broadcasting Co., 716 F.2d 1155, 1159 (7th Cir. 1983). No language in the clause indicates that its payment obligations would survive the expiration or termination of the contracts. Survival should not be inferred.

Even if construed as resembling a permanent indemnification clause, the Taxes clause is expressly limited to taxes, fees, and charges incurred "by reason of" the production or distribution of the avgas which was delivered during the contract terms. CERCLA liability is not a tax, nor is it a fee. The Oil Companies must argue, therefore, that their liabilities are a "charge." The term "charge," however, plainly connotes an amount paid in exchange for receiving a privilege, product, or service. Plaintiffs' CERCLA liabilities do not fit that description, especially as they were imposed by a court: Courts are not naturally said to

"charge" parties monies that are awarded as damages in civil suits. Finally, even if construed as a "charge," plaintiffs' CERCLA liabilities were not imposed "by reason of the production, manufacture, sale or delivery of commodities delivered" under the contracts, as the Taxes clause requires. The liabilities were imposed by reason of the evidence that the Oil Companies dumped acid waste at the McColl site in California.

Plaintiffs argue the Taxes clause is not limited to costs incurred during performance, upon the grounds that the clause contains the phrases "by reason of" and "new or additional," which, plaintiffs argue, refer to future events. Pl. Br. 26. These syntactical arguments carry no weight. The Taxes clause simply refers to taxes, fees, and charges that might be imposed after execution of the contracts, and during the War. As noted, nothing in the clause supports the argument that the obligations extend into the indefinite future, decades after the contracts were closed out, even assuming CERCLA liability could be deemed a tax, fee, or charge. Remarkably, plaintiffs argue that our plain meaning construction is "foreclosed by" Ford Motor Co. v. United States, 378 F.3d 1314 (Fed. Cir. 2004), and Du Pont. Pl. Br. 26-27. Ford and Du Pont, however, cannot foreclose anything in this case, because those decisions involved contractual provisions entirely unlike the Taxes clause upon which plaintiffs rely.

The contract in Ford stated that "costs and expenses incurred in the defense and/or discharge of such claims of others on account of death or bodily injury of persons or loss or destruction of or damage to property as may arise out of or in connection with the performance of the work" were reimbursable under the contract. 378 F.3d at 1322 (Schall, J., dissenting) (emphasis added). Reimbursement was not limited to "taxes, fees, or charges," as in the Taxes clause. More important, the specific obligation which the court said was "not diluted by the passage of time" arose under a different provision, the so-called "unknown claims" clause

contained in a Termination Settlement Agreement which was executed after performance. Id. at 1319-20 (quoting United States Rubber Co. v. United States, 142 Ct. Cl. 42, 160 F. Supp. 492, 499-500 (1958)), quoted in Pl. Br. 27. The Oil Companies do not even allege that Termination Settlement Agreements were executed here, and they rely upon no comparable reservation of claims or rights. See Compl. ¶ 11.

Du Pont is even further removed from this case. That contract stated that "the Government will hold [Du Pont] harmless," and the post-War Termination Settlement Agreement expressly reserved "[c]laims by [Du Pont] against the Government which are based upon responsibility of [Du Pont] to third parties and which involve costs reimbursable under the contract, but which are not now known to [Du Pont]." 365 F.3d at 1370. Notwithstanding the Oil Companies' conclusory assertion that Ford and Du Pont "cannot be distinguished from this case," Pl. Br. 27, plaintiffs' reliance upon those decisions serves only to underscore the absence from the Taxes clause of any similar language, which could reasonably be construed as a "clear" or "unmistakable" promise of unlimited and unending indemnity, as would be required. Cf. Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51 (2d Cir. 1993).

Plaintiffs argue they incurred litigation and response costs, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), "by reason of" producing or selling the avgas, within the meaning of the Taxes clause, because, they assert, "the Oil Companies could only have avoided disposing of the waste by reducing the production of Avgas in violation of their obligation to satisfy the Government's massive wartime requirements." Pl. Br. 27. They argue they would not have been held liable for cleanup costs under CERCLA "but for" the waste disposal practices they allegedly "necessarily" adopted in connection with performing the contracts. Id. at 28-30 (quoting, inter alia, Pacific

Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 589 (1st Cir. 2004)). This argument should fail, as a threshold matter, because the phrase "by reason of" is naturally read as imposing a proximate cause requirement, rather than only a but-for test. See, e.g., Holmes v. Security Inv. Protec. Corp., 503 U.S. 258, 267-68 (1992) (construing 18 U.S.C. § 1964(c) in light of common law principles); McNeilab, Inc. v. North River Ins. Co., 645 F. Supp. 525, 535-36 (D.N.J. 1986) ("The causal connection implied by the phrase 'by reason of' is normally that of proximate causation.") (citing, inter alia, Currier v. McKee, 59 A. 442 (Me. 1904)).

