IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | No. 06-141 C (Senior Judge Smith) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of this Court's Rules ("RCFC"), defendant, the United States, respectfully responds proposed findings filed by plaintiffs with their motion for partial summary judgment as to liability.

1. On April 10, 1942, Shell Oil Company, Incorporated, and the United States, through the Defense Supplies Corporation ("DSC"), entered into a contract for the sale and purchase of large volumes of 100-octane aviation gasoline ("Avgas"). Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (April 10, 1942) ("1942 Shell Contract"), Pl. App. 1-24.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

2. On May 1, 1943, Shell Oil Company, Incorporated, and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract

between Defense Supplies Corporation and Shell Oil Company, Incorporated (May 1, 1943) ("1943 Shell Contract"). Pl. App. 25-53.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

3. On December 31, 1942, Union Oil Company of California and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract between Defense Supplies Corporation and Union Oil Company (Dec. 31, 1942) ("1942 Union Contract"), Pl. App. 54-67.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

4. On May 1, 1943, Union Oil Company of California and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract between Defense Supplies Corporation and Union Oil Company of California (May 1, 1943) ("1943 Union Contract). Pl. App. 68-98.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

5. On February 3, 1942, Richfield Oil Corporation and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract between the Defense Supplies Corporation and Richfield Oil Corporation (Feb. 3, 1942) ("1942 Richfield Contract"), Pl. App. 99-116.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

6. On February 20, 1943, Richfield Oil Corporation and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract between Defense Supplies Corporation and Richfield Oil Corporation (Feb. 20, 1943) ("1943 Richfield Contract"), Pl. App. 117-48.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

7. On January 17, 1942, The Texas Company and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract between Defense Supplies Corporation and the Texas Company (Jan. 17, 1942) ("1942 Texas Contract"), Pl. App. 149-63.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

8. On February 8, 1943, The Texas Company and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract between the Defense Supplies Corporation and the Texas Company (February 8, 1943) ("1943 Texas Contract"), Pl. App. 164-91.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

9. On June 10, 142 Tidewater Associated Oil Company and the United States, through DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (June 10, 1942) ("Tidewater Contract"), Pl. App. 192-215.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

10. On February 18, 1943, Tidewater Associated Oil Company and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas.

Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (Feb. 18, 1943) ("1943 Tidewater Contract"), Pl. App. 216-43.

Response:

This is a legal conclusion to which RCFC 56 requires no response here.

11. The contracts identified in Paragraphs 1-10 required the Oil Companies to produce, manufacture, sell, and deliver large volumes Avgas. 1942 Shell Contracts, Pl. App. 1-24; 1943 Shell Contract, Pl. App. 25-53; 1942 Union Oil Contract, Pl. App. 54-67; 1943 Union Oil Contract, Pl. App. 68-98; 1942 Richfield Contract, Pl. App. 99- 116; 1943 Richfield Contract, Pl. App. 117-48; 1942 Texas Contract, Pl. App. 149-63; 1943 Texas Contract, Pl. App. 164-91; 1942 Tidewater Contract, Pl. App. 192-215; 1943 Tidewater Contract, Pl. App. 216-43.

Response:

These are legal conclusions to which RCFC 56 requires no response here. They cannot be supported, in any event, by the cited documents, which are unsigned and not authenticated in this record.

12. "Two byproducts, acid sludge and spent alkylation acid, necessarily resulted from the production of avgas." United States v Shell Oil Co., No. 91-0589, 1995 U.S. Dist. LEXIS 19778, at *7 (C.D. Cal. Sept. 18, 1995); see also United States v. Shell Oil Co., 294 F.3d 1045, 1050-51 (9th Cir. 2002); United States v. Shell Oil Co., 13 F. Supp. 2d 1018, 1023-25 (C.D. Cal. 1998); Stipulation 398, 493-96' Pl/ App. 452, 510-11.

Response:

Uncontroverted as matter of chemistry.

13. "[I]ncreased avgas production increased acid generation." Shell, 294 F.3d. at 1051; see also id. at 1050-51; Shell Oil Co.,13 F. Supp. 2d.at 1026; Stipulation Paragraphs 319-21, 338, Pl. App. 448-49, 452.

Response:

This is uncontroverted, but potentially misleading regarding the proportion of waste at the McColl Site from avgas versus other refinery products. A large majority of the total waste discovered at the McColl site "was acid sludge resulting from the chemical treatment of non-avgas refinery products using spent alkylation acid." 294 F.3d at 1051 (emphasis added). Moreover, "[t]he government never specifically ordered or approved the dumping of spent acid and acid sludge by the Oil Companies, and there is no evidence that the United States was aware of the disposal contracts between the Oil Companies and McColl." 294 F.3d at 1051. "'Spent' alkylation acid could be reprocessed, at some expense, so that its purity was once again high enough for use as an alkylation catalyst. Alternatively, spent acid either could be used in other refinery processes, or could be dumped without being reused." Id. at 1049.

