**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 06-CV-141 (Senior Judge Smith) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)

September 1, 2006

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INDEX TO SUPPLEMENTAL APPENDIX ........ v

ARGUMENT ........ 1

I. THE AVGAS CONTRACTS UNAMBIGOUSLY REQUIRE THE GOVERNMENT TO REIMBURSE THE OIL COMPANIES FOR THE CERCLA CLEANUP COSTS ........ 2

A. The Oil Companies' Claimed Costs Are "Charges" ........ 3

B. The Reimbursement Clause Does Not Require That The New Or Additional Costs Be Imposed Or Incurred During Contract Performance ........ 6

C. The Oil Companies' Claimed Costs Were Incurred By Reason of the Production of Avgas in Performance of the Avgas Contracts ........ 7

II. THE OIL COMPANIES' CLAIMS ARE NOT BARRED BY THE ANTI-DEFICIENCY ACT ........ 10

A. The First War Powers Act and Executive Order 9024 ........ 11

B. Executive Order 9001 ........ 14

C. Executive Order 9040 and National Defense Act of 1916 ........ 18

III. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT ........ 21

A. Stipulation No. 609 ........ 22

B. Authentication of the Avgas Contracts ........ 23

CONCLUSION ........ 26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Atlantic & Gulf Stevedores, Inc. v. Donovan*, 274 F.2d 794 (5th Cir. 1960)................................16

*Bancamerica Commercial Corp. v. Trinity Indus., Inc.*, 900 F. Supp. 1427 (D. Kan. 1995)..........5

*Buchanan v. Department of Energy*, 247 F.3d 1333 (Fed. Cir. 2001).......................................4, 5

*Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019 (2002).....11, 12, 14, 15, 18

*City of Wichita v. APCO*, 306 F. Supp. 2d 1040 (D. Kan. 2003) ..................................................5

*Consumers Ice Co. v. United States*, 475 F.2d 1161 (1973)..........................................................7

*Currier v. McKee*, 59 A. 442 (Me. 1904) ........................................................................................8

*E.I. DuPont de Nemours & Co. v. United States*, 365 F.3d 1367 (Fed. Cir. 2004).....................6, 7

*Ford Motor Co. v. United States*, 378 F.3d 1314 (Fed. Cir. 2004)......................................6, 7, 22

*Foster v. United States*, 130 F. Supp. 2d 68 (D.D.C. 2001) .........................................................5

*Holmes v. Security Inv. Protec. Corp.*, 503 U.S. 258 (1992).........................................................8

*Huntington Cab Co. v. American Fidelity & Cas. Co.*, 155 F.2d 117 (4th Cir. 1946) ....................8

*Information Sys. & Network Corp. v. United States*, 68 Fed. Cl. 336 (2005).............................4, 6

*International Paper Co. v. United States*, 282 U.S. 399 (1931)............................................19, 21

*Longo v. Shore & Reich LTD*, 25 F.3d 94 (2d Cir. 1994)............................................................25

*McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525 (D.N.J. 1986)......................................8

*Radcliff Gravel Co. v. Henderson*, 138 F.2d 549 (5th Cir. 1943)................................................16

*Roxford Knitting Co. v. Moore & Tierney, Inc.*, 265 F. 177 (2d Cir. 1920)...........................19, 20

*C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539 (Fed. Cir. 1993) .........................................3

*Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d 629 (Fed. Cir. 1997) .....................4

*United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018 (C.D. Cal. 1998) ........................................10

*United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002) ....................19

*Wang Labs., Inc. v. Applied Computer Sci., Inc.*, 958 F.2d 355 (Fed. Cir. 1992) ....................25

**Administrative Opinions**

40 Op. Att'y Gen. 225 (1942) ....................15, 17

55 Comp. Gen. 812 (1976) ....................15

62 Comp. Gen. 361 (1983) ....................15, 16

**Statutes, Rules, and Regulations**

42 U.S.C. § 9601, *et seq.* ....................1

44 U.S.C. § 2116(b) ....................24

National Defense Act of 1916, Pub. L. No. 64-85, 39 Stat. 166 (1916) ....................10, 18

First War Powers Act of 1941, Pub. L. No. 77-354, 55 Stat. 838 (1941) .................... *passim*

48 C.F.R. § 1.101 ....................5

48 C.F.R. § 1.108 ....................5

Exec. Order No. 9001, 6 Fed. Reg. 6787 (Dec. 27, 1941) .................... 10, 14-18

Exec. Order No. 9024, 7 Fed. Reg. 329 (Jan. 16, 1942) .................... 10-14

Exec. Order No. 9040, 7 Fed. Reg. 527 (Jan. 24, 1942) ....................10, 18

Exec. Order No. 9246, 7 Fed. Reg. 7379 (Sept. 17, 1942) ....................11, 12, 14

Federal Rules of Evidence 901 and 902 ....................24

**Other**

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 312 (4th ed. 2000) ....................4

BLACK'S LAW DICTIONARY 248 (8th ed. 2004) ....................4

BLACK'S LAW DICTIONARY 310, 1102 (3d ed. 1933) ....................4

THE NEW CENTURY DICTIONARY 239 (2d ed. 1946) ....................4

WEBSTER'S NEW CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 288 (Unabridged 1941).....4

# INDEX TO SUPPLEMENTAL APPENDIX

**Declaration**

Declaration of Amanda L. Butler (September 1, 2006) ..........0561

Attachment 1 – Contract between Defense Supplies Corporation and Shell Oil Company, Inc. (Apr. 10, 1942)..........0563

Attachment 2 – Contract between Defense Supplies Corporation and Shell Oil Company, Inc. (May 1, 1943)..........0588

Attachment 3 – Contract between Defense Supplies Corporation and Union Oil Company (Dec. 31, 1942)..........0614

Attachment 4 – Contract between Defense Supplies Corporation and Union Oil Company of California (May 1, 1943) ..........0629

Attachment 5 – Contract between Defense Supplies Corporation and Richfield Oil Corporation (Feb. 3, 1942)..........0663

Attachment 6 – Contract between Defense Supplies Corporation and Richfield Oil Corporation (Feb. 20, 1943)..........0682

Attachment 7 – Contract between Defense Supplies Corporation and The Texas Company (Jan. 17, 1942) ..........0715

Attachment 8 – Contract between Defense Supplies Corporation and The Texas Company (Feb. 8, 1943)..........0731

Attachment 9 – Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (June 10, 1942) ..........0760

Attachment 10 – Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (Feb. 18, 1943) ..........0785

Attachment 11 – Contract between Defense Supplies Corporation and Tidewater Associated Oil Company (May 19, 1943) ..........0814

