**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., Plaintiffs, | |
| v. | Case No. 06-CV-141 (Senior Judge Smith) |
| UNITED STATES OF AMERICA, Defendant. | |

**PLAINTIFFS' SUPPLEMENTAL APPENDIX IN SUPPORT OF THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)

September 1, 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | Case No. 06-CV-141 (Senior Judge Smith) |

**DECLARATION OF AMANDA L. BUTLER**

I, Amanda L. Butler, hereby state and declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the following is true and correct:

1. I am a legal assistant at the law firm of Cooper & Kirk, PLLC, counsel to Plaintiffs Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc. (collectively, the "Oil Companies"). I submit this Declaration in support of the Oil Companies' Motion for Partial Summary Judgment as to Liability.

2. On Thursday, August 17, 2006 and Friday, August 18, 2006, I visited the National Archives in College Park, Maryland and reviewed several files of the Petroleum Administration for War ("PAW").

3. Specifically, within Record Group 253 (PAW files), Entry Group 510, I reviewed in their entirety the documents within boxes 3545 (Richfield Oil Company records), 3553 and 3554 (Shell Oil Company records), 3590 (The Texas Company records), 3593 (Tidewater Associated Oil Company records), and 3594 and 3595 (Union Oil Company records).

4. Within these records, and in particular within folders labeled as containing contract material, I found the conformed copies and drafts of the contracts at issue in this case.

5. I requested the National Archives and Records Administration (NARA) copy each conformed copy of the contracts at issue in this case that I found within the files I reviewed. The NARA has certified the authenticity of these contracts, which are attached to this Declaration as Attachments 1-10.

6. I also located one additional conformed copy of a contract that has not been previously submitted in this case. This contract is between the Defense Supplies Corporation and the Tidewater Associated Oil Corporation, dated May 19, 1943 and labeled as the "Fourth Contract." I requested that NARA copy this conformed copy of the contract and NARA has certified the authenticity of this contract, which is attached to this Declaration as Attachment 11.

7. I did not find any original hand signed contracts between the Defense Supplies Corporation and the Oil Companies, or any photo duplications thereof.

8. I found no indication within any file I reviewed that the contracts submitted within the Supplemental Appendix were not executed or not intended to be final; and I found no indication of any executed or final contract post-dating and superseding the latest-dated contract between the Defense Supplies Corporation and each Oil Company, with the single exception of the contract identified in Paragraph 6 of this Declaration.

9. I have carefully compared the text of the contracts submitted to courts in this litigation and the CERCLA litigation in the United States District Court for the Central District of California: the seven contracts submitted to the Ninth Circuit by the Government on June 16, 2000, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1050 (9th Cir. 2002); the ten contracts submitted to this Court by the Oil Companies on July 3, 2006; and the eleven contracts attached herewith to this Declaration today.

10. The contracts identified in Paragraph 9 vary in the following material ways and none other:

    a. The 1943 Union contract, as submitted to the Ninth Circuit and in our Appendix (Pl. App. 68-98), omitted pages 31 and 32, which are an amendment to the contract in the form of a letter dated August 16, 1943 from DCS to Union. These pages are included within Attachment 4.
    b. The 1943 Shell contract in our Appendix reproduces an error first introduced in the Ninth Circuit Appendix: it is an amalgam of the actual conformed contract (Pl. App. 25-49) and an exhibit and guarantee of an unconformed, unsigned contract (Pl. App. 50-53). The complete conformed copy of the contract, which omits those final four unconfirmed pages, is submitted herewith as Attachment 2.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on this 1st day of September 2006.

[signature]
Amanda L. Butler

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

T ll to whom these presents shall come. Greeting:

virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, he seal of the National Archives of the United States, that the attached reproduction(s) is a true and copy of documents in his custody.

SIGNATURE

NAME Timothy K. Nenninger

DATE AUG 21 2006

TITLE Chief, Modern Military Records

NAME AND ADDRESS OF DEPOSITORY
National Archives at College Park
8601 Adelphi Road
College Park, MD 20740-6001

NA FORM 14007 (10-88)

SHELL OIL COMPANY, INCORPORATED

(California Refineries)

100-OCTANE AVIATION GASOLINE

April 10, 1942.



DECLASSIFIED
Authority NND-730034
By TM NARA Date

184407

April 8, 1942

DWW

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

SHELL OIL COMPANY, INCORPORATED

(California Refineries)

100-OCTANE AVIATION GASOLINE

April 10, 1942.



DECLASSIFIED
Authority NND 730 014
By [illegible] NARA Date [illegible]

184407

DEFENSE SUPPLIES - SHELL CONTRACT

(California Refineries)

April 8, 1942.

CONTRACT made as of April 10, 1942, between SHELL OIL COMPANY, INCORPORATED, a Virginia corporation, having offices at 100 Bush Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Expansion of Seller's Refining Facilities.

Seller has existing facilities for the production at its Wilmington-Dominguez and Martinez, California, refineries of approximately three thousand (3,000) barrels per calendar day of the type of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, and is currently expanding the facilities at its Wilmington-Dominguez, Refineries at an estimated cost of approximately Two Million Dollars ($2,000,000.00), to a degree which it is estimated will enable Seller to produce at its said Refineries a total of approximately four thousand (4,000) barrels per calendar day of said gasoline. Seller is willing to expand its facilities at its Wilmington-Dominguez Refineries further at an estimated additional cost of approximately Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00), to a degree which it is estimated will enable Seller to produce at its Wilmington-Dominguez and Martinez Refineries a total of approximately ten thousand (10,000) barrels per calendar day of said aviation gasoline.

Seller shall use its best efforts so to expand said facilities to maintain work on the expansion day and night in so far as the requisite labor and materials are available, and to complete such expansion as soon as possible and not later than August 1, 1943.

Seller represents that there has not been included in the estimated expenditure of approximately Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00) any allowance for premium payments to secure



DECLASSIFIED
Authority NND 730 034
By JM NARA, Date

earlier delivery of material, overtime, or bonus payments (all of which are herein called "bonus payments"). Seller will make or arrange for such bonus payments as will in its judgment substantially expedite the completion of the new facilities, and full and complete records of such payments shall be maintained and made available to Buyer. Buyer shall pay Seller the amount by which the actual cost of construction of the facilities not now under construction, including all such bonus payments, exceeds whichever is the greater of (a) the actual cost of construction of the facilities not now under construction, excluding all bonus payments, and (b) Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00).

Such repayment of bonus payments shall be made by distributing the same as an addition to the unit price of the first three million five hundred thousand (3,500,000) barrels of 100-Octane aviation gasoline purchased after receipt of the notice of completion referred to in Section I (a) hereof. If Buyer fails to purchase said quantity of three million five hundred thousand (3,500,000) barrels at such increased price on or before July 31, 1944, Buyer shall on or before August 20, 1944 pay to Seller the unpaid balance of such bonus payments, which shall be treated as an advance payment of a portion of the purchase price of the remainder of the three million five hundred thousand (3,500,000) barrels at the time the purchase of such remaining quantity is made at the increased price.

If Buyer shall notify Seller at any time that it does not desire that additional expenditures for bonus payments shall be incurred or that such additional expenditures should be limited in a specified way or to a specified amount, Seller shall endeavor to arrange for the termination of any contracts or commitments for such bonus payments to the extent indicated in such notice so as to reduce the liability of Buyer hereunder.

As used above, the term "bonus payments" shall include any charges for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments.

The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.





DECLASSIFIED Authority NND 730034 By [illegible] NARA, Date [illegible]

Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive 100-Octane aviation gasoline which shall be in accordance with the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) The quantity of said gasoline shall be such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez Refineries, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, from and after Buyer's receipt of the notification referred to in paragraph (a) of this Section II until the end of the original term of this contract and during any extension thereof; provided, however, that from and after Buyer's receipt of said notification until the end of the original term of this contract but not during any extension thereof, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of six thousand (6,000) barrels per day. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various grades of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various grades of gasoline. The damages, if any, for a breach of the foregoing provisions of paragraphs (a) and (b) of this Section II shall be in accordance with Section VIII hereof.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation





DECLASSIFIED
Authority NND 730034
By [illegible] NARA, Date [illegible]

184407

the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(d) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100-Octane aviation gasoline as the total refining capacity for 100-Octane aviation gasoline at Seller's Wilmington-Dominguez and Martinez Refineries, less the quantity of Seller's sales of 100-Octane aviation gasoline from said refineries to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(g) Seller shall maintain storage facilities at, or in the vicinity of, its Wilmington-Dominguez Refineries to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline at six thousand (6,000) barrels per day. Seller represents that it has, and agrees to maintain storage facilities at its Martinez Refinery to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline at five hundred (500) barrels per day, which is the present production.

(h) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder



DECLASSIFIED
Authority NND-720 014
By TM NARA, Date 8/9

...er shall have substantially reduced by purchase and removal the ...of gasoline in storage. If such full storage condition exists, ...ler shall have the right to diminish the quantities otherwise to be ...livered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantity specified in paragraph (b) of this Section II. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof.

(i) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(j) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time in the facilities referred to in Section II (g) hereof to the extent of not more than Three hundred and ninety thousand (390,000) barrels.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez Refineries between the date of execution of this contract and the date of receipt of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such



DECLASSIFIED
Authority NND 730034
By [illegible] NARA, Date [illegible]

Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez Refineries between the date of receipt by Buyer of the notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (1) the quantity to be purchased by Buyer under the provisions of paragraphs (a) and (b) of Section II hereof and (2) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) The base price of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, shall be Thirteen and sixty-five hundredths cents ($0.1365) per gallon, f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California. The base price of 100-Octane aviation gasoline specified as Item 2 of Exhibit A hereof shall be Thirteen and four-tenths cents ($0.134) per gallon, f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California.

(b) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.





