176608

177835

CONFORMED COPY

Revised February 3, 1942.

# C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

RICHFIELD OIL CORPORATION

100-OCTANE AVIATION GASOLINE

February 3, 1942.



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

176608

DEFENSE SUPPLIES - RICHFIELD CONTRACT

(Watson, California, Refinery)

Revised February 3, 1942.

CONTRACT made as of February 3, 1942, between RICHFIELD OIL CORPORATION, a Delaware Corporation, having its principal business office at 555 South Flower Street, Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

I. Expansion of Seller's Refining Facilities.

Seller has facilities for the production at Watson, California, of approximately one thousand seven hundred (1,700) barrels per calendar day of 100-Octane aviation gasoline and is willing to expand its facilities, at an estimated cost of approximately Three Million Dollars ($3,000,000.00), to a degree which it is estimated will enable Seller to produce at Watson, California, approximately three thousand seven hundred fifty (3,750) barrels per calendar day of 100-Octane aviation gasoline. Seller shall use its best efforts to expand said facilities and shall endeavor to maintain work on said expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as soon as possible and not later than January 1, 1943. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, in accordance with provisions of this contract, seventy-five thousand (75,000) barrels per calendar month of 100-Octane aviation gasoline which shall be in accordance with



DECLASSIFIED Authority NND 730 014 By JM NARA Date

the specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A. Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline such quantity is an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggregate quantity among the various kinds of gasoline.

(b) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(c) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(d) Seller shall maintain storage facilities at, or in the vicinity of, Watson, California, to accommodate at least one hundred fifty thousand (150,000) barrels of 100-Octane aviation gasoline. Subject to Section VIII hereof, Buyer shall order and take deliveries in such quantities as it may determine; provided, however, that whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract,



DECLASSIFIED
Authority NND 730034
By IM NARA, Date

then such additional aviation gasoline shall be treated as covered by Section III hereof. In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

III. Optional Gasoline.

Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of the 100-Octane aviation gasoline which Seller may produce between the execution of this contract and the date of receipt by Buyer of notification of the completion of the expansion of said facilities to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100-Octane aviation gasoline which Seller may produce between said receipt by Buyer of notification of completion and the expiration of this contract. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

The options granted in this Section III shall terminate on any termination of this contract.

IV. Price and Payment.

The base price of 100-Octane aviation gasoline specified as Item 1 of Exhibit A hereof, shall be thirteen and one-half cents ($0.135) per gallon f.o.b. Seller's refinery at Watson, California. The base price of 100-Octane aviation gasoline specified as Item 2 of Exhibit A hereof shall be thirteen and one-quarter cents ($0.1325) per gallon f.o.b. Seller's refinery at Watson, California. The base prices of other kinds of 100-Octane aviation gasoline shall be as specified by addenda to Exhibit A



DECLASSIFIED
Authority NND-730 034
By TM NARA Date 8/5

hereof. Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

Buyer shall pay promptly, but not later than the twentieth (20th) day after the end of each calendar month, all money due for gasoline delivered to it by Seller during said month. On or before the tenth (10th) day of each calendar month, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of one dollar and eleven cents ($1.11) per barrel for Signal Hill crude, twenty-six degrees (26°) A.P.I., deliverable to Seller in the Los Angeles Basin Field. The price shall be increased or decreased six hundred eight ten-thousandths of one cent ($0.000608) per gallon for each one cent ($0.01) advance or decrease in the average price paid for said crude over or under one dollar and eleven cents ($1.11) per barrel by the three (3) largest purchasers of such crude in the Los Angeles Basin Field. The prices posted for such crude in the Los Angeles Basin Field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seven hundred twenty-two ten-thousandths of one cent ($0.000722) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5). The effective



DECLASSIFIED
Authority NND 730 0?4
By J.M. NARA Date ?

176608

date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number, regardless of what Seller's crude inventory may be at the time of such change. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Watson, California, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price



DECLASSIFIED
Authority NND 730034
By [illegible] NARA, Date [illegible]

ten (10) days thereafter, Buyer may give notice to Seller that it [illegible] to have the amount of such increase fixed by arbitration in ac-[illegible]ance with Section XI hereof. The arbitrators to be chosen in this [illegible]tance shall be persons who have had at least ten (10) years' experi-[illegible]ce in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on December 31, 1945. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. During such extension or extensions all of the provisions of this contract except those not then applicable shall be in full force and effect.

VII. Advance on Account of Purchase of Gasoline.

(a) Buyer shall make an advance payment to Seller on account of the purchase of 100-Octane aviation gasoline in the amount of Two Million One Hundred Thousand Dollars ($2,100,000.00) which shall be disbursed in monthly installments as the construction of the expanded facilities progresses. The first installment shall be disbursed in the amount of one-twelfth (1/12th) of said Two Million One Hundred Thousand Dollars ($2,100,000.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer from Seller of Seller's waiver of its right to



DECLASSIFIED
Authority NND 730 034
By TM NARA Date [illegible]

terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall deliver to Buyer statements, showing only principal items, to certify that it has expended, or firmly committed itself to expend, on account of the construction of the expanded facilities all of the funds theretofore advanced to it by Buyer and in addition has so expended, or firmly committed itself to expend, from its own funds not less than thirty-three and one-third percent (33-1/3%) of the aggregate of such installments advanced by Buyer. Buyer shall have the privilege of examining Seller's books to verify said statements, but such verification shall not be a condition of payments by Buyer. If such examination shall lead to any disagreement, it shall be settled by arbitration under Section XI hereof.

(b) From the amount due Seller for deliveries of 100-Octane aviation gasoline for each of the first thirty-six (36) full calendar months following receipt by Buyer of Seller's notification of completion of the expanded facilities referred to in Section I hereof, Buyer shall deduct and retain one thirty-sixth (1/36th) of the sum of:

(1) the above advance payment, and

(2) interest at the rate of two percent (2%) per annum on outstanding balances of such advance payment accruing subsequent to the date of receipt by Buyer of Seller's notification of completion of said expanded facilities;

provided that Buyer shall also deduct and retain, with respect to each of the first twelve (12) full calendar months after the date of receipt of such notification of completion the sum of:

(1) one-twelfth (1/12th) of the amount of interest at the rate of two percent (2%) per annum on the outstanding balances of such advance payment accrued prior to and including the date of receipt by Buyer of Seller's notification of completion of said expanded facilities; and



DECLASSIFIED Authority NND 730034 By TM NARA, Date

(2) one-twelfth (1/12th) of the amount of the credit, if any, referred to in paragraph (c) of this Section VII.

The above deductions shall be considered as payment for the first purchases by Buyer in each of the first thirty-six (36) full calendar months following receipt by Buyer of Seller's notification of completion of said expanded facilities.

(c) If, by reason of delay in the completion of the expanded facilities, the notification of completion referred to in Section II hereof shall not be received at least thirty-six (36) months prior to December 31, 1945, then Seller shall repay to Buyer one thirty-sixth (1/36th) of the principal amount of the advance payment for each month or fraction thereof by which receipt of said notification of completion is delayed after January 1, 1943, such repayment to be credited against any purchases by Buyer of 100-Octane aviation gasoline hereunder delivered during each of the twelve (12) full calendar months following receipt of said notification of completion; provided, however, that not more than one-twelfth (1/12th) of such credit shall be taken in each of said twelve (12) full calendar months; and provided further that any such repayment not made as provided above or in paragraph (d) of this Section VII shall be made by Seller to Buyer in cash on December 31, 1945.

(d) In the event of Seller's failure to deliver sufficient 100-Octane aviation gasoline hereunder following such notification of completion, due to reasons other than the force majeure reasons referred to in Section X hereof, to permit Buyer to recoup in any month the monthly repayment installment as provided in paragraph (b) of this Section VII, the unrecouped portion of the monthly repayment installment as aforesaid shall be repaid immediately by Seller to Buyer in cash; but if such failure was due to such force majeure reason then the repayment period provided in paragraphs (b) and (c) of this Section VII shall be extended one month for each month in which such failure due to such force majeure reason occurred.





DECLASSIFIED Authority NND 730 034 By [illegible] NARA, Date [illegible]

VIII. Liquidated Damages and Limitation of Liability.

The parties mutually agree that the Seller would be seriously damaged in the event that Buyer should breach its obligation to take that minimum quantity of 100-Octane aviation gasoline herein agreed upon and that the liquidated damages herein provided for are not in the nature of a penalty or forfeiture and that they reflect allowance for the possible cessation of war prior to the expiration of the original term of the contract. If Buyer shall fail to purchase sufficient 100-Octane aviation gasoline in any one full calendar month following receipt by Buyer of Seller's notification of completion of said expanded facilities to liquidate the monthly repayment installment (determined as provided in paragraphs (b) and (c) of Section VII hereof), Buyer shall have the privilege to deduct and retain from amounts owing to Seller for purchases of 100-Octane aviation gasoline during the next succeeding month, over and above amounts sufficient to liquidate the regular monthly repayment installment for such month, an amount up to the unrecouped portion of the monthly repayment installment for the preceding month. If Buyer so fails to make recoupment, as aforesaid, during such succeeding month, then Seller shall, upon the expiration of such month, be entitled to retain as liquidated damages such unrecouped amount plus interest at the rate of two percent (2%) per annum on such unrecouped amount computed from the first (1st) day of the preceding month.

It is understood that the foregoing liquidated damages relate solely to a default by Buyer in not purchasing the stipulated quantities. Damages for any other default by Buyer and for any default by Seller shall be determined by Arbitration.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the intake pipe of the means of transportation, f.o.b. Seller's refinery at Watson, California.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of Seller's capacity for loading tank trucks and tank car deliveries





DECLASSIFIED
Authority NND 730 034
By TM NARA Date

not to be in excess of two thousand (2,000) barrels in any one day all to be supplied by Buyer at its own cost and expense.

(c) Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each tanker or barge and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board.

Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Seller shall furnish certificates of inspection, by a licensed inspector satisfactory to the parties which shall set forth the quantity and quality of each shipment of gasoline. Inspection shall be based on samples taken from Seller's storage tanks from which the product is delivered. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall forthwith be delivered to Buyer, and a third submitted to Buyer with the monthly statement required by Section IV hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, in which event Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(e) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery except in case of deliveries into tank trucks, in which case no adjustment shall be made.

