189506

(g) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(h) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100-Octane aviation gasoline as the total refining capacity for 100-Octane aviation gasoline at Seller's Avon Refinery, less the quantity of Seller's sales of 100-Octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100-Octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(i) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons and a gallon is a United States gallon of two hundred and thirty-one (231) cubic inches.

(j) Seller shall maintain storage facilities at, or in the vicinity of, its Avon Refinery to accommodate at least two hundred forty thousand (240,000) barrels of 100-Octane aviation gasoline, or components thereof ready for blending, said storage facilities to be available by the effective date of the second notification referred to in Paragraph (a) of this Section II, and at least one hundred forty thousand (140,000) barrels of said storage facilities to be available by the effective date of the first notification referred to in paragraph (a) of this Section II.

(k) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered



DECLASSIFIED
Authority NND 730 014
By TM NARA Date

to Buyer by an amount equal to the amount of 100-Octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantity specified in paragraph (b) of this Section II, or any obligation undertaken under Section III hereof. If, however, Seller shall produce during any such period of full storage any additional 100-Octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof, provided that Buyer shall arrange for the prompt removal from Seller's storage facilities of all such additional gasoline which Buyer may elect to purchase.

(l) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

(m) Seller shall sell and deliver and Buyer shall buy and receive at the end of the original term of this contract or any extension thereof the 100-Octane aviation gasoline stored at that time (as such or as components thereof ready for blending) in the facilities referred to in Section II (j) hereof to the extent of not more than two hundred forty thousand (240,000) barrels.

III. <u>Optional Gasoline</u>.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Avon Refinery between the date of execution of this contract and the effective date of the first notification referred to in Section II (a) hereof to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate





DECLASSIFIED
Authority NND 730 034
By I.M NARA, Date

the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Avon Refinery between the effective date of the first notification referred to in Section II (a) hereof and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under the provisions of paragraphs (a), (b) and (c) of Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) The base prices of 100-Octane aviation gasoline shall be as follows f.o.b. Seller's refinery at Avon, California:

(1) For deliveries prior to the effective date of the second notification referred to in Section II (a) hereof, fourteen cents ($0.14) per gallon for 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof and thirteen and three-fourth cents ($0.1375) per gallon for 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof;

(2) For deliveries from and after the effective date of the second notification referred to in Section II (a) until the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the first notification referred to in Section II (a) hereof, or until December 31, 1945 if said last day is subsequent to December 31, 1945, thirteen and nine-tenths cents ($0.139) per gallon for 100-Octane aviation





DECLASSIFIED Authority NND 730 034 By JM NARA Date

189506

gasoline in accordance with Item 1 of Exhibit A hereof and thirteen and sixty-five one-hundredths cents ($0.1365) per gallon for 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof; and

(3) For deliveries from and after the aforementioned last day, or after December 31, 1945 if said last day is subsequent to December 31, 1945, thirteen and eight-tenths cents ($0.138) per gallon for 100-Octane aviation gasoline in accordance with Item 1 of Exhibit A hereof and thirteen and fifty-five one hundredths cents ($0.1355) per gallon for 100-Octane aviation gasoline in accordance with Item 2 of Exhibit A hereof.

(b) Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100-Octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.



DECLASSIFIED
Authority NND-730034
By TM NARA, Date

189506
190384

Price Escalation.

The base prices of 100-Octane aviation gasoline set forth in Section IV (a) hereof shall be subject to adjustment as follows:

(a) The said prices are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven to twenty-seven and nine-tenths degree (27 to 27.9°) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field, California. Each of the base prices set forth in Section IV (a) hereof shall be increased or decreased by four hundred thirty-five thousandths of one percent (0.435%) of said base price for each one cent ($0.01) advance or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) Each of the base prices set forth in Section IV (a) hereof shall also be increased or decreased by five hundred twenty-seven thousandths of one percent (0.527%) of said base price for each one point increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index number is over or under ninety-four and nine-tenths (94.9), which is an average figure based on the latest available index numbers as of the date of the aforementioned contract made as of March 26, 1942 and as of the date of this contract. The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.





DECLASSIFIED
Authority NND 730 034
By TM NARA Date

189506

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's Avon Refinery, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100-Octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100-Octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100-Octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100-Octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100-Octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100-Octane aviation gasoline by the refinery affected may be reduced as above provided.



DECLASSIFIED
Authority NND
By NARA, Date

(d) If Seller acquires, at the request of Buyer or other agency of the United States Government, some of the components of 100-Octane aviation gasoline from other refiners and moves the same to its Avon Refinery for blending with other stocks for the production of 100-Octane aviation gasoline, thereby incurring increased costs of such components at said refinery, or if Seller acquires isobutane, base stock, or other components of 100-Octane aviation gasoline from sources other than those presently contemplated, thereby effecting reduced costs of such isobutane, base stock or other components at said refinery, the prices hereinabove provided shall be increased or decreased, as the case may be, to compensate for any such increase or decrease in costs. If Buyer and Seller are unable to agree on the existence or amount of such increase or decrease in costs, or on the resulting increase or decrease in the prices hereinabove provided, the question shall be submitted to arbitration in the manner provided in Section XI hereof.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the second notification referred to in Section II (a) hereof, but not later, in any event, than August 31, 1946. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Sections II (b) and II (c) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Omitted).



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100-Octane aviation gasoline in accordance with Sections II (b) and II (c) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100-Octane aviation gasoline unless the storage facilities referred to in Section II (j) hereof, shall contain, prior to the effective date of the second notification referred to in Section II (a) hereof, an aggregate of at least one hundred forty thousand (140,000) barrels of 100-Octane aviation gasoline, leaded or unleaded, or components thereof ready for blending, and from and after the effective date of said second notification, an aggregate of at least two hundred forty thousand (240,000) barrels of 100-Octane aviation gasoline, leaded or unleaded, or components thereof ready for blending; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100-Octane gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100-Octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (k) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100-Octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (1) of this Section IX) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.





DECLASSIFIED Authority NND 730034 By TM NARA Date

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on Board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform to usual industry practice. The certificates of inspection shall be issued in quadruplicate, one set of which shall accompany the relative shipment, a second set of which shall be forwarded forthwith to Buyer, a third set of which shall be submitted to Buyer with the monthly statement required by Section IV hereof, and a fourth set of which shall forthwith be delivered to Seller. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

k cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of deliveries into tank trucks in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Associated Division of Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date 85

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, explosions, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date 8/87

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

[with]out the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable. With Buyer's consent, which consent shall not be unreasonably withheld, Seller may assign to any party to whom Seller may transfer substantially all of the assets of its Associated Division, including the Avon, California, Refinery.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any worker because of race, creed, color or national origin, except as directed by the United States Government.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of, or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum



DECLASSIFIED
Authority NND 730 034
By JM NARA Date

price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller or otherwise changed in a manner satisfactory to Seller.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By (Signed) H. A. Mulligan
President

ATTEST:

(Signed) Dudley H. Digges
Acting Secretary

(SEAL)

TIDE WATER ASSOCIATED OIL COMPANY

By (Signed) L. F. Beyer
Vice-President

ATTEST:

(Signed) J. P. Edwards
Exec. Secretary

(SEAL)





DECLASSIFIED
Authority NND 730 034
By T.H. NARA, Date 5/87

189506

EXHIBIT "A"

Item 1.

U. S. ARMY - NAVY SUPPLY

| | |
|---|---|
| AN-VV-F-781 | Sept. 26, 1940 |
| Amendment No. 3 | June 6, 1941 |
| Knock Test Method | AN-VV-F-746 |
| | 100-Octane Number by Method AN-VV-F-746 |
| | Lead Limit 3.0 cc/Gal. |

Item 2.

U. S. ARMY - NAVY SUPPLY

Same as above with Amendment No. 4 Nov. 24, 1941

Lead Limit 4.0 cc/Gal.



DECLASSIFIED
Authority NND-730034
By JM NARA, Date 8/83

189506

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Tide Water Associated Oil Company to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of June 10, 1942.

RECONSTRUCTION FINANCE CORPORATION

By (Signed) Charles B. Henderson
Chairman

ATTEST:

(Signed) A. T. Hobson
Acting Secretary

(SEAL)



DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

189506

ADDENDUM #1

Tide Water Associated Oil Company

San Francisco, California

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract Tide Water Associated Oil Company, a Delaware corporation, (hereinafter designated as "Contractor") agrees:

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

Addendum #1

189506
190384

any violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of June 10, 1942.

TIDE WATER ASSOCIATED OIL COMPANY

By: (Signed) L. F. Bayer.
Vice-President



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

T ll to whom these presents shall come. Greeting:

virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, the seal of the National Archives of the United States, that the attached reproduction(s) is a true and t copy of documents in his custody.

SIGNATURE

NAME
Timothy K. Nenninger

DATE
AUG 21 2006

TITLE
Chief, Modern Military Records

NAME AND ADDRESS OF DEPOSITORY
National Archives at College Park
8601 Adelphi Road
College Park, MD 20740-6001

NA FORM 14007 (10-86)

DEFENSE SUPPLIES CORPORATION

and

TIDE WATER ASSOCIATED OIL COMPANY
(Associated Division)
(Third Contract)

100-OCTANE AVIATION GASOLINE

February 18, 1943



DECLASSIFIED
Authority NND 730034
By TM NARA Date 85

COPY



C O N T R A C T

between

DEFENSE SUPPLIES CORPORATION

and

TIDE WATER ASSOCIATED OIL COMPANY
(Associated Division)
(Third Contract)

100-OCTANE AVIATION GASOLINE

February 18, 1943



DECLASSIFIED
Authority NND 730 024
By IM NARA, Date

58959

DEFENSE SUPPLIES - TIDE WATER ASSOCIATED CONTRACT
(Associated Division)
(Third Contract)

Revised April 12, 1943.

CONTRACT made as of February 18, 1943, between TIDE WATER ASSOCIATED OIL COMPANY (Associated Division), a Delaware corporation, having a principal place of business at 79 New Montgomery Street, San Francisco, California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of June 10, 1942, between the parties, entitled "Contract between Defense Supplies Corporation and Tide Water Associated Oil Company (Associated Division), (Second Contract)" is replaced by the present contract and is hereby terminated and cancelled, effective as of the effective date of this contract; all rights accrued under the contract of June 10, 1942 to such date to be reserved.

I. Expansion of Seller's Refining Facilities.

(a) Seller has existing facilities for the production at its Avon, California, refinery of approximately two thousand seven hundred forty (2,740) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof, said facilities having been completed on October 8, 1942, and has contracted to expand its facilities, at an estimated cost of approximately One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00), to an extent which it is estimated will enable Seller to produce at its Avon Refinery a total of approximately four thousand seven hundred twenty-two (4,722) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. Seller shall use its best efforts so to expand said facilities, to maintain work on the expansion day and night to the extent necessary to expedite substantially said expansion, in so far as the requisite labor and materials are available, and to complete such expansion as soon as possible. Seller extimates such expansion will be completed by May 1, 1943.



