FOR DEFENDANT ATLANTIC RICHFIELD COMPANY

Date: 16 Jun 94

SAH CRK

Robert J. Trunek
Vice President, Environment Health & Safety

Agent Authorized to Accept Service on Behalf of Atlantic Richfield Company:

R. Walter Simmons
Manager of Operations
Corporate Environmental Remediation
Atlantic Richfield Company
AP41125
515 South Flower Street
Los Angeles, California 90071

FOR DEFENDANT TEXACO, INC.

Date: ________________

J. Donald Annett
President, Environment Health & Safety Division

Agent Authorized to Accept Service on behalf of Texaco, Inc.:

Lowell N. Elsen
Legal Department
Texaco, Inc.
10 Universal City Plaza
Suite 1300
Universal City, California 91608

FOR DEFENDANT ATLANTIC RICHFIELD COMPANY

Date: ________________ ______________________________
Robert J. Trunek
Vice President, Environment Health & Safety

Agent Authorized to Accept Service on Behalf of Atlantic Richfield Company:

R. Walter Simmons
Manager of Operations
Corporate Environmental Remediation
Atlantic Richfield Company
AP41125
515 South Flower Street
Los Angeles, California 90071

FOR DEFENDANT TEXACO, INC.

Date: 5/31/94 J Donald Annett
jaw J Donald Annett
President, Environment Health & Safety Division

Agent Authorized to Accept Service on behalf of Texaco, Inc.:

Lowell N. Elsen
Legal Department
Texaco, Inc.
10 Universal City Plaza
Suite 1300
Universal City, California 91608

CERTIFICATE OF SERVICE BY MAIL

I, MARILEN ILISCUPIDES, declare:

That I am a citizen of the United States and a resident or employed in Los Angeles County, California; that my business address is Office of the United States Attorney, Room 7516, Federal Building, 300 North Los Angeles Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action.

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on November 18, 1994, I deposited in the United States mails in the Federal Building at 300 North Los Angeles Street, Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of: PARTIAL CONSENT DECREE AMONG PLAINTIFFS AND OIL COMPANY DEFENDANTS REGARDING CERTAIN COST CLAIMS

addressed to: SEE ATTACHED SERVICE LIST

at their last known addresses, at which place there is a delivery service by United States mail.

This Certificate is executed on November 18, 1994, at Los Angeles, California.

I declare under penalty of perjury that the foregoing is true and correct.

Marilen Iliscupides

MARILEN ILISCUPIDES

SERVICE LIST

Peter R. Taft
Munger, Tolles & Olson
355 S. Grand Avenue
35th Floor
Los Angeles, CA 90071-1560

Cynthia L. Burch
Allen, Matkins, Leck, Gamble & Mallory
515 South Figueroa Street
Eighth Floor
Los Angeles, CA 90071-3398

Jeffrey Wolin
Demetriou, Del Guercio, Springer & Moyer
Chase Plaza, 10th Floor
801 South Grand Avenue
Los Angeles, CA 90017

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural
Resources Division

JOSHUA M. LEVIN
MICHAEL ZEVENBERGEN
H. MICHAEL SEMLER
Environment & Natural
Resources Division
Environmental Defense Section
United States Department of
Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: 202-514-4198

NORA M. MANELLA
United States Attorney

LEON W. WEIDMAN
Assistant United States
Attorney
Chief, Civil Division

KURT ZIMMERMAN
Assistant United States
Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: 213-894-0474

RONALD L. OLSON
PETER R. TAFT
CARY B. LERMAN
CYNTHIA L. BURCH
MUNGER, TOLLES & OLSON
355 South Grand Avenue
Los Angeles, California
90071-1560
(213) 683-9100

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SHELL OIL COMPANY, et al.,<br><br>Defendants.<br><br>AND RELATED ACTIONS. | CASE NO. Civ. 91 0589 RJK(Ex)<br><br>**STIPULATED FACTS OF THE PARTIES RELATING TO PENDING MOTIONS FOR SUMMARY JUDGMENT AND RELATED MOTIONS**<br><br>Date: [No Hearing]<br>Time: [None]<br>Ctrm: Honorable Robert J. Kelleher |

321. Because of other uses of acid in the refinery and less efficient use of acid in alkylation at the start of the war, the actual growth of acid use was not as dramatic as the increase in aviation gasoline production. According to the Shell operating reports for its Los Angeles refineries, annual acid use went from 24 million pounds in 1941 to 120 million pounds at the peak in 1944, a five fold increase. [co105]

322. Sulfuric acid is used by refineries primarily as a catalyst or for treatment of product. Generally, sulfuric acid is not incorporated into products leaving the refinery. For example, during the war years at Shell's Los Angeles refinery, roughly 10% of acid was consumed within the refinery. Thus, virtually all the acid coming into the refinery must leave the refinery after use. [co106]

323. The Oil Companies' Southern California refineries generated two general types of sulfuric acid by-products during the war: "spent alkylation acid" and "acid sludge." Spent alkylation acid was 87% to 90% sulfuric acid by weight and could be reused and recycled within the refineries up to the limit of other processes that could use spent alkylation acid. [us299]

324. Acid sludge was different. It contained only 45% to 65% unreacted and reacted sulfuric acid by weight, and generally could not be put to further use within the refineries. [us300]

325. In 1941, 85% of the fresh sulfuric acid going into the Shell Los Angeles refineries was used for alkylation, a figure that reached 91% in 1944. Depending on the year, some or all of the spent alkylation acid was reused within the refinery to treat

other products, including motor gasoline, kerosene, lubricating oil, and aviation gasoline components. [co107]

326. Just before Pearl Harbor, the OPC initiated a sulfuric acid survey for "the determination of prospective requirements of refineries for sulphuric acid in view of the large required expansion of alkylation precesses." One of the six questions was: "5. Procedure for disposing of acid sludge if no acid recovery system in operation:" [co108]

327. A compilation of District Five results dated early January 1942, shows that eight refineries dumped acid sludge (including Richfield and Shell); three hauled it away, destination unknown; Texas Co. burned it; and Union replied, "Given away." [co109]

328. On August 8, 1942, an OPC national acid survey showed that every District in the nation dumped waste sulfuric acid and that 12 refineries in District 5 dumped waste acid including Richfield, Texaco, and Shell. [co110]

329. Fresh sulfuric acid was in short supply in California from the end of 1943 through the end of the war. Refinery spent alkylation acid could be a valuable commodity since, for many industrial processes, spent alkylation acid could substitute for fresh acid, thereby freeing up fresh acid for use in alkylation. For example, spent sulfuric acid could be used to treat other refinery products, to manufacture ammonium sulfate and superphosphates and to pickle steel. Sulfuric acid sludge could be used in the manufacture of ammonium sulfate although the demands were small. Spent alkylation acid and acid sludge could also be regenerated into fresh acid. However, acid sludge was

Department. We are well isolated, it must be accessible and it must be available."

McColl added that "we [i.e., he and the refiners he represented] knew that something like this would have to be done. That is why my committee instructed me to make a study to find something satisfactory to all the parties concerned." [cc154]

McColl Site Disposal

492. Eli McColl's permit from the City of Fullerton to dump acid sludge at the McColl Site was granted on June 8, 1942. [us493]

Production Of Waste Disposed At The McColl Site

493. Each of the Oil Company Crossclaimants entered into contracts to produce avgas and to sell it to the United States. The parties contemplated that the Oil Companies would expand their refining facilities. These expanded facilities included additional alkylation units which used substantial amounts of 98% sulfuric acid as a catalyst to produce alkylate, a major component of avgas. When sulfuric acid reached a concentration in the neighborhood of 87-90% in the alkylation unit, it no longer served its catalytic function and was replaced. Portions of this "spent alkylation acid" were used in acid treating units in the refinery. The result was the production of acid sludge, a byproduct that was, among other disposal methods, dumped at the McColl Site as found by this Court. Some spent alkylation acid was also dumped at the McColl Site between late 1944 and early 1945 when Stauffer's new acid reprocessing plant at Dominguez experienced problems. [ccl]

494. The alkylation process itself did not generate acid sludge. Rather, it generated spent alkylation acid of approximately 87-90% strength. [us437]

495. Acid sludge was generated in acid treating units. [us438]

496. Most of the acid waste at the McColl Site began as fresh sulfuric acid of approximately 98% strength that was used in the alkylation units to produce alkylate for aviation gasoline. The "spent alkylation acid" that resulted from the alkylation process was of approximately 87-90% strength. Much of the spent alkylation acid generated at the Oil Companies' facilities was reprocessed at plants built by Stauffer Chemical Company and General Chemical Company. Some of the spent alkylation acid was used within the defendants' refineries to treat other petroleum fractions, including motor gasoline (both civilian and military), kerosene and other products. Many of these other petroleum fractions were not used in aviation gasoline. The acid sludge that resulted from acid treating these other petroleum fractions was between 35% and 65% strength. [us432]

497. As described in Stipulation 496, most of the acid waste dumped at the McColl Site was used in the Oil Company Defendants' refineries for both aviation gasoline production and the production of other products. Thus, any given barrel of waste dumped at the McColl Site likely contained contamination from both aviation gasoline production and production of other products. [us433]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | No. 06-141 C (Senior Judge Smith) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFFS'**
**<u>PROPOSED FINDINGS OF UNCONTROVERTED FACT</u>**

Pursuant to Rule 56(h)(2) of this Court's Rules ("RCFC"), defendant, the United States, respectfully responds proposed findings filed by plaintiffs with their motion for partial summary judgment as to liability.

1. On April 10, 1942, Shell Oil Company, Incorporated, and the United States, through the Defense Supplies Corporation ("DSC"), entered into a contract for the sale and purchase of large volumes of 100-octane aviation gasoline ("Avgas"). Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (April 10, 1942) ("1942 Shell Contract"), Pl. App. 1-24.

<u>Response:</u>

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

2. On May 1, 1943, Shell Oil Company, Incorporated, and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract