**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., Plaintiffs, | |
| v. | Case No. 06-CV-141 (Senior Judge Smith) |
| UNITED STATES OF AMERICA, Defendant. | |

**PLAINTIFFS' BRIEF IN SUPPORT OF**
**<u>THEIR MOTION FOR SUMMARY JUDGMENT</u>**

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Michael Weitzner
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

June 20, 2008

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

INDEX TO APPENDIX ........ iv

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 5

I. THE GENERATION OF SULFURIC ACID WASTE IN AVGAS PRODUCTION ........ 5

II. THE COSTS INCURRED BY THE OIL COMPANIES ........ 7

STANDARD OF REVIEW ........ 9

ARGUMENT ........ 9

ALL OF THE OIL COMPANIES' CERCLA CLEANUP COSTS WERE INCURRED BY REASON OF THEIR PRODUCTION OF THEIR PRODUCTION OF AVGAS UNDER THE CONTRACTS ........ 9

A. This Court's Prior Ruling Forecloses the Governments' Causation Argument ........ 9

B. Even if This Court Had Not Previously Resolved the Issue, the Government's Stipulations and the California District Court's Findings Require the Conclusion that the Oil Companies Incurred All of the CERCLA Costs by Reason of Avgas Production ........ 12

C. The Oil Companies Are Entitled to Recovery of All of Their Costs Because They Indisputably Would Not Have Been Incurred But For the Production of Avgas Under the Contracts ........ 18

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Cases** **Page/s**

*Bingaman v. Dep't of the Treasury*, 127 F.3d 1431, 1439 (Fed. Cir. 1997) ...........14

*Citizens Fed. Bank v. United States*, 66 Fed. Cl. 173, 185 (2005) ..........................17

*Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365-66 (Fed. Cir. 2000)..........14

*Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584, 589 (1st Cir. 2004)............18

*Rappold v. Indiana Lumbersmen's Mut. Ins. Co.*, 431 S.E.2d 302, 304 (Va. 1993). ..........................................................................................19

*Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002)..........................17

*Shell Oil Co. v. United States*, 80 Fed. Cl. 411, 413 (2008)............................ *passim*

*Spiritas Co. Insurance Co. of the State of Pa.*, 2006 U.S. Dist. LEXIS 27498 (E.D. Mo. May 9, 2006) ..........................................................19

*United States v. Mendoza*, 464 U.S. 154, 158 (1984).............................................13

*United States v. Rosa-Ortiz*, 348 F.3d 33, 38 (1st Cir. 2003).................................18

*United States v. Shell Oil Co.*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778 (C.D. Cal. Sept. 18, 1995)..............................................................3, 5, 11, 12

*United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1026 (C.D. Cal. 1998).. *passim*

*United States v. Shell Oil Co.*, 294 F.3d 1045, 1051 (9th Cir. 2002)........4, 6, 10, 14

**Other**

Contract Settlement Act of 1944, 41 U.S.C. § 106(f)...........................................3, 7

E. ALLEN FARNSWORTH, CONTRACTS § 12.12 (3d ed. 1999) .................................17

RESTATEMENT OF CONTRACTS (SECOND) § 350(1) (1981) .....................................17

WEBSTER'S THIRD NEW INT'L DICTIONARY .........................................................18

# Index of Appendix

Partial Consent Decree Among Plaintiffs and Oil Company Defendants Regarding Certain Cost Claims and Order (12/9/1999) .......................................... 1

Stipulated Facts of the Parties Relating to Pending Motions for Summary Judgment and Related Motions (¶ 323-24, 493-96) (6/23/1995) ............................ 33

Defendant's Response to Plaintiffs' Proposed Findings of Uncontroverted Fact (¶ 12, 23-24)(8/11/2006)........................................................................ 38

Final Judgment Pursuant to Rule 54(b) (10/13/1999) ............................................ 41

Second Five-Year Review Report for McColl Superfund Site (pgs. 14-15) (9/25/2007).......................................................................................................... 49

Declaration of Edmond Bourke & Exhibit A (6/20/2008) ..................................... 52

Summary of Interest Calculation on Pre-1998 Stipulated Costs............................. 58

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., Plaintiffs, | ) | |
| v. | ) | Case No. 06-CV-141<br>(Senior Judge Smith) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF**
**<u>THEIR MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc. (collectively, the "Oil Companies") respectfully submit this brief in support of their motion for summary judgment.

## INTRODUCTION

During World War II, the United States entered supply contracts with the Oil Companies for the production of massive quantities of 100-octane aviation fuel, colloquially known as avgas. The production of avgas necessarily resulted in two related hazardous waste byproducts – spent alkylation acid and acid sludge – some of which was sent to the McColl Superfund site in Fullerton, California ("McColl Site"). Decades later, the Oil Companies were held liable in a federal district court action brought by the United States and the State of California under the Comprehensive Environmental Response, Compensation and Liability Act of 1978, 42 U.S.C.

§§ 9601, *et seq.* ("CERCLA"), for the costs of cleaning up the waste generated during the production of the avgas.

The Oil Companies brought this action seeking reimbursement of those costs from the United States. Plaintiffs based their claim in this Court on a provision of the avgas supply contracts requiring the Government to reimburse the Oil Companies for "any new or additional … charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of [avgas]." *Shell Oil Co. v. United States*, 80 Fed. Cl. 411, 413 (2008) (quoting pertinent contractual provision).

On cross-motions for summary judgment, this Court held that "the reimbursement clause of the contracts encompasses costs for the CERCLA cleanup as those costs were 'charges' and [they were incurred] 'by reason of' production of the avgas." *Id.* at 418. The Court also rejected the Government's argument that the Anti-Deficiency Act, Pub. L. 59-28, 34 Stat. 27, 49 (1906), barred the reimbursement sought by the Oil Companies. *See id.* at 418-20. Accordingly, the Court granted the Oil Companies' motion for summary judgment as to liability. Thus, the sole remaining issue is the amount of damages.

As explained below, there is no dispute as to the total costs incurred to date by the Oil Companies in connection with the clean up of the McColl Site. The vast majority of the clean up effort took place in the 1990s, and the parties stipulated in the California CERCLA action to the total costs incurred through October 1998. Since 2002, the Oil Companies have incurred additional expenses operating, maintaining, and monitoring the remedy implemented in the 1990s ("OM&M expenses"), and the Government has not disputed these expenses either. Nor can there be any dispute on the amount of interest owed on these sums: Section 106(f) of the

Contract Settlement Act of 1944, 41 U.S.C. § 106(f), mandates the payment of simple interest at 2.5 percent.

Nevertheless, the Government has taken the position that the Oil Companies are not entitled to recover all of the costs they incurred cleaning up the McColl Site. Specifically, the Government contends that the Oil Companies are not entitled to recover the costs associated with cleaning up some of the acid sludge at the McColl site. As this Court has previously recognized, however, "it is undisputed that the relevant hazardous substances, '*acid sludge and alkylation acid*, necessarily resulted from the production of avgas.' " *Shell*, 80 Fed. Cl. at 417 (quoting *United States v. Shell Oil Co.*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778 (C.D. Cal. Sept. 18, 1995) at *7) (emphasis added). The Government nonetheless contends that the costs associated with cleaning up some of the acid sludge were not incurred "by reason of" the production of avgas because some of the acid sludge arising originally from the production of avgas was then reused in other products before being dumped at the McColl Site.

As explained below, we respectfully submit that, fairly read, this Court's liability ruling has already resolved this question against the Government. *See Shell*, 80 Fed. Cl. at 416-18. The issue was raised (albeit briefly and in passing) in the liability summary judgment briefing, and in the course of holding that the Oil Companies had demonstrated that the cleanup costs were incurred "by reason of" the production of avgas, the Court specifically described "the relevant hazardous substances" as consisting of both " 'acid sludge and alkylation acid.' " *Id*. at 417 (citation omitted). Accordingly, this Court concluded its analysis of the contract by quoting and adopting the district court's finding that " '100 percent of the non-benzol waste at the McColl site is attributable to the avgas program.' " *Id*. (quoting *United States v. Shell Oil Co.*, 13 F.

Supp. 2d 1018, 1026 (C.D. Cal. 1998), *aff'd in part and rev'd in part on other grounds*, 294 F.3d 1045 (9th Cir. 2002).

Alternatively, even if Court's opinion did not reach the Government's argument, the undisputed facts established by stipulation in the underlying CERCLA litigation compel the conclusion that cost of cleaning up the acid sludge arose "by reason of" the production of avgas (just as the cost of cleaning up the spent alkylation acid did). There is no dispute that acid sludge originated as spent alkylation acid created during the production of avgas, and the reuse in the manufacture of other products mitigated the environmental damage by lowering the acid content of the waste. This mitigating reuse prior to disposal cannot change the fact that the waste existed "by reason of" the production of avgas.

As the California district court found based on the stipulated record before it: "one important fact is clear: the primary contaminant at the McColl Site is the sulfuric acid. This acid would be present in the same (or slightly greater) quantities irrespective of whether the Oil Companies had chosen to make secondary use of the acid for non-avgas products." *Shell*, 13 F. Supp. 2d at 1026. Accordingly, the court concluded that "100 percent of the non-benzol waste [i.e., all of the spent alkylation acid and acid sludge] at the McColl Site is attributable to the avgas program." *Id*.; *see also id*. at 1023 (both the non-benzol acid sludge and the spent acid alkylation "can be traced to the production of avgas").

These findings foreclose the Government's attempt to evade its contractual responsibility to reimburse all of the costs incurred by the Oil Companies in support of our Nation's efforts to win World War II. As this Court well put the matter, "[t]o now refuse to pay costs imposed by supporting the war effort on behalf of the United States does not befit the honor of our Nation." *Shell*, 80 Fed. Cl. at 417.

## STATEMENT OF FACTS

### I. THE GENERATION OF SULFURIC ACID WASTE IN AVGAS PRODUCTION

Avgas was a blend of several different chemical elements, the production of which necessarily produced sulfuric acid waste. *See, e.g.*, *Shell*, 1995 U.S. Dist. LEXIS 19778, at *7. Specifically, "[t]wo byproducts, acid sludge and spent alkylation acid, necessarily resulted from the production of avgas." Gov't SJ Liability Fact Resp. ¶ 12 (quoting *Shell*, 1995 U.S. Dist. LEXIS 19778, at *7), Pl. Damages SJ App. 39; *see also* Stipulations between the United States and the Oil Companies in *United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.) ("Stipulation") ¶¶ 323, 493-96, Pl. Damages SJ App. 34.[1] The Oil Companies' refineries "used substantial amounts of 98% sulfuric acid as a catalyst to produce alkylate, a major component of avgas." Stipulation ¶ 493, Pl. Damages SJ App. 36. As the alkylate was produced, the concentration of the sulfuric acid would be reduced, and when it "reached a concentration in the neighborhood of 87-90% in the alkylation unit, it no longer served its catalytic function and was replaced." *Id.*

To the extent possible, this "spent alkylation acid" was then "used in acid treating units in the refinery, … [resulting in] the production of acid sludge." *Id.* These acid treating units used spent alkylation acid in "the acid treatment of avgas base stocks to remove sulfur compounds and thus improve the quality of the stocks." *Shell*, 13 F. Supp. 2d at 1024. Spent alkylation acid was also used for "the acid treatment of certain components before they entered the alkylation process [i.e., the process of producing alkylate which composed 25 to 40 percent of the avgas] in order to remove impurities and improve their quality." *Id.* Finally, some of the spent alkylation

[1] The materials submitted in support of the Oil Companies' motion for summary judgment will be filed herewith in Plaintiffs' Appendix in Support of Their Motion for Summary Judgment, which will be cited as "Pl. Damages SJ App."

acid was reprocessed and reused in the production of other products such as motor gasoline and kerosene. Stipulation ¶ 496, Pl. Damages SJ App. 37. By 1944, "the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries, and the facilities for reprocessing this acid were insufficient. When the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl site." *Shell*, 294 F.3d at 1050-51; *see also Shell*, 80 Fed. Cl. at 417 (same).

All of the refinery uses of spent alkylation acid produced acid sludge. *Shell*, 13 F. Supp. 2d at 1024. "The acid sludge that resulted from acid treating these other petroleum fractions [i.e., the other non-avgas products produced using spent alkylation acid arising from the production of avgas] was between 35% and 65% strength." Stipulation ¶ 496, Pl. Damages SJ App. 37. The acid sludge "generally could not be put to further use within the refineries," Stipulation ¶ 324, Pl. Damages SJ App. 34-35, and much of it was dumped at the McColl site. Stipulation ¶ 493, Pl. Damages SJ App. 34.

The Government stipulated in the California CERCLA action, and has admitted again in this Court, that "[m]ost of the acid waste at the McColl Site began as fresh sulfuric acid … that was used in the alkylation units to produce alkylate for [avgas]." Stipulation ¶ 496, Pl. Damages SJ App. 37; Gov't SJ Liability Fact Resp. ¶ 23, Pl. Damages SJ App. 40. The Government has further admitted that the remaining waste was related to benzol production for which the Government has already been held liable (and thus is not at issue in this case as the Oil Companies did not bear the cost of cleaning up the benzol waste). Gov't SJ Liability Fact Resp. ¶ 24, Pl. Damages SJ App. 40; *see also United States v. Shell Oil Co.*, 294 F.3d 1045, 1051 (9th Cir. 2002); *Shell*, 13 F. Supp. 2d at 1023.

Based on this evidence, the district court in the CERCLA case found that the quantity of sulfuric acid waste at the McColl Site – both the spent alkylation acid and the acid sludge – was "the same (or slightly greater) … irrespective of whether the Oil Companies had chosen to made secondary use of the acid for non-avgas products." 13 F. Supp. 2d at 1026. The court found that there was no "persuasive evidence that the secondary use of the spent alkylation acid substantially aggravated the waste cleanup problems at the McColl Site beyond what they would have been in the absence of that secondary use …." *Id* . Accordingly, the court concluded that "100 percent of the non-benzol waste [i.e., both the spent alkylation acid and the acid sludge] at the McColl Site is attributable to the avgas program." *Id*.; *see also id*. at 1023 (both the non-benzol acid sludge and the spent acid alkylation "can be traced to the production of avgas").

## II. THE COSTS INCURRED BY THE OIL COMPANIES

The parties have previously stipulated that "the Oil Companies' total claimed response costs (excluding interest but including payments made by the Oil Companies to Plaintiffs) through October 31, 1998 consists of the sum of $64,219,514.46." Stipulation dated September 30, 1999 in *United States, et al. v. Shell Oil Company, et al.*, No. CIV 91 0589 RJK (C.D. Cal.), at 1, Doc. No. 489, Pl. Damages SJ App. 46.

In addition, the Oil Companies are entitled to recover statutory simple interest at 2.5 percent pursuant to § 106(f) of the Contract Settlement Act, 41 U.S.C. § 106(f). Interest on $18 million of this sum began to run no later than January 1, 1995 since the Oil Companies paid that amount to the United States and California on or about December 12, 1994 in accordance with a Partial Consent Decree entered on that date. *See* Partial Consent Decree, Pl. Damages SJ App. 1. Interest on the remainder began to run in November 1997 since that is when the Environmental Protection Agency concluded that "construction had been completed according to specifications

and remediation had been successfully implemented." Second Five-Year Review Report for McColl Superfund Site (Sept. 25, 2007) at 14, Pl. Damages SJ App. 50. Through July 1, 2008, interest accrued on the $64,219,514.46 expenses incurred totals $18,400,203.86, and interest continues to accrue at rate of $133,790.66 per month. *See* Summary of Interest Calculation on Pre-1998 Stipulated Costs, Pl. Damages SJ App. 58.

Between 1998 (when the district court held the Government 100 percent liable for the McColl Site clean up costs) and 2002 (when the Ninth Circuit reversed), the Oil Companies incurred no additional clean up costs. Beginning in November 2002, the Oil Companies have incurred OM&M expenses in connection with the work done by their contractor, C2REM, Inc. *See* Declaration of Edmund Bourke ("Bourke Decl.") ¶ 5, Pl. Damages SJ App. 53. To date, the Oil Companies have paid C2REM invoices totaling $1,669,623.31. Bourke Decl. ¶ 9 & Exhibit A, Pl. Damages SJ App. 53. Interest accrued on this amount totals $120,986.81. Bourke Decl. ¶ 11 & Exhibit A, Pl. Damages SJ App. 53. In addition, the Oil Companies have paid at total of $118,800 to McAuley LCX for surface maintenance and site security. Bourke Decl. ¶ 13 & Exhibit A, Pl. Damages SJ App. 53; *see also* Second Five-Year Review Report for McColl Superfund Site (Sept. 25, 2007) at 15, Pl. Damages SJ App. 51. Interest accrued on these expenses through June 30, 2008 totals $7,635.21. Bourke Decl. ¶ 14 & Exhibit A, Pl. Damages SJ App. 53. The Oil Companies continue to incur monthly expenses for the work done by C2REM, and interest continues to accrue on both past and current expenses.

In total, the Oil Companies have incurred $84,536,763.65 in total costs and statutory interest through June 30, 2008. The Oil Companies allocated these costs among themselves as follows:

| | |
|---|---|
| Shell | 58.58 percent |
| Union | 18.94 percent |
| Arco | 18.94 percent |
| Texaco | 3.54 percent |

*See* Bourke Decl. ¶ 16, Pl. Damages SJ App. 54.

**STANDARD OF REVIEW**

Summary judgment is appropriate where, as here, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c) (summary judgment warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

**ARGUMENT**

**ALL OF THE OIL COMPANIES' CERCLA CLEANUP COSTS WERE INCURRED BY REASON OF THEIR PRODUCTION OF AVGAS UNDER THE CONTRACTS.**

The Government argues that the Oil Companies did not incur the costs associated with the clean up of some of the acid sludge "by reason of" the production of the avgas based on the fact that some of the spent alkylation acid arising from avgas production was reprocessed and reused in the production of non-avgas products such as motor gasoline and kerosene, thereby producing some of the acid sludge dumped at the McColl Site. This argument is foreclosed both by this Court's prior ruling and by the Government's stipulations and the ruling of the district court in the CERCLA action.

**A. This Court's Prior Ruling Forecloses the Government's Causation Argument.**

During the course of the liability summary judgment briefing, the Government admitted that it was "literally uncontroverted" that all of the acid waste at the McColl site other than the benzol waste for which the Government has previously been found liable " 'began as fresh

sulfuric acid … that was used in the alkylation units to produce alkylate for [Avgas].' " Gov't SJ Liability Fact Resp. ¶ 23, Pl. Damages SJ App. 40 (quoting Stipulation ¶ 496, Pl. Damages SJ App. 37); *see also* Gov't SJ Liability Fact Resp. ¶ 24, Pl. Damages SJ App. 40 (admitting that "remaining acid waste at the McColl Site was related to benzol production"). But, the Government argued, this statement of fact was "incomplete and potentially misleading" because "[a] majority of the total waste discovered at the McColl site 'was acid sludge resulting from the chemical treatment of <u>non-avgas refinery products</u> using spent alkylation acid.' " Gov't SJ Liability Fact Resp. ¶ 23, Pl. Damages SJ App. 40 (quoting *Shell*, 294 F.3d at 1051 (emphasis added by the Government)).

The Oil Companies responded to this argument in an extensive footnote in their reply brief, pointing out that the secondary use of the waste arising from production of the avgas mitigated the extent of the environmental harm and thus did not, and could not, break the causal chain. Plaintiffs' Reply Brief in Support of their Cross-Motion for Partial Summary Judgment, Doc. No. 19-1, at 10, n.4. The Oil Companies emphasized the district court's finding that " 'one important fact is clear: the primary contaminant at the McColl Site is the sulfuric acid. This acid would be present in the same (or slightly greater) quantities irrespective of whether the Oil Companies had chosen to make secondary use of the acid for non-avgas products.' " *Id*. (quoting *Shell*, 13 F. Supp. 2d at 1026). The Government's acid sludge argument, the Oil Companies argued, could not be reconciled with the district court's conclusion that " '100 percent of the non-benzol waste at the McColl site is attributable to the avgas program,' notwithstanding the fact that some acid sludge resulted from the treatment of non-avgas products using spent alkylation acid that was itself a product of avgas production." *Id*. (quoting *Shell*, 13 F. Supp. 2d at 1026).

With the issue thus joined, the Court issued its liability decision in favor of the Oil Companies. In the course of its opinion, the Court held that "the only connection between the costs and contract performance specified in the contract is that the Oil Companies must incur the costs 'by reason of' the production of avgas in performance of their contracts." *Shell*, 80 Fed. Cl. at 416. The Court ruled further that "the phrase 'by reason of' means 'because of' as used in these contracts," thus establishing a requirement that "the costs [be] causally related to performance of the Avgas contracts." *Id*. The Court declined to pass upon the Government's argument that "by reason of" established a proximate cause standard rather than simply a but-for causation standard: "Even if the contract is interpreted to require a showing that the Oil Companies' avgas production proximately caused them to incur the CERCLA costs, the undisputed facts show that this standard has been satisfied." *Id*. at 417.

The Court's opinion clearly extended this conclusion to *all* of the CERCLA costs – both those arising from the disposal of the spent alkylation acid and those arising from the disposal of the acid sludge. In supporting its conclusion that the Oil Companies' avgas production proximately caused them to incur the CERCLA costs, the Court emphasized that "it is undisputed that the relevant hazardous substances, '*acid sludge and alkylation acid*, necessarily resulted from the production of avgas.' " *Id*. (quoting *Shell*, 1995 U.S. Dist. LEXIS 19778, at *7) (emphasis added). And the Court closed its analysis of the contract by quoting the district court's finding that " '100 percent of the non-benzol waste at the McColl site is attributable to the avgas program.' " *Id*. (quoting *Shell*, 13 F. Supp. 2d at 1026). Accordingly, this Court concluded that "the reimbursement clause of the contracts encompasses costs for the CERCLA cleanup as those costs were 'charges' and 'by reason of' production of the avgas." *Id*. at 418.

Fairly read, we respectfully submit that this Court's opinion forecloses the Government's argument that the costs associated with the clean up of the acid sludge were not incurred "by reason of" the production of avgas. To be sure, the Court did not expressly reference the Government's assertion of a distinction between the acid sludge and the spend alkylation acid. But in holding that the CERCLA clean up costs were proximately caused by the Oil Companies' avgas production, the Court quoted and adopted the California district court's findings, based on the parties' stipulations, that (i) both of the relevant sulfuric acid wastes, "spent alkylation acid and acid sludge, necessarily resulted from the production of avgas"; and (ii) "100 percent of the non-benzol waste at the McColl site is attributable to the avgas program."

### B. Even if This Court Had Not Previously Resolved the Issue, the Government's Stipulations and the California District Court's Findings Require the Conclusion that the Oil Companies Incurred All of the CERCLA Costs By Reason of Avgas Production.

The Government has acknowledged the following facts to be uncontroverted:

- " 'Two byproducts, acid sludge and spent alkylation acid, necessarily resulted from the production of avgas.' " Gov't SJ Liability Fact Resp. ¶ 12, Pl. Damages SJ App. 39 (quoting *Shell*, 1995 U.S. Dist. LEXIS 19778, at *7); *see also* Stipulation ¶¶ 323, 493-96, Pl. Damages SJ App. 34, 36-37.

- " 'Most of the acid waste at the McColl Site began as fresh sulfuric acid … that was used in the alkylation units to produce alkylate for [Avgas],' " Gov't SJ Liability Fact Resp. ¶ 23 (quoting Stipulation ¶ 496, Pl. Damages SJ App. 37), and "[t]he remaining acid waste at the McColl Site was related to benzol production" for which the Government has already been liable. Gov't SJ Liability Fact Resp. ¶ 24, Pl. Damages SJ App. 40.

Thus, there is no dispute that *all* of the non-benzol acid waste at the McColl Site – both the spent alkylation acid and the acid sludge – originated from the production of avgas. As we understand its position, the Government does not deny that, under this Court's liability ruling, it must reimburse the Oil Companies for the cost of cleaning up all of the spent alkylation acid at the McColl Site. But the Government claims that it need not reimburse the Oil Companies for

the cost of cleaning up the acid sludge that resulted from the Oil Companies' re-use of spent alkylation acid (which had been generated in the production of avgas) in the production of non-avgas products.[2] This argument fails for multiple reasons.

*First*, the California district court has found that the quantity of sulfuric acid waste at the McColl Site – both the spent alkylation acid and the acid sludge – was "the same (or slightly greater) … irrespective of whether the Oil Companies had chosen to made secondary use of the acid for non-avgas products." *Shell*, 13 F. Supp. 2d at 1026. The court found that there was no "persuasive evidence that the secondary use of the spent alkylation acid substantially aggravated the waste cleanup problems at the McColl Site beyond what they would have been in the absence of that secondary use …." *Id* . Accordingly, the court found that "100 percent of the non-benzol waste [i.e., both the spent alkylation acid and the acid sludge] at the McColl Site is attributable to the avgas program." *Id*.; *see also id*. at 1023 (both the non-benzol acid sludge and the spent acid alkylation "can be traced to the production of avgas").

These findings are binding on the Government as a matter of issue preclusion (or collateral estoppel, as it was once known). It is settled that "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464

[2] Not all of the acid sludge at the McColl Site was the product of re-use in the production of non-avgas products. Some of "spent alkylation acid" was used in "the acid treatment of avgas base stocks to remove sulfur compounds and thus improve the quality of the stocks." *Shell*, 13 F. Supp. 2d at 1024. Spent alkylation acid was also used for "the acid treatment of certain components before they entered the alkylation process [i.e., the process of producing alkylate which composed 25 to 40 percent of the avgas] in order to remove impurities and improve their quality." *Id*. Presumably, the Government does not contest its liability with respect to acid sludge thus generated because these re-uses were also integral to the production of avgas. Rather, we understand the Government's argument to be limited to the acid sludge arising from the reprocessing of spent alkylation acid (itself produced in the production of avgas) for reuse in the production of non-avgas products such as motor gasoline and kerosene. *See* Stipulation ¶ 496, Pl. Damages SJ App. 37.

U.S. 154, 158 (1984). This doctrine applies in full against the United States where, as here, "the Government is litigating the same issue with the same party …. [W]here the parties are the same, estopping the Government spares a party that has already prevailed once from having to relitigate …." *Id*. at 164; *see also Bingaman v. Dep't of the Treasury*, 127 F.3d 1431, 1439 (Fed. Cir. 1997) (same). The doctrine of issue preclusion will bar re-litigation when four pre-requisites are satisfied: "(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365-66 (Fed. Cir. 2000).

Prerequisites (1), (2), and (4) are plainly satisfied here – the California district court's finding that 100 percent of the non-benzol acid waste was attributable to avgas production is obviously at issue in this case, the issue was clearly actually litigated in the CERCLA case, and the Government unquestionably had a full and fair opportunity to litigate the issue. The third pre-requisite is also satisfied here because the court's finding was necessary to the final judgment in the CERCLA case. To be sure, on the Government's appeal, the Ninth Circuit reversed the district court's ruling that the United States was liable as an "arranger" for the non-benzol waste. *See Shell*, 294 F.3d at 1048-49 (summarizing rulings). As a result, the Court of Appeals did not directly address the district court's allocation of liability for the cleanup of the non-benzol waste at issue in this case. *Id.* at 1059. But the underlying findings were nevertheless necessary to the Ninth Circuit's decision to affirm the trial court's allocation of 100 percent of the benzol-related waste cleanup costs to the United States.

The court held that although the "analysis in *Shell III* [i.e., the 1998 post-trial allocation opinion] was focused on the non-benzol [related] waste," the district court was "entirely

justified" in "explicitly extend[ing] its *Shell III* analysis to the benzol waste." *Id.* at 1060. Moreover, "to the degree that the equitable factors support allocation of the cleanup costs to the United States with respect to the non-benzol waste, where the arranger status of the United States was disputed, such factors are even stronger with respect to the benzol waste, where the United States concedes that it was an arranger." *Id.* Accordingly, the Ninth Circuit expressly upheld the findings that led the district court to allocate 100 percent of the non-benzol related cleanup costs to the Government even though it had reversed the judgment as to those costs, and those findings were necessary to the judgment allocating 100 percent of benzol related cleanup costs to the Government. *Id.*

*Second*, even if the Government was not barred from relitigating the question, the CERCLA district court was clearly correct. Again, it is undisputed that *all* of the waste originated in the production of avgas. As this Court recognized in its prior opinion, the costs associated with cleaning up the McColl Site were incurred "by reason of" the production of avgas because "the fact remains that the production of avgas necessarily entailed the creation of the waste, and the Oil Companies had no alternative means available for disposing of it." *Shell*, 80 Fed. Cl. at 417. The intermediate re-use of some of the waste created by avgas production in the production of other products in an effort to mitigate the waste that was ultimately dumped does not change the fact that the waste came into being "because of," *see id*. at 416, the production of avgas and the Oil Companies had no other means of disposing of it. The re-use in other products merely delayed (and somewhat abated) what was inevitable given the massive production of avgas and the correspondingly massive creation of sulfuric acid waste. As this Court put it, "the only alternative to dumping the waste" – including the acid sludge that

originated as spent alkylation acid from the production of avgas and then was re-used in other non-avgas products – was "the reduction or halting of avgas production." *Id*. at 417.

To the extent the Oil Companies might have produced the non-avgas products and thus generated some acid waste absent their contracts with the Government, their existing treatment facilities were more than sufficient such that there would have been no need to dump any waste at the McColl Site. As this Court recognized, "[t]he huge volume of avgas required by the Armed Forces resulted in a correspondingly huge volume of acid waste that overwhelmed existing treatment facilities." *Id*. (citing Government Stipulations). Indeed, the California district court found that "[a]s a by-product of the enormous volume of fuel produced and acid used, the Oil Companies were confronted with quantities of spent alkylation acid and acid sludge that were too great to be reused, treated or disposed of under then-existing circumstances." *Shell*, 13 F. Supp. 2d at 1023. As a direct result, the waste was dumped at the McColl Site. *Id*. In contrast, "[p]rior to World War II, waste had been transported to and acceptably disposed of at other sites" that could handle the considerably lower volume. *Id*., n.8. Moreover, as a result of the avgas production contracts, "[t]he Companies had massive surpluses of spent alkylation acid that they would not have had but for the avgas program. It is surely the case that much of the acid treating of non-avgas products, acid treating that often was not necessary but merely preferable, occurred solely because the acid was on hand and had to be put to some use or dumped." *Id*. at 1026.

*Third*, the Government cannot deny that the re-use of some of spent alkylation acid originally generated by the production of avgas in the production of non-avgas products served to *mitigate* environmental harm inflicted by the dumping of the acid waste. The spent alkylation acid had "a concentration in the neighborhood of 87-90%," Stipulation ¶ 493, Pl. Damages SJ

App. 36, while the "acid sludge that resulted from acid treating these other petroleum fractions [i.e., the other non-avgas products produced using spent alkylation acid arising from the production of avgas] was between 35% and 65% strength." Stipulation ¶ 496, Pl. Damages SJ App. 37. As the CERCLA district court observed, "the primary contaminant at the McColl Site is the sulfuric acid," *Shell*, 13 F. Supp. 3d at 1026, so the reuse of the spent alkylation acid had the salutary effect of reducing the amount of sulfuric acid dumped at the McColl Site.

It is the policy of the law of contracts to encourage parties to make reasonable efforts to avoid or mitigate losses. Thus, it is settled that "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." RESTATEMENT OF CONTRACTS (SECOND) § 350(1) (1981); *see also Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (damages are not recoverable for losses that could have been avoided through reasonable efforts). This rule "reflect[s] the policy of encouraging the injured party to avoid loss." RESTATEMENT OF CONTRACTS (SECOND) § 350, comment a (1981). An important corollary to this policy is the rule that " 'a party that takes reasonable steps that seemed reasonable at the time will not be judged in hindsight.' " *Citizens Fed. Bank v. United States*, 66 Fed. Cl. 173, 185 (2005) (quoting E. ALLEN FARNSWORTH, CONTRACTS § 12.12 (3d ed. 1999)), *aff'd* 474 F.3d 1314 (Fed. Cir. 2007).

The Government's argument that steps taken to mitigate the loss somehow break the causal chain cannot be reconciled with these well established principles of law. It was perfectly reasonable for the Oil Companies to attempt to mitigate the damage to the environment by reusing as much of the spent alkylation acid as they reasonably could so that the waste ultimately dumped had a lower concentration of "the primary contaminant at the McColl Site …[,] the sulfuric acid." *Shell*, 13 F. Supp. 2d at 1026. Yet the Government's argument would penalize

efforts to mitigate the loss by denying recovery to the extent the Oil Companies attempted to abate the harm. This, of course, is precisely the opposite of what the law requires: damages are to be withheld when the plaintiff *fails* to take reasonable steps to mitigate the loss, not when such steps are undertaken.

### C. **The Oil Companies Are Entitled to Recovery All of Their Costs Because They Indisputably Would Not Have Been Incurred But For the Production of Avgas Under the Contracts.**

The foregoing, we respectfully submit, establishes beyond reasonable dispute that all of the costs associated with the clean up of the McColl Site were proximately caused by the Oil Companies' avgas production. But even if that were not so, the Oil Companies would still be entitled to recover all of their costs because it is indisputable that the CERCLA costs would not have been incurred "but for" the avgas production. It is undisputed that *all* of the non-benzol acid waste at the McColl Site – both the spent alkylation acid and the acid sludge – originated from the production of avgas; it necessarily follows that but for the production of avgas, the Oil Companies would not have incurred CERCLA clean up costs.

While the Court again need not reach the question if it agrees that the Oil Companies have demonstrated proximate causation, *cf. Shell*, 80 Fed. Cl. at 417, the settled judicial understanding of the phrase "by reason of," as it is used in contracts promising to reimburse costs limits its meaning to "but for" causation. For example, the First Circuit has held that "the language [is] unambiguous: 'by reason of' means 'because of,' BLACK'S LAW DICTIONARY 201 (6th ed. 1990), and thus necessitates an analysis at least approximating a 'but-for' causation test." *Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584, 589 (1st Cir. 2004) (citing *United States v. Rosa-Ortiz*, 348 F.3d 33, 38 (1st Cir. 2003) ("The statutory phrase 'by virtue of,' by its plain meaning, suggests a but-for causation test.") (citing WEBSTER'S THIRD NEW INT'L

DICTIONARY 307) (defining "by virtue of" to mean "by reason of")); *see also Spirtas Co. v. Insurance Co. of the State of Pa.*, 2006 U.S. Dist. LEXIS 27498, at *17 (E.D. Mo. May 9, 2006) (" 'by reason of' … means … 'but for' "). Likewise, the Virginia Supreme Court has held that "the words 'by reason of,' found in the indemnity agreement … hav[e] the same effect as 'resulting from,' and establish[] causation as the test for determining whether a particular loss or expense is recoverable …." *Rappold v. Indiana Lumbersmen's Mut. Ins. Co.*, 431 S.E.2d 302, 304 (Va. 1993).

**CONCLUSION**

For the foregoing reasons, we respectfully submit that the Oil Companies are entitled to summary judgment holding that *all* of the costs they incurred cleaning up the non-benzol related acid waste at the McColl Site were incurred "by reason of" the production of avgas under their contracts with the United States. As there is no dispute as to the amounts of those costs, the Court should enter summary judgment in favor of the Oil Companies awarding $84,536,763.65 in damages and statutory interest through June 30, 2008, to be apportioned as follows among the Plaintiffs: $49,521,636.14 (58.58 percent) payable to Plaintiff Shell Oil Company, $16,011,263.04 (18.94 percent) payable to Plaintiff Union Oil Company of California, $16,011,263.04 (18.94 percent) payable to Plaintiff Atlantic Richfield Company, and $2,992,601.43 (3.54 percent) payable to Plaintiff Texaco, Inc. As the Oil Companies' contractual damages and statutory interest continue to accrue, Plaintiffs will supplement their damage calculations prior to the entry of judgment.

June 20, 2008

Respectfully Submitted,

s/ Michael W. Kirk

Michael W. Kirk
*Counsel of Record*

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)

Counsel for Plaintiffs Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc.

*Of Counsel*:

Michael Weitzner

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)

**CERTIFICATE OF FILING**

I certify that on June 20, 2008, the attached document was filed electronically. I understand that service is complete upon filing and that parties may access this filing through the Court's ECF system.

s/Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)