No. 06-141C
(Senior Judge Smith)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA,
ATLANTIC RICHFIELD COMPANY, and TEXACO, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S OPPOSITION, IN SUBSTANTIAL PART,
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification U nit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202)616-0476

Attorneys for Defendant

July 11, 2008

TABLE OF CONTENTS


STATEMENT OF THE ISSUE. .................................................................................... 2

INTRODUCTION AND SUMMARY OF RESPONSES TO PLAINTIFFS' FACTUAL ALLEGATIONS. .................................................................................... 2

ARGUMENT .................................................................................... 6

PLAINTIFFS ARE ENTITLED TO RECOVER NO MORE THAN $10,820,705. ...................... 6

I. Plaintiffs Must Establish Proximate, Not Merely But-For, Cost Causation. .................................................................................... 6

II. No More Than 12.8 Percent Of The Claimed Costs, If Any, Were Incurred "By Reason Of" The Oil Companies' Avgas Production. ...................... 10

CONCLUSION. .................................................................................... 16


INDEX TO DEFENDANT'S APPENDIX


Stipulations of parties in United States v. Shell Oil Co., Civ. 91-0589 RJK (Ex) (C.D. Cal.) ..... 1

Excerpts of trial transcript from United States v. Shell..............................................................37

Joint Request For Status Conference filed in United States v. Shell, Aug. 13, 2003 (excerpt)... 43

# TABLE OF AUTHORITIES

## CASES

Associated General Contractors of California, Inc. v. Carpenters,
459 U.S. 519 (1983). .......... 7

Cf. United States v. Turtle Mt. Band of Chippewa Indians,
222 Ct. Cl.12 F.2d 517 (1979). .......... 11

Chrysler Motors of Cal. v. Royal Indem. Co.,
174 P.2d 318 (Cal. App. 1946). .......... 7

Commissioner v. Sunnen,
333 U.S. 591 (1948). .......... 11

Currier v. McKee,
59 A. 442 (Me. 1904). .......... 7, 8

Franconia Assocs. v. United States,
61 Fed. Cl. 335 (2004). .......... 1

General Acc. Fire & Life Assur. Corp. v. Continental Cas. Co.,
287 F.2d 464 (9th Cir 1961). .......... 7

Griswold v. United States,
61 Fed. Cl. 458 (2004). .......... 11

Hannahville Indian Community v. United States,
180 Ct. Cl. 477, ___ (1967). .......... 11, 12

Holmes v. Security Investors Protection Corp.,
503 U.S. 258 (1992). .......... 7

International Refugee Org. v. Republic S.S.,
189 F.2d 858 (4th Cir. 1951). .......... 11

McNeilab, Inc. v. North River Ins. Co.,
645 F. Supp. 525 (D.N.J. 1986). .......... 7

Pacific Insurance Co. v. Eaton Vance Management,
369 F.3d 584 (1st Cir. 2004). .......... 8, 9

Rappold v. Indiana Lumbermen's Mutual Insurance Co.,
431 S.E.2d 302 (Va. 1993). .......... 8, 9

Schism v. United States,
316 F.3d 1259 (Fed. Cir. 2002)........................................................................... 7

Shell Oil Co. v. United States,
80 Fed. Cl. 411 (2008). ....................................................................................... passim

Sipco Servs. & Marine, Inc. v. United States,
41 Fed. Cl. 196 (1998). ....................................................................................... 8

Southern Bell Tel. & Tel. Co. v. Mayor and Board of Aldermen of City of Meridian,
74 F.2d 983 (5th Cir. 1935). ................................................................................ 8

Spirtas Co. v. Insurance Co. of the State of Pennsylvania,
2006 WL 1300669 (E.D. Mo. May 9, 2006)................................................................ 8, 9

Three Sons, Inc. v. Phoenix Ins. Co.,
257 N.E.2d 774 (Mass. 1970). ............................................................................. 8, 9

United States v. Alexander,
148 U.S. 186 (1893)............................................................................................. 7

United States v. Shell Oil Co.,
13 F. Supp. 2d 1018 (C.D. Cal. 1998), rev'd in relevant part and aff'd in part, 294 F.3d 1045 (9th Cir. 2002) ....................................................... 11, 12, 15

United States v. Shell Oil Co.,
294 F.3d 1045 (9th Cir. 2002). .......................................................................... passim

STATUTES

41 U.S.C. § 113.................................................................................................. 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | No. 06-141 C (Senior Judge Smith) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION, IN SUBSTANTIAL PART, TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC") and the Court's scheduling order, defendant, the United States, respectfully responds to the motion filed on June 20, 2008, by the four plaintiffs in this action ("the Oil Companies") seeking a final judgment in the amount of $84,536,763.65, to be apportioned between them.[1]

As we demonstrate below, in view of the Court's February 2008 decision holding the United States liable, under World War II contracts, for costs incurred by plaintiffs in connection with the cleanup of an acid waste dump in Southern California, plaintiffs should recover no more than 12.8 percent of the claimed costs ($10,820,705), based upon the percentage of the relevant waste that the record establishes plaintiffs dumped by reason of performing the contracts. In

---

[1] While we take no position on the issue, the Court might conclude that plaintiffs, who are suing upon different contracts that share common language, are improperly joined. See Franconia Assocs. v. United States, 61 Fed. Cl. 335, 336-37 & n.1 (2004) (string-citing cases rejecting proposition that RCFC 19(a) "may be construed to allow joinder of parties having only 'similar' claims, for example, breach of contract claims based on the same form contract"). If so, the remedy would be to sever plaintiffs and resolve their claims upon a consolidated basis.

addition to this brief, we rely upon the accompanying (1) responses to plaintiffs' proposed findings of uncontroverted fact, and (2) defendant's proposed findings of uncontroverted fact.

## STATEMENT OF THE ISSUE

Whether, to the extent plaintiffs chose to use spent alkylation acid generated in their production of high-octane aviation fuel for the Government to treat other petroleum products, and then dumped the acid sludge resulting from the production of those other products at a waste dump, the environmental costs that plaintiffs incurred in connection with the acid sludge contamination arose "by reason of" the production of the aviation fuel, so as to be recoverable under plaintiffs' contracts.

## INTRODUCTION AND SUMMARY OF RESPONSES TO PLAINTIFFS' FACTUAL ALLEGATIONS

This Court summarized the background of this contract lawsuit, brought jointly in 2006 by the Oil Companies pursuant to the Contract Settlement Act of 1944, 41 U.S.C. § 113, in its decision granting partial summary judgment to plaintiffs with respect to contract liability. Shell Oil Co. v. United States, 80 Fed. Cl. 411, 412-14 (2008). Previously, the United States Court of Appeals for the Ninth Circuit set forth relevant facts and circumstances, through the late 1990s, in United States v. Shell Oil Co., 294 F.3d 1045, 1048-51 (9th Cir. 2002).

Plaintiffs sold 100 octane military aviation fuel ("avgas") to the Defense Supplies Corporation, from their refineries in Southern California, between 1942 and the end of World War II in 1945. Before, during, and after their performance of the World War II contracts, plaintiffs used sulfuric acid to produce many petroleum products, including, but not limited to, avgas. Def. PFF ¶¶ 1-4. Plaintiffs used sulfuric acid in avgas production as a catalyst in a process called alkylation. "As a consequence of its use in alkylation, the purity of the acid was

greatly reduced. 'Spent' alkylation acid could be reprocessed, at some expense, so that its purity was once again high enough for use as an alkylation catalyst[, or it] could be used in other refinery processes, or could be dumped without being reused." Shell, 294 F.3d at 1049.

"Some of the Oil Companies reprocessed spent alkylation acid themselves, but at various times all of them entered into contracts to have other private entities reprocess it. The Oil Companies also used spent alkylation acid to [treat] avgas additives and . . . other refinery products, including gasoline, kerosene, and lubricating oil." Id. at 1050. Using spent alkylation acid for these refining purposes "produced waste in the form of 'acid sludge.'" Id. The Oil Companies dumped large quantities of acid sludge and (beginning in late 1944, when a Southern California reprocessing plant failed to operate at capacity) spent alkylation acid, at a waste dump known as the "McColl site," after its operator, Eli McColl. Id. at 1051; Def. PFF ¶¶ 15-19.

The McColl site contained both "benzol waste," which is not relevant here, and "non-benzol waste," which included the acid sludge and spent alkylation acid just described. The parties in this matter stipulated in a lawsuit filed by the United States and the State of California against the Oil Companies in the United States District Court for the Central District of California in 1991, pursuant to the Comprehensive Environmental Response, Control and Liability Act of 1978 ("CERCLA"), to recover cleanup and response costs associated with the McColl site, that approximately 93.75 percent of the McColl waste was non-benzol waste. Def. App. 44-45. (This 2003 stipulation postdates the statement by the Court of Appeals for the Ninth Circuit that 94.5 percent of the total waste was non-benzol. Shell, 294 F.3d at 1051.)

In turn, the vast majority – between 87 and 88 percent – of the non-benzol waste "was acid sludge resulting from [plaintiffs'] chemical treatment of non-avgas refinery products using

spent alkylation acid." Id. at 1051 (emphasis added)[2]; see also Stip. 431 (Def. App. 20) ("The McColl Site . . . contain[ed] acid sludge resulting from the treatment of civilian and military petroleum products.") (emphasis added). By contrast, less than 13 percent of the non-benzol waste was spent alkylation acid dumped by plaintiffs during World War II.[3]

This Court held in February 2008 that the Oil Companies are entitled to reimbursement under their World War II avgas contracts for certain costs of the CERCLA cleanup at the McColl site, because CERCLA costs constitute "charges" which plaintiffs were "required . . . to . . . pay by reason of the production, manufacture, sale or delivery of" avgas, within the meaning of the "Taxes" clauses of the various contracts. 80 Fed. Cl. at 417-18.

Plaintiffs contend that – although seven-eighths of the relevant waste undeniably was acid sludge "resulting from" their production of petroleum products other than avgas, Shell, 294 F.3d at 1051 – they should recover all of their remediation and response costs, because, they assert, all of the non-benzol waste was avgas waste. Plaintiffs posit that when they came into possession of spent alkylation acid as a byproduct of producing avgas, it was preordained and "inevitable," Pl. Br. 15, that either the spent alkylation acid itself, or acid sludge resulting from plaintiffs' subsequent use of the spent acid to produce other products, would be dumped. Accordingly, they

---

[2] Acid sludge from plaintiffs' treatment of non-avgas products accounted for "most" of 82.5 percent of the total waste at the site. Shell, 294 F.3d at 1051. Accordingly, acid sludge from the treatment of non-avgas products was "most" of 87.3 percent (.825 ÷ .945) of the non-benzol waste, if the Ninth Circuit's 94.5 percent ratio of non-benzol waste to benzol waste is used in the denominator; or 88 percent of the non-benzol waste (.825 ÷ .9375) if the parties' stipulated ratio of 93.75 percent non-benzol waste is used as the denominator.

[3] Spent alkylation acid was "approximately 12 percent of the total waste at the McColl Site." Shell, 294 F.3d at 1051. Thus, using the same arithmetic as in the previous footnote, the approximate amount of the non-benzol waste alone that was spent alkylation acid is either 12.7 percent (.12 ÷ .945) or 12.8 percent (.12 ÷ .9375). We have chosen the conservative figure.

argue, "all" of their dumping of non-benzol acid waste at the McColl site occurred, and "all" of their CERCLA cleanup "charges" were incurred, "by reason of" avgas production within the meaning of the Taxes clause. See id. at 14-18.

The crucial flaw in plaintiffs' theory – as demonstrated in our accompanying responses to plaintiffs' proposed findings of fact, our additional proposed findings, and below – is the unsupported premise that spent alkylation acid from the treatment of avgas would necessarily have been dumped, whether or not it was first put to further use in plaintiffs' refineries, to produce other products.

The record establishes that plaintiffs could do at least four things with spent alkylation acid. They could: (1) use the spent acid to treat non-avgas products; (2) sell it; (3) reprocess it (or contract to have it reprocessed) to full strength; or (4) dump it. Def. Resp. Pl. PFF ¶ 10; Def. PFF ¶¶ 6, 11-14; see Shell, 49 F.3d at 1051. The Oil Companies' decisions to use, sell, reprocess, or dump spent alkylation acid were business decisions, guided by profit motive, not by environmental concerns. Def. PFF ¶ 10. Indeed, plaintiffs reprocessed more spent alkylation acid than they used in their refineries. Id. ¶ 13. In contrast to acid sludge, spent alkylation acid was a valuable commodity. Simply dumping spent alkylation acid was a last resort, and occurred only, the record demonstrates, when an acid reprocessing plant opened by Stauffer Chemical Company in late 1944, which was expected to handle plaintiffs' reprocessing needs, failed to operate at capacity. Id. ¶¶ 7, 15.

Other things equal, furthermore, options 2 and 3 above – selling or reprocessing spent acid – would not require plaintiffs to dump any waste, i.e., either spent alkylation acid or acid sludge created by the refinery use of spent alkylation acid, at the McColl site. Def. PFF ¶ 17.

Accordingly, the record establishes that any causal link between the creation of spent alkylation acid in avgas production and plaintiffs' dumping of acid sludge at the McColl site was broken when plaintiffs independently decided, for their own commercial reasons, to use the spent acid to make other petroleum products, and thus to produce acid sludge, rather than choosing options that would not result in dumping at the McColl site. There was nothing "wrong," at the time, to be sure, with the Oil Companies' business decisions to make secondary use of spent alkylation acid and to dump the resulting acid sludge. Nor – contrary to the conclusory and anachronistic assertions in their brief – were plaintiffs acting as proto-environmentalists by making use of spent acid. See Pl. Br. 4, 5, 10, 15 (advancing "acid mitigation" theory).

What is relevant here, however, is that the vast majority of the remediated waste, which was "acid sludge resulting from chemical treatment of non-avgas refinery products using spent alkylation acid," Shell, 294 F.3d at 1051, was not created proximately, necessarily, or foreseeably "by reason of" avgas production, and, consequently, the resulting CERCLA costs are not recoverable under the avgas contracts.

## ARGUMENT

## PLAINTIFFS ARE ENTITLED TO RECOVER NO MORE THAN $10,820,705

### I. Plaintiffs Must Establish Proximate, Not Merely But-For, Cost Causation

This Court previously declined to decide whether the requirement in the Taxes clause that reimbursable "charges" be imposed "by reason of" the production of avgas "establishes a proximate causation standard [or] a but-for causation standard." 80 Fed. Cl. at 417 ("[T]he Court need not resolve this issue."). Plaintiffs' motion seeking reimbursement of 100 percent of their McColl-related CERCLA costs, however, requires resolution of the issue. Assuming the

Government is liable, the avgas contracts permit plaintiffs to recover only costs that they can establish resulted proximately from avgas production.

The words "by reason of" should be given their plain and ordinary meaning. E.g., Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc). "The causal connection implied by the phrase 'by reason of' is normally that of proximate causation." McNeilab, Inc. v. North River Ins. Co., 645 F. Supp. 525, 535-36 (D.N.J. 1986) (citing, inter alia, Currier v. McKee, 59 A. 442 (Me. 1904)). The Court of Appeals for the Ninth Circuit, for example, construed a clause in an insurance policy as requiring only a but-for connection between an accident and the policy holder's business, specifically because the words "by reason of," which would have denoted proximate cause, did not appear in the clause. General Acc. Fire & Life Assur. Corp. v. Continental Cas. Co., 287 F.2d 464, 466-67 (9th Cir 1961) (distinguishing, inter alia, Chrysler Motors of Cal. v. Royal Indem. Co., 174 P.2d 318 (Cal. App. 1946)).

Similarly, based upon this generally accepted usage, the United States Supreme Court held in Holmes v. Security Investors Protection Corp., 503 U.S. 258 (1992), and Associated General Contractors of California, Inc. v. Carpenters, 459 U.S. 519 (1983), that the words "by reason of," in the Racketeering Influenced and Corrupt Organizations Act and the Sherman Act, respectively, "incorporate common-law principles of proximate causation." Holmes, 503 U.S. at 268-69 (emphasis added); see Associated Gen. Contrs., 459 U.S. at 533-34. Those familiar principles require "some direct relation between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268; see also United States v. Alexander, 148 U.S. 186, 192 (1893) (construing trial court's finding, in takings case, that property was destroyed "by reason of the construction of [a] tunnel" to mean "that the owners of the property suffered a direct injury").

Accordingly, the common and ordinary meaning of "by reason of" in the Taxes clause of the avgas contracts is that the United States "[wa]s not bound to anticipate what [wa]s merely possible, nor, on the other hand, is [it] liable for such consequences only as usually follow." Currier, 59 A. at 444; see also Sipco Servs. & Marine, Inc. v. United States, 41 Fed. Cl. 196, 225 (1998) (construing legal test for equitable adjustment based upon "'the altered position in which the contractor finds himself by reason of [a] modification'" as encompassing only "costs that directly resulted from" the modification) (quoting Bruce Constr. Corp. v. United States, 163 Ct. Cl. 97, 100, 324 F.2d 516, 518 (1963)); Southern Bell Tel. & Tel. Co. v. Mayor and Board of Aldermen of City of Meridian, 74 F.2d 983, 984-85 (5th Cir. 1935) (construing words "by reason of or in connection with" in indemnity as requiring "proximate cause").

As against the weight of authority cited above, the Oil Companies rely upon three decisions: Pacific Insurance Co. v. Eaton Vance Management, 369 F.3d 584 (1st Cir. 2004); Spirtas Co. v. Insurance Co. of the State of Pennsylvania, 2006 WL 1300669 (E.D. Mo. May 9, 2006); and Rappold v. Indiana Lumbermen's Mutual Insurance Co., 431 S.E.2d 302 (Va. 1993). Pl. Br. 18-19. None of those decisions, however, supports plaintiffs' argument that the words "by reason of" normally entail only but-for causation.

In Pacific Insurance, the litigants asked the Court of Appeals for the First Circuit to choose between interpreting the words "by reason of" in an insurance policy as requiring either (1) "but-for causation," or (2) a "more generous standard that extends coverage beyond the strict [sic] 'but-for' test . . . ." 369 F.3d at 589 (emphasis added). The court chose the more "strict" reading. It held that "by reason of" "necessitates an analysis at least approximating a 'but-for' causation test" – which, significantly, the court described as requiring "'a direct causal relation.'" Id. (emphasis added) (quoting Three Sons, Inc. v. Phoenix Ins. Co., 257 N.E.2d 774, 776 (Mass.

1970)). Thus, Pacific Insurance does not hold that "by reason of" always implies only but-for causation. To the contrary, the court indicated that "by reason of" requires "at least" "direct" causation, which is, in effect, proximate causation.

Indeed, in applying its interpretation of the policy to the facts of the case, the Pacific Insurance court looked for proximate, not simply but-for causation. It held that coverage for costs incurred "by reason of" the insured's actual or alleged breach of fiduciary duties in administering its pension plan did not cover monies, including back interest, which the insured transferred to its plan after receiving a letter threatening litigation. Id. at 586-87, 590. The court held that the payment to the pension plan, including the interest, was made proximately or directly "by reason of" the language of the plan itself, rather than "by reason of" the insured's breach of its funding obligations. Id. at 590 & n.8. The court so held, even though the insured plainly would not have made the interest payment "but for" its prior delay in funding the plan. Id. Thus, mere but-for causation was not enough in Pacific Insurance. The unpublished Spirtas decision simply overstates the holding of Pacific Insurance. 2006 WL 1300669, at *5.

Rappold, on the other hand, is consistent with Pacific Insurance and the authorities we cited above. In Rappold, the Virginia Supreme Court did not opine, against the weight of authority, that the words "by reason of" necessarily impose a but-for test. It held only that litigation costs incurred in enforcing an indemnity executed in connection with the posting of a construction performance bond were incurred "by reason of" the indemnitee's posting of the bond for the indemnitor. 431 S.E. at 304. There was a direct and foreseeable, i.e., proximate, connection in Rappold between the litigation and the indemnity, not merely a but-for connection.

Accordingly, given the established meaning of the words "by reason of," the reference in the Taxes clause to charges imposed "by reason of" avgas production plainly refers to costs caused proximately by avgas production.

## II. No More Than 12.8 Percent Of The Claimed Costs, If Any, Were Incurred "By Reason Of" The Oil Companies' Avgas Production

It is conclusively established, as noted, that more than 87 percent of the non-benzol acid waste that the Oil Companies dumped at the McColl site, and for which they later incurred remediation costs pursuant to CERCLA, "was acid sludge resulting from the chemical treatment of non-avgas refinery products using spent alkylation acid." Shell, 294 F.3d at 1051 (emphasis added); see also Stip. 431 (Def. App. 20) ("The McColl Site . . . contain[ed] acid sludge resulting from the treatment of civilian and military petroleum products.") (emphasis added).

Plaintiffs advance three alternative reasons why, despite this undisputed fact, the Court should find that all of the costs they seek arose proximately "by reason of" avgas production. All three lack merit. Plaintiffs argue that: (1) this Court has already resolved this question in their favor, Pl. Br. 9-12; (2) we are collaterally estopped by certain findings made by the district court in the CERCLA matter from denying plaintiffs' allegation that all of the non-benzol waste was avgas waste, id. at 13-15; and (3) if not res judicata, the district court's cited findings are nevertheless "clearly correct." Id. at 15-18.

Regarding the first argument, we presume that if plaintiffs were correct in construing the Court's February 2008 liability decision as having already found that all of "the costs associated with the clean[up] of the acid sludge were . . . incurred 'by reason of' the production of avgas," id. at 12, the Court would not have ordered plaintiffs to file a new motion addressing that same issue. Even if plaintiffs correctly read the Court's liability opinion, moreover, that decision is

interlocutory and is subject to reconsideration to correct factual or legal error. Cf. United States v. Turtle Mt. Band of Chippewa Indians, 222 Ct. Cl. 1, 612 F.2d 517, 520-21 (1979); Griswold v. United States, 61 Fed. Cl. 458, 460-61 (2004). This brief and our accompanying factual filings provide grounds for such reconsideration, if necessary.

In their second argument, plaintiffs seek to invoke issue preclusion (collateral estoppel) based upon findings by the district court in the CERCLA matter to the effect that plaintiffs' decisions concerning whether to use, sell, reprocess, or dump spent alkylation acid did not "substantially aggravat[e] the waste cleanup problems at the McColl site." United States v. Shell Oil Co., 13 F. Supp. 2d 1018, 1026 (C.D. Cal. 1998), rev'd in relevant part and aff'd in part, 294 F.3d 1045 (9th Cir. 2002), quoted in Pl. Br. 13. Those findings have no preclusive effect, however, because the Ninth Circuit did not review them, since it reversed the aspect of the district court's judgment concerning the non-benzol waste upon different grounds. Shell, 294 F.3d at 1059. "[W]hen a lower court's decision on a question of fact is challenged in a proper appeal, and the appellate court does not pass upon that finding of fact in reaching its decision, the lower court's finding is not conclusive against the appellant in a subsequent suit on a different cause of action." Hannahville Indian Community v. United States, 180 Ct. Cl. 477, 485 (1967) (citing, inter alia, International Refugee Org. v. Republic S.S., 189 F.2d 858 (4th Cir. 1951); see generally Commissioner v. Sunnen, 333 U.S. 591, 597-98 (1948) (explaining the centrality of conclusions upon "which the [allegedly preclusive] finding or verdict was [based]").

This is a paradigmatic case for application of this rule. The United States challenged the district court's findings with respect to the allocation of liability under CERCLA for the non-benzol waste as clearly erroneous, see Shell, 294 F.3d at 1048, but the Ninth Circuit's holding that "the United States [wa]s not liable as an arranger," in the first instance, rendered "the

question of allocation of liability for the non-benzol waste between the United States and the Oil Companies . . . moot." Id. at 1049. Accordingly, the trial court's factual findings relating to responsibility for non-benzol waste are not binding. See Hannahville, 180 Ct. Cl. at 485-86.

The Oil Companies argue that, although "the Ninth Circuit reversed the district court's ruling" concerning the Government's liability for non-benzol waste, the trial court's "underlying findings were nevertheless necessary to the Ninth Circuit's decision to affirm the trial court's allocation of 100 percent of the benzol-related waste cleanup costs to the United States." Pl. Br. 14 (emphasis added). The major flaw in this argument, however, is that the "underlying findings" that the court of appeals discussed, in addressing the benzol waste, have nothing to do with plaintiffs' contention that their internal decisions – e.g., whether to use, sell, reprocess, or dump spent alkylation acid – did not "substantially aggravat[e]" the non-benzol contamination at the McColl site. See Pl. Br. 13 (quoting Shell, 13 F. Supp. 2d at 1026).

In the discussion by the Ninth Circuit upon which plaintiffs rely, the court apparently found no "clear error" in the district court's findings concerning three equitable "factors." See 294 F.3d at 1060. None of these generalized factors, however, bears upon the relevant question, i.e., whether plaintiffs' business decisions exacerbated the contamination vel non. The court of appeals set out the equitable factors as follows: "First, cleanup costs are properly seen as part of the war effort for which the American public as a whole should pay. Second, the United States generally refused to make tank cars available to the Oil Companies to transport the waste to Northern California for reprocessing. Finally, the United States refused to allocate resources to build reprocessing plants [at some locations]." Id. (emphasis added).

Accepting these propositions as true, but see Def. PFF ¶¶ 25-26, they do not support plaintiffs' allegation that 100 percent of the non-benzol waste resulted from their performance of

the avgas contracts. Even if "cleanup costs" should, in general, be deemed "part of the war effort," and if, in general, tank cars and reprocessing plants were in short supply during the War, it remains undisputed that the vast majority of the waste at the McColl site "result[ed] from [plaintiffs'] chemical treatment of non-avgas refinery products using spent alkylation acid." Shell, 294 F.3d at 1051; see also Stip. 431 (Def. App. 20) ("The McColl Site . . . contain[ed] acid sludge resulting from the treatment of civilian and military petroleum products."). "Equitable factors" cannot refute this fact, or compensate for the lack of evidentiary support for plaintiffs' contention that 100 percent of the non-benzol waste resulted from avgas production.

Indeed, and most importantly, the record establishes that plaintiffs' allegation, paraphrased by the Court in dictum in its February 2008 liability decision, that all of the non-benzol waste was avgas waste because "the Oil Companies could only have avoided disposing of th[is] waste by reducing or stopping the production of avgas," 80 Fed. Cl. at 417, is incorrect.

The record establishes, instead, that any causal link between plaintiffs' use of sulfuric acid to produce avgas and their subsequent dumping of acid sludge at the McColl site, to the extent such a link existed, was severed when plaintiffs decided, based upon their own business considerations, what to do with spent alkylation acid. As noted, while performing the avgas contracts, plaintiffs could use spent alkylation acid to treat non-avgas products, sell the spent acid, reprocess it to full strength, or dump it. Selling or reprocessing the spent acid would not, other things equal, result in dumping at the McColl site. Accordingly, when plaintiffs chose to use spent alkylation acid to treat non-avgas products, the resulting acid sludge resulted proximately from plaintiffs' business decisions concerning the production of those other products, and not from plaintiffs' earlier production of avgas. Def. PFF ¶¶ 10-17.

The Oil Companies allege anachronistically, and without support, that they chose to use spent alkylation acid, "to the extent possible," Pl. Br. 5, to "mitigat[e] the environmental damage by lowering the acid content of the waste." Id. at 4; see id. at 10, 15. Plaintiffs cite no evidence to support their "mitigation theory," which they developed in and for this litigation. Not only do plaintiffs cite no record evidence that they intended to mitigate contamination; they do not demonstrate that a lower acid content would, in fact, have mitigated the harm of producing more total acid waste. Instead, the record shows, the Oil Companies were motivated by ordinary market considerations – not by prescient environmentalism – when they made their business decisions to use, sell, reprocess, or dump spent alkylation acid. Def. PFF ¶¶ 10-13.

It was most often to plaintiffs' commercial advantage, moreover, to sell or reprocess spent alkylation acid, rather than to use it themselves or dump it. "Some of the Oil Companies reprocessed spent alkylation acid themselves, but at various times all of them entered into contracts to have other private entities reprocess it." Shell, 294 F.3d at 1050. In contrast to acid sludge – the reprocessing of which plaintiffs largely abandoned in the 1930s for cost reasons – spent alkylation acid was a valuable commodity in the 1940s. Def. PFF ¶¶ 7-9; Def. Resp. Pl. PFF ¶¶ 9-10. The Oil Companies reprocessed greater volumes of spent alkylation acid during the War than they used in their refineries. Def. PFF ¶ 13.

The record further demonstrates that they United States did not materially interfere during the War with plaintiffs' ability to reprocess or sell spent alkylation acid. The War Production Board approved multiple applications to build reprocessing plants in California. Id. ¶ 24. Indeed, the board granted the application of Stauffer Chemical Company to build a reprocessing plant that the record indicates could have handled most or all of plaintiffs' spent acid reprocessing needs, beginning in the fall of 1944, had the Stauffer plant functioned properly. Id.

¶¶ 14-16. "The Stauffer plant failure" – not any action or inaction by the Government – "resulted in the dumping of both spent alkylation acid and acid sludge in late 1944 and 1945." Stip. 364 (Def. App. 9). The technical problems at the Stauffer plant are the only reason supported by this record that plaintiffs dumped spent alkylation acid (as opposed to acid sludge) during the War. Def. PFF ¶ 15; Shell, 49 F.3d at 1051.

Similarly, the record fails to demonstrate that a shortage of tank cars caused the Oil Companies to dump acid waste. The War Production Board took steps to alleviate tank car shortages both nationwide and in California, Def. PFF ¶ 26; and there is no evidence that plaintiffs were denied railroad tank cars for acid sludge during the terms of their avgas contracts.

Given (1) this Court's prior ruling, with which we respectfully disagree, that some costs incurred by plaintiffs pursuant to CERCLA in connection with the McColl site arose "by reason of" avgas production within the meaning of plaintiffs' contracts; (2) the evidence that the spent alkylation acid dumped at the site is attributable to the avgas program, Shell, 13 F. Supp. 2d at 1024-25; and (3) the absence of evidence that plaintiffs bore responsibility for the Stauffer plant failure, or acted in a commercially unreasonable manner by dumping spent acid in late 1944 and 1945, after that failure, the Court might conclude that the CERCLA costs attributable to the spent alkylation acid that plaintiffs dumped at the McColl site arose "by reason of" avgas production. This accounts, as noted, for approximately 12.8 percent of the relevant waste.

The United States estimated in the CERCLA litigation that approximately 10.5 percent of the non-benzol acid sludge could be attributed "indirectly" to avgas production, because the use of spent alkylation acid, rather than fresh acid, to treat non-avgas products required the use of more total acid, which created more total sludge. However, because, as demonstrated above, there was no necessary or direct causal connection between the creation of spent alkylation acid

in avgas production and the Oil Companies' subsequent business decisions to use, sell, reprocess, or dump the spent acid, the marginal increase in the volume of acid sludge at the McColl site was not proximately caused by, i.e., did not occur "by reason of," avgas production, and thus did not give rise to charges recoverable under the Taxes clause.

Rather, the vast majority of the costs sought by plaintiffs (1) resulted from the acid sludge produced by plaintiffs' treatment of non-avgas products with spent alkylation acid; (2) arose proximately and by reason of the production of those other products; and (3) are, therefore, not recoverable under the Taxes clause of the contracts.

## CONCLUSION

For the reasons given above, we respectfully request the Court to enter judgment for plaintiffs in a total amount no greater than $10,820,705, which represents 12.8 percent of the claimed costs.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

July 11, 2008