IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | No. 06-141 C (Senior Judge Smith) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully responds to the proposed findings filed by plaintiffs ("the Oil Companies") with their June 20, 2008 motion for summary judgment with respect to damages.

1. The Oil Companies' refineries "used substantial amounts of 98 percent sulfuric acid as a catalyst to produce alkylate, a major component in avgas." Stipulations between the United States and the Oil Companies in United States v. Shell Oil Co., No. 91-0589 (RJK) (C.D. Cal.) ("Stipulation") ¶ 493, Pl. Damages SJ App. 36.

Response:

Uncontroverted.

2. As the alkylate was produced, the concentration of the sulfuric acid would be reduced, and when it "reached a concentration in the neighborhood of 87-90 percent in the alkylation unit, it no longer served its catalytic function and was replaced." Id.

Response:

Uncontroverted.

3. To the extent possible, this "spent alkylation acid" was then "used in acid treating units in the refinery, … [resulting in] the production of acid sludge." Id.

Response:

Controverted in significant part. The cited stipulation does not support the Oil Companies' current allegation that they used spent alkylation acid in their refineries "to the extent possible" (i.e., plaintiffs' "acid mitigation theory"). To the contrary, the record establishes that plaintiffs had a financial incentive to reprocess or sell spent alkylation acid, to the extent possible. Stips. 343, 346-356 (Def. App. 6-7). "Some of the Oil Companies reprocessed spent alkylation acid themselves, but at various times all of them entered into contracts to have other private entities reprocess it." Shell, 294 F.3d at 1050. Indeed, plaintiffs reprocessed greater volumes of spent alkylation acid than they used. Def. App. 37 (Anderson Tr. 435-38). Plaintiffs' "decisions to pursue technologies to reprocess, burn, dump, or otherwise dispose of their acid sludge were based in part on economic considerations." Stips. 500-511 (Def. App. 26-28). (emphasis added). For example, "during the war, Shell elected not to develop a process for acid reprocessing that it could have used, but chose not to use, at its Wilmington refinery." Stip. 518 (Def. App. 30).

4. These acid treating units used spent alkylation acid "in the acid treatment of avgas base stocks to remove sulfur compounds and thus improve the quality of the stock." United States v. Shell Oil Co., 13 F. Supp. 2d 1018, 1024 (C.D. Cal. 1998), aff'd in part and rev'd in part on other grounds, 294 F.3d 1045 (9th Cir. 2002).

Response:

Uncontroverted, except that the final word in the quotation should be "stocks."

5. Some of the spent alkylation acid was used for "the acid treatment of certain components before they entered the alkylation process [i.e., the process of producing alkylate which composed 25 to 40 percent of the avgas] in order to remove impurities and improve their quality." Id.

Response:

Uncontroverted.

6. Some of the spent alkylation acid arising from the production of avgas was reprocessed and reused in the production of other products such as motor gasoline and kerosene. Stipulation ¶ 496, Pl. Damages SJ App. 37.

Response:

Controverted in part: "Much of the spent alkylation acid . . . was reprocessed at plants built by Stauffer Chemical Company and General Chemical Company. Some of the [unreprocessed] spent alkylation acid was used within the [Companies'] refineries to treat other petroleum fractions including motor gasoline (both civilian and military)[,] kerosene[,] and other products." Stip. 496 ( Pl. App. 37) (emphasis added); see also Stips. 343-348 (Def. App. 6). Indeed, plaintiffs reprocessed greater volumes of spent alkylation acid than they used in their refineries. Def. App. 37 (Anderson Tr. 435-38).

7. "The acid sludge that resulted from acid treating these other petroleum fractions [i.e., the other non-avgas products produced using spent alkylation acid arising from the production of avgas] was between 35% and 65% strength." Id.

Response:

Uncontroverted.

8. "[T]he primary contaminant at the McColl Site is the sulfuric acid." Shell, 13 F. Supp. 2d at 1026.

Response:

Uncontroverted.

9. The quantity of non-benzol sulfuric acid waste at the McColl Site – both the spent alkylation acid and the acid sludge – was "the same (or slightly greater) … irrespective of whether the Oil Companies had chosen to made secondary use of the acid for non-avgas products." Id.

Response:

Controverted. As demonstrated in our accompanying brief, this finding by the district court has no collateral estoppel effect, because (1) the United States Court of Appeals for the Ninth Circuit reversed the portion of the district court's judgment relating to non-benzol waste, 294 F.3d at 1059 ("Because the United States is not an arranger, it has no liability under CERCLA for the cleanup costs."), and (2) the quoted finding was not essential to the portion of the judgment, relating to benzol waste, that was affirmed. Id. at 1060-61. Equally important, this proposed finding finds no support in "the record in th[is] case." RCFC 56(h)(1). The proposed finding wrongly presumes that plaintiffs' only two options were to (1) dump spent alkylation acid or (2) reuse it in their refineries (and then dump the acid sludge). This overlooks the facts that plaintiffs could also (3) sell spent alkylation acid or (4) have it reprocessed by, for example, Stauffer Chemical or General Chemical. Stips. 325, 329, 343, 346-356, 364, 485, 500, 519-520,

526 (Def. App. 3-4, 6-9, 23, 26, 30-33, 35); Shell, 294 F.3d at 1051 Indeed, when plaintiffs did not "make secondary use of" spent alkylation acid in their refineries, their most profitable option was to reprocess it, when possible – not to dump it. Stips. 343, 346-356 (Def. App. 6-7). "Some of the Oil Companies reprocessed spent alkylation acid themselves, but at various times all of them entered into contracts to have other private entities reprocess it." Shell, 294 F.3d at 1050. Plaintiffs' "decisions to pursue technologies to reprocess, burn, dump, or otherwise dispose of their acid sludge were based in part on economic considerations." Stips. 500-511 (Def. App. 26-28) (emphasis added). See also our response to proposed finding number 10 immediately below.

10. There is no "persuasive evidence that the secondary use of the spent alkylation acid substantially aggravated the waste cleanup problems at the McColl Site beyond what they would have been in the absence of that secondary use . . . ." Id.

Response:

Controverted. For the reasons stated in our response to proposed finding number 9 above, we are not collaterally estopped from denying the quoted finding. Contrary to this proposed finding, the record establishes that plaintiffs had four alternatives for dealing with spent alkylation acid. They could (1) use the spent acid to produce non-avgas products, until it became acid sludge, which would then typically be dumped, because acid sludge was difficult to reprocess; (2) sell the spent acid; (3) reprocess it (except when a reprocessing plant was unavailable); or (4) dump it – which, as far as this record reflects, plaintiffs did only when the Stauffer plant failed in 1944 and 1945. Stips. 329, 343, 346-356, 364 ("The Stauffer plant failure resulted in the dumping of both spent alkylation acid and acid sludge in late 1944 and 1945."), 485, 500, 519-520, 526 ((Def. App. 4, 6-7, 31-32, 35); Shell, 49 F.3d at 1051. Other things

equal, based upon the evidence in this record, dumping of spent acid at the McColl Site would not have occurred if the spent acid had been sold, reused or reprocessed. Accordingly, when plaintiffs chose options 1 or 4 above, for their own business reasons, plaintiffs caused acid waste to be dumped at the McColl site and, to that same extent, caused the contamination that was remediated in the 1990s. Stips. 431, 499 (Def. App. 20, 26).

11. "The [Oil] Companies had massive surpluses of spent alkylation acid that they would not have had but for the avgas program." Id.

Response:

Controverted. For the reasons stated in our response to proposed finding number 9 above, we are not collaterally estopped from denying the quoted finding. The district court record establishes that the avgas program did not materially increase the volume of spent alkylation acid generated by plaintiffs' refineries. The Oil Companies began using sulfuric acid to refine petroleum "[d]ecades before World War II," Stips. 514, 522 (Def. App. 29, 34); see Stips. 2, 326-328, 409 (Def. App. 1, 4, 15) (all plaintiffs were generating acid sludge as of December 1941), 443-448 (Def. App. 21-22) (describing Shell's acid waste disposal contracts), 484-488 (Def. App. 23-24) (statements of Eli McColl, a former Shell Oil Company employee); and plaintiffs continued to generate spent alkylation acid after the War. Stips. 2, 413 (Def. App. 1, 16). During the War, plaintiffs continued to use sulfuric acid to produce non-avgas products, "including motor gasoline, kerosene, and lubricating oils." Stip. 431 (Def. App. 20); see Stip. 375 (Def. App. 10) (Texas Co.). Civilian gasoline, in particular, was a valuable, rationed commodity during the War. Stip. 623 (Def. App. 36). "These [non-avgas] products would have been [acid] treated regardless of [how much] aviation gasoline was made for the U.S.

Government or for anybody else." Def. App. 41-42 (Anderson Tr. 582-85) "There is no evidence that, during the war, the federal government required the Oil Companies to alter how their acid treating units were used." Stip. 499 (Def. App. 26). Nor is there any evidence that (1) the crude oil throughput of plaintiff's refineries increased substantially during the War or that (2) the avgas program, rather than the production of other petroleum products, caused such an increase. (Pursuant to RCFC 56(h)(2), we rely upon the absence of evidence to support plaintiff's proposed finding in these respects.) For these reasons, the avgas contracts were not the but-for cause of the quantities of spent alkylation acid that plaintiffs possessed or dumped during the contract terms.

12. "100 percent of the non-benzol waste [i.e., both the spent alkylation acid and the acid sludge] at the McColl Site is attributable to the avgas program." Id.

Response:

Controverted. "The undisputed facts indicate that the Oil Companies . . . dumped acid waste from operations other than avgas production at the McColl site . . . ." Shell, 294 F.3d at 1062. The parties have stipulated that "[t]he McColl Site . . . contain[ed] acid sludge resulting from the treatment of civilian and military petroleum products," Stip. 431 (Def. App. 20) (emphasis added), and that "the Oil Companies' decisions to reprocess, burn, dump, or otherwise dispose of their acid sludge were based in part on economic considerations." Stips. 500, 519 (Def. App. 26, 30-31). Moreover, the owner of the McColl site had a financial incentive, under his purchase agreement for the property, to dump at least 50,000 barrels of acid sludge there per year. Stip. 430 (Def. App. 19). In contrast to acid sludge, spent alkylation acid was a valuable commodity. Stips. 485, 519-520, 526 (Def. App. 23, 30-33, 35). The only reason supported by

this record that plaintiffs dumped any spent alkylation acid (as opposed to acid sludge) at the McColl site is the failure of the Stauffer plant. Stips. 329, 363-364, 376, 493, 500, 524 (Def. App. 4, 9-10, 25-26, 34); Shell, 49 F.3d at 1051 ("[The Stauffer plant] failed to operate at design capacity and this failure resulted in the dumping of both spent alkylation acid and acid sludge.") (emphasis added). If plaintiffs chose not to use spent alkylation acid in their own refineries, their favored alternative, when possible, was to reprocess the spent acid, not to dump it. Stips. 343, 346-356 (Def. App. 6-7). No more than 12.8 percent of the non-benzol waste at the site resulted directly from plaintiffs' performance of their avgas contracts. Def. PFF ¶¶ 21-23.

13. The parties have previously stipulated that "the Oil Companies' total claimed response costs (excluding interest but including payments made by the Oil Companies to Plaintiffs) through October 31, 1998 consists of the sum of $64,219,514.46." Stipulation dated September 30, 1999 in United States, et al. v. Shell Oil Company, et al., No. CIV 91 0589 RJK (C.D. Cal.), Doc. No. 489, Pl. Damages SJ App. 46.

Response:

Uncontroverted.

14. Of the response costs incurred by the Oil Companies prior to October 31, 1998, $18 million was paid to the United States and California on or about December 12, 1994 in accordance with a Partial Consent Decree entered on that date. See Partial Consent Decree, Pl. Damages SJ App. 1.

Response:

Uncontroverted.

15. The remainder of the response costs incurred by the Oil Companies prior to October 31, 1998, was paid on or before November 1, 1997, when the Environmental Protection Agency concluded that "construction had been completed according to specifications and the remediation had been successfully implemented." Second Five-Year Review Report for McColl Superfund Site (Sept. 25, 2007) at 14, Pl. Damages SJ App. 50.

Response:

Uncontroverted.

16. Through June 30, 2008, interest accrued on the $64,219,514.46 in response costs incurred by the Oil Companies prior to October 31, 1998, calculated at 2.5 percent simple interest, totals $18,400,203.86. Interest continues to accrue at rate of $133,790.66 per month. See Summary of Interest Calculation on Pre-1998 Stipulated Costs, Pl. Damages SJ App. 58.

Response:

Uncontroverted.

17. Beginning in November 2002, the Oil Companies have incurred operations and maintenance expenses in connection with the work done by their contractor, C2REM, Inc. See Declaration of Edmund Bourke ("Bourke Decl.") ¶ 5, Pl. Damages SJ App. 53.

Response:

Uncontroverted.

18. To date, the Oil Companies have paid C2REM invoices totaling $1,669,623.31. Bourke Decl. ¶ 9 & Exhibit A, Pl. Damages SJ App. 53.

Response:

Uncontroverted.

19. Interest accrued on the amounts the Oil Companies have paid to C2REM, calculated at 2.5 percent simple interest, totals $120,986.81 through June 30, 2008. Bourke Decl. ¶ 11 & Exhibit A, Pl. Damages SJ App. 53.

Response:

Uncontroverted.

20. In addition, the Oil Companies have paid at total of $118,800 to McAuley LCX for surface maintenance and site security. Bourke Decl. ¶ 13 & Exhibit A, Pl. Damages SJ App. 53; see also Second Five-Year Review Report for McColl Superfund Site (Sept. 25, 2007) at 15, Pl. Damages SJ App. 51.

Response:

Uncontroverted.

21. Interest accrued on the amounts the Oil Companies have paid to C2REM, calculated at 2.5 percent simple interest, totals $7,635.21 through June 30, 2008. Bourke Decl. ¶ 14 & Exhibit A, Pl. Damages SJ App. 53.

Response:

Uncontroverted.

22. The Oil Companies continue to incur monthly expenses for the work done by C2REM, and interest continues to accrue on both past and current expenses.

Response:

Uncontroverted.

23. In total, the Oil Companies have incurred $84,536,763.65 in total costs and statutory interest through June 30, 2008.

Response:

Uncontroverted.

24. The Oil Companies allocated these costs among themselves as follows:

| | |
|---|---|
| Shell | 58.58 percent |
| Union | 18.94 percent |
| Arco | 18.94 percent |
| Texaco | 3.54 percent |

See Bourke Decl. ¶ 16, Pl. Damages SJ App. 54.

Response:

Uncontroverted, although, as noted in our accompanying brief, the Court might conclude that the Oil Companies are improperly joined as plaintiffs in this action.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

s/Kyle Chadwick
KYLE CHADWICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0476
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:

RUTH KOWARSKI
Senior Assistant General Counsel
Real Property Division
General Services Administration

July 11, 2008

CERTIFICATE OF FILING

I certify that on July 11, 2008, the foregoing was filed electronically. I understand that service is complete upon filing and parties and others may access this filing through the Court's electronic system.

s/Kyle Chadwick