**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No. 06-CV-141
(Senior Judge Smith)

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Michael Weitzner
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

July 25, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INDEX TO SUPPLEMENTAL APPENDIX ........ iv

ARGUMENT ........ 1

I. THE PRODUCTION OF AVGAS PROXIMATELY CAUSED THE OIL COMPANIES TO INCUR THE COST OF CLEANING UP THE ACID SLUDGE AT THE MCCOLL SITE. ........ 1

II. THE GOVERNMENT IS BOUND BY THE FINDINGS ENTERED BY THE CALIFORNIA DISTRICT COURT. ........ 7

III. WHEN USED IN AN INDEMNIFICATION PROMISE, “BY REASON OF” DOES NOT ESTABLISH A PROXIMATE CAUSATION STANDARD. ........ 9

IV. EVEN IF THE GOVERNMENT’S ANALYSIS WAS CORRECT (AND IT IS NOT), THE OIL COMPANIES ARE ENTITLED TO RECOVER MORE THAN 12.8 PERCENT OF THEIR COSTS. ........ 12

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

**Cases** **Page/s**

*American Society for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557 (3rd Cir. 2007)....10, 12

*Bruce Constr. Corp. v. United States*, 324 F.2d 516 (Ct. Cl. 1963) ............................................11

*Cienega Gardens v. United States*, 62 Fed. Cl. 28 (2004)..........................................................15

*Currier v. McKee*, 59 A. 442 (Me. 1904) ....................................................................................11

*Franconia Assocs. v. United States*, 61 Fed. Cl. 335 (2004) .......................................................15

*General Accident Fire & Life Assur. Corp. v. Continental Cas. Co.*, 287 F.2d 464
(9th Cir. 1961)..........................................................................................................................11

*General Contractors of California, Inc. v. Carpenters*, 459 U.S. 519 (1983)..............................11

*Holmes v. Security Inv. Protec. Corp.*, 503 U.S. 258 (1992).......................................................11

*In re Miller*, 290 F.3d 263 (5th Cir. 2002)....................................................................................10

*McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525 (D.N.J. 1986)....................................11

*Mississippi Power Co. v. Roubicek*, 462 F.2d 412 (5th Cir. 1972)..............................................11

*Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584 (1st Cir. 2004) ..................................10, 12

*Shell Oil Co. v. United States*, 80 Fed. Cl. 411 (2008) .....................................................2, 3, 6, 9

*Sipco Servs. & Marine, Inc. v. United States*, 41 Fed. Cl. 196 (1998) ........................................11

*Southern Bell Tel. & Tel. Co. v. Mayor and Board of Aldermen of Meridian*, 74 F.2d 983
(5th Cir. 1935)..........................................................................................................................11

*Spirtas Co. v. Insurance Co. of the State of Pa.*, 2006 U.S. Dist. LEXIS 27498
(E.D. Mo. May 9, 2006)...........................................................................................................10

*United States v. Mendoza*, 464 U.S. 154 (1984)..............................................................................9

*United States v. Rosa-Ortiz*, 348 F.3d 33, 38 (1st Cir. 2003) ....................................................10

*United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018 (C.D. Cal. 1998),
*aff'd in part and rev'd in part on other grounds*, 294 F.3d 1045 (9th Cir. 2002) ........... *passim*

*United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.)..............................................4, 13

*Witco Corp. v. Beekhuis*, 38 F.3d 682 (3rd Cir. 1994) ....................................................................10

# Index to Supplemental Appendix

United States' Responses to Plaintiffs' Proposed Findings of Uncontroverted Fact (Doc. No. 18) (8/11/2006) ....................59

Stipulated Facts of the Parties Relating to Pending Motions for Summary Judgment and Related Motions....................63

Contract between Defense Supplies Corporation and Shell Oil Company (5/1/1943) ....................70

United States Post-Trial Brief for the Allocation Trial (Filed in *United States v. Shell,* No. 91-0589 (April 1, 1998))....................72

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 06-CV-141 |
| | ) (Senior Judge Smith) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco Inc. (collectively, the "Oil Companies") respectfully submit this reply brief in support of their motion for summary judgment.

## ARGUMENT

### I. THE PRODUCTION OF AVGAS PROXIMATELY CAUSED THE OIL COMPANIES TO INCUR THE COST OF CLEANING UP THE ACID SLUDGE AT THE MCCOLL SITE.

The Government does not deny that *all* of the non-benzol sulfuric acid waste at the McColl Site originated as 98 percent pure sulfuric acid that was used in the production of avgas as a catalyst in a process called alkylation. All agree that alkylation produces spent alkylation acid, and the Government accordingly has conceded that "the CERCLA costs attributable to the spent alkylation acid that plaintiffs dumped at the McColl site arose 'by reason of' avgas production." Defendant's Opposition, In Substantial Part, to Plaintiffs' Motion for Summary

Judgment (Doc. No. 34) ("Gov't Damages Br.") 15. But the Government contends that the cost arising from the cleanup of the acid sludge did not arise "by reason of" avgas production because some (though not all) of the acid sludge resulted from the Oil Companies' use of spent alkylation acid in the production of non-avgas products.

The Government cannot deny that its argument is directly contrary to the findings entered by the United States District Court for the Central District of California in the underlying CERCLA case on the basis of extensive stipulations agreed upon by the parties and a five day trial at which both sides presented expert testimony. That court found that "100 percent of the non-benzol waste [i.e., all of the spent alkylation acid and acid sludge] at the McColl Site is attributable to the avgas program." *United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1026 (C.D. Cal. 1998), *aff'd in part and rev'd in part on other grounds*, 294 F.3d 1045 (9th Cir. 2002). Nor can the Government deny that this Court quoted and adopted this conclusion in its earlier ruling in this case. *See Shell Oil Co. v. United States*, 80 Fed. Cl. 411, 417 (2008); *see also id.* ("it is undisputed that the relevant hazardous substances, '*acid sludge and alkylation acid*, necessarily resulted from the production of avgas' ") (quoting *United States v. Shell Oil Co.*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778, at *7 (C.D. Cal. Sept. 18, 1995)) (emphasis added). The Government says that the California district court was wrong, but the evidence it cites and the argument it advances were presented to and fully considered by the district court in the CERCLA case.

The Government claims that the "crucial flaw" in the Oil Companies' theory – which was adopted by the court in *Shell* – "is the unsupported premise that spent alkylation acid from the treatment of avgas would <u>necessarily</u> have been dumped, whether or not it was first put to further use in plaintiffs' refineries, to produce other products." Gov't Damages Br. 5 (emphasis in

original). The Government says that the Oil Companies could have avoided dumping the waste by selling or reprocessing the spent alkylation acid. *Id*. Thus, the Government argues, "any causal link between the creation of spent alkylation acid in avgas production and plaintiffs' dumping of acid sludge at the McColl site was broken when plaintiffs independently decided, for their own commercial reasons, to use the spent acid to make other petroleum products, and thus to produce acid sludge, rather than choosing options that would not result in dumping at the McColl site." *Id*. at 6.

The Government's argument fails because its own admissions and stipulations establish that the Oil Companies had *no* viable options for dealing with the massive quantities of spent alkylation acid generated by avgas production that did not involve dumping. This Court's prior opinion recounted and cited the evidence on this score in some detail:

> It is likewise without dispute that, once it was produced, the Oil Companies had no alternative but to dump the hazardous waste. Furthermore, there were no reasonable alternative methods of disposal. *Shell*, 13 F. Supp. 2d at 1028. The huge volume of avgas required by the Armed Forces resulted in a correspondingly huge volume of acid waste that overwhelmed existing treatment facilities. *See* Stipulation ¶¶ 379-94, 413-20, Pl. App. 461-67, 471-73; *Shell*, 294 F.3d at 1060; *Shell*, 13 F. Supp. 2d at 1027. Plus, "[when] the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl site." *Shell*, 294 F.3d at 1050-51. There is no evidence that the Oil Companies had any other available alternative but to dump the waste. In fact, the Oil Companies sought Government permission to transport the waste, or alternatively to build additional treatment facilities, but the Government refused to authorize the diversion of resources necessary to implement alternatives. *See* Stipulation ¶¶ 379-94, 413-20; *Shell*, 294 F.3d at 1060; *Shell*, 13 F. Supp. 2d at 1027.

*Shell*, 80 Fed. Cl. at 417.

The Government nevertheless asserts that the Oil Companies could have avoided dumping the waste by selling or reprocessing it. *See* Gov't Damages Br. 5.[1] But these assertions are foreclosed by the Government's admissions that were cited in this Court's prior opinion. The Oil Companies could not have sold the spent alkylation acid because even if someone wanted to buy it (and the Government has not identified a potential buyer), the fact remained that there were no tank cars available to transport the waste. *See* Defendant's Responses to Plaintiffs' Proposed Findings of Uncontroverted Fact (Doc. No. 18) ("Gov't SJ Liability Fact Resp.") ¶ 21, Plaintiffs' Supplemental Appendix in Support of Their Motion for Summary Judgment ("Pl. Supp. Damages SJ App.") 61 (" '[T]he United States generally refused to make tank cars available to the Oil Companies to transport the [acid] waste to Northern California for reprocessing.") (quoting *Shell*, 294 F.3d at 1060); *see also Shell*, 13 F. Supp. 2d at 1028 ("tank cars were needed by the Government for war purposes" and thus were rarely available to transport acid waste); *see also* Stipulations between the United States and the Oil Companies in *United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.) ("Stipulation") ¶¶ 342, 393, 417-18, 487, Pl. Supp. Damages SJ App. 64-68.[2]

The Government's stipulations and admissions similarly foreclose its claim that the Oil Companies could have reprocessed the spent alkylation acid. The Government has squarely

---

[1] The Government identifies four options that it claims were available to the Oil Companies for dealing with the spent alkylation acid generated by the production of avgas: (i) use it in the production of non-avgas products; (ii) sell it; (iii) reprocess it; or (iv) dump it. Gov't Damages Br. 5. As the Government recognizes, options (i) and (iv) necessarily involve the dumping of either the spent alkylation acid itself (option (iv)) or the remaining acid sludge after spent alkylation acid is used in the production of other products (option (i)). *See id.*

[2] The Government claims, without citation, that "there is no evidence that plaintiffs were denied railroad tank cars for acid sludge during the terms of their avgas contracts." Gov't Damages SJ Br. 15. The Government stipulations and admissions cited and quoted in the text conclusively refute that claim.

admitted that " '[o]n two occasions, the government refused to allocate the materials and resources necessary to build new acid reprocessing facilities in northern California.' " Gov't SJ Liability Fact Resp. ¶ 18, Pl. Supp. Damages SJ App. 60 (quoting *Shell*, 294 F.3d at 1060). The Government has also admitted that "the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries, and the [existing] facilities for reprocessing this acid were insufficient." Gov't SJ Liability Fact Resp. ¶ 22, Pl. Supp. Damages SJ App. 61 (quoting *Shell*, 294 F.3d at 1051).

The Government attempts to evade the import of these admissions by pointing to instances when reprocessing plants were approved during the War, and to the fact that Oil Companies were able to reprocess some of the spent alkylation acid generated by the production of avgas. *See* Gov't Damages Br. 14. Of course, this misses the point. The Oil Companies have not claimed that there were *no* available reprocessing facilities; rather, as shown above, the reprocessing facilities that existed were insufficient to cope with the overwhelming volume of spent alkylation acid resulting from the Government's massive demand for avgas, and the Government would not approve new ones. Simply stated, there was no available, unused reprocessing capacity that the Oil Companies could have used to avoid dumping acid waste at the McColl Site.

Ironically enough, the Government's own argument confirms the lack of any viable alternative. The Government emphasizes that "spent alkylation acid was a valuable commodity in the 1940s," *id*., yet the Government cannot deny that the Oil Companies dumped considerable quantities of this "valuable commodity" – about 12.8 percent of the non-benzol waste – at the McColl Site, *see id*. at 15. If the Oil Companies really had the ability to sell or reprocess it as the Government claims, surely they would have done so. Yet they did not, and the record provides a

clear explanation as to why not: all available reprocessing capacity was fully utilized, the Government would not approve the construction of new reprocessing facilities, and the Government would not approve the diversion of tank cars to transport the waste to a buyer (assuming that any such buyer existed).

One further point bears mention. The intermediate use of the spent alkylation acid in the production of non-avgas products did not break the causal chain, but rather was a direct, foreseeable link in the chain running between the production of the avgas and the dumping of acid sludge. Indeed, the parties actually foresaw the close integration and connection between the production of avgas and the production of other petroleum products. The contracts all contained a provision expressly recognizing that during "normal operation of [the] refineries … substantial quantities of motor fuel and other products *must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline*." *E.g.*, Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (May 1, 1943) 11, Pl. Supp. Damages App. 71 (emphasis added); *see also* Stipulation ¶ 608, Pl. Supp. Damages App. 69 ("[e]ach of the oil companies' contracts" contained this provision). Thus, the intermediate use of the spent alkylation acid in the production of non-avgas products, far from representing an independent business decision unrelated to the production of avgas, was fully integrated into the production of avgas.

In short, the record strongly supports this Court's conclusion that "because the only alternative to dumping the waste was the reduction or halting of avgas production, it is clear that the dumping occurred 'by reason of' the production of avgas." *Shell*, 80 Fed. Cl. at 417. The alternatives to dumping or halting production identified by the Government were no options at all. As the California district court concluded, "the Government's policy … not to grant

priorities [for new reprocessing plants] unless the plant was needed to provide fresh acid to be used in manufacture of avgas … in combination with the unavailability of tank cars, … left the Oil Companies with no reasonable choice but to dump acid sludge." *Shell*, 13 F. Supp. 2d at 1028.

## II. THE GOVERNMENT IS BOUND BY THE FINDINGS ENTERED BY THE CALIFORNIA DISTRICT COURT.

The Government cannot, and does not, deny that its submission in this Court is foreclosed if it is bound by the California district court's finding that "100 percent of the non-benzol waste at the McColl Site is attributable to the avgas program." *Shell*, 13 F. Supp. 2d at 1026; *see also id*. (the "acid [waste] would be present in the same (or slightly greater) quantities irrespective of whether the Oil Companies had chosen to make secondary use of the acid for non-avgas products"). Instead, the Government argues that it is not precluded from challenging the district court's findings in this Court "because the Ninth Circuit did not review them, since it reversed the aspect of the district court's judgment concerning the non-benzol waste upon different grounds." Gov't SJ Damages Br. 11 (citing *Shell*, 294 F.3d at 1059).

The Court need not resolve the question whether issue preclusion applies if it concludes, based on the Government's factual stipulations and admissions, that the court's findings are supported by the undisputed evidence in the record. However, if the Court chooses to reach the question, the Government's argument must be rejected because the Ninth Circuit *did* uphold the district court's findings. It is true, as the Government argues, that the Ninth Circuit did reverse the judgment holding the United States liable as an "arranger" for the non-benzol waste. *See Shell*, 294 F.3d at 1048-49 (summarizing rulings). But the non-benzol findings were nevertheless necessary to the Ninth Circuit's decision to affirm the trial court's allocation of 100 percent of the benzol-related waste cleanup costs to the United States. *See id*. at 1060 (citing

with approval *Shell*, 13 F. Supp. 2d at 1026-28); *see also id*. (the district court was "entirely justified" in "explicitly extend[ing] its *Shell III* [non-benzol] analysis to the benzol waste").

The Government attempts to dismiss this portion of the Ninth Circuit's decision, arguing that the Ninth Circuit merely upheld the district court's application of "equitable factors." *See* Gov't Damages Br. 12-13. This attempt fails, for it cannot be squared with the Ninth Circuit's opinion. The Court of Appeals emphasized that the trial court had "conducted a full-scale trial with respect to allocation of cleanup costs at the McColl site." 294 F.3d at 1060. The court stated that the trial court's decision to allocate 100 percent of the costs of cleaning up the non-benzol waste was supported by a "thorough opinion." *Id*. (citing *Shell*, 13 F. Supp. 2d at 1026-28).

Most significantly, the Ninth Circuit specifically cited with approval and relied upon the district court findings that were the linchpin to the trial court's conclusion that the all of the costs arose from the production of avgas: the facts that "the United States generally refused to make tank cars available to the Oil Companies," and "the United States refused to allocate resources to build reprocessing plants." *Id*. As explained above, it was these two facts that "left the Oil Companies with no reasonable choice but to dump acid sludge." *Shell*, 13 F. Supp. 2d at 1028. The Ninth Circuit squarely held that the trial court was "entirely justified" in extending this analysis to the benzol waste, and on that basis affirmed the judgment imposing 100 percent of the benzol waste cleanup costs on the United States. *Shell*, 294 F.3d at 1060.

In sum, the Ninth Circuit upheld the findings made by the California district court on pp. 1026-28 of its opinion, including the finding that "100 percent of the non-benzol waste [i.e., all of the spent alkylation acid and acid sludge] at the McColl Site is attributable to the avgas program," *Shell*, 13 F. Supp. 2d at 1026, and that finding was necessary to the Ninth Circuit's

judgment. Accordingly, the United States is precluded from challenging that finding in this case. *See United States v. Mendoza*, 464 U.S. 154, 158 (1984) ("once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation").

## III. WHEN USED IN AN INDEMNIFICATION PROMISE, "BY REASON OF" DOES NOT ESTABLISH A PROXIMATE CAUSATION STANDARD.

As the Government implicitly recognizes, *see* Gov't Damages Br. 6 (arguing only that the cost of cleaning up the acid sludge was not "proximately, necessarily, or foreseeably 'by reason of' avgas production"), its argument that the Oil Companies are not entitled to recover the full amount of their cleanup costs depends upon its assertion that the contractual requirement that the costs be incurred "by reason of" avgas production establishes a proximate causation standard. As demonstrated above, both the undisputed evidence – consisting primarily of the Government's own stipulations and admissions – and the prior findings of the district court (which this Court adopted in its liability opinion) compel the conclusion that *all* of the costs incurred by the Oil Companies were proximately caused by their production of avgas under the contracts. Accordingly, the Court again need not reach the question whether the contractual phrase "by reason of" establishes a proximate causation standard. *See Shell*, 80 Fed. Cl. at 417 (declining to decide the issue because "[e]ven if the contract is interpreted to require a showing that the Oil Companies' avgas production proximately caused them to incur the CERCLA costs, the undisputed facts show that this standard has been satisfied").

Should the Court decide to reach the issue, however, the strong weight of authority holds, contrary to the position advanced by the Government, that in the context of a contractual agreement to indemnify another party against specified costs, the phrase "by reason of" establishes a causation standard far less rigorous than traditional proximate cause. In *American*

*Society for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557 (3rd Cir. 2007), the Third Circuit considered a bylaw provision that indemnified directors, officers, and employees against litigation and related costs incurred "by reason of" their service on a committee. The indemnitor argued that this language established "either a proximate or 'but for' causation standard," but the Third Circuit held that *both* "overstate[ the indemnitee's] burden here. Rather, we are satisfied that the 'by reason of' language … requires nothing more than there be a showing of a nexus between an indemnitee's activity and the matter for which indemnification is being sought." *Id*. at 576-77. Indeed, the federal courts of appeal have uniformly interpreted a Delaware statute providing for indemnification of officers, directors, and employees against litigation brought "by reason of" indemnitee's service required only that the litigation "arise from or have a nexus to his corporate position." *Witco Corp. v. Beekhuis*, 38 F.3d 682, 691-92 (3rd Cir. 1994); *see also In re Miller*, 290 F.3d 263, 267 (5th Cir. 2002) ("The cases thus broadly interpret 'by reason of the fact' to require no more than a nexus between the corporate officers' or directors' official activity and the matter for which indemnification is sought.") (citing cases).

Even if, contrary to the cases cited above, more than a mere nexus is required, "by reason of" in the context of an indemnification promise at most requires a showing of but-for causation. *See Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584, 589 (1st Cir. 2004) (" 'by reason of' … necessitates an analysis at least approximating a 'but-for' causation test") (citing *United States v. Rosa-Ortiz*, 348 F.3d 33, 38 (1st Cir. 2003) ("The statutory phrase 'by virtue of,' by its plain meaning, suggests a but-for causation test."); *see also Spirtas Co. v. Insurance Co. of the State of Pa.*, 2006 U.S. Dist. LEXIS 27498, at *17 (E.D. Mo. May 9, 2006) (" 'by reason of' … means … 'but for' ").

Most of the authorities cited by the Government are inapposite because they do not interpret the phrase “by reason of” in the context of a promise to indemnify or reimburse specified costs. *Holmes v. Security Inv. Protec. Corp.*, 503 U.S. 258, 267-68 (1992) (RICO statute), *Associated General Contractors of California, Inc. v. Carpenters*, 459 U.S. 519, 533-34 (1983) (Sherman Act), and *Currier v. McKee*, 59 A. 442, 444 (Me. 1904) (tort statute establishing liability for injuries caused “by reason of” intoxication), all involved interpretation of the phrase in a statute having nothing to do with the indemnification of costs. *Bruce Constr. Corp. v. United States*, 324 F.2d 516, 518 (Ct. Cl. 1963), and *Sipco Servs. & Marine, Inc. v. United States*, 41 Fed. Cl. 196, 225 (1998), both involved the standard for equitable adjustments to contractual terms, not the meaning of the phrase “by reason of” in a contract promising indemnification or reimbursement of costs.

While the Government claims that *General Accident Fire & Life Assurance Corp. v. Continental Cas. Co.*, 287 F.2d 464 (9th Cir. 1961), held that the phrase “by reason of” denoted proximate cause in the context of an indemnification agreement, *see* Gov’t Damages Br. 7, the Ninth Circuit’s opinion said nothing whatever about proximate cause. Rather, the court merely held that the absence of the phrase in the contract it was construing suggested the absence of “a causation factor” entirely. *General Accident*, 287 F.2d at 467. Similarly, while *McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525, 536 (D.N.J. 1986), did suggest in dicta that “ ‘by reason of’ … would appear to require proximate causation,” the court’s *holding* was limited to the proposition that the phrase merely “requires at least some causal connection ….” *Id.* And *Southern Bell Tel. & Tel. Co. v. Mayor and Bd. of Aldermen of Meridian*, 74 F.2d 983, 984-85 (5th Cir. 1935), merely applied the rule (since repudiated in Mississippi, *see Mississippi Power Co. v. Roubicek*, 462 F.2d 412, 415, n.7 (5th Cir. 1972) (noting that *Southern Bell* is no longer

good law)), that "a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms." Although the indemnity provision did use the phrase "by reason of," the court did not interpret the phrase at all – much less to impose a proximate cause standard.

In sum, the clear weight of authority rejects the notion that the phrase "by reason of," when used in a contractual indemnification or reimbursement promise, establishes a proximate cause standard. Rather, "nothing more than there be a showing of a nexus between [the Oil Companies' production of avgas] and the [McColl Site cleanup costs]" is required. *American Soc'y for Testing & Materials,* 478 F.3d at 576-77. At worst, the Oil Companies need only satisfy "a 'but-for' causation test." *Pacific Ins. Co.*, 369 F.3d at 589. The Government cannot, and does not, deny that both the "nexus" and the "but-for" causation standards are easily satisfied here, for as noted above, there is no dispute that all of the waste originated as 98 percent sulfuric acid used in the production of avgas.

## IV. EVEN IF THE GOVERNMENT'S ANALYSIS WAS CORRECT (AND IT IS NOT), THE OIL COMPANIES ARE ENTITLED TO RECOVER MORE THAN 12.8 PERCENT OF THEIR COSTS.

For all of the foregoing reasons, the Court should reject the Government's argument that the Oil Companies are not entitled to recover all costs they incurred cleaning up the non-benzol related acid waste at the McColl Site. Even if the Government's argument was correct and the Oil Companies are held not entitled to recover the costs associated with the acid sludge produced from the intermediate use of the spent alkylation acid (which itself arose from the production of avgas) in the production of non-avgas products, however, the Government's conclusion that the

Oil Companies are entitled to recover only 12.8 percent of their costs, *see* Gov't Damages Br. 16, is wrong.

The Government bases its conclusion on the fact that 12.8 percent of the non-benzol acid waste at the McColl Site was spent alkylation acid, *see id*. at 4, n.3, and it implicitly assumes that the *all* of the acid sludge arose from the production of non-avgas products. The evidence in the record refutes that assumption. The Government has admitted that some of the acid sludge arose from the use of "spent alkylation acid 'in the acid treatment of avgas base stocks to remove sulfur compounds and thus improve the quality of the stock[s].' " Defendant's Responses to Plaintiffs' Proposed Findings of Uncontroverted Fact (Doc. No. 35) ("Gov't SJ Damages Fact Resp.") ¶ 4 (quoting *Shell*, 13 F. Supp. 2d at 1024). The Government has likewise admitted that some of the acid sludge arose from the use of spent alkylation acid "for 'the acid treatment of certain components before they entered the alkylation process [i.e., the process of producing alkylate which composed 25 to 40 percent of the avgas] in order to remove impurities and improve their quality.' " *Id*. at ¶ 5 (quoting *Shell*, 13 F. Supp. 2d at 1024); *see also Shell*, 294 F.3d at 1050 ("The Oil Companies also used spent alkylation acid to improve the effectiveness of other avgas additives …. The use of spent alkylation acid in other refinery processes produced waste in the form of 'acid sludge.' ").

Indeed, in the proceedings in California district court, the Government admitted (on the basis of the testimony of its own expert) that as much as "25 percent of the [non-benzol] acid waste at the McColl Site came from av gas production." United States' Post-Trial Brief for the Allocation Trial (filed in *United States v. Shell*, No. 91-0589 (April 1, 1998)) at 8, Pl. Supp. Damages SJ App. 73. In addition to the 12.8 percent of the waste that was spent alkylation acid, the Government acknowledged that its expert had calculated that "13% of the *acid sludge* that

[the Oil Companies] sent to the Site came from av gas production." *Id*. at 11, Pl. Supp. Damage SJ App. 74 (emphasis added).[3]

In addition, the Government's 12.8 percent calculation depends upon the proposition that the dumping of the acid sludge at the Site increased the costs that would have been incurred in any event if only the spent alkylation acid was there. Given the nature of the remedy and physical nature of spent alkylation acid (which tends to be more liquid and thus to spread over more of the Site than acid sludge), it is entirely possible that the dumping of the acid sludge added little, if any, incremental cost to the costs incurred to clean up the spent alkylation acid – costs that the Government concedes were incurred "by reason of" avgas production.

In short, if the Court were to accept the Government's causation arguments, further proceedings – discovery and most likely, a trial – would be necessary to determine how much, if any, of the total cleanup cost was incurred solely as a result of the presence of the acid sludge that arose from the secondary use in non-avgas products of the spent alkylation acid (that resulted from the production of avgas).

## CONCLUSION

For the foregoing reasons, and those stated in our opening brief, we respectfully submit that the Oil Companies are entitled to summary judgment holding that *all* of the costs they incurred cleaning up the non-benzol related acid waste at the McColl Site were incurred "by reason of" the production of avgas under their contracts with the United States. The parties are in agreement as to the amounts of those costs and the proper apportionment among the

[3] Of course, the California district court rejected the Government's arguments, finding instead that "100 percent of the non-benzol waste [i.e., all of the spent alkylation acid and acid sludge] at the McColl Site is attributable to the avgas program." *Shell*, 13 F. Supp. 2d at 1026.

Plaintiffs.[4] Accordingly, the Court should enter summary judgment in favor of the Oil Companies awarding $84,536,763.65 in damages and statutory interest through June 30, 2008, to be apportioned as follows among the Plaintiffs: $49,521,636.14 (58.58 percent) payable to Plaintiff Shell Oil Company, $16,011,263.04 (18.94 percent) payable to Plaintiff Union Oil Company of California, $16,011,263.04 (18.94 percent) payable to Plaintiff Atlantic Richfield Company, and $2,992,601.43 (3.54 percent) payable to Plaintiff Texaco Inc. In addition, the Court should permit the Plaintiffs to supplement their damages request prior to the entry of final judgment to capture the contractual damages and statutory interest incurred after June 30 and prior to the entry of judgment.

July 25, 2008

Respectfully Submitted,

s/ Michael W. Kirk

Michael W. Kirk
*Counsel of Record*

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)

Counsel for Plaintiffs

---

[4] The Government suggests that the Court consider whether plaintiffs' claims are improperly joined in the same case, though it takes no position on the issue. *See* Gov't Damages Br. 1, n.1. We respectfully submit that the claims are properly joined as Rule 20(a) of the Rules of United States Court of Federal Claims permits joinder of claims "arising out of …the same series of transactions" where, as here, the claims present common questions of fact or law. In any case, if the Court concludes otherwise, the proper course would be to sever the plaintiffs' claims into separate actions and then consolidate the actions pursuant to RCFC 42(a). *See Franconia Assocs. v. United States,* 61 Fed. Cl. 335, 336-38 (2004); *Cienega Gardens v. United States*, 62 Fed. Cl. 28, 31-32 (2004). Thus, whether the Court elects to order severance ultimately makes no substantive difference.

*Of Counsel*:

Michael Weitzner

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of July 2008, I caused to be served by the Court's electronic filing system a copy of the foregoing on the following counsel:

Stephen C. Tosini, Esq.
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, N.W., Room 11014
Attn: Classification Unit—8th Floor
Washington, DC 20530

s/ Michael W. Kirk