**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 06-CV-141<br>(Senior Judge Smith) |

**PLAINTIFFS' SUPPLEMENTAL APPENDIX IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel*:
Michael Weitzner
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

July 25, 2008

# Index to Appendix

United States' Responses to Plaintiffs' Proposed Findings of Uncontroverted Fact (Doc. No. 18) (8/11/2006) ........................................59

Stipulated Facts of the Parties Relating to Pending Motions for Summary Judgment and Related Motions........................................63

Contract between Defense Supplies Corporation and Shell Oil Company (5/1/1943) .................70

United States Post-Trial Brief for the Allocation Trial (Filed in *United States v. Shell*, No. 91-0589 (April 1, 1998))........................................72

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | No. 06-141 C (Senior Judge Smith) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of this Court's Rules ("RCFC"), defendant, the United States, respectfully responds proposed findings filed by plaintiffs with their motion for partial summary judgment as to liability.

1. On April 10, 1942, Shell Oil Company, Incorporated, and the United States, through the Defense Supplies Corporation ("DSC"), entered into a contract for the sale and purchase of large volumes of 100-octane aviation gasoline ("Avgas"). Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (April 10, 1942) ("1942 Shell Contract"), Pl. App. 1-24.

Response:

This is a legal conclusion to which RCFC 56 requires no response here. It cannot be supported, in any event, by the cited document, which is unsigned and not authenticated in this record.

2. On May 1, 1943, Shell Oil Company, Incorporated, and the United States, through the DSC, entered into a contract for the sale and purchase of large volumes of Avgas. Contract

remaining waste is acid sludge, most of which "result[ed] from the chemical treatment of non-avgas refinery products using spent alkylation acid." Id.

16. During World War II, the Government was aware that the increase in acid waste generation created problems for the Oil Companies in how to dispose of the acid waste. See, e.g., Shell, 294 F.3d. at 1050-1051; Shell, 13 F. Supp. 2d.at 1027-28; Stipulation ¶¶ 360-64, 366-70,373-75, 378, 388, 391-93, 395, Pl. App. 455-56, 457-59, 459-60, 461, 464-65, 466-67, 468.

Response:

This is an argumentative paraphrase, and potentially misleading. See our response to number 15.

17. The Oil Companies sought Government approval to build additional acid reprocessing facilities to handle increased acid waste. See, e.g., Shell 13 F. Supp. 2d.at 1028; Stipulation 339-41, 379-92, Pl. App. 452, 461-67.

Response:

Uncontroverted, but potentially misleading. Most of the reprocessing facilities approved by the Government during the War were built by chemical companies that processed the Oil Companies' spent alkylation acid under contract. 294 F.3d. at 1051.

18. The "United States refused to allocate resources to build reprocessing plants." Shell, 294 F.3d. at 1060; see also id. at 1051; Shell, F. Supp. 2d.at 1028; Stipulation 357-64, Pl. App. 454-56.

Response:

This is a truncated quotation from the cited decision and is highly misleading. The appellate court stated, "On two occasions, the government refused to allocate the materials and

resources necessary to build new acid reprocessing facilities in northern California. However, some reprocessing facilities were built during the war. . . ." 294 F.3d. at 1060.

19. One reprocessing facility that was built near the Oil Companies' refineries during World War II failed to operate at design capacity. See, e.g., Shell, 294 F.3d. at 1051; Stipulation 357-64, Pl. App. 454-56.

Response:

Uncontroverted, but the Government was not responsible. Pl. App. 520 (¶ 524).

20. . "[T]his failure resulted in dumping of both spent alkyation acid and acid sludge." Shell, 294 F.3d. at 1051; Stipulation 364, Pl. App. 456.

Response:

Uncontroverted, but the Government was not responsible. Pl. App. 520 (¶ 524). Moreover, "[t]he United States did not exercise any actual control over the Oil Companies' disposal of spent acid and acid sludge at the McColl site; indeed, it did not even know that the Oil Companies had contracts to dispose of their waste at the site." 294 F.3d at 1057.

21. "[T]he United States generally refused to make tank cars available to the Oil Companies to transport the [acid] waste to Northern California for reprocessing." Shell, 294 F.3d. at 1060; see also id. at 1050-1051; Shell, 13 F. Supp. 2d.at 1027-28; Stipulation 342, 393, 401-02, 414-15,417-18,487, Pl. App. 452, 467, 468-69, 471, 472, 507.

Response:

Uncontroverted, but see our response to number 15.

22. "By late 1944 and 1945, the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries, and the facilities for

reprocessing this acid were insufficient. When the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl site." Shell, 294 F.3d. at 1051.

Response:

Uncontroverted, but the Government was not responsible. Pl. App. 520 (¶ 524). Moreover, "[t]he United States did not exercise any actual control over the Oil Companies' disposal of spent acid and acid sludge at the McColl site; indeed, it did not even know that the Oil Companies had contracts to dispose of their waste at the site." 294 F.3d at 1057.

23. "Most of the acid waste at the McColl Site began as fresh sulfuric acid … that was used in the alkylation units to produce alkylate for [Avgas]." Stipulation 496, Pl. App. 511; See, e.g., Shell, 13 F. Supp. 2d.at 1023-26.

Response:

This is literally uncontroverted but incomplete and potentially misleading. A majority of the total waste discovered at the McColl site "was acid sludge resulting from the chemical treatment of non-avgas refinery products using spent alkylation acid." 294 F.3d at 1051 (emphasis added).

24. The remaining acid waste at the McColl Site was related to benzol production. Shell at 294 F.3d.1051; Shell, 13 F. Supp. 2d at 1023.

Response:

Uncontroverted, but, for precision, "about 5.5% was acid sludge resulting from the treatment of government-owned benzol." 294 F.3d at 1051.

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural
Resources Division

JOSHUA M. LEVIN
MICHAEL ZEVENBERGEN
H. MICHAEL SEMLER
Environment & Natural
Resources Division
Environmental Defense Section
United States Department of
Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: 202-514-4198

NORA M. MANELLA
United States Attorney

LEON W. WEIDMAN
Assistant United States
Attorney
Chief, Civil Division

KURT ZIMMERMAN
Assistant United States
Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: 213-894-0474

RONALD L. OLSON
PETER R. TAFT
CARY B. LERMAN
CYNTHIA L. BURCH
MUNGER, TOLLES & OLSON
355 South Grand Avenue
Los Angeles, California
90071-1560
(213) 683-9100

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., Plaintiffs, v. SHELL OIL COMPANY, et al., Defendants. | CASE NO. Civ. 91 0589 RJK(Ex) |
| | **STIPULATED FACTS OF THE PARTIES RELATING TO PENDING MOTIONS FOR SUMMARY JUDGMENT AND RELATED MOTIONS** |
| AND RELATED ACTIONS. | Date: [No Hearing]<br>Time: [None]<br>Ctrm: Honorable Robert J. Kelleher |

under which particular amounts of sulfuric acid could be allocated. [us272]

337. The actual allocation was done through sub-orders sent to individual acid producers. These sub-orders specified the amount of certain grades of sulfuric acid that an acid producer could sell to each customer. [us273]

Acid Reprocessing Plants

338. From 1941, the United States was aware that spent alkylation acid and acid sludge were produced in the manufacture of aviation gasoline and that increasing production of aviation gasoline would increase the amount of spent alkylation and acid sludge produced. [co181]

339. Limitation Order L-41 required WPB approval for all industrial construction projects above a minimal size, including the construction of facilities to produce and reprocess sulfuric acid. [us274]

340. Construction of new regeneration facilities required WPB approval. Without that approval, the materials needed for construction could not be obtained. [co120]

341. All WPB decisions relating to construction or modification of spent sulfuric acid reprocessing facilities subject to Limitation Order L-41 were made pursuant to the WPB's powers to allocate resources for the war effort. [us275]

342. Similarly, all WPB decisions regarding construction of storage tanks, or the use of tank cars for sulfuric acid transport, were made pursuant to the WPB's powers to allocate resources for the war effort. [us276]

392. By letter dated September 9, 1944, Tidewater stated that it did not agree that there were adequate facilities, stating:

> "Our Company is still greatly concerned with the fact that there do not appear to be adequate sludge disposal facilities available here in California to handle the acid sludge resulting from the maximum operations of present and authorized alkylation facilities. As we understand the situation, the War Production Board has taken full responsibility to dispose of all our acid sludge when we operating these large facilities at Avon at well above AGAC maximum rating."

The PAW sent this correspondence to the Chairman of the PAW District V, Aviation Gasoline Subcommittee who responded to the PAW that Paul C Skinner, the WPB employee following the acid situation, had informed the Committee that the "alkylation spent acid is pretty much in balance in California at the present time" and that General Chemical could increase the amount of spent alkylation acid reprocessing capacity if required, provided reasonable notice were given. [co126]

393. On December 1, 1944, Tidewater stated that, in its view, the projected increase in alkylation acid sludge could not be handled, specifically mentioning tank car shortages and inconsistent demands of Shell Chemical as an example. [co127]

394. There is no evidence that any of the acid sludge dumped at the McColl Site was shipped from Tidewater's San Francisco-area refinery. [us346]

report these deliveries on a monthly basis to the WPB. This included all petroleum refiners. [co153]

417. A WPB publication dated December 9, 1944, stated that it was not just sulfuric acid that was in short supply, but that "tank cars are more critical than the product they carry." It reported that an additional 1,100 acid tank cars would be needed by April 1945. It stated that the WPB intended to convert petroleum tank cars, but there was already a shortage of 15,000 petroleum tank cars. Nonetheless, telegrams were sent to oil companies ordering them to deliver tank cars for conversion no matter what their objection. [co154]

418. In January 1945, the Office of Defense Transportation noted that shortage would be 1,200 tank cars as of July 1945, and stated that there was already a shortage of at least 290 acid tank cars with none idle. The WPB recommended a construction program for 600 new acid tank cars and the conversion of 600 additional cars. The DSC was requested to finance the conversion of 239 to be provided by private industry. [co155]

419. On the West Coast, in part due to the failure of the Stauffer reclamation plant, acid had to be obtained from Arizona. [co156]

420. When the government determined that the provision of tank cars was a war priority, it had the authority to order the cars where it wished. As part of the December 1944 conversion, it ordered the Carter Oil Company to deliver five specifically identified cars as follows:

Exhibit A To Preliminary Draft Pretrial Order

Dated December 11, 1997

United States et al. v. Shell Oil Co. et al.

Case No. 91 0589 RJK(Ex)

**SUPPLEMENTAL STIPULATED FACTS OF THE PARTIES RELATING TO PENDING TRIAL TO ALLOCATE RESPONSE COSTS BETWEEN THE OIL COMPANIES AND THE UNITED STATES**

TABLE OF CONTENTS

Page(s)

Prologue . . . . . . . . . . . . . . . . . . . . . . . . . 1

Amounts Of Waste Disposed Of At The McColl Site By Each Oil Company . . . . . . . . . . . . . . . . . . . . . . . . 2

The Oil Companies' Relationships With Eli McColl . . . . . . 3

Shell's Disposal Contracts With Gray Trucking . . . . . . . . 6

Shell's 1941 Oil And Gas Leases At The Emery Ranch, Including Part Of The McColl Site . . . . . . . . . . . . 7

Charles Emery's 1942 Lease . . . . . . . . . . . . . . . . . 11

Eli McColl's Lease Of The Charles Emery Property . . . . . . 12

Eli McColl's Agreement With Helen Grant . . . . . . . . . . . 12

Shell's Disposal Contracts With Eli McColl . . . . . . . . . 14

Eli McColl's Unsuccessful Application For A Sludge Disposal Permit In Los Angeles County . . . . . . . . . . . . . . . 16

McColl Site Disposal . . . . . . . . . . . . . . . . . . . . 20

Production Of Waste Disposed At The McColl Site . . . . . . . 20

Acid Disposal Practices Of The Oil Companies . . . . . . . . 22

487. During his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl represented that "the government [would] not allow [him, or the companies he represented] to use tank cars" to ship acid to northern California for use as fertilizer. McColl provided no further details or illustrations to the Commission in support of this contention. [cc151]

488. In his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl described the refinery process resulting in acid sludge as follows:

> "The sulfuric acid, the product which we start with, serves a dual purpose. It is used in concentrated form in the production of a product called alkalate which is essential in the production of aviation gasoline. We have it in concentrated form, and use it for this first of all. After serving its purpose in that respect, we then use it as a treating agent in the manufacture of kerosene and petroleum. It has the ability to absorb the pitch, tar and gum out of the gasoline. After it has absorbed all of this, it is then known as acid sludge. It is then a waste product and there is a question of disposing of it."

[cc152]

489. In his presentation to the Los Angeles County Planning Commission on May 5, 1942, seeking a permit for a dump in Brea Canyon, Eli McColl stated that he represented "seven oil companies in the Wilmington area. As far back as 1930, we

cost of avgas. Unocal included 100% of the capital cost of the catalytic cracker in determining the facilities charge, which was then included in the price of avgas. [cc50]

608. Each of the oil companies' contracts stated: "substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline." [cc55]

609. The contracts for avgas entered into between the United States and the oil companies during World War II were terminated in 1945 or, in the case of Richfield, shortly thereafter. Matters relating to profits from these contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s. [cc58]

<u>The Planned Blending Program</u>

610. There is no direct evidence linking the Planned Blending Program to waste dumping at the McColl Site. [us442]

611. The "quickie" program was to increase the production of avgas in 1942 before new facilities were to come on line. This was done by converting existing facilities and combining components often from different refineries. The 1948 RFC Report stated that "[t]he transference of components from one plant to another and the diversion of refining facilities was sometimes cumbersome, often costly. However, cost was secondary factor to military requirements." [cc27]

612. The Government diverted butylenes from the manufacture of butydiene, the main ingredient of synthetic rubber, to the production of aviation gasoline. This shift required that the

CONFORMED COPY

BKB

CONTRACT

between

DEFENSE SUPPLIES CORPORATION

and

SHELL OIL COMPANY, INCORPORATED

(California Refineries - Second Contract)

100-OCTANE AVIATION GASOLINE

May 1, 1943

230052

most closely approximate the discontinued one, and if they shall be unable to agree within ten (10) days after notice of such discontinuance as to the index to be substituted, the determination of the new index shall be made by arbitration under Section XI hereof.

(d) The base prices specified in Sections IV (a) and IV (b) hereof are based upon present normal methods of transporting petroleum raw materials to Seller's refineries at Wilmington-Dominguez and Martinez, California, and upon a normal operation of said refineries in which substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline. If it becomes necessary to transport petroleum raw materials to said refineries by other than present normal methods thereby incurring additional cost of transportation, or if through an abnormal reduction of available markets for motor fuel and petroleum products other than 100 octane aviation gasoline, or if by reason of any cause or condition (whether or not of the same class or kind) resulting directly or indirectly from the existence of a state of war, the normal functioning of any refinery at which any portion of the 100 octane aviation gasoline supplied hereunder is manufactured shall be interfered with to such an extent that in the opinion of Seller the cost of refining that 100 octane aviation gasoline sold at such base prices is increased in respects other than those corrected by adjustment of the base prices under the above paragraphs (a), (b), and (c), of this Section V, Seller may give notice to Buyer that the delivery of 100 octane aviation gasoline will be reduced in an amount sufficient in the judgment of Seller to offset the added cost of refining unless Buyer shall agree with Seller to increase such prices paid for 100 octane aviation gasoline by an amount sufficient to offset such increased cost. If within ten (10) days after the date of mailing such notice Buyer advises Seller that it does no elect to take such reduced output and Buyer and Seller are unable to agree upon the amount of such increase in price within ten (10) days thereafter, Buyer may give notice to Seller ~~that it~~ desires to have the amount of such increase fixed by arbitration in accordance with Section XI hereof. The arbitrators to be chosen in this instance shall be persons who have had at least ten (10) year's experience in the petroleum business and who are not connected with either of the parties hereto. The arbitrators shall be directed to make their findings as to the amount and effective date of such price increase, if any, within fifteen (15) days after the appointment of the last-appointed arbitrator and if no decision is reached by the

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural Resources Division
JOSHUA M. LEVIN
MICHAEL J. ZEVENBERGEN
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Telephone: 202-514-4198

NORA M. MANELLA
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
JOHN RUBINER
Assistant United States Attorney
Room 7516 Federal Building
300 North Los Angeles Street
Los Angeles, CA 90012
Telephone: 213-894-2451

Attorneys for United States of America

RECEIVED
APR 02 1998
PRT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., Plaintiffs, v. SHELL OIL COMPANY, et al., Defendants, | CASE NO. Civ. 91 0589 RJK(Ex) |
| | UNITED STATES' POST-TRIAL BRIEF FOR THE ALLOCATION TRIAL |
| AND RELATED ACTIONS. | Date: N/A<br>Time: N/A<br>Ctrm: Honorable Robert J. Kelleher |

2. ***Whether all or only a part of the acid waste at the McColl Site is attributable to av gas production.***

3. ***Whether all or only a part of the acid waste at the McColl Site is related to av gas production.***

Because the United States was sued only for av gas wastes, the threshold issue is, "How much of the waste at the McColl Site came from av gas production?" Disputed Issues 2 and 3 both raise this issue; differences in their wording are insignificant.

This Court heard the testimony of Robert Anderson, a refinery operations expert, who explained that, as an upper limit, no more than 25% of the acid waste at the McColl Site came from av gas production. Tr. 520:20-521:25. In addition, roughly 5.5% of McColl waste came from Shell's benzol treating. Ex. 1593 (pie chart showing benzol waste as 5.5% of McColl Site waste); Tr. 493:3-494:6; 509:4-19; Stip. Fact 498 (benzol waste was approximately 9% of Shell's McColl Site waste). This results in a total upper limit of 30.5% of McColl waste for which the United States shares some liability with the Oil Companies.

In opposition, the Oil Companies failed to present any refinery expert to rebut Mr. Anderson's testimony. Their retained expert, Dr. Charles Satterfield, an emeritus professor at M.I.T. and a frequent refinery operations consultant to major oil companies, was not called to testify. See Decl. of Dr. Charles Satterfield ¶ 1 (filed with Oil SJ Br., Jan. 11, 1995).

The United States submits that Mr. Anderson's calculations are therefore the only credible evidence on the pivotal question of the percentage of McColl Site waste due to av gas. In the

Table 5, lines 15-16 (all refiners); Tr. 461:25-462:4; 545:19-546:25.

Adding the direct and indirect contributions of av gas to acid sludge generation, Mr. Anderson determined that 13% of the acid sludge that Defendants sent to the Site came from av gas production. Ex. 1593 (chart showing percentage of acid sludge from av gas production for all defendants); Tr. 509:4-510:6. In addition, roughly 5.5% of the acid sludge was from Shell's benzol treating, and the remaining 81.5% of the acid sludge was from other products. Id. These composite numbers were calculated based on a weighted average of the percentage of each Defendant's sludge due to av gas, multiplied by the percentage of waste each defendant sent to the site. Tr. 506:20-509:11. The weighted average calculations are shown on Table 5 of Exhibit 1042 and the chart identified as Exhibit 1593.[4] See Tr. 504:13-510:6.

2. Upper limit of spent alkylation acid dumped

In addition to the acid sludge sent to the McColl Site, the parties agree that during a roughly six-month interval from November 1944 through April 1945, the Oil Companies also sent some spent alkylation acid to the McColl Site. Stip. Facts 493,

---

[4] The weighted average calculation uses the percentages of waste sent by each Company in Stipulation 432. See Ex. 1042, Table 5, line 17. Slightly different percentages appear in Stipulations 433 and 434. The source of Stipulation 432 is the later of two meeting minutes of the Refiners' Committee on Waste Disposal at which such estimates were given. The figures are also more specific than those in the other two sources. The United States therefore believes these figures are the most accurate. In any event, all three sources agree that Shell, Union and Richfield sent at least 90% of the wastes to the McColl Site. Differences over how the remaining 10% is apportioned have almost no effect on Mr. Anderson's weighted average calculation.

**CERTIFICATE OF SERVICE**

I certify that on July 25, 2008, the attached document was filed electronically. I understand that service is complete upon filing and that parties may access this filing through the Court's ECF system.

s/Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)