# In the United States Court of Federal Claims

Case No. 06-141C
FOR PUBLICATION
Filed: May 27, 2010

* * * * * * * * * * * * * * * * * * * * * * * *
**SHELL OIL COMPANY and**          *      RCFC 12(a); RCFC 12(b)(6);
**ATLANTIC RICHFIELD COMPANY,**    *      RCFC 56(c); CERCLA; "Charges;
                                   *      "By reason of;" *Ford Motor Co. v.*
            *Plaintiffs*,          *      *United States*, 378 F.3d 1314 (Fed
                                   *      Cir. 2004); First War Powers Act of
       v.                          *      1941; Executive Orders 9024, 9001
                                   *      9040; National Defense Act of 1916;
**THE UNITED STATES**,             *      *Cadillac Fairview/California, Inc. v.*
                                   *      *Dow Chem. Co.*, 299 F.3d 1019 (9th
            *Defendant.*           *      Cir. 2002); Anti-Deficiency Act,
                                   *      Pub. L. No. 59-28, 34 Stat. 27, 49 (1906)
* * * * * * * * * * * * * * * * * * * * * * * *

*Michael W. Kirk*, with whom were *Nicholas A. Oldham,* and *Vincent J. Colatriano,* Cooper & Kirk, PLLC, Washington, D.C., for Plaintiffs.

*Kyle Chadwick,* Senior Trial Counsel, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for Defendant. *Ruth Kowarski,* Senior Assistant General Counsel, Real Property Division, General Services Administration, of Counsel, for Defendant.

## OPINION

**SMITH, Senior Judge:**

### I INTRODUCTION[1]

During World War II, the United States required massive quantities of 100-octane aviation gasoline ("avgas") for use in airplane engines. The production of avgas was a critical requirement

---
[1] Unless otherwise stated, the following facts and procedural history, which are not in dispute, can be found in Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss and in Support of Their Cross-Motion for Summary Judgment as to Liability.

1

for the successful prosecution of the war.[2] Because of this, the Government had the authority to require the production of avgas at refineries owned by Plaintiffs and to seize the refineries if necessary. However, instead of seizing the refineries, the Government entered into contractual agreements with Plaintiffs to ensure avgas production.

Long after World War II (WWII) was over and after the contracts had expired, Plaintiffs were held liable for the costs of cleaning up the waste produced during the production of the avgas.[3] Plaintiffs come before this Court contending that, pursuant to the contracts, the Government must reimburse them for the cleanup costs. The Government counters that Plaintiffs' claims allege an indemnification clause, a clause that was not found on the face of the contracts and, therefore, the Government is not liable. Even if an indemnification clause can be read into the contracts, the Government further argues that it lacked statutory authority under the Anti-Deficiency Act (ADA) to agree to such a clause. Thus, the Government contends that it cannot be responsible for reimbursing the Plaintiffs for their cleanup costs.

Presently before the Court are Defendant's Motion to Dismiss and Plaintiffs' Cross-Motion for Summary Judgment as to Liability. After full briefing, oral argument, and careful consideration, the Court hereby **DENIES** Defendant's Motion to Dismiss and **GRANTS** Plaintiff's Cross-Motion for Summary Judgment as to Liability for the reasons set forth below.

## II. FACTS

### A. The Contracts

From January 1942 through May 1943, Plaintiffs entered into 10 separate contracts[4] (collectively Avgas Contracts) with the Defense Supplies Corporation (DSC), a component of the Reconstruction Finance Corporation (RFC). Plaintiffs' Appendix (P. App.) 1-243; *see also* D. Br. 2. The Avgas Contracts contained 17 numbered sections, not all of them used in every contract. D. Br. 6. The pertinent section for this opinion can be found in the "Taxes" clause, which states in subsection (a), that the Government agreed to pay:

---

[2] As Under Secretary of War Robert P. Patterson's stated "[i]f we have a program more urgent than the 100-octane gasoline program, I do not know what it is." Memorandum from Robert P. Patterson (Oct. 10, 1942).

[3] These facts can be found in cases reported at *United States v. Shell Oil Co.*, 294 F.3d 1045, 1050 (9th Cir. 2002); *United States v. Shell Oil Co.*, 841 F. Supp. 962, 968-74 (C.D. Cal. 1993).

[4] Because one of the contracts canceled another contract, there are actually nine contracts at issue here. Hr'g Tr. 4-5.

> [A]ny new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [avgas].

P. App. at 41-42. The contracts also contained provisions in which the Government agreed to bear the risk of increased costs in the production of avgas, unless the Government was willing to accept reduced production. P. App. 36.

### B. The Dumping of Acid Waste

Avgas is a blend of several different chemical elements which produced sulfuric acid waste as a byproduct. During WWII, it was necessary to produce large quantities of avgas which generated much larger quantities of acid waste than before the war. As a result, Plaintiffs had to send some of the acid waste to a hazardous materials dump (the McColl Site). The McColl Site was chosen because the demands of WWII caused chronic shortages of tank cars that otherwise might have otherwise been available to transport acid waste elsewhere for reprocessing. Plaintiffs also requested additional resources for the construction of new reprocessing plants to eliminate the waste. However, the Government denied these requests.

### C. The Clean-Up

In 1991, the United States and the State of California brought suit against Plaintiffs in the Central District of California pursuant to CERCLA[5] for recovery of costs incurred in cleaning up the acid waste at the McColl Site. Plaintiffs counterclaimed against the United States, asserting that the Government should be held responsible for the CERCLA costs. Under CERCLA, the United States Environmental Protection Agency (EPA) has broad authority to provide for cleanup of sites contaminated by hazardous substances. The United States may bring suit to hold the parties responsible for the hazardous substances financially liable for the cleanup. While all responsible parties are jointly and severally liable, the court has the authority to equitably apportion the cleanup costs among them. 42 U.S.C. § 9613(f)(1).

In 1993, the district court granted partial summary judgment in favor of the United States and the State of California, holding that Plaintiffs were responsible parties and thus liable under CERCLA. *Shell Oil*, 841 F. Supp. at 968-74. Later, in 1994, the parties entered into a partial consent decree pursuant to which Plaintiffs provisionally paid $18,000,000 for CERCLA costs incurred by the United States and State of California through 1990; however, Plaintiffs retained the right to recover those funds should the Government ultimately be held responsible for the cleanup or liable under the Avgas Contracts to reimburse the Plaintiffs. Partial Consent Decree, P. App.

---

[5] The Comprehensive Environmental Response, Compensation and Liability Act of 1978, as amended, 42 U.S.C. §§ 9601-9675 (2006).

345-76.

In 1995, the district court granted Plaintiffs partial summary judgment as to the liability of the United States as an "arranger" under CERCLA for the CERCLA costs.[6] *United States v. Shell Oil Co.*, No. CV 91-589, 1995 U.S. Dist. LEXIS 19778, at *18-*25 (C.D. Cal. Sep. 18, 1995). Because the court had found both the Plaintiffs and United States jointly liable under CERCLA, it conducted a trial in 1998 to determine the appropriate allocation of the cleanup costs. Based on the parties' stipulations and the evidence presented at trial, the district court allocated 100 percent of the costs of cleaning up the avgas waste[7] to the United States, which included the $18,000,000 previously paid by the Plaintiffs. *Shell Oil*, 13 F. Supp. 2d 1018, 1030 (C.D. Cal. 1998).

On appeal, the Ninth Circuit reversed the ruling that the United States was liable as an "arranger" for the avgas waste and remanded the case back to the district court. *Shell Oil*, 294 F.3d at 1048-49. Because the Court of Appeals concluded that the United States was not an "arranger" under CERCLA for the avgas waste, it did not directly address the district court's allocation of liability for the cleanup of that waste. *Id*. at 1059. Following remand, the district court resolved all remaining counterclaims, except that it transferred the Plaintiffs' counterclaim for breach of contract to this Court, pursuant to 28 U.S.C. § 1631. *Shell Oil Co. v. United States*, No. 05-704 (Fed. Cl. 2005).

In order to exhaust their administrative remedies in accordance with the Contract Settlement Act of 1944 (CSA), 41 U.S.C. § 113, Plaintiffs voluntarily dismissed the transferred complaint without prejudice. After exhausting those administrative remedies as required by the CSA, Plaintiffs brought this action.

### III. STANDARD OF REVIEW

---

[6] An "arranger" under CERCLA is "any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party." 42 U.S.C. § 9607(a)(3).

[7] The McColl Site was also found to have a small percentage of benzol-related waste, caused by the refinement of benzol which was wholly owned by the government and not directly related to the production of avgas. The district court, later affirmed by the Ninth Circuit, found the Government wholly liable for the cleanup of this benzol (or non-avgas) waste. *See Shell Oil*, 294 F.3d at 1060.

RCFC 12(b)(6) provides for dismissal of a claim when a plaintiff has failed to state a claim upon which relief can be granted. Dismissal is only appropriate when the accepted pleading standard set forth in RCFC 8(a)(2) is not met: "once a claim for relief has been stated adequately, it may be supported by showing any set of facts consistent with the allegation in the complaint." *Bell Atl. Corp.v. Twombly*, 550 U.S. --, 127 S. Ct. 1955, 1969 (2007). Moreover, once a claim has been adequately stated, "a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* (citation and internal quotation marks omitted).

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Genuine issues of material fact that may significantly affect the outcome of the matter preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine issue concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Id.* at 248. The non-movant must establish the existence of a material element on which movant bears the burden of proof. *Celotex*, 477 U.S. at 324. The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *Anderson*, 477 U.S. at 242. As the parties agree that the material facts are not in dispute, disposition by summary judgment is appropriate here.

## IV. DISCUSSION

Two questions are now before this Court. First, do the Avgas Contracts require the United States to reimburse the Oil Companies for the CERCLA cleanup costs they incurred by reason of their production of the avgas during WWII? And Second, did the Anti-Deficiency Act ("ADA") deprive the Government of the authority to promise to reimburse the Oil Companies for the CERCLA cleanup costs they incurred by reason of their production of the avgas during WWII?

### A. The Contract Language Requires Reimbursement

The "Taxes" clause in each of the Avgas Contracts states in pertinent part that:

> [The Government] shall pay . . ., any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required to pay by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [avgas] . . . .

P. App. at 41-42.  Plaintiffs claim that, under the language of the contracts, the Government must reimburse Plaintiffs for costs to clean up the McColl site because the costs are: (1) new or additional charges; (2) which Plaintiffs have been required to pay under federal law; and (3) were incurred by reason the production, manufacture, sale, or delivery of the avgas.  Plaintiffs contend that none of the elements above are in factual dispute and thus, Defendant's refusal to compensate Plaintiffs is a breach of the Avgas Contracts.  P. Mot 26.  In response, the Government contends that Plaintiffs cannot recover despite the reimbursement clause's plain meaning because: (1) the new or additional costs must have been imposed during contract performance, and (2) the Oil Companies did not incur the costs "by reason of" their performance of the Avgas Contract.  D. Br. 11-12.

### 1.  The Claimed Costs are "Charges"

The Government argues that the "Taxes" clause is a supplemental pricing term, not an indemnification clause. The Government further argues that the clause should not be construed so that it locks the parties into any rights or obligations indefinitely without clear indication showing such intent.  *Consumers Ice Co. v. United States*, 475 F.2d 1161, 1166-67 (Ct. Cl. 1973). Furthermore, even if construed to resemble an indemnification clause, the Government contends that the "Taxes" clause is expressly limited to taxes, fees, and charges incurred by reason of the production, manufacture, sale, or delivery of avgas, and thus, CERCLA liabilities do not fit into those categories.  D. Reply 2-4.

In response, Plaintiffs argument is two-fold.  First, Plaintiffs direct the Court's attention to both the WWII and current editions of both legal and general dictionaries for the definition of the word "charge."  The definition as found in Black's Law Dictionary 2004 edition, states that "charge" is, among other things, "[p]rice, cost or expense."  BLACK'S LAW DICTIONARY 248 (8th ed. 2004). In the 1993 version "charges" were defined as "[t]he expenses which have been incurred, or disbursements made in connection with a contract, suit, or business transaction."  BLACK'S LAW DICTIONARY 310 (3d ed. 1933).   The general dictionaries define "charge" as an "expense, cost"; THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000); The New Century Dictionary 239 (2d ed. 1946) (same), and the Webster's 1941 edition defines "charge" as, among other things, "[c]ost; expense; as the charges of war."  WEBSTER'S NEW CENTURY DICTIONARY OF THE ENGLISH LANGUAGE  288 (Unabridged 1941).  Pl. Reply 3-5.

Second, Plaintiffs assert that courts often speak of "charges" as encompassing CERCLA costs. Plaintiffs cite several cases supporting this contention. *See, e.g. City of Wichita v. APCO*, 306 F. Supp. 2d 1040, 1093-94 (D. Kan. 2003) (the district court found that a state agency's "charges [for government oversight were] necessary costs of the response at the Site and were fully recoverable); *Bancamerica Commercial Corp. v. Trinity Indus., Inc.*, 900 F. Supp. 1427, 1460-61 (D. Kan.1995) (finding that the 'charges" the liable party paid to a vendor relating to testing, characterizing, and removing hazardous substances "are to be considered CERCLA response costs").

Likewise, in *Foster v. United States*, 130 F. Supp. 2d 68 (D.D.C. 2001), the court stated that "[a] party liable for the presence of hazardous substances under CERCLA may be charged for the cost of ascertaining the danger posed by an actual or threatened release of hazardous substances." *Id.* at 77.

It has been repeatedly held that a court may rely on the dictionary definition of a contract term to identify that term's plain meaning. *See, e.g. Buchanan v. Dept. of Energy*, 247 F.3d 1333 (Fed. Cir. 2001); *Info. Sys. & Network Corp. v. United States*, 68 Fed. Cl. 336 (2005). It is clear that the definition of the word "charge" includes costs and expenses. The Court finds that under this backdrop, the Plaintiffs claimed "costs" are "charges" as the term is understood in "ordinary parlance." *Buchanan*, 247 F.3d at 1339. Specific CERCLA liability, while not contemplated by the parties at the time the contract was signed, was clearly a new charge which was contemplated by parties under the language of the contracts. Thus, this Court finds that the money paid by Plaintiffs to the Government as a result of their CERCLA liability was a cost that is a reimbursable charge under the Avgas Contracts. What strengthens this view is the undisputed fact that but for the contracts' production of avgas no CERCLA "charge" would have occurred.

### 2. Contract Performance Not Limited to Costs Imposed or Incurred During Contract Performance

The Government urges the Court to read a time limitation into the reimbursement clause, stating that "nothing in the clause supports the argument that the obligations extend into the *indefinite* future, decades after the contracts were closed out . . . ." D. Reply 4 (emphasis in original). The Government asserts that "it is clear" that the reimbursement clause covers only "costs imposed *during* contract performance." D. Br. 11 (emphasis in original). And, even if the CERCLA liabilities were construed as a "charge," the Government argues that Plaintiffs' liabilities were not imposed "by reason of" the production, manufacture, sale or delivery of the avgas. D. Reply 4. Instead,"[t]he liabilities were imposed by reason of the evidence that the Oil Companies dumped acid waste at the McColl site in California." *Id.* This is a little like saying in a murder defense, "there is no evidence the shooter caused the death; it was caused by the bullet!"

Plaintiffs argue that the Taxes clause is not limited to the costs incurred during the performance on the grounds that the clause contains the phrase "by reason of"and "new or additional." P. Br. 26. Plaintiffs again rely on the basic principle of contract interpretation, that contract terms are accorded their "plain and ordinary meaning." *Info. Sys.*, 68 Fed. Cl. at 341; P. Reply 6. Moreover, Plaintiffs argue that the plain language of the clause in no way distinguishes between new costs imposed during contract performance and new costs imposed after contract performance. P. Br. 26.

It is clear to the Court that the only connection between the costs and contract performance specified in the contract is that the Oil Companies must incur the costs "by reason of" the production of avgas in performance of their contracts. Taxes Clause, P. App. 41-42. It is also clear that the plain language of the reimbursement clause does not limit reimbursement to costs imposed only during contract performance. Once again, the Court relies on the plain language of the clause in its determination and judicial interpretation of the phrase "by reason of." In *Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584, 589 (1st Cir. 2004), the First Circuit held that "the language [is] unambiguous: 'by reason of' means 'because of.'" BLACK'S LAW DICTIONARY 201 (6th ed. 1990)." This Court also finds that the phrase is unambiguous; the phrase "by reason of" means "because of" as used in these contracts. Further, it is apparent after reading the clause, that it does not matter when the Oil Companies incurred the costs or when they were imposed; instead what matters is that the costs are causally related to performance of the Avgas Contracts. This is what "by reason of" clearly means. The contract language itself in no way distinguishes between new costs imposed during contract performance and new costs imposed after contract performance, a limitation the Government most certainly could have imposed. It can be presumed that this was not done because such a distinction would be contrary to the parties' shared understanding that the Government would bear all of the costs associated with the production of avgas in order to win the war.

The Government further argues that the contractual phrase "by reason of" establishes a proximate causation standard rather than a but-for causation standard. However, the Court need not resolve this issue. Even if the contract is interpreted to require a showing that the Oil Companies' avgas production proximately caused them to incur the CERCLA costs, the undisputed facts show that this standard has been satisfied. The CERCLA litigation facts and the Government's own stipulations make clear that production of the avgas to satisfy the Oil Company's contractual obligations necessarily entailed disposal of the hazardous waste. Put another way, the Oil Companies could only have avoided disposing of the waste by reducing or stopping the production of avgas. If the Oil Companies reduced the production of avgas, the Oil Companies would have been in violation of their contractual obligation satisfying the Government's wartime requirements. Further, it is undisputed that the relevant hazardous substances, "acid sludge and alkylation acid, necessarily resulted from the production of avgas." *Shell*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778 at *7.

It is likewise without dispute that, once it was produced, the Oil Companies had no alternative but to dump the hazardous waste. Furthermore, there were no reasonable alternative methods of disposal. *Shell*, 13 F. Supp. 2d at 1028. The huge volume of avgas required by the Armed Forces resulted in a correspondingly huge volume of acid waste that overwhelmed existing treatment facilities. *See* Stipulation, ¶¶ 379-94, 413-20; Pl. App. 461-67, 471-73; *Shell*, 294 F.3d at 1060; *Shell*, 13 F. Supp. 2d at 1027. Plus, "[when] the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl site." *Shell*, 294 F.3d at 1050-51. There is no evidence that the Oil Companies had any other available alternative but to dump the waste. In fact, the Oil Companies sought Government permission to transport the waste, or alternatively to build additional treatment facilities, but the

Government refused to authorize the diversion of resources necessary to implement alternatives. *See* Stipulation, ¶¶ 379-94, 413-20; *Shell*, 294 F.3d at 1060; *Shell*, 13 F. Supp. 2d at 1027. Thus, because the only alternative to dumping the waste was the reduction or halting of avgas production, it is clear the dumping occurred "by reason of" the production of avgas. To ignore this fact is to ignore history of our Nation's struggle in WWII. To now refuse to pay costs imposed by supporting the war effort on behalf of the United States does not befit the honor of our Nation.

Plaintiffs further rely on *Ford Motor Co. v. United States*, 378 F.3d 1314 (Fed. Cir. 2004) (holding that Ford was later entitled to recover environmental cleanup costs that arose long after Ford's WWII contract) and *E. I. DuPont de Nemours & Co. v. United States*, 365 F.3d 1367, 1369 (Fed. Cir. 2004) (holding that DuPont was entitled "to recover costs it incurred pursuant to [CERCLA] for an ordnance plant it built and operated for the government during World War II") in support of their position that the passage of time does not negate liability "nor does it defeat the government's obligation of reimbursement." *Ford*, 378 F.3d 1320. The Government asserts that these cases are not applicable to the case at hand because the reimbursement clauses in *Ford* and *DuPont* do not use the same language as the Avgas contracts. D. Reply 4-5. Indeed, the language in *Ford* is different than *Dupont*, yet the Federal Circuit did not find that the different language required a different result. In fact, if anything, the language found in the Avgas contracts is stronger than that found in the *Ford* or *Dupont* reimbursement clauses as the reimbursement clause here expressly refers to "new or additional" charges.

Both the district court and the Ninth Circuit found, "the cleanup costs are properly seen as part of the war effort for which the American public as a whole should pay." *Shell,* 294 F.3d at 1060, *see also Shell,* 13 F. Supp. 2d at 1027. Further, the fact remains that the production of avgas necessarily entailed the creation of the waste, and the Oil Companies had no alternative means available for disposing of it. As the district court found in the underlying CERCLA case, "100 percent of the non-benzol waste at the McColl site is attributable to the avgas program." *Shell*, 13 F. Supp. 2d at 1026. The Court, therefore, finds that the reimbursement clause of the contracts encompasses costs for the CERCLA cleanup as those costs were "charges" and "by reason of" production of the avgas.

### B. The Anti-Deficiency Act Does Not Apply

The Government contends that the Anti-Deficiency Act (ADA), Pub. L. No. 59-28, 34 Stat. 27, 49 (1906) bars the Oil Companies' claims. D. Br. 13-14. The relevant part of the ADA in effect during WWII provided, in relevant part:

> No Executive Department or other Government establishment of the United States shall expend, in any one fiscal year, any sum in excess

> of appropriations made by Congress for that fiscal year, or involve the Government in any contract or obligation for the future payment of money in excess of such appropriations *unless such contract or obligation is authorized by law*.

(emphasis added).

The Government contends that under the ADA it cannot be held to indefinitely indemnify a party. Further, the Government asserts that the Plaintiffs do not point to any exception within the ADA which is applicable to the contracts at issue. However, Plaintiffs argue that the contracts were, in fact, authorized by law. Plaintiffs rely on numerous statutes, executive orders and executive directives; specifically, the First War Powers Act, Executive Order 9024, Executive Order 9001, the National Defense Act of 1916, and the Defense Supplies Corporation (DSC). The Court will turn its attention to each in turn.

### 1. The First War Powers and Executive Order 9024

In *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 299 F.3d 1019 (9th Cir. 2002), the Ninth Circuit held that First War Powers Act of 1941 empowered President Roosevelt "to authorize agencies to make contracts 'without regard to the provision of law' such as the as the Anti-Deficiency Act, 'whenever he deemed such action would facilitate the prosecution of the war.'" *Id*. at 1029 (quoting First War Powers Act of 1941, Pub. L. No. 77-354, § 201, 55 Stat. 838, 839 (1941) (repealed 1996)). This the Government does not challenge. Instead, the Government argues that there is a distinction between Executive Order 9024 (the order conveying authority to enter petroleum contracts) and Executive Order 9246 (the order governing rubber production that was before the Ninth Circuit in *Cadillac Fairview*). The Government argues that Executive Order 9024 should not be read to authorize the reimbursement because of a paragraph that it claims incorporates antideficiency principles into the authority delegated by the President to the War Production Board (WPB), and, thus into the authority delegated by the WPB to the DSC. D. Reply 11. In reading it this way, the Government concludes that the holding in *Cadillac Fairview* is "immaterial." *Id.* at 12. The Court disagrees.

Executive Order 9024 established the WPB, the position of WPB chairman, and set forth its powers. The powers were broad, including the power to "[d]etermine the policies, plans, procedures, and methods of several departments, establishments, and agencies in respect to war procurement and production, including purchasing, contracting, specifications, and construction." Exec. Order No. 9024 ¶ 2 (b), Fed. Reg. 329, 330 (Jan. 16, 1942). It also mandated that all federal entities "shall comply" with the WPB Chairman's determinations and that "his decisions shall be final." *Id.* at ¶¶ 3-5.

It is paragraph 6 of the Order that the Government asserts limits the WPB Chairman's powers. This paragraph states "[t]he Chairman is further authorized within the limits of such funds as may be allocated or appropriated to the Board to employ necessary personnel and make provision for necessary supplies, facilities and services." *Id*. at ¶ 6. The Government advances the argument that this paragraph limits the previous powers granted to the Chairman. The Government asserts that because the WPB Chairman's delegation "indicates nothing with respect to the manner in which the DSC was authorized to obligate or expend appropriated funds" and because the RFC and DSC were appropriated entities, neither agency could obligate or expend funds in advance of appropriations. D. Reply 9. This simply cannot be. On its face, the provision is clear, this paragraph covers administrative expenditures of funds allocated or appropriated to the WPB. This provision created the bureaucracy of the WPB, nothing more.

Executive Order 9024 gave the Chairman broad powers, including the power to make reimbursement promises, notwithstanding the ADA. It is without dispute that the WPB Chairman delegated to the DSC the power to set the terms of the avgas contracts under the authority that was granted to him under Executive Order 9024. Following *Cadillac Fairview*, Executive Order 9024 cannot be distinguished from Executive Order 9246 and, therefore, it follows that the ADA does not bar Plaintiffs recovery for reimbursement.

### 2. Executive Order 9001

In *Cadillac Fairview*, the Ninth Circuit also invoked Executive Order 9001, 6 Fed. Reg. 6787 (Dec. 27, 1941) in support of its holding that the ADA did not bar reimbursement. *Cadillac Fairview*, 299 F.3d at 1029 n. 27. A contemporaneous opinion of Attorney General Biddle, who authored a formal opinion in 1942, concluded that the First War Powers Act and Executive Order 9001 authorized an agreement to "indemnify [a] dredge owner against loss of his dredge and plant by enemy action, and against liability as a self-insurer, under various Workman's Compensation laws." 40 U.S. Op. Atty. Gen. 225, 234, 240 (1942). This opinion makes clear that First War Powers Act and Executive Order 9001 authorized open ended indemnification agreements, as we have here. Yet, the Government asserts that this opinion has no merit, as the opinion was based on a hypothetical agreement, an agreement that would not implicate the ADA in the first instance because the Government's liability could be determined and covered by a set-aside of appropriated funds. D. Reply 10. Thus, the Government concludes, the AG's opinion has nothing to do with the ADA because the AG concluded that dredging was absolutely essential for the war effort, not indemnification. *Id*.

The interpretation of the Government's contracting authority under the First War Powers Act and Executive Order 9001 did not depend on the assumption that anti-deficiency rules were satisfied. Rather, it depended on whether the indemnification clause was "in the interest of facilitating the war effort." There is no factual dispute in this case that avgas production was essential to the war effort and to victory. Here, as in the AG opinion, the contracts were entered into "in the interest of facilitation the war effort." In *Cadillac Fairview* the ADA did not render the Government's promise to indemnify Dow Chemical for its CERCLA costs *utlra vires* because the First War Powers Act authorized the President to make such promises "without regard to the provision of law." 299 F.3d

at 1029 & n. 27. Therefore, as in *Cadillac Fairview*, the ADA does not bar reimbursement to the Oil Companies.

### 3. Executive Order 9040 and National Defense Act of 1916

Lastly, Plaintiffs rely on Executive Order 9040, 7 Fed. Reg. 527 (Jan. 24, 1942), invoking Section of 120 of the National Defense Act of 1916, Pub. L. No 64-85, § 120, 39 Stat. 166, 213 (1916) (Section 120). This provides yet another independent authorization for the Government's reimbursement promises. Pl. Reply 18. The Government contends that there is evidence that the Oil Companies received orders pursuant to Section 120, and therefore, the statute and Executive Order 9040 are irrelevant. D. Reply 12. As the Court has already found ample authority for reimbursement, the Court will only briefly address this issue.

In this case, the Oil Companies were effectively required to enter into the contracts; if the Oil Companies did not, the Government had the authority to seize the refineries. *Shell Oil*, 294 F.3d 1045, 1050. The Government asserts that being "effectively" required is insufficient absent an actual Section 120 order. D. Reply 12. However, in *International Paper Co. v. United States,* 282 U.S. 399 (1931), this argument was squarely rejected. The Supreme Court held that "all agreements were on the footing that the Government had made a requisition that the other party was bound to obey." *Id*. at 407. Further, in *Roxford Knitting Co. v. Moore & Tierney, Inc*., 265 F. 177 (2d Cir. 1920), the Second Circuit rejected the defendant's contention that the plaintiff had not been "ordered" within the scope of Section 120 to contract with the Government. The court explained that the terms of Section 120 authorized the President "to place an order" but the statute "does not prescribe the method by which an order shall be placed[.]" *Id*. at 190. Moreover, the Second Circuit held that "when a manufacturer is given to understand that he is required to supply certain goods to the government . . . and told [there is] no option to decline . . . we are satisfied that as to those goods an order has been placed . . . . Substance is not be sacrificed in such cases to form." *Id*. at 191. The situation at hand is one that is similar to *Roxford*. Section 120 was not specifically invoked, yet it applies because the Oil Companies had to provide the avgas, and if they did not, their refineries would have been seized. Thus, as in *Roxford*, substance should not be sacrificed to form.

### C. There are No Genuine Issues of Material Fact[8]

The Government argues that a stipulation entered into between the parties creates a genuine issue of material fact. The Court disagrees. The parties have stipulated that the Avgas Contracts were terminated at the end of WWII, and "[m]atters relating to profits from these contracts,

---

[8]

The Government also argues that the conformed copies of the Avgas Contracts submitted by Plaintiffs were not authentic. These contracts were culled from the Archives of the United States, and although they may not be "originals" it does not invalidate them. That complete and detailed records dating from the period of World War II may not be available at this time is not remarkable. Absent any evidence to the contrary by the Government, this Court accepts the copies of the Avgas Contracts as authenticated.

12

termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s." Stipulation No. 609.[9]  The Government argues that an issue of material fact exists as to whether the settlement of "all other issues" in the 1940s extinguished the Oil Companies' claim that the Government must reimburse them for the CERCLA costs incurred.  This cannot be.  In 1940, CERCLA issues did not exist.  Simply put, the Stipulation settled all issues that were pending at that time, and that time was in the late 1940s.  Obviously, the CERCLA liability issue could not have been resolved at that time.  Therefore, because the claim did not exist at the time of the Stipulation, it could not have been settled.

## CONCLUSION

For the reasons set forth above, the Court hereby **GRANTS** Plaintiffs' Partial Summary Judgment as to Liability, and **DENIES** Defendant's Motion to Dismiss.

**IT IS SO ORDERED.**

>                                    s/Loren A. Smith
>                                    LOREN A. SMITH
>                                    SENIOR JUDGE

---

[9] During the district court CERCLA litigation the parties entered certain stipulations. *Shell Oil Co.*, No 91-0589 (RJK) (C.D. Cal.) (Stipulation).