# In the United States Court of Federal Claims

Case No. 06-141C
For Publication
Filed: May 27, 2010

* * * * * * * * * * * * * * * * * * * * * * * * * * *
                                                          \*

**SHELL OIL COMPANY, and**                \*
**ATLANTIC RICHFIELD COMPANY,**    \*    Damages; CERCLA; Summary
                                               \*    Judgment; Issue Preclusion;
                          *Plaintiffs,*        \*    Collateral Estoppel
                                                 \*
               v.                           \*
                                               \*
**THE UNITED STATES**,                    \*
                                             \*
                         *Defendant.*          \*
                                               \*
* * * * * * * * * * * * * * * * * * * * * * * * * * *

     *Michael W. Kirk*, Cooper & Kirk, PLLC, Washington, D.C., for Plaintiffs.

     *Stephen Tosini*, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC with whom were *Gregory G. Katsas*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Kyle Chadwick*, *Joshua Levin* and *Ruth Kowarski*, for Defendant.

### OPINION and ORDER

**SMITH, Senior Judge:**

     This case involves contracts between Oil Companies and the United States that were entered into during the Second World War. At that time, the Government agreed to purchase aviation gasoline from the Oil Companies to aid in the war effort. Long after the War, and long after the expiration of the contracts, the Oil Companies were held liable for the costs of cleaning up the waste produced during the production of the gasoline. This Court held that the contracts required the Government to indemnify the Oil Companies from such costs and found the Government liable for the costs incurred as a result of the waste clean up. The Oil Companies now bring this Motion for Summary Judgment seeking reimbursement of the full costs associated with the clean up. However, the Government contends that the Oil Companies are not entitled to recover all costs incurred. After full briefing, oral argument, and careful consideration, the Court hereby **GRANTS IN PART**

1

Plaintiffs' Motion for Summary Judgment as to Damages for the reasons set forth below.

## I. Introduction

During World War II ("WWII"), the United States entered supply contracts with the Oil Companies for the production of massive quantities of 100-octane aviation gasoline ("avgas") for use in airplane engines. Long after WWII ended and the contracts expired, Plaintiffs were held liable for the costs of cleaning up the waste produced during the production of avgas.[1] Plaintiffs brought this action seeking reimbursement of those costs from the United States.

After considering motions from both parties, this Court denied the Government's motion to dismiss and granted the Oil Companies' cross-motion for summary judgment as to liability. *Shell Oil Co. v. United States*, 80 Fed. Cl. 411 (2008). The Court held that the costs incurred by the Oil Companies under the CERCLA cleanup were "charges" within the meaning of the "Taxes" clause of the aviation gasoline supply contracts. *Id.* at 415-16. Further, the clause of the contracts requiring the United States to reimburse the Oil Companies for charges related to the production of avgas was not limited to costs incurred during contract performance and thus was applicable to CERCLA cleanup costs incurred after contract performance. *Id.* at 416-18. Finally, the Court held that the Anti-Deficiency Act (ADA) did not bar claims of Oil Companies for government reimbursement of CERCLA cleanup costs, as the contracts were authorized by the First War Powers Act and various executive orders and, thus, fell within ADA exception for appropriations "authorized by law." *Id.* at 418-20.

The sole remaining issue now before the Court is the amount of damages to be awarded to Plaintiffs. Plaintiffs claim that this Court's liability ruling, various Government stipulations and the California District Court's findings establish a damage amount equal to the full amount of clean up costs. On the other hand, the Government has taken the position that the Oil Companies are not entitled to recover all of the costs they incurred cleaning up the McColl Site. Specifically, the Government contends that the costs associated with cleaning up some of the acid sludge were not incurred "by reason of" the production of avgas because some of the acid sludge arising originally from the production of avgas was then reused in other products before being dumped at the McColl Site.

---

[1] The United States and the State of California brought suit against Plaintiffs in the Central District of California pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1978, as amended, 42 U.S.C. §§ 9601-9675 (2006) ("CERCLA") for recovery of costs incurred in cleaning up the acid waste at the McColl Superfund Site in Fullerton, California ("McColl Site").

## II. Facts

Avgas was a blend of several different chemical elements, the production of which necessarily produced sulfuric acid waste.  *See*, *e.g.*, *United States v. Shell Oil Co.*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778, at *7.  Specifically, "[t]wo byproducts, acid sludge and spent alkylation acid, necessarily resulted from the production of avgas." Def. Liability Fact Resp. ¶ 12 (quoting *Shell*, 1995 U.S. Dist. LEXIS 19778, at *7), Pl. Damages App. 39; *see also* Stipulations between the United States and the Oil Companies in *United States v. Shell Oil Co.*, No. 91-0589 (RJK) (C.D. Cal.) ("Stipulation") ¶¶ 323, 493-96, Pl. Damages App. 34.  The Oil Companies' refineries "used substantial amounts of 98% sulfuric acid as a catalyst to produce alkylate, a major component of avgas."  Stipulation ¶ 493, Pl. Damages App. 36.  As the alkylate was produced, the concentration of the sulfuric acid would be reduced, and when it "reached a concentration in the neighborhood of 87-90% in the alkylation unit, it no longer served its catalytic function and was replaced."  *Id.*

This "spent alkylation acid" was then "used in treating units in the refinery, . . . [resulting in] the production of acid sludge."  *Id.*  Spent alkylation acid was also used for "the acid treatment of certain components before they entered the alkylation process in order to remove impurities and improve their quality.  *United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1024 (C.D. Cal. 1998).  In addition, some of the spent alkylation acid was reprocessed and reused in the production of other products such as motor gasoline and kerosene. Stipulation ¶ 496, Pl. Damages App. 37.  Eventually, the Oil Companies were producing so much spent alkylation acid that they could not reuse all of it in their own refineries and the facilities for reprocessing the acid were insufficient. The Oil Companies then dumped large quantities of spent alkylation acid at the McColl Site.  *United States v. Shell Oil Co.*, 294 F.3d 1045, 1050-51 (9th Cir. 2002); *see also Shell Oil Co. v. United States*, 80 Fed. Cl. 411, 417 (2008).

All of the uses of spent alkylation acid produced acid sludge.  *Shell*, 13 F. Supp. 2d at 1024.  The acid sludge "generally could not be put to further use within the refineries."  Stipulation ¶ 324, Pl. Damages App. 34-35.  Therefore much of it was dumped at the McColl Site.  Stipulation ¶ 493, Pl. Damages App. 34.

The Government stipulated in the CERCLA action that "[m]ost of the acid waste at the McColl Site began as fresh sulfuric acid . . . that was used in the alkylation units to produce alkylate for [avgas]."  Stipulation ¶ 496, Pl. Damages SJ App. 37; Def. Liability Fact Resp. ¶ 23, Pl. Damages App. 40.  The Government has also stated that the remaining waste was related to benzol production for which the Government has already been held liable.[2]  Def. Liability Fact Resp. ¶ 24, Pl. Damages App. 40; *see also Shell*, 294 F.3d at 1051; *Shell*, 13 F. Supp. 2d at 1023.

Based on these facts, the district court in the CERCLA case found that the quantity of sulfuric acid waste at the McColl Site, both spent alkylation acid and acid sludge, was "the same (or slightly

---

[2] The benzol waste is not at issue here as the Oil Companies did not bear the cost of cleaning up the benzol waste.

3

greater) . . . irrespective of whether the Oil Companies had chosen to make secondary use of the acid for non-avgas products." *Shell*, 13 F. Supp. 2d at 1026.  The court found that there was no "persuasive evidence that the secondary use of the spent alkylation acid substantially aggravated the waste cleanup problems at the McColl Site beyond what they would have been in the absence of that secondary use. . . ." *Id.*  Accordingly, the court concluded that "100 percent of the non-benzol waste at the McColl Site is attributable to the avgas program." *Id.*; *see also id.* at 1023 (both the non-benzol acid sludge and the spent alkylation acid "can be traced to the production of avgas").

### III. Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Genuine issues of material fact that may significantly affect the outcome of the matter preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine issue concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Id.* at 248, 106 S.Ct. 2505.  The non-movant must establish the existence of a material element on which movant bears the burden of proof. *Celotex*, 477 U.S. at 324.  The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  *Anderson*, 477 U.S. at 242.  The material facts are not in dispute, therefore disposition by summary judgment is appropriate here.

### IV. Discussion

#### A. The Government's Stipulations and the California District Court's Findings

The Government has conceded that "the CERCLA costs attributable to the spent alkylation acid that plaintiffs dumped at the McColl site arose 'by reason of' avgas production." Def. Opp. Brief 15.  However, the Government contends that the cost arising from the cleanup of the acid sludge did not arise "by reason of" avgas production because some of the acid sludge resulted from the Oil Companies' use of spent alkylation acid in the production of non-avgas products. *Id*. at 13-14.

This argument is contrary to the findings entered by the United States District Court in the underlying CERCLA case on the basis of extensive stipulations agreed upon by the parties and a trial at which both sides presented testimony.  That court found that "100 percent of the non-benzol waste at the McColl Site is attributable to the avgas program." *Shell*, 13 F. Supp. 2d at 1026, *aff'd in part and rev'd in part on other grounds*, 294 F.3d 1045.  In addition, this Court quoted and adopted this conclusion in its earlier ruling in this case.  *See Shell*, 80 Fed. Cl. at 417 ("it is undisputed that the relevant hazardous substances, '*acid sludge and alkylation acid*, necessarily resulted from the production of avgas'") (quoting *Shell*, No. 91-0589, 1995 U.S. Dist. LEXIS 19778 at *7) (emphasis added).

The Government claims that the "crucial flaw" in the Oil Companies' theory "is the unsupported premise that spent alkylation acid from the treatment of avgas would *necessarily* have been dumped, whether or not it was first put to further use in plaintiffs' refineries, to produce other products." Def. Opp. Br. 5 (emphasis in original). The Government claims that the Oil Companies could have avoided dumping the waste by selling or reprocessing the spent alkylation acid. *Id.*

This argument fails because the Government's own admissions and stipulations establish that the Oil Companies had no viable options for dealing with the massive quantities of spent alkylation acid generated by avgas production that did not involve dumping. This Court's prior opinion recounted and cited the evidence concerning alternatives to dumping:

> It is likewise without dispute that, once it was produced, the Oil Companies had no alternative but to dump the hazardous waste. Furthermore, there were no reasonable alternative methods of disposal. *Shell*, 13 F. Supp. 2d at 1028. The huge volume of avgas required by the Armed Forces resulted in a correspondingly huge volume of acid waste that overwhelmed existing treatment facilities. *See* Stipulation ¶¶ 379-94, 413-20, Pl. App. 461-67, 471-73; *Shell*, 294 F.3d at 1060; *Shell*, 13 F. Supp. 2d at 1027. Plus, "[when] the resulting bottleneck threatened to halt avgas production, the Oil Companies dumped large quantities of spent alkylation acid at the McColl site." *Shell*, 294 F.3d at 1050-51. There is no evidence that the Oil Companies had any other available alternative but to dump the waste. In fact, the Oil Companies sought Government permission to transport the waste, or alternatively to build additional treatment facilities, but the Government refused to authorize the diversion of resources necessary to implement alternatives. *See* Stipulation ¶¶ 379-94, 413-20; *Shell*, 294 F.3d at 1060; *Shell*, 13 F. Supp. 2d at 1027.

*Shell*, 80 Fed. Cl. at 417.

The Government asserts that the Oil Companies could have avoided dumping the waste by selling or reprocessing it. *See* Def. Opp. Br. 5. This argument is foreclosed by the Government's admissions that were cited in this Court's prior opinion. The Oil Companies could not have sold the spent alkylation acid because even if someone wanted to buy it, the fact remained that there were no tank cars available to transport the waste. *See* Def. Resp. to Pl. Findings of Fact (Doc. No. 18) ¶ 21, Pl. Supp. Damages App. 61; *see also Shell*, 13 F. Supp. 2d at 1028; *see also* Stipulation ¶¶ 342, 393, 417-18, 487, Pl. Supp. Damages App. 64-68.

The Government's stipulations and admissions similarly foreclose its claim that the Oil Companies could have reprocessed the spent alkylation acid. The Government has admitted that "'[on] two occasions, the government refused to allocate the materials and resources necessary to build new acid reprocessing facilities in northern California.'" Def. Liability Fact Resp. ¶ 18, Pl. Supp. Damages App. 61 (quoting *Shell*, 294 F.3d at 1051).

Further, the intermediate use of the spent alkylation acid in the production of non-avgas products did not break the causal chain, but rather was a direct, foreseeable link in the chain running

between the production of the avgas and the dumping of acid sludge. Indeed, the parties actually foresaw the close integration and connection between the production of avgas and the production of other petroleum products. The contracts all contained a provision expressly recognizing that during "normal operation of [the] refineries . . . substantial quantities of motor fuel and other products *must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline*." Contract between Defense Supplies Corp. and Shell Oil Company, Inc. (May 1, 1943) 11, Pl. Supp. Damages App. 71 (emphasis added); *see also* Stipulation ¶ 608, Pl. Supp. Damages App. 69. Thus, the intermediate use of the spent alkylation acid in the production of non-avgas products was fully integrated into the production of avgas.

The record supports this Court's prior conclusion that "because the only alternative to dumping the waste was the reduction or halting of avgas production, it is clear that the dumping occurred 'by reason of' the production of avgas." *Shell*, 80 Fed. Cl. at 417. As the California district court concluded,

> After review of evidence of the denial of these two attempts to obtain priorities for the construction of treatment plants, as well the evidence submitted concerning the denial of the Tidewater request and the grant of the Stauffer request, it is clear that the Government's policy with respect to spent acid or acid sludge was not to grant priorities unless the plant was needed to provide fresh acid for use in the manufacture of avgas.
>
> It is likely that this policy was that which best furthered the war effort. However, it came at the expense of the environment as, in combination with the unavailability of tank cars, it left the Oil Companies with no reasonable choice but to dump acid sludge. Simply put, the Government's war requirements created the waste and Government acts or omissions foreclosed the reasonable alternative methods of disposal (transportation via tank cars for recycling or construction of regeneration plants) of the waste. Having created the problem and foreclosed the possible solutions, the Government will receive a 100 percent allocation of waste attributable to the avgas program.

*Shell*, 13 F. Supp. 2d at 1028.

**B. The Government is Bound by the Findings of the California District Court**

The doctrine of issue preclusion or collateral estoppel will bar re-litigation when four pre-requisites are met: "(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365-66 (Fed. Cir. 2000). Here, the prerequisites are satisfied, thus, the Government's argument that it is not precluded from challenging the district court's findings in this Court "because the Ninth Circuit did not review them, since it reversed the aspect of the district court's judgment concerning the non-benzol waste upon different grounds" must be rejected. Def. Opp. Br. 11. (citing *Shell*, 294 F.3d 1059). It is clear that the Ninth Circuit did in fact uphold the district court's findings. It is true that the Ninth Circuit reversed the portion

of the judgment holding the United States liable as an "arranger" for the non-benzol waste, *see Shell*, 294 F.3d at 1048-49, but the non-benzol findings were nevertheless necessary to the Ninth Circuit's decision to affirm the trial court's allocation of 100 percent of the benzol related waste cleanup costs to the Government. *See id.* at 1060. The Government attempts to dismiss this portion of the Ninth Circuit's decision arguing that the Ninth Circuit merely upheld the district court's application of "equitable factors." *See* Def. Opp. Br. 12-13. This cannot be squared with the Ninth Circuit's opinion. The Court of Appeals emphasized the trial court had "conducted a full-scale trial with respect to the allocation of cleanup costs at the McColl site." 294 F.3d at 1060. The court stated that the trial court's decision to allocate 100 percent of the costs of cleaning up the non-benzol waste was supported by a "thorough opinion." *Id.* (citing *Shell*, 13 F. Supp. 2d at 1026-28).

The Ninth Circuit cited with approval and relied upon the district court's findings that all costs arose from the production of avgas. Specifically, the court held that "the United States generally refused to make tank cars available to the Oil Companies," and "the United States refused to allocate resources to build reprocessing plants." *Id.* It was these two facts that "left the Oil Companies with no reasonable choice but to dump acid sludge." *Shell*, 13 F. Supp. 2d at 1028. The Ninth Circuit held that the trial court was "entirely justified" in extending this analysis to the benzol waste, and on that basis affirmed the judgment imposing 100 percent of the benzol waste cleanup costs on the United States. *Shell*, 294 F.3d at 1060.

The Ninth Circuit upheld the findings made by the California district court on pages 1026-28 of its opinion, including the finding that "100 percent of the non-benzol waste [i.e., all of the spent alkylation acid and acid sludge] at the McColl Site is attributable to the avgas program," *Shell*, 13 F. Supp. 2d at 1026, and that finding was necessary to the Ninth Circuit's judgment. Accordingly, the United States is precluded from challenging that finding in this case as these findings are binding on the Government as a matter of issue preclusion or collateral estoppel.

**C. The Costs Incurred by the Oil Companies Must be Recalculated**

Both parties have previously stipulated that the Oil Companies total claimed costs through October 31, 1998 are in the sum $64,219,514.46. Stipulation dated September 30, 1999 in *United States, et al. v. Shell Oil Company, et al.*, No. CIV 91 0589 RJK (C.D. Cal.), at 1, Doc. No. 489, Pl. Damages App. 46. In addition, the Oil Companies are entitled to recover statutory simple interest at 2.5 percent pursuant to § 106(f) of the Contract Settlement Act, 41 U.S.C. § 106(f). The total amount of costs and interest previously submitted included Texaco Inc. and Union Oil Company. As the Court has now severed these parties from this action, new calculations on total costs and statutory interest must be provided to the Court. For this reason, the parties are **DIRECTED** to file within 60 days from the date of this Opinion and Order new calculations for costs and interest which exclude any amounts owed to Texaco Inc. and Union Oil Company of California.

**Conclusion**

For the reasons set forth supra, the Court hereby **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment as to Damages. The parties are **DIRECTED** to file within 60 days from the date of this Opinion and Order new calculations for costs and interest excluding any amounts owed to Texaco Inc. and Union Oil Company of California.

**It is so ORDERED.**

s/ Loren A. Smith
LOREN A.SMITH
SENIOR JUDGE