# In the United States Court of Federal Claims

Nos. 06-141C, 06-1411C

(Filed: January 14, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

| | |
|---|---|
| SHELL OIL COMPANY, ATLANTIC RICHFIELD COMPANY, TEXACO, INC., and UNION OIL COMPANY OF CALIFORNIA,           Plaintiffs, v. THE UNITED STATES,           Defendant. | Government Contracts for Production of Aviation Fuel During World War II; CERCLA Liability for Waste Site Clean-up Costs; Interpretation of Contract "Taxes" Clause; Anti-Deficiency Act Limits on Indemnification in Government Contracts; First War Powers Act of 1941; National Defense Act of 1916; Issue Preclusion. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

*Michael W. Kirk*, with whom were *Vincent J. Colatriano*, *Peter A. Patterson*, and *Michael Weitzner*, Cooper & Kirk, PLLC, Washington, D.C., for Plaintiffs.

*Stephen C. Tosini*, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C.; *Michael J. Zevenbergen* and *Joshua M. Levin*, U.S. Department of Justice, Environmental and Natural Resources Division; and *Heather Cameron*, General Services Administration, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

Plaintiffs in this contract case are well-known oil companies, Shell Oil Company, Atlantic Richfield Company, Texaco, Inc., and Union Oil Company of California. During the 1940s, at the urging of the U.S. Government, Plaintiffs entered into contracts to manufacture vast quantities of aviation fuel (called "avgas") to help assure that the United States would prevail in World War II.  The production of avgas was critical to the fueling of the nation's fleet of military aircraft and unquestionably aided the war effort of

the United States.  However, the avgas manufacturing process yielded significant acid waste material that Plaintiffs by separate agreement deposited on real property in Fullerton, California known as the "McColl Site."  Plaintiffs' avgas contracts were terminated at the end of World War II.

Many years later, under a statute known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1978, 42 U.S.C. § 9601, et seq. ("CERCLA"), the U.S. Government and the State of California undertook a substantial effort to clean up the McColl Site.  These clean-up efforts precipitated extensive litigation in California to determine which parties were responsible for the clean-up costs, and to what extent.  See United States v. Shell Oil Co., 841 F. Supp. 962 (C.D. Cal. 1993); Shell Oil Co. v. United States, 13 F. Supp. 2d 1018 (C.D. Cal. 1998); United States v. Shell Oil Co., 294 F.3d 1045 (9th Cir. 2002).  When the California CERCLA litigation failed to produce a satisfactory outcome to Plaintiffs, they pursued a contract counterclaim arguing that, in the "Taxes" clause of each contract, the Government accepted full responsibility for all "charges" resulting from the production of avgas.  The "Taxes" clause stated in part as follows:

> Buyer shall pay in addition to the prices as established [in the price provisions of the contract], any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States, or any foreign country to pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder.

Joint Appendix ("JA") 16-17, 41-42, 61-62, 84-85, 112, 132-33, 159, 183-84, 208-09, 231-32 ("Taxes" clause from the Government avgas contracts with each plaintiff company).

Following completion of the California CERCLA litigation, Plaintiffs commenced their action in this Court on February 24, 2006, and the case was assigned to Senior Judge Loren A. Smith.  Based upon extensive discovery and stipulations of fact developed in the California litigation, the parties agreed, and the Court concurred, that the case could be decided without trial.  After considering cross-motions for summary judgment on liability and damages, Judge Smith ruled in Plaintiffs' favor.  Shell Oil Co. v. United States, 80 Fed. Cl. 411 (2008) (liability decision); Shell Oil Co. v. United States, 86 Fed. Cl. 470 (2009) (damages decision).  On appeal, however, the Federal Circuit ruled that Judge Smith should have recused himself from this case under 28 U.S.C. § 455(b)(4) due to a stock ownership issue, and it vacated and remanded the case for reassignment to a different judge.  Shell Oil Co. v. United States, 672 F.3d 1283 (Fed. Cir. 2012).  On remand, Judge Wheeler received the case through reassignment.

In the remand proceedings, the parties again elected to file cross-motions for summary judgment, relying upon the discovery and stipulations of fact developed during the California litigation. Plaintiffs filed their motion for summary judgment on June 29, 2012, and Defendant filed its cross-motion for summary judgment on September 7, 2012. Additional response and reply briefs were filed on October 19, 2012 and November 16, 2012, and the parties submitted a Joint Appendix of relevant documents on November 20, 2012. The Court heard oral argument on December 18, 2012.

The amount at issue is $92,546,566.94, plus any additional interest and damages accruing since Plaintiffs filed their new motion for summary judgment in this Court. Of this amount, Plaintiffs' claims are allocated as follows:   (a) Shell Oil Company – $54,213,778.91 (58.58 percent); (b) Union Oil Company of California – $17,528,319.78 (18.94 percent); (c) Atlantic Richfield Company – $17,528,319.78 (18.94 percent); and (d) Texaco, Inc. – $3,276,148.47 (3.54 percent).

The resolution of this dispute turns on the meaning and effect of the "Taxes" clause that existed in each of Plaintiffs' contracts. For reasons that will be explained, the Court finds that the "Taxes" clause deals only with taxes, and is not a broad indemnification clause promising that Plaintiffs will never have to pay for later-imposed liabilities such as CERCLA environmental clean-up costs. Even by inclusion of the word "charges," the "Taxes" clause cannot reasonably be interpreted as Plaintiffs would like. Moreover, the parties have stipulated that the avgas contracts in question were terminated in 1945, and that all issues relating to these contracts were settled in the late 1940s. JA 545, ¶ 609. There is nothing in the contracts to suggest that the United States would remain liable for any of the claimed costs after the contracts were terminated.

Major oil companies and the U.S. Government surely would know how to draft broad hold harmless indemnification clauses extending in perpetuity if that were their intent. The "Taxes" clause here does not accomplish that end. Words like "indemnify," "hold harmless," or any of their synonyms do not appear in the "Taxes" clause. Plaintiffs' best opportunity to obtain reimbursement of its clean-up costs was in the California CERCLA litigation, where the courts dealt directly with the proper allocation of such costs under the CERCLA statute. The "Taxes" clause in Plaintiffs' contracts does not trump the California courts' CERCLA result. Accordingly, the Court finds for the Government. Plaintiffs' motion for summary judgment is denied, and Defendant's cross-motion for summary judgment is granted.

Factual Background[1]

During World War II, the U.S. Government procured large quantities of high-octane aviation gasoline ("avgas") to fuel its fleet of military aircraft.  Because avgas was an essential war supply, the Government possessed the authority to compel its production from private oil companies, and even to seize refineries, had it deemed such steps necessary.  See United States v. Shell Oil Co., 294 F.3d 1045, 1049-50 (9th Cir. 2002).  However, the Government did not need to resort to these measures to acquire avgas.  As a matter of practice the Government, acting through the Defense Supplies Corporation ("DSC"), obtained avgas almost exclusively through consensual contract agreements with private sector oil companies.  Among these companies were the Plaintiffs (or their predecessors-in-interest) (collectively, the "Oil Companies").

The avgas contracts were "base price" supply contracts, providing that the Government would pay the Oil Companies a fixed price per gallon of avgas, but with certain cost adjustment mechanisms built in to account for such things as fluctuations in crude oil prices.  One such cost adjustment clause, entitled "Taxes," lies at the center of the present controversy.  The Oil Companies believe that the terms of the "Taxes" clause require the Government to indemnify them for environmental clean-up costs incurred decades after the contracts were terminated.  The Government disagrees, contending that the "Taxes" clause was meant only to create a price adjustment mechanism in the event the Oil Companies incurred unforeseen tax liabilities by reason of their production of avgas.

Avgas consists of a blend of components, including alkylate.  JA 383 (Stips. 8-9).  During World War II, the standard method for producing alkylate consisted of mixing certain base components together in the presence of a catalyst, 98% sulfuric acid.  Known as alkylation, this process yielded both alkylate and 89% spent alkylation acid.  JA 383-84, 510-11 (Stips. 9, 14, 493-94).  The alkylate became a component of the avgas blend.  The spent alkylation acid proceeded into one of three general "streams" for reuse or disposal:  (1) reuse in the acid treatment of additional avgas components; (2) reuse in the acid treatment of non-avgas products also manufactured by the Oil Companies, such as motor gasoline and kerosene; or (3) disposal.  JA 511(Stip. 496), 636-37 (Gov't Liability Admis. ¶ 22).  Whenever the spent alkylation acid was reused, the reuse process further diluted its acetic concentration, yielding a product of between 35% and 65% strength known as "acid sludge" that carried no further industrial utility.  JA 511 (Stip. 496); JA 643 (Gov't Damages Admis. ¶ 7).  At that point, the acid sludge was added to the disposal "stream."

---

[1] As noted, the parties entered into extensive stipulations of fact during the California CERCLA litigation.  The parties have included the stipulations in a Joint Appendix prepared for this action.  All of the facts recited herein are undisputed.

The Oil Companies disposed of both the excess spent alkylation acid and the acid sludge in large part by contracting with Mr. Eli McColl, who arranged to dump the waste into sumps on his property in Fullerton, California (the "McColl site").  At the end of the war, the Oil Companies settled "all … issues concerning [the avgas] contracts" with the Government, thus terminating their contractual relationships.  JA 545 (Stip. 609).  At approximately the same time, the Oil Companies also ceased dumping avgas-related waste at the McColl site, and, in the 1950s, McColl, with the assistance of the Oil Companies, filled in the sumps.  United States v. Shell Oil Co., 841 F. Supp. 962, 967 (C.D. Cal. 1993).

A few decades later, however, the acid waste began oozing up through the surface of the ground at the McColl site.  The U.S. Government and the State of California jointly began removing the waste, and later brought suit against the Oil Companies to recover the clean-up costs.  Id. at 965-66.  This prior litigation is relevant to the present proceedings, and will be addressed below.

## CERCLA Environmental Litigation

Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1978, 42 U.S.C. § 9601 et seq. ("CERCLA"), financial responsibility for environmental clean-up costs lies with the party or parties who caused the contamination, regardless of which entity conducts the clean-up work.  However, CERCLA allows any responsible party to seek contribution from other responsible parties, and grants federal district courts broad discretion to equitably apportion clean-up costs among those who are liable.  See, e.g., Cadillac Fairview/California, Inc. v. Dow Chem. Co., 299 F.3d 1019, 1023-24 (9th Cir. 2002) (explaining the basic operation of CERCLA).  In 1991, pursuant to this environmental framework, the United States and the State of California jointly initiated an action to recover from the Oil Companies the costs incurred for the clean-up work at the McColl site, as well as to obtain a declaratory judgment regarding the Oil Companies' liability for costs to be incurred in the future.  United States v. Shell Oil Co., 841 F. Supp. 962 (C.D. Cal. 1993) ("Shell I").  The defendant Oil Companies filed counterclaims, seeking among other things indemnification under the avgas contracts.

Two categories of waste at the McColl site were at issue in the CERCLA litigation.  The first of these, which accounted for approximately 5.5% of the total waste, consisted of acid sludge resulting from the treatment of government-owned benzol.  United States v. Shell Oil Co., 294 F.3d 1045, 1051 (9th Cir. 2002); Shell Oil v. United States, 13 F. Supp. 2d 1018, 1023 (C.D. Cal. 1998).  The Government conceded that it was liable under CERCLA for the clean-up costs of this waste.  United States v. Shell Oil Co., 294 F.3d 1045, 1059-60 (9th Cir. 2002) (discussing the Government's concession with respect to the benzol waste).  The second category of waste in the CERCLA litigation and now at issue here is the combination of the spent alkylation acid and acid sludge discussed above, referred to as the "non-benzol" waste.

A. <u>District Court Proceedings</u>

The U.S. District Court for the Central District of California separated the liability and damages portions of the proceedings, and bifurcated the Oil Companies' counter- and cross-claims from the remainder of the cost recovery phase of the litigation. <u>Shell I</u>, 841 F. Supp. at 975-76. With respect to liability for the non-benzol waste, the court issued two decisions that had the effect of finding both the Oil Companies and the governmental entities responsible. First, the court granted the motions for summary judgment of the United States and California, holding that the record before it "establishe[d] beyond dispute that the oil companies generated the [non-benzol] hazardous waste dumped at the McColl site," and thus were liable for the attendant clean-up costs under CERCLA. <u>Id.</u> at 969-70. However, in a separate unpublished decision, the court nonetheless held that the U.S. Government was also liable for the non-benzol clean-up costs, under an "arranger" theory of liability under CERCLA. <u>See</u> <u>Shell Oil v. United States</u>, 13 F. Supp. 2d 1018, 1019 (C.D. Cal. 1998) ("<u>Shell II</u>") (citing the unpublished decision, dated September 18, 1995); Dkt. No. 109-1 (the September 18, 1995 decision).

Having found both the Oil Companies and the Government liable under CERCLA for the non-benzol waste clean-up costs, the district court then held a trial to determine the proper allocation of the total clean-up costs among the parties. <u>Shell II</u>, 13 F. Supp. 2d 1018. During these proceedings, as the Ninth Circuit later observed, the Government "introduced very little evidence with respect to the benzol waste," <u>United States v. Shell Oil Co.</u>, 294 F.3d 1045, 1060 (9th Cir. 2002), and the district court mistakenly believed that the Government had conceded not just that it was liable to some degree for the benzol waste, but that it was completely responsible for this waste. <u>Id.</u> at 1059; <u>Shell II</u>, 13 F. Supp. 2d at 1024. Working under this assumption, the district court engaged in a lengthy analysis of the proper allocation of the *non*-benzol clean-up costs at the McColl site, for which the Oil Companies and Government were both liable.

The court began this analysis by emphasizing the unique nature of its task. Under CERCLA, courts resolve contribution claims according to "such equitable factors as [they] determine[] are appropriate," 42 U.S.C. § 9613(f)(1), such that the court must first choose, and only then apply, the relevant equitable factors. <u>Shell II</u>, 13 F. Supp. 2d at 1020. The court then held that there were two categories of relevant equitable factors in the case before it: first, "the percentage of the McColl site waste attributable to the avgas program," and second, "the percent of that waste for which each party is responsible." <u>Id.</u> at 1024. The court explained that the first factor required it to approximate, as closely as it could with the information before it, "what percentage of the sludge … is avgas sludge," and also that the second inquiry was "more conventional. Once a percentage is affixed to the amount of sludge attributable to avgas production, [this inquiry] seeks to determine how much responsibility for that sludge the Government and the Oil Companies each must bear." <u>Id.</u>

Considering the first of these questions, the district court rejected both the Oil Companies' and the Government's attribution theories, and held instead that the relevant question was "[g]iven that all of the treatment of avgas stocks was going to occur as it in fact did occur irrespective of the Oil Companies' plans to make other products using spent alkylation acid, how much additional waste was created by the Oil Companies' secondary use of the acid?"  Id. at 1026.  In answering this question, the court found that:

> the primary contaminant at the McColl Site is the sulfuric acid.  This acid would be present in the same (or slightly greater) quantities irrespective of whether the Oil Companies had chosen to make secondary use of the acid for non-avgas products.  Had the waste dumped at the McColl Site been purely spent alkylation acid the Court … would readily attribute 100 percent of that waste to the avgas program. Without persuasive evidence that the secondary use of the spent alkylation acid substantially aggravated the waste cleanup programs at the McColl site beyond what they would have been in the absence of that secondary use, the Court cannot say that th[is] secondary use … materially aggravated the waste treatment problems at the McColl site.

Id.  The court therefore concluded that "100 percent of the non-benzol waste at the McColl site is attributable to the avgas program."  Id.

The district court then found, and weighed as additional discretionary, equitable factors favoring the Oil Companies (1) that the waste and the clean-up costs were costs of World War II, such that "the American public" should "bear the[ir] burden"; (2) that "the Oil Companies had no reasonable recourse" to their dumping practices, in part because of a governmental failure to facilitate the creation of disposal alternatives; and (3) that the Oil Companies' profits from the avgas program were not excessive, and thus did not warrant an offset in favor of the Government.  Id. at 1027-29. The district court therefore allocated 100 percent of the non-benzol clean-up costs to the Government.  Id. at 1030. If the district court's ruling had prevailed, the full allocation to the Government would have ended the dispute, and the Oil Companies' action in this Court would have been unnecessary.  However, the appellate court held a different view.

B.  Ninth Circuit Proceedings

On appeal, the Ninth Circuit affirmed in part and reversed in part the district court decisions.  United States v. Shell Oil Co., 294 F.3d 1045 (9th Cir. 2002) ("Shell III"). First, the appellate court reversed the district court's holding that the Government had sufficient control over the avgas production and disposal to be held liable as an

"arranger" under CERCLA.  Id. at 1059.  In reaching this conclusion, the Ninth Circuit emphasized that the United States was only the end purchaser, not the manufacturer, of the avgas; that it never owned any of the raw materials or intervening products; that it "did not even know that the Oil Companies had contracts to dispose of their waste at the [McColl] site"; that the Oil Companies "voluntarily entered into the contracts and profited from the sale[s]"; and that the Government "was aware that waste was being produced, but did not direct the manner in which the companies disposed of it."  Id. at 1056-59.  Thus, "[b]ecause the United States [was] not an arranger, it [had] no liability under CERCLA for the clean-up costs" of the non-benzol waste.  Id. at 1059.

However, the Ninth Circuit upheld the district court's determination that the United States was 100 percent liable for the clean-up costs of the benzol waste also present at the McColl site.  Id. at 1060-61. As noted above, the trial court had at one point mistakenly understood the Government to have conceded its full liability for this category of waste.  However, after the Government discovered and notified the district court of this error, that court had reinstated the issue for further review.  In an unpublished order, the court allocated 100 percent of the benzol costs to the Government, "for the same reasons that avgas sludge is fully allocable to the Government."  Id. at 1060 (quoting the unpublished decision).   Reviewing this determination, the Ninth Circuit expressly recognized that, because of the district court's error, its "analysis ... was focused on the non-benzol rather than the benzol waste."  Id.  However, the appellate court found that the lower court was "entirely justified" in extending that analysis from one category of waste to the other, for two reasons: first, the United States had "introduced very little evidence with respect to the benzol waste," and second:

> to the degree that the [district court's chosen] equitable factors support allocation of the cleanup costs to the United States with respect to the non-benzol waste, where the arranger status of the United States was disputed, such factors are even stronger with respect to the benzol waste, where the United States concedes that it was an arranger.

Id.  The Ninth Circuit therefore held that "the district court did not abuse its discretion in choosing the factors on which to rely in determining allocation, nor did it clearly err in applying those factors to the benzol waste."  Id.

C.  Prior Proceedings in This Court

On remand from the Ninth Circuit, the district court transferred the Oil Companies' indemnity counterclaims to this Court pursuant to 28 U.S.C. § 1631.  The Oil Companies then voluntarily dismissed their complaint in the transferred action and filed a new complaint, thus initiating the present action.  Proceeding before Senior Judge Smith, the parties cross-moved for summary judgment and received final decisions as to both

liability and damages.  See Shell Oil Co. v. United States, 80 Fed. Cl. 411 (Fed. Cl. 2008); Shell Oil Co. v. United States, 86 Fed. Cl. 470 (Fed. Cl. 2009).[2]  Shortly after entering final judgment, however, Judge Smith disclosed to the parties that his wife owned a small amount of stock in a parent company of two of the plaintiffs.  On review, the Federal Circuit was careful to "emphasize that there [was] neither an allegation nor [a] suggestion that [Judge Smith] was unduly influenced by his wife's financial interest," but nonetheless ultimately held that under these circumstances, 28 U.S.C. § 455(b)(4) required that Judge Smith recuse himself entirely from the case.  Shell Oil Co. v. United States, 672 F.3d 1283, 1291 (Fed. Cir. 2012).  The Federal Circuit therefore vacated the judgment, and the Oil Companies' consolidated claims were duly transferred to the undersigned for fresh consideration.  Following transfer, the parties again cross-moved for summary judgment and re-briefed their motions.

Discussion

A.  Standard of Review

Summary judgment is appropriate where the evidence demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule of the Court of Federal Claims ("RCFC") 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–49 (1986); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008).  A "genuine" dispute is one that "may reasonably be resolved in favor of either party," Anderson, 477 U.S. at 250, and a "material" fact is one that "might affect the outcome of the suit under the governing law[.]" Id. at 248.  The moving party carries the burden of establishing its entitlement to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Once that burden is met, the onus shifts to the non-movant to identify evidence demonstrating a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor.  Anderson, 477 U.S. at 256.  It is not necessary that such evidence be admissible, but mere denials, conclusory statements, or evidence that is merely colorable will not defeat summary judgment.  Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 249–50.

In considering a motion for summary judgment, a court does not weigh each side's evidence but, rather, must draw all inferences in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Where, as here, the parties have filed cross-motions for summary judgment, the

---

[2] The Court notes that, in addition to these decisions, Judge Smith has issued an opinion in another avgas contract case, Exxon Mobile Corp. v. United States, 101 Fed. Cl. 576 (2011), in which the Court ruled in favor of the Plaintiff on all liability issues.  As in the earlier decisions in this case, Judge Smith based his ruling on a broad interpretation of the "Taxes" clause, and a rejection of the Government's Anti-Deficiency Act arguments.  Oddly, neither party cited this highly relevant decision in the briefs or at oral argument in this case.  As will become evident from the analysis that follows, the Court respectfully disagrees with the ruling in Exxon Mobile.

court evaluates each motion on its own merits and makes all reasonable inferences against the party whose motion is under consideration.  Marriot Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968–69 (Fed. Cir. 2009) (internal citation omitted).  To the extent there exists a genuine issue of material fact, both motions must be denied.  Id. at 969.

B. Analysis

Only the clean-up costs for the non-benzol waste remain at issue in the present case.  Having failed in their attempt to hold the Government liable for these costs in the California CERCLA litigation, the Oil Companies now advance a different, strictly contractual theory of liability that under the terms of the avgas contracts, they are indemnified for these costs.  In response, the Government raises several defenses.

First, the Government contends that the contract clause relied on by the Oil Companies was not intended to create a broad, open-ended indemnification, but rather merely a price-adjustment mechanism in the event that the Oil Companies were assessed unforeseen taxes by reason of their avgas production.  Second, the Government argues that any claim to the contrary is barred by the fact that, as the Oil Companies stipulated in the CERCLA litigation, "all … issues concerning [the avgas contracts] were settled between the parties in the late 1940s," at the time of their termination.  JA 545 (Stip. 609).  Third, the Government argues that even if the Court could construe the contract clause in question as an indemnification agreement, such an agreement would be *ultra vires* under the Anti-Deficiency Act, and therefore unenforceable.  Finally, the Government argues that, as a factual matter, the majority of the waste at the McColl site resulted from the manufacture of products other than avgas.

The Court will examine each of these issues in turn below.

1. The CERCLA Clean-Up Costs Are Not "Charges" Within the Meaning of the "Taxes" Clause

The "Taxes" clause at the heart of the present dispute is substantially the same in each of the Oil Companies' contracts, and states as follows:

Taxes.

[(a)] Buyer shall pay in addition to the prices as established [in the price provisions of the contract], any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States, or any foreign country to pay by reason of the production,

manufacture, sale or delivery of the commodities delivered hereunder.  Buyer shall also pay any such taxes on crude petroleum or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.

[(b)] Buyer shall also pay in addition to the prices established [in the price provisions of the contract], any now existing taxes, fees, or charges measured by the volume or sales price of the aviation gasoline delivered hereunder, imposed upon Seller by reason of the production, manufacture, storage, sale or delivery of such gasoline, unless Buyer or Seller is entitled to exemption from a given tax, fee or charge by virtue of Buyer's governmental status; it being understood that Buyer now believes that both Buyer and Seller are entitled to such exemption.  Seller represents that the taxes, fees, and charges referred to in this paragraph have not been included in its computation of costs on which the prices set forth in Section IV hereof are based.

[(c)] If in any case the parties cannot agree on the question as to whether or not Buyer or Seller is entitled to an exemption from a given tax by virtue of Buyer's governmental status, the burden shall be upon Buyer to obtain a ruling in writing from a duly constituted and authorized governmental tax authority as to such exemption.  Until such ruling is obtained Buyer shall pay the amount of the tax to Seller or to the appropriate tax collecting agency or make satisfactory arrangements with such tax collecting agency.

JA 16-17, 41-42, 61-62, 84-85, 112, 132-33, 159, 183-84, 208-09, 231-32.

The Oil Companies' legal theory is tethered to the very first sentence of this clause, which provides that "Buyer shall pay … any new or additional taxes, fees, or *charges*, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States, … to pay by reason of the production, manufacture, sale or delivery of [avgas]." (emphasis added). Although the Oil Companies concede that CERCLA liability is neither a "tax" nor a "fee," they argue that such liability is a "charge" within the meaning of the clause, for two textual reasons.  First, as the Oil Companies point out, the plain meaning of a "charge" includes, among many other definitions, a "cost," which CERCLA liability most certainly constitutes for the party on whom it is imposed.  See Pls. Mem. at 25-26 (quoting, *e.g.*, BLACK'S LAW DICTIONARY 311 (3d ed. 1933) (partially defining

"charges" as "[t]he expenses which have been incurred, or disbursements made in connection with a contract, suit, or business transaction") and THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 312 (4th ed. 2000) (a "charge" is, *inter alia*, an "expense [or] cost")).  Second, the Oil Companies posit that "courts often speak of 'charges' as encompassing CERCLA costs." Id. at 26 (collecting cases and quoting, *e.g.*, Del-Ray Battery Co. v. Douglas Battery Co., 635 F.3d 725, 732 (5th Cir. 2011) ("CERCLA is the federal statute that … *charges* the costs of [environmental] cleanup to those responsible for the contamination.") (emphasis added)).

In a related vein, the Oil Companies also attempt to analogize the "Taxes" provision at issue here to contract clauses that appeared in two other World War II-era government contracts which were also the subject of federal litigation.  Id. at 28-29 (citing Ford Motor Co. v. United States, 378 F.3d 1314 (Fed. Cir. 2004) and E.I. DuPont de Nemours & Co. v. United States, 365 F.3d 1367 (Fed. Cir. 2004)).  In Ford Motor and DuPont, the plaintiffs were, like the Oil Companies, manufacturers of war materials purchased by the Government.  And, in both cases, the Federal Circuit found that the contract clauses in question indemnified the manufacturers for CERCLA-mandated clean-up costs imposed decades later.  The Oil Companies argue that the Court should find a similar indemnification here.

In response, the Government offers some compelling counter-arguments.  First, it asserts that the wording of the contract clauses at issue in Ford Motor and DuPont are simply not analogous to the "Taxes" clause in the avgas contracts, and that the "Taxes" clause here has a much more limited scope.  Gov't Mem. at 12-16.  Second, the Government argues that even if the "Taxes" clause could be construed generally as an indemnification clause, the term "charges" cannot encompass CERCLA liability, which is a "legal responsibility to clean up one's own pollution." Id. at 17.  The Government also points out that the word "charge" does not appear anywhere in CERCLA, with the exception of its use in the context of a "person in charge." Id. (citing 42 U.S.C. §§ 9603, 9604).  Further, the Government notes that none of the CERCLA cases cited by Plaintiffs for their use of the word "charge" actually examined the meaning of that word in the context of either CERCLA liability or purported indemnification under a contract clause. Id. at 18.

Reading the relevant clause as a whole, including the title, "Taxes," the Court finds that it was plainly intended as a price-adjustment mechanism in the event the Oil Companies were assessed additional or unanticipated taxes as a result of their avgas production. Cf. INS v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 190 (1991) (while not dispositive, titles of statutory sections "can aid in resolving an ambiguity in the legislation's text").  In addition to the title of the clause, other textual signals within the clause support this reading.  For example, although the clause speaks in terms of "taxes, fees, or charges" three times, it also twice refers back to this trio of terms by the umbrella identifier "such *taxes*." See the "taxes" clause at paragraph [(a)] ("Buyer shall also pay

any *such taxes* on crude petroleum or the transportation thereof, to the extent *such taxes* result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.") (emphasis added).   Similarly, the first sentence of the clause expressly excludes from the "taxes, fees, or charges" that were eligible for recoupment "income [taxes], excess profits [taxes], or corporate franchise taxes."  Thus, the limitation lists only specific types of *taxes*, and not any other form of liability or category of costs. Although not dispositive, this fact supports the conclusion that the parties intended the clause to create a tax-related price-adjustment mechanism, not a broad indemnification.

Moreover, the Court also rejects the Oil Companies' argument that the word "charge" is never synonymous with a "tax," and therefore that the Court must, on pain of otherwise reading this term out of the "Taxes" clause altogether, read it as meaning a "cost or expense." Pls. Mem. at 25-26; see also Tr. Oral Arg., Dec. 18, 2012, at 69 ("[T]he place where you go to find out what the ordinary, everyday meaning [of a given term] … is the dictionary, and I would submit and I'm not aware of one that suggests that 'charges' is a synonym for taxes. And that's really the most important point I wanted to leave you with.").   Indeed, this argument is belied by the very dictionaries cited by the Oil Companies, among others.  See, e.g., BLACK'S LAW DICTIONARY 311 (3d ed. 1933) (a "charge" is, *inter alia*, "[a]n *encumbrance, lien*, or burden"); BLACK'S LAW DICTIONARY 265 (9th ed. 2009) ("[a]n *encumbrance, lien,* or claim"); WEBSTER'S NEW INTERNATIONAL DICTIONARY 452 (2d ed. 1937) ("whatever constitutes a burden on property, as rents, *taxes, liens,* etc."); THE WINSTON DICTIONARY, COLLEGE EDITION 162 (1942) ("an expense or liability"); THE OXFORD ENGLISH DICTIONARY 36 (2d ed. 1989, Vol. III) ("[a] liability to pay money laid upon a person or estate"[3]); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 312-13 (4th ed. 2000) ("a financial burden, *such as a tax or lien*") (emphasis added in all instances).

Of course, the mere existence of this relatively narrow definition of "charge" – *i.e.,* an encumbrance, lien, or other like financial burden or liability, especially one that relates to real property – does not compel the conclusion that it was the one intended and understood by the parties to the avgas contracts.  However, in addition to the textual signals discussed above, the canon of construction known by its Latin name *noscitur a sociis* also supports a narrow interpretation of the term, as it was used here.  That canon "counsels that a word [be] given more precise content by the neighboring words with which it is associated." Reema Consulting Servs., Inc. v. United States, --- Fed. Cl. ---, 2012 WL 5901035, at *8 n.11 (Fed. Cl. Nov. 6, 2012) (quoting United States v. Williams, 553 U.S. 285, 294 (2008)).[4]  Because the "Taxes" clause associates the words

---

[3] The O.E.D. includes as examples of this usage "[w]hether the same proportional *charge* should be made on incomes of 100*l.* or 500*l.*, as on those of 1000*l.* or 5000*l.*?" (1852) and "[l]imitation has …been put upon proceedings to recover *charges* on the estate" (1858) (alteration in original).

[4] Although this canon is more frequently used by courts in interpreting statutes, it applies with equal force to contracts.  See, e.g., La Salle Bank Nat'l Ass'n v. CIBC Inc., 2011 WL 4943341, at *4 (S.D.N.Y. Oct.

"taxes, fees, [and] charges," this canon thus counsels that "charges" be "given more precise content" by "taxes" and "fees." Applying this principle, the Court finds that, as it was used in the "Taxes" clause, the term "charges" connotes the fairly narrow *tax-related* meaning suggested by the definitions listed above.[5] As such, it cannot bear the open-ended, indemnifying meaning advanced by the Oil Companies.

In addition, the Court agrees with the Government that <u>Ford Motor</u> and <u>DuPont</u> hinder, rather than aid, the Oil Companies' case on this question. As noted, both of these cases involved claims, at least superficially similar to the one at issue here, that manufacturers of certain war materials were indemnified for later-imposed CERCLA liability under the terms of their contracts. <u>See</u> <u>Ford Motor</u>, 378 F.3d 1314; <u>DuPont</u>, 365 F.3d 1367. However, while the Federal Circuit held in both cases that the contract clauses in question did, in fact, provide for such indemnity, it based its holding in each instance on specific language found in each of the relevant contracts. In <u>DuPont</u>, that language stated, in relevant part, that subject to certain exceptions not relevant here:

> [i]t is the understanding of the parties hereto, and the intention of this contract, that all work … is to be performed at the expense of the Government and that the Government shall hold [DuPont] harmless against any loss, expense (including expense of litigation), or damage (including damage to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever arising out of or in connection with the performance of the work[.]

365 F.3d at 1370.

As part of its analysis of this language, the Federal Circuit quoted with approval a test set forth by a Pennsylvania district court: "[i]n order for a pre-CERCLA indemnification clause to cover CERCLA liability, courts have held that the clause must be either '[1] specific enough to include CERCLA liability or [2] general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims.'" <u>DuPont</u>, 365 F.3d at 1373 (quoting <u>Elf Atochem N. Am. v. United</u>

---

17, 2011) (noting that "the canon *noscitur a sociis* urges a court to construe contract terms in accordance with the meaning of the words that are associated with them") (internal quotation omitted); <u>Integra Telecom, Inc. v. Twin City Fire Ins. Co.</u>, 2010 WL 1753210, at *4-6 (D. Or. April 29, 2010) (similar).

[5] At oral argument, Plaintiffs' counsel advanced the plain-language argument that "if [one] just thinks about ordinary, everyday usage of the word ["charges"], one does not say that 'I'm paying my income charges to the IRS.' One does not say 'I'm paying my property charges to the state government.' Taxes and charges simply don't mean the same thing." Tr. Oral Arg. at 69. However, the Court notes that it is perfectly natural to speak of one's "tax liabilities," and that "liability" frequently appears as a synonym for "charge" in the above-listed dictionary definitions.

<u>States</u>, 866 F. Supp. 868, 870 (E.D. Pa. 1994)).  Regarding the contract language in question, the Court held that because the relevant clause "contain[ed] no limiting language, and show[ed] an intent to allocate all possible liabilities among the parties," <u>id.</u> (internal quotation omitted), "[t]he indemnity language of this provision ('any … expense … of any kind whatsoever') [was] clearly sufficiently broad on its face to include DuPont's CERCLA-related liability," <u>id.</u> at 1372 (ellipses in original).

Similarly, in finding that the contract clause in <u>Ford Motor</u> indemnified the company for its CERCLA liability, the Federal Circuit again tied its holding to the relevant contract language.  In <u>Ford Motor</u>, that language expressly stated that "allowable costs" under the contract included "loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract."  378 F.3d 1319.[6]

The Court agrees with the Government that the language in the "Taxes" clause here is not analogous to the language in either <u>DuPont</u> or <u>Ford Motor</u>.  In contrast to the clause at issue in <u>DuPont</u>, the "Taxes" clause does not state that the Government will hold the Oil Companies harmless for anything, much less "any loss, expense …, or damage … of any kind whatsoever."  In contrast to *both* clauses, the "Taxes" clause does not make any mention of the allocation of liability for any property damage arising out of Plaintiffs' performance.  <u>Cf.</u> <u>Shell II</u>, 13 F. Supp. 2d at 1020 (noting that the avgas contracts "were silent on the question of who should bear the burden of waste treatment").  To the contrary, the "Taxes" clause is specific *only* with respect to the types of taxes excluded from the clause's coverage, as well as the duty of the Oil Companies to obtain a ruling from "a duly constituted governmental *tax* authority" in the event a tax dispute arose.  Under the test endorsed by the Federal Circuit, therefore, the Court finds that the "Taxes" clause is neither "specific enough to include CERCLA liability," nor "general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims." <u>DuPont</u>, 365 F.3d at 1373.  Indeed, the Court finds that the "Taxes" clause was not concerned with environmental liability or property damage at all.  Instead, it merely created a price-adjustment process in the event the Oil Companies incurred unexpected tax liability from any level of government.

Finally, the Court finds that, contrary to the Oil Companies' assertions, it is irrelevant that the word "charge" sometimes appears in the text of CERCLA decisions.  <u>See</u> Pls. Mem. at 27 (collecting and quoting cases).  As noted above, "charge" has many definitions, one of which is "cost or expense," and another of which is, in a related verbal iteration, "to hold financially liable; demand payment from."  THE AMERICAN HERITAGE

---

[6]  The rulings in <u>DuPont</u> and <u>Ford Motor</u> were also contingent upon the Federal Circuit's finding that (1) the plaintiffs had expressly preserved their indemnification rights through the terms of their termination agreements, and (2) the Contract Settlement Act of 1944, 41 U.S.C. § 101 *et seq*, provided the necessasry waiver of the Anti-Deficiency Act that allowed them to do so.  <u>DuPont</u>, 365 F.3d at 1373-78; <u>Ford Motor</u>, 378 F.3d at 1318-20.  The Court will address these questions as to the Oil Companies below.

DICTIONARY OF THE ENGLISH LANGUAGE 312 (4th ed. 2000).  It is therefore entirely natural and unremarkable that courts would sometimes employ the word "charge" in cases involving CERCLA liability, where they are asked to impose significant costs in allocating clean-up cost responsibility.  See, e.g., City of Wichita v. APCO Oil Corp. Liquidating Trust, 306 F. Supp. 2d 1040, 1093-94 (D. Kan. 2003) ("a state agency's "*charges* [for oversight] are necessary costs of response at the Site, and are fully recoverable" under CERCLA); Foster v. United States, 130 F. Supp. 2d 68, 77 (D.D.C. 2001) ( "A party liable for the presence of hazardous substances under CERCLA may be *charged* for the cost of ascertaining the danger posed by an actual or threatened release of hazardous substances") (internal citation omitted) (emphasis added in both).

The fact that judges have sometimes employed this exceedingly common usage of the word "charge" in their CERCLA opinions does not indicate anything about the intent of the Oil Companies and the Government in the avgas contracts.  Indeed, in none of the opinions cited by the Oil Companies does "charge" carry or connote any particular legal meaning.  To the contrary, the opinions simply use the term in a common colloquial manner, as demonstrated by the examples cited.  The existence of this general usage simply has no bearing on what the parties intended by the term "charge" in the "Taxes" clause of the avgas contracts.

Thus, for the reasons stated, the Court finds that the Oil Companies' claims of indemnification must fail as a matter of law because their CERCLA liability is not a "charge" within the meaning of the "Taxes" clause in the avgas contracts.

> **2.**   The Oil Companies Discharged Any Right to Indemnification When They Terminated Their Avgas Contracts in the Late 1940s

The Court finds that the Oil Companies' claims fail for a second, independent reason.  The Oil Companies stipulated in the course of the California CERCLA litigation that the avgas contracts "were terminated in 1945 or … shortly thereafter.  Matters relating to profits from the[] [avagas] contracts, termination costs, and *all other issues concerning these contracts were settled* between the parties in the late 1940s." JA 545 (Stip. 609) (emphasis added).  Even assuming that the Oil Companies once had colorable claims for indemnification, they have not offered any explanation for how such claims survived the contract terminations, and the Court finds that none exists.

Again, a comparison to the indemnification claims in DuPont and Ford Motor cases is instructive.  As discussed above, the contract clauses in those cases provided, respectively, that the Government would "hold [DuPont] harmless against any loss, expense …, or damage … of any kind whatsoever," 365 F.3d at 1370, and, in Ford Motor, that "allowable costs" under the contract included "loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract," 378 F.3d at 1319.  The "Taxes" clause here differs markedly from

both of these provisions in that it lacks any comparable intent to indemnify the Oil Companies. Setting this issue aside, however, the Court notes that in <u>DuPont</u> and <u>Ford Motor,</u> the indemnification language alone was insufficient for the plaintiffs to prevail on their claims. Rather, each case also hinged on a finding that, in agreeing to a termination of the contract, each party expressly preserved its rights to indemnification into the future.

In <u>DuPont</u>, the termination agreement provided that, upon the payment of a certain sum by the Government to the company, "all rights and liabilities of the parties under the Contract … shall cease and be forever released *except*[,] [*inter alia*] … "[a]ll rights and liabilities of the parties under the contract articles … applicable to … covenants of indemnity." 365 F.3d at 1370 (emphasis added).[7] Having first found that the "hold harmless" clause was a qualifying covenant of indemnity, the Court expressly relied on this language, as well as the fact that the termination agreement carried no apparent expiration date, to hold that DuPont's indemnity "remain[ed] in effect" notwithstanding the general contract termination. <u>Id.</u> at 1374-75.

Similarly, the termination agreement between Ford and the Government expressly provided that Ford maintained the right to recover costs "which are based upon responsibility of the Contractor to Third Parties ... and which involve costs reimbursable under the Contract … but which are not now known." <u>Ford Motor</u>, 378 F.3d at 1318. Relying on this language, the Federal Circuit held that "the Termination Agreement … reserved unknown claims from a general release of claims, [thus] preserv[ing] Ford's claim for payment under the War Contract…. Because Ford's [indemnity] claim was exempted from settlement by the[se] terms …, the government's liability … was not released." <u>Id.</u>

At oral argument in this case, counsel explained that neither party was able to locate the Oil Companies' termination agreements with the Government. Tr. Oral Arg. at 54. However, while the Court lacks direct evidence of the terms of these agreements, during the course of the California CERCLA litigation the Oil Companies stipulated that:

> [t]he contracts for avgas entered into between the United States and the oil companies during World War II were terminated in 1945 or … shortly thereafter. Matters relating to profits from these contracts, termination costs, and all other issues concerning these contracts were settled between the parties in the late 1940s.

---

[7] Neither the Government nor DuPont was able to locate an actual copy of the relevant termination agreement. However, the court credited evidence presented by DuPont that the termination agreement included this and other provisions. <u>DuPont</u>, 365 F.3d at 1370 n.3.

JA 545 (Stip. 609).  The Oil Companies do not disavow this stipulation, but instead attempt to evade its consequences by changing the subject.  Pointing to the language in the "Taxes" clause that the Government was to "pay … any *new or additional* taxes, fees, or charges …[,]" the Oil Companies argue that "[f]ar from limiting the duration of potential government liability," this language "in no way distinguishes between new charges imposed during the Oil Companies' performance and new charges imposed later."  Pls. Mem. at 27 (emphasis added).  Thus, according to the Oil Companies, "CERCLA costs are no less 'new or additional' charges because Congress passed CERCLA long after the Oil Companies delivered the much-needed avgas," and the Government's liability for the CERCLA "charges" is, by its plain terms, without temporal limitation.  Id. at 27-28.

For reasons already explained, the Court disagrees that the term "charges," as it appears in the avgas contracts, can fairly be read to encompass CERCLA liability.  Even if it did, however, the Oil Companies still have failed to explain how their claims of indemnification survive the contract terminations.  There is no suggestion that the Oil Companies preserved their rights as the plaintiffs in DuPont and Ford Motor did.  The Court can only conclude that the Oil Companies have no answer as to how their claims are still intact.

"One who has a contractual right against another has the power to discharge such rights and the other's duty by executing a release[,]" which is "an instrument terminating one's rights under a contract and bar[ring] the later assertion of claims with respect to that contract."  Imprimis Investors LLC v. United States, 83 Fed. Cl. 46, 61 (Fed. Cl. 2008) (citing, *inter alia*, Cairo, Truman & S. R.R. Co. v. United States, 267 U.S. 350, 351 (1925) and Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d 1367, 1370-71 (Fed. Cir. 1999)).  Thus, it is well-settled that "'a contractor who executes a general release is thereafter barred from maintaining a suit for damages or for additional compensation under the contract based upon the events that occurred prior to the execution of the release.'"  Id. (quoting, *inter alia*, B.D. Click Co. v. United States, 222 Ct. Cl. 290, 305 (Ct. Cl. 1980)).

The Oil Companies stipulated that the parties terminated the avgas contracts in the mid- to late1940s, at which time "matters relating to profits," as well as "all other issues concerning these contracts," were "settled."  While the Court does not have the actual termination agreements before it, the Oil Companies have offered no evidence or argument that this "termination" and "settle[ment]" differed in any material way from a general release.  Indeed, the wording of the stipulation indicates essentially a general release.  In the absence of any evidence that the Oil Companies preserved their purported indemnification rights from the settlement of "all issues" related to the contract, the Court is without any basis to find that anything was left unsettled.

Accordingly, the Court finds that the Oil Companies' claims must fail by reason of their admission that "all issues" related to the avgas contracts were settled following the close of the war.

> 3. The Government Was Not Authorized to Waive the Anti-Deficiency Act in Order to Indemnify the Oil Companies

Finally, the Court finds that the Oil Companies' claims must fail for a third independent reason. Even if the parties had intended the "Taxes" clause to operate as a broad indemnification clause, and even if the companies' indemnification rights had been preserved after the contract terminations, any such "rights" would have been *ultra vires* under the Anti-Deficiency Act ("ADA"). The version of the ADA in effect in the 1940s at the time the parties executed the avgas contracts provided, in relevant part:

> [n]o Executive Department or other Government establishment of the United States shall expend, in any one fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the Government in any contract or other obligation for the future payment of money in excess of such appropriations unless such contract or obligation is authorized by law.

Pub. L. No. 59-28, 34 Stat. 27, 49 (1906), 31 U.S.C. § 665 (1940) (current version at 31 U.S.C. § 1341). Thus, as the Federal Circuit explained in DuPont, under the ADA the Government was at all relevant times, and remains today, prohibited from entering into "open-ended indemnification clauses [with its contractors] … without specific appropriation or statutory authority." 365 F.3d at 1371; see also, e.g., Calfornia-Pacific Utilities Co. v. United States, 194 Ct. Cl. 703, 710 (1971) ("The United States Supreme Court, the Court of Claims, and the Comptroller General have consistently held that absent an express provision in an appropriation for reimbursement adequate to make such payment [or other statutory authority], [the ADA] proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated.") (collecting cases).

The Oil Companies do not dispute that, as a general matter, the ADA bars open-ended indemnification clauses in government contracts. However, they argue that in the case of the avgas contracts, the purported indemnifications were authorized by (1) the First War Powers Act of 1941, as implemented by various Executive Orders; (2) the National Defense Act of 1916; and (3) a June 1941 amendment to the charter of the DSC, the public corporation designated as the purchaser of avgas during World War II. The Court will discuss each of these theories separately below. For the reasons set forth below, the Court finds that none of these sources provided the requisite ADA waiver that would have allowed the Government to indemnify the Oil Companies.

a.   The First War Powers Act

Title II of the First War Powers Act ("FWPA" or "Title II"), enacted in 1941, granted the President the power to:

> authorize any department or agency [engaged in the war effort], in accordance with regulations prescribed by the President for the protection of the interests of the Government, to enter into contracts and into amendments or modifications of contracts hereafter made … *without regard to the provisions of law relating to the making, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war*: Provided, That nothing herein shall be construed to authorize the use of the cost-plus-a-percentage-of-cost   system   of   contracting: Provided further, That nothing herein shall be construed to authorize any contracts in violation of existing law relating to limitation of profits: Provided further, That *all acts under the authority of this section shall be made a matter of public record under regulations prescribed by the President* and when deemed by him not to be incompatible with the public interest.

Pub. L. No. 77-354, § 201, 55 Stat. 838, 839 (1941) (repealed 1966), JA 286 (emphasis added).

The Oil Companies argue, and the Court agrees, that the plain language of Title II authorized the President to delegate to designated agencies the ability to waive, among other "provisions of law relating to the making, amendment, or modification of contracts," the anti-deficiency limitations of the ADA.   Just as plainly, however, this provision was not self-executing, but required an affirmative act by the President, "deem[ing]," "as a matter of public record under regulations," that "such action would facilitate the prosecution of the war[.]"   Thus, the question is whether President Roosevelt ever exercised his authority under Title II to waive the ADA in a manner relevant to the avgas contracts.   Recognizing as much, the Oil Companies point to several Executive Orders, each of which the Court will discuss below.   As the Court will explain, it disagrees that any of the cited Executive Orders waived the anti-deficiency limitations with respect to the avgas contracts.

b.  Executive Order 9001

The first "regulation" advanced by the Oil Companies as a relevant exercise of President Roosevelt's authority under Title II is Executive Order 9001 ("E.O. 9001"), issued on December 27, 1941.  6 Fed. Reg. 6787, JA 244.  In E.O. 9001, President Roosevelt expressly invoked the FWPA to "hereby order," among other things:

> that the War Department, the Navy Department, and the United States Maritime Commission be and they hereby respectively are authorized *within the limits of the amounts appropriated therefor* to enter into contracts and into amendments or modifications of contracts heretofore or hereafter made, and to make advance, progress, and other payments thereon, *without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts.*

Id. (emphasis added).

As noted, the public corporation tasked with purchasing avgas for the Government during World War II was the Defense Supplies Corporation, or DSC.  Incorporated in 1940, DSC originally was housed within the Federal Loan Agency and then transferred, in February 1942, to the Department of Commerce.  See JA 329-30 (DSC Charter); Executive Order 9071 ("E.O. 9071"), 7 Fed. Reg. 1531 (Feb. 24, 1942), JA 249 (transferring the powers and duties of DSC and its parent agency, the Reconstruction Finance Corporation (or RFC), from the Federal Loan Agency to the Department of Commerce).  Neither the Federal Loan Agency nor the Department of Commerce is among the agencies enumerated in E.O. 9001.  However, by separate order dated November 5, 1942, President Roosevelt extended E.O. 9001 to the Department of Commerce and, by extension, to DSC.  Executive Order 9264 ("E.O. 9264"), 7 Fed. Reg. 105 (Nov. 5, 1942), JA 251 (extending "the provisions of Executive Order No. 9001 … to the Department of Commerce … subject to the limitations and regulations contained in such Executive Order").  Thus, the Oil Companies contend, and the Government does not contest, that the terms of E.O. 9001 applied to DSC by operation of E.O. 9071 and E.O. 9264.  For ease of reference, the Court will refer to this group of Executive Orders, as they apply to the DSC, simply as "E.O. 9001" throughout the remainder of this opinion.

However, while the parties agree that E.O. 9001 applied to DSC, they vigorously dispute the consequences of this fact.  The Oil Companies focus on the last line of the above-quoted passage, authorizing designated agencies to enter into contracts "without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts."  In the Oil Companies' view, as a law "relating to the making, performance, amendment, or modification of contracts," the ADA is plainly a qualifying

"provision of law," and hence waived by operation of E.O. 9001 (and its statutory enabler, the FWPA). Pls. Mem. at 45-47. The Government, on the other hand, points out that even as E.O. 9001 delegated expanded contracting authority to the designated agencies, it also expressly restricted such authority to "the limits of the amounts appropriated therefor." The Government therefore argues that, far from waiving ADA prohibitions against open-ended indemnification clauses, E.O. 9001 expressly *affirmed* them. Gov't Mem. at 27-28.[8]

The Oil Companies do not address this limiting language directly, but instead argue that the Government's position is precluded by operation of a contemporaneous formal opinion issued by then-Attorney General Francis Biddle. Pls. Mem. at 45-47. This opinion, issued on August 29, 1942, was prepared in response to an inquiry from the Secretary of War as to whether, pursuant to the FWPA and E.O. 9001, his agency could conduct its contracting activity without regard to a discrete set of statutes. 40 Op. Att'y Gen. 225, JA 307-16 ("Biddle Opinion"). This list included, *inter alia*, "[t]he act of March 3, 1933 … concerning foreign-made, foreignmined, or foreign-produced goods," "[t]he act of June 25, 1938 … concerning purchases of blind-made goods," and "[t]he act of January 12, 1895 … requiring that Government printing, etc., be done at the Government Printng Office." JA 313-14. Notably, this list did not include the ADA. Id. In addition to his general question regarding the waivability of the enumerated statutes, the Secretary of War also posited three specific examples of proposed contracting actions, and asked that Attorney General Biddle inform him whether each could be properly undertaken. JA 315-16.

Although the Oil Companies recognize that the Biddle Opinion does not mention the ADA, they latch on to the Opinion's response to the third of these examples – which involved certain specific kinds of indemnity for a dredging contractor – and argue that this portion of the opinion "definitively establishes" that by signing E.O. 9001, President Roosevelt "authorize[ed] indemnification agreements with war contractors." Pls. Mem. at 46. The Oil Companies make the separate argument that, at a minimum, the Biddle Opinion demonstrates that the Roosevelt administration understood this to be the case, and that the Court therefore owes "substantial deference" to Attorney General Biddle's position. The Court disagrees with both of these propositions, for the following reasons.

First, the Court does not believe that the dredging example can reasonably bear such a broad interpretation. This example posited "a firm contract on a lump-sum basis to do certain dredging," entered into by the War Department prior to the attack on Pearl Harbor. JA at 316. As the Secretary explained:

---

[8] The Government also points out that when Executive Order 9264 extended "the provisions of Executive Order No. 9001 … to the Department of Commerce," it did so "*subject to the limitations and regulations contained in such Executive Order*," thus reaffirming, again, E.O. 9001's articulation of the anti-deficiency principle and extending this principle to the Department of Commerce – and, by extension, the DSC. (emphasis added). Gov't Mem. at 27.

> [t]he equipment employed in this dredging is worth a very
> large sum, believed to be about [one-sixth of the total contract
> value]. The dredging to be done is absolutely essential to the
> war effort. Although the Government is under no obligation
> to do so, it is desired to enter into an agreement by which the
> Government will agree to undertake to indemnify the dredge
> owner against loss of his dredge and plant by enemy action,
> and against liability as a self-insurer, under various
> Workmen's Compensation laws. There is some possibility
> that unless this is done, the owner of the dredge will prefer to
> run the risks of damages by breach of contract rather than to
> proceed [with performance]….

Id. Responding to this and the two other hypotheticals simultaneously, Attorney General Biddle stated, with little analysis, that he "agreed" that the "proposed action[s] may be taken if it is determined administratively that such action[s] would facilitate the prosecution of the war." JA 313. On the Oil Companies' reading, this statement "confirms that the First War Power Act and [E.O.] 9001 authorized indemnification agreements like those before the Court in this case." Pls. Reply at 32.

The Court, however, declines to read the Biddle Opinion so broadly. First, as the Government points out, the indemnification in the dredging example was limited to the cost of equipment and potential Workmen's Compensation liability, and hence was much different in kind from the type of open-ended, all-purpose liability the Oil Companies contend was promised here.[9] Whether or not that distinction is material,[9] however, the fact remains that the question of the waivability of the ADA under the FWPA and E.O. 9001 was neither squarely presented in, nor addressed by, the Biddle Opinion. The Court therefore agrees with the Government that "the most that can be said" about the opinion is that it failed to "flag a marginal anti-deficiency issue in one of its hypothetical examples." Gov't Mem. at 34. In these circumstances, the Court finds that adopting the sweeping interpretation of the Biddle Opinion advanced by the Oil Companies would be unwarranted.

Moreover, to the extent that the Biddle Opinion arguably could be read as interpreting E.O. 9001 to authorize open-ended indemnification agreements, the Court further holds that such an interpretation is contrary to the plain language of E.O. 9001. At least two other courts have reached similar conclusions. First, in Johns-Manville

---

[9] As recently noted by this Court, "[v]arious decisions have held that the ADA does not pose a problem if the maximum amount of liability under an indemnification clause is fixed or readily ascertainable." Lublin Corp. v. United States, 98 Fed. Cl. 53, 58 n.1 (2011). The parties dispute whether Workmen's Compensation liability is ascertainable, but the Court need not reach that issue, for the reasons that follow.

Corp. v. United States, 12 Cl. Ct. 1, 23-24 (1987), this Court construed Title II of the FWPA as "granting the President the authority to delegate to departments and agencies contracting power virtually unfettered by contract law, including the ADA." However, Johns-Manville further held that the delegation that was *in fact* implemented by E.O. 9001:

> authorized [the designated agencies] to exercise this contracting power only 'within the limits of the amounts appropriated therefor.'   The effect of this limitation was nearly identical to that of the ADA. Just as the ADA prohibited government officials from spending or obligating an amount in excess of appropriations for the particular purpose, the language of the Executive Order delegated this broad power to make or amend contracts only insofar as the exercise of that power did not exceed the amounts appropriated for those contracts. Just as an indemnity agreement exposing the Government to potentially unlimited liability would create an obligation in excess of appropriations (a violation of the ADA), the same agreement would be an exercise of the power to make or amend contracts that [went] beyond 'the limits of the amounts appropriated therefor' (and therefore is an action not authorized by the Executive Order).

Id. at 24.

Like the Oil Companies here, the plaintiff in Johns-Manville tried to avoid the consequences of this limitation in the express terms of E.O. 9001 by pointing to the Biddle Opinion.  Although the court apparently agreed with the plaintiff that the opinion was best read as broadly authorizing indemnification agreements, it nonetheless held that the fact that:

> the Attorney General and other government officials, in their honest efforts to facilitate the war effort, may have misunderstood or ignored the limitations on powers to contract and genuinely believed unlimited indemnification agreements to have been valid and essential does not render them valid or enforceable in the face of contrary language in [E.O.] 9001.

Id.

Fifteen years later, when these issues resurfaced in identical form in DuPont, the trial court in that case adopted the reasoning and holding of Johns-Manville in full, quoting extensively from the earlier opinion.  E.I. DuPont de Nemours & Co. v. United States, 54 Fed. Cl. 361, 370-71 (2002), reversed in part on other grounds by 365 F.3d 1367 (Fed. Cir. 2004).  The Federal Circuit expressly noted that DuPont did not challenge the lower court's holding with respect to the FWPA and E.O. 9001, and the appellate court let stand the lower court's holding "that to the extent the First War Powers Act … made ADA prohibitions as to open-ended indemnification clauses irrelevant to wartime contracts … the President re-imposed those ADA limits in [E.O. 9001]."  365 F.3d at 1374 n.12.

The Court agrees with and adopts the sound analysis of both Johns-Manville and DuPont.  By its express terms, E.O. 9001 delegated expanded contracting authority to the designated agencies, including the DSC, *only* within "the limits of the amounts appropriated therefor."  Thus, E.O. 9001 cannot supply the requisite ADA waiver to the avgas contracts.  To the extent the Biddle Opinion is to the contrary, it does not control.[10]

### c.  Executive Order 9024

The Oil Companies also argue that President Roosevelt separately waived the ADA, again pursuant to his authority to do so under the FWPA, by means of Executive Order 9024 ("E.O. 9024").   Issued on January 16, 1942, E.O. 9024 established the War Production Board ("WPB").  Simultaneously, E.O. 9024 granted the WPB Chairman the

---

[10] Citing primarily Udall v. Tallman, 380 U.S. 1 (1965), the Oil Companies assert that "[i]t is well-established that courts must accord substantial deference to interpretations of Executive Orders by the Executive Branch."  Pls. Mem. at 46.  The Udall case did hold that the Department of the Interior's interpretation of an Executive Order was, in a specific instance, entitled to judicial deference.  380 U.S. at 4.  However, Udall has since been limited to instances in which the agency has been expressly charged with the implementation of the Executive Order in question, and it is unclear from the record in this case whether the Attorney General (as opposed to the agencies bestowed with the additional contracting authority) was authorized to implement and administer E.O. 9001.  See, e.g., Washington v. Chu, 558 F.3d 1036, 1043 n.15 (9th Cir. 2009) ("We give deference to an agency's interpretation of statutes and executive orders it is charged with administering.  When an agency interprets a statute outside its administration, however, we review that interpretation de novo.") (internal citation omitted); El-Ganayni v. U.S. Dep't of Energy, 591 F.3d 176, 187 (3d Cir. 2010) (similar); Sherley v. Sebelius, 776 F. Supp. 2d 1, 22 (D.D.C. 2011), affirmed on other grounds by 689 F.3d 776 (D.C. Cir. 2012) (similar).

At any rate, doctrines of judicial deference are inapplicable where the original text in question is unambiguous, see Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43 (1984), and also where the agency has not acted pursuant to a delegated authority to issue an interpretation carrying the force of law, United States v. Mead Corp., 533 U.S. 218, 226-27 (2001); see also Gonzales v. Oregon, 546 U.S. 243, 258 (2006) ("Chevron deference … is not accorded merely because the statute is ambiguous and an administrative official is involved.").  As E.O. 9001 unambiguously limited the contracting authority it delegated to "the amounts appropriated therefor," and the Oil Companies offer no argument as to how the Biddle Opinion meets the standards established in Mead and its progeny, the Court finds that it owes no deference to this Opinion.

power to, *inter alia*, "[d]etermine the policies, plans, procedures, and methods of the several Federal departments, establishments, and agencies in respect to war procurement and production, including purchasing, contracting, specifications, and construction[.]"  7 Fed. Reg. 329, 330  ¶ 2(b) (Jan. 16, 1942), JA 246-47.  By letter dated February 13, 1942, WPB Chairman Harold I. Ickes then delegated to the Office of the Petroleum Coordinator the responsibility to "determine the price at which aviation gasoline is to be purchased, the capacity of the particular refiner to perform[,] and the technical details of the particular contract."  JA 305.  By the same letter, Chairman Ickes also delegated to DSC (and another agency not relevant here) the residual responsibility to determine "the other terms and the form of such [avgas] contracts."  Id.

Thus, the relevant authorization and delegation here proceeded in steps.  First, as discussed above, the FWPA authorized the President to delegate to agencies of his choosing the ability to enter into procurement contracts without regard to normal legal constraints.  Second, in an arguable (but not explicit) exercise of at least some of that statutory power, President Roosevelt delegated to the WPB Chairman the authority to set governmental "policy" with respect to "contracting" for "war procurement and production."  Finally, Chairman Ickes re-delegated to DSC the authority to set all terms of the avgas contracts that were unrelated to price, the Oil Companies' production capacity, or "technical details."

The question is at what point in this process, if ever, a waiver of the ADA occurred.  According to the Oil Companies, the magic moment occurred at step two, by means of E.O. 9024's delegation to the WPB Chairman of the authority to set governmental "policy" with respect to "contracting" for "war procurement and production."   In addition, the Oil Companies repeatedly characterize the residual contracting authority that this officer re-delegated to DSC at step three (that is, to set "other" terms in the avgas contracts, not related to price, the Oil Companies' production capacity, or "technical details"), as a power "without limitation."  Pls. Mem. at 42-44. Putting these two contentions together, the Oil Companies argue that DSC possessed "all power, without limitation, to 'determine' on behalf of the United States contract terms with respect to war procurement and production of [a]vgas."  Id. at 44.  In the Oil Companies' estimation, this "limitless" authority necessarily included the authority to waive the ADA in the course of such procurement-related action.

The Court disagrees.  As noted, the FWPA did grant authority to the President to designate, at his option, agencies that could bypass normal contracting restrictions. However, in contrast to E.O. 9001, E.O. 9024 did not invoke the FWPA or employ any language demonstrating an intent to allow covered agencies to bypass *any* subset of contracting restrictions, much less anti-deficiency restrictions.  Instead, E.O. 9024 simply granted the WPB Chairman the authority to set "policy" with respect to "contracting."  It is a long jump, and one this Court declines to take, from this unadorned language to the proposition that general "policy-making" authority necessarily includes the power to

waive the ADA – or, for that matter, any other federal statute. Thus, even assuming that Chairman Ickes re-delegated the full extent of the "policy-making" authority conferred to him by E.O. 9024 to DSC, there is no evidence that this authority included the ability to waive the ADA.[11]

The Court's conclusion is, moreover, bolstered by the fact that both E.O. 9001 as well as yet another Executive Order – E.O. 8512, issued on August 13, 1940 – expressly reaffirmed the anti-deficiency principles of the ADA as they applied to wartime contracting. The Court has already discussed E.O. 9001 above and need not repeat that analysis here. However, E.O. 8512 mandated that "[n]o agency shall make expenditures or involve the Government in any contract or obligation for the future payment of money in excess of the amount currently available therefor under the apportionments so approved or revised." 6 Fed. Reg. 2849 (Aug. 13, 1940).

The Oil Companies attempt to evade the plain meaning of this directive (as well as the similar anti-deficiency language found in E.O. 9001) by arguing that the later-issued E.O. 9024 overrode the relevant portions of these two prior Executive Orders. Pls. Reply at 31. However, while E.O. 9024 stated that "any provisions" of any prior Executive Order "conflicting with this Order are hereby superseded," 7 Fed. Reg. at 330, JA 247, the Court does not read the anti-deficiency language of either E.O.'s 8512 or 9001 as "conflicting" with E.O. 9024's simple grant to the WPB Chairman of the authority to set "policy" with respect to "contracting." Especially in light of E.O. 9024's silence with respect to the ADA (as well as other contracting limitations), the Court sees no basis to construe that Order's grant of general "policy-making" authority to the WPB Chairman as in any way creating a material conflict with the anti-deficiency language in E.O.'s 8512 and 9001.

Finally, the Court notes that, contrary to the Oil Companies' assertions, <u>Cadillac Fairview/California, Inc. v. Dow Chemical Company</u>, 299 F.3d 1019 (9th Cir. 2002),

---

[11] As noted, Chairman Ickes delegated the responsibility to "determine the price at which aviation gasoline is to be purchased, the capacity of the particular refiner to perform[,] and the technical details of the particular contract," to the Office of the Petroleum Coordinator, and only the residual responsibility to determine "the other terms and the form of such [avgas] contracts" to DSC. JA 305. The Court is therefore puzzled by the Oil Companies' insistence on characterizing DSC's contracting authority as "limitless." Nonetheless, the Court understands the Oil Companies' fundamental contention here to be that DSC's power to "'determine,' on behalf of the United States, all 'other' terms … includ[ed] [the power to determine] terms governing what costs would be reimbursed by the Government." Pls. Mem. at 43. Because the Court finds that E.O. 9024 did not grant *any* agency the authority to waive the ADA, it need not reach the question of whether the Office of the Petroleum Coordinator or DSC in fact retained the power to determine avgas contract terms involving, in the Oil Companies' words, "what costs would be reimbursed by the Government." However, the Court notes that, although neither party addressed the question, it would seem on the basis of the record before the Court that a case might plausibly be made that these kinds of terms are closely related to price, and therefore fell within the contracting authority re-delegated by Chairman Ickes to the Office of the Petroleum Coordinator, not to DSC.

does not compel a different result.  That case involved another instance of CERCLA litigation stemming from clean-up costs related to the production of military supplies during World War II.  In that case, the product was synthetic rubber.  On appeal, the Ninth Circuit upheld the district court's equitable allocation of the clean-up costs to the Government, in part based on the existence of a "hold harmless" clause in the contract. The Government argued that notwithstanding this clause, any purported indemnification would have been *ultra vires* under the ADA, because the relevant Rubber Reserve agency there lacked the authority to commit the Government to holding the rubber manufacturer harmless.

The Ninth Circuit rejected this argument, emphasizing that "[e]ven if there were a serious question about whether the Rubber Reserve acted *ultra vires* in making the contract … it would make no difference, because in this case the contract [itself] was not enforced.  It was merely considered as a factor in the equitable allocation of response costs."  Id. at 1029.  However, in dicta and without the benefit of any substantive analysis, the Ninth Circuit also stated that the Government's ADA argument was "without force" on its merits, because:

> the agreement with [the manufacturer], including the hold harmless language, was authorized by law, namely the emergency powers Congress gave the President, and the regulations issued by the executive branch, for the prosecution of the war.  The [First] War Powers Act authorized the President to authorize agencies to make contracts 'without regard to the provisions of law' such as the Anti-Deficiency Act, 'whenever he deem[ed] such action would facilitate the prosecution of the war.'  The president exercised this authority in an [E]xecutive [O]rder particularly directed to the Rubber Reserve.

Id. at 1028-29.  The Court cited, in support of the last sentence of this passage, Executive Order 9246 ("E.O. 9246" or the "Rubber Reserve Order"), 7 Fed. Reg. 7379 (Sept. 17, 1942) and, following a "see also" signal, E.O. 9001 as well.  Id. at 1029 n.27.

The Oil Companies argue that the language in E.O. 9024 granting the WPB Chairman the authority to make "policy" with respect to "contracting" is "considerably broader" than the corresponding language in E.O. 9246 (*i.e.*, the Rubber Reserve Order). Pls. Mem. at 45.  Therefore, they contend, if the Rubber Reserve Order sufficed to allow the Rubber Reserve to indemnify its contractors, it must follow *a fortiori* that E.O. 9024 similarly authorized the DSC to do the same.  Pls. Reply at 30-31.

Even assuming the Oil Companies are correct that E.O. 9024 is "considerably broader" than E.O. 9246, the Court is not bound or persuaded by Cadillac Fairview's

cursory treatment, in dicta, of the ADA question.  Although <u>Cadillac Fairview</u> states that President Roosevelt exercised the full extent of his FWPA authority in the Rubber Reserve Order, the decision offers no textual analysis in support of this conclusion, and does not consider or address the anti-deficiency constraints reiterated in E.O. 8512 and E.O. 9001.  In these circumstances, the Court finds the relevant passage in <u>Cadillac Fairview</u> unpersuasive.

d.  <u>The National Defense Act of 1916</u>

The Oil Companies also argue that the purported indemnification agreements were independently authorized by the National Defense Act of 1916 ("NDA"), Pub. L. No. 64-85, 39 Stat. 166, in conjunction with Executive Order 9040 ("E.O. 9040"), 7 Fed. Reg. 527 (Jan. 24, 1942), JA 248.

Enacted during World War I, Section 120 of the NDA authorized the President to "place an order" with any supplier for any "product or material as may be required" for the furtherance of war efforts.  Pub. L. No. 64-85, 39 Stat. at 213.  The Act further made compliance with such an order "obligatory" on both the supplier and "the responsible head or heads thereof," on penalty of "imprisonment for not more than three years and by fine not exceeding $50,000."  <u>Id.</u>  In the event the supplier refused to comply with such an order, the NDA additionally authorized the President to "take immediate possession" of its plant or plants.  However, the Act also mandated that the Government pay suppliers a "fair and just" price for all provisions.  <u>Id.</u>  As the Oil Companies note, the NDA authorized the President to employ these powers "in addition to the present authorized methods of purchase or procurement."  <u>Id.</u>

On January 24, 1942, President Roosevelt issued E.O. 9040, delegating to the WPB Chairman the authority to "[p]erform the functions and exercise the powers" vested in the President by the NDA. 7 Fed. Reg. 527 ¶1(c), JA 248.  E.O. 9040 further provided that the WPB Chairman "may exercise the powers, authority, and discretion conferred upon him by this or any other Order through such officials or agencies and in such manner as he may determine; and his decisions shall be final."  <u>Id.</u> ¶3.  Although neither the NDA nor E.O. 9040 made any mention of the ADA or other contracting limitations, the Oil Companies argue that "[t]he additional grant of the President's powers under Section 120 … confirms beyond any doubt that the Anti-Deficiency Act did not limit the authority of [the] WPB and DSC[12] to make the reimbursement promises."  Pls. Mem. at

---

[12] The Government protests that E.O. 9040 applied only to the WPB Chairman, and not DSC.  However, as the Oil Companies point out, by its plain terms E.O. 9040 authorized the WPB Chairman to "exercise the powers, authority, and discretion conferred upon him by this or any other Order *through such officials or agencies and in such manner as he may determine*."  7 Fed. Reg. 527, JA 248 (emphasis added).  And, as discussed above, by letter dated February 13, 1942, Chairman Ickes delegated to DSC the responsibility to determine "other" avgas contract terms (not related to price or technical specifications).  JA 305.  Because the Court finds that the NDA did not grant *any* governmental authority the ability to

29

48-49.   This argument has two main components, neither of which the Court finds convincing.

First, the Oil Companies emphasize the provision in the NDA stating that the President's powers under that Act were "in addition to the present authorized methods of purchase or procurement."  According to the Oil Companies, this language shows:

> an explicit grant of additional authority allowing the Executive Branch to deviate from the existing 'methods of … procurement.  The limitations imposed by the ADA (enacted in 1906) constrained 'present authorized methods of purchase or procurement': by its plain terms, Section 120 expanded the President's purchase and procurement authority beyond such constraints.

Pls. Reply at 39-40 (quoting the NDA).  The bald contortions to the actual language of the NDA present in this interpretation, however, need hardly be identified.  The only reasonable meaning of the Act's statement that the powers created therein were "in addition to the present authorized methods of purchase or procurement" is that the Act *did not in any way abridge* the Government's *existing procurement powers*.  This proposition, however, bears no logical relation to the quite different proposition advanced by the Oil Companies that the Act somehow *abolished* existing procurement *constraints* (such as the ADA).  In other words, the Oil Companies' argument here is made possible only by an overt substitution of meanings.  To borrow their phrasing, the "plain terms" of the Act in fact "expanded the President's purchase and procurement authority" *not* beyond existing "constraints," but rather beyond existing "*methods*," a different matter altogether.

Second, the Oil Companies quote extensively from a 1931 Supreme Court takings case, International Paper Company v. United States, 282 U.S. 399, 405 (1931), which involved the Government's requisition of electrical power during World War I.  Although the Government paid the power supplier for the electricity, it failed to reimburse the plaintiff in the case, a company that owned a portion of the water that was necessary for the power supplier to fill the Government's order.  The Court awarded the plaintiff the costs it had incurred as a result of the diversion of its water, and stated, in a passage the Oil Companies urge is quite pertinent to the case at hand:

> [t]he Government has urged … that it does not appear that the action of the Secretary was authorized by Congress. We shall give scant consideration to such a repudiation of

---

waive the ADA, however, it need not determine whether this re-delegation sufficed to bring DSC within the purview of E.O. 9040.

> responsibility.  The Secretary of War in the name of the
> President, with the power of the country behind him, in
> critical time of war, requisitioned what was needed and got it.
> Nobody doubts, we presume, that if any technical defect of
> authority had been pointed out it would have been remedied
> at once.  The Government exercised its power in the interest
> of the country in an important matter, without difficulty, so
> far as appears, until the time comes to pay for what it has had.
> The doubt is rather late. We shall accept as sufficient answer
> the reference of the petitioner to the National Defen[s]e Act
> of June 3, 1916…giving the President in time of war power to
> place an obligatory order …

Id. at 406.

Seizing on this passage, the Oil Companies argue that "[t]he only difference between this case and International Paper is that here the Government did not just seize property but actually promised to pay for it.  The Government's authority to do so under Section 120 follows *a fortiori* from its authority under the same provision to seize the property at issue." Pls. Mem. at 50.

The problem with this argument, as the Government points out, is that International Paper was a Fifth Amendment takings case that had nothing to do with the ADA.  Elsewhere in their briefing and at oral argument, the Oil Companies concede that, absent a specific applicable waiver, the ADA has always prohibited the use of open-ended indemnification clauses in government contracts.  Pls. Mem. at 41; Tr. Oral Arg. at 33-34.  Their International Paper argument, however, is not tied to any purported ADA waiver, but instead is an attempt to bolster the waiver requirement by way of analogy between the Government's contracting and eminent domain powers.

The Court rejects this analogy.  The relevant question here is not, as the Oil Companies imply, whether the Government's purported power to indemnify its private suppliers of war materials can or should somehow be conceived of as a "lesser" power than that which it admittedly possessed to seize private property in order to ensure the production of the same materials.  Nor is the Government's seizure authority relevant in any way to the actual facts of the avgas program, where, as the Ninth Circuit stated in Shell III:

> [t]hroughout the war, the Oil Companies designed and built
> their factories, maintained private ownership of their
> facilities, and managed their own refinery operations.  The
> Oil Companies affirmatively sought contracts to sell avgas to
> the government, and the contracts were profitable throughout

the war.    After the war, the Oil Companies retained
ownership of the facilities they had built with the help of
government loans.

294 F.3d at 1050; see also Shell I, 841 F. Supp. At 966-67 ("[I]t is beyond dispute that
the oil companies entered into their contracts to supply the federal government with
aviation fuel volitionally."). Rather, the apposite question here is simply whether the
NDA effected an ADA waiver of benefit to the avgas contracts.    For the reasons
explained, the Court finds that it did not.

e.   The DSC Charter

The Oil Companies' final ADA argument is that the statute was independently
waived by DSC's enabling charter, as amended in July 1941.    The DSC charter
amendment in question enumerated a list of the "objects, purposes, and powers" of DSC.
Amendment to the Charter of the Defense Supplies Corporation, July 9, 1941, JA 331.
These included "[t]o produce, acquire, carry, sell, or otherwise deal in strategic and
critical materials …," id. ¶1(a), and "[t]o purchase and lease land; purchase, lease, build,
and expand plants; purchase and produce equipment, facilities, machinery, materials and
supplies for the manufacture of strategic and critical materials…" id. ¶1(b).  In addition,
the charter amendment states that:

> [t]he [DSC] shall have power and authority to do and
> perform all acts and things whatsoever which are necessary,
> suitable[,] convenient, or proper in connection with or
> incidental to the foregoing objects, purposes, and powers,
> including, but *without limitation*, the power to lease,
> purchase, or otherwise acquire, and to lease, sell, or otherwise
> dispose of, and to deal in, manage, and control transportation
> facilities in and between the other American countries of the
> Western Hemisphere and the United States and to otherwise
> develop such facilities and equipment incidental thereto in
> order to facilitate trade between those countries and the
> United States and for other purposes affecting the national
> defense, the power to borrow and hypothecate, to lend
> money, to adopt and use a corporate seal, *to make contracts*,
> to acquire, hold, and dispose of real and personal property,
> and to sue and be sued in any court of competent jurisdiction.

Id. ¶1 (emphasis added).

Once again, the Oil companies attempt to build an argument through selective
quotation.  Specifically, seizing on only the highlighted language in the above passage,

they posit that "[t]he DSC, therefore, was expressly authorized by law to perform 'all acts and things whatsoever,' including specifically, '*without limitation, the power … to make contracts.*"  Pls. Mem. at 52 (emphasis added).

Plainly, the phrase "all things whatsoever" and the "without limitation" qualifier are used in the above passage to indicate that the subsequent list of powers possessed by DSC was not exhaustive.  The argument advanced by the Oil Companies, that "without limitation" somehow specifically described the scope of the DSC's *contracting* authority and bypasses the ADA, is without merit, and the Court need not consider it further.

4. The Government Would Be Free to Argue that the Oil Companies' CERCLA Liability Was Not Incurrred "by Reason of" Their Avgas Production

Notwithstanding the Court's holding that the Oil Companies' indemnification claims fail as a matter of law for the multiple reasons discussed above, the Court will also address one remaining area of contention raised by these proceedings:  whether the non-benzol waste was dumped at the McColl site "by reason of" the Oil Companies' "production, manufacture, sale or delivery" of avgas.

As noted, the language in the "Taxes" clause on which the Oil Companies rely for their indemnification claims provides that "Buyer shall pay … any new or additional taxes, fees, or charges … which Seller may be required by any [government] … to pay *by reason of* the production, manufacture, sale or delivery of [avgas]." (emphasis added). Thus, had the Oil Companies been able to demonstrate that CERCLA liability was a "charge" within the meaning of the "Taxes" clause, they still would  have been required to demonstrate that all or some of these "charges" were incurred "by reason of" the companies' avgas production.  The Oil Companies contend that the Government is collaterally estopped from arguing against the presence of the necessary causal relationship by the outcome of the CERCLA litigation.  In the alternative, they argue that the factual record before the Court establishes this relationship beyond any "genuine issue" that would preclude entry of summary judgment in their behalf.  Pls. Mem. at 30-40.  The Government disagrees on both counts, contending that a majority of the acid waste at the McColl site resulted from the production of *non*-avgas products, and that Shell III is not to the contrary.  Gov't Mem. at 36-43.  Although this issue is secondary to the legal questions already discussed, in the interests of completeness the Court will address this subject.

Under the doctrine of issue preclusion (sometimes known as collateral estoppel), a litigant is barred from relitigating a factual or legal issue that has already been raised and decided in a prior proceeding.  This doctrine applies where "(i) the issue previously adjudicated is identical with that now presented, (ii) that issue was actually litigated in the prior case, (iii) the previous determination of that issue was necessary to the end-

decision then made, and (iv) the party precluded was fully represented in the prior action." Whiteman v. Dep't of Transp., 688 F.3d 1336, 1340 (Fed. Cir. 2012) (internal citation omitted). The Oil Companies argue that the Ninth Circuit's decision in Shell III, 294 F.3d 1045, meets these prerequisites on the issue of whether the non-benzol waste was generated and disposed of at the McColl site "by reason of" the Oil Companies' avgas production. Due to the peculiarities of the CERCLA litigation, as well as the trial court's confusion regarding the extent of the Government's benzol waste admissions in Shell II, analyzing this claim requires careful scrutiny of both decisions.

As explained in the factual background section of this opinion, after conducting an extensive analysis of the avgas program, the trial court in Shell II determined that, as a factual and equitable matter, "100 percent of the non-benzol waste at the McColl site [was] attributable to the avgas program" (as opposed to, and distinct from, the Oil Companies' secondary use of the spent alkylation acid to treat non-avgas products). 13 F. Supp. 2d at 1026. The district court then determined, and weighed in favor of the Oil Companies, a group of additional equitable factors, among them that, in the district court's estimation, the waste and its clean-up costs were war costs, such that "the American public" should "bear the[ir] burden," and that "the Oil Companies had no reasonable recourse" to their dumping practices as a result of the Government's failure to create or facilitate disposal alternatives. Id. at 1027-28.

As also explained in the factual background section, on review the Ninth Circuit reversed the district court's holding as to the Government's liability for *any* of the non-benzol clean-up costs. In reaching this conclusion, the Ninth Circuit emphasized that the United States was only the end purchaser, not the manufacturer, of the avgas; that it never owned any of the raw materials or intervening products; that it "did not even know that the Oil Companies had contracts to dispose of their waste at the [McColl] site"; that the Oil Companies "voluntarily entered into the contracts and profited from the sale[s]"; and that the Government "was aware that waste was being produced, but did not direct the manner in which the companies disposed of it." 294 F.3d at 1056-59. Accordingly, the Ninth Circuit held that "[b]ecause the United States is not liable as an arranger, the question of allocation of liability for the non-benzol waste between the United States and the Oil Companies …is moot." 294 F.3d at 1049.

However, the Ninth Circuit also upheld the district court's determination that the United States was 100 percent liable for the clean-up costs of the benzol waste at the McColl site "for the same reasons that avgas sludge is fully allocable to the Government." Id. at 1060 (quoting the district court's unpublished decision regarding the benzol liability). In so holding, the Ninth Circuit expressly recognized that, due to the district court's initial confusion regarding the extent of the Government's benzol concession, its actual "analysis ... was focused on the non-benzol rather than the benzol waste." Id. However, the Ninth Circuit found that the lower court was "entirely

justified" in extending that analysis from the non-benzol category of waste to the benzol category of waste, in part because:

> to the degree that the [district court's chosen] equitable factors support allocation of the cleanup costs to the United States with respect to the non-benzol waste, where the arranger status of the United States was disputed, such factors are even stronger with respect to the benzol waste, where the United States concedes that it was an arranger.

Id. The Ninth Circuit therefore held that "the district court did not abuse its discretion in choosing the factors on which to rely in determining allocation, nor did it clearly err in applying those factors to the benzol waste." Id.

In the present case, the Oil Companies argue that, although the district court's findings with respect to the non-benzol waste were mooted by the appellate court, those same findings were "necessary to the judgment allocating 100 percent of the benzol-related cleanup costs to the government." Pls. Mem. at 33. Thus, the Oil Companies contend that these findings – and in particular, that "100 percent of the non-benzol waste at the McColl site [was] attributable to the avgas program" – should be given preclusive effect on the question of whether the Oil Companies incurred the non-benzol-related clean-up costs "by reason of" their avgas production. Pls. Mem. at 31 (quoting Shell II, 13 F. Supp. 2d at 1026). The Court acknowledges a superficial appeal to this argument, but, on careful inspection, finds its logic illusory, for the following reasons.

It is true, as the Oil Companies point out, that the Ninth Circuit found the district court to be "entirely justified" in extending its reasoning regarding the non-benzol waste to the separate category of the benzol waste. However, it is also true that the majority of the relevant findings there were *generalized*, such that they could logically apply to both the non-benzol and benzol waste alike. Examples of such generalized findings include, for example, the district court's holding that the clean-up costs were properly conceived of as war costs and should therefore be broadly shared by the public, and that "the Oil Companies had no reasonable recourse" to their dumping practices as a result of certain governmental actions or inaction. Id. at 1027-28. The one exception to this rule, however, also happens to be the sole finding to which the Oil Companies stake their estoppel argument – the district court's finding that "100 percent of the non-benzol waste at the McColl site [was] attributable to the avgas program." This finding, in particular, plainly had no bearing on the question of the proper allocation of liability on the benzol waste. To the contrary, this finding simply was beside the point.

Thus, the district court's finding that "100 percent of the non-benzol waste at the McColl site [was] attributable to the avgas program," fails, at a minimum, the third requirement of collateral estoppel, that the previous determination of the issue in question

was "necessary to the end-decision then made."  Whiteman v. Dep't of Transp., 688 F.3d at 1340.  Accordingly, the Oil Companies would not have been entitled to summary judgment on this issue, even had they prevailed on the other legal issues discussed in the prior sections of this opinion.

Having made this determination, the question then presented is whether this Court, acting on a blank slate, would have found all or some of the Oil Companies' CERCLA liability to have been incurred "by reason of" their avgas production.  While the Court will not engage in a lengthy analysis of this issue, it finds that, had it been necessary for the Court to reach this question, further proceedings would have been necessary for the Court to reach a final determination.  Setting aside the question of what level of causation this phrase connotes, the issue of what portion of the non-benzol waste was created "by reason of" the avgas program raises factual questions that are simply not adequately answered by the evidence or stipulations currently before the Court.

For example, the Government has introduced evidence that various oil companies, including but not limited to the Plaintiffs (or their predecessors-in-interest) in this action, successfully disposed of acid waste by means other than dumping – such as reprocessing or burning – throughout the course of the war.  JA 512-14 (Stips. 500-12).  However, the facts in the record do not necessarily allow the Court to extrapolate the extent to which the Oil Companies had, as an overall matter, access to reprocessing facilities, nor about their ability to safely (if not cleanly) burn any remaining acid waste that could not be reprocessed.  Conversely, the Oil Companies point to a few instances in which certain Plaintiffs sought federal permission to build additional acid reprocessing facilities, but were denied or frustrated in these plans.  JA 452-53, 456-57, 461-67, 635.  Similarly, were it to resolve the question of what portion of the Oil Companies' CERCLA costs were incurred "by reason of" their avgas production, the Court would desire additional information about these events, the proposed capacities of the never-built facilities, and their likelihood of completion within a time frame relevant to the use of the McColl site.

In any event, the Court reiterates that resolution of these questions (among other similar ones) is not, in the end, necessary to its disposition of this matter.  To the contrary, the Court has found three other, independent bases for dismissing the Oil Companies' claims as a matter of law and entering judgment in favor of the Government.  Consequently, the Court need not further address or require the evidentiary proceedings that would be necessary to resolve the "by reason of" factual issue.

Conclusion

Based upon the foregoing, the Court DENIES the Oil Companies' motion for summary judgment, and GRANTS the Government's cross-motion for summary judgment. The Clerk of Court is directed to enter judgment in favor of the Government.  No costs.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge