# In the United States Court of Federal Claims

Consl. Ct. No. 06-141 C
Filed: October 30, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| \* | 28 U.S.C. § 1491(b)(1) |
| \* |    (Tucker Act jurisdiction over claims against the United States for breach of contract); |
| \* | 28 U.S.C. § 2501 |
| \* |    (Tucker Act statute of limitations); |

SHELL OIL COMPANY, ATLANTIC
RICHFIELD COMPANY, TEXACO INC., and
UNION OIL COMPANY OF CALIFORNIA,

    Plaintiffs,

v.

THE UNITED STATES,

    Defendant.

28 U.S.C. § 1491(b)(1)
   (Tucker Act jurisdiction over claims against the United States for breach of contract);
28 U.S.C. § 2501
   (Tucker Act statute of limitations);
28 U.S.C. § 2508
   (Jurisdiction over set off, counterclaims, claims for damages, or demand against plaintiff);
28 U.S.C. § 2514
   (Special Plea In Fraud);
41 U.S.C. § 113(a), Contract Settlement Act of 1944, (repealed and replaced by Pub. L. 111-350, 124 Stat. 3677 (2011));
42 U. S. C. § 9601 *et seq.*,
   (Comprehensive Environmental Response, Compensation, and Liability Act);
Rules of the United States Court of Federal Claims ("RCFC"),
   RCFC 8(c) (Affirmative defenses),
   RCFC 15(a)(2) (Amended pleadings).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Michael William Kirk**, Cooper & Kirk, PLLC, Washington, D. C., Counsel for Plaintiffs.

**Stephen Carl Tosini**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFFS' MOTIONS
FOR PARTIAL SUMMARY JUDGMENT OR A PROTECTIVE ORDER, THE
GOVERNMENT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
MOTION TO AMEND ANSWER TO ASSERT COUNTERCLAIMS**

**BRADEN**, *Judge*.

On April 28, 2014, the United States Court of Appeals for the Federal Circuit held in this case that defendant (the "Government") was liable for breach of a production contract entered into during World War II and remanded the case for a determination of damages. *See Shell Oil Co. v. United States*, 751 F.3d 1282, 1303 (Fed. Cir. 2014). During post-remand discovery allowing the Government to finalize preparation for a February 2016 evidentiary hearing on damages, a dispute arose about the discovery of Plaintiffs' insurance policies and settlements reached in environmental liability coverage litigation in other judicial forums many years ago.

Before the court resolves the four pending motions concerning this discovery dispute, a review of this case, initially filed 24 years ago in the United States District Court for the Central District of California ("California District Court"), is required.

## I.    RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY.[1]

### A.    Relevant Factual Background.

In 1942 and 1943, during World War II, the Government entered into contracts with Shell Oil Company ("Shell"), Atlantic Richfield Company ("ARCO"), Texaco, Inc. ("Texaco"), and Union Oil Company of California ("Union Oil") (collectively, "the Oil Companies") to produce high octane aviation gasoline to fuel military aircraft (the "Avgas Contracts"). *See Shell IX*, 751 F.3d at 1284–85. The production of this type of gasoline, resulted in waste products such as spent alkylation acid and acid sludge. *Id.* The Oil Companies disposed of this toxic waste through a separate arrangement with Mr. Eli McColl, a former Shell engineer, who dumped the waste at a site in Fullerton, California (known as "the McColl site"). *Id.*

### B.    Proceedings Before The United States District Court For The Central District Of California.

On February 1, 1991, the Government and the State of California brought an action against the Oil Companies in the California District Court, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(a) ("CERCLA"), to recover cleanup

---

[1] Portions of the factual background and procedural history of this case have been discussed in: *United States v. Shell Oil Co.*, 841 F. Supp. 962, 965–67 (C.D. Cal. 1993) ("*Shell I*"); *United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1019–24 (C.D. Cal. 1998) ("*Shell II*"); *United States v. Shell Oil Co.*, 281 F.3d 812, 815–18 (9th Cir. 2002) ("*Shell III*"); *United States v. Shell Oil Co.*, 294 F.3d 1045, 1047–51 (9th Cir. 2002) ("*Shell IV*"); *Shell Oil Co. v. United States*, 93 Fed. Cl. 439, 441–43 (2010) ("*Shell V*"); *Shell Oil Co. v. United States*, 93 Fed. Cl. 153, 154–56 (2010) ("*Shell VI*"); *Shell Oil Co. v. United States*, 672 F.3d 1283, 1284–88 (Fed. Cir. 2012) ("*Shell VII*"); *Shell Oil Co. v. United States*, 108 Fed. Cl. 422, 424–29 (2013) ("*Shell VIII*"); and *Shell Oil. Co. v. United States*, 751 F.3d 1282, 1284–90 (Fed. Cir. 2014) ("*Shell IX*"). The relevant facts and procedural history discussed herein also were derived from: the parties' November 20, 2012 Joint Appendix ("JA 1–818"); an Appendix to the Oil Companies' April 10, 2015 Motion ("Pls. Exs. A–G"); and an Appendix to the Government's May 15, 2015 Response And Cross-Motion ("Gov't Exs. 1–73").

costs at the McColl site.  *See Shell I*, 841 F. Supp. at 975.  In that case, the Oil Companies filed counterclaims against the Government, including a claim for breach of contract.  *Id.* at 974–75.

On September 28, 1993, the California District Court determined that the Oil Companies were liable under CERCLA as "arrangers," under 42 U.S.C. § 9607(a)(3).  *Id.* at 968–70 (holding "any person [as liable] who [by contract, agreement, or otherwise] *arranged for disposal or treatment . . .* of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity  and containing such hazardous substances" (quoting 42 U.S.C. § 9607)) (emphasis added).  The California District Court then bifurcated a determination of the costs of recovery and ruling on the Oil Companies' counterclaims.  *Id.* at 975–76.

On December 12, 1994, the California District Court entered a Partial Consent Decree as to the recovery amount due.  JA 345–77.  The Oil Companies agreed to pay $13,248,000 to the United States Environmental Protection Agency and $4,752,000 to the California Department of Toxic Substances Control for "past response costs."  The parties acknowledged that "the amounts paid under this Decree are less than [the Government's] current claim."  JA 353.  The Oil Companies reserved their rights to appeal any final judgment and independently pursue counterclaims.  JA 360 ("[A]ll actions and orders of the Court are appealable as would otherwise be provided by law[.]"); *see also* JA 361 ("Settling Defendants reserve their rights to pursue the claims set forth in their current counterclaims[.]").

On August 11, 1998, the California District Court issued a Final Opinion regarding cost recovery.  *See Shell II*, 13 F. Supp. 2d at 1019–30.  The Government did not contest that it was liable for 100% of the benzol waste, *i.e.*, roughly 5.5% of the total waste at the McColl site.  *Id.* at 1023.  As to non-benzol waste, it was determined that both spent alkylation acid and acid sludge were "attributable to the avgas program."  *Id.* at 1024.  The parties stipulated that 100% of the spent alkylation acid at the McColl site, or 12% of the total waste, was "attributable to the avgas program."  *Id.* at 1024–25.  Because 100% of the non-benzol waste was "attributable to the avgas program" and the California District Court found that "[th]e Government should bear 100 percent responsibility for waste attributable to the avgas program," the Government was found to be liable for 100% of the non-benzol waste.  *Id.* at 1024–27.

The following Table shows the final determination of the California District Court as to the apportionment of liability for all wastes at the McColl site:

| Type of waste | % of total waste at McColl site | % of waste attributable to Government | % of waste attributable to Oil Companies |
|---|---|---|---|
| **Benzol waste** | 5.5 | 100 | 0 |
| Acid sludge | 5.5 | 100 | 0 |
| **Non-benzol waste** | 94.5 | 100 | 0 |
| Spent alkylation acid | 12 | 100 | 0 |
| Acid sludge from treatment of avgas products | 82.5 | 100 | 0 |
| Acid sludge from treatment of non-avgas products | 0 | 0 | 0 |

*See Shell II*, 13 F. Supp. 2d at 1024–30.

On October 12, 1999, the California District Court entered a Final Judgment that ordered the Government to pay the Oil Companies $64,219,514.46, pending appeal. *See Final J. Order App.* at 1–2, *United States v. Shell Oil Co.*, No. 91-0589 (C.D. Cal. Oct. 12, 1999); *see also* JA 610–11 (same).

**C.     Proceedings Before The United States Court Of Appeals For The Ninth Circuit.**

On February 11, 2002, the United States Court of Appeals for the Ninth Circuit overruled the California District Court's determination that the Government was an "arranger." *See Shell III*, 281 F.3d at 815 ("We reverse the holding of the district court that the [Government] is liable for the 'non-benzol' waste cleanup costs as an 'arranger' under § 9607(a)(3). Because the [Government] is not liable as an 'arranger,' the question of allocation of liability between the [Government] and the Oil Companies under § 9613(f)(1) is moot.").

On March 28, 2002, both the Oil Companies and the Government filed petitions for rehearing. *See Shell IV*, 294 F.3d at 1048–49. On June 28, 2002, the United States Court of Appeals for the Ninth Circuit denied both parties' petitions and withdrew the February 11, 2002 Opinion:

> We reverse the holding of the district court that the [Government] is liable for the non-benzol waste cleanup costs as an arranger under § 9607(a)(3). Because the [Government] is not liable as an arranger, the question of allocation of liability for the non-benzol waste between the [Government] and the Oil Companies under § 9613(f)(1) is moot. . . . We affirm the holding of the district court that 100% of the cleanup costs for the benzol waste should be allocated to the [Government].

*Id.* at 1048–49.[2]

### D.   Remand Proceedings In The United States District Court For The Central District Of California.

In August 2003, the Government and the Oil Companies stipulated that:

> [T]he Oil Companies are legally responsible under CERCLA for 93.75% of the response costs incurred by the [Government] and the State in relation to the McColl site. With respect to the costs previously resolved pursuant to the 1994 Consent Decree, the [Government] is responsible under CERCLA for reimbursing the Oil Companies for the [Government's] 6.25% share of the costs paid by the Oil Companies to the State pursuant to the 1994 Consent Decree.

> * * *

> The remaining claims in this case consist of (1) the [Government's] claim under CERCLA for environmental response costs incurred generally between July 1, 1990 and June 30, 2012, plus related prejudgment interest, in an amount that the [Government] alleges totals approximately $43 million and (2) the State's claim under CERCLA for environmental response costs incurred generally between October 1990 and . . . June 30, 2013, plus related prejudgment interest, in an amount that the State alleges totals approximately $5.7 to $6 million. As noted above, the State has settled with the [Government] for 6.25 percent of the State's claim for costs incurred between October 1990 through June 2011.

Joint Status Report at 4–5, 7–8, *United States v. Shell Oil Co.*, No. 91-0589 (C.D. Cal. Dec. 6, 2013).

On July 16, 2004, the Government filed a Motion To Dismiss the Oil Companies' breach of contract counterclaims for lack of subject-matter jurisdiction. *See* Gov't Mot. Dismiss, *United States v. Shell Oil Co.*, No. 91-0589 (C.D. Cal. July 16, 2004). On December 14, 2004, the California District Court granted the Government's July 16, 2004 Motion. *See* Min. Order, *United States v. Shell Oil Co.*, No. 91-0589 (C.D. Cal. Dec. 14, 2004); *see also Shell IX*, 751 F.3d at 1289 (discussing the transfer of the Oil Companies' breach of contract counterclaim from the California District Court to the United States Court of Federal Claims).

---

[2] On January 13, 2003, the United States Supreme Court denied the Oil Companies' joint petition for a writ of certiorari. *See Shell Oil Co. v. United States*, 537 U.S. 1147 (2003).

5

**E.      Initial Proceedings Before The United States Court Of Federal Claims, Case No. 05-704.**

On June 30, 2005, the California District Court transferred the Oil Companies' breach of contract counterclaims to the United States Court of Federal Claims. *See* Transfer Order, *Shell Oil Co. v. United States*, No. 05-704 (Fed. Cl. June 30, 2005). On July 28, 2005, the Oil Companies filed an Amended Complaint. But, on September 22, 2005, the Oil Companies voluntarily dismissed the July 28, 2005 Amended Complaint. *See* Notice, *Shell Oil Co. v. United States*, No. 05-704 (Fed. Cl. Sept. 22, 2005).

**F.      Proceedings Before The General Services Administration.**

On November 23, 2005, the Oil Companies filed a claim with the General Services Administration ("GSA"), seeking $66,283,698.40 in response costs under Section 113(a) of the Contract Settlement Act of 1944. JA 554–59. On February 15, 2006, the GSA informed the Oil Companies that, "there was no basis for recovery," because the "[w]ar contracts that were not terminated in the manner prescribed by the [Contract Settlement] Act [of 1944] are not eligible for compensation or consideration under the [Contract Settlement] Act [of 1944]." JA 560. The GSA also stated that it "neither receives nor currently has any authorized appropriations or other funds available for the purpose of liquidating or otherwise paying for any alleged liability[.]" JA 560.

**G.      Additional Proceedings In The United States Court Of Federal Claims, Case No. 06-141.**

On February 24, 2006, the Oil Companies filed a Complaint ("Compl.") in the United States Court of Federal Claims: Count I alleged that the Government's "refusal to pay and/or reimburse the Oil Companies . . . under the Avgas Contracts materially breaches those contracts"; Count II alleged that the Government's "refusal to pay and/or reimburse the Oil Companies . . . constitutes a failure to pay 'fair compensation' in violation of the Contract Settlement Act of 1944, 41 U.S.C. §§ 101 *et seq.*" Compl. ¶¶ 27, 29. This case was assigned to Senior Judge Loren A. Smith.

On April 17, 2006, the Government filed a Motion To Dismiss. On June 30, 2006, the Oil Companies filed a Cross-Motion For Partial Summary Judgment As To Liability. On February 8, 2008, the United States Court of Federal Claims issued an Opinion, denying the Government's April 17, 2006 Motion To Dismiss, but granting the Oil Companies' June 30, 2006 Cross-Motion For Partial Summary Judgment. *See Shell Oil Co. v. United States*, 80 Fed. Cl. 411, 414–20 (2008) (determining that the Government was required to reimburse the Oil Companies for cleanup costs, because such expenses were "charges" under the "Taxes Clause" of the Avgas Contracts and the Anti-Deficiency Act, Pub. L. No. 59-28, 34 Stat. 27, 49 (1906) was not applicable to those contracts).

On February 25, 2008, the Government filed an Answer to the February 24, 2006 Complaint. No discovery stay was entered during any subsequent proceedings before Senior Judge Smith. Nevertheless, the Government elected not to conduct any discovery.

On June 20, 2008, the Oil Companies filed a Motion For Summary Judgment as to damages. Following briefing by the parties, on March 31, 2009, the United States Court of Federal Claims issued an Opinion determining that the California District Court's August 11, 1998 Opinion collaterally estopped the Government from claiming less than full liability for cleanup costs associated with non-benzol waste at the McColl site and awarded the Oil Companies all claimed costs, plus statutory interest. *See Shell Oil Co. v. United States*, 86 Fed. Cl. 470, 475 (2009) ("The Ninth Circuit upheld the findings made by the California district court . . . that '100 percent of the non-benzol waste . . . at the McColl Site is attributable to the avgas program,' and that finding was necessary to the Ninth Circuit's judgment. Accordingly, the United States is precluded from challenging that finding in this case as [it is] binding on the Government as a matter of issue preclusion or collateral estoppel.") (citation omitted). *Id.* at 475.

On November 16, 2009, however, Senior Judge Smith held a status conference to inform the Oil Companies that he recently learned his spouse owned 97.59 shares of stock in Texaco's parent company.

On December 28, 2009, the Government filed a Notice Of Appeal.

On May 27, 2010, Senior Judge Smith vacated the February 8, 2008 and March 31, 2009 Opinions that granted summary judgment on liability and damages in favor of the Oil Companies. No. 06-141, ECF No. 74. In addition, he severed the Texaco and Union Oil claims, but reinstated summary judgment in favor of Shell and ARCO, and entered final judgment against the Government in the amount of $68,849,505.88. No. 06-141 ECF, No. 79.

On September 17, 2010, the Government filed a second Notice Of Appeal. On March 7, 2012, the United States Court of Appeals for the Federal Circuit held: "Because we find that the presiding judge was required to recuse himself under 28 U.S.C. § 455(b),[3] and that vacatur is appropriate in the circumstances of this case, we vacate the final judgment and the summary judgment orders on which it was premised, and remand with instructions that this case be reassigned to a different judge." *See Shell VII*, 672 F.3d at 1285.

On remand, this case was transferred to Judge Thomas Wheeler on May 14, 2012.

On June 29, 2012, the Oil Companies jointly filed a Motion For Summary Judgment. On September 7, 2012, the Government filed a Cross-Motion For Summary Judgment. No discovery stay was entered at any time during the proceeding before Judge Wheeler and the Government

---

[3] Section 455(b), in relevant part, provides:

[A judge] shall also disqualify himself in the following circumstances: . . . (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding[.]

28 U.S.C. § 455(b).

again elected not to conduct any discovery.  On November 20, 2012, the Oil Companies filed a Joint Appendix ("JA 1–818").

On January 14, 2013, the United States Court of Federal Claims issued an Opinion that granted summary judgment on liability in favor of the Government.  *See Shell VIII*, 108 Fed. Cl. at 425–26 ("The 'Taxes' clause in [the Oil Companies'] contracts does not trump the California courts' CERCLA result.  Accordingly, the Court finds for the Government.").  Because the Government was not liable, the court was not required to reach the issue of damages, but "in the interests of completeness the Court . . . address[ed] this subject," observing that, even if the Government was liable, "the issue of what portion of the non-benzol waste was created 'by reason of' the avgas program raise[d] factual questions that [were] simply not adequately answered by the evidence or stipulations currently before the Court."  *Id.* at 446, 448.

On January 30, 2013, the Oil Companies filed a Notice Of Appeal.  On April 28, 2014, the United States Court of Appeals for the Federal Circuit held that, "[b]ecause the [A]vgas [C]ontracts require the Government to reimburse the Oil Companies for their CERCLA 'charges,' this court reverses with respect to breach of contract liability.  The [United States] Court of Federal Claims correctly determined, however, that material factual disputes preclude granting summary judgment on damages, and that issue is accordingly remanded for trial."  *Shell IX*, 751 F.3d at 1285.

After the second remand, this case was transferred to the undersigned judge on September 11, 2014.  On November 12, 2014, the court entered a Scheduling Order.  Two months later on January 12, 2015, the Government served the Oil Companies with a First Set Of Requests For Production Of Documents.  Pls. Ex. A.

On March 12, 2015, the court convened a telephone status conference to discuss a dispute arising from the Government's January 12, 2015 discovery request and other scheduling issues.  On March 19, 2015, the parties filed a Joint Motion To Amend Schedule that the court granted on March 23, 2015.  On March 24, 2015, the parties filed a Joint Motion For Protective Order Regarding Confidentiality that the court entered on March 25, 2015.

On April 10, 2015, the Oil Companies filed a Motion For A Protective Order And Motion For Partial Summary Judgment And A Memorandum In Support ("Pls. S. J. Mem."), seeking to prevent discovery of the Oil Companies' insurance policies and any insurance coverage settlements.  The Oil Companies also filed an Appendix with seven exhibits ("Pls. Exs. A–G").

On May 6, 2015, the parties filed a Joint Motion To Amend Discovery Schedule.  On May 7, 2015, the Government also filed a Notice of Seven Applications For Access To Protected Materials, including that of Mr. Matthew Low, an arbitration and mediation consultant.  On May 12, 2015, the Oil Companies filed a Response, objecting to Mr. Low's Application.

On May 15, 2015, the Government filed an Opposition And Cross-Motion To The Oil Companies' April 10, 2015 Motion For Protective Order And Partial Summary Judgment ("Gov't Opp.").  On May 18, 2015, the Government filed an Appendix with 73 exhibits ("Gov't Exs. 1–73").  On May 19, 2015, the parties filed a Joint Motion To Amend [The] Schedule.

On May 21, 2015, the court entered Orders that granted the parties' May 6, 2015 and May 19, 2015 Motions.  On that same day, the court also entered an Order that granted six of the Government's May 7, 2015 Applications For Access To Protected Materials, but denied Mr. Low's Application.  On May 26, 2015, the Government filed a Notice of an Application For Access To Protected Materials.

On June 15, 2015, the Oil Companies filed a Reply To The Government's May 15, 2015 Response And Cross-Motion ("Pls. Reply").  The Oil Companies filed a second Appendix with two exhibits ("Pls. Reply App. Exs. A–B").

On June 17, 2015, the Government filed a Notice, objecting to the Oil Companies' proposed redactions to the Government's May 15, 2015 Response And Cross-Motion.  On June 29, 2015, the Oil Companies filed a Response to the Government's June 17, 2015 Notice.  On June 30, 2015, the court convened a telephone status conference.

On July 8, 2015, the Government filed a Reply In Support Of its May 15, 2015 Cross-Motion ("Gov't Reply").

On August 27, 2015, the court entered an Order setting a hearing on the pending motions for October 20, 2015.  The Order also scheduled an evidentiary hearing on damages for the week of February 17, 2016 at the United States Court of Federal Claims.

On September 3, 2015, the Government filed a Motion For Leave To Amend Its Answer To Assert Counterclaims ("Gov't Mot. To Am.").  Specifically, the Government requested leave to assert affirmative defenses and counterclaims, based upon the Special Plea in Fraud, 28 U.S.C. § 2514[4] and the antifraud provision of the Contract Settlement Act of 1944 ("CSA"), 41 U.S.C. § 119 (2005) (repealed 2011).[5]  Gov't Mot. To Am. at 1.

---

[4] Section 2514 of the Forfeiture of Fraudulent Claims Act provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 (2012).

[5] Section 119 of the CSA provided:

Every person who makes or causes to be made, or presents or causes to be presented to any officer, agent, or employee of any Government agency any claim, bill, receipt, voucher, statement, account, certificate, affidavit, or deposition, knowing the same to be false, fraudulent, or fictitious or knowing the same to contain or to be based on any false, fraudulent, or fictitious statement or entry, or who shall cover

On September 14, 2015, the Oil Companies filed a Response To The Government's Motion To Amend Pleadings ("Pls. Resp. To Gov't Mot. To Am."), together with a third Appendix including seven additional exhibits ("Pls. Resp. App. Exs. A–G").

On September 25, 2015, the Government filed a Reply In Support Of Its Motion For Leave To Amend Its Answer ("Gov't Reply In Supp.").

On October 20, 2015, the court held an oral argument on the pending motions ("10/20/15 TR 1–54").

## II.    DISCUSSION.

### A.    Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money

---

up or conceal any material fact, or who shall use or engage in any other fraudulent trick, scheme, or device, for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any benefit, payment, compensation, allowance, loan, advance, or emolument from the United States or any Government agency in connection with the termination, cancelation, settlement, payment, negotiation, renegotiation, performance, procurement, or award of a contract with the United States or with any other person, and every person who enters into an agreement, combination, or conspiracy so to do, (1) shall pay to the United States an amount equal to 25 per centum of any amount thereby sought to be wrongfully secured or obtained but not actually received, and (2) shall forfeit and refund any such benefit, payment, compensation, allowance, loan, advance, and emolument received as a result thereof and (3) shall in addition pay to the United States the sum of $2,000 for each such act, and double the amount of any damage which the United States may have sustained by reason thereof, together with the costs of suit.

41 U.S.C. § 119 (repealed 2011).

In 2011, the CSA was repealed and replaced by An Act To Enact Certain Laws Relating To Public Contracts, Pub. L. 111-350, 124 Stat. 3677. The 2011 Act contained a savings clause providing that, "the laws . . . are repealed except for *rights and duties that matured*, penalties that were incurred, and proceedings that were begun before the date of this Act." Pub. L. No. 111-350, § 7(b), 124 Stat. 3677, 3855 (2011) (emphasis added).

damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'") (citations omitted). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (quoting *Testan*, 424 U.S. at 400). And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

In this case, the February 24, 2006 Complaint alleges that the Oil Companies entered into Avgas Contracts that were breached by the Government. Compl. ¶¶ 27, 29. As such, the court has jurisdiction to adjudicate the Oil Companies' claims.

## B.      Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)). The party invoking federal jurisdiction bears the burden of establishing standing. *Id.* at 560–61. Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180–81 (2000).

In this case, the February 24, 2006 Complaint alleges that the Oil Companies suffered an "injury in fact" that is "concrete," "particularized," and "fairly traceable" to the Government's actions. Compl. ¶¶ 27, 29. And, any injury sustained by the Oil Companies can be redressed by a monetary award. For these reasons, the court has determined that the Oil Companies have standing to seek adjudication of the claims alleged in the February 24, 2006 Complaint.

C.   **The Oil Companies' April 10, 2015 Motion For A Protective Order And Motion For Partial Summary Judgment And The Government's May 15, 2015 Response And Cross-Motion For Partial Summary Judgment.**

The Oil Companies' April 10, 2015 Memorandum In Support Of The Motion For Partial Summary Judgment argues that the Government should not be allowed to engage in discovery about the Oil Companies' insurance policies at this late date for three reasons: (1) the Government has waived any insurance offset defense; (2) the Government's insurance offset defense exceeds the scope of the mandate in *Shell IX*, 751 F.3d at 1282; and (3) the Government's offset defense is barred by the collateral source rule or ancillary remote transaction rule. Pls. S. J. Mem. at 2–3, 27.

1.   **Whether The Government's Offset Defense Has Been Waived.**

a.   **The Oil Companies' Argument.**

The Oil Companies argue any insurance offset is an affirmative defense[6] that the Government waived by failing to raise it more than seven years after the February 25, 2008 Answer was filed. Pls. S. J. Mem. at 9–16; Pls. Reply at 3–9.

The Government has been aware that the Oil Companies were involved in litigation with their insurance carriers about environmental coverage since at least June 1992. Pls. Ex. F (the Government's 6/19/1992 Memorandum of Points and Authorities submitted to the California District Court stating "that [the Oil Companies] initiated [a] lawsuit in 1983 for the purpose of establishing coverage under its policies of insurance in the event it was liable for contamination at the McColl site"). Although the Government did not have knowledge of the actual terms of those settlements, "in 2008, it would have been reasonably apparent to *anyone* with knowledge . . . [of the Oil Companies' insurance coverage litigation] that the Oil Companies might have recovered proceeds on their insurance claims." Pls. Reply at 8. As such, "[t]here is no justification for the Government's decision to raise this defense now." Pls. S. J. Mem. at 13.

Allowing the Government to assert an insurance offset defense at this late date would prejudice the Oil Companies. Pls. S. J. Mem. at 11–13 (citing *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 751 (6th Cir. 2015) ("When the defendant is unable to offer any reasonable explanation for its tardiness in presenting a defense, finding waiver is not an abuse of discretion."); *Venters v. City of Delphi*, 123 F.3d 956, 967–68 (7th Cir. 1997) ("Once the availability of an affirmative defense is reasonably apparent, the defendant must alert the parties and the court to his intent to pursue that defense. A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.") (citation omitted).

Moreover, "many of the employees with knowledge of the insurance coverage cases no longer work at the Oil Companies" and "[d]etermining how much, if any, of the environmental liability insurance proceeds the Oil Companies received are attributable to the CERCLA claims at

---

[6] The terms "offset" and "set off" are used interchangeably. *See Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995) (stating that a "setoff" is "also called 'offset'"). Herein, the court has used the term "offset" or "insurance offset."

issue in this case could be extremely difficult[,] because the Oil Companies' omnibus insurance recoveries resolved countless actual and threatened claims." Pls. S. J. Mem. at 14. In addition, the court would be forced "to wade into this morass of decades-old settlements and litigation" that would "implicate numerous subsidiary questions," and significant additional litigation expense. Pls. S. J. Mem. at 15–16; *see also* Pls. Reply at 6–7.

### b. The Government's Response.

In short, the Government responds that the Oil Companies' arguments are "unpersuasive, because (1) as an element of damages, no affirmative defense is required to address . . . the [O]il [C]ompanies['] duplicative recovery of the same 'charges'; and (2) [the Government] did not discover the settlements that the [O]il [C]ompanies had withheld until this year [, *i.e.*, 2015]." Gov't Opp. at 23.

First, there is no precedent holding that "recovery of 'charges'" must be raised in an answer. Gov't Opp. at 23. Moreover, "the distinction that rendered collateral payments subject to [the Federal Rules of Civil Procedure] FRCP 8(c)[7] . . . is absent here." Gov't Opp. at 24 (discussing *Hassan v. U. S. Postal Service*, 842 F.2d 260, 263 (11th Cir. 1968) where that appellate court held that "[e]vidence about the collateral source payments is distinct from evidence about the accident and evidence about the physical and emotional damage borne by [the plaintiff]")). For this reason, the *Hassan* court held that, "even though the Government['s] . . . requested offset involved an affirmative defense, the trial court had correctly allowed evidence on collateral source payments." Gov't Opp. at 24 (citing *Hassan*, 842 F.2d at 263 (holding that there was no error "[w]hen a plaintiff has notice that an affirmative defense will be raised at trial, [because] the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice") (emphasis omitted). In this case, the Government first "obtained 'concrete and positive evidence' before . . . initiat[ing] discovery into matters relevant [to] insurance recovery." Gov't Opp. at 25 (quoting *Am. Airlines Inc. v. United States*, 551 F.3d 1294, 1306 (Fed. Cir. 2008) (citation omitted)).

Second, the court should reject the Oil Companies' waiver argument, because during the litigation in the California District Court, the Government asked the Oil Companies to identify any insurance litigation and settlements in April 30, 1997 interrogatories. Gov't Opp. at 26; *see also* Gov't Ex. 1 (the Government's April 30, 1997 interrogatories). But, the Oil Companies "withheld information regarding their secret insurance settlements" and "now seek to benefit from the fact that the [Government] did not first learn about the insurance settlements—and of [the Oil Companies'] attempt to obtain a double-recovery . . . —until very recently[.]" Gov't Opp. at 26–27. [8] Although the Government was aware of the fact that the Oil Companies were involved in

---

[7] Rule 8(c) of FRCP and Rule 8(c) of the Rules of the United States Court of Federal Claims ("RCFC") are identical, except FRCP lists one additional affirmative defense—"injury by fellow servant"—that is not relevant here. *Compare* FRCP 8(c), *with* RCFC 8(c).

[8] The Oil Companies respond that "they were under no obligation to answer the Government's interrogatory, because discovery [in the California District Court] had closed." Pls. Reply at 8 (citing Pls. Reply App. Ex. B, at A10 (6/16/97 Joint Status Report) ("It is the Oil Companies' position that the discovery cutoff occurred on August 31, 1994. The [Government]

ongoing insurance coverage litigation since 1992, the Government did not know that those cases had settled for hundreds of millions of dollars, which was not revealed until January 2015.  Gov't Opp. at 27–29 (citing Gov't App. Exs. 4–7 (2012 to 2015 press releases regarding the Oil Companies' settlement agreements)).  Therefore, the Government's delay in raising an offset defense is justified, particularly since "the 'prejudice' that the [Oil Companies] really allege is the loss of double-payments to which they have no right."  Gov't Opp. at 27.

### c.   The Court's Resolution.

RCFC 8(c)(1) states: "[i]n responding to a pleading, a party *must* affirmatively state any . . . affirmative defense[.]"  RCFC 8(c)(1) (emphasis added).[9]  An affirmative defense, however, "once forfeited, is 'exclu[ded] from the case.'"  *Wood v. Milyard*, 132 S. Ct. 1826, 1832 (2012) (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 at 644–45 (3d ed. 2004) ("WRIGHT & MILLER")); *see also Pei-Herng Hor v. Ching-Wu Chu*, 699 F.3d 1331, 1337–38 (Fed. Cir. 2012) ("[T]he failure to plead [an affirmative defense] can result in waiver[.]"); *Am. Airlines Inc. v. United States*, 75 Fed. Cl. 237, 241 (2006) ("The Government . . . did not plead set off as an affirmative defense. . . .  Therefore, to the extent the Government is now seeking discovery to establish a counterclaim or set off, that time has passed.") (citation omitted), *aff'd*, 551 F.3d 1294, 1307 (Fed. Cir. 2008).  More importantly, the Government's obligation to plead any affirmative defense "is not limited to complete defenses," but also extends to "matters that tend to mitigate damages."  *See* 5 WRIGHT & MILLER § 1273.

It is true that, "[f]ailure to raise an affirmative defense, by responsive pleading does not always result in waiver.  The purpose of [RCFC 8(c)] is to give the opposing party notice of the affirmative defense and a chance to respond."  *See Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005) (quoting *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)).  For example, the United States Court of Appeals for the Eleventh Circuit, has determined "[w]hen a plaintiff ha[d] notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice."  *Hassan,* 842 F.2d at 263.  In that case, where an offset defense was raised during depositions and by interrogatory, "it [was] clear that there was no prejudice to [the plaintiff]."  *Id.*  The determinative factor is whether there is "unfair surprise or prejudice."  *Entergy Nuclear Fitzpatrick, LLC v. United States*, 93 Fed. Cl. 739, 746 (2010) ("[T]his court has been hesitant to allow affirmative defenses to proceed once

---

cannot unilaterally reopen discovery.")).  Moreover, the Government's 1997 interrogatory "*proves* that the Government fully understood that the Oil Companies might have received . . . related insurance proceeds, and thus, . . . the potential availability of the [offset] defense was reasonably apparent to the Government."  Pls. Reply at 9 (emphasis added) (citing Pls. Reply App. Ex. B, at A10).

[9] RCFC 8(c)(1) provides the following non-exhaustive list of affirmative defenses: accord and satisfaction; arbitration and award; assumption of risk; contributory negligence; duress; estoppel; failure of consideration; fraud; illegality; laches; license; *payment*; release; res judicata; statute of frauds; statute of limitations; and waiver.  *See* RCFC 8(c)(1) (emphasis added).

significant activity, such as a trial or discovery, has concluded because the plaintiffs would be unfairly prejudiced."), *aff'd*, 711 F.3d 1382 (Fed. Cir. 2013).

In this case, the Avgas Contracts date back to the 1940s, the California District Court CERCLA litigation began in 1991, the United States Court of Federal Claims litigation was initiated in 2006, and the United States Court of Appeals for the Federal Circuit reached a liability determination on April 28, 2014. *See Shell IX*, 751 F.3d at 1285–90 (reviewing the case's factual background and procedural history). Although the Government contends that it only learned of the Oil Companies' insurance coverage *settlements* sometime between 2012 and 2015, the record reflects that the Government was aware of the fact of the existence of the Oil Companies' *insurance policies and coverage litigation* as early as 1992 and certainly by 1997. *Compare* Pls. Ex. F (the Government's 6/19/92 Memorandum of Points and Authorities submitted to the California District Court), *and* Pls. Reply Ex. B (6/16/97 Joint Status Report), *and* 10/20/15 TR 4, 6, *with* Gov't App. Exs. 4–7 (2012 to 2015 press releases regarding the Oil Companies' settlement agreements).

At this juncture, the Oil Companies will be substantially prejudiced by having to engage in a whole new area of discovery more than twenty years after the CERCLA litigation began and nearly ten years after the breach of contract counterclaim was transferred to the United States Court of Federal Claims. *See Tenneco Resins, Inc. v. Reeves Bros.*, 752 F.2d 630, 634 (Fed. Cir. 1985) ("[T]wo factors—delay and prejudice—reinforce each other: [T]he risk of substantial prejudice increases with the passage of time.").

For these reasons, the court has determined that the Government's insurance offset is an affirmative defense that could and should have been asserted no later than February 25, 2008 when it filed its Answer. As such, the Government has waived this defense.

## 2. Whether Consideration Of The Government's Offset Defense Exceeds The Scope Of The United States Court Of Appeals For The Federal Circuit's Mandate.

In the court's judgment, the Government's failure to comply with RCFC 8(c) is dispositive of the Oil Companies' Motion For Summary Judgment. Nevertheless the court briefly will address the Oil Companies' alternative argument that allowing the Government to assert a new offset defense exceeds the mandate of the United States Court of Appeals for the Federal Circuit.

The Government asserts that, although its insurance offset defense was not raised before the California District Court, nor in prior proceedings before the United States Court of Federal Claims or the United States Court of Appeals for the Federal Circuit, nevertheless the court is not barred by the mandate rule from considering this defense. Gov't Opp. at 30 ("[I]f an 'issue was not briefed or argued [such that a] panel therefore express[ed] no view on [a] question' then the mandate rule does not bar the trial court from addressing a new issue on remand.") (quoting *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1478 (Fed. Cir. 1998). Therefore, the court may consider this issue during the "new trial" for damages, particularly because the United States Court of Appeals for the Federal Circuit agreed with the United States Court of Federal Claims' observation that damages in this case is a "blank slate." Gov't Opp. at 30 (quoting *Shell VIII*, 108 Fed. Cl. at 447–48).

It is well established that a remand order should be construed narrowly. *See In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895) (holding that a trial court may not "vary," "give any other or further relief," or "intermeddle with" the appellate court's mandate)); *see also United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) (distinguishing limited remands from general remands and holding that the former "explicitly outline[s] the issues to be addressed by the district court"); *see also* 18B WRIGHT & MILLER § 4478.3 (2d ed. 2002) ("A specific mandate direction binds the lower court[.]").

The United States Court of Appeals for the Federal Circuit's mandate rule does not favor introducing a new affirmative defense on remand. *See Yankee Atomic Elec. Co. v. United States*, 679 F.3d 1354, 1361 (Fed. Cir. 2012) (holding that the Government "was barred from asserting [a] position, because it was not presented at trial" and was not before the trial court on remand); *cf. Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1352–56 (Fed. Cir. 2009) (holding that the defendant was not permitted on remand to introduce an anticipation defense challenging a patent's validity, because, "anticipation was not properly before the district court on remand").

Therefore, in considering the scope of a remand, the United States Court of Appeals for the Federal Circuit requires "the trial court [to] consider both the letter and the spirit of th[e appellate] court's remand order." *Yankee Atomic*, 679 F.3d at 1362. "The mandate rule provides that issues actually decided [on appeal]—those within the scope of the judgment appealed from, minus those explicitly reversed or remanded by the court—are foreclosed from further consideration." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008). But, "it may be appropriate in some circumstances for a court to revisit an issue that would otherwise be deemed waived and beyond the scope of an appellate mandate. Such circumstances, however, must be exceptional. Otherwise, the underlying rationales for the doctrines of law of the case and the mandate rule would be thwarted." *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1349 (Fed. Cir. 2001) (citation omitted).

Our appellate court has stated that the following factors should be considered by a trial court in determining the scope of a mandate: (1) whether the party introduced a new affirmative defense as a result of intervening case law or new evidence; (2) whether the party could have introduced the defense as an alternative theory at an earlier phase of trial; (3) whether manifest injustice would result from excluding the defense; and (4) whether limiting the mandate to the precise language of the appellate court's order would unduly constrain the scope of issues that could properly be considered. *See Yankee Atomic*, 679 F.3d at 1360–63.

In this case, the United States Court of Appeals for the Federal Circuit described the scope of the remand in three places in the 2014 decision:

- In the introduction, the United States Court of Appeals for the Federal Circuit stated, "The [United States] Court of Federal Claims correctly determined . . . that material factual disputes preclude granting summary judgment on damages, and *that issue* is accordingly *remanded for trial*." *Shell IX*, 751 F.3d at 1285 (emphasis added).

16

- In the summary judgment discussion as to damages, the United States Court of Appeals for the Federal Circuit stated, "The case is *remanded* for the [United States] Court of Federal Claims *to determine how much acid waste at the McColl site was 'by reason of' the avgas contracts.*" *Id.* at 1303 (emphasis added); *see also id.* at 1302 ("The *sole remaining issue* is whether the [United States] Court of Federal Claims correctly determined that genuine disputed facts prevented granting summary judgment with respect to damages.") (emphasis added).

- In the conclusion, the United States Court of Appeals for the Federal Circuit stated, "For the foregoing reasons, this court reverses the [United States] Court of Federal Claims' grant of summary judgment with respect to breach of contract liability, and *remands for a trial on damages*." *Id.* at 1303 (emphasis added).

In the court's view, the second exposition defines the scope of the remand. As to the first *Yankee Atomic* factor, in this case there has been no intervening change in case law and the only "new" evidence is the Government's proffer of a collection of press releases discussing insurance coverage settlements reached by the Oil Companies in state court actions. Gov't Exs. 4–7 (2012 to 2015 press releases). As to the second factor, the Government was aware of the Oil Companies' insurance coverage litigation in 1992 and could have intervened in those cases to protect its perceived interest in the monetary proceeds and/or asserted an affirmative defense when this case was pending in the California District Court. Pls. Ex. F (the Government's 6/19/1992 Memorandum of Points and Authorities). In addition, the Government elected not to raise this issue previously in the United States Court of Federal Claims or the United States Court of Appeals for the Federal Circuit so it could be included in the scope of the remand. Certainly, the Government was not barred from raising its need for insurance coverage litigation settlements during the most recent appellate proceedings. As to the third issue, *i.e.*, whether excluding the Government's offset defense would cause "manifest injustice," any injustice to the Government for its failure to undertake any discovery of potential insurance settlements must be balanced against the imposition of a significant burden on the Oil Companies since such discovery would expand the scope of the damages inquiry and delay a final damage determination. As to the fourth factor, limiting the mandate "to determine how much acid waste at the McColl site was 'by reason of' the avgas contracts" would not unduly constrain the scope of the remand, because liability and the general parameters of damages already have been determined. *Shell IX*, 751 F.3d at 1303.

For these reasons, the court has determined that the Government's insurance offset is an affirmative defense that the Government has knowingly waived and consideration thereof at this late juncture would exceed the scope of the mandate.[10]

---

[10] The Government also advanced five additional arguments: (1) the Oil Companies waived their objections to the Government's January 12, 2015 First Set Of Discovery Requests; (2) the Oil Companies failed to identify each request to which they object; (3) communications with insurers are relevant; (4) the requests are not unduly burdensome; and (5) the Oil Companies

**D.      The Government's September 3, 2015 Motion For Leave To Amend Its Answer.**

**1.      The Government's Argument.**

In the alternative, the Government argues that the court should grant the September 3, 2015 Motion For Leave To Amend Its February 25, 2008 Answer to assert affirmative defenses and counterclaims, based upon the Special Plea in Fraud, 28 U.S.C. § 2514, and the antifraud provision of the Contract Settlement Act of 1944, 41 U.S.C. § 119. Gov't Mot. To Am. at 1. As an initial matter, the Government contends that leave to amend should be given, as there has been no "undue delay," because the Government only first learned of the Oil Companies' insurance coverage settlement agreements in January 2015, just two months into the damages discovery in this phase of the case. Gov't Mot. To Am. at 7.

The Government adds that it does not have a "bad faith or dilatory motive" in requesting leave to amend the February 25, 2008 Answer, because as soon as the Government learned of the insurance coverage settlements, discovery commenced in this case. Gov't Mot. To Am. at 7. In addition, the Oil Companies' refusal to comply with the Government's January 12, 2015 subpoena required the Government to develop "outside sources to confirm . . . suspicions that Shell's and ARCO's claim to the contracting officer sought payment for costs that those companies knew that they did not, in fact, incur." Gov't Mot. To Am. at 7.

And, allowing the Government leave to amend its Answer would not result in an undue burden on or prejudice the Oil Companies. "Our counterclaim is merely one additional claim alleging that plaintiffs wrongly sought double-payment from Federal and state entities of amounts that they had already recovered from their insurers." Gov't Mot. To Am. at 8. Nor is amendment futile, because "the insurance settlement documents demonstrate that Shell and ARCO did . . . seek a payment from the taxpayers for 'charges' that they did not incur." Gov't Mot. To Am. at 8. This conduct "is analogous to double-billing the Government" and "seeking such double recovery is presumptively fraudulent." Gov't Mot. To Am. at 8.

**2.      The Oil Companies' Response.**

The Oil Companies respond that, allowing the Government to amend its February 25, 2008 Answer at this junction is *prima facie* "undue delay," because the Government has known about the Oil Companies' insurance coverage litigation since 1992. Pls. Resp. To Gov't Mot. To Am. at 6–7. Specifically, in 1992, the Government sent a set of interrogatories to the Oil Companies in the California District Court case to identify any involvement in insurance coverage litigation related to the McColl site. Pls. Resp. App. Ex. A. In response, the Oil Companies disclosed the citations of several insurance cases. Pls. Resp. App. Ex. B (2/17/98 exhibit list for California

---

have admitted that they have recovered response costs as overhead on other government contracts. Gov't Opp. at 18–22; *see also* Gov't Reply at 1–3. The court considers these arguments to be duplicative or without merit.

District Court).  Moreover, during the 1998 CERCLA trial in the California District Court, the Government introduced these exhibits as evidence.  Pls. Resp. App. Ex. B.

In summary, the Government had actual knowledge of the existence of insurance coverage litigation between the Oil Companies and their carriers as these suits were a matter of public record.  Pls. Resp. To Gov't Mot. To Am. at 8–9.  In addition, ARCO's February 28, 1996 SEC Form 10-K reported that a settlement was reached with several insurance companies for the expense of cleanup costs.  Pls. Resp. App. Ex. E.  Likewise, Shell's March 1, 1997 SEC Form 10-K also disclosed that settlements were reached with some of its insurers for claims arising out of operations from 1952 to 1982 at the United States Army's Rocky Mountain Arsenal site.  Pls. Resp. App. Ex. F.  In addition, a 1996 news article reported that Shell settled "a dispute that has been dragging through the California courts for years."  Pls. Resp. App. Ex. G.  Although ARCO's SEC Form 10-K, Shell's SEC Form 10-K, and the 1996 news article did not identify the names of the Oil Companies' insurers, the Government "had more than enough information to know that it was *possible* that Shell and Atlantic Richfield had recovered on their McColl insurance claims."  Pls. Resp. To Gov't Mot. To Am. at 10.

Therefore, allowing the Government to interject fraud counterclaims would prejudice the Oil Companies and "completely transform the litigation, expanding a relatively straightforward trial on damages into a fraud inquiry," and concern "the application of decades of comprehensive general liability policies to environmental liabilities nationwide and extensive coverage litigation against hundreds of insurers."  Pls. Resp. to Gov't Mot. To Am. at 13–15.  This would require production of tens of thousands of documents and retention of experts to analyze insurance policies and claims.  Pls. Resp. to Gov't Mot. To Am. at 16–17.

The Oil Companies also argue that the September 3, 2015 Motion For Leave To Amend's proposed counterclaims, based on Section 119 of the Contract Settlement Act and Section 2514 of the Forfeiture of Fraudulent Claims Act, have no basis in fact or law.  Pls. Resp. To Gov't Mot. To Am. at 18–19.  First, the Oil Companies were under no legal duty to disclose any insurance recoveries to the contracting officer in 2005.  Pls. Resp. To Gov't Mot. To Am. at 20; *see* 10/20/15 TR 12–13.  For this reason, the Government did not cite a single case holding "that claimants have an affirmative duty to disclose collateral insurance claims or recoveries."  Pls. Resp. To Gov't Mot. To Am. at 20.  In fact, the "insurance contracts are separate from the breach and actually *pre-date* the breach itself."  Pls. Resp. To Gov't Mot. To Am. at 23.  Therefore, any past insurance coverage recoveries are remote from the Government's breach at issue in this case.  Pls. Resp. To Gov't Mot. To Am. at 23.

Second, offsetting the damages owed to the Oil Companies by their insurance coverage recoveries is barred by the collateral source rule.  Pls. Resp. To Gov't Mot. To Am. at 23.  The collateral source rule prohibits reducing damages by the "collateral benefits received by the injured party."  Pls. Resp. To Gov't Mot. To Am. at 24.  As a matter of law, "a breaching party is not entitled to an offset of its liability where . . . the breach victim passes the costs of the breach to a third party in a transaction that is not directly related to the breach."  Pls. Resp. To Gov't Mot. To Am. at 20 (citing *Southern Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step.") and *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1373 (Fed. Cir. 2003) (recognizing "[t]he general rule . . . that unrelated events and remote consequences do not reduce

the liability of the wrongdoer for the losses caused by the wrong[.]")).   In other words, "'[the Government is] not permitted to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance.'"   Pls. Resp. To Gov't Mot. To Am. at 24 (quoting *Shelden v. United States*, 34 Fed. Cl. 355, 372 (1995)).   Moreover, an insurance offset would be a windfall to the Government, the wrongdoer in this case.   Pls. Resp. To Gov't Mot. To Am. at 24–25.   Therefore, as a matter of law and policy, the court should apply the collateral source rule to bar the Government from engaging in discovery of their insurance coverage settlements.

Third, the Oil Companies could not have committed fraud under Section 119 of the Contract Settlement Act or Section 2514 of the Forfeiture of Fraudulent Claims Act, because the existence of their insurance claims and the coverage litigation were a matter of public record.   Pls. Resp. App. Ex. B (2/17/98 exhibit list for California District Court trial); *see also* Pls. Resp. App. Ex. E (ARCO's 2/28/96 SEC Form 10-K); *see also* Pls. Resp. App. Ex. F (Shell's 3/1/96 SEC Form 10-K).

In addition, the proposed counterclaims are barred by relevant statutes of limitation.   Pls. Resp. To Gov't Mot. To Am. at 36.   Section 119 of the Contract Settlement Act imposes civil penalties subject to the five year statute of limitations in 28 U.S.C. § 2462.[11]   As a matter of law, a claim of fraud accrues when a party's alleged fraud occurs, not when it is discovered.   Pls. Resp. To Gov't Mot. To Am. at 37 (citing *Gabelli v. SEC*, 133 S. Ct. 1216–21 (2013) ("Petitioners argue that a claim based on fraud accrues—and the . . . clock begins to tick—when a defendant's allegedly fraudulent conduct occurs. That is the most natural reading of the statute.").   In this case, the Government contends that the Oil Companies engaged in fraud when they submitted their claim to the GSA contracting officer on November 23, 2005, without disclosing prior insurance coverage settlements.   Pls. Resp. To Gov't Mot. To Am. at 37.   But, almost ten years have passed since the Oil Companies submitted their contract claim.   Therefore, the Government's proposed Section 119 counterclaim is time-barred.

As to the proposed Section 2514 of the Forfeiture of Fraudulent Claims Act counterclaim, 28 U.S.C. § 2501[12] is the applicable statute of limitations.   Pls. Resp. To Gov't Mot. To Am. at 37;

---

[11] 28 U.S.C. § 2462, in relevant part, provides:

Except as otherwise provided by an Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

[12] 28 U.S.C. § 2501, in relevant part, provides:

"Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues[.]"   28 U.S.C. § 2501.

*see also SGW, Inc. v. United States*, 20 Cl. Ct. 174, 181 (1990) (holding that "the only statute of limitation applicable is the general six year statute of limitation" for the defendant's special plea in fraud claim). But, Section 2501 provides a time limit of "six years after such claim first accrues." 28 U.S.C. § 2501. Therefore, a Section 2514 claim accrues at the earliest time that a defendant could have been aware of the alleged fraud. *See TS Infosystems, Inc. v. United States*, 36 Fed. Cl. 570, 574 (1996) (recognizing that "the six-year statute of limitations in 28 U.S.C. § 2501 applies to FFCA [Forfeiture of Fraudulent Claims Act] claims made under 28 U.S.C. § 2514."). In this case, the Government, knew about the Oil Companies' insurance coverage litigation in 1992. Pls. Resp. App. Ex. A (the Government's 3/19/92 interrogatories). And, the fact that these cases were settled was a matter of public knowledge prior to the time the Oil Companies submitted their claim to the GSA on November 23, 2005. Pls. Resp. App. Ex. B (2/17/98 exhibit list for California District Court trial); *see also* Pls. Resp. App. Ex. E (ARCO's 2/28/96 SEC Form 10-K); *see also* Pls. Resp. App. Ex. F (Shell's 3/1/96 SEC Form 10-K). Therefore, the Government's Section 2514 counterclaim also is time-barred. Pls. Resp. To Gov't Mot. To Am. at 39.

Additionally, a Section 2514 counterclaim cannot relate back to the original Answer, because "'[a] new pleading cannot relate back if the effect of the new pleading is to fault [a party] for conduct different from that identified in the original [pleading]." Pls. Resp. To Gov't Mot. To Am. at 39 (quoting *Klamath Irrigation Dist. v. United States*, 113 Fed. Cl. 688, 706 (2013)) (remand decision). Since the proposed fraud allegations fault the Oil Companies for conduct different than that identified in the Government's February 25, 2008 Answer, "[r]elation-back does not help the Government." Pls. Resp. To Gov't Mot. To Am. at 39. Moreover, there is no basis for equitable tolling in this record. Pls. Resp. To Gov't Mot. To Am. at 39–40.

### 3.    The Government's Reply.

The Government replies that its Motion For Leave To Amend was not unduly delayed. Gov't Reply In Supp. at 6. Although the Oil Companies disclosed that they settled some insurance coverage claims before submitting a claim to the GSA on November 23, 2005, they did not specifically disclose that they had recovered money from their insurance providers for the McColl site. Gov't Reply In Supp. at 4. "Because [the Oil Companies] cannot show Government knowledge of their fraud before 2015, the [O]il [C]ompanies cannot show [undue] delay." Gov't Reply In Supp. at 5.

The Government again argues that the Oil Companies would not be prejudiced if the Motion For Leave To Amend is granted, "because the [insurance] information is already in their possession, extensive discovery is unnecessary." Gov't Reply In Supp. at 6. The Government adds that the Oil Companies need not ascertain which insurance settlements were allocated to the McColl site, because any CERCLA insurance settlements should be allocated to the McColl site as a matter of law. Gov't Reply In Supp. at 7. Moreover, a party cannot "self-servingly and retroactively attempt to allocate recovery so as to avoid another party's rights." Gov't Reply at 7 (quoting *Moore v. Blue Cross & Blue Shield*, 70 F. Supp. 2d 9, 39 (D.D.C. 1999); *see also Wheeler v. Travelers Ins. Co.*, 22 F.3d 530, 534 (3d Cir. 1994) (holding that the plaintiff did not have standing, because she would "be obliged to remit any payment she now receives.").

The Government also contends that the Oil Companies' failure to disclose their insurance recoveries for the McColl site is an omission of a material fact, which is sufficient to support a finding of fraud. Gov't Reply In Supp. at 16. Even assuming that the Oil Companies can show that they reasonably concluded that their insurance recoveries were not material, "their decision not to reveal their analysis illustrates fraudulent intent." Gov't Reply In Supp. at 13. Indeed, if the Oil Companies "truly believed their plan to receive double payment and lack of incurred costs was not 'material' . . . then the [O]il [C]ompanies would have disclosed both the receipt of the insurance payment and their explanation why the taxpayers should be required to make a payment." Gov't Reply In Supp. at 13–14. Therefore, the Oil Companies' knowledge and intent are "issues of fact that must be resolved through discovery and trial." Gov't Reply In Supp. at 13.

In addition, the remote transactions rule that the Oil Companies cite is inapplicable. Gov't Reply In Supp. at 9. That rule allows a court to "terminate inquiry into recovery of costs when the act by which the recovery occurred was not directly related to the breach." Gov't Reply In Supp. at 9. Here, "[t]here is no basis to argue that payment of costs by insurers is irrelevant." Gov't Reply In Supp. at 9. That is why the Oil Companies did not cite to a single case where the court applied the remote transaction rule to insurance recoveries in calculating damages. Gov't Reply In Supp. at 9.

Likewise, the collateral source rule is inapplicable, because it arises "primarily in connection with tort damages." Gov't Reply In Supp. at 9–10. This is a routine breach of contract case. Gov't Reply In Supp. at 9. The Oil Companies do not suggest that the Government has acted tortiously. Gov't Reply In Supp. at 10. "In the absence of wrongful action, which the mere fact of a breach of contract is not, the collateral source rule cannot apply." Gov't Reply In Supp. at 11.

Finally, the proposed counterclaims based on Section 119 of the Contract Settlement Act and Section 2514 of the Forfeiture of Fraudulent Claims Act are not time-barred. Gov't Reply In Supp. at 18. As to the proposed Section 2514 counterclaim, the Government argues that the statute of limitations in 28 U.S.C. § 2415[13] applies. Gov't Reply In Supp. at 18–19 (citing *Am. Heritage Bancorp v. United States*, 56 Fed. Cl. 596, 606 (2003) ("[T]he court finds that when 28 U.S.C. §

---

[13] Section 2415, in relevant part, provides:

The provisions of this section shall not prevent the assertion, in an action against the United States or an officer or agency thereof, of any claim of the United States or an officer or agency thereof against an opposing party, a co-party, or a third party that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. A claim of the United States or an officer or agency thereof that does not arise out of the transaction or occurrence that is the subject matter of the opposing party's claim may, if time-barred, be asserted only by way of offset and may be allowed in an amount not to exceed the amount of the opposing party's recovery.

28 U.S.C. § 2415.

2501 is read in light of 28 U.S.C. § 2415, there is no statute of limitations applicable to the government's Special Plea in Fraud counterclaim."). Section 2415 permits the Government to assert any claim *without limit*, if it arises out of the same transaction that is the subject matter of the plaintiff's claim. Gov't Reply In Supp. at 19 (emphasis added). The Government's proposed counterclaims arise from the Oil Companies' claim to the GSA. Gov't Reply In Supp. at 19–20. Moreover, even if, the statute of limitations has run it should be equitably tolled, because where a party has been injured by fraud and "'remains in ignorance of it without any fault or want of diligence or care on his part,'" the statute of limitations does not begin to run until the fraud is discovered. Gov't Reply In Supp. at 19–20 (quoting *SGW Inc.*, 20 Cl. Ct. at 181).

### 4.    The Court's Resolution.

The Government's Motion For Leave To Amend Its Answer requests permission to assert affirmative defenses and two counterclaims—one based on Section 119 of the Contract Settlement Act, 41 U.S.C. § 119, and one based upon the Special Plea in Fraud, 28 U.S.C. § 2514.[14] RCFC 13(a)(1)[15] requires that compulsory counterclaims must be set forth in a pleading. The Government's February 25, 2008 Answer did not assert either proposed counterclaim. As such, in order to assert these counterclaims now, the Government must amend its Answer. *See* RCFC 15(a)(2).[16]

Generally, "[i]n the absence of any apparent or declared reason—such as undue delay . . . undue prejudice to the opposing party . . . futility of amendment, etc.—the leave [to amend] sought should, as the rules require, be 'freely given.'" *See Foman v. Davis*, 371 U.S.178, 182 (1962). "Delay alone, [however,] even without a demonstration of prejudice, has thus been sufficient

---

[14] In the September 3, 2015 Motion For Leave To Amend, the Government did not specify whether it also would assert an insurance offset affirmative defense.

[15] RCFC 13(a)(1), in relevant part, provides:

A pleading must state as a counterclaim any claim that—at the time of its service— the pleader has against an opposing party if the claim:

(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
(B) does not require adding another party over whom the court cannot acquire jurisdiction.

RCFC 13(a)(1).

[16] RCFC 15(a)(2), in relevant part, provides, "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

grounds to deny amendment of pleadings." *Te-Moak Bands of Western Shoshone Indians of Nevada v. U.S.*, 948 F.2d 948 (Fed. Cir. 1991).

The Government cites two cases in support of the proposition that Shell's insurance coverage recoveries must be deducted from damages arising from a breach of the Avgas Contracts. Gov't Reply at 7 (citing *Moore* 70 F. Supp. 2d at 39 and *Wheeler*, 22 F.3d at 538). Both cases, however, are inapplicable. *Moore* concerned the Employee Retirement Income Security Act ("ERISA"), but ERISA preempts the application of any other laws, decisions, rules, and regulations. *See Moore*, 70 F. Supp. 2d at 18 ("Congress intended ERISA to provide a comprehensive and *exclusive* civil enforcement scheme that would protect the interests . . . of ERISA-plan participants[.]") (emphasis added). The relevant statute in this case is the Tucker Act and the court's rules of practice and procedure, namely RCFC 13(a) govern how and when a claim must be raised. In *Wheeler*, the United States Court of Appeals for the Third Circuit held that the plaintiff did not have standing, because she would be obligated "to remit any payment she now receives from Travelers to [the] Medicare program, pursuant to 42 U.S.C. § 1395y(b)(1) (1982)."[17] *See Wheeler*, 22 F.3d at 538. The relevant statute in that case mandated that any health insurance payment that a Medicare plan participant received for covered services *must be* remitted to the United States. *See* 42 U.S.C. § 1395y(b)(1) (1982). As the Government points out, CERCLA may prevent a party from receiving "compensation for removal costs or damages or claims and compensation under another federal or state law," and receiving "compensation for the same removal costs or damages or claims[.]" 42 U.S.C. § 9614(b); *see also* 10/20/15 TR 21. But, the United States Court of Federal Claims' Tucker Act jurisdiction does not extend to adjudicating limitations on CERCLA recovery. Claims arising under CERCLA are the exclusive province of the United States District Courts.[18]

The relevant facts here are that the Government was on notice in 1992, that the Oil Companies were involved in insurance coverage litigation. Pls. Resp. App. Ex. A (the Government's 3/19/1992 interrogatories). In 1997, during a Joint Status Conference before the

---

[17] Section 1395y(b)(1) of the Social Security Act Title XVIII, in relevant part, provides:

Payment . . . may not be made with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made . . . with respect to such item or service, under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance. Any payment made . . . with respect to any item or service shall be conditioned on reimbursement to the appropriate Trust Fund . . . when notice or other information is received that payment for such item or service has been made under such a law, policy, plan, or insurance.

42 U.S.C. §1395y(b)(1) (1982).

[18] Section 9613 of CERCLA, in relevant part, provides, "[t]he United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter [of CERCLA]" 42 U.S.C. § 9613 (1982).

24

California District Court, the Government also stated, "The United States has long known that . . . the Oil Company Defendants actively litigated claims against their insurance carriers, in which they alleged that any liability for . . . the McColl Site was an 'occurrence' within the meaning of their insurance policies[.]" Pls. Reply App. Ex. B. Therefore, at the *very* least, the Government knew that the Oil Companies had made insurance coverage claims that likely included the McColl site, *well before* the allegedly fraudulent conduct—the Oil Companies' submission of their claim to the GSA in November 2005. Thus, the Government's argument that it could not have raised its proposed fraud counterclaims in its Answer before 2015 is simply not credible. Likewise, the Government's excuse that "we were snookered" and "the victims of fraud" is not supported by the record. 10/20/15 TR 13–14.

The CERCLA litigation between the United States and the Oil Companies began more than twenty years ago and it has been ten years since this case was transferred to the United States Court of Federal Claims. To permit the Government to assert fraud counterclaims "substantially changes the theory on which the case has been proceeding[.]" *Cencast Services, L.P. v. United States*, 729 F.3d 1352, 1364 (Fed. Cir. 2013) (quoting 6 WRIGHT & MILLER § 1487 (3d ed. 2013)).

Finally, it did not escape the court's attention that the Government improperly advised the court that "[t]here is no statute of limitations for the special plea on fraud." 10/20/15 TR 14. But, the predecessor to the United States Court of Appeals for the Federal Circuit has held "the only statute of limitations applicable is the general six-year statute of limitations" in a Government special plea in fraud claim case. *See SGW, Inc.*, 29 Cl. Ct. at 181. Here the "fraud" alleged by the Government is the claim the Oil Companies submitted to GSA in 2005. Therefore, the statute of limitations has run. In addition, the six-year statute of limitations in 28 U.S.C. § 2501 applies to FFCA claims alleged under 28 U.S.C. § 2514 now bars the Government from litigating a FFCA claim in this case.

For these reasons, the court has determined the Government's Motion For Leave To Amend Its February 25, 2008 Answer is late and baseless.[19]

---

[19] One of the Government's more disingenuous arguments in support of its Motion for Leave to Amend concerned the October 20, 2015 oral argument.

> GOVERNMENT COUNSEL: The [G]overnment was . . . supposed to be an additional insured on these policies, and that's one of the things we're asking for is the insurance policies to see if the taxpayers would have been covered, and, in fact, if the [O]il [C]ompanies had settled the Government rights.

> THE COURT: So you waited all these years even though you knew the litigation was going on, that was my point before, in 1992 or whenever the litigation was, these cases are going on, you just kind of sat around. You weren't very curious about whether you had any rights to those policies at that point. I mean, typically, you know, if you think somebody else has your money, you would want to intervene and say, it's my money.

III.    CONCLUSION.

For these reasons, the Oil Companies' April 10, 2015 Motion For Partial Summary Judgment is granted.  The Oil Companies' April 10, 2015 Motion For A Protective Order is denied as moot.  The Government's May 15, 2015 Cross-Motion For Partial Summary Judgment is denied.  The Government's September 3, 2015 Motion for Leave To Amend is denied.

**IT IS SO ORDERED.**

> s/ Susan G. Braden
> **SUSAN G. BRADEN**
> **Judge**

---

GOVERNMENT COUNSEL: Well, we —

THE COURT: Or interplead.

GOVERNMENT COUNSEL: We're unaware of any basis for the [G]overnment to then . . . proceed under a direct action theory against insurance companies in state court litigation.

THE COURT: Well, you said taxpayer was on these insurance policies, wouldn't that be a reason?

GOVERNMENT COUNSEL: We would like to see those insurance policies because it's likely the taxpayers are, but we don't know.  We don't know because that's part of the discovery we've asked for.

THE COURT: So the [G]overnment was [a] party to [the] insurance, they had access to insurance policies or they were . . . named on the insurance policies but they don't have copies of the policies, and so you want to now know whether you really were on the policy or not and —

GOVERNMENT COUNSEL: That's part of what we want.  All we need to do —

THE COURT: And this Court, that's what I'm supposed to get involved with, huh?

GOVERNMENT COUNSEL: Yes, exactly, the Court is supposed to get involved with the amount of damages that —

THE COURT: Well, I intend to do that.  With trial coming up, I'm not changing the [February 16, 2016] date[.]

10/20/15 TR 19–20.