# JAY L. BRIGHAM, Ph.D.

# WRITTEN DIRECT EXAMINATION

## Shell Oil Company, Atlantic Richfield Company,

## Texaco Inc., and Union Oil Company of California v.

## The United States of America

## (No. 1:06-cv-00141-SGB)

### FEBRUARY 11, 2016

Jay L. Brigham, Ph.D.
Morgan, Angel and Associates, L.L.C.
Washington, DC

# TABLE OF CONTENTS

SECTION                                                                          PAGE

I.      Introduction                                                                1

II.     Qualifications and Experience                                               1

III.    Opinions                                                                    2

IV.     Opinion 1 – The Development of High Octane Gasoline in the 1930s            3

V.      Opinion 2 – Plaintiff Companies Dumping of Refinery Waste in               14
        Southern California

VI.     Opinion 3 – Plaintiff Companies Negotiations of DSC Contracts              18

VII.    Opinion 4 – The War Production Boards Allocation of Materials              41

VIII.   Opinion 5 – The DSC Did Not Purchase 100 Octane Before January 1, 1943     44

IX.     Authentication of Exhibits                                                 49

Appendix One – Jay L. Brigham, Ph.D. Resume

## I.     Introduction:

This testimony presents my historical findings of issues associated with the production of 100-octane aviation gasoline at the four refineries owned during World War II by Shell Oil Company of California, Texas Company, Richfield Oil Company, and Union Oil Company.

## II.     Qualifications and Experience

I earned my doctoral degree in United States history focusing on the twentieth century from the University of California, Riverside.  My dissertation examined the political debates that emerged over the electrification of the United States in the early twentieth century.  I completed work for my master's degree at the University of Maryland,College Park.  My master's thesis examined an element of the American isolationist movement in the years preceding American entry into World War II.  After completing my graduate studies, I taught for five years at the university level.  Among the courses I taught were lower and upper division undergraduate courses and graduate level courses that examined the history of the United States in the twentieth century.  Most of those courses included examining political, economic, and diplomatic issues associated with the United States' involvement in World War II.

Since 1997, I have worked for Morgan, Angel & Associates, LLC (Morgan Angel). Morgan Angel is a public history and public policy firm headquartered in Washington, D.C.  I am now managing partner.  In my more than eighteen years at Morgan Angel, I have worked on many projects that involved the domestic economy, not only during World War II, but also during World War I and the Cold War.  Most of this work has involved research and writing on issues associated with the mobilization of the nation's economy for wartime production. Included in this work has been an examination of the regulatory state during wartime, the allocation of resources, and the expansion of the nation's industrial capacity to support the military.  I have given expert testimony in United States District Courts (District of Kansas, District of New Jersey, Central District of California, District of South Carolina, Western District of Washington, and Southern District of California) and the United States Court of Federal Claims.  My resume is attached to my written direct testimony as Appendix One.

In order to complete the work required for this report, staff under my supervision conducted research at the Library of Congress in Washington, D.C.; the U.S. National Archives and Records Administration facilities in College Park, MD and in Perris, CA.  I, or staff under my direct supervision, also reviewed documents provided by the U.S. Department of Justice.  In addition to the research conducted for this case, I previously conducted research, wrote an expert report, and gave deposition testimony concerning the petroleum industry in the United States during World War II and the Korean War, focusing on the ExxonMobil facilities in Baton Rouge, LA and Baytown, TX.

### III.    Opinions

Based upon my review of the pertinent materials, my background in twentieth century United States history, and my professional experience I offer the following expert opinions. Each of these opinions is listed below in my testimony followed by a narrative discussing my basis for each opinion.

1.  Beginning in the early 1930s, automobile manufacturers, airplane manufacturers, and the petroleum industry undertook work to increase the octane rating of gasoline for automobile and aircraft engines.  That research and development allowed for the development of larger and more powerful engines.  Shell Oil and The Texas Company were among petroleum industry leaders in the development of high octane aviation gasoline.  In 1935, Shell made its first sale of 100-octane aviation gasoline.  The Texas Company made its first sale of 100-octane aviation gasoline in 1937.  Union Oil and Richfield Oil made 100-octane sales in 1940 and 1941 respectively.  All of these sales occurred before each company signed a Defense Supplies Corporation contract for that corporation's purchase of 100-octane aviation gasoline.

2.  The plaintiff companies' use of McColl during World War II was consistent with their practice of disposing acid sludge in pits in Southern California before the war.

3.  Each of the four companies in the current litigation signed Defense Supplies Corporation's 100-octane aviation gasoline contracts after a period of negotiations.  I have found nothing in the historical record to suggest that any of the four companies were forced into signing a Defense Supplies Corporation contract.

4.  During World War II the War Production Board oversaw the allocation of materials and construction nationwide including at the Southern California refineries of the Shell, Union, Texas, and Richfield Oil Companies during World War II.  The WPB was an allocation agency that oversaw the distribution of raw materials, semi-finished goods, and finished products during World War II.

5.  The Defense Supplies Corporation did not purchase 100-octane aviation gasoline before 1943 from the four companies in the current litigation.  In 1943, after the Defense Supplies Corporation began to purchase 100-octane aviation gasoline, Shell and Richfield continued to sell 100-octane aviation gasoline to customers other than the Defense Supplies Corporation.

6.  Each of the four companies in the current litigation expanded refinery operations through the expenditure of private funds, although each participated in a wartime program that allowed for accelerated depreciation of any construction or other purchases required for national defense. The expenditure of private funds, as opposed to government financing, indicates that each company recognized the postwar value of facility expansion.

**IV. Opinion 1: Beginning in the early 1930s, automobile manufacturers, airplane manufacturers, and the petroleum industry undertook work to increase the octane rating of gasoline for automobile and aircraft engines.  That research and development allowed for the development of larger and more powerful engines.  Shell Oil and The Texas Company were among petroleum industry leaders in the development of high octane aviation gasoline.  In 1935, Shell made its first sale of 100-octane aviation gasoline.  The Texas Company made its first sale of 100-octane aviation gasoline in 1937.  Union Oil and Richfield Oil made 100-octane sales in 1940 and 1941 respectively.  All of these sales occurred before each company signed a Defense Supplies Corporation contract for that corporation's purchase of 100-octane aviation gasoline.**

In the 1930s the petroleum, automobile, and emerging aircraft industries worked to increase the octane rating of gasoline.  Early in the decade, it generally became recognized that low octane gasoline hampered engine performance.  Shell was among the petroleum industry leaders in developing higher octane gasoline, including 100-octane aviation gasoline.

On April 23, 1930, Charles Kettering, President of the General Motors Research Corporation, addressed the National Petroleum Association meeting in Cleveland, OH. Kettering opened his address, "Automotive Developments Held Back By Lack of True Anti-Knock Fuels," by saying "[t]he limiting factor of what you can do with the internal combustion engine is purely a question of fuel."  DX101.  The challenge for the petroleum industry, Kettering continued, was to "remove detonation from the fuel."[1]

---

[1] DX101 - *National Petroleum News*, "Automotive Developments Held Back by Lack of True Anti-Knock Fuels," 4/30/1930, pp. 27-31, NR00000120.

**Excerpt from DX101:**



Two months later an article in *National Petroleum News* reported on a meeting of the Society of Automotive Engineers in which octane ratings as a measure of engine knock had been discussed.[2]

Aircraft engine designers also faced problems with engine development. Unlike the automobile engineer who could increase the size of a fuel tank without too many complications, the aircraft engineer and later the pilot, would have to take the extra weight of a larger aircraft fuel tank into consideration. In the fall of 1930, the President of Wright Aeronautical Corporation, G. W. Vaughan, addressed these issues in an article he wrote for *The Oil and Gas Journal* and noted that in the aircraft industry, "the weight of the engine and fuel is a far more important element in the gross weight" than in the automobile engine. Existing fuels were inadequate and just as Kettering had called on the petroleum industry to manufacture better fuels for automobiles; Vaughan called on the petroleum industry to produce better fuels for aircraft:

> It is squarely up to the oil companies now to contribute their share toward further progress by supplying better and more uniform grades of fuel for the automotive industry, and to add the weight of their concerted effort to that of the automotive industry in

---

[2] DX102 - *National Petroleum News*, "Automobile Engineers to Rate Knocking by Octane Number," 6/4/1930, p. 35, NR00000154.

educating the general public to the economies inherent in their use.  This movement is important to the automobile industry; it is absolutely vital to the prosperity of the commercial aircraft industry.[3]

United States Army Air Corps (AAC) personnel were also looking to improve aircraft engine performance.  In 1930, the AAC decided that all combat planes would use 87-octane gasoline.  By the early 1930s, Shell, Texas, Phillips, and Standard Oil of New Jersey were researching aviation gasoline and had hired individuals to help develop and promote their aviation gasoline.  Shell hired James Doolittle, who later led "Doolittle's Raiders" in the first U.S. bombardment of Japan in World War II.  Standard hired Eddie Aldrin, whose son Buzz became the second American to walk on the moon.[4]

General Doolittle, a West Point graduate, later testified that in 1930 he left the Army and accepted a position with the Shell Petroleum Company in St. Louis, MO.  His "primary mission at Shell was to develop and promote aviation gasoline for commercial and military use."[5]  In 1934, at Doolittle's "urging," Shell built three plants for the production of 100-octane aviation gasoline.  Shell combined ordinary 87-octane aviation gasoline, iso-octane, and tetraethyl lead to produce 100-octane fuel.[6]

---

[3] DX103 - *The Oil and Gas Journal,* 9/25/1930, "Fuel Problems in Aviation Engines," pp. 38, 76, NR00000200.

[4] Doolittle, *I Could Never Be So Lucky Again* (New York, 1991), pp. 76-77, 151, and 172-77.  In early 1938, the AAC mandated that all combat aircraft would use 100-octane gasoline.  The reason why 100-octane gasoline became so important in World War II was clear: a tank of 100-octane aviation gasoline allowed the pilot to fly faster and farther than on the same size tank of lower-octane gasoline.

[5] Declaration of James Doolittle (Doolittle Declaration), 4/10/1992, p. 2.  The beginning of Shell's operations in the United States began in 1912 when the Royal Dutch Shell Group established the American Gasoline Company to market gasoline on the west coast.  In 1914, the company's name was changed to Shell Company of California.  Shell Petroleum Incorporated was the Royal Dutch/Shell holding company in the United States.  "The History of Shell Oil Company," http://www.shell.us/aboutshell/who-we-are-2013/history.html; Howarth, *A Century of Oil, The "Shell" Transport and Trading Company, 1897-1997* (London, 1997), pp. 76-77 and 92-93.  Also see, DX109 - *National Petroleum News*, "Royal Dutch Shell Operations In U.S. Profitable in 1935," 4/15/1936, pp. 86-87, NR00000111.

[6] Doolittle Declaration, p. 3.  Also see, DX107 - Doolittle to Bureau of Aeronautics, 10/23/1935, CERCLA0093170, at pp. 7-8.

**Excerpt from DX107:**



Reviewing petroleum industry trade journals in the 1930s reveals reasons for the research and development of higher octane gasoline throughout the decade.  As noted, while civilian and military aviators wanted better-performing gasoline, two more interrelated reasons existed for the development of higher octane gasoline.  The first was that as the automobile industry developed larger cars with more powerful engines, higher octane gasoline was needed.  The second was that in order to increase engine power, engineers increased the compression ratio of engines (the ratio between the space above the piston when at the bottom of the piston cylinder to that when the piston is at the top of the piston cylinder).  However, engines with high compression ratios were subject to engine "knocking," which is the igniting of fuel at the incorrect time.  Engineers discovered higher octane gasolines were less prone to "knock" allowing for the use of more powerful engines with higher compression ratios.  Essentially, engines using higher octane gasoline meant more power; in the case of cars, better mileage and in aircraft more power and longer flight time.[7]

The petroleum industry, despite not being the actual users of higher octane gasoline, recognized an emerging market and invested in research and development in order to meet market demand.  General Doolittle all but stated this when he wrote in his memoir, and later

---

[7] Doolittle discussed "knock" on page 2 of his declaration.

testified, that Shell had hired him to develop higher octane gasoline.[8]  The automobile, aircraft, and petroleum industries' interest in formulating higher octane gasoline continued through the 1930s so that by the last years of the decade new technologies were in place to manufacture 100-octane aviation gasoline and higher octane automobile gasoline.

Discussions of higher octane continued in the early 1930s.  For example, an article in *The Oil and Gas Journal* in December 1931 discussed the new model car designs being announced the following month that would have higher compression ratings requiring higher octane gasoline.[9]  In the spring of 1932, another article in the same trade journal stated that car manufacturers wanted higher octane gasoline.  As the Great Depression worsened, auto makers wanted to offer better performing engines in their less expensive cars which could only be accomplished by "higher compression ratios in engines which mean better antiknock motor fuels."  The author canvassed the auto industry and stated that higher compression engines could not be built unless better gasoline was available.[10]  Attention was not only focused on automobile engines.  In August 1932, *The Oil and Gas Journal* printed an article by the journal's technical editor titled, "Rapid Development in Aviation Is Due Largely to Extensive Improvements in Gasoline," in which the author attributed recent growth in air travel to advances in aviation gasoline.[11]

The July 4, 1935, issue of *The Oil and Gas Journal* carried an article discussing 100-octane aviation gasoline.  Commercial aircraft companies, whose planes had previously used 87-octane fuel, were experimenting with 100-octane gasoline that gave pilots more power and better handling at lower speeds.[12]

---

[8] Doolittle Declaration, p. 3.  Also see, DX107 - Doolittle to Bureau of Aeronautics, 10/23/1935, CERCLA0093170, at pp. 7-8.

[9] DX104 - *The Oil and Gas Journal*, "Many 1932 Model Cars Will Need Gasoline of Higher Octane Number," 12/24/1931, p. 15, NR00000204.

[10] DX105 - *The Oil and Gas Journal,* "Car Manufacturers Want Higher Octanes," 4/28/1932, p. 12, NR00000207.

[11] *The Oil and Gas Journal,* "Aviation Progress Due to Gasoline Improvement," 8/4/1932, p. 14, NR00000209.

[12] DX 106 - *The Oil and Gas Journal,* "New Airplanes Demand 100 Octane Number Motor Fuel for Starting," 7/4/1935, p. 16, NR00000249.

**Excerpt from DX106:**



> Marked improvement in the take-off of passenger airplanes by the use of gasoline of ultra-high anti-knock quality is a probable development of the near future, according to Dr. Graham Edgar, vice president and director of research of the Ethyl Gasoline Corporation.
>
> A commercial interest has developed in the past few months for gasoline of 100 octane value. The high quality fuel is being used in ...

      While commercial aircraft interests experimented with 100-octane aviation gasoline, the AAC purchased the fuel.  The *National Petroleum News* reported in January 1936 that the AAC bought 900,000 gallons of 100-octane the previous year.  Of that amount, Shell had sold 600,000 gallons of 100-octane to the AAC for use at Hamilton Airfield in California during the last six months of 1935.  Shell also had submitted a proposal to sell 400,000 gallons of 100-octane to the AAC for use at Hamilton Airfield from January to July 1936.[13]

      In his autobiography and in his testimony General Doolittle took credit for Shell's early sales of 100-octane gasoline to the AAC.  In 1934 at his urging, Doolittle wrote that Shell sold the AAC "1,000 gallons of pure iso-octane fuel . . . for testing engine modifications and improvements."[14]  The author of Shell's corporate biography also believed Doolittle was responsible for these first sales:

> It was also he who in 1934 succeeded in selling Shell's first batch of 100-octane to the US Army, and who persuaded his own senior management to invest heavily in a business which had not as yet properly existed. . . . The risk was emphasized early on: it took two years for the Army General Staff to be persuaded that 100-octane was the aviation fuel of the future, during which time Shell built iso-octane refineries capable of producing 14.5 million gallons of 100-octane a year.[15]

---

[13] DX108 - *National Petroleum News*, "Air Corps Buys 900,000 Gallons of Super-Fuel in 1935," 1/8/1936, p. 28, NR00000050.

[14] Doolittle Declaration, p. 3.  In his autobiography, Doolittle wrote that the 1,000 gallons was a mixture of iso-octane, straight run gasoline, and iso-pentane tetraethyl lead.  Doolittle, *I Could Never Be So Lucky Again*, pp. 176-77.

[15] DX212 - Howarth, *A Century of Oil*, p. 185.

A laudatory article on the cooperation of the automobile, aviation, and petroleum industries that led to the improved auto and aircraft engines appeared in *The Oil and Gas Journal* in May 1937.  Discussing the cost savings of using 100-octane aviation gasoline, the author noted that the additional power the fuel offered meant that manufacturers did not have to increase engine size in order to increase power.  If more speed was not desired, a savings could be realized by using a lighter engine that burned 100-octane fuel.  The same distance could be flown with less fuel.  An additional savings and benefit resulting from 100-octane fuel was less engine damage, due to its being lead-free.[16]

At the end of the 1930s, and as it turned out the beginning of World War II, significant advances had been made in improving gasoline for automobiles and aircraft.  In January 1938 the *American Petroleum Institute Quarterly* published an article that highlighted the organization's eighteenth annual meeting the previous November. (DX111).  Among the items discussed at the meeting were: improved gasoline for planes including 100-octane aviation gasoline, aircraft cruising speeds that had increased to 220 miles per hour, and better automobile gas that had resulted in the speed of cars increasing from sixty to 100 miles per hour since 1925.[17]

**Excerpt from DX111:**



### Fuels for Aircraft

Improved fuels now being produced by the petroleum industry for consumption by aircraft are making it possible for planes to take off in shorter distances and with greater safety, to have a greater cruising range, and to utilize larger carrying and earning capacities, the Friday morning group session of the Division of Refining was told by S. D. Heron, of the Ethyl Gasoline Corporation, Detroit.

Mr. Heron described the advantages of using high-octane fuel in aircraft, saying that at least one-half the improvement in aircraft-engine performance in the past 10 years has been due to the progress during that period from fuels of 50 octane number to fuels of 87-100 octane number.

---

[16] DX110 - *The Oil and Gas Journal,* "Three Industries Cooperate to Advance Aviation," 5/20/1937, pp. 69, 86, NR00000290.

[17] DX111 - *American Petroleum Institute Quarterly,* "3,000 Oil Men Discuss Industry at Institute's Eighteenth Annual Meeting, 1/1938, pp. 2-3, 6-7, NR00000018.

In the aftermath of the Munich Crisis in the fall of 1938, President Roosevelt asked Congress for 10,000 planes for the AAC and expansion of aircraft production capacity to accommodate the manufacture of another 10,000 annually.[18]

Not long after the Munich Crisis, articles about the possibility of war began to appear in the petroleum trade journals, questioning what role the industry would play if the country became involved in a war.[19]  In January 1939 an issue of the *National Petroleum News* carried an article titled "National Defense and Industrial Mobilization."  The author wrote that modern engines and aviation fuel gave the United States "an invaluable tactical advantage in the air . . . [T]he refiners of this country can put into military aviation tanks a far greater quantity of 100-plus octane number fuel than can any people on the globe.[20]

Soon after the *National Petroleum News* published the article regarding national defense, *The Oil and Gas Journal* printed the article "Defense Plan Will Require High Octane Gasoline."  The author stated that the President's request for increased defense spending would not immediately increase the military's need for petroleum products, although the defense program would result in a gradual increase in the demand for petroleum products in coming years.  Military officials did not see a dramatic increase in the need for fuel in 1939 or 1940, unless war broke out.[21]

---

[18] Sherry, *The Rise of American Air Power, The Creation of Armageddon* (New Haven: Yale University Press, 1987), pp. 78-81.  At Munich in the fall of 1938, in an attempt to avoid war, the leaders of France, Britain, Italy, and Germany agreed to allow Germany to occupy the strategically important Sudetenland of Czechoslovakia.

[19] The international situation quickly deteriorated after the Munich Agreement.  In August 1939, the Soviet Union and Germany signed a non-aggression pact.  A week later, Germany invaded Poland and the British and French declared war on Germany.  The so-called "Phony War" followed until May 1940, when Hitler turned his forces west and invaded the Low Countries and France.  France fell in June 1940.  In August 1940, the Battle of Britain began and Germany tried to force a British surrender through a strategic bombing campaign.  When that failed, Hitler turned east and in June 1941 invaded the Soviet Union.

[20] *National Petroleum News*, "National Defense and Industrial Mobilization," 1/11/1939, p. 21.  This edition of the *National Petroleum News* also had an article titled "Aviation Fuels, In the Spotlight," in which the author discussed 100-octane use by military and civilian aircraft, NR00000036.

[21] DX 113 - *The Oil and Gas Journal*, 1/19/1939, "Defense Plane Will Require High Octane Gasoline," pp. 8-9, NR00000256.

On September 1, 1939, Germany invaded Poland.  A few days after the German invasion, the *National Petroleum News* published "Oil Industry Prepared to Meet Wartime Demands for Products, No Runaway Market is Expected" written by the publication's editor.[22]

The European situation continued to deteriorate in the spring of 1940, and France fell in June.  In May, the President asked for appropriations to fund construction of 50,000 airplanes annually.  The May 22, 1940 issue of the *National Petroleum News* contained numerous articles on the President's announcement and the need for increased aviation gasoline, including:

Fueling 50,000 Planes Is Not Worrying FDR;

Warplane Program will Need Big Supply of Aviation 'Gas;'

Estimates of Requirements Range Into Millions Daily; and

Egloff Sees Oil Industry Ready for War Emergencies.[23]

Similar articles appeared several weeks later in the *National Petroleum News* on June 12, 1940, just less than a year before President Roosevelt created the Office of Petroleum Coordinator.  Among the titles:

Defense Plan Begins to Shape Up;

Ickes Studies War-Oil Plan;

Army's Needs Told to S.A.E. [Society of Automotive Engineers];

See Aviation 'Gas' Civil Demand Rise; and

Fueling of Warplane Fleet Studied By Defense Group.[24]

The research and development in the 1930s of higher octane gasoline proved timely as the United States gradually moved to a wartime economy.  Although Shell and Standard Oil of

---

[22] *National Petroleum News*, "Oil Industry Prepared to Meet Wartime Demands for Products, No Runaway Market is Expected," 9/6/1939, p. 5, NR00000190.

[23] *National Petroleum News*, 5/22/1940, "Fueling 50,000 Planes Is Not Worrying FDR," "Warplane Program will Need Big Supply of Aviation 'Gas,'" "Estimates of Requirements Range Into Millions Daily," and Egloff Sees Oil Industry Ready for War Emergencies," pp. 9-11, 22-23, NR00000131. Demonstrating that the animosity between the President and the petroleum industry had not yet abated, the issue also featured an article titled, "FDR Eyes Oil Suit In View of War Plan," pp. 9-11, NR00000131.

[24] DX116 - *National Petroleum News*, "Defense Plan Begins to Shape Up," "Ickes Studies War-Oil Plan," "Army's Needs Told to S.A.E.," "See Aviation 'Gas' Civil Demand Rise," and "Fueling of Warplane Fleet Studied By Defense Group," 6/12/1940, pp. 9-11, NR00000141.

New Jersey were among the industry leaders in the development of 100-octane aviation gasoline, other companies, including three of the plaintiff companies in the present litigation, also manufactured 100-octane aviation before President Roosevelt created the Office of Petroleum Coordinator in May 1941.

For example, Charles S. Jones, president of Richfield from 1937 to 1962, wrote in Richfield's corporate biography, "[w]e were among the pioneers in manufacturing this history-making fuel . . .," DX203.[25].

**Excerpt from DX203:**



> **29. "WE HAD 100-OCTANE!"**
>
> WITH its crude production and its new 50,000-barrel Watson refinery, Richfield was ready to meet the demands of World War II. As early as 1937 the war between Japan and China had created a large demand for 100-octane aviation gasoline in the Pacific. We were among the pioneers in manufacturing this history-making fuel, which provided more speed, enormous lifting power, quicker takeoff, longer range, greater maneuverability—all the qualities that meant the margin of victory in combat.
>
> Richfield had contracted to sell the product to Japan, and by 1940 we had completed new refining facilities and begun manufacturing it. But before we made any shipments, the United States government imposed sanctions on trade with Japan (although the
>
> 207

Table One (DX1006) displays cost data for 100-octane sales for select companies between 1935 and 1941.

---

[25] DX203 - Jones, *From the Rio Grande to the Artic, The Story of the Richfield Oil Corporation* (Norman: University of Oklahoma Press, 1972), p. 207

Table One

Price of 100-Octane Gasoline in Cents[26]

| Company | 1935 | 1936 | 1937 | 1938 | 1939 | 1940 | 1941 |
|---|---|---|---|---|---|---|---|
| Richfield Oil, Watson | | | | | | | 15.597 |
| Shell Oil, Martinez & Wilmington | 50.00 | 22.50 | 18.65 | 17.375 | 17.25 | 17.00 | 13.56 |
| Shell Oil, Wood River | | | 18.65 | 17.25 | 16.625 | 15.50 | 15.00 |
| The Texas Company, Port Arthur | | | 25.56 | 25.98 | 21.40 | 15.54 | 15.60 |
| The Texas Company, Wilmington | | | | | | | 14.90 |
| Union Oil, Wilmington | | | | | | 16.25 | 15.56 |

Shell's early research and development efforts are evident in the data in Table One.  In July 1944, Shell responded to an inquiry from the Petroleum Administration for War (PAW) concerning the company's 100-octane production.  In its response, Shell informed the PAW, that at the refinery in Martinez, CA, 100-octane production for commercial sales began in July 1935 and similar production began the following June at the Wilmington-Dominguez Refinery.

As a review of the information in Table One indicates, beginning in the mid-1930s, Shell, followed by Texas, then Union, and finally Richfield engaged in the production of 100-octane aviation gasoline prior to each company signing contracts in 1942 and 1943 with the Defense Supplies Corporation for production of 100-octane aviation gasoline.

The information in Table One shows the gradual development of 100-octane aviation gasoline from the mid-1930s through 1941 when the United States became a direct combatant in World War II.  By the time the war ended in August 1945, the nation's refineries produced quantities of aviation gasoline unfathomable in 1940 when the RFC created the DSC.  The increase in production was an evolutionary process marked by fits and starts.  Although the RFC created the DSC in August 1940, nine months passed before the President appointed Harold Ickes as Petroleum Coordinator for War.  Not until eighteen months later, in December 1942, did Roosevelt use an Executive Order to create the PAW and give it legal authority to issue directives and orders.  The DSC, although organized in August of 1940 to purchase aviation gasoline, did not make such purchases for almost 2.5 years.  In the meantime, in addition to negotiating and signing contracts with petroleum companies, the DSC facilitated plant construction through low-cost loans and necessary certificates.  The DSC was part of the national effort to increase 100-octane production, but the PAW and WPB also played significant roles not only in the production of 100-octane, but in the increase of bunker fuel, 80-octane gasoline for military vehicles, and the many other petroleum products needed to fight a mechanized war.  The

---

[26] DX174 - Stiles to Jayne, 12/12/1944, NACP_00003423.

petroleum industry, working with the Rubber Reserve Company, played a significant role in the synthetic rubber program, yet another vital wartime program.


**V.  Opinion 2:  The plaintiff companies' use of McColl during World War II was consistent with their practice of disposing acid sludge in pits in Southern California before the war.**

Concern over disposal of refinery waste in the Long Beach area existed at least as far back as 1930.  In that year, an article in the *Oil Bulletin* discussed air pollution problems that resulted from the incomplete burning of refinery waste.  Each of the companies operating refineries in the Long Beach area—including Richfield, Shell, Texas, and Union—appointed engineers to serve on a committee to study the disposal problem.[27]

<u>**Excerpt from DX67:**</u>



An article from 1940 refers to acid sludge as "a truckman's delight" and "good old goo," due to its ubiquity and need for disposal (DX115):[28]

---

[27] DX67 - H. Wade, "Battling Air Pollution at Long Beach, Committee's Investigators Trace Chief Cause for Complaints to Incomplete Combustion of 'Acid Tar' at Refineries; Now Being Remedied by Installation of Special Equipment," *Oil Bulletin*, 9/1930, CERCLA0084061.  Also see, J. Taylor to G. Van Senden, 3/22/1932, CERCLA0064652; C. Jenkin to G. Van Senden, 12/2/1932, CERCLA064651; C. Jenkin to G. Van Senden, 7/14/1933, CERCLA0064646; "Memo, Wilmington refinery to Legal Department, Shell Oil Company," 3/2/1937, CERCLA0064659; and E. McColl to Refiners Committee on Waste Disposal, 5/10/1938, CERCLA0064658.

[28] DX151 – *Petroleum World, 1940*, "Now-Desulphurization Without Sludge." *Petroleum World*.

FULL many a flower, as the poet puts it, is born to blush unseen—and by the same token, full many a technical report, dry and formal, contains an interesting story, if you can worm it out.

Here is a technical report, and even the writer would not deny that it is a little dry reading for anybody not intimately acquainted with refinery processes.

It is a report about something that was hauled away from a refinery, a truckman's delight, and now that stuff need not be hauled away, because there isn't any more of it at that refinery—and you'd never guess what becomes of it

But as far as the report is concerned, the story isn't there for your wife to read and enjoy, and so we will endeavor to give you the report along with the story.

The truckman's delight was sludge—good old goo, composed principally of sulphur, with the routine gum-forming components that Nature puts into crude oil, and nobody wants in gasoline.

The customary method of getting it out of the crude is to treat the oil with sulphuric acid, which is hungry for such undesirables, and the acid with the undesirables makes the sludge, a steady waste product of all refineries, and in the Han-

Available documentation discussing the plaintiff companies' use of landfills for disposal of acid waste is sparse. Yet, the documentation that does exist shows that the plaintiff companies did use landfills for waste disposal prior to their use of the McColl site beginning in 1942. In 1992, the firm PHR Environmental Consultants, Inc. (PHR) wrote a report during the Shell CERCLA litigation. Among the findings that PHR offered was that "evidence indicates that some Long Beach/Wilmington area refineries, beginning as [sic] least in 1936, employed private trucking companies to haul the waste material to offsite sumps."[29] PHR identified three trucking companies that hauled refinery waste in the late 1930s and early 1940s. Ralph Gray, of the Ralph Gray Trucking Company, owned sites in Orange County (near Westminster and Bolsa Chica) where he hauled refinery waste from 1936 to 1941. The O. M. Slosson Trucking Company likely hauled waste to a site near Yorba Linda in the fall of 1941 and later transported waste to the McColl site. Likewise, John Morrison hauled refinery waste to Gardena in Los Angeles County from as early as 1940 to 1943.[30]

---

[29] PHR Environmental Consultants to M. Zevenbergen, 8/31/1992, re. Land Disposal of Sulfuric Acid Waste from Long Beach/Wilmington Refineries, p. 4, CERCLA0109679. In fact, in December 1932, the Gray Trucking Company offered to haul Shell's "sludge acid" for $00.075 per gallon. See, C. Jenkin to B. Koontz, 12/13/1932, CERCLA00008355. For more on Gray Trucking see, A. Bradley, "Head Office Treasury Management Manufacturing, Legal Department, Gray Trucking Company Contracts," 12/16/1935; C. Rockafield to B. Koontz, 12/31/1934; and A. Bradley to C. Jenkin, 11/27/1934, CERCLA0064662 (pp. 5-7). The Ralph Gray Trucking Westminster dump was located between Goldenwest Avenue and Chestnut Street, Westminster, Orange County, California. See Superfund Site Overview, Ralph Gray Trucking Co., Pacific Southwest, US EPA, http://yosemite.epa.gov/r9/sfund/r9sfdocw.nsf/vwsoalphabetic/Ralph+Gray+Trucking+Co.?OpenDocument.

[30] PHR Environmental Consulting to M. Zevenberg, 8/31/1992, re. Land Disposal of Sulfuric Acid Waste from Long Beach/Wilmington Refineries, pp. 4-20, CERCLA0109679.

In 1997, historian Martin Melosi discussed acid sludge disposal in the United States and more specifically in Southern California in a report that he prepared for the CERCLA litigation involving the plaintiff companies.  In Part III of his report, Melosi discussed "Trends in Acid Sludge Utilization and Disposal in Southern California Before World War II."  Among the issues Melosi discussed was the use of the Wardlow property (Thomas Ranch) in Riverside County, CA that was used as a disposal site for refinery waste in the late 1930s and early 1940s.[31]

On January 26, 1942, the Riverside, CA, *Daily Press Enterprise* ran a story titled, "Acid Sludge Dump in County Opposed."  The writer of the article noted that the dump was west of the town of Corona and that county supervisors had been urged to close the dump.  The acid sludge originated "from Wilmington ethyl gasoline refining operations."[32]  Two months later the newspaper ran an article that discussed a recent report authored by the Riverside County health commissioner.  The commissioner concluded the dump a "menace to the domestic water supply" that emitted odors that could be smelled as far away as 4000 feet.[33]

In March 1999, the court in the case of Western Properties Service Corp. v. Shell Oil, et al. issued its Findings of Fact and Conclusions of Law.  The court found, among other findings, that,

11.   The Thomas Ranch site comprises 38 acres near Corona, Riverside County, California.  The site consists of three parts: four ponds comprising 14 acres; the Wardlow Wash comprising 4 acres; and dirt and storage areas comprising 20 acres.  The four unlined petroleum waste ponds are now surrounded by a predominately residential area.

15.   The waste ponds at Thomas Ranch consist of acid sludge byproducts of alkylation processes used by oil companies during World War II to produce high octane aviation fuel.

---

[31] M. Melosi, 3/26/1997, A Study of Acid Sludge Utilization and Disposal for the case United States v. Shell Oil Company et al., pp. 9-12, CERCLA0058717. The Thomas Ranch property was located south of Palisades Drive and west of Serfas Club Drive in Corona, California. See California Department of Toxic Substances Control Envirostor Database, Thomas Ranch (33290115), http://www.envirostor.dtsc.ca.gov/public/profile_report.asp?global_id=33290115

[32] "Acid Sludge Dump In County Opposed," *Daily Press Enterprise*, 1/26/1942, CERCLA0109607.

[33] "Detailed Report on Sludge Dump Filed," *Daily Press Enterprise*, 3/23/1942, CERCLA0109626.

51.     The second article, published January 27, 1942 in the Wilmington Press, was
entitled, "Oil Refineries Face Sludge Dumping Ban," and read:

> Large oil companies of Wilmington, prohibited from dumping oil refinery
> sludge in Los Angeles and Orange Counties, are about to lose the privilege
> in Riverside County.
>
> The Board of Supervisors today instructed County Counsel Redwine to
> prepare an ordinance that will halt sludge dumping on property near
> Corona and prevent the practice elsewhere in the county . . .[34]

When the Ninth Circuit Court of Appeals ruled on the case in 2004 it offered additional
facts regarding the Wardlow property.  The open pits resulted from gravel excavation in 1938 for
a nearby dam on the Santa Ana River.  The Wardlows sold the rights to their property for $2,000
to be used for the dumping of "'acid tar' – petroleum waste consisting in substantial part of
sulfuric acid into those pits."  The court further found,

> Oil refineries, for over a decade by then, had been going farther and farther afield from
> their Long Beach locations for disposal sites because the stink of acid tar was notoriously
> offensive to neighbors.  This sludge could be smelled from almost a mile away.

By January 1942, as the first pit reached capacity, citizens began protesting against
continued dumping.  The oil companies, represented by Eli McColl, agreed that no additional
dumping would occur in Riverside County without the approval of county officials.  The issue in
Riverside County became moot in June 1942 when McColl found a new site that would bear his
name in Orange County.[35]  Shell and McColl signed an agreement for the disposal on June 23,
1942, under which Shell agreed to provide at least 50,000 barrels of waste during the next twelve
months.  Eli McColl's son later testified that "[f]rom June 1942 to February 1946 sulfuric acid

---

[34] DX5 - Western Properties Services Corp. v. Shell Oil, et al., United States District Court Central
District of California, Case No. 94-4695 CM, Findings of Fact and Conclusions of Law, 3/31/1999,
CERCLA0094440.  The court concluded that the assertion in the article that banning dumping in Los
Angeles or Orange Counties was incorrect based on the fact that a permit application had been submitted
for dumping at Brea Canyon in Los Angeles County and beginning in 1942 dumping started at the
McColl site in Orange County (ibid., p. 15, n. 2).  Orange County strengthened industrial waste regulation
in 1948. See Orange County Ordinance No. 536, An Ordinance of the County of Orange Regulating the
Disposal of Industrial Waste, 8/17/1948, NR00000625.

[35] Western Properties Services Corp. v. Shell Oil Company et al., 2004, 358 F.3d 678, United States Court
of Appeals, Ninth Circuit, p. 5.  Also see DX96 - the Declaration of John McColl, Shell Oil Company v.
Accident and Casualty Insurance Company, 7/29/1987, CERCLA0062913; and Earl Redwine to
Riverside County Board of Supervisors, 2/14/1942, CERCLA0109621.

sludge waste from several Southern California refineries was transported and dumped into the pits on my father's property."[36]  The dumping at the McColl property during World War II was a continuation of the disposal practices started in the 1930s.


**VI. Opinion 3.  Each of the four companies in the current litigation signed Defense Supplies Corporation's 100-octane aviation gasoline contracts after a period of negotiations.  I have found nothing in the historical record to suggest that any of the four companies were forced into signing a Defense Supplies Corporation contract.**

In June 1940, Congress revised the charter of the Reconstruction Finance Corporation (RFC)—established during Hoover's presidency to provide Depression-era relief—to allow the RFC to create government corporations.[37]  Two months later the RFC, with President Roosevelt's approval, created the Defense Supplies Corporation (DSC) with the express purpose of purchasing aviation gasoline.[38]  However, for nearly a year, the DSC and other Federal agencies did little to increase the nation's supply of aviation gasoline.  Inaction began to change to action in the spring and summer of 1941 as the United States increased production to either serve as the "Arsenal of Democracy" or in preparation for possible entry into World War II.  In May, President Roosevelt declared an "Unlimited National Emergency."  It was also in May that the President established the Petroleum Coordinator for National Defense, also known as the Office of Petroleum Coordinator (OPC).  Roosevelt appointed Secretary of the Interior Harold Ickes Chairman and Ralph Davies—formerly of Standard Oil of California—Vice Chairman.[39] The OPC became the Petroleum Coordinator for War in the spring of 1942 and then the Petroleum Administrator for War (PAW) in December 1942.  The history of the PAW written shortly after the war noted "approximately three-fourths of the executive and technical staff of

---

[36] DX19 - Agreement Between Eli S. McColl and Shell Oil Company, 6/23/1942, CERCLA0084036; and DX97 - Declaration of John McColl, Shell Oil Company v. Accident and Casualty Insurance Company, 7/29/1987, CERCLA0062913.

[37] Act of 6/25/1943, 54 Stat. 572.

[38] Jones to Knox, Secretary of the Navy, 9/27/1940, NACP_00000658.  Also see, Stettinius, Jr. to Jones, 8/14/1940.

[39] President Roosevelt declared the "Unlimited National Emergency" on May 27, 1941.  President Roosevelt established the office of Petroleum Coordinator for National Defense on May 28, 1941.  On April 20, 1942, the office's name was changed to Petroleum Coordinator for War.  The Petroleum Administration for War was established by Executive Order 9276 on December 2, 1942, and assumed the functions of the Petroleum Coordinator for War.  For the sake of clarity "PAW" will be used throughout this report.

PAW came from oil companies, large and small alike, or from fields closely associated with the oil industry."[40]

In late July 1941, the PAW sent telegrams to the nation's petroleum companies inquiring about production of 100-octane aviation gasoline and learned that production capacity was about 40,000 barrels per day (42 gallons per barrel).[41]  Five oil companies in California responded including Shell (on July 25), Richfield (on July 28), Union (on July 29), and The Texas Company (on October 3) and they all ultimately expanded their facilities.[42]  During the fall of 1941, the PAW, DSC, and other government agencies started negotiating with various petroleum companies to sign long-term contracts for the production and sale of 100-octane aviation gasoline.

Shell's reply to the PAW's July 1941 telegram included several tables of data on the anticipated output of 100-octane aviation gasoline components at its Martinez and Wilmington refineries for the last six months of 1941 and 1942.  The company provided information on alkylates, hot acid octane, iso-pentane, and aviation base stock.  Shell estimated the sale of 311,400 barrels of 100-octane aviation gasoline that included approximately fourteen percent (45,000 barrels) to commercial customers and about eighty-six percent to the Army or Navy.[43]

Shell, however, had already started expanding its production capacity for high-octane gasoline in 1941, and Shell's 1941 Annual Report noted that "[s]everal large projects" for high-octane gasoline and other war products were either underway or awaiting government approval.[44]  On October 27, 1941, Mr. Thomas of Shell Oil met with a PAW official.  At the meeting Thomas told PAW officials that he would submit an application to build a 1,000 barrel plant in Wilmington, CA to make 100-octane aviation gasoline.[45]

---

[40] Frey and Ide, *A History of the Petroleum Administration for War* (1946; reprint Buffalo, NY: W. Hein and Company, 1974), p. 33.

[41] DX161 - Tidwell and O'Callaghan, *The Role of Defense Supplies Corporation*, p. 11.  The official history of the Petroleum Administration for War states that in June 1941 nationwide aviation gasoline production figures varied from 33,400 to 71,000 barrels daily, Frey and Ide, *A History of the Petroleum Administration for War*, p. 194.

[42] N.D., District No. 5, Letters received in reply to Mr. Gary's telegram of July 21, 1941, NACP_00001304; and DX118 - Shell to PAW, 7/25/1941, NACP_00001309

[43] DX118 -Shell to PAW, 7/25/1941, NACP_00001309.

[44] DX41 - "Shell Union Oil Corporation, Annual Report For the Year Ended, December 31, 1941," NACP_00001063, pp. 7-8.

[45] Robinson to Gary, 11/1/1941, NACP_00001124.

Although Thomas of Shell had met with the PAW in late October, DSC officials did not meet with Shell executives to discuss a DSC contract until late January 1942 for its Wood River, IL refinery.  According to PAW's George Hill it took only an hour for the DSC to negotiate and agree on all points of the contract except the price.  Hill wrote that once the price was determined the PAW would recommend that the contracts be signed.[46]  According to PAW pricing policy, the government should not pay more, and should probably pay less, than what the government had previously paid under contracts signed following competitive bidding.[47]  Shell wanted fifteen cents per gallon, which the government believed was too much.  Once signed, Shell would increase production from 4,000 to 10,000 barrels per day.  Expansion of Shell's Wood River refinery would cost $15 million of which the government would lend $11.25 million.[48]

In mid-February, PAW, Army, Navy, and DSC officials revisited the cost figures that Shell had previously provided.  With that information, the government then offered the following prices to Shell: 14.75 cents for 100-octane purchased before January 1, 1943; 14.50 cents per gallon from January 1, 1943 to when the facilities started operating; and then 14.10 cents per gallon after that date.  Shell agreed to this price structure for Wood River.  Having completed the Wood River contract, the PAW expressed optimism to Shell that contracts for other Shell refineries including Wilmington could soon be signed.[49]

Preliminary discussions for expanding Shell refineries in Houston and California took place in late February 1942.  Shell proposed installing a catalytic cracking plant in either Houston or California that would increase production by 8,000 barrels a day of 100 octane with three cubic centimeters of tetraethyl lead.  The Shell representatives expected to return to Washington in two weeks with more detailed information.  Government officials urged Shell to begin contract negotiations immediately.[50]  Although discussions for expansion of Shell's California production capacity first centered on the refinery in Martinez, the focus shifted to expansion of the Wilmington-Dominguez facility.  In March, Shell first proposed a price of 15.4 cents per gallon.  After revising their design process, Shell then proposed 13.80 cents per gallon.  Following a meeting with PAW officials the parties agreed to 13.65 cents per gallon for 100-octane gas with three cubic centimeters of tetraethyl lead and 13.4 cents for gasoline with four cubic centimeters of tetraethyl lead.  In early April 1942, F. Clulow, Shell's Vice President for

---

[46] Hill, Memorandum of Oil Negotiations, 1/28/1942, NACP_00000725 and NACP_00000727.

[47] Brown to Davies, 12/12/1941, NACP_00001074.

[48] Hill, Memorandum to Mr. Jones, 1/30/1942, NACP_00000743.

[49] Hill, Memorandum to Mr. Jones, 2/16/1942, NACP_00000701 and NACP_00000702; G. Hill, Memorandum for The Files, 2/17/1942, NACP_00000700; and Gary to Cummings, 2/18/1942, NACP_00002182.

[50] Parkhurst to Gary, Memorandum of Conference, 2/27/1942, NACP_00002180.

Manufacturing, sent the DSC a breakdown of costs that Shell expected to incur when producing an additional 6,000 barrels of 100-octane gasoline.[51]

Shell and the DSC signed the 100-octane aviation gasoline contract effective April 10, 1942.  The contract covered the company's California refineries.  Expansion at Wilmington-Dominguez would increase production not only at that refinery but also at Shell's refinery in Martinez.  Original total capacity for both plants was 3,000 barrels per day.  Expansion already underway, scheduled for completion on July 1, 1942, would add another 1,000 barrels to daily production.  Another 6,000 barrels per day would be realized under the expansion agreed to on April 10 at an estimated cost of $15.5 million.[52]

Section IV of the contract outlined the price the government would pay for 100-octane, the figures that Shell and the PAW had agreed to a few days earlier.  Section V contained price escalation language that would allow price adjustments if the price of crude oil changed.  Contract prices were based on normal transportation of raw materials.  If events caused such transportation methods to change, including "directly or indirectly from the existence of a state of war," then prices could change.  The DSC, in section VII, also agreed to loan Shell $11.625 million in installments of approximately $1 million at a two percent interest rate.  Section XII contained language on taxes.[53]

The Richfield Oil Corporation responded to the PAW's July 21, 1941 telegram on July 28th.  Company vice president A. M. Kelley provided information on equipment, production, aviation gasoline, and component specifications.  He told the PAW that the company's current facilities "include a sulphuric [sic] acid alkylation plant."  At the time Kelley wrote to the PAW, Richfield had on hand 92,716 barrels of alkylate and other components that could be converted to 100-octane aviation gasoline in twenty-three days.  He also added that Richfield currently had a contract to sell the Navy 187,619 barrels of 100-octane gasoline from July 1 to December 31, 1941.[54]  Discussions between PAW and Richfield continued through the fall and into the winter

---

[51] DX136 - Brown to Gary, 3/10/1942, NACP_00002176; circa 4/8/1942, 100-Octane Aviation Gasoline, Cost Analysis and Breakdown, NACP_00002146-2150; and DX135 - Wilson to Gray, Memorandum of Conference, 4/8/1942, NACP_00002171.  Also see Clulow to DSC, 4/8/1942, NACP_00002097.

[52] DX17 - Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (California Refineries) 100-Octane Aviation Gasoline, 4/10/1942, NACP_00002289; and Office of Petroleum Coordinator, 100-Octane Aviation Gasoline Report to the Supply Priorities and Allocations Board, NACP_00001047.

[53] DX17 - Contract between Defense Supplies Corporation and Shell Oil Company, Incorporated (California Refineries) 100-Octane Aviation Gasoline, 4/10/1942, NACP_00002289; and Office of Petroleum Coordinator, 100-Octane Aviation Gasoline Report to the Supply Priorities and Allocations Board, NACP_00001047.

[54] Kelley to Gary, 7/28/1941, NACP_00001305.  Richfield had been selling aviation gasoline to the Navy since at least July 1932.  See D. Nesbit to Commanding Officer Naval Station, Anacostia, DC, 7/15/1932,

of 1941.  Richfield received the November 4 letter from the PAW promising "high priorities will be granted" on expansion projects for 100-octane aviation gasoline.  On December 5, 1941, Wright Gary, PAW Director of Refining, reported to Ralph Davies that he expected "concrete proposals" to be forthcoming in the "very near future" from several companies including Richfield.[55]

In early January 1942 Richfield Chairman E. F. Sinclair wrote the DSC.  Sinclair told the DSC that after a meeting on December 10 and a subsequent meeting with Ralph Davies and his staff "our company is desirous of doing its share in contributing to the national defense through increased facilities for the manufacture of 100 octane aviation gasoline."  Richfield was most interested in expanding its Watson, CA refinery and utilizing "crude oil which we control."[56]

**Excerpt from DX125:**



Sinclair wrote that at the time, the Watson refinery was producing 1,700 barrels per day of 100-octane aviation gasoline and that when expansion was completed an additional 2,050 would be manufactured.  Sinclair wanted an advance of $2.1 million from the government in increments of $175,000 per month.  He understood that contracts would be negotiated with the PAW, and he believed that Richfield could construct the new facilities as soon as building material was delivered.  Sinclair thought fifteen cents per gallon a fair price for 100-octane aviation gasoline under the proposed contract.[57]

---

(discussing the sale of 200,000 gallons to the Navy for use at Naval Air Station, Anacostia) NACP_00000288.

[55] DX121 - W. Gary to A. Fraser, 11/4/1941, NACP_00001313; Gary to Davies, 12/5/1941, NACP_00003605; and P. Robinson, Memorandum to Gary, 10/18/1941, NACP_00001122.

[56] DX125 - Sinclair to DSC, 1/5/1942, NACP_00001910.  The Sinclair Oil Company, which was owned by the Consolidated Oil Corporation, managed Richfield, Brown, Parkhurst, and Gary, Memorandum, 1/26/1942, NACP_00001900 (DX130).

[57] DX125 - Sinclair to DSC, 1/5/1942, NACP_00001910.

On January 6, 1942—Jesse Jones, Federal Loan Administrator, head of the RFC, and Secretary of Commerce—with President Roosevelt's approval, authorized the DSC to make advanced payments to Richfield the following day.[58]  Two day later E. W. Isom wrote the PAW on behalf of Richfield in which he outlined the basis of the company's proposed price per gallon. Isom's letter was a detailed breakdown of the cost of producing a gallon of 100-octane aviation gasoline that included not just components (alkylate, isopentane, and 76.7 blending naptha) but also operating costs, depreciation, taxes and insurance, and profit.  Regarding taxes, Isom wrote,

> [t]he 3% on per year taxes and insurance item is based on company experience.  For future operation under war conditions this item, which is normally stable, may increase considerably.

Concerning the company's return on investment, he wrote,

> [s]everal government agencies have indicated that a 7% return on investment is a fair figure.  Over a three-year period this return would average 6.3%, which is the [sic] above 7% on each of the three years' depreciated value of the plant.[59]

Isom stated that the cost data did not apply to the entire length of the proposed three-year contract and that some sort of escalation clause would need to be written into the contract.  The proposed cost per gallon, he continued, was for 100-octane aviation with three cubic centimeters of tetraethyl lead.   Isom noted that the proposed price only applied to the production of the additional 2,050 barrels a day that was currently under consideration.  The proposed price did not apply to the company's current 1,700 barrel a day production of 100-octance aviation gasoline.[60]  Evidently, Richfield anticipated continuing those non-DSC sales.  On January 19, 1942, Richfield provided the PAW with a list of exiting aviation contracts for all grades of the fuel.  Among the contracts listed were 100-octane contracts with the Army Air Corp for 75,000 barrels to be "taken" by February 15, 1942 and one with the Navy for 118,000 barrels for delivery between December 1, 1941, and March 31, 1942.  Also, Richfield listed contracts with private entities for 92-octane, 95-octane and 87-octane contracts, and numerous 73-octane contracts.[61]

D. W. Wilson of the PAW reviewed Richfield's proposal and in a letter to W. Gary of the PAW offered his views of the proposal.  Wilson thought the proposal "generally reasonable" except for one provision, which was item "l," a 2.40 cents per gallon allowance that was "to

---

[58] DX126 - Jones to Mulligan, 1/6/1942, NACP_00000652.

[59] DX127 - Isom to Gary, 1/8/1942, NACP_00001907.

[60] DX127 - Isom to Gary, 1/8/1942, NACP_00001907.

[61] Richfield to PAW, 1/19/1942, NACP_00003489.

cover increased costs which are anticipated when maintaining aviation gasoline production." [62] Although Isom had written that an escalator clause needed to be included in the contract, it appears that Richfield had included such a clause in the company's proposal.  Wilson told Isom that the 2.40 cents per gallon seemed arbitrary and a question of policy, and he doubted it would be allowed, although that decision was not his to make. [63]

On January 13, 1942, Richfield wrote to the PAW and acknowledged discussions of the company's January 5 letter.  In the letter dated January 13, Richfield "formally offers to supply 100 octane gasoline" to the DSC "for a price of 15 cents per gallon."  The letter contained a lengthy paragraph on the proposed tax clause:

10.  Section (13), which relates to taxes, should have an addition to the same.  In addition to any new or additional taxes, fees or charges, Buyer should be required to pay any existing taxes, fees or charges which Seller is compelled to pay by reason of the production, manufacture, sale or delivery of the commodities delivered under the contract.  Particular reference is here made to possible liability for State gasoline tax and inspection fees.  Under a recent decision of the United States Supreme Court certain States are taking the position that sales direct to the Federal Government may be taxed to the oil companies or other suppliers under certain circumstances, and we believe that we are entitled to have such existing taxes or fees added to the price if this company is compelled to pay the same.  There should also be added to section (13) a provision that if any taxes are added to the price, the amount of such taxes shall not be taken into consideration in arriving at the amount of money involved under section (8) nor in arriving at the value of the gasoline ordered by Defense Supplies Corporation in any calendar month. [64]

Richfield's tax concern, it appears, involved state gasoline taxes and fees and the taxing of sales directly to the federal government.

The price of aviation gasoline produced under the proposed contract, not taxes, seems to have been the sticking point in the negotiations.  On January 20th, Isom told Gary that the company thought the allowance amount per gallon could be dropped a penny to 1.4 cents, bringing the total cost per gallon to 14 cents.  Yet, Isom reiterated that working under blackout conditions and expanding the number of guards at the refinery increased production costs.  Another issue impacting the cost was that Richfield was proposing adding on to an existing plant that already was in operation.  Because of that, operating facilities would be shut down for four

---

[62] DX127 - Wilson to Gary, 1/10/1942, NACP_00002070; and Isom to Gary, 1/8/1942, NACP_00001907.

[63] Wilson to Gary, 1/10/1942, NACP_00002070.

[64] DX128 - Sinclair to Davies, 1/13/1942, NACP_00001905.

to six weeks while the new facilities would be connected to the existing plant, which would effectively increase the cost.[65]

Negotiations between Richfield and the government continued through January 1942. On the 26th of that month several PAW officials prepared a memorandum on the negotiations. They noted that the price per gallon originally quoted at 15 cents had been reduced to 13.75 cents for 100-octane aviation gasoline with three cubic centimeters of tetraethyl lead. Another issue that emerged was repayment of the money the government advanced Richfield for plant expansion. The advance was to be repaid over thirty-six months so Richfield proposed that each month the government take delivery of gasoline valued at 1/36 of the repayment price. If the government took delivery of an amount valued at less than 1/36 of the loaned money in a given month Richfield would retain the value of the undelivered 100-octane aviation gasoline as damages. PAW officials met with the Army, Navy, and DSC and decided instead that the DSC would agree to purchase the entire production the first year and a pro-rata percentage in years two and three. This concept was agreed to by Richfield's representatives, thus assuring the company that the DSC would purchase its entire production the first year the new facilities were in operation.[66]

The PAW's review of the Richfield contract continued. On January 27, in an inter-office memorandum, PAW personnel noted that the project involved expansion of the existing alkylation plant at Watson. The proposal was favorably reviewed except for the 1.4 cents allowance (down from 2.4 cents in earlier drafts). Price remained the problematic issue three days later when the DSC reported to Jesse Jones that in regards to the Richfield contract "[a]ll matters have been decided . . . with this contract except price." Richfield wanted 13.75 cents per gallon. DSC was offering 13.5 cents per gallon. The stalemate was finally broken when the parties agreed that the DSC would pay 13.5 cents per gallon for all 100-octane gasoline with three cubic centimeters of tetraethyl lead produced at Watson, regardless if from the existing facilities or the new facilities.[67]

A PAW interoffice memorandum that D. Wilson wrote explained the "Reasonableness of Price Quoted" to Gary. Wilson noted that all base prices were subject not only to the escalation clause, but could be changed through "agreement or by arbitration as the result of unusual conditions which might be created by the war." Two criteria guided the price negotiations, not just for the Richfield contract but for all contracts, as PAW recognized the price paid for 100-octane aviation gasoline would range from 12 to 16 cents. The criteria were,

---

[65] DX127 - Isom to Gary, 1/20/1942, NACP_00002067.

[66] DX130 -Brown, Parkhurst, and Gary, Memorandum, 1/26/1942, NACP_00001900.

[67] Parker to Wilson, 1/27/1942, NACP_00001899; Hill to Jones, 1/30/1942, NACP_00000743; and Wilson and Gary, Memorandum, 2/2/1942, NACP_00001898.

(1) it must be intrinsically low enough to be economical for use under the prevailing circumstances and (2) however high or low it may be it must be established to our satisfaction that it does not contain any abnormal profit element nor any improper amortization factor.[68]

Wilson continued that some prices for some DSC contracts would be negotiated, such as the Richfield contract, while others put on a cost-plus-fix-fee basis. The later would involve refiners operating Defense Plant Corporation owned facilities. Sinclair from Richfield and Mulligan from the DSC signed the contract on February 3, 1942. Two days later, Davies wrote to the Secretary of the Interior and recommended that the Secretary approve the contract.[69] As in the Shell contract, Section IV in the Richfield contract discussed the price the government would pay for 100-octane. Section V discussed the price escalation language. Section VII discussed the $2.1 million advance, and Section XII contained language on taxes.[70]

On June 24, 1942, Richfield wrote Davies and proposed additional expansion at the Watson plant that would increase capacity to 8,750 barrels per day of 100-octane gasoline with three cubic centimeters of tetraethyl lead or 9,750 barrels of gasoline with four cubic centimeters of tetraethyl lead. The expansion would cost $12.7 million and would be treated as a "revision" to the February 3 contract.[71] The installation of a "full size fluid catalytic cracker" would make the expansion possible. The proposed cost of 13.21 cents per gallon would be the least expensive 100-octane on the west coast, where a shortage existed.[72] The shortage of 100-octane aviation gasoline on the west coast continued through the summer of 1942.

On September 1, 1942, Parkhurst wrote Brown and told him of the "present and prospective" shortage of 100-octane aviation gasoline on the west coast and that it was his understanding that a "prospective shortage for the country" existed even when the current production facilities were completed. Richfield's June proposal was one of two from the west coast that the PAW had received. Brown agreed with Parkhurst's idea to get the proposals so

---

[68] DX131 - Wilson to Gary, 2/3/1942, NACP_00002071 and NACP_00002072.

[69] Wilson to Gary, 2/3/1942, NACP_00002071 and NACP_00002072; DX22 - Contract between Defense Supplies Corporation and Richfield Oil Corporation, 100-Octane Aviation Gasoline, 2/3/1942, NACP_00001936; and DX133 - Davies to My Dear Mr. Secretary, 2/5/1942, NACP_00001897 (also see NACP_00002073).

[70] DX22 - Contract between Defense Supplies Corporation and Richfield Oil Corporation, 100-Octane Aviation Gasoline, 2/3/1942, NACP_00001936; and Office of Petroleum Coordinator, 100-Octane Aviation Gasoline Report to the Supply Priorities and Allocations Board, NACP_00002289.

[71] DX139 - Isom to Davies, 6/24/1942, NACP_00002010.

[72] DX140 - Parkhurst to Brown, 6/25/1942, NACP_00002009.

that they could be moved forward once authorized.[73]  A draft addendum to the February 3 Richfield contract was written in early October.[74]  In late November 1942, Richfield sent a revised proposal to Parkhurst with the cost per gallon raised to 14.72 cents per gallon and then sent another proposal in early December with the price per gallon estimated at 15.27 cents per gallon.[75]

Negotiations between the government and Richfield continued into 1943, with both parties seeking to resolve the issues of price, 100-octane specifications, and depreciation.[76] Finally, on February 20, 1943, Davies of PAW wrote Jesse Jones, head of the RFC and the Secretary of Commerce, recommending approval of revised Richfield-DSC contract.  As was "usual" policy, the DSC would "advance" Richfield seventy-five percent of the cost.  The negotiated price was 13.5 cents, which Davies considered "fair and reasonable."[77]  A revised contract was also dated February 20, 1943.  Jones authorized the advance payment to Richfield a week later.[78]  Although a revised contract was in place, changes continued that led to another revision dated March 23, 1943.  That contract was not finalized until April 1943.

The delay in the contract resulted from Richfield's studies regarding the production of 100-octane aviation gasoline.  As noted in the PAW's Refining Division's Weekly Report for the week ending March 27, 1943, the contract was revised to allow for the installation of a thermofor catalytic cracker instead of a fluid catalytic cracker.  Richfield had made that determination since February 23, when the memorandum of that date was written.[79]  On March 30, 1943, Richfield sent the DSC four executed copies of the revised contract.  Three days later Ralph Davies sent

---

[73] DX143 - Parkhurst to Brown, 9/1/1942, NACP_00002624.

[74] Addendum to Defense Supplies – Richfield Contract (Watson, California, Refinery, 10/6/1942), NACP_00001932.

[75] Isom to Parkhurst, 11/25/1942, NACP_00002032; and Isom to Parkhurst, 12/4/1942, NACP_00002001.

[76] See for example, Isom to Parkhurst, 1/6/1943, NACP_00001994; Parkhurst to Brown, 1/26/1943; NACP_00001997; DX149 - Brown to Davies, 2/3/1943, NACP_00001888; Parkhurst to Isom, 2/13/1943; and Isom to Cragin, 2/15/1943, NACP_00001918.

[77] Davies to Jones, 2/20/1943, NACP_00001885

[78] DX24 - Defense Supplies – Richfield Contract (Watson Refinery – Second Contract), 2/20/1943, "Revised 2/16/1943, NACP_00002021; and Jones to Mulligan, 2/27/1943, NACP_00000674.

[79] Weekly Report Refining Division, Week Ending – March 27, 1943, Construction Division, NACP_00001240; and Werlin to Carlson, 3/29/1943, NACP_00001975.

the contract to Jesses Jones and noted that the PAW approved of Richfield's plans and that the minor changes were advantageous to the government.[80]

Union Oil Vice President, W. L. Stewart, responded to the PAW's July 21, 1941 telegram requesting production information on the 29th of the month.  Stewart told the PAW that Union manufactured 100-octane aviation gasoline by combining alkylate produced from cracking operations, "straight-run gasoline from Los Angeles Basin crude," and lead.  Union also manufactured 70-octane, 73-octane, and 91-octane gasoline.  Union had started manufacturing 100-octane gasoline in July 1940.[81]  Stewart followed up a week later when he furnished the PAW information on the production and supply of isopentane in California.  When reporting on his own company, Steward said that Union did not currently produce isopentane, but when an existing plant expansion project was completed in the spring of 1942, Union would produce about 220 barrels per day.  In September 1941, Union provided a more detailed response to the PAW's District No. Five Refining Committee.  The company's Wilmington Refinery could run up to 60,000 barrels of crude oil a day and manufacture 680 barrels of 100-octane aviation gasoline daily.[82]  In fact, in 1940 Union produced 53,635 barrels of 100-octane aviation gasoline and in 1941, 160,244 barrels.[83]

In mid-November 1941, Union submitted a proposal to the PAW "to build equipment, manufacture and sell" toluene and 100-octane aviation gasoline.  Included in the proposal was a provision to alter the company's alkylate plant to increase output from 700 barrels to 1,250 barrels per day.  Altogether, Union proposed selling to the government 3,840,000 barrels of 100-octane gasoline priced at 16 cents per gallon.  Union anticipated that the total cost of delivered toluene and 100-octane gasoline, excluding "State and Federal sales or excise taxes" would be $34,240,000.  The company asked for advanced payment of thirty-five percent within the first

---

[80] Ragland to Hill, 3/30/1943, NACP_00001974; Davies to Jones, 4/2/1943, NACP_00000671; and Jones to Davies, 4/14/1943, NACP_00000670.  Also see, DX26 - Contract between Defense Supplies Corporation and Richfield Oil Corporation (Second Contract) 100-Octane Aviation Gasoline, 2/20/1943, Revised 3/23/1943, NACP_00002020; and DX152 - PAW, Reasonableness of Price Quoted, 5/24/1943, NACP_00002083.

[81] Stewart, Jr. to Gary, 7/29/1941, NACP_00001306.  Stewart became the chairman of the refining committee in district five, Gary to Stewart, 11/19/1941, NACP_00003468; DX121 - Gary to Fraser, 11/4/1941, NACP_00001313.  Also see, Stewart to PAW, 12/31/1941, NACP_00003496; and Hopper to Frame, 8/28/1944, NACP_00001402.

[82] Stewart to Gary, 8/5/1941, NACP_00003231; and B. Hopper to Subcommittee on Aviation Gasoline Refining Committee for District No. 5, 9/26/1941, NACP_00003474.  In October, Union's isopentane project received a priority ratings of A-1-a, Gary to Davies, 10/13/1941, NACP_00001066.  For more on the company's plant expansion in 1941 see, *Union Oil Company of California, Annual Report, 1941*, NACP_00001065.

[83] Hopper to Frame, 8/28/1944, NACP_00001402.

year of signing the contract.  The government had until January 1, 1942, to accept the offer.[84]
The government, however, considered the cost too high, and Union agreed to submit new
proposals with and without the production of toluene.[85]

Union submitted another proposal to the PAW on December 16, 1941 to increase its
production of 100-octane aviation gasoline from 690 to 4,000 barrels per day.  Such an increase
would be possible by installation of a black oil cracking facility and butane isomerization
equipment in addition to expanding alkylation facilities.  Wilson of the PAW met with Union
personnel and later recommended approval of the project.  The PAW informed Union that it
generally agreed with the approval but needed to examine construction material requirements
before signing off on the proposal.[86]  Also, during this time, the War Department's Ordnance
office told the PAW that the price Union had proposed for toluene was too high when compared
to other producers for the office to recommend approval.[87]

Union submitted yet another proposal to the PAW on January 20, 1942 to raise 100-
octane production to 5,500 barrels per day.  As before, Union said it would provide the necessary
labor and material for plant expansion.  The estimated cost of the proposal was $11,712,070 with
an estimated completion date of August 1943.  Union said that 100-octane production would be
700 barrels per days through May of 1942 and then, increase to 850 through August 1943 at
which time production would be 5,500 barrels per day.  And, as before, Union proposed a price
of 16 cents per gallon, not including state and federal taxes.  The company also asked for an
advanced payment of $8.9 million, which was seventy-five percent of the estimated cost of
construction.  March 1, 1942 was the deadline for the government to accept the offer, which
superseded all previous proposals.[88]  The PAW rejected the proposal because "it diverged" from
the DSC's policy on 100-octane contracts.  Union told the PAW that the company would
resubmit a proposal.[89]  In subsequent discussions with PAW officials, Reese Taylor—President
of Union—said the estimated cost of production was 13.9 cents per gallon.  The PAW told

---

[84] DX122 - Taylor to Gary, 11/16/1941, NACP_00003232.  Also see Wilson, Memorandum of
Conference, 11/17/1941, NACP_00003682.  Union provided the government with a detailed proposal in
early December, Proposed Units for Production of 100 Octane Gasoline and Toluene *At Union Oil
Company's Los Angeles Refinery*, 12/3/1941, NACP_000003265.

[85] Wilson to Gary, 12/11/1941, NACP_00003227.  Also see, Wilson to Gary, 12/15/1941,
NACP_00003265.

[86] DX124 - Geis to Gary, 12/16/1941, NACP_00003220-3221; Wilson to Gary, 12/17/1941,
NACP_00003224; and Gary to Stewart, 12/18/1941, NACP_00003223.

[87] Wilson to Gary, 12/19/1941, NACP_00003603; and Wilson to Gary, 12/22/1941, NACP_00003673.

[88] Stewart to Ickes, 1/20/1942, NACP_00003266.  Also see, Gibson to Gary 1/24/1942, NACP_00003671

[89] Gary to Stewart, 1/29/1942, NACP_00003216

Taylor that for several parts of the proposal 100 percent of the cost was being charged against 100-octane production although the company would benefit from those facilities in automobile gasoline production. Taylor responded that Union could move forward on the contract price of 14.5 cents per gallon, which Wilson said he would have to study before committing to such a price.[90] Several days later, after Wilson had again met with Taylor, Wilson told Gary that he had informed Taylor that anything higher than 13.75 cents per gallon needed "complete and detailed substantiation." Taylor scoffed at that suggestion and said there was no point in having additional discussions. Wilson told Taylor that Union needed a contract for its "own protection." Taylor said he would prepare a contract with the company's best price and submit it to the PAW where it could "be accepted or rejected." In fact, Taylor submitted a contract the next day that he had signed. Under the proposed contract, Union would be paid 14.2 cents for 100-octane gasoline with three centimeters of tetraethyl lead.[91]

The PAW passed Union's proposed contract on to the DSC for consideration, but the PAW also let Taylor know that in its current form the contract was unacceptable. Although pleased with the reduction in price to 14.2 cents per gallon, Gary told Taylor that the PAW was examining the information provided to see if the price was acceptable. Of greater concern to the PAW than price was that the escalation clause Union included in the proposed contract, in which Union had tied more than fifty percent to crude oil prices (instead of fifty percent to crude oil prices and fifty percent to commodity prices), was unacceptable. The second major issue was that the price might "include an allowance of more than ten percent for depreciation, amortization, and obsolescence." The PAW also asked if the completion date of July 1, 1943, could be moved up.[92] Taylor wrote a displeased letter to PAW and stated that the 14.2 cent price was firm, that he did not understand the concern about Union's proposed allocation between crude oil prices and commodity prices in the escalation clause, nor did he understand PAW's concern about the ten percent allowance.[93] The standoff between the PAW and Union continued through February and into March of 1942.

On February 20, Brown wrote Taylor and told him that the government would not move on the escalation clause or on the allowance clause that had the support of the Army and Navy, and had already been written into eleven DSC 100-octane aviation gasoline contracts.[94] Taylor replied a few days later that Union would continue with expansion of the 100-octane facilities

[90] Wilson to Gary, 1/31/1942, NACP_00003217.

[91] DX132 - Wilson to Gary, 2/4/1942, NACP_00003666; DX133 - Taylor to Ickes, 2/5/1942, NACP_00003256; and Defense Supply Contract, 2/4/1942, NACP_00003257.

[92] Brown to Taylor, 2/10/1942, NACP_00003208.

[93] Taylor to Gary, attention Brown, 2/13/1942, NACP_00003662.

[94] Brown to Taylor, 2/20/1942, NACP_00003207.

even without a DSC contract for 100-octane aviation gasoline.  Brown waited for more than a month to respond to Taylor, and finally wrote to him on March 31, 1942.  Brown's letter was more informational in tone, but hinted that Union might miss out on the 100-octane program. Brown noted that DSC had contracted for almost 160,000 barrels a day of 100-octane gasoline with three cubic centimeters of tetraethyl lead.  The total current and future capacity of refiners without DSC contracts was 33,681 barrels a day, most of which was produced by Shell, Union, Standard of California, and Gulf.  However, he anticipated that Shell and Gulf soon would sign DSC contracts.  All companies, either with or without a DSC contract, would have the ultimate capacity to produce 275,000 barrels a day of 100-octane aviation gasoline.  However, changes in specification might ultimately reduce daily production to 200,000 barrels.  Brown continued,

> Defense Supplies Corporation is working on a program which will involve it becoming sole buying agent for all 100 octane aviation gasolines before many more months have passed, and since a very large proportion of current purchases are being made on a spot basis from manufacturers who have already signed contracts granting Defense Supplies the option to buy such gasolines at the contract price, it is really quite important that we clean up the contract situation as soon as possible.[95]

The policy of the DSC regarding the purchase of 100-octane aviation gasoline was that the provisions of the three-year contracts did not begin until facility expansion was completed.

> The principal term of each of these contracts commences on the date when the expanded facilities for producing 100 octane aviation gasoline which are being installed by the refiner come into full production, and commencing on that date and continuing for three years, or substantially three years thereafter, Defense Supplies is obligated to buy and refiner is obligated to sell all or substantially all of his production from his present facilities as well as from his new facilities.[96]

Yet, the standoff between the PAW, the DSC, and Union continued.  In late May 1942, the PAW reported to the Army Air Force on the status of the 100-octane program and noted that a contract had not been reached with Union.  One point of contention was price.  Union wanted to sell 100-octane with four cubic centimeters of tetraethyl lead for 13.95 cents per gallon, whereas the government would not go higher than 13.65 cents.[97]  Several weeks later, Brown wrote Stewart and mentioned Union's letter of February 23 and his letter of March 31.  Brown

---

[95] Brown to Taylor, 3/31/1942, NACP_00003206.

[96] DX134 - Brown, Memorandum, 3/6/1942, NACP_00000826.

[97] Parkhurst to Kessler, 5/28/1942, NACP_00003593.  Stewart wrote the PAW on 7/6/1942, and informed the PAW that the figure of 13.95 cents per gallon was incorrect.  The lowest that Union had ever offered for any 100-octane aviation gasoline was 14.2 cents per gallon, Stewart to R. Cragin, 7/6/1942, NACP_00001486.

wrote that the DSC had negotiated and signed contracts with nearly every petroleum company producing or planning to produce 100-octane aviation gasoline.  All of those contracts had the standard cost escalation and ten percent depreciation, amortization, and obsolescence clauses that Union had long opposed.  Brown hoped that Union could now agree to them.  Regarding the price issue, Brown noted that the Army and Navy specification had changed so that 100-octane aviation gasoline would contain four instead of three centimeters of tetraethyl lead and needed to "[meet] 'rich mixture' specifications."  Brown hoped that this change would lead to fruitful negotiations between Union and the government.[98]

In early August 1942, without a contract in place, the PAW again told Union that the government would pay 13.9 cents for 100-octane with three cubic centimeters of lead and 13.65 cents for fuel with four cubic centimeters of lead, provided cost data and other information had not dramatically changed since February when Union last submitted cost data.  Brown also reiterated to Stewart that neither the DSC nor PAW would require Union to sign a DSC contract if the company's executive committee did not want to sign such a contract.  However, if the company desired a contract, cost data would be required.[99]  In an August 19 letter, Stewart informed Brown that the Union Oil Company Executive Committee decided not to sign a DSC contract, and instead opted to sell directly to the Army or Navy.[100]

[98] Brown to Stewart, 6/17/1942, NACP_00003204.

[99] Brown to Stewart, 8/3/1942, NACP_00001770.  Also see Brown to Stewart, 8/3/1942, NACP_00003202.

[100] DX141 - Stewart to Brown, 8/19/1942, NACP_00003201.

**Excerpt from DX141:**

Dear Mr. Brown:

Thank you very much for your letter of August 3rd with which you sent copies of contract Form 3-A and forms for presentation of cost figures. I appreciate your assistance regarding the contract covering the sale of our production of 100 octane aviation gasoline.

Our Executive Committee after further consideration has reached the conclusion that it does not wish to have a contract with the Defense Supplies Corporation for the sale of this gasoline. Instead, we prefer to negotiate for the sale of this material directly with the Army and the Navy.

Ten days later, Brown responded. Brown told Stewart "that Defense Supplies Corporation will buy all 100 octane aviation gasoline after about January 1, 1943." Only Union and Standard of California had not signed DSC contracts. Brown continued that the DSC would not require Union, and presumably Standard of California, to sign long-term contracts, however, the DSC did "insist that its purchases be made at prices approved by this Office on the basis of cost data." Brown reiterated that the government would pay 13.55 cents per gallon for 100-octane with four cubic centimeters of lead asked for "assurance" that 13.55 cents per gallon would "be satisfactory" when the facilities started operation. If that price was unacceptable, he asked Stewart for cost data to justify a different price.[101] Toward the end of September, Stewart informed Brown that Union could charge 13.65 cents per gallon until the new facilities went on line and 13.55 cents after the new facilities became operational. The PAW agreed to that proposal and so informed the DSC, the Army, and the Navy.[102] Through the fall of 1942, Union continued to sell 100-octane aviation gasoline to the Army and the Navy for 13.65 cents per gallon.[103]

---

[101] Brown to Stewart, 8/29/1942, NACP_00001489. On September 4, 1942, Brown wrote Stewart to inform him that the PAW had recently received price data from Standard of California leaving Union as the only company to either not have signed a DSC contract or to not have submitted price data, Brown to Stewart, 9/8/1942, NACP_00003199.

[102] Stewart to Brown, 9/17/1942, NACP_00001773; and Brown to Stewart, 9/22/1942, NACP_00001491. Also see, Parkhurst to Cragin, 9/23/1942, NACP_00003196; and Parkhurst to Hill, 9/24/1942, NACP_00003651.

[103] Cragin to Commanding General, Materiel Command, 11/3/1942, NACP_00003519.

Although the PAW, DSC, and Union had reached agreement on price, the problem of selling directly to the Army and Navy remained, especially in light of the DSC's desire to take over all 100-octane purchases on January 1, 1943.  Given Union's objection to a three-year contract, the PAW proposed a six-month DSC contract beginning January 1, 1943 that "would correspond in general to War and Navy Department practice" and sent copies of a draft contract.[104]  Union agreed in principle to the six-month contract but had several questions including what would happen if the DSC did not purchase all of the 100-octane the company produced, language regarding payment by the buyer, concerns when aviation gasoline specifications changed, and questions regarding price escalation.  Union did tell PAW that the company thought the new facilities, originally scheduled for completion in July, would be finished by mid-April 1943.  Parkhurst responded to Union by telegram on December 28 and addressed most of Union's concerns, although he said the escalation clause could not be altered.[105]

The parties continued to negotiate into the new year.  Union submitted a draft contract that the PAW objected to for three reasons.  First, the PAW refused to write a reimbursement plan into the Union contract since the company's production would fall under the Aviation Gasoline Reimbursement Plan approved July 1942.  Second, the PAW rejected the company's proposed escalation clause and said that it would have to be the same as the clause for the rest of the industry.  Third, contract language had to be included that addressed depreciation, amortization, and obsolescence.[106]  In a January 25 letter from Brown of the PAW to Hill of DSC, Brown said that the proposed six-month Union contract was "essentially" the same as the three-year DSC contracts except for four provisions.

1.      The six months' duration;

2.      The absence of a quantity requirement;

3       The omission of the abnormal conditions clause (Section V(c);

4.      The omission of financing provisions.[107]

The parties finally came to agreement on a six-month contract in mid-January that was backdated to December 31, 1942.  The contract noted that the facilities would be completed on

---

[104] Parkhurst to Stewart, 11/23/1942, NACP_00003185.

[105] Stewart to Parkhurst, 12/22/1942, NACP_00003184; and Parkhurst to Stewart, 12/28/1942, NACP_00003183.

[106] Parkhurst to Stewart, 1/6/1943, NACP_00003180.  Also see, Hill to Stewart, circa. December 1942, NACP_00003181.

[107] Brown to Hill, 1/25/1943, NACP_00003174.

April 15.  Prices were in line with recent negotiations.  The government had the right to extend the contract once for six months.  Section nine contained the contracts tax clause that was similar to the tax clause in three-year DSC contracts.[108]

Only a few months passed after Union signed the six-month contract before company representatives and the PAW began to discuss plant construction and a new three-year contract. Following discussions that extended over four days, the PAW recommended to the War Production Board that priority orders be issued for the necessary material for Union to expand 100-octane production by 6,300 barrels per day at a cost of $9,730,000.[109]  Through the summer of 1943, Union and the PAW negotiated the provisions of the three-year contract.  As before cost was at the forefront of the negotiations.  On August 2, Parkhurst wrote to Stoner of the DSC and enclosed a draft contract dated July 29.  Parkhurst stated that the contract was "satisfactory" to Union and was "substantially of the normal form."[110]  From August into October, Union, the PAW, and the DSC discussed modifications to the proposed contract that largely dealt with recent changes in 100-octane aviation gasoline specifications.  In late September, the PAW forwarded to the DSC the Union contract and recommended that the DSC sign the contract, which it did in late-October 1943.  The contract, revised on July 29, was backdated to May 1, 1943.  This new contract replaced the six-month contract.[111]

Section II of the contract addressed sales and storage of 100-octane gasoline.  Section IV discussed the price and payment for 100-octane gasoline and spelled out the different prices Union would receive based on the completion of plant expansion projects.  Section V discussed the price escalation language, and Section XII contained language on taxes.[112]

---

[108] DX21 - Contract between Defense Supplies Corporation and Union Oil Company (Wilmington Refinery), 100 Octane Aviation Gasoline, 12/31/1942, revised 1/14/1943, NACP_00003255.

[109] Parkhurst to B. Hopper, 4/27/1943, NACP_00003325; and Hopper to Parkhurst, 5/3/1943, NACP_0003324.

[110] Parkhurst to Stoner, 8/2/1943, NACP_00003310.  For documents discussing the negotiations see, for example, Parkhurst to Hopper 7/7/1943, NACP_00003315; Parkhurst to Hopper 7/13/1943, NACP_00003314; and Parkhurst to Hopper 7/22/1943, NACP_00003313.

[111] Mulligan to Stewart, 8/16/1943, NACP_00003305; Parkhurst to Hopper, 9/10/1943, NACP_00003306; Stewart to Mulligan, 9/10/1943, NACP_0002524; Stewart to Parkhurst, 9/13/1943, NACP_00003296; DX156 - Parkhurst, Memorandum of Recommendation, 9/13/1943, NACP_00000711; Parkhurst to Hill, 9/29/1943, NACP_00003293; R. Werlin to R. Carlson, 9/29/1943, NACP_00002543; Hill to Stewart, 10/25/1943, NACP_00003288; and Contract between Defense Supplies Corporation and Union Oil Company of California (Wilmington Refinery) (Second Contract), 100 Octane Aviation Gasoline, 5/1/1943, NACP_00003334.

[112] Contract between Defense Supplies Corporation and Union Oil Company of California (Wilmington Refinery) (Second Contract), 100 Octane Aviation Gasoline, 5/1/1943, NACP_00003334.

The Texas Company also undertook research and development work in the late 1930s. In 1938, the Texaco Development Corporation signed an agreement with Ruhr Chemie of Germany for patents and information needed for hydrogenation. Reportedly, The Texas Company and Texaco Development Corporation "[had] been actively interested for many years in the process for the production of synthetic liquid hydrocarbons by the hydrogenation of carbon monoxide." Plans were under way to build a ten barrel a day pilot plant at or near the company's refinery in Wilmington, CA.[113] Texas first produced 100-octane at its Los Angeles refinery in April 1941.[114]

On October 3, 1941, A. Statuck, of The Texas Company, sent D. Day, of the PAW's District Five Refining Committee, copies of the aviation gasoline questionnaire. Statuck reported that at its Los Angeles refinery The Texas Company currently was producing 400 barrels a day of 100-octane aviation gasoline with three cubic centimeters of tetraethyl lead. The company was also manufacturing ninety-four barrels per day of 91-octane aviation gasoline with lead. Statuck estimated that during the fourth quarter of 1941, the refinery would produce 550 barrels a day of aviation alkylate of which 172 barrels went into production of aviation gasoline and the remainder went to storage.[115] As of August 1, 1941, at its California refineries, the Texas Company was producing 1,070 barrels a day of 100-octane aviation gasoline and 450 barrels per day of blending agents. By late October, construction was underway to increase production at Wilmington by 238 barrels per day of 100-octane aviation gasoline. In late November estimated production at Wilmington of 100-octane gasoline was 1,280 barrels per day. As did the presidents of the other plaintiff companies in the present litigation, the President of the Texas Company received the PAW's November 4, 1941 letter regarding priorities for expansion of 100-octane facilities.[116]

Discussions between the PAW and The Texas Company regarding the company's 100-octane proposal started in early December. The talks included the company's refineries in Los Angeles (Wilmington, CA); Port Arthur, TX; and Lockport, IL. In early December, the Texas Company proposed a price of 15 cents per gallon for 100-octane aviation gasoline, which the PAW considered too high. Texas also wanted $9 million upfront that would be credited against deliveries, Necessity Certificates that would allow accelerated depreciation materials, and

---

[113] The Texas Company and the Texaco Development Corporation, Hycosynthesis, Ten Barrel Per Day Pilot Plant, n.d., NACP_00002829.

[114] Halpern to Parkhurst, 8/18/1944 NACP_00001406.

[115] Statuck to Day, 10/3/1941, NACP_00003471 and NACP_00003472.

[116] DX120 - Wilson, Memorandum for the Files, 10/6/1941, NACP_00003485; Gary to Davies, 10/30/1941, NACP_00003580; 100 Octane Gasoline, 11/28/1941, NACP_00001796 (according to this document Texas did not manufacture any 100-octane gasoline at its Fillmore, CA refinery); and DX121 - Gary to Fraser, 11/4/1941, NACP_00001313.

equipment needed for plant expansion.  However, at a meeting on December 21, 1941, the company proposed a price of 13.5 cents at Wilmington for 100-octane with thee cubic centimeters of tetraethyl lead.  PAW officials considered that price acceptable.[117]

The Texas Company provided the PAW with another cost estimate for 100-octane aviation gasoline on January 6, 1942.  The company did not include any interest charges, money for unexpected costs, allowances for additional production (if production of motor gasoline decreased), or language addressing depreciation over five years (although a DSC contract would be for three years).  The letter's author did express concern about the supply of tetraethyl lead, specifically, that the company's use of tetraethyl leads for aviation gasoline production did not impact its use of lead in the production of "regular commercial gasolines."  Estimated cost per gallon for the Wilmington Refinery was 12.75 cents per gallon.[118]

On January 7, 1942, Texas proposed a $16,695,000 expansion of the Wilmington Refinery to increase production of 100-octane gasoline from 1,800 barrels to 8,513 barrels per day.  Texas would sell the 100-octane for 12.9 cents per gallon if the government also purchased "the byproduct 91 octane aviation gasoline."  If not, the price would increase to 13.1 cents per gallon.  The PAW recommended approval of the proposal.[119]  However, on January 10, Texas raised questions about the contracts involving depreciation, prepayments, and other details.[120]  Three days later, Texas submitted another estimate of costs for 100-octane that was more detailed than the company's proposal of January 6.  The new proposal included cost estimates for depreciation, contingencies, interest on investment, and profit.  The estimated cost per gallon for 100-octane from Wilmington had increased to 13.25 cents per gallon.[121]

Texas, however, dropped expansion of the Wilmington Refinery from the proposal.  A January 16, 1942 PAW document noted that Texas did not propose expansion at Wilmington and that the refinery had been in operation for six months.  Texas considered the plant "a National Defense venture."  The proposed contract called for the DSC to purchase 1,170 barrels of 100-octane aviation gasoline manufactured at Wilmington for 13.25 cents per gallon.  Those terms were in the DSC-Texas contract dated the next day.  In paragraph I of the contract, the Wilmington Refinery was called an "emergency plant facilities."  Also noted in section one was

---

[117] Brown to Gary, 12/23/1941, NACP_00001655.  Additional discussion of Necessity Certificates is in section IV of this report.

[118] DX126 - Halpern to Gary, 1/6/1942, NACP_00001664.

[119] Davies to Jones, 1/7/1942, NACP_00001634; and Parkhurst to Deputy Administrator, 1/7/1942, NACP_00001150.

[120] Wilson to Gary, 1/10/1942, NACP_00001480.

[121] DX129 - Halpern to Gary, 1/13/1942, NACP_00001660.

that the DSC would begin to purchase 100-octane aviation gasoline on January 1, 1945. Paragraph II of the contract gave the DSC the option of buying 100-octane aviation gasoline from Texas from the date of the contracts execution through December 31, 1942.  Section IX contained the tax language common to DSC contracts.[122]  A few days after the parties signed the contract an attorney discussed plant expansion with the PAW, and they agreed that the PAW would help Texas acquire Necessity Certificates for plant expansion in Port Arthur and Lockport.[123]  It was not long before the demands of war led Texas to reconsider plant expansion at Wilmington and ask for Necessity Certificates to accelerate the depreciation of the expansion.

In mid-September 1942, Mike Halpern of Texas and other company officials approached the PAW about expanding company facilities in Los Angeles, Tulsa, and Lockport.  The PAW was most interested in expansion in Los Angeles.  In late November 1942, Texas submitted to the PAW a draft contract to expand 100-octane production at Wilmington.  At about this time, Parkhurst of the PAW told the director of refining in District Five that an agreement had been reached with Texas for installation of a catalytic cracker and alkylation facility at Wilmington.[124]

In an early December letter, Texas explained its proposal to the PAW.  At that time, Wilmington could manufacture 656,465 barrels per year of 100-octane aviation gasoline.  The company proposed expansion to increase that production to 2,614,114 barrels per year. Production volumes of other grades of aviation gasoline (73-octane, 80-octane, 88-octane, and 91-octane) would not change.  It was also noted that the refinery was manufacturing 630 more barrels per day than called for in the January 17, 1942 contract for a total of 1,800.  Under the proposal barrels per day would increase by 5,363.  Later in December, Halpern told Parkhurst that Texas had already spent more than $1.2 million on the Wilmington Refinery.  If approved, the planned expansion would increase the total cost of the refinery to $18,508,000.[125]

Ralph Davies favored the expansion of the Wilmington facility calling it "necessary and advantageous" and recommended that the DSC and RFC approve the project.  Davies reported

---

[122] Wilson to Gary, 1/16/1942, NACP_00001658; and DX16 - Contract between Defense Supplies Corporation and The Texas Company (Los Angeles Refinery), 100-Octane Aviation Gasoline, 1/17/1942, NACP_00001652.

[123] Van Dusen to Keeley, 1/20/1942, NACP_00001656.

[124] Parkhurst to Wilson, 9/15/1942, NACP_00001653; Parkhurst, Progress Report For Week Ending November 28, 1942, NACP_00001115; and Parkhurst to Youker, 11/27/1942, NACP_00003598.  Also see, Parkhurst to Hill, 11/28/1942, NACP_00001643; and Parkhurst to Ray, 11/30/1942, NACP_00001666.

[125] DX146 - Halpern to Cumming, 12/5/1942, NACP_00002502; and Halpern to Parkhurst, 12/22/1942, NACP_00001640.  The increase in production to 1,800 barrels per day resulted from increasing the amount of tetraethyl lead to 4 cubic centimeters per gallon and the installation of new equipment, Parkhurst, Merlin, and Ridgway, Reasonableness of Price Quoted, NACP_00001615.

that the price per gallon for 100-octane gasoline under the contract would be 12.9 cents per gallon, and Texas had agreed that sales from existing facilities would be at 12.75 cents per gallon—the lowest price on the west coast.  Texas estimated that it would take one year to complete the expansion, which the PAW considered optimistic.[126]  The government and Texas signed the contract in mid-February 1943, although it was backdated to February 8.[127]  The contract replaced the contract of January 1942.  Section III contained language that gave the DSC the option to purchase gas prior to the completion of the refinery's expansion.  As did the other DSC contracts, the Texas contract contained a price escalation clause (section V).  In section VII, the DSC agreed to loan Texas $12,521,000 to finance the expansion at a rate of two percent.  The DSC would make the loan in monthly installments as work progressed.  Section XII contained the tax provisions.[128]

At least one refinery believed absolute government control of the industry should occur.  On October 16, 1942, Union president Reese H. Taylor wrote a letter to Mr. Davies.[129] (DX145).

---

[126] Davies to Jones, 1/7/1943, NACP_00000705; and Parkhurst, Memorandum of Recommendation, NACP_00000706.

[127] Parkhurst to Halpren, 2/13/1943, NACP_00001614; Halpren to Hill, 2/16/1943, NACP_00001613; and Contract between Defense Supplies Corporation and The Texas Company (Los Angeles Refinery – Second Contract), 100 Octane Aviation Gasoline, 2/28/1943, NACP_00001572.

[128] DX23 - Contract between Defense Supplies Corporation and The Texas Company (Los Angeles Refinery – Second Contract), 100 Octane Aviation Gasoline, 2/8/1943, NACP_00001572.

[129] DX145 – Taylor to Davies, 10/16/1942

**Excerpt from DX145:**

For the oil industry to make its greatest contribution to the successful prosecution of the war, clarification of responsibility within the Industry, under clearly defined authority of the Petroleum Coordinator for War, must be established.

1.  The Petroleum Coordinator for War should have complete authority to direct the operations of the Industry.  A proposed Order, outlining this authority, is attached.

* * *

It is my opinion that such a scheme of operation would make possible the proper and equitable use of facilities and products, and thus eliminate much of the existing confusion.

This is, of course, a very general and brief outline.  This should not be construed as a criticism of the splendid cooperative spirit which exists between the oil industry and the Petroleum Coordinator for War.  However, I feel that, as the war progresses, a tightening of the reins, and an upgrading of organization, is a necessity.

Respectfully submitted,

*[signature]*

As the letter states, Union actually drafted an executive order to enforce this plan.  See DX 145 at 3-4.  The Government did not follow this suggestion.

**VII. Opinion 4: During World War II the War Production Board (WPB) oversaw the allocation of materials and construction nationwide including at the Southern California refineries of the Shell, Union, Texas, and Richfield Oil Companies during World War II. The WPB was an allocation agency that oversaw the distribution of raw materials, semi-finished goods, and finished products during World War II.**

On November 4, 1941, the PAW sent a letter to the presidents of twenty-three petroleum companies.[130]  In the letter, Wright Gary, PAW's Director of Refining, wrote that a recent survey of PAW's Petroleum Industry Committee revealed "that a substantial increase in the production of 100-octane aviation gasoline could be realized through the utilization of potential raw materials in your refinery."  Gary continued,

> It is essential to the defense program of the Army and Navy that the production of 100-octane gasoline be greatly increased, and therefore we strongly urge that you give careful consideration to the possibility of constructing a plant for its manufacture.  We would be pleased to receive from you a proposal setting forth a plan for the manufacture of 100-octane gasoline, and attach hereto a suggested outline for such a proposal.  Provided that your scheme meets with our approval from the standpoint of the most efficient use of construction materials and the general feasibility of the operation, we will recommend that the War Department invite you to negotiate with the proper government agencies.[131]

Gary promised that through the Office of Production Management (OPM)—the War Production Board's predecessor—and the Army Navy Munitions Board (ANMB) that companies who agreed to build 100-octane facilities would receive a high priority rating for materials.[132]  In January 1942, President Roosevelt created the WPB.  The WPB was the primary government agency during World War II that oversaw the allocation of raw, semi-finished, and finished material and goods.  The WPB's primary goal was to ensure that business and industry engaged in war production received the necessary materials.  To the degree that the WPB impacted production or "waste disposal" at refineries, it did so tangentially.  If the WPB thought adequate facilities existed—either for production or disposal of waste—the board denied requests for steel or other scarce material.

In February 1998, Lincoln Gordon testified in the allocation phase of the CERCLA case involving Shell and the other defendant companies, and the United States.  Gordon worked for

---

[130] Listings  of Refineries operating in California (and in other states) can be found in *The Oil and Gas Journal* in 1938, 1943 and 1945, DX52-54.

[131] DX121- Gary to Fraser, 11/4/1941, NACP_00001313.  The presidents of Texas, Richfield, and Union also received this letter.

[132] DX121- Gary to Fraser, 11/4/1941, NACP_00001313.

the WPB during World War II and eventually became deputy director of the WPB's Program Bureau.  During his cross examination, the following exchange took place.

Q.      If the issue of whether or not a company would be permitted to build a regeneration facility for sulfuric acid, it would require that the War Production Board agree; is that correct?

A.      That is correct.

Q.      What I am asking is, what would be the factors that the War Production Board would use in making that decision?

A.      Oh, the factors . . . I thought I explained them before.

The Court: You did.

The Witness: -- on direct –

The Court: If that was in competition for materials in the rubber, for example, industry or in the Manhattan Project or in the Liberty Ship, victory ship program, that would be balanced, would it not?

The Witness: That is correct.

The Court: Self-evident.

Q.      My question is, in other words you would measure against wartime needs; is that right?

A.      Against other competing wartime needs of high urgency, that's right.

Q.      And if that particular regeneration facility had no direct wartime benefit, what, in your view, would be the result and the ruling on –

A.      If it had no wartime benefit, direct or indirect, it would be turned down.[133]

---

[133] U.S. v. Shell Oil Company, et al, United States District Court, Central District of California, CV 91-0589-RJK, Reporter's Transcript of Proceedings, 2/23/1998, vol. 5, pp. 651-53 and 694-95, CERCLA000343.

As Gordon explained in his testimony, the WPB's criteria in approving or disapproving a project depended on the project's wartime benefit.  In the case of the Texas Company's application for a 52-ton regeneration plant, the government officials thought existing facilities were adequate to provide the necessary sulfuric acid need for alkylation.  The WPB officials rejected the proposal because they considered it unnecessary and thus a waste of crucial materials.  This attitude was consistent with the government's policy during the war to conserve material for the war effort.

In late 1942 and early 1943, when Texas was negotiating the terms of its 100-octane contract with the DSC, it included in the project the construction of "a Sludge Acid Conversion Unit."[134]  On March 17, 1943, in a PAW interoffice memorandum J. Griswold explained to D. Wilson the decision to delete the 52-ton sludge re-concentration unit from the Texas contract.  According to Griswold, the PAW considered 52 tons of sulfuric acid "excessive for their alkylation plant."  Griswold further explained that 40 tons would be for the alkylation plant.  Mr. Kuhn of the Texas Company discussed the project with the WPB.  After the discussion Kuhn told Griswold that the unit had been deleted from the project.  If the WPB was "unable to provide this capacity from other sources in the California area, a new priority request will be issued."[135]

The following week, George Parkhurst of the PAW wrote Mr. Halpern of Texas and asked that once Texas had compiled and submitted information on the effect of the deletion of the unit that the parties modify the DSC contract.  Parkhurst followed with a similar letter in mid-April noting that "deletion of the sulphuric [sic] acid facilities" from Texas' request for material for the 100-octane expansion and again asking for additional information.  Halpern wrote back to Parkhurst on May 19, 1943, noting that "certain sulphuric [sic] acid facilities had been deleted . . . at the request of the Chemicals Branch of the War Production Board, on the grounds that existing facilities would be adequate to take care of our acid requirements."  After

---

[134] DX146 - M. Halpern to H. Cummings, 12/5/1942, NACP_00002502, p. 18.  Texas signed its DSC contract (DX23) on 2/8/1943, J. Brigham, An Expert Witness Report Regarding 100-Octane Aviation Gasoline and the Southern California Refineries Owned by The Shell Oil Company, Atlantic Richfield Company, Texaco Inc., and Union Oil Company of California During World War II, Shell Oil Company, Atlantic Richfield Company, Texaco Inc., and Union Oil Company of California v. The United States of America (No. 1:06-CV-00141-SGB), pp. 33-36.

[135] J. Griswold to D. Wilson, 3/17/1943, NACP_00001608.  Kuhn is identified as Texas employee in a 1943 Petroleum Industry War Council Document, Technical Advisory Committee, Round Table Discussion on 100 Octane Aviation Gasoline, 8/28/1943, CERCLA0014144.

further explanation, Halpern concluded that the cancelled facility should not yet be deleted from the contract, to which Parkhurst agreed.[136]

In the correspondences discussed above there is no mention of waste disposal, only the need for an adequate supply of sulfuric acid at the Texas refinery. The WPB's request that the unit be deleted from the 100-octane expansion was consistent with the board's overall policy of not approving projects if the WPB believed the project not critical for the war effort.

**VIII. Opinion 5: The Defense Supplies Corporation did not purchase 100-octane aviation gasoline before 1943 from the four companies in the current litigation. In 1943, after the Defense Supplies Corporation began to purchase 100-octane aviation gasoline, Shell and Richfield continued to sell 100-octane aviation gasoline to customers other than the Defense Supplies Corporation.**

As noted, in August 1940, the RFC created the Defense Supplies Corporation (DSC) with the express purpose of purchasing aviation gasoline.[137] The formation of the DSC and the idea of a three-year contract were directly tied to expansion of the 100-octane aviation gasoline capacity.

PAW and DSC officials, military leaders, and the petroleum industry all agreed that a significant increase in production of high-octane aviation gasoline and all petroleum products was necessary. Most important was the prohibition of the Army or Navy to enter into purchase contracts spanning longer than one year. As Tidwell and O'Callaghan wrote in their history of the DSC (DX161):

> Meanwhile, PAW and industry representatives were exploring the possibility of expanding productive facilities. They soon saw that an expansion of facilities to the extent desired was a risky multi-million dollar proposition with relatively poor postwar commercial possibilities. Private capital was willing to invest in the program if it could be reasonably assured of a return on its investment. But neither the Army nor Navy could make purchase commitments beyond the year in which they were operating.

---

[136] G. Parkhurst to M. Halpern, 3/23/1943, NACP_00001607; Parkhurst to Halpern 4/19/1943, NACP_00001690; DX151 - Halpern to Parkhurst, 5/19/1943, NACP_00001606; and Parkhurst to Halpern, 5/25/1943, NACP_00001602.

[137] Jones to Knox, Secretary of the Navy, 9/27/1940, NACP_00000658. Also see, Stettinius, Jr. to Jones, 8/14/1940.

Industry felt that a one-year purchase commitment was inadequate for the size of the investment required.[138]

More than a year had passed between the creation of the DSC and Wright Gray's November 4, 1941 letter to the petroleum industry reporting on the PAW's Petroleum Industry Committee survey discussed above.  Gray concluded that letter by telling the industry that the DPC could finance plant construction and that the DSC was "empowered to purchase 100-octane aviation gasoline at negotiated prices over a maximum of three years."[139]

It was also in November 1941 that the PAW, Army, Navy, and RFC agreed that the DSC—a corporation not subject to one-year budget restrictions—would procure all aviation gasoline for resale to the Army and Navy.[140]  The bombing of Pearl Harbor and American entry into the war added urgency to an already serious situation.  Yet, another year would pass before the agencies and the services came to a formal agreement on the DSC purchase plan.

Another issue of concern to the petroleum industry was the risk of monetary loss due to the high costs of producing 100-octane aviation gasoline and its components.  As discussed in the *History of the Petroleum Industry for War*:

> The manufacturers of 100-octane were operating under contract to Defense Supplies Corporation to supply finished aviation gasoline at a predetermined price, which was generally lower than that of the components which PAW was asking them to purchase. This was particularly true when freight and handling costs were taken into account as they had to be.[141]

In June 1942, Ralph Davies addressed this issue in a letter to Jesse Jones—who simultaneously served as Director of the RFC, Federal Loan Administrator, and Secretary of Commerce—and explained that increased production was possible, but significant financial loss to the petroleum industry could result.  Davies provided Jones with a draft plan that called on the

---

[138] Tidwell and O'Callaghan, *The Role of Defense Supplies Corporation in the Wartime Aviation Gasoline Program* (Washington, DC: Reconstruction Finance Corporation, 1948), p. 12.  In reviewing the expansion of aviation gasoline facilities Tidwell and O'Callaghan noted that large companies "preferred not to use the DPC mechanism" and wrote that the PAW desired to achieve "the widest possible participation by industry."  (DX161).  In discussing the involvement of small refiners Tidwell and O'Callaghan wrote, "the DPC mechanism was used when the company indicated its willingness to take part in the program," p. 14.

[139] DX121 - Gary to Fraser, 11/4/1941, NACP_00001313.

[140] DX161 - Tidwell and O'Callaghan, *The Role of Defense Supplies Corporation*, pp. 12-19; a summary of the types of products being sold from District V refineries in 1942 and thereafter can be found at DX117.

[141] Frey and Ide, *A History of the Petroleum Administration for War*, p. 202.

DSC to pay for "extraordinary costs directly, after proper certification by the manufacturers and recommendation by the Office of the Petroleum Coordinator."[142]  In July, the Army, Navy, PAW, and DSC signed a "Memorandum of Understanding" that incorporated Davies's idea that the DSC would reimburse refiners for extraordinary costs.  The July agreement became known as the Aviation Gasoline Reimbursement Plan (AGRP).[143]

It was not until December 19, 1942, that the Army, Navy, DSC, and PAW formally agreed that the War and Navy Departments would advance the DSC $100 million for the purchase of 100-octane aviation gasoline and the payment of expenses as set forth in the AGRP. The preamble of the December 19 Four-Party Agreement read:

> Whereas, it appears desirable to establish a procedure under which such supplies will be received by Defense Supplies Corporation and made available to the War Department, Navy Department, and other consumers.

What followed were fourteen procedural steps.  The fifteenth step noted that the agreement would become effective on January 1, 1943.  Exhibit A to the document was a sample "Certificate of Inspection and Receipt" of which five copies were to be prepared for each sale (as discussed in paragraph eight of the document).  And, as the authors of the DSC history wrote, the corporation's first purchase of 100-octane aviation gasoline occurred after January 1, 1943.[144]

---

[142] Davies to Jones, 6/2/1942, NACP_00000904.

[143] "Memorandum of Understanding on Plan To Reimburse Manufacturers of 91 Octane and Higher Aviation Gasoline for Loses Incurred in Following Office of Petroleum Coordinator Recommendations," 7/24/1942, NACP_00003435.  The Memorandum of Understanding was extended through the duration of the war and portions of it were extended until June 30, 1947.  See "Agreement Extending and Modifying The Aviation Gasoline Reimbursement Plan and the Four-Party Purchase Agreement," 7/1/1944, NACP_00000918; and Continuation 7/1/1946, NACP_00000914.  In their history of the DSC, Tidwell and O'Callaghan wrote that among those for which expenses could be reimbursed were the blending program, changes in plant facilities and equipment, and production with frequent specification changes, Tidwell and O'Callaghan, *The Role of Defense Supplies Corporation*, p. 70.  At about the same time as these discussions were going on, the military was still negotiating its own contracts for purchase of avgas. See DX138 – letter from R. Herndon to R. Cragin, June 9, 1942.

[144] DX20 - An agreement between the Army, Navy, DSC, and PAW, 12/19/1942, NACP_00003509.  For extension of the agreement through the end of the war see, Contract Nod-3173, DX170 - Agreement Between War Department, Navy Department, Defense Supplies Corporation, Petroleum Administration for War, NACP_00001533; Agreement Extending and Modifying The Aviation Gasoline Reimbursement Plant and the Four-Party Purchase Agreement, 7/1/1944, NACP_00003868, and Tidwell and O'Callaghan, *The Role of the Defense Supplies Corporation*, p. 33.  Also see, Aviation Petroleum Products Allocation Committee Proposed Procedure for Procurement of 87 and Higher Grades Aviation Gasoline to be Effective January 1, 1943,".

**Excerpt from DX20:**

CONTRACT NO6-3173 *[handwritten annotation]*

AGREEMENT

Between

WAR DEPARTMENT

NAVY DEPARTMENT

DEFENSE SUPPLIES CORPORATION

PETROLEUM ADMINISTRATION FOR WAR

* * *

Whereas, it appears desirable to establish a procedure under which such supplies will be received by Defense Supplies Corporation and made available to the War Department, Navy Department, and the other consumers;

NOW THEREFORE, It is agreed by the War Department, Navy Department, Petroleum Administration for War, and Defense Supplies Corporation, as follows:

1. The War Department will advance to Defense Supplies Corporation $34,000,000 and the Navy Department will advance to Defense Supplies Corporation $66,000,000 which funds are estimated to be equivalent to 50% of the cost, including extraordinary expenses, of gasoline to be delivered to those Departments during the six-month period from January 1, 1943 through June 30, 1943. Adjustments in the amount of such

* * *

15. The provisions of this memorandum become effective January 1, 1943, and shall be effective through June 30, 1943.

Executed as of December 19, 1942.

WAR DEPARTMENT                    DEFENSE SUPPLIES CORPORATION

(s) Robert P. Patterson           (s) H. A. Mulligan

Tidwell and O'Callaghan (DX161) wrote:

DSC did not actually purchase aviation gasoline until after January 1, 1943. The Army and Navy continued to make their own purchases until that date mainly because of outstanding contracts they had with industry. Thereafter they did their buying through DSC.[145]

---

[145] Tidwell and O'Callaghan, *The Role of Defense Supplies Corporation*, p. 33.

Additional documents underscore the lack of DSC sales before 1943. The Union contract was not signed until mid-January 1943, although it was back dated to December 21, 1942 (at which time it was still in fact under negotiation).[146] Given that the DSC sales had to be at a negotiated price it is unlikely that Union made any sales to the DSC before it signed the contract.

In 1944, Richfield submitted a report to the Navy's Price Adjustment Board. In the document, Richfield stated that "no sales of petroleum products were made during 1942 to the following agencies: Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, Rubber Reserve Company."[147]

A Shell document dated February 17, 1943, listed current petroleum product contracts with the government for 1942-1943. The document included eight 100-octane contracts valued at $3.38 million. At the bottom of the document, a note stated that the listed contracts did not include the DSC contract for "our entire 100 Octane production which over the year 1943 is estimated to amount to $19,600,000."[148]

An interoffice OPC memorandum, dated June 1943, discussed DSC and non-DSC sales. G. Skerritt, OPC, speculated that in January and February of 1943 "less than half" of the refiners were selling their entire 100-octane production to the DSC. Although, he also admitted that his assertion might be incorrect. In January and February 1943, Texas and Union sold 100 percent of their 100-octane gasoline to the DSC. Richfield sold 61.7 percent and 29.2 percent for January and February respectively. Shell (Wilmington and Martinez), had sold 68.5 percent and 82.3 percent in January and February respectively.[149]

---

[146] See note 70 and DX 147 – Letter from W. Stewart to G. Parkhurst, dated December 22, 1942.

[147] Richfield Oil Corporation and Subsidiary Companies, Report to the Price Adjustment Board of the United States Navy Department Covering Operations for the Year 1942, 1/1944, 9581MCD01407.17-750, at 9581MCD01407.24.

[148] Shell Oil Company, Appendix A, 2/17/1943, NACP_00001321.

[149] DX153 - Skerritt to Stone, 6/19/1943.

**Excerpt from DX153:**

> You will notice that apparently less than half of the manufacturers are selling their entire production of 100 octane aviation gasoline to Defense Supplies Corporation. It may well be that this is not a fair statement as it is possible that, due to the complexity of the 100 octane distribution by companies such as Socony-Vacuum and the Standard Oil Company of New Jersey, deliveries as reported to this Office may not be set up on a comparable basis with those reported to D.S.C. It may be desirable for you to communicate with the manufacturers whose delivery statements do not show an exact comparison with the DSC invoices to determine the reason for the differences.

## IX. Authentication of Exhibits

In putting together this testimony, I have relied on numerous documents that I have personally observed. With regard to the portions of those documents that counsel for the Government may seek to admit into evidence in this matter, I have the following observations.

**Annual Reports (DX39-50, 293)** – Historians working under my supervision obtained copies of historic annual reports from The Library of Congress and National Archives. The Library of Congress has extensive periodical holdings that include records collected produced by private industry, including annual reports and is a repository where I would expect these documents to be found. We stamped documents obtained from the National Archives (NARA) with a label stating that they came from NARA and the record group wherein they are held. Record group 253 is the Petroleum Administration for War group and is a location where I would expect this type of record to be found.

Some of these records were also obtained from documents produced in the CERCLA litigation (DX46-47). Based on the nature of that litigation, I would expect annual reports from these companies to be included therein.

The style of the reports is consistent with the format of annual reports in the World War II period and thereafter. The substance of the reports is consistent with what companies were reporting to stockholders in that timeframe based on my knowledge of the historical record. Based on my training and experience I believe these documents are what they purport to be.

These documents show NARA stamps and are from boxes and files where such documents would be located.

**Communications to and from the Government During World War II (DX118, 122, 124-129, 133, 138-139, 141, 145-147, 151).** Historians working under my direction retrieved numerous letters from various NARA locations. We stamped those documents with coding in the bottom right corner to identify that they came from a particular NARA location and the

specific box and file wherein they can be found and many of them also show a NARA stamp at the top of the document.  I have routinely conducted and overseen research in the National Archives and the coding on these documents is consistent with World War II communications to and from persons acting on behalf of the government regarding petroleum issues.  The contents of these documents are consistent with the historical record and their format and typesetting is consistent with official and business communications from the World War II period.  The condition of these documents creates no suspicion about their authenticity.  Based on my training and experience I believe these documents are what they purport to be.

**Contracts (DX16-17, 19-24, 26, 170).**  The various contracts between private and public and private entities, entered into during World War II, are consistent with the historic forms of contracts I have observed from this time period.  DX20, the Agreement between the Army, Navy, DSC, and PAW, was obtained from NARA and has both NARA and our stamping.  The record group on DX20 is 72, the records from the Navy's Bureau of Aeronautics.  The formatting and typeface of these documents is consistent with that of other contracts from the World War II period.  The condition of these documents creates no suspicion about their authenticity.  Based on my training and experience I believe these documents are what they purport to be.

**Corporate Histories (DX203, 212).**  Large corporations commonly commission histories of their work.  DX203 (*From the Rio Grande to the Arctic*) and DX212 (*A Century of Oil*) show copyright and publication information that are consistent with the information they relate and are of a style and format consistent with other corporate histories I have reviewed.  Historians routinely review corporate histories for information on the corporations discussed therein.  Historians working under my supervision obtained these documents from The Library of Congress, which is a location at which I would expect them to be found as they are twentieth century publications under copyright.  The condition of these documents creates no suspicion about their authenticity.   Based on my training and experience I believe these documents are what they purport to be.

**Documents From Other Litigation (DX5, 96-97).**  DX5 are filed findings of fact and conclusions of law from other litigation that state on their face they were filed in federal district court.  DX96 and 97 are affidavits submitted by John McColl, the son of Eli McColl in prior litigation.  I obtained these documents from filings submitted in the CERCLA matter, which is a location at which I would expect them to be found.  The condition of these documents creates no suspicion about their authenticity.  Based on my training and experience these documents are what they purport to be.

**Doolittle Letter (DX107).**  General Doolittle's October 23, 1935 letter is a document obtained from discovery in the CERCLA matter, in which matter it would likely have been relevant, based on my understanding that the development of avgas was at issue in that matter.  The typesetting, style, and formatting of the letter are consistent with other letters I have

observed from this time frame and the content of the letter is consistent with the activities General Doolittle identified in his autobiography that he was conducting at this time on behalf of Shell. The condition of this document creates no suspicion about their authenticity. Based on my training and experience I believe this document is what it purports to be.

**Government Report (DX161).** This is a document reporting on the activities of the DSC in World War II. It shows a publication date of shortly after the war. It is more than twenty years old and its condition creates no suspicion about its authenticity.

**Industry Publications (DX52-54, 67, 101-106, 108-111, 113, 116).** *American Petroleum Institute Quarterly, National Petroleum News*, *The Oil and Gas Journal*, *Oil Bulletin,* and *Petroleum World* were industry trade journals published in the 1930s and later. Historians working under my supervision obtained DX101-106, 108-111, 113, and 116 from the Library of Congress which is a repository where I would expect them to be in light of its collection of published periodical materials. DX52-54 and DX67 were obtained from other sources.

The typeface, content, and formatting of these documents is consistent with other trade publications that I have observed from this period. The condition of these documents creates no suspicion about their authenticity. Based on my training and experience I believe these documents are what they purport to be.

**Intergovernmental communications (DX117, 120-121, 130-135, 140, 143, 149, 152-153, 156, 174).** Historians working under my supervision obtained copies of intergovernmental communications and records from NARA. We stamped documents obtained from NARA with a label stating that they came from NARA and the record group wherein they are held. Record group 253 is the Petroleum Administration for War group and 234 is the Reconstruction Finance Corporation (which contained the Defense Service Corporation) and are locations where I would expect these types of record to be found. DX117 and 153 does not contain our stamping, but does show a NARA stamp indicating where it can be found.

Two of these records DX131 and DX152 were obtained from productions in prior litigation. Both of these documents are memoranda on the reasonableness of price quoted, a form of document historians working under my supervision also obtained from NARA. DX131 and DX152 are consistent with those documents obtained from NARA.

I have routinely conducted and overseen research into the National Archives and these documents are consistent with World War II intergovernmental communications regarding petroleum issues. The contents of these documents are consistent with the historical record and their format and typesetting are consistent with governmental communications from the World War II period. The condition of these documents creates no suspicion about their authenticity. Based on my training and experience I believe these documents are what they purport to be.

Appendix One



## JAY L. BRIGHAM, PH.D., MANAGING PARTNER
Morgan, Angel & Associates, LLC
1601 Connecticut Avenue, NW, Suite 600
Washington, DC 20009
P 202-265-1833, ext. 113 • F 202-265-8022
jay@morganangel.com • www.morganangel.com

## EDUCATION

Ph.D., American History, The University of California, Riverside, CA, 1992
M.A., American History, The University of Maryland, College Park, MD, 1986
B.A., American History, Linfield College, McMinnville, OR, 1982

## CAREER SUMMARY

After receiving his Ph.D. from the University of California, Riverside (UCR), Dr. Brigham taught at UCR; the University of Nevada, Las Vegas; and Arizona State University. His areas of expertise include American Political History, the American West, and Environmental History. The University of Kansas published his book on the public power movement *Empowering the West: Electrical Politics Before FDR*, in 1998. Dr. Brigham has also authored several articles, written book reviews, and delivered presentations on the history of energy, the West, and the environment. He has authored expert witness reports that examined public policy issues during World War II and the Korean War, energy issues, mining cases, U.S. Army Corps of Engineer dredging, and Takings cases for the U.S. Department of Justice and for private law firms. Dr. Brigham has given expert testimony in U.S. District Courts and the U.S. Court of Federal Claims and is presently serving as an expert witness on several superfund cases involving issues dating from World War II through the Cold War and a number of cases involving Native Americans.

## PROFESSIONAL EXPERIENCE

**Morgan, Angel & Associates, LLC, Washington, DC**
Managing Partner, 2014-present
Partner, 2009-2013
Senior Research Associate, 2000-2008
Research Associate, 1997-1999

**Arizona State University, Tempe, AZ**
Senior Visiting Lecturer, 1996-1997

**University of Nevada, Las Vegas, NV**
Visiting Assistant Professor, 1995-1996

**University of California, Riverside, CA**
Visiting Assistant Professor, 1992-1995

## EXPERT WITNESS EXPERIENCE

Retained by the United States Department of Justice in the following:

*United Nuclear Corporation, El Paso Natural Gas Company, L.L.C., and Homestake Mining Company of California v. United States of America,* 1:15-CV-411 (D. of NM.).

*Honeywell International, Inc. Onondaga Lake Superfund Site Mediation.*

*United States of America and California Department of Toxic Substances Control v. Sterling Centrecorp, Inc., Stephen P. Elder, and Elder Development, Inc.,* 2:08-CV-02556-MCD-JFM (E.D. CA., Sacramento Division).

*LCP Chemicals Superfund Sites Mediation.*

*Atlantic Richfield Company v. United States of America, et al.*, 1:1CV-56 (D. of NM.).

*Shell Oil Company v. United States of America,* 06-141C (CFC).

*Regarding Former Vanadium Corporation of America and Climax Uranium Company Mines on the Navajo Reservation.*

*El Paso Natural Gas Company, L.L.C. v. United States of America, et al.,* 3:14-CV-8165 (D. AZ.).

*Boeing Mediations at the Former Long Beach Site and the former Wichita Site.*

*Navajo Nation Abandoned Uranium Mines Discussions.*

*F.E.B. Corps v. United States of America*, Case No.: 12-10072-CV-Martinez (S.D. FL.).

A Report on The Political Controversy Leading to the Passage of the Submerged Lands Act.

*PPG Industries, Inc., v. United States of America,* 2:12-CV-0352(KM)(MF) (D. of NJ.).

*United States v. Federal Resources Corporation*, 2:11-CV-000127-BLW (D. of ID.). Deposition testimony was given in this case.

> A Report on the Defense Minerals Exploration Administration Contracts for the Conjecture Mine and the Minnie Moore Mine.

*Lockheed Martin Corporation v. United States of America*, 06-1438-RJL (D. of DC.).

> A Rebuttal Report.

> A Report on the Lockheed Martin Facility at Great Neck, New York (Plancor 146) Formerly Owned by the Sperry Gyroscope Company.

*Exxon Mobil Corporation v. United States of America*, 4:11-CV-1914 (D. LA.).

*Exxon Mobil Corporation v. United States of America*, H:10-2386 (S.D. TX., Houston Division).

*Exxon Mobil Corporation v. United States of America,* (S.D. TX. C. A. Nos. H-10-2386 and H-11-1844) and (Fed. Cl. Nos. 09-165C and 09-0882C).

Deposition testimony was given in the above three Exxon Mobil cases (February 2013, April 2015).

> A Rebuttal Report Regarding the ExxonMobil Facility at Baytown, Texas Formerly Owned by the Humble Oil and Refining Company and the Facility at Baton Rouge, Louisiana Formerly Owned by the Standard Oil of Louisiana, From the World War II Era through the Korean War.

> A Report Regarding the ExxonMobil Facility at Baytown, Texas Formerly Owned by the Humble Oil and Refining Company and the Facility at Baton Rouge, Louisiana Formerly Owned by the Standard Oil of Louisiana, From the World War II Era through the Korean War.

Mediation involving National Fireworks (Cordova, TN plant).

*United States of America v. Washington State Department of Transportation,* 3:08-CV-05722-RJB (W.D. WA.). Deposition and trial testimony were given in this case.

> A Report on the Army Corps of Engineers and City Waterway, Tacoma Harbor, Washington: 1900-1950.

*Texas Instruments Incorporated, f/k/a Metals and Controls Corp., M&C Nuclear, Inc. v United States of America,* 09-701 (CFC).

*AVX Corporation v. Horry Land Company, Inc., and United States of America,* 4:07-CV-3299-TLW-TER (D. S.C. Florence Division). Deposition and trial testimony were given in this case.

A Report on the Myrtle Beach Army Air Field, 1941-1955.

*Appleton Papers, Inc. and NCR Corporation v. George Whiting Paper Company, et al.,* 08-CV-00016-WCG (Consolidated with 08-CV-0895) (E.D. WI.). Deposition testimony was given in this case.

A Report on the Environmental Protection Agency's Recycling Program and the Recycling of Carbonless Paper.

*City of Fresno v. United States of America, et al.*, 1:06-CV-01559-OW-LJO (E.D. CA.). Deposition testimony was given in this case.

A Report on Hammer Army Air Field, 1940-1948.

*American International Specialty Lines Insurance Company v. United States of America*, CV06-4686 AHM (RZx), (C.D. CA.). Deposition and trial testimony were given in this case.

A Rebuttal Report.

A Report on the Whittaker-Bermite Company.

*Litgo New Jersey, Inc., et al. v. Mauriello,* 06-2891 (AET) (TB) (D. N.J.). Deposition and trial testimony were given in this case.

A Supplemental Report on Columbia Aircraft Products, Incorporated, Somerville, NJ: 1940-1947.

A Report on Columbia Aircraft Products, Incorporated, Somerville, NJ: 1940-1947.

*Seminole Nation of Oklahoma v. Salazar, et al.*, Case No. CIV-06-556-SPS (OK E.D.) CV-935-L; and *Seminole Nation of Oklahoma v. United States*, 06-CV-935-L (CFC).

*Blue Tee Matter* (meditation involving the former American Zinc plant in Dumas, TX.).

*TDY Holdings, LLC and TDY Industries, Inc. v. United States of America,* 07-cv-0787-JAH (POR), (S.D. CA.). Deposition and trial testimony was given in this case.

A Rebuttal Report.

A Report on the Ryan Aeronautical Plant in San Diego, California: World War II through the 1950s.

*Ute Tribe of Uintah and Ouray Tribes v. United States of America*, 06-CV-00866 (CFC).

*Raytheon Aircraft Company v. United States of America*, 05-CV-2328, (D. KS.). Deposition and trial testimony were given in this case.

> A Rebuttal Report on Potential Trichloroethyelene Use at the Herington Army Air Field, Herington, Kansas.

*Hudson RiverKeeper Fund Inc. v. Atlantic Richfield Co*., 94-CV-2741 (WCC) (S.D. N.Y.).  Deposition testimony was given in this case.

> A Report on the Anaconda Wire and Cable Plant During World War II at Hastings-on-Hudson, New York.

*Tar Creek Superfund Site*, Ottawa County, OK, EPA ID OKD980629844.

*Ford Motor Company v. United States,* 04-CV-72018 (E.D. MI.).

*Land Grantors in Henderson, Union, & Webster Counties, KY & Their Heirs (Taking Realty)*, Congressional Reference No. 93-648X (CFC). Trial testimony was given in this case.

> A Report on the Government's Acquisition of Land for the Construction of Camp Breckinridge, Kentucky.

*Reynolds Metals Co. and Alcoa Inc. v. United States et al.*, Civil Action No. 03-1180 (W.D. PA.).

*Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, Case No. 02-126L (CFC).

*United States of America v. Horsehead Industries, Inc., et al.,* Civil Action No. 3: CV-98-0654 (M.D. PA.).

*United States of America v. Monsanto,* Civil Action No. 99-63-DRH (S.D. IL.).

*The Shoshone and Arapahoe Tribes of the Wind River Indian Reservation v. United States*, Dockets 458-79 and 459-79 (CFC).

*Alcoa, Inc. v. United States, et al.*, Civil Action No. 96-1098 (W.D. PA.).

Mediation involving Old American Zinc Superfund Site, Fairmont, IL, EPA ID IL0000034355.

Mediation involving Exxon Mobil, Inc. (Sharon Steel Fairmont Coke Works).

Mediation involving Martin-Dennis (Chemical Land Holding).
*Red Lake Band of Chippewa Indians, et al., v. United States*, No. 189-C (CFC).

Retained by the law firm of Covington and Burling in the case of *Travelers Indemnity Company et al., v. Northrop Grumman Corporation*, 1:12-CV-03040 (S.D. NY.).

Retained by the law firm of Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim in the case of *Skokomish Indian Tribe v. City of Tacoma, et al.,* Civil Action No. C99-5606 FDB (W.D. WA.).

Tacoma's Public Power System, 1890s-1930s.

## SELECT PUBLICATIONS

### BOOKS
*Empowering the West, Electrical Politics Before FDR* (University Press of Kansas, 1998).

This book was nominated for the George P. Marsh Award presented by the American Society for Environmental History, the Sharlin Memorial Award presented by the Social Science History Association, and the Best Book Award presented by Westerners International.

### CHAPTERS IN BOOKS
"From Water to Power: The Changing Charge of the Bureau of Reclamation," *Reclamation, Managing Water in the West, The Bureau of Reclamation: History Essays from the Centennial Symposium*, Volume 2 (U.S. Department of the Interior, Bureau of Reclamation, 2008).

"Lighting Las Vegas: Electricity and the City of Glitz" in Mike Davis and Hal Rothman, eds., *The Grid Beneath the Glitter: Tales from the Real Las Vegas* (University of California Press, 2002).

### ARTICLES
"Lighting the Reservation: The Impact of the Rural Electrification Administration on Native Lands," *The Journal of the West* (2001).

"Hydro Power's Legacy," *Public Power* 58 (2000). This article was reprinted as "Governing Hydropower: The Story Behind the Law," *Hydro Review* (2001).

"The Ace: Local Control," *Public Power* 58 (2000).

"Moving Out and Settling In: Residential Mobility, Homeowning, and the Public Enframing of Citizenship, 1921-1950," with Ronald Tobey and Charles Wetherell, *American Historical Review* 95 (1990): 1395-1422.

### ENCYCLOPEDIA ENTRIES
"Federal Power Act," Steven L. Danver, ed., *The Encyclopedia of Politics in the American West* (Washington, DC: Mesa Verde Publishing/CQ Press, forthcoming).

"Public Utilities (Federal Policy)," Donald Critchlow and Philip VanderMeer, eds., *Oxford University Encyclopedia of American Political, Policy and Legal History* (New York: Oxford University Press, 2012).

**BOOK REVIEWS**

Gene A. Budig and Don Walton, *George Norris, Going Home: Reflections of a Progressive Statesman*. (Lincoln and London: University of Nebraska Press, 2013), *Journal of the West*, forthcoming.

Eugene P. Moehring, *Reno, Las Vegas, and The Strip: A Tale of Three Cities*. Wilbur S. Shepperson Series in Nevada History. (Reno: University of Nevada Press, 2014), *Western Historical Quarterly 46 (Winter)* 2015.

Paul W. Hirt, *The Wired Northwest, The History of Electrical Power, 1870s-1970s* (Lawrence: University Press of Kansas, 2012), *Journal of American History*, 2013.

Char Miller, eds. *Cities and Nature in the American West* (Reno and Las Vegas: University of Nevada Press, 2010), *Journal of the West,* 2012.

Zachary A. Smith and John C. Freemuth, eds. *Environmental Politics and Policy in the West*, Revised Edition (Boulder: University Press of Colorado, 2007), *Journal of the West,* 2009.

Gary D. Libecap, *Owens Valley Revisited, A Reassessment of the West's First Great Water Transfer* (Palo Alto: Stanford University Press, 2007), *Journal of the West,* 2008.

John Trombold & Peter Donahue, eds. *Reading Portland: The City in Prose* (Portland: Oregon Historical Society Press; and Seattle University of Washington Press, 2006), *Journal of the West,* 2008.

Renée Corona Kolvet and Victoria Ford, *The Civilian Conservation Corps in Nevada: From Boys to Men* (Reno and Las Vegas: University of Nevada Press, 2006), *Journal of the West,* 2007.

William D. Layman, *River of Memory: The Everlasting Columbia* (Seattle: University of Washington Press; and Vancouver: University of British Columbia Press, 2006), *Journal of the West*, 2007.

Marjorie Weinberg, *The Real Rosebud, The Trump of a Lakota Woman* (Lincoln, NE: University of Nebraska Press, 2004), *Journal of the West*, 2005.

Frank H. Goodyear III, *Red Cloud, Photographs of a Lakota Chief* (Lincoln, NE: University of Nebraska Press, 2003), *Journal of the West*, 2005.

Daniel Tyler, *Silver Fox of the Rockies: Delphus E. Carpenter and Western Water Compacts* (Norman, OK: University of Oklahoma Press, 2003), *Register of the Kentucky Historical Society*, 2003.

Tom H. Hastings, *Ecology of War & Peace: Counting the Cost of Conflict* (Lanham, MD: University Press of America, 2001), *Peace & Change*, 2002.

J. William T. Youngs, *The Fair and The Falls: Spokane's Expo '74 and the Transforming of an American Environment* (Cheney, WA: Eastern Washington University Press, 1996), *Pacific Northwest Quarterly*, 2000.

Char Miller, ed., *American Forests: Nature, Culture, and Politics* (University Press of Kansas, 1997), H-ASEH, H-Net Reviews, 2000.  URL: http://www.h-net.msu.edu/reviews/showrev.cgi?path=10514954955461.

**REPORTS**

*Public Power and Democracy* (American Public Power Association, 2000).

## SELECT PRESENTATIONS

"The Changing Political Landscape of Electrical Generation, Transmission, and Distribution in the American West," panelist, The Electric West: A Roundtable Discussion held at the Western History Association Conference in Denver, CO, October 2009.

"Salmon and Hydropower: The Policy Debates over Hydroelectric Development on the Cowlitz River," paper delivered at the Western History Association Conference in Fort Worth, TX, October 2003.

"Homer Truett Bone: Hydro and Public Power Crusader," paper delivered at the American Society of Environmental History Conference, Providence, RI, March 2003.

"From Water to Power: The Changing Charge of the Bureau of Reclamation," paper delivered at the Bureau of Reclamation's Centennial Conference, Las Vegas, NV, June 2002.

Panelist, "Public vs. Private: Who Should Own Utilities," 13th Annual Envisioning California Conference, Center for California Studies at California State University, Sacramento, Sacramento, CA, October 2001.

"Energy Resources and the Development of Modern America," paper delivered at the Woodrow Wilson National Symposium, "America: Transformation Toward the Modern, 1856-1924," Staunton, VA, October 2000.

**ACADEMIC EXPERIENCE**

*Courses taught include:*
Twentieth Century American History (numerous courses)
American West
Twentieth Century U.S. and American West Undergraduate Writing Seminars
Quantitative Methods and Social Science History
U.S. Survey, 1607-1865 and 1865-Present
Slavery and the Old South
Vietnam War
American Indian Policy


**PROFESSIONAL MEMBERSHIPS AND SUBSCRIPTIONS**

American Society for Environmental History
Western History Association
*Environmental History*
*Western Historical Quarterly*
*Montana, The Magazine of Western History*
*Pacific Historical Review*

**SELECT PROFESSIONAL ACTIVITY AND SERVICE**

Manuscript reviewer for the University of Nebraska Press, 2007.

Guest on "Springboard" technology program, produced by KQED Television, San Francisco, August 2001.  Discussed technology and the electrification of rural America.

Guest Lecturer, The George Washington University, Washington, DC 2000, 1997.