## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____ )
                                        )
SHELL OIL COMPANY,                      )
ATLANTIC RICHFIELD COMPANY,             )
TEXACO, INC.,                           )
AND UNION OIL COMPANY OF CALIFORNIA,    )
                                        )
          Plaintiffs,                   )       No. 1:06-cv-00141-SGB
                                        )       Hon. Susan G. Braden
          v.                            )
                                        )
THE UNITED STATES OF AMERICA,           )
                                        )
          Defendant.                    )
_____ )

## AMICUS BRIEF ON BEHALF OF AMERICAN FUEL AND PETROCHEMICAL MANUFACTURERS

April 15, 2016

Kenneth J. Sheehan
*Counsel of Record*
Baker & Hostetler LLP
1050 Connecticut Ave, N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1682
(202) 861-1783 (fax)

*Of Counsel*
Christopher H. Marraro
Richard B. Raile
Baker & Hostetler LLP
Suite 1100
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
(202) 861-1661
(202) 861-1783 (fax)

TABLE OF CONTENTS

Interest of the Amicus Curiae ................................................................................1

Statement of the Case ...........................................................................................2

Argument ..............................................................................................................7

I.    Governing Law Requires Application of a Nexus Test in Assessing How
Much Cleanup Liability Is Attributable to the Avgas Contracts .......................8

      A.    Reimbursement Is Warranted Where, as Here, a Nexus Exists
            Between the Cost and the Contract .......................................................8

      B.    The Government's Position Is Contrary to Law and Logic ..................11

      C.    The Phrase "By Reason Of" in the Contracts Is Not a Basis To
            Deviate from the Established Law ......................................................15

      D.    The Government's Theory Would Deny the Oil Companies Their
            Benefit of the Bargain Under the Contracts ........................................18

II.    If the Court Declines To Apply a Nexus Test, It Should Apply a
Substantial Factor Test ...................................................................................20

Conclusion .........................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Am. Chem. Soc'y v. United States*, 194 Ct. Cl. 370 (1971)..................................7, 8, 11, 12, 13, 14

*Am. Soc'y for Testing & Materials v. Corrpro Companies*, 478 F.3d 557 (3d Cir. 2007) ..............................................................................................................................17

*Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274 (Fed. Cir. 2002) ........................................8

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).........................................16

*Burrage v. United States*, 134 S. Ct. 881 (2014) .........................................................16

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) ................7, 20, 21

*Energy Northwest v. United States*, 641 F.3d 1300 (Fed. Cir. 2011) ...........................20

*Energy Capital Corp. v. United States*, 47 Fed. Cl. 382 (2000) ...................................21

*Fed. Cartridge Corp. v. United States*, 111 Ct. Cl. 372 (1948)...........................8, 10, 13

*Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327 (Fed. Cir. 2003)..........................................................................16

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ....................................................16

*Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384 (1965)......................................15

*Houdaille Indus. Inc. v. United States*, 138 Ct. Cl. 301 (1957) ..............................10, 16

*Hunkin Conkey Constr. Co. v. United States*, 198 Ct. Cl. 638 (1972)...........................16

*Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369 (Fed. Cir. 2002)...................15

*In re Miller*, 290 F.3d 263 (5th Cir. 2002)..................................................................17

*KMS Fusion, Inc. v. United States*, 24 Cl. Ct. 582 (1991) .........................................9, 13

*Lockheed Aircraft Corp. v. United States*, 179 Ct. Cl. 545 (1967).....................9, 12, 13

*Metric Constr., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999) ............................................................................................................15

*Nw. Marine Iron Works v. United States*, 203 Ct. Cl. 629 (1974)................................16

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)....................................................17

*Sharp v. CGG Land (U.S.) Inc.*, No. 14-CV-0614-CVE-TLW, 2015 WL 6142897 (N.D. Okla. Oct. 19, 2015)...................................................................................17

*Shell Oil Co. v. United States*, 751 F.3d 1282 (Fed. Cir. 2014)...........................5, 6, 8, 15, 18, 19

*Telescope Folding Furniture Co. v. United States*, 90 Ct. Cl. 635 (1940) ...............10, 13

*United States Rubber Co. v. United States*, 142 Ct. Cl. 42 (1958) ..........................10, 16

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).....................................17

**Statutes and Regulations**

26 C.F.R. § 53.4941 ...................................................................................................18

29 C.F.R. § 778.217 .................................................................................................17

42 C.F.R. § 51c.107 .................................................................................................18

48 C.F.R. § 31.000 ....................................................................................................9

48 C.F.R. § 31.201-4 .................................................................................................9

48 C.F.R. § 752.7028 ...............................................................................................18

**Other Authorities**

*Appeal of Roscoe-Ajax Const. Co., Inc.*, A.S.B.C.A. No. 12110, 71-1, 71-1 B.C.A.
    (CCH), 1971 WL 1352 (Armed Serv. B.C.A. 1971) ...............................................9

David Fain & Richard F. Watt, *War Procurement—A New Pattern in Contracts*,
    44 Colum. L. Rev. 127, 206 (1944) ......................................................................20

*Explanation of Principles for Determination of Costs Under Government
    Contracts* ("Green Book") ..............................................................................9, 10

Non-Confidential Brief of Defendant-Appellee United States,
    *Swiff-Train Co. v. United States*, No. 2014-1814 (Fed. Cir. filed Jan. 28, 2015)....................17

33 Op. Att'y Gen. 528 (1924) ..................................................................................16

Treasury Decision 5000 ...........................................................................................9

1 Williston on Contracts § 1:1 (4th ed.)..................................................................19

**Interest of the Amicus Curiae**

American Fuel & Petrochemical Manufacturers ("AFPM") is a national trade association of more than 450 companies. Its members include virtually all petroleum refiners and petrochemical manufacturers in the United States. AFPM members supply consumers with a wide variety of products and services used daily in their homes and businesses. These products include gasoline, diesel fuel, home heating oil, jet fuel, lubricants, and the chemicals that serve as "building blocks" in making diverse products, such as plastics, clothing, medicine, and computers.

Many of AFPM's members have contracted with the United States for various purposes over the past 75 years, including supplying high octane aviation gasoline during World War II. AFPM believes that Government obligations should be enforceable according to the terms as understood at the time of contracting, and bargains designed to satisfy contractor concerns should not be re-written in subsequent litigation, even if it occurs decades later. Many AFPM members have outstanding claims under Government contracts that may be affected by the decision in this litigation, especially concerning the standard to be applied when allocating costs.

AFPM states that no person other than AFPM or its counsel authored this brief or contributed money that was intended to fund the preparation or submission of this brief.

## STATEMENT OF THE CASE

It is historical fact that the American petroleum refining industry played a defining role in saving the world from Axis domination during World War II by supplying Allied forces with tens of billions of gallons of high-octane aviation fuel ("avgas"). A fighter plane "designed for and supplied with 100 octane gasoline ha[d] an almost insuperable advantage against a similar plane operating on 87 or 92 octane gasoline…."[1] In 1940, however, the entire American refining capacity for avgas was a mere 40,000 barrels per day ("bpd"),[2] and the armed forces estimated that the war would require at least 190,000 bpd, nearly five times existing capacity.[3] Ramping up American avgas production to satisfy the armed services' requirements necessitated "one of the biggest industrial undertakings in the history of the United States."[4]

To ensure that this incredible feat could be accomplished, the Government exercised substantial operational control over almost every aspect of the refining industry. Through the Petroleum Administration for War ("PAW"), the "virtual czar"[5] of the avgas program, the Government took a series of unprecedented actions, including industry wide and facility specific measures, to control and direct refining company operations in order to maximize avgas production. It limited each refiner's monthly supply of crude oil and raw materials,[6] ordered

---

[1] Amicus Appendix Excerpts ("AE") 7, Robert E. Wilson & C. C. Monrad, Petroleum Section, Draft of Report on 100 Octane Aviation Gasoline Situation, pt. 2, at 2 (Aug. 2, 1940).

[2] AE5, *id.* pt. 1, at 2.

[3] AE4, *id.* pt. 1, at 1.

[4] AE13, Brendan J. O'Callaghan, Reconstruction Finance Corporation, The Role of Defense Supplies Corporation in the Wartime Aviation Gasoline Program, at 2 (1948).

[5] PX811, John W. Frey & H. Chandler Ide, A History of the Petroleum Administration for War, 1941–1945, 199 (U.S. Gov't Prt. Off. 1946) ("Frey & Ide").

[6] AE15, Recommendation 16 (PAW), 6 Fed. Reg. 6433 (Dec. 16, 1941).

refiners to "cease" using various blending stocks except for producing avgas,[7] directed avgas and blending stock specifications,[8] and ordered refineries to "maximize" the production of avgas.[9] In its quest to treat the entire refining industry as "one vast national refinery," the PAW also imposed direct controls over each individual refinery, usually in the form of telegrams that mandated operational requirements, including refinery scheduling and blending plans, to assure "maximum" avgas production.[10] The Government even ordered refineries to make operational changes to increase avgas production, despite any economic hardship they incurred. In short, the PAW's mandate to the refining companies was to "maximize" avgas production, and "[e]verything else will have to be regarded as secondary and adjustments, regardless of severity, must be made to accomplish the military purpose…."[11]

So pervasive was the Government's wartime control over the avgas refining companies, that it routinely prioritized wartime exigencies over sound environmental practices and denied the refiners permission to take steps that would have mitigated the environmental harms caused by avgas production. Refiners were forbidden to undertake any construction projects involving building materials or labor without PAW or War Production Board ("WPB") approval.[12] The PAW denied requests for tank-bottom sludge burning facilities and cooling water replacement facilities at avgas refineries in Oklahoma; for oil-water separators at avgas refineries in

---

[7] AE18, Recommendation 8 (PAW), 6 Fed. Reg. 5017, 5017–18 (Oct. 2, 1941).

[8] PX812, Frey & Ide at 200.

[9] AE21, Directive 77 (PAW), 9 Fed. Reg. 8933 (July 24, 1944).

[10] AE24, Telegram dated Mar. 6, 1943 from PAW Refining Division to Shell and other refiners. *See also* AE28, Telegram from Brown, Asst. Dep. PAW Administrator (providing that oil companies operate refineries "on stream [for the] maximum possible time" and "[p]ostpone shutdowns for routine inspection and maintenance").

[11] AE32, Letter from Ralph K. Davies to Secretary of War Patterson (Mar. 9, 1942).

[12] AE35, Directive for War-Time Construction, War Production Board (May 20, 1942).

California, Ohio, Louisiana, Pennsylvania, and Texas; for facilities to reduce fuel consumption at avgas refineries in Maryland; and for additional rail cars to transport waste out of the avgas refineries in California.[13]

However, Government control alone was insufficient to meet the Government's massive wartime avgas needs. New construction and expansion of avgas refinery facilities became imperative. But in 1940, oil refining economics would not justify production on the scale required by the Government. The commercial market for avgas was already satisfied, indeed "overbuil[t],"[14] and the Government agreed that "upon cessation of war, the demand for 100 octane gasoline is bound to diminish to such a degree the industry will be over-built and many of the manufacturing units will become practically useless."[15] Contributing further to the financial insecurity of the refiners was the fact that the Government had been greatly frustrated with excessive private sector profiteering in other industries during the "Great War" and was steadfast that it would control the price of war commodities to curtail profits.

To accomplish the Government's exigent avgas production goal, the Government and the refining industry reached a "grand bargain" that became embodied in the avgas supply contracts ("avgas contracts") at issue in this litigation. The PAW explained the bargain: "To provide reimbursement for the added expense of this additional volume, the Army and Navy agreed with

---

[13] In one example, the Gulf Oil Corporation sought permission to install an oil water separator at its Philadelphia avgas refinery to mitigate increased pollution resulting from wartime activity. The PAW rejected the application as lacking "sufficient urgency to justify the expenditure of materials and labor required," at a "time when every effort must be made to channel all available material and labor to projects which will increase production of aviation gasoline." AE39–40, Letter from George L Parkhurst, Assistant Director of Refining, to W.J. Kelly (Gulf Oil) (Feb. 27, 1945)

[14] AE5, Robert E. Wilson & C. C. Monrad, Petroleum Section, Draft of Report on 100 Octane Aviation Gasoline Situation, at pt. 1, p. 2 (Aug. 2, 1940).

[15] AE43, Letter from Ralph K. Davies, Deputy Petroleum Coordinator, to Honorable Robert P. Patterson, Undersecretary of War (Jan. 23, 1942).

the Defense Supplies Corporation that it would reimburse the companies for *any* losses incurred in such operations."[16] In this case, the Federal Circuit also described this bargain: "the Oil companies worked to achieve the Government's goal of maximizing avgas production and the Government assumed the risks of such increased production."[17] Hence, the Court found that the avgas contracts "contained cost-allocation measures to limit the [refiners'] risk in producing avgas."[18] The Court expanded on these reimbursement obligations: "[t]hese price-adjustment mechanisms ensured the [refiners] would not be forced into loss-making activities by factors outside their control, such as the costs of materials and transportation, or unforeseen Government-imposed charges. The avgas contracts thus assured the manufacturer of his costs, plus a fair but moderate profit."[19] Consequently, the Court held that one bargained-for benefit governing "unforeseen Government-imposed charges" was that the "avgas contracts require the Government to reimburse the Oil Companies for their Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 'charges.'"[20]

The refining companies held up their end of the "grand bargain." As heralded by the Petroleum Administration for War, "[o]ne of the great achievements of industry in this war has been the successful development of the 100 octane gasoline program."[21] The refining companies invested over $900 million (approximately $12 billion in 2016) in less than three years[22] and

---

[16] AE51–52, Memorandum dated May 18, 1944 from G. Parkhurst, PAW to B. Brown, PAW re: prepared Statement of J. H. Marshall before the House Appropriations Committee.

[17] *Shell Oil Co. v. United States ("Shell Oil")*, 751 F.3d 1282, 1287 (Fed. Cir. 2014).

[18] *Id.*

[19] *Id.* (quotation marks omitted).

[20] *Id.* at 1285.

[21] AE55, Tide Water Associated Oil Company, 1943 Annual Report 3 (1944)

[22] AE58, Sun Oil Company, 1943 Annual Report 4 (1944).

"avgas production increased over twelve-fold … to 514,000 barrels per day in 1945, and was crucial to Allied success in the war."[23]

Nearly two years ago the Government reneged on the bargain it made with the avgas companies by claiming in this case that the avgas contracts did not provide for the reimbursement of environmental cleanup costs. The Federal Circuit soundly rejected the Government's attempt to break its promise then. Now, for the second time in the very same case, the Government is once again attempting to renege on the bargain it made 75 years ago with avgas refiners, a bargain dutifully honored by the avgas refiners that enabled America to triumph over the Axis powers. In this case, the Government contends that the operative phrase at issue in the avgas contracts, "by reason of," requires that the Plaintiff Oil Companies "construct[] a model of their avgas production and disposal methods had they not entered into the contracts."[24] Stated differently, the Government incorrectly asserts that Plaintiffs must show what their costs would have been in a hypothetical world without the WWII avgas contracts. Under this irrational interpretation of "by reason of," Plaintiffs—and other refiners with similar claims—would lose most or all the benefit of their bargains and potentially recover nothing because the Government contends that Plaintiffs would have the same costs in this alternative and speculative hypothetical world.

The Government applies the wrong standard for reimbursement under the avgas contracts. The Federal Circuit held that the contracts require reimbursement for CERCLA "charges" and the federal courts have consistently held that reimbursement means repayment of all costs incident to the contract. Here, "by reason of" requires Plaintiffs to demonstrate only their actual costs incident to the contract, not their hypothetical costs in a speculative world

---

[23] *Shell Oil*, 751 F.3d at 1287.

[24] Def. Pre-Trial Br. at 31–32.

without the avgas contracts. As demonstrated herein, the Government promised to pay the refining companies all of their costs of producing avgas and thus, the Government's reimbursement obligation under the avgas contracts must honor this bargain. The Government's arguments to the contrary would wreak havoc on hundreds if not thousands of outstanding reimbursement obligations the Government owes. This Court should reject the Government's position in clear terms so as to avoid confusion in future cases.

## ARGUMENT

The Government agreed to reimburse the Oil Companies for CERCLA charges incurred as a result of the avgas program. Under longstanding Government-contracting principles, the standard for allowing these costs is a "nexus" test, and all costs incident to performance of the avgas contracts should be repaid. The Government's argument to the contrary, based on the supposition that the Oil Companies would have engaged in "land dumping" even had they not entered the avgas contracts, is nonsense. If accepted, this view would call into question all kinds of expenses routinely reimbursed under Government contracts. The argument was, on that basis, rejected decades ago. *See Am. Chem. Soc'y v. United States*, 194 Ct. Cl. 370 (1971).

If the Court does indulge in the Government's counter-factual, world-without-the-contract arguments (it should not), it should at minimum do so under a "substantial factor" rubric, which better accounts for the difficulties in proving damages in this context. Under Federal Circuit contract-damages case law, the Court has discretion to use this test, rather than the Government's, and this is an appropriate case for it. *See Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007).

I.     **Governing Law Requires Application of a Nexus Test in Assessing How Much Cleanup Liability Is Attributable to the Avgas Contracts**

The Federal Circuit's remand order directs this Court to answer a "factual question" of "*the amount* of acid waste attributable to the avgas contracts." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1302–03 (Fed. Cir. 2014) (emphasis added). This inquiry—"how much," not "whether"— follows from the Federal Circuit's finding that the avgas contracts required "reimbursement of the Oil Companies' CERCLA costs." *Id.* at 1296.

Basic principles of contract reimbursement require that the Government repay the Oil Companies for all CERCLA costs incident to the avgas program. The Government's assertion that the Plaintiff Oil Companies would have engaged in "land dumping" even without the avgas contracts has no relevance under that standard. The United States Court of Claims definitively rejected that argument over 40 years ago in *American Chemical Society v. United States*, 194 Ct. Cl. 370 (1971), observing that the argument conflicts with "generally accepted accounting principles" and "could not logically be made." Indeed, taken to its logical conclusion, the Government's argument would exclude from actual contract expenses such items as property rent and "the salaries of staff who would have remained on the payroll even if [the] contract had not been undertaken." *Id.* Accordingly, the correct standard requires reimbursement of all allowable costs incident to performance, and the Court should apply that standard, not the Government's, here.

A.     **Reimbursement Is Warranted Where, as Here, a Nexus Exists Between the Cost and the Contract**

Attribution of costs to a Government contract turns on "whether a sufficient 'nexus' exists between the cost and [the] Government contract," *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1281 (Fed. Cir. 2002), or, in the words of World War II-era case law, whether the expense was "incident to the carrying out of this contract," *Fed. Cartridge Corp. v. United States*, 111 Ct.

Cl. 372, 388 (1948). If the nexus exists, the cost is reimbursed. That is because "it is fair to allocate to Government contracts the costs of services which facilitate performance of the particular contracts or are essential to the existence and continuance of the business entity." *Lockheed Aircraft Corp. v. United States*, 179 Ct. Cl. 545, 558 (1967). The lynchpin of the nexus test is the existence of some "benefit" to the Government contract.[25] *Id.*

Today, this standard is codified in the Federal Acquisition Regulation. A cost is allocable to a contract if it is "incurred specifically for the contract," or can be distributed to it and other contracts "in reasonable proportion to the benefits received," or is "necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown." 48 C.F.R. § 31.201-4. At the time of the avgas contracts at issue, this "nexus" test was incorporated in Treasury Decision 5000 and the *Explanation of Principles for Determination of Costs Under Government Contracts* ("Green Book"),[26] which were "the two most widely used cost standards" during World War II, *see Lockheed Aircraft*, 179 Ct. Cl. at 556.[27]

Section 26.9(a) of Treasury Decision 5000 allowed recovery of both "direct" and "indirect" costs. T.D. 5000. "Direct costs" were those "incurred by the contracting party in

---

[25] "Any discussion of benefit" in an allocation analysis "must begin with *Lockheed Aircraft Corporation v. United States*." *KMS Fusion, Inc. v. United States*, 24 Cl. Ct. 582, 5889 (1991).

[26] AE60, War & Navy Departments, *Explanation of Principles for Determination of Costs Under Government Contracts* (Apr. 1942).

[27] These principles were binding on cost-plus-a-fixed-fee contracts and were used as a guide for fixed-price contracts. *Id.* at 557; *see also id.* at 557–59 (applying cost-accounting principles to allocate reimbursement under fixed-price contract); 1 Government Contract Costs & Pricing § 6:21 (noting that "auditors and contracting officers … rigidly appl[ied] the cost principles in negotiating and modifying fixed price contracts"). The rules for reimbursement under fixed-fee contracts were generally more generous to the contractor. *See, e.g.*, *Appeal of Roscoe-Ajax Const. Co., Inc.*, A.S.B.C.A. No. 12110, 71-1, 71-1 B.C.A. (CCH) ¶8828, at 41,058, 1971 WL 1352 (Armed Serv. B.C.A. 1971) (explaining that costs may be reimbursed under a fixed-fee contract even if not allowable under cost-plus regulations). Today, cost principles are binding "whenever cost analysis is performed" and provide for "allowance of costs when required by a contract clause." 48 C.F.R. § 31.000.

performing the contract or subcontract." *Id.* "Indirect costs" were those "incident to and necessary for the performance of the contract or subcontract." *Id.* The Green Book allowed recovery of "all costs incurred by the contractor incident to and necessary for the performance of the contract and properly chargeable thereto." Green Book ¶ 4, AE64. Costs "directly identifiable immediately with particular products or with operations or processes performed thereon" were recoverable in full. *Id.* ¶ 55, AE69.

This was a "lenient standard." *United States Rubber Co. v. United States*, 142 Ct. Cl. 42, 49 (1958). Expenditures that "arose on account of the contractor's performance under the contract" and were "not otherwise excluded from payment by other provisions" were "*attributable*" to the Government contract and reimbursed. *Houdaille Indus. Inc. v. United States*, 138 Ct. Cl. 301, 324–25 (1957) (emphasis added); *see also Fed. Cartridge*, 111 Ct. Cl. at 388 (ordering reimbursement of a tax that "was an expense incident to the carrying out of this contract"). If an allowable tax was paid on materials for a Government contract, the amount was reimbursed in full. *See Telescope Folding Furniture Co. v. United States*, 90 Ct. Cl. 635, 643 (1940). The "intervention of time" did not "dilute[]" this principle, *United States Rubber*, 142 Ct. Cl. at 53, and thus, unemployment taxes incurred years after a wartime contract had terminated were reimbursed where "the expenditure arose on account of the contractor's performance under the contract," *Houdaille*, 138 Ct. Cl. at 324–25.

Applying this standard in this case requires the Government to reimburse the Oil Companies for all of their environmental costs in producing avgas because that was the bargain the Government struck with the refining companies. Not only did the PAW contemporaneously state that it agreed to reimburse these companies for "any losses incurred in such operations"

10

(*see* 8–9 *supra*), but the Chief Counsel for the PAW, Howard J. Marshall swore under oath in the

District Court case in *Shell Oil* that this was so. Mr. Marshall testified that:

> Q.   And my question to you is this:  If the oil industry executives had come to the War Production Board in response to this urging by Secretary Ickes and said, "We're going to produce it. We're going to produce the alkylate we need, but there's acid sludge there, are you going to pay for it?" is there any question but that the war production - but that the Petroleum Administration for War would have said, "If you can verify your costs, we'll take care of it"?
>
> A.   Of course, we would. That was part of the program.[28]

Mr. Marshall further testified that the Government intended to underwrite the financial

costs that the Oil Companies incurred to implement the avgas program:

> Q.   Certainly. Is it fair to say that the Government knew that there would be tremendous costs involved in gearing up the industry and producing the 100 octane program and that the Government was standing ready to underwrite the financing of that?
>
> A.   Yes.
>
> Q.   And that was - -
>
> A.   We had no choice.
>
> Q.   Because you needed the 100 octane.
>
> A.   Exactly right.[29]

**B.      The Government's Position Is Contrary to Law and Logic**

The Government's contention that *no* charges can be attributable to the contracts unless

the Oil Companies show that "but for avgas produced under the contracts, no land dumping

would have occurred," Def. Pre-Trial Br. at 31, is contrary to law. The U.S. Court of Claims

rejected that approach in *American Chemical Society*. There, the Government objected to

reimbursing mortgage interest expenses on property owned by the contractor that was used both

---

[28] AE72–73, *Shell Oil Company v. United States* (No. CV 91-0589) (Deposition of J. H. Marshall Dep. Tr. Vol. II (Aug. 9, 1991), at 344–45).

[29] AE78, *Id.* (Deposition of J. H. Marshall Dep. Tr. Vol. I (Aug. 8, 1991), at 101).

for contract and non-contract work; it argued the expense "would have been incurred anyway." 194 Ct. Cl. at 384. But this proved too much: "the same argument could have been made with respect to" all kinds of expenses: "rent incurred for housing the [contractor's] staff, some of whom were engaged on prior, similar contracts"; "other building ownership costs incurred on this contract, such as amortization and building operating costs"; "salaries of staff who would have remained on the payroll even if this contract had not been undertaken." *Id.* Yet all of these expenses—when allowable under a contract's terms—"are readily recognized under generally accepted accounting principles as costs or expenses reimbursable to the extent allocable to a particular contract" and "have been reimbursed without question." *Id.* The probability that the expense would "have been incurred anyway" is thus irrelevant. *Id.*

The Government's position also cannot be squared with the United States Court of Claims' decision in *Lockheed Aircraft*. That case concerned allocation of taxes incurred against a facility that serviced both Government and commercial contracts. The court agreed with the contractor that the Government's "but-for" argument was "superficial."[30]  179 Ct. Cl. at 565–66. The relevant consideration was whether there was a *benefit* to the contract, and "the facts suggest the questioned cost has produced an overall benefit" in allowing the facility to operate in the community and thereby service the Government contract. *Id.* at 566. The "'but-for' argument [did] not prevail because the cost…[was] necessary to the existence of the business entity and would benefit all work" performed at the site. *Id.* at 565–66.

---

[30] The Government in *Lockheed Aircraft* had a far stronger "but for" argument than it does here, because the taxes in that case were only levied against the commercial enterprise, yet the Court found a benefit to the Government contracts because payment of the tax allowed the operation to remain open in the community subject to the tax. 179 Ct. Cl. at 548–49, 565–66. Here, CERCLA charges were unquestionably the direct result of performing the avgas contracts and levied against those contracts directly.

Likewise, in *KMS Fusion, Inc. v. United States*, 24 Cl. Ct. 582, 589 (1991), this Court found that costs of a contractor in maintaining its Washington, D.C., office—which had been opened two years prior to commencement of its first Government contract—were allocable to a Government contract for the years of performance because the contractor was "highly technical and specialized in nature" and depended on the federal Government for the "majority of its business," and, hence, the expenses were "necessary to the overall operation of the business." *Id.* Reimbursement did not require proof that the expense would not have occurred without the contract.

These principles were applied during World War II era contracts. *See, e.g.*, *Lockheed Aircraft*, 179 Ct. Cl. at 556–62 (interpreting materials from World War II era in developing appropriate allocation standard); *Telescope Folding Furniture*, 90 Ct. Cl. at 643 (ordering reimbursement of tax paid on manufactured products without discussion of whether plaintiff's manufacturing business would have manufactured products without the Government contract); *Federal Cartridge*, 111 Ct. Cl. at 388 (ordering reimbursement of a tax that "was an expense incident to the carrying out of this contract" with no requirement to construct a model to prove the business would not have incurred taxes in an alternative world without the contract).

Moreover, as the U.S. Court of Claims observed in *American Chemical Society*, the Government's argument defies logic. *See* 194 Ct. Cl. at 384. If a contractor and buyer agree that the contractor's lumber costs in building a house are to be reimbursed by the buyer, the contractor submits an invoice reflecting the cost of lumber that *actually went into* the house, and that amount is reimbursed. The contractor does not provide a "model" of what its "lumber-buying activity" would have been without the contract, nor is it relevant that the contractor had "a long practice" of buying lumber for other contracts before and after that given contract.

13

*Compare* Def. Pre-Trial Br. at 31–32. Likewise, a business that agrees to reimburse its employees' business-related meal expenses does not condition repayment on proof that a given employee would not have eaten a meal that day but for his involvement in the work-related project; the business repays the meal expenses in full as long as it is incident to his/her employment. So too here: the Government agreed to "*reimburse*" the Oil Companies' avgas-related clean-up costs, and this is precisely the sort of cost that should be reimbursed "without question." *Am. Chem. Soc'y*, 194 Ct. Cl. at 384.

Even when applying the Government's absurd legal standard, the Government loses complete sight of the wartime facts. Erroneously, the Government argues that it is "abundantly clear that plaintiffs merely would have continued their … practice of dumping acid sludge …, regardless of the existence of the avgas contracts." Def. Pre-Trial Br. at 32. However, the Government's newly minted, counter-factual scenario is contrary to the wartime reality. Indeed, the sole concern of the PAW was to "maximize" avgas production, and it is beyond all doubt that the Government did everything in its control to assure "maximum" capacity, including cutting off raw material supply to any non-compliant avgas producer. Thus, the PAW controlled the allocation of crude oil to each refinery, and denied crude oil to any refinery that failed to follow its direction and maximize the production of avgas.[31] Crude oil is the basic raw material needed

---

[31] The Chief Counsel for the PAW, Howard J. Marshall, testified on deposition in the District Court proceedings in *Shell Oil et al. v. United States* that the PAW cut-off crude oil supply to recalcitrant refineries in the avgas program. He testified:

    Q.  Okay. You once mentioned a company up in Ventura, California that showed some reluctance to go along with the program.

    A.  Not some, everything he could muster.

    Q.  What . . . was the problem there?

    A.  Well, we had a series of quotas for each company in the field. And all of them, with this one exception, obeyed the quotas and lived by them. And they said, "To heck with you. We're going to run our business and you keep your hands off of

to produce petroleum products and refineries cannot operate without crude oil. Thus, the Government misapplies its own illogical "counterfactual" analysis because the "counterfactual" scenario here would be one where there are no refinery operations because the Government would have denied (and indeed did deny) crude oil to any refinery which did not agree to the avgas program.

**C.    The Phrase "By Reason Of" Is Not a Basis To Deviate from the Established Law**

There is no merit to the Government's contention that the phrase "by reason of" in the avgas contracts requires a different result from the established law governing allocation of costs. A "contract must be considered as a whole," *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002), in light of trade practice and custom, *Metric Constr., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999), and from the perspective of a "reasonable intelligent person acquainted with the contemporaneous circumstances," *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388 (1965). Here, the Government agreed to "reimburse" CERCLA costs through its "assumption of certain risks outside the Oil Companies' control." *Shell Oil*, 751 F.3d at 1296. In that context, the phrase "by reason of" clearly refers to the established principles of attributing or allocating costs to a contract. The Federal Circuit's decision suggests as much. *Id.* at 1303.

The Government does not even attempt to address the consequences of its argument for clauses requiring reimbursement of taxes and similar expenses. Language such as "with respect to," "on account of," and "because of" frequently appears in clauses requiring Government

---

it." It took me a day to take his material priorities away from him. He came, with his tail between his legs about a week later, said "All right. I want to make peace." I said, "You better." AE76–77, *Shell Oil Co. v. United States* (No. CV 91-0589) (Deposition of J. H. Marshall Dep. Tr. Vol. II (Aug. 8, 1991), at 81–82).

reimbursement of such expenses. *See* 33 Op. Att'y Gen. 528, 529 (1924) (quoting clause requiring reimbursement of taxes incurred "with respect to the business or property"); *United States Rubber*, 142 Ct. Cl. at 50 (quoting clause requiring reimbursement of taxes incurred "because of a specific contractual obligation or by operation of law"); *Houdaille*, 138 Ct. Cl. at 305 (quoting clause requiring reimbursement of taxes "the Contractor may be required, on account of this contract, to pay…."). Yet in nearly every case, the Government's standard would render these clauses nugatory because contractors typically have "a long practice" of paying taxes. Def. Pre-Trial Br. at 26–31. The Government's standard would require a contractor to show that, in a counter-factual world without its Government contract, it would not have engaged in operations subject to the taxes for which it sought reimbursement—which would be unprovable in many cases and unworkable in all. *See Nw. Marine Iron Works v. United States*, 203 Ct. Cl. 629, 637 (1974) ("Construction of the terms of a contract…should avoid absurd and whimsical results.") (quotation marks omitted); *Hunkin Conkey Constr. Co. v. United States*, 198 Ct. Cl. 638, 642 (1972) (noting that "effect should be given to all of the contract terms"). Indeed, the very clause at issue here requires reimbursement of not only CERCLA charges, but also "taxes" incurred "by reason of" avgas production.

Ignoring all of this, the Government relies on cases interpreting "by reason of" to mean "but-for" causation in the Controlled Substances Act, *Burrage v. United States*, 134 S. Ct. 881, 888 (2014), the Racketeer Influenced and Corrupt Organizations Act, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008), and the Age Discrimination in Employment Act of 1967, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). Def. Pre-Trial Br. at 26–31. But words "often have different meanings … in different contexts," *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003), such as the

16

phrase "because of" in Title VII of the Civil Rights Act, which incorporates "but for" causation

in one provision and a "motivating" or "substantial factor" test in another, *Univ. of Tex. Sw. Med.*

*Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228

(1989) (superseded by statute)).[32] Likewise, "by reason of" *does* refer to a nexus standard in

some contexts. *See, e.g.*, *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557, 577

(3d Cir. 2007); *In re Miller*, 290 F.3d 263, 267 (5th Cir. 2002). Here the context is certain:

Plaintiffs bargained for a benefit—reimbursement of "any losses incurred in such

[avgas]operations," including all CERCLA and waste disposal costs—and "by reason of" merely

refers to ordinary reimbursement principles.

     Indeed, the Government's counter-factual standard could not apply to all uses of "by

reason of." For instance, in calculating overtime pay under the Fair Labor Standards Act, an

employer's reimbursements for employee expenses incurred "*solely by reason of* action taken for

the convenience of his employer" are not included in the employee's "regular rate" (i.e., the rate

against which overtime is measured). 29 C.F.R. § 778.217 (emphasis added). One item often

included within this exemption is "meal expenses incurred by employees while working at [a]

remote work site." *See, e.g.*, *Sharp v. CGG Land (U.S.) Inc.*, No. 14-CV-0614-CVE-TLW, 2015

WL 6142897, at *3 (N.D. Okla. Oct. 19, 2015). Under the Government's reading, that cannot be:

employees would still eat meals were it not "for the convenience of [their] employer[s]."

     Likewise, a typical allowance under contracts with the United States Agency for

International Development includes "expenses … incurred *by reason of* [an employee's] service

---

[32] Indeed, in a recent briefing before the U.S. Court of Appeals for the Federal Circuit, the
Government conceded that "the Supreme Court's construction of 'because of' language has
turned on *a contextual reading of each specific statutory provisions*." Non-Confidential Brief of
Defendant-Appellee United States, *Swiff-Train Co. v. United States*, No. 2014-1814 (Fed. Cir.
filed Jan. 28, 2015), at 38 (emphasis added).

in a foreign area" for "adequate elementary and secondary education for [the employee's] children." 48 C.F.R. § 752.7028(f) (emphasis added). But many, perhaps most, parents would incur educational expenses for their children "but for" their "service in a foreign area." In addition, grant money properly allocable to reimburse the grantee's governing board "for reasonable expenses actually incurred *by reason of* their participation in board activities," 42 C.F.R. § 51c.107(b)(3) (emphasis added), would have to exclude any number of expenses, such as business meals, that would ordinarily be associated with "board activities." And the Internal Revenue Code's exclusion from the definition of "self-dealing" for a foundation that reimburses "meals and lodging which are reasonable and necessary (but not excessive) to a foundation manager *by reason of* his being a foundation manager" would, under the Government's interpretation, be nonsense: being a foundation manager is not the *sine qua non* of anyone's needing "meals." 26 C.F.R. § 53.4941(d)-2 (emphasis added).

In light of the context here (and the Federal Circuit's ruling), the meaning of the clause "by reason of" is clear: Plaintiff Oil Companies must be reimbursed for all expenses incurred in connection with or incident to the avgas contracts.

### D. The Government's Theory Would Deny the Oil Companies Their Benefit of the Bargain Under the Contracts

As the Federal Circuit found, "[t]he Oil Companies agreed to the avgas contracts' low profits in return for the Government's assumption of certain risks outside of the Oil Companies' control." *Shell Oil*, 751 F.3d at 1296. The Government proposes that those "risks" would still have materialized even without the contracts and thus should, notwithstanding *Shell Oil*, be allocated to Plaintiff Oil Companies. The Government's position would defeat Plaintiffs' benefit of the bargain, and contradicts the *Shell* decision that recognized and enforced that benefit.

Reimbursement should cover all costs associated with materials used to make avgas and their waste.

As the *Shell Oil* court observed, had the Oil Companies not entered into the avgas contracts, they would have made *more* profits. *Id*. at 1296. Yet the Government is not offering to pay the Oil Companies a reasonable estimate of the lucrative profits the Oil Companies missed out on in assisting the war effort. Nor does the Government account for burdens it would have had to shoulder "but for" the contracts: finding a source for avgas production and disposal for the war effort. Indeed, it completely ignores the obvious conclusion that it would have still needed avgas—and thus, would still have needed to *dispose of acid sludge and other waste generated in the production of avgas*—even if it had not enlisted the Oil Companies' services to meet those goals. Thus, in a world without the avgas contracts, the Government would have incurred all avgas-disposal expenses sought in this case.

Now, decades after "[t]he Oil Companies held up their end of the bargain" and the Government received its benefit in full, *Shell Oil*, 751 F.3d at 1287, the Government asks the Court to impose on the parties a world *without* the avgas contracts. That is not how contract enforcement works. Parties make contracts to allocate costs, risks, and benefits for the purpose of navigating uncertainty in the future, and enforcing a contract means "hold[ing] parties to their agreements so that they receive the benefits of their bargains," 1 Williston on Contracts § 1:1 (4th ed.), not guessing what the world would have looked like had they not entered those agreements in the first instance. Because of the impactful exigencies of the war, the Government embraced a new pattern of Government procurement: "[u]nder the pressure of war conditions …, the Government devised a new procurement contract procedure which underwrites the contractor – not only with respect to extraordinary war-time risks, but also with respect to the normal risks

of doing business." David Fain & Richard F. Watt, *War Procurement—A New Pattern in Contracts*, 44 Colum. L. Rev. 127, 206 (1944). In 1942, the Government assumed Plaintiffs' business risk of producing avgas. Plaintiffs performed their duties under the avgas contracts. Accordingly, the Government is now required to reimburse Plaintiffs for all of their CERCLA "charges" that are incident to producing avgas under the subject contracts that were so needed by the Government in 1942.

*Energy Northwest v. United States*, 641 F.3d 1300 (Fed. Cir. 2011), a case relied on by the Government, Def. Pre-Trial Br. at 31, makes this exact point in holding that damages for breach of contract are measured against what costs "would have been in the absence of *breach*"—meaning the breach of contract. *Id.* at 1305 (emphasis added). *Energy Northwest* involved a non-performing breach of contract and the measure of damages was determined to be the difference between the contract with performance and the contract without performance. In this case, both parties performed the contract and the only issue is one of reimbursement for a bargained-for cost under the contract. Neither *Energy Northwest* nor any standard of contract expectancy damages support the Government's request to impose a world in absence of the *contract*. Rather, the Court must place the Oil Companies where they would have been in a world where the Government performed its end of the deal and reimbursed what it promised to pay.

## II.    If the Court Declines To Apply a Nexus Test, It Should Apply a Substantial Factor Test

If the Court disagrees that the nexus standard governing reimbursement should apply, it should apply a "substantial factor" test, rather than the Government's version of a "but-for" test. "[T]he selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, 474

F.3d 1314, 1318 (Fed. Cir. 2007). A substantial factor test is appropriate in seeking damages

from a Government contract. *Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 395 (2000),

*aff'd in part, rev'd in part on other grounds*, 302 F.3d 1314 (Fed. Cir. 2002).

As described above, the facts of this case are ill-suited for the Government's version of a

counter-factual "but-for" test, which is designed to eliminate all recovery. Ascertaining what

would have occurred at the various sites without the avgas contracts is speculative, if not

impossible, under many of the avgas contracts. It is far more appropriate to allow recovery for

those damages where the avgas production was a substantial factor. Under that test, recovery is

available if the breach "was a 'substantial factor' in causing [the contractor's] losses." *Citizens*

*Fed. Bank*, 474 F.3d at 1319 (quotation marks omitted).

## CONCLUSION

For the foregoing reasons, this Court should apply a "nexus" standard, as routinely

applied to Government contracts to allocate damages in this case.

April 15, 2016

<div style="display:flex">
<div>

*Of counsel:*
Christopher H. Marraro
Richard B. Raile
Baker & Hostetler LLP
Suite 1100
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
(202) 861-1661
(202) 861-1783 (fax)

</div>
<div>

Respectfully submitted,

/s/ Kenneth J. Sheehan
Kenneth J. Sheehan
*Counsel of Record*
Baker & Hostetler LLP
Suite 1100
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
(202) 861-1682
(202) 861-1783 (fax)

</div>
</div>

# CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2016, I caused a copy of the foregoing to be served by

the Court's electronic filing system on the following counsel of record:


Stephen C. Tosini                                  Michael W. Kirk
Commercial Litigation Branch, Civil Division       Cooper & Kirk, PLLC
U.S. Department of Justice                          1523 New Hampshire Ave., N.W.
Post Office Box 480                                 Washington, DC 20036
Ben Franklin Station
Washington, DC 20044


                                          /s/  Kenneth J. Sheehan
                                          Kenneth J. Sheehan