## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————————————— )
)
SHELL OIL COMPANY, )
ATLANTIC RICHFIELD COMPANY, )
TEXACO, INC., )
AND UNION OIL COMPANY OF CALIFORNIA )
)
Plaintiffs, ) No. 1:06-cv-00141-SGB
) Hon. Susan G. Braden
v. )
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )
———————————————————— )

### APPENDIX TO AMICUS BRIEF ON BEHALF OF AMERICAN FUEL AND PETROCHEMICAL MANUFACTURERS

April 15, 2016

Kenneth J. Sheehan
*Counsel of Record*
Baker & Hostetler LLP
1050 Connecticut Ave, N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1661
(202) 861-1783 (fax)

*Of Counsel*
Christopher H. Marraro
Richard B. Raile
Baker & Hostetler LLP
Suite 1100
1050 Connecticut Ave, N.W.
Washington, D.C. 20036
(202) 861-1682
(202) 861-1783 (fax)

APPENDIX TABLE OF CONTENTS

Excerpt 1: Robert E. Wilson & C. C. Monrad, Petroleum Section, Draft of Report on 100 Octane Aviation Gasoline Situation (Aug. 2, 1940) ................................................ AE1

Excerpt 2: Brendan J. O'Callaghan, Reconstruction Finance Corporation, The Role of Defense Supplies Corporation in the Wartime Aviation Gasoline Program (1948) ........................................................................................................... AE8

Excerpt 3: Recommendation 16 (PAW), 6 Fed. Reg. 6433 (Dec. 16, 1941).......................... AE14

Excerpt 4: Recommendation 8 (PAW), 6 Fed. Reg. 5017 (Oct. 2, 1941) ............................... AE17

Excerpt 5: Directive 77 (PAW), 9 Fed. Reg. 8933 (July 24, 1944)......................................... AE20

Excerpt 6: Telegram from PAW Refining Division to Shell and Other Refiners (Mar. 6, 1943) ........................................................................................................ AE23

Excerpt 7: Telegram from Brown, Asst. Dep. PAW Administrator ........................................ AE27

Excerpt 8: Letter from Ralph K. Davies to Secretary of War Patterson (Mar. 9, 1942) ................................................................................................................... AE30

Excerpt 9: Directive for War-Time Construction, War Production Board (May 20, 1942) ................................................................................................................... AE33

Excerpt 10: Letter from George L Parkhurst, Assistant Director of Refining, to W.J. Kelly (Gulf Oil) (Feb. 27, 1945)................................................................ AE38

Excerpt 11: Letter from Ralph K. Davies, Deputy Petroleum Coordinator, to Honorable Robert P. Patterson, Undersecretary of War (Jan. 23, 1942) .......................... AE41

Excerpt 12: Memorandum from G. Parkhurst, PAW to B. Brown, PAW re:  prepared Statement of J. H. Marshall before the House Appropriations Committee (May 18, 1944) .............................................................................. AE49

Excerpt 13: Tide Water Associated Oil Company, 1943 Annual Report (1944) .................... AE53

Excerpt 14: Sun Oil Company, 1943 Annual Report (1944).................................................. AE56

Excerpt 15: War & Navy Departments, *Explanation of Principles for Determination of Costs Under Government Contracts* (Apr. 1942)................................. AE59

Excerpt 16: *Shell Oil Co. v. United States* (No. CV 91-0589) (Deposition of J. H. Marshall Dep. Tr. Vol. II (Aug. 9, 1991)) ......................................................... AE70

Excerpt 17: *Shell Oil Co. v. United States* (No. CV 91-0589) (Deposition of J. H. Marshall Dep. Tr. Vol. I (Aug. 8, 1991))........................................................... AE74

# Excerpt 1

CLASSIFICATION CANCELLED
BY ~~O.M.Russell~~ DATE 1-1-46

POLICY DOC. FILE
LOG NO. 139
CLASS NO.

~~C O N F I D E N T I A L~~

DRAFT OF REPORT ON

100 Octane Aviation Gasoline Situation

Analysis and Recommendations

DECLASSIFIED
Authority NND730022
By LB NARA Date 5-25-06

REPRODUCED AT THE NATIONAL ARCHIVES

AE2



BY [signature] DATE 1-2-46

C O N F I D E N T I A L

DRAFT OF REPORT ON

100 Octane Aviation Gasoline Situation

Analysis and Recommendations

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I | Summary | Part 1 / 1-9 |
| II | Introduction – Acknowledgments of cooperation – Background of 100 octane development – Other Aviation Gasoline | Part 2 |
| III | Requirements of Army and Navy for Peace and War Situations | 2 |
| IV | Present and Potential Supplies – Effect of Specification Changes | 4 |
| V | Recommendations regarding Building up Reserve Stocks | 10 |
| | (a) 100 days supply of 100 octane gasoline | 10 |
| | (b) Location and character of storage | 11 |
| | (c) Possible separate storage for blending stocks and ethyl fluid | 14 |
| | (d) Quantity and desirable terms of purchases for storage | 15 |
| | (e) Desirable provisions of purchasing contracts | 16 |
| | (f) Probable cost of program | 18 |
| | (g) Possible purchase and storage of 92 octane gasoline | 19 |
| | (h) Mechanism for financing | 21 |
| VI | Recommendations on Related Matters | 22 |
| | (a) New plant construction | 22 |
| | (b) Export Licensing situation | 24 |
| | (c) Preventing diversion of 100 octane gasoline to other uses | 24 |

August 2, 1940



DECLASSIFIED
Authority NND 730022
By LB NARA Date 5-25-16

REPRODUCED AT THE NATIONAL ARCHIVES

AE3

REPORT ON 100 OCTANE AVIATION GASOLINE SITUATION

ANALYSIS AND RECOMMENDATIONS

## I. SUMMARY

1.      One of the outstanding technical achievements of recent years
has been the development of processes for the synthesis of very high
octane blending stocks for aviation gasoline from certain constitu-
ents of refinery gas, formerly burned as fuel.  These synthetic
processes, while rather expensive, place this country in a very
favorable position, as adding these blending stocks to about an
equal amount of good aviation gasoline plus 3cc of tetraethyl lead
per gallon, makes possible the production of large quantities of 100
octane aviation gasoline.  This development of very high octane fuels
is in turn largely responsible for the tremendous increase in the
performance of our aviation engines and planes during recent years.

2.      The Army and Navy have cooperated effectively in encouraging
this development, and as a result all the new planes for tactical use
are designed around the 100 octane gasoline, and indeed can utilize
advantageously gasoline of even higher octane rating if same can be
made available in the necessary quantities.

3.      The determination of the Army and Navy requirements of 100
octane gasoline for a major war effort is naturally difficult at
this time.  Figures recently supplied to the N.A.C.A. by representa-
tives of the two services totaled about 190,000 barrels per day for
a major war effort, which seems too high except for a possible peak
demand for a few days.  Estimates very recently supplied by the air
corps of the two services at the request of this section of the

DECLASSIFIED
Authority NND 730022
By LB NARA Date 5-25-16

AE4

Defense Commission set the maximum wartime demand (averaged over
a year, and based on 7378 tactical operating planes for the Army
and 5507 for the Navy) at 71,000 barrels per day, which seems low
both as to number of tactical planes to be eventually available,
and especially in view of the fact that would mean only about
three quarters of an hour per day use of these tactical planes.
It is almost certain that there will be further revisions of these
figures as plans are more fully developed, but rather than wait
for such revisions, it seems wise to present a preliminary report
in order to start promptly on an absolute minimum program, which
can be expanded later if necessary. This minimum program is ac-
cordingly based on only 75,000 barrels of 100 octane gasoline re-
quired per day, not including commercial needs or those of possible
allies, such as Canada.

4.      To indicate the magnitude of the problem it should be pointed
out that present Army and Navy consumption of 100 octane fuel is
less than 4,000 barrels per day. Exports of such gasoline during
recent months have been running in the neighborhood of 10,000
barrels per day. Additional quantities have been made for export but
not actually exported, due mainly to the collapse of the French ef-
fort.

5.      Fortunately, in spite of the low present demand for this fuel,
and without any official encouragement, the genius of the oil indus-
try for overbuilding has resulted in a manufacturing capacity for
100 octane aviation fuel of about 40,000 barrels per day by October 1,
1940, and several thousand barrels more daily capacity is definite-
ly projected and will probably be installed unless demand largely



DECLASSIFIED
Authority NND 730022
By LB NARA Date 5-25-06

REPRODUCED AT THE NATIONAL ARCHIVES

A55

disappears.  The product is now made by fourteen different compan-
ies in about 20 different plants, the details of which are set
forth in the body of the report.

At the present time most of the manufacturing capacity in ex-
cess of present demand is either shut down or the product diverted
to other uses which makes it unavailable for National Defense pur-
poses.

6.    Since our producing capacity for 100 octane gasoline is only
about half the minimum estimate of wartime demand, and since pre-
sent stocks of the two services are negligible, it seems vital to
proceed at once to build up more adequate reserve stocks.  In the
opinion of the writer (after consultation with several Army and Navy
representatives) this should be at least 100 days' supply of prob-
able maximum war demand for whatever number of airplanes and war
program may be projected for at any given time.  For the minimum
program above referred to this will mean the storage of around seven
and a half million barrels, but it is hoped that about 18 months will
be available in which to build up this total.  Even with this 100
day supply, and assuming a minimum of destruction of stocks or of
synthetic plants, a shortage would develop in four or five months of
war, allowing for the fact that undoubtedly some of the storage would
be in the wrong places and that the operation of some of the plants
and transportation and storage facilities would be interfered with
in any such major effort.  On the average about ten months would
probably be required for the construction of new plants under normal
conditions so the projected 100 days' storage again seems to be an
absolute minimum.


DECLASSIFIED
Authority NND730022
By LB NARA Date 5-25-16

REPRODUCED AT THE NATIONAL ARCHIVES

AE6

use of high octane fuel, because it makes it possible to use a higher
compression ratio with higher output and greater efficiency, aviation
engines benefit to a much greater extent, first because of a much lower
fuel load for a given distance; second because of a much smaller and
lighter engine; and third, because of less waste heat, which means less
cooling surface and head resistance to maintain proper engine tempera-
tures.

The combination of these three things means that in military
service a plane designed for and supplied with 100 octane gasoline has
an almost insuperable advantage against a similar plane operating on 87
or 92 octane gasoline, and recognition of this fact has been a great
stimulus to the development.

As the result of this, the new plane program contemplates the
exclusive use of 100 octane gasoline in all fighting planes, and 92
octane in most training planes.

### III.  REQUIREMENTS OF ARMY AND NAVY
###       FOR PEACE AND WAR SITUATIONS

On June 24, 1940, Army and Navy representatives on the Fuels
and Lubricants subcommittee of the Power Plants Committee of N.A.C.A.,
submitted estimated wartime requirements on the basis of 36,500 planes
for the Army and 10,000 for the Navy.  This indicated roughly 190,000
barrels per day requirement for 100 octane aviation gasoline, and 20,000
barrels per day of the 92 octane gasoline.  These preliminary figures
indicated that there would be no particular problem in the production of
the 92 octane grade, but that it would be necessary to greatly increase
present facilities for the production of the 100 octane grade.  The high
figure of 190,000 barrels per day requirement was based on maximum war-



DECLASSIFIED
Authority NND 730022
By LB NARA Date 5-25-06

REPRODUCED AT THE NATIONAL ARCHIVES

AE7

# Excerpt 2

RECORD COPY

THE ROLE OF DEFENSE SUPPLIES CORPORATION
in the
WARTIME AVIATION GASOLINE PROGRAM


A Monograph


Prepared in the Division of Information
Reconstruction Finance Corporation


Under the Direction and Supervision

of

William Peyton Tidwell


by


Brendan J. O'Callaghan


1948
Historical Reports on War Administration:
Reconstruction Finance Corporation.

AE9

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **Chapter I.** | |
| Introduction | 1 |
| | |
| **Chapter II.** | |
| The Uncertain Period | 7 |
| Petroleum Coordinator Established | 10 |
| | |
| **Chapter III.** | |
| Organising for Expansion | 15 |
| Government Organisation | 18 |
| | |
| **Chapter IV.** | |
| The "Quickie" Program | 26 |
| | |
| **Chapter V.** | |
| Construction of New Private Facilities | 31 |
| Initial Contracting Period | 33 |
| The Escrow Fund Contracts | 38 |
| Profit Allowance | 41 |
| Interest on Government Loans | 43 |
| | |
| The Regular Supply Contract | 44 |
| Termination Provisions | 46 |
| | |
| **Chapter VI.** | |
| Construction of Government Plants | 52 |
| | |
| **Chapter VII.** | |
| Administering the Supply Contracts | 64 |
| Purchase Program | 64 |
| Expediting Production | 69 |
| Reimbursement Plan | 69 |
| Extraordinary Construction Measures | 72 |
| Other Expedients | 74 |
| | |
| **Chapter VIII.** | |
| Summary and Conclusion | 77 |

## TABLE OF APPENDICES

I.      Memorandum of Understanding on Plan to Reim-
        burse Manufacturers of 91 Octane and Higher
        Aviation Gasoline for Losses Incurred in
        following Office of Petroleum Coordination
        Recommendations, July 24, 1942.

II.     Agreement Extending and Modifying the Avi-
        ation Gasoline Reimbursement Plan and the
        Four Party Purchase Agreement. July 1, 1944.

III.    Four Party Agreement of December 19, 1942.

IV.     An Escrow Fund Type of Supply Contract
        (between Defense Supplies Corporation and
        Cities Service Oil Company).

V.      An Example of the Regular Type of Supply Con-
        tract (between Defense Supplies Corporation
        and The Atlantic Refining Company).

VI.     A Defense Plant Corporation Lease Agreement.

VII.    A Supply Contract between Defense Supplies
        Corporation and an Operator of a Government-
        owned Plant.

VIII.   Four Party Agreement of January 3, 1944.

IX.     Four Party Agreement of May 20, 1943.

X.      DSC Gasoline Receipt Form, BSC-50.

XI.     The 100 Octane Aviation Gasoline Program -
        Table.

CHAPTER I

INTRODUCTION

When World War II broke out the United States had a vigorous and technically advanced oil refining industry. Its processes for producing aviation gasoline, one of several products obtained from petroleum refining, were well-developed and its plants were capable of producing more than was being sold at the time.

In mid-1941 total U.S. productive capacity of 100 octane aviation gasoline was 40,000 barrels a day. While this was more than sufficient for the needs of the day, it was far less than the United States required to fight a modern global war. In keeping with the vast expansion of aerial warfare in World War II, these plant facilities were multiplied more than twelve times in the ensuing four years to bring total U.S. 100 octane rated capacity up to 514,000 barrels a day. This increase in productive ability enabled the United States to meet all essential civilian and military requirements during the war.

The program for increasing plant facilities was slow to begin. There was a reluctance on the part of the interested Government agencies to expend funds on new defense plants. If war did not come, the facilities would have little use. Agencies sponsoring such

facilities might thus be subject to public criticism. The Army and
Navy believed a small stockpile of aviation fuel would be adequate
preparation for an emergency. From mid-1940 until a year later,
when PAW came into being, no other defense agency disputed this view.
At PAW's insistence a small plant expansion program did begin in
mid-1941, and Pearl Harbor blew away any remaining reluctance to act.

Thereafter the program to increase aviation gasoline capacity,
which became one of the biggest industrial undertakings in the history
of the United States, was on in full swing. But because other segments
of American economy had also failed to effect a wartime mobilization
in the pre-war period, the aviation gasoline plant builders ran into
a mad scramble for construction materials. Naval vessels required
practically the same materials and equipment as did aviation gasoline
plants, and naval vessels had to be built by the hundreds. Synthetic
rubber plants, merchant ships and aircraft, all of which had to be con-
structed in unprecedented volume, also demanded the materials needed
for erecting aviation gasoline facilities. All these activities had
been similarly slow in getting under way in the pre-war period.

It was not until mid-1943 that the aviation gasoline program
got a clear track to adequate materials, meaning top priorities. So it
was not until the end of 1944 that its greatly expanded plants were pro-
ducing in full stream. More urgent segments of other programs had been
given overriding priorities earlier and were in operation sooner. Not-
withstanding, adequate quantities of aviation gasoline were produced to
meet essential requirements. As leaders of the Army and Navy said at

AE13

# Excerpt 3

districts by agreement among the General Committees for the districts involved.[*]

HAROLD L. ICKES,
*Petroleum Coordinator
for National Defense.*

DECEMBER 9, 1941.

[F. R. Doc. 41–9392; Filed, December 15, 1941; 9:58 a. m.]

---

[Recommendation No. 24]

PART 1500—ADMINISTRATIVE; GENERAL

PETROLEUM INDUSTRY COUNCIL FOR NATIONAL DEFENSE

In order to aid in the accomplishment of the purposes and objectives of the petroleum defense policy defined by the President of the United States in his letter of May 28, 1941, establishing the Office of Petroleum Coordinator for National Defense, the Petroleum Coordinator for National Defense on November 29, 1941, established the Petroleum Industry Council for National Defense. The purpose of the Council is to mobilize most effectively the resources and abilities of the petroleum industry to deal with the emergency conditions under which the industry must operate and to provide a competent, responsible and representative body equipped and authorized both to advise the Petroleum Coordinator for National Defense with respect to the petroleum industry and to carry into effect immediately measures affecting that industry recommended by the Petroleum Coordinator for National Defense as essential to the national defense.

The resolution of December 8, 1941, of the Congress of the United States declaring that a state of war exists between the Imperial Japanese government and the Government and the people of the United States has made it vital to the national welfare that the Petroleum Industry Council for National Defense be enabled to act swiftly and effectively to advise the Petroleum Coordinator with respect to matters affecting the petroleum industry and to carry into effect recommendations of the Petroleum Coordinator for National Defense.

Therefore, pursuant to the President's letter of May 28, 1941, establishing the Office of Petroleum Coordinator for National Defense, I do hereby recommend that immediately, and until further notice:

§ 1500.8  *Duties and functions.* The Petroleum I n d u s t r y Council shall: (a) advise or inform the Petroleum Coordinator for National Defense with respect to any matter relating to the petroleum industry submitted to it by the Petroleum Coordinator for advice or information; (b) raise and consider on its own motion and, if deemed necessary or desirable, propose to the Petroleum Coordinator for National Defense any action relating to the proper coordination of the petroleum industry for national

No. 243——3

defense, as indicated by the President of the United States in his letter of May 28, 1941, establishing the Office of Petroleum Coordinator for National Defense; (c) take any action or perform any duty or function specified in any formal recommendation of the Petroleum Coordinator for National Defense which has been duly submitted to the Attorney General and entered in the Federal Register, or in any approved plan effective under any such recommendation.[*]

[*]§§ 1500.8 to 1500.12, inclusive, issued under the authority contained in the President's letter of May 28, 1941 to the Secretary of the Interior (6 F.R. 2760).

§ 1500.9  *Surveys and investigations.* In accomplishing the purposes and objectives of the Petroleum Industry Council for National Defense, defined in § 1500.8, the Petroleum Industry Council shall obtain, compile and analyze all pertinent and available facts, figures, and other data with respect to any matter which may properly be before it. In this connection the Council is authorized:

(a) To direct such inquiries and questionnaires to such companies, organizations, or persons as may be necessary or appropriate.

(b) To ask and receive expert assistance from any company, organization, or person.

(c) To afford any interested or affected persons an opportunity to present their views.

(d) To consult with any of the committees or temporary or permanent subcommittees established by or under the authority of the Petroleum Coordinator for National Defense, and with any appropriate representative of the Office of Petroleum Coordinator for National Defense.[*]

§ 1500.10  *Plans.* The Petroleum Industry Council for National Defense, after compiling and analyzing all available and pertinent data with respect to any matter which may be before it, shall, if the Council deems it necessary or desirable, formulate and reduce to writing such specific plan or proposal as shall seem necessary or appropriate and shall submit it, with a statement of facts and reasons, to the Petroleum Coordinator for National Defense, Washington, D. C.[*]

§ 1500.11  *Organization of council.* The Petroleum Industry Council for National Defense shall select an executive committee which shall have all the duties, functions and authorities of the Council whenever the Council is not in session.

The Petroleum Industry Council for National Defense may maintain such staff and employ such persons as it finds necessary for carrying out its duties, responsibilities and functions under this recommendation, and may appoint such committees as it deems necessary for investigation and report on specific problems.

Minutes shall be kept of all meetings of the Council and of the executive com-

mittee and two copies thereof shall be filed in the Office of the Petroleum Coordinator for National Defense.[*]

§ 1500.12  *Expenses and contributions.* Operating expenses heretofore or hereafter incurred or paid for the Petroleum Industry Council for National Defense shall be met from a fund to which contributions may be made by companies or individuals engaged in the petroleum industry upon solicitation by the Council.[*]

HAROLD L. ICKES,
*Petroleum Coordinator
for National Defense.*

DECEMBER 11, 1941.

[F. R. Doc. 41–9394; Filed, December 15, 1941; 9:53 a. m.]

---

[Recommendation No. 16]

PART 1504—PROCESSING AND REFINING

AVIATION GASOLINE

To the Refining Committees of the several Districts and to such Subcommittees on Aviation Gasoline as may be designated, and to all persons, natural or artificial, engaged in the petroleum industry, or in industries which affect the petroleum industry, or who hold or have an interest in any patent affecting the manufacture of any grade of aviation gasoline.

On December 7, 1941, the Government of the Empire of Japan declared war upon the United States of America.

It is essential, in the national interest, that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses be increased immediately to the maximum.

Therefore, pursuant to the President's letter of May 28, 1941, establishing the Office of Petroleum Coordinator for National Defense, I do hereby recommend that immediately and until further notice:

§ 1504.10  *Aviation gasoline survey.* The Refining Committees of the several Districts or such temporary Subcommittees on Aviation Gasoline as may be designated shall obtain, compile, and analyze all pertinent and available facts, figures, and other data with respect to the production of all grades of aviation gasoline, including but not limited to information concerning the existence, location and availability of all grades of aviation type crude oils, all grades of aviation gasoline base stocks, aviation gasoline blending agents, aviation gasoline manufacturing patents and processes, the capacity of existing aviation gasoline production and manufacturing facilities, and the possibilities of expansion thereof and the possibilities of the conversion thereto of facilities not now employed for such purposes.[*]

[*]§§ 1504.10 to 1504.18, inclusive, issued under the authority contained in the President's letter of May 28, 1941 to the Secretary of the Interior (6 F.R. 2760).

§ 1504.11  *Plans to increase production to be drafted.* In order to increase

to a maximum the production of all grades of aviation gasoline, the Committees or Subcommittees shall prepare plans for the use of all sources of the components of such gasoline and of all components of and facilities for producing or capable of producing any grade of aviation gasoline in such manner as will result in the maximum production of all grades of aviation gasoline in the shortest possible time.*

§ 1504.12 *Provisions of plans.* Such plans may provide for the allocation, exchange, license, pooling, loan, sale or lease of crude oil, base stocks, blending agents, processes and patents, and production, transportation and refining facilities among persons, natural or artificial, whenever and to whatever extent may be necessary to facilitate the maximum production of all grades of aviation gasoline or to reduce the time required to produce such gasoline.*

§ 1504.13 *Further provisions of plans.* Such plans may provide for the exchange, loan, sale, pooling, allocation, or leasing of other petroleum or petroleum products and of production, transportation, refining and storage facilities wherever and to whatever extent may be necessary to avoid inequities among the various affected units of the petroleum industry, whether producing, refining, transporting or marketing, and, specifically, may provide for a reduction in any locality or area of the quality and octane rating of motor fuels so far as consistent with defense or essential civilian needs where such action is made necessary because of the operation of any plan provided for in § 1504.11.*

§ 1504.14 *Adjustments or changes in costs.* In the preparation of the plans pursuant to § 1504.11 and in carrying such plans into effect, the Committees or Subcommittees shall obtain, compile, and analyze facts, figures and other data showing such increases or decreases in costs as may be occasioned or realized in the execution of such plans. Reports shall be made to the Office of Petroleum Coordinator for National Defense in order that that Office and the Committees or Subcommittees may advise and consult with the Office of Price Administration or other appropriate Federal agencies concerning the effect of such plans upon costs.*

§ 1504.15 *Terms of existing contracts to be filed.* Within 30 days from the date hereof there shall be filed in the Office of Petroleum Coordinator for National Defense a full statement of the terms of existing contracts and agreements for the production, storage, use, sale, or other disposition of all grades of aviation gasoline and all grades of aviation gasoline base stocks and blending agents.*

§ 1504.16 *Prior review of action affecting aviation gasoline.* Except where in accordance with the provisions of an approved plan formulated under the provisions of § 1504.11, after the date hereof no action shall be taken by any producer or refiner of any grade of aviation gasoline, aviation gasoline base stocks or avia-

tion gasoline blending agents with respect to the production, storage, use, sale, or other disposition thereof without giving antecedent advice thereof to the Petroleum Coordinator for National Defense in order that he may have an opportunity to make specific recommendation with respect thereto.*

§ 1504.17 *Meetings.* Meetings of the Committees or Subcommittees and representatives of the petroleum industry shall be held from time to time for the purpose of preparing the plans provided for in § 1504.11, and the Committees or Subcommittees shall meet from time to time with any Committees or Subcommittees established by the Office of Production Management or other Federal agency to study the problems involved in the production of all grades of aviation gasoline, aviation gasoline base stocks or aviation gasoline blending agents. The Committees or Subcommittees and representatives of the petroleum industry shall, upon the approval of any of the aforesaid plans by the Chief Counsel of the Office of Petroleum Coordinator for National Defense, and pursuant to the direction of the Petroleum Coordinator for National Defense, meet from time to time for the purpose of doing all things necessary to carry into effect any such plan in accordance with the foregoing provisions of this Recommendation.*

§ 1504.18 *Effectuating plans.* The Committees or Subcommittees and all persons affected by any plan formulated in accordance with the provisions of § 1504.11 shall, upon the approval by the Chief Counsel of the Office of Petroleum Coordinator for National Defense of any plan prepared pursuant to § 1504.11, and pursuant to the direction of the Petroleum Coordinator for National Defense, carry into effect such plan according to its terms, conditions and intent.*

HAROLD L. ICKES,
*Petroleum Coordinator
for National Defense.*

DECEMBER 9, 1941.

[F. R. Doc. 41–9393; Filed, December 15, 1941; 9:58 a. m.]

---

## Notices

## TREASURY DEPARTMENT.

Fiscal Service: Bureau of the Public Debt.

[1941, First Amendment to Dept. Circ. No. 654]

UNITED STATES SAVINGS BONDS, DEFENSE SERIES F

DECEMBER 12, 1941.

1. On and after January 1, 1942, the additional denomination of $25 (maturity value) of United States Savings Bonds of Defense Series F will be provided, the issue price of which will be $18.50; paragraph 1 of Section II, and paragraph 6 of Section III of Department Circular No. 654, dated April 15, 1941, are amended accordingly.

2. The table of redemption values and investment yields for United States Savings Bonds—Defense Series F, appended to Department Circular No. 654,[1] is modified by the addition of the following:

REDEMPTION VALUES

| | |
|---|---|
| Maturity value | $25.00 |
| Issue price | 18.50 |

| *Period after issue date* | ([1]) |
|---|---|
| First ½ year | ([1]) |
| ½ to 1 year | $18.50 |
| 1 to 1½ years | 18.55 |
| 1½ to 2 years | 18.62 |
| 2 to 2½ years | 18.72 |
| 2½ to 3 years | 18.85 |
| 3 to 3½ years | 19.00 |
| 3½ to 4 years | 19.17 |
| 4 to 4½ years | 19.40 |
| 4½ to 5 years | 19.65 |
| 5 to 5½ years | 19.92 |
| 5½ to 6 years | 20.23 |
| 6 to 6½ years | 20.55 |
| 6½ to 7 years | 20.87 |
| 7 to 7½ years | 21.20 |
| 7½ to 8 years | 21.52 |
| 8 to 8½ years | 21.85 |
| 8½ to 9 years | 22.17 |
| 9 to 9½ years | 22.50 |
| 9½ to 10 years | 22.85 |
| 10 to 10½ years | 23.22 |
| 10½ to 11 years | 23.62 |
| 11 to 11½ years | 24.05 |
| 11½ to 12 years | 24.50 |

MATURITY VALUE

| | |
|---|---|
| 12 years from issue date | $25.00 |

[1] Not redeemable.

D. W. BELL,
*Acting Secretary of the Treasury.*

[F. R. Doc. 41–9400; Filed, December 15, 1941; 11:09 a. m.]

---

## DEPARTMENT OF THE INTERIOR.

Bituminous Coal Division.

[Docket No. D–4]

IN THE MATTER OF THE APPLICATION OF ALABAMA FUEL AND IRON COMPANY FOR PERMISSION TO RECEIVE SALES AGENTS' COMMISSIONS AND DISTRIBUTORS' DISCOUNTS ON COAL SOLD BY IT TO ACTON COAL COMPANY

NOTICE OF AND ORDER FOR HEARING

The Alabama Fuel and Iron Company, a corporation organized under the laws of Alabama with its principal offices in Birmingham, Alabama, being registered with the Division as a distributor, No. 92, and acting as a sales agent for certain producers, filed its petition praying:

For a determination herein that its "ownership" or "control" over Acton Coal Company, if any, is bona fide, is not established to secure an indirect price reduction, and is not within the prohibition of Paragraphs 11 and 12 of section 4, Part II (l) of the Bituminous Coal Act.

*It is ordered,* That a hearing on such matter be held on February 10, 1942, at 10 a. m. in the forenoon of that day, at a hearing room of the Bituminous Coal Division, 734 15th Street, NW., Washington, D. C. On such day the Chief of the Records Section in Room 502 will advise

[1] 6 F.R. 1969.

# Excerpt 4

of the anti-trust laws, and this because it clearly lacks the elements of conspiracy or combination by private interests with an intent to restrain trade or commerce.

The procedure to be followed by District Committees in all cases where industry action is deemed necessary or appropriate is as follows:

1. A careful survey of each problem and the facts bearing on such problem shall be made by the appropriate industry committee or such subcommittee as may be designated, and consultation shall be had with the appropriate governmental representatives of the Coordinator. In this connection any committee is authorized:

   (a) to direct such inquiries and questionnaires to such companies or persons as may be necessary or appropriate;

   (b) to ask and receive expert assistance from any company or person;

   (c) to afford any interested or affected persons, particularly consumers, an opportunity to present their views;

   (d) to compile and analyze facts, figures, or other data.

2. Whatever specific plan or proposal shall seem necessary or appropriate shall be reduced to writing, together with a statement of facts and reasons, and submitted to the Deputy Coordinator, Department of the Interior, Washington, D. C., with copies to the General District Chairman and to the District counsel for the coordinator.

3. The General District Chairman shall forward his comments on the proposal or plan to the Deputy Coordinator as quickly as possible and it shall be the duty of the District counsel likewise to review the plan or proposal and to make a report to the Chief Counsel of the Office of Petroleum Coordinator for National Defense immediately.

4. When plans or proposals are received by the Deputy Coordinator they will be reviewed immediately and, with such modifications as he may deem necessary, embodied in a formal recommendation which will first be submitted to the Department of Justice in accordance with the procedure set forth in the correspondence between the Petroleum Coordinator for National Defense and the Attorney General.

5. Following submission of the proposed formal recommendation to the Department of Justice, it will be signed by the Coordinator or the Deputy Coordinator and published and forwarded to the proper parties, including the appropriate committees, together with copies of the response of the Department of Justice.

It is contemplated that most of the recommendations issued will continue in effect until further notice but the committees are expected at any time to submit for the consideration of the Deputy Coordinator necessary changes, extensions, or modifications. All submissions should be specific.

### IV. Public Information

The functions of Industry Committees are in the public interest and are well able to undergo public examination. The public relations of each committee starts with this assumption. Committees should be prepared to report accurately to the public on policies and programs adopted by the Coordinator. When the public understands these policies it will support them, but it cannot support them if they are not explained. Committees, therefore, are invited to report to the public on adopted programs by such means as they may elect. To avoid conflict and confusion, statements should be issued only through the committee chairman, all to be cleared through the General District Chairman.

No good could be served the public, and confusion would be bred, if committees were to undertake public advocation or discussion of yet unadopted policies or actions. Committees therefore should confine their statements to adopted policies and actions, and should avoid speculation and prophecy. Policies and programs undertaken by the Coordinator's office are designed for the public welfare and are not partisan or political. Discussion of policy and action therefore should be kept on the level of fact.

Problems of public relations always may be taken up with the office of the Deputy Coordinator. Correspondence on this subject should be addressed to him.

### V. Miscellaneous

1. Committee members do not serve as representatives of any company, association, or special interests but serve as representatives of the petroleum industry. They have been appointed because of their special knowledge and experience in some field of the petroleum industry.

2. Members of functional committees will elect Vice Chairmen. When the General Chairman is to be absent from any general committee meeting, he will in advance designate some member of the general committee to serve in his place for that particular meeting.

3. Committees may designate members to meet with outside groups and organizations in the discussion of problems relating to the coordination of the petroleum industry for national defense.

4. Official correspondence with committee members shall be addressed to them in their capacities as members, and sent to their business addresses in care of the companies with which they may be affiliated.

5. Committee chairmen and members shall segregate all correspondence, and other records relating to the committees' activities.

6. Correspondence on all matters relating to the committees' activities shall be written on stationery printed in conformity with the sample form attached.

7. Committees in one district may submit matters for the consideration of committees in another district, sending copies to the General Chairman of both districts and to the Deputy Coordinator.

8. Any company, individual, or organization shall have the right to present for committee consideration, any suggestions, complaints, or other matters relating to the coordination of the petroleum industry for national defense.

9. Any committee member who feels that the committee fails to give appropriate consideration to his views or proposals may make his viewpoint a part of the record by submitting a written statement, in triplicate, sending one copy to the committee, for incorporation in the minutes, one copy to the appropriate District Director of the Coordinator, and one copy to the Coordinator or the Deputy Coordinator.

R. K. DAVIES,
*Acting Petroleum Coordinator
for National Defense.*

AUGUST 19, 1941.

(Sample Form)

PETROLEUM INDUSTRY COMMITTEE

Appointed by

PETROLEUM COORDINATOR FOR NATIONAL DEFENSE
District No. [     ]          [City and State]
[     ] Committee

[F. R. Doc. 41–7275; Filed, September 29, 1941;
4:09 p. m.]

RECOMMENDATION No. 8

*To all persons engaged directly or indirectly in the production or manufacture of aviation gasoline or in producing or manufacturing gasoline containing blending agents of a petroleum origin:*

Whereas a completely adequate supply of 100 octane aviation gasoline must be kept continuously available at all times to meet any possible demands of the defense program; and

Whereas at the present time an enlarged supply of 100 octane aviation gasoline must be assured to meet the demands of the army and navy air forces; and

Whereas assurance of such enlarged supply requires that blending agents of a petroleum origin be fully utilized in the production and manufacture of such gasoline:

Now, therefore Pursuant to the President's letter of May 28, 1941, establishing the Office of Petroleum Coordinator for National Defense, I do hereby recommend that immediately, and until further notice:

All persons, natural or artificial, engaged directly or indirectly in the production or manufacture of aviation gasoline or in the production or manufacture of gasolines containing blending agents of a petroleum origin, such as but not limited to, Iso-octanes, including alkylates, hot acid octanes, and hydrocodimers, Iso-pentanes, and Neo-hexanes, cease to use such blending agents ex-

000260

AE18

cept for the production and manufacture of 100 octane aviation gasoline or such other aviation gasolines as may hereafter be recommended by the Office of the Petroleum Coordinator.

R. K. DAVIES,
*Acting Petroleum Coordinator
for National Defense.*
AUGUST 23, 1941.

[F. R. Doc. 41-7276; Filed, September 29, 1941; 4:09 p. m.]

### RECOMMENDATION No. 9

*To the Petroleum Supply Committee for Latin America and to the Anglo-Mexican Petroleum Corporation, The Atlantic Refining Company, Socony-Vacuum Oil Company, Standard Oil Company (New Jersey), The Texas Corporation, and their various subsidiary companies:*

Whereas the diversion of a part of the American tanker fleet for national defense purposes has resulted in a shortage of petroleum tanker tonnage in the Western Hemisphere; and

Whereas many of the Republics of South and Central America depend for their supplies of petroleum and petroleum products upon tanker transportation; and

Whereas most of the tankers available for such service are under the control of the United States of America; and

Whereas it is the policy of the United States of America that the other American Republics shall not sustain an unfair or disproportionate curtailment of petroleum supplies but, on the contrary, shall share equally with the comparable areas of the United States such curtailment as may be necessary; and

Whereas the Petroleum Coordinator for National Defense has appointed a Petroleum Supply Committee for Latin America to advise and consult with the Coordinator and the Deputy Coordinator, and with local representatives to be designated, on matters relating to the proper coordination for national defense of the activities of the petroleum industry, as set forth in the President's letter of May 28, with respect to the supplying of petroleum and petroleum products to Latin America on such fair and equitable basis as will maintain maximum efficiency and result in supplies to such countries on a basis comparable with supplies to the seaboard areas of the United States;

Now, therefore, pursuant to the President's letter of May 28 establishing the Office of Petroleum Coordinator for National Defense, I do hereby recommend that immediately and until further notice:

(1) The aforesaid companies and their various subsidiary companies devise and submit to the Chief Counsel of the Office of the Petroleum Coordinator for National Defense, and, after its approval in writing by said Chief Counsel, put into effect a plan to release or procure and so allocate among themselves and among the national and local companies which distribute petroleum products in the other American Republics, sufficient tanker space which, when added to or subtracted from that space otherwise available to such national and local companies, shall result in a curtailment of deliveries of petroleum products, to each such Republic and to each company distributing petroleum products in each such Republic, approximately equal to that necessary at seaboard points in the United States where a shortage of tanker transportation facilities results in curtailment of deliveries of petroleum or its products.

(2) The aforesaid companies so utilize available tankers to haul petroleum and petroleum products from the points of supply nearest the markets to be served and in such a manner as to avoid multiple port loading and discharging, cross hauling, and unnecessary ballast voyages.

(3) For the purpose of carrying out this recommendation the barge, terminal and storage facilities of all of the aforesaid companies be utilized in such a way and without regard to individual ownership of such facilities as to reduce to an absolute minimum idle time in port and the splitting of cargoes between two or more ports of discharge.

(4) The aforesaid companies arrange for the exchange or loan of products among themselves whenever and to whatever extent may be necessary to facilitate the reduction of the tanker tonnage required to transport the required petroleum products to the aforesaid American Republics.

(5) The Petroleum Supply Committee for Latin America and the aforesaid companies consult with the State Department and the United States missions in the various American Republics on matters of policy, particularly matters affecting relations with the Latin American governments or companies, and cooperate with such local committees as may be appointed in each of the countries concerned in order to coordinate their local activities with the governmental policies of each such country.

(6) Meetings of the Petroleum Supply Committee for Latin America and meetings of representatives of the aforesaid companies may be held from time to time for the purpose of working out the physical and contractual details and arrangements necessary to carry into effect the foregoing recommendations.

(7) The Petroleum Supply Committee for Latin America and the aforesaid companies shall coordinate their activities under this recommendation with the policies of the Tanker Control Board established by the Petroleum Coordinator for National Defense.

R. K. DAVIES,
*Acting Petroleum Coordinator
for National Defense.*
AUGUST 26, 1941.

[F. R. Doc. 41-7277; Filed, September 29, 1941; 4:09 p. m.]

### RECOMMENDATION No. 10

*To all persons engaged in marketing petroleum products in the Atlantic Coast area:*

Whereas the inadequacy of available tanker transportation facilities threatens the Atlantic Coast area with a shortage of petroleum and petroleum products; and

Whereas because of this threatened shortage it has become increasingly difficult for the small, nonintegrated, spot and noncontract marketers of petroleum products to obtain supplies of petroleum products in this area; and

Whereas the Office of Petroleum Coordinator for National Defense has adopted the policy of asking that the petroleum industry operate in such a way that all marketers of petroleum products may secure their proportionate share, without discrimination, of the sum total of whatever petroleum products are made available in the Atlantic Coast area, or other areas of threatened shortage;

Now, therefore, pursuant to the President's letter of May 28 establishing the Office of Petroleum Coordinator for National Defense, I do hereby recommend that:

(1) All spot, noncontract, or other buyers of petroleum products who are engaged in the Atlantic Coast area in the business of reselling such products and who are experiencing difficulty in procuring supplies, file promptly with the Director of Marketing, Office of Petroleum Coordinator for National Defense, Washington, D. C., and with the Chairman of the Marketing Committee for District No. 1, a tabulation giving the following information:

(a) Purchases, including name or names of the person or company from whom purchased, of the petroleum product or products with respect to which procurement difficulties are being experienced, broken down by months for the period January 1940–August 1941, inclusive.

(b) Sales of the petroleum product or products with respect to which procurement difficulties are being experienced, broken down by months for the period January 1940–August 1941, inclusive.

(c) Stocks on hand, or inventories, of the petroleum product or products with respect to which procurement difficulties are being experienced, at the end of each month for the period January 1940–August 1941, inclusive.

(d) A statement setting forth in detail whatever difficulties such buyer is actually experiencing in securing such buyer's proportionate share of the sum total of whatever petroleum products are made available in the Atlantic Coast area.

R. K. DAVIES,
*Acting Petroleum Coordinator,
for National Defense.*
SEPTEMBER 6, 1941.

[F. R. Doc. 41-7278; Filed, September 29, 1941; 4:09 p. m.]

000261   AE19

# Excerpt 5

FEDERAL REGISTER, *Tuesday, July 25, 1944*                                   8933

Kind of seed:                          *Maximum price*
  Onion—Continued.                        *Per pound*
    Bulbs grown by farmer-pro-
      ducer:
      Sweet Spanish (yellow)_____ $1.60
      Sweet Spanish (white)_____  1.60
      Southport White Globe_____  1.45
      White Portugal_____  1.35
      Yellow Globes_____  1.20
      Ebenezer_____  1.10

For varieties of onion seed not mentioned above, the farmer-producer shall determine his maximum price by adding to or subtracting from the maximum price for the most similar variety for which a maximum price is established above, the premium or discount, as the case may be, in dollars and cents normal to the trade during the period January 1 to May 31, 1943, for the variety to be priced in relation to said most nearly similar variety for which a maximum price is established; and the resultant figure shall be his maximum price for the variety in question.

Turnip and Rutabaga_____ $0.15

plus transportation charges from the farm where grown to the buyer's receiving point by a usual route and method of transportation.

This amendment shall become effective July 29, 1944.

Issued this 24th day of July 1944.

JAMES G. ROGERS, JR.,
*Acting Administrator.*

Approved: July 13, 1944.

GROVER B. HILL,
*Acting War Food Administrator.*

[F. R. Doc. 44–11059; Filed, July 24, 1944; 11:42 a. m.]

---

Chapter XIII—Petroleum Administration for War

[Recommendation 8,[1] Revocation]

PART 1504—PROCESSING AND REFINING

AVIATION GASOLINE

Recommendation No. 8 of the Office of Petroleum Coordinator for National Defense is hereby revoked, effective immediately.

(E.O. 9276, 7 F.R. 10091; E.O. 9319, 8 F.R. 3687)

Issued this 24th day of July 1944.

RALPH K. DAVIES,
*Deputy Petroleum Administrator
for War.*

[F. R. Doc. 44–11050; Filed, July 24, 1944; 11:26 a. m.]

---

[Recommendation 16,[2] Revocation]

PART 1504—PROCESSING AND REFINING

AVIATION GASOLINE

Sections 1504.10 to 1504.18, inclusive (Recommendation No. 16 of the Office of Petroleum Coordinator for National Defense), are hereby revoked, effective immediately.

[1] 7 F.R. 1802.
[2] 6 F.R. 6433.

No. 147——22

(E. O. 9276, 7 F.R. 10091; E.O. 9319, 8 F.R. 3687)

Issued this 24th day of July 1944.

RALPH K. DAVIES,
*Deputy Petroleum Administrator
for War.*

[F. R. Doc. 44–11051; Filed, July 24, 1944; 11:26 a. m.]

---

[Petroleum Directive 77]

PART 1535—PETROLEUM PROCESSING AND REFINING

HIGH-OCTANE AVIATION GASOLINE

The fulfillment of the requirements for the defense of the United States has created in certain areas a shortage in the supply of aviation gasoline for defense, for private account, and for export; and the following directive is deemed necessary for the prosecution of the war and to provide adequate supplies of aviation gasoline for military and other essential uses.

§ 1535.4 *Petroleum Directive 77.* (a) *Scope and purpose.* This directive governs the manufacture, blending, transfer, and delivery of high-octane aviation gasoline and its components. It also describes the functions of the two governmental agencies which exercise coordinate jurisdiction in this field, and specifies how to make application to them for authority to act.

The Petroleum Administration for War is an executive agency deriving its authority from Executive Orders 9276 and 9319. The Aviation Petroleum Products Allocation Committee is a subcommittee of the Munitions Assignment Committee (Air), and derives its authority from directives of the Combined Chiefs of Staff dated June 12, 1942, and September 25, 1943.

The Petroleum Administration for War Controls all transfers within the petroleum industry of aviation-grade base stock, blending agents, and high-octane aviation fuel. The Petroleum Administration for War instructs industry with respect to specifications for the types and grades of high-octane aviation fuel which shall be manufactured or blended in regular commercial production. For the manufacture or blending of any other grade or type of fuel, such as experimental fuels, specific authorization must be obtained from the Petroleum Administration for War.

The Petroleum Administration for War and the Aviation Petroleum Products Allocation Committee exercise joint control over all deliveries, from the petroleum industry to consumers (or their agents), of blending agents, aviation-grade base stock, and high-octane aviation fuel. After the Aviation Petroleum Products Allocation Committee has made an assignment to the War Department, the Navy Department, or for export to any person, delivery cannot be made until, in addition to the assignment by the Aviation Petroleum Products Allocation Committee, a release for each specific quantity to be assigned has been issued by the Petroleum Administration

for War. An assignment by the Aviation Petroleum Products Allocation Committee is deemed to carry such release by the Petroleum Administration for War automatically in all cases other than deliveries to the War Department, the Navy Department, or for export.

Consumption of finished high-octane aviation fuel within the petroleum industry (for instance, in research) requires release in advance by the Petroleum Administration for War, which is deemed to carry with it automatically the approval of the Aviation Petroleum Products Allocation Committee.

(b) *Definitions.* (1) "Person" means any individual, partnership, association, business trust, corporation, governmental corporation or agency, or any organized group of persons, whether incorporated or not.

(2) "Blending agents" means materials suitable for use in the manufacture of aviation gasoline, such as, but not limited to, iso-octane, alkylate, hydrocodimer, hot acid octanes, neohexane, isopentane, and cumene. It also means toluene, xylenes, and other aromatic components which are released by the War Production Board to the Aviation Gasoline Program.

(3) "Aviation-grade base stock" means gasoline (either straight-run or cracked) which meets then current Army-Navy specifications for aviation gasoline stability after the addition of inhibitors, and which tests 87 O. N. or higher by the ASTM Aviation Method (ASTM D614–43T) after the addition of the amount of tetraethyl lead then authorized by current Army-Navy specifications for aviation gasoline of 87 octane number.

(4) "High octane aviation fuel" means finished aviation gasoline which has an octane rating of 87 or more (ASTM D357–42T), or which would have an octane rating of 87 or more by said method after the addition of sufficient tetraethyl lead to bring the total thereof up to the total tetraethyl lead content then authorized by current Army-Navy specifications for aviation gasoline of 87 octane number.

(c) *Limitations upon transfers.* No person shall deliver or transfer blending agents, aviation-grade base stock, or high-octane aviation fuel to any other person except as authorized or directed by the agency having jurisdiction, as set forth in paragraph (a).

(d) *Limitations upon use.* No person, unless otherwise authorized by the agency having jurisdiction as set forth in paragraph (a), shall use or consume blending agents or aviation-grade base stock otherwise than in the production and blending of the regular types and grades of high-octane aviation fuel as directed by the Petroleum Administration for War. No person shall use or consume high-octane aviation fuel unless, and until, assignment of such fuel has been made by the agency having jurisdiction as set forth in paragraph (a).

(e) *Applications for authority.* (1) Applications to the Aviation Petroleum Products Allocation Committee for as-

signments of high-octane aviation fuel, or for authority to deliver blending agents or aviation-grade base stock to persons not in the petroleum industry, shall be made upon such forms as may be prescribed from time to time. Such applications shall be addressed to the Executive Secretary, Aviation Petroleum Products Allocation Committee, Interior Building, Washington 25, D. C.

(2) Applications to the Petroleum Administration for War for authority for transfers within the petroleum industry, or for release of materials assigned by the Aviation Petroleum Products Allocation Committee, or for authority to consume finished fuel within the petroleum industry, shall be made in writing in such forms as the applicant may elect. Such applications shall be addressed to the Refining Division, Petroleum Administration for War, Interior Building, Washington 25, D. C.

(f) *Surveys and recommendations by committees.* The Refining Committees of the several Districts of the Petroleum Administration for War, and such Subcommittees on Aviation Gasoline (of nation-wide or District-wide jurisdiction) as have been or may hereafter be appointed, shall, from time to time, obtain, compile, and analyze, as directed by the Petroleum Administration for War, all pertinent and available facts, figures, and other data with respect to the production of all grades of aviation gasoline, including, but not limited to, information concerning the existence, location, and availability of all grades of aviation gasoline base stocks and aviation gasoline blending agents held within the petroleum industry, aviation gasoline manufacturing patents and processes, the capacity of existing aviation gasoline production and manufacturing facilities, and the possibilities of expansion of facilities now employed for such purposes, as well as the conversion thereto of facilities not now so employed. The Refining Committees and the Subcommittees on Aviation Gasoline shall recommend to the Petroleum Administration for War such measures as they deem necessary or proper for improving the quantity or quality of aviation gasoline.

(g) *Applications for exception.* Any person affected by this directive who considers that compliance therewith would work an exceptional and unreasonable hardship upon him may file an application for exception, setting forth the pertinent facts and reasons why he considers himself entitled to relief. Applications for exception shall be addressed to the Director of Refining, Petroleum Administration for War, Interior Building, Washington 25, D. C.

(h) *Effective date.* This directive shall take effect on the date of issuance.

(E.O. 9276, 7 F.R. 10091; E.O. 9319, 8 F.R. 3687.)

Issued this 24th day of July, 1944.

RALPH K. DAVIES,
*Deputy Petroleum Administrator
for War.*

[F. R. Doc. 44–11040; Filed, July 24, 1944; 11:26 a. m.]

[Petroleum Distribution Order 21,¹ Amdt. 1]

PART 1543—PETROLEUM PROCESSING, REFINING, AND MARKETING

PREMIUM MOTOR FUEL

Section 1543.1 (Petroleum Distribution Order No. 21) is hereby amended by changing subparagraph (5) of paragraph (a), and paragraph (b) to read as follows:

(a) *Definitions.* (5) "B a s e period" means, in the States of Washington, Oregon, California, Nevada, and Arizona, and in the Territories of Alaska and Hawaii, the three months period immediately preceding June 1, 1944, and in all other States of the United States, the six months period immediately preceding April 1, 1944.

(b) *Limitation on manufacture of premium motor fuel.* After the effective date of this order, the percentage of premium motor fuel manufactured by any person:

(1) In the States of Washington, Oregon, California, Nevada, and Arizona, and in the Territories of Alaska and Hawaii, based on his total manufacture of gasoline, shall not exceed nine-twentieths of the percentage of premium motor fuel, based upon total gasoline, which he manufactured during the base period; and

(2) In all other States of the United States, based upon his total manufacture of gasoline, shall not exceed one-half of the percentage of premium motor fuel, based upon total gasoline, which he manufactured during the base period.

Computation to determine that the amount of premium motor fuel manufactured by any person is within this limitation shall be made on the basis of successive three months periods, the first of which shall commence on July 1, 1944.

Nothing in this order shall be construed to limit in any way the volume of gasoline of any grade or type which any person may manufacture or deliver to the Army or Navy.

(E.O. 9276, 7 F.R. 10091; E.O. 9125, 7 F.R. 2719; E.O. 9319, 8 F.R. 3687; WPB Directive No. 30, 8 F.R. 11559; sec. 2 (a), Pub. Law 671, 76th Cong.; as amended by Pub. Laws 89 and 507, 77th Cong.)

Issued this 21st day of July 1944.

RALPH K. DAVIES,
*Deputy Petroleum
Administrator for War.*

[F. R. Doc. 44–11041; Filed, July 24, 1944; 11:26 a. m.]

TITLE 50—WILDLIFE

Chapter I—Fish and Wildlife Service, Department of the Interior

Subchapter Q—Alaska Commercial Fisheries

PART 211—PRINCE WILLIAM SOUND AREA FISHERIES

Effective only through December 31, 1944, § 211.12, Areas Open to Salmon

¹ 9 F.R. 6952.

Traps is amended as follows: Paragraph (v) is hereby suspended.

OSCAR L. CHAPMAN,
*Assistant Secretary.*

JULY 17, 1944.

[F. R. Doc. 44–10998; Filed, July 21, 1944; 9:53 a. m.]

---

## Notices

DEPARTMENT OF LABOR.

Wage and Hour Division.

ST. THOMAS AND ST. JOHN, VIRGIN ISLANDS

NOTICE OF HEARINGS ON MINIMUM WAGE RECOMMENDATIONS

Notice of hearings on the minimum wage recommendations of the Special Industry Committee for the municipality of Saint Thomas and Saint John, Virgin Islands, for the liquor, shipping, property motor carrier, wholesaling, electric power, communications, bay oil, bay rum and miscellaneous manufacturing industries in such municipality and of the Special Industry Committee for the municipality of Saint Croix, Virgin Islands, for the liquor, shipping, property motor carrier, wholesaling, communications and meat packing industries in such municipality.

Whereas, the Acting Administrator of the Wage and Hour Division of the United States Department of Labor, acting pursuant to section 5 (e) of the Fair Labor Standards Act of 1938, on March 4, 1944, by Administrative Order No. 228, appointed a Special Industry Committee for the municipality of Saint Thomas and Saint John, Virgin Islands, composed of residents of this municipality and residents of the United States outside of this municipality and including an equal number of representatives of the public, employers in the Liquor Industry, the Bay Oil, Bay Rum and Miscellaneous Manufacturing Industries, the Shipping Industry, the Property Motor Carrier Industry, the Wholesaling Industry, the Electric Power Industry, and the Communications Industry in this municipality and employees in such industries in this Municipality; and by Administrative Order No. 229, dated March 4, 1944, appointed a Special Industry Committee for the municipality of Saint Croix, Virgin Islands, composed of residents of this municipality and residents of the United States outside of this Municipality and including an equal number of representatives of the public, employers in the Liquor Industry, the Shipping Industry, the Property Motor Carrier Industry, the Wholesaling Industry, the Communications Industry, and the Meat Packing Industry in the municipality and employees in such industries in this municipality; and

Whereas, the Special Industry Committee for the municipality of Saint Thomas and Saint John, Virgin Islands, has made separate minimum wage recommendations and has duly filed with the Administrator a report containing such recommendations pursuant to section 8 (d) of the act and § 511.19 of the

AE22

# Excerpt 6



B. M. Scofield Ext. 3217.                    PETROLEUM ADMINISTRATION FOR WAR

GULF COAST WAR PLANT TELEGRAM                     REFINING DIVISION

Please note paragraphing                       WASHINGTON, D. C.   March 5, 1943.

STRAIGHT WIRE                                                3/6/43

(Please send the following wire to the attached list of names.
Fill in blank (1) with the refinery location, filling in blank
(2) with Total Input.)

    Until further advised and in accordance with Plan 15, Revised, you are now
directed to limit the total input including crude, casing head, condensate and
other raw materials for your ____(1)____ plant to ____(2)____ barrels per
calendar day. From the total input you should extract maximum quantities of which-
ever of the following products are produced at your plant:  100 and 91 octane
number aviation gasoline and components thereof, toluene, butadiene, petroleum
synthetics and petroleum coke.

    Military lubricating oils and heavy duty oils should be manufactured in
quantitiessufficient to fulfil actual commitments. Asphalt production, except
those grades excluded by Recommendation 45, Amended, and Recommendation 61, is
to be limited by intra District consumption plus box car shipments to District I
and official exceptions to P.D.C. #3 when and if granted.

    It is absolutely necessary that the above instructions be followed in order
to use available transportation effectively, to guarantee the greatest volume of
the products named above and to prevent a serious inventory build up of other
products which if not controlled will adversely effect the war program.

    Kindly acknowledge receipt of this wire and your complete understanding of
the above instructions.

                            Ralph K. Davies,
                            Deputy Petroleum Administrator.

BMS:men

cc:  Joe Nyer              R. K. Minckler 5212
     Gordon Granger        B. K. Brown 6637
     David G. Gray         D. P. Bailey 5040
     John W. Newton        C. B. Gale 5343
     K. D. Cumming 5257    R. L. Speer 5042
     B. M. Scofield

1027737

Reproduced at the National Archives

MISC-00008854
AE24

| Company Name and Address | (1) Plant Location | (2) Total Amount |
|---|---|---|
| Mr. J. A. Bartlett, Amsco Refining Company, P. O. Box 2291, Corpus Christi, Texas. | Corpus Christi, Texas | 8,108 |
| Mr. E. J. Henry, Atlantic Refining Company, 260 Broad Street, Philadelphia, Pennsylvania. | Atreco, Texas | 19,227 |
| Mr. G. L. Rowsey, Coastal Refineries Inc., P. O. Box 1039, Taylor, Texas. | Port Isabel | 6,368 |
| Mr. Walter Miller, Continental Oil Company, Ponca City, Oklahoma. | Lake Charles | 12,383 |
| Mr. K. W. Shimeall, Crown Central Petroleum Corporation, Houston, Texas. | Houston | 19,075 |
| Mr. T. J. Sullivan, Gulf Oil Corporation, Gulf Building, Pittsburgh, Pennsylvania. | Port Arthur | 120,809 |
| Mr. H. H. Baker, Humble Oil & Refining Company, Humble Building, Houston, Texas. | Baytown and Ingleside | 182,995 |
| Mr. J. W. Newton, Magnolia Petroleum Company, Magnolia Building, Dallas, Texas. | Beaumont | 86,000 |
| Mr. L. F. Rothermel, Maritime Oil Company, 2121 Semmes Street, Houston, Texas. | Houston | 5,630 |
| Mr. D. J. Smith Pan-American Refining Company, 132 E. 42nd Street, New York, New York. | Texas City | 88,200 |
| Mr. Edwin Singer, Pontiac Refining Corporation, 3400 Lawrence Street, Corpus Christi, Texas. | Corpus Christi | 20,776 |

**1027738**

Reproduced at the National Archives

MISAE2508855

| Company Name and Address | (1) Plant Location | (2) Total Input |
|---|---|---|
| Mr. J. P. Langfitt, Pure Oil Company, 35 E. Wacker Drive, Chicago, Illinois. | Nederland | 35,822 |
| Mr. O. D. Robinson, Republic Oil Refining Company, 800 Main Street, Houston, Texas. | Texas City | 12,669 |
| Mr. J. F. M. Taylor, Shell Oil Company, Inc., 50 West 50th Street, New York, New York. | Houston and Norco | 93,857 |
| Mr. G. H. Taber, Jr., Sinclair Refining Company, 630 Fifth Avenue, New York, New York. | Houston | 55,443 |
| Mr. S. S. Seltzer, Southwestern Oil & Refining Company, P. O. Box 1147, Corpus Christi, Texas. | Corpus Christi | 9,700 |
| Mr. M. J. Rathbone, Standard Oil Company of Louisiana, Baton Rouge, Louisiana. | Baton Rouge | 105,074 |
| Mr. G. L. Rowsey, Taylor Refining Company, P. O. Box 1039, Taylor, Texas. | Corpus Christi | 15,991 |
| Mr. M. Halpern, The Texas Company, 135 E. 42nd Street, New York, New York. | Port Neches, Port Arthur and Galena Park. | 135,592 |
| Mr. D. J. Smith, Pan-American Refining Company, 122 E. 42nd Street, New York, New York. | Destrehan | 7,000 |

1027739

Reproduced at the National Archives

MIS-0208856

# Excerpt 7

6/23

COPY

WA 25   WA 27-25   AA 28   GOVT NL WASHINGTON DC 22

Gordon T. Granger, Director of Refining District III
Petroleum Administration for War
245 Mellie Esperson Building, Houston, Texas

Following telegram sent June 21 by undersigned to presidents all companies
producing alkylate or codimer and to superintendents of refineries producing
alkylate or codimer:

"Further to my telegram June 17 regarding extreme need for addi-
tional Grade 130 Aviation Gasoline during next few months.  Situa-
tion sufficiently critical that we strongly urge refineries be
operated insofar as practicable along following lines until further
advice:

(1)  Those facilities contributing in any way to 100
Octane Gasoline production should be kept on stream
maximum possible time.

(2)  Postpone shutdowns for routine inspection and main-
tenance as long as possible and minimize down time by
every means at your disposal, particularly through
obtaining cooperation maintenance forces in working
overtime and shifts during unit shutdowns.

(3)  Operate catalytic and thermal cracking units at
maximum production rates with emphasis on production
additional feed stocks for alkylation and codimer
operations.  Review cracking studies your refinery
prepared by AGAC Codimer Subcommittee, and insofar
as possible place suggestions in effect to produce
maximum butylenes.

(4)  Operate isomerization plants to produce absolute
maximum isobutane, as indications are isobutane a
major current limitation increased nationwide avia-
tion production.

(5)  Foregoing should be done even if your own alkylation
and codimer plants cannot process the additional charge
stocks, as surpluses can be moved to other refiners
having available alkylation and codimer capacity.
Pressure tank cars for such transfers are available.



MISAE280384

-2-

(6) Operate alkylation plants at maximum possible production rates, supplementing butylenes with catalytic amylenes, light thermal amylenes, full range thermal amylenes, propylene, or other available olefins as situation will permit.

(7) Use every expedient to increase recovery of available isobutane, isopentane, butylenes, light amylenes, etc. for use in your own or others refineries.

(8) Notify this office immediately as indicated below, with as much advance notice as possible, whenever you anticipate having isobutane, butane-butylene, amylenes, etc. available which you cannot utilize in alkylation or codimer plants. We can generally arrange transfers to other refiners upon advance notice.

Projects for elimination of plant bottlenecks that will increase production Aviation Gasoline or components or feed stocks within next few months still urgently solicited and our Facilities Section, Refining Division prepared expedite priority requests worth-while projects.

Financial matters involved in increasing aviation production will be given preferred consideration by our Economics Section Refining Division with view eliminating any financial hindrances to increased production.

Aviation Gasoline Advisory Committee and its various Subcommittees are cooperating whole-heartedly with PAW in this urgent program and stand ready furnish expert technical assistance in fields of catalytic cracking, thermal cracking, alkylation, isomerization, aviation blending, and other contributing operations. Requests for such technical assistance from AGAC should be made through PAW as indicated below.

Initial contacts and communications with PAW pertaining to additional production, utilization, transfers and supplies of light hydrocarbons should be handled through our Mr. W. M. Holaday, Assistant Director of Refining, Attention: Mr. L. R. Goldsmith, Chief, Technological Section. Members of Refining Division will endeavor contact your organization within next few days to discuss possibilities increasing 100 Octane Aviation production your plants. Meantime appreciate your studying all possibilities this direction. Speed is vital and we know we can count on your complete cooperation."

Anything that you can do to implement foregoing program and to increase Grade 130 Aviation Gasoline production immediately will be greatly appreciated."

Bruce K. Brown, Ass't Deputy Petroleum Administrator.

MISAE020385

# Excerpt 8

**WAR DEPARTMENT**

OFFICE OF THE UNDER SECRETARY

WASHINGTON, D. C.

March 4th, 1942.

Honorable Ralph K. Davies,
Deputy Petroleum Coordinator,
Washington, D. C.

Dear Mr. Davies:

Attached is a confidential memorandum from the Chief of Ordnance, pointing out the critical condition in production of T.N.T., caused by the refinery trouble on the Gulf Coast. A like condition will prevail in aviation gasoline and butadiene.

It seems to the War Department that the refineries which are engaged in production of these materials which are vital to the war effort should be kept in operation to the full extent, in priority to refineries engaged merely in supplying ordinary civilian demands. Otherwise the war effort will be seriously impaired, as pointed out in the memorandum of the Chief of Ordnance. We urge that every measure be taken toward keeping up full production of toluene, aviation gasoline and butadiene.

Sincerely yours,

Robert P. Patterson,
Under Secretary of War.

rpp:lm
Enc.(1)lt.2/28/42
fr.Gen.Wesson,OO.471.85–
5084



**CONFIDENTIAL**



1039461

Reproduced at the National Archives

AE31

MIS-00003188

March 9, 1942.

My dear Mr. Patterson:

I have your letter of March 4 on the subject of the critical
need for high-octane gasoline and toluene, and quite agree with the
views therein expressed. Those of our refineries which are produc-
ing 100-Octane gasoline and toluene must continue to produce these
products to maximum capacity. Everything else will have to be re-
garded as decidedly secondary and adjustments, regardless of severity,
must be made to accomplish the military purposes.

This Office is very much alive to the problems so introduced
and is energetically working on them from all angles. The adjust-
ments will range all the way from alterations in crude production,
on through to changes in refinery practice, pooling facilities and
stocks, and re-allocating transportation.

Whatever is necessary to keep the production of these critical
products at maximum will be done, even though this mean as an ex-
tremity that products normally marketed be considered as waste if
there is no possible way of storing them. We hope, of course, to
avoid any such extreme through delicate balancing, adjusting, and
pooling, but the requirements of the Army and Navy must at all costs
be met.

Sincerely yours,

Ralph K. Davies,
Deputy Petroleum Coordinator.

Hon. Robert P. Patterson,

Under Secretary of War.

CI:imp

1039460

Reproduced at the National Archives

AE32
MIS-00003187

# Excerpt 9

DEFENSE PLANT CORPORATION
Washington, D. C.

ENGINEERING SECTION

Supplement No. 4 to DPC
Engineering Circular No. 94
June 2, 1942

MEMORANDUM TO SUPERVISING ENGINEERS:

Supervising Engineers are requested to familiarize themselves with the contents of the attached directive dated May 20, relative to war time construction and the urgency of saving critical materials.  The directive was prepared by the War Production Board with the approval of the War and Navy Departments.

Supervising Engineers are instructed to see to it that the provisions of the attached directive are carried out on all projects coming under their supervision.

(signed) W. L. Drager

W. L. DRAGER
Chief Engineer

6/2/42

C O P Y

AE34

## DIRECTIVE FOR WAR-TIME CONSTRUCTION

To make available all possible material and effort for immediate war production, the following outlines the principles governing war-time construction:

1. In order that the consumption of materials and equipment by construction activities shall not impede the production of combat supplies and equipment, it is essential that all construction, whether financed by Government or other funds, be reduced to the absolute minimum necessary for the war effort. This applies also to construction essential for vital civilian needs.

2. Reduction in the consumption of materials and equipment by construction operations can be achieved either by the elimination of non-essential projects or parts thereof, by deferring projects not needed immediately, or by appropriate changes in design and construction methods which will favor the use of those materials which are most plentiful and which will interfere least with the production of combat material.

3. In order to establish effective measures for the control of construction, the following general policies have been established by the War Production Board, in consultation with the War and Navy Departments.

4. Before any construction project can proceed, it must be acted upon affirmatively by some agency of the Federal Government or by its duly authorized representative. No project will be approved for construction unless it is found, by responsible authority, to meet the following criteria:

    (a)   It is essential for the war effort.

    (b)   Postponement of construction would be detrimental to the war effort.

    (c)   It is not practicable to rent or convert existing facilities for the purpose.

    (d)   The construction will not result in duplication or unnecessary expansion of existing plants or facilities now under construction or about to be constructed.

    (e)   All possible economies have been made in the project, resulting in deletion of all non-essential items and parts.

    (f)   The structure of the project has been designed of the simplest type, just sufficient to meet the minimum requirements. See paragraphs 5 and 6 also.

AE35

(g)  The answers to the following questions relating to conditions at the proposed site are all affirmative to the extent that they are pertinent:

(1)  Are there sufficient labor and materials available to build it?

(2)  Will adequate public utilities be available without costly extensions?

(3)  Will transportation be available to serve it?

(4)  Will labor be available to man it? (Are housing and other community facilities adequate?)

(5)  Will machine tools and other equipment be available to equip it?

(6)  Will raw materials be available to operate it?

(7)  Can the manufactured product be used at once - or stored until needed?

5.  <u>Priority of materials</u> - In general, all construction shall be of the cheapest, temporary character with structural stability only sufficient to meet the needs of the service which the structure is intended to fulfill during the period of its contemplated war use.  Ordinarily, wood frame construction is preferable to reinforced concrete, and reinforced concrete is preferred to steel.  However, the guiding principle should always be to <u>utilize those materials which are most plentiful</u> and which, in the ultimate analysis, will cause the least interference with the production of combat materiel and the utilization of transportation and power.

6.  Mechanical and electrical features shall be reduced to bare essentials.  Air conditioning may only be used where manufacturing processes make its use essential and not for the comfort or to increase efficiency of personnel.  Electrical systems shall be of the simplest designs.

7.  Construction materials and end products, the use of which is prohibited by the ANMB directive, "List of Prohibited Items for Construction Work", dated April 1, 1942, and revisions thereof, shall not be

specified, purchased, or used except under special waiver issued by competent authority as provided for.

8. <u>Enforcement</u> - Each department having cognizance of construction work will require its subordinate activities to comply strictly with the foregoing general policies and any extensions thereof issued by proper authority. Each department shall arrange for frequent and adequate spot checks of its projects to make sure that all subordinate agencies of the department concerned are rigorously conforming to the established policies. Furthermore, violations of these policies must be followed by proper disciplinary action and the imposition of suitable penalties.

9. It should be made clear to all concerned that these general policies should govern not only direct construction for the War and Navy Departments but also other construction financed directly or indirectly with Government funds, and all private construction. The evasion of the requirements of the general policies by manufacturers or other parties will result in the imposition of penalties.

10. The War Production Board, the Army, and the Navy shall take immediate steps to effectuate in detail this directive. It is particularly important that any governmental agency which has contact with or control of privately-owned expansions see to it that no violations of this directive occurs.

WAR AND NAVY DEPARTMENTS

Approved:

(signed) Henry L. Stimson
Henry L. Stimson
Secretary of War

(signed) Frank Knox
Frank Knox
Secretary of the Navy


May 20, 1942

C O P Y

WAR PRODUCTION BOARD

Recommended:

(signed) W. H. Harrison
W. H. Harrison, Director
Production Division

Approved:

(Signed) Donald M. Nelson
Donald M. Nelson
Chairman

AE37

# Excerpt 10

Wilk
Room —5247

25, D. C.

In reply please refer to
REF S63 FHR

Mr. E. J. Kelly
Manager Engineering Department
Gulf Oil Corporation
P. O. Box 1166
Pittsburgh 30, Pa.

Dear Mr. Kelly:

Your application, FAN Form 30, covering the construction of
an oil separator at the Philadelphia Refinery at a total cost of
$89,497 has been reviewed by this office. The data submitted,
in our opinion, do not substantiate sufficient urgency to justify
the expenditure of materials and labor required for this project
at this time when every effort must be made to channel all avail-
able material and labor to projects which will increase produc-
tion of aviation gasoline and other urgently needed products.

Our opinion in this case is based on the following:

1.  Although the application does state that over a period of
years, plant changes and additions have progressively increas-
ed the load on the two existing separators to such an extent
that they no longer operate within the limitations of American
Petroleum Institute recommendations, it is no place states
that the Philadelphia Refinery is allowing oil to escape in
such quantity that it constitutes a polution problem which
must be rectified without delay. The strongest statement
in the application is, "oil may escape into the Schuylkill
River during heavy rains". The photostatic copy of the
letter from the Commonwealth of Pennsylvania, Department of
Health does not indicate that immediate action is necessary.
It is true that this letter does state that they have urged
the Gulf Oil Corporation for some time to install additional
facilities, but the reason given is only general in nature,
this being that "the Board is now engaged in a campaign to
bring about reduction in pollution of State waters by in-
dustrial wastes.

2.  In the event circumstances did make it necessary to in-
stall the requested facilities immediately, the present
design could not be allowed. Because of the critical steel
situation, only the minimum of steel could be allowed and
this would mean at least the substitution of concrete for
the proposed walls of sheet steel piling.

Reproduced from the Unclassified / Declassified Holdings of the National Archives

AE39

-2-

3.  Since this refinery is located in a critical labor area, only extremely urgent projects can be recommended for favorable action at this time. Where possible, all work must be deferred until the labor situation eases.

The information presented indicated that this project is desirable, but it does not substantiate an immediate undeniable need, therefore, we believe it advisable to hold this application in our files to be considered at a later date as outlined in our letter dated May 29, 1944 "To All Petroleum Refiners".

Very truly yours,

(Sgd.) GEORGE L. PARKHURST
George L. Parkhurst
Assistant Director of Refining


FHR:mdj

cc:     Parkhurst
        Wilk
        Culbertson
        Barnes
        Ref. File (2)
        Chron. File

Reproduced from the Unclassified / Declassified Holdings of the National Archives

# Excerpt 11

Hon. Robert P. Patterson,
    Under Secretary of War,
        Room 5160, New War Dept. Bldg.,
            Washington, D. C.

### Re: 100 Octane Aviation Gasoline

My dear Mr. Secretary:

A situation has arisen which has the effect of retarding the execution of about 75% of all of our plans for erecting additional facilities for 100 octane aviation gasoline. In view of the urgency and importance of this matter, I wish to lay before you, in general terms, the happenings of recent weeks and the situation in which we now find ourselves. Since Defense Supplies Corporation is essential in this plan, I am addressing an identical letter to Hon. Jesse Jones on this subject.

Briefly put, since December 10, 1941, there has been a progressive withdrawal, on the part of the Government agencies involved, from the procurement policy originally agreed upon. The policy has now reached a point of illiberality such that we will not be able to induce many of the refining companies, large and small, to install additional facilities at their own expense. Defense Plants have a place in the aviation gasoline facilities picture but if we rely entirely upon the erection of such plants for our requirements, the effect is going to be to increase the ultimate cost of the product and to retard the date when adequate supplies will be available.

In reviewing the happenings of recent weeks, I should first state that after a series of conferences with the War Department and Defense Supplies Corporation, this office was advised that, at the request of the War Department, Defense Supplies Corporation would contract with petroleum refiners for the output of their new or expanded facilities for producing 100 octane aviation gasoline for a period of three years, with option to the Government to extend the period, if desirable, for two more years. It was recognized by every-one, Government agencies and refiners alike, that should the war cease before December 31, 1945 (the end of the original term of the proposed contracts) Government would not need all of the 100 octane gasoline

NARA - CP
RG 253 E 50 Box 755
January 1942

for which it had contracted. Should the war cease in 1943 or
1944 it would obviously be necessary that Government amend or
terminate such contracts and recognize that under these circum-
stances the contractor might be entitled to damages for failure
to take its product. Acting in reliance on the expressed policy,
I personally told the presidents of some sixty-six oil companies,
on December 10, 1941, to proceed in all haste to expand their
facilities for the manufacture of this product or to contract new
facilities, if such were feasible, in order to meet this demand,
and I told them that Defense Supplies Corporation was prepared
to contract with them for three years' output starting - say -
January 1, 1943, which was about as early a date as new facilities
could go into operation. Secretary Ickes, acting on information I
gave him, made a similar plea to the refining industry. Representa-
tives of the War Department had in many meetings and on many occasions
expressed this same policy.

The refining industry responded very loyally and we have received
many proposals for the increase of facilities for making aviation
gasoline in privately financed plants, even though it is the firm
opinion of most of the refiners that, upon cessation of war, the
demand for 100 octane gasoline is bound to diminish to such a
degree the industry will be over-built and many of the manufacturing
units will become practically useless.

In an effort to secure the greatest increase in 100 octane
capacity at the earliest possible moment this Office followed the
policy of first dealing with the companies who were furthest advanced
in their plans and who offered the best proposals to Government.
At this same time a separate staff, especially created for this
purpose, commenced the laborious task of working out the details of
Defense Plants plans to take a part of the requirements load.

The Standard Oil Company of New Jersey which is a tremendously
wealthy company already manufacturing sixteen thousand barrels per
day of 100 octane gasoline, submitted a plan to us in which, for
reasons applying only to it, it did not even <u>ask</u> for a three year
output contract. Jersey asked that Defense Supplies commit itself
merely to take one year's full output from its expanded facilities.
As to the second and third years Jersey contented itself with request-
ing that Government treat it fairly by buying from it a pro rata share
of Government's actual requirements. This proposal was so advantageous
to Government that we acted on it as rapidly as possible, brought it
to the attention of War, Navy and Defense Supplies, and a contract
was signed on this basis.

2

The next most liberal proposal we have received was from the Magnolia Petroleum Company which is a 100% owned subsidiary of the very large and wealthy Socony-Vacuum Company. While Magnolia requested a three year contract its proposal was in reality only a two year contract, in the sense, that no damage would result should Government refuse to purchase in the third year. Even as to the first two years its proposal was very liberal because while it desired a prepayment amounting to 75% of the estimated new investment, no damages would result, if Defense Supplies purchased as little as 20% of the total gasoline which Magnolia would be capable of producing in its expanded facilities.

On account of its liberality we promptly submitted this proposal to War, Navy and Defense Supplies. The resulting negotiations with Magnolia were arduous, but the points of difference did not involve the principle of the Magnolia proposal but related to legal details. Mr. John A. Brown, President of Socony-Vacuum Company, who has cooperated very loyally with this office in all matters relating to the petroleum industry, became so confused by the reception his liberal proposal received that for a time he refused to sign any contract. Had he persisted in this he would have added immeasurably to the difficulty of placing under contract other companies who are not able , for technical, economic and financial reasons, to make proposals of the same liberality.

Accordingly we persuaded Mr. Brown that the Magnolia Company should sign a contract. To further indicate his attitude towards the matter, he changed his proposal, at the last moment, in such a way that Magnolia asked for only half as much advance as before and insisted on returning it to Defense Supplies as a credit against gasoline purchased over a period of one year. As a result of this particular set of negotiations, Defense Supplies has an assured source of 12,000 barrels per day of aviation gasoline until December 31, 1947, and no commitment to take any of it except 20% of full capacity during one year. Representatives of the Office of the Petroleum Coordinator have been careful to explain, on many occasions, that the Jersey and Magnolia proposals were more liberal than could possibly be made by most units of the petroleum industry. During the period of the Magnolia and Jersey negotiations we were dealing with a number of refiners in an effort to put their proposals in such condition to be considered by War, Navy and Defense Supplies. In this connection you will remember that before such proposals can be submitted formally to Defense Supplies it is necessary for us to pass on technical points, economy of investment and the price. Following the opinion of the representatives of the various governmental agencies as to correct policy, we endeavored to induce a number of the refiners to follow the general pattern of the Magnolia

3

NARA - CP
RG 253 E 50 Box 755
January 1942

AE44

agreement.

Restating the Magnolia pattern, it provides for a prepayment
from Defense Supplies which shall in no case exceed 75% of the new
investment, a negotiated price, and an agreement that the prepayment
(upon which the refiner pays 2% interest) shall be returned in
monthly increments in the form of a credit on gasoline purchases.
In the event Defense Supplies fails to make such purchases this
monthly increment becomes liquidated damage for the failure to
purchase. Whereas Magnolia originally wanted to return the pre-
payment over a period of two operating years and later insisted
on returning the same in one operating year, other refiners desire
to return the prepayment in monthly increments over the entire life
of the contract - i.e. - three years. This attitude on their part
is understandable in view of the fact they were told that Government
would contract on a three year basis.

On Friday, January 16, representatives of this office introduced
officials of the Texas Company to War, Navy and Defense Supplies
representatives. Previous to this meeting we had helped Texas develop
a contract along the pattern of the Magnolia agreement as provided
for a prepayment to be returned as a credit on gasoline purchases
each of thirty-six months. These contracts, it appeared to us,
fitted the pattern already set down and were reasonable and fair
to both the Government and to the Texas Company, although instead of
being contracts for three years' full capacity they were essentially
only contracts for three years' 40% capacity with an option to
Defense Supplies to take the remaining production. After a two hour
discussion in the absence of the Texas Company officials, it was
concluded, representatives of the War Department taking the initiative,
that these contracts were not satisfactory because they imposed an
obligation on Government to buy a fixed amount of gasoline in the
year commencing January 1, 1945 - i.e. - the third operating year
of the three year contract which we had in effect promised the refiners.

In an effort to reach some solution it was suggested and agreed
by representatives of the various Government agencies, that Defense
Supplies should offer to purchase the full output of the proposed
Texas plants for one year and then incur an obligation to buy from
Texas in the second and third years only Texas' pro rata share of
Government purchases. The Texas Company had already worked for
about two weeks on these contracts but after the proposal was made
to them and they had half an hour to consider, they accepted it.
Accordingly the Texas contracts were rewritten on this basis.

In the meantime representatives of The Consolidated Oil Company
acting on behalf of its affiliates, Sinclair and Richfield, also adapted

4

NARA - CP
RG 253 E 50 Box 755
January 1942

AE45

themselves to the original pattern. On Saturday, January 17 they presented to Defense Supplies Corporation two such contracts already signed by them. In the case of the Consolidated subsidiaries the prepayment requested was 75% and this was to be returned over thirty-six months. Failure to take the amount of gasoline equivalent to 1/36th of the prepayment would result in the company retaining the residue as damages for that month. In the case of the Sinclair refinery at Houston, the practical effect was that Defense Supplies would have to take 26% of the full output for three years in order to recapture its down payment, whereas in the case of the Richfield plant in California, only 19% of the full output (from old and new facilities) would have to be purchased. As a result of a meeting on the preceeding day (January 16) representatives of this Office understood the policy to be that Defense Supplies would contract to take one year's full capacity from a refiner and obligate itself to give him a pro rata share of the business in the second and third years of the contract, or alternatively, to commit itself to take 50% of full capacity for two years and a pro rata share the third.

Accordingly we told representatives of Consolidated that it would be wise for them to adapt themselves to this new policy. After reflection they agreed, subject to Richfield's approval, to adopt the policy in the case of the Richfield installation but felt that it was not sufficient insurance to them in the case of the Sinclair installation at Houston, where they had no existing facilities and all of the product would have to be produced at plants yet to be built at very high investment costs.

Representatives of Consolidated made this opinion known to Defense Supplies and to this office and accordingly on Tuesday, January 20 another meeting was held by representatives of War, Navy, Defense Supplies and this office to reconsider the plan. However, instead of liberalising the policy the concensus of opinion (representatives of this office dissenting) was to the effect that no contract would be signed with any oil company which contained any commitment as to the second and third years beyond a commitment to give the company its pro rata share of whatever Government business might then exist.

In summary, as a result of the series of events recounted above, Government has moved during the period December 10 - January 22 from the position of being willing to contract for three years output of 100 octane gasoline from new facilities down to where it is willing to contract for only one year's output. The result of the continuous tightening of our policy has already had the effect of slowing up the conclusion of contracts

5

with refiners, although those who are able are continuing to invest their funds in preliminary engineering and construction activities in the hope of securing that fair treatment which we promised them.

Pertinent to this case is the well known fact that it has been the experience of the refining industry that manufacturing units become technologically obsolete long before treasury depreciation rates have written them off the refiners books. As a matter of fact no well informed refiner in time of peace, is willing to make any investment in new equipment except on the basis of computation that he can pay off the cost of his facilities in five year's at the maximum, preferably three years. The procurement policy which requires that the contractor include no more than "normal" depreciation, amortization and obsolescence (which we have interpreted as 10%) in the price at which the product sells, plus a modest profit, is regarded as unfair by refiners because they are firm in the belief that most of the equipment they install for the manufacture of 100 octane gasoline will be technologically obsolete after the war and that the market for the product will drop off to such an extent that they will not be able to operate the units on a full-capacity basis. However, as a result of rigid insistence on this policy and a careful policing of the contracts submitted to us, we have been able to convince most of the refiners who have submitted proposals that this is an inexorable requirement to which they must adapt themselves. They are proceeding on this basis, despite the fact that they feel quite sure that the contracts they are entering into will be a source of loss to them, except in the very unfortunate and undesirable event that the war lasts for a period of seven or eight years. This point is well illustrated by the fact that we have submitted proposals for Government investment in the same type of facilities -i.e. - Defense Plants and the business prudence of the Defense Plant Corporation has caused it to reject any idea of amortizing its own facilities at the rate of 10% per annum and is requiring the Army to underwrite its investment, with the practical effect that the units may be amortized over a shorter period. We see no way out of this particular matter, but we point to the relative illiberality of our treatment of the refining industry on whom we must absolutely rely for the bulk of 100 octane aviation gasoline needed in this war, as compared with the plain facts of the case as recognized by Defense Plant Corporation.

In conclusion, bearing in mind that the refiners must toe the mark on that part of the procurement policy that does not permit even the usual rate of amortization on the facilities and which does not permit any hope of a profit commensorate with the risks involved, it is going to be necessary, in our opinion, to adhere to the original

6

NARA - CP
RG 253 E 50 Box 755
January 1942

AE47

proposal to take all or most of three year's output from the
new facilities. By this I do not imply that the refiners are
in any way disloyal or unpatriotic; the reverse is the case.
I merely point out that, confronted with an impossible situation,
some of them are having to withdraw or recast their plans with all
the accompanying delays which such changes necessitate. Some of
these refiners will doubtless offer to build Defense Plants at
Government expense because they cannot endure the costs proposed
by Government for private industry. These Defense Plants are
bound to require more time than privately owned plants, both to
negotiate the complicated cost-plus deals and to construct the
plants. The administrative load on Government will be much greater
and the future operation of the plant will probably be less efficient.

Accordingly, I strongly recommend that we restore the three
year purchase policy on privately owned plants.

Sincerely yours,

(Sgd) Ralph K. Davies

Ralph K. Davies,
Deputy Petroleum Coordinator.

BKB:cc
1/22/42

7

NARA - CP
RG 253 E 50 Box 755
January 1942

AE48

# Excerpt 12

REPRODUCED AT THE NATIONAL ARCHIVES

PRICES OF 100 OCTANE GASOLINE AS FURNISHED BY
THE PETROLEUM ADMINISTRATION FOR WAR

So-called "100 octane" gasoline was first developed and produced in labora-
tories in the early 1930's and sold at prices which precluded its use other than
for experimentation. From these early laboratory developments, commercial plants
were built and the product was produced in small quantities and sold at very
high prices, inasmuch as practically no market existed for the product and
equipment and operating costs were extremely high in relation to the quantity
produced. During this period, the petroleum materials used were by-products
of ordinary refinery operations, being available in fairly large quantities in
comparison to the demand for this purpose, and the petroleum materials cost,
therefore, was a minor one.

During the middle 30's, additional installations were made and 100 octane
aviation gasoline was sold at prices around 35 cents per gallon at the refineries,
but as demand for the product increased and the process improved, the price was
gradually reduced. During the latter 30's, a new process of alkylation was
introduced, and, being more efficient than the previous polymerization and
hydrogenation processes, further reductions in prices were possible; and by the
outbreak of the war f.o.b. refinery price on large sales, such as to the
Army and Navy, had dropped to approximately 15.50 cents per gallon.

The only posted price for 100 octane aviation gasoline that has been located
is that of the Standard Oil Company of Ohio for the years 1940, 1941, and 1942,
as reported by the Oil Price Handbook. The price quoted was 24.5 cents per
gallon for Esso ethyl 100 octane, which is stated to be the Ohio state-wide
consumers' tank wagon price. If it is assumed, for comparative purposes, that

RG 253, NARA-CP
Entry 379
Box 2207

MAA_EM-004839

REPRODUCED AT THE NATIONAL ARCHIVES

The range of prices paid to the refiner for 100 octane aviation gasoline
by the Defense Supplies Corporation is shown by areas for January and Decem-
ber, 1943:

### 100 Octane Prices
### Defense Supplies Corporation

| Period | Atlantic Coast | | Inland | | Gulf Coast | | Pacific Coast | |
|---|---|---|---|---|---|---|---|---|
| | L. | H. | L. | H. | L. | H. | L. | H. |
| **1943** | | | | | | | | |
| January | 14.26 | 14.26 | 12.68 | 13.90 | 12.91 | 13.49 | 13.14 | 13.75 |
| December | 12.64 | 14.30 | 13.13 | 13.97 | 12.45 | 13.61 | 13.00 | 14.09 |

As noted above, there has been a gradual improvement in the quality of 100
octane aviation gasoline furnished by the petroleum industry during this period.
This quality improvement has been obtained through the installation of new
modern equipment and through the use of special high quality components. Where
the increased quality is furnished by the installation of special equipment,
the contract prices cover such increased quality, but where quality is made
as a result of the use of high cost components, such as cumene, toluene, and
xylene, the contract prices do not reflect the cost of these materials and the
prices mentioned in the table, therefore, do not include the cost of such components.

During the early stages of the war, the estimated normal production of 100
octane aviation gasoline was far below the demand of the armed forces and it was
desired to use every possible means of adding to the meager supply. High cost
and uneconomic sources were called into operation for the manufacture of high
cost components not only to improve quality but also to increase the overall
quantity available. To provide reimbursement for the added expense of this

4

RG 253, NARA-CP
Entry 379
Box 2207

MAA_EM-004842

REPRODUCED AT THE NATIONAL ARCHIVES

additional volume, the Army and Navy agreed with Defense Supplies Corporation that it would reimburse the companies for any losses incurred in such operations. These losses are paid by Defense Supplies Corporation and are passed on to the Army and the Navy and other users in the price at which the Defense Supplies Corporation resells its purchases. Not only has there been a continuation of the high cost operations undertaken in the early months of the war, but other uneconomic means have been found to further expand and improve the quality of the 100 octane aviation gasoline produced. At the request of the armed services, many refiners, installing new facilities, added additional hours to their work week, and paid bonuses for quick completion of these installations, which extra costs are also being paid by Defense Supplies Corporation and are included in the resale price at which Defense Supplies Corporation delivers this material.

As a result of the conditions described above, while the base price of 100 octane aviation gasoline has gradually dropped during this period, the resale price of 100 octane gasoline has been increased because of the additional expense incurred in high cost uneconomic operations and the costs incident to the rapid completion of new facilities.

The resale prices used by Defense Supplies Corporation since that agency started purchasing and reselling 100 octane aviation gasoline are set forth below, but in reading this table, it must be always kept in mind that into these resale prices have been added all of the extra construction and processing expenses that have been necessary to get the last possible drop of improved qualities of 100 octane in the shortest possible time. Thus, while the unit cost of 100 octane of the former specifications made in the normal way has been constantly falling, this trend has been obscured by the extraordinary expenses described above.

5

RG 253, NARA-CP
Entry 379
Box 2207

MAA_EM-004843

A1998

AE52

# Excerpt 13

RECEIVED
APR 14 1944
EXECUTIVE SECRETARY

# T I D E   W A T E R

# A S S O C I A T E D

# OIL COMPANY

## AND SUBSIDIARY COMPANIES

## ANNUAL REPORT 1943



*This report is respectfully submitted for the general information of the stock-holders of Tide Water Associated Oil Company, and is not intended for use in connection with any sale or purchase of, or offer or solicitation of offers to buy or sell, any securities.*

*This report is sent to stockholders of the Company in advance of the solicitation by or on behalf of the Board of Directors of proxies for the Annual Meeting of Stockholders to be held May 4, 1944. Proxies will be solicited, and a proxy statement will be sent to stockholders, at a later date commencing on or about April 13, 1944.*

TIDE WATER ASSOCIATED OIL COMPANY          17 BATTERY PLACE, NEW YORK 4, N. Y.

that it was largely completed in 1943. The major pipe lines to be completed in 1944 comprise the 330 miles from Midland, Texas, to Corsicana, Texas, and the 385 miles from Slaughter, Texas, to Drumright, Oklahoma. Both lines were designed to provide additional outlet for West Texas crude oil. The 24-inch pipe line commonly known as the "Big Inch" line, beginning at Longview, Texas and extending 1,250 miles to Philadelphia and New York Harbor, is the longest and largest crude oil pipe line in the world. It began delivering crude oil to the refineries on the East Coast in August, 1943. It is now regularly pumping crude oil and has a designed capacity of 300,000 barrels daily, and should deliver at least 100,000,000 barrels of crude oil in the year 1944. It is the main factor contributing to the large increase in refining on the East Coast.

The 20-inch line known as "Little Big Inch", constructed to handle petroleum products from Beaumont, Texas, to New York Harbor, a distance of 1,475 miles, has been completed and is now delivering products to the East Coast. Its rated capacity is 235,000 barrels daily.

The completed pipe line program is now estimated to cost $270,000,000, of which $187,000,000 has been financed by the Government. The total authorized program involved the construction of approximately 7,800 miles of pipe lines, but including pipe lines, the flow of which has been reversed or which have been converted from one type of service to another, the total mileage of pipe lines in the program is in excess of 11,700.

The number of high speed tankers completed and delivered in accordance with the Maritime Commission's building program amounted to sixty-two during the year 1942 and two hundred and fifty-two during the year 1943. This same program calls for the construction of two hundred ninety-two additional tankers in 1944. This Country's prewar tanker fleet was approximately three hundred fifty tankers.

Tank car movements into the Eastern States averaged about 5,000 barrels daily in the early part of 1941. As a result of the combined efforts of the Government and the Petroleum and Transportation Industries, this movement had increased to 800,000 barrels daily by July, 1942. One year later, with the aid of the 24-inch pipe line from Texas to Norris City, Illinois, a peak of 1,000,000 barrels a day was reached. With the completion of the 24-inch line to the Eastern Seaboard some of the tank cars were re-assigned to longer hauls and some were transferred to other areas and services, as a result of which the total volume delivered by tank cars was reduced to about 700,000 barrels daily. With the completion of the 24-inch crude oil pipe line and the 20-inch products line and the freedom of tankers on the Atlantic Coast from the submarine menace, it is expected that all military and essential industry requirements of petroleum products for the East Coast will be met during the year 1944.

## Refining

The year 1943 has been the greatest construction year in the history of the Petroleum Industry. The Petroleum Administrator for War recently stated:

> "One of the great achievements of industry in this war has been the successful development of the 100 octane aviation gasoline program. Starting from almost nothing, a tremendous schedule of construction is being carried out by the oil companies of the United States, Canada, Great Britain, and Holland, in record-breaking time. This is being accomplished in the face of many difficulties such as the intense competition with other important programs for man-power and materials, nor is it being hindered by the comparative lack of direct commercial post-war value for many of the plants which are being built."

Since Pearl Harbor a total of seventy-two 100 octane construction projects have been initiated, more than half of which have been completed. An additional twenty-two plants have been scheduled for the 1944 program and more than two hundred minor projects of an experimental type are being constructed to aid in the study of determining how the production of 100 octane aviation and other gasolines needed for military training can be increased. With the completion of the 1942-43 program, one hundred twenty-six domestic refineries will be contributing to the production of 100 octane gasoline, seventy-two of them making the completed product. On January 1, 1942, only twenty-two refineries in the United States were making 100 octane gasoline.

3



AE55

# Excerpt 14

# SUN OIL COMPANY

## and Subsidiaries

# ANNUAL REPORT
## for the year ended
## December 31, 1943

AE57

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 3:16-cv-01541-SGB Document 66-2 Page Filed 04/15/07 Page 60

Company was a breath-taking increase in the production of aviation fuels as the result of a construction program costing $900,000,000. During the year approximately forty plants for the manufacture of 100-octane gasoline were completed, with another thirty more nearing completion. This constitutes the largest construction program ever undertaken by the petroleum industry in a short period of time. It has resulted in increasing the total output of 100-octane gasoline more than 300 per cent over January 1942. During this year the 1943 production of 100-octane gasoline will be doubled.

These results have been achieved in the face of severe difficulties growing out of manpower and material shortages. They constitute effective testimony to the initiative, ingenuity, determination and technological resourcefulness of the industry as a whole. What is more, 75 per cent of this $900,000,000 program was financed by the industry without government assistance. Your Company has invested more than $20,000,000 in new and converted facilities for the aviation gasoline program, necessitated by the war. Altogether it has refining equipment representing an investment in excess of $60,000,000 devoted to producing aviation fuel and other essential war products.

Great as this contribution to the war effort is, your Company takes satisfaction in having made an even greater contribution growing out of its part in the commercial development and perfection of the Houdry catalytic cracking process. In addition to the cost of plant construction, the Sun Oil Company spent $11,000,000 in research and development for perfecting this process over the last ten years. It has been the backbone of the 100-octane aviation fuel program. At the end of 1943, twenty-seven out of thirty-two catalytic cracking units operating were Houdry licensed plants. Had it not been for the development of the catalytic cracking principle, it would not have been commercially possible to fulfill the United Nations' huge requirements for 100-octane aviation gasoline.

### TRANSPORTATION DIFFICULTIES OVERCOME

During the year the industry solved in large part the serious transportation problems which hampered its activities during 1942. The excellent job of the railroads in transporting crude oil from the Southwest to the Atlantic Coast refineries was augmented during the year

4

AE58

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# Excerpt 15

# Explanation

OF

## PRINCIPLES FOR DETERMINATION OF COSTS UNDER GOVERNMENT CONTRACTS

**WAR DEPARTMENT • NAVY DEPARTMENT**

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : APRIL 1942

For sale by the Superintendent of Documents, Washington, D. C. - - - - - - - Price 10 cents

Generated on 2016-03-30 16:17 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE60

355, 26
Un382e
cop. 3

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Introduction | 1 |
| Outline of the Items of Cost | 2 |
| Manufacturing costs: | |
| Direct shop costs: | |
| Materials and parts | 4 |
| Direct labor | 4 |
| Shop engineering expense | 5 |
| Other direct shop costs | 6 |
| Indirect shop costs: | |
| Supplies and sundry materials | 6 |
| Indirect labor | 6 |
| Service and maintenance | 7 |
| Fixed charges | 7 |
| Other indirect shop costs | 8 |
| Other manufacturing costs: | |
| Amortization of patents, purchased designs, etc. | 8 |
| Engineering and development expenses | 9 |
| Other contract performance costs: | |
| Delivery costs | 9 |
| Installation and servicing costs | 9 |
| Sundry specific contract costs | 10 |
| Administration and distribution expenses: | |
| General corporate and administration expenses | 10 |
| Bidding and selling and distribution expenses | 11 |
| Limitations on Admissible Costs: | |
| Costs of materials, parts, and supplies | 11 |
| Unreasonable compensation | 12 |
| Defective work | 12 |
| Self-insurance | 12 |
| Selling expenses | 13 |
| Advertising | 14 |
| Selling and advertising expenses of independent subcontractors | 14 |
| Interplant and intercompany transfers | 14 |
| Inadmissible Costs | 15 |
| Basis of Apportionment of Items of Cost: | |
| Shop engineering expense | 16 |
| Other direct shop costs | 16 |
| Indirect shop costs | 16 |
| Other manufacturing costs | 18 |
| Other contract performance costs | 18 |
| Administration and distribution expenses | 18 |
| Summary | 19 |
| Examination of methods in use | 19 |
| Contractor's Accounts: | |
| Accounting system | 20 |
| Inventory methods | 20 |
| Index | 21 |

(I)

Generated on 2016-03-30 16:18 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

J. N. Newton Bailey

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE61

## Introduction

1. This explanation has been prepared to present in basic outline the principles according to which costs may be determined under contracts with the United States Government for supplies for the War and Navy Departments. It is not intended to designate any particular system of accounting or to provide any rigid formula or set procedure. The object is to state in principle which costs may be admissible under Government contracts, which costs may be inadmissible, and which costs may be subject to limitations as to their admissibility.

2. In many Army and Navy contracts, provision has been made for determining allowable items of cost in accordance with Treasury Decision 5000, which Treasury Decision was promulgated under section 2 (b) of the act of June 28, 1940, and other provisions (sometimes referred to as the Vinson-Trammell Act), relating to excess profits on contracts for naval vessels and Army and Navy aircraft. In the case of any such contract, or any future contract in which provision is made for determining allowable items of cost in accordance with Treasury Decision 5000, the provisions of Treasury Decision 5000 shall be applicable.

3. The principles outlined herein are directed to the validity of items of cost as components of the total contract cost, without regard to their status as allowable deductions from taxable income for the purpose of computing Federal income taxes. In other words, whether or not an item of cost is allowable as a deduction in computing Federal income taxes is not the criterion whether such item is proper as a part of cost under Government contracts.

(1)

Generated on 2016-03-30 16:20 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE62

# OUTLINE OF THE ITEMS OF COST

4. The total cost under a contract is the sum of all costs incurred by the contractor incident to and necessary for the performance of the contract and properly chargeable thereto.   The items of cost that enter into Government contracts are classified in logical order in the following outline:

### MANUFACTURING COSTS

Direct shop costs:
 Materials and parts.
 Direct labor.
 Shop engineering expense.
 Other direct shop costs.
Indirect shop costs:
 Supplies and sundry materials.
 Indirect labor.
 Service and maintenance.
 Fixed charges.
 Other indirect shop costs.
Other manufacturing costs:
 Amortization of patents, purchased designs, etc.
 Engineering and development expenses.

### OTHER CONTRACT PERFORMANCE COSTS

Delivery costs.
Installation and servicing costs.
Sundry specific contract costs.

### ADMINISTRATION AND DISTRIBUTION EXPENSES

General corporate and administration expenses.
Bidding and selling and distribution expenses.

5. In presenting this outline there is no requirement that the contractor shall follow this particular classification in his own system of accounts so long as that system will furnish the information here called for.   As has been stated, it is not the purpose of this statement to prescribe uniform accounting methods.   It is the purpose to lay down the basic principles governing the determination of costs under Government contracts, which principles can be observed by means of any suitable accounting system in accordance with accepted accounting practices.

(2)

Digitized by 

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Generated on 2016-03-30 16:21 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

AE63

3

**6.** Description in more detail of the components of the above-mentioned items of cost is given in the ensuing pages. This description is intended to be informative upon the nature of the items falling under each heading and the accounting treatment to be accorded to them. All conceivable items can not be mentioned specifically, and the description furnished is indicative and not inclusive, that is to say, omission of mention is to be in no way restrictive upon the Government in determining the costs of a contract. If an item of cost is not specifically mentioned under admissible costs it is not to be thereby automatically excluded and conversely, if an item of cost is not listed under inadmissible costs or described as one subject to limitation, it does not therefore follow that such item is acknowledged to be admissible. In such cases any questions are subject to interpretation and decision according to the nature of the item. Moreover, any of the explanations given herein naturally are subject to the application of any special provisions expressly included in a contract.

Generated on 2016-03-30 16:21 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE64

6

### Other direct shop costs

18. Frequently there are items identifiable with and properly chargeable directly to manufacturing cost, which items do not come within the scope of materials, direct labor or shop engineering expense but which, because they are associated with specific operations or products, logically are direct shop costs. Items of this kind are:

    (*a*) Manufacturing royalties or license fees. (See par. 45 (*d*).)

    (*b*) Amortization of the initial cost of dies, patterns, and special tools on the basis of useful life, equitably apportioned.

19. The extraordinary circumstances which demand the acceleration of production under the war program may entail costs and expenses attributable directly to special rearrangements of plant facilities, amortization of special facilities at a rate greater than normal, etc., which should be distinguished from normal plant rearrangement and normal depreciation. The special costs and expenses here mentioned are those which are directly attributable to production under Government contracts, for which reason they are included under direct shop costs. Ordinary rearrangements of facilities not directly attributable to production under Government contracts are provided for under indirect shop costs. (See par. 29 (*a*).)

### INDIRECT SHOP COSTS

### Supplies and sundry materials

20. Under this description fall all supplies needed for general use in the factory in current operations, such as fuel, lubricants, heat treating, plating, cleaning and anodizing supplies, nondurable or small tools, gauges, factory-office supplies, boxing and wrapping materials, etc. The term "supplies" relates to a wide variety of miscellaneous materials the peculiar characteristic of which is that they are needed for the operation of the shop rather than to become a part of the product (although, as stated, some materials which are actually applied to the product may be treated as supplies). The terms "nondurable tools" and "small tools" refer to small portable tools which have a comparatively short term of effective life, such as axes, bits, chisels, drills, threading dies, templates, etc.

### Indirect labor

21. Indirect labor in a productive department covers the salaries and wages of employees in the department other than direct labor employees. By this is meant foremen and assistants, inspectors, machine setters, cleaners, crane operators, general laborers, oilers, timekeepers, and shop clerks, etc.

Generated on 2016-03-30 16:23 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE65

**7**

22. The term "indirect labor" also applies to salaries and wages paid employees in service and maintenance departments, general factory storerooms, receiving and shipping departments, factory administrative offices, laboratories, etc.

23. In general, therefore, indirect labor represents all labor for the described various activities except (1) direct labor, (2) shop engineering labor, and (3) research and development labor.

24. Instructions regarding direct labor (par. 13) as to compensation insurance, old age benefit and social security taxes, etc., apply equally to indirect labor.

### Service and maintenance

25. Ordinary and usual factory expenses of a general nature come under this heading, such as those for power, heat, and light (whether purchased or produced) water, gas, compressed air, ventilation, air conditioning, and for the operation and maintenance of plant assets and facilities. Service and maintenance expenses which are not ordinary and usual should be set out separately in the accounts of the contractor, in order that a conclusion may be based on the facts and circumstances concerning their admissibility and pertinence to the performance of the contract.

26. Service and maintenance expenses will mainly consist of supplies, indirect labor, and fixed charges (except for special purchases) all of which are mentioned in other brackets under indirect shop costs. They are referred to here only for the sake of clarity, because in most modern cost accounting systems separate accounts are kept for these departments.

### Fixed charges

27. Under this heading are included recurring charges with respect to properties used for manufacturing purposes, such as:

    (*a*) Premiums for various kinds of property insurance.

    (*b*) Property and plant taxes.

    (*c*) Rentals.

    (*d*) Allowances for depreciation and obsolescence of property and equipment (including reasonable stand-by equipment) but excluding under this heading amortization of special war production facilities (mentioned previously, par. 19). In making allowances for depreciation the rates used should be based on cost and should be such as to provide for normal exhaustion, wear and tear, and for obsolescence. Consideration may be given to an extended number of machine hours due to multishift operation. Amortization of unrealized appreciation of values of assets and depreciation of excess facilities are not admissible. (See par. 54 (*j*) and (*k*).)

Generated on 2016-03-30 16:23 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE66

8

(*e*) Depletion of natural resources.—Depletion is generally calculated on a unit basis intended to amortize the estimated content of a mineral deposit or other natural resource over the period of its expected life. Depletion for purposes of arriving at costs should generally be calculated on the basis of the actual cost of the property rather than on a basis arrived at for income tax purposes.

28. With respect to depreciation, care should be taken to observe the requirements under various forms of Government contracts. For instance, depreciation of facilities provided under an Emergency Plant Facilities contract or a Defense Plant Corporation contract may not be included as an item of cost under a Government contract for the furnishing of supplies.

**Other indirect shop costs**

29. Other indirect shop costs include miscellaneous factory expenses not directly attributable to the contract but necessary and incidental to services, operations, plant, equipment or facilities involved in the performance of the contract, such as:

(*a*) Ordinary and normal rearrangement of facilities within a department or plant.

(*b*) Employees' welfare expenses.

(*c*) Vacation pay.

(*d*) Premiums or dues on compensation insurance, not elsewhere included.

(*e*) Employer's payments to unemployment, old age, and social security funds, not elsewhere included.

(*f*) Pensions and retirement payments to factory employees.

(*g*) Factory accident compensation (as to self-insurance see par. 47).

(*h*) Amortization of the initial cost of dies, patterns, drawings and special equipment when not logically or practicably a direct shop cost. (See par. 58.)

### OTHER MANUFACTURING COSTS

30. Certain kinds of costs related to the conduct of manufacturing operations and the manufacture of products under a contract are sometimes not satisfactorily included under shop costs and are preferably to be set down as separate items of manufacturing cost. Examples of such items are mentioned hereunder.

**Amortization of patents, purchased designs, etc.**

31. The costs of obtaining patents, purchasing designs, etc., may be amortized over the period of their useful life and absorbed in the costs of manufacture by means of suitable rates.

Generated on 2016-03-30 16:24 GMT  /  http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE67

16

## BASIS OF APPORTIONMENT OF ITEMS OF COST

55. Of the items of cost which have been described, those for materials and parts and for direct labor are in the main directly identifiable immediately with particular products or with operations or processes performed thereon. Most of the other items of cost will require some means of apportionment by which to charge an equitable share of the various items to the cost of the products or the performance of the contract.

56. No general rules applicable to all cases can be stated to define particular methods or bases of apportionment because they are obviously dependent upon the conditions and the nature of the operations in each individual case. Some methods commonly in use are described in the following paragraphs.

### Shop engineering expense

57. Usually shop engineering expenses can be accumulated by jobs or projects and thus related to particular products, product groups or operations. The amounts of the respective expenses can be reduced to percentages, in relation to either the direct labor cost or the direct shop cost of production, by means of which a ratable share of the shop engineering expenses can be apportioned more or less on the principle of services rendered or incidence of benefit.

### Other direct shop costs

58. Admissible manufacturing royalties or license fees are usually at stipulated rates for specified operations or production. Such rates may afford the basis of apportionment. Amortization of the initial cost of dies, patterns, etc. (see par. 18 ($b$)) is usually apportioned on the basis of productive output or useful life. To arrive at productive output an estimate is made on the basis of experience or engineering knowledge of the quantity of products which can be produced before the facility will be discarded. The initial cost of the facility divided by this quantity affords a unit rate which can be applied to actual production. The useful life basis as here meant is akin to depreciation in that the initial cost is to be absorbed on the basis of time during the period in which the facilities are expected to be in use. Extraordinary rearrangements of plant facilities, etc., arising from acceleration of production for the completion of war contracts (see par. 19) should be accumulated in separate accounts and since they are caused by war contracts, it should not be difficult to apportion the costs equitably to them.

### Indirect shop costs (see pars. 20–29)

59. These indirect shop costs normally can be identified with individual departments in the factory. These departments are generally physically distinguishable and separate, involving different equipment

Generated on 2016-03-30 16:27 GMT  /  http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE68

**17**

and operations and individual supervision. In large factories such departments may be further subdivided into production centers. Broadly speaking, departments fall into two categories, namely (1) productive departments and (2) nonproductive departments. Productive departments are those engaged in manufacturing completed or partly completed products or parts of products. "Nonproductive departments" is a term here used to represent all other departments, such as service and maintenance, general factory storerooms, receiving and shipping departments, factory administrative offices, laboratories, etc.

60. The indirect shop costs of the nonproductive departments are usually accumulated in separate departmental accounts under modern cost accounting procedures. That is to say the supplies and sundry materials, the indirect labor pay rolls, the fixed charges and the other indirect shop costs pertinent to these departments can be identified and set down in the departmental accounts. The total of these expenses thus accumulated then can be apportioned to productive departments on different bases, selecting for each department that which appears to be the most logical and practicable and is, so far as possible, related to the services rendered. The power plant can be analyzed into facilities for electric power, heat, light, gas, compressed air, etc., and the respective costs of these can be distributed according to their use. Electric power is usually applied on the basis of rated horsepower of motors modified by a load factor, heat on the basis of area with perhaps special rates for equipment using high-pressure steam, light on floor space and type of lighting, gas per thousand cubic feet where used, and so forth. General plant expenses as distinct from service and maintenance usually must be apportioned more arbitrarily and various bases are used such as total man-hours, total pay rolls or overriding percentage on other expenses, etc.

61. The indirect shop costs of the nonproductive departments thus distributed to productive departments then are added to the indirect shop costs directly distributed to the productive departments and their totals are reduced to departmental rates (usually called burden rates) by means of which all the expenses are distributed to the operations and products of the productive departments.

62. These burden rates are expressed in various factors, whichever appear to be the most appropriate under the conditions, such as the following:

    (*a*) Percent to direct labor dollars.

    (*b*) Dollars per man-hour.

    (*c*) Dollars per machine-hour.

    (*d*) Dollars or cents per unit (weight, quantity, length, area, cubic content, etc.)

Generated on 2016-03-30 16:28 GMT / http://hdl.handle.net/2027/uiug.30112101585294
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

AE69

# Excerpt 16

1

2
IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT CALIFORNIA

3

4
UNITED STATES OF AMERICA;
STATE OF CALIFORNIA, ex rel.
CALIFORNIA DEPARTMENT OF

5
HEALTH SERVICES, HAZARDOUS
SUBSTANCE ACCOUNT, and

6
HAZARDOUS SUBSTANCE CLEANUP
FUND

7
Vs.                    CA. NO. CV 91 0589 RJK (Ex)

8

9
SHELL OIL COMPANY; UNION OIL
COMPANY OF CALIFORNIA; ATLANTIC
RICHFIELD COMPANY; TEXACO, INC.;

10
LOS COYOTES ESTATES, LTD.;
RAMPARTS RESEARCH & FINANCIAL

11
CORPORATION; and McCAULEY LCX
CORPORATION

12

13

14
DEPOSITION OF J. HOWARD MARSHALL

VOLUME II

15

16

17

18

19

20

21

22

23

24

25



One West Loop South, Suite 822
Houston, Texas 77027
(713) 993-0202

Continental
Court Reporters, Inc.
Certified Court Reporters

2201 Market Street
Galveston, Texas 77550
(409) 763-2201

AE71

1         possible means of so adjusting your

2         operations so as to assure that maximum

3         production is attained."  Here he's talking

4         about 100 octane aviation gasoline?

5   A.  Yes.

6   Q.  He continues, "The provisions of the Aviation

7         Gasoline Reimbursement Plan of July 24, 1942

8         are available to reimburse you for net losses

9         occurred in adjusting your operations to

10        increase production of these desirable

11        components."  And by components, he must be

12        referring up ahead to a number of them,

13        including alkylate.

14  A.  It does.

15  Q.  And my question to you is this:  If the oil

16        industry executives had come to the War

17        Production Board in response to this urging

18        by Secretary Ickes and said, "We're going to

19        produce it.  We're going to produce the

20        alkylate we need, but there's acid sludge

21        there, are you going to pay for it?"  Is

22        there any question but that the war

23        production -- but that the Petroleum

24        Administration for War would have said, "If

25        you can verify your costs, we'll take care of


One West Loop South, Suite 822          Continental          2201 Market Street
Houston, Texas 77027          Court Reporters, Inc.          Galveston, Texas 77550
(713) 993-0202                                              (409) 763-2201

Certified Court Reporters

AE72

```
1              it"?

2                        MR. LEVIN:  Objection.

3                        MR. WEINISCHKE: Object to the form.

4    Q.   You can go ahead and answer.

5    A.   Of course, we would.  That was part of the

6         program.

7    Q.   Isn't it true, Mr. Marshall, that if alkylate

8         is going to be produced in order to make 100

9         octane, there's going to be acid sludge?

10   A.   Well, at that time, I don't know of any way

11        to do it without it.  Making acid sludge is a

12        by-product.  Hell, today we do.

13   Q.   Isn't it like, Mr. Marshall, if someone asked

14        you to make a donut, you are going to have to

15        make a donut hole.

16                       MR. LEVIN:  Objection.

17   Q.   Isn't it something like that?  You're going

18        to have acid sludge if you are going to make

19        100 octane using alkylate?

20                       MR. LEVIN:  Objection.

21   A.   In all my refinery experience that's

22        happened.  I own a big piece of refinery in

23        Minnesota -- Minneapolis St. Paul and we have

24        to wrestle with acid sludge all the time, and

25        do.  So far we haven't polluted anything, I
```

One West Loop South, Suite 822
Houston, Texas 77027
(713) 993-0202


Continental
Court Reporters, Inc.
Certified Court Reporters

2201 Market Street
Galveston, Texas 77550
(409) 763-2201

E73

# Excerpt 17

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT CALIFORNIA

UNITED STATES OF AMERICA;
STATE OF CALIFORNIA, <u>ex rel.</u>
CALIFORNIA DEPARTMENT OF
HEALTH SERVICES, HAZARDOUS
SUBSTANCE ACCOUNT, and
HAZARDOUS SUBSTANCE CLEANUP
FUND

Vs.                    CA. NO. CV 91 0589 RJK (Ex)

SHELL OIL COMPANY; UNION OIL
COMPANY OF CALIFORNIA; ATLANTIC
RICHFIELD COMPANY; TEXACO, INC.;
LOS COYOTES ESTATES, LTD.;
RAMPARTS RESEARCH & FINANCIAL
CORPORATION; and McCAULEY LCX
CORPORATION

<u>DEPOSITION OF J. HOWARD MARSHALL</u>

<u>VOLUME I</u>



One West Loop South, Suite 822
Houston, Texas 77027
(713) 993-0202

Continental
Court Reporters, Inc.
Certified Court Reporters

2201 Market Street
Galveston, Texas 77550
(409) 763-2201

AE75

1    Q.    So you -- you felt that on the whole,

2          although you had these powers, you really

3          didn't have to use them for the most part?

4    A.    You get a lot more done with flys -- with

5          honey than you do with vinegar.  Just that

6          such rule.  When you start to use force, then

7          you have to use it all the time and there

8          wasn't enough force to do that.  Once or

9          twice, maybe more than that, I had to

10         threaten, saying to some oil executive much

11         my senior, "Well, you have to do it.  If you

12         don't do it, we have to bring down your head

13         and a lot of things that I don't want to

14         invoke.  I don't want to invoke the Second

15         War Powers Act, but I can if I have to."

16   Q.    Okay.  You once mentioned a company up in

17         Ventura, California that showed some

18         reluctance to go along with the program.

19   A.    Not some, everything he could muster.

20   Q.    What -- what was the problem there?

21   A.    Well, we had a series of quotas for each

22         company in the field.  And all of them, with

23         this one exception, obeyed the quotas and

24         lived by them.  And they said, "To heck with

25         you.  We're going to run our business and you

One West Loop South, Suite 822
Houston, Texas 77027
(713) 993-0202


Continental
Court Reporters, Inc.
Certified Court Reporters

2201 Market Street
Galveston, Texas 77550
(409) 763-2201

AE76

1          keep your hands off of it."

2                    It took me a day to take his

3          material priorities away from him.  He came,

4          with his tail between his legs about a week

5          later, said, "All right.  I want to make

6          peace."

7                    I said, "You better."

8     Q.   Explain what you mean by materials priority.

9     A.   To run a refinery, or an oil well, you have

10         to have a constant supplies of materials and

11         maintenance.  Just run-of-the-mill stuff to

12         keep the thing on -- in operation.  And you

13         take those essential parts away and the

14         fellow goes down.  He can't operate without

15         it.  Now, only one part will stop him.  He

16         might have enough of five but lack the sixth.

17         Down he goes.

18    Q.   Under the wartime controls, what branch of

19         government had the power to control the

20         materials and supplies to these various

21         petroleum companies?

22    A.   Theoretically the War Production Board.

23                   MR. LEVIN:  Let me record my

24         objection to the use of the word "control."

25                   MR. LERMAN:  Go ahead.

One West Loop South, Suite 822
Houston, Texas 77027
(713) 993-0202


Continental
Court Reporters, Inc.
Certified Court Reporters

2201 Market Street
Galveston, Texas 77550
(409) 763-2201

AE77

```
 1            remember.  It's been too damn long.  I don't

 2            remember just all the occasions --

 3    Q.      Sure.

 4    A.      But I know there were some.

 5    Q.      Were there times when it cost more for

 6            specific components that went into the 100

 7            octane gasoline and the cost was not

 8            anticipated and that became an extraordinary

 9            cost?  Do you recall that?

10    A.      I don't recall it, but I'm sure there were.

11            I'm very sure there were.

12    Q.      I'm going to --

13    A.      After 50 years that -- that kind of detail

14            slips away.

15    Q.      Certainly.  Is it fair to say that the

16            government knew that there would be

17            tremendous costs involved in gearing up the

18            industry and producing the 100 octane program

19            and that the government was standing ready to

20            underwrite the financing of that?

21    A.      Yes.

22    Q.      And that was --

23    A.      We had no choice.

24    Q.      Because you needed the 100 octane?

25    A.      Exactly right.
```

One West Loop South, Suite 822
Houston, Texas 77027
(713) 993-0202


Continental
Court Reporters, Inc.
Certified Court Reporters

2201 Market Street
Galveston, Texas 77550
(409) 763-2201

AE78

1   Q.   And the extraordinary cost reimbursement

2        program was designed to do just that?

3   A.   Just that.  With all of its shortcomings.

4   Q.   While you were at the PAW, do you recall if

5        the cost of disposing of by-products of 100

6        octane ever came up?

7   A.   I think it did, but I don't remember

8        specifically.  Hell, everything came up one

9        way or another.  So far as the moaning and

10       groaning about disposal cost, I think my

11       usual reply to it was, "Oh, go get the job

12       done and quite worrying about it."

13  Q.   And if there was extraordinary costs the

14       government would deal with you fairly later

15       on?

16  A.   Well, I guess I -- I don't remember

17       specifically saying that, but I'm sure I did.

18       I didn't say the government would deal with

19       you fairly.  I said, "We'll go see Uncle

20       Jesse."  The government is a great big

21       sprawling monstrosity, as you fellows know,

22       and when you talk about "the government,"

23       it's relatively meaningless.  What part of

24       the government?  Who?

25  Q.   In this case, it was the DSC that was

One West Loop South, Suite 822
Houston, Texas 77027
(713) 993-0202


Continental
Court Reporters, Inc.
Certified Court Reporters

2201 Market Street
Galveston, Texas 77550
(409) 763-2201

AE79