## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
)
SHELL OIL COMPANY,                                    )
ATLANTIC RICHFIELD COMPANY,                )
TEXACO INC.,                                              )
AND UNION OIL COMPANY OF CALIFORNIA )
)
        Plaintiffs,                                         )
)     No. 1:06-cv-00141-SGB
        v.                                                )     Hon. Susan G. Braden
)
THE UNITED STATES OF AMERICA,            )
)
        Defendant.                                        )
_____)

## PLAINTIFFS' POST-TRIAL REPLY BRIEF

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
mkirk@cooperkirk.com

*Of counsel*:
Vincent J. Colatriano
William C. Marra
 J. Joel Alicea
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

June 10, 2016

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

EXHIBITS CITED........................................................................................... v

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 4

I.      The Federal Circuit's Mandate Permits This Court
to Award Plaintiffs 100 Percent of Their Incurred Costs. ...................... 4

II.     The Court Should Reject the Government's Attempt to Impose
Atextual Limitations on the Scope of the Indemnity. .............................. 7

III.    The Nexus Standard Is the Correct Standard of Causation under
the Contracts. ...................................................................................... 15

IV.    The Government's Understanding of But-For Causation
Would Render the Charges Provision Worthless.................................... 20

V.     Plaintiffs Are Entitled to Recover All of Their
Remediation Costs Under Either Standard of Causation....................... 25

      A.    All Acid Waste at the McColl Site Was Generated
By Reason of the Production of Avgas.................................... 26

            1.    *Spent Alkylation Acid* .................................................. 26

            2.    *Acid Sludge from the Production of Avgas Components* ............... 29

            3.    *Acid Sludge from the Reuse of Spent Alkylation Acid
for the Treatment of Non-Avgas Products*....................... 31

      B.    All Acid Waste at the McColl Site Was Dumped
By Reason of the Production of Avgas. ................................... 33

            1.    *The Increase in Acid Waste Generation*.......................... 33

            2.    *The Comparison Between 1944 and 1946
Acid Sludge Generation Rates*........................................ 33

       *3.*     *The Government's Argument Concerning Pre-War Dumping* ...........................................................39

   C.     The Oil Companies' Response Costs Were Incurred By Reason of the Sulfuric Acid Necessary for the Production of Avgas....................42

   D.     The Oil Companies' Response Costs Were Incurred By Reason of the Spent Alkylation Acid Generated by the Production of Avgas.......44

VI.    Judgment Should Be Entered Against the Government in the Amount of $99,509,847.32. ....................................................48

CONCLUSION..............................................................................................................54

# TABLE OF AUTHORITIES

**Cases**          **Page**

*Abbott v. Equity Grp., Inc.*, 2 F.3d 613 (5th Cir. 1993) ................................................20

*American Chem. Soc'y v. United States*, 194 Ct. Cl. 370 (1971) .................................22

*American Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557 (3d Cir. 2007)........17, 18

*Breese Burners, Inc. v. United States*, 128 Ct. Cl. 649 (1954) .....................................18

*Brook Vill. N. Assocs. v. General Elec. Co.*, 686 F.2d 66 (1st Cir. 1982) .....................49

*Bruno New York Indus. Corp. v. United States*, 169 Ct. Cl. 999 (1965) .......................49

*Cross Petroleum v. United States*, 51 Fed. Cl. 549 (2002) ...........................................10

*Dimalanta v. Board for Prof'l Eng'rs & Land Surveyors*, 2012 WL 363924
    (Cal. Ct. App. Feb. 6, 2012) ...................................................................................46

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ...........................18

*Heffernan v. Pacific Dunlop GNB Corp.*, 965 F.2d 369 (7th Cir. 1992) .......................17

*Howard Indus., Inc. v. United States*, 126 Ct. Cl. 283 (1953) ......................................53

*In re Miller*, 290 F.3d 263 (5th Cir. 2002) ...................................................................17

*Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256 (Fed. Cir. 2007) ...............9, 10

*Jaramillo v. State Board for Geologists & Geophysicists*, 39 Cal. Rptr. 3d 170
    (Cal. Ct. App. 2006) ................................................................................................46

*Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747,
    (Fed. Cir. 1999) ................................................................................................16, 19

*National Leased Hous. Ass'n v. United States*, 32 Fed. Cl. 762 (1995) .......................19

*Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584 (1st Cir. 2004) .........................19

*Rose Acre Farms, Inc. v. United States*, 55 Fed. Cl. 643 (2003) .................................25

*Shell Oil Co. v. United States*, 751 F.3d 1282 (Fed. Cir. 2014).............................. *passim*

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950) ....................................18

*Southern Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531 (1918) ...................25

*Spirtas Co. v. Insurance Co. of Pa.*, 555 F.3d 647 (8th Cir. 2009) ..............................19

*Storfer v. Guarantee Tr. Life Ins. Co.*, 666 F.3d 1277 (11th Cir. 2012) .......................53

*Swiff-Train Co. v. United States*, 793 F.3d 1355 (Fed. Cir. 2015) ...............................18

*Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace,*
    *Agric. Implement Workers of America, Int'l Union*, 523 U.S. 653 (1998) ..............19

*United States v. Great American Ins. Co. of New York*, 738 F.3d 1320 (Fed. Cir. 2013) .............15

*United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018 (C.D. Cal. 1998) ........................4, 5

*United States v. Shell Oil Co.*, 841 F. Supp. 962 (C.D. Cal. 1993) ................................................52

*United States v. Turner Constr. Co.*, 819 F.2d 283 (Fed. Cir. 1987)............................................20

*Vallejos v. C. E. Glass Co.*, 583 F.2d 507 (10th Cir. 1978)..........................................................49

## **Other**

Bert Black & David H. Hollander, Jr., *Unravelling Causation: Back to the Basics*,
    3 U. BALT. J. ENVTL. L. 1 (1993) ....................................................................................23, 24

Nancy A. Weston, *The Metaphysics of Modern Tort Theory*, 28 VAL. U. L. REV. 919
    (1994)...................................................................................................................................24

*Nexus*, BLACK'S LAW DICTIONARY (10th ed. 2014) ......................................................................20

**EXHIBITS CITED**

DX128          Letter from Richfield to Ralph K. Davies re Proposed Additional Facilities for
               100 Octane Gasoline at Watson, California (Jan. 13, 1942)

DX1053         Written testimony of Dr. James R. Kittrell, *Shell Oil Co. v. United States*
               (Feb. 5, 2016) (No. 06-141C) ("Kittrell")

DX1056         Written testimony of Dr. Allen Medine, *Shell Oil Co. v. United States*
               (Feb. 5, 2016) (No. 06-141C) ("Medine")

PX3            Shell Avgas Contract (Apr. 10, 1942)

PX11           CERCLA Stipulations

PX12           Judgment and Stipulation as to pre-October 31, 1998 costs incurred
               (Oct. 13, 1999)

PX13           Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact, *Shell Oil Co. v.
               United States* (Aug. 11, 2006) (No. 06-141C)

PX14           Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact, *Shell Oil Co. v.
               United States* (July 11, 2008) (No. 06-141C)

PX15           2012 Gov't Responses to Pls.' Proposed Findings of Uncontroverted Fact, *Shell
               Oil Co. v. United States* (Sept. 7, 2012) (No. 06-141C)

PX16           Def.'s Resp. to Pls.' First Set of Requests for Admission, *Shell Oil Co. et al. v.
               United States* (Dec. 9, 2015) (No. 06-141C)

PX17           Written Direct Testimony of Gregory G. Kipp, *Shell Oil Co. v. United States*
               (Feb. 5, 2016) (No. 06-141C) ("Kipp")

PX18           Written Direct Testimony of Edmond F. Bourke, *Shell Oil Co. v. United States*
               (Feb. 5, 2016) (No. 06-141C) ("Bourke")

PX101          Decl. of Edmond F. Bourke, *Shell Oil Co. v. United States* (June 20, 2008)

PX511          EPA Superfund Record of Decision: McColl (Apr. 11, 1984)

PX526          EPA Superfund Record of Decision: McColl, USEPA (May 15, 1996)

PX606          Transcript of CERCLA Allocation Trial, *United States v. Shell Oil Co.*,
               No. 91-589-RJK (Feb. 18, 1998)

PX811          A History of the Petroleum Administration for War, John W. Frey & H. Chandler
               Ide (1946)

PX812          Petroleum Refinery Engineering, W. L. Nelson (1949)

PX902          Expert Report Table 1.2 Increase in Avgas Production Over 1942 Levels, Gregory
               G. Kipp (Oct. 19, 2015)

PX904          Revised Table 3.1 Destination of Acid Sludge and Spent Alkylation Acid at
               Shell's Refineries (Barrels), Gregory G. Kipp (Oct. 19, 2015)

PX908        Expert Report Table 4.3 Acid Reprocessing Capacity of Los Angeles Chemical
             Companies, Gregory G. Kipp (Oct. 19, 2015)

PX910        Expert Report Table 4.5 Total Spent Alkylation Acid Sent to McColl Site (Tons),
             Gregory G. Kipp (Oct. 19, 2015)

PX916        Expert Report Revised Figure 3 Comparison of Spent Alkylation Acid Generated
             and Avgas Produced, Gregory G. Kipp (Oct. 19, 2015)

PX918        Expert Report Figure 5 Spent Alkylation Acid Generated at Shell Dominguez,
             Gregory G. Kipp (Oct. 19, 2015)

PX919        Expert Report Figure 6 Destination of Acid Sludge & Spent Alkylation Acid at
             Shell's Refineries, Gregory G. Kipp (Oct. 19, 2015)

PX926        Rebuttal Report Figure 3 Sludge Production at Shell's Refineries (1941-1946),
             Gregory G. Kipp (Dec. 21, 2015)

PX931        Rebuttal Report Figure 8 Contribution of Sulfate to the McColl Site, Gregory G.
             Kipp (Dec. 21, 2015)

PX940–43     Rebuttal Report Table 8 Contribution of Sulfate to the McColl Site: Sulfuric Acid
             v. Organic Material, Gregory G. Kipp (Dec. 21, 2015)

PX1009       Expert Report App. Photo 2 Aerial Imagery, Edmond F. Bourke (1947)

PX1103       Shell Wilmington & Dominguez Refineries Operating Reports (1939–1943)

PX1104       Yearly Operating Reports Wilmington Refinery, Shell Oil Co. (1944–1947)

PX1106       Memo from Ludwig Rosenstein to C. B. deBruyn (May 8, 1939)

PX1107       Memo from Ludwig Rosenstein to J. F. M. Taylor (Aug. 11, 1939)

PX1113       Refinery Sulfuric Acid Survey Table, Refining Comm. Dist. 5 (Dec. 1941)

PX1115       Richfield Oil Corporation--100-Octane Aviation Gasoline Cost Analysis and
             Breakdown (Jan. 1942)

PX1116       Texas Co.--100-Octane Aviation Gasoline Cost Analysis and Breakdown
             (Jan.1942)

PX1143       Union Oil Company of California--100-Octane Aviation Gasoline Cost Analysis
             and Breakdown (May 1945)

## INTRODUCTION

The Government's post-trial brief rests substantially on an important but unstated assumption: that its previous factual representations to this Court and the Federal Circuit are not worth the paper they are written upon. On issue after issue, the Government's position is refuted by the stipulations and admissions it agreed to over the course of a quarter-century of litigation.[1] The Government once agreed that "the Oil Companies dumped large quantities of spent alkylation acid at the McColl site," PX13, ¶ 22; *see also* Pls.' Post-Trial Proposed Findings of Fact & Mem. of Law ¶ 98(a) (Apr. 8, 2016), Doc. 202 ("PFOF" or "Pls.' Post-Trial Br.");[2] now it does not. The Government once agreed that "[t]he primary contaminant at the McColl Site is the sulfuric acid," PX14, ¶ 8; now it does not. And the Government once agreed that the Oil Companies "incurred $92,546,566.94 in total costs and statutory interest through June 30, 2012," PX15, ¶ 7; *see also* PFOF 430(a) through (c); now it does not. On any given issue of import, one is likely to find that what the Government said up until the eve of trial is precisely the opposite of what the Government says now. Indeed, the Government's brief depends on it.

But the Government's brief does not just contradict facts it once deemed uncontroversial; it ignores evidence that decisively refutes its positions. Through more than 400 proposed findings of fact and over 300 exhibits, Plaintiffs' post-trial brief catalogued the evidence proving that they are entitled to recover 100 percent of the costs that they have incurred remediating the McColl Superfund Site ("McColl" or the "Site"). Yet one would never know this after reading

---

[1] *See* Transcript of Hearing on Cross-Motions for Summ. J. Held Dec. 18, 2012 at 57:24–25 (Jan. 2, 2013), Doc. 111 (Government counsel describing a CERCLA stipulation as "a binding fact on the parties"); Transcript of Hearing Held Oct. 1, 2008 at 41:8–10 (Nov. 17, 2008), Doc. 45 (Government counsel stating that the Court "need look no further than the parties' own stipulations").

[2] Throughout this brief, citations to Plaintiffs' Proposed Findings of Fact should be understood to incorporate the evidence cited therein.

the Government's brief, which fails even to address, much less refute, the great majority of these proposed findings of fact, and it has not disputed Plaintiffs' most significant lines of evidence. These facts are now uncontested, and they compel judgment in favor of the Oil Companies.

The Government instead chooses to rest its defense on a handful of legal arguments, none of which withstand scrutiny.

First, the Government asserts that the Federal Circuit "has already rejected" Plaintiffs' argument that they are entitled to recover 100 percent of the costs that they have incurred remediating the McColl Site. Def.'s Proposed Findings of Facts & Conclusions of Law at 1 (May 23, 2016), Doc. 210 ("Gov't Post-Trial Br."). The Federal Circuit did no such thing. It offered no view on whether Plaintiffs were entitled to recover all of their response costs. Rather, the Federal Circuit left such a determination to this Court on remand. The Government's argument is an attempt to foreclose precisely the kind of inquiry that the Federal Circuit instructed this Court to conduct.

Second, the Government suggests that Plaintiffs can only recover if they can show that their remediation costs (1) were incurred by reason of the production of avgas, *and* (2) have no connection whatsoever to non-avgas products or to non-Defense Supplies Corporation (DSC) avgas. The Government's proposed test is contrary to the language of the Charges Provision (*see* PX3, § XII(a), Shell Avgas Contract (Apr. 10, 1942)), the Federal Circuit's opinion, other language within the Contracts, and the Government's own expressed understanding of the Contracts. Rather, the Contracts ask a straightforward question: did the production of avgas under the Contracts cause the Oil Companies to incur their remediation costs? The evidence overwhelmingly demonstrates that the answer is "yes," and Plaintiffs are entitled to recover all such costs.

Third, the Government argues that the Contracts impose a but-for causation standard, rather than a nexus standard. The evidence proves that all of the Oil Companies' remediation costs were incurred by reason of the production of avgas under the Contracts under either causation standard. In any case, the Federal Circuit instructed that the historical context surrounding the formation of the Contracts was essential to interpreting the Charges Provision, and that context compels the use of the less-restrictive nexus standard. Federal appellate precedent confirms this understanding of the Charges Provision.

Fourth, the Government argues that, under the but-for causation standard, Plaintiffs must prove that "the refineries would have shut down but for the avgas contracts." Gov't Post-Trial Br. at 62. The Government's test is contrary to well-established causation doctrine; it would render the Charges Provision worthless; and it is at odds with the nature of an indemnity agreement. Instead, insofar as a but-for standard of causation applies, it asks the following question: holding all else constant, if the Refineries had not produced the avgas that they *in fact* produced under the Contracts, would the Oil Companies have incurred any of the McColl remediation costs they were required to pay? Again, the evidence overwhelmingly demonstrates that the answer is "no."

Finally, the Government attacks Plaintiffs' damages figure for several meritless reasons. But the fundamental problem with the Government's position is that *all* of its arguments require it to abandon its prior and repeated admissions as to the amount of CERCLA response costs incurred by the Oil Companies. Once the Government's prior damages admissions are considered, none of its objections remain viable.

The evidence in the record is clear and decisive: all of Plaintiffs' remediation costs—$99,509,847.32 through November 30, 2015—were incurred by reason of the production of avgas under the Contracts, and Plaintiffs are entitled to full indemnification by the Government.

The Government's post-trial brief only reinforces that conclusion.

## ARGUMENT

I.    **The Federal Circuit's Mandate Permits This Court
to Award Plaintiffs 100 Percent of Their Incurred Costs.**

The Government begins its brief with the erroneous assertion that the Federal Circuit

"has already rejected" Plaintiffs' argument that they are entitled to recover 100 percent of the

costs that they have incurred remediating the McColl Site. Gov't Post-Trial Br. at 1. According

to the Government, by seeking to recover all of their remediation costs, Plaintiffs "ignore their

burden of proof and the Federal Circuit's instruction to perform an allocation." *Id.* at 36.

The Government seems to attach special significance to the Federal Circuit's instruction

that this Court determine "how much" of the acid waste at McColl exists by reason of the pro-

duction of avgas. *Id.* at 1–2, 71. Apparently, the Government is under the mistaken impression

that the answer to the Federal Circuit's question—"how much of the acid waste dumped at the

McColl site was 'by reason of' the avgas program," *Shell Oil Co. v. United States*, 751 F.3d

1282, 1303 (Fed. Cir. 2014)—cannot be "all of it." Of course, basic grammar is to the contrary.

The Government misleadingly argues that the Federal Circuit rejected the Oil Compa-

nies' claim for 100 percent of their remediation costs, implying that the Court's ruling forecloses

an award of all of the Oil Companies' costs on remand. Gov't Post-Trial Br. at 32–33, 49–50.

But the Government fails to inform the Court that the Federal Circuit rejected *only* Plaintiffs'

collateral estoppel argument. Plaintiffs had argued that "the Government [was] collaterally es-

topped from arguing that anything less than 100% of the non-benzol acid waste was due to the

avgas contracts." *Shell Oil*, 751 F.3d at 1302. The argument was based on the CERCLA district

court's factual finding that all of the non-benzol acid waste at McColl was attributable to the pro-

duction of avgas. *See United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1019–20, 1029–30

(C.D. Cal. 1998). The Federal Circuit concluded that collateral estoppel did not apply, thus permitting the Government to argue that the Oil Companies were entitled to less than 100 percent of their remediation costs. *Shell Oil*, 751 F.3d at 1303. "Absent collateral estoppel," the Oil Companies did not dispute that a remand would be necessary to determine how much of their remediation costs were incurred by reason of the production of avgas. *Id.* Thus, the Federal Circuit's holding was limited to a rejection of collateral estoppel; it did *not* opine on the question of how much acid waste exists by reason of the production of avgas. Answering that question was the whole point of the remand. *Id.* The Government seeks to turn a holding *permitting the Government* to argue *for less* than 100 percent into a holding *forbidding the Oil Companies* from arguing *in favor* of 100 percent. But nothing in the Federal Circuit's opinion precludes this Court, based on the evidence submitted in this case, from reaching the same finding that the CERCLA district court reached; the Court of Appeals merely held that this Court is not bound by the CERCLA district court's finding.

The Government also claims that the Federal Circuit's opinion contained a "holding that plaintiffs . . . dumped acid waste from operations other than avgas production at the McColl site." Gov't Post-Trial Br. at 49 (alteration in original) (emphasis omitted) (quotation marks omitted); *see also id.* at 33, 71. The Federal Circuit held no such thing. Rather, the Federal Circuit quoted the *Ninth Circuit's* opinion to show that that court "did not rely on or incorporate the district court's" factual findings with regard to non-benzol acid waste. *Shell Oil*, 751 F.3d at 1303. Because the Ninth Circuit did not do so, there was no basis for collateral estoppel. *Id.* The Federal Circuit said *nothing* that could even plausibly be construed as endorsing the Ninth Circuit's description of the facts—let alone *holding* that the Ninth Circuit's description was correct.

The Government's portrayal of the Federal Circuit's opinion with regard to the binding

nature of the Government's damages admissions are of the same character. Although the Government has stipulated to the amount of remediation costs incurred by the Oil Companies on multiple occasions, *see* PFOF 430(a) through (c), the Government assures the Court that its previous factual concessions are "of no moment" because "the Federal Circuit allowed the Government to 'challeng[e]' the amount of damages owed—or put another way—required plaintiffs to prove the amount of damages that they incurred," Gov't Post-Trial Br. at 66 (alteration in original); *see also id.* 69–70. The Federal Circuit *did* say that the Government could "challeng[e] *the amount of acid waste* attributable to the avgas contracts," *Shell Oil*, 751 F.3d at 1303 (emphasis added); it did *not* say that the Government could challenge the *amount of remediation costs* incurred by the Oil Companies. Indeed, how could it have? The Government had never questioned the amount of remediation costs incurred by the Oil Companies until the eve of trial on remand. And the Court of Appeals most certainly did not suggest that the Government could dispute the facts that it had previously stipulated or admitted were true;[3] nor did the Court even hint that the stipulations and admissions the Court relied upon in entering judgment on liability might not be admissible in the damages trial.

Nothing in the Federal Circuit's decision prevents this Court from awarding the Oil Companies 100 percent of the costs that they have incurred remediating the McColl Site. The Federal Circuit remanded a question of fact to this Court; it did not purport to answer that question.

---

[3] The Government continues to argue that this Court abrogated the effect of the admissions and stipulations by creating a "blank slate" with regard to damages and that the Federal Circuit affirmed this alleged holding. Gov't Post-Trial Br. at 33. Plaintiffs have refuted the Government's arguments on this score already, *see* Pls.' Post-Trial Br. at 157–58; Pls.' Resp. to Def.'s Objections to Written Testimony of Pls.' Experts at 9 (Feb. 15, 2016), Doc. 189 ("Response to Objections"), and since the Government offers nothing new, we will not repeat those points here.

**II.     The Court Should Reject the Government's Attempt to Impose
Atextual Limitations on the Scope of the Indemnity.**

As noted, the Federal Circuit remanded to this Court to answer a simple question: "[H]ow much of the acid waste dumped at the McColl site was 'by reason of' the avgas program"? *Shell Oil*, 751 F.3d at 1303. If the Oil Companies incurred all of their CERCLA response costs by reason of the production of avgas under the Contracts, the Government is obligated to indemnify them for all such costs. *Id.* at 1293 ("The plain language of the new or additional charges provision thus requires the Government to indemnify the Oil Companies for CERCLA costs incurred 'by reason of' the avgas contracts."). The case thus comes down to this: did the production of avgas cause the Oil Companies to incur their CERCLA response costs?

The Government's brief obscures this straightforward question. After ten pages discussing the relevant contractual language, the Government concludes that "plaintiffs may recover environmental cleanup costs under the avgas contracts only to the extent remediated wastes are attributable to the specific avgas delivered under the contracts, not to non-DSC avgas or all other products that plaintiffs produced and sold for decades before the war, during the war." Gov't Post-Trial Br. at 44; *see generally id.* at 35–44. It is not entirely clear what the Government means by this. Plaintiffs have never argued that they are entitled to costs that were not incurred by reason of the production of avgas sold under the Contracts. Rather, the Oil Companies have submitted hundreds of extensive and detailed proposed findings of fact—supported by voluminous evidence—that prove the connection between avgas production under the DSC Contracts and their CERCLA remediation costs.

For example, the Oil Companies have demonstrated that all of their remediation costs were incurred by reason of the production of avgas under the Contracts even if some of the avgas produced in 1942 and early 1943 was not sold under the Contracts. Plaintiffs offered three lines

7

of evidence in favor of this position. First, because the acid sludge dumped at the Site actually mitigated response costs, none of the acid waste dumped in 1942 and early 1943 (which consisted solely of acid sludge from Shell) added to the remediation costs. *See* PFOF 385–88. The Oil Companies incurred their remediation costs based on acid waste dumped after mid-1943, a period during which (the Government has previously stipulated) the Oil Companies sold their avgas to the DSC under the Contracts. *Id.*; *see also* PX11, Stip. 158, CERCLA Stipulations (the Contracts required the Oil Companies "to sell 100% of their 100 octane aviation gasoline to the DSC"). Second, the Oil Companies opened the McColl Site specifically because they anticipated that they would not be able to handle the enormous increase in acid waste that would be generated by reason of the production of avgas under the Contracts. *See* PFOF 389–404. Since the McColl Site only exists because of avgas production under the Contracts, all of the costs of remediating the Site are attributable to such production, even if some of the waste was generated in the production of non-DSC avgas. *Id.* Finally, Plaintiffs have proven that Shell made significant avgas sales to the DSC in 1942 via the Optional Gasoline provision of its Contract.[4] *See* PFOF 405–23. Although the Government's brief continues to assert that no avgas sales were made under the Contracts prior to January 1, 1943, Gov't Post-Trial Br. at 5, 30–31, it never addresses the extensive evidence to the contrary, *see* PFOF 405–23. Any non-DSC avgas sales were, therefore, minimal. Each of these arguments shows why—even assuming non-DSC avgas sales in

---

[4] Since it is undisputed that Shell is the only Oil Company that deposited acid waste at McColl in 1942 and early 1943, *see* PFOF 59–68, it is the only company whose avgas sales during that period are relevant.

1942 and early 1943—all of the Oil Companies' remediation costs are attributable to the produc-

tion of avgas under the DSC Contracts.[5]

The Government states that the Oil Companies can only recover "for charges imposed by

state or federal governments related to the production, manufacture, sale, or delivery of avgas, so

long as the charges occurred by reason of avgas sold under the contracts, and *not* by reason of

the multitude of other petroleum products – including non-DSC avgas." Gov't Post-Trial Br. at

37 (emphasis in original). The Government seems to be saying that, in order to recover, the Oil

Companies would have to show that their remediation costs both (1) were incurred by reason of

the production of avgas, *and* (2) have no connection whatsoever to non-avgas products or non-

DSC avgas. This argument fails for multiple, independent reasons.

First, the Contracts simply do not say that the covered costs may not have any connection

with non-avgas products or non-DSC avgas. The Contracts set up a straightforward test: were the

costs incurred by reason of the production of avgas under the Contracts? If the answer is yes,

then the Oil Companies recover their costs. The Government tries to rewrite the Contracts so

that, *even if* the Oil Companies' remediation costs were incurred by reason of the production of

avgas under the Contracts, those costs are not recoverable if they also have some connection to

non-avgas processes. That would certainly be more advantageous to the Government, but it is not

the language to which the parties agreed.[6] As the Federal Circuit stressed, "[t]he avgas contracts

---

[5] Should the Court reject all of Plaintiffs' arguments relating to 1942 and early 1943 avgas sales and decide to deduct costs associated with waste dumped during this period, Plaintiffs have offered proof that the deduct should be no more than 14.82 percent of damages ($14,747,359.37). *See* PFOF 421–23. This estimate is undisputed, as the Government has neither contested it nor offered its own estimate.

[6] For this reason, the Government's citation of *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256 (Fed. Cir. 2007), is misplaced. In that case, the Federal Circuit interpreted the phrase "resulting from" in a narrower fashion than the plaintiff sought because the rest of the lan-

promise reimbursement of '**any** new or additional . . . charges' the Government imposes on the

Oil Companies 'by reason of the production, manufacture, sale or delivery of [avgas],' " *Shell*

*Oil*, 751 F.3d at 1292 (second alteration in original), not just the charges that are *exclusively*

avgas related.

Second, if the Contracts meant what the Government claims, the Federal Circuit's opin-

ion would have looked quite different. In explaining why it was remanding for a trial on dam-

ages, the Federal Circuit noted that some of the acid sludge resulted from the treatment of non-

avgas products. *Id.* at 1303 ("The McColl Site 'contains acid sludge resulting from the treatment

of civilian and military petroleum products.' "). If the Contracts only reimbursed costs arising

solely from avgas production, the fact that there was sludge generated in the treatment of non-

avgas products would *not* have been a reason to remand; it would have been a reason to enter

partial judgment in favor of the United States as to the costs associated with that sludge. That the

Federal Circuit saw the presence of acid sludge from the treatment of non-avgas products as giv-

ing rise to a question of fact to be resolved on remand refutes the Government's position. The

Federal Circuit's decision allowed for the possibility that the Oil Companies could recover the

costs of remediating such waste—if they could show that it was "dumped at the McColl

site . . . 'by reason of' the avgas program." *Id.*

---

guage in the clause "expressly limit[ed]" the meaning of "resulting from." *Id.* at 1266. By con-
trast, the Government's attempt to limit the meaning of the Charges Provision depends on insert-
ing *unwritten* terms into the Contracts. The language of the Charges Provisions is broad, apply-
ing to "any" charges incurred by reason of the production of avgas; it does not limit the indem-
nity to charges with no connection to non-avgas products. In this way, *Cross Petroleum v. United
States*, 51 Fed. Cl. 549 (2002), actually supports Plaintiffs' argument. The indemnity provision in
*Cross Petroleum* applied to the fuel spill at issue in that case because the provision covered spills
of "*any* oil," without limitation. *Id.* at 555 (emphasis added). In the same way, the Charges Pro-
vision covers "any" charge, so long as the charge was incurred by reason of the production of
avgas. Just as the Court rejected the attempt to limit the indemnity in *Cross Petroleum* contrary
to its express, broad terms, the Court should do the same here.

Third, the Government has repeatedly taken positions that contradict the interpretation advanced in its post-trial brief. During trial, for example, the Government offered the testimony of Dr. James Kittrell concerning "red oil." Red oil is the term for the hydrocarbons contained in spent alkylation acid. PFOF 113. Dr. Kittrell observed that, when spent alkylation acid was used to treat non-avgas products, some of it was carried into the resultant acid sludge and was dumped at McColl. Dr. Kittrell admitted that this red oil at McColl was "directly attribut[able] to the production of avgas under the relevant avgas contracts." Trial Transcript of February 19 at 575:5–12 ("Feb. 19 Tr."); *see also* Gov't Post-Trial Br. at 64. But under the Government's new interpretation, *even the red oil* would not be attributable to the production of avgas because it has *some connection* to non-avgas products. After all, most of the acid sludge containing the red oil was generated during the acid treatment of non-avgas products. The testimony of the Government's own expert, then, is contrary to its new interpretation of the Contracts.[7]

Fourth, and perhaps most compelling, the parties' contemporaneous course of conduct forecloses the Government's newly minted theory that any connection to a non-avgas product severs the causal link with avgas production and forecloses reimbursement. The undisputed evidence is that both Union and Richfield included 100 percent of the cost of sulfuric acid in the agreed upon price of avgas, PFOF 107(e), and there is no reason to believe the same was not true of Shell and Texaco's Contracts as well, *see* PX1116 at JHM-0053-1524, Texas Co.--100-Octane Aviation Gasoline Cost Analysis and Breakdown (Jan. 1942) (listing "Acid" as part of price of

---

[7] Plaintiffs argued in their post-trial brief that Dr. Kittrell's red oil theory logically compels the conclusion that all of the sulfuric acid contained in the acid sludge at the Site is directly attributable to the production of avgas. *See* PFOF 113–22. Importantly, the Government offers *no answer* to this argument. That is not surprising: Dr. Kittrell was also unable to offer a coherent way of distinguishing between the red oil and sulfuric acid contained in the acid sludge at McColl. PFOF 375(d).

avgas at Texaco's Refinery). The Government agreed to attribute the entire cost of the acid to avgas production even though it was fully aware that the acid would be reused to treat non-avgas products. *See, e.g.*, PX1113 at 2, Refinery Sulfuric Acid Survey Table, Refining Comm. Dist. 5 (Dec. 1941) (showing Richfield using spent alkylation acid to treat lube oil); *id.* at 4 (showing Union reusing spent alkylation acid); PX1143 at SIC-1-0195, Union Oil Company of California--100-Octane Aviation Gasoline Cost Analysis and Breakdown (May 1945) (same). If the Government had been unwilling to reimburse the Oil Companies for costs that had some connection to non-avgas products, it would not have agreed to pay the full cost of the sulfuric acid. The Government's current interpretation is thus refuted by its own actions.

The Government points to the Price Escalation Provision for support, but that clause actually cuts *against* the Government's position. That provision acknowledges that the price of avgas is premised on "normal [refinery] operation[s]" in which "substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100-Octane aviation gasoline." PX3, § V(c), Shell Avgas Contract (Apr. 10, 1942). Because the Contracts obligated the Refineries to maximize avgas production, and because maximizing avgas production necessarily required them to produce non-avgas products, there was a risk that "an abnormal reduction" in demand for "motor fuel and petroleum products other than 100-Octane aviation gasoline" would cause the market to be flooded with non-avgas products. *Id.* If that happened, the Price Escalation Provision permitted the Refineries to reduce production of avgas in order to reduce the production of non-avgas products and permit supply and demand to realign, unless the Government agreed to increase the price of avgas to compensate the Refineries for having to continue producing an over-supply of non-avgas products. *Id.*

Thus, the Price Escalation Provision establishes the very principle that the Government

resists: that the Contracts permit the Refineries to recover costs associated with the production of non-avgas products *if* such costs are attributable to avgas production.[8] If the Refineries incurred increased costs in the production of non-avgas products because of the need to continue maximizing avgas production, the Price Escalation Provision allowed the Refineries to recover those costs by modifying the price or production of avgas. In the same way, because the Refineries generated more acid sludge from non-avgas products by reason of the production of avgas and were forced to dump the sludge to maintain maximum avgas production, the Charges Provision permits the Refineries to recover the "charge" of remediating that waste.

The Government suggests that, because the Price Escalation Provision refers to non-avgas products and the Charges Provision does not, the Charges Provision was not meant to compensate costs having any connection to non-avgas products. Gov't Post-Trial Br. at 38–39. But whereas recovery of costs under the Price Escalation Provision is limited to abnormal disruptions of the market for non-avgas products, recovery of costs under the Charges Provision is much broader, encompassing *any* new or additional charge incurred by reason of the production of avgas. *Shell Oil*, 751 F.3d at 1292. It makes sense, therefore, that the Price Escalation Provision specifically refers to non-avgas products while the Charges Provision does not.

The Government claims that Plaintiffs' interpretation of the Charges Provision would require the Government to reimburse all taxes imposed on all of the Refineries' products during the contracting period, such as gasoline taxes, and that such an interpretation is absurd. Gov't

---

[8] The Government is therefore wrong when it says that the Price Escalation Provision shows that the Refineries were supposed to "recover all costs associated with [non-avgas] products through the sale of those products." Gov't Post-Trial Br. at 38. The Clause actually says the opposite: it provides a way for the Refineries to recover the costs of *non-avgas* products through *avgas* production or pricing.

Post-Trial Br. at 41. But no absurdity exists. First, the Charges Provision is limited to *new* or *additional* taxes that were not in place at the time the Contracts were signed, so it only applies to a small universe of taxes. That is even clearer when one considers that the parties provided for the reimbursement of taxes in existence at the time they signed the Contracts through both the price of avgas and the "existing taxes" provision (PX3, § XII(b), Shell Avgas Contract (Apr. 10, 1942)). *See, e.g.*, PX1115 at NAW-0077-7230, Line 12, Richfield Oil Corporation--100-Octane Aviation Gasoline Cost Analysis and Breakdown (Jan. 1942) (taxes included in price of avgas); PX1116 at JHM-0053-1543, Texas Co.--100-Octane Aviation Gasoline Cost Analysis and Breakdown (Jan. 1942) (same); *see also* DX128 at 3, Letter from Richfield to Ralph K. Davies re Proposed Additional Facilities for 100 Octane Gasoline at Watson, California (Jan. 13, 1942) (adding the "existing taxes" provision to ensure that the Refineries would be reimbursed for state "gasoline tax[es]"); PFOF 21–23. Second, the Charges Provision *itself* directs the Government to pay "any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by [the Price Escalation Provision]." PX3, § XII(a), Shell Avgas Contract (Apr. 10, 1942). Since crude oil was used to produce non-avgas products, the above language shows that the Charges Provision contemplates that the Oil Companies can recover taxes paid even where the taxes were not imposed *solely* on avgas production.

The Government asserts that Plaintiffs' interpretation of the Charges Provision "would effectively render the 'commodities delivered hereunder' provision meaningless," Gov't Post-Trial Br. at 40, but that is clearly wrong. Any party seeking indemnification under the Charges Provision would have to show that its claimed costs were incurred by reason of the production of avgas delivered under the Contracts. That is why Plaintiffs have submitted hundreds of proposed

14

findings of fact proving the connection between their remediation costs and the avgas that they sold to the DSC under the Contracts (almost all of which the Government entirely fails to address). But it is one thing to require Plaintiffs to show a connection between the costs that they have incurred and the avgas that they sold to the DSC; it is quite another to require them to show that such costs *also* had *no connection* to any other type of product in the Refineries. The former requirement is imposed by the Contracts; the latter requirement is invented by the Government.[9]

The question for the Court is simply this: did the production of avgas under the Contracts cause the Oil Companies to incur their remediation costs? The evidence overwhelmingly demonstrates that the answer is "yes," and that entitles them to full indemnification.

### III.     The Nexus Standard Is the Correct Standard of Causation under the Contracts.

The Federal Circuit has established that "World War II and the stark necessity of increased avgas production are the circumstances surrounding the formation of the avgas contracts." *Shell Oil*, 751 F.3d at 1296. That context is decisive in determining the meaning of the

---

[9] The Government mentions, in passing, that the Contracts specify that "damages under this contract shall be limited to those arising proximately from a breach of contract." Gov't Post-Trial Br. at 40 (quoting PX3, § VIII(b), Shell Avgas Contract (Apr. 10, 1942) (the "Damages Provision")). The Government does not make much of this provision (which only appears in a few Contracts), and rightly so. The breach in this case occurred in 2006, when the Government refused to pay the Oil Companies' claims under the Contracts. Obviously, that breach is the proximate cause of Plaintiffs' damages.

Relatedly, the Government has now waived any argument that the Contracts impose a proximate-cause standard, and Plaintiffs urge the Court to so hold. The Government did not mention proximate cause in its pre-trial brief and has failed to do so again post-trial, other than a throw-away line about the need to show a "direct or proximate link between a causal event and resulting charges." Gov't Post-Trial Br. at 36. *See United States v. Great American Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

In any event, the Federal Circuit has foreclosed a proximate-cause standard in this case, as Plaintiffs demonstrated in their pre- and post-trial briefs. *See* Pls.' Post-Trial Br. at 137–38; Pls.' Mem. of Contentions of Fact & Law at 39 (Jan. 8, 2016), Doc. 171-1 ("Pls.' Pre-Trial Br.").

contractual provision in this case. As shown below, *see infra* Section V, Plaintiffs are entitled to recover 100 percent of their remediation costs regardless of whether the Contracts impose a but-for or nexus standard of causation, and we urge the Court to so find. But in determining the correct standard of causation, the context in which the Contracts were formed demonstrates that "by reason of" imposes a nexus standard.

"[T]he language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Shell Oil*, 751 F.3d at 1296 (quoting *Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999)). The historical context of the Contracts was essential to the Federal Circuit's holding that "charges" included CERCLA remediation costs: "To resolve this contract claim . . . we *must* recall and place into its appropriate context the atmosphere of stark determination for victory at all costs, which drove our war effort after the Japanese Empire attacked the United States Naval Base at Pearl Harbor on December 7, 1941." *Id.* at 1284 (emphasis added).

The Federal Circuit described the historical context relevant to interpretation of the Contracts in some detail. The Contracts were formed during a time when the United States was determined to achieve "victory at all costs," *id.*, and it was "essential to the United States' war effort" that avgas production be increased to the maximum, *id.* at 1285. For that reason, "[d]uring contract negotiation and the years that followed, the Government's primary concern was maximum avgas production." *Id.* at 1287; PFOF 7–14.

To achieve maximum avgas production, the Government needed the cooperation of the nation's refineries. *Shell Oil*, 751 F.3d at 1286 ("the Government's substantial authority to control production only extended to *existing* facilities; it could not force companies to invest in new

ones" (emphasis in original)). But because the Contracts would only provide for "low profit mar-gin[s]," they "contained various concessions to the Oil Companies." *Id.* at 1287. Critically, "[t]he Oil Companies agreed to the avgas contracts' low profits in return for the Government's assump-tion of certain risks outside of the Oil Companies' control." *Id.* at 1296. There was, in other words, a bargained-for exchange "in which the Oil Companies worked to achieve the Govern-ment's goal of maximizing avgas production and the Government assumed the risks of such in-creased production." *Id.* at 1287; *see also id.* (the Contracts contained "measures to limit the Oil Companies' risk in producing avgas"). Because the Oil Companies "could not have contem-plated such CERCLA charges at the time they entered into the contracts," the Federal Circuit held that the Charges Provision "must be interpreted to require reimbursement for the Oil Com-panies' CERCLA costs arising from avgas production." *Id.* at 1296.

This context is undisputed—the Government never so much as mentions it in its analysis of causation—and it is decisive here. Just as the Federal Circuit relied on the context of the Charges Provision to reject the Government's more restrictive definition of "charges," this Court should rely on it to reject the Government's more restrictive definition of "by reason of." As the Fifth Circuit recognized in *In re Miller*, where an indemnification clause in a contract is intended to encourage a particular action while shielding the indemnitee from risk, the phrase "by reason of" must be "broadly interpret[ed]." 290 F.3d 263, 267 (5th Cir. 2002). The Seventh Circuit has likewise interpreted a contractual indemnification clause according to its risk-shifting purpose, holding that such a clause must be interpreted "expansively" to impose a nexus standard. *See Heffernan v. Pacific Dunlop GNB Corp.*, 965 F.2d 369, 375 (7th Cir. 1992). And the Third Cir-cuit has specifically rejected the but-for standard in the context of a "by reason of" contractual indemnity provision. *See American Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557,

17

576 (3d Cir. 2007).[10]

The Government cites Supreme Court authority suggesting that "by reason of" imposes a but-for standard, Gov't Post-Trial Br. at 46, but all the cases the Government cites involved interpretation of statutory provisions. The Supreme Court has warned that "[e]ven though the language of the contract may be identic with that of [a statute], this language in the contract may have a scope independent of the proper construction of [the statute]." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 678 (1950). "The same words, in different settings, may not mean the same thing. Parties do not necessarily endow statutory language in a contract with the scope of the statute, particularly when the same term may have variant meanings for different applications of the statute." *Id.* (citations omitted). The Court of Claims has likewise rejected the notion that contractual language should always be interpreted the same way as statutory text:

> [T]he meaning of words in a statute is not always the same as the meaning of the same words in a contract. In construing a contract we must ascertain the meaning *understood by both parties*, the meaning on which the minds of the parties met; in construing a statute we look for the meaning in which Congress used the words.

*Breese Burners, Inc. v. United States*, 128 Ct. Cl. 649, 659 (1954) (emphasis added). The key to interpreting "by reason of," then, is what *the parties* understood it to mean, not what *Congress* understood that language to mean in unrelated federal statutes,[11] and the best evidence of that shared intent is the historical context outlined and relied upon by the Federal Circuit.

The Government also cites cases from the First and Eighth Circuits interpreting the

---

[10] Contrary to the Government's implicit suggestion that the Oil Companies have changed litigating positions during post-trial briefing, Gov't Post-Trial Br. at 45–46, Plaintiffs have argued that the nexus standard is the correct standard of causation since July 2008, *see* Pls.' Reply Br. in Supp. of Their Mot. for Summ. J. at 9–10 (July 25, 2008), Doc. 38.

[11] For the same reason, the Government's reliance on *Swiff-Train Co. v. United States*, 793 F.3d 1355 (Fed. Cir. 2015) and *Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997), is misplaced. *See* Gov't Post-Trial Br. at 47. Both cases interpreted "by reason of" in the context of statutes, not indemnity contracts.

phrase "by reason of" to require but-for causation in the context of indemnity contracts. *See Spirtas Co. v. Insurance Co. of Pa.*, 555 F.3d 647, 652 (8th Cir. 2009); *Pacific Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584, 589 (1st Cir. 2004). But neither case analyzed the language at issue in the manner prescribed by the Federal Circuit for these Contracts. Rather than examining the language of the contract *in context* in order to understand the intent of the parties, the First and Eighth Circuits merely cited authorities and declared that "by reason of" required but-for causation. *Spirtas* contains no analysis beyond citations of *Pacific Insurance* and Black's Law Dictionary, 555 F.3d at 652, but the Federal Circuit has instructed that "to interpret disputed contract terms, the context and intention [of the contracting parties] are more meaningful than the dictionary definition," *Metric Constructors*, 169 F.3d at 752 (alteration in original) (quotation marks omitted). *Pacific Insurance* likewise relied almost exclusively on statutory interpretation cases, without any analysis of the relevant context. 369 F.3d at 589. This lack of a contextualized analysis is at odds with both Federal Circuit precedent and sound principles of interpretation. *See also Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace, Agric. Implement Workers of America, Int'l Union*, 523 U.S. 653, 657 (1998) (Scalia, J.) ("it is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used" (quotation marks omitted)); *National Leased Hous. Ass'n v. United States*, 32 Fed. Cl. 762, 765 (1995) (examining historical context to interpret a contractual provision), *aff'd*, 105 F.3d 1423 (Fed. Cir. 1997).

But to the extent there remains any doubt as to the meaning of "by reason of," the principle of *contra proferentem* requires imposing a nexus standard. It is undisputed that the Government drafted the Charges Provision, *see* PFOF 21–24, and if the provision is ambiguous, it must

be "construed against the party who drafted [it]," *United States v. Turner Constr. Co.*, 819 F.2d

283, 286 (Fed. Cir. 1987). The Government never responds to this argument in its brief, and if

the historical context of the Contracts does not compel the use of the nexus standard, *contra*

*proferentem* does. Therefore, Plaintiffs need only show a "connection or link" between the pro-

duction of avgas and the remediation costs that they have incurred. *Nexus*, BLACK'S LAW DIC-

TIONARY (10th ed. 2014).

IV.    **The Government's Understanding of But-For Causation**
       **Would Render the Charges Provision Worthless.**

In any event, even if the but-for standard applies, the Government's proposed application

of the standard is clearly wrong. As the Federal Circuit held, the purpose of the Charges Provi-

sion was to ensure that "the Government assumed the risks of such increased [avgas] produc-

tion." *Shell Oil*, 751 F.3d at 1287. This transfer of risk is in the nature of an indemnity contract:

"[T]he purpose of an indemnity agreement is to allocate the risk inherent in the activity between

the parties to the contract." *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 627 n.52 (5th Cir. 1993). The

risk-shifting nature of an indemnity is crucial to understanding how but-for causation must be ap-

plied, and it is a concept that the Government utterly fails to grasp.

The Government argues that, if the Refineries had not maximized avgas production,

"they would have manufactured additional war products or civilian products to meet the excess

demand, thereby generating even more pollution." Gov't Post-Trial Br. at 54; *see also id.* at 2. In

the Government's but-for world, the Refineries would have increased their production of non-

avgas products to make up for the absence of avgas production. Because these non-avgas prod-

ucts would generate acid waste, the Government speculates that the Refineries would have pro-

20

duced just as much—if not more—acid waste had they not produced avgas. The Government essentially argues that the Refineries' acid waste production was six of one and half dozen of the other: if they had not produced acid waste from avgas, they would have produced acid waste from non-avgas products instead. Therefore, in the Government's view, the Oil Companies can only prove but-for causation by showing that "they would have idled their refineries had they not entered into the contracts." *Id.* at 3. As the Government puts it: "Under the correct but-for analysis, the operative question to ask is whether the refineries would have *shut down* but for the avgas contracts." *Id.* at 62 (emphasis added); *see also id.* at 52 ("taking away the contracts from the equation, the oil companies would not have shut down their refineries and stopped manufacturing motor gasoline and other acid treated products").

This conception of but-for causation badly misunderstands the nature of an indemnity, and it would render the Charges Provision worthless. To understand why, consider how the Government's interpretation of but-for causation would affect the reimbursement of taxes under the Charges Provision. Imagine that the State of California imposed a new tax on the sale of all petroleum products in 1944. The Refineries would have had to pay the tax on all avgas sold to the DSC, as well as on all other products sold. Under the Government's logic, the Oil Companies could not seek reimbursement under the Charges Provision for the taxes they paid on *avgas sales* because, had they not produced avgas, they might have produced some *other* petroleum products that would have incurred the new tax. Thus, even where a tax was indisputably levied on avgas, the Government's novel application of the but-for standard would preclude indemnification.

Or consider the example of a provision intended to cover the costs of production. Imagine a carpenter who runs a highly successful business making bookshelves. Customer A asks the car-

penter to build her a bookshelf and promises to reimburse the carpenter for all costs that he in-

curs by reason of the production of the bookshelf, plus a fee. The carpenter dutifully gets to

work, produces a magnificent bookshelf, and delivers it to Customer A. But Customer A refuses

to pay for the cost of making the bookshelf on the grounds that those costs were not incurred by

reason of the production of the bookshelf. After all, given the success of the carpenter's shop, if

the carpenter had not built a bookshelf for *her*, he would have built the bookshelf for *someone*

*else*. Clearly, Customer A's argument is ridiculous. The relevant question is not whether the car-

penter *would have* incurred the same expenses to build a bookshelf for *someone else*; the relevant

question is whether he *in fact* incurred the expenses to build *this particular* bookshelf. Any other

interpretation of "by reason of" in this context would defeat the entire purpose of the carpenter's

contract with Customer A. *See American Chem. Soc'y v. United States*, 194 Ct. Cl. 370, 384

(1971) (rejecting the Government's argument that it did not have to reimburse costs under a con-

tract if those costs would have been incurred anyway but for the contract and stating that such an

argument "could not logically be made").

In the same way, the relevant question is not whether, in the absence of avgas production,

the Refineries *would have* produced the same acid waste making *other* products; the relevant

question is whether they *in fact* generated their acid waste (and incurred their remediation costs)

because of the avgas that they *did* produce. Any other interpretation defeats the purpose of the

Charges Provision, which is to shift the risk and the cost of maximum avgas production to the

Government. *Of course* the Refineries would not have shut down absent the Contracts,[12] and the

---

[12] There *is* evidence, however, that the Government would have dramatically curtailed the
Refineries' production of non-avgas products (and, therefore, acid sludge) by restricting their
supply of crude oil, since the Government controlled the supply of crude oil and was willing to
cut off refineries that did not agree to produce avgas. *See* PX606 at 149:12–150:4, Transcript of
CERCLA Allocation Trial, *United States v. Shell Oil Co.*, No. 91-589-RJK (Feb. 18, 1998) ("We

fact that the Government's conception of but-for causation would require the Refineries to prove otherwise is the strongest possible proof that the Government's test is wrong. The Federal Circuit made clear that the Oil Companies viewed the Charges Provision as an essential and valuable concession in their negotiations with the Government, but according to the Government, the Oil Companies were played for fools. Since the Charges Provision, as misinterpreted by the Government, only entitles the Oil Companies to indemnification if they can prove a completely fanciful counterfactual, it is *worthless*. This cannot be what the Charges Provision means.

Rather, the proper but-for test is simple: holding all else constant, if the Refineries had not produced the avgas that they *in fact* produced under the Contracts, would the Oil Companies have avoided incurring their remediation costs at McColl? This test is not only rooted in the nature of an indemnity, as explained above; it is dictated by the language of the Charges Provision itself. The Charges Provision asks whether the costs were incurred by reason of the production of "the commodities delivered hereunder." PX3, § XII(a), Shell Avgas Contract (Apr. 10, 1942). The commodity delivered under the Contracts was *avgas*, and, therefore, the Charges Provision instructs courts to take avgas production under the Contracts—and only avgas production under the Contracts—out of the picture, and see what results. Thus, the but-for world is one in which everything other than avgas production is held constant; the world remains the same as it was except for the production of avgas under the Contracts.

Basic principles of but-for causation doctrine dictate this test. "Any effect has an infinite

---

quit allocating crude oil to those that didn't devote themselves to what we called the war effort."); PX11, Stip. 118 ("[t]he Government regulated refiners' access to crude oil"); PX811 at 176–77, A History of the Petroleum Administration for War, John W. Frey & H. Chandler Ide (1946) (describing crude oil allocation in District 5 by the Petroleum Administration for War). So, even under the Government's absurd but-for world, the Refineries would not have dumped at McColl.

number of 'but for' causes," Bert Black & David H. Hollander, Jr., *Unravelling Causation: Back to the Basics*, 3 U. BALT. J. ENVTL. L. 1, 9 (1993), but to test whether a specific factor was a but-for cause of an effect, one has to "hold the world constant except for the deletion of the cause at issue," Nancy A. Weston, *The Metaphysics of Modern Tort Theory*, 28 VAL. U. L. REV. 919, 929 n.12 (1994). If the but-for world is changed in multiple ways, one quickly loses control of the chain of causation and crosses the line into pure speculation.

The Government falls into this error when it asserts that, but-for the avgas contracts, the Refineries would have produced more non-avgas products and would not have installed catalytic crackers and hydrogenators. *See, e.g.*, Gov't Post-Trial Br. at 53–54. First, the Government is wrong to focus on the Contracts as the relevant but-for factor. The Charges Provision specifies that the test is whether the costs were incurred by reason of the production of *avgas*, not by reason of the avgas *contracts*. Second, the Government's but-for world is one in which multiple factors have changed: not only avgas production, but the production of non-avgas products and the technology within the Refineries as well.[13] Doing so opens the door to an infinite regress of causation, where parties change factors in the but-for world in response to each other. So, for instance, when the Government argues that, absent avgas production, the Refineries might have increased production of non-avgas products, Plaintiffs could respond that the Refineries would have been able to burn more acid waste if they did not have to produce avgas, *see* PX17 at 71–76, Written Direct Testimony of Gregory G. Kipp, *Shell Oil Co. v. United States* (Feb. 5, 2016)

---

[13] For reasons described below, *see infra* Section V.B.2, Plaintiffs' comparison of 1944 and 1946 acid sludge production rates effectively zeroes-out the impact of catalytic cracking and hydrogenation, and so the Government's objection based on technology is irrelevant for factual as well as legal reasons.

(No. 06-141C) ("Kipp"), which would have offset the effect of any increased production of non-avgas products.

It should be obvious that this speculative back-and-forth will quickly get out-of-hand, rendering any but-for analysis useless. *Cf. Southern Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533–34 (1918) (refusing to trace damages "beyond the first step" because of the "endlessness and futility of the effort to follow every transaction to its ultimate result"). A proper but-for analysis isolates the factor to be tested and removes *only* that factor from the but-for world, holding all else constant. *See Rose Acre Farms, Inc. v. United States*, 55 Fed. Cl. 643, 654 (2003) ("A 'but-for' world is a hypothetical scenario predicting what would have happened if some *outcome determinative factor* had not occurred." (emphasis added)), *vacated and remanded on other grounds*, 373 F.3d 1177 (Fed. Cir. 2004). Here, the Charges Provision clearly states that the relevant factor to be removed from the but-for world (insofar as the but-for standard applies) is the production of avgas under the Contracts; all else remains equal.

## V.    Plaintiffs Are Entitled to Recover All of Their Remediation Costs Under Either Standard of Causation.

As described above, *see supra* Section III, the Charges Provision imposes a nexus standard of causation, and Plaintiffs urge the Court to so hold. However, Plaintiffs respectfully request that the Court also find that Plaintiffs are entitled to recover all of their remediation costs under *either* a but-for or a nexus standard. The evidence clearly shows that Plaintiffs satisfy both standards of causation.

### A. All Acid Waste at the McColl Site Was Generated By Reason of the Production of Avgas.

There are three types of acid waste at McColl: (1) spent alkylation acid; (2) acid sludge resulting from the acid treatment of avgas components; and (3) acid sludge resulting from the acid treatment of non-avgas products.[14] The evidence proves that each category of acid waste was generated by reason of the production of avgas under the Contracts.

*1. Spent Alkylation Acid*

The Government has conceded that spent alkylation acid is attributable to avgas production, PFOF 99, and its own expert, Dr. Kittrell, admitted as much at trial, Feb. 19 Tr. at 505:14–17. However, the Government disputes—contrary to its repeated and longstanding admissions over the course of decades of litigation, *see* PFOF 98(a)—that spent alkylation acid was dumped at McColl. In our post-trial brief, Plaintiffs documented the extensive evidence in the record, in addition to the Government's repeated stipulations and admissions, that spent alkylation acid was

---

[14] The Government accuses Plaintiffs of using the term "acid waste" as a way of "double-count[ing]" sulfuric acid by first counting it as spent alkylation acid and then counting it as acid sludge. Gov't Post-Trial Br. at 57. First, both the Federal Circuit and the Government have used the term "acid waste" routinely in the past. *See, e.g., Shell Oil*, 751 F.3d at 1303; Def.'s Resp. to Pls.' Mot. for Summ. J. & Cross Mot. for Summ. J. (Sept. 7, 2012), Doc. 100 (*passim*). Second, the Shell operating reports distinguish between spent alkylation acid reused in acid treatment and spent alkylation acid sent off-site. *See, e.g.,* PX1103 at Year 1942 at 98, Shell Wilmington & Dominguez Refineries Operating Reports (1939–1943). Mr. Kipp was careful to only count the spent alkylation acid sent off-site in his estimates of total acid waste in order to avoid double-counting, *see* PX17 at 52, Kipp (calculation of acid waste "does not include the reuse of spent alkylation acid for acid treatment; the only methods of waste management accounted for in this graph are those that actually eliminate waste from the Refineries."); PX904, Revised Table 3.1 Destination of Acid Sludge and Spent Alkylation Acid at Shell's Refineries (Barrels), Gregory G. Kipp (Oct. 19, 2015); PX919, Expert Report Figure 6 Destination of Acid Sludge & Spent Alkylation Acid at Shell's Refineries, Gregory G. Kipp (Oct. 19, 2015), and he did the same with regard to acid sludge, Trial Transcript of February 16 at 167:9–168:2 ("Feb. 16 Tr."). The Government's accusation is baseless.

dumped at the Site. *See* PFOF 98(a) through (g). For instance, USEPA's 1996 Record of Decision (ROD) described the waste at McColl as including "spent sulfuric acid catalyst," PX526, § I.B, EPA Superfund Record of Decision: McColl, USEPA (May 15, 1996), which Dr. Kittrell admitted on cross-examination "clearly refers to spent alkylation acid," Feb. 19 Tr. at 517:17–518:7. Plaintiffs also cited evidence about the acidity of the waste, PFOF 98(b), and the viscosity of the waste, PFOF 98(c); contemporaneous accounts of surplus spent alkylation acid at the Refineries in late 1944 and early 1945, PFOF 98(d); a contemporaneous description of the dumping of spent alkylation acid on the West Coast, PFOF 98(e); the presence of tar in each sump, PFOF 98(f); and Shell's disposal contract with Eli McColl, which specifically contemplated the dumping of spent alkylation acid, PFOF 98(g).

Yet, the Government's post-trial brief resolutely ignores *all* of this evidence, much as Dr. Kittrell did under cross-examination at trial. *See, e.g.*, Feb. 19 Tr. at 507:10–14; PFOF 375(a). The Government asserts that all of the Refineries' surplus spent alkylation acid in late 1944 and early 1945 was shipped to Northern California and that, when these shipments are deducted from Mr. Kipp's calculations of spent acid dumped at McColl, the result is that no spent acid was dumped. Gov't Post-Trial Br. at 28. But in his expert testimony, Mr. Kipp explained that such shipments were *already accounted for* in his analysis, PX17 at 96–102, Kipp; PFOF 98(d), and neither the Government nor any of its experts has ever addressed—let alone answered—Mr. Kipp's explanation. Indeed, not only does the Government fail to answer Mr. Kipp's decisive response to its argument, it accuses Mr. Kipp of "*assum[ing]* that the oil companies did not ship any spent alkylation acid from Southern California to Northern California," Gov't Post-Trial Br. at 56 (emphasis added); *see also id.* at 28 (stating that Mr. Kipp's analysis "depends on there be-

ing no shipments" to Northern California), which even a perfunctory reading of Mr. Kipp's testimony would show to be false.

The same pattern repeats itself when the Government asserts that, since Shell did not dump spent alkylation acid at McColl, none of the other Refineries did either. Gov't Post-Trial Br. at 26–27, 56. In his direct testimony, Mr. Kipp anticipated this argument and explained that Shell had priority access to Stauffer's acid reprocessing facilities, which permitted it to avoid dumping spent alkylation acid when there was insufficient reprocessing capacity in Southern California in late 1944 and early 1945. PX17 at 102–03, Kipp; PFOF 98(d). The other Refineries did not have priority access, and they were forced to dump their excess spent alkylation acid. PX17 at 102–03, Kipp; PFOF 98(d). Once again, this explanation is uncontested: neither the Government nor any of its experts has ever addressed it.

Finally, the Government cites Mr. Bourke's observation that the sumps at McColl have similar chemical and physical properties and that, if spent alkylation acid had been dumped in only one or two sumps, one would expect their properties to be different. Gov't Post-Trial Br. at 27–28; *see also* PX18 at 50, Written Direct Testimony of Edmond F. Bourke, *Shell Oil Co. v. United States* (Feb. 5, 2016) (No. 06-141C) ("Bourke"); PFOF 320, 323. Both parties agree that the uniform physical and chemical composition of the sumps is inconsistent with spent alkylation acid being dumped in only a few sumps; the question is whether that indicates that all sumps contain spent alkylation acid or that none of them do. In light of the overwhelming evidence that spent alkylation acid was dumped at McColl, this logically compels the conclusion that spent alkylation acid was dumped in each sump, as Mr. Bourke testified. PX18 at 50, Bourke; PFOF 320, 323.

The Government, however, disputes that conclusion by pointing to the testimony—approximately fifty years after the fact—of Eli McColl's son, John McColl. Gov't Post-Trial Br. at 27–28. But the Government places far too much weight on a single, ambiguous response. John McColl was asked if "one [sump] was filled and then they would dig another one when one was filled," and he responded "I *believe* so." Transcript of Deposition of John McColl Taken Sept. 21, 1990 at 58:1–3 (Mar. 23, 2016), Doc. 201-1 (emphasis added). Not only was McColl's answer tentative and given almost fifty years after the fact, *id.* at 5, it is contradicted by USEPA's 1984 ROD, which states that "[i]n 1942 Eli McColl had 12 pits constructed," PX511, § II, EPA Superfund Record of Decision: McColl (Apr. 11, 1984). Thus, according to USEPA, Eli McColl did *not* dig one hole at a time, as John McColl tentatively suggested; rather, all twelve sumps were dug in 1942, which is consistent with all sumps being used simultaneously. Moreover, as Mr. Bourke testified, the fact that all sumps were open and uncovered in 1947 (as shown by aerial photographs) is likewise consistent with all sumps being used simultaneously. PX18 at 51, Bourke; PX1009, Expert Report App. Photo 2 Aerial Imagery, Edmond F. Bourke (1947). In the face of the mountain of evidence proving that spent alkylation acid was dumped at McColl—including the Government's own admissions to that fact—the evidence weighs heavily in favor of the conclusion that spent alkylation acid was dumped in each sump.

### 2. *Acid Sludge from the Production of Avgas Components*

As with spent alkylation acid, the Government has conceded that acid sludge from the treatment of avgas components is attributable to avgas production, PFOF 100(a), and Dr. Kittrell admitted as much at trial, Feb. 19 Tr. at 502:9–16; PFOF 102. But the Government disputes—contrary to its repeated and longstanding admissions, PFOF 100(a)—that any such sludge was produced by the Refineries. Plaintiffs have described the numerous sources of evidence proving

that the Refineries generated acid sludge from the treatment of avgas components. *See* PFOF

100(a) through (d). For instance, Shell's operating reports clearly state that it produced over 1

million barrels of avgas base stock using an experimental thermal cracker, PX1103 at Year 1943

at 1-f, 51-a, Shell Wilmington & Dominguez Refineries Operating Reports (1939–1943), and Dr.

Kittrell admitted at trial that, because "the pressure distillate from this experimental cracker"

would be "used to make avgas basestock, it [would have] to be acid treated," Feb. 19 Tr. at

555:10–13. He also admitted that such treatment "would produce some sludge." *Id.* at 501:25–

502:5. This was just one example of Shell treating avgas components and producing sludge as a

result. *See also* PFOF 100(d) (describing pentene amylene pre-treatment). Plaintiffs also de-

scribed evidence that the other Refineries generated sludge from the treatment of avgas compo-

nents, and the evidence is particularly extensive with regard to Texaco. PFOF 100(c). Perhaps

for that reason, even the Government's expert in the CERCLA trial testified that all four Refiner-

ies generated acid sludge from the treatment of avgas components. PFOF 100(b).

      Once again, the Government ignores virtually all of this evidence in its brief. The only

evidence it addresses is the treatment by Texaco, which forces the Government to begrudgingly

admit that "Texaco ma[y] have acid treated" avgas base stock. Gov't Post-Trial Br. at 9. The

Government tries to minimize the significance of its Texaco admission, *id.*, but it does so without

mentioning Shell's more than *1 million barrels* of treated avgas base stock that, by Dr. Kittrell's

own admission, would have generated acid sludge, PFOF 100(d). The Government asserts that

Shell's operating reports show no acid treatment of avgas components, Gov't Post-Trial Br. at 8

(citing "p. 87ff" for each year's report); *id.* at 15, but we have been unable to find the pages the

Government cites from the operating reports for that assertion. In any case, the Government ig-

nores passages from the operating reports that clearly indicate such treatment. *See* PFOF 100(d)

(collecting citations of Shell operating reports). The Government states that the treatment of al-kylation feed stocks "produced no sludge," Gov't Post-Trial Br. at 8, but both Mr. Kipp and the Government's own CERCLA expert testified otherwise, *see* PX17 at 15, Kipp; PFOF 100(b). In-deed, the Government itself has admitted in the past that treatment of alkylation feed stocks gen-erates sludge. PX11, Stip. 16. In short, the evidence overwhelmingly demonstrates that the Re-fineries generated acid sludge from the treatment of avgas components.

### 3. Acid Sludge from the Reuse of Spent Alkylation Acid for the Treatment of Non-Avgas Products

Finally, the acid sludge from the treatment of non-avgas products is likewise attributable to avgas production. As we explained in our opening post-trial brief, *see* PFOF 104–12, the pro-duction of avgas required, as a byproduct, the production and acid-treatment of non-avgas prod-ucts, which in turn produced acid sludge. Therefore, as a matter of chemistry, in order to produce avgas, the Refineries had to generate acid sludge from non-avgas products.

The Government's brief does not deny that the Refineries had to produce non-avgas products in order to produce avgas; nor does the Government deny that all non-avgas products produced by the Refineries had to be acid treated (indeed, the Government has affirmatively con-ceded that they had to be, *see* PX16, ¶ 45, Def.'s Resp. to Pls.' First Set of Requests for Admis-sion, *Shell Oil Co. et al. v. United States* (Dec. 9, 2015) (No. 06-141C)). Instead, the Govern-ment asserts that the Refineries *could* have produced other non-avgas products that would not have required acid treatment. Gov't Post-Trial Br. at 7–8. But Mr. Kipp testified that, "with rare exceptions, every non-avgas product that might come out of the Refineries traditionally required acid treatment as a matter of standard refinery practice." PX17 at 20–21, Kipp. Mr. Kipp's testi-mony is supported by a standard textbook on refinery operations published just after World War

II: "Impurities that are present in crude oils and those produced during refinery distillation and cracking operations must be removed from *nearly all* commercial products." PX812 at 252, Petroleum Refinery Engineering, W. L. Nelson (1949) (emphasis added). The Government has not shown that the Refineries could have produced *only* non-avgas products that did not require acid treatment.

Even if the Government had made such a showing, that raises the question of what the Refineries would have done with the unprecedented quantities of spent alkylation acid confronting them by reason of the production of avgas. During 1942 and 1943, in particular, the reuse of spent alkylation acid in acid treatment processes was "the primary means of managing the spent acid" because there was a shortage of reprocessing capacity. PX17 at 34, Kipp; PFOF 134–42; 150–58. The Government is essentially arguing that the Refineries should have made their spent alkylation acid situation far worse in order to avoid producing acid sludge.

The Government also argues that the non-avgas products produced by the Refineries cannot be thought of as byproducts of avgas production because the Refineries produced non-avgas products "before, during, and after World War II." Gov't Post-Trial Br. at 41. But as shown in our opening post-trial brief, both the Government and the Refineries viewed avgas production as the primary purpose of the Refineries' operations; all other products were secondary and incidental. PFOF 107(a) through (e). Indeed, the Refineries were even willing to destroy valuable non-avgas products as well as produce unnecessary non-avgas products in order to maximize avgas production, PFOF 107(b)(iv), 107(c), something that makes no sense unless non-avgas products were viewed as incidental byproducts of avgas production. The Government's brief never addresses this evidence.

32

**B.  All Acid Waste at the McColl Site Was Dumped
    By Reason of the Production of Avgas.**

Quite apart from whether all acid waste was generated by reason of the production of

avgas, it was certainly *dumped* by reason of the production of avgas. *See Shell Oil*, 751 F.3d at

1303 (remanding on the question "how much of the acid waste dumped at the McColl site was

'by reason of' the avgas program"). The evidence shows that maximizing avgas production un-

der the Contracts generated unprecedented quantities of spent alkylation acid and acid sludge,

PFOF 123–82, and while the Refineries were able to avoid dumping the vast majority of their

acid waste, PFOF 183–95, they had to dump their excess waste in order to maintain maximum

avgas production, PFOF 196–201. But for the production of avgas under the Contracts, the Re-

fineries would not have dumped *any* waste at McColl. *See* PFOF 200–01. This conclusion sup-

ports causation under either the but-for or nexus standards.

*1.  The Increase in Acid Waste Generation*

The Government argues that avgas production did not cause an increase in acid waste

generation. It asserts that acid sludge production "depends on the capacity of a refinery's thermal

cracking units," Gov't Post-Trial Br. at 8, and because the Refineries' thermal cracking capaci-

ties were "static" from 1939 through 1945, *id.* at 9, acid sludge production at the Refineries "re-

mained steady" during the war, *id.* This argument fails at every level. Acid sludge production did

*not* remain steady during the war, as the acid sludge production chart for Shell's Refineries

demonstrates, *see* PX926, Rebuttal Report Figure 3 Sludge Production at Shell's Refineries

(1941-1946), Gregory G. Kipp (Dec. 21, 2015), and that is why the Government has previously

conceded that the Refineries produced "much greater quantities" of acid sludge during the war

than ever before, PX13, ¶ 15, Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact,

*Shell Oil Co. v. United States* (Aug. 11, 2006) (No. 06-141C); PFOF 167. Nor did the thermal

cracking capacities of the Refineries remain static from 1939 through 1945; the thermal cracking

capacities at the Refineries fluctuated significantly from 1939 through 1945, *see* PFOF 169(a). In

any event, there are numerous factors besides thermal cracking capacity that influence the pro-

duction of acid sludge at a refinery. Plaintiffs have described those factors in detail, *see* PFOF

169(b), and the Government discusses none of them. The evidence shows that the Refineries

faced an unprecedented amount of acid sludge during the war.

There can also be no doubt that avgas production is what drove the surge in acid sludge

generation. The evidence demonstrates that the production of avgas increased acid sludge gener-

ation in at least six ways, all of which Plaintiffs described in their opening brief. PFOF 160(a)

through (f). Of the six ways in which avgas production increased acid sludge generation, the

Government only responds to two of them, even as it admits that the Refineries' overuse of spent

alkylation acid in 1942 and 1943 as a means of managing the acid may have increased acid

sludge production by as much as 20 percent. Gov't Post-Trial Br. at 64.

The Government denies that the Refineries generated acid sludge from the treatment of

avgas components, but, as discussed above, *see supra* Section V.A.2, the evidence is overwhelm-

ingly against the Government on this point. The Government also argues that the Refineries pri-

marily relied upon the importation of avgas components to produce avgas and, therefore, did not

have to increase crude throughput (which would increase the production and acid treatment of

non-avgas products). Gov't Post-Trial Br. at 15–17. But the argument that the Refineries primar-

ily relied on imports to produce avgas was thoroughly discredited at trial when Dr. Kittrell ad-

mitted that he did not take into account *exports* of avgas components. PFOF 360–61. When one

corrects that fundamental error in his analysis, the net effect of imports into the Refineries was

minimal. *See* PFOF 108–09, 359–62.[15] In short, the Government has offered no persuasive response to the overwhelming evidence demonstrating that avgas production substantially increased acid sludge generation at the Refineries. *See* PFOF 159–72.

### 2.   The Comparison Between 1944 and 1946 Acid Sludge Generation Rates

As Mr. Kipp testified, a comparison between 1944 (Shell's peak avgas production year) and 1946 (when avgas production fell to pre-war levels) permits us to isolate the effect of avgas production on acid sludge generation. PX17 at 44, Kipp. This is precisely the kind of but-for analysis appropriate to the Charges Provision: it identifies avgas production as the variable to be tested, examines a year with maximum avgas production and one with pre-war levels of avgas production, and holds constant or controls for all other factors that might affect the generation of acid waste. The result is dramatic: Shell's acid sludge production rate was *three times higher* in 1944 compared with 1946, and Shell produced *244 percent* more acid sludge in 1944 than it would have had it generated sludge at the 1946 rate. PFOF 161(b) through (c). If Shell's Refineries had produced acid sludge at the same rate in 1944 as they did in 1946, they would have sent *no acid waste* to McColl in 1944. PFOF 161(d). Clearly, then, the production of avgas was responsible for the unprecedented amount of acid sludge that confronted the Refineries during the war.

The Government disputes Mr. Kipp's straightforward analysis on three grounds. First, it

---

[15] The Government argues that there was a stronger correlation between avgas production and imported avgas components than between avgas production and crude throughput. Gov't Post-Trial Br. at 16. That argument is based on Dr. Kittrell's discredited analysis of imported avgas components. Even if it were true, it would hardly be surprising that the production of *avgas* was highly correlated with *avgas components*. Indeed, it would be bizarre if it were not. But that does nothing to undermine Mr. Kipp's separate analysis of crude throughput's correlation with avgas production.

asserts that the decrease in sludge production in 1946 was attributable to the reduction of thermal cracking as Shell transitioned to visbreakers. Gov't Post-Trial Br. at 53. But as Dr. Kittrell admitted at trial, the reason Shell transitioned to visbreakers was that it "no longer needed to maximize production of butylene and pentene amylene" for avgas production. Feb. 19 Tr. at 597:22–598:4; PX1104 at Year 1945 at 1-n, Yearly Operating Reports Wilmington Refinery, Shell Oil Co. (1944–1947) (alkylation of "thermal pentane-amylene was discontinued" when "the demand for 100 octane gasoline was drastically reduced" in August 1945). Thus, *even under the Government's logic*, the decrease in acid sludge generation in 1946 was due to the decrease in avgas production. All of this was laid out in Plaintiffs' post-trial brief, *see* PFOF 163, but the Government offers no response.

Second, the Government contends that, but for the Contracts, Shell's Refineries would not have installed the catalytic cracker and hydrogenator that reduced acid sludge generation, and, therefore, it is inaccurate to construct a but-for scenario in which Shell has those technologies online. Gov't Post-Trial Br. at 53. As explained above, it is wrong to base the but-for world on the absence of the avgas *contracts* rather than on the absence of avgas *production* under the Contracts. Again, the relevant provision does not say "by reason of this Contract"; it says "by reason of the production . . . of the commodities delivered hereunder." But even leaving that aside, the Government's argument falls flat. One of the primary benefits of comparing 1944 and 1946 is that catalytic cracking and hydrogenation were online in *both* years, which permits an apples-to-apples comparison that cancels out the effect of these technological developments. In other words, the analysis is *unaffected* by the presence of catalytic cracking and hydrogenation. The Government's objection is beside the point.

Relatedly, the Government spends a considerable amount of space in its brief making the

argument that, because catalytic cracking and hydrogenation would not have been installed at the Refineries but for the Contracts, "the reduction in sludge production between 1943 and 1945 was 'by reason of' sales of the avgas delivered under the contracts." Gov't Post-Trial Br. at 10–13. It is noteworthy that the Government has now conceded that these technologies "reduced the need for acid treatment and sludge production," *id.* at 10, which Dr. Kittrell refused to acknowledge under cross-examination despite having essentially admitted as much earlier in his testimony, *see* PFOF 375(c). The Government's concession reinforces Mr. Kipp's analysis of why Shell's acid sludge production increased through 1943 and then decreased in 1944 and 1945, PX17 at 59–61, Kipp, and it largely refutes Dr. Kittrell's simplistic argument that, since sludge generation went down as avgas production went up after 1943, avgas production had nothing to do with sludge generation, *see* DX1053 at 45–47, Written testimony of Dr. James R. Kittrell, *Shell Oil Co. v. United States* (Feb. 5, 2016) (No. 06-141C) ("Kittrell"). The Government's concession effectively acknowledges that acid sludge generation would have continued to increase in 1944 and 1945—in line with increased avgas production—but for the installation of the catalytic crackers and hydrogenator. *See* PX17 at 61, Kipp; PFOF 165(a), 166.

But, more fundamentally, the Government's argument that the Contracts are responsible for the decrease in sludge production in 1944 and 1945 has no possible relevance to the question on remand. This case is not about who gets credit for the decrease in acid sludge generation in 1944 and 1945. What matters is that the production of avgas is responsible for the increase in the acid sludge that *was* generated by the Refineries, and it was that increase that forced the Refineries to dump acid sludge at McColl in order to maintain maximum avgas production.

Finally, the Government argues that Mr. Kipp's 1944 and 1946 comparison is flawed because it compares peacetime conditions with wartime conditions, and since Shell produced many

more products during wartime, it produced more sludge during wartime. Gov't Post-Trial Br. at 54. But Mr. Kipp compared the amount of acid sludge generated in 1944 and 1946 on a *per-barrel* basis: that is, he compared how much acid sludge was generated for every barrel of non-avgas product produced in each year. One advantage of this methodology is that it *controls* for the decrease in the total number of non-avgas products between wartime and peacetime by looking at the *average* amount of acid sludge produced in each year. The Government's argument misses this crucial point. Moreover, the Government fails to identify a better set of years to compare in testing the but-for scenario, whereas Plaintiffs have justified using 1944 and 1946 at considerable length.[16] *See* PFOF 162(a) through (d).

In short, Mr. Kipp's 1944/1946 analysis is the only evidence in the record quantifying the effect that maximum avgas production had on acid sludge generation,[17] and it proves that the production of avgas was the but-for cause of the dumping of acid waste at McColl. Shell would not have dumped any acid waste had it reduced its acid sludge generation by only 28 percent

---

[16] As Mr. Kipp testified, one of the reasons why it is inappropriate to compare 1944 with a pre-1944 year is that Shell transitioned away from high-sulfur crude oil between 1941 and 1943, finishing the transition to less-sulfurous crude by 1944. Feb. 16 Tr. at 246:6–247:13; PFOF 162(b). Since high-sulfur crude produces more acid sludge when treated, there can be no apples-to-apples comparison between a year in which Shell used high-sulfur crude and a year in which it used low-sulfur crude. Feb. 16 Tr. at 246:6–247:13; PFOF 162(b). The Government—citing no expert testimony and apparently relying solely on the knowledge of its attorneys—asserts that "changes in the types of crude oil used by Shell would have had [a] negligible effect on the amount of sludge generated." Gov't Post-Trial Br. at 16. The Government notes that the Signal Hill and Ventura Fields were only two of the fields used by Shell, but what it fails to note is that those two fields constituted over 60 percent of Shell's crude oil supply from 1941 through 1946. *See* PX1103, Shell Wilmington & Dominguez Refineries Operating Reports (1939–1943) (page 3 for Years 1941–1943); PX1104, Yearly Operating Reports Wilmington Refinery, Shell Oil Co. (1944–1947) (page 3 for Years 1944–1946). Clearly, as Mr. Kipp testified, a change in crude sources of that magnitude would have a significant effect on acid sludge generation.

[17] The Government has never disputed that the production of avgas is what drove the unprecedented increase in spent alkylation acid. *See* PX916, Expert Report Revised Figure 3 Comparison of Spent Alkylation Acid Generated and Avgas Produced, Gregory G. Kipp (Oct. 19, 2015); PFOF 129–33.

during the war, and maximizing avgas production caused Shell to generate 244 percent more acid waste than it would have under the 1946 sludge-generation rate. PFOF 194. The unavoidable conclusion is that the Refineries would not have dumped *any* acid waste but for the production of avgas. *Id.*

### 3. The Government's Argument Concerning Pre-War Dumping

Notwithstanding the foregoing, the Government asserts that the Oil Companies would have continued dumping acid waste even in the absence of avgas production. Gov't Post-Trial Br. at 51. The Government rests this assertion on its characterization of the Oil Companies' record of dumping acid waste before and during World War II. *Id.* at 17–21. The Government is wrong for at least four reasons.

First, the Government's argument hinges on the notion that the Refineries invariably dumped acid waste. The problem with this narrative is that, according to the undisputed evidence, each of the Refineries had a significant period of time during which it did *not* dump acid waste—either at McColl or anywhere else. PFOF 191. Texaco dumped no acid waste from the beginning of the war through late 1944 and only began dumping after expansion of its Refinery caused it to increase avgas production (and, therefore, acid sludge) dramatically, PFOF 59–61; PX902, Expert Report Table 1.2 Increase in Avgas Production Over 1942 Levels, Gregory G. Kipp (Oct. 19, 2015) (showing a 288 percent increase in Texaco's 1945 avgas production over 1942 levels). Union had access to General Chemical's El Segundo sludge reprocessing plant and dumped no acid waste from the start of the war through late 1943. PFOF 62–64. Richfield did not dump any acid waste from late 1943 through at least early 1944, managing to burn or reprocess all of it instead. PFOF 65–67. Indeed, Dr. Kittrell testified that Richfield burned all of its sludge throughout 1944. PFOF 66. And, as has already been noted, Shell did not dump any acid

waste in 1946, after it ceased maximizing avgas production. PFOF 71–73. That each Refinery went a significant period of time without dumping acid waste falsifies the Government's narrative that the Refineries would have inevitably dumped acid waste even in the absence of the avgas program.

Second, and relatedly, the evidence demonstrates that the Refineries viewed the dumping of acid waste as a last resort to be used only when other means of managing acid waste were inadequate. Shell dumped a smaller proportion of its acid waste each year of the war as other waste management options became more available. PFOF 183–88. By way of illustration, in 1942, Shell sent only 2,176 barrels of acid waste off-site for reuse, and it dumped 100,340 barrels. PFOF 185. But by 1945, those proportions were reversed: 198,720 barrels of acid waste were sent off-site for reuse while only 1,402 barrels were dumped. *Id.* And, as described above, Shell dumped *no acid waste* in 1946 after avgas production plummeted, and each Refinery went a significant period of time without dumping acid waste. The Government's argument rests on its assertion that the Refineries viewed the dumping of acid waste as a "standard practice" to be routinely employed, Gov't Post-Trial Br. at 17, but these undisputed facts are completely inconsistent with the Government's assertion. Rather, they show that dumping was "a last resort," as Eli McColl himself stated at the time.[18] PFOF 398.

_____

[18] The Government states that Shell dumped nearly 40,000 barrels of acid sludge in 1940 and 90,000 barrels of sludge in 1941, Gov't Post-Trial Br. at 19, but these numbers actually confirm that Shell viewed dumping as a last resort. In 1939, Shell dumped less than 900 barrels of acid sludge, PX1103 at Year 1939 at 98, Shell Wilmington & Dominguez Refineries Operating Reports (1939–1943), and its increase in dumping before the war can be traced directly to the reduction in sludge burned within the Refineries and shipped to Shell Chemical for reprocessing, *see id.* at Years 1940–1941 (page 98 for each year). As Mr. Kipp explained, Shell stated in a pair of 1939 memos that it could not continue burning sludge because doing so generated an enormous amount of sulfur dioxide, PX17 at 73–75, Kipp; PX1107, Memo from Ludwig Rosenstein to J. F. M. Taylor (Aug. 11, 1939); PX1106 at DEF0024314, Memo from Ludwig Rosenstein to C. B. deBruyn (May 8, 1939), and the Government had stopped making tank cars available to the

Third, the Government insinuates that the opening of the McColl Site was an inevitable continuation of the Refineries' alleged pre-Contract dumping at the Thomas Ranch site, Gov't Post-Trial Br. at 20–21, but the evidence shows that the Refineries opened the McColl Site in anticipation of the massive increase in acid waste that the production of avgas would generate. Plaintiffs detailed this evidence in their post-trial brief, *see* PFOF 389–404, yet the Government never addresses it. Suffice it to say that Eli McColl specifically referenced the increase in acid waste that the Oil Companies anticipated would result from the production of avgas under the Contracts and the need to maintain maximum avgas production as the bases for seeking a sludge disposal site. *See* PFOF 398–401. Regardless of why the *Thomas Ranch* site closed, the reason the *McColl Site* opened was the anticipated need for a back-up option for disposal of acid waste generated by the production of avgas. The Government's fixation on the Thomas Ranch site is a red herring.

Finally, as Mr. Kipp's 1944/1946 analysis proves, there would have been no need for the Refineries to dump at McColl but for the production of avgas under the Contracts. The Government must therefore make the implausible claim that the Refineries would have dumped acid waste at McColl *even if it had been unnecessary*. Gov't Post-Trial Br. at 51. In light of the foregoing, there is no basis for that conclusion: the Refineries viewed the dumping of acid waste as a last resort during the war and would not have dumped any acid waste if they could have avoided it. The production of avgas under the Contracts was the but-for cause of the dumping of acid waste at the McColl Site.

---

Oil Companies in 1941 and throughout much of the war because the cars were needed for military purposes, PX17 at 48–51, Kipp. Thus, the increase in dumping between 1939 and 1941 confirms that Shell dumped sludge only when alternative means of managing acid waste were unavailable.

### C.  The Oil Companies' Response Costs Were Incurred By Reason of the Sulfuric Acid Necessary for the Production of Avgas.

The Government has previously admitted that all of the acid waste at issue in this case originated in sulfuric acid used in the production of avgas. *See* PX13, ¶¶ 24–25, Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact, *Shell Oil Co. v. United States* (Aug. 11, 2006) (No. 06-141C). The Government does not dispute that admission in its post-trial brief. As Mr. Bourke's testimony demonstrated, the sulfuric acid was responsible for the formation and mobilization of the Chemicals of Concern (COCs) at the Site, *see* PFOF 202–53, led to the costly failures of the three remedies attempted prior to implementation of the current remedy, *see* PFOF 254–66, and was responsible for all features of the current remedy, *see* PFOF 267–301. Indeed, the Government has previously admitted that "the primary contaminant at the McColl Site is the sulfuric acid." PX14, ¶ 8, Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact, *Shell Oil Co. v. United States* (July 11, 2008) (No. 06-141C). In short, the sulfuric acid that was used in the production of avgas was the but-for cause of all the remediation costs incurred by the Oil Companies. *See* PFOF 302–04; *see also* PFOF 125–28. It necessarily follows that there is also a nexus between the production of avgas and the Oil Companies' remediation costs.

The Government almost entirely overlooks this part of Plaintiffs' case in its response brief. Plaintiffs submitted over 100 detailed proposed findings of fact demonstrating that sulfuric acid drove the remediation costs at the McColl Site, yet the Government responds with conclusory quotations from Dr. Allen Medine's testimony to the contrary. Gov't Post-Trial Br. at 55, 60. The Government notes that sulfuric acid was not classified as a COC. *Id.* at 24–25. That is true—but also irrelevant. As Mr. Bourke testified, COCs are *risk*-drivers but not necessarily *cost*- or *remedy*-drivers. PX18 at 32–34, Bourke; PFOF 267–69. In assessing what drove the *costs* at McColl, what matters is "why COCs were present at the Site, what mobilized them, and what

42

steps were necessary to remediate them." PX18 at 33, Bourke. "The answers to these questions show the predominant role of sulfuric acid in driving response costs at McColl." *Id.*

The Government asserts—without citation to any evidence—that all of the potential chemicals of concern (PCOCs) are relevant to the analysis because they are "still being monitored as part of the remedy." Gov't Post-Trial Br. at 24. But even Dr. Medine admitted that the PCOCs were identified early in USEPA's investigation, before USEPA conducted a more in-depth analysis of the Site, and that "[t]he risks were driven by" the primary COCs. PFOF 210 (alteration in original). The Government's attempt to attribute the costs of the remediation to chemicals that might be present only in trace amounts at the Site falls flat. *Id.*

The Government also insinuates that, while USEPA initially failed to classify tetrahydrothiophene (THT) as a COC, it later did so. Gov't Post-Trial Br. at 24. To the contrary, USEPA never classified THT as a COC, PX18 at 39–40, Bourke, and the Government can only imply that USEPA did so by misquoting Dr. Medine's testimony, *compare* DX1056 at 28, Written testimony of Dr. Allen Medine, *Shell Oil Co. v. United States* (Feb. 5, 2016) (No. 06-141C) ("Medine") ("Initially, EPA's investigations didn't identify THT") *with* Gov't Post-Trial Br. at 24 ("Initially, EPA's investigations did not identify THT *as a contaminant of concern*" (emphasis added to show misquotation)). Dr. Medine testified that USEPA initially failed to *detect* THT at the Site, but it later noted the presence of THT. DX1056 at 28–29, Medine. In any event, Mr. Bourke's testimony amply demonstrates that THT did not add anything to the remediation costs at McColl. PX18 at 39–41, Bourke; PFOF 283–91.

Lastly, the Government asserts that sulfur dioxide forms from organic sulfates generally found in the acid sludge (as opposed to the spent alkylation acid). Gov't Post-Trial Br. at 26. Although this assertion is quite untrue, *see* PX17 at 105–13, Kipp; PX931, Rebuttal Report Figure 8

Contribution of Sulfate to the McColl Site, Gregory G. Kipp (Dec. 21, 2015); PX940–43, Rebuttal Report Table 8 Contribution of Sulfate to the McColl Site: Sulfuric Acid v. Organic Material, Gregory G. Kipp (Dec. 21, 2015), it is also beside the point. What matters is that sulfuric acid is essential to the generation of sulfur dioxide and that sulfur dioxide would not have been present in significant quantities at the Site absent the sulfuric acid. PFOF 239–40. As Dr. Medine admitted, "[t]he sulfur dioxide emissions are, therefore, related to the sulfuric acid." Trial Transcript of February 17 at 330:1–3 ("Feb. 17 Tr.").

Because the sulfuric acid drove the remediation costs at McColl, and because all the sulfuric acid at the Site originated in the production of avgas and was brought into the Refineries as part of avgas production, the production of avgas has a clear nexus with all of the Oil Companies' remediation costs and was a but-for cause of such costs.

### D. The Oil Companies' Response Costs Were Incurred By Reason of the Spent Alkylation Acid Generated by the Production of Avgas.

As discussed above, the Government has conceded that spent alkylation acid is generated by reason of the production of avgas. The Government disputes whether the acid sludge at the Site is attributable to avgas production, but as Mr. Bourke's testimony proves, even if the Government were correct that none of the acid sludge is attributable to avgas production, the Oil Companies would still be entitled to recover 100 percent of their remediation costs because the acid sludge *did not add to the remediation costs*. Rather, all of the costs incurred by the Oil Companies would have been incurred—plus $64 million more—had the Refineries only dumped spent alkylation acid at McColl. Specifically, the acid sludge mitigated response costs by creating a non-engineered barrier at the bottom of each sump (i.e., the char) that prevented downward migration of COCs and acid waste. *See* PFOF 305–19. Without the char barrier, there would

44

have been significant groundwater contamination at the Site, *see* PFOF 320–46, and the cost of remediating the groundwater would have been at least $64 million, in addition to the costs that the Oil Companies did, in fact, incur, *see* PFOF 347–51. Because the production of avgas caused the massive increase in spent alkylation acid that forced the Refineries to dump spent alkylation acid in late 1944 and early 1945, avgas production is the but-for cause of the costs incurred by the Oil Companies, as well as having a strong nexus to those costs.

The Government makes three arguments in response. First, it rehashes its argument that no spent alkylation acid was dumped at McColl. Gov't Post-Trial Br. at 56–57. This argument has been thoroughly repudiated by the Government's repeated stipulations and admissions and all of the other evidence described above. *See supra* Section V.A.1.

Second, it argues that Mr. Bourke's testimony as to the nature and cost of the groundwater remediation should not be credited because he lacks the requisite qualifications. Gov't Post-Trial Br. at 57–60. The undisputed evidence is that Mr. Bourke has "decades of experience assessing potential groundwater contamination and designing remedies for it," including experience designing the kind of pump-and-treat system he proposed in his testimony; he has been an environmental engineer for over thirty years; he has been routinely approved by USEPA as a project coordinator for Superfund sites; he has worked on the McColl Site longer than any environmental engineering professional; he authored several reports on the Site; and he has served as the USEPA-approved project coordinator at McColl since 2002, where he has successfully supervised the remediation of the Site. PX18 at 2–4, Bourke. Despite these undisputed facts, the Government contends that Mr. Bourke is unqualified to offer an assessment of groundwater re-

mediation at McColl because he is "not a civil engineer authorized by law to practice civil engineering," "could not state whether he took organic chemistry [in college]," and "did not take differential equations [in college]." Gov't Post-Trial Br. at 58–59.

If these objections appear trivial, that is because they are. It should hardly require stating that Mr. Bourke's college transcript is utterly irrelevant in light of his more than three decades of experience and USEPA's repeated recognition of his qualifications. Nor is it at all relevant whether the Oil Companies could "implement[ ] his remediation plan based solely on his approval" under California law. *Id.* at 59. Mr. Bourke testified, based on his decades-long experience in his field, that one need not be licensed as a civil engineer under California law in order to propose an appropriate groundwater remedy and assess its cost, and the Government has offered no authority that supports its contrary view.[19] Mr. Bourke has helped assess and design groundwater remedies throughout his career, *see, e.g.*, PX18 at 4, Bourke (served as design engineer for groundwater remediation at Purity Oil Superfund site in Fresno, California), and that is the relevant expertise for purposes of his testimony.

The Government also asserts that Mr. Bourke "refused to answer a question [about] whether sulfur dioxide was an organic chemical." Gov't Post-Trial Br. at 60. This is misleading. The Government quotes a portion of Mr. Bourke's testimony where he was explaining that he did not have sufficient information to resolve the dispute between Dr. Kittrell and Mr. Kipp over whether sulfur dioxide arises from organic or inorganic sulfates. That is not surprising, given that

---

[19] Neither case cited by the Government involved the design and cost-assessment of a hypothetical project, as is the case here. *See Dimalanta v. Board for Prof'l Eng'rs & Land Surveyors*, 2012 WL 363924, at *1 (Cal. Ct. App. Feb. 6, 2012) (non-citable opinion) (Dimalanta prepared a parcel map for submission to a city agency, without a land surveyor or civil engineering license); *Jaramillo v. State Bd. for Geologists & Geophysicists*, 39 Cal. Rptr. 3d 170, 171 (Cal. Ct. App. 2006) (Jaramillo performed a site survey and produced a computer profile of subsurface conditions, without a geophysics license).

Mr. Bourke does not claim to be a chemist, PX18 at 2, Bourke, but Mr. Bourke *does* have "an understanding and working knowledge of many of the chemical properties of the materials at such waste sites, the chemical reactions that can take place at such sites, and the results of such chemical reactions," *id.* USEPA seems to think so too, since it has kept Mr. Bourke in charge of the McColl remediation for over a decade.

Indeed, for all the Government's bluster over qualifications, its own expert, Dr. Medine, did not dispute that the pump-and-treat system that Mr. Bourke proposed could have been implemented by USEPA to remediate contamination of the McColl groundwater, Feb. 17 Tr. at 352:22–353:10; nor did he disagree with Mr. Bourke's assessment that remediating the groundwater at McColl would have cost at least $64 million, *id.* at 353:11–21. Mr. Bourke's credibility should be beyond serious dispute. *See* PFOF 376–84.

In contrast with the picayune nature of the Government's arguments against Mr. Bourke's qualifications, Plaintiffs documented several significant errors, as well as highly misleading claims, in Dr. Kittrell's testimony. *See* PFOF 352–75. On the basis of this evidence, Plaintiffs argued in their opening brief that Dr. Kittrell's testimony should be disregarded as not credible. Tellingly, the Government offers no defense of Dr. Kittrell's credibility in its brief.

Finally, the Government puts forward a series of arguments that were analyzed and refuted in Plaintiffs' opening post-trial brief. It asserts that sulfuric acid did not drive remediation costs at McColl, Gov't Post-Trial Br. at 60–61, but it never addresses the evidence to the contrary, *see* PFOF 202–304. It claims that no significant groundwater contamination would have occurred because "acid rapidly neutralizes when it comes into contact with soil or water," Gov't Post-Trial Br. at 61, but we know from actual events that the soil and water at the Site did not, in fact, neutralize enough acid to prevent contamination of perched aquifers, *see* PFOF 344–45.

And it claims that the spent alkylation acid would have been flushed out of the Site within seventy years through dilution and migration, Gov't Post-Trial Br. at 61, but it ignores the fact that, even assuming this were true, it would still mean that groundwater remediation would have been required when USEPA arrived at McColl approximately forty years after the acid waste was dumped, *see* PFOF 346. Once again, the Government has no answer to the evidence marshaled in Plaintiffs' post-trial brief, and so it simply chooses to ignore it.[20]

For the reasons described above, Plaintiffs have more than met their burden, under either the nexus or but-for standard of causation, to show that they incurred their remediation costs by reason of the production of avgas under the Contracts.

### VI.    Judgment Should Be Entered Against the Government in the Amount of $99,509,847.32.

The Government has previously admitted that Plaintiffs incurred $92,546,566.94 in response costs and interest through June 30, 2012, PFOF 424–30, and Plaintiffs have incurred an

---

[20] The Government states, in passing, that if all costs were incurred by reason of the spent alkylation acid and all of Plaintiffs' other arguments were rejected, Shell would be entitled to no relief, since Shell did not dump spent acid at McColl. Gov't Post-Trial Br. at 67. But Mr. Kipp's uncontradicted testimony was that Shell had priority access to the Stauffer reprocessing plants in late 1944 and early 1945. *See* PFOF 98(d); PX17 at 102–03, Kipp. If Shell had not generated unprecedented quantities of spent alkylation acid by reason of the production of avgas, Stauffer would very likely have been able to reprocess the other Refineries' excess spent alkylation acid, and no spent acid would have been dumped at McColl, *compare* PX910, Line 20, Expert Report Table 4.5 Total Spent Alkylation Acid Sent to McColl Site (Tons), Gregory G. Kipp (Oct. 19, 2015) (shortage of reprocessing capacity by month) *with* PX908, Lines 11–12, Expert Report Table 4.3 Acid Reprocessing Capacity of Los Angeles Chemical Companies, Gregory G. Kipp (Oct. 19, 2015) (Stauffer's reprocessing capacity) *and* PX918, Expert Report Figure 5 Spent Alkylation Acid Generated at Shell Dominguez, Gregory G. Kipp (Oct. 19, 2015) (showing Shell's pre-war spent alkylation acid generation). Thus, the production of avgas by Shell has a clear nexus to the dumping of spent alkylation acid by the other Refineries and the costs that Shell incurred at the Site.

additional $6,963,280.38 in response costs and interest since then, PFOF 430–37. The Government offered *no evidence* at trial to contradict these numbers, PFOF 438, and it has pointed to none in its post-trial brief. Thus, Plaintiffs are entitled to recover $99,509,847.32 in damages. *See Bruno New York Indus. Corp. v. United States*, 169 Ct. Cl. 999, 1007 (1965) (awarding damages on basis of stipulation entered into at a different stage of the proceedings); *see also Brook Vill. N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 75 (1st Cir. 1982); *Vallejos v. C. E. Glass Co.*, 583 F.2d 507, 510–11 (10th Cir. 1978).

The Government nevertheless makes four arguments in response, all of which are meritless. First, it repeats its argument that PX12—a 1999 stipulation between the parties in which the Government agreed that Plaintiffs had incurred $64,219,514.46 in response costs through October 31, 1998—is inadmissible. Gov't Post-Trial Br. at 66. Plaintiffs have refuted this argument already, *see* Pls.' Post-Trial Br. at 165–67, and since the Government offers nothing new, we will not repeat those points here. In any event, the Government's 1999 stipulation has been incorporated into the Government's subsequent admissions in this case, *see* PFOF 430(a)(i) through (ii), and those admissions are binding on the Government or, at a bare minimum, are admissible evidence, Pls.' Post-Trial Br. at 150–60.

The Government argues that the 1999 stipulation lapsed of its own accord after the Ninth Circuit failed to affirm in full.[21] Gov't Post-Trial Br. at 66. But nowhere does the stipulation say it will lapse after some period of time or some particular event. Rather, it states that, should the Ninth Circuit "not affirm[ ] in full, the Parties shall again negotiate in good faith to attempt to

---

[21] The Government makes a similar argument about the remaining CERCLA stipulations, contending that, by their own terms, they no longer bind the parties. Gov't Post-Trial Br. at 31–32. Plaintiffs have responded to this argument before, *see* Pls.' Post-Trial Br. at 162–64; Response to Objections at 12–15, and since the Government adds nothing new, we will not repeat those points here.

reach a stipulated payment for response costs." PX12 at JA611, Judgment and Stipulation as to

pre-October 31, 1998 costs incurred (Oct. 13, 1999). And that makes perfect sense: if the Ninth

Circuit affirmed in full, it would be clear that the Government was responsible for the entirety of

the $64 million in response costs, but if the Ninth Circuit issued a mixed judgment, it would be

unclear how the parties should allocate the $64 million in costs between themselves, therefore

requiring more negotiation. But none of this suggests that the stipulation *as to the total amount of*

*response costs incurred* (i.e., $64,219,514.46) was invalid. Moreover, the Government's subse-

quent admissions incorporating and re-affirming the 1999 stipulation constitute the post-Ninth

Circuit review agreement contemplated by the parties in their 1999 stipulation. In any event, the

Government's subsequent admissions *are* binding or, at least, admissible evidence.

 Second, the Government asserts that Plaintiffs must prove how much each individual Oil

Company incurred in response costs, not just the total amount of damages, and that Plaintiffs

have offered no such evidence. Gov't Post-Trial Br. at 66–67. Not so. Plaintiffs submitted undis-

puted evidence proving the amount of costs that each Oil Company incurred. Mr. Bourke, whose

company issued the invoices for costs incurred by the Oil Companies since August 2002, testi-

fied that the Oil Companies "have allocated the costs they have incurred" in the following man-

ner: Shell (58.58 percent); Union (18.94 percent); Richfield (18.94 percent); and Texaco (3.54

percent). PX18 at 76, Bourke. Mr. Bourke, as the *issuer of the invoices*, had direct knowledge

that the Oil Companies had incurred costs in those proportions. Mr. Bourke also submitted a dec-

laration to the same effect in 2008, which is in evidence. PX101, ¶ 16, Decl. of Edmond F.

Bourke, *Shell Oil Co. v. United States* (June 20, 2008). In addition, the *Government itself* admit-

ted in 2008 that the Oil Companies had allocated their costs in the manner described by Mr.

Bourke. PX14, ¶ 24, Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact, *Shell Oil*

*Co. v. United States* (July 11, 2008) (No. 06-141C). Aside from challenging the admissibility of its own prior admissions, the Government has not disputed any of this evidence.

Moreover, the Government's argument is contrary to basic common sense. The four Plaintiff Oil Companies have introduced evidence, in the form of Mr. Bourke's testimony and the Government's prior admission, establishing the precise percentage of the total McColl remediation costs that each Oil Company paid. The Government has presented no evidence to the contrary, and its argument would have the Court believe that three of the Oil Companies might permit the fourth to claim a larger share of the recovery than it is entitled to claim by virtue of the costs it actually paid. If the evidence in the record were not sufficient to prove the costs that each Plaintiff incurred, the incentive that each Oil Company has to ensure an accurate assessment of damages certainly is.

The Government suggests that the Oil Companies' representation as to how they divided up costs is the equivalent of assigning a claim, in violation of the Anti-Assignment Act. Gov't Post-Trial Br. at 67. But Plaintiffs have not assigned anything; they have simply presented evidence informing the Court of exactly what percentage of the total response costs each one paid. And since *all* of the evidence in the record supports Plaintiffs' claim as to the total amount of response costs, it is a matter of simple arithmetic to determine how much each Plaintiff incurred. *See* PFOF 441.

Third, the Government argues that Plaintiffs have failed to allocate their damages between those costs incurred by reason of the production of avgas and those incurred by reason of the production of other products. Gov't Post-Trial Br. at 67. It further argues that Plaintiffs had an obligation to produce invoices documenting each individual cost incurred by the Oil Compa-

nies.[22] *Id.* at 68–70. These arguments are simply question-begging. Plaintiffs have presented evidence demonstrating that *all* of their remediation costs were incurred by reason of the production of avgas under the Contracts, and it follows that they have no obligation to allocate costs or prove-up individual charges in the manner described by the Government.

For example, if the Court finds that the Refineries would not have dumped acid waste at McColl but for the production of avgas, then it necessarily follows that all remediation costs at the Site were incurred by reason of the production of avgas. The Oil Companies only incurred those costs because of the presence of acid waste at the Site. *See United States v. Shell Oil Co.*, 841 F. Supp. 962, 969 (C.D. Cal. 1993) (imposing liability on the Oil Companies based on the acid waste). Or consider the Government's example of THT remediation. Gov't Post-Trial Br. at 70–71. Plaintiffs have presented evidence the Government does not contest in its post-trial brief demonstrating that THT was irrelevant to the cost of the remedy at McColl. *See* PFOF 283–91. It follows that the actions taken to remediate THT are irrelevant to the determination of damages. The Government's insistence on an allocation among costs is nothing more than a way of re-fighting the causation argument in the context of calculating damages.

In any event, the Government has previously *admitted* that all of the $64,219,514.46 in costs incurred by the Oil Companies prior to October 31, 1998 were "response costs," PX15, ¶ 1, 2012 Gov't Responses to Pls.' Proposed Findings of Uncontroverted Fact, *Shell Oil Co. v. United States* (Sept. 7, 2012) (No. 06-141C); PX14, ¶ 13–16, Def.'s Resp. to Pls.' Proposed

---

[22] The Government alludes more than once to its discovery requests relating to pre-2002 remediation costs, Gov't Post-Trial Br. at 69–70, but the Government fails to note that, before serving its discovery requests on Plaintiffs, the Government had repeatedly admitted to the total amount of costs incurred over the course of more than fifteen years. PFOF 430(a) through (c). In that context, it was entirely reasonable for Plaintiffs to object to the highly burdensome and completely unnecessary demand for extensive cost records dating back to the early 1980s, more than three decades ago. It is hardly surprising that the Government never moved to compel.

Findings of Uncontroverted Fact, *Shell Oil Co. v. United States* (July 11, 2008) (No. 06-141C); PX12 at JA610, Judgment and Stipulation as to pre-October 31, 1998 costs incurred (Oct. 13, 1999); that is, costs relating to the CERCLA remediation of the McColl Site, *see Shell Oil*, 751 F.3d at 1290 ("CERCLA response costs"); *see also Storfer v. Guarantee Tr. Life Ins. Co.*, 666 F.3d 1277, 1279–80 (11th Cir. 2012) (parties' stipulation about amount of reimbursable costs was sufficient evidence to support damages award even though defendant argued reimbursable costs were inseparable from other costs). Plaintiffs have provided all invoices for costs claimed by the Oil Companies since 1998, and the Government's brief does not question a single charge. The Government's attempt to now suggest that Plaintiffs' costs were unrelated to the remediation at McColl is just the latest effort by the Government to repudiate its prior concessions.

The Government cites *Howard Industries, Inc. v. United States*, 126 Ct. Cl. 283 (1953), to support its argument, but that case is readily distinguishable. Howard Industries had several contracts with the Government that it claimed resulted in a net loss, and it sought to attribute the entirety of this loss to a single contract. *Id.* at 290–91. But "the record contain[ed] *no evidence* from which the court [could] even approximate the amount of plaintiff's loss, if any, under the contract on which the claim [was] based." *Id.* at 293 (emphasis added). Here, by contrast, *both parties agreed*, on multiple occasions, to the total amount of costs incurred by the Oil Companies and that such costs were "response costs" relating to the McColl remediation. For all the Government's foot-stamping about "allocations," it never explains why *it* was convinced that the Oil Companies' costs were "response costs" in 1999, 2008, and 2012 but is now consumed with doubt. The Government's admissions, as well as the invoices submitted by the Oil Companies, are more than sufficient evidence to prove that all of the Oil Companies' costs were related to remediation of the McColl Site, and the Government presents no evidence to the contrary.

## CONCLUSION

Plaintiffs respectfully request that the Court enter judgment against the Government in the amount of $99,509,847.32. That judgment should be awarded as follows:

| Plaintiff | Percent of Damages | Damages |
|---|---|---|
| Shell | 58.58 percent | $58,292,868.56 |
| Union | 18.94 percent | $18,847,165.08 |
| Atlantic Richfield | 18.94 percent | $18,847,165.08 |
| Texaco | 3.54 percent | $3,522,648.60 |

June 10, 2016                                    Respectfully submitted,

*Of counsel*:                                   s/ Michael W. Kirk
Vincent J. Colatriano                          Michael W. Kirk
William C. Marra                               *Counsel of Record*
J. Joel Alicea                                 COOPER & KIRK, PLLC
COOPER & KIRK, PLLC                            1523 New Hampshire Avenue, N.W.
1523 New Hampshire Avenue, N.W.                Washington, D.C. 20036
Washington, D.C. 20036                         (202) 220-9600
(202) 220-9600                                 (202) 220-9601 (fax)
(202) 220-9601 (fax)                           mkirk@cooperkirk.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2016, I caused a copy of the foregoing to be served by

the Court's electronic filing system on the following counsel:

> Stephen C. Tosini
> Commercial Litigation Branch, Civil Division
> U.S. Department of Justice
> Post Office Box 480
> Ben Franklin Station
> Washington, DC 20044

> s/ Michael W. Kirk
> Michael W. Kirk