IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHELL OIL COMPANY, UNION OIL COMPANY OF CALIFORNIA, ATLANTIC RICHFIELD COMPANY, and TEXACO, INC., | ) | |
| Plaintiffs, | ) | Consol. Ct. No. 06-141 C (Judge Braden) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR LEAVE TO RESPOND AND RESPONSE TO PLAINTIFFS' SUPLEMENTAL RESPONSE TO THE COURT'S QUESTIONS DURING CLOSING ARGUMENT**

## MOTION FOR LEAVE TO RESPOND

Defendant, the United States, respectfully requests that the Court grant it leave to respond to Plaintiffs' Supplemental Response To The Court's Questions During Closing Argument. ECF No. 219 (Pls. Supp. Br.). A response is warranted because plaintiffs' brief contains additional argument and factual allegations beyond those requested by the Court and, as demonstrated below in our proposed response, further contains erroneous factual assertions that should be corrected.

## PROPOSED RESPONSE

### I. Plaintiffs Have Failed To Proffer Any Evidence Supporting Their Proposed Internal Allocation Of Costs Despite Binding Precedent Requiring This Showing To Prevail

As we demonstrated in our Notice of Supplemental Authority, ECF No. 211 (Def. Supp. Auth.), *Northrop Grumman Computing Sys., Inc. v. United States*, 823 F.3d 1364, 1368 (Fed. Cir. 2016), establishes that plaintiffs "'had the burden of proving, not that someone suffered actual damages from the defendant's breach of contract, but that they, plaintiffs, suffered actual damages.'" (citation omitted). The mandate in *Northrop* has issued. *Northrop Grumman*

*Computing Systems, Inc. v. United States*, No. 15-5074 (Fed. Cir.), ECF No. 33 (mandate issued July 15, 2016). Accordingly, because plaintiffs have failed to establish how much of the costs were properly allocated to each, beyond their unilateral assignment of the claim among themselves, they have failed to meet their burden. Def. Supp. Auth. at 2.

In support of the allocation between themselves that they put forward, plaintiffs continue to rely on the same non-evidentiary assertions from their post-trial brief. Pls. Supp. Br. at Ex. 1, n.1. They nowhere assert how doing so complies with the Federal Circuit's binding decision in *Northrop*. Plaintiffs do not address *Northrop* because their allocation does not comply with its dictates: Their unilateral allocation absent any *evidence* regarding damages actually sustained by each plaintiff is invalid and is an insufficient basis for the award of damages.[1]

## II. <u>Plaintiffs Dumped Over 60,000 Barrels Of Acid Sludge At McColl In 1942</u>

Plaintiffs assert, based on a calculation from their expert, that Shell produced 1,410,310 barrels of avgas in 1942. Pls. Supp. Br. at 2. *But see* PX1139 (plaintiffs' contemporaneous record that only 1,382,380 barrels of avgas were produced at Wilmington only). As shown at trial, no avgas was sold under the subject contracts before 1943. DX1054 at 44-51 (Brigham); DX161 at 33 ("DSC did not actually purchase aviation gasoline until after January 1, 1943. The Army and Navy continued to make their own purchases until that date mainly because of outstanding contracts they had with industry. Thereafter they did their buying through DSC."); DX20 at 2.

---

[1] Moreover, the McColl site "charges" sought by the oil companies include more than $43 million already paid by the Government and awarded by the district court to the United States in *United States v. Shell Oil Co.*, No. 91-00589CV (C.D. Cal.). *See* Attachment A at 8 (ECF No. 630, joint status report in *United States v. Shell Oil Co.*, dated December 6, 2013, noting amounts paid by Government). We expect that there will be a full accounting once all McColl litigation is closed.

While producing that non-DSC avgas, Shell dumped 60,033 barrels of sludge at McColl. Page 98 of each of Shell's yearly operating reports provides recurring meticulous accounting for disposal of acid-based wastes. *See* PX1103-1104 (Shell's operating reports); Trial. Tr. at 131:13-133:2 (Kipp confirming nature of information in operating reports). Review of page 98 of Shell's 1942 operating report shows that Shell disposed of 2,030 barrels of sludge from its Wilmington refinery and 98,310 barrels of sludge from its Dominguez refinery, for a total of 100,340 barrels of dumped sludge in 1942. PX1103 at 560.

According to the oil companies' expert, dumping at McColl began "in late June or early July 1942." Kipp Direct at 52, 114, ECF No. 180-1. Because Shell did not keep month-by-month records of its sludge disposal, to split its sludge disposal for all of 1942 into the two halves of the year one must look to the percent of avgas produced in those periods and apply that ratio to sludge dumping. PX1139 shows that 59.83 percent of Shell's avgas production at its Wilmington refinery occurred in the second half of 1942. PX1139 at 2.[2]

Applying the 59.83 percent to the 100,340 barrels of Shell sludge for that year, PX1103 at 560, yields 60,033 barrels of sludge in the second half of 1942, which is 19.77 percent of the total 303,622 barrels of sludge the Oil Companies contend they dumped at McColl.[3]

That Shell dumped acid sludge at McColl in 1942, while it was producing and selling avgas exclusively to non-DSC customers under contracts that presumably lacked any indemnity

---

[2] PX1139 shows the average production of barrels per day in each month for the Wilmington refinery (Martinez is in Northern California). This figure shows that 59.83 percent of Shell's 1942 avgas production occurred between July and December 1942, while Shell was dumping acid sludge at McColl.

[3] Shell produced and sold avgas to entities other than the DSC in 1943. Kipp Direct at 121. Mr. Kipp calculates that Shell sent an additional 3,947 of barrels of acid sludge to McColl in 1943 based on these non-DSC sales. *Id.* He further calculates that this represents an

clause, demonstrates that any assertion that dumping of sludge during the time of DSC-avgas production is the cause of all remediation costs at McColl would be clearly erroneous. If it is correct to state that once dumping began then the cost of the remedy became unavoidable, then plaintiffs made that cost unavoidable long before they sold a single drop of avgas to the DSC due to their dumping of over 60 thousand barrels of acid sludge at McColl. Because the costs are therefore not "by reason of" the production of the "commodities delivered hereunder," as the DSC contracts state, no costs would be recoverable from the United States under this theory. *See, e.g.* PX3 at 16.

## III. The Evidence Shows That Eli McColl Dug And Filled One Sump Before Digging And Filling Another

The only person who testified as to when Eli McColl dug the sumps was John McColl, the son of Eli McColl. Based on John McColl's testimony, the practice at McColl was to open and fill one sump before opening another. PX706 at 58:1-2. Plaintiffs' contrary evidence is not persuasive. First, they rely on a passing mention in the background section of an EPA report from decades after the events. Pls. Supp. Br. at 3. Second, they misread Dr. Medine's recitation of the obvious proposition that a sump must be dug before it can be filled to mean that all twelve sumps were dug before *any* were filled. *Id.* Neither contention overcomes testimony from the sole source with firsthand knowledge as to the practice at the McColl site is that a new sump was dug only after a prior sump was filled.

---

additional 1.3 percent of the acid sludge at McColl. Under plaintiffs' theory that acid sludge is related to avgas production, adding that 1.3 percent to the 19.77 percent of 1942 dumping leads to 21.07 percent of the barrels of acid sludge that could relate only to non-DSC avgas production.

## IV. Shell Obtained Crude Oil From Numerous Sources From 1941 To 1944

It is only by ignoring their own records that plaintiffs can claim that the difference between their 1941-1943 and 1944-1945 rate of sludge production was due to use of Signal Hill oil in the first period and not in the second. Pls. Supp. Br. at 4. Shell's contemporaneous records show that it received crude oil from nine different fields in 1941 and 1942 and ten fields in 1943. PX1103 at 322, 469, 582. Contrary to Mr. Kipp's unsupported contention that "almost all" of Shell's 1941 production was from Signal Hill oil, review of the math shows this is not correct: only 43 percent of Shell's oil in 1941 came from Signal Hill. PX1103 at 338. Moreover, oil from Signal Hill was only 20.65 percent of total oil at Shell in 1943. PX1103 at 608. Further, 16.08 percent of Shell's oil received in 1944 and 14.36 percent of oil received in 1945 came from Signal Hill, belying the claim that there was a significant change in source oil between 1943 and 1944 that caused the reduction in sludge production. PX1104 at 7, 31. Lastly, plaintiffs have introduced no scientific evidence that the allegedly higher sulfur content in a fraction of their oil supply, which changed year-by-year and changed minimally between 1943 and 1945, accounts for any change in Shell's sludge production. In fact, the plain numbers disprove their claim.

## V. The WPB Allocated Sufficient Tank Cars To Plaintiffs For Their Needs

We agree that the War Production Board (WPB) controlled tank car allocation during World War II. Pls. Supp. Br. at 5. It used that authority to delegate sufficient tank cars so that 200 tons of spent alkylation acid could be shipped from Southern to Northern California, such that no spent alkylation acid was dumped at McColl. DX1053 at 47-51 (shipping of 200 tons per day of spent alkylation acid); PX1182 at 2 (Mr. Skinner reporting, in February 1945, that 200

tons of spent alkylation acid were being shipped each day to reprocessing facilities in San Francisco).

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ FRANKLIN E. WHITE, JR.
Assistant Director

/s/ STEPHEN C. TOSINI
Senior Trial Counsel
/s/ ADAM E. LYONS
/s/ SEAN A. SIEKKINEN
Trial Attorneys
Commercial Litigation Branch
Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
tel. (202) 616-5196
email: stephen.tosini@usdoj.gov

December 9, 2016

Attorneys for Defendant