Plaintiffs do not argue, nor could they, that their CERCLA liabilities in the district court arose as a proximate result of manufacturing, selling, or delivering avgas during World War II. Nor do they argue they were held liable as a proximate result of a breach by the Government. This should be enough to bar their recovery under the Taxes clause. Assuming, for purposes of argument, that the words "by reason of" might be broadly construed to include mere but-for causation of costs, plaintiffs' logic is flawed. Liability was imposed under CERCLA based upon the dumping of waste. Moreover, "[i]n the 1930s and early 1940s, the Oil Companies' decisions to reprocess, burn, dump, or otherwise dispose of their acid sludge were based in part on economic considerations." Pl. App. 512 (¶ 500). The avgas contracts did not require particular disposal practices; and the Government never ordered or approved dumping at the McColl site. E.g., Def. Resp. Pl. PFF ¶ 15. Given these circumstances, there exist multiple, intervening "reason[s]," distinct from the production and sale of avgas, for the CERCLA liabilities for which the Oil Companies seek reimbursement under the contracts.

Even the authorities cited by the Oil Companies support the conclusion that their claimed costs did not arise "by reason of" any activities listed in the Taxes clause. See Pl. Br. 29-30. In Pacific Insurance, for instance, the United States Court of Appeals for the First Circuit held that

an insurance policy covering costs incurred "by reason of" the insured's actual or alleged breach of fiduciary duties in administering its pension plan did not cover monies, including interest owed, which the insured transferred to its plan after receiving a letter threatening litigation based upon under funding of the plan. 369 F.3d at 586-87, 590. The court held that the payment to the pension plan (including the back interest) was made proximately "by reason of" the language of the plan itself, rather than "by reason of" the insured's preexisting breach of its funding obligations. Id. at 590 & n.8. This was so, although the interest plainly would not have been paid "but for" the delay in funding the plan. Id. Similarly, here, plaintiffs' liability under CERCLA was not imposed "by reason of" performance of the avgas contracts during World War II, but "by reason of" the fact that plaintiffs were found, decades later, to have dumped acid waste, upon their own initiative, at a contaminated site. There is no proximate causal relationship between these events; and there is a "but for" connection only in the loosest sense, in which any event may appear, in retrospect, to depend upon preceding circumstances.

In Rappold v. Indiana Lumbermen's Mutual Insurance, 431 S.E. 302 (Va. 1993), quoted in Pl. Br. 30, the court held that litigation costs incurred in enforcing an indemnity agreement executed in connection with the posting of a construction performance bond were incurred "by reason of" the indemnitee's posting of the bond for the indemnitor. Id. at 304. There was a direct and foreseeable connection between the litigation and the transaction in which the indemnity was provided. By contrast, the link between plaintiffs' CERCLA liabilities and their production and sale of avgas is contingent and attenuated, at best. Finally, in Huntington Cab Co. v. American Fidelity & Casualty Co., 155 F.2d 117 (4th Cir. 1946), quoted in Pl. Br. 30, the United States Court of Appeals for the Fourth Circuit stated there was a "rational basis" for construing an insurance policy covering tort liabilities arising "by reason of the ownership,

maintenance or use" of a taxicab as excluding liability for actions of a driver that did not involve maintaining or driving the vehicle. Id. at 119. The court further noted that other courts had so held. Id.; see National Mut. Cas. Co. v. Clark, 7 So.2d 800 (Miss. 1942).

In the end, however, the Huntington Cab court adopted a liberal interpretation of "by reason of . . ." (encompassing an assault by a driver upon a passenger), based upon "the general purpose to be served by the [insurance] policy," as well as public policy considerations, including the view expressed by a different court regarding the probable intent of a New York State official who had approved similar policy language. 155 F.2d at 119-21 (quoting Green Bus Lines v. Ocean Acc. & Guaranty Corp., 39 N.E.2d 251, 254 (N.Y. 1942)). Huntington Cab, which is apparently cited because it dates from the 1940s, is hardly persuasive authority in this case, which involves commercial contracts, rather than an insurance policy, and in which there is no basis for adopting an unnaturally broad construction of the common phrase "by reason of." Cf. Currier, 59 A. at 444 (noting, under a "by reason of" test, "[o]ne is not bound to anticipate what is merely possible, nor, on the other hand, is he liable for such consequences only as usually follow").

The Taxes clause, which obligated the Government to provide, in addition to the prices specified by the contracts, reimbursement of new taxes and similar expenses imposed upon plaintiffs by Government entities "by reason of the production, manufacture, sale or delivery of" the fuel purchased under the contracts, cannot reasonably read either as having been intended to survive the contract term indefinitely, or as relating to liabilities which are not taxes, fees, or charges and which arose for a "reason" other than those stated in the clause. Since it is beyond doubt, based upon a proper interpretation of the Taxes clause, that the Oil Companies cannot recover damages, the Court should dismiss the complaint. Cf. Dynamics Corp. of Am.

v. United States, 182 Ct. Cl. 62, 389 F.2d 424, 429 (1968) ("[T]he interpretation of the language of a contract is a question of law, not a question of fact . . . .").

II. The Anti-Deficiency Act Bars Relief, In Any Event

In the event the Court disagrees with our reading of the Taxes clause, we showed that the DSC lacked statutory authority to enter into an open-ended indemnity agreement which would violate the Anti-Deficiency Act. The Oil Companies respond by surveying a variety of authorities which were in effect during World War II; however, plaintiffs fail to point to an exception to the ADA which is applicable to these contracts. Pl. Br. 32-45. Conspicuously absent from the cited authorities is any language, such as would be required, authorizing the DSC to obligate or spend funds in advance of appropriations. We know of no applicable exception to the ADA. Nor can the Oil Companies cite one judicial decision finding a relevant exception to the ADA. The ADA thus independently precludes relief under the Taxes clause, assuming plaintiffs' reading of the clause is adopted. Cf. California-Pacific Utils. Co. v. United States, 194 Ct. Cl. 703, 715 (1971) (per curiam).

The Reconstruction Finance Corporation and its subsidiaries, including the DSC, were funded by annual congressional appropriations and were "agenc[ies] selected by Government to accomplish purely Governmental purposes." Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539 (1946). (Had appropriated funds not been involved, this Court might lack Tucker Act jurisdiction. See, e.g., AINS, Inc. v. United States, 365 F.3d 1333 (Fed. Cir. 2004)). Thus, the mere fact that the Chairman of the War Production Board delegated to the DSC, on February 13, 1942, authority to "determine . . . the . . . terms and the form of [its] contracts" indicates nothing with respect to the manner in which the DSC was authorized to obligate or expend appropriated funds. See Pl. Br. 34-35. (Two of plaintiffs' contracts were, in any event, executed

prior to this delegation and cannot, therefore, be affected by it. Compl. ¶ 9.c, g.) Nor does the DSC's charter, which lists its "corporate" purposes, contain any language authorizing it to obligate funds without regard to the appropriations process. See Pl. Br. 43-45.

Plaintiffs maintain that the relevant spending power which was delegated to the DSC had its source in the First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941) (repealed 1996). Pl. Br. 33. However, regardless of the extent to which the 1941 act may have loosened anti-deficiency restrictions upon spending for the War, President Franklin D. Roosevelt expressly and repeatedly reimposed anti-deficiency constraints when delegating his war powers. First, in Executive Order No. 9001 (Dec. 27, 1941), the President delegated power to make and administer contracts only "within the limits of the amounts appropriated therefor . . . .." Id. ¶ 1. Executive Order 9001, therefore, does not create an exception to the ADA.

The contemporaneous opinion of Attorney General Francis Biddle concerning Executive Order 9001, upon which plaintiffs rely, is not to the contrary. See Pl. Br. 37-38. That opinion addressed, among other things, a hypothetical agreement "to indemnify [a] dredge owner against loss of his dredge and plant by enemy action, and against liability as a self-insurer under various Workmen's Compensation laws." 40 U.S. Op. Atty. Gen. 225, 234 (1942). Indemnity for the contractor in that hypothetical example, however, would not implicate the ADA in the first instance, because the Government's maximum liability could be determined and covered by a reserve set aside from appropriated funds. See 62 Comp. Gen. 361 (1983); 55 Comp. Gen. 812 (1976). Thus, the 1942 Attorney General's opinion has nothing to do with the ADA.

Plaintiffs assert or imply that the Attorney General "conclu[ded] that 'unlimited indemnification agreements [were] valid and essential to the war effort.'" Pl. Br. 38 (quoting Johns-Manville Corp. v. United States, 12 Cl. Ct. 1, 24 (1987), lack of jurisd. recognized, 855

F.2d 1571 (Fed. Cir. 1988)).[1] That is manifestly incorrect. No language to that effect can be found in the 1942 opinion. The Attorney General simply adopted the premise, set forth in a letter from the Secretary of War to the Attorney General, that the "dredging . . . is deemed 'absolutely essential in the war effort'" – not that an indemnification agreement is essential. Id. (emphasis added). And, as noted, an agreement promising reimbursement for the loss of a dredge and for workers' compensation obligations is not an example of an "unlimited" or indefinite indemnity barred by the ADA, in any event. The 1942 Attorney General's opinion thus does not aid plaintiffs in any respect; and neither it nor Executive Order 9001 contain findings relevant to this case to which a court might "defer." See Pl. Br. 39-40.

Plaintiffs' argument that Executive Order 9024 (1942), in which the President created the War Production Board, contains an exception to the ADA is equally unfounded. Pl. Br. 33-34. Although plaintiffs quote extensively from that Order, they inexplicably ignore its most relevant paragraph, number 6: "The Chairman is further authorized within the limits of such funds as may be allocated or appropriated to the Board to employ necessary personnel and make provision for necessary supplies, facilities, and services" (emphasis added). As in Executive Order 9001, the President expressly incorporated anti-deficiency principles, limiting the scope of the delegation. None of the various policy making or contracting powers of the Chairman of the War Production Board, described at length by plaintiffs, however broad, could supersede this fundamental, original constraint upon the board's spending authority. Cf. Pl. Br. 34-36.

Executive Order 9246 (1942), which established the Rubber Reserve program and is cited in Cadillac Fairview/California v. Dow Chemical Co.. 299 F.3d 1019, 1029 & n.27 (9th

---

[1] The 1988 judgment of the court of appeals in Johns-Manville vacated a different trial court decision.

Cir. 2002), cited in Pl. Br. 35-36, contains no similar limitation upon the use of appropriated funds. Consequently, the holdings of Cadillac Fairview with regard to the ADA are immaterial to this case. Plaintiffs argue that "[t]he delegation of power in Executive Order 9024 is considerably broader than the Rubber Reserve order." Pl. Br. 36. However, with respect to the agencies' authority to obligate funds in advance of appropriations – which is the only relevant issue here – that reading is refuted by the text of the two Orders.

Plaintiffs also mistakenly argue that Executive Order 9040 (1942), in which the President delegated to the Chairman of the War Production Board the President's powers under section 120 of the National Defense Act of 1916, Pub. L. No. 64-85, § 120, 39 Stat. 166, 213 (1916), created an exception to the ADA that is relevant here. Pl. Br. 41-43. The 1916 act authorizes the President, "in time of war or when war is imminent . . ., through the head of any department of the Government, in addition to the present authorized methods of purchase or procurement, to place an order" with a natural or corporate person for goods ordinarily produced or sold by that person. 39 Stat. at 166 (emphasis added). A recipient of a section 120 order must comply or face criminal penalties, whereas the Government must provide "fair and just" compensation. Id.

One threshold difficulty for the Oil Companies with respect to Executive Order 9040 is that they do not allege, and we know of no evidence, that they received orders pursuant to section 120 of the 1916 act for the avgas delivered under these contracts. Plaintiffs argue they "were effectively required to enter the agreements at issue in this case, subject only to the Government's obligation to provide 'fair and just' compensation." Pl. Br. 42 (emphasis in original). There is a large and material legal gap, however, between "effectively" and actually. Absent evidence that section 120 authority was exercised, the statute and Executive Order 9040 are irrelevant.

An equally large problem for plaintiffs is that, even assuming section 120 was invoked in connection with the avgas contracts, the 1916 act does not create an exception to the ADA. Section 120 authorizes the President, in specified circumstances, to place mandatory "orders" for goods, outside of the ordinary procurement "methods," e.g., competitive bidding. Nowhere in the 1916 act, however, did Congress suggest, much less expressly state, that the President may disregard Congress' constitutional power of the purse and place an obligatory order absent available appropriations to pay for it. Cf. U.S. Const. art. I, § 9, cl. 7. Furthermore, even assuming section 120 could be read as creating an exception to the ADA, this exception would, by its terms, extend solely to the purchase of materials in exchange for "fair and just" compensation for the goods provided. The 1916 act, so read, still would not authorize the President to enter into open-ended indemnities in advance of appropriations. For all of these reasons, Executive Order 9040 does not affect plaintiffs' claims.

Even assuming the applicability of Executive Order 9040, finally, that Order could not aid plaintiff Texaco, Inc. in recovering under the avgas contract into which it allegedly entered on January 17, 1942, seven days before the issuance of Executive Order 9040. See Compl. ¶ 9.g.

Plaintiffs argue that International Paper Co. v. United States, 282 U.S. 399 (1931), "forecloses" our Anti-Deficiency Act defense because, there, in affirming an award of damages to a paper company under the Fifth Amendment, for a taking of its property, the United States Supreme Court relied in part upon the authority of the Secretary of War to requisition supplies under section 120 of the 1916 act. Pl. Br. 42; see 282 U.S. at 407-08. Reliance upon International Paper is misconceived. In addition to the fact, just noted, that section 120 was never invoked with respect to the avgas contracts, as it was in International Paper, see id. at 405-06, whether the United States is liable for a constitutional taking by an agency has nothing

whatsoever to do with the limitations imposed by the ADA. The ADA restricts only contracts and similar bilateral obligations of appropriated funds. See 31 U.S.C. § 1341. To our knowledge, no court has construed the ADA as potentially diminishing the "authority" of an agency to effect a taking. Certainly, no anti-deficiency arguments were raised or passed upon by the Court in International Paper. Plaintiffs' attempt to bootstrap their contractual and ADA arguments by reference to International Paper, a takings case, makes so sense. See Pl. Br. 43.

Because plaintiffs cite no authority lifting or easing the constraints of the ADA with respect to their avgas contracts, they cannot recover pursuant to the indefinite indemnity which they argue is contained in the Taxes clause, and their complaint should be dismissed.

## III. Alternatively, The Oil Companies Are Not Entitled To Summary Judgment

Even assuming the Court disagrees with our reading of the Taxes clause and our arguments with regard to the Anti-Deficiency Act, plaintiffs are not entitled to summary judgment with respect to liability. Among the stipulations entered into by the United States and the Oil Companies during the district court CERCLA litigation was a statement, drafted by the Oil Companies themselves, that "[m]atters relating to profits from these [avgas] contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s." Pl. App. 545 (¶ 609). The Court cannot determine from plaintiffs' appendix materials, and it certainly could not determine without weighing facts, whether or to what extent the admitted settlements of "all" issues "in the late 1940s" limited or extinguished plaintiffs' ability to claim indemnification under the Taxes clause of the contracts. Judgment as to liability should be denied upon the basis of this genuine and material issue of fact alone. See RCFC 56(c); Contract Settlement Act of 1944, 41 U.S.C. § 106(c) ("Where any such settlement [of a

World War II termination claim] is made by agreement, the settlement shall be [presumptively] final and conclusive . . . .").

Should additional grounds for denying plaintiffs' motion be necessary, all of the documents in the record which are alleged to constitute plaintiffs' avgas contracts appear to be unsigned by representatives of either plaintiffs or the Government and, therefore, do not suffice, without further authentication, to establish contracts for purposes of summary judgment. See Wang Labs., Inc. v. Applied Comp. Sci., Inc., 958 F.2d 355, 359-60 (Fed. Cir. 1992); Longo v. Shore & Reich, Ltd., 25 F.3d 94, 97 (2d Cir. 1994). The Government stipulated, in the course of the district court litigation, that the DSC entered into avgas contracts with plaintiffs Shell Oil Company and Union Oil Company, and with Richfield Oil Corporation (predecessor of plaintiff Atlantic Richfield Company), Texas Company (predecessor of plaintiff Texaco, Inc.), and Tidewater Oil Company (also a predecessor of Texaco), on or near the dates which are alleged by plaintiffs and reflected in the documents in their appendix. However, plaintiffs cite no stipulation in their moving papers, and we know of none, in which the Government authenticated as the "avgas contracts" any of the apparently unsigned documents upon which the Oil Companies rely in their motion. The inference must be drawn, for purposes of summary judgment, therefore, that these are draft or otherwise nonbinding or incomplete documents, and that the actual contracts may have contained other terms. See RCFC 56(c).

Finally, assuming the Court determines that the Oil Companies' factual allegations regarding their acid waste dumping practices in the 1940s are material to their liability arguments (although we see no connection), we controvert those allegations in our response to the Oil Companies' proposed findings. There are no grounds upon which to find the Government liable to any plaintiff, at this juncture, even if our motion is denied.

CONCLUSION

For the reasons given above and in our moving brief, we respectfully request the Court to dismiss the complaint or, in the alternative, deny plaintiffs' motion for judgment as to liability.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s

s/David M. Cohen
DAVID M. COHEN
Director

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

August 11, 2006

CERTIFICATE OF FILING

I certify that on August 11, 2006, the attached was filed electronically. I understand that service is complete upon filing and that parties and others may access this filing through the Court's electronic system.

s/Kyle Chadwick