14. During World War II, the Government was aware that the "increased avgas production increased acid waste generation." Shell, 294 F.3d. at 1051; see also Shell, 13 F. Supp. 2d.at 1027; Stipulation 338, Pl. App. 452.

Response:

Uncontroverted, but potentially misleading regarding the proportion of waste at the McColl Site from avgas versus other refinery products. See our response to number 13.

15. The increased volume of acid waste generated by the Oil Companies increased production of Avgas in satisfaction of their obligations under the contracts identified in

Paragraphs 1-10 overwhelmed existing acid waste reprocessing facilities. Shell, 294 F.3d. at 1051; Shell, 13 F. Supp. 2d.at 1023.

Response:

This is an argumentative paraphrase, and potentially misleading. A large majority of the total waste discovered at the McColl site "was acid sludge resulting from the chemical treatment of non-avgas refinery products using spent alkylation acid." 294 F.3d at 1051 (emphasis added). Moreover, "[t]he government never specifically ordered or approved the dumping of spent acid and acid sludge by the Oil Companies, and there is no evidence that the United States was aware of the disposal contracts between the Oil Companies and McColl." 294 F.3d at 1051. "'Spent' alkylation acid could be reprocessed, at some expense, so that its purity was once again high enough for use as an alkylation catalyst. Alternatively, spent acid either could be used in other refinery processes, or could be dumped without being reused." Id. at 1049. Moreover, although the quantities of spent alkylation acid increased during the war, the Oil Companies themselves reused or reprocessed much of that spent acid. Id. at 1051.

In contrast to spent alkylation acid, “[a]cid sludge had an acid content significantly lower than spent alkylation acid. Because of its low purity, it was difficult to reprocess and was not useful for refinery processes. Acid sludge had been a product of refinery operations before the discovery of the alkylation process. Before the war, the technology to reprocess acid sludge had existed, and some had, in fact, been reprocessed. For reasons of cost, however, most acid sludge had been dumped or burned. During the war, acid sludge was generated in much greater quantities than ever before, and the Oil Companies dumped most of it.” Id. Thus, only approximately 12 percent of the waste at the McColl Site is spent alkylation acid, while the

remaining waste is acid sludge, most of which "result[ed] from the chemical treatment of non-avgas refinery products using spent alkylation acid." Id.

16. During World War II, the Government was aware that the increase in acid waste generation created problems for the Oil Companies in how to dispose of the acid waste. See, e.g., Shell, 294 F.3d. at 1050-1051; Shell, 13 F. Supp. 2d.at 1027-28; Stipulation ¶¶ 360-64, 366-70,373-75, 378, 388, 391-93, 395, Pl. App. 455-56, 457-59, 459-60, 461, 464-65, 466-67, 468.

Response:

This is an argumentative paraphrase, and potentially misleading. See our response to number 15.

17. The Oil Companies sought Government approval to build additional acid reprocessing facilities to handle increased acid waste. See, e.g., Shell 13 F. Supp. 2d.at 1028; Stipulation 339-41, 379-92, Pl. App. 452, 461-67.

Response:

Uncontroverted, but potentially misleading. Most of the reprocessing facilities approved by the Government during the War were built by chemical companies that processed the Oil Companies' spent alkylation acid under contract. 294 F.3d. at 1051.

18. The "United States refused to allocate resources to build reprocessing plants." Shell, 294 F.3d. at 1060; see also id. at 1051; Shell, F. Supp. 2d.at 1028; Stipulation 357-64, Pl. App. 454-56.

Response:

This is a truncated quotation from the cited decision and is highly misleading. The appellate court stated, "On two occasions, the government refused to allocate the materials and

resources necessary to build new acid reprocessing facilities in northern California. However, some reprocessing facilities were built during the war. . . ." 294 F.3d. at 1060.

19. One reprocessing facility that was built near the Oil Companies' refineries during World War II failed to operate at design capacity. See, e.g., Shell, 294 F.3d. at 1051; Stipulation 357-64, Pl. App. 454-56.

Response:

Uncontroverted, but the Government was not responsible. Pl. App. 520 (¶ 524).

20. . "[T]his failure resulted in dumping of both spent alkyation acid and acid sludge." Shell, 294 F.3d. at 1051; Stipulation 364, Pl. App. 456.

Response:

Uncontroverted, but the Government was not responsible. Pl. App. 520 (¶ 524). Moreover, "[t]he United States did not exercise any actual control over the Oil Companies' disposal of spent acid and acid sludge at the McColl site; indeed, it did not even know that the Oil Companies had contracts to dispose of their waste at the site." 294 F.3d at 1057.

21. "[T]he United States generally refused to make tank cars available to the Oil Companies to transport the [acid] waste to Northern California for reprocessing." Shell, 294 F.3d. at 1060; see also id. at 1050-1051; Shell, 13 F. Supp. 2d.at 1027-28; Stipulation 342, 393, 401-02, 414-15,417-18,487, Pl. App. 452, 467, 468-69, 471, 472, 507.

Response:

Uncontroverted, but see our response to number 15.

22. "By late 1944 and 1945, the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries, and the facilities for

reprocessing this acid were insufficient. When the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl site." Shell, 294 F.3d. at 1051.

Response:

Uncontroverted, but the Government was not responsible. Pl. App. 520 (¶ 524). Moreover, "[t]he United States did not exercise any actual control over the Oil Companies' disposal of spent acid and acid sludge at the McColl site; indeed, it did not even know that the Oil Companies had contracts to dispose of their waste at the site." 294 F.3d at 1057.

23. "Most of the acid waste at the McColl Site began as fresh sulfuric acid … that was used in the alkylation units to produce alkylate for [Avgas]." Stipulation 496, Pl. App. 511; See, e.g., Shell, 13 F. Supp. 2d.at 1023-26.

Response:

This is literally uncontroverted but incomplete and potentially misleading. A majority of the total waste discovered at the McColl site "was acid sludge resulting from the chemical treatment of non-avgas refinery products using spent alkylation acid." 294 F.3d at 1051 (emphasis added).

24. The remaining acid waste at the McColl Site was related to benzol production. Shell at 294 F.3d.1051; Shell, 13 F. Supp. 2d at 1023.

Response:

Uncontroverted, but, for precision, "about 5.5% was acid sludge resulting from the treatment of government-owned benzol." 294 F.3d at 1051.

25. The United States was held liable under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, 42 U.S.C. §§ 9601 et seq, for 100 percent of the cleanup costs of the benzol-related acid waste dumped at the McColl Site. Shell, 294 F.3d. at 1059-61.

Response:

Uncontroverted. As noted, this was approximately 5.5 percent of the total waste.

26. The Oil Companies were held liable under CERCLA for the cleanup costs of the non-benzol-related acid waste dumped at the McColl Site. Shell, 294 F.3d. at 1048-49 (summarizing rulings).

Response:

This is uncontroverted but incomplete. The courts held, among other things, that the United States had no "arranger" liability under CERCLA inasmuch as the Oil Companies "voluntarily entered into the contracts and profited from the sale[s]; and . . . the United States was aware that waste was being produced, but did not direct the manner in which the companies disposed of it." 294 F.3d. at 1059.

27. The Oil Companies were required under CERCLA to pay for the cleanup costs of the non-benzol-related acid waste dumped at the McColl Site. Shell, 294 F.3d. at 1048-49 (summarizing rulings).

Response:

Uncontroverted.

28. Each of the Contracts identified in Paragraphs 1-10 contain the following contract clause, in relevant part:

> [A]ny new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [Avgas].

1942 Shell Contract 15, Pl. App. 16; 1943 Shell Contract 11, Pl. App. 26; 1942 Union Contract 7-8, Pl. App. 61-62; 1943 Union Contract 16, Pl. App. 84; 1942 Richfield Contract 13, Pl. App. 112; 1943 Richfield Contract 15, Pl. App. 132; 1942 Texas Contract 10, Pl. App. 159; 1943 Texas Contract 19-20, Pl. App. 183-84; 1942 Tidewater Contract 16, Pl. App. 208; 1943 Tidewater Contract 15-16, Pl. App. 231-32.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited documents, which are unsigned and not authenticated in this record. (This quotation also truncates the clause into a sentence fragment.)

29. Each of the contracts identified in Paragraphs 1-10 [was] terminated at the end of World War II. Stipulation ¶¶ 296, 609, Pl. App. 444, 545.

Response:

Uncontroverted. However, the record contains no evidence of the manner in which the terminations were negotiated or memorialized. We do know that "[m]atters relating to profits from these [avgas] contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s." Pl. App. 545 (¶ 609) (emphasis added).

30. On November 23, 2005, in accordance with § 13(a) of the Contract Settlement Act of 1944, 41 U.S.C. § 113(a), the Oil Companies submitted their demand for written findings addressing their termination claims under the contracts identified in Paragraphs 1-10 for the costs

of cleaning up the non-benzol related waste at the McColl Site. Letter from Michael W. Kirk to the Acting Administrator of the United States General Services Administration (Nov. 23, 2005), Pl. App. 554-59.

Response:

These are legal conclusions and plaintiffs' characterizations of their correspondence to which RCFC 56 requires no response here.

31. On February 15, 2006, the General Services Administration denied the Oil Companies' termination claim. Letter from Ruth Kowarski to Michael W. Kirk (Feb. 15, 2006), Pl. App. 560.

Response:

The allegation that the November 2005 letter constitutes a "termination claim" is a legal conclusion to which RCFC 56 requires no response here. See 41 U.S.C. § 103(h). That the cited letter from GSA denies compensation is uncontroverted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

August 11, 2006

CERTIFICATE OF FILING

I certify that on August 11, 2006, the foregoing was filed electronically. I understand that service is complete upon filing and parties and others may access this filing through the Court's electronic system.

s/Kyle Chadwick