**Other**

Appellant's Excerpts of Record in *United States v. Shell Oil Co.*, Nos. 00-55027 & 00-55072 (9th Cir., June 16, 2000) ..........0845

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 06-CV-141<br>(Senior Judge Smith) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

The Government seeks to avoid liability for breaching its contractual promise to Plaintiffs (collectively, the "Oil Companies") with three sets of arguments. First, the Government offers strained interpretations of the relevant contractual language that are contradicted by its own prior concessions, the plain language of the agreements, and binding Federal Circuit precedent. Second, notwithstanding the settled precedent holding that promises made by the United States to reimburse environmental cleanup costs arising from performance of World War II contracts were authorized by law, the Government asserts that the Anti-Deficiency Act bars relief. Third, the Government seeks to manufacture issues of material fact by reference to a stipulation entered by the parties during the litigation of the underlying claims made under the Comprehensive Environmental Response, Compensation and Liability Act of 1978 ("CERCLA"), as amended, 42 U.S.C. § 9601, *et seq.*, and by asserting that the copies of the contracts submitted with the Oil Companies' cross-motion for partial summary judgment "appear to be unsigned," Defendant's

Reply in Support of Motion to Dismiss and Opposition to Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 17) ("Gov't SJ Opp.") 15, even though the contracts signify that they were executed by both sides with typewritten signatures on the signature line, often with the notation "(Sgd)", in accordance with common pre-Xerox practice. *See*, *e.g.*, Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (May 1, 1943) ("1943 Shell Contract") 19, Pl. App. 44. For the reasons set forth below, all of these arguments fail.

## I. THE AVGAS CONTRACTS UNAMBIGUOUSLY REQUIRE THE GOVERNMENT TO REIMBURSE THE OIL COMPANIES FOR THE CERCLA CLEANUP COSTS.

The Oil Companies' argument on the merits is straightforward. The reimbursement clause in each of the Avgas Contracts states, in relevant part, that:

> [The Government] shall pay in addition to the prices as established [in other parts of the contract], any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [Avgas].

*See*, *e.g.*, 1943 Shell Contract 16-17, Pl. App. 41-42. As we demonstrated in our cross-motion, the Oil Companies' claimed costs are indisputably (1) new or additional charges; (2) which the Oil Companies have been required to pay by federal law; and (3) which were incurred by reason of the production, manufacture, sale or delivery of the Avgas.[1] Nevertheless, the Government raises four primary objections to the inevitable conclusion that flows from this contract language. First, contrary to its concession in its Motion to Dismiss, the Government now argues that the Oil Companies' claimed costs are not "charges." Second, the Government urges the Court to read

[1] The Oil Companies only seek recovery of costs that they have been required to pay under CERCLA, Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss and in Support of Their Cross-Motion for Partial Summary Judgment (Doc. No. 10) ("Pl. Br.") 25, and the Government has not disputed that the Oil Companies satisfy the second element of the reimbursement clause requiring that the claimed costs be required by federal law.

into the reimbursement clause a temporal requirement. Third, the Government argues that the phrase "by reason of" requires a showing of proximate causation, and that the Oil Companies cannot satisfy that standard. Finally, the Government argues that even if "by reason of" establishes a "but for" causation standard, the Oil Companies still cannot satisfy that standard.

As we demonstrate below, none of these arguments can overcome the unambiguous language of the reimbursement clause.

**A. <u>The Oil Companies' Claimed Costs Are "Charges"</u>.**

It is well established that "[a] contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993). The Government accurately captured the plain meaning of the term "charge" in its Motion to Dismiss the Complaint ("Gov't Mot. to Dismiss") (Doc. No. 7). There, the Government conceded that the reimbursement clause "*by its terms, covers only new costs* (with exceptions not pertinent here) imposed by authorities at any level of Government 'by reason of the production, manufacture[,] sale [or delivery] of [the Avgas].' " *Id*. at 11 (quoting 1943 Shell Contract 16-17, Pl. App. 42) (emphasis added). Thus, the Government correctly stated that the plain meaning of "charges" includes costs, which necessarily includes the Oil Companies' claimed costs.

Despite its own reading of the term "charges," the Government now opposes our summary judgment motion by advancing a new, arbitrarily narrow definition of the term that is crafted to exclude the Oil Companies' claimed costs. The Government asserts that "charge … plainly connotes an amount paid in exchange for receiving a privilege, product or service," and, we are now told, the Oil Companies' "CERCLA liabilities do not fit [the Government's definition], especially … [because c]ourts are not naturally said to 'charge' parties monies that

are awarded as damages in civil suits." Gov't SJ Opp. 3-4. The Government, however, does not, and cannot, cite *any* authority – legal or otherwise – in support of its new interpretation, and the authority that does exist uniformly refutes it.

First, both legal and general dictionaries, both World War II era and current editions, confirm the correctness of the Government's original understanding that the plain meaning of "charge" includes costs and expenses, and is not as narrowly limited as the Government now argues. *See, e.g.*, BLACK'S LAW DICTIONARY 248 (8th ed. 2004) ("charge" means, among other things, "[p]rice, cost or expense"); BLACK'S LAW DICTIONARY 310 (3d ed. 1933) ("charges" means "[t]he expenses which have been incurred, or disbursements made in connection with a contract, suit, or business transaction"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 312 (4th ed. 2000) ("charge" means, among other things, an "expense, cost"); THE NEW CENTURY DICTIONARY 239 (2d ed. 1946) (same); WEBSTER'S NEW CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 288 (Unabridged 1941) ("charge" means, among other things, "[c]ost; expense; as the <u>charges</u> of war"). The Federal Circuit and this Court have repeatedly held that courts may rely on the dictionary definition of a contract term to identify that term's plain meaning. *See, e.g., Buchanan v. Department of Energy*, 247 F.3d 1333, 1338-39 (Fed. Cir. 2001) (relying on the dictionary definition in holding that the contract term was unambiguous); *Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d 629, 633 (Fed. Cir. 1997) (same); *Information Sys. & Network Corp. v. United States*, 68 Fed. Cl. 336, 344-45 (2005) (granting summary judgment after relying on dictionary definition in holding that the contract term was

unambiguous).[2] Here, the dictionaries uniformly confirm that the ordinary meaning of "charges" encompasses the Oil Companies' CERCLA costs.

Second, contrary to the Government's unsupported claim, courts often speak of "charges" as encompassing CERCLA costs. In *City of Wichita v. APCO*, 306 F. Supp. 2d 1040 (D. Kan. 2003), for example, the district court found that a state agency's "charges [for government oversight were] necessary costs of the response at the Site, and are fully recoverable" under CERCLA. *Id.* at 1093-94; *see also Bancamerica Commercial Corp. v. Trinity Indus., Inc.*, 900 F. Supp. 1427, 1460-61 (D. Kan. 1995) (finding that the "charges" the liable party paid to a vendor relating to testing, characterizing, and removing hazardous substances "are to be considered CERCLA response costs"). Likewise, the United States District Court for the District of Columbia recently noted that, "[a] party liable for the presence of hazardous substances under CERCLA may be *charged* for the cost of ascertaining the danger posed by an actual or threatened release of hazardous substances," subject to certain statutory restrictions. *Foster v. United States*, 130 F. Supp. 2d 68, 77 (D.D.C. 2001) (internal quotation marks and citation omitted) (emphasis added). And we are aware of no court that has held to the contrary.

Against this background, there can be no question that the Oil Companies' claimed "costs" are "charges" as that term is understood in "ordinary parlance." *Buchanan*, 247 F.3d at 1339. Thus, the Court should reject the Government's newly minted and wholly unsupported definition of the term and hold that the Oil Companies' CERCLA costs are reimbursable charges.

---

[2] Notably, the Federal Acquisition Regulations (FAR) that were established to codify and publish "uniform policies and procedures for acquisition by all executive agencies," 48 C.F.R. § 1.101, provides that in interpreting FAR all "[u]undefined words retain their common dictionary meaning." 48 C.F.R. § 1.108.

### B. The Reimbursement Clause Does Not Require That The New Or Additional Costs Be Imposed Or Incurred During Contract Performance.

The Government seeks to read in a temporal requirement where none exists. As an initial matter, the Government attempts to dismiss as "syntactical arguments [that] carry no weight," Gov't SJ Opp. 4, our reliance upon the plain meaning of the contract terms "by reason of" and "new or additional" as not imposing a requirement that the costs be incurred during contract performance. But the Government does not, and cannot, articulate how the ordinary reading of those terms creates a temporal requirement. More fundamentally, the Government's assertion that our plain meaning arguments "carry no weight" does violence to the most basic principle of contract interpretation, that contract terms are accorded their "plain and ordinary meaning." *Information Sys.*, 68 Fed. Cl. at 341.

The Federal Circuit has twice rejected the argument the Government now asks this Court to accept. *See Ford Motor Co. v. United States*, 378 F.3d 1314, 1320 (Fed. Cir. 2004) (holding that "[t]he passage of time did not negate Ford's [CERCLA] liability, and does not defeat the government's obligation of reimbursement"); *E.I. DuPont de Nemours & Co. v. United States*, 365 F.3d 1367, 1373-74 (Fed. Cir. 2004). The Government attempts to distinguish *Ford* and *DuPont* by pointing out that the reimbursement clauses in those cases used somewhat different language than the Oil Companies' contracts. Gov't SJ Opp. 4-5. The differences in wording do not help the Government, however, because the Oil Companies' contracts, like those in *Ford* and *DuPont*, contain no language whatever limiting the promised reimbursement to charges incurred during contract performance. Indeed, the language of the *Ford* contract also differed from that of the *DuPont* contract, yet the Federal Circuit did not find that the differences in language required a different result. If anything, the Oil Companies' contractual language is stronger than

that in either the *Ford* contract or the *DuPont* contract on this point because it expressly refers to "new or additional" charges.

The Government argues that, absent a clear statement that no temporal limit exists, the Court must assume that one exists. Gov't SJ Opp. 3 (citing *Consumers Ice Co. v. United States*, 201 Ct. Cl. 116, 475 F.2d 1166-67 (1973)). But both *Ford* and *DuPont* "confirmed the government's obligation of indemnification for a later-arising CERCLA claim" where the contract includes "no temporal limit." *Ford*, 378 F.3d at 1319 (citing *DuPont*, 365 F.3d at 1373-74). Neither contract included the "clear" or "unmistakable" statement that the Government claims is required. *Consumers Ice* is wholly inapposite. That case involved a Government lease of real property at a nominal rent of $1 per year. The dispute concerned an ambiguous duration provision that the Government asserted effectively granted a perpetual right of occupation. 201 Ct. Cl. at 125, 475 F.2d at 1166. In the language quoted by the Government in this case, the court was merely invoking a provision of the Restatement of Property that the court read to bar reading an indefinite duration term in a lease as a perpetual property grant. 201 Ct. Cl. at 125-26, 475 F.2d at 1166-67. As the Federal Circuit's decisions in *Ford* and *DuPont* demonstrate, this rule of lease interpretation has no application in this context.

### C. The Oil Companies' Costs Were Incurred By Reason of the Production of Avgas in Performance of the Avgas Contracts.

The Government argues that the contractual phrase "by reason of" establishes a proximate causation standard rather than a but-for causation standard as the cases cited in our opening brief held. The authority cited by the Government does not support its argument in this context, but the Court need not resolve this issue because even if the contract is interpreted to require a showing that the Oil Companies' Avgas production proximately caused them to incur

the CERCLA costs, the undisputed facts in the record compel the conclusion that this standard has been satisfied.

The cases cited in our opening brief all stand for the proposition that the phrase "by reason of," as it is used in contracts promising to reimburse costs, establishes a but-for causation standard. *See* Pl. Br. 29-30 (citing cases). In response, the Government cites three other cases in urging this Court to find that the contract phrase " 'by reason of' is naturally read as imposing a *proximate* causation requirement, rather than only a but-for-test." Gov't SJ Opp. 6 (emphasis in original). However, two of the three cases are wholly inapposite because they involved use of the phrase in a statute, not in a contract. *See Holmes v. Security Inv. Protec. Corp.*, 503 U.S. 258, 267-68 (1992); *Currier v. McKee,* 59 A. 442 (Me. 1904). The third, *McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525, 536 (D.N.J. 1986), does suggest in dicta that " 'by reason of' … would appear to require proximate causation," 645 F. Supp. at 536, but the court's *holding* was limited to the proposition that the phrase merely "requires at least some causal connection …." *Id*. *McNeilab* involved an insurance claim by the manufacturer of Tylenol for the costs associated with its voluntary recall after some Tylenol capsules had been laced with cyanide.[3] The insurance policy covered only costs incurred "by reason of the liability" of the insured, and the manufacturer had not been found liable, so the "recall in the present case was not caused by *liability* …." *Id*. (emphasis in original).

In any event, the facts the Government admits in its Responses to Plaintiffs' Proposed Findings of Uncontroverted Fact ("Gov't Fact Resp.") are more than sufficient to demonstrate

[3] Ironically, enough, the Government argues that the contemporaneous authority we cited, *Huntington Cab Co. v. American Fidelity & Casualty Co.*, 155 F.2d 117 (4th Cir. 1946), is "hardly persuasive" because it involved "an insurance policy" rather than, as here, "commercial contracts." Gov't SJ Opp. 8. The Government obviously does not believe its own argument as the Court would likewise be required under the same reasoning to reject *McNeilab* because it too involved an insurance contract.

that the CERCLA costs incurred by the Oil Companies were proximately caused by the Avgas production. First, the Government admits that the relevant hazardous substances, acid sludge and alkylation acid, "necessarily resulted from the production of avgas." Gov't Resp. ¶ 12 (citation and internal quotation omitted). The Government likewise admits that "[m]ost of the acid waste at the McColl Site began as fresh sulfuric acid … that was used in the alkylation units to produced alkylate for [Avgas]." Gov't Resp. ¶ 23 (citation and internal quotation omitted). The remaining waste was related to benzol production for which the Government has already been held liable. Gov't Resp. ¶ 24. We also demonstrated, and the Government admits, that the huge volume of Avgas required by our Armed Forces resulted in a correspondingly huge volume of acid waste that overwhelmed existing treatment facilities. Pl. Br. 18; Gov't Resp. ¶¶ 13-14, 22. Finally, we demonstrated, and the Government admits, that the Oil Companies had no reasonable alternative but to dump the waste if they were to maintain the Avgas production required by the contracts. *See* Pl. Br. 28-29; Gov't Resp. ¶¶ 17-22. In fact, nowhere in the Government's opposition does it contend that the Oil Companies had any other available alternative but to dump the waste. In short, these admissions are more than sufficient to establish proximate causation in this case.

The Government points to a stipulation generally describing the Oil Companies' acid sludge disposal practices in the 1930s and early 1940s, *see* Gov't Opp. 6 (citing Stipulation ¶ 500, Pl. App. 512), but the stipulation says nothing about the causal relationship between Avgas production and the dumping at the McColl Site during World War II – it is not clear whether the acid sludge referenced in the stipulation was even sent to McColl. The Government also argues that "[t]he avgas contracts did not require particular disposal practices; and the Government never ordered or approved dumping at the McColl site." Gov't Opp. 6. Neither of

these assertions in any way changes the fact that the dumping occurred "by reason of" the production of avgas. The fact remains that the production of avgas necessarily entailed the creation of the waste, and the Oil Companies had no alternative means available for disposing of it. As the district court found in the underlying CERCLA action, "100 percent of the non-benzol waste at the McColl site is attributable to the avgas program." *Shell*, 13 F. Supp. 2d at 1026.[4]

## II. THE OIL COMPANIES' CLAIMS ARE NOT BARRED BY THE ANTI-DEFICIENCY ACT.

We demonstrated in our opening brief that the Government's promises to reimburse the Oil Companies for CERCLA costs incurred by reason of their production of Avgas were not *ultra vires* under the Anti-Deficiency Act because they were authorized by numerous statutes, executive orders, and executive directives. *See* Pl. Br. 32-45. The First War Powers Act, Executive Order 9024, Executive Order 9001, the National Defense Act of 1916, Executive Order 9040, and the Defense Supplies Corporation ("DSC") charter provide at least four independent lines of authority for the Government's promise to reimburse the Oil Companies for

[4] Although it does not raise the argument in its brief, the Government suggests in its response to our statement of undisputed facts that causation has not been established because a large percentage of the waste at the McColl Site "was acid sludge resulting from the chemical treatment of non-avgas refinery products using spent alkylation acid." *See, e.g.*, Gov't SJ Resp. ¶ 23 (emphasis, internal quotation, citation omitted). This argument fails because it is undisputed that the acid sludge arising from treatment of non-avgas products all resulted from the Oil Companies' secondary use of spent alkylation acid derived from Avgas production. This secondary use of the waste arising from Avgas production thus mitigated the extent of the dumping. As the district court found, "one important fact is clear: the primary contaminant at the McColl Site is the sulfuric acid. This acid would be present in the same (or slightly greater) quantities irrespective of whether the Oil Companies had chosen to make secondary use of the acid for non-avgas products." *Shell*, 13 F. Supp. 2d at 1026. For this reason, the court squarely found that "100 percent of the non-benzol waste at the McColl site is attributable to the avgas program," notwithstanding the fact that some acid sludge resulted from the treatment of non-avgas products using spent alkylation acid that was itself a product of avgas production. *Id*. The Government's argument here is simply a red-herring, because the Oil Companies' secondary use does not, and cannot, break the causal chain. To put it somewhat differently, mitigation does not defeat causation.

the costs at issue in this case, any one of which is sufficient to defeat the Government's Anti-Deficiency Act argument. In effort to repudiate its contractual promises, the Government challenges three of these authorizations. We address each of those challenges in turn.[5]

### A. <u>The First War Powers Act and Executive Order 9024</u>

The Government does not challenge the Ninth Circuit's holding that a similar World War II reimbursement promise was not barred by the Anti-Deficiency Act because it "was authorized by law, namely the emergency powers Congress gave the President, and the regulations issued by the executive branch for the prosecution of the war." *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019, 1029 (9th Cir. 2002). In particular, the Government does not take issue with the Ninth Circuit's holding that the First War Powers Act of 1941 empowered President Roosevelt "to authorize agencies to make contracts 'without regard to the provisions of law' such as the Anti-Deficiency Act, 'whenever he deemed such action would facilitate the prosecution of the war.' " *Id.* (quoting First War Powers Act of 1941, Pub. L. No. 77-354, § 201, 55 Stat. 838, 839, Pl. App. 0286). Instead, the Government attempts to manufacture a distinction between Executive Order 9024 (the order conveying authority to enter petroleum contracts) and Executive Order 9246 (the order governing rubber production that was before the Ninth Circuit in *Cadillac Fairview*). The asserted distinction fails.

---

[5] The fourth independent line of authority authorizing the reimbursement promises arises from DSC's charter and the RFC's enabling legislation. *See* Pl. Br. 43-45. The Government all but ignores it, limiting its response to the unsupported claim that DSC's charter does not "contain any language authorizing it to obligate funds without regard to the appropriations process." Gov't SJ Opp 10. To the contrary, the charter granted DSC extraordinarily broad power (i.e., the power to "perform all acts and things *whatsoever* which are necessary, suitable, convenient, or proper in connection with or incidental to the foregoing objects, purposes, and powers, including, but without limitation, the power . . . to make contracts," Pl. App. 331 (emphasis added)), that clearly encompassed the power to make the reimbursement promises. Notably, the Government does not deny that the charter had the force of law.

The Government claims that Executive Order 9024 should not be read to authorize the reimbursement promises because paragraph 6 of the Order "expressly incorporate[s] anti-deficiency principles" into the authority delegated by the President to the War Production Board ("WPB"), Gov't SJ Opp. 11, and thus into the authority delegated by the WPB to DSC. Paragraph 6, the Government argues, renders the Ninth Circuit's holding in *Cadillac Fairview* "immaterial." *Id*. at 12. The Government, however, misreads paragraph 6 and bases its argument on a tortured and implausible reading of Executive Order 9024 as a whole.

Executive Order 9024 contains seven separately numbered paragraphs, five of which are relevant to this discussion. *See* Exec. Order No. 9024, 7 Fed. Reg. 329 (Jan. 16, 1942), Pl. App. 246-47. Paragraph 1 establishes the WPB and position of WPB Chairman. Paragraph 2 then sets forth the WPB Chairman's powers, including, without limitation, the power to "[d]etermine the policies, plans, procedures, and methods of the several departments, establishments, and agencies in respect to war procurement and production, including purchasing, contracting, specifications, and construction." Exec. Order No. 9024, ¶ 2(b), Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247. Next, paragraphs 3 and 5 provide the means for implementing paragraph 2: first, paragraph 3 mandates that all other federal entities "shall comply" with the WPB Chairman's determinations under paragraph 2; second, paragraph 5 provides that the WPB Chairman "may exercise the powers, authority, and discretion conferred upon him by [Executive Order 9024] through such officials or agencies and in such manner as he may determine; and his decisions shall be final." Exec. Order No. 9024, ¶¶ 3, 5, Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247. As we have previously demonstrated, *see* Pl. Br. 35-36, these provisions of Executive Order 9024 granted *considerably broader* authority than do the corresponding provisions of Executive Order 9246, a point the Government does not deny.

Instead, the Government claims that this sweeping substantive power is limited by paragraph 6, which states that "[t]he Chairman is *further* authorized within the limits of such funds as may be allocated or appropriated to the Board to employ necessary personnel and make provision for necessary supplies, facilities, and services." Exec. Order No. 9024, ¶ 6, Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247 (emphasis added). On its face, this grant of additional power simply does not limit the authority granted in the other paragraphs of the order. Rather, paragraph 6, by its plain language, merely authorizes the WPB Chairman to "employ necessary personnel," and to "make provision for necessary supplies, facilities, services," for the administration of the WPB and limits only these *administrative expenditures* authorized in paragraph 6 to funds allocated or appropriated to the WPB. Nothing in this grant of additional power to create a WPB bureaucracy and employee personnel, purchase supplies, and house that bureaucracy purports to limit the power granted in the substantive provisions of the Executive Order. Indeed, far more noteworthy is the absence of such a limitation in paragraphs 2, 3 and 5.[6]

The Government does not dispute the proposition that the WPB Chairman delegated to the DSC the power to set the terms of the Avgas Contracts that was granted to him in Executive Order 9024. *See* Letter dated Feb. 13, 1942 from WPB Chairman Nelson to Harold I. Ickes, Petroleum Coordinator for National Defense, Pl. App. 305.[7] Instead, it asserts that because the

---

[6] Indeed, the WPB Chairman's power to "[d]etermine policies, plans, procedures, and methods," for the Government with respect to "contracting" for "war procurement and production" could not conceivably have been limited to the extent of the funds appropriated or allocated to the WPB for *administrative expenses* as provided for in paragraph 6, as the Government's argument necessarily suggests.

[7] The Government does state that two of the Avgas Contracts were "executed prior to this delegation and cannot, therefore, be affected by it." Gov't SJ Opp. 9-10 (citing Complaint ¶ 9.c, g.). As an initial matter, we assume that the Government meant to refer to the 1942 Richfield contract identified in Complaint ¶ 9.e., instead of the 1942 Union contract identified in Complaint ¶ 9.c, as that contract is dated ten months after the date of the WPB Chairman's delegation. With respect to the 1942 Richfield contract, the 1943 Richfield contract,

RFC and DSC were appropriated entities, the WPB Chairman's delegation "indicates nothing with respect to the manner in which the DSC was authorized to obligate or expend appropriated funds." Gov't SJ Opp. 9. But as we have established, Executive Order 9024 permitted the WPB Chairman to make the reimbursement promises notwithstanding the Anti-Deficiency Act, and his decisions in this regard are "final." Exec. Order No. 9024, ¶ 5, Fed. Reg. 329, 330 (Jan. 16, 1942), Pl. App. 247. Because the WPB Chairman delegated the authority to the DSC to determine "[o]n behalf of the Government," Letter dated Feb. 13, 1942 from WPB Chairman Nelson to Harold I. Ickes, Petroleum Coordinator for National Defense, Pl. App. 305, the terms of the contract, the DSC received the WPB Chairman's authority to make the reimbursement promises at issue here.

Executive Order 9024 cannot be distinguished from the Executive Order before the Ninth Circuit in *Cadillac Fairview*. It follows that, as in that case, the Anti-Deficiency Act does not bar enforcement of the Government's reimbursement promises.

**B. <u>Executive Order 9001</u>**

Wholly apart from Executive Order 9024, President Roosevelt exercised the power granted to him in the First War Powers Act in Executive Order 9001. The Ninth Circuit invoked Executive Order 9001 in addition to Executive Order 9246 in support of its holding that the Anti-

---

indisputably entered into after the WPB Chairman's delegation, expressly states that the 1942 contract is "hereby modified to the extent that it is inconsistent herewith and shall otherwise remain in full force and effect." Contract between Defense Supplies Corporation and Richfield Oil Corporation (February 20, 1943), Pl. App. 118. With respect to the 1942 Texas Company contract identified in Complaint ¶ 9.g, the 1943 Texas Company contract, indisputably entered into after the WPB Chairman's delegation, expressly states that the 1942 contract "is replaced by the present contract and is hereby terminated and cancelled." Contract between Defense Supplies Corporation and The Texas Company (February 18, 1943), Pl. App. 165. Accordingly, the Government's liability in no way depends on the dates of entry of the 1942 Richfield and 1942 Texas Company contracts.

Deficiency Act did not bar the reimbursement promise in *Cadillac Fairview*, 299 F.3d at 1029 n.27, and the contemporaneous opinion of the Attorney General of the United States confirms the correctness of that holding. As we explained in our opening brief, *see* Pl. Br. 36-40, Attorney General Biddle authored a formal opinion in 1942 concluding that the First War Powers Act and Executive Order 9001 authorized an agreement to "indemnify [a] dredge owner against loss of his dredge and plant by enemy action, and against liability as a self-insurer, under various Workmen's Compensation laws." 40 U.S. Op. Atty. Gen. 225, 234, 240 (1942), Pl. App. 313, 316. This opinion clearly confirms that the First War Powers Act and Executive Order 9001 authorized open-ended indemnification agreements like those before the Court in this case. *Id.* Despite this clear conclusion, the Government challenges Attorney General Biddle's opinion on two grounds, both of which lack merit.

The Government first relies on two opinions of the Comptroller General in asserting that the indemnification example "would not implicate the [Anti-Deficiency Act] in the first instance." Gov't SJ Opp. 10 (citing 62 Comp. Gen. 361 (1983); 55 Comp. Gen. 812 (1976)) (emphasis removed). However, the Comptroller Opinions the Government cites do not support its argument. These opinions stand for the unremarkable proposition that the Comptroller General has never objected to indemnity agreements where, at the time of contracting, (1) "the maximum amount of liability is fixed or readily ascertainable," and (2) "the agency had sufficient funds in its appropriation which could be obligated or administratively reserved to cover the maximum liability." 62 Comp. Gen. at 364-66; *accord* 55 Comp. Gen. at 826-27 (exercise of contract option did not violate Anti-Deficiency Act where the Navy's binding commitments did not exceed available appropriations). The Government has provided *no analysis*, much less made a showing, of how the indemnification approved by Attorney General

Biddle, on its face, meets both elements such that it would be valid under the Anti-Deficiency Act absent separate authorization by law.

Nor could the Government make such a showing. While the Government claims that its "maximum liability could be determined," Gov't SJ Opp. 10, nothing in the Attorney General's opinion supports that assertion. Even if the value of the dredge was determinable, the approved indemnification also protected the contractor against liability as a "self-insurer" under worker's compensation laws. There would be "no possible way to know … whether there are sufficient funds in the appropriation to cover" the worker's compensation liability, "if and when it arises because no one knows in advance how much the liability may be." 62 Comp. Gen. at 366. By its nature, it is not possible to know in advance the number, extent, or cost of the injuries suffered by a contractor's employees. Indeed, federal worker's compensation law provided *unlimited* medical benefits in this context.[8] Attorney General Biddle's interpretation of the Government's contracting authority under the First War Powers Act and Executive Order 9001 thus clearly did not depend upon the assumption that anti-deficiency rules were satisfied. Rather, he concluded that because the indemnification agreement was "in the interest of facilitating the war effort," the First War Powers Act and Executive Order 9001 authorized it.

[8] The Longshoremen's and Harbor Workers' Compensation Act ("LHWCA") requires "payment of substantial compensation and the furnishing of medical benefits *unlimited in duration and cost*." *Atlantic & Gulf Stevedores, Inc. v. Donovan*, 274 F.2d 794, 802 (5th Cir. 1960) (interpreting statutory language first adopted in 1927) (emphasis added). It was well settled at the time of Attorney General Biddle's opinion that injuries to dredging employees are covered by the LHWCA. *See, e.g.*, *Standard Dredging Corp. v. Henderson*, 150 F.2d 78, 80 (5th Cir. 1945) (worker employed by company engaged in dredging navigable channel and whose injury and death occurred on navigable waters was covered by the LHWCA, even though most of his work was on land); *Radcliff Gravel Co. v. Henderson*, 138 F.2d 549, 550 (5th Cir. 1943) (death of two men who trimmed sand and gravel as it was loaded on barges after being dredged from a lakebed was compensable under the LHWCA).

Finally, it is noteworthy that the Government has not disputed the point made in our opening brief that Attorney General Biddle's opinion itself constitutes a considered exercise of the power granted to the Executive in the First War Powers Act to authorize the making of contracts that the Anti-Deficiency Act may have otherwise prohibited, and as such, it is definitive without regard to any claim that its reasoning is deficient. *See* Pl. Br. 38-40. Nor has the Government taken issue with our alternative submission that the opinion stands as the Executive's authoritative interpretation of Executive Order 9001. *Id.* The Government's only response to both points is the erroneous claim that the Attorney General did not, in fact, consider an open-ended indemnity agreement. Because we have conclusively shown that this is incorrect, the Court should and must defer to the Attorney General's findings.

The Government's second argument – that it was the dredging, not the indemnification, that was essential to the war effort, Gov't SJ Opp. 11 – borders on sophistry. The question put to the Attorney General was whether the War Department could agree to the indemnification, given the War Department's statements that the dredging was "absolutely essential to the war effort," and that it was "to the Government's advantage to guard against any possible interference with this vital work." 40 Op. Att'y Gen. 225, 240 (1942), Pl. App. 313. Accordingly, the Attorney General expressly stated his understanding that "the proposed action [i.e., the indemnification agreement] 'is deemed expedient in the interest of facilitating the war effort, of insuring the continued operation of the dredge, and as a fair assumption of the risk caused solely by the war.' " *Id*, at 234. Based on this understanding, the Attorney General specifically concluded that the indemnification agreement itself – the proposed action – was necessary "to protect the interests of the United States within the meaning of Title of the First War Powers Act," and thus authorized by the Act and by Executive Order 9001.

The Government does not address, or even acknowledge, the Ninth Circuit's holding in *Cadillac Fairview* that the Anti-Deficiency Act did not render the Government's promise to indemnify Dow Chemical for its CERCLA costs *ultra vires* because the First War Powers Act authorized the President to make such promise " 'without regard to the provisions of law' such as the Anti-Deficiency Act," and President Roosevelt had exercised that power in, *inter alia*, Executive Order 9001. 299 F.3d at 1029 & n.27. This Court should adopt the Ninth Circuit's conclusion, and reject the Government's mistaken criticism of Attorney General Biddle's opinion.

**C. Executive Order 9040 and National Defense Act of 1916**

In our opening brief, we showed that Executive Order 9040, 7 Fed. Reg. 527 (Jan. 24, 1942), Pl. App. 248, invoking Section of 120 of the National Defense Act of 1916, Pub. L. No. 64-85, § 120, 39 Stat. 166, 213 (1916), Pl. App. 259 ("Section 120"), provides yet another independent authorization for the Government's reimbursement promises. *See* Pl. Br. 41-43. In response, the Government raises multiple arguments largely without citing *any authority* to support its position. Gov't SJ Opp. 12-14. We address each of the Government's arguments below.[9]

First, the Government asserts that there is "no evidence[] that [the Oil Companies] received orders pursuant to Section 120," and "[a]bsent evidence that section 120 authority was exercised, the statute and Executive Order 9040 are irrelevant." Gov't SJ Opp. 12. Notably, the

[9] The Government observes that the 1942 Texas Company contract was entered seven days before the issuance of Executive Order 9040. Gov't SJ Opp. 13. The 1943 Texas Company contract, indisputably entered into after Executive Order 9040 expressly states that the 1942 contract "is replaced by the present contract and is hereby terminated and cancelled." 1943 Texas Company Contract, Pl. App. 169. Accordingly, the Government's liability in no way depends on the date of entry of the 1942 Texas Company contracts.

Government does not deny that the Oil Companies were effectively required to enter the contracts in this case – as the Ninth Circuit pointed out, the Government "had the authority to require production of goods at refineries owned by the Oil Companies, and even to seize refineries if necessary." *United States v. Shell Oil Co.*, 294 F.3d 1045, 1050 (9th Cir. 2002). Rather, the Government asserts that being "effectively" required is insufficient absent an actual Section 120 order. Gov't SJ Opp. 12. The Government cites no authority for this claim, and its argument is directly contrary to settled case law. *See International Paper Co. v. United States,* 282 U.S. 399 (1931); *Roxford Knitting Co. v. Moore & Tierney, Inc.*, 265 F. 177 (2d Cir. 1920).

In *International Paper*, the Government argued, as it does here, that Section 120 did not apply on the ground that the case involved "merely a making of arrangements by contract." 282 U.S. at 407. The Court squarely rejected this argument, holding that "all the agreements were on the footing that the Government had made a requisition that the other party was bound to obey." *Id*.

In *Roxford*, plaintiff claimed that it had been required under Section 120 to fulfill its contracts with the Army and Navy during World War I, thus excusing its failure to perform under contracts with the defendant in the case. 265 F. at 178-79. The contracts with the Army and Navy did not specify that they were entered into pursuant to Section 120. *Id.* at 179, 187. In fact, the Navy had established a form order for commandeering orders such as under Section 120 to distinguish them from the Navy's usual contracts, but did not use that form in connection with the plaintiff's contracts. *Id.* at 186-87.

Nevertheless, the Second Circuit rejected the defendant's contention that plaintiff had not been "ordered," within the scope of Section 120, to contract with the Government. The court explained that by its terms Section 120 authorizes the President "to place an order," but the

statute "does not prescribe the method by which an order shall be placed[.]" *Id.* at 190. "An order might be placed in the form and terms of polite request. It is left to the discretion of the government to determine the manner in which orders are to be placed, and how its intentions are to be communicated, orally or by writing." *Id.* at 188. Thus, an "order" within the scope of the Section 120 is not "necessarily exclusive of orders which the government has placed and put into a writing which appears to be contractual because a price to be paid is stated therein and signed by both parties." *Id.* at 191; *see also id.* at 186 (noting that "[a]ll four of the plaintiff's 'orders' thus appear in the record as formal contracts, reduced in writing and signed by the contracting parties"). Accordingly, Section 120 does not require an "order" to take a specific form or even refer to the statute.

Moreover, where, as here, the circumstances surrounding the contracting indicate that the contractor was effectively required to enter the contracts at issue, that is sufficient to invoke Section 120. As the Second Circuit well stated:

> And when a manufacturer is given to understand that he is required to supply certain goods to the government of the United States, and is told that he has no option to decline to comply, we are satisfied that as to those goods an 'order' has been placed or received within the spirit and intent and the letter of the statute, whether the authoritative direction is written or oral, and notwithstanding the fact that the parties actually come to an agreement in what has the form of a contact. Substance is not to be sacrificed in such cases to form.

*Roxford*, 265 F. at 191. The Government cannot, and does not, dispute that the Oil Companies were effectively required to enter the Avgas Contracts – i.e., they "were given to understand that [they] were required to supply certain goods to the government … and [had] no option to decline to comply," *id.* *See United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1022 (C.D. Cal. 1998) ("Suffice it to say, the petroleum industry was essentially required to cooperate with the Government in providing essential resources to support our fighting forces and was subject to pervasive oversight by the WPB, PAW, and other agencies of the federal Government").

Next, the Government argues that Section 120's grant of power to the President, "in addition to the present authorized methods of purchase or procurement" to requisition materials necessary to the war effort, is insufficient to authorize indemnification agreements like the reimbursement promises in this case. Gov't SJ Opp. 13. According to the Government, the power granted "in addition to present authorized methods of purchase or procurement" is not specific enough to overcome the otherwise applicable limitations of the Anti-Deficiency Act. But the Government offers no authority whatever for this assertion, and the language of the statute refutes it. The limitations imposed by the Anti-Deficiency Act (enacted in 1906) clearly constrained "present authorized methods of purchase or procurement"; by its terms, Section 120 expanded the President's purchase and procurement authority beyond such constraints and authorized "the President, with the power of the country behind him, in critical time of war, [to] requisition[] what was needed and g[e]t it." *International Paper*, 282 U.S. at 406. The Court rejected the Government's argument, made here as well, that it lacked authority in these circumstances, pointedly emphasizing that "if any technical defect of authority had been pointed out it would have been remedied at once." *Id*.

Finally, the Government struggles mightily to distinguish *International Paper*, asserting that because it was a takings case, it "has nothing whatsoever to do with the limitation imposed by the [Anti-Deficiency Act]." Gov't Opp. 13-14. But the Government's invocation of the Anti-Deficiency Act here directly implicates the core issue decided by the Supreme Court in *International Paper*: did the Government have the authority to do whatever it took (including in this case promising to reimburse costs incurred by reason of the Oil Companies' production of Avgas) to procure materials essential to the Nation's war effort?

## III. <u>THERE ARE NO GENUINE ISSUES OF MATERIAL FACT</u>.

The Government argues that a stipulation entered between the parties creates a genuine issue of material fact. The Government also argues that the conformed copies of the Avgas Contracts submitted in our appendix were unsigned, and therefore creates a genuine issue of material fact as to the contracts' authenticity. As we detail below, the Court may easily dispense with these arguments.

**A. <u>Stipulation No. 609</u>**

The parties have stipulated that the Avgas Contracts were terminated at the end of World War II, and "[m]atters relating to profits from these contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s." Stipulations between the United States and the Oil Companies in *United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.) ("Stipulation"), ¶ 609, Pl. App. 545. The Government argues that an issue of material fact exists as to whether the settlement of "all other issues" in the 1940s extinguished the Oil Companies' claim that the Government must reimburse CERCLA costs incurred in the 1990s.

On its face, this stipulation merely states that the parties settled all issues that were pending between them in the late 1940s. Obviously, no "issue" existed at that time concerning the Oil Companies' CERCLA liability. As the Federal Circuit has held in rejecting a closely analogous argument, the "claim for reimbursement is not barred merely because the originating events are long past, for the liability for cleanup did not arise until after enactment of CERCLA and other environmental laws, and the claim was timely made after it arose." *Ford*, 378 F.3d at 1320. Simply stated, the parties could not have settled the claim before this Court in the late 1940s because it did not exist at that time.

The context in which the parties agreed to Stipulation ¶ 609 confirms this obvious point. The stipulation was entered in 1997 when the parties were actively litigating the Government's contractual liability, yet neither the district court nor the Government ever read the stipulation as resolving the Oil Companies' contract claims.[10]

### B. <u>Authentication of the Avgas Contracts</u>

Contrary to the Government's assertion—which stands in striking opposition to its previous statements—there can be no question that the contracts submitted in our appendix (Pl. App. 1-243) are authentic and the face of the documents demonstrates they were in fact executed. The Government has advanced no evidence to contrary. Indeed, the Government has admitted the existence of these contracts, *see* Gov't SJ Opp. 15; Gov't Mot. to Dismiss 2 ("The Oil Companies alleged, *and we agree*, that, between them, they entered into 10 individual contracts between January 1942 and May 1943 with the Defense Supplies Corporation.") (emphasis added), it has stipulated that each of the contracts contains the reimbursement provision relied upon by the Oil Companies in this action, *see* Stipulation ¶ 605, Pl. App. 543, and indeed *the Government* submitted copies of most of the Avgas Contracts to the Ninth Circuit in its appeal in the underlying CERCLA action.

The contracts submitted to this Court in our Appendix were originally produced during discovery in the CERCLA litigation, and, we believe, were obtained from the National Archives

[10] Although unnecessary for the Court to reject the Government's argument, we note that the parties have been litigating the contractual and CERCLA liability issues for *fifteen years*, including through several summary judgment proceedings and one trial. Certainly, after all of the discovery that has taken place, the Government would have brought evidence to the Court's attention if it seriously believed that the resolution of "all other issues … in the late 1940s," Stipulation ¶ 609, "limited or extinguished plaintiffs' ability to claim indemnification under" the reimbursement clause. Gov't Opp. 14. That it did not do so reinforces the conclusion that "all other issues" refers only to those issues pending between the parties in the late 1940s.

for that case. Seven of those had been previously submitted to the Ninth Circuit by the Government in its Appendix. *See* Plaintiffs' Supplemental Appendix ("Pl. Supp. App.") 845-46.[11] Though the contracts submitted to this Court were not photocopies of the Government's Ninth Circuit appendix, but rather were copies produced in discovery that, we believe, had been obtained from the National Archives, the text of the contract reproductions submitted to this Court and those submitted by the Government to the Ninth Circuit are identical. *See* Declaration of Amanda L. Butler ("Butler Decl.") ¶¶ 9-10, Pl. Supp. App. 562.

To remove all doubt as to the contracts' authenticity, we have obtained from the National Archives certified reproductions of all contracts at issue in this case, certified as "true and correct cop[ies]" of the contracts housed there. *See* Butler Decl. ¶ 5, Pl. Supp. App. 561. These certified copies are submitted herewith, Pl. Supp. App. 563-844. As these documents are authenticated by the official seal and certification of the National Archives, the Court is required to take judicial notice of their authenticity. 44 U.S.C. § 2116(b).[12] The Government can do no less. This seal and certificate also satisfies the requirements of the Federal Rules of Evidence, as there is no genuine suspicion concerning the provenance of well-preserved records at the National Archives

[11] The Government's Ninth Circuit Appendix did not include the contracts between DSC and Tidewater or the 1942 contract between the DSC and Texas Company. Additionally, the Supplemental Appendix includes a contract that has not been previously submitted in this case. This contract is between the Defense Supplies Corporation and the Tidewater Associated Oil Corporation, dated May 19, 1943 and labeled as the "Fourth Contract." This contract was discovered during our recent research at the National Archives. *See* Butler Decl. ¶ 6, Pl. Supp. App. 562.

[12] Each contract submitted in our Supplemental Appendix contains a Certificate of Authenticity personally signed by Timothy K. Nenninger, Chief, Modern Military Records, who attests, "By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and correct copy of documents in his custody."

dating to a half-century ago, of which certified copies have been made pursuant to statute. *See* FED. R. EVID. 901(a), (b)(8) and 902(4),(8).

The Government also argues that there is no evidence in the record demonstrating that the contracts were executed, as the copies of the contracts do not bear ink signatures. Gov't SJ Opp. 2, 15. However, the Government overlooks the fact that each contract included in our Appendix and Supplemental Appendix is identified, on its face, as a *conformed* copy of the original contract. The technology of the day during World War II did not permit photocopies of original contract documents reflecting ink signatures. Rather, conformed copies were necessarily produced for the files. That is to say, each contract we have submitted to this Court is "[a]n exact copy of a document bearing written explanation of things that were not or could not be copied, such as a note on the document indicating that it was signed by a person whose signature appears in the original." BLACK'S LAW DICTIONARY 360 (8th ed. 2004). The contracts submitted in Plaintiffs' original appendix and the certified copies obtained from the National Archives and submitted in our supplemental appendix are each labeled as a "CONFORMED COPY" and contain the notes "sgd" or "SEAL" alongside the typed signature, demonstrating that the original was in fact signed.[13] *See* Pl. Supp. App. 564, 582, 589, 608, 615, 625, 630, 649, 664, 679, 683, 701, 716, 728, 732, 755, 761, 780, 786, 805, 815, and 834.

The Government cites two cases, both of which stand for the unremarkable – and inapplicable – proposition that parties cannot be bound by unexecuted contracts where the record demonstrates that they did not intend to be so bound. In *Wang Laboratories, Inc. v. Applied*

[13] Ironically enough, the march of technology has led to the revival of this practice for documents that are electronically filed with this Court. In the very brief in which the Government claims the contracts at issue were not executed, the signature of Government counsel does not appear in ink, but rather is indicated by the symbol "s/" followed counsel's typed name. Surely the Government does not contend that counsel did not sign the brief. *Cf.* RCFC 11(a).

*Computer Sciences, Inc.*, 958 F.2d 355, 359-60 (Fed. Cir. 1992), the Federal Circuit reversed a grant of summary judgment enforcing draft settlement agreement that, all agreed, had not been executed by the parties. Likewise, in *Longo v. Shore & Reich LTD*, 25 F.3d 94, 96 (2d Cir. 1994), the Second Circuit merely held that "there [could] be no recovery under the negotiated but unsigned [employment agreement] since the defendants evidenced their intent not to be bound by the instrument until it was signed by both parties." Neither of these cases have any application where, as here, the record compels the conclusion that the contracts were in fact executed.

## CONCLUSION

For the foregoing reasons, and those stated in our principal brief, we respectfully submit that the Court should deny the Government's motion to dismiss and enter partial summary judgment as to liability for breach of contract in favor of the Oil Companies.

**CERTIFICATE OF FILING**

I certify that on September 1, 2006, the attached document was filed electronically. I understand that service is complete upon filing and that parties may access this filing through the Court's ECF system.

s/ Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Vincent J. Colatriano
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)