DECLASSIFIED
Authority NND 730034
By [illegible] NARA Date [illegible]

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven degree ($27^{0}$) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field. The prices shall be increased or decreased five hundred ninety-three ten-thousandths of one cent ($0.000593) per gallon for each one cent ($0.01) advance or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seven hundred nineteen ten-thousandths of one cent ($0.000719) per gallon for each one point increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index number is now ninety-four and nine-tenths (94.9). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be





DECLASSIFIED
Authority NND 730 014
By TM NARA, Date

...tuted, the determination of the new index shall be made by arbitra-... under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refineries at Wilmington-Dominguez and Martinez, California, and upon a normal operation of said refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refineries by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by





DECLASSIFIED
Authority NND 730034
By TM NARA Date 3/65

the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

(d) If at the request of Buyer or other agency of the United States Government, Seller acquires from other refiners some of the components of 100-Octane aviation gasoline and moves the same to its refineries for blending with other stocks for the production of 100-Octane aviation gasoline, it shall be entitled to compensation for any increase in costs thereby incurred by increasing the price of the 100-Octane aviation gasoline so produced by an amount which will equal the difference between the purchase price of such components and the cost of manufacturing the same or similar components at its own refineries, plus transportation and other costs of any kind or character involved in the delivery of the components to the refinery where the blending occurs. If Seller and Buyer are unable to agree upon the amount of such additional compensation, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later, in any event, than July 31, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.





DECLASSIFIED
Authority NND 730034
By IM NARA Date

Loan to Seller.

(a) Buyer shall loan to Seller Eleven Million Six Hundred Twenty-Five Thousand Dollars ($11,625,000.00) which shall be disbursed by Buyer to Seller in installments of approximately One Million Dollars ($1,000,000.00) each as the expansion of the facilities referred to in Section I hereof progresses. The first installment shall be disbursed immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. Each remaining installment shall be disbursed upon Seller's request and upon receipt by Buyer from Seller of satisfactory evidence that it has expended or firmly committed itself to expend within the succeeding thirty (30) days on account of the expansion of the facilities referred to in Section I hereof all of the funds theretofore advanced to it by Buyer plus the amount of the installment requested, and in addition has so expended or firmly committed itself to expend within the succeeding thirty (30) days from its own funds not less than Thirty-Three and One-Third percent (33 1/3%) of the aggregate of such installments advanced by Buyer, including the installment for which the request is then being made.

(b) Such loan shall bear interest at the rate of two percent (2%) per annum on the outstanding balance thereof, until repaid.

(c) Seller shall repay the principal amount of the aforementioned loan to Buyer in equal monthly installments, as near as can be determined, plus interest accrued to the time of each such repayment, beginning the twentieth (20th) day of the month following the month in which Buyer receives the notification referred to in Section II (a) hereof and ending on the twentieth (20th) day of the month following the expiration of the original term of this contract; provided, however, that if Buyer shall breach its obligation to disburse the installments of said loan in accordance with this Section VII, or shall breach its obligation to buy the quantities of 100-Octane aviation gasoline called for by Section II (a) hereof, then Seller may withhold such part or all of the unrepaid portion of said loan including interest thereon (other than repayments, if any,



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

...ing due prior to such breach), as shall not exceed the amount of dam-ages claimed by Seller to result from such breach pending determination by agreement, arbitration or otherwise, of Buyer's liability, if any, for such breach. Upon such determination Seller shall only be obligated to repay to Buyer the unrepaid portion of said loan, plus interest accrued to date of breach, plus interest from date of breach on the amount, if any, by which said unrepaid portion of said loan exceeds the amount of the damages, if any, sustained by Seller, less the amount of said damages, if any.

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100-Octane aviation gasoline in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline unless the storage facilities referred to in Section II (g) hereof are full of 100-Octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100-Octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (h) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in



DECLASSIFIED
Authority NND-730034
By TM NARA Date

cess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's said refineries in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on Board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform to usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States within





DECLASSIFIED
Authority NND 730 034
By TM NARA Date

which Seller customarily delivers gasoline from its Wilmington-Dominguez and Martinez Refineries, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss during the performance of such service, Seller shall make its records available to Buyer to prove the extent and value of such loss.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to





DECLASSIFIED Authority NND 730 034 By TM NARA, Date

select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes





DECLASSIFIED Authority NND 730034

that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.





DECLASSIFIED
Authority NND 730 [illegible]
By [illegible] NARA Date [illegible]

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days; (a) Seller shall have entered into satisfactory contracts, with responsible engineering contractors for the expansion of the facilities referred to in Section I hereof at a cost not materially in excess of Seller's presently estimated cost as set forth in Section I hereof; and (b) Seller shall have received (1) all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations





DECLASSIFIED
Authority NND 730034
By TM NARA Date 85

184407

necessary for obtaining materials, equipment, supplies and crude petroleum; and (2) such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

Dudley H. Digges
Acting Secretary

(Seal)

SHELL OIL COMPANY, INCORPORATED

By F. S. Clulow
Vice-President

ATTEST:

C. S. Gentry
Secretary

(Seal)



DECLASSIFIED
Authority NND-730 034
By TM NARA, Date

184407

EXHIBIT A.

Item 1.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.



DECLASSIFIED
Authority NND 730 014
By TM NWA Date

184407

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Shell Oil Company, Incorporated, to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of April 10, 1942.

RECONSTRUCTION FINANCE CORPORATION

By Charles B. Henderson
Chairman

ATTEST:

A. T. Hobson
Acting Secretary

(Seal)



DECLASSIFIED
Authority NND 730034
By TM NARA Date 8/5

GUARANTEE BY SHELL UNION OIL CORPORATION

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, Shell Union Oil Corporation, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Shell Oil Company, Incorporated, (a subsidiary of Shell Union Oil Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Shell Union Oil Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of April 10, 1942.

SHELL UNION OIL CORPORATION

By R. G. A. Van Der Woude
President

ATTEST:

F. W. Woods
Secretary

(Seal)





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

184407

ADDENDUM #1

Shell Oil Company, Incorporated

San Francisco, California

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract Shell Oil Company, Incorporated, a Virginia corporation, (hereinafter designated as "Contractor") agrees:

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture of furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of



DECLASSIFIED
Authority NND 730 0/35
By TM NARA Date

184407

Addendum #1

any violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of April 10, 1942.

SHELL OIL COMPANY, INCORPORATED

By: F. S. Clulow
Vice-President



DECLASSIFIED
Authority NND 730034
By TM NARA Date

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**o all to whom these presents shall come. Greeting:**

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, der the seal of the National Archives of the United States, that the attached reproduction(s) is a true and rect copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Timothy K. Nenninger | DATE<br>AUG 21 2006 |
| TITLE<br>Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY<br>National Archives at College Park<br>8601 Adelphi Road<br>College Park, MD 20740-6001 | |

NA FORM 14007 (10-88)

between

DEFENSE SUPPLIES CORPORATION

and

SHELL OIL COMPANY, INCORPORATED

(California Refineries - Second Contract)

100-OCTANE AVIATION GASOLINE

May 1, 1943



DECLASSIFIED
Authority NND 730034

67971

560
Cal
22

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

SHELL OIL COMPANY, INCORPORATED

(California Refineries - Second Contract)

100-OCTANE AVIATION GASOLINE

May 1, 1943



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

67971

DEFENSE SUPPLIES - SHELL CONTRACT

(California Refineries - Second Contract)

Revised January 19, 1944

CONTRACT made as of May 1, 1943, between SHELL OIL COMPANY, INCORPO-RATED, a Virginia corporation, having offices at 100 Bush Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5(d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of April 10, 1942, between the parties entitled "Contract between Defense Supplies Corporation and SHELL OIL COMPANY, INCORPORATED (California Refineries)" is hereby modified to the extent but only to the extent hereinafter expressed and shall otherwise remain in full force and effect. Said certain contract will be referred to hereinafter as "the prior California contract".

I. Expansion of Seller's Refining Facilities.

(a) Seller has existing facilities for the production at its Wilmington-Dominguez and Martinez, California, refineries of approximately four thousand (4,000) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 1 of Exhibit A attached hereto and made a part hereof, having previously expanded its existing facilities at a cost of approximately Two Million Dollars ($2,000,000.00) to increase its production from three thousand (3,000) barrels to four thousand (4,000) barrels per calendar day of said gasoline, and has under the prior california contract contracted to expand further the facilities at its Wilmington-Dominguez, refineries at an estimated cost of approximately Fifteen Million Five Hundred Thousand Dollars ($15,500,000.00) to a degree which it is estimated will enable Seller to produce at its said refineries a total of approximately ten thousand (10,000) barrels per calendar day of said 100 octane aviation gasoline specified as Item 1 of Exhibit A hereof, or nine thousand five hundred (9,500) barrels per calendar day of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof.

(b) Seller is willing to make an additional expansion of its facilities at its Wilmington-Dominguez refineries at an estimated additional cost of



DECLASSIFIED
Authority NND 730034
By TM NARA, Date

approximately One Million Five Hundred Thousand Dollars ($1,500,000.00) to a degree which it is estimated will enable Seller to increase production at its Wilmington-Dominguez and Martinez refineries by two thousand one hundred (2,100) barrels per calendar day to a total of approximately eleven thousand six hundred (11,600) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof.

(c) Seller shall use its best efforts so to make the additional expansion of its facilities referred to in paragraph (b) of this Section I, to maintain work thereon day and night in so far as the requisite labor and materials are available, and to complete such additional expansion as soon as possible and not later than March 1, 1944.

(d) Seller represents that there has not been included in the estimated additional expenditures referred to in paragraph (b) of this Section I of approximately One Million Five Hundred Thousand Dollars ($1,500,000.00) any allowance for premium payments to secure earlier delivery of material, overtime, or bonus payments (all of which are herein called "bonus payments"). Seller will make or arrange for such bonus payments as will in its judgment substantially expedite the completion of the new facilities, and full and complete records of such payments shall be maintained and made available to Buyer. Buyer shall pay Seller the amount by which the actual cost of construction of the facilities for such additional expansions, including all such bonus payments, exceeds whichever is the greater of (a) the actual cost of construction of the additional facilities contemplated by this contract, excluding all bonus payments, and (b) One Million Five Hundred Thousand Dollars ($1,500,000.00).

(e) Such repayment of bonus payments shall be made by distributing the same as an addition to the unit price of the first seven hundred fifty thousand (750,000) barrels of 100 octane aviation gasoline purchased after the effective date of the notification referred to in Section II (a) hereof. If Buyer fails to purchase said quantity of seven hundred fifty thousand (750,000) barrels at such increased price on or before, February 28, 1945, Buyer, shall on or before March 20, 1945 pay to Seller the unpaid balance of such bonus payments, which shall be treated as an advance payment of a portion of the purchase price of the remainder of the seven hundred fifty thousand (750,000) barrels at the time the purchase of such remaining quantity is made at the increased price.



DECLASSIFIED
Authority NND 730034

67971

(f) If Buyer shall notify Seller at any time that it does not desire that additional expenditures for bonus payments shall be incurred or that such additional expenditures should be limited in a specified way or to a specified amount, Seller shall endeavor to arrange for the termination of any contracts or commitments for such bonus payments to the extent indicated in such notice so as to reduce the liability of Buyer hereunder.

(g) As used above, the term "bonus payments" shall include any charges for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments.

(h) The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the additional expansion of Seller's facilities referred to in paragraph (b) of Section I hereof shall be completed and ready for operation, Seller shall promptly notify Buyer.

(b) In lieu of the obligations under Section II (b) of the prior California contract, and subject to the provisions of Section IV (d) hereof, Seller shall sell and deliver and Buyer shall buy and receive the following aggregate quantities of 100 octane aviation gasoline which shall be in accordance with Item 2 of Exhibit A hereof prior to the effective date of the notification referred to in Section II (a) hereof and thereafter shall be in accordance with Item 3 of Exhibit A hereof:

(1) From and after the effective date of the notification referred to in Section II (a) of the prior California contract, until but not including the effective date of the notification referred to in Section II (a) hereof; such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez refineries from all the aforesaid facilities, excluding the aforesaid additional expansion, shall equal Seller's pro-rata share of the entire requirements



DECLASSIFIED Authority NND 730 034 By [illegible] NARA, Date [illegible]

of the United States Government, as hereinafter defined, but not less than six thousand (6000) barrels per calendar day;

(2) From and after the effective date of the notification referred to in Section II (a) hereof until the end of the original term of the prior California contract; such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez refineries from all the aforesaid facilities, including the aforesaid additional expansion, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than seven thousand eight hundred (7,800) barrels per calendar day;

(3) From and after the end of the original term of the prior California contract until midnight on February 28, 1947, such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Wilmington-Dominguez and Martinez refineries from all the aforesaid facilities, including the aforesaid additional expansion, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than two thousand one hundred (2,100) barrels per calendar day;

(4) From and after midnight on February 28, 1947 until the end of the original term of this contract; two thousand one hundred (2,100) barrels per calendar day.



DECLASSIFIED
Authority NND-730 034
By TM NARA, Date 8/87

(c) Whenever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline, such quantity is an aggregate quantity of the various grades of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various grades of gasoline. The damages, if any, for a breach of the foregoing provisions of paragraphs (a) and (b) of this Section II shall be in accordance with Section VIII hereof. Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with Seller's available refining facilities and Seller's available raw materials then capable of use in producing 100 octane aviation gasoline in accordance with said specifications other than those originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties or by arbitration in accordance with Section XI hereof. Deliveries of aviation gasoline of such other specifications shall not be suspended during such negotiations. Any agreement so reached shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(d) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100 octane aviation gasoline as the total refining capacity for 100 octane aviation gasoline at Seller's Wilmington-Dominguez and Martinez refineries, less the quantity of Seller's sales of 100 octane aviation gasoline from said refineries to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.



DECLASSIFIED Authority NND 730034 By TM NARA Date

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(g) From and after the effective date of notification referred to in Section II (a) hereof, Seller shall maintain storage facilities at, or in the vicinity of, its Wilmington-Dominguez refineries to accommodate an aggregate of at least six hundred thousand (600,000) barrels of 100 octane aviation gasoline produced under this contract and the prior California contract. Seller represents that it has, and agrees to maintain storage facilities at its Martinez refinery to accommodate at least sixty (60) days' full capacity production of 100 octane aviation gasoline at five hundred (500) barrels per day, which is the present production.

(h) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantity specified in paragraph (b) of this Section II. If, however, Seller shall produce during any such period of full storage any additional 100 octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof.

(i) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(j) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100 octane aviation gasoline stored at that time in the facilities referred to in



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

Section II (g) hereof to the extent of the difference between the quantity of aviation gasoline which Buyer is required to buy and receive and Seller to sell and deliver in accordance with Section II (b) hereof during the period of the contract, and the quantity actually purchased by Buyer and delivered by Seller during said period.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez refineries between the date of execution of this contract and the effective date of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Wilmington-Dominguez and Martinez refineries in any of the facilities referred to in Section I hereof between the effective date of the notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (1) the quantity to be purchased by Buyer under the provisions of paragraph (b) of Section II hereof and (2) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) From January 1, 1943 until the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline specified as Item 2 of Exhibit A hereof purchased under the present contract and the prior California contract shall be thirteen and thirty-seven one-hundredths cents ($0.1337) per gallon, f. o. b. Seller's refineries at Wilmington-Dominguez and Martinez, California.



DECLASSIFIED Authority NND 730034 By TM NARA Date 5/85

(b) For deliveries from and after the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline specified as Item 3 of Exhibit A, hereof, purchased under the present contract and the prior California contract produced by Seller in Seller's facilities described in Section I hereof (together with components purchased from others) shall be:

(1) Thirteen and fifty hundredths cents ($0.1350) per gallon f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California, for such volume of said aviation gasoline delivered to Buyer, as does not exceed an average of eleven thousand six hundred (11,600) barrels per day from the date of first delivery hereunder in pursuance of notification referred to in Section II (a) hereof;

(2) Ten cents ($0.10) per gallon f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California, for such volume of said aviation gasoline delivered to Buyer as exceeds said average daily delivery of eleven thousand six hundred (11,600) barrels per day;

it being understood and agreed that at the end of each calendar month of the term hereof, the number of days elapsing in the period from and after commencement of delivery in pursuance of notification referred to in Section II (a) hereof (including the first day of delivery and the last day of such calendar month), shall be determined, and such total number of days shall be multiplied by eleven thousand six hundred (11,600) barrels, and settlement and payment for such calendar month shall be made by Buyer in such amount as will adjust and result in total payment for all deliveries during such period equalling thirteen and fifty hundredths cents ($0.1350) per gallon for the quantity so determined (if that quantity shall have been delivered), and ten cents ($0.10) per gallon for any excess thereof delivered; it being understood that in adjusting for delivery in any month below the base average of eleven thousand six hundred (11,600) barrels per calendar day by delivery during another month of a quantity in excess of said



DECLASSIFIED
Authority NND 730034
By [illegible] NARA Date [illegible]

base average, escalation in accordance with Section V hereof of the base price of such excess quantity shall be at the rate applicable at the time of delivery of such excess; it being further understood that excesses which are applied to balance subsequent deficiencies below said base average shall be applied in the chronological order of the accumulation of such excesses;

(3) In no event shall Seller be entitled to a payment under this Section IV (b) to the extent that Seller has previously otherwise received reimbursement for losses incurred in selling 100 octane aviation gasoline at a base price of ten cents ($0.10) per gallon f.o.b. Seller's refineries at Wilmington-Dominguez and Martinez, California.

(c) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture plus ten per cent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes. Seller also represents that there has not been included in its computation of such prices any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder.

(d) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the total quantity of aviation gasoline delivered during the preceding month, the price per gallon of each individually priced quantity, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

67971

Price Escalation.

The base prices of 100 octane aviation gasoline purchased under the present contract and the prior California contract shall be subject to adjustment as follows and not in accordance with Section V of the prior California contract:

(a) The base prices specified in Sections IV (a) and IV (b) hereof are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven degree (27) A. P. I. Signal Hill crude deliverable to Seller in the Signal Hill Field. Such base prices shall be increased or decreased by a percentage thereof equal to one-half (½) the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) Prior to the effective date of the notification referred to in Section II (a) hereof, the base price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall also be increased or decreased by a percentage thereof equal to one-half (½) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-four and nine-tenths (94.9) (the final index number used in the prior California contract).

(c) From and after the effective date of the notification referred to in Section II (a) hereof until the expiration of this contract, the said base prices for 100 octane aviation gasoline set forth in Section IV (b) hereof shall also be increased or decreased by a percentage thereof equal to one-half (½) the percentage increase or decrease in such final monthly wholesale price Index Number over or under a calculated index figure which is the weighted average of nine thousand five hundred (9,500) barrels per calendar day at ninety-four and nine-tenths (94.9) and two thousand one hundred (2,100) barrels per calendar day at ninety-six and five-tenths (96.5) (the present final index number). The effective date of a change in price due to a change in the index numbers in paragraphs (b) and (c) of this Section V shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may



DECLASSIFIED Authority NND-730034 By TM NARA Date 85

closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(d) The base prices specified in Sections IV (a) and IV (b) hereof are based upon present normal methods of transporting petroleum raw materials to Seller's refineries at Wilmington-Dominguez and Martinez, California, and upon a normal operation of said refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refineries by other than present normal methods thereby incurring additional cost of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining that 100 octane aviation gasoline sold at such base prices is increased in respects other than those corrected by adjustment of the base prices under the above paragraphs (a), (b), and (c), of this Section V, Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase such prices paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does no elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) year's experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the



DECLASSIFIED Authority NND 730 034 By TM NARA Date

...trators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustments shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

(f) Section V (d) of the prior California contract is hereby cancelled and is of no force and effect.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later, in any event, than June 30, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect. Section VI of the prior California contract is hereby superseded and cancelled, except for the first sentence thereof.

VII. (Section Omitted).

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasoline in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities referred to in Section II (g) hereof are full of 100 octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to





DECLASSIFIED
Authority NND 730034
By TM NARA Date

and pay for 100 octane aviation gasoline only to the extent that the amount and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (h) and V (d) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section IX) at its own cost and expense, at Seller's said refineries in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on Board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments of 100 octane aviation gasoline purchased under the present contract and the prior California contract made from refineries and any other points where licensed inspectors are regularly available, Seller shall





DECLASSIFIED
Authority NND 730 034
By T.M NARA Date

furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (m) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of each delivery of a quantity of less than three thousand five hundred (3,500) gallons into a tank truck or motor transport in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.





DECLASSIFIED Authority NND 730 034 By TM NARA Date 85

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States within which Seller customarily delivers gasoline from its Wilmington-Dominquez and Martinez Refineries, such service to be at the expense of Buyer and at Buyer's risk. Such expense shall be Seller's cost for such service. In the event of loss during the performance of such service, Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder and under the prior California contract, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such aviation gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.





DECLASSIFIED
Authority NND-730034

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefore by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrators as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other





DECLASSIFIED Authority NND 730034 By TM NARA Date

than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV herebf are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery and cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram; except that the notice of completion of facilities referred to in Section II (a) hereof shall be deemed to be effective as of the date of completion of the facilities therein referred to. Each party shall immediately send to the other by regular mail confirming copies of any notice sent by



DECLASSIFIED Authority NND 730 [illegible] By [illegible] NARA, Date [illegible]

cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin, and will include a similar provision in all contracts entered into by it with others incidental to or in connection with this contract.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.





DECLASSIFIED
Authority NND-730 014
By TM NARA Date

(c) Seller shall comply with requirements of the Walsh-Healy Act (41 USCA Sections 35-45) insofar as such Act is applicable to this transaction.

(d) Notwithstanding anything herein to the contrary this contract shall be subject to the provisions of Exhibit B attached hereto and made a part hereof.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days; (a) Seller shall have entered into satisfactory contracts, with responsible engineering contractors for the additional expansion of the facilities referred to in Section I (b) hereof at a cost not materially in excess of Seller's presently estimated additional cost as set forth in Section I (b) hereof; and (b) Seller shall have received (1) all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the additionally expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum; and (2) such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
President

ATTEST:

(Sgd) George H. Hubert
Assistant Secretary

(SEAL)

SHELL OIL COMPANY, INCORPORATED

By (Sgd) F. S. Clulow
Vice-President

ATTEST:

(Sgd) C. S. Gentry
Secretary

(SEAL)





DECLASSIFIED
Authority NND 730034
By TM NARA Date

67971

EXHIBIT A.

Item 1.

U. S. ARMY – NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY – NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.

Item 3.

U. S. ARMY – NAVY SUPPLY

AN-F-28 Dec. 23, 1942

Amendment No. 1. March 23, 1943

100 Octane Number by Method AN-VV-F-746, as amended Nov. 5, 1940, or 99 Octane Number by Method ASTM-D-357-41T, S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a March 23, 1943

Tetraethyl Lead Limit 4.0 cc/Gal.



DECLASSIFIED
Authority NND 730014
By TM NARA Date 8/61

Contractor: Shell Oil Company, Incorporated

EXHIBIT B

RENEGOTIATION PURSUANT TO SECTION 403 OF THE SIXTH SUPPLEMENTAL NATIONAL DEFENSE APPROPRIATION ACT, 1942, AS AMENDED.

A. Upon the written request of Defense Supplies Corporation at such period or periods when in the judgment of Defense Supplies Corporation the profits accruing under the contract of which this Exhibit is a part can be determined with reasonable certainty, the contract price shall be renegotiated to eliminate therefrom such amount as is found as a result of such renegotiation to represent excessive profits.

B. Any profits found as a result of such renegotiation to be excessive and not eliminated through reductions in the contract price hereunder or otherwise shall, as Defense Supplies Corporation may direct, (1) be retained by the Government from amounts otherwise due the contractor, or (2) be repaid by the contractor to the Government, if such excessive profits have been paid to the contractor.

C. The contractor shall require the insertion of the following provisions in each subcontract described in subparagraph F(2)(ii) of this Exhibit and in each subcontract for an amount in excess of $100,000 described in subparagraph F(2)(i) of this Exhibit, directly entered into by the contractor under this contract:

(1) Upon the written request of Defense Supplies Corporation at such period or periods when in the judgment of Defense Supplies Corporation the profits accruing under this contract can be determined with reasonable certainty, the contract price shall be renegotiated by Defense Supplies Corporation and ______________ (Subcontractor) to eliminate therefrom such amount as is found as a result of such renegotiation to represent excessive profits.

(2) Any profits found as a result of such renegotiation to be excessive and not eliminated through reductions in the contract price hereunder or otherwise, shall, as Defense Supplies Corporation may direct, (i) be retained by ______________ (Contractor) for the Government, or (ii) be repaid by ______________ (Subcontractor) to the Government, if such excessive profits have been paid to ______________ (Subcontractor).

(3) ______________ (Contractor) is hereby relieved from any liability to ______________ (Subcontractor) on account of any amount retained or repaid pursuant to paragraph (2) above.

(4) ______________ (Subcontractor) shall, upon the direction of Defense Supplies Corporation, require the insertion in any subcontract made hereunder, of contract provisions conforming substantially to the provisions of this Exhibit.

(5) Any renegotiation under this Exhibit shall be conducted pursuant to the provisions of Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended.

The contractor shall also require the insertion of the definitions which are contained in subparagraph F of this Exhibit in each such subcontract.



DECLASSIFIED Authority NND 730034 By TM NARA Date

D. Any profits under any subcontract hereunder which are found as the result of renegotiation to be excessive and which the contractor is directed by Defense Supplies Corporation to withhold from payments otherwise due the subcontractor and actually unpaid at the time of receipt of such direction, shall, as Defense Supplies Corporation may direct, (1) be retained by the Government from amounts otherwise due the contractor, or (2) be repaid by the contractor to the Government.

E. Any renegotiation under this Exhibit shall be conducted pursuant to the provisions of Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended.

F. For the purpose of this Exhibit,

(1) The term "Defense Supplies Corporation" shall be deemed to include any authorized representative of Defense Supplies Corporation, and

(2) The term "subcontract" means (i) any purchase order or agreement to perform all or any part of the work or to make or furnish any article, required for the performance of any other contract or subcontract, unless exempted from the provisions of Section 403, as amended, under subsection (i) thereof, or (ii) any contract or arrangement (other than a contract or arrangement between two contracting parties, one of which parties is found by Defense Supplies Corporation to be a bona fide executive officer, partner, or full-time employee of the other contracting party), (a) any amount payable under which is contingent upon the procurement of a contract or contracts with Defense Supplies Corporation or of a subcontract or subcontracts thereunder, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts, or (b) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with Defense Supplies Corporation or a subcontract or subcontracts thereunder. The term "article", as used in this definition, includes any material, part, assembly, machinery, equipment, or other personal property.



DECLASSIFIED
Authority NND 730024
By TM NARA Date

67971

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Shell Oil Company, Incorporated, to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 1, 1943.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles B. Henderson
Chairman

ATTEST:

(Sgd) A. T. Hobson
Acting Secretary

(SEAL)



DECLASSIFIED
Authority NND 730034
By TM NARA, Date

67971

GUARANTEE BY SHELL UNION OIL CORPORATION

In consideration of the execution of the within contract and as an inducement to Defense Supplies Corporation to enter into said contract, Shell Union Oil Corporation, a Delaware corporation, does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Shell Oil Company, Incorporated, (a subsidiary of Shell Union Oil Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Shell Union Oil Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 1, 1943.

SHELL UNION OIL CORPORATION

By (Sgd) R. G. A. Van Der Woude
President

ATTEST:

(Sgd) F. W. Woods
Secretary

(SEAL)



DECLASSIFIED
Authority NND 730034
By TM NARA Date

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**all to whom these presents shall come. Greeting:**

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, der the seal of the National Archives of the United States, that the attached reproduction(s) is a true and rect copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Timothy K. Nenninger | DATE<br>AUG 21 2006 |
| TITLE<br>Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY<br>National Archives at College Park<br>8601 Adelphi Road<br>College Park, MD 20740-6001 | |

NA FORM 14007 (10-86)

UNION OIL COMPANY

(Wilmington Refinery)

100 OCTANE AVIATION GASOLINE

December 31, 1942.



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

57440

COPY

12

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

UNION OIL COMPANY

(Wilmington Refinery)

100 OCTANE AVIATION GASOLINE

December 31, 1942.



DECLASSIFIED
Authority NND 730034
By TM NARA Date

56346

DEFENSE SUPPLIES - UNION CONTRACT
(Wilmington Refinery)

Revised January 14, 1943.

CONTRACT made as of December 31, 1942, between UNION OIL COMPANY OF CALIFORNIA, a California corporation, having its principal place of business at Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Seller's Refining Facilities.

Seller has existing facilities at its Wilmington, California refinery for producing approximately nine hundred (900) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 1 of Exhibit A attached hereto and made a part hereof, and is currently expanding its facilities at its own expense to an extent which it is estimated will increase its production to approximately fifty-five hundred (5500) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 1 of said Exhibit A. It is estimated that the new facilities will be completed about April 15, 1943.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer.

(b) Beginning January 1, 1943, Seller shall sell and deliver and Buyer shall buy and receive 100 octane aviation gasoline which shall be in accordance with the specification set forth in Exhibit A hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(c) The quantity of said gasoline shall be such quantity as Buyer may require for delivery from Seller's refinery at Wilmington, California and such quantity may be all or any part of the aviation gasoline which Seller may produce at its Wilmington refinery during the period between January 1, 1943 and the expiration of the original term of this contract or any extension thereof. However, Buyer shall not require delivery from Seller



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date 8/65

of a quantity of such gasoline in excess of Seller's maximum production thereof which is estimated to be approximately nine hundred (900) barrels per calendar day until April 15, 1943 and approximately fifty-five hundred (5500) barrels per calendar day thereafter, and Seller agrees to operate said facilities during said period at full capacity or at a capacity sufficient al least to satisfy Buyer's requirements; provided, however, that Seller shall not be required to operate said facilities during any period in which Seller's inventory of 100 octane aviation gasoline, leaded or unleaded, exceeds three hundred thousand (300,000) barrels.

(d) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refinery facilities and the same raw materials as are used in producing 100 octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(e) Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet any other specifications required by Buyer.

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

III. Price and Payment.

(a) The base price of 100 octane aviation gasoline shall be as follows f.o.b. Seller's refinery at Wilmington, California:

(1) For deliveries made between January 1, 1943 and the earlier of the following dates: (a) the end of the original term of this contract or (b) the effective date of the notification referred to in Section II(a)



DECLASSIFIED
Authority NND 730 034

hereof, thirteen and sixty five one-hundredths cents ($0.1365) per gallon for 100 octane aviation gasoline in accordance with Item 1 of Exhibit A hereof.

(2) For deliveries from and after the effective date of said notification, if prior to the end of the original term of this contract, until the end of the original term of this contract, thirteen and fifty five one-hundredths cents ($0.1355) per gallon for 100 octane aviation gasoline in accordance with Item 1 of Exhibit A hereof.

(b) Seller represents that there has not been included in computation of costs upon which the base prices were negotiated any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section V hereof shall accompany the aforesaid monthly statements.

IV. Duration of Contract.

The original term of this contract shall expire at midnight on June 30, 1943. Buyer shall have the option to extend this contract for one six month period beyond the original term by giving notice in writing to Seller of the exercise of such option at least thirty (30) days prior to the end of the original term. Upon such extension the obligations to purchase and receive shall be in accordance with Section II(b) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the thirty (30) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.



DECLASSIFIED
Authority NND-730 034

...iveries and Inspections.

(a) Seller warrants full and unencumbered title to all gaso-... delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, ...rges, tank cars, or tank trucks (tank truck deliveries to be not in ex-cess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section III(c) hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set



DECLASSIFIED
Authority NND 730 0/8
By JM NARA, Date

which shall be delivered forthwith to the hereinafter referred to authorized officer or employee of the War Department or Navy Department. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.





DECLASSIFIED
Authority NND 730034
By TM NARA Date

56346
57440

(l) Notwithstanding the preceding provisions of this Section V and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer in appropriate limited quantities to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section V any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

VI. (Section Omitted)

VII. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

VIII. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either



DECLASSIFIED
Authority NND 730 014
By TM NARA, Date 8/87

party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

IX. Taxes.

(a) Buyer shall pay in addition to the prices as established in Section III hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States





DECLASSIFIED
Authority NND 730034
By IM NARA Date 8/85

or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section III hereof.

(b) Buyer shall also pay in addition to the prices as established in Section III hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section III hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized government tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

X. <u>Notices</u>.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XI. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XII. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XIII. Statutory Compliance.

(a) In carrying out this Contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.





DECLASSIFIED
Authority NND 730 0/4
By TM NARA, Date

56346

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller, or otherwise changed in a manner satisfactory to Seller.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

H. H. Turner
Secretary

(Seal)

UNION OIL COMPANY OF CALIFORNIA

By W. L. Stewart, Jr.
Executive Vice-President

ATTEST:

W. R. Edwards
Secretary

(Seal)



DECLASSIFIED
Authority NND 730 014
By TM NARA, Date 5/5

EXHIBIT A

Item 1: U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 - - - - - September 26, 1940

Amendment No. 4 - - - November 24, 1941

Knock Test Method - - AN-VV-F-746

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc./Gal.





DECLASSIFIED
Authority NND 730 0/4
By TM NARA Date 8/97

56346

ADDENDUM #1

Union Oil Company of California

Los Angeles, California

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, Union Oil Company of California, a California corporation, (hereinafter designated as "Contractor") agrees to the provisions set forth below, provided, however, that to the extent that the obligations of manufacturers or dealers are limited, restricted or relaxed by amendments of the law or by authorized governmental regulations, then the obligations of the Contractor shall be automatically and correspondingly limited, restricted or relaxed.

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c). No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be perfomred shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

56346

Addendum #1

violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of December 31, 1942.

UNION OIL COMPANY OF CALIFORNIA

By: W. L. Stewart, Jr.
Executive Vice-President

(Seal)



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**To ... to whom these presents shall come. Greeting:**

...irtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, u... e seal of the National Archives of the United States, that the attached reproduction(s) is a true and ... copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Timothy K. Nenninger | DATE<br>AUG 21 2006 |
| TITLE<br>Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY<br>National Archives at College Park<br>8601 Adelphi Road<br>College Park, MD 20740-6001 | |

NA FORM 14007 (10-86)

DEFENSE SUPPLIES CORPORATION

and

UNION OIL COMPANY OF CALIFORNIA

(Wilmington Refinery)

(Second Contract)

100 OCTANE AVIATION GASOLINE

May 1, 1943.



DECLASSIFIED
Authority NND 730034
By TM NARA Date

Conformed Copy

60351
62826

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

UNION OIL COMPANY OF CALIFORNIA

(Wilmington Refinery)

(Second Contract)

100 OCTANE AVIATION GASOLINE

May 1, 1943.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

60351
62826

DEFENSE SUPPLIES - UNION CONTRACT
(Wilmington Refinery)
(Second Contract)

Revised July 29, 1943.

CONTRACT made as of May 1, 1943, between UNION OIL COMPANY OF CALIFORNIA, a California corporation, having its principal place of business at Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of December 31, 1942, between the parties entitled "Contract between Defense Supplies Corporation and Union Oil Company (Wilmington Refinery)" is replaced by the present contract and is hereby terminated and cancelled.

I. Seller's Refining Facilities.

(a) Seller has existing facilities at its Wilmington, California refinery for producing approximately nine hundred (900) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 2 of Exhibit A attached hereto and made a part hereof, or approximately six hundred (600) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof, and is currently expanding its facilities at its own expense, at an estimated cost of approximately Fifteen Million One Hundred Fifty-nine Thousand Eight Hundred Forty-three Dollars ($15,159,843.00), to an extent which it is estimated will increase its production to approximately five thousand five hundred (5,500) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 2 of said Exhibit A, or approximately four thousand nine hundred (4,900) barrels per calendar day of the type of 100 octane aviation gasoline specified as Item 3 of said Exhibit A. It is estimated that the expanded facilities will be completed about August 1, 1943.

(b) Seller is willing to construct or cause to be constructed at its Wilmington refinery additional facilities at an estimated cost of approximately Nine Million Seven Hundred Thirty Thousand Dollars ($9,730,000.00), which it is estimated will enable Seller to increase production at its Wilmington refinery by approximately six thousand three hundred (6,300) barrels



DECLASSIFIED
Authority NND 730034
By TM NARA Date

60351
62826

per calendar day of 100 octane aviation gasoline to a total, from all of the aforesaid facilities, of approximately eleven thousand two hundred (11,200) barrels per calendar day of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof. Seller shall use its best efforts to complete said additional facilities as soon as posible and not later than July 1, 1944 and shall maintain work on the construction day and night insofar as the requisite labor and materials are available.

(c) Seller represents that there has not been included in the estimated expenditure of approximately Nine Million Seven Hundred Thirty Thousand Dollars ($9,730,000.00) set forth in paragraph (b) of this Section I, any allowance for premium payments to secure earlier delivery of material, overtime in excess of that required by law or executive order for six work days of eight hours each per week, or bonus payments (all of which are herein called "bonus payments"). Seller will make or arrange for such bonus payments as will in its judgment substantially expedite the completion of the new facilities, and full and complete records of such payments shall be maintained and made available to Buyer each month as such bonus payments accrue. Buyer shall pay Seller the amount by which the actual cost of construction of the additional facilities referred to in paragraph (b) of this Section I, including all such bonus payments, exceeds whichever is the greater of (a) the actual cost of construction excluding all bonus payments, and (b) Nine Million Seven Hundred Thirty Thousand Dollars ($9,730,000.00).

(d) Such repayment of bonus payments shall be made by distributing the same as an addition to the unit price of the first two million three hundred thousand (2,300,000) barrels of 100 octane aviation gasoline purchased after the effective date of the second notification referred to in Section II (a) hereof. If Buyer fails to purchase said quantity of two million three hundred thousand (2,300,000) barrels at such increased price on or before June 30, 1945, Buyer shall on or before July 31, 1945 pay to Seller the unpaid balance of such bonus payments, which shall be treated as an advance payment of a portion of the purchase price of the remainder of the two million three hundred thousand (2,300,000) barrels at the time the purchase of such remaining quantity is made at the increased price.

(e) If Buyer shall notify Seller at any time that it does not desire that additional expenditures for bonus payments shall be incurred or that



DECLASSIFIED
Authority NND 730 014
By JM NARA, Date

60351
62826

such additional expenditures should be limited in a specified way or to a specified amount, Seller shall endeavor to arrange for the termination of any contracts or commitments for such bonus payments to the extent indicated in such notice so as to reduce the liability of Buyer hereunder, but in the event Seller is unable to make such arrangements Buyer shall not be relieved of its obligation to pay Seller for such bonus payments as hereinabove provided.

(f) As used above, the term "bonus payments" shall include any charges for Social Security, Unemployment Compensation and Workmen's Compensation which must be expended by reason of such bonus payments.

(g) The force majeure provisions set forth in Section X hereof shall apply in all respects to the construction of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the expansion of Seller's facilities referred to in Section I (a) hereof shall be completed and ready for operation, Seller shall promptly notify Buyer, and when the additional facilities referred to in Section I (b) hereof shall be completed and ready for operation, Seller shall again promptly notify Buyer.

(b) Under the terms of this contract, Seller shall sell and deliver and Buyer shall buy and receive the following quantities of 100 octane aviation gasoline which shall be in accordance with Item 2 of Exhibit A hereof prior to the effective date of the second notification referred to in paragraph (a) of this Section II, and thereafter shall be in accordance with Item 3 of Exhibit A hereof:

(1) During the period from January 1, 1943 until the effective date of the second notification referred to in paragraph (a) of this Section II, such quantity as Buyer may require for delivery from Seller's Wilmington refinery, which quantity may be all or any part of the aviation gasoline which Seller may produce at its Wilmington refinery during said period.

(2) From the effective date of the second notification referred to in paragraph (a) of this Section II until the expiration of this contract; such quantity as together



DECLASSIFIED
Authority NND 730 014
By TM NARA, Date

with all other sales by Seller to the United States government of said gasoline produced at Seller's Wilmington refinery from all the aforesaid facilities shall equal Seller's pro rata share of the entire requirements of the United States government, as hereinafter defined, but not less than six thousand three hundred (6,300) barrels per calendar day.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100 octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with Seller's available raw materials and with Seller's available refining facilities then capable of use in producing 100 octane aviation gasoline in accordance with said specifications other than those originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties or by arbitration under Section XI hereof. Deliveries of the products shall not be suspended during such negotiations. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(d) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(e) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100 octane aviation gasoline as the total refining capacity for 100 octane aviation gasoline at Seller's Wilmington Refinery, less the quantity of Seller's sales of 100 octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) Seller shall maintain storage facilites at, or in the vicinity of Wilmington, California, to accomodate an aggregate of at least three hundred thousand (300,000) barrels of 100 octane aviation gasoline or components thereof ready for blending produced under this contract prior to the effective date of the second notification referred to in paragraph (a) of this Section II, and





DECLASSIFIED
Authority NND 730 034
By TM NARA Date

60351
62826

thereafter to accommodate an aggregate of at least four hundred fifty thousand (450,000) barrels of aviation gasoline or components thereof ready for blending produced under this contract.

(g) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller, in addition to all other remedies it may have, shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition, and shall not thereafter be required to make deliveries of said amount, but this shall not be in derogation of Buyer's rights under Section III hereof. Such discontinuance of production shall not be construed as a waiver by Seller of any of its rights under this contract.

(h) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(i) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100 octane aviation gasoline stored at that time in the facilities referred to in Section II (f) hereof to the extent of not more than four hundred and fifty thousand (450,000) barrels, but this paragraph (i) shall not be construed to enlarge Buyer's obligations under Section II (b) and Section VIII hereof.

III. Optional Gasoline.

(a) During the period prior to the effective date of the second notification referred to in Section II (a) hereof, Seller shall operate all its available facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements as they may be indicated from time to time in accordance with the provisions of Section II (b) (1) hereof.

(b) Buyer shall also have the option from time to time and at any time to purchase all or any part of the aviation gasoline which Seller may produce



DECLASSIFIED
Authority NND 730034
By TM NARA Date

at its Wilmington Refinery between the date of receipt by Buyer of the second notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II (b) hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) The base prices of 100 octane aviation gasoline shall be as follows f.o.b. Seller's refinery at Wilmington, California:

(1) For deliveries made between January 1, 1943 and midnight June 30, 1943, thirteen and sixty-five one-hundredths cents ($0.1365) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.

(2) For deliveries made between midnight June 30, 1943 until the effective date of the first notification referred to in Section II (a) hereof, thirteen and five hundred eighty-six one-thousandths cents ($0.13586) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.

(3) For deliveries from and after the effective date of the first notification referred to in Section II (a) hereof until the effective date of the second notification referred to in Section II (a) hereof, thirteen and fifty-five one-hundredths cents ($0.1355) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.



DECLASSIFIED
Authority NND 730034
By TM NARA, Date

62826

(4) For deliveries from and after the effective date of the second notification referred to in Section II (a) hereof until the end of the original term of this contract, the base price of 100 octane aviation gasoline specified as Item 3 of Exhibit A hereof shall be thirteen cents ($0.13) per gallon for that volume of said aviation gasoline delivered to Buyer in each calendar month which does not exceed eleven thousand two hundred (11,200) barrels multiplied by the number of days in that calendar month (hereinafter called "Base Volume"), and for all aviation gasoline delivered to Buyer in such calendar month in excess of the Base Volume (such excess being hereinafter called "Monthly Excess"), the base price shall be ten cents ($0.10) per gallon, except as hereinafter provided in accordance with the following subparagraph (ii) of this paragraph (a) (4):

(i) If prior to final termination of the sale and purchase of aviation gasoline hereunder the delivered volume for any month for which payment is made is less than the Base Volume for such month (such deficiency being hereinafter called "Deficiency Volume"), and the total volume delivered to Buyer up to the first day of such month exceeds the sum of all the Base Volumes up to the first day of such month (such excess hereinafter called "Accumulated Excess"), then such Deficiency Volume shall be applied to extinguish such Accumulated Excess or an amount thereof equal to such Deficiency Volume, whichever is the lesser, in the chronological order of accumulation of the Accumulated Excess, and Seller shall receive from Buyer a payment equal to the difference between the base price of thirteen cents ($0.13) per gallon and the base price of ten cents ($0.10) per gallon multiplied by the number



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA Date [illegible]

of gallons of Accumulated Excess so extinguished; provided that both base prices used in applying this subparagraph (i) shall be escalated in accordance with the provisions of Section V hereof as of the date of delivery of the so extinguished excess.

(ii) If in any month for which payment is made there is a Monthly Excess and the total volume delivered to Buyer up to the first day of such month is less than the sum of the Base Volumes up to the first day of such month (such difference hereinafter called "Accumulated Deficiency"), then the base price of so much of said Monthly Excess as does not exceed the Accumulated Deficiency shall be thirteen cents ($0.13) per gallon and the base price of the remainder of such Monthly Excess, if any, shall be ten cents ($0.10) per gallon.

(iii) In no event shall Seller be entitled to a payment under this Section IV (a) (4) to the extent that Seller has previously otherwise received reimbursement for losses incurred in selling 100 octane aviation gasoline at a base price of ten cents ($0.10) per gallon f.o.b. Seller's Wilmington refinery.

(b) Seller represents that there has not been included in its computation of costs upon which the base prices were negotiated any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said aviation gasoline which is properly allocable to





DECLASSIFIED
Authority NND 730 014
By TM NARA Date

such manufacture, plus ten percent (10%) per annum of that portion of the original estimated cost of its additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The price of 100 octane aviation gasoline purchased hereunder shall be subject to adjustments as follows:

(a) As to deliveries on or after October 1, 1943, the base prices set forth in Section IV hereof shall be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the average price paid at the well for 25.0° - 25.9° A.P.I. Signal Hill crude over or under the present price of One Dollar Seven Cents ($1.07) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima-facie evidence of the prices paid by such purchasers.

(b) As to deliveries on or after October 1, 1943, the base prices set forth in Section IV hereof shall also be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-six (96.0). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall



DECLASSIFIED
Authority NND 730 034
By TM NARA Date 8/87

65268

use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Wilmington, California, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced out-put and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, the amount of such increase shall be fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after





DECLASSIFIED
Authority NND 730 014
By [illegible] NARA, Date [illegible]

60351
62826

the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(d) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

(e) In the event of changes in royalties paid by Seller, price adjustment shall be made in accordance with Exhibit B attached hereto and made a part hereof.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the second notification referred to in Section II (a) hereof, but not later, in any event, than midnight on November 20, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive and the prices to be paid shall be fixed by agreement between the parties hereto, or failing agreement, by arbitration in accordance with Section XI hereof, during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Omitted)

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasoline in accordance with Section II (b) and IV (c) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities referred to in Section II (f) hereof are full of 100 octane



DECLASSIFIED
Authority NND 730034
By JM NARA, Date 8/5

60351
62826

aviation gasoline, leaded or unleaded or components thereof ready for blending (but if Buyer shall repudiate this contract and Seller shall accept such repudiation and terminate this contract then this proviso shall not apply); provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) (3) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) multiplied by the number of days in the period over which damages accrue, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (g) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank trucks deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on Board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.





DECLASSIFIED

60351
62826

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (m) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of each delivery of a quantity of less than four thousand (4,000) gallons into a tank truck or motor transport in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.



DECLASSIFIED
Authority NND 730 014
By [illegible] NARA, Date [illegible]

60351
62826

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer in appropriate limited quantities to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, such service to be at the expense of Buyer and at Buyer's risk. Such expense shall be Seller's cost for such service. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault





DECLASSIFIED
Authority NND 730034
By TM NARA Date

negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material, or in securing labor necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA Date [illegible]

60351
62826

expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes, fees or charges on crude petroleum, or the transportation thereof, to the extent such taxes, fees or charges result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is



DECLASSIFIED
Authority NND 730034
By NARA, Date

obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify the extent of such waiver, and include a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable



DECLASSIFIED
Authority NND 730014

federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin and will include a similar provision in all contracts entered into by it with others incidental to or in connection with this contract.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) Omitted.

(d) Seller shall comply with requirements of the Walsh-Healey Act (41 USCA Sections 35-45) insofar as such Act is applicable to this transaction.

(e) This contract shall be subject to the provisions of Exhibit C attached hereto and made a part hereof.

XVII. Right to Terminate.

(a) Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for performing this contract and for the prompt completion of the additional facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

(b) In the event of termination of this contract in accordance with the provisions of paragraph (a) of this Section XVII, the aforesaid certain contract made as of December 31, 1942 shall be reinstated as of the date of such termination and thereafter shall remain in effect according to its terms.





DECLASSIFIED
Authority NND 730034
By TM NARA Date

65268

IN WITNESS WHEREOF the parties hereto have executed this con-

as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
President

(SEAL)

ATTEST:

(Sgd) Merle A. Crandell
Assistant Secretary

UNION OIL COMPANY OF CALIFORNIA

By (Sgd) W. L. Stewart, Jr.
Executive Vice-President

(SEAL)

ATTEST:

(Sgd) W. R. Edwards
Secretary



DECLASSIFIED
Authority NND-730014
By TM NARA Date 6/85

60351
62826

EXHIBIT A

Item 1: (Item Omitted)

Item 2: U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 - - - - - September 26, 1940

Amendment No. 4 - - - November 24, 1941

Knock Test Method - - AN-VV-F-746

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc./Gal.

Item 3:

AN-F-28 December 23, 1942

Amendment No. 1 March 23, 1943

100 Octane Number by Method AN-VV-F-746, as amended November 5, 1940, or

99 Octane Number by Method ASTM-D-357-43T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a-March 23, 1943

Tetraethyl Lead Limit - 4.0 cc. per gallon.



DECLASSIFIED
Authority NND 730034
By TM NARA, Date 8/94

60351
62826

EXHIBIT B

I. (A). Seller represents that the base prices set forth in Section IV (a) (4) of the foregoing contract include certain "catalytic cracking royalty sums" representing patent royalties which Seller expects to pay to a third party or parties; that said "catalytic cracking royalty sums" are calculated at a running royalty rate of $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operation, and amounts to $0.00151 per gallon of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A of the foregoing contract.

I. (B). In the event that Seller's licensor at any time during the term of the foregoing contract, shall issue to any third party a patent license covering catalytic cracking operations of the type employed by Seller at a running royalty rate lower than $0.05 per barrel of fresh stock charged to said third party's catalytic cracking operation, which lower running royalty rate is applicable to Seller's license, then as between Buyer and Seller, the first receiving such information shall notify the other and the base price which includes said "catalytic cracking royalty sum" shall, for all aviation gasoline thereafter delivered under the foregoing contract, be adjusted by subtracting from such base price, an amount equal to said "catalytic cracking royalty sum" multiplied by a factor equal to $\frac{A}{B}$, where A equals the difference between $0.05 and said lower running royalty rate payable by said third party, and B equals $0.05; and Seller shall within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer, without interest, an amount equal to the total number of gallons of 100 octane aviation gasoline delivered under the foregoing contract at a base price including said "catalytic cracking royalty sum" between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the amount of said "catalytic cracking royalty sum" and (b) by said factor $\frac{A}{B}$.

I. (C). In the event that during the term of the foregoing contract Seller does not pay to any third party or parties the "catalytic cracking royalty sum" aforesaid, or any part thereof, then within sixty (60) days following the date of termination, cancellation or expiration of the foregoing contract, Seller shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking royalty sum".



DECLASSIFIED
Authority NND 730034
By TM NARA Date

60351
62826

I. (D). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "catalytic cracking royalty sum" then Seller shall promptly notify Buyer and the base price of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from said base price an amount equal to said "catalytic cracking royalty sum"; and Seller shall within sixty (60) days after the date of said notification refund to Buyer, without interest, an amount equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum," multiplied by said "catalytic cracking royalty sum".

II (A). Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract also include certain "alkylation royalty sums" representing patent royalties which Seller is obligated to pay to its licensor for a certain sulfuric acid alkylation process employed by Seller in the manufacture of said aviation gasoline; that said "alkylation royalty sums" are calculated in the cost computations for the period prior to July 1, 1943 at the rate of $0.21 per barrel of total alkylate included in said aviation gasoline and after July 1, 1943 at the rate of $0.15 per barrel of total alkylate and amount to the following sums per gallon of 100 octane aviation gasoline:

| | Item 2 (Exhibit A) | Item 3 (Exhibit A) |
|---|---|---|
| For the period from January 1, 1943 to Midnight June 30, 1943 | $0.00225 | None |
| From midnight June 30, 1943 to the effective date of the first notification referred to in Section II(a) of the foregoing contract: | $0.00161 | None |
| For the period from the effective date of the first notification referred to in Section II(a) of the foregoing contract until the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.00174 | None |
| For the period after the effective date of the second notification referred to in Section II(a) of the foregoing contract: | None | $0.00106 |



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

60351
62826

II. (B). In the event that during the term of the foregoing contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such alkylation process, shall be reduced below $0.15 per barrel with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices as set forth in Section IV of the foregoing contract for 100 octane aviation gasoline manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "alkylation royalty sum" applicable thereto as set forth in Section II (A) of this Exhibit B, and an amount equal to such "alkylation royalty sum" multiplied by the factor $\frac{C}{D}$ where C equals the reduced running royalty per barrel that Seller is obligated to pay, and D equals fifteen cents ($0.15). As to any of said gasoline delivered to and paid for by Buyer under the foregoing contract at a price including said "alkylation royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "alkylation royalty sum" has been reduced.

III. (A). Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract include certain "isomerization royalty sums" representing royalties which Seller is obligated to pay to its licensor for a certain isomerization process employed by Seller in the manufacture of said aviation gasoline; that said "isomerization royalty sums" are calculated at the rate of $0.05 per barrel of isobutane produced by said process and used in the manufacture of said aviation gasoline and are as follows per gallon of 100 octane aviation gasoline:

| | Item 2 (Exhibit A) | Item 3 (Exhibit A) |
|---|---|---|
| For the period from the effective date of the first notification referred to in Section II(a) of the foregoing contract until the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.00024 | None |
| For the period after the effective date of the second notification referred to in Section II(a) of the foregoing contract: | None | $0.00001 |





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

III. (B). In the event that during the term of said contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such isomerization process shall be reduced with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices of 100 octane aviation gasoline, as set forth in Section IV of said contract, manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "isomerization royalty sum" applicable thereto, as set forth in Section III (A) of this Exhibit B, and an amount equal to such "isomerization royalty sum" multiplied by the factor $\frac{E}{F}$ where E equals the reduced running royalty per barrel that Seller is obligated to pay, and F equals five cents ($0.05). As to any of said gasoline delivered to and paid for by Buyer under said contract at price including said "isomerization royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "isomerization royalty sum" has been reduced.

IV. (A). In the event that any base price of said aviation gasoline is reduced under the provisions of this Exhibit B, and in the event that at any time prior to six (6) years following the date of termination, cancellation or expiration of the foregoing contract, a suit or suits for infringement with respect to the aforesaid catalytic cracking process or the products thereof, or with respect to the aforesaid alkylation process or the products thereof, or with respect to the aforesaid isomerization process or the products thereof, shall be made or brought against Seller, and if such suit or suits so brought, shall result in final adjudication or settlement which shall establish an obligation to be paid by Seller in satisfaction thereof, Buyer shall make payment to Seller as follows: The amount so payable by Buyer to Seller in each case shall in no event exceed whatever amount is the lessor of (1) the amount whereby Buyer's price for the total quantity of gasoline purchased under this contract and involved in such suit



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

60351
62826

reduced under this Exhibit B, or (2) the amount required to be paid in settlement or satisfaction of such suit, above any portion thereof for which Seller is reimbursed by its licensor; it being expressly understood that all payments by Buyer to Seller (under this paragraph) shall be solely for the purpose of paying damages or other moneys applicable to the case, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation; provided, however, that with respect to such settlement no payment shall be made by Buyer to Seller unless Buyer shall first have given in writing its approval to such settlement; Buyer hereby agreeing that it will give its approval to any such settlement which, under the circumstances, appears to be reasonable.

IV. (B). With respect to such suit or suits for infringement referred to in Section IV. (A) hereof, Seller agrees that it will defend, with all due diligence and at its own expense, such suit or suits at least until an adjudication shall have been made therein by a court of record having primary jurisdiction thereof, or until a settlement approved by Buyer, as above provided, has been effected. Seller further agrees to notify Buyer promptly of the institution of each such suit and shall permit Buyer at its own election, to be represented therein by counsel of its own choice and at its own expense.

IV. (C). If an adjudication adverse to Seller has been made in any such suit by said court of record having primary jurisdiction thereof, and if no settlement approved by Buyer has been effected previously, and Seller shall, in its best judgment, elect not to appeal from such adverse adjudication or to continue the defense of such suit, then, in that event, Seller agrees to give timely notice to Buyer and agrees that Buyer may, at its election and at its own expense, continue to defense of such suit, file and perfect appeals to courts of higher jurisdiction, and do such other things as Buyer believes necessary or desirable to obtain a final adjudication or settlement of such suit, and in such event, Seller agrees that Buyer may use its name for all proper purposes connected with the continuance of such suits, and that it will cooperate fully with Buyer in any proper and legal manner necessary to aid Buyer in the furtherance of the defense of such suits.



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date 8/87

60351
62826

V. Seller also represents that there have not been included in its computation of the base prices set forth in Section IV of the foregoing contract any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder other than those set forth in Sections I, II and III of this Exhibit B; except that Seller in its computation of such base prices has included as a capital investment, and has amortized at the rate of ten percent (10%) per annum the sum of $200,000.00 which Seller expects to pay for fully paid-up licenses for certain thermal cracking employed by Seller in the manufacture of such aviation gasoline.

VI. Seller covenants that any "catalytic cracking royalty sum" and any "alkylation royalty sum" and any "isomerization royalty sum" paid by it and included within the base prices set forth in Section IV of the foregoing contract, shall be paid in good faith only to a third party or parties who, in Seller's judgment, are entitled to receive such royalties and to license the respective processes covered thereby.





DECLASSIFIED
Authority NND 730034
By NARA, Date

60351
62826

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to UNION OIL COMPANY OF CALIFORNIA to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 1, 1943.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles S. Fisher, Jr.
Vice-Chairman

ATTEST:

(Sgd) A. T. Hobson
Secretary

(SEAL)





DECLASSIFIED Authority NND 730 014 By TM NARA Date 85

62715
62826

EXHIBIT C

Contractor: Union Oil Company of California

Renegotiation Pursuant to Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, hereinafter referred to as "the Act".

(a) Upon the written demand of Defense Supplies Corporation, at such period or periods when, in the judgment of Defense Supplies Corporation, the profits accruing to Contractor under this contract can be determined with reasonable certainty, the contract price will be renegotiated to eliminate therefrom any amount found as a result of such renegotiation to represent excessive profits. The demand of Defense Supplies Corporation shall fix a place for renegotiation and a time for commencement thereof not later than one year after the close of the fiscal year of Contractor within which completion or termination of the contract, as determined by Defense Supplies Corporation, occurs.

(b) Contractor will furnish to Defense Supplies Corporation such statements of actual costs of production and such other financial statements, at such times and in such form and detail, as Defense Supplies Corporation may prescribe, and will permit such audits and inspections of its books and records as Defense Supplies Corporation may request.

(c) Defense Supplies Corporation shall retain from amounts otherwise due to Contractor, or Contractor shall repay to the United States if paid to him, any amount of the contract price found as a result of such renegotiation to represent excessive profits and not eliminated through reductions in contract price or otherwise, as Defense Supplies Corporation may direct.

(d) In each subcontract made by Contractor under this contract, Contractor will include in each subcontract described in paragraph (f) (2) (ii) of this Exhibit C, and in each subcontract for an amount in excess of $100,000 described in paragraph (f) (2) (i) of this Exhibit C, the following provisions:

"ARTICLE .........Renegotiation Pursuant to Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, hreinafter referred to as 'the Act'.

(1) Upon the written demand of Defense Supplies Corporation at such period or periods when, in the judgment of Defense Supplies Corporation the profits accruing to .............. (subcontractor) under this contract can be determined with reasonable certainty, Defense Supplies Corporation and ...................... will renegotiate the contract price to eliminate therefrom any amount found as a result of such renegotiation to represent excessive profits. The demand of Defense Supplies Corporation shall fix a place for renegotiation and a time for the commencement thereof not later than one year after the close of the fiscal year of the subcontractor within which completion or termination of the contract, as determined by Defense Supplies Corporation, occurs.

(2) .............. (subcontractor) will furnish to Defense Supplies Corporation such statements of actual costs of production and such other financial statements, at such times and in such form and detail, as Defense Supplies Corporation may prescribe, and will permit such audits and inspections of its books and records as Defense Supplies Corporation may request.

(3) Any amount of the contract price found as a result of such renegotiation to represent excessive profits shall, as directed by Defense Supplies Corporation,--

(A) Be deducted by . . . . . . . . . (contractor) from payments otherwise due to . . . . . . . . . . . (subcontractor) under this contract; or

(B) Be paid by . . . . . . . . . . . (subcontractor) directly to the United States, if paid to him; or

(C) Be eliminated through reductions in the contract price, or otherwise.





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

62715
62826

(4) . . . . . . . . . . . .agrees that . . . . . . . . . shall not
(subcontractor) (contractor)
be liable to . . . . . . . . . . . for or on account of any amount paid
(subcontractor)
to the United States by . . . . . . . . . . or deducted by . . . . . . . .
(subcontractor) (contractor)
from payments otherwise due under this contract, pursuant to directions from Defense Supplies Corporation in accordance with the provisions of this Article. Under its contract with Defense Supplies Corporation, . . . . . . . is obligated to pay or credit to Defense Supplies Corpora-
(contractor)
tion all amounts withheld by it from . . . . . . . . . . hereunder.
(subcontractor)

(5) . . . . . . . . . . . . agrees (a) upon direction of Defense
(subcontractor)
Supplies Corporation, to include in any subcontract hereunder sections (1) to (6), inclusive, of this Article, and (b) to make no subdivisions of any contract for the purpose of evading the provisions of this Article, and (c) to repay to the United States the amount of any reduction in the contract price of any such subcontract which results from renegotiation thereof by Defense Supplies Corporation, and which Defense Supplies Corporation directs . . . . . . . . . . . to withhold from payments which
(subcontractor)
are otherwise due under such subcontract and actually unpaid at the time . . . . . . . . . . . receives such direction.
(subcontractor)

(6) As used in this Article - -

(a) The term 'Defense Supplies Corporation' shall be deemed to include any duly authorized representative or representatives.

(b) Except as exempted under or exempted pursuant to section 403 (1) of the Act, the term 'subcontract' means (i) any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of this contract, or (ii) any contract or arrangement (other than a contract or arrangement between two contracting parties, one of which is found by Defense Supplies Corporation to be a bona fide executive officer, partner, or full time employee of the other contracting party), (A) under which any amount payable is contingent upon the procurement of this contract with Defense Supplies Corporation or of a subcontract or subcontracts hereunder, or determined with reference to the amount of this contract or such subcontract or subcontracts, or (B) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring this contract with Defense Supplies Corporation, or any subcontract or subcontracts hereunder; Provided, that nothing in this sentence shall be construed (1) to affect in any way the validity or construction of provisions in any contract with Defense Supplies Corporation, or any subcontract thereunder, heretofore at any time or hereafter made, prohibiting the payment of contingent fees or commissions; or (2) to restrict in any way the authority of Defense Supplies Corporation to determine the nature or amount of selling expenses under subcontracts as defined in (ii) herein, as a proper element of the contract price or as a reimbursable item of cost, under a contract with Defense Supplies Corporation, or a subcontract thereunder. The term 'Article' as used in this subsection (b) includes any material, part, assembly, machinery, equipment, or other personal property.

(c) The term 'renegotiate' and 'renegotiation' have the same meaning as in section 403(b) of the Act.

(d) The term 'this contract' means this contract as modified from time to time.

(e) The term 'contract price' includes without limitation any amount paid or to be paid pursuant to this contract."



DECLASSIFIED
Authority NND-730 034
By TM NARA Date

62715
62826

(e) (1) Contractor agrees to make no subdivisions of any contract or subcontract for the purpose of evading the provisions of this Exhibit C.

(2) If any renegotiation between Defense Supplies Corporation and any subcontractor pursuant to the provisions required by section (d) hereof results in a reduction of the contract price of the subcontract, Defense Supplies Corporation shall retain from payments otherwise due to Contractor, or Contractor shall repay to the United States, as Defense Supplies Corporation may direct, the amount of such reduction which Defense Supplies Corporation directs Contractor to withhold from payments which are otherwise due to the subcontractor under the subcontract and actually unpaid at the time Contractor receives such direction.

(f) As used in this Exhibit C--

(1) The term "Defense Supplies Corporation" shall be deemed to include any duly authorized representative or representatives.

(2) Except as exempted under or exempted pursuant to section 403 (i) of the Act, the term "subcontract" means (i) any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of this contract, or (ii) any contract or arrangement (other than a contract or arrangement between two contracting parties, one of which is found by Defense Supplies Corporation to be a bona fide executive officer, partner or full time employee of the other contracting party), (A) any amount payable under which is contingent upon the procurement of this contract with Defense Supplies Corporation or of a subcontract or such subcontracts hereunder, or determined with reference to the amount of this contract or subcontract or subcontracts, or (B) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring this contract with Defense Supplies Corporation, or any subcontract or subcontracts hereunder: Provided, That nothing in this sentence shall be construed (1) to affect in any way the validity or construction of provisions in any contract with Defense Supplies Corporation or any subcontract thereunder, heretofore at any time or hereafter made, prohibiting the payment of contingent fees or commissions; or (2) to restrict in any way the authority of Defense Supplies Corporation to determine the nature or amount of selling expenses under subcontracts as defined in (ii) herein, as a proper element of the contract price or as a reimbursable item of cost, under a contract with Defense Supplies Corporation or a subcontract thereunder. The term "Article" as used in this subsection (b) includes any material, part, assembly, machinery, equipment, or other personal property.

(3) The terms "renegotiate" and "renegotiation" have the same meaning as in section 403(b) of the Act.

(4) The term "this contract" means this contract as modified from time to time.

(5) The term "contract price" includes without limitation any amount paid or to be paid pursuant to this contract.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

65268

DECLASSIFIED Authority NND 730 048 By [illegible] NARA, Date [illegible]

DEFENSE SUPPLIES CORPORATION

Washington, D. C.

August 16, 1943.

Mr. Wm. L. Stewart, Jr.,
Union Oil Company,
Union Oil Building,
Los Angeles, California.

Dear Mr. Stewart:

Reference is made to proposed contract between Defense Supplies Corporation and Union Oil Company of California to be dated as of May 1, 1943 relating to the sale and purchase of 100 octane aviation gasoline.

This contract calls for the sale and purchase of 100 octane aviation gasoline in accordance with Amendment 4 until completion of the new facilities described in Section I (b) of the said contract and in accordance with Item 3 (AN-F-28) thereafter. We nevertheless desire that you deliver under this contract 100 octane aviation gasoline meeting other specifications in accordance with advices given to you from time to time by the Petroleum Administration for War. It may be that such action on your part will entail losses as compared with delivery of Amendment 4 gasoline and/or Item 3 gasoline. In this event you will presumably wish to seek reimbursement for such losses under the provisions of the "Memorandum of Understanding on Plan to Reimburse Manufacturers of 91 Octane and Higher Aviation Gasoline for Losses Incurred in Following Office of Petroleum Coordinator Recommendations", dated July 24, 1942 as amended June 3, 1943. This is to assure you that that Plan remains in full force and effect and that it will remain in full force and effect until notice is given to industry, including your company, as provided in the aforementioned Memorandum of Understanding.

So long as that Memorandum of Understanding is in effect we assume that you will deliver gasoline in accordance with specifications as advised by the Petroleum Administration for War, notwithstanding the provisions of Section II (c) of the aforementioned contract and that you will continue to do so at least so long as the Plan covered by the aforementioned Memorandum of Understanding remains in effect.

The aforegoing is, of course, without prejudice to our rights under Section II (c), if at some future date it shall appear desirable to exercise such rights.

We would also like to call your attention to the fact that since the proposed contract was negotiated specification AN-F-28 has been amended in such manner as to reduce the cost of the product. We shall expect an equitable adjustment in this connection and expect to write your company and other companies shortly as to how the matter will be handled.

65268

DECLASSIFIED Authority NND 73268 By ... NARA Date ...

DEFENSE SUPPLIES CORPORATION

Washington, D. C.

- 2 -

Inadvertantly Paragraph XVI (c) was included in the copies of the contract forwarded to you by the Petroleum Administration for War. In accordance with understanding between yourselves and Petroleum Administration for War this clause was to have been eliminated and therefore will you please strike this clause from the contract, change the references to sub-paragraphs (d) and (e) to (c) and (d), respectively, and initial the deletion and changes.

If the foregoing is satisfactory to you we would appreciate your signing and returning a copy of this letter along with four copies of the contract duly executed by Union Oil Company. Upon your assent to the provisions of this letter and receipt of these contracts signed by you they will be executed by Defense Supplies Corporation and two copies returned to you.

Yours very truly,

(Sgd) H. A. Mulligan

H. A. Mulligan
President.

ASSENT:

UNION OIL COMPANY OF CALIFORNIA

By Wm. L. Stewart, Jr.

Executive Vice President
Title

GS:erg

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## T[illegible]l to whom these presents shall come. Greeting:

[illegible]virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, [illegible]he seal of the National Archives of the United States, that the attached reproduction(s) is a true and [illegible] copy of documents in his custody.

| | |
|---|---|
| SIGNATURE [signature] | |
| NAME Timothy K. Nenninger | DATE AUG 21 2006 |
| TITLE Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY National Archives at College Park 8601 Adelphi Road College Park, MD 20740-6001 | |

NA FORM 14007 (10-88)

DEFENSE SUPPLIES CORPORATION

and

RICHFIELD OIL CORPORATION

100-OCTANE AVIATION GASOLINE

February 3, 1942.



DECLASSIFIED
Authority NND-730034
By TM NARA Date [illegible]