(f) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society



DECLASSIFIED
Authority NND-730 ...
By ... NARA, Date ...

for Testing Materials, wherever applicable, and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(g) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(h) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(i) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may nevertheless accept such product and claim an adjustment for such deficiency; provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(j) Upon request by Buyer, Seller shall make deliveries of 100-Octane aviation gasoline under this contract in appropriate limited quantities to points where Seller may be currently engaged in making deliveries of aviation gasoline in the ordinary course of its business. The delivery costs shall be paid by Buyer and are to be mutually agreed upon.

(k) Seller shall not be obligated to procure the 100-Octane gasoline to be delivered hereunder from any source other than its Watson, California, refinery.

X. <u>Force Majeure</u>.

Seller shall not be liable for delays or defaults in its performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts or requests of the Government, or of any Governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

176608

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provisions of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days after receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the person who at the time is the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit, acting in his individual and not judicial capacity, upon application therefore by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expenses of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.



DECLASSIFIED
Authority NND-730034
By TM NARA, Date

XII. <u>Taxes</u>.

Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

Any addition of taxes to the prices as established in Sections IV and V hereof shall not be considered in arriving at the value of the gasoline delivered hereunder in connection with those portions of the contract referring to liquidated damages, repayment of advance or recoupment of advance, and such taxes shall be shown separately and be in addition to the price.





DECLASSIFIED

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or registered mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question. No modification shall be binding unless in writing and signed by officers of the parties. Authorization or ratification by the boards of directors of the parties shall not be required in respect of modifications.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other governmental Agency, department, instrumentality or wholly government-owned corporation in which event Buyer shall remain liable.

XVI. Statutory Compliance.

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations,



DECLASSIFIED
Authority NND-730 034
By TM NARA, Date 89

and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and assurances from the Treasury Department, in the form of closing agreements, that the advance payment provided for in Section VIII hereof, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder. Failure so to terminate shall not constitute a waiver of any other rights of Seller.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

Dudley H. Digges
Acting Secretary

(Seal)

RICHFIELD OIL CORPORATION

By H. F. Sinclair
Chairman of the Board of Directors

ATTEST:

Cleve B. Bonner
Secretary

(Seal)

679



DECLASSIFIED
Authority NND 730 0?4
By TM NARA Date ?

176199

EXHIBIT "A"

Item 1..................................price, 13.5 cents per gallon, F.O.B. Seller's refinery at Watson, California.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2..................................price, 13.25 cents per gallon, F.O.B. Seller's refinery at Watson, California.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Richfield Oil Corporation to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 3rd day of February, 1942.

RECONSTRUCTION FINANCE CORPORATION

By CHARLES B. HENDERSON
Chairman

Attest:

A. T. HOBSON
Acting Secretary

(Seal)



DECLASSIFIED
Authority NND 730034
By TM NARA Date 8/84

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, der the seal of the National Archives of the United States, that the attached reproduction(s) is a true and rect copy of documents in his custody.

al)

SIGNATURE

NAME Timothy K. Nenninger

DATE AUG 21 2006

TITLE Chief, Modern Military Records

NAME AND ADDRESS OF DEPOSITORY
National Archives at College Park
8601 Adelphi Road
College Park, MD 20740-6001

NA FORM 14007 (10-88)

DEFENSE SUPPLIES CORPORATION

and

RICHFIELD OIL CORPORATION

(Second Contract)

100-OCTANE AVIATION GASOLINE

February 20, 1943.



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date 85

57158

CONFORMED COPY

Revised March 23, 1943.

# C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

RICHFIELD OIL CORPORATION

(Second Contract)

100-OCTANE AVIATION GASOLINE

February 20, 1943.



DECLASSIFIED
Authority NND-730034
By [illegible] NARA, Date [illegible]

57158

DEFENSE SUPPLIES - RICHFIELD CONTRACT

(Watson Refinery - Second Contract)

Revised March 23, 1943.

CONTRACT made as of February 20, 1943, between RICHFIELD OIL CORPORATION, a Delaware Corporation, having its principal business office at 555 South Flower Street, Los Angeles, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of February 3, 1942, between the parties entitled "Contract between Defense Supplies Corporation and Richfield Oil Corporation" is hereby modified to the extent that it is inconsistent herewith and shall otherwise remain in full force and effect. Said certain contract will be referred to hereinafter as "the prior contract".

I. Expansion of Seller's Refining Facilities.

As of the date of the prior contract, Seller had existing facilities for the production at Watson, California, of approximately one thousand seven hundred (1,700) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 1 of Exhibit A hereof.

Seller has now recently completed an expansion of such facilities contemplated by the prior contract, to an extent which Seller originally estimated would enable it to produce approximately three thousand seven hundred fifty (3,750) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 1 of Exhibit A hereof and which Seller currently estimates will enable it to produce approximately three thousand sixty-five (3,065) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof.



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

57158
58333

Seller is willing to make an additional expansion of its facil- at an estimated cost of approximately Fourteen Million Three Hun- Seventy-five Thousand Dollars ($14,375,000.00), which it is estimated will enable Seller to produce at Watson, California, a total of approxi- mately ten thousand two hundred (10,200) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. Seller shall use its best efforts to expand said additional facilities and shall endeavor to maintain work on said expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as soon as possible and not later than March 1, 1944. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid additional expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer; and from and after receipt of such notification Seller shall sell and deliver and Buyer shall buy and receive, in accord- ance with provisions of this contract, two hundred twenty-five thousand (225,000) barrels per calendar month of 100 octane aviation gasoline which shall be in accordance with the specifications set forth in Exhibit A hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) Wherever in this contract provision is made for the sale and delivery to Buyer of a stated quantity of gasoline such quantity shall be an aggregate quantity of the various kinds of gasoline specified in Exhibit A collectively considered. Buyer may apportion such aggre- gate quantity among the various kinds of gasoline.

(c) Buyer on giving reasonable notice to Seller may re- quire the delivery hereunder of 100 octane aviation gasoline of specifi- cations other than those originally set forth in Exhibit A hereof which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100 octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A





DECLASSIFIED Authority NND 730034 By IM NARA, Date 8/87

hereof. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A hereof.

(d) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(e) Seller shall maintain storage facilities at, or in the vicinity of, Watson, California, to accommodate at least three hundred thousand (300,000) barrels of 100 octane aviation gasoline. Subject to Section VIII hereof, Buyer shall order and take deliveries in such quantities as it may determine; provided, however, that whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100 octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof. In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.



DECLASSIFIED Authority NND 730034 By TM NARA Date

...tional Gasoline.

(a) Buyer shall also have the option from time to time and ... time to purchase all or any part of the 100 Octane aviation gaso... which Seller may produce between the effective date of the notifica... referred to in Section II (a) hereof and the expiration of this con...tract. Upon the exercise of such option Seller shall, subject to Section V (c) hereof, operate the facilities at full capacity or at least to an extent sufficient to satisfy Buyer's indicated requirements.

IV. Price and Payment.

(a) Prior to the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline, specified as Item 2 of Exhibit A hereof, shall be thirteen and one-quarter cents ($0.1325) per gallon f.o.b. Seller's refinery at Watson, California, but said base price shall not apply from and after the effective date of the notification referred to in Section II (a) hereof.

(b) From and after the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof purchased under the present contract and under the prior contract shall be thirteen and one-half cents ($0.135) per gallon f.o.b. Seller's refinery at Watson, California.

(c) Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture, plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.





DECLASSIFIED
Authority NND 730 034
By TM NARA Date 5/86

(d) Buyer shall pay promptly, but not later than the (20th) day after the end of each calendar month, all money due aline delivered to it by Seller during said month. On or before th (10th) day of each calendar month, Seller shall render to Buyer statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

V. Price Escalation.

The base prices of 100 octane aviation gasoline purchased under the present contract and under the prior contract shall be subject to adjustment, first, as provided in Exhibit B hereof, and second, as follows:

(a) The said base prices are based on a price of One Dollar and Eleven Cents ($1.11) per barrel for twenty-six degree (26°) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field. The said prices shall be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Eleven Cents ($1.11) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field should constitute prima facie evidence of the prices paid by such purchasers.

(b) The base price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics. United States Department of Labor, over or under the index figure of ninety-three and five-tenths (93.5) (the final index number used in the prior contract). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The base price for 100 octane aviation gasoline set forth in Section IV (b) hereof shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease over or under a calculated index figure which is the weighted average of three thousand sixty-five (3,065) barrels per calendar day at ninety-three and five-tenths (93.5) and seven thousand one hundred thirty-five (7,135) barrels per calendar day at ninety-five and eight-tenths (95.8) (the present final index number). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number.

(d) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Watson, California, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a), (b), and (c), Seller may give notice to Buyer that the delivery of



DECLASSIFIED Authority NND 730 014 By TM NARA Date 85

57158

octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the notification referred to in Section II (a) hereof, but not later, in any event, than June 30, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of



DECLASSIFIED
Authority NND-730034
By TM NARA, Date

57158
58333

first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect. Section VI of the prior contract is hereby superseded and cancelled, except for the first sentence thereof.

VII. Advance on Account of Purchase of Gasoline.

(a) In addition to the advance payment provided for in the prior contract, Buyer shall make an advance payment to Seller on account of the purchase of 100 octane aviation gasoline under this contract in the amount of Ten Million Seven Hundred Eighty-one Thousand Two Hundred Forty-four Dollars ($10,781,244.00) which shall be disbursed in monthly installments as the construction of the expanded facilities progresses. The first installment shall be disbursed in the amount of one-twelfth (1/12th) of said Ten Million Seven Hundred Eighty-one Thousand Two Hundred Forty-four Dollars ($10,781,244.00) immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer from Seller of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. The remaining installments shall be disbursed when Seller shall deliver to Buyer statements, showing only principal items, to certify that it has expended, or firmly committed itself to expend, on account of the construction of the additional expansion of facilities referred to in Section I hereof all of the funds theretofore advanced to it by Buyer and in addition has so expended, or firmly committed itself to expend, from its own funds not less than thirty-three and one-third percent (33-1/3%) of the aggregate of such installments advanced by Buyer. Buyer shall have the privilege of examining Seller's books to verify said statements, but such verification shall not be a condition of payments by Buyer. If such examination shall lead to any disagreement, it shall be settled by arbiration under Section XI hereof.



DECLASSIFIED
Authority NND 730 0?4
By TM NARA Date

57158
58333

(b) From the amount due Seller for deliveries of 100 octane aviation gasoline for each of the first thirty-six (36) full calendar months following receipt by Buyer of Seller's notification of completion of the additional expansion of facilities referred to in Section I hereof, Buyer shall deduct and retain the sum of:

(1) one thirty-sixth (1/36th) of the above advance payment, and

(2) interest at the rate of two percent (2%) per annum on outstanding balances of such advance payment accruing subsequent to the date of receipt by Buyer of Seller's notification of completion of said additional expansion of facilities;

provided that Buyer shall also deduct and retain, with respect to each of the first twelve (12) full calendar months after the date of receipt of such notification of completion the sum of:

(1) one-twelfth (1/12th) of the amount of interest at the rate of two percent (2%) per annum on the outstanding balances of such advance payment accrued prior to and including the date of receipt by Buyer of Seller's notification of completion of said additional expansion of facilities; and

(2) one-twelfth (1/12th) of the amount of the credit, if any, referred to in paragraph (c) of this Section VII.

The above deductions, plus the deductions under the provisions of Section VII of the prior contract accruing subsequent to the effective date referred to in Section II (a) hereof, shall be considered as payment for the first purchases by Buyer in each of the first thirty-six (36) full calendar months following the effective date of the notification referred to in Section II (a) hereof.

(c) If, by reason of delay in the completion of the expanded facilities, the effective date of the notification referred to in Section II (a) hereof shall not be at least thirty-six (36) months prior



DECLASSIFIED
Authority NND-730034
By TM NARA, Date 8/6

June 30, 1947, then Seller shall repay to Buyer one thirty-sixth (1/36th) of the principal amount of the advance payment for each month or fraction thereof by which the effective date of said notification is subsequent to July 1, 1944, such repayment to be credited against any purchases by Buyer of 100 Octane aviation gasoline hereunder delivered during each of the twelve (12) full calendar months following the effective date of said notification; provided, however, that not more than one-twelfth (1/12th) of such credit shall be taken in each of said twelve (12) full calendar months; and provided further that any such repayment not made as provided above or in paragraph (d) of this Section VII shall be made by Seller to Buyer in cash on expiration of the original term of this contract.

(d) In the event of Seller's failure to deliver sufficient 100 octane aviation gasoline hereunder following the effective date of the notification referred to in Section II (a) hereof, due to reasons other than the force majeure reasons referred to in Section X hereof, to permit Buyer to recoup in any month the monthly repayment installment as provided in paragraph (b) of this Section VII, the unrecouped portion of the monthly repayment installment as aforesaid shall be repaid immediately by Seller to Buyer in cash; but if such failure was due to such force majeure reason then the repayment period provided in paragraphs (b) and (c) of this Section VII shall be extended one month for each month in which such failure due to such force majeure reason occurred.

VIII. Liquidated Damages and Limitation of Liability.

(a) The parties mutually agree that the Seller would be seriously damaged in the event that Buyer should breach its obligation to take that minimum quantity of 100 octane aviation gasoline herein agreed upon and that the liquidated damages herein provided for are not in the nature of a penalty or forfeiture and that they reflect allowance for the possible cessation of war prior to the expiration of the original term of the contract. If Buyer shall fail to purchase sufficient 100 octane aviation gasoline in any one full calendar month following the effective date of the notification referred to in Section II (a) hereof to liquidate the



DECLASSIFIED
Authority NND 730034
By TM NARA, Date 8/61

total of the monthly repayment installments under this contract and the prior contract (determined as provided in paragraphs (b) and (c) of Section VII hereof and in paragraphs (b) and (c) of Section VII of the prior contract), Buyer shall have the privilege to deduct and retain from amounts owing to Seller for purchases of 100 octane aviation gasoline during the next succeeding month, over and above amounts sufficient to liquidate the regular monthly repayment installments for such month, an amount up to the unrecouped portion of the monthly repayment installments for the preceding month. If Buyer so fails to make recoupment, as aforesaid, during such succeeding month, then Seller shall, upon the expiration of such month, be entitled to retain as liquidated damages such unrecouped amount plus interest at the rate of two percent (2%) per annum on such unrecouped amount computed from the first (1st) day of the preceding month.

(b) The foregoing liquidated damages and the liquidated damages provided in Section VIII of the prior contract relate solely to a default by Buyer in not purchasing the stipulated quantities and there shall be no other damages for any failure by Buyer to take the quantities stipulated in Section II (a) of the prior contract and Section II (a) of the present contract. Damages for any other default by Buyer and for any default by Seller shall be determined by arbitration under Section XI hereof.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the intake pipe of the means of transportation, f.o.b. Seller's refinery at Watson, California.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of Seller's capacity for loading tank trucks and tank car deliveries not to be in excess of two thousand (2,000) barrels in any one day) all to be supplied by Buyer at its own cost and expense.



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

57158

(c) Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each tanker or barge and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Seller shall furnish certificates of inspection, by a licensed inspector satisfactory to the parties which shall set forth the quantity and quality of each shipment of gasoline. Inspection shall be based on samples taken from Seller's storage tanks from which the product is delivered. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (1) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(e) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the



DECLASSIFIED
Authority NND-730 034
By TM NARA Date 8/62

correction tables of the United States Bureau of Standards prevailing at the time of delivery except in case of deliveries of quantities less than four thousand (4,000) gallons into tank wagons, in which case no adjustment shall be made.

(f) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials, wherever applicable, and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(g) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(h) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(i) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may neverthless accept such product and claim an adjustment for such deficiency; provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(j) Upon request by Buyer, Seller shall make deliveries of 100 octane aviation gasoline under this contract in appropriate limited quantities to points where Seller may be currently engaged in making deliveries of aviation gasoline in the ordinary course of its business. The delivery costs shall be paid by Buyer and are to be mutually agreed upon.

(k) Seller shall not be obligated to procure the 100 octane gasoline to be delivered hereunder from any source other than its Watson, California, refinery.

(l) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and





DECLASSIFIED
Authority NND 730034
By JM NARA Date

authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such aviation gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in its performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts or requests of the Government, or of any Governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the expansion of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provisions of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days after receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the person who at the time is the Senior Judge of the United States Circuit





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

[Cou]rt of Appeals for the Ninth Circuit, acting in his individual and not [ju]dicial capacity, upon application therefore by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint is arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expenses of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Section IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.



DECLASSIFIED Authority NND 730034 By TM NARA Date

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

(d) Any addition of taxes to the prices as established in Sections IV and V hereof shall not be considered in arriving at the value of the gasoline delivered hereunder in connection with those portions of the contract referring to liquidated damages, repayment of advance or recoupment of advance, and such taxes shall be shown separately and be in addition to the price.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or registered mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized





DECLASSIFIED
Authority NND 730034
By TM NARA Date

...and specify a duration sufficient in time to embrace the matter in question. No modification shall be binding unless in writing and signed by officers of the parties. Authorization or ratification by the boards of directors of the parties shall not be required in respect of modifications.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other governmental Agency, department, instrumentality or wholly government-owned corporation in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for the prompt completion of the expanded facilities which Seller



DECLASSIFIED
Authority NND 730034
By TM NARA, Date 8/6

57158

will erect and install hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and assurances from the Treasury Department, in the form of closing agreements, that the advance payment provided for in Section VII hereof, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder. Failure so to terminate shall not constitute a waiver of any other rights of Seller.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
President

ATTEST:

(Sgd) H. H. Turner
Secretary

RICHFIELD OIL CORPORATION

(SEAL)

By (Sgd) Chas. S. Jones
President

ATTEST:

(Sgd) C. B. Bonner
Secretary

(SEAL)



DECLASSIFIED
Authority NND-730034
By TM NARA, Date [illegible]

57158

EXHIBIT "A"

Item 1.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 3.0 cc/Gal.

Item 2.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 4 Nov. 24, 1941

Knock Test Method AN-VV-F-746

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc/Gal.

Item 3.

U. S. ARMY - NAVY SUPPLY

AN-F-28 Dec. 23, 1942

100 Octane Number by Method AN-VV-F-746, or

99 Octane Number by Method ASTM-D-357-41T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748

Tetraethyl Lead Limit 4.0 cc/Gal.



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date 8/87

EXHIBIT B

I. (A). Seller represents that the base price set forth in Section IV (b) of the foregoing contract for 100 octane aviation gasoline includes a certain "catalytic cracking royalty sum" representing patent royalties which Seller expects to pay to a third party or parties; that said "catalytic cracking royalty sum" is calculated at a running royalty rate of $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operation, and is as follows:

| | Item 3 |
|---|---|
| Period before date of Seller's notification referred to in Section II (a) of the foregoing contract. .................. | none |
| Period after date of Seller's notification referred to in Section II (a) of the foregoing contract. .................. | $0.00132 |

I. (B). In the event that at any time during the term of the foregoing contract, there shall issue to any third party a patent license covering catalytic cracking operations of the type employed by Refiner, at a running royalty rate lower than $0.05 per barrel of fresh stock charged to said third party's catalytic cracking operation, then as between Buyer and Seller, the first receiving such information shall notify the other, and the base prices of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from such base price, an amount equal to said "catalytic cracking royalty sum" multiplied by a factor equal to $\frac{A}{B}$, where A equals the difference between $0.05 and said lower running royalty rate payable by said third party, and B equals the sum of $0.05; and Seller shall within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline delivered under the foregoing contract, between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the amount of said "catalytic cracking royalty sum" and (b) by said factor $\frac{A}{B}$.



DECLASSIFIED
Authority NND 730034
By IM NARA, Date

57158

I. (C). In the event that during the term of the foregoing contract Seller does not pay to any third party or parties the "catalytic cracking royalty sum" aforesaid, or any part thereof, then within sixty (60) days following the date of termination, cancellation or expiration of the foregoing contract, Seller shall refund to Buyer an amount of money equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking royalty sum".

I. (D). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "catalytic cracking royalty sum" then Seller shall promptly notify Buyer and the base price of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from said base price an amount equal to said "catalytic cracking royalty sum"; and Seller shall within sixty (60) days after the date of said notification refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic cracking royalty sum", multiplied by said "catalytic cracking royalty sum".

II. (A). Seller further represents:

(1) That the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract also include certain "contingent sums", as follows:

| | Item 2 | Item 3 |
|---|---|---|
| Period before the effective date of the notification referred to in Section II (a) of the foregoing contract. ....... | $0.00113 | $0.00155 |
| Period after the effective date of the notification referred to in Section II (a) of the foregoing contract. ....... | $0.00096 | $0.00096 |

(2) That said "contingent sums" represent patent royalties which Seller may or may not be obligated to pay to third parties with



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA Date [illegible]

respect to the manufacture of certain "alkylate" constituents of aviation gasoline covered by the foregoing contract, according to a certain process to be employed by Seller. Said "contingent sums" have been calculated at the rate of $0.15 per barrel of total alkylate included in said aviation gasoline.

(3) That said "contingent sums" include the following "prepaid sums" as follows:

| | Period before the effective date of the notification referred to in Section II (a) of the foregoing contract. | | Period after the effective date of the notification referred to in Section II (a) of the foregoing contract. | |
|---|---|---|---|---|
| | Item 2 | Item 3 | Item 2 | Item 3 |
| Prior to July 1, 1943 | $0.00047 | $0.00064 | $0.00019 | $0.00019 |
| From July 1, 1943 to November 16, 1944 | 0.00038 | 0.00052 | 0.00016 | 0.00016 |
| On and after November 16, 1944 | 0.00023 | 0.00031 | 0.00009 | 0.00009 |

(4) That said "prepaid sums" represent certain sums of money which have heretofore been paid on behalf of Seller for licenses under certain alkylation patent rights of Universal Oil Products Company and Stratford Engineering Corporation. Said "prepaid sums" have been calculated upon the basis of 1,330 barrels of total alkylate at the rate of $0.062 per barrel of total alkylate manufactured prior to July 1, 1943, $0.050 per barrel of total alkylate manufactured from July 1, 1943 to November 16, 1944, and $0.030 per barrel of total alkylate manufactured after November 16, 1944.

II. (B). If, at any time, prior to one year after the termination of the Present Emergency, Seller shall in good faith become obligated to pay patent royalties to third parties having an established sulfuric acid alkylation patent licensing position at rates lower than those set forth hereinabove, Seller shall so advise Buyer, and the base prices of all aviation gasoline, if any, delivered under the foregoing contract after the date Seller becomes so obligated shall be adjusted by subtracting from each of the base prices set forth in Section IV of the foregoing contract, an amount equal to the respective "contingent sum" applicable



DECLASSIFIED Authority NND 730034 By TM NARA Date 87

thereto, minus the respective "prepaid sum" applicable thereto, multiplied by a factor equal to $\frac{C}{D}$, where C equals the difference between \$0.15 and the rate which Seller becomes obligated to pay to said third parties, and D equals \$0.15, and Seller shall, within sixty (60) days after becoming so obligated, refund to Buyer an amount equal to the total number of gallons of aviation gasoline delivered under the foregoing contract prior to the date Seller becomes so obligated under each base price, multiplied (a) by an amount equal to the respective "contingent sum" applicable to the said base price and (b) by said factor $\frac{C}{D}$.

II. (C). If any suit for infringement with respect to said "alkylate" constituents or the manufacture thereof is pending against Seller at the expiration of one year after the termination of the Present Emergency, no refund shall be made by Seller until final adjudication or settlement of such suit in good faith, but within sixty (60) days after such final adjudication or settlement, if the same establishes an obligation on the part of Seller to pay damages or other moneys at a rate lower than the royalty rate set forth hereinabove, Seller shall refund to Buyer an amount equal to the total number of gallons of aviation gasoline sold to Buyer under the foregoing contract under each base price multiplied (a) by the difference between the respective "contingent sum" and the respective "prepaid sum" and (b) by a factor equal to $\frac{E}{F}$, where E equals the difference between \$0.15, and the rate which Seller becomes obligated to pay under such final adjudication or settlement, and F equals \$0.15, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation.

II. (D). In the event that no suit for infringement is brought against Seller and Seller itself undertakes no obligation to pay any patent royalties to others with respect to said "alkylate" constituents or the manufacture thereof, prior to the expiration of one year after the termination of the Present Emergency, Seller shall, within sixty (60) days after



DECLASSIFIED
Authority NND-730 034
By TM NARA Date

the expiration of said one-year period, refund to Buyer an amount equal to the total number of gallons of aviation gasoline sold to Buyer under this contract at each base price multiplied by a factor equal to G - H, where G equals the respective "contingent sum" applicable thereto, and H equals the respective "prepaid sum" applicable to said base price.

II. (E). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "contingent sums", then Seller shall promptly notify Buyer and within sixty (60) days after the date of such notification, Seller shall refund to Buyer an amount of money equal to the total number of gallons of 100 octane aviation gasoline so sold to Buyer under the foregoing contract at each base price multiplied by the factor G - H applicable to said base price.

II. (F). In no event shall the combined amounts of all the said "prepaid sums" which may be deducted from said "contingent sums" establishing the amounts of the refunds set forth in Sections II (B), II (C), II (D), and II (E) hereof exceed the total sum of Sixty Four Thousand Eight Hundred Dollars ($64,800) for the periods of the foregoing contract and the prior contract and any extensions thereof.

II. (G). In determining the effect of this Section II of this Exhibit B with respect to any obligation on the part of Seller to pay royalty on a paid-up or commuted basis, such royalty shall be considered as amortized at a rate not to exceed 10% per annum, or at such other rate as shall be determined by negotiations between the parties at the time the payment of such royalty on a paid-up or commuted basis is projected. In the event the parties fail to agree upon a mutually satisfactory rate of amortization, the question shall be determined by arbitration in accordance with Section XI of the foregoing contract.

II. (H). In determining the effect of this Section II of this Exhibit B with respect to any payment by Seller for past infringement, only that portion of such payment shall be considered which is ratably attributable to aviation gasoline sold under the foregoing contract.





DECLASSIFIED
Authority NND 730 034
By TM NARA Date

III. (A). Seller represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract include certain "isomerization royalty sums" representing patent royalties which Seller expects to pay to a third party or parties; that said "isomerization royalty sums" are calculated at a running royalty rate of $0.05 per barrel of isomerized product from Seller's catalytic isomerization operation, and are as follows:

| | Item 2 | Item 3 |
|---|---|---|
| Period before the effective date of the notification referred to in Section II (a) of the foregoing contract. .................. | $0.00012 | $0.00017 |
| Period after the effective date of the notification referred to in Section II (a) of the foregoing contract. .................. | $0.00008 | $0.00008 |

III. (B). In the event that at any time during the term of the foregoing contract, there shall issue to any third party a patent license covering catalytic isomerization operations of the type employed by Seller, at a running royalty rate lower than $0.05 per barrel of isomerized product from third party's catalytic isomerization operation, then as between Buyer and Seller, the first receiving such information shall notify the other, and the base prices of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from each of the said base prices, an amount equal to the "catalytic isomerization royalty sum" applicable thereto multiplied by a factor equal to $\frac{J}{K}$, where J equals the difference between $0.05 and said lower running royalty rate payable by said third party, and K equals the sum of $0.05; and Seller shall within sixty (60) days after the date of said notification by Buyer or Seller to the other, refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline delivered under the foregoing contract, between the date such running royalty rate becomes payable by said third party and said date of notification, multiplied by (a) the amount of the "catalytic isomerization royalty sum" and (b) by said factor $\frac{J}{K}$.





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

III. (C). In the event that during the term of the foregoing contract Seller does not pay to any third party or parties the "catalytic isomerization royalty sum" aforesaid, or any part thereof, then within sixty (60) days following the date of termination, cancellation or expiration of the foregoing contract, Seller shall refund to Buyer an amount of money equal to the number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic isomerization royalty sum", multiplied by said "catalytic isomerization royalty sum".

III. (D). In the event that at any time during the term of the foregoing contract, it shall be finally determined that Seller will not be required to pay said "catalytic isomerization royalty sum" then Seller shall promptly notify Buyer and the base price of all aviation gasoline thereafter delivered under the foregoing contract shall be adjusted by subtracting from said base price an amount equal to said "catalytic isomerization royalty sum"; and Seller shall within sixty (60) days after the date of said notification refund to Buyer an amount equal to the total number of gallons of 100 octane aviation gasoline sold to Buyer under the foregoing contract at a price including said "catalytic isomerization royalty sum", multiplied by said "catalytic isomerization royalty sum".

IV. (A). In the event that Seller shall make refunds to Buyer in accordance with the provisions of Sections I (C), II (D) and III (C) hereof, and in the event that at any time within six (6) years after the termination of the Present Emergency a suit or suits for infringement with respect to said "alkylate" constitutents or the manufacture thereof, or with respect to said catalytic isomerization operations, shall be brought against Seller and such suit or suits shall result in final ajudication or settlement which shall establish an obligation on the part of Seller to pay damages or other moneys in satisfaction thereof, Buyer shall repay to Seller from the particular refund applicable in each case a sum of money, which shall in no event exceed the total amount of that refund,



DECLASSIFIED Authority NND 730 034 By TM NARA Date

for the payment solely of said damages or other moneys applicable to that case, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation; provided, however, that with respect to such settlement, no repayment shall be made by Buyer unless Buyer shall first have given in writing its approval to such settlement.

IV. (B). With respect to such suit or suits for infringement referred to in Section IV. (A) hereof, Seller agrees that it will defend, with all due diligence and at its own expense, such suit or suits at least until an adjudication shall have been made therein by a court of record having primary jurisdiction thereof, or until a settlement approved by Buyer, as above provided, has been effected. Seller further agrees to notify Buyer promptly of the institution of each such suit and shall permit Buyer at its own election, to be represented therein by counsel of its own choice and at its own expense.

IV. (C). If an adjudication adverse to Seller has been made in any such suit by said court of record having primary jurisdiction thereof, and if no settlement approved by Buyer has been effected previously, and Seller shall, in its best judgment, elect not to appeal from such adverse adjudication or to continue the defense of such suit, then, in that event, Seller agrees to give timely notice to Buyer and agrees that Buyer may, at its election and at its own expense, continue the defense of such suit, file and perfect appeals to courts of higher jurisdiction, and do such other things as Buyer believes necessary or desirable to obtain a final adjudication or settlement of such suit, and in such event, Seller agrees that Buyer may use its name for all proper purposes connected with the continuance of such suits, and that it will cooperate fully with Buyer in any proper and legal manner necessary to aid Buyer in the furtherance of the defense of such suits.

IV. (D). As used in Sections II and IV of this Exhibit B, the term "Present Emergency" shall mean the period that the United States is at war or the period of the existing National Emergency as declared by the President to exist in his proclamation dated May 27, 1941, whichever period is the longer.



DECLASSIFIED
Authority NND 730034
By TM NARA Date

V. Seller further represents that no patent royalties other than those set forth in Sections I, II and III of this Exhibit B have knowingly been included in the base prices set forth in Section IV of the foregoing contract.

VI. Seller further covenants that any "catalytic cracking royalty sums", any "contingent sums" and any "catalytic isomerization sums" paid by it and included within said base prices shall be paid in good faith only to a third party or parties having a licensing position recognized by a substantial portion of the refining industry to license the catalytic cracking process, the sulfuric acid alkylation process, and the catalytic isomerization process, respectively, of the type employed by Seller.



DECLASSIFIED
Authority NND-730034
By TM NARA Date

57158

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Richfield Oil Corporation to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of February 20, 1943.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles B. Henderson
Chairman

Attest:

(Sgd) A. T. Hobson
Secretary

(SEAL)



DECLASSIFIED
Authority NND 730 0?4
By TM NARA Date ??

57158

ADDENDUM #1

Richfield Oil Corporation

Los Angeles, Calif.

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, Richfield Oil Corporation, a Delaware corporation, (hereinafter designated as "Contractor") agrees to the provisions set forth below, provided, however, that to the extent that the obligations of manufacturers or dealers are limited, restricted or relaxed by amendments of the law or by authorized governmental regulations, then the obligations of the Contractor shall be automatically and correspondingly limited, restricted or relaxed.

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

57158

Addendum #1

violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of February 20, 1943.

RICHFIELD OIL CORPORATION

By: (Sgd) Chas. S. Jones



DECLASSIFIED
Authority NND-730034
By TM NARA, Date 8/8/

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**To all to whom these presents shall come. Greeting:**

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and correct copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME Timothy K. Nenninger | DATE AUG 21 2006 |
| TITLE Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY National Archives at College Park 8601 Adelphi Road College Park, MD 20740-6001 | |

NA FORM 14007 (10-86)

100-OCTANE AVIATION GASOLINE

January 17, 1942.



DECLASSIFIED
Authority NND 730034
By JM NARA, Date

173126

.FORMED COPY

Revised January 17, 1942.

C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

THE TEXAS COMPANY

(Los Angeles Refinery)

360
LOS
12

100-OCTANE AVIATION GASOLINE

January 17, 1942.



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date 8/87

DEFENSE SUPPLIES - TEXAS CONTRACT

(Los Angeles, Refinery)

CONTRACT made as of January 17, 1942, between The Texas Company, a Delaware corporation, having its principal place of business at 135 East 42nd St., New York, N. Y., hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of mutual agreements herein contained the parties agree as follows:

I. Sale and Storage of Products.

(a) Seller, having constructed emergency plant facilities at Los Angeles, California, which enables it to produce 100-Octane aviation gasoline, agrees to sell and deliver and Buyer agrees to purchase and receive in accordance with provisions of this contract, for the period January 1, 1943 to and including December 31, 1943, one thousand one hundred ten (1,110) barrels per calendar day of 100-Octane aviation gasoline which shall be in accordance with the specifications set forth in Exhibit A attached hereto and made a part hereof, or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) During the period beginning at the end of the one year period provided in paragraph (a) above and ending December 31, 1945, Buyer shall purchase and receive and Seller shall sell and deliver a quantity of 100-Octane aviation gasoline produced in the facilities referred to in Section I hereof, which together with any other sales of said gasoline by Seller to the United States Government shall equal the pro-rata share of the entire requirements of the United States Government during such period, as hereinafter defined.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100-Octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties, and Seller shall not be required to



DECLASSIFIED Authority NND 730 034 By TM NARA Date

deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(d) The term "United States Government" shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "pro-rata share of the entire requirements of the United States Government" shall mean a quantity equal to the proportion of the entire requirements of the United States Government for 100-Octane aviation gasoline which the refining capacity for 100-Octane aviation gasoline of the facilities referred to in Section I hereof less the quantity of Seller's sales of 100-Octane aviation gasoline from said facilities to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd. in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) The term "barrel" as used in this contract means a barrel of forty two (42) gallons and a gallon is a United States gallon of two hundred and thirty one (231) cubic inches.

(g) Seller shall maintain storage facilities at, or in the vicinity of, Los Angeles, California, to accommodate at least sixty (60) days' full capacity production of 100-Octane aviation gasoline. Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section II hereof.



DECLASSIFIED

...ional Gasoline.

Buyer shall have the option from time to time and at any time ...rchase from Seller all or any part of the 100-Octane aviation gaso... which Seller may produce in the facilities hereinabove mentioned be...en the execution of this contract and December 31, 1942 to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100-Octane aviation gasoline which Seller may produce in said facilities between January 1, 1943 and December 31, 1945 to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section I hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will satisfy Buyer's indicated requirements.

III. Price and Payment.

The base price of 100-Octane aviation gasoline, specified as Item 1 of Exhibit A hereof, shall be thirteen and one-quarter cents ($0.1325) per gallon f.o.b. Seller's Los Angeles, California refinery. The base price of 100-Octane aviation gasoline, specified as Item 2, Exhibit A, shall be thirteen cents ($0.13) per gallon f.o.b. Seller's Los Angeles, California, refinery. Seller represents that there has not been included in its computation of such prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original estimated cost of the refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.





DECLASSIFIED Authority NND 730 034 By JM NARA, Date 8/84

Buyer shall pay promptly, but not later than the twentieth (20th) of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section VI hereof shall accompany the aforesaid monthly statements.

IV. Price Escalation.

The prices of 100-Octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) The said prices are based on a price of one dollar and eleven cents ($1.11) per barrel for Signal Hill crude, 26° A.P.I., deliverable to Seller in the Los Angeles Basin Field. The price shall be increased or decreased sixty thousandths of one cent ($0.00060) per gallon for each one cent ($0.01) advance or decrease in the average price paid for said crude over or under one dollar and eleven cents ($1.11) per barrel by the three (3) largest purchasers of such crude in the Los Angeles Basin Field. The prices posted for such crude in the Los Angeles Basin Field by such purchasers shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The said prices shall also be increased or decreased by seventy-one thousandths of one cent ($0.00071) per gallon for each one point increase or decrease in the wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index figure is now ninety-three and five-tenths (93.5). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number, regardless of what Seller's crude inventory may be at the time of such change. If said index shall cease to be issued, the parties shall use such other index as may closely approximate the discontinued one, and if they shall be unable to agree within





DECLASSIFIED

ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section VIII hereof.

(c) The prices herein above set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Los Angeles, California, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section VIII hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount

and effective date of such price increase within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.

In making adjustments under this Section, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

V. Duration of Contract.

The original term of this contract shall expire at midnight on December 31, 1945. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section I (b) hereof and the price to be paid shall be fixed by agreement of the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VI. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the point of manufacture.

(b) Buyer shall take delivery of said gasoline in tank cars, barges, tank vessels, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section) at its own cost and expense, at Seller's Los Angeles refinery, in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller





DECLASSIFIED
Authority NND 730 034

furnish without cost to Buyer berth at which each vessel may safely afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, and a third submitted to Buyer with the monthly statement required by Section III hereof. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in the shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.





DECLASSIFIED
Authority NND 730 034
By [illegible] NARA Date [illegible]

173126

(h) Inspection as to quality shall be made according to latest standard or tentative standard methods ofthe American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specificationsset forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform, completely, to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, where such gasoline is to be used, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

VII. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of any governmental authority, floods, fires, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery,



DECLASSIFIED
Authority NND 730 0/4
By TM NARA Date 8/5

product, service or material necessary in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

VIII. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreeement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Second Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other cost and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be divided. Pending such determination of every disagreement as to the price to be



DECLASSIFIED
Authority NND 730 0/4

paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

IX. Taxes.

Buyer shall pay in addition to the prices as established in Sections III and IV hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller or its Suppliers may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section IV hereof.

It is understood that Buyer's obligation under this Section shall include all presently existing taxes not now deemed applicable by Buyer, but which may later be held to apply to the commodities delivered hereunder. It is understood that Buyer does not deem sales taxes or excise taxes in the nature of sales taxes to be applicable.

If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

X. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or





DECLASSIFIED
Authority NND-730 034
By TM NARA Date

telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XI. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XII. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental Agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

XIII. Statutory Compliance.

In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

No Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or to any benefit





DECLASSIFIED
Authority NND 720 0/4
By JM NARA, Date

that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce the price payable to Seller as provided for in this contract, Seller shall have the option at any time thereafter to terminate this contract by thirty (30) days written notice to Buyer.

XIV. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date hereof, on written notice to Buyer, unless within said ninety (90) days it shall receive such certificates or other evidence as may be necessary to permit them to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

Dudley H. Digges
Acting Secretary

(Seal)

THE TEXAS COMPANY

By M. Halpern
Vice-President

ATTEST:

Meeker H. Smith
Assistant Secretary

(Seal)





DECLASSIFIED
Authority NND-730 034
By TM NARA, Date

173126

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to The Texas Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized this 17th day of January, 1942.

RECONSTRUCTION FINANCE CORPORATION

By Charles B. Henderson
Chairman

ATTEST:

Leo Nielson
Assistant Secretary

(Seal)



DECLASSIFIED
Authority NND-730014
By IM NARA, Date [illegible]

173126

EXHIBIT "A"

Item 1. ............................ price, thirteen and one-quarter cents ($0.1325) per gallon, F.O.B. Seller's refinery at Los Angeles, California.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 3 June 6, 1941

Knock Test Method AN-VV-F-746

100-Octane Number by Method AN-VV-F-746

Lead Limit 3.0 cc/Gal.

Item 2. ............................ price, thirteen cents ($0.13) per gallon, F.O.B. Seller's refinery at Los Angeles, California.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.





DECLASSIFIED
Authority NND 730034
By T.M. NARA Date

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## T... l to whom these presents shall come. Greeting:

...virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, ...he seal of the National Archives of the United States, that the attached reproduction(s) is a true and ... copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME<br>Timothy K. Nenninger | DATE<br>AUG 21 2006 |
| TITLE<br>Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY<br>National Archives at College Park<br>8801 Adelphi Road<br>College Park, MD 20740-6001 | |

NA FORM 14007 (10-86)

100 OCTANE AVIATION GASOLINE

February 8, 1943.



DECLASSIFIED
Authority NND 730034
By TM NARA, Date 5/85

CONFORMED COPY

57442

36
1
22

CONTRACT

between

DEFENSE SUPPLIES CORPORATION

and

THE TEXAS COMPANY
(Los Angeles Refinery - Second Contract)

100 OCTANE AVIATION GASOLINE

February 8, 1943.



DECLASSIFIED
Authority NND 730 014
By TM NARA, Date 8/5/

55429

DEFENSE SUPPLIES - TEXAS COMPANY

(Los Angeles Refinery - Second Contract)

Revised
February 8, 1943.

CONTRACT made as of February 8, 1943, between THE TEXAS COMPANY, a Delaware corporation, having its principal place of business at 135 E. 42nd St., New York, N. Y., hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D.C., hereinafter called Buyer.

In consideration of mutual agreements herein contained the parties agree as follows:

A certain contract made as of January 17, 1942, between the parties entitled "Contract between Defense Supplies Corporation and the Texas Company (Los Angeles Refinery)" is replaced by the present contract and is hereby terminated and cancelled.

I. Expansion of Seller's Refining Facilities.

Seller has existing facilities for the production at Los Angeles, California of approximately one thousand eight hundred (1,800) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 2 of Exhibit A attached hereto and made a part hereof, having heretofore expanded its production from approximately one thousand one hundred seventy (1,170) barrels per calendar day by the expenditure of approximately Two Hundred Thousand Dollars ($200,000.00) for this purpose, and is willing to expand its facilities further, at an estimated cost of approximately Sixteen Million Six Hundred Ninety-Five Thousand Dollars ($16,695,000.00), to a degree which it is estimated will enable Seller to produce at Los Angeles, California as much as eight thousand five hundred thirteen (8,513) barrels per calendar day of 100-octane aviation gasoline but not less than approximately seven thousand one hundred and sixty-three (7,163) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 4 of Exhibit A hereof. In addition Seller will expend approximately Six Hundred Thousand Dollars ($600,000.00) for facilities to enable it to store and deliver to its Los Angeles refinery for use in producing said 100 octane aviation gasoline, certain condensate products to be produced in the



DECLASSIFIED
Authority NND 730034
By TM NARA Date

Paloma Field, Kern County, California by means of a Cycling Plant to be installed in said Paloma Field at an estimated cost of approximately Four Million One Hundred Thousand Dollars($4,100,000.00) by Paloma Operators of 417 South Hill Street, Los Angeles, California. The present members of said Paloma Operators are Seller, Western Gulf Oil Company, and Ohio Oil Company. Said storage and delivery facilities and said Cycling Plant, if approved by the appropriate agencies of Government, are to be constructed substantially concurrently with the construction of said 100 octane aviation gasoline facilities at Seller's Los Angeles refinery. Seller shall use all reasonable efforts to expand said refining facilities at its Los Angeles refinery and said storage and delivery facilities and shall endeavor to maintain work on the expansion day and night in so far as the requisite labor and materials are available. Seller shall use its best efforts to complete such expansion as soon as possible and estimates that such expansion will be completed by about January 1, 1944. Seller shall also use its best efforts to assure completion of said Cycling Plant by Paloma Operators on or before the date of completion of said facilities at Seller's Los Angeles refinery. The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of said facilities and said Cycling Plant as well as the sale of gasoline and all other obligations of Seller.

II. <u>Sale</u> <u>and</u> <u>Storage</u> <u>of</u> <u>Products</u>.

(a) When the aforesaid expansion of Seller's facilities shall be completed and ready for operation, Seller shall promptly notify Buyer.

(b) Under the terms of this contract and subject to the provisions of Section IV (h) hereof, Seller shall sell and deliver and Buyer shall buy and receive the following aggregate quantities of 100 octane aviation gasoline which shall be in accordance with Item 2 of Exhibit A hereof prior to the effective date of the notification referred to in Section II (a) hereof and thereafter shall be in accordance with Item 4 of Exhibit A hereof:

(1) From and after January 1, 1943 until, but not including the earlier of the following dates: January 1, 1944 or the effective date of the notification referred to in Section II (a) hereof, one thousand eight hundred (1,800) barrels per calendar day;



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

(2) If said effective date of notification is prior to January 1, 1944, then from and after said effective date until, but not including January 1, 1944, seven thousand one hundred sixty-three (7,163) barrels per calendar day; from and after January 1, 1944, until and including December 31, 1945, five thousand three hundred sixty-three (5,363) barrels per calendar day plus such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined.

(3) If said effective date of notification is after January 1, 1944, then from and after January 1, 1944, until said effective date of notification such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined; from and after said effective date of notification until and including December 31, 1945, five thousand three hundred sixty-three (5,363) barrels per calendar day plus such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined.

(4) If said effective date of notification is January 1, 1944, from and after January 1, 1944





DECLASSIFIED
Authority NND 730 014
By TM NARA Date 8/5

55429
55819

until and including December 31, 1945, five thousand three hundred sixty-three (5,363) barrels per calendar day plus such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from the aforesaid existing facilities at Seller's Los Angeles refinery referred to in Section I hereof, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined;

(5) From and after January 1, 1946 until the expiration of this contract, five thousand three hundred sixty-three (5,363) barrels per calendar day, or such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from all of said facilities at Seller's Los Angeles refinery, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, whichever is greater; and

(6) During any extension of this contract, unless the parties shall otherwise agree, such quantity as, together with all other sales by Seller to the United States Government of said 100 octane aviation gasoline produced from all of said facilities at Seller's Los Angeles refinery, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined.

(c) Buyer on giving reasonable notice to Seller may require the delivery hereunder of 100 octane aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with the same refining facilities and the same materials as are used in producing 100 octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

55429
55819

between the parties. Deliveries of the products covered by this contract shall not be suspended during such negotiations. Such agreement shall be reduced to writing as an addendum to Exhibit A.

(d) The term "United States Government" shall include the War Department, the Navy Department, any other department, agency, or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(e) The term "pro-rata share of the entire requirements of the United States Government" shall mean a quantity equal to the proportion of the entire requirements of the United States Government for 100 octane aviation gasoline which the refining capacity for 100 octane aviation gasoline of the facilities referred to in Section I hereof less the quantity of Seller's sales of 100 octane aviation gasoline from said facilities to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd. in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(f) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(g) Seller shall maintain storage facilities at, or in the vicinity of, Los Angeles, California, to accommodate at least two hundred forty thousand (240,000) barrels of 100 octane aviation gasoline. Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller, in addition to all other remedies it may have, shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such



DECLASSIFIED
Authority NND 730034
By JM NARA Date

full storage condition, and shall not thereafter be required to make up deliveries of said amount, but this shall not be in derogation of Buyer's rights under Section III hereof. Such discontinuance of production shall not be construed as a waiver by Seller of any of its rights under this contract.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller all or any part of the 100 octane aviation gasoline which Seller may produce in any of the facilities hereinabove mentioned between the execution of this contract and receipt of the notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will at least satisfy Buyer's indicated requirements.

(b) Buyer shall also have the option from time to time and at any time to purchase all or any part of the 100 octane aviation gasoline which Seller may produce in any of the facilities hereinabove mentioned between receipt by Buyer of the notification referred to in Section II (a) hereof and the expiration of this contract to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at such lesser capacity as will at least satisfy Buyer's indicated requirements.

(c) In addition to the quantities of 100 octane aviation gasoline referred to in Section I hereof, Seller will be able to produce, as a result of the installation of the new facilities and the Cycling Plant referred to in Section I hereof, approximately one thousand one hundred thirty three (1,133) barrels per calendar day of 91 octane aviation gasoline in accordance with Item 5 of Exhibit A hereof. Buyer shall also have the option from time to time and at any time to purchase all or any part of the 91 octane aviation gasoline which Seller may produce in any of the facilities hereinabove mentioned between receipt by Buyer of the





DECLASSIFIED Authority NND 730 034 By TM NARA Date

notification referred to in Section II (a) hereof and the expiration of this contract to the extent that such 91 octane aviation gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of exercise of such option, contracted to sell to parties other than Buyer; provided, however, Buyer shall exercise this option for half-calendar year option periods, except that the first of said option periods shall start with the effective date of the notification referred to in Section II (a) hereof and shall end on the next succeeding June 30 or December 31, by giving notice thereof to Seller for the first such option period within ten (10) days following receipt by Buyer of said notification, and not less than thirty (30) days prior to the beginning of each subsequent option period. Upon exercise of such option Buyer shall buy and receive and Seller shall sell and deliver the quantity of said 91 octane aviation gasoline covered by said exercised option.

IV. Price and Payment.

(a) Prior to the effective date of the notification referred to in Section II (a) hereof, the base price of 100 octane aviation gasoline specified as Item 2 of Exhibit A hereof, shall be twelve and seventy-five one-hundredths cents ($0.1275) per gallon f.o.b. Seller's Los Angeles, California refinery.

(b) From and after the effective date of the notification referred to in Section II (a) hereof the base prices for 100 octane aviation gasoline specified as Item 4 of Exhibit A hereof, shall be thirteen and one-tenth cents ($0.131) per gallon f.o.b. Seller's Los Angeles, California refinery, except as hereinafter provided in Paragraphs (d) and (e) of this Section IV.

(c) The price of 91 octane aviation gasoline specified as Item 5, of Exhibit A hereof shall he eight and three quarter cents ($0.0875) per gallon f.o.b. Seller's Los Angeles, California refinery.

(d) In the event Buyer exercises its option set forth in Section III (c) hereof to purchase not less than one thousand one hundred thirty three (1,133) barrels per calendar day of 91 octane aviation gasoline, the base prices for 100 octane aviation gasoline specified as Item 4 of Exhibit A hereof delivered during the period covered by said option shall be twelve and nine-tenths cents ($0.129) per gallon f.o.b. Seller's Los Angeles, California refinery.





DECLASSIFIED Authority NND-730034 By TM NARA, Date 8/6

(e) In the event that during any of the option periods set forth in Section III (c) hereof, whether or not such option has been exercised, Seller shall, in addition to one hundred twenty-two (122) barrels per calendar day now being produced and sold, sell and deliver to any customer or customers not less than an average of one thousand one hundred and thirty-three (1,133) barrels per calendar day of 91 octane aviation gasoline produced in Seller's Los Angeles, California refinery during such option period at an average price netting Seller not less than eight and three-quarters cents ($0.0875) per gallon at Seller's Los Angeles, California refinery, the base prices for 100 octane aviation gasoline specified as Item 4 of Exhibit A hereof, during such option period shall be adjusted to twelve and nine-tenths cents ($0.129) per gallon f.o.b. Seller's Los Angeles, California refinery.

(f) Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 91 octane and 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes. Seller also represents that there has not been included in its computation of such prices any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder.

(g) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month all money due for gasoline delivered to it by Seller during the preceding calendar month; provided, however, that Buyer may deduct from amounts due Seller, amounts due Buyer from Seller under Section VII hereof. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

55429
55819
56555

a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.

(h) The base prices for 100 octane aviation gasoline set forth in paragraphs (b), (d) and (e) of this Section IV are based upon a presently estimated production of seven thousand one hundred sixty-three (7,163) barrels per calendar day of such 100 octane aviation gasoline from the existing and new facilities referred to in Section I hereof. If the actual average calendar day production of said 100 octane aviation gasoline from said existing and new facilities shall be found to exceed said estimated production, after said new facilities are in settled production, Seller shall promptly so notify Buyer and if Buyer so desires the parties shall promptly thereafter renegotiate said prices upon the basis of the increased production. The base prices determined by said renegotiation shall become effective either when Buyer agrees to purchase the excess quantity upon which the renegotiation was based or, if Buyer does not so agree, when Seller arranges the sale thereof to third parties at a price at least equal to the renegotiated price and shall be retroactive to the date which shall be proper under the circumstances.

In the event Buyer agrees to purchase said excess quantity, the provisions of Section II (b) (2), (3), (4) and (5) shall be deemed amended as of the date of such agreement to purchase, by substituting therein (1) for seven thousand one hundred sixty-three (7,163) barrels, wherever said quantity appears, the actual average calendar day production of said 100 octane aviation gasoline from said existing and new facilities and (2) for five thousand three hundred sixty-three (5,363) barrels, wherever said quantity appears, a quantity equivalent to five thousand three hundred sixty-three (5,363) barrels plus the number of barrels by which said actual average calendar day production exceeds seven thousand one hundred sixty-three (7,163) barrels.

In the event said excess quantity is purchased either by Buyer or by said third parties, Section V (d) shall be deemed amended as of the date when said renegotiated price becomes effective, by substituting therein for five thousand three hundred sixty-three (5,363) barrels, wherever such



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

55429
55819
56555
56936

[illegible]tity appears, a quantity equivalent to five thousand three hundred [illegible]rty-three (5,363) barrels plus the number of barrels by which said actual average calendar day production exceeds seven thousand one hundred sixty-three (7,163) barrels.

V. Price Escalation.

The base prices of 100 octane aviation gasoline purchased hereunder shall be subject to adjustment as follows:

(a) From January 1, 1943 until the effective date of the notification referred to in Section II (a) hereof, the base price for 100 octane aviation gasoline set forth in Section IV (a) hereof is based on a price of One Dollar and Eleven Cents ($1.11) per barrel for Signal Hill crude, 26° A.P.I., deliverable to Seller in the Los Angeles Basin Field. Effective on the date of any change in the price of said Signal Hill crude, the base price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the average price over or under One Dollar and Eleven Cents ($1.11) per barrel paid by the three (3) largest purchasers of such crude in the Los Angeles Basin Field. The prices posted for such crude in the Los Angeles Basin Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) The base prices for 100 octane aviation gasoline set forth in Section IV (b), (d), and (e) hereof are based on a crude oil price of One Dollar Twelve and Ninety-three One-hundredths Cents ($1.1293) per barrel, hereinafter called "crude oil base price". The crude oil base price was computed by taking weighted average of the prices for five thousand five hundred seventy-three (5,573) barrels per calendar day of debutanized Paloma recycle condensate at One Dollar and Twenty-five Cents ($1.25) per barrel in the Paloma Field and for thirty four thousand nine hundred thirty-two (34,932) barrels per calendar day of 26° A.P.I. Signal Hill crude at One Dollar and Eleven Cents ($1.11) per barrel in the Los Angeles Basin.

Seller represents that the price of One Dollar and Twenty-five Cents ($1.25) per barrel for Paloma recycle condensate in the Paloma Field used in computing said weighted average is the price presently being paid by Seller for the product produced by Paloma Operators from a plant in the Paloma Field now producing approximately One thousand (1,000) barrels per calendar day of such product.





DECLASSIFIED Authority NND 730 078

55429
55819
56555

In computing increases or decreases in the crude oil base price;

(1) the weighted average of the prices for Five thousand five hundred seventy-three (5,573) barrels per calendar day of said condensate at the lowest of the following prices:

(i) the maximum field price which has been or may be established for such condensate by the United States Government;

(ii) the field price for such condensate then payable by Seller;

(iii) the field price as covered by paragraph (ii) hereof which would be payable if the effect, if any, of postings by Seller or any company controlled by Seller were eliminated from the contract provision under which said condensate is purchased by Seller;

and for thirty four thousand nine hundred thirty-two (34,932) barrels per calendar day of 26° A.P.I. Signal Hill crude at the average of the field prices posted therefor by the three (3) purchasers of the largest quantities thereof shall be determined; and

(2) the difference between the weighted average so determined and the crude oil base price shall be ascertained. The difference so ascertained shall be the increase or decrease in the crude oil base price as the case may be. From and after the effective date of the notification referred to in Section II (a) hereof until the expiration of this contract, and effective on the date of any change in the crude oil base price, the base prices for 100 octane aviation gasoline set forth in Section IV (b), (d), and (e) hereof shall be increased or decreased by a percentage equal to one half the percentage increase or decrease in the crude oil base price.

(c) From and after January 1, 1943 until the effective date of the notification referred to in Section II (a) hereof the price for 100 octane aviation gasoline set forth in Section IV (a) hereof shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods," as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index figure of ninety-three and five-tenths (93.5) (The final index number used in the aforesaid contract of January 17, 1942).





DECLASSIFIED
Authority NND 730 ...
By ... NARA Date ...

55429
55819
56555
56936
57442

effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number.. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(d) From and after the effective date of the notification referred to in Section II (a) hereof until the expiration of this contract, the said prices for 100 octane aviation gasoline shall also be increased or decreased by a percentage equal to one-half the percentage increase or decrease over or under the weighted average of eighteen hundred (1800) barrels per calendar day at the index number of ninety-three and five-tenths (93.5) and five thousand three hundred and sixty-three (5,363) barrels per calendar day at ninety-five and five-tenths (95.5) (the present final index number). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number.

(e) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's refinery at Los Angeles, California, and upon a normal operation of that refinery, in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of the refinery at which the aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

55429
55819
56555

opinion of Seller the cost of refining aviation gasoline is increased in respects other than those corrected by adjustment of the base prices under the above paragraphs (a), (b), (c), and (d) of this Section V, Seller may give notice to Buyer of this circumstance and thereupon Seller and Buyer shall endeavor to reach an agreement with respect to increasing said base prices by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer and Seller are unable to agree upon the amount of such increase in price, within ten (10) days thereafter, Buyer or Seller may give notice to the other party that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as speedily as possible as to the amount and effective date of such price increase.

(f) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after Buyer's receipt of the notification referred to in Section II (a) hereof, but not later, in any event, than midnight on April 30, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) (6) hereof and the price to be paid shall be fixed by agreement of the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

55429
55819
56555

VII. Loan to Seller.

(a) Buyer shall loan to Seller Twelve Million Five Hundred Twenty-One Thousand Dollars ($12,521,000.00) which shall be disbursed by Buyer to Seller in approximately monthly installments as the construction of the 100 octane aviation gasoline facilities referred to in Section I hereof progresses. The first installment shall be disbursed immediately following the expiration of ninety (90) days from the date of this contract or immediately following receipt of notice by Buyer of Seller's waiver of its right to terminate this contract under Section XVII hereof, whichever event shall first occur. Each remaining installment shall bo disbursed upon Seller's request and upon receipt by Buyer from Seller of satisfactory evidence that it has expended or firmly committed itself to expend within the succeeding ninety (90) days on account of the additional expansion of the 100 octane aviation gasoline facilities referred to in Section I hereof all of the funds theretofore advanced to it by Buyer plus the amount of the installment requested, and in addition has so expended or firmly committed itself to expend within the succeeding ninety (90) days from its own funds not less than thirty-three and one-third percent (33-1/3%) of the aggregate of such installments advanced by Buyer, including the installment for which the request is then being made.

(b) Such loan shall bear interest at the rate of two percent (2%) per annum on the outstanding balance thereof, until repaid.

(c) Seller shall repay the principal amount of the aforementioned loan to Buyer in equal monthly installments, as near as can be determined, plus interest accrued to the time of each such repayment, beginning the twentieth (20th) day of the month following the month in which Buyer receives the notification referred to in Section II (a) hereof and ending on the twentieth (20th) day of the month following the expiration of the original term of this contract; provided, however, that if Buyer shall breach its obligation to disburse the installments of said loan in accordance with this Section VII, or shall breach its obligation to buy the quantities of 100 octane aviation gasoline called for by paragraphs (2), (3), (4), and (5) of Section II (b) hereof, then Seller may withhold such part of or all the unrepaid portion of said loan including interest thereon (other than repayments, if any, falling due prior to



DECLASSIFIED
Authority NND 730034
By [illegible] NARA, Date [illegible]

55429
55819
56555

such breach), as shall not exceed the amount of damages claimed by Seller to result from such breach, pending determination by agreement, arbitration or otherwise, of Buyer's liability, if any, for such breach. Upon such determination Seller shall be obligated to repay to Buyer only the unrepaid portion of said loan, plus interest accrued to date of breach, plus interest from date of breach on the amount, if any, by which said unrepaid portion of said loan exceeds the amount of damages, if any, sustained by Seller, less the amount of said damages.

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasoline in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure, shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities referred to in Section II (g) hereof are full of 100 octane aviation gasoline, leaded or unleaded; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline only to the extent that the aggregate amount taken and paid for is less than (1) the aggregate amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) multiplied by the number of days in the period over which damages accrue, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (g) and V(e) hereof.

(b) The first proviso of paragraph (a) of this Section VIII shall not apply in the event of rescission, abrogation, or termination of this contract by Buyer, or anticipatory breach thereof by Buyer.





DECLASSIFIED
Authority NND 730 0/3
By TM NARA Date

55429
55819

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract. Title to said gasoline, and risk of loss in respect thereof, shall pass from Seller to Buyer upon delivery of the gasoline at the point of manufacture.

(b) Buyer shall take delivery of said gasoline in tank cars, barges, tank vessels, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each barge or tank vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such points to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

55429
55819

ction IV hereof, a fourth set of which shall be delivered forthwith Seller, and a fifth set of which shall be delivered forthwith to the hereinafter referred to authorized officer or employee of the War Department or Navy Department. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform, completely, to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency; provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.



DECLASSIFIED
Authority NND 730034

55429
55819
56555

(l) Notwithstanding the preceding provisions of this Section and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Seller, where such gasoline is to be used, such service to be at the expense of Buyer and at Buyer's risk. Such expense shall be Seller's cost for such service. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, epidemics, quarantine restrictions, strikes, picketing, freight embargoes and failures, exhaustion or unavailability, or delays in delivery, of any product, service or material necessary in the construction of the facilities and Cycling Plant contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to



DECLASSIFIED Authority NND 730 034 By T.M. NARA Date

heir mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed; provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Second Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the price as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller or its Suppliers may be required by any municipal, state, or federal



DECLASSIFIED Authority NND 730 034 By TM NARA Date 8/5/

law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities or any components thereof delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) It is understood that Buyer's obligation under this Section shall include all presently existing taxes not now assessed or deemed applicable but which may later be assessed or held to apply to the commodities delivered hereunder, or any raw or component material or ingredients thereof. It is understood that Buyer does not deem sales taxes or excise taxes in the nature of sales taxes to be applicable.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram, or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice as aforesaid change its address for notices thereafter.



DECLASSIFIED
Authority NND 730034
By TM NARA Date

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect of the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties hereto; provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation in which event Buyer shall remain liable.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable Federal laws and further agrees to require such compliances, representations, and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable Federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin.

(b) No Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded, or changed so as not to reduce the price payable to Seller or otherwise changed in a manner satisfactory to Seller.

XVII. Right to Terminate.

(a) Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all Governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will erect and install hereunder, including, without limitation, priorities and allocation necessary for obtaining materials, equipment, supplies, crude petroleum and other raw or component materials, and (1) such certificates or other evidence as may be necessary to permit Seller to invoke the provisions of Section 124, Internal Revenue Code; (2) assurances from the Treasury Department, in the form of closing agreements, that the advance payment of Twelve Million Five Hundred Twenty-one Thousand Dollars ($12,521,000.00) herein provided for, or any part thereof, will not be treated as taxable income upon receipt by Seller, but that the ratable portions thereof will be treated as amounts received for products supplied, when and as such ratable portions are credited for that purpose hereunder.

(b) Seller shall also have the right to terminate this contract within ninety (90) days of the date thereof unless within said ninety (90) days Paloma Operators shall receive all Government assistance which is available or necessary for the prompt completion of the facilities included in the Cycling Plant referred to in Section I hereof, including, without limitation, priorities and allocation necessary for obtaining materials, equipment and supplies therefor, and such certificates or other evidence as may be necessary to permit Paloma Operators to invoke the provisions of Section 124, Internal Revenue Code.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date 85

(c) In the event of the termination of this contract as herein provided, that certain contract between the parties hereto made as of January 17, 1942 shall be reinstated and shall thereupon become effective and shall remain in full force and effect according to its terms, except that the base price for the 100 octane aviation gasoline sold and delivered thereunder will be twelve and seventy-five one-hundredths cents ($0.1275) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A thereof.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By H. A. Mulligan
President

ATTEST:

H. H. Turner
Acting Secretary

(SEAL)

THE TEXAS COMPANY

By M. Halpern
Vice-President

ATTEST:

W. G. Elicker
Assistant Secretary

(SEAL)





DECLASSIFIED
Authority NND 730034
By [illegible] NARA, Date [illegible]

55429
55819

EXHIBIT "A"

100 OCTANE AVIATION GASOLINE

Item 1. (Omitted)

Item 2.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 September 26, 1940

Amendment No. 4 November 24, 1941

Knock Test Method AN-VV-F-746 as amended November 5, 1940.

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc/Gal.

Item 3. (Omitted)

Item 4.

U. S. ARMY - NAVY SUPPLY

AN-F-28 December 23, 1942

100 Octane Number by Method AN-VV-F-746 as amended November 5, 1940, or

99 Octane Number by Method ASTM-D-357-41T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a - June 17, 1942

Tetraethyl Lead Limit 4.0 cc/Gal.

91 OCTANE AVIATION GASOLINE

Item 5.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-776 October 15, 1940

Amendment No. 4 August 13, 1942

Knock Test Method AN-VV-F-746 as amended November 5, 1940.

91 Octane Number by Method AN-VV-F-746 as amended November 5, 1940.

Tetraethyl Lead Limit 4.0 cc/Gal.



DECLASSIFIED
Authority NND 730 0/4
By TM NARA Date

55429

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to The Texas Company to enter into said contract, RECONSTRUCTION FINANCE CORPORATION does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of February 8, 1943.

RECONSTRUCTION FINANCE CORPORATION

By Charles B. Henderson
Chairman

ATTEST:

A. T. Hobson
Acting Secretary

(SEAL)



DECLASSIFIED
Authority NND 730 034
By T.M NARA

55429

ENDUM #1

The Texas Company

New York, N. Y.

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, The Texas Company, a Delaware corporation, (hereinafter designated as "Contractor") agrees to the provisions set forth below, provided, however, that to the extent that the obligations of manufacturers or dealers are limited, restricted or relaxed by amendments of the law or by authorized governmental regulations, then the obligations of the Contractor shall be automatically and correspondingly limited, restricted or relaxed.

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of February 8, 1943.

THE TEXAS COMPANY

By: M. Halpern
Vice-President



DECLASSIFIED
Authority NND-730034
By TM NARA Date

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

**To all to whom these presents shall come. Greeting:**

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives of the United States, that the attached reproduction(s) is a true and correct copy of documents in his custody.

| | |
|---|---|
| SIGNATURE | |
| NAME Timothy K. Nenninger | DATE AUG 21 2006 |
| TITLE Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY National Archives at College Park 8601 Adelphi Road College Park, MD 20740-6001 | |

NA FORM 14007 (10-86)

TIDE WATER ASSOCIATED OIL COMPANY
(Associated Division)
(Second Contract)

100-OCTANE AVIATION GASOLINE

June 10, 1942.



DECLASSIFIED
Authority NND 730034
By TM NARA Date

190384
189506

360
AVO
22

CONTRACT

between

DEFENSE SUPPLIES CORPORATION

and

TIDE WATER ASSOCIATED OIL COMPANY
(Associated Division)
(Second Contract)

100-OCTANE AVIATION GASOLINE

June 10, 1942.



DECLASSIFIED
Authority NND-730034
By TM NARA, Date

189506

DEFENSE SUPPLIES - TIDE WATER ASSOCIATED CONTRACT
(Associated Division)
(Second Contract)

Revised June 3, 1942.

CONTRACT made as of June 10, 1942, between TIDE WATER ASSOCIATED OIL COMPANY (Associated Division), a Delaware corporation, having a principal place of business at 79 New Montgomery Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of March 26, 1942, between the parties, entitled "Contract between Defense Supplies Corporation and Tide Water Associated Oil Company (Associated Division)", is replaced by the present contract and is hereby terminated and cancelled.

I. Expansion of Seller's Refining Facilities.

(a) Seller has existing facilities for the production at its Avon, California, refinery of approximately one thousand four hundred thirty-five (1,435) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof, or approximately one thousand seven hundred twenty (1,720) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof; and is proceeding to expand its facilities, at an estimated cost of approximately One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00), to an extent which it is estimated will enable Seller to produce at its Avon Refinery a total of approximately two thousand two hundred eighty-five (2,285) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof, or approximately two thousand seven hundred forty (2,740) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof. Seller shall use its best efforts so to expand said facilities, to maintain work on the expansion day and night to the extent necessary to expedite substantially said



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

189506

in so far as the requisite labor and materials are available, to complete such expansion as soon as possible and not later than November 1, 1942.

(b) Seller is willing to construct additional facilities at an estimated cost of approximately One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) which will enable Seller to produce at Avon, California, a total of approximately three thousand nine hundred thirty-five (3,935) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof, or approximately four thousand seven hundred twenty-two (4,722) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof. Seller shall use its best efforts to construct said additional facilities, to maintain work on said construction day and night to the extent necessary to expedite substantially said construction and in so far as the requisite labor and materials are available, and to complete such construction as soon as possible and not later than June 1, 1943.

(c) The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the aforesaid expansion of Seller's facilities referred to in Section I (a) hereof shall be completed and ready for operation, Seller shall promptly notify Buyer, and when the construction of the additional facilities referred to in Section I (b) hereof shall be completed and ready for operation, Seller shall again promptly notify Buyer. From and after the effective date of the first of the above-mentioned notifications, Seller shall sell and deliver and Buyer shall buy and receive 100-Octane aviation gasoline which shall be in accordance with the alternate specifications set forth in Exhibit A attached hereto and made a part hereof or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) From and after the effective date of the first notification referred to in paragraph (a) of this Section II until the end of the original term of this contract and during any extension thereof, the quantity of said gasoline shall be such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced

4,722
2,740
1982



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

at Seller's Avon Refinery, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than the following minimum quantities:

(1) From and after the effective date of said first notification until the effective date of the second notification referred to in paragraph (a) of this Section II, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of eight hundred fifty (850) barrels per day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof or one thousand twenty (1,020) barrels of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof, or a corresponding quantity of 100-Octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(2) From and after the effective date of said second notification until midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of said first notification, but not later, in any event, than December 31, 1945, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of two thousand five hundred (2,500) barrels per day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof or three thousand (3,000) barrels of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof or a corresponding quantity of 100-Octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(3) From midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of said first notification, but not later, in any event, than December 31, 1945, until the end of the original term of this contract, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum





DECLASSIFIED
Authority NND 730034
By TM NARA Date

quantity of one thousand six hundred fifty (1,650) barrels per day of 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof or one thousand nine hundred eighty (1,980) barrels per calendar day of 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof or a corresponding quantity of 100-Octane aviation gasoline of any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(c) The above quantities which Seller shall be required to sell and deliver hereunder may, at Seller's option, be temporarily reduced during the period from the effective date of said first notification to December 31, 1942, both dates inclusive, by part or all of the amount of such gasoline as Seller may have contracted, prior to the effective date of said first notification, to sell and deliver during said period to the United States Government other than Buyer.

(d) Buyer may apportion the above aggregate quantities among the various grades of gasoline specified in Exhibit A hereof, and the quantities shall be adjusted to correspond to the grades required by Buyer.

(e) The damages, if any, for a breach of the foregoing provisions of this Section II shall be in accordance with Section VIII hereof.

(f) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which is capable of being produced with the same refining facilities and the same raw materials as are used in producing 100-Octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation between the parties, and neither party shall be relieved of any of its obligations hereunder and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date