DECLASSIFIED
Authority NND 730034
By TM NARA Date

(b) Seller is willing to construct additional facilities at an estimated cost of approximately One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) which will enable Seller to produce at Avon, California, a total of approximately six thousand three hundred fifty-three (6,353) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. Seller shall use its best efforts to construct said additional facilities, to maintain work on said construction day and night to the extent necessary to expedite substantially said construction and in so far as the requisite labor and materials are available, and to complete such construction as soon as possible and estimates such construction will be completed by February 1, 1944.

(c) The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) Seller agrees that for the purpose of this contract the aforesaid expansion of Seller's facilities referred to in Section I (a) hereof shall be deemed to be completed and ready for operation on May 1, 1943, and when the construction of the additional facilities referred to in Section I (b) hereof shall be completed and ready for operation, Seller shall promptly notify Buyer. Prior to midnight April 30, 1943, Seller shall sell and deliver and Buyer shall buy and receive 100 octane aviation gasoline which shall be in accordance with the specification set forth as Item 2 of Exhibit A attached hereto and made a part hereof and thereafter 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof, or any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(b) From the date of this contract until the end of the original term of this contract and during any extension thereof, the quantity of said gasoline shall be such quantity as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Avon Refinery, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than the following minimum quantities:



DECLASSIFIED
Authority NND 730014
By TM NARA, Date 8/87

(1) From the date of this contract until midnight April 30, 1943 Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of one thousand twenty (1,020) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof;

(2) From and after midnight April 30, 1943 until the effective date of the notification referred to in paragraph (a) of this Section II, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of three thousand (3,000) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof, or a corresponding quantity of 100 octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(3) From and after the effective date of said notification until midnight on October 31, 1945, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of four thousand six hundred thirty (4,630) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof or a corresponding quantity of 100 octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;

(4) From and after midnight on October 31, 1945 until midnight on April 30, 1946, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of three thousand six hundred ten (3,610) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof or a corresponding quantity of 100 octane aviation gasoline of any other specifications which by mutual agreement shall be attached as an addendum to Exhibit A;





DECLASSIFIED
Authority NND 730034
By TM NARA Date

(5) From midnight on April 30, 1946 until the end of the original term of this contract, Seller shall sell and deliver and Buyer shall buy and receive hereunder a minimum quantity of one thousand six hundred thirty (1,630) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof or a corresponding quantity of 100 octane aviation gasoline of any other specification which by mutual agreement shall be attached as an addendum to Exhibit A.

(c) Buyer may apportion the above aggregate quantities among the various grades of gasoline specified in Exhibit A hereof, and the quantities shall be adjusted to correspond to the grades required by Buyer.

(d) The damages, if any, for a breach of the foregoing provisions of this Section II shall be in accordance with Section VIII hereof.

(e) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which is capable of being produced with the same refining facilities and the same raw materials as are used in producing 100 octane aviation gasoline in accordance with the specifications originally set forth in Exhibit A. The prices and specifications of such products shall be determined by negotiation between the parties, and neither party shall be relieved of any of its obligations hereunder and Seller shall not be required to deliver such products unless and until an agreement has been reached. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(f) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(g) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States



DECLASSIFIED
Authority NND 730034

[illegible]nt of 100 octane aviation gasoline as the total refining capacity [illegible] 100 octane aviation gasoline at Seller's Avon Refinery, less the quantity of Seller's sales of 100 octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(h) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(i) Seller shall maintain storage facilities at, or in the vicinity of, its Avon Refinery to accommodate at least two hundred forty thousand (240,000) barrels of 100 octane aviation gasoline, or components thereof ready for blending.

(j) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantities specified in paragraph (b) of this Section II, or any obligation undertaken under Section III hereof. If, however, Seller shall produce during any such period of full storage any additional 100 octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof, provided that Buyer shall arrange for the prompt removal from Seller's storage facilities of all such additional gasoline which Buyer may elect to purchase.



DECLASSIFIED
Authority NND 730014

(k) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Avon Refinery between the date of this contract and midnight April 30, 1943, to the extent that such gasoline is in excess of quantities which Seller has, prior to receipt by Seller of notification of the exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

(b) Buyer shall also have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Avon Refinery between midnight April 30, 1943 and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under the provisions of paragraphs (a) and (b) of Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.

IV. Price and Payment.

(a) The base prices of 100 octane aviation gasoline shall be as follows f.o.b. Seller's refinery at Avon, California:

(1) For deliveries prior to midnight April 30, 1943, thirteen and eighty-two one-hundredths cents



DECLASSIFIED
Authority NND 730034
By [illegible] NARA, Date [illegible]

($0.1382) per gallon for 100 octane aviation gasoline in accordance with Item 2 of Exhibit A hereof;

(2) For deliveries from and after midnight April 30, 1943 until the date of the notification referred to in Section II (a) hereof, fourteen cents ($0.14) per gallon for 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof; and

(3) For deliveries from and after the effective date of the notification referred to in Section II (a) hereof until the end of the original term of this contract, fourteen and five one-hundredths cents ($0.1405) per gallon for 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof.

(b) Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(c) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statements.



DECLASSIFIED
Authority NND 730034
By [illegible] NARA, Date [illegible]

(d) The base price set forth in Section IV (a) (3) hereof 100 octane aviation gasoline meeting the specifications set forth as Item 3 of Exhibit A hereof is based upon a presently estimated production of six thousand three hundred fifty-three (6,353) barrels per calendar day of such aviation gasoline from all of the facilities referred to in Section I hereof. If the actual average calendar day production of said 100 octane aviation gasoline from all of said facilities shall be found to substantially exceed said estimated production after said facilities are in settled production, Seller shall promptly so notify Buyer, but not oftener than once every six (6) months, and, if Buyer so desires, the parties shall promptly thereafter renegotiate said base price upon the basis of the increased production, but in a manner consistent with the costing principles upon which the original price negotiation was based. The base price determined by said renegotiation shall be effective only so long as Buyer purchases the increased quantity upon which the renegotiation was based or Seller sells said increased quantity to third parties at a price at least equal to the renegotiated price. Said renegotiated base price for said gasoline shall be retroactive to the date which shall be proper under the circumstances and payment shall be made thereunder promptly without interest. Appropriate amendments in respect of such renegotiated prices and quantities shall be made in such provisions of this contract as are affected thereby. Any questions arising from such renegotiation which cannot be settled by agreement between the parties, shall be determined by arbitration in accordance with the provisions of Section XI hereof. During any period for which a renegotiated base price and effective date therefor and quantity to which same are applicable have not been arrived at by renegotiation or arbitration, Buyer shall continue to pay the price provided in Sections IV and V hereof subject to retroactive adjustment as provided above.

V. Price Escalation.

The base prices of 100 octane aviation gasoline set forth in Section IV hereof shall be subject to adjustment, first, by revision of the base prices specified in Section IV (a) (2) and (3) under the provisions of Exhibit B hereof, and second, as follows:

(a) The said base prices are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven to twenty-seven and nine-tenths degree (27 to 27.9°) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field, California. Each of the





DECLASSIFIED
Authority NND 730034
By TM NARA, Date

prices set forth in Section IV (a) hereof shall be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) Each of the base prices set forth in Section IV (a) hereof shall also be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, which index number is presently ninety-five and nine-tenths (95.9). The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's Avon Refinery, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning



DECLASSIFIED Authority NND 730 034 By [illegible] NARA Date [illegible]

refinery at which any portion of the 100 octane aviation gasoline [supp]lied hereunder is manufactured shall be interfered with to such an [ex]tent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a) and (b), Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(d) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the notification referred to in Section II (a) hereof, but not later, in any event, than midnight May 31, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to



DECLASSIFIED
Authority NND 730 034
By TM NARA Date 8/67

the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Omitted).

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasoline in accordance with Section II (b) hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline unless the storage facilities referred to in Section II (i) hereof, shall contain, from and after the date of this contract, an aggregate of at least two hundred forty thousand (240,000) barrels of 100 octane aviation gasoline, leaded or unleaded, or components thereof ready for blending; provided further that Seller shall be entitled to damages for failure by Buyer to take and pay for 100 octane gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (j) and V (c) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.





DECLASSIFIED
Authority NND 730 014
By TM NARA, Date

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section IX)at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (m) of this Section IX. Buyer may, at its option, waive the



DECLASSIFIED
Authority NND-730034
By TM NARA Date

requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of each delivery of a quantity of less than four thousand (4,000) gallons into a tank truck or motor transport in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date 85

(l) Notwithstanding the preceding provisions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Associated Division of Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such aviation gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, explosions, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder,





DECLASSIFIED Authority NND 730 01X By TM NARA Date

the parties shall make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or





DECLASSIFIED
Authority NND 730 014
By JM NARA Date 8/5

charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is





DECLASSIFIED
Authority NND-730034
By JM NARA Date 8/5

normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable. With Buyer's consent, which consent shall not be unreasonably withheld, Seller may assign to any party to whom Seller may transfer substantially all of the assets of its Associated Division, including the Avon, California, Refinery.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this





DECLASSIFIED
Authority NND 730 074
By TM NARA Date 8/87

contract it will not discriminate against any worker because of race, creed, color or national origin, except as directed by the United States Government.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) If any statute now in existence or hereafter enacted, or any present or future governmental ruling or order, or the action of any governmental department, agency or instrumentality shall reduce any price payable to Seller, as provided for in this contract, or shall prevent or prohibit the Seller from receiving from Buyer the prices provided for in this contract, then Seller and Buyer agree that this shall, for the purpose of this contract, be deemed to be and shall constitute a breach by Buyer of its obligation to accept and pay for aviation gasoline at the prices provided for in this contract, and thereupon the Seller shall have the option upon thirty (30) days' written notice to Buyer to elect to continue to make the deliveries provided for in this contract at the maximum price fixed by any such ruling, order or action, or to consider this contract terminated, unless within said thirty (30) days said ruling or order shall be rescinded or changed so as not to reduce the price payable to Seller or otherwise changed in a manner satisfactory to Seller.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.





DECLASSIFIED
Authority NND 730 034
By TM NARA Date 8/85

IN WITNESS WHEREOF the parties hereto have executed this contract as of the date and year first above written.

DEFENSE SUPPLIES CORPORATION

By /s/ H. A. Mulligan
President

(Seal)

ATTEST:

H. H. Turner
Secretary

TIDE WATER ASSOCIATED OIL COMPANY

By /s/ L. F. Bayer
Vice-President

(Seal)

ATTEST:

/s/ J. P. Edwards
Exec. Secretary





DECLASSIFIED
Authority NND 730 014
By [illegible] NARA, Date [illegible]

EXHIBIT A

Item 1. (Omitted)

Item 2.

U. S. ARMY - NAVY SUPPLY

AN-VV-F-781 Sept. 26, 1940

Amendment No. 4 Nov. 24, 1941

Knock Test Method AN-VV-F-746

100 Octane Number by Method AN-VV-F-746

Tetraethyl Lead Limit 4.0 cc/Gal.

Item 3.

U. S. ARMY - NAVY SUPPLY

AN-F-28 Dec. 23, 1942

100 Octane Number by Method AN-VV-F-746, or

99 Octane Number by Method ASTM-D-357-41T

S+1.25 cc. tetraethyl lead by Method AN-VV-F-748

Tetraethyl Lead Limit 4.0 cc/Gal.





DECLASSIFIED Authority NND 730 034 By TM NARA, Date

EXHIBIT B

I (A). Seller represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract include a certain "alkylation royalty sum" representing royalties under process license agreement with Shell Development Company which Seller will be obligated to pay to its licensor for a certain sulphuric acid alkylation process employed by Seller in the manufacture of said aviation gasoline; that said "alkylation royalty sum" is calculated at the rate of $0.15 per barrel of total alkylate included in said aviation gasoline, and which rate is the royalty rate thereon effective as of July 1, 1943 (present royalty rate thereon effective until July 1, 1943, being $0.21 per barrel); and that said "alkylation royalty sum", at the said royalty rate of $0.15 per barrel, is $0.0013 per gallon for 100 octane aviation gasoline in accordance with Item 3 of Exhibit A of the foregoing contract.

I (B). In the event that during the term of said contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such alkylation process, shall be reduced below $0.15 per barrel with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices of 100 octane aviation gasoline, as set forth in Section IV of said contract manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "alkylation royalty sum" applicable thereto as set forth in Section I (A) of this Exhibit B, and an amount equal to such "alkylation royalty sum" multiplied by the factor $\frac{A}{B}$ where A equals the reduced running royalty per barrel that Seller is obligated to pay, and B equals fifteen cents ($0.15). As to any of said gasoline delivered to and paid for by Buyer under said contract at a price including said "alkylation royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "alkylation royalty sum" has been reduced.





DECLASSIFIED
Authority NND 730 034
By TM NARA Date

II (A). Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract include certain "isomerization royalty sums" representing royalties which Seller is obligated to pay to its licensor, the Shell Development Company, for a certain isomerization process employed by Seller in the manufacture of said aviation gasoline; that said "isomerization royalty sums" are calculated at the rate of $0.05 per barrel of isobutane produced by said process and used in the manufacture of said aviation gasoline and are as follows per gallon of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A of the foregoing contract:

For period prior to effective date of notification referred to in Section II (a) of foregoing contract - - - - - - - - - - - - - - - - -$0.0001 per gal.

For period subsequent to said effective date of notification - - - - - - - - - - - - -$0.0002 per gal.

II (B). In the event that during the term of said contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such isomerization process shall be reduced with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices of 100 octane aviation gasoline, as set forth in Section IV of said contract, manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "isomerization royalty sum" applicable thereto, as set forth in Section II (A) of this Exhibit B, and an amount equal to such "isomerization royalty sum" multiplied by the factor $\frac{A}{B}$ where A equals the reduced running royalty per barrel that Seller is obligated to pay, and B equals five cents ($0.05). As to any of said gasoline delivered to and paid for by Buyer under said contract at price including said "isomerization royalty sum", and as to which gasoline base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "isomerization royalty sum" has been reduced.





DECLASSIFIED
Authority NND 730 034
By TM NARA, Date 8/5

III (A). In the event that any base price of said aviation gasoline is reduced under the provisions of this Exhibit B, and in the event that at any time prior to six (6) years following the date of termination, cancellation or expiration of the foregoing contract, a claim or claims, suit or suits for infringement with respect to the aforesaid alkylation process or the products thereof, or with respect to the aforesaid isomerization process or the products thereof, shall be made or brought against Seller, and if such suit or suits so brought, or any suit or suits brought on any such claim or claims so made, shall result in final adjudication or settlement which shall establish an obligation to be paid by Seller in satisfaction thereof, Buyer shall make payment to Seller as follows: The amount so payable by Buyer to Seller in each case shall in no event exceed whatever amount is the lesser of (1) the amount whereby Buyer's price for the total quantity of gasoline purchased under this contract subsequent to April 30, 1943 and involved in such claim or suit was reduced under this Exhibit B, or (2) the amount required to be paid in settlement or satisfaction of such claim or suit, above any portion thereof for which Seller is reimbursed by its licensor; it being expressly understood that all payments by Buyer to Seller (under this paragraph) shall be solely for the purpose of paying damages or other moneys applicable to the case, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement)as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation; provided, however, that with respect to such settlement no payment shall be made by Buyer to Seller unless Buyer shall first have given in writing its approval to such settlement; Buyer hereby agreeing that it will give its approval to any such settlement which, under the circumstances, appears to be reasonable.

III (B). With respect to such claim or claims, suit or suits for infringement referred to in Section III (A) hereof, Seller agrees that promptly upon receipt of notice by Seller of the making or institution of each such claim or suit, Seller will notify Buyer thereof. Under Seller's present licenses covering said alkylation process and said isomerization process, respectively, Seller's licensors have certain rights and obligations concerning handling of such claims or suits. Subject to the approval of its respective licensors and to the extent that Seller has the right





DECLASSIFIED
Authority NND 730 034
By JM NARA Date 85

under its said licenses to do so, Buyer shall be permitted at its election to be represented in any such suit by counsel of its own choice and at its own expense and subject to such conditions and restrictions, if any, as Seller's licensors may specify.

III (C). If an adjudication adverse to Seller has been made in any such suit by the court of record having primary jurisdiction thereof, and if no settlement approved by Buyer has been effected previously, and if election is made not to appeal from such adverse adjudication or to continue the defense of such suit, then Seller agrees that upon receiving notice, from its licensors or otherwise, of such events and decisions, it will promptly give notice thereof to Buyer; and Seller further agrees that, subject to the same conditions as those hereinabove specified in paragraph III (B) hereof, Buyer at its election and at its own expense may continue the defense of such suit, file and perfect appeals to courts of higher jurisdiction, and do such other things as Buyer believes necessary or desirable to obtain a final adjudication or settlement of such suit, and in such event and subject to the same conditions, Seller agrees that Buyer may use Seller's name for all proper purposes connected with the continuance of such suits and that it will cooperate fully with Buyer in any proper and legal manner necessary to aid Buyer in the furtherance of the defense of such suits, all of same, however, to be at Buyer's expense; it being further agreed that in the event Buyer elects to do any of the things covered by this paragraph III (C), Buyer will indemnify and hold harmless Seller, its officers, agents and representatives from and against any and all liability, costs, damages, claims, judgments and obligations decreed by the court resulting therefrom over and above those to which Seller would have been liable had such actions and elections not been taken by Buyer.

IV. Seller also represents that there have not been included in its computation of the base prices set forth in Section IV of the foregoing contract any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder other than those set forth in Sections I and II of this Exhibit B.

V. Seller convenants that any "alkylation royalty sum" and any "isomerization royalty sum" paid by it and included within the base price set forth in Section IV of the foregoing contract, shall be paid in good faith only to third party or parties who, in Seller's judgment, are entitled to receive such royalties and to license the respective processes covered thereby.





DECLASSIFIED
Authority NND 730 034
By [illegible] NARA, Date [illegible]

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Tide Water Associated Oil Company to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided; it being further agreed that this guarantee shall cover and attach to any and all changes in, amendments of, or supplements to said contract which may be hereafter agreed upon between Defense Supplies Corporation and Tide Water Associated Oil Company, and the undersigned guarantor hereby approves and consents to any and all such changes in, amendments of, or supplements to said contract.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of February 18, 1943.

RECONSTRUCTION FINANCE CORPORATION

By /s/ Charles B. Henderson
Chairman

ATTEST: (Seal)

/s/ A. T. Hobson
Secretary





DECLASSIFIED
Authority NND 730 014
By TM NARA Date 8/5

ADDENDUM #1

Tide Water Associated Oil Company

San Francisco, California

All material ordered hereunder is for Defense Supplies Corporation, a corporation created by Reconstruction Finance Corporation pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, and in accepting this contract, Tide Water Associated Oil Company, a Delaware corporation, (hereinafter designated as "Contractor") agrees to the provisions set forth below, provided, however, that to the extent that the obligations of manufacturers or dealers are limited, restricted or relaxed by amendments of the law or by authorized governmental regulations, then the obligations of the Contractor shall be automatically and correspondingly limited, restricted or relaxed.

I. (a) The Contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract.

(b) All persons employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles or equipment used in the performance of the contract will be paid, without subsequent deduction or rebate on any account, not less than the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract; PROVIDED, however, that this stipulation with respect to minimum wages shall apply only to purchases or contracts relating to such industries as have been the subject matter of a determination by the Secretary of Labor.

(c) No person employed by the Contractor in the manufacture or furnishing of the materials, supplies, articles, or equipment used in the performance of the contract shall be permitted to work in excess of eight (8) hours in any one day or in excess of forty (40) hours in any one week, unless such person is paid such applicable overtime rate as has been set by the Secretary of Labor.

(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.

(e) No part of the contract will be performed nor will any of the materials, supplies, articles, or equipment to be manufactured or furnished under said contract be manufactured or fabricated in any plants, factories, buildings, or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary, and factory inspection laws of the State in which the work or part thereof is to be performed shall be prima-facie evidence of compliance with this subsection.

(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of ten dollars ($10.00) per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract, and a sum equal to the amount of any deductions, rebates, refunds or underpayment of wages due to any employee engaged in the performance of the contract; and, in addition, the agency of the United States entering into the contract shall have the right to cancel same and to make open-market purchases or enter into other contracts for the completion of the original contract, charging any additional cost to the original Contractor. Any sums of money due to the United States of America by reason of any



DECLASSIFIED
Authority NND 730034
By TM NARA, Date

Addendum #1

violation of any of the representations and stipulations of the contract as set forth herein may be withheld from any amounts due on the contract or may be recovered in a suit brought in the name of the United States of America by the Attorney General thereof. All sums withheld or recovered as deductions, rebates, refunds, or underpayments of wages shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered; PROVIDED, That no claims by employees for such payments shall be entertained unless made within one year from the date of actual notice to the Contractor of the withholding or recovery of such sums by the United States of America.

(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Regulations under the Act available for inspection by authorized representatives of the Secretary of Labor.

(h) The foregoing stipulation shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.00.

This Addendum #1 is hereby made a part of the contract between Defense Supplies Corporation and the undersigned dated as of February 18, 1943.

TIDE WATER ASSOCIATED OIL COMPANY

By: /s/ L. F. Bayer
Vice-President



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

T... to whom these presents shall come, Greeting:

...irtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, ...e seal of the National Archives of the United States, that the attached reproduction(s) is a true and ...opy of documents in his custody.

| SIGNATURE | |
|---|---|
| NAME<br>Timothy K. Nenninger | DATE<br>AUG 21 2006 |
| TITLE<br>Chief, Modern Military Records | |
| NAME AND ADDRESS OF DEPOSITORY<br>National Archives at College Park<br>8601 Adelphi Road<br>College Park, MD 20740-6001 | |

NA FORM 14007 (10-86)

DEFENSE SUPPLIES CORPORATION

and

TIDE WATER ASSOCIATED OIL COMPANY

(Fourth Contract)

100-OCTANE AVIATION GASOLINE

May 19, 1943



DECLASSIFIED
Authority NND 730047
By TM NARA

CONFORMED COPY 68486

# CONTRACT

between

DEFENSE SUPPLIES CORPORATION

and

TIDE WATER ASSOCIATED OIL COMPANY

(Fourth Contract)

100-OCTANE AVIATION GASOLINE

May 19, 1943



DECLASSIFIED
Authority NND-730 034
By TM NARA, Date

DEFENSE SUPPLIES - TIDE WATER ASSOCIATED CONTRACT
(Fourth Contract)

Revised February 8, 1944

CONTRACT made as of May 19, 1943, between TIDE WATER ASSOCIATED OIL COMPANY, a Delaware corporation, having a principal place of business at 79 New Montgomery Street, San Francisco (20), California, hereinafter called Seller, and DEFENSE SUPPLIES CORPORATION, a corporation created by Reconstruction Finance Corporation, pursuant to Section 5 (d) of the Reconstruction Finance Corporation Act as amended, having its principal place of business at Washington, D. C., hereinafter called Buyer.

In consideration of the mutual agreements herein contained the parties agree as follows:

A certain contract made as of February 18, 1943, between the parties, entitled "Contract between Defense Supplies Corporation and Tide Water Associated Oil Company (Associated Division), (Third Contract)," hereinafter referred to as the "third contract", is replaced by the present contract and is hereby terminated and cancelled effective as of the effective date (May 19, 1943) of this contract; all rights accrued under the contract of February 18, 1943 to such date to be reserved: it being further agreed that the price of gasoline delivered by Seller to Buyer from January 1, 1943 to and including February 17, 1943 shall be computed in accordance with said "Third Contract".

I. Expansion of Seller's Refining Facilities.

(a) Seller has existing facilities for the production at its Avon, California, refinery of approximately four thousand seven hundred twenty-two (4,722) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof, said facilities having been completed as of May 1, 1943.

(b) Seller has contracted to construct additional facilities at an estimated cost of approximately One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) which will enable Seller to produce at Avon, California, a total of approximately six thousand three hundred fifty-three (6,353) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof. Seller shall use its best efforts to construct said additional facilities, to maintain work on said construction day and night to the extent necessary to expedite substantially said construction and in so far as the requisite labor and materials are available, and to complete such construction as soon as possible and estimates such construction will be completed by February 1, 1944.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

(c) Seller is willing to construct a further expansion of its facilities at an estimated additional cost of Nine Million Five Hundred Thousand Dollars ($9,500,000.00) which will enable Seller to produce at Avon, California, an additional quantity of approximately seven thousand five hundred (7,500) barrels per calendar day of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof, thereby enabling Seller to increase production of such aviation gasoline from all its facilities at Avon, California to a total of approximately thirteen thousand eight hundred fifty-three (13,853) barrels per calendar day. Seller shall use its best efforts to construct said further expansion of its facilities, to maintain work thereon day and night to the extent necessary to expedite substantially said construction and insofar as the requisite labor and materials are available, and to complete such construction as soon as possible and estimates such construction will be completed by August 1, 1944.

(d) The force majeure provisions set forth in Section X hereof shall apply in all respects to the expansion of facilities as well as to the sale of gasoline and all other obligations of Seller.

II. Sale and Storage of Products.

(a) When the construction of the additional facilities referred to in Section I (b) hereof shall be completed and ready for operation, Seller shall promptly notify Buyer, and when the construction of the further expansion of its facilities referred to in Section I (c) hereof shall be completed and ready for operation, Seller shall again promptly notify Buyer.

(b) From and after midnight April 30, 1943, until the end of the original term of this contract and during any extension thereof, Seller shall sell and deliver and Buyer shall buy and receive such quantity of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof, or a corresponding quantity of 100 octane aviation gasoline of any other specification which by mutual agreement shall be attached as an addendum to Exhibit A, as, together with all other sales by Seller to the United States Government of said gasoline produced at Seller's Avon Refinery, shall equal Seller's pro-rata share of the entire requirements of the United States Government, as hereinafter defined, but not less than the following minimum quantities:

(1) From and after midnight April 30, 1943 until the effective date of the first notification referred to in paragraph (a) of this Section II, three thousand (3,000) barrels per calendar day;





DECLASSIFIED
Authority NND 730 034
By TM NARA Date 8/87

(2) From and after the effective date of said first notification until the effective date of the second notification referred to in paragraph (a) of this Section II, four thousand six hundred thirty (4,630) barrels per calendar day;

(3) From and after the effective date of said second notification until midnight on October 31, 1945, twelve thousand one hundred thirty (12,130) barrels per calendar day;

(4) From and after midnight on October 31, 1945 until midnight on April 30, 1946, eleven thousand one hundred ten (11,110) barrels per calendar day;

(5) From midnight on April 30, 1946 until midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of said first notification, but not later, in any event, than May 31, 1947, nine thousand one hundred thirty (9,130) barrels per calendar day; and

(6) From midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of said first notification, but not later, in any event, than May 31, 1947 until the end of the original term of this contract, seven thousand five hundred (7,500) barrels per calendar day.

During each of said six periods, Buyer shall take deliveries in accordance with this Section II (b); and any quantity not so taken shall be stored by Seller in the facilities specified in Section II (i) hereof, up to the aggregate amounts therein specified, and Buyer may thereafter draw on said storage in fulfilling its purchase obligations hereunder at any time.

(c) Buyer may apportion the above aggregate quantities among the various grades of gasoline specified in Exhibit A hereof, and the quantities shall be adjusted to correspond to the grades required by Buyer.

(d) The damages, if any, for a breach of the foregoing provisions of this Section II shall be in accordance with Section VIII hereof.

(e) Buyer on giving reasonable notice to Seller may require the delivery hereunder of aviation gasoline of specifications other than those originally set forth in Exhibit A which are capable of being produced with Seller's





DECLASSIFIED
Authority NND 730034
By TM NARA Date

available raw materials and with Seller's available refining facilities then capable of use in producing 100 octane aviation gasoline in accordance with said specifications other than those originally set forth in Exhibit A. The prices, specifications and quantities of such products shall be determined by negotiation between the parties or, failing agreement, by arbitration under Section XI hereof. Deliveries of the products shall not be suspended during such negotiations. Such agreement shall be reduced to writing as an addendum to Exhibit A and shall constitute a part thereof.

(f) The term "United States Government", whenever used in this contract, shall include the War Department, the Navy Department, any other department, agency or instrumentality of the United States Government, and any corporation wholly owned by the United States.

(g) The term "Seller's pro-rata share of the entire requirements of the United States Government" shall mean that quantity which bears the same ratio to the entire requirements of the United States Government of 100 octane aviation gasoline as the total refining capacity for 100 octane aviation gasoline at Seller's Avon Refinery, less the quantity of Seller's sales of 100 octane aviation gasoline from said refinery to customers other than the United States Government, bears to the total refining capacity for 100 octane aviation gasoline of all refiners in the United States and Lago Oil & Transport Company, Ltd., in Aruba, Netherlands West Indies, less the quantity of said refiners' sales to customers other than the United States Government. Buyer shall use its best efforts to furnish the data necessary for the calculation of such pro-rata share.

(h) The term "barrel" as used in this contract means a barrel of forty-two (42) gallons. The term "gallon" means a United States gallon of two hundred and thirty-one (231) cubic inches.

(i) Seller shall maintain storage facilities at, or in the vicinity of its Avon refinery to accommodate an aggregate of at least two hundred forty thousand (240,000) barrels of 100 octane aviation gasoline (or components thereof ready for blending) produced under this contract prior to the effective date of the second notification referred to in paragraph (a) of this Section II, and thereafter to accommodate an aggregate of at least four hundred fifty thousand (450,000) barrels of aviation gasoline (or components thereof ready for blending) produced under this contract.





DECLASSIFIED
Authority NND-730034
By JM NARA, Date 8/97

(j) Whenever Seller's above-specified storage facilities for said aviation gasoline shall be filled, Seller shall not be obligated to produce any more of said gasoline for delivery to Buyer hereunder until Buyer shall have substantially reduced by purchase and removal the amount of gasoline in storage. If such full storage condition exists, Seller shall have the right to diminish the quantities otherwise to be delivered to Buyer by an amount equal to the amount of 100 octane aviation gasoline which was produced during such full storage condition or which would have been produced except for such full storage condition; but Buyer shall not thereby be relieved of its obligation to take delivery of the quantities specified in paragraph (b) of this Section II, or any obligation undertaken under Section III hereof. If, however, Seller shall produce during any such period of full storage any additional 100 octane aviation gasoline of the kind covered by this contract, then such additional aviation gasoline shall be treated as covered by Section III hereof, provided that Buyer shall arrange for the prompt removal from Seller's storage facilities of all such additional gasoline which Buyer may elect to purchase.

(k) In accumulating said storage, Seller may store gasoline of the specifications last ordered by Buyer unless Buyer otherwise directs by written notice; and Buyer in ordering deliveries shall first order against the gasoline in storage; provided, however, that on Buyer's request and if Seller can do so without extra cost, or if Seller can do so at extra cost and Buyer shall agree to assume such extra cost, Seller shall change the gasoline in storage to meet other specifications covered in Exhibit A hereof.

III. Optional Gasoline.

(a) Buyer shall have the option from time to time and at any time to purchase from Seller hereunder all or any part of the aviation gasoline which Seller may produce at its Avon Refinery between midnight April 30, 1943 and the expiration of the original term of this contract, to the extent that such gasoline is in excess of the sum of (a) the quantity to be purchased by Buyer under the provisions of paragraph (b) of Section II hereof and (b) the quantities which Seller has, prior to receipt of notification of exercise of such option, contracted to sell to parties other than Buyer. Upon the exercise of such option Seller shall operate the facilities at full capacity or at a capacity sufficient at least to satisfy Buyer's requirements indicated in such notification.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

**Price and Payment.**

(a) The base prices of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A hereof shall be as follows, f.o.b. Seller's refinery at Avon, California:

(1) For deliveries from and after midnight April 30, 1943 until the effective date of the first notification referred to in Section II (a) hereof (hereinafter called "First Period"), Fourteen Cents ($0.14) per gallon.

(2) For deliveries from and after the effective date of the first notification referred to in Section II (a) hereof until the effective date of the second notification referred to in Section II (a) hereof (hereinafter called "Second Period"), Fourteen and Five One-Hundredths Cents ($0.1405) per gallon for that volume of said aviation gasoline delivered to Buyer in each calendar month during the Second Period which does not exceed the estimated daily production multiplied by the number of days in that calendar month (hereinafter called "Base Volume"), and for all such aviation gasoline delivered to Buyer in any calendar month during the Second Period in excess of the Base Volume (such excess hereinafter called "Monthly Excess"), Eleven and Nine-tenths Cents ($0.1190) per gallon, except as hereinafter provided in accordance with the following sub-paragraph (ii) of this paragraph (2). The estimated production for the Second Period shall be as specified in Section I (b): to wit, six thousand three hundred and fifty-three (6,353) barrels per calendar day.

(i) If during the Second Period, the delivered volume for any month for which payment is made is less than the Base Volume for such month (such deficiency being hereinafter called "Deficiency Volume"), and the total volume delivered to Buyer up to the first day of such month exceeds the sum of all the Base Volumes up to the first day of such month (such excess being hereinafter called "Accumulated Excess"), then such Deficiency Volume shall be applied to extinguish such Accumulated Excess or an amount thereof equal to such Deficiency Volume, whichever is the lesser, in the chronological order of the accumulation of the Accumulated Excess, and





DECLASSIFIED
Authority NND 730034
By TM NARA, Date 85

Seller shall receive from Buyer a payment equal to the difference between the base price of Fourteen and Five-One-Hundredths Cents ($0.1405) per gallon and the base price of Eleven and Nine-tenths Cents ($0.1190) per gallon multiplied by the number of gallons of Accumulated Excess so extinguished; provided that both base prices used in applying this sub-paragraph (i) shall be escalated in accordance with the provisions of Section V hereof as of the date of delivery of the so extinguished Accumulated Excess.

(ii) If in any month during the Second Period for which payment is made there is a Monthly Excess, and the total volume delivered to Buyer up to the first day of such month is less than the sum of the Base Volumes up to the first day of such month (such difference hereinafter being called "Accumulated Deficiency"), then the base price of so much of such Monthly Excess as does not exceed the Accumulated Deficiency shall be Fourteen and Five One-Hundredths Cents ($0.1405) per gallon and the base price of the remainder of such Monthly Excess, if any, shall be Eleven and Nine-tenths Cents ($0.1190) per gallon.

(iii) In no event shall Seller be entitled to a payment under this Section IV (a) (2) which would constitute a duplication of any payment which Seller has previously otherwise received as reimbursement for the differential between the base prices specified in Section IV (a) (2).

(3) For deliveries from and after the effective date of the second notification referred to in Section II (a) hereof, until the end of the original term of this Agreement (hereinafter called the "Third Period"), Thirteen Cents ($0.13) per gallon for that volume of aviation gasoline delivered to Buyer in each calendar month which does not exceed the Base Volume, and Ten and Three-tenths Cents ($0.103) per gallon for any Monthly Excess; except as hereinafter



DECLASSIFIED
Authority NND 730 014
By TM NARA, Date

provided in accordance with the following sub-paragraph (ii) of this paragraph (3). The estimated production for the Third Period shall be as specified in Section I (c); to wit, thirteen thousand eight hundred fifty-three (13,853) barrels per calendar day.

(i) If during the Third Period, the delivered volume for any month for which payment is made is less than the Base Volume for such month (such deficiency being hereinafter called "Deficiency Volume"), and the total volume delivered to Buyer up to the first day of such month exceeds the sum of all the Base Volumes up to the first day of such month (such excess being hereinafter called "Accumulated Excess"), then such Deficiency Volume shall be applied to extinguish such Accumulated Excess or an amount thereof equal to such Deficiency Volume, whichever is the lesser, in the chronological order of the accumulation of the Accumulated Excess, and Seller shall receive from Buyer a payment equal to the difference between the base price of Thirteen Cents ($0.13) per gallon and the base price of Ten and Three-Tenths Cents ($0.103) per gallon multiplied by the number of gallons of Accumulated Excess so extinguished; provided that both base prices used in applying this sub-paragraph (i) shall be escalated in accordance with the provisions of Section V hereof as of the date of delivery of the so extinguished Accumulated Excess.

(ii) If in any month during the Third Period for which payment is made there is a Monthly Excess, and the total volume delivered to Buyer up to the first day of such month is less than the sum of the Base Volumes up to the first day of such month (such difference hereinafter being called "Accumulated Deficiency"), then the base price



DECLASSIFIED
Authority NND-730 034
By TM NARA, Date

of so much of such Monthly Excess as does not exceed the Accumulated Deficiency shall be Thirteen Cents ($0.13) per gallon and the base price of the remainder of such Monthly Excess, if any, shall be Ten and Three-tenths Cents ($0.103) per gallon.

(iii) In no event shall Seller be entitled to a payment under this Section IV (a) (3) which would constitute a duplication of any payment which Seller has previously otherwise received as reimbursement for the differential between the base prices specified in Section IV (a) (3).

(b) The Accumulated Deficiency and the Accumulated Excess in any one of the aforesaid Periods shall not be transferrable to any other of the aforesaid periods.

(c) Seller represents that there has not been included in its computation of the above prices any allowance for depreciation, amortization and obsolescence in excess of ten percent (10%) per annum of that portion of the original cost of its existing refining facilities used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture plus ten percent (10%) per annum of that portion of the original estimated cost of its proposed additional refining facilities to be used in the manufacture of said 100 octane aviation gasoline which is properly allocable to such manufacture. Nothing in the preceding sentence shall preclude Seller from using a different rate or rates for tax and accounting purposes.

(d) Buyer shall pay promptly, but not later than the twentieth (20th) day of each calendar month, all money due for gasoline delivered to it by Seller during the preceding calendar month. On or before the tenth (10th) day of each month in which such payments are to be made, Seller shall render to Buyer a statement setting forth the quantity of aviation gasoline delivered during the preceding month, the price per gallon, and the total amount to be paid therefor. Copies of the certificates of inspection referred to in Section IX hereof shall accompany the aforesaid monthly statement.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date 8/8/

Price Escalation.

The base prices of 100 octane aviation gasoline set forth in Section IV hereof shall be subject to adjustment, first, under the provisions of Exhibit B hereof, and second, as follows:

(a) The said base prices are based on a price of One Dollar and Fifteen Cents ($1.15) per barrel for twenty-seven to twenty-seven and nine-tenths degree (27 to 27.9°) A.P.I. Signal Hill crude deliverable to Seller in the Signal Hill Field, California. Each of the base prices set forth in Section IV (a) hereof shall be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the average price paid for such crude over or under One Dollar and Fifteen Cents ($1.15) per barrel by the three (3) largest purchasers of such crude in the Signal Hill Field. The prices posted for such crude in the Signal Hill Field shall constitute prima facie evidence of the prices paid by such purchasers.

(b) Prior to the effective date of the second notification referred to in Section II (a) hereof each of the base prices set forth in Section IV (a) (1) and (2) hereof shall also be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index number of ninety-five and nine-tenths (95.9), the index number used in the third contract. The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(c) From and after the effective date of the second notification referred to in Section II (a) hereof, the base prices set forth in Section IV (a) (3) hereof shall also be increased or decreased by a percentage thereof equal to one-half (1/2) the percentage increase or decrease in the final monthly wholesale price Index Number for "All Commodities other than Farm Products and Foods", as now published by the Bureau of Labor Statistics, United States Department of Labor, over or under the index number of ninety-six and five tenths (96.5), the present





DECLASSIFIED
Authority NND 730 034
By JM NARA Date

index number. The effective date of a change in price due to a change in the index number shall be the date of publication by the Bureau of Labor Statistics of the latest final monthly index number. If said index shall cease to be issued, the parties shall use such other index as may most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(d) The prices hereinabove set forth are based upon present normal methods of transporting petroleum raw materials to Seller's Avon Refinery, and upon a normal operation of that refinery in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refinery by other than present normal methods thereby incurring additional costs of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining 100 octane aviation gasoline is increased in respects other than those corrected by adjustment of the base price under the above paragraphs (a), (b) and (c), Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase the price paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does not elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller that it desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) years' experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase,



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the arbitrators within such period, the production of 100 octane aviation gasoline by the refinery affected may be reduced as above provided.

(e) In making adjustments under this Section V, the prices to be adjusted shall be those prices in effect immediately prior to the adjustment and such adjustment shall be made regardless of what Seller's crude inventory may be at the time of such adjustment.

VI. Duration of Contract.

The original term of this contract shall expire at midnight on the last day of the last of thirty-six (36) consecutive calendar months after the effective date of the second notification referred to in Section II (a) hereof, but not later, in any event, than midnight November 30, 1947. Buyer shall have the option to extend this contract for two (2) successive yearly periods beyond the original term by giving notice in writing to Seller of the exercise of such option at least ninety (90) days prior to the end of the original term for the first yearly extension and at least ninety (90) days prior to the end of the first yearly extension for the second yearly extension. Upon such extension the obligations to purchase and receive shall be in accordance with Section II (b) hereof and the prices to be paid shall be fixed by agreement between the parties hereto during the ninety (90) day period prior to each such extension. All of the other provisions of this contract except those not then applicable shall be in full force and effect.

VII. (Section Omitted).

VIII. Damages.

(a) In the event that Seller shall fail to sell and deliver or Buyer shall fail to take and pay for 100 octane aviation gasoline in accordance with Section II (b) and Section IV hereof, the amount of damages, if any, to which Buyer or Seller, as the case may be, shall be entitled for such failure shall be determined by agreement or, failing agreement, by arbitration in accordance with Section XI hereof; provided, however, that Seller shall not be entitled to damages for failure by Buyer to take and pay for any 100 octane aviation gasoline which Seller shall have failed to store in accordance with the provisions of the last paragraph of Section II (b) hereof and until the quantities stored shall attain the aggregate quantities set forth in Section II (i) hereof; provided further that





DECLASSIFIED
Authority NND 730 014
By TM NARA, Date

Seller shall be entitled to damages for failure by Buyer to take and pay for 100 octane aviation gasoline only to the extent that the amount taken and paid for is less than (1) the amount called for in Section II (b) hereof or (2) Seller's average productive capacity per calendar day for 100 octane aviation gasoline (of current specifications) over the period in question, whichever quantity is the lesser; and provided further that Buyer's right to damages under this Section VIII shall be subject to Seller's rights under Sections II (j) and V (d) hereof.

(b) Damages under this contract shall be limited to those arising proximately from a breach of contract.

IX. Deliveries and Inspections.

(a) Seller warrants full and unencumbered title to all gasoline delivered under this contract.

(b) Buyer shall take delivery of said gasoline in tankers, barges, tank cars, or tank trucks (tank truck deliveries to be not in excess of available tank truck loading facilities for 100 octane aviation gasoline) to be supplied by Buyer (except as otherwise provided in paragraph (l) of this Section IX) at its own cost and expense, at Seller's refinery in quantities approximating the current rate of production.

(c) Each vessel delivery shall be made and title and risk of loss shall pass at the intake pipe of the vessel. Buyer shall give notice to Seller as far in advance as practicable, and in no case less than forty-eight (48) hours, of the arrival of each vessel and of the quantity of and specifications of the gasoline to be loaded. Seller shall furnish without cost to Buyer berth at which each vessel may safely lie afloat together with all connections and facilities for loading, and shall load the product on board. Deliveries shall be made in accordance with the delivery conditions at each loading point which currently are in effect with respect to deliveries made at such point to other customers.

(d) Each tank car delivery shall be made and title and risk of loss shall pass at the time the loaded tank car is turned over to the railroad.

(e) Each tank truck delivery shall be made and title and risk of loss shall pass at the time the loading of the truck is completed.

(f) On shipments made from refineries and any other points where licensed inspectors are regularly available, Seller shall furnish certificates of inspection by a licensed inspector satisfactory to Buyer which shall set forth



DECLASSIFIED

the quantity and quality of each shipment of gasoline. The inspection procedure and the form of the certificate shall conform with usual industry practice. The certificates of inspection shall be issued in five counterparts, one set of which shall accompany the relative shipment, one of which shall be forwarded forthwith to Buyer, a third submitted to Buyer with the monthly statement required by Section IV hereof, a fourth set of which shall be delivered forthwith to Seller, and a fifth set of which shall be delivered forthwith to the authorized officer or employee of the War Department or Navy Department referred to in paragraph (m) of this Section IX. Buyer may, at its option, waive the requirements of inspection by a licensed inspector, and in such event, and in case of shipments made from points (other than refineries) where no licensed inspector is available, Seller shall furnish its own certificates of inspection, which certificates shall be controlling.

(g) Inspection as to quantity of delivery into vessels shall be made by taking the temperature and measuring and gauging the product in shore tanks from which delivery is made immediately before and immediately after loading. Inspection as to quantity of delivery into tank cars and tank trucks shall be made in accordance with the accepted practices of the trade. Adjustment in volume to a sixty degree Fahrenheit (60°F.) basis shall be made in accordance with the correction tables of the United States Bureau of Standards prevailing at the time of delivery, except in case of each delivery of a quantity of less than three thousand five hundred (3,500) gallons into a tank truck or motor transport in which case no adjustment shall be made.

(h) Inspection as to quality shall be made according to the latest standard or tentative standard methods of the American Society for Testing Materials wherever applicable and the product as shipped shall conform as to quality with the specifications set forth in Exhibit A hereof.

(i) The cost of product inspection shall be paid by Seller and billed separately to Buyer, which shall pay such cost, except when Seller's inspection is accepted in which case Seller shall assume the cost of its own inspection.

(j) The certificates of inspection of quantity and quality shall be accepted by Buyer and Seller as conclusive for invoice, payment, and all other purposes of this contract.



DECLASSIFIED
Authority NND 730 034
By TM NARA Date

(k) Should any such certificate indicate a failure of the product shipped to conform completely to the specifications of quality, Buyer may accept delivery of the product and claim an adjustment for such deficiency, provided, that in the event that such a claim is made Seller shall be notified and given an opportunity to inspect said shipment within five (5) days after arrival at destination but in any event before unloading.

(l) Notwithstanding the preceding previsions of this Section IX and at the request of Buyer, Seller shall utilize its existing and available facilities (other than tankers and barges) for handling, metering and delivering the gasoline purchased by Buyer to points (other than Seller's refinery at which the gasoline was manufactured) designated by Buyer within the marketing area in the continental United States served by Associated Division of Seller, such service to be at the expense of Buyer and at Buyer's risk. In the event of loss Seller shall make its records available to Buyer to prove the extent and value of such loss.

(m) Until further notice from Buyer to Seller, for the purposes of this Section IX any officer or employee of the War Department or Navy Department who is properly authorized to accept deliveries of gasoline for his Department is hereby nominated as agent for Buyer and authorized to take delivery of aviation gasoline hereunder, to waive the aforesaid requirements of inspection by a licensed inspector, and to receipt on behalf of Buyer, in a manner approved by Buyer, for deliveries of such aviation gasoline from Seller to Buyer.

X. Force Majeure.

Seller shall not be liable for delays or defaults in performance under this contract due to causes beyond its control and without its fault or negligence, including, but not restricted to, acts of God or of the public enemy, acts or requests of the Government or of any governmental officer or agent purporting to act under authority, floods, fires, earthquakes, explosions, epidemics, quarantine restrictions, strikes, freight embargoes and failures, exhaustion or unavailability, or delays in delivery of any product, service or material necessary in the construction of the facilities contemplated by Section I hereof or in the manufacture and delivery of aviation gasoline deliverable hereunder, including crude oil, supplies, raw materials, ingredients and lead tetraethyl.

XI. Arbitration.

In case of any disagreement between Buyer and Seller as to any right, obligation, term, or provision of this contract, including any disagreement as to the price to be paid for gasoline to be delivered hereunder, the parties shall





DECLASSIFIED Authority NND 730 034 By J.M. NARA, Date 8/6

make an earnest effort to settle such disagreement to their mutual satisfaction. If such effort be unsuccessful, then either party may cause such disagreement to be submitted for determination by arbitrators (none of whom shall be connected with either party hereto) by giving to the other party a notice in writing or by telegraph to that effect and giving the name of the arbitrator chosen by the party giving the notice. Within five (5) days of receipt of such notice of arbitration, the other party shall, in writing or by telegraph, name the arbitrator chosen by such party, and within five (5) days after the appointment of the second arbitrator, an additional arbitrator shall be selected by the two (2) arbitrators theretofore appointed, provided, however, if one of the parties shall have failed to appoint an arbitrator as hereinbefore provided, the sole arbitrator shall arbitrate the disagreement alone. If two (2) arbitrators shall have been appointed as aforesaid and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by the Senior Judge of the United States Circuit Court of Appeals for the Ninth Circuit acting in his individual capacity, upon application therefor by either of the parties. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator as aforesaid, the decision of the sole arbitrator shall be final and binding on the parties for all purposes. Each party shall pay the cost and expenses of the arbitrator appointed by such party, and the other costs and expenses of the arbitration, including the cost and expense of the additional arbitrator, shall be paid by the party to the arbitration whose claim is not sustained or if partially sustained the costs shall be apportioned. Pending such determination of every disagreement as to the price to be paid for gasoline delivered hereunder, Buyer shall, upon contesting any price claimed by Seller to be due, pay the price which Buyer alleges to be due and shall immediately upon such determination pay any balance found by mutual agreement or by said arbitrators to be due.

XII. Taxes.

(a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery

 

DECLASSIFIED
Authority NND-730034
By TM NARA, Date 8/84

of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

(b) Buyer shall also pay in addition to the prices as established in Sections IV and V hereof, any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption. Seller represents that the taxes, fees and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

(c) If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption. Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

XIII. Notices.

Any notice to be given hereunder shall be in writing and may be personally delivered or sent by cable, telegram or mail to the party for whom intended at the address of such party as specified above. A notice personally delivered to either party must be personally delivered to an officer or manager thereof. Notice by registered mail shall be deemed to have been given at the expiration of that time after mailing which is normally required by the postal authorities to make delivery. Cabled or telegraphed notice shall be deemed given the day after sending the cable or telegram. Each party shall immediately send to the other by regular mail confirming copies of any notices sent by cable, telegraph or air mail. Either party may by notice given as aforesaid change its address for notices thereafter.



DECLASSIFIED
Authority NND 730034
By TM NARA Date

XIV. Entirety of Contract.

This instrument contains the entire agreement between the parties in respect to the subject matter and there are no oral conditions, warranties, representations or stipulations relating thereto which are not merged herein. The right of either party to require strict performance shall not be affected by any previous waiver or course of dealing, unless such waiver be in writing signed by an officer or other duly authorized person and specify a duration sufficient in time to embrace the matter in question.

XV. Assignability.

This contract shall be binding upon, and shall inure to the benefit of, the successors and assigns of the respective parties thereto, provided, however, neither party shall have the right to assign this contract without the written consent of the other party, except that Buyer may assign to any other Governmental agency, department, instrumentality or wholly Government-owned corporation, in which event Buyer shall remain liable. With Buyer's consent, which consent shall not be unreasonably withheld, Seller may assign to any party to whom Seller may transfer substantially all of the assets of its Associated Division, including the Avon, California, Refinery.

XVI. Statutory Compliance.

(a) In carrying out this contract Seller agrees to comply with, and give all stipulations and representations required by applicable federal laws and further agrees to require such compliances, representations and stipulations with respect to any contract entered into by it with others incidental to or in connection with this contract as may be required by applicable federal laws; and notwithstanding the generality of the foregoing, Seller further agrees that in the performance of this contract it will not discriminate against any employee or applicant for employment because of race, creed, color or national origin, and will include a similar provision in all contracts entered into by it with others incidental to or in connection with this contract.

(b) Seller is a corporation and this contract is made with it for its general benefit and no Member of or Delegate to Congress, or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise therefrom in violation of the law of the United States covering such matters.

(c) Anything herein contained to the contrary notwithstanding, this contract shall be subject to the provisions of Exhibit C, attached hereto and made a part hereof.



DECLASSIFIED
Authority NND 730 034
By JM NARA, Date 85

68486

(d) Seller shall comply with requirements of the Walsh-Healey Act (41 USCA Sections 35-45) insofar as such Act is applicable to this transaction.

XVII. Right to Terminate.

Seller shall have the right to terminate this contract within ninety (90) days of the date thereof, unless within said ninety (90) days it shall receive all governmental assistance which is available or necessary for performing this contract and for the prompt completion of the expanded facilities which Seller will construct hereunder, including, without limitation, priorities and allocations necessary for obtaining materials, equipment, supplies and crude petroleum, and such certificates as may be necessary to permit it to invoke the provisions of Section 124, Internal Revenue Code.

IN WITNESS WHEREOF, the parties have made this contract as of May 19, 1943 and have executed it on March 24, 1944.

DEFENSE SUPPLIES CORPORATION

By (Sgd) H. A. Mulligan
President

ATTEST: (SEAL)

George H. Hubert
Asst. Secretary

TIDE WATER ASSOCIATED OIL COMPANY

By (Sgd) L. F. Bayer
Vice-President

ATTEST: (SEAL)

J. P. Edwards
Exec. Secretary



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

EXHIBIT A

Item 1: (Item Omitted)

Item 2: (Item Omitted)

Item 3:

AN-F-28 December 23, 1942

Amendment No. 1 March 23, 1943

100 Octane Number by Method AN-VV-F-746, as amended November 5, 1940, or

99 Octane Number by Method ASTM-D-357-42T

S + 1.25 cc. tetraethyl lead by Method AN-VV-F-748a-March 23, 1943

Tetraethyl Lead Limit - 4.0 cc. per gallon.





DECLASSIFIED
Authority NND 730034
By TM NARA, Date

EXHIBIT B

I. (A). Seller represents that the base price set forth in Section IV (3) of the foregoing contract for 100 octane aviation gasoline includes a certain "catalytic cracking royalty sum" representing patent royalties which Seller expects to pay to a third party or parties for a certain fluid catalytic cracking process to be employed by Seller in its operations applicable to the manufacture of said aviation gasoline; that said "catalytic cracking royalty sum" is calculated at a running royalty rate of $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operation applicable to the manufacture of said aviation gasoline; and is as follows per gallon of 100 octane aviation gasoline in accordance with Item 3 of Exhibit A of the foregoing contract:

Period before the date of the second notification referred to in Section II (a) of the foregoing contract: . . . . . . . . . none

Period after the date of the second notification referred to in Section II (a) of the foregoing contract: . . . . . . . . . $0.0012 per gal.

I. (B). In the event that at any time during the term of the foregoing contract there shall be available to Seller a running royalty rate lower than $0.05 per barrel of fresh stock charged to Seller's catalytic cracking operations applicable to the manufacture of said aviation gasoline, or if such running royalties are entirely eliminated so as to free Seller from any obligation to pay any thereof, then the base price which includes said "catalytic cracking royalty sum", for all aviation gasoline delivered under the foregoing contract after such reduction or elimination and after Seller has been informed thereof, and as to which gasoline such royalty rate available to Seller shall have been reduced or eliminated, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be determined by subtracting from such base price an amount equal to said "catalytic cracking royalty sum" multiplied by a factor equal to $\frac{A}{B}$ where A equals the difference between $0.05 and said lower running royalty rate (or A equals $0.05 if such royalties are eliminated), and B equals the sum of $0.05. As to any of said gasoline delivered to and paid for by Buyer under said contract at a price including said "catalytic cracking royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of



DECLASSIFIED
Authority NND 730 034
By TM NARA, Date

money equal to the total number of gallons of said gasoline subject to the aforesaid reduction, multiplied by (a) the amount of said "catalytic cracking royalty sum" and by (b) said factor $\frac{A}{B}$.

I. (C). The base prices of said gasoline shall be subject to reduction in accordance with Section I (B) of this Exhibit B notwithstanding that pursuant to the terms of catalytic cracking license agreement which Seller expects to execute and which license agreement is subject to government approval, Seller may have elected to pay its licensor on a paid-up royalty basis in lieu of on a running royalty basis; in which event whatever reduction or elimination of running royalty would be available to Seller but for the fact that Seller may than be on a paid-up royalty basis, shall be deemed as available to Seller for the purposes hereof.

II. (A). Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract also include certain "alkylation royalty sums" representing patent royalties which Seller is obligated to pay to its licensor for a certain sulfuric acid alkylation process employed by Seller in the manufacture of said aviation gasoline; that said "alkylation royalty sums" are calculated at the rate of $0.15 per barrel of total alkylate included in said aviation gasoline and amount to the following sums per gallon of 100 octane aviation gasoline:

| | Item 3 |
|---|---|
| For the period prior to the effective date of the first notification referred to in Section II(a) of the foregoing contract: | $0.0013 |
| For the period from the effective date of the first notification referred to in Section II(a) of the foregoing contract until the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.0013 |
| For the period after the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.0011 |

II. (B). In the event that during the term of the foregoing contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such alkylation process, shall be reduced below $0.15 per barrel with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices as set forth in Section IV of the foregoing contract for 100 octane aviation gasoline manufactured by Seller and





DECLASSIFIED
Authority NND 730034
By TM NARA, Date

delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "alkylation royalty sum" applicable thereto as set forth in Section II (A) of this Exhibit B, and an amount equal to such "alkylation royalty sum" multiplied by the factor $\frac{C}{D}$ where C equals the reduced running royalty per barrel that Seller is obligated to pay, and D equals fifteen cents ($0.15). As to any of said gasoline delivered to and paid for by Buyer under the foregoing contract at a price including said "alkylation royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "alkylation royalty sum" has been reduced.

III. (A). Seller further represents that the base prices for 100 octane aviation gasoline set forth in Section IV of the foregoing contract include certain "isomerization royalty sums" representing royalties which Seller is obligated to pay to its licensor for a certain isomerization process employed by Seller in the manufacture of said aviation gasoline; that said "isomerization royalty sums" are calculated at the rate of $0.05 per barrel of isobutane and isopentane produced by said process and used in the manufacture of said aviation gasoline and are as follows per gallon of 100 octane aviation gasoline:

| | Item 3 |
|---|---|
| For the period prior to the effective date of the first notification referred to in Section II(a) of the foregoing contract: | $0.0001 |
| For the period from the effective date of the first notification referred to in Section II(a) of the foregoing contract until the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.0002 |
| For the period after the effective date of the second notification referred to in Section II(a) of the foregoing contract: | $0.0002 |





DECLASSIFIED
Authority NND 730034
By JM NARA, Date

III. (B). In the event that during the term of said contract the running royalties per barrel that Seller has obligated itself to its licensor to pay for such isomerization process shall be reduced with respect to the 100 octane aviation gasoline manufactured by Seller and delivered under the foregoing contract, then the base prices of 100 octane aviation gasoline, as set forth in Section IV of said contract, manufactured by Seller and delivered thereunder, and as to which gasoline Seller's royalty payments to its said licensor are in accordance with said reduced royalty rate, shall be reduced in accordance herewith. The amount of said reduction in the base price of said gasoline shall be the difference between the "isomerization royalty sum" applicable thereto, as set forth in Section III(A) of this Exhibit B, and an amount equal to such "isomerization royalty sum" multiplied by the factor $\frac{E}{F}$ where E equals the reduced running royalty per barrel that Seller is obligated to pay, and F equals five cents ($0.05). As to any of said gasoline delivered to and paid for by Buyer under said contract at price including said "isomerization royalty sum", and as to which gasoline the base price is subject to reduction hereunder, Seller, within sixty (60) days of receipt by it of such payment from Buyer, shall refund to Buyer, without interest, an amount of money equal to the total number of gallons of said gasoline subject to the aforesaid reduced royalties, multiplied by an amount equal to the said difference by which said "isomerization royalty sum" has been reduced.

IV (A). In the event that any base price of said aviation gasoline is reduced under the provisions of this Exhibit B, and in the event that at any time prior to six (6) years following the date of termination, cancellation or expiration of the foregoing contract, a claim or claims, suit or suits for infringement with respect to the aforesaid catalytic cracking process or the products thereof, or with respect to the aforesaid alkylation process or the products thereof, or with respect to the aforesaid isomerization process or the products thereof, shall be made or brought against Seller, and if such suit or suits so brought, or any suit or suits brought on any such claim or claims so made, shall result in final adjudication or settlement which shall establish an obligation to be paid by Seller in satisfaction thereof, Buyer shall make payment to Seller as follows: The amount so payable by Buyer to Seller in each case shall in no event exceed whatever amount is the lesser of (1) the amount whereby Buyer's price for the total quantity of gasoline purchased under this contract subsequent to April 30, 1943





DECLASSIFIED
Authority NND 730 014
By TM NARA, Date

and involved in such claim or suit was reduced under this Exhibit B, or (2) the amount required to be paid in settlement or satisfaction of such claim or suit, above any portion thereof for which Seller is reimbursed by its licensor; it being expressly understood that all payments by Buyer to Seller (under this paragraph) shall be solely for the purpose of paying damages or other moneys applicable to the case, it being expressly understood that Seller's said obligation, as the term is used herein, shall not include any expenses of settlement (as distinguished from actual payments to the party or parties with whom settlement is made) or costs of litigation; provided, however, that with respect to such settlement no payment shall be made by Buyer to Seller unless Buyer shall first have given in writing its approval to such settlement; Buyer hereby agreeing that it will give its approval to any such settlement which, under the circumstances, appears to be reasonable.

IV (B). With respect to such claim or claims, suit or suits for infringement referred to in Section IV (A) hereof, Seller agrees that promptly upon receipt of notice by Seller of the making or institution of each such claim or suit, Seller will notify Buyer thereof. Under Seller's licenses covering said catalytic cracking process, said alkylation process and said isomerization process, respectively, Seller's licensors have certain rights and obligations concerning handling of such claims or suits. Subject to the approval of its respective licensors and to the extent that Seller has the right under its said licenses to do so, Buyer shall be permitted at its election to be represented in any such suit by counsel of its own choice and at its own expense and subject to such conditions and restrictions, if any, as Seller's licensors may specify.

IV (C). If an adjudication adverse to Seller has been made in any such suit by the court of record having primary jurisdiction thereof, and if no settlement approved by Buyer has been effected previously, and if election is made not to appeal from such adverse adjudication or to continue the defense of such suit, then Seller agrees that upon receiving notice, from its licensors or otherwise, of such events and decisions, it will promptly give notice thereof to Buyer; and Seller further agrees that, subject to the same conditions as those hereinabove specified in paragraph IV (B) hereof, Buyer at its election and at its own expense may continue the defense of such suit, file and perfect appeals to courts of higher jurisdiction, and do such other things as Buyer believes necessary or desirable to obtain a final adjudication or settlement of such suit, and in such event and





DECLASSIFIED
Authority NND-730 034
By TM NARA, Date

subject to the same conditions, Seller agrees that Buyer may use Seller's name for all proper purposes connected with the continuance of such suits and that it will cooperate fully with Buyer in any proper and legal manner necessary to aid Buyer in the furtherance of the defense of such suits, all of same, however, to be at Buyer's expense; it being further agreed that in the event Buyer elects to do any of the things covered by this paragraph IV (C), Buyer will indemnify and hold harmless Seller, its officers, agents and representatives from and against any and all liability, costs, damages, claims, judgments and obligations decreed by the court resulting therefrom over and above those to which Seller would have been liable had such actions and elections not been taken by Buyer.

V. Seller also represents that there have not been included in its computation of the base prices set forth in Section IV of the foregoing contract any patent royalties for processes employed by Seller in the manufacture of aviation gasoline hereunder other than those set forth in Sections I, II and III of this Exhibit B.

VI. Seller convenants that any "catalytic cracking royalty sum", any "alkylation royalty sum" and any "isomerization royalty sum" paid by it and included within the base prices set forth in Section IV of the foregoing contract, shall be paid in good faith only to third party or parties who, in Seller's judgment, are entitled to receive such royalties and to license the respective processes covered thereby.





DECLASSIFIED
Authority NND 730034
By TM NARA, Date

Contractor: Tide Water Associated Oil Company

EXHIBIT C

RENEGOTIATION PURSUANT TO SECTION 403 OF THE SIXTH SUPPLEMENTAL NATIONAL DEFENSE APPROPRIATION ACT, 1942, AS AMENDED.

A. Upon the written request of Defense Supplies Corporation at such period or periods when in the judgment of Defense Supplies Corporation the profits accruing under the contract of which this Exhibit is a part can be determined with reasonable certainty, the contract price shall be renegotiated to eliminate therefrom such amount as is found as a result of such renegotiation to represent excessive profits.

B. Any profits found as a result of such renegotiation to be excessive and not eliminated through reductions in the contract price hereunder or otherwise shall, as Defense Supplies Corporation may direct, (1) be retained by the Government from amounts otherwise due the contractor, or (2) be repaid by the contractor to the Government, if such excessive profits have been paid to the contractor.

C. The contractor shall require the insertion of the following provisions in each subcontract described in subparagraph F(2)(ii) of this Exhibit and in each subcontract for an amount in excess of $100,000 described in subparagraph F(2)(i) of this Exhibit, directly entered into by the contractor under this contract:

(1) Upon the written request of Defense Supplies Corporation at such period or periods when in the judgment of Defense Supplies Corporation the profits accruing under this contract can be determined with reasonable certainty, the contract price shall be renegotiated by Defense Supplies Corporation and ________ (Subcontractor) to eliminate therefrom such amount as is found as a result of such renegotiation to represent excessive profits.

(2) Any profits found as a result of such renegotiation to be excessive and not eliminated through reductions in the contract price hereunder or otherwise, shall, as Defense Supplies Corporation may direct, (i) be retained by ________ (Contractor) for the Government, or (ii) be repaid by ________ (Subcontractor) to the Government, if such excessive profits have been paid to ________ (Subcontractor).

(3) ________ (Contractor) is hereby relieved from any liability to ________ (Subcontractor) on account of any amount retained or repaid pursuant to paragraph (2) above.

(4) ________ (Subcontractor) shall, upon the direction of Defense Supplies Corporation, require the insertion in any subcontract made hereunder, of contract provisions conforming substantially to the provisions hereof.

(5) Any renegotiation hereunder shall be conducted pursuant to the provisions of Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended.

The contractor shall also require the insertion of the definitions which are contained in subparagraph F of this Exhibit in each such subcontract.





DECLASSIFIED Authority NND 730 034 By TM NARA, Date

D. Any profits under any subcontract hereunder which are found as the result of renegotiation to be excessive and which the contractor is directed by Defense Supplies Corporation to withhold from payments otherwise due the subcontractor and actually unpaid at the time of receipt of such direction, shall, as Defense Supplies Corporation may direct, (1) be retained by the Government from amounts otherwise due the contractor, or (2) be repaid by the contractor to the Government.

E. Any renegotiation under this Exhibit shall be conducted pursuant to the provisions of Section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended.

F. For the purpose of this Exhibit,

(1) The term "Defense Supplies Corporation" shall be deemed to include any authorized representative of Defense Supplies Corporation, and

(2) The term "subcontract" means (i) any purchase order or agreement to perform all or any part of the work or to make or furnish any article, required for the performance of any other contract or subcontract, unless exempted from the provisions of Section 403, as amended, under subsection (i) thereof, or (ii) any contract or arrangement (other than a contract or arrangement between two contracting parties, one of which parties is found by Defense Supplies Corporation to be a bona fide executive officer, partner, or full-time employee of the other contracting party), (a) any amount payable under which is contingent upon the procurement of a contract or contracts with Defense Supplies Corporation or of a subcontract or subcontracts thereunder, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts, or (b) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with Defense Supplies Corporation or a subcontract or subcontracts thereunder. The term "article", as used in this definition, includes any material, part, assembly, machinery, equipment, or other personal property.





DECLASSIFIED
Authority NND 730 034
By TM NARA Date

68486

GUARANTEE BY RECONSTRUCTION FINANCE CORPORATION

In consideration of the execution of the within contract and as an inducement to Tide Water Associated Oil Company to enter into said contract, Reconstruction Finance Corporation does hereby guarantee the full and complete performance of all of the terms and conditions of said contract on the part of Defense Supplies Corporation (a subsidiary of Reconstruction Finance Corporation) to be performed at the time and in the manner therein provided; it being further agreed that this guarantee shall cover and attach to any and all changes in, amendments of, or supplements to said contract which may be hereafter agreed upon between Defense Supplies Corporation and Tide Water Associated Oil Company, and the undersigned guarantor hereby approves and consents to any and all such changes in, amendments of, or supplements to said contract.

IN WITNESS WHEREOF, Reconstruction Finance Corporation has caused this Guarantee to be executed by its officers thereunto duly authorized as of May 19, 1943.

RECONSTRUCTION FINANCE CORPORATION

By (Sgd) Charles B. Henderson
Chairman

ATTEST: (SEAL)

(Sgd) A. T. Hobson
Secretary



DECLASSIFIED
Authority NND 730034
By TM NARA, Date 8/85

Nos. 00-55027 & 00-55077

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

RECEIVED
JUN 19 2000
PRT

UNITED STATES OF AMERICA,
Plaintiff-Appellant/Cross-Appellee,

STATE OF CALIFORNIA ex rel. CALIFORNIA DEPARTMENT OF HEALTH SERVICES; HAZARDOUS SUBSTANCE ACCOUNT AND HAZARDOUS CLEANUP FUND,
Plaintiffs/Cross-Appellees,

v.

SHELL OIL CO.; UNION OIL CO. OF CALIFORNIA; ATLANTIC RICHFIELD CO.; TEXACO, INC.,
Defendants-Appellees/Cross-Appellants,

LOS COYOTES ESTATES LTD; RAMPARTS RESEARCH & FINANCIAL CORP.; MCAULEY LCX CORP.,
Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

EXCERPTS OF RECORD

VOLUME I

LOIS J. SCHIFFER
Assistant Attorney General

JOSHUA M. LEVIN
MICHAEL J. ZEVENBERGEN
DAVID C. SHILTON
TODD S. KIM
Attorneys
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20026
(202) 514-2762

# TABLE OF CONTENTS

## Volume I

Deposition of Dr. Monroe Spaght (Jan. 28, 1992) (CR 101) . . . . . . . . . . . . . . . . . 1

Memorandum of Decision and Order (Sept. 28, 1993) (CR 228) . . . . . . . . . . . . . 6

Judgment (Sept. 28, 1993) (CR 229) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Executive Order No. 9276 (Dec. 2, 1942) (CR 295) (Companies' Ex. 5) . . . . . . 36

Executive Order No. 9024 (Jan. 16, 1942) (CR 295) (Companies' Ex. 6) . . . . . . 43

Contract Between DSC and ARCO (Feb. 3, 1942)
(CR 296) (Companies' Ex. 75) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Contract Between DSC and ARCO (Feb. 20, 1943)
(CR 296) (Companies' Ex. 76) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Contract Between DSC and Shell (May 1, 1943)
(CR 296) (Companies' Ex. 83) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Contract Between DSC and Shell (Apr. 10, 1942)
(CR 296) (Companies' Ex. 85) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Contract Between DSC and Texaco (Feb. 8, 1943)
(CR 296) (Companies' Ex. 86) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

Contract Between DSC and Union (Dec. 31, 1942)
(CR 296) (Companies' Ex. 87) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Contract Between DSC and Union (May 1, 1943)
(CR 296) (Companies' Ex. 88) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

Memorandum of Understanding on AGRP (July 24, 1942)
(CR 297) (Companies' Ex. 103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

Letter from PAW to WPB (Mar. 23, 1945) (CR 298) (Companies' Ex. 160) . . 220

History of the Chemicals Bureau of the WPB (Feb. 1946)
(CR 315) (U.S. Ex. 80) . . . . . . . . . . 221

District 5 Transportation Committee Minutes (Sept. 15, 1943)
(CR 315) (U.S. Ex. 81) . . . . . . . . . . 225

WPB Inorganic Acid Industry Advisory Committee Minutes
(Oct. 13, 1944) (CR 315) (U.S. Ex. 82) . . . . . . . . . . 238

Letter from Union to the Deputy Petroleum Coordinator for War
(Oct. 16, 1942) (CR 316) (U.S. Ex. 130) . . . . . . . . . . 243

<u>Volume II</u>

Stipulated Facts of the Parties (June 23, 1995) (CR 364) . . . . . . . . . . 247

Supplemental Stipulated Facts of the Parties (July 25, 1995) (CR 368) . . . . . . . 346

Memorandum of Decision and Order (Sept. 18, 1995) (CR 379) . . . . . . . . . . 349

Contract Between Shell and Eli McColl (June 23, 1942)
(CR 398) (U.S. Supp. Ex. 2) . . . . . . . . . . 369

Contract Between Shell and Eli McColl (June 23, 1943)
(CR 398) (U.S. Supp. Ex. 3) . . . . . . . . . . 376

Contract Between Shell and Eli McColl (June 30, 1944)
(CR 398) (U.S. Supp. Ex. 4) . . . . . . . . . . 383

Agreement Between Shell and Wilshire (Apr. 6, 1945)
(CR 398) (U.S. Supp. Ex. 43) . . . . . . . . . . 390

Preliminary Draft Pretrial Conference Order (Dec. 11, 1997) (CR 431) . . . . . . 392

Supplemental Stipulated Facts of the Parties
(Dec. 11, 1997) (CR 431 Ex. A) . . . . . . . . . . 402

Addendum to the Preliminary Pretrial Conference Order
(Feb. 17, 1998) (CR 453) . . . . . . . . . . 464

Volume III

Forecast of Operations of PAW After V-E Day (Oct. 1944)
(CR 457) (Companies' Ex. 484) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 471

Charts from Declaration of Robert Anderson (Feb. 16, 1995)
(CR 457) (Companies' Ex. 505) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475

Testimony of Eli McColl Before Los Angeles County Regional Planning
Commission (May 6, 1942) (CR 457) (Companies' Ex. 508) . . . . . . . . . . . . . . 499

Summary of Acid Sludge Deliveries to Shell Chemical
(CR 457) (Companies' Ex. 563) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 506

Charts from Declaration of Robert Anderson (Feb. 31, 1997)
(CR 465) (U.S. Ex. 1042) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Shell Memorandum Regarding Alkylation Sludge (Jan. 24, 1940)
(CR 459) (U.S. Ex. 1085) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 529

Chart: Shell Refinery Acid Use and Disposition (CR 455) (U.S. Ex. 1585) . . . 531

Chart: Good Correlation of Fresh Acid for Alkylation with Avgas Production
(CR 455) (U.S. Ex. 1586) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 532

Chart: Good Correlation of Acid Used for Alkylation with Avgas Production
(CR 455) (U.S. Ex. 1587) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 533

Chart: Refinery Acid Flow (CR 455) (U.S. Ex. 1588) . . . . . . . . . . . . . . . . . . . . 534

Chart: McColl Site Sludge from All Defendants (CR 455) (U.S. Ex. 1592) . . . 535

Chart: Sludge Production by All Defendants Weighted by Amount
Sent to McColl Site (CR 455) (U.S. Ex. 1593) . . . . . . . . . . . . . . . . . . . . . . . . 536

Chart: Poor Correlation of Sludge Production or Disposal with
Alkylation Acid Use (CR 455) (U.S. Ex. 1599) . . . . . . . . . . . . . . . . . . . . . . . . 537

Trial Transcript Excerpts (Feb. 1998) (CR 461–64, 467–68) . . . . . . . . . . . . . . 538

Memorandum of Decision and Order (Aug. 11, 1998) (CR 478) . . . . . . . . . . . . 577

Memorandum of Decision and Order (Nov. 2, 1998) (CR 487) . . . . . . . . . . . . 609

Final Judgment (Oct. 13, 1999) (CR 489) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 612

Notice of Appeal (Dec. 9, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 620

Trial Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 626

**CERTIFICATE OF FILING**

I certify that on September 1, 2006, the attached document was filed electronically. I understand that service is complete upon filing and that parties may access this filing through the Court's ECF system.

s/ Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
555 Eleventh Street, NW
Suite 750
Washington, DC 20004
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Vincent J. Colatriano
Nicholas A. Oldham
COOPER & KIRK, PLLC
555 Eleventh Street, N.W.
Suite 750
Washington, D.C. 20004
(202) 220-9600
(202) 220-9